# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT DAVID H. SAFAVIAN TO COMPEL DISCOVERY

Defendant David H. Safavian, through counsel, respectfully submits this memorandum of law in support of his motion to compel discovery and disclosure of exculpatory and other information material to the preparation of dispositive motions and his defense.  Mr. Safavian's outstanding discovery requests are listed in Attachment A to this Memorandum.

## I.      BACKGROUND

### A.      <u>Procedural History</u>

The Indictment against Mr. Safavian was returned on October 5, 2005.  (Ex. 1)  Mr. Safavian was arraigned on October 7, 2005.  The Indictment includes three counts of alleged false or otherwise concealing statements under 18 U.S.C. § 1001 and two counts of obstruction of justice under 18 U.S.C. § 1505.  The allegations center on the purported misstatements, misrepresentations or concealments by Safavian of material facts in connection with:

1.   obtaining an ethics opinion from the General Services Administration Office of General Counsel ("GSA/OGC") in July 2002 (Count Two § 1001);

2.   responding to questions from a General Services Administration Inspector General ("GSA/IG") hotline complaint in March-May 2003 (Count One § 1505 and Count Three § 1001); and

3.   responding to a request for documents from the staff of the Senate Indian

Affairs Committee in Feb-March 2005 (Count Four § 1505 and Count Five § 1001).

**B.**    **The Status of Discovery Production to Date**

Prior to Mr. Safavian's arraignment, defense counsel made a discovery request based on the allegations of the September 16, 2005 Criminal Complaint. See Sept. 26, 2005 Ltr. (Ex. 2). The October 5, 2005 Indictment included additional charges. The night before the Court's arraignment on October 7, 2005, the prosecution produced a meager collection of documents totaling approximately seventy pages. The prosecutor represented at the status hearing that the disclosure represented materials he intended to rely on in its case-in-chief. Immediately after the arraignment, defense counsel conferred with the prosecution in effort to secure full discovery of records material to Mr. Safavian's defense as well as documents that would aid in determining whether Mr. Safavian had viable dispositive motions.

Before and after the October 17, 2005 status hearing, defense counsel sent supplemental requests for discovery to the prosecutors. Oct. 14 and Oct. 20 Ltrs. (Exs. 3, 4). In response, the prosecutors produced approximately 1600 pages of information, consisting mostly of a subset of a production of e-mails bates-marked "GT."[1] The prosecution declined to produce documents that are the most important to Mr. Safavian's defense. Gov't Oct. 24 Ltr. at II-III (Ex. 5). Undersigned counsel made a third attempt to secure voluntary disclosure of materials needed to defend or rebut the charges, and to prepare motions on Mr. Safavian's behalf on October 25 and 26, 2005, but to no avail. (Exs. 6, 7).[2]

---

[1]    The Bates stamp numbers run *at least* as high as 98,782, thus demonstrating that the prosecution has provided Mr. Safavian but a fraction of these documents.

[2]    Defense counsel has requested information regarding an individual that counsel has reason to believe was the informant referred to in the Indictment. Indictment ¶ 24 (Ex. 1). For the purpose of this motion, counsel has redacted the identity of the suspected informant in Exs. 7 and 8. For the purpose of this motion, the issue is whether the prosecution has a duty to disclose

**C.**     **The Requested Information is Material to Mr. Safavian's Defense**

The prosecution has taken a paternal view of its obligation to provide Mr. Safavian appropriate discovery.  The universal response to the bulk of the defense requests is that Mr. Safavian is "not entitled to them for preparation of dispositive motions."  Gov't Oct. 26 Ltr. (Ex. 8).  Unfortunately, it is not up to the prosecutor to unilaterally determine what Mr. Safavian needs to prepare his defense.  Rule 16 requires production not procrastination and the Speedy Trial clock is ticking.  By refusing to acknowledge that our requests have a dual purpose – the preparation of Mr. Safavian's defense as well as the preparation of dispositive motions – the prosecution is avoiding it's obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1983), to produce documents "in sufficient time for the defendant to 'use the favorable material effectively in the preparation and presentation of its case.'"   <u>United States  v. Ramirez</u>, 54 F. Supp. 2d at 25, 32 (D.D.C. 1999) (quoting <u>United States v. Pollack</u>, 534 F.2d 964, 973 (D.C. Cir. 1976)).  As this Court also observed, the prosecution's obligations under <u>Brady</u>, like its obligations under Rule 16, are to be construed broadly:

> [I]t is important to note that courts in this jurisdiction look with disfavor on narrow readings of the [G]overnment's Brady obligations; it simply is insufficient for the [G]overnment to offer "niggling excuses" for its failure to provide potentially exculpatory evidence to the defendant.

<u>Ramirez, 54 F. Supp. 2d at 33 (D.D.C. 1999) (quoting United States v. Paxson, 861 F.2d 730, 737 (D.C. Cir. 1988)).</u>

The heart of the matter is whether Lobbyist A (a.k.a Jack Abramoff) was "doing business" before the GSA in July-August 2002.  The Indictment takes selective snippets of e-mail correspondence between Mr. Safavian and Mr. Abramoff, Mr. Abramoff and his wife,

---

information regarding this individual that the defense believes is material and potentially exculpatory.

friends, and business associates (identified in the Indictment as Lobbyists B and C), and Mr. Safavian and other GSA officials and/or employees to create the impression that Mr. Abramoff was seeking to do business before the GSA and that Mr. Safavian attempted to shield or otherwise mislead prosecution officials as to the exact nature of Mr. Abramoff's interest in GSA-controlled property. Indictment ¶¶ 27, 29, 31, 38, and 40. (Ex. 1).

The Indictment is replete with vague and conclusory assertions that Mr. Safavian's statements had the effect of impeding separate investigations conducted by GSA/IG and the Senate Indian Affairs Committee in violation of 18 U.S.C. §§ 1001 and 1505. Yet, the prosecution has declined to produce, *inter alia*, documents identifying the very substance of Mr. Safavian's alleged misstatements.

Despite the prosecution's apparent theory of the case, it has also refused to disclose e-mails and correspondence to and from Abramoff's business associates relating to the lobbyist's expressions of interest in the two properties at issue in the Indictment, as well as correspondence to and from the GSA officials authorized to make such "business" decisions. Such documents are central to the preparation of Mr. Safavian's defense.

In addition, because the Indictment alleges that Mr. Safavian made these communications to several different agencies, there are a substantial number of relevant documents residing outside the Department of Justice, apparently never considered by the grand jury or the prosecutors, that are relevant to the charges against Mr. Safavian. The defendant has received only a minimal number of these documents.

## D.    <u>Summary of Relevant Law</u>

The legal bases for the requests in Attachment A are Rule 16 of the Federal Rules of Criminal Procedure and <u>Brady v. Maryland</u>, 373 U.S. 83 (1983).

1.     **Rule 16**

Rule 16 requires, *inter alia*, that the prosecution provide the defendant with documents or other tangible objects within its "possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim P. 16(a)(1)(E). "The language and spirit of [Rule 16] are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case." United States v. Poindexter, 727 F. Supp. 1470, 1473 (D.D.C. 1989).

Consequently, the materiality "hurdle is not a high one" and documents requested under Rule 16(a)(1)(E) "need not directly relate to the defendant's guilt or innocence." United States v. George, 786 F. Supp. 11, 13 (D.D.C. 1991) ("George I"). Documents are "material" if they "bear[] some abstract logical relationship to the issues in the case." United States v. Lloyd, 992 F.2d 348, 350-51 (D.C. Cir. 1993) (acknowledging that the materiality standard "is not a heavy burden") (citing United States v. Caicedo-Llanos, 960 F.2d 158, 164 n. 4 (D.C. Cir. 1992); see also United States v. Secord, 726 F. Supp. 845, 849 (D.D.C. 1989) ("evidence is material if it contains information which bears upon Defendant's belief in the legality of the activities . . . or could reasonably lead to the discovery of such information").

Notably, inculpatory, as well as exculpatory, evidence in the possession, custody or control of the prosecution must be produced to a defendant. United States v. Marshall, 132 F.3d 63, 67 (D.C. Cir. 1998) ("Inculpatory evidence, after all, is just as likely to assist in the 'preparation of the defendant's defense' as exculpatory evidence, . . . it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths.").

Moreover, this Court has inherent power to enter discovery orders beyond the specific terms of Rule 16 since "[t]he rule is intended to prescribe the minimum amount of discovery to

which the parties are entitled." Fed. R. Crim. P. 16, Adv. Comm. Notes, reprinted in 62 F.R.D. 271, 308 (1974); see, e.g., United States v. Gallo, 654 F. Supp. 463, 471 (E.D.N.Y. 1987) ("The rules are intended, and must be construed, to enhance a just determination, not to inhibit it"); United States v. Beckford, 962 F. Supp. 748, 756 (E.D.Va. 1997).

This discretion was recognized, for example, in George I where the defendant sought discovery of classified pleadings filed in other cases. The prosecution objected to such discovery because it was not required by Rule 16. The court held that the defendant was entitled to such discovery even though the discovery request did not fall within the stricture of Rule 16. The court reasoned that "[b]ecause an item does not fall within Rule 16 does not mean, however, that they cannot be made available to defense counsel. A district court judge may be permitted to order discovery beyond that specified by Rule 16." George I, 786 F. Supp. at 15 (citing United States v. Germain, 411 F. Supp. 719, 725 (S.D. Ohio 1975)).

## 2. Brady

The Supreme Court in Brady v. Maryland held that due process requires the prosecution to disclose to the defendant any favorable evidence in its possession. 373 U.S. 83 (1983). "Favorable evidence for purposes of Brady encompasses both evidence that is exculpatory and evidence that could be used to impeach a government witness." United States v. Trie, 21. F. Supp. 2d 7, 23 (D.D.C. 1998). A number of courts have recognized that the prosecution's obligations under Brady extend both to evidence that is exculpatory, as well as evidence that could be used to impeach a prosecution witness. See, e.g., United States v. Bagley, 473 U.S. 667, 676-77 (1985). Also, "the existence of a duty to disclose witness statements at trial pursuant to the Jencks Act, 18 U.S.C. § 3500, does not eviscerate the government's Brady obligation to disclose witness statements well in advance of trial if those statements also fall under Brady. This is important because the government is required to disclose Brady material in

sufficient time for the defendant to 'use the favorable material effectively in the preparation and presentation of its case' . . . ." Trie, 21 F. Supp.2d at 23-24 (citations omitted).

This Court wrote in Trie that "[w]hile it generally is not the court's role to 'referee . . . disagreements about materiality and supervise the exchange of information' . . . the government acts at its own risk when it withholds even arguably favorable evidence." Id. (citations omitted).

Significantly, the prosecution's discovery obligations under Rule 16 and Brady extend beyond the information in its own investigative files. Rule 16 and Brady require the production of documents not only "in the hands of the prosecutor," but also "any other federal agency allied with the prosecution or involved in the prosecution of criminal litigation." Poindexter, 727 F. Supp. at 1477. In determining what agencies are "allied with the prosecution," the Court must be "more concerned with fairness to the defendant, on the one hand, and the prosecution's ease of access to the documents sought, on the other than with the issue whether the documents are actually within the physical possession of the prosecutor." Id.; see also, Stickler v. Greene, 527 U.S. 263, 281 (1999) (Brady rule imposes on the prosecutor a duty to learn of any evidence favorable to the defense which is known to others in the government); United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992); United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995); United States v. Bryan, 868 F.2d 1032, 1036 (9th Cir. 1989) ("The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant.").

## II.    ARGUMENT

### A.    The Prosecution Must Produce Documents Identifying the Substance of Mr. Safavian's Actionable Statements.

Count Two of the Indictment charges that on July 25, 2002, Mr. Safavian "falsely stated to the GSA ethics officer that Lobbyist A did not have any business and was not seeking to do

business with GSA. . . ." in violation of 18 U.S.C. § 1001.  Indictment at ¶ 29 (Ex. 1).  This charge is apparently based on the July 26, 2002 ethics opinion from the GSA General Counsel's regarding Mr. Safavian's participation in the Scotland trip.  This document states that "you [Mr. Safavian] stated that neither Mr. Abramhoff nor his firm does business with or is seeking to do business with GSA."  See March 1, 2005 Ellison Fascimile (Ex. 9).[3]  Mr. Safavian's alleged July 25, 2002 e-mail request for a GSA ethics opinion, however, does not contain this language.  See id.

Therefore, Mr. Safavian asked the prosecutors to produce "the record of his purported statement [at issue in Count Two] and any related documents, rough notes, or memoranda that memorialize the discussion with Mr. Safavian that is referred to in the March 1, 2005 fascimile from Ms. Eugenia D. Ellison."  See Oct. 14th Disc. Ltr. (Ex. 3).  The prosecutors responded: "at this time, we have no additional notes or memoranda concerning these communications" other than the ones contained in the Ellison Fascimile that Mr. Safavian himself had provided to the Senate.  See Gov't Oct. 19 Disc. Resp. at 2(a) (Ex. 10).

Defense counsel then sent a clarification letter to the prosecutors, noting that particularly in light of the absence of any notes or memoranda from Mr. McKenna or Ms. Ellison regarding a conversation with Mr. Safavian, any and all 302s, Reports of Interview (ROI), or other materials (such as interview notes) incorporating these statements attributed to Mr. Safavian should be produced.  See Oct. 20 Ltr. at 5 (Ex. 4).  The prosecutors declined to produce these materials that

---

[3]    The prosecution asserts that Mr. Safavian received a copy of this ethics opinion from GSA General McKenna in an e-mail dated July 26, 2002.  Indictment ¶¶ 19-20 (Ex. 1).  Counsel official Ms. Eugenia D. Ellision sent a fascimile copy of Mr. Safavian's request and this ethics opinion on March 1, 2005 to assist Mr. Safavian with his response to the Senate Committee's February 23, 2005 request for information.  Ellison Fascimile (Ex. 9).

would determinatively identify the substance of the defendant's alleged false statements in Count Two.  See Gov't Oct. 24 Resp. at 5 (Ex. 5).

Mr. Safavian also asked the prosecutors for any and all 302s, ROIs, or other materials, including rough notes and memoranda, incorporating Mr. Safavian's actionable statements in paragraph 36 of Counts Four and Five (18 U.S.C. §§ 1001, 1505) in order to identify the substance of Mr. Safavian's conversation with the Senate "investigator."  Oct. 25 Ltr. at 1 (Ex. 6).  They did produce interview reports of two Senate staffers, including the report with the individual identified as the "investigator" in paragraph 36; however, these interviews were conducted on September 30, 2005, nearly two weeks after Mr. Safavian's widely publicized arrest and over six months after the conversation at issue in Counts Four and Five.  See Gov't Oct. 24 Ltr. at 4-5 (Ex. 7).  They refused to turn over the rough notes or tapes of the interviews. Obviously, it will important, when interviewing or cross examining these staffers, to have the best available evidence of what was actually asked and answered in the interviews.

There are at least four independent grounds for the prosecution's obligations to produce the 302s, ROIs, and other materials identifying the substance of Mr. Safavian's statements to GSA and Senate officials, particularly in this context where the statements themselves are the alleged "crime."

First, for any criminal charge, let alone inchoate allegations, Rule 16(a)(1)(A) and (B)(ii) require the prosecution to produce "the substance of any relevant oral statement made by the defendant" or "the portion of any written record containing the substance of any relevant oral statement" made "in response to interrogation by a person the defendant knew was a prosecution agent."  Fed. R. Crim. P. 16(a)(1)(A)-(a)(1)(B)(ii).   Count Two alleges that Mr. Safavian knowingly made legally binding statements to GSA counsel under 18 U.S.C. § 1001.  The gap

between Mr. Safavian's statements in the July 25, 2002 e-mail and those attributed to him in the July 26, 2002 ethics opinion suggest that either conversations – if not direct questions and answers – took place between Mr. Safavian and potential party opponents, or that the ethics opinion did not accurately report Mr. Safavian's representations at issue in this case.  The law on this question is that "if the defendant has made a relevant oral statement, either before or after arrest, to any person then known to him to be a prosecution agent, the rule requires the prosecution to disclose to defendant that portion of any written record containing the substance of the statement . . . without regard to whether the prosecution intends to use the statement at trial."  Charles Alan Wright & Miller, 2 Federal Practice & Procedure § 253 at 89 (citing Rule 16 Advisory Notes (1991 Amendments)).  Hence, the prosecution should produce these materials on this principle alone.

Second, Rule 16(a)(1)(E) obligates the prosecution to produce items "material to preparing the defense."  The substance of Mr. Safavian's statements as memorialized by these GSA officials unequivocally "bear[] some abstract logical relationship to the issues in the case."  Lloyd, 992 F.2d at 350-51 (citing Caicedo-Llanos, 960 F.2d at 164 n. 4).  Indeed, they are more than simply "issues" in this case under §§ 1001 and 1505 – they are the very heart of the case.  The prosecution cannot withhold production of the only documents or records available to identify the substance of the very statements alleged to be false or concealing.

Third, any reports memorializing the statements of these GSA officials to investigatory agents would be material to Mr. Safavian's defense and discoverable under Rule 16 or Brady v. Maryland, whether the prosecution deemed them inculpatory or exculpatory.  Marshall, 132 F.3d at 67.  The substance of the actionable questions and answers are material to standard § 1001 defenses that Mr. Safavian's representations were in fact accurate and/or that he did not have a

duty to disclose information the prosecution has alleged he has concealed.  See e.g., United States v. Curran, 20 F.3d 560, 566 (3d Cir. 1994) (stating that defendant could not be guilty of concealment as a matter of law because he had no duty to disclose the source of contributions to the Federal Election Commission); United States v. Gimbel, 830 F.2d 621, 624 n.2 (7th Cir. 1987) (ruling that the defendant lacked legal capacity to violate § 1001 where he had no legal duty to inform the Treasury Department of structured transactions).

Finally, the prosecution cannot simply provide isolated portions of statements by Mr. Safavian without providing the full statements, the context, and the questions that were asked. The nature and contours of the questioning are critically important to evaluate the allegations of any false statements.  See, e.g.,  Bronston v. United States, 409 U.S. 352, 362 (1973) ("Precise questioning is imperative as predicate for the offense of perjury.").  Indeed, contemporaneous documents and notes – or subsequent interviews memorialized in 302s if there are no such contemporaneous documents – are essential in defendant's preparation of his defense and his motions.

As an example, these reports, notes, or documents would speak to whether any of the GSA General Counsel's questions were "fundamentally ambiguous" and therefore immune from § 1001 prosecution.  United States v. Manapat, 928 F.2d 1097, 1099-1102 (11th Cir. 1991) (affirming dismissal of § 1001 charge and holding that, as matter of law, questions about traffic and criminal convictions on a medical history form were so fundamentally ambiguous as to preclude conviction under § 1001); United States v. Lattimore, 127 F. Supp. 405, 409-10 (D.D.C.) (dismissing a perjury indictment, as a matter of law, because the questioning was ambiguous and terms were vague), aff'd by an equally divided court, 232 F.2d 334 (D.C. Cir.

1955).[4]  As the Court stated in Manapat, "[I]n order to successfully prosecute an indictment for making a false statement, the prosecution must not remove questions from the context which their answers were given in an attempt to prove their clarity."  928 F.2d at 1101.  Because the prosecution is withholding critical information related to these issues, such withholding will materially affect the defendant's ability to defend the case and prepare his motions.

Consequently, it is imperative that Mr. Safavian receive *contemporaneous* notes or documents, as well as the subsequent 302s, that memorialize both the questions and the answers to the GSA General Counsel in July 2002 (Count Two) and the Senate Investigator (Counts Four and Five).

**B.    The Prosecution Must Produce the Interview Notes of Agents Reising and Brook Minnick from the May 26, 2005 Interview.**

While steadfastly refusing to produce the interview notes from Mr. Safavian's meeting with FBI agent Jeffrey Reising and DOI-OIG agent Brook Minnich on May 26, 2005, the prosecution has produced the GSA-OIG agent's interview notes from March and April of 2003.  Gov't Oct. 24 Ltr. (Ex. 5).  The main reason the prosecution has proffered for non-production of interview notes from the May 26, 2005 interview is that the interview is not the basis of any Count in the Indictment, id. at 2-3.  They also say, however, that the summary of the interview "informs Mr. Safavian of his statements made to known Government agents" and in any case, they "do not believe that Mr. Safavian is entitled to those notes in preparation of dispositive motions."  Gov't Oct. 26 Ltr (Ex. 8).

---

[4]    In Lattimore, 127 F. Supp. at 406, the prosecution indicted the defendant for committing perjury before a Senate sub-committee for denying that he was a "follower of the Communist line."  The court held that this phrase had no uniform, commonly accepted definition and that the jury would have to engage in "groundless surmise" to determine the meaning which defendant attributed to this phrase.  Id. at 409.  Hence, the question was fundamentally ambiguous and could not support a perjury conviction as a matter of law.  Id.

According to the report, the reason the FBI requested an interview in May 2005 was because of the Senate Committee on Indian Affairs' investigation into allegations of misconduct made by Indian tribes against their lobbyists. However, the report proceeds to discuss the circumstances surrounding Mr. Safavian's participation in the August 2002 Scotland trip.

At the beginning of the interview, Mr. Safavian asked directly whether he was a target of the investigation. The report, which did not contain verbatim description of this exchange, is murky with respect to the agents' response, containing a vague claim that they did not want to put Mr. Safavian "in a 'trick bag.'"

The defense has been forthright with the prosecution regarding its belief that the Government's campaign to secure Mr. Safavian's cooperation in other investigations may constitute a violation of Mr. Safavian's Constitutional rights to due process. This interview is a prime example – along with other recently acknowledged evidence of FBI surveillance of Mr. Safavian.[5] These notes are crucial to Mr. Safavian's pretrial motions as well as defense at trial.

Courts have uniformly acknowledged that Rule 16(a)(1)(A) requires the production of not only official prosecution agent reports but also the agent's draft notes taken during interrogations, particularly in the context of §§ 1001 and 1505 prosecutions. United States v. Clark, 385 F.3d 609, 619-20 (6th Cir. 2004) (holding that the prosecution "violated Rule 16 by failing to turn over [the investigating agent's] rough notes upon Defendant's request" under Rule 16(a)(1)(A) and (B)). This is not a recent development. An agent's rough notes were discoverable even *before* the 1975 and 1991 Amendments to Rule 16. See, e.g., United States v.

---

[5]    After reviewing the second production of documents, the defense requested information regarding wiretaps, body wires and surveillance. The prosecution responded that it "ha[s] nothing" in this regard. Gov't Oct. 26 Ltr. at 3 (Ex. 8). The prosecution was unclear as to whether it was referring to just its own possession, or to the custody and control of agencies affiliated with this investigation that it has knowledge of and access to as well.

Lewis, 511 F.2d 798 (D.C. Cir. 1975); United States v. Benlizar, 459 F. Supp. 614, 616-17 (D.D.C. 1978) (holding that the prosecution's failure to preserve rough interview notes "was not only egregious conduct on the part of the government of the United States but was also in blatant disregard of the fundamental rights of the defendant"); United States v. Harris, 543 F.2d 1247, 1252-53 (9th Cir. 1976) (citing cases). This rule of production exists because "in some cases the information contained in thorough notes taken from the witness himself might be more credible and more favorable to the defendant's position than the final version." United States v. Lilly, No. 1:02CR00085, 2003 WL 168443 *2 (citing the 1991 Rule 16 Advisory Notes).

The 1991 Advisory Notes to Rule 16(a)(1)(A) direct that the prosecution must "disclose any written record which contains reference to a relevant oral statement by the defendant which was in response to interrogation, without regard for whether the prosecution intends to use such statement at trial." Id. at *2. The requested items "need not be a transcription or summary of the defendant's statement but must only be some written reference which would provide some means for the prosecution and the defense to identify the statement." United States v. Vallee, 380 F. Supp.2d 11, 12-13 (D. Mass. 2005). The handwritten notes of a prosecution agent containing the substance of defendant's statements thus fall directly within the scope of the rule's disclosure requirements. See id.; see also United States v. Egan, 501 F. Supp. 1252, 1264 (S.D.N.Y. 1980) (granting requests for statements made by Government agents in interview, including copies of "any rough notes made by a Government agent concerning such statements").

Interview notes are also discoverable under Rule 16(a)(1)(B)(ii), since they constitute a "portion of any written record containing the substance of any relevant oral statement" made by the defendant. Fed. R. Crim. P. 16(a)(1)(B)(ii); United States v. Almohandis, 307 F. Supp.2d

253, 255 (D. Mass. 2004) ("The [handwritten] notes . . . may not be the only written record, but they certainly are 'a' written record."); accord United States v. Molina-Guevara, 96 F.3d 698, 705 (3d Cir.1996); United States v. Carucci, 183 F.R.D. 614, 615 (S.D.N.Y. 1999).

Courts in the District of Columbia have already rejected the contention – even before the 1991 Amendments expanded the scope of Rule 16 material – that interview notes should be withheld as Jencks Act material, 18 U.S.C. § 3500, as well as attempts to restrict the review *in camera*. Poindexter, 727 F. Supp. at 1483 (directing the prosecution to produce "[a]ll notes and memoranda, whether or not verbatim, made at any time of interviews with North/Poindexter by lawyers or investigators . . . .").

As noted above, the prosecution never offered any substantive defenses for its selective withholding of notes production in our communications. Other than the generic repetition that "we do not believe Mr. Safavian is entitled" to the notes, their main argument is the May 26, 2005 interview does not actually comprise an Indictment count. However, that is not the standard under any Rule 16 provision or Brady and its progeny. The only question(s) for production is whether the notes are either: (a) related to a "relevant" statement by the defendant and "in response to interrogation," Rule 16(a)(1)(A)-(B); (b) "material to preparing the defense" or "intended for use at trial," Rule 16(a)(10(E); or (c) otherwise exculpatory under Brady.

The requested notes actually satisfy all of the alternative grounds for discoverability. The May 2005 interview not only discussed Mr. Safavian's written and oral statements before the GSA, GSA-OIG, and Senate, but by production the prosecution established that it intends to use the May 26, 2005 interview, and the interviewing agents' testimony, against Mr. Safavian in its case-in-chief. The May 2005 interview is not only material to the central issues of §§ 1001 and 1505 cases – what was the defendant obligated to say to the prosecution, what did he say,

and was his statement sufficient or material – but would also speak to the viability of a motion concerning possible violations of Mr. Safavian's due process rights by, *inter alia*, cryptically responding to Mr. Safavian's question about whether he was a target of the investigation and withholding documents which would have refreshed Mr. Safavian's memory regarding the timeline of events in 2002.

Moreover, production of interview notes is warranted under Rule 16(a)(1)(E) and potentially <u>Brady</u>. Given that notes "taken from the witness himself might be more credible and more favorable to the defendant's position than the final version," <u>Lilly</u>, 2003 WL 168443 *2, they could clarfiy the scope and lines of inquiry of the respective "proceedings" at issue in this case and thereby relate directly to, *inter alia*, whether: (a) the prosecution agencies had jurisdiction to inquire into Mr. Safavian's participation in the Scotland trip; (b) Mr. Safavian had a "duty to disclose" information alleged to have been concealed, and/or (c) the substance of Mr. Safavian's allegedly false, concealing, or otherwise obstructive responses.

**C.** **The Prosecution Must Produce E-Mail Correspondence Between Business Associates of Lobbyist A and GSA Officials Relating to Lobbyist A's Expressions of Interest in the Old Post Office Building and NSWC-White Oak Property, as well as Mr. Safavian and His Participation in the Scotland Trip.**

The thrust of the prosecution's indictment is that Mr. Safavian has concealed or otherwise misrepresented Lobbyist A's expressions of interest in two GSA managed properties, the Old Post Office Building ("OPB"), and the NSWC-White Oak Property in Silver Spring ("White Oak") when he requested an advisory opinion from GSA counsel regarding his participation in a golf trip to Scotland with Mr. Abramoff. However, while Mr. Safavian did receive an advisory opinion, he did not rely on it. Instead, he paid his own way for the trip and took a leave of absence from the GSA during that time.

The prosecution's tenuous thread raises the possibility of several other defenses, not least of which is the fact that Mr. Safavian accurately represented that Lobbyist A's expressions of interest did not constitute "doing business" before the GSA as contemplated in the agency's regulations. Hence, communications between Mr. Abramoff and his associates concerning Mr. Safavian, the nature of these expressions of interest in these properties, the details of the Scotland trip, and internal GSA correspondence with respect to these properties would certainly "bear[] some abstract logical relationship to the issues in this case" or potentially enable Mr. Safavian to alter the quantum of proof in his favor. Lloyd, 992 F.2d at 350-51; Marshall, 132 F.3d at 67.

The prosecution's initial set of documents included e-mails and directives from Mr. Abramoff to his associates regarding interests in the OPB and NSWC-White Oak property, as well as the topic of Mr. Safavian and his participation in the Scotland trip. Specifically, these e-mails either addressed or copied his wife Pam Abramoff, as well as Mr. Abramoff's law firm colleagues Anthony Rudy, John Van Horne, Neil Volz, Holly Bowers, and "entity A" associates Colin Stevens and Rabbi David Lapin from Eshkol Academy. The defense requested any additional e-mails in the prosecution's possession, custody, or control sent to or from these individuals concerning these issues. See Oct. 14 Ltr. (Ex. 3). The prosecution has refused to acquiesce.

The initial set of discovery papers also included emails addressed to and from GSA Commissioner Joseph Moravec, the official ultimately responsible for property decisions, as well as GSA officials Paul Chrisolini (Mr. Moravec's former Deputy)), Leah Uhre (Mr. Moravec's former Chief of Staff), Tony Costa (GSA Ass't Regional Administrator), Sharon Jenkins (GSA Deputy Regional Administrator), Ann Everett (Deputy Regional Administrator), Ray McKenna

(General Counsel), and Eugenia Ellison (General Counsel's Office). The e-mails related to the status of the OPB and NSWC-White Oak properties and Mr. Safavian's request for an advisory opinion. As the prosecutor noted during the October 17, 2005 status hearing before this Court, the prosecution intends to use these e-mails in support of its case-in-chief.

Therefore, obtaining other e-mails in the prosecution's "possession, custody, or control" between the named Abramoff associates regarding Mr. Safavian, the OPB, the NSWC-White Oak property, and/or the Scotland trip would, for example, assist the defense's preparation of a time-line of events, and help determine the exact nature of Mr. Abramoff's intentions regarding the properties.[6]  E-mails in the prosecution's (including the GSA and Senate) "possession, custody, or control" regarding GSA procedures and policies relating to the disposal of these properties would provide similar assistance.

Given that the Scotland trip took place in August 2002, the most relevant time-frame would be the May-August 2002 period. However, with respect to e-mails and communications concerning the Post Office and White Oak properties and Mr. Safavian's participation in the Scotland trip only, any and all correspondence before and after this period would also be material to Mr. Safavian's defense, since they would reflect the availability of these properties for "business" in the first instance, the GSA's ultimate decision concerning these matters, and Mr. Safavian's participation in these matters.

The prosecution has denied production of any of these items, even after the defense narrowed the context, on grounds that the request is overbroad. In doing so, the prosecution has

---

[6]     Since it is public record that Mr. Abramoff is the target of multiple investigations, it will be impossible to get that information from him. In addition, it doubtful that Mr. Abramoff or his associates have access to their emails. The Government does possess this information from a previous production, bates-stamped "GT." The emails are critical to the preparation of Mr. Safavian's defense and dispositive motions as well as potential cross-examination of witnesses.

ignored that the "scope of the government's obligation under [Rule 16(a)(1)(E)] should turn on the extent to which the prosecutor has knowledge of and access to the documents sought by the defendant in each case." United States v. Bryan, 868 F.2d 1032, 1036 (9th Cir. 1989); George I, 786 F. Supp. at 13 (acknowledging that the materiality "hurdle is not a high one" and documents requested under Rule 16(a)(1)(E) "need not directly relate to the defendant's guilt or innocence."); Secord, 726 F. Supp. at 849 ("evidence is material if it contains information which bears upon Defendant's belief in the legality of the activities . . . or could reasonably lead to the discovery of such information").

Indeed, as the Court stated in George I:

> [t]he prosecution will not be burdened by a decision of this court to permit the defendant to examine all of the . . . documents. Indeed, it is likely that the [prosecution] will be relieved of work because they will not need to search through the documents to make their own assessment of materiality. At least one of the rationales behind the materiality requirement (and limiting discovery by criminal Defendants generally) is to insure that the prosecution not expend excessive time and effort securing documents for the defendant. Here there is no burden on the prosecution. The only effort required will be the work of a few strong people to move some very large boxes a few feet.

George I, 786 F. Supp. 11, 14 (D.D.C. 1991)

## D.    The Prosecution Must Produce All Discoverable Items In the Possession, Custody or Control of Any Federal Branch or Agency For Which It Has Had Knowledge Of and Access To.

The prosecution has failed to produce several material items on the grounds that they are not currently in the prosecution's "possession." Gov't Oct. 26 Ltr. (Ex. 8). The prosecution's limitations on the scope of Rule 16 obligations are misplaced. The language and jurisprudence concerning Rule 16 is global. See LaFave, Criminal Procedure § 20.03(a) (2005) ("Under the broad language of Federal Rule 16, material which is possessed by any agency of the 'government,' whether or not investigatory, should be discoverable if it is identified by reference

to its likely location in the defense request (and thereby made 'known' to the 'attorney for the government')." That is, the government must produce material information that is in the hands of any pertinent government branch or agency. United States v. Santiago, 46 F.3d 885, 893-94 (9th Cir. 1995) (acknowledging that the term "Government" includes federal entities that are in possession of materials of which prosecution simply had "knowledge of and access to") (citing Bryan, 868 F.2d at 1036); accord United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (holding that the prosecution is required to search the files of all branches of Government that are closely aligned with the prosecution).

First, the express language of Rule 16(a) extends to the "government," not merely the Department of Justice. Second, it renders discoverable items not only in the "possession" of the Government, but in its "custody or control." Therefore, if these items are believed to be in the possession, custody, or control of the GSA, Senate, or other investigative agency looking into this defendant, they are discoverable. Several courts, including this one, have long established that the prosecution cannot simultaneously maintain that it can bring a case predicated on the fact that statements were made to *government* agents (GSA and Senate) but that documents held by those respective agencies are not in the "prosecution's" possession. See also United States v. Jennings, 960 F.2d 1488, 1490 (9th Cir. 1992) (holding that the Brady obligation to produce known exculpatory material cannot be evaded by claiming lack of control over the files of other agencies).

Second, "Courts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor." Poindexter, 727 F.Supp. at 1477. In Poindexter, the defendant requested

documents indicating that United States officials, including Members of Congress and congressional staff, as well as former President Reagan and then Vice President Bush, knew of the defendant's activities and those of Oliver North.  The defendant argued that these documents *might* have provided support for three of defendant's defenses that he did not attempt to conceal the National Security Council's activities, that he had no motive to conceal these activities since they were already widely known, and/or that since they were widely known, he reasonably believed them to be legal.  The Government contended that Rule 16(a)(1)(C) – now Rule 16(a)(1)(E) after the 1991 Amendments – required only the production of documents in the hands of the prosecutor, any investigative unit under the prosecutor's control, and any other federal agency allied with the prosecution or involved in the prosecution of criminal litigation. And since neither the former or current President, nor any archive or presidential library that may presently have custody of presidential materials, was an agency of Government allied with the prosecution for purposes of Rule 16, the prosecution contended it had no obligation to secure and produce executive materials.  <u>Poindexter</u>, 727 F. Supp. at 1477.

The Court rejected this attempt to "compartmentalize the Department of Justice," holding that "a prosecutor who has had access to documents in other agencies in the course of his investigation cannot avoid his discovery obligations by selectively leaving the materials with the agency once he has reviewed them."  727 F. Supp. at 1477-78.  Once Government counsel "has benefited from the cooperation of [the Government agency] in this area, . . . he cannot now, in fairness, be permitted to disclaim all responsibility for obtaining [agency] documents that are material to the preparation of the defense."  <u>Id</u>.  The Court ordered all documents material to §§ 1001, 1505 defenses to be produced, regardless of agency or branch.

The prosecution's misunderstanding of its Rule 16 obligations impacts several discovery requests, including, but not limited to:

**1.      The Identity of the Author of the Hotline Complainant**

The prosecution has represented that it does not know the identity of the hotline complainant who opened the GSA-OIG investigation into Mr. Safavian's "participation in an 'international golfing trip provided by lobbyists.'"  Indictment ¶ 24. (Ex. 1).  The prosecutors have stated that the GSA-OIG does not know the identity of the complainant either.  The prosecution was able to produce the second page of the complainant's two-page March 26, 2003 fascimile that opened the GSA-OIG investigation.  March 26, 2003 Comp. Fax p. 2 (Ex. 11). However, it stated that the first page of the March 2003 fascimile is not in the possession, custody, or control of either its offices or those of the GSA.  Counsel pointed out that the document shows that a similar fascimile was sent to a Congressional office, but the prosecution has refused to make this production from the Congressional office.

The identity of the hotline complainant is material to several issues in this case.  For example, the defense, upon information and belief, must ascertain whether the complainant is a "serial complainant" who has made a number of politically-charged complaints against other GSA officials.  The familiarity with this individual's repeated complaints may have been a factor in the GSA-OIG's decision to close its investigation immediately after Mr. Safavian adequately demonstrated that he had not accepted any gift in the first place.  The identity of the complainant would also bear logical relationship to the related defense of entrapment.  See, e.g., DiBlasio v. Keane, 932 F.2d 1038, 1041-42 (2d Cir. 1991) (citing Roviaro v. United States, 353 U.S. 53 (1957)).

Consequently, the prosecution must disclose the identity of the complainant by name, if known by any prosecution agency or branch affiliated with this investigation, including

Congress.  If not known by name, the prosecution must disclose all documents with any generic reference to the complainant.  Therefore, the request would encompass any missing pages or attachments relating to the March 2003 complaint, as well as all documents, 302s, Freedom of Information Act requests and responses, or other reports or documents, which include the complainant's statements, whether inculpatory or exculpatory, relating to Mr. Safavian.

Finally, if the Government has information, such as other complaints that use a similar font, language or method of transmittal, it should produce them to the defense, so the defense investigators may attempt to locate the individual prior to trial.

### 2.     GSA Procedures or Agreements Related to Ethics Opinions

The basis for Count Two, and essentially all counts of the Indictment, is Mr. Safavian's request for an ethics opinion from the GSA General Counsel's office.  Yet, basic information regarding the issuance of the advisory opinion is missing.  Mr. Safavian has requested internal, (i.e. not readily available on websites or federal register) documents, guidelines, and agreements regarding the issuance of advisory opinions.  Mr. Safavian contends that these documents will assist him in his preparation of dispositive motions and his defense because they establish the statutory, regulatory and internal framework for handling requests for ethics advice.  See, e.g., United States v. Bedore, 455 F.2d 1109, 1111 (9th Cir. 1972) (stating that § 1001 is not intended to reach all false statements made to Governmental agencies and departments).

Mr. Safavian has also requested any internal guidelines regarding the extent of the attorney-client privilege between GSA General Counsel and GSA officials.  The defense has already been informed by potential Government witnesses that they can not speak to the defense because they were acting as attorneys for the Government when they spoke to Mr. Safavian.  However, we maintain that when those very same individuals speak to the prosecutors or their agents, the Government has waived any privilege attached to the underlying communications.

Clearly, any internal guidelines, memoranda or instruction regarding the expectations of GSA attorneys (or for that matter, attorneys for the Senate Indian Affairs Committee) will aid in our ability to secure interviews with these potential witnesses.

However, when asked for such information, the response is "we do not have currently have those in possession."  Oct. 24, 2005 Ltr. (Ex. 5).  The GSA-OIG is incontrovertibly a participant in the investigation of the defendant (see Counts One through Three), and the prosecution has had knowledge of and access to GSA documents and materials.  Hence, the prosecution is obligated to confirm that no such documents are in the "possession, custody, or control" of the GSA or GSA-OIG.

> **3.    Reports, Documents, and Correspondence Sent to, or Emanating From GSA Commissioner Joseph Moravec Concerning the OPB and NSWC-White Oak Properties**

The initial set of e-mails produced by the prosecution identifies the Hon. Joseph Moravec as the GSA Commissioner of Public Buildings during the relevant time.  As the ultimate arbiter of GSA "business" of property management and disposal, including the two properties at issue in the indictment, e-mails and correspondence relating to the ultimate disposition of these properties bear logical relationship to ultimate question of whether there was any "business" available at the GSA.

Mr. Moravac has stated publicly that when he left the GSA in July 2005, "the White Oak facility was still in 'the planning and conceptual stage' and had yet to be offered to agencies, which is the GSA's first step in determining what to do with surplus property before considering whether to make it publicly available."  Federal Times, September 20, 2005 p. 21.  Also, a document provided in the initial production, bates-numbered GTG –E000093172, reveals that Mr. Abramoff was aware on August 1, 2002 that the GSA had decided not to issue a Request for Qualification for the Old Post Office building.

Clearly, internal GSA documents relating to these properties will have a direct bearing on Mr. Safavian's state of mind when he allegedly emailed his request for an ethics opinion, which stated that Mr. Abramoff did not have business with the GSA.

**4.      Documents Concerning Communications About Mr. Safavian's Arrest and/or Cooperation in this Matter**

The basis for the materiality of this request is that Agent Reising's affidavit in support of the criminal complaint indicates that in 2004, the Washington Field Office opened an investigation, which is presently being conducted by agents from "numerous agencies." This is the entity that in correspondence with the prosecutors, defense counsel has dubbed, for lack of a better term, the "task force." It is clear that the "taskforce" is looking into the actions of various lobbyists, especially Mr. Abramoff, as well as executive agency employees and congressmen.

Upon information and belief, as part of that investigation, the task force devised a plan to secure Mr. Safavian's cooperation in the Abramoff investigation. This plan may have included, *inter alia*, the decision to have prosecution agents threaten Mr. Safavian with the decision to "cooperate or face arrest." Documents received in the second production confirm that the FBI set up a surveillance team that conducted undercover observation Mr. Safavian's home and that on about August 8, 2005, the FBI followed him as he left his neighbor on his way to work, pulled him over without probable cause and was told to contact Department of Justice attorneys by noon that day or criminal charges would be filed.[7]

Mr. Safavian has requested information that was developed in the investigation of "lobbying activity" because it directly relates to his defense and potential dispositive motions

---

[7]      As with every other FBI report, the 302 clearly states that the report was dictated. No notes or tapes were produced in response to the defense request. The 302 from the August 8, 2005 incident is an example of why summaries are inaccurate. The bottom of the 302 states that the agent dictated the information on August 8, 2005 but the top right hand corner of the same page states that the report was transcribed on May 27, 2005.

regarding Constitutional due process violations.  Notably, while Rule 16(a)(2) excludes from discovery "reports, memoranda, or other internal prosecution documents made by the attorney for the prosecution," that section applies only to attorney work product on the current "case" – that is, the matter being prosecuted in the Indictment.  Rule 16(a)(2) does not apply to work product or other investigative documents created or collected as a result of a separate prosecution investigation not leading to the Indictment at hand.

### 5.     Senate Investigator Notes and Rough Notes of Senate Staff

Also included in the second document production is a letter from the Senate Office of Legal Counsel to the Department of Justice, dated September 28, 2005.  The letter states, *inter alia*, "consistent with the Committee's strong interest in assisting the Department's and Bureau's law enforcement efforts, the Committee is pleased to make its counsel available to you…"

As explained in II.A, the Senate Investigator's personal notes with respect to the conversations described in paragraph 36 and his September 302 are necessary to provide contemporaneous description of the questions and answers for which Mr. Safavian is being held criminally liable.  They must be produced regardless of their current location given that the prosecution has clearly had knowledge and access to the investigator in support of this indictment.

In sum, though the prosecution has made some effort at production, it has not met the broad obligations imposed by Rule 16 and <u>Brady</u> in responding to a criminal defendant's requests for discovery.  As this Court has recognized:

> [T]he [G]overnment must bear in mind that it has the "affirmative duty to resolve doubtful questions in favor of disclosure," and that "if the sword of Damocles is hanging over the head of one of the two parties, it is hanging over the head of the [G]overnment.". . . [T]he [G]overnment must remember that "the prosecutor's role transcends that of an adversary; he [or she] is the representative not of an ordinary party to a controversy, but a sovereignty . . . whose

> interest . . . in a criminal prosecution is not that it shall win a case,
> but that justice shall be done."

Ramirez, 54 F. Supp. 2d at 33 (quoting United States v. Blackley, 986 F. Supp. 600, 607 (D.D.C. 1997)); United States v. Bagley, 473 U.S. at 675 n.6.

Hence, any of the requested materials in the possession of the Department of Justice, FBI, GSA, Department of the Interior, Senate, or any other federal agency involved or accessed in this investigation must be produced in a timely fashion in order for Mr. Safavian to assess the viability of dispositive motions with a watchful eye on the speedy trial clock.

### III.    CONCLUSION

For the aforementioned reasons, Mr. Safavian respectfully requests that this Court issue the attached proposed Order compelling the prosecution to produce the requested materials pursuant to Rule 16, Brady v. Maryland, and the interests of justice.

Respectfully submitted,

WILEY REIN & FIELDING LLP


By: /s/ Barbara Van Gelder

    Barbara Van Gelder, Esq.
    Bar No. 265603
    Roderick Thomas, Esq.
    Bar No. 433433
    Albert Lambert, Esq.
    Bar No. 489562
    Wiley Rein & Fielding LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032
    FASCIMILE: 202.719.7049

    Attorneys for David H. Safavian

Dated: October 28, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of October, 2005, a true copy of the foregoing

Motion to Compel Discovery, Memorandum of Law in Support of the Motion to Compel

Discovery, and a Proposed Order were sent to the following via electronic mail and U.S. mail to:

Peter Zeidenberg
Nathaniel B. Edmonds
Public Integrity Section
United States Department of Justice
1400 New York St. NW
Suite 12100
Washington, DC 20005

<u>/s/ Barbara Van Gelder</u>
Barbara Van Gelder