# EXHIBIT 1

FROM                                                    (WED)10. 5' 05 15:05/ST. 15:02/NO. 4861219939 P 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on April 29, 2005

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 05-370 |
| ) | GRAND JURY ORIGINAL |
| ) | |
| ) | Counts 1 and 4: Obstruction |
| ) | 18, U.S.C. §§ 1505, 2 |
| v. ) | |
| ) | |
| ) | Counts 2, 3, and 5: False |
| ) | Statements, 18 U.S.C. § 1001 |
| DAVID HOSSEIN SAFAVIAN ) | |

### INDICTMENT

THE GRAND JURY CHARGES:

Unless specified otherwise, at all times relevant to this Indictment:

#### Background

1. From on or about May 16, 2002 to in or about January 2004, defendant **DAVID HOSSEIN SAFAVIAN** was the Chief of Staff for the Administrator of the General Services Administration ("GSA"). The GSA Administrator is the highest ranking official in the GSA. From in or about November 2004 to September 2005, defendant **SAFAVIAN** served as the Administrator of the Office of Federal Procurement Policy, Office of Management and Budget, Executive Office of the President. Defendant **SAFAVIAN** was an attorney admitted in Michigan, Missouri, and the District of Columbia.

2. "Lobbyist A" was a Washington D.C. lobbyist whose clients included Native

American tribes. Defendant **SAFAVIAN** and Lobbyist A worked together at a law firm in Washington, D.C. beginning in or about 1995.

3. Entity A was a private school established and supported by Lobbyist A.

## The General Services Administration

4. GSA is an agency of the Executive Branch of the United States Government. Among other things, GSA is responsible for the development and management of property owned or leased by the Government and the disposition of property no longer used by the Government.

5. The Old Post Office ("OPO") was a building in Washington, D.C. that was managed by GSA. The OPO, built in 1899, once served as the Post Office for Washington D.C. During the summer of 2002, GSA was considering ways to develop the OPO.

6. The Naval Surface Warfare Center-White Oak ("NSWC-White Oak") was a property consisting of approximately 600 acres in Silver Spring, Maryland that was managed by GSA. During the summer of 2002, GSA was considering ways to develop NSWC-White Oak.

## Lobbyist A's Business Before GSA

7. Beginning shortly after defendant **SAFAVIAN** became the Chief of Staff of GSA in May 2002, Lobbyist A repeatedly contacted defendant **SAFAVIAN** about the possibility of leasing the OPO for his clients and the possibility of acquiring or leasing a portion of NSWC-White Oak for Entity A.

8. On or about July 2, 2002, defendant **SAFAVIAN** in an email to Lobbyist A stated in substance and in part that GSA was still determining how to develop NSWC-White Oak. In the same email, defendant **SAFAVIAN** also stated in substance and in part that Lobbyist A "should know" that Native American tribes have "'hub-zone' status, which provides for enterprise zone-

2

like status." Defendant SAFAVIAN suggested in the email that he and Lobbyist A continue discussing these matters.

9. On or about July 22, 2002, Lobbyist A sent defendant SAFAVIAN an email requesting defendant SAFAVIAN's comments on a draft letter, which supposedly would be sent by two Members of the United States House of Representatives urging the GSA Administrator to consider providing certain organizations with preferential contracting opportunities in developing the OPO.

10. On or about July 25, 2002, defendant SAFAVIAN forwarded by email to Lobbyist A an internal GSA email entitled "Old Post Office and leases" discussing internal GSA strategy on proposed changes in regulations for leasing the OPO.

11. On or about July 26, 2002, Lobbyist A sent an email to defendant SAFAVIAN's home email address seeking defendant SAFAVIAN's advice on a draft letter ostensibly from the Headmaster of Entity A to the GSA Commissioner of Public Buildings requesting a lease of NSWC-White Oak to Entity A.

12. On or about July 26, 2002, defendant SAFAVIAN forwarded to Lobbyist A internal GSA emails discussing problems with disposing of land at NSWC-White Oak to Entity A.

13. On or about July 28, 2002, defendant SAFAVIAN sent an email from his home email address to Lobbyist A making suggestions about how to draft the proposed letter ostensibly from Entity A's Headmaster to GSA.

14. On or about July 30, 2002, defendant SAFAVIAN forwarded to Lobbyist A an internal GSA email that outlined GSA land use requirements and indicated that Entity A's lease of any land at NSWC-White Oak would be problematic.

15. On or about July 30, 2002, defendant SAFAVIAN sent to various GSA officials an email with the subject line, "[Entity A] & White Oak" in which he stated in part "Per our conversation, how do you folks look for a meeting on this issue and possibly a quick trip to White Oak on Friday morning?"

16. On or about August 2, 2002, defendant SAFAVIAN attended a meeting he had arranged in the GSA Administrator's office with other GSA officials, two Entity A representatives, Lobbyist A's lobbying colleague and Lobbyist A's wife to discuss the possibility of Entity A leasing from GSA portions of the NSWC-White Oak property.

### The August 3 to August 11, 2002 Scotland Golf Trip

17. Throughout June and July 2002, defendant SAFAVIAN and Lobbyist A were in contact with each other regarding a golf trip they planned to take with a member of Congress, Congressional staff and others to Scotland in August 2002.

18. On or about July 25, 2002, defendant SAFAVIAN sought an opinion from a GSA ethics officer about whether he could attend the golf trip when Lobbyist A was fully funding the cost of a chartered jet to Scotland. In the email in which he sought this opinion, defendant SAFAVIAN stated in part that Lobbyist A "is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill)."

19. A GSA ethics officer responded with an ethics opinion in an email to defendant SAFAVIAN on or about July 26, 2002. The ethics opinion noted that the Standards of Ethical Conduct for Employees of the Executive Branch prohibited an employee from accepting a gift from a "prohibited source," which was defined as one who was seeking official action by the employee's agency or did business, or was seeking to do business, with the employee's agency.

4

The ethics opinion further stated that "[y]ou stated that neither [Lobbyist A] nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend."

20. On or about July 26, 2002, defendant SAFAVIAN forwarded the ethics opinion directly to Lobbyist A and stated in part "[Lobbyist A] - fyi. It looks like Scotland is a go."

21. On or about August 3, 2002, defendant SAFAVIAN, Lobbyist A, and seven others boarded a chartered jet and flew to Scotland where they played golf on multiple well-known and historic golf courses, including the Old Course at St. Andrews. On or about August 8, defendant SAFAVIAN, Lobbyist A, and others continued on to London, England. On or about August 11, defendant SAFAVIAN, Lobbyist A, and others returned from London to the United States aboard the chartered jet. The total cost of the trip for nine people exceeded $130,000.

## COUNT ONE

### (Obstruction)

22. The Grand Jury realleges paragraphs 1 through 21 as though fully stated herein.

23. The GSA Office of Inspector General ("GSA-OIG") is responsible for the investigation of illegal or improper activities involving GSA programs, operations, and personnel. GSA-OIG has authority to investigate allegations of illegal gratuities and bribes provided to GSA officials by persons with business before GSA. GSA-OIG also has authority to investigate allegations of improper or unethical conduct by GSA employees.

24. On or about March 26, 2003, GSA-OIG opened an administrative investigation pursuant to an anonymous hotline complaint regarding defendant SAFAVIAN's participation in an "international golfing trip provided by lobbyists."

5

25. In Washington, D.C., on or about March 27, 2003 and again on or about April 25, 2003, the GSA-OIG Regional Inspector General for Investigations interviewed defendant SAFAVIAN as part of this GSA-OIG investigation. During these interviews, defendant SAFAVIAN falsely stated in substance and in part that Lobbyist A had no business with GSA. Defendant SAFAVIAN further stated in substance that he had paid Lobbyist A for the total cost of the trip including airfare, hotels and golf green fees. Defendant SAFAVIAN provided to GSA-OIG a $3,100 check to Lobbyist A dated August 3, 2002, which is the date defendant SAFAVIAN boarded the chartered jet to Scotland

26. Based in part on defendant SAFAVIAN's statement that Lobbyist A had no business with GSA at the time of the golf trip and that defendant SAFAVIAN had fully paid for his cost of the trip, GSA-OIG closed its investigation.

27. From on or about March 27, 2003 to in or about May 2003, in the District of Columbia and elsewhere, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law in a proceeding that he knew was then pending before a department and agency of the United States, that is the official investigation being conducted by the GSA-OIG into defendant SAFAVIAN's participation in an "international golfing trip provided by lobbyists."

In violation of Title 18, United States Code, Sections 1505 and 2.

6

## COUNT TWO

### (False Statement)

28. The Grand Jury realleges paragraphs 1 through 21 as though fully stated herein.

29. From in or about May 2002 to in or about August 2002, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts, that is in connection with seeking and obtaining a GSA ethics opinion regarding his travel, defendant SAFAVIAN (A) concealed his assistance to Lobbyist A in GSA-related activities; (B) concealed Lobbyist A's business relationships with GSA; and (C) falsely stated to the GSA ethics officer that Lobbyist A did not have any business with and was not seeking to do business with GSA and that Lobbyist A did all his work on Capitol Hill, when in truth and in fact, as defendant SAFAVIAN well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property.

In violation of Title 18, United States Code, Section 1001(a)(1).

7

## COUNT THREE

### (False Statement)

30. The Grand Jury realleges paragraphs 1 through 21 and 23 through 26 as though fully stated herein.

31. From on or about March 27, 2003 to in or about May 2003, in the District of Columbia, in a matter within the jurisdiction of the executive branch of the Government of the United States, defendant,

## DAVID HOSSEIN SAFAVIAN,

did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts; that is, during the course of an official investigation being conducted by the GSA-OIG, defendant SAFAVIAN (A) concealed his assistance to Lobbyist A in official GSA-related activities; (B) concealed Lobbyist A's business relationships with GSA; and (C) falsely stated to the GSA-OIG Regional Inspector General for Investigations that Lobbyist A did not have any business with GSA; when in truth and in fact, as defendant SAFAVIAN well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property.

In violation of Title 18, United States Code, Section 1001(a)(1).

8

## COUNT FOUR

### (Obstruction)

32. The Grand Jury realleges paragraphs 1 through 21 and 23 through 26 as though fully stated herein.

33. In or about March 2004, the Committee on Indian Affairs of the United States Senate (the "Committee") began an investigation into allegations of misconduct by Lobbyist A and others that had been made by several Native American tribes. As a member of the Committee, Senator John McCain and his staff had the responsibility to gather materials related to those allegations.

34. The Committee held public hearings on this matter on or about September 29, 2004 and November 17, 2004. Testimony and documents revealed that tribal funds were used by Lobbyist A to pay for a portion of the August 2002 Scotland trip.

35. On or about February 23, 2005, acting in his capacity as Chairman of the Committee, Senator McCain caused to be sent to defendant **SAFAVIAN** a letter requesting information about the August 2002 Scotland trip with Lobbyist A.

36. In or about March 2005, defendant **SAFAVIAN** spoke with an investigator from the Committee and represented in substance and in part that he had received approval for the Scotland golf trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics officer who prepared the opinion.

37. On or about March 17, 2005, defendant **SAFAVIAN** responded to Chairman McCain's request for information with a letter in which he stated in part

[w]hen the invitation was made, I was the chief of staff to the U.S.

9

> General Services Administration ("GSA"). [Lobbyist A] did not have any business before the agency at that time. Prior to departure, I consulted with the GSA Office of General Counsel to obtain guidance on the propriety of this trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a 'gift from a prohibited source' under the applicable regulations, nor was it considered a gift given because of my official position.

Defendant SAFAVIAN enclosed with his letter to the Committee his July 25, 2002 email to the GSA ethics officer, the GSA ethics opinion regarding the August 2002 Scotland trip and a copy of his $3100 check to Lobbyist A dated August 3, 2002.

38. From in or about February 2005 to in or about March 2005, in the District of Columbia and elsewhere, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an investigation and review was being had by the United States Senate and a Committee of the United States Senate; that is, the inquiry by Senator John McCain, as Chairman of the Senate Committee on Indian Affairs, into allegations of misconduct by lobbyists for Native American tribes.

In violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT FIVE

### (False Statement)

39. The Grand Jury realleges paragraphs 1 through 21, 23 through 26, and 33 through 37 as though fully stated herein.

40. From in or about February 2005 to in or about March 2005, in the District of Columbia, in a matter within the jurisdiction of the legislative branch of the Government of the United States, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts; that is, during the course of an official investigation and review conducted pursuant to the authority of a Committee of the United States Senate, consistent with applicable rules of the Senate, defendant SAFAVIAN (A) concealed his assistance to Lobbyist A in GSA-related activities; (B) concealed Lobbyist A's business relationships with GSA; (C) falsely stated in a letter to the Committee that Lobbyist A did not have any business with GSA at the time defendant SAFAVIAN was invited on the trip to Scotland; and (D) provided documentation in which defendant SAFAVIAN stated in substance and in part that Lobbyist A did all of his work on Capitol Hill, when in truth and in fact, as defendant SAFAVIAN well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property.

In violation of Title 18, United States Code, Section 1001(a)(1).

11

A TRUE BILL

_____
FOREPERSON


_____                    _____
PAUL E. PELLETIER                                  NOEL L. HILLMAN
Acting Chief, Fraud Section                        Chief, Public Integrity Section
Criminal Division                                  Criminal Division
United States Department of Justice                United States Department of Justice


_____                    _____
NATHANIEL B. EDMONDS                               PETER R. ZEIDENBERG
Trial Attorney, Fraud Section                      Trial Attorney, Public Integrity Section
Criminal Division                                  Criminal Division
United States Department of Justice                United States Department of Justice