UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Cr. No 05-370 (PLF) |
| | : | |
| v. | : | |
| | : | |
| DAVID HOSSEIN SAFAVIAN | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION TO COMPEL DISCOVERY

The United States of America, by and through its undersigned attorneys, hereby

respectfully submits its Memorandum in Opposition to Defendant's Motion to Compel

Discovery. For the reasons set forth herein, the government requests that the Court deny

defendant's motion. In his Motion to Compel, defendant Safavian asks this Court to order the

government to provide thousands of documents that are either 1) not within the government's

possession or control; 2) do not exist; or 3) do not fit the legal requirements of materiality.

In order that the Court can properly rule on whether the requested documents are material

in this case, it is critical that the Court understand what it is the government has alleged and, just

as importantly, has not alleged, in this indictment. See United States v. George, 786 F. Supp. 56,

58 (D.D.C. 1992) ("When analyzing materiality, a court should focus first on the indictment

which sets out the issues to which the defendant's theory of the case must respond.").

## I. Factual Background

### A. Abramoff's Business with GSA

Defendant Safavian became the Chief of Staff for the General Services Administration ("GSA") in

May, 2002. Within days of becoming Chief of Staff, defendant Safavian began getting emails from

an old friend and former colleague, Jack Abramoff, a well-known and very successful lobbyist in Washington, D.C. Abramoff advised defendant Safavian that he was interested in acquiring or leasing the Old Post Office Building ("OPO") located on Pennsylvania Avenue, N.W. for some of his clients. The OPO was managed and its fate was controlled by GSA. Abramoff also expressed to defendant Safavian his interest in acquiring or leasing a portion of the Naval Surface Warfare Center-White Oak ("White Oak"), a property consisting of approximately 600 acres in Silver Spring, Maryland, which was also managed by GSA. Abramoff was interested in obtaining the White Oak property to house a private school that he had started.

Defendant Safavian advised Abramoff by email in early July, 2002, that the GSA had not yet determined what it was going to do with the White Oak property. Defendant Safavian, who knew that Abramoff had many Native American Indian tribes as clients, also advised Abramoff in that same email that Abramoff "should know" that Native American tribes have "hub-zone" status, which provides for enterprise zone-like status and consequently would provide a benefit in acquiring government contracts.

On July 22, 2002, Abramoff emailed defendant Safavian and requested that defendant Safavian comment on a draft letter which was to be sent by two Members of the House of Representatives. The letter urged the GSA Administrator to consider providing "hub-zone" organizations with preferential contracting opportunities in developing the OPO.

Three days later, on July 25, defendant Safavian forwarded by email to Abramoff an internal GSA email entitled "Old Post Office and leases" which discussed internal GSA strategy on proposed changes in regulation for leasing the OPO.

The following day, on July 26, Abramoff sent an email to defendant Safavian's home email

2

address seeking defendant Safavian's advice on another draft letter, this one ostensibly from the Headmaster of Abramoff's school to the GSA Commissioner of Public Buildings requesting a lease of the White Oak property to Abramoff's school.

Later on that day, defendant Safavian forwarded to Abramoff more internal GSA emails discussing problems with disposing of land at White Oak to Abramoff's school.

Two days later, on July 28, defendant Safavian sent an email from his home email address to Abramoff. Defendant Safavian analyzed Abramoff's letter and made a number of suggestions as to how to improve the proposed letter requesting a lease of White Oak to Abramoff's school.

Two days after that, on July 30, defendant Safavian forwarded to Abramoff an internal GSA email that outlined GSA land use requirements and indicated that Abramoff's school's lease of any land at White Oak would be problematic.

Later on that same day, defendant Safavian sent to various GSA officials an email with the subject line, "Eshkol [sic] & White Oak" in which he stated in part, "Per our conversation, how do you folks look for a meeting on this issue and possibly a quick trip to White Oak on Friday morning?"

On August 2, 2002, defendant Safavian attended a meeting, which he had arranged, with other GSA officials, two representatives of Abramoff's school, Abramoff's lobbying colleague and Abramoff's wife to discuss the possibility of the school leasing from GSA portions of the White Oak property.

### B. The Scotland Golf Trip and Ethics Opinion

At the same time these discussions regarding White Oak and OPO were occurring, defendant Safavian and Abramoff were also in contact with each other regarding a golf trip they planned to take

3

to Scotland in August 2002. The attendees of the trip would include a member of Congress, Congressional staff and others. On July 25, 2002, defendant Safavian sought an opinion from a GSA ethics officer, Raymond McKenna, about whether he could attend the golf trip when Abramoff was fully funding the cost of a chartered jet to Scotland. In the email in which he sought this opinion, defendant Safavian stated in part that Abramoff "is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill)."

The following day, on July 26, Mr. McKenna responded to defendant Safavian with an ethics opinion contained in an email to defendant Safavian. Eugenia Ellison, a lawyer within the GSA General Counsel's office, had drafted the ethics opinion. The ethics opinion noted that the Standards of Ethical Conduct for Employees of the Executive Branch prohibited an employee from accepting a gift from a "prohibited source," which was defined as one who was seeking official action by the employee's agency or did business, or was seeking to do business, with the employee's agency. The ethics opinion further stated that "[y]ou stated that neither Mr. Abramoff nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend."

After receiving this ethics opinion, defendant Safavian forwarded it directly to Abramoff and stated in part "Jack - fyi. It looks like Scotland is a go."

One week later, on August 3, defendant Safavian, Abramoff and seven others boarded a chartered jet and flew to Scotland where they played golf on multiple well-known and historic golf courses, including the Old Course at St. Andrews. On August 8, defendant Safavian, Abramoff, and others continued on to London where they spent the weekend at a luxury hotel, and then returned to the United States aboard the chartered jet. The total cost of the trip for nine people exceeded

4

$130,000.

### C. The GSA-OIG Investigation

In the Spring of 2003, GSA Office of Inspector General ("GSA-OIG") received an anonymous hotline complaint regarding defendant Safavian's participation in an "international golfing trip provided by lobbyists." As a result of this complaint, GSA-OIG opened an administrative investigation. On both March 27 and April 25, 2003, the GSA-OIG Regional Inspector General for Investigations interviewed defendant Safavian about his golf trip with Abramoff.

During these interviews, defendant Safavian stated that at the time he took the trip with Abramoff, Abramoff had no business with GSA. Defendant Safavian also stated that he had paid Abramoff for the total cost of the trip including airfare, hotels and golf green fees. Defendant Safavian provided to GSA-OIG a $3,100 check to Abramoff dated August 3, 2002, which is the date defendant Safavian boarded the chartered jet to Scotland.

Based in part on defendant Safavian's statement that Abramoff had no business with GSA at the time of the golf trip and that defendant Safavian had fully paid for his cost of the trip, GSA-OIG closed its investigation.

### D. The Senate Investigation

In March 2004, the Committee on Indian Affairs of the United States Senate (the "Committee") began an investigation into allegations of misconduct by Abramoff and others that had been made by several Native American tribes. As a member of the Committee, Senator John McCain and his staff had the responsibility to gather materials related to those allegations. The Committee held public hearings on this matter on September 29, 2004 and November 17, 2004.

Additionally, the Committee's investigation revealed that tribal funds were used by Abramoff to pay for a portion of the August 2002 Scotland trip.

Acting in his capacity as Chairman of the Committee, Senator McCain authorized his staff to send to defendant Safavian a letter dated February 23, 2005 requesting information about the August 2002 Scotland trip with Abramoff.

In March 2005, defendant Safavian spoke by telephone with an investigator from the Committee and represented that he had received approval for the Scotland golf trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics officer who prepared the opinion.

On March 17, 2005, defendant Safavian responded to Chairman McCain's request for information about his golf trip with Abramoff with a letter in which he stated in part

> [w]hen the invitation was made, I was the chief of staff to the U.S. General Services Administration ("GSA"). Mr. Abramoff did not have any business before the agency at that time. Prior to departure, I consulted with the GSA Office of General Counsel to obtain guidance on the propriety of this trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a 'gift from a prohibited source' under the applicable regulations, nor was it considered a gift given because of my official position.

Defendant Safavian enclosed with his letter to the Committee his July 25, 2002 email to the GSA ethics officer, the GSA ethics opinion regarding the August 2002 Scotland trip and a copy of his $3100 check to Abramoff dated August 3, 2002.

As a result of the factual allegations discussed supra, the grand jury returned a five-count Indictment that charges defendant Safavian with Obstructing a GSA-OIG Proceeding (Count One); False Statements (in connection with the representations made to both the GSA ethics officer and

the GSA-OIG) (Counts Two and Three); Obstructing a Senate Proceeding (Count Four) and False

Statements (Count Five) (in connection with his representations with the Senate Committee).


## II.  Defendant's Discovery Motion and the Applicable Law

It is against this factual backdrop that defendant Safavian's discovery requests must be

viewed.  Defendant Safavian is now seeking to compel the government to disclose to him tens of

thousands of pages of documents to which he has no right and that have no relevance or connection

to the charges in this case.

The principles of law relevant to defendant's discovery motion are well-settled.  As this

Court is aware, in criminal prosecutions, "the Brady rule, Rule 16 and the Jencks Act exhaust the

universe of discovery to which the defendant is entitled."  United States v. Presser, 844 F.2d 1275,

1286 n. 12 (6th Cir. 1988); see Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987); United States v.

Bagley, 473 U.S. 667, 676 (1985) ("the prosecutor is not required to deliver his entire file to defense

counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive

the defendant of a fair trial").

Under the Brady doctrine, the prosecution has an affirmative duty to produce exculpatory

evidence when such evidence is material to either guilt or punishment.  Evidence is material,

however, "only if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different."  Strickler v. Greene, 527 U.S. 263,

280 (1999) citing United States v. Bagley, 473 U.S. at 682.  The prosecutor is not required to

disclose neutral or inculpatory evidence.  See United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir.),

cert. denied, 493 U.S. 858 (1989) (evidence is not automatically exculpatory because is not

7

inculpatory); United States v. Comosona, 848 F.2d 1110, 1115 (10th Cir. 1988) (the United States

does not have to produce any statements which do not "expressly" contain exculpatory material);

United States v. Cochran, 697 F.2d 600, 605 (5th Cir. 1983); United States v. Agurs, 427 U.S. 97,

106 (1976) (the government is under "no duty to provide defense counsel with unlimited discovery

of everything known by the prosecutor").

The central requirements for discovery pursuant to Rule 16(a)(1)C) is that the defendant must

show that the documents or evidence sought to be discovered are material to the preparation of his

defense. "The evidence must not simply 'bear some abstract logical relationship to the issues in the

case .... There must be some indication that pretrial disclosure of the disputed evidence would

[enable] the defendant significantly to alter the quantum of proof in his favor." United States v.

George, 786 F. Supp. 11, 13 (D.D.C. 1991) citing United States v. Ross, 511 F.2d 757, 762-63 (5th

Cir.) cert. denied, 423 U.S. 836 (1975); United States v. Caaicedo-Llanos, 960 F.2d 158, 164, fn. 14

(D.C. Cir. 1992); United States v. Poindexter, 727 F. Supp. 1470, 1485 (D.D.C. 1989) ("The law is

clear that the United States is not required simply to turn all its files over to a defendant. Nor is it

required to provide to the defendant evidence that is not exculpatory but is merely not inculpatory

and might therefore form the groundwork for some argument in favor of the defense").


**III. Argument**

Defendant Safavian outlines his request in Attachment A of his Motion. We have patterned

our response to that structure including the two major sections: A) documents that the Government

possesses that we decline to produce; and B) documents not in the Government's possession that we

decline to or cannot produce.

*A. Documents for Which the Prosecution Has Acknowledged Possession But Has Stated It Will Not Produce*

Defendant Safavian has made four separate requests for documents that the Government has in its possession, but that we have stated we decline to produce.

1. Attachment A - Page 2 - Paragraph A
*Defendant Safavian's request for documents identifying the substance of Defendant Safavian's actionable statements, including all investigative reports, rough notes, and tapes of GSA General Counsel Ray McKenna and Eugenia Ellison pertaining to the July 2002 request for an advisory opinion*

Defendant Safavian requests that the government to turn over to him "the record of his purported statement [at issue in Count Two] and any related documents, rough notes, or memoranda that memorialize the discussion with Defendant Safavian that is referred to in the March 1, 2005 facsimile from Ms. Eugenia D. Ellison." D. Motion, p. 8.

On October 7, 2005, the government provided to defendant Safavian the email sent by defendant Safavian to the ethics officer (Mr. McKenna) as well as the email response from Mr. McKenna to defendant Safavian. Both of these documents are quoted in part in the indictment. We have previously represented to defendant Safavian, and now represent to the Court, that there are no rough notes of any conversations between defendant Safavian and Mr. McKenna or Ms. Ellison. Nor are there any tapes or other recordings of these emails. To the extent that this request also seeks FBI 302s or ROIs of Mr. McKenna and/or Ms. Ellison, the government asserts that such items are not discoverable pursuant to Rule 16.

While Rule 16 does authorize broad pretrial discovery of a defendant's statements,[1] the Rule

_____

[1] Rule 16(a)(1)(A) defines a defendant's statement as one that is "made by the defendant before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial."

In this case, neither Mr. McKenna or Ms. Ellison were acting as government agents when they sought to provide Defendant Safavian with an appropriate ethics opinion. Mr. McKenna was

does not apply to statements made by prospective government witnesses. The production of witness statements is governed solely by the Jencks Act. Palermo v. United States, 360 U.S. 343 (1959). Rule 16(a)(2) explicitly recognizes this fact in its directive that Rule 16 does not authorize "the discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. Sec. 3500." United States v. Tarantino, 846 F.2d 1384, 1414 (D.C. Cir. 1988) ( "Federal Rule of Criminal Procedure 16(a)(2) prohibits discovery of statements by government witnesses or prospective government witnesses except as provided in the Jencks Act, 18 U.S.C. Sec. 3500 (1982). The Jencks Act directs that in a criminal prosecution, statements made by government witnesses are not open to discovery or inspection by the defense until said witnesses have testified on direct examination in the trial of the case.... The Act supplies the only avenue to the materials it encompasses, and 'statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. Sec 3500 ... cannot be produced at all'") (United States v. Haldeman, 559 F.2d 31, 77 n. 111 (D.C. Cir. 1976) (quoting Palermo v. United States, 360 U.S. at 351).

In this case, the ROI and/or 302 of Mr. McKenna and Ms. Ellison will be disclosed if they testify and if it is determined that the ROI or 302 constitutes Jencks. The fact that Defendant Safavian believes having advance copies of the 302 or ROI of these witnesses would be helpful in preparing his case is simply not a legally relevant consideration for the Court. See Tarantino, 846 F.2d 1418 ("Under our law, the adversary system is the 'primary means by which truth is uncovered'") (quoting United States v. Bagley, 473 U.S. 667, 675 (1985)).

---

the general counsel of GSA; Ms. Ellison was a staff attorney at GSA. Thus, neither can be deemed a "government agents" who were questioning Defendant Safavian.

Although not specifically identified in Attachment A of Defendant Safavian's motion in his memorandum in support of the motion, he also seeks "all 302s, ROIs, or other materials, including rough notes and memoranda, incorporating Defendant Safavian's actionable statements in paragraph 36 of Counts Four and Five in order to identify the substance of his conversation with the Senate 'investigator.'" D. Motion, p. 9. Although not required to do so by Rule 16, the Jencks Act or Brady, the government has turned over to defendant Safavian the FBI 302s of the interviews with the Senate staffers. This disclosure is above and beyond what is mandated by Rule 16. The government has previously represented to defendant Safavian's counsel that it does not have in its possession any contemporaneous notes that were taken by the Senate investigator in his conversation with defendant Safavian. However, we have asked the staffer to maintain these notes and they will be provided to the defense as Jencks if the staffer testifies and if the notes are deemed to be Jencks. See 18 U.S.C. Sec. 3500(e)(1) and (2).

Defendant Safavian also is asking the Court to compel the government to disclose "rough notes or tapes of the interviews" with the Senate staffers. D. Mem. 9. These interviews were not tape-recorded, and thus there is no tape of the interview.[2] The government will not disclose the agent's notes of these interviews because they are not discoverable under Rule 16. Nor will the government turn over 302s or ROIs of government witnesses over and above what has already been provided to the defense. See United States v. Palermo, 360 U.S. 343, 350 ("One of the most important motive forces behind the enactment of [the Jencks Act] was the fear that an expansive

---

[2]Defendant Safavian also focuses on the terms "dictation" and "transcription" in the FBI 302 form in the request for any tapes of the agent dictating the 302. As counsel for the Defendant is undoubtedly aware, the FBI 302 form is a standard form, and the date of dictation does not necessarily mean that the 302 was dictated. In all 302s relevant to this case, no dictation occurred, and no tapes of the FBI agent exist.

reading of Jencks would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness....[I]t was felt to be grossly unfair to allow the defense to use statements and impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." See also United States v. Trie, 21 F. Supp. 2d 7, 26 (D.D.C. 1998) (defendant "not entitled to the notes and records upon which the FBI 302 reports of witness statements [are] based").


2. Attachment A - Page 2 - Paragraph B
 *Rough Interview Notes and Tapes of Agents Reising and Brook Minnick from the May 26, 2005 Interview*

On May 26, 2005, FBI Special Agent Jeffrey Reising and Department of Interior Office of Inspector General Special Agent Brook Minnick interviewed defendant Safavian at his office at the Office of Management and Budget. Defendant Safavian has been previously provided a copy of the FBI 302 from this May 26, 2005 interview. Nonetheless, Defendant Safavian is seeking the rough notes of the interviewing agents. Although the government does not concede that Rule 16 requires that the government provide to the defense a copy of the agent's notes under these circumstances (where the 302 summarizes the substance of the statement) it will agree to provide a redacted copy of the agent's notes to defendant.[3]  Therefore, the government respectfully requests that this

---

[3]United States v. Vallee, 380 F.Supp 2d 11, 14 (D. Ma. 2005) ("The Court is cognizant that the production of an agent's handwritten notes is fraught with potential dangers and problems. Such notes are rarely accurate transcriptions, and instead often consist in substantial part of sentence fragments, abbreviations, and disconnected words. They are likely to be confusing, ambiguous, or misleading in the absence of an explanation as to their content.  They may contain mental impressions, comments, notes to one's self, or possible follow-up questions, which may require painstaking redactions....[T]he Rule only requires the production of that 'portion' of any written record containing the substance of a defendant's statement. Under ordinary circumstances, therefore, the government may redact all materials in the notes other than the substance of the statement itself.

particular request be denied, without prejudice, as being moot.

3.   Attachment A - Page 2 - Paragraph C
   *Email correspondence between business associates of Lobbyist A concerning Defendant*
   *Safavian, the Old Post Office Building, the NSWC-White Oak Property, and the 2002*
   *Scotland Trip*

It is necessary to refer to defendant Safavian's discovery letter of October 14, 2005 (D. Mem.

Ex. 3) in conjunction with his instant motion to fully appreciate the scope of this demand.  In

addition to emails to and from defendant Safavian, defendant Safavian is seeking all emails sent to

or from 17 other named individuals.  The October 14 letter states that defendant Safavian is

requesting all of these emails between May and August, 2002 "whether they directly relate to this

case or any related investigation."  In his motion in Attachment A, Defendant Safavian appears to

"limit" this request to emails "concerning" the Old Post Office Building, White Oak and the

Scotland trip. D. Mem. 17-18.  Defendant Safavian's request has no time restrictions: he is seeking

"any and all correspondence" both before and after the Scotland trip.

On October 7, 2005, the government provided to defendant Safavian emails between himself,

Abramoff or other individuals that pertained to the OPO, White Oak or the Scotland trip.  The

government advised defendant Safavian that those emails comprised the vast majority of the email

evidence it intends to introduce at trial.  After the initial discovery request, the government

subsequently turned over all of the email traffic between defendant Safavian and Abramoff,

regardless of date. This disclosure involved over 1300 pages of emails over a nine year period from

1995 to 2004.

---

Moreover, the Courts interpretation is limited solely to Rule 16(a)(1)(b)(ii), which applies only to
defendant's statements; it does not, for example, extend to witness statements under the Jencks Act,
18 U.S.C. Sec. 3500, which contains a substantially different disclosure obligation.")

Defendant's present demand for emails to and from 17 various individuals, with no time frame involved, and regardless of whether or not defendant Safavian was even aware of their existence, should be denied because defendant Safavian has utterly failed to make the requisite showing that these documents – which he has never seen – are material to his defense, i.e. "that the pretrial disclosure of the disputed evidence would [enable] the defendant significantly to alter the quantum of proof in his favor." United States v. Lloyd, 992 F.2d 348, 351 (DC Cir. 1993).

To understand just how completely defendant Safavian has failed in making this showing, it is necessary to recall what it is the government must prove at trial: that at the time defendant Safavian emailed and spoke to the GSA ethics officer in May of 2002 or the GSA-OIG agent in March and April 2003, he made false statements or concealed the fact that he knew Abramoff was doing business before GSA, and that in February and March, 2005, defendant Safavian repeated those same falsehoods and concealed Abramoff's business interests in representations with a Senate Committee. At trial, the issue will be whether defendant Safavian knowingly and intentionally lied or concealed information on these particular occasions. Defendant Safavian does not allege that he saw any of the thousands of emails he now seeks. Therefore, because he was unaware of the content of these emails, they obviously could not have had any bearing on his state of mind at the relevant – or, for that matter, any other – time frame.

Defendant Safavian's motion states, in a wholly conclusory fashion, that "communications between Mr. Abramoff and his associates concerning Mr. Safavian, the nature of these expressions of interest in these properties, the details of the Scotland trip, and internal GSA correspondence . . . would certainly `bear[] some abstract logical relationship to the issues in this case." D. Motion, p.17. The government disputes flatly this contention. Indeed, it seems inconceivable that any of

14

these communications, if they were unknown to defendant Safavian, could have any "logical relationship to the issues in this case," be it abstract or not. Moreover, defendant Safavian fails to note that the legal standard he proposes - an "abstract logical relationship" - is not the sum of the materiality test; he must also show that the information would "[enable] the defendant significantly to alter the quantum of proof in his favor." Lloyd, 992 F.2d at 351. This he cannot do. It is simply not enough for defendant Safavian to make a conclusory allegation that the requested evidence is material. "If the courts credited such statements, defendants could obtain absolutely anything they wanted simply by making such an assertion." United States v. Savarese, 2002 WL 265153 at *2 (S.D.N.Y. 2002).

Indeed, by this request defendant Safavian seeks the Court's permission to go on a classic "fishing expedition" in the hopes of disrupting ongoing investigations and thus force the government to choose between this prosecution and other investigations. The government has already provided to defendant Safavian all of the email traffic between defendant Safavian and Abramoff over a nine year period regardless of subject matter. The defense can make of this material what it likes. If the previously disclosed material refers to a particular email on a particular date or date range that the defense feels is important to its case, the government will certainly attempt to accommodate such a request. But, as presently framed, this request should be denied.

4.  Attachment A - Page 2 - Paragraph D
    *Emails sent to/from GSA officials relating to the status of the OPB and NSWC-White Oak properties.*

The government has produced all of the emails from GSA officials regarding OPO and NSWC-White Oak that it has in its possession. As illustrated in the discovery production, those emails were obtained because defendant Safavian forwarded that information to Abramoff.

15

*B. Documents the Prosecution Has Stated It Will Not Produce Because They Are Not in the Government's Possession*

Defendant Safavian is seeking documents that the Department of Justice or its investigative agencies, GSA-OIG and the FBI, do not possess. The government understands its obligations to provide discovery mandated by Rule 16 and Brady and is not attempting to evade these responsibilities by claiming that it does not have "technical" or "actual" possession of requested items when in fact the government knows of the existence of the item in question. For purposes of this motion response, the government is not attempting to distinguish between items in its possession and those in the possession of any of its investigative agencies, GSA-OIG or the FBI. The government acknowledges that for purposes of this particular prosecution, it is appropriate to consider the Department of Justice, GSA-OIG and the FBI as one and the same (at least in the context of discovery).

The same cannot be said of the United States Senate which – at the risk of stating the obvious – is a separate branch of government. See, United States v. Trie, 21 F. Supp. 2d 7, 25, fn. 17 ("The Congress is not an 'agency,' and the DOJ has no obligation under Brady to disclose information in the possession of Congress that is not also in the possession of the DOJ or the FEC.") The Senate in this case, while by no means uncooperative with this investigation, has not permitted us to inspect their files or records.

The government does not quarrel with the proposition that "a prosecutor who has had access to documents in other agencies in the course of his investigation cannot avoid his discovery obligations by selectively leaving the materials with the agency once he has reviewed them." D. Motion, p. 21, quoting Poindexter, 727 F. Supp. 1470, 1477 (D.D.C. 1989). The government has attempted to do no such thing in this case. We have not avoided any of our discovery obligations

16

by deliberately leaving relevant materials with "other" government agencies. We have or will disclose to defendant Safavian all of the documents of which we are aware and which constitute either Brady, Rule 16 or Jencks.

1.  Attachment A - Page 3 - Paragraph A
    *The Identity of the Author of the Hotline Complaint, and evidence of any other complaints made to the GSA that bear similar markings*

Defendant Safavian seeks from the government the identity of the author of the hotline complaint against him. According to his motion, the identity of this author is material to the defense because the defendant "must ascertain whether the complainant is a 'serial complainant' who has made a number of politically-charged complaints against other GSA officials" and that a "familiarity with this individual's repeated complaints may have been a factor in the GSA-OIG's decision to close its investigation immediately after defendant Safavian adequately demonstrated that he had not accepted any gift in the first place." D. Motion, p. 22. Defendant Safavian also states, without any further explanation, the startling proposition that "[t]he identity of the complainant would also bear a logical relationship to the related defense of entrapment."[4] Id.

The government has previously represented to counsel for defendant Safavian that the Department of Justice and all related investigating agencies do not know the identity of the hotline tipster. Nor will the government attempt to argue to the jury that the complaint was or was not true.

_____

[4]Defendant Safavian does not explain the basis for his puzzling suggestion that the identity of the tipster could somehow bolster an entrapment defense. The government cannot conceive how the identity of the hotline tipster could have any bearing on whether or not defendant was entrapped. We also note that even if defendant Safavian were somehow entrapped into lying to the GSA-OIG in 2002 (i.e., Abramoff really was doing business before GSA and defendant Safavian knew this to be true yet he was entrapped into denying this was the case), that it seems very unlikely – to say the least – that defendant Safavian was still somehow entrapped three years later when he repeated the same lie to the Senate Committee in 2005.

The complaint is relevant only because it explains why the GSA-OIG initiated this investigation.

The government further objects to defendant Safavian's request that we produce "other complaints that use a similar font, language or method of transmittal" so that the defense can attempt to locate the tipster. The method of transmittal in this case was a fax; there was nothing unique about either the language or the font employed in the tip.[5] Moreover, the identity of the tipster is not material to the defense in this case. The particular reason that GSA-OIG initiated this complaint has no bearing on whether defendant Safavian was or was not truthful to the GSA ethics officer, the GSA-OIG and the Senate. Defense counsel will, of course, be free to cross-examine the GSA-OIG agent who interviewed defendant Safavian about what the agent's objectives were and what he was trying to accomplish when speaking with the defendant Safavian, as well as what role, if any, the substance of the hotline complaint played in his questioning of defendant. There is, however, simply no reason to force the government to undertake an investigation into the identity of an individual when any results can hardly be considered Brady in this case.

2. Attachment A - Page 3 - Paragraph B
   *GSA Procedures or Agreements Related to Ethics Opinions*

Defendant Safavian wants the government to disclose to him "internal (i.e. not readily available on websites or federal register) documents, guidelines, and agreements regarding the issuance of advisory opinions." D. Motion, p. 23. In short, the government does not understand what it is that defendant Safavian is seeking, although it seems clear that the requested documents would

---

[5]Defendant Safavian has attached a copy of the scanned Hotline complaint as D. Mem. Ex. 11. As noted in our October 24, 2005 correspondence, D. Mem. Ex. 5, we provided two copies of the Hotline complaint - a scanned electronic version (DOJ-DS-1470) and a copy of the paper file (DOJ-DS-1523). A review of a copy of the paper file indicate no unique typographical characteristics of the Hotline complaint. A copy of the paper file is attached hereto as Exhibit "A."

not be evidence in the case. Nor would "internal guidelines regarding the extent of the attorney-client privilege between GSA General Counsel and GSA officials." Id. Defendant Safavian is seeking these documents because they "will aid in our ability to secure interviews with [] potential witnesses." Id. Neither Rule 16 nor Brady applies to this type of request. This is not evidence that is "material to the defense," as that term is described in the case-law. Nor is it Brady evidence. Thus, this request should be denied.

3.  Attachment A - Page 3 - Paragraph C
   *Reports, documents and correspondence sent to, or emanating from, GSA Commissioner Joseph Moravec and related GSA officials concerning the Old Post Office Building, NSWC-White Oak Properties, and GSA Procedures and Policies for disposal of Government property*

This request fails for the same reason that the prior request for all emails of 17 various individuals also failed: Defendant Safavian cannot demonstrate the materiality of his request. The emails, reports, documents and correspondence "sent to or emanating from GSA Commissioner Joseph Moravec" are being requested regardless of whether or not they were ever seen by Defendant Safavian. Indeed, Defendant Safavian is seeking documents that were sent in the three years after he allegedly lied to the GSA-OIG in 2002. Defendant Safavian cannot demonstrate by any logic how emails and correspondence sent to or from Mr. Moravec – correspondence which Defendant Safavian does not allege he ever saw or relied upon in any fashion – could have any bearing on what his state of mind was when he sought an ethics opinion in 2002, was interviewed by the GSA-OIG in 2003, or sent a letter to the Senate committee in 2005. Again, this is, pure and simple, a fishing expedition.

19

4.  Attachment A - Page 3 - Paragraph D

>   *Documents, videotapes, reports, or other records about Defendant Safavian's arrest and/or cooperation in any other matter*

Defendant Safavian states that "upon information and belief" the government "may" have developed a plan to "have prosecution agents threaten Defendant Safavian with the decision to 'cooperate or face arrest.'" D. Motion, p. 26.  According to Defendant Safavian's discovery letter of October 26 (D. Motion, Ex. 7), this request is for information about "a plan [] to secure Mr. Safavian's cooperation in the Abramoff investigation."  Defendant Safavian, it appears, is seeking internal government memoranda, emails and communications that relate to a purported "plan" to get Defendant Safavian to cooperate with the government, including attorney work product.

This request should be denied for a number of reasons.  First and foremost, Rule 16(a)(2) expressly prohibits this type of request.[6]  Defendant Safavian argues that the Rule only prohibits such disclosures in the defendant's own case and not in other investigations.  Because Defendant is requesting documents relating to a plan to secure <u>his</u> cooperation, such memorandum, if any exist, would be clearly related to <u>his</u> own case, and thus specifically prohibited from Rule 16 disclosure.

In any event, the Defendant has once again failed to show how these memoranda, even they exist, are material to his case.  The issue at trial is whether or not Defendant Safavian lied to the GSA and the Senate Committee in 2002, 2003 and early 2005.  The internal deliberative process of the Department of Justice in the Summer and Fall of 2005 is simply irrelevant to the allegations that

---

[6]Rule 16(a)(2) states:

**(2) Information Not Subject to Disclosure.** Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection os statements made by prospective government witnesses except as provided in 18 U.S.C. Sec. 3500.

the government will seek to prove at trial.  Because the materials sought are not material to the

defense in this case and their disclosure is expressly prohibited by Rule 16, this request should be

denied.

5.  Attachment A - Page 3 - Paragraph E
> *Notes and Rough Notes of the Senate Investigator and Senate Staffers regarding statements
> made by Defendant Safavian*

As noted <u>supra</u>, these materials may be covered by the Jencks Act, and the government will

make this determination at the time of trial.  They are clearly not <u>Brady</u>; nor are they discoverable

by Rule 16.  Therefore, this request should be denied.


**III. Conclusion**

For the foregoing reasons, the Government submits that Defendant Safavian's motion to

compel is without legal or factual merit, and respectfully requests the Court deny the Defendant's

Motion to Compel Discovery.


Respectfully submitted,


_____
NATHANIEL B. EDMONDS
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

_____
PETER R. ZEIDENBERG
Trial Attorney, Public Integrity Section
Criminal Division
United States Department of Justice

# EXHIBIT "A"

Untitled

GSA Inspector General

Fax (202) 501-4119

Suject: David Safavian


It has recently come to my attention that David Safavian engaged in activity in violation
of federal law.

It is my understanding that shortly after his appointment to GSA he participated in an international golfing trip provided by lobbyists.

In November of 2002 he participated in political campaigns in other states.   During these
activities he used his government cellphone, computer and Blackberry.
Those of us who work in the federal government expect more from those who are appointed
and would like to make sure resources aren't misused.

Page 1

DOJ-DS-001523

CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2005, a copy of the foregoing was served

on the following counsel by facsimile, electronic service and first class mail to:


Barbara Van Gelder, Esq.
Wiley Rein & Fielding
1776 K Street NW
Washington, DC 20006
Tel: 202-719-7032
Facsimile: 202-719-7049


NATHANIEL B. EDMONDS
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice