# TABLE OF CONTENTS

**Page**

I. COUNT TWO MUST BE DISMISSED BECAUSE THE GOVERNMENT CANNOT SHOW FAIR NOTICE TO THE DEFENDANT, FALSITY OF THE STATEMENTS, A LEGAL DUTY TO DISCLOSE, OR THAT ANY ALLEGED FALSE STATEMENTS WERE MATERIAL ............................................ 13

 A. The Unprecedented Application of 18 U.S.C. § 1001 To the Alleged Statements at Issue Here Must Be Dismissed As a Matter of Law. ................... 14

 B. Even if § 1001 Could Reach the July 25, 2002 Ethics Request, The Government Cannot Show Falsity By Trick, Scheme, or Device As a Matter of Law. ..................................................................................... 17

 C. Mr. Safavian Did Not Conceal Any Material Information Nor Did the Circumstances Create a Legal Duty to Disclose Such Information ................... 30

 D. Mr. Safavian's Statements in the Ethics Request Regarding Abramoff Were Immaterial ................................................................................... 35

II. COUNT ONE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT DEMONSTRATE OBSTRUCTION OF THE GSA-OIG INVESTIGATION INTO WHETHER MR. SAFAVIAN ACCEPTED A GIFT .......... 38

III. COUNT THREE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT ESTABLISH THAT MR. SAFAVIAN DID KNOWINGLY OR WILLFULLY FALSIFY OR CONCEAL ANY MATERIAL FACTS DURING THE GSA-OIG INVESTIGATION ................................................................ 42

 A. Mr. Safavian Did Not Use a Trick, Scheme, or Device to Conceal Material Information. ...................................................................... 42

 B. The Allegedly Concealed Assistance Was Immaterial ....................................... 43

 C. Mr. Safavian Did Not Knowingly or Willfully Falsify Any Material Facts During the GSA-OIG Investigation .................................................... 44

IV. COUNT FOUR MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO DEMONSTRATE THAT THE ALLEGED FALSE STATEMENTS WERE PERTINENT TO THE SENATE COMMITTEE ON INDIAN AFFAIRS INVESTIGATION ................................................................................... 45

 A. The SCIA Did Not Have Jurisdiction to Investigate Whether Mr. Safavian Made False Statements to the GSA .................................................. 48

 B. Mr. Safavian's Statements Were Not False Let Alone Corruptly Designed to Obstruct ........................................................................................... 52

V. COUNT FIVE MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO DEMONSTRATE THAT MR. SAFAVIAN DID FALSIFY OR CONCEAL ANY MATERIAL FACTS IN HIS RESPONSE TO THE SENATE COMMITTEE ON INDIAN AFFAIRS. ........................................................ 54

# TABLE OF CONTENTS
(continued)

**Page**

A.    Mr. Safavian Did Not Conceal Any Material Information Nor Did the Circumstances Create a Duty to Disclose Such Information ............................... 55

B.    Mr. Safavian Accurately Represented to the Committee that Abramoff Had No Business Before the GSA ......................................................... 57

C.    Mr. Safavian's Statements Regarding Abramoff Were Immaterial to, and Were Not Within the Jurisdiction of, the Committee's Investigation into Alleged Fraud Against Indian Tribes .................................................. 58

VI.    COUNTS ONE AND FOUR MUST ALSO BE DISMISSED WITH RESPECT TO THE 18 U.S.C. § 2 CHARGES. ................................................................ 60

## TABLE OF AUTHORITIES

### FEDERAL CASES

*United States v. Aguilar*, 515 U.S. 593 (1995) ...................................................................54

*Arthur Andersen, LLP v. United States*, 125 S. Ct. 2129 (2005).......................................39

*United States v. Barrett*, 111 F.3d 947 (D.C. Cir. 1997) ....................................................54

*United States v. Bass*, 404 U.S. 336 (1971) ........................................................................3

*Brogan v. United States*, 522 U.S. 398 (1998)..................................................................142

*Bronston v. United States*, 409 U.S. 352 (1973)...........................................................22, 24

*United States v. Buckley*, 192 F.3d 708 (7th Cir. 1999)................................................41, 54

*United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998)..............................................48

*United States v. Clifford*, 426 F. Supp. 696 (E.D.N.Y. 1976) .............................................2

*Crandon v. United States*, 494 U.S. 152 (1990) ..................................................................3

*United States v. Crop Growers Corp.*, 954 F. Supp. 335 (D.D.C. 1997) .................. passim

*United States v. Curran*, 20 F.3d 560 (3d Cir. 1994).....................................................33, 43

*Dowling v. United States*, 473 U.S. 207 (1985).....................................................................3

*United States v. Ehrlichman*, 379 F. Supp. 291 (D.D.C. 1974).........................................16

*United States v. Gahagan*, 881 F.2d 1380 (6th Cir. 1989) ..........................................18, 19

*United States v.  Garrett*, 720 F.2d 705 (D.C. Cir. 1983)..................................................61

*United States v. Gatewood*, 173 F.3d 983 (6th Cir. 1999)............................................20, 22

*United States v. Gaudin*, 515 U.S. 506 (1995)............................................................36, 59

*United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987) ...............................................33, 43

*Gojack v. United States*, 384 U.S. 202 (1966) ..................................................................50

*United States v. Hess*, 124 U.S. 483 (1888).................................................................57, 61

# TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Kanchanalak*, 37 F. Supp. 2d 1 (D.D.C. 1999) ................................41, 61

*United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999) .....................3, 14, 38, 57

*Kungys v. United States*, 485 U.S. 759 (1988)..................................................36

*United States v. Lambert*, 501 F.2d 943 (5th Cir. 1974)......................................2

*United States v. Lanier*, 520 U.S. 259 (1997)........................................... passim

*United States v. Lattimore*, 127 F. Supp. 405 ........................................... passim

*United States v. London*, 550 F.2d 206 (5th Cir. 1977)................................ passim

*United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991)........................... passim

*United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986)................................34, 43

*United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987)....................................3

*United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994)........................20, 28

*United States v. Mitchell*, 877 F.2d 294 (4th Cir. 1989)..................................48

*Morgan v. United States*, 159 F.3d 85 (10th Cir. 1947) ....................................61

*United States v. Moses*, 94 F.3d 182 (5th Cir. 1996)............................20, 22, 28

*Moskal v. United States*, 498 U.S. 103 (1990)..................................................3

*Nye & Nissen v. United States*, 336 U.S. 613 (1949)........................................60

*United States v. Poindexter*, 725 F. Supp. 13 (D.D.C. 1989) ...........................48

*United States v. Price*, 951 F.2d 1028 (9th Cir. 1991).....................................38

*United States v. Race*, 632 F.2d 1114 (4th Cir. 1980) ................................18, 19

*United States v. Rodgers*, 466 U.S. 475 (1984) ........................................34, 56

*United States v. Rowe*, 144 F.3d 15 (1st Cir. 1988)..........................................4

*United States v. Rumely*, 345 U.S. 41 (1952)..........................................47, 50

## TABLE OF AUTHORITIES
(continued)

**Page**

*Russell v. United States*, 369 U.S. 749 (1962) ...........................................................60, 61

*Sacher v. United States*, 356 U.S.576 (1958) ...................................................................46

*United States v. Shannon*, 836 F.2d 1125 (8th Cir. 1988) ...........................................30, 42

*United States v. Surasky*, 976 F.2d 242 (5th Cir. 1992)....................................................54

*Watkins v. United States*, 354 U.S. 178 (1957).......................................................... 48-51

*United States v. Weinstock*, 231 F.3d 699 (D.C. Cir. 1956) ...................................... passim

*Wilkerson v. United States*, 365 U.S. 399 (1961) ............................................................47

*United States v. Woodward*, 469 U.S. 105 (1985)................................................32, 42, 55

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 7353.....................................................................................................................27

31 U.S.C. § 1058 (1976 ed.) ...............................................................................................33

18 U.S.C. § 1001 ......................................................................................................... passim

18 U.S.C. § 1505 ......................................................................................................... passim

18 U.S.C. § 2 .......................................................................................................................14

18 U.S.C. § 1515 ..................................................................................................................52

5 C.F.R. § 2635 et seq..................................................................................................passim

5 C.F.R. § 2638 et seq..................................................................................................passim

## MISCELLANEOUS

*Standards of Ethical Conduct for Employees of the Executive Branch,* 56 Fed.
    Reg. 33778-01, at 33778 (July 23, 1991)....................................................................27

Act of Mar. 2, 1863, ch. 67, 12 Stat. 696-697 ...................................................................2

Exec. Order No. 11,222, 30 Fed. Reg. 6,469 (May 8, 1965).............................................2

**TABLE OF AUTHORITIES**
(continued)

**Page**

Fed. R. Crim. P. 7(c) ........................................................................................................60

S. Res. 4, § 105(b)(2) ...................................................................................................49, 50

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES of AMERICA**,

v.

**DAVID HOSSEIN SAFAVIAN,**                                    **Criminal No. 05-370 (PLF)**

Defendant

### DEFENDANT DAVID H. SAFAVIAN'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION TO DISMISS THE INDICTMENT

The charges in the Indictment are all predicated on the central allegation that Mr. Safavian lied in his July 25, 2002 ethics request, when he said that the trip's host, lobbyist Jack Abramoff, "has no business before the GSA." The government contends that the initial statement, as well as each subsequent iteration, is the basis for separate criminal charges for making false statements (Counts Two, Three, and Five) and obstruction of justice, based on the submission of false statements (Counts One and Four).[1]

The application of the false statements statute to an ethics opinion request is completely unprecedented. It appears that there has never been a § 1001 prosecution for statements made in a request for a formal advisory opinion, let alone general internal ethics advice, in almost a century and a half of the statute's existence and the forty years of overlap with the executive standards. See Act of Mar. 2, 1863, ch. 67, 12 Stat. 696-697; Exec. Order No. 11, 222, 30 Fed. Reg. 6,469 (May 8, 1965). Indeed, we have yet to find a single case that involves a prosecution based upon a request for an ethics opinion.

---

[1] The Indictment also alleges that Mr. Safavian violated 18 USC § 2 while he was obstructing justice. However, neither charge (Counts One and Four) specifies whether the violation pertains to § 2(a) or § 2(b) or provides *any* factual basis for an aiding and abetting offense. Indictment ¶¶ 22-27; 32-38. See infra Part VI.

The circumstances at bar hardly present an opportunity for bucking precedent. Mr. Safavian did not even seek to rely on the ethics opinion he received, but rather, after receiving further advice from GSA counsel McKenna, decided to pay for the trip. See McKenna 302 (Insp. Ex. 4) at DOJ-DS006969-70.[2] Needless to say, dangling a felonious sword before the voluntary solicitation of counsel's general advice would chill this desirable activity.

Furthermore, as detailed later, the government seeks to hold Mr. Safavian accountable for alleged statements where there is no context for such statements – either questions or alleged answers from him. In a prosecution for knowingly and willfully making a false statement, in the absence of evidence indicating "what question was asked and what response was given," a finding that a false statement was made is unreasonable and cannot stand. United States v. Clifford, 426 F. Supp. 696, 703 (E.D.N.Y. 1976); see also United States v. Lambert, 501 F.2d 943, 948 (5th Cir. 1974). Furthermore, as our separate Motion to Inspect the Grand Jury Record demonstrates, significant discrepancies in the characterization of Mr. Safavian's statements further demonstrate that this case cannot proceed.[3]

In addition to these deficiencies, as described below, the regulatory or ethics framework at issue have no definition whatsoever for any of the relevant terms involved here – whether characterized as "doing business," "seeking to do business," or otherwise. "In the criminal context, courts have traditionally required greater clarity in draftsmanship than in civil contexts,

---

[2]     McKenna's 302, and all other 302s and notes thereof cited in this Memorandum, are referenced as exhibits in the Jan. 27, 2006 Motion to Inspect Grand Jury Records and will be referenced as "Insp. Ex."

[3]     See, e.g., United States v. Poutre, 646 F.2d 685 (1st Cir. 1980) (finding oral evidence too fragile to support a guilty verdict in a prosecution charging crime of making false statements to special agents of Internal Revenue Service where a transcript of some answers had been taken with no apparent constraint on the interrogators to cut short their inquiry, two of the three allegedly false answers were not included in such transcript, and one of the three statements was found only in a solitary prosecution witness' testimony without any contemporary corroboration).

commensurate with the bedrock principle that in a free country citizens who are potentially subject to criminal sanctions should have clear notice of the behavior that may cause sanctions to be visited upon them." United States v. McGoff, 831 F.2d 1071, 1077 (D.C. Cir. 1987) (citing Dowling v. United States, 473 U.S. 207, 218, 228-29 (1985)).

Moreover, an application of an agency's interpretation of regulations "must be sufficient clear to provide a defendant with fair notice of what is forbidden or required in order to satisfy the due process requirements of a criminal conviction." United States v. Ward, 2001 WL 1160168 *8 (E.D. Pa. 2001) (citing, inter alia, United States v. Kanchanalak, 192 F.3d 1037, 1042-43 (D.C. Cir. 1999)). In light of the absence of any established guidance or definitions whatsoever, the circumstances of this case simply are not within the purview of § 1001, and the government cannot show any fair notice to the defendant.

Finally, even if the Court has some pause on whether this case should go forward, the rule of lenity requires a court to dismiss criminal charges in "situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute." Moskal v. United States, 498 U.S. 103, 108 (1990) (citation omitted) (emphasis in original). This "canon of strict construction of criminal statutes . . . ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct *clearly covered*." United States v. Lanier, 520 U.S. 259, 266-67 (1997) (emphasis added); see also Crandon v. United States, 494 U.S. 152, 158 (1990) (concluding that "any ambiguity in the ambit of [a penal] statute's coverage" must be resolved against criminal prosecution); United States v. Bass, 404 U.S. 336, 347-48 (1971) (providing that ambiguous statutes be construed strictly in favor of the defendant under the rule of lenity); United States v. Rowe, 144 F.3d 15, 21-22 (1st Cir. 1988) (discussing principles underlying rule of lenity applied

in interpreting potentially ambiguous questions in a prosecution for making false statements in a bankruptcy proceeding).

Mr. Safavian disputes the allegations in the Indictment.  However, for the purpose of this motion, relying on the government's allegations, documents and witness statements as true, the Indictment is so fatally deficient on its face, that Mr. Safavian respectfully asks this Court to dismiss:

- Count One because the government cannot demonstrate obstruction of the GSA-OIG investigation into whether Mr. Safavian accepted a gift;

- Count Two because the government cannot show fair notice to the defendant, falsity of the statements, a legal duty to disclose, or that any alleged false statement was material;

- Count Three because the government cannot establish that Mr. Safavian did knowingly or willfully use a trick, scheme, or device to conceal any material facts for which he had a duty to disclose, or falsify any material facts through such means during the GSA-OIG investigation;

- Count Four because the government cannot demonstrate that Mr. Safavian's statements were pertinent to the Senate Committee on Indian Affairs Investigation, or that they were false and "corruptly" designed to obstruct the pending proceeding; and

- Count Five because the government fails to demonstrate that Mr. Safavian did knowingly or willfully use a trick, scheme, or device to conceal any material facts for which he had a duty to disclose, or falsify any material facts through such means in his response to the SCIA letter.

## FACT SUMMARY

### 1.      Scotland Trip and the Request for Ethics Advice

In early June 2002, Jack Abramoff ("Lobbyist A") invited David Safavian to attend a trip

to Scotland to play golf.  Indictment ¶17.  Before agreeing to go, Mr. Safavian e-mailed GSA

General Counsel Ray McKenna to request an ethics opinion regarding his attendance.  07/25/02

E-mail Request at DOJ-DDS007001 (Ex. 1).[4]  McKenna does not recall getting the e-mail from

Mr. Safavian.  See 11/07/05 McKenna FD-302 (Insp. Ex. 4) at DOJ-DS006969.  Then-GSA

Associate General Counsel, and Alternate Designated Agency Ethics Official, Eugenia Ellison

believes that McKenna forwarded the request to her to draft the response.  See 06/28/05 Ellison

Marked 302 (Insp. Ex. 5) at DOJ-DS007019.[5]  Neither Ellison nor McKenna recall speaking

with Mr. Safavian about the request before the response was purportedly returned to Mr.

Safavian the next day via e-mail.  See id. at DOJ-DS007019; McKenna 302 (Insp. Ex. 4) at DOJ-

DS006969.

The response informed that under the Standards of Ethical Conduct for Employees of the

Executive Branch, 5 C.F.R. § 2635.202 et seq., an executive "employee shall not solicit or accept

a gift from a prohibited sources or a gift given because of the employee's official position."

07/26/02 E-mail at DOJ-DS007002 [sic] (Ex. 2) (citing 5 C.F.R. § 2635.202).  It explained that

the term "prohibited source" covered any person who, inter alia, "[d]oes business or seeks to do

---

[4]      Count Two of the Indictment adds language to Mr. Safavian's July 25, 2002 e-mail.  It
says that he "falsely stated to the GSA ethics officer that Lobbyist A did not have any business
with *and was not seeking to do business with GSA* and that Lobbyist A did all his work on
Capitol Hill."  Indictment ¶ 29 (emphasis added).

[5]      The government has produced two versions of Ellison's June 21, 2005 302 interview.
See 06/21/05 Ellison Revised 302 at DOJ-DS006998 (Insp. Ex. 6) and 06/28/05 Ellison Marked
302 (Insp. Ex. 5).  On June 28, 2005, Ms. Ellison struck language and otherwise edited several
statements and terms from the government's original draft.  See Insp. Ex. 5.  For purposes of this
motion, the defense will rely upon the Marked 302.

business with the employee's agency." Id. (citing 5 C.F.R. § 2635.203(d)).  It concluded that "[s]ince the gift is not being offered by a prohibited source and the it is not being given because of your official position, the gift acceptance restrictions under 5 C.F.R. § 2635.202 do not apply to you.  Consequently, you may accept the gift of free air transportation." [*sic*]  Id.

McKenna recalls that shortly after the ethics opinion was sent, and before Mr. Safavian's departure for Scotland on August 3, 2002, he discussed Abramoff with Mr. Safavian and further advised Mr. Safavian that if Mr. Safavian paid for the trip, it would not be a gift.  Insp. Ex. 4 at DOJ-DS006970.  During their conversation, Mr. Safavian concurred that he would pay for the trip.  Id.

Mr. Safavian provided Abramoff with a check in the amount of $3,100 on the day of the Scotland flight.  See Indictment ¶ 25.  Nevertheless, Count Two alleges that Mr. Safavian "did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts, that is in connection with seeking to obtain a GSA ethics opinion regarding his travel" under 18 U.S.C. § 1001(a)(1).  The material fact alleged to be falsified and/or concealed is whether Mr. Abramoff "had business" with the GSA based on the inquiries Abramoff made regarding the availability of the Old Post Office ("OPO") and Naval Surface Warfare Center – White Oak ("White Oak") properties.

### 2.    Old Post Office Building and Naval Surface Warfare Center - White Oak Inquiries

On June 19, 2002, Abramoff e-mailed Mr. Safavian for information on leasing the OPO from GSA.  09/16/05 Criminal Complaint ("Compl.") ¶ 15.  Mr. Safavian informed Abramoff on July 25, 2002, that the Office of Management and Budget ("OMB"), consistent with an April 2002 GSA prospectus, had decided it was not going to lease the property: it was either going to "fix it up for a federal tenant or sell it."  Compl. ¶ 33; 07/25/02 e-mails at DOJ-DS001018-1019

6

(Ex. 3).  One week later, Abramoff advised Mr. Safavian that the GSA website had announced a delay of the OPO Request for Qualifications Process ("RFQ"), which would have been a preliminary step to opening up competitive procurement for the property.  08/01/02 e-mail at DOJ-DS001063 (Ex. 4).  As of September 2003, GSA had still not opened up the bidding process and there was discussion in the Senate about awarding the property to the National Women's History Museum.  OPO Fact Sheet at DOJ-DS0006182 (Ex. 5).  In fact, plans to outlease the OPO remain on hold by the OMB as of January 2006.

On June 30, 2002, Abramoff sent an e-mail to Mr. Safavian inquiring as to whether the GSA had control of the White Oak Federal Research Center in Silver Spring, Maryland.  Compl. ¶ 21.  Mr. Safavian responded that as far as he knew, GSA did have control, but that it had not fully allocated the property and was first going to "survey[] whether any other federal agencies [were] interested."  Compl. ¶ 17.  Only if all agencies passed on the property, would the GSA consider private disposal.  Id.

On July 26, 2002, Mr. Safavian forwarded to Abramoff a series of e-mails from GSA official Sharon Jenkins, who in response to inquiries on behalf of the Capital Athletic Foundation from "the Hill," stated that GSA could not accommodate the request for occupancy at White Oak because "we're not considering disposal at this time.  However, we will be assessing federal needs in the fall."  07/25/02 e-mail at DOJ-DS001034-36 (Ex. 6).  Abramoff asked Mr. Safavian whether GSA had the ability to give a short term lease.  Compl. ¶ 31.  An August 2, 2002 meeting was scheduled with Pam Abramoff and Tony Costa, a GSA official.  Compl. ¶ 47.  Mrs. Abramoff came back from the meeting that afternoon and told Abramoff that the "White Oaks property is dead."  08/02/02 e-mail at DOJ-DS007062-63 (Ex. 7).

3.     **GSA-OIG Inquiry**

On March 27, 2003, an agent with the GSA Office of Inspector General ("GSA-OIG"), Gregory Rowe, interviewed Mr. Safavian pursuant to an allegation made in a March 26, 2003 anonymous hotline complaint.  The faxed complaint stated that: "It is my understanding that short? [*sic*] after his appointment to GSA [Safavian] participated in an international golfing trip provided by lobbyists."   03/26/03 Hotline Complaint (Ex. 8) at DOJ-DS001470.   The complainant also alleged that "[I]n November of 2002 h@ [*sic*] participated in political campaigns in other states.  During these activities he used his gavernmeng cellphone. computer and Blackberry." [*sic*] Id.

The GSA-OIG conducted interviews with Mr. Safavian on March 27 and April 25, 2003, regarding these allegations.  Concerning the first inquiry into Mr. Safavian's alleged acceptance of an international golf trip as a gift, the GSA-OIG concluded the investigation because:

> Safavian did make a golf trip to Scotland, British Isles, while on annual leave from GSA, with a group of eight people to include a congressman and two congressional staff members.   According to Safavian, Jack Abramoff, an attorney with Greenberg and Traurig, arranged the trip. Safavian worked for Jack Abramoff in 1995 at Preston, Gates, and Ellis law firm and has maintained a friendship since that time.  Currently, Jack Abramoff is a professional lobbyist, however he does not have any business relationship with GSA.  Jack Abramoff calculated the cost of the trip to be $3,100, which included airfare, hotels and golf green fees.  A copy of the cancelled check was provided during the interview (see attachment [check]).

05/09/03 GSA-OIG Rep. at DOJ-DS001431-32 (Insp. Ex. 1).  The report also closed the Hatch Act investigation without further action or referral.  Id.  The GSA-OIG forwarded the report to then-GSA Administrator, Stephen Perry, on May 15, 2003, informing that "[o]ur investigation did not substantiate any of the allegations."  05/15/03 GSA-OIG Report at DOJ-DS001479 (Ex. 9).  There is no evidence that the GSA-OIG initiated any further contact with Mr. Safavian or the Department of Justice concerning these matters.

Nevertheless, Count One charges that Mr. Safavian "did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law in a proceeding . . . conducted by the GSA-OIG" into whether his participation in an international golfing trip was provided by lobbyists. Indictment ¶ 27. Count Three charges that Mr. Safavian "did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts" in the investigation being conducted by the GSA-OIG. Indictment ¶ 31.

### 4. The Senate Committee on Indian Affairs Investigation of Indian Tribe Fraud

On February 22, 2004, <u>The Washington Post</u> published a story concerning the payment of approximately $45 million by Indian gaming tribes to Abramoff, and Michael Scanlon, a lobbyist and former aide to then-House Majority Leader Tom DeLay. According to the article, the tribes made the payments to Abramoff and Scanlon to lobby members of Congress. <u>See</u> Susan Schmidt, *A Jackpot From Indian Gaming Tribes*, WASH. POST, Feb. 22, 2004 at A7 (Ex. 10).

In March 2004, Senator John McCain, a member of the Senate Committee on Indian Affairs ("SCIA"),[6] initiated an investigation into whether Abramoff and Scanlon defrauded the tribes. Indictment ¶ 33. On September 29, 2004, the SCIA initiated a series of hearings into the allegations against Abramoff and Scanlon. <u>Id.</u> ¶ 34.

The hearings were entitled "Oversight Hearing In re Tribal Lobbying Matters, et al." The statements of the Chairman of the SCIA at the time, Senator Ben Nighthorse Campbell, Vice

---

[6]    Senator McCain was elected chairman (a position he still holds) of the SCIA in January 2005.

Chairman Senator Daniel Inouye, and Senator McCain at this first hearing also make clear the scope and purpose of the investigation:

> The Committee today is launching the first in a planned series of hearings into allegations of improprieties by Mr. Jack Abramoff and Mr. Michael Scanlon involving lobbying and so-called grassroots political activities on behalf of Indian tribes.

Oversight Hearing Before the Senate Comm. on Indian Affairs In Re Tribal Lobbying Matters, et al., 108th Cong. 1 (2004) (statement of Sen. Ben Nighthorse Campbell, Chairman, SCIA), available at <http://indian.senate.gov/2004hrgs/092904hrg/092904wit_list.htm>.

The SCIA investigative staff had a similar understanding of the scope and purpose of their work.  In his September 30, 2005 interview with the FBI, Pablo Carrillo, SCIA Chief Investigative Counsel, explained that the SCIA was "investigating allegations of misconduct by Indian tribes against Jack Abramoff and Michael Scanlon."  Carrillo 302 (Insp. Ex. 9) at DOJ-DS001617.  Likewise, Bryan David Parker, SCIA Deputy Chief Investigative Counsel, has said that his role was to "investigat[e] allegations of fraud against the Indian tribes."  Parker 302 (Insp. Ex. 11) at DOJ-DS001610.  Parker (according to his statement to the FBI) advised Mr. Safavian of this purpose -- "to investigate fraud against the tribes" -- in a March 1, 2005 conversation concerning a request for records relating to the 2002 Scotland trip.  Id. at DOJ-DS001612.

### 5.    The SCIA Document Request

Since Mr. Safavian was one of the August 2002 trip attendees, SCIA counsel sent a document request in Senator McCain's name to Mr. Safavian's home address to obtain his trip records.  Id. at DOJ-DS001611.[7]  The document request explained that "the [SCIA] is

---

[7]    Senate Investigative Counsel Carrillo could not recall if Senator McCain ever specifically authorized this document request in his FBI interview.  Carrillo 302 (Insp. Ex. 9) at DOJ-

investigating allegations of misconduct made by several Indian tribes against their lobbyists and other representatives." Feb. 23, 2005 SCIA Ltr. (Ex. 11). Accordingly, it asked for "all records reflecting referring, or relating to the 2002 Scotland golf trip you attended with Mr. Jack Abramoff and others." Id.

Mr. Safavian called Dep. Counsel Parker to acknowledge receipt of the request on March 1, 2005. Parker 302 (Insp. Ex. 11) at DOJ-DS001612. According to the September 30, 2005 FBI interview, Parker recollects that Mr. Safavian stated in this conversation that he had been "cleared" by the GSA's ethics counsel to attend the Scotland trip and had "disclosed his friendship with Abramoff to them [ethics counsel]." Id. at DOJ-DS001612; see also Agent Saler Notes on Parker 302 (Insp. Ex. 10) at DOJ-DS007030. Parker did not ask Mr. Safavian to describe his relationship with Abramoff, but did ask for a copy of the 2002 ethics opinion. Id.; see also Insp. Ex. 10 at DOJ-DS007031. Mr. Safavian told them he would seek to find and provide it (and referred Parker to contact McKenna and Ellison). Id. That same day, Safavian asked Eugenia Ellison for the e-mail opinion. Ellison faxed a copy. 03/01/05 Ellison Fax (Ex. 12).

By the middle of March 2005, and before Mr. Safavian responded to the document request, SCIA counsel decided that they "needed to advance the ball on the investigation of fraud against the tribes, so they never did an interview of Safavian." Parker 302 (Insp. Ex. 11) at DOJ-DS001611; Agent Saler's Parker 302 Notes (Insp. Ex. 10) at DOJ-DS007031 ("[Parker] probably made decision to focus on fraud pre-Safavian [March 17, 2005] letter.") Mr. Safavian submitted his document response on March 17, 2005. (Ex. 13) at DOJ-DS001557-58. The response included a cover letter. The letter noted his long-standing relationship with Abramoff. It also

DS001618. Senate counsel Parker believes that Senator McCain did not sign the letter but did authorize it. Parker 302 (Insp. Ex. 11) at DOJ-DS001614.

informed that the GSA Office of General Counsel had "determined that the trip did not meet the definition of a 'gift from a prohibited source,' since Abramoff was not conducting business before GSA," but that "in the exercise of caution, [he] gave Abramoff a check for the value of the trip prior to departure [and] took leave without pay to travel." Id. Mr. Safavian included: a) a copy of his e-mail to Ray McKenna seeking advice on the invitation; b) Eugenia Ellison's response; and c) a cancelled check and bank statement showing the payment by check of $3,100 to Abramoff by Mr. Safavian. Id. Mr. Safavian said that he had no other records concerning the August 2002 trip and invited the Senator to contact him for additional information. Id.

Mr. Safavian called Parker shortly after producing documents about whether there would be an interview. Parker 302 (Insp. Ex. 11) at DOJ-DS001612. Mr. Parker told him that he [Safavian] was just a "check the box interview" and that he would eventually get to him. Parker 302 Notes (Insp. Ex. 10) at DOJ-DS007031. Mr. Safavian was never contacted for an interview or any other matter by the Senate counsel or any other SCIA official.

On September 23, 2005, approximately two weeks *after* the filing of the September 16, 2005 Complaint and one week before the return of the October 5, 2005 Indictment, the Department of Justice solicited FBI-302 interviews of Parker and Carrillo. See 09/28/05 Senate Ltr. (Ex. 14) at DOJ-DS001621. In their September 30, 2005 interviews, both Parker and Carrillo stated that Safavian's statements had "*no impact*" on their investigation into Indian tribe fraud. Parker 302 Notes (Insp. Ex. 10) at DOJ-DS007034 (emphasis added); Notes of Agent Saler for Carrillo 302 at DOJ-DS007026. (Insp. Ex. 8) (emphasis added). Counts Four and Five of the Indictment, however, charge that Mr. Safavian did "knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper exercise of [SCIA] power of inquiry" under 18 U.S.C. §§ 1505, 2 (Count Four), and did "knowingly and

willfully falsify, conceal, and cover up by a trick, scheme, and device material facts" under 18 U.S.C. § 1001 (Count Five).

## ARGUMENT

**I.     COUNT TWO MUST BE DISMISSED BECAUSE THE GOVERNMENT CANNOT SHOW FAIR NOTICE TO THE DEFENDANT, FALSITY OF THE STATEMENTS, A LEGAL DUTY TO DISCLOSE, OR THAT ANY ALLEGED FALSE STATEMENTS WERE MATERIAL**

The central allegation in the Indictment is the allegation in Count Two that Mr. Safavian made false statements in connection with his request for an ethics opinion about the golfing trip to Scotland. Indictment at ¶¶ 28-29. Perhaps recognizing the weakness of this centerpiece of the Indictment, the government does not lead off with this allegation. Indeed, the government places this allegation into Count Two, rather than Count One, where it temporally[8] and logically belongs. Because the ethics opinion request allegations in Count Two pre-date all of the other allegations in the Indictment -- and because these fatal allegations infect the later allegations – this motion begins with Count Two.

Regardless of the placement in the Indictment, it is plain that Count Two must be dismissed because it suffers from fatal defects as a matter of law. First, the unprecedented application of 18 U.S.C. § 1001 to a request for an ethics opinion – which has never been attempted to our knowledge – violates basic principles of fair notice and due process. Second, Count Two must be dismissed because it is based upon alleged statements and a regulatory framework that are fundamentally ambiguous, thus falling squarely within judicial decisions that hold that such § 1001(a)(1) allegations must be dismissed as a matter of law. As a corollary to

---

[8]     Count Two alleges that Mr. Safavian committed acts from May 2002 to August 2002 "in connection with seeking and obtaining a GSA ethics opinion regarding his travel," Indictment ¶ 29, while Count One alleges that he committed acts from March 27, 2003 to May 2003, in connection with the GSA-OIG's investigation of the trip. Indictment ¶ 27.

this argument, the government simply will not be able to show that defendant's statements were falsified by a trick, scheme, or device as a matter of law.  Third, to the extent that the Indictment alleges a concealment violation under § 1001, the allegations must fail because the government cannot show that Mr. Safavian engaged in any scheme or that he was under any duty to disclose. Finally, the government cannot show that any alleged misstatements were material.   As detailed below, courts have not hesitated to dismiss allegations *as a matter of law* where they suffer the defects evident in this Indictment.

### A.    The Unprecedented Application of 18 U.S.C. § 1001 To the Alleged Statements at Issue Here Must Be Dismissed As a Matter of Law

Section 1001 of Title 18, to be sure, prohibits a wide range of false statements to the government.  See, e.g., Brogan v. United States, 522 U.S. 398 (1998) (concluding that the statute prohibits simple denials of guilt to IRS agents).  The statute is not boundless, however.  Indeed, the statements must be made in a context that gives the individual some notice of the potential consequences of alleged false statements.   Because Count Two utterly fails to satisfy the strictures of fair notice, due process, and the rule of lenity, it must be dismissed as a matter of law.

As our Circuit recognized in Kanchanalak, 192 F.3d at 1046, the "Due Process Clause of the Fifth Amendment prohibits punishing a criminal defendant for conduct 'which he could not reasonably understand to be proscribed.'"   Id. (quoting United States v. Harriss, 347 U.S. 612, 614 (1954)).   The Court further recognized that the "Supreme Court has held that this 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal."   Id. (quoting Lanier, 520 U.S. at 266); see also United States v. Crop Growers Corp., 954 F. Supp. 335, 344-50 (D.D.C. 1997) (dismissing § 1001 allegations on the grounds that "the predicate for

14

criminal behavior must be set out with sufficient clarity to put a potential defendant on notice that the conduct is proscribed").

The Supreme Court has recognized that there are various "manifestations of the fair warning requirement." Lanier, 520 U.S. at 266. "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267. According to Lanier,

> [A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope[.].

Id. at 266 (citations omitted); see also id. (citing H. Packer, The Limits of the Criminal Sanction 79-96 (1968) (discussing "principle of legality," "that conduct may not be treated as criminal unless it has been so defined by [a competent] authority ... before it has taken place," as implementing separation of powers, providing notice, and preventing abuses of official discretion)).[9]

Count Two of the Indictment suffers numerous flaws under any fair notice or due process analysis, and accordingly must be dismissed. Federal courts have emphasized that a prosecution cannot be based upon statements where there are no safeguards for ensuring that a defendant is on notice of a possible violation. As the Court stated in United States v. Ehrlichman, 379 F.

---

[9]     As the Supreme Court recognized in Kolender v. Lawson, 461 U.S. 352, 357 (1983), a criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."   See also United States v. Handakas, 286 F.3d 92, 111 (2d Cir. 2002) ("The principle that a statute must provide both 'notice' and 'explicit standards' to survive an 'as-applied' constitutional challenge based on vagueness is well established.") (emphasis added).

Supp. 291, 291-92 (D.D.C. 1974),[10] for example, a prosecution cannot occur where the statements are made under "extremely informal circumstances which do not sufficiently alert the person interviewed to the danger that false statements may lead to a felony conviction." Courts are particularly concerned in situations where there is no requirement of oath, no strict rule of materiality, no obligation to speak, and no guarantee that the proceeding will be transcribed or reduced to memorandum. Id. (dismissing § 1001 charges based upon FBI interview).

In this case, Mr. Safavian's e-mail was not responding to a GSA counsel query, let alone a review or investigation into conduct. It was not even a request for a "formal advisory opinion" from the United States Office of Government Ethics ("OGE"). 5 C.F.R. § 2638.301(b). The e-mail simply sought counsel as to *whether* accepting a gift of airfare *would* violate ethics rules. See DOJ-DS007001 (Ex. 1). In connection with this informal request, there certainly was no oath, no warnings, and no notice that a request for legal advice[11] would subject him to any alleged false statements. Indeed, the regulations provide that the consequence for an alleged failure to provide full information is potential prosecution for the underlying conduct, and an inability to rely upon any ethics advice given. 5 C.F.R. § 2635.107(b). Here, of course, Mr. Safavian has not been charged with the underlying conduct and, in fact, after additional advisement from ethics officials, decided to pay for his portion of the trip. The decision not to

---

[10]    Ehrlichman did not rely upon due process for its holding, but rather held that a particular FBI interview was not within the purview of Section 1001. We submit that the Indictment fails here, whether construed as a due process violation, or construed as an issue related to the scope of Section 1001.

[11]    Mr. Safavian directed his request to Ray McKenna – then General Counsel of GSA. The government not only cannot show that a request for legal or ethics advice is subject to Section 1001 or provided fair notice under the facts of this case, but such a rule would lead to a perverse result. Under the government's theory, an individual would need to seek legal or ethics advice about the specific language and characterizations in the request before making such a request. Indeed, any alleged statements focused upon "business," "seeks to do business," "seeking to do business," or otherwise, are either legal definitions, or ambiguous statements of fact.

act solely on the July 26, 2002 Ellison e-mail, made in consultation with the General Counsel, see DOJ-DS006969-70 (Insp. Ex. 4), further defeats the ability of the government to show the proper application of § 1001 to the circumstances of this case.

> **B.    Even if § 1001 Could Reach the July 25, 2002 Ethics Request, The Government Cannot Show Falsity By Trick, Scheme, or Device As a Matter of Law**

Even if the alleged statements related to the ethics request could be subject to prosecution under § 1001, the allegations must be dismissed in this case because the government cannot show falsity as a matter of law based upon three independent grounds:  (1) the government cannot show that Mr. Safavian's statements were not truthful or, more precisely, cannot negate interpretations that would make the statements accurate, (2) fundamental ambiguity infects the alleged statements at issue, and (3) the government cannot rely upon an ambiguous regulatory framework to support a § 1001 claim.  As demonstrated below, federal courts have not hesitated to dismiss charges, *as a matter of law*, where any of these three grounds have been shown.

> **1.    The Government Cannot Negate Interpretations of the Statements That Would Make Them Truthful**

The Indictment claims that Mr. Safavian falsely stated "that Lobbyist A did not have any business with and was not seeking to do business with GSA and that Lobbyist A did all his work on Capitol Hill, when in truth and in fact, as defendant Safavian well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property." Indictment (Count Two) ¶ 29.  The government bases its Indictment on a crucial false premise: it claims that Mr. Safavian "stated to the GSA ethics officer that Lobbyist A . . . was not *seeking to do business* with GSA."  Indictment ¶ 29 (emphasis added).

*The July 25, 2002 ethics request makes no such representation.*  Rather, Mr. Safavian wrote to GSA counsel McKenna:  "the host is a lawyer and lobbyist, but one that has no business

before GSA (he does all of his work on Capitol Hill)." DS-DOJ007001 (Ex. 1). Both Ellison and McKenna have *no* recollection of speaking with Mr. Safavian about the request prior to McKenna purportedly returning the e-mail opinion to Mr. Safavian the next day. Ellison 302 at DOJ-DS007019 (Insp. Ex. 5); McKenna 302 at DOJ-DS006969 (Insp. Ex. 4). The e-mail opinion concluded that: "You stated that neither Mr. Abramhoff [*sic*] nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend." DOJ-DS007002 (Ex. 1).

As the Court is aware, the government vigorously opposed the defendant's motion to compel the disclosure of the 302s of Ellison and McKenna. That vigorous opposition is now understandable since those 302s demonstrate that there is *no support* for the allegation that Mr. Safavian stated that Abramoff "did not have any business with and *was not seeking to do business* with GSA." Indictment (Count Two) ¶ 29 (emphasis supplied). Therefore, insofar as Count Two alleges that Mr. Safavian falsely represented to the ethics counsel that Abramoff was not "seeking to do business" before the GSA, that portion of the Indictment is without foundation in either law or fact and must therefore be dismissed.

The only statement to a government official at issue for Count Two is Mr. Safavian's representation in his e-mail that the Lobbyist "ha[d] no business with the GSA, (he does all of his work on Capitol Hill)." This statement is accurate. On July 25, 2002, Abramoff had no business with the GSA, and an indictment for a false statement cannot survive if it is premised on a statement that on its face is not false. United States v. Crop Growers Corp. 954 F. Supp. 335, 349 (D.D.C. 1997) (listing § 1001 elements); United States v. Gahagan, 881 F.2d 1380, 1383 (6th Cir. 1989) (reversing a conviction because defendant's denial was "on its face not a false representation"); United States v. Race, 632 F.2d 1114, 1120 (4th Cir. 1980) (reversing

defendant's conviction because the government failed to establish the defendant willfully submitted the reimbursement invoices knowing the certifications to be false).[12]

Abramoff's expressions of interest in the White Oak and Old Post Office facilities in June and July 2002, properties which were not available for competitive procurement or disposal on July 25, 2002, do not rise to the level of doing "business" as that term has been used by OGE. See 5 C.F.R. § 2638.102. As OGE explained in response to a query as to "whether a senior procurement official and his wife could accept meals from a contractor that [was] competing for a government contract following a solicitation of bids," a "competing contractor is a prohibited source because it seeks to do business with the agency [and] [e]ven a contractor that is not presently competing for new business with the agency is a prohibited source if it is actually doing business with the agency pursuant to existing arrangements." Letter to a Federal Employee from Marilyn L. Glynn, Acting Director, Office of Government Ethics (Jan. 7, 2004) (Ex. 15). Id. In other words, a source is "doing business" when it has "existing agreements" with the agency and is "seeking to do business" after it has actually placed one of the solicited bids. See id.[13]

It is undisputed that Abramoff was not a contractor with the GSA or that he had any contractual agreement with the GSA. It was an impossibility. The GSA was "not considering disposal" of the White Oak property at the time and would still be assessing whether federal agencies needed the property in the fall. (Ex. 6) at DOJ-DS-001035. Likewise, Mr. Safavian informed Abramoff on July 25, 2002 that OMB had decided it was not going to outlease OPO or

---

[12]     See also United States v. Dale, 991 F.2d 819, 832-33 n.22 (D.C. Cir. 1993) (adopting the burden of proof announced in Gahagan and Race).

[13]     Accordingly, even if the Court assumes that Mr. Safavian said "seeking to do business," the government also cannot show that the statement is false as a matter of law.

open up the bidding process at that time, it was either going to "fix it up for a federal tenant or

sell it."  (Ex. 3) at DOJ-DS-001019, and that it would take legislation or legislative pressure to

alter OMB's approach.  Id. at DOJ-DS001018.  As Abramoff himself learned on August 1, 2002,

the GSA had delayed its issuance of the RFQ, a preliminary step to competitive procurement.

08/01/02 e-mail at DOJ-DS-001063 (Ex. 4).  Indeed, as of September 2003, GSA had not even

opened up the bidding process.  OPO Fact Sheet at DOJ-DS0006182 (Ex. 5).  Its status remains

the same as of January 2006.

 Accordingly, Mr. Safavian's alleged representation that Abramoff had no business with

the GSA was, in fact, truthful under the OGE construction of regulations applicable to the

GSA.[14]  The government cannot sustain its burden of "negat[ing] any reasonable interpretations

that would make a defendant's statement factually correct" based on the information it has

provided.  United States v. Migliaccio, 34 F.3d 1517, 1525 (10th Cir. 1994); see also United

States v. Gatewood, 173 F.3d 983, 988 (6th Cir. 1999) (holding evidence to be insufficient to

support conviction because government failed to negate "any reasonable interpretation that

would make the defendant's statement factually correct") (citation omitted); United States v.

Moses, 94 F.3d 182, 188 (5th Cir. 1996) (vacating conviction where the alleged statement

forming the basis of the violation, making false statements on an INS form, was "true on its

face").  Because Mr. Safavian's statements in this regard were true on their face, and a

---

[14] Eugenia Ellison herself in June 28, 2005 edits to the government's 302 report for the June 21, 2005 interview said as much.  She struck out the government's attempt to put words in her mouth on this key point.  Where the 302 says that having reviewed three e-mails between Safavian and Abramoff (actually sent after the ethics opinion was released), Ellison performed the following strikes: "Safavian's statement that 'the host is a lawyer and lobbyist, but one that has no business before GSA (he does all his work on Capitol Hill)' was ~~not true~~."  Marked 302 (Insp. Ex. 5) at DOJ-DS007021.

reasonable interpretation of those statements render them factually correct, the government has failed to allege actionable conduct under § 1001 and Count Two must therefore be dismissed.[15]

### 2.    The Government Cannot Maintain This Action Based Upon Fundamental Ambiguities

As demonstrated above, the government cannot show that Mr. Safavian's statements were false as a matter of law.  The government, no doubt, will argue that these issues should be submitted to a jury.  Federal courts, however, have soundly rejected these arguments where there is fundamental ambiguity surrounding the statements, and accordingly have dismissed allegations as a matter of law.  See United States v. Culliton, 328 F.3d 1074, 1078 (9th Cir. 2003) (finding that excessive vagueness or fundamental ambiguity in questions may not, *as a matter of law*, form the basis of a prosecution for perjury or false statement; no ambiguity found on facts of case), cert. denied, 540 U.S. 1111 (2004); United States v. Manapat, 928 F.2d 1097, 1099-1102 (11th Cir. 1991) (affirming dismissal of § 1001 charge and holding that, *as matter of law*, questions about traffic and criminal convictions on a medical history form were so fundamentally ambiguous as to preclude conviction under § 1001); United States v. Lattimore, 127 F. Supp. 405, 409-10 (D.D.C.) (dismissing a perjury indictment, *as a matter of law*, because the questioning was ambiguous and terms were vague), aff'd by an equally divided court, 232 F.2d 334 (D.C. Cir. 1955).[16]  As the Court stated in Manapat, "[I]n order to successfully

---

[15]    Notably, because the government has brought action under 18 U.S.C. § 1001(a)(1) as opposed to 18 U.S.C. § 1001(a)(2), it must also allege and demonstrate that Mr. Safavian made false statements through an affirmative act of "trick, scheme, or device."  See United States v. London, 550 F.2d 206, 212 (5th Cir. 1977) (holding that the "trick, scheme, or device" language must be given effect.).  It has not done so.

[16]    In Lattimore, 127 F. Supp. at 406, the prosecution indicted the defendant for committing perjury before a Senate sub-committee for denying that he was a "follower of the Communist line."  The court held that this phrase had no uniform, commonly accepted definition and that the jury would have to engage in "groundless surmise" to determine the meaning which defendant

prosecute an indictment for making a false statement, the prosecution must not remove questions from the context which their answers were given in an attempt to prove their clarity."  928 F.2d at 1101.

The fundamental ambiguity principle as applied to § 1001 has its roots in perjury prosecutions.  As the Supreme Court recognized in <u>Bronston v. United States</u>, 409 U.S. 352, 362 (1973), "[p]recise questioning is imperative as a predicate for the offense of perjury."  Indeed, the application of these fundamental ambiguity principles to the facts of this § 1001 case is even more imperative in light of the complete lack of any of the safeguards generally associated with a perjury charge – such as a verbatim transcript of the proceedings, specific warnings of the penalty for false statements, and the typical judicial or grand jury setting alerting the speaker to the need for precision in answering questions.  Numerous courts have recognized the applicability of these principles in setting aside perjury charges or charges under § 1001.[17]

---

attributed to this phrase.   <u>Id.</u> at 409.  Hence, the question was fundamentally ambiguous and could not support a perjury conviction as a matter of law.  <u>Id.</u>

[17]     <u>See</u> <u>Manapat</u>, <u>supra</u>.; <u>Lattimore</u>, <u>supra</u>.; <u>United States v. Moses</u>, 94 F.3d 182, 188 (5th Cir. 1996) ("A prosecution for a false statement under § 1001 . . . cannot be based on an ambiguous question where the response may be literally and factually correct.  An indictment premised on a statement which on its face is not false cannot survive.") (<u>quoting</u> <u>United States v. Vesaas</u>, 586 F.2d 101, 104 (8th Cir. 1978) (emphasis in original); <u>United States v. Gatewood</u>, 173 F.3d 983, 988 (6th Cir. 1999) (indictment was fatally defective because defendant's allegedly false statement was not inconsistent with actual events); <u>see</u> <u>also</u> <u>United States v. Sainz</u>, 772 F.2d 559, 564 (9th Cir. 1985) (holding that a question incorporating the word "procedure" was fatally ambiguous when used by a prosecutor during an investigation of corruption in the Immigration and Naturalization Service because the term could refer to the entire procedure of admitting automobiles across the border or to some individual step in that procedure); <u>United States v. Tonelli</u>, 577 F.2d 197, 198 (3d Cir. 1978) (ruling indictment defective, where indictment had alleged defendant falsely denied that he had "participated" in the placement of certain funds at a bank, but omitted the defendant's truthful response to a crucial follow-up question in which the prosecutor had recognized that the earlier question was ambiguous and had qualified and defined his meaning of the term "participation"); <u>United States v. Wall</u>, 371 F.2d 398, 399 (6th Cir. 1967) (reversing perjury conviction because prosecutor's question about whether defendant had "been on trips" with someone was vague and insufficient

Under these principles, Count Two simply cannot stand. As detailed earlier, the government cannot show that Mr. Safavian made a false statement when he stated that Abramoff "has no business before GSA." 07/25/02 Ethics Request at DOJ-DS007001 (Ex. 1). Even if the Court accepted the unsupported allegation that Mr. Safavian somehow added that Abramoff also "was not seeking to do business with GSA," Indictment ¶ 29, the government cannot show that this statement was false either as discussed above. More importantly, however, Count Two of the Indictment must fail because the government cannot demonstrate the context of this "added" statement whatsoever. Indeed, McKenna and Ellison both indicate that they do not recall talking to Mr. Safavian before the issuance of the opinion which added the "seeking to do business" language. See Ellison Marked 302 (Insp. Ex. 5) at DOJ-DS007019; McKenna 302 (Insp. Ex. 4) at DOJ-DS006969.

Lacking *any* information related to Mr. Safavian's specific alleged statements, *any* information about questions that were asked of him, or indeed *any* context for the alleged statements whatsoever, there is absolutely no basis for the government to pursue a charge that asserts that the statements were untruthful. Indeed, the lack of any context for these statements flies in the face of Culliton, Manapat, and Lattimore, and every other federal court that has reviewed the sufficiency of § 1001 or perjury allegations based upon the context in which the statements were made. There is simply no basis for a court to assess the sufficiency of the allegations – and certainly no basis for a jury to speculate about the *content* or *context* of questions or answers, the meaning of terms, or any other circumstances related to the alleged statements.

―――――――――――――

to support perjury charge, since the phrase could refer to physically traveling with someone or merely being with someone at a particular place).

The government's approach to this case is obvious – and fatal under the law.  The government seeks to cull out e-mails between Mr. Safavian and Abramoff, and then seeks to have a jury speculate as to whether those e-mails are inconsistent with the meaning of the terms "business" or "seeking to do business."  Because the government cannot negate reasonable interpretations that make these statements correct, and because the government cannot provide any context whatsoever for the added "seeking to do business" language, the government's charge must fail.

The government's allegations also suffer from further flaws because of the inherent ambiguity associated with the phrase "business" or  "seeking to do business."  The government, apparently, would have a jury speculate as to the meaning of these terms, or perhaps engraft a lay person's view of these amorphous phrases.  There are many legal flaws with this reasoning, mandating dismissal.

First, the ethics regulations provide absolutely no definition of  "business" or "seeking to do business," nor did the ethics decision provide any guidance on this issue or any definition.  Accordingly, lacking any context for any alleged statements by Mr. Safavian, and any guidance for the meaning of the terms, Count Two is based upon fundamental ambiguity and sheer speculation of falsity.  See United States v. Crop Growers Corp., 954 F. Supp. 335, 344-50 (D.D.C. 1997) (finding that disclosure regulations were ambiguous, and dismissing § 1001 allegations on the grounds that "the predicate for criminal behavior must be set out with sufficient clarity to put a potential defendant on notice that the conduct is proscribed.").

The government apparently asserts that Mr. Safavian stated that Abramoff neither "does business with or is seeking to do business with GSA."  Indictment ¶ 29.  The charge of falsity is based upon layer upon layer of ambiguity.  As the Supreme Court noted in Bronston, 409 U.S. at

24

362, precise words are critical to asserting falsity. As an initial matter, the "seeking to do business" language attributed to Mr. Safavian differs from the definition of "prohibited source" in 5 CFR § 2635.203(d)(2), which provides that a prohibited source includes any person who "Does business or *seeks to do business* with the employee's agency. . . ."[18] Even if we assume that "seeks to do business" and "seeking to do business" are one and the same,[19] the regulations provide absolutely no definition for either phrase.

Moreover, in addition to the ambiguity in the phrase itself, the "seeks to do business" language in 5 CFR § 2635.203(d)(2), has no basis in the statute that authorized the regulation. The history surrounding the promulgation of this regulatory language, in fact, further demonstrates the ambiguity of the phrase. When the OGE proposed the regulation, it stated that the definition of "prohibited source" was derived from the gift statute, 5 U.S.C. § 7353, and the Executive Order that followed the passage of the statute. See Standards of Ethical Conduct for Employees of the Executive Branch, 56 Fed. Reg. 33778-01, at 33778 (July 23, 1991) (to be codified at 5 CFR Part 2635), attached as Ex. 16, at pages 3, 7. Indeed, to justify the proposal for the first four paragraphs of the definition in § 2635.203(d), the OGE asserted that "the first

---

[18]     The provision states, in full:

  (d) Prohibited source means any person who:
         (1) Is seeking official action by the employee's agency;
         (2) Does business or seeks to do business with the employee's agency;
         (3) Conducts activities regulated by the employee's agency;
         (4) Has interests that may be substantially affected by performance or nonperformance of the employee's official duties; or
         (5) Is an organization a majority of whose members are described in paragraphs (d)(1) through (4) of this section.

[19]     There certainly is no basis for assuming this, however, in light of the lack of any context for the alleged statement in the ethics opinion or, as described below, any definition for any of these terms.

four paragraphs of § 2635.203(d) *merely restate* language in the statute and Executive Order 12674." Id. at 33778 (Ex. 16 at 7) (emphasis supplied).

Despite this assertion that the regulation "merely restates" the statute and Executive Order, the "seeks to do business" language *is nowhere to be found in these sources.* The relevant provision of 5 U.S.C. § 7353(a), only states "doing business with. . .,"[20] and does not say "seeks to do business." Furthermore, the Executive Order relied upon by the OGE -- Executive Order 12674 – also *only* refers to "doing business with," and never mentions "seeks to do business." See Ex. 17 (dated April 12, 1989). Additionally, Executive Order 12731, which modified Executive Order 12674, also only mentions "doing business with." See (Ex. 18) (dated October 17, 1990).

If the OGE is correct that the first four paragraphs "merely restate" the statute and the Executive Order, then the additional language of "seeks to do business" is either surplusage, meaningless, or subsumed in the "doing business" language. Under any interpretation, however, the lack of any definition for the terms reveals the ambiguities in the phrases and fallacy in holding a defendant criminally liable under the circumstances of this case – *i.e.,* where the government seeks to hold a defendant liable based upon bald, fundamentally ambiguous

---

[20]     The statute provides, in pertinent part:

   (a) Except as permitted by subsection (b), no Member of Congress or officer or employee of the executive, legislative, or judicial branch shall solicit or accept anything of value from a person—
      (1) seeking official action from, **doing business with,** or (in the case of executive branch officers and employees) conducting activities regulated by, the individual's employing entity; or
      (2) whose interests may be substantially affected by the performance or nonperformance of the individual's official duties.

5 U.S.C. § 7353(a) (emphasis added).

statements and the lack of any information on the context or questions allegedly eliciting those statements. See, e.g., Crop Growers, 954 F. Supp. at 344-50.

The lack of the phrase "seeks to do business" is not confined to the actual statutory authority or Executive Orders identified above. Indeed, regulations themselves do not consistently discuss the gift prohibitions. While § 2635.203(d) contains the phrase "seeks to do business," the "general principles" regulations regarding the acceptance of gifts *only* discusses "doing business with" and does not include the phrase "seeks to do business." See 5 C.F.R. § 2635.101(b)(4).[21] Furthermore, *GSA's own website* reveals a Code of Ethics detailed in one of its regional offices. In describing the gift prohibition, the "GSA Ethics" list also only refers to "doing business with," and nowhere refers to "seeks to do business." See Ex. 19 (attaching http://rmrpbs.gsa.gov/internet/PBSWebnew.nsf/0/27496e3709f8aeda87256c76005c8949?OpenD ocument).[22] GSA certainly is not alone in the lack of a reference to "seeks to do business."[23]

---

[21]     5 C.F.R. § 2635.101(b)(4) (emphasis added), provides:

An employee shall not, except as permitted by subpart B of this part, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, **doing business with,** or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.

[22]     The pertinent provision states:

4.     An employee shall not, except as permitted by the standards of Ethical Conduct, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, **doing business with,** or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.

Ex. 19 at 1 (emphasis added).

[23]     Indeed the head of the Executive Department – the President – has issued a memorandum (in addition to Executive Orders) without this phrase. See Ex. 20 (attaching http:www.whitehouse.gov/news/releases/print/20010124-2.html). Additionally, the Code of Conduct for judicial employees, who are also subject to 5 U.S.C. § 7353, also does not contain the "seeks to do business" language. See Code of Conduct for Judicial Employees, Chapter II,

In light of the lack of any definition for terms, the inconsistencies in the regulations, the lack of any context and basis for alleged statements by Mr. Safavian, the allegations cannot stand. This is particularly true, here, where the application of ethics rules are highly technical,[24] requiring precision in the ethics advice from the government – something that was completely lacking here.

The lack of definitions and ambiguities in "business" or "seeks to do business" in the ethics field is further compounded by the nature of the governmental agency involved here. GSA has explicit rules with respect to entities conducting business with the Federal government.

Based upon GSA's unique lens for viewing "doing business" with the government, even a cursory review of these sources reveal the further ambiguities in the alleged false statements at issue. At a minimum, based upon these sources, the government certainly cannot negate "any reasonable interpretation that would make the defendant's statement factually correct." Moses, 94 F.3d at 188; Migliaccio, 34 F.3d at 1525.

For example, companies interested in selling products or services to a Federal agency obtain a "GSA Number," or a GSA Federal Supply Schedule contract number. This may be obtained, for example, by downloading a solicitation, which is an invitation to submit an offer,

---

Canon 4, § C(2), Ex. 21 (attaching excerpts from http://www.uscourts.gov/guide/vol2/ch2a.html).

[24]     The OGE itself has recognized the difficulty in applying the exceptions to the gift rules. In its proposal of the rules that became the current 5 CFR part 2635, OGE recognized that there were complaints "that the exceptions are so overly technical and difficult to apply . . . " See Standards of Ethical Conduct for Employees of the Executive Branch, 56 Fed. Reg. 33778-01, at 33778 (July 23, 1991) (to be codified at 5 CFR Part 2635), attached as Ex. 16 at 8. Furthermore, OGE recognized that certain changes to the regulations only "reduce[d] the need for employees to become aware of a number of technical exceptions dealing with specific situations." Id. at 33778-01, at 33781, Ex. 16 at 9.

from the "FedBizOpps" web site (http://www.fbo.gov).[25]    Indeed, GSA has described the "FedBizOpps" web site as designed for "[p]roviding a 'single-point-of-entry' for *doing business* with the government."[26]    Furthermore, GSA also provides an extensive, 49 page document identifying the requirements for "*doing business*" with GSA.    See Ex. 24 (attaching first three pages of http://www.gsa.gov/gsa/cm_attachments/GSA_BASIC/english_R2-ySD6_0Z5RDZ-i34K-pR.pdf).

    As detailed earlier, it is undisputed that Abramoff was not a contractor with the GSA or that he had any contractual agreement with the GSA.  It was an impossibility.  Moreover, the White Oak and Old Post Office facilities were simply not available for competitive procurement or disposal.  The government also cannot show that Abramoff was involved in any other characterization of "doing business" viewed through the lens of GSA – thus demonstrating yet another truthful explanation for the alleged statements that the government cannot negate.[27]  The OGE itself has endorsed the view that "prohibited sources" may be determined based upon lists of *contractors* or *grantees*.  In its guidance to reviewers of executive branch employees' public disclosure reports (SF 278s), the OGE addresses the review of gifts to federal employees.  In doing so, the Office advises the reviewers on multiple occasions to "determine if the donor was a

---

[25]    See Ex. 22 (attaching http://www.gsa.gov/Portal/gsa/ep/contentView.do?faq=yes&pageTypeId=8199&contentId=12991&contentType=GSA_OVERVIEW).

[26]    See GSA, Annual Performance Report, Fiscal Year 2001, Ex. 23 (attaching portions of http://www.gsa.gov/gsa/cm_attachments/GSA_DOCUMENT/2001annperfrpt_R2F-aAB_0Z5RDZ-i34K-pR.pdf) (emphasis supplied).

[27]    Furthermore, the government also ignores the fact that Abramoff was not the principal in any of these expressions of interest in White Oaks and the Old Post Office, and would not have been the contracting party even if the facilities were available for competitive procurement or disposal.

PROHIBITED SOURCE by consulting with the agency's listing of contractors, grantees or other similar listing."[28]

As detailed above, the government cannot show as a matter of law any falsity in the statements. Moreover, the fundamental ambiguities surrounding the context of the statements, as well as the lack of any definition of the terms at issue, demonstrate that Count Two must be dismissed as a matter of law.

### C.    Mr. Safavian Did Not Conceal Any Material Information Nor Did the Circumstances Create a Legal Duty to Disclose Such Information.

Count Two also alleges that Mr. Safavian purportedly concealed "his assistance to Lobbyist A in GSA-related activities" and "Lobbyist A's business relationships with GSA." Indictment ¶ 29. The government's § 1001(a)(1) burden is more onerous when predicated on concealment. It must establish that, beyond mere nondisclosure, Mr. Safavian actively concealed material facts by means of a "trick, scheme, or device" in seeking the GSA ethics opinion. It also must allege and demonstrate that Mr. Safavian was under a specific legal duty to disclose such material facts. Crop Growers Corp. 954 F. Supp. at 344 (citing cases). The government fails to meet this burden. Thus, the Count Two concealment charges must be dismissed.

### 1.    The Indictment Does Not Allege Any Affirmative Acts to Conceal

To successfully prosecute under the concealment prong of § 1001, the government must allege and prove more than just a "passive failure on the part of the defendant to reveal a material fact." United States v. Shannon, 836 F.2d 1125, 1129-30 (8th Cir. 1988). Rather, the government must allege an affirmative act by which a material fact is actively concealed."

---

[28]    See Public Financial Disclosure:  A Reviewer's Reference (2nd Ed. 2004), at pages 9-4 and 9-13, Ex. 25 (attaching excerpts from http://www.usoge.gov/pages/forms_pubs_otherdocs/fpo_files/reference/rf278guide_04.pdf) (emphasis in original).

United States v. London, 550 F.2d 206, 213-14 ("[T]the mere omission of failing truthfully to disclose a material fact, which is simply the negative aspect of the affirmative act of falsely stating the same material fact, does not make out an offense under the conceal or cover up clause of § 1001."). The government must further establish that the affirmative act of concealment took place by "a trick, scheme or device." 18 U.S.C. § 1001; London, 550 F.2d 206 at 213 (finding that "full effect must be given" to the clause). There is no allegation or evidence that Mr. Safavian employed any such means in seeking ethics advice from the GSA General Counsel. To the contrary, he sought out guidance from ethics officers on what was permissible. (Ex. 1). He discussed the matter further with counsel after the written opinion, McKenna 302 (Insp. Ex. 4) at DOJ-DS006969, and after receiving McKenna's additional ethics advice, ultimately decided not to accept the gift in question. Id. at DOJ-DS006970; Indictment ¶ 25.

The government contends that Mr. Safavian failed to reveal "Lobbyist A's business relationships with GSA" in connection with seeking and obtaining the GSA ethics opinion regarding his travel. Indictment ¶ 29. As explained above, however, the OGE equates "business relationships" with "existing contractual arrangements" with the GSA. See supra at I.B.1 (citing Jan. 7, 2004 OGE Letter (Ex. 15)). Abramoff had no such arrangements on July 25, 2002 nor could he have at the time. See supra at I.B.1. Even if he had such agreements in place, there is no evidence of any "trick, scheme, or device" in Mr. Safavian's July 25, 2002 ethics request given his decision to voluntarily address the matter further with counsel.

The allegation that Mr. Safavian "concealed his assistance to Lobbyist A in GSA-related activities" is also without merit. Indictment ¶ 29. As explained above, "doing business" has been considered as having "existing arrangements" or contracts in place with the government, rather than merely providing information regarding the status of certain properties under control

of the GSA and general advice as to succeeding in a future solicitation. Nevertheless, there is no evidence of any "trick, scheme, or device" by which Mr. Safavian actively concealed these alleged activities. Mr. Safavian simply submitted an e-mail ethics request, received an advisory opinion in response, and ultimately decided not to accept the gift, thus mooting any concern. Neither McKenna or Ellison asked Mr. Safavian about the nature of his relationship with Abramoff and Mr. Safavian did not affirmatively provide any statements that were in fact not truthful.

These circumstances do not establish an affirmative act under § 1001(a)(1). As the Supreme Court has explained:

> A person could, without employing a "trick, scheme, or device," simply and willfully fail to file a currency disclosure report. A traveler who enters the country and passes through Customs prepared to answer questions truthfully, but is never asked whether he is carrying over $5,000 in currency, might nonetheless be subject to conviction under 31 U.S.C. § 1058 (1976 ed.) for willfully transporting money without filing the required currency report. However, because he did not conceal a material fact by means of a "trick, scheme, or device," (and did not make any false statement) his conduct would not fall within 18 U.S.C. § 1001.

United States v. Woodward, 469 U.S. 105, 108 (1985).

In the absence of any allegation establishing an "affirmative act by which a material fact is actively concealed," the government has failed to allege facts sufficient to support the concealment charge under Count Two. See London, 550 F.2d at 213-14 ("[T]he mere omission of failing truthfully to disclose a material fact, which is simply the negative aspect of the affirmative act of falsely stating the same material fact, does not make out an offense under the conceal or cover up clause of § 1001.").

### 2.    The Indictment Does Not Establish That Mr. Safavian Had An Unambiguous Duty to Disclose All Communications with Abramoff

Even if the Court were to find that Mr. Safavian affirmatively concealed material facts through trick, scheme, or device, it must also find that the circumstances created an unambiguous duty to disclose the material facts at the time he was alleged to have concealed them.  Crop Growers Corp., 954 F. Supp. at 345 (holding that the Court must decide, as a matter of law, whether a duty existed to disclose the information alleged as the basis of liability) (citing cases); United States v. Curran, 20 F.3d 560, 566 (3d Cir. 1994) (stating that defendant could not be guilty of concealment because he had no duty to disclose the source of contributions to the Federal Election Commission); United States v. Gimbel, 830 F.2d 621, 624 n.2 (7th Cir. 1987) (ruling that the defendant lacked legal capacity to violate § 1001 where he had no legal duty to inform the Treasury Department of structured transactions).  The government cannot show any unambiguous duty.

Significantly, there are no relevant statutes or regulations that impose an unambiguous duty to disclose the allegedly concealed information in pursuit of an advisory opinion.  The pertinent regulations direct individual employees who have questions about "their own specific present or proposed activities or financial transactions" to seek "general advice" from the designated agency official.  5 C.F.R. § 2638.301 (noting that formal OGE advisory opinions are only available upon referral from the designated ethics official); 5 C.F.R. § 2635.107.  A violation of the underlying ethics regulations (such as the prohibited source rule in 5 C.F.R. § 2635.202) "may be cause for appropriate corrective or disciplinary action to be taken under applicable Governmentwide regulations or procedures . . . in addition to any action or penalty prescribed by law" for the underlying conduct.  5 C.F.R. § 2635.106.  The regulations provide

fourteen "basic obligations of public service," but none relate directly to the solicitation of an advisory opinion or general ethics advice.  5 C.F.R. § 2635.101.

In the absence of "specific statutes and regulations" that "unambiguously required disclosure" of Mr. Safavian's communications concerning Abramoff's expressions of interest, there can be no § 1001 concealment action.  Crop Growers Corp., 954 F. Supp. at 347.  In Crop Growers, unlike in this case, the underlying regulations actually supplied *some* required disclosure guidance for the filings (SEC) at issue.  Even so, the Court found the general disclosure regulations, "quite simply, too vague and amorphous to give fair notice, required by the Due Process clause, of what disclosure is required."  Id. at 348 (citing United States v. Matthews, 787 F.2d 38 (2d Cir. 1986)).

The Indictment does not allege that anyone in the GSA General Counsel's Office asked Mr. Safavian any additional questions that would have required him to disclose Abramoff's expressions of interest.  Indictment ¶¶ 17-20, 28-29.  GSA officials McKenna and Ellison do not recall any communications other than the July 25, 2002 e-mail prior to the issuance of the opinion.  See Ellison Marked 302 (Insp. Ex. 5) at DOJ-DS007019; McKenna 302 (Insp. Ex. 4) at DOJ-DS006969.  A material concealment can only exist when the information is offered in response to an executive department or agency request for information within its general authority or that which is required by statute.  See United States v. Rodgers, 466 U.S. 475, 479 (1984) (stating that "[a] department or agency has jurisdiction" for purposes of § 1001 "when it has the power to exercise authority in a particular situation ... as differentiated from matters peripheral").[29]

---

[29]     Notably, even statements responding to ambiguous or vague questioning do not come within the purview of § 1001.  See supra at I.B.2 (citing Manapat, 928 F.2d at 1099-1102 (affirming dismissal of § 1001 charge and holding that, as matter of law, questions about traffic and criminal convictions on a medical history form were so fundamentally ambiguous as to

In this instance, the Indictment never alleges that Mr. Safavian was even questioned by a GSA official in the course of seeking the ethics opinion.  This failure to set forth the specific duty that Mr. Safavian was subject to when seeking the ethics opinion or answering the SCIA's inquiry is fatal.  Crop Growers, 954 F. Supp. at 344 (holding that "a violation of § 1001 predicated on concealment requires that the defendant must have a legal duty to disclose the information").[30]  In the absence of a pronounced duty, Mr. Safavian's responses [in both the contexts of Counts 2 and 5] could be categorized, at worst, as a "passive failure to disclose" or "mere silence in the face of an unasked question," and therefore do not violate § 1001.  London, 550 F.2d at 213-14 (holding the "mere omission of failing truthfully to disclose a material fact" is not "an offense under the conceal or cover up clause of § 1001").

In short, Mr. Safavian was under no legal duty to disclose any of the material facts the government alleges he concealed, and Count Two must be dismissed accordingly.

### D.    Mr. Safavian's Statements in the Ethics Request Regarding Abramoff Were Immaterial

Even if the July 25, 2002 correspondence had contained a knowing and willful concealment or falsification of Abramoff's "expressions of interest" in affairs managed by the GSA, the allegedly concealed or falsified facts were also not "material" to any agency action.

---

preclude conviction under § 1001); Lattimore, 127 F. Supp. at 409-10 (dismissing a perjury Indictment, as a matter of law, because the questioning was ambiguous and terms were vague).

[30]    This Court has consistently required that the charging papers set forth the specific obligation the defendant is under in a concealment action under § 1001.  In United States v. Dale, the district court denied the defendants' motion to dismiss because the Indictment in that case specifically alleged that the defendants "failed to disclose material facts to the Department of Defense *which they had an obligation to disclose*."  782 F.Supp. 615, at 626 (D.D.C. 1991) (emphasis added).  Similarly, in United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998), the district court rejected the argument that the defendant was not under a legal obligation to disclose certain details to the FBI because the specific language of the Indictment stated that the purpose of the FBI interview "was to ensure that complete, current, and accurate information would be available and obtained concerning [defendant]'s background" and that the defendant had "to be completely truthful and forthcoming during the background investigation."  Id. at 42.  No such language exists in this Indictment for *any* of the concealment counts.

United States v. Weinstock, 231 F.3d 699, 701 (D.C. Cir. 1956) (recognizing that § 1001 requires the statement of the accused to be false as to "a material fact").  A fact is "material" if it "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination."  Id. at 701-02.   The central object of any materiality inquiry is whether the misrepresentation or concealment had a "natural tendency to influence, or [was] capable of influencing, the decision of the decision making body to which it was addressed."  United States v. Gaudin, 515 U.S. 506, 509 (1995) (citing Kungys v. United States, 485 U.S. 759, 770 (1988)).

As discussed below, the statements at issue in this case are immaterial under § 1001 in two important ways.  First, Mr. Safavian's statements were simply not capable of influencing or affecting any agency decision made by the GSA.  Second, the July 26, 2002 ethics opinion issued by the GSA General Counsel did not constitute agency action because Mr. Safavian did not use the advisory opinion to accept the gift offered by Abramoff.  Instead, Mr. Safavian paid for the entire trip using his own monies and even took an unpaid leave of absence during the travel.

### 1.    Mr. Safavian's Statements Did Not Have a Natural Tendency to Influence or Capability of Affecting an Official Decision of the GSA

The GSA serves, by its own terms, as "the government's 'landlord,' meeting office and other space requirements of the federal workforce."  See GSA Website at http://www.gsa.gov. The GSA is also "the premiere federal acquisition and procurement force offering equipment, supplies, telecommunications, and integrated information technology solutions to customer agencies."  Id.   One of the GSA's other principal functions is to oversee disbursement of government-controlled properties – a process that often involves considerable amounts of

communication and paperwork to ensure that the property is being used according to the particular guidelines established by the agency.

Mr. Safavian's statements to the GSA ethics officer concerning the propriety of accepting a gift from Abramoff had absolutely no ability to affect or influence the handling of any property then-controlled by the GSA. Mr. Safavian's request did not invite the GSA to take any official action in this instance over any government controlled properties. He merely asked for an advisory opinion on an ethics question. It is a stretch of both statutory interpretation and application to assert a § 1001 cause of action against an individual where statements are so clearly disconnected from the GSA's actual agency duties as the "government's landlord."

### 2.    Mr. Safavian's Statements Were Not Material Because He Did Not Accept the Offered Gift

Regardless of whether Mr. Safavian fully disclosed his relationship with Abramoff, his statements were immaterial because he did not accept the offered gift. Indeed, the ethics process worked according to design. Mr. Safavian asked for "general advice" from the designated ethics official. 5 C.F.R. § 2638.301; Id. § 2635.107. Mr. Safavian spoke further with the GSA General Counsel about the issue. See McKenna 302 (Insp. Ex. 4) at DOJ-DS006969. After thinking about the advice received, Mr. Safavian voluntarily suggested not accepting the gift. Id. The General Counsel indicated that paying for the trip would close the door on the ethics issue given that there would be no "gift" to accept from the source, prohibited or otherwise. Id. Mr. Safavian ultimately did not accept the gift. See 05/09/03 IG Report (Insp. Ex. 1) at DOJ-DS001435.

In doing so, Mr. Safavian displayed the prudence the OGE guidance:

[J]ust because you may accept a gift under one of the exceptions to the gift rule doesn't mean that you must accept the gift. It is never wrong and is often wise to decline a gift offered by a person or organization whose interests could be affected by actions of the agency where you work or a gift

offered because of your official position.  Exercising your discretion to decline a gift may be particularly smart when a gift is offered by a person or organizations whose interests could be affected by your official actions.

OGE, AN ETHICS HANDBOOK FOR EXECUTIVE BRANCH EMPLOYEES 8-9, Jan. 1995.  He also foreclosed any notion that his actions "ha[d] a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination."  Weinstock, 231 F.2d at 701-02.

## II.    COUNT ONE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT DEMONSTRATE OBSTRUCTION OF THE GSA-OIG INVESTIGATION INTO WHETHER MR. SAFAVIAN ACCEPTED A GIFT

The Indictment claims that in representing to the GSA-OIG in its spring 2003 investigation that Abramoff "had no business with GSA at the time of the golf trip and that defendant Safavian had fully paid for the cost of the trip," Mr. Safavian "did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede . . . the official investigation into [his] participation in an 'international golfing trip provided by lobbyists'" in violation of 18 U.S.C. § 1505.  Indictment (Count One) at ¶¶ 26-27.  This charge is without merit.  The government does not establish beyond conclusory statements that Mr. Safavian intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.

In order to make a § 1505 obstruction charge: (1) there must be a proceeding pending before a department or agency of the United States; (2) the defendant must be aware of the pending proceeding; and (3) the defendant must have intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.  See United States v. Kanchanalak, 37 F. Supp. 2d 1, 4-5 (D.D.C. 1999) (dismissing obstruction charge where government did not adequately establish § 1505 elements); United States v. Price, 951 F.2d 1028, 1031 (9th Cir.

1991); see also Arthur Andersen, LLP v. United States, 125 S. Ct. 2129, 2135 (2005) ("Only persons conscious of wrongdoing can be said to 'knowingly corruptly persuade.'").

Pursuant to the March 26, 2003 anonymous complaint,[31] the GSA-OIG opened a "proceeding" into whether Mr. Safavian "participated in an international golfing trip *provided by lobbyists*."  05/09/03 GSA-OIG ROI at DOJ-DS001431 (Insp. Ex. 1) (emphasis added).  As part of its investigation, the OIG interviewed Mr. Safavian about the Scotland trip allegation on March 27, 2003.  See id.

The GSA-OIG concluded that the investigation did not "substantiate" the allegation that Mr. Safavian participated in an "international golfing trip provided by lobbyists."  See 05/15/03 GSA-OIG (Ex. 9) at DOJ-DS001479.  Consequently, the GSA-OIG closed the proceeding and informed the GSA Administrator that "[n]o further actions or referrals are necessary to close this matter."  Id.

The obstruction charge cannot be supported.  First, the GSA-OIG report itself undermines the Indictment's charge that Mr. Safavian even represented that Abramoff "had no business with GSA at the time of the golf trip."  Indictment ¶ 26.  The May 9, 2003 ROI records Mr. Safavian as representing that "*Currently*, [Lobbyist A] is a professional lobbyist, however he *does not have* any business relationship with GSA."  (Insp. Ex. 1) at DOJ-DS001432.  The GSA-OIG

---

[31]    The complaint stated:

> It has recently come to my attention that David safavian engaged in activity in violation of federal law.  It is my understanding that short? [*sic*] after his appointment to GSA he participated in an international golfing trip provided by lobbyists.  In November of 2002 h@ [*sic*] participated in political campaigns in other states.  During these activities he used his gavernmeng cellphone. computer and Blackberry.  [*sic*] Those *of* us who work in the federal government expect more from those who are appoinred and would like to make sure resources aren't misused.

(Ex. 8) at DOJ-DS00001470.

notes from the March 27, 2003 interview simply state that Abramoff "No Business with GSA." (Insp. Ex. 12) at DOJ-DS001528.[32]  The government is precluded from bringing § 1505 claims in such fundamentally ambiguous contexts.  See supra at I.B.2 & n. 18 (citing, inter alia, Culliton, 328 F.3d at 1078; Manapat, 928 F.2d at 1099-1102; Lattimore, 127 F. Supp. at 409-10).

Second, even assuming arguendo that the government's Indictment and documentation supported the notion that Mr. Safavian made this representation, it did not have the capacity to influence or obstruct the pending proceeding.  The Standards for Conduct for Executive Employees do not prohibit the acceptance of gifts provided by "lobbyists," but rather a "prohibited source" as that term is defined by the OGE.  See 5 C.F.R. § 2635.202 et seq.; Jan. 7, 2004 OGE Letter (Ex. 15); see supra at I.B.1.  More importantly, General Counsel McKenna modified the ethics advice for Mr. Safavian in their conversation subsequent to the July 26, 2002 ethics opinion, advising that even if Mr. Safavian paid for the trip it would not be a gift.  See McKenna 302 (Insp. Ex. 4) at DOJ-DS006970 (summarizing McKenna as "advis[ing] Safavian that if he paid for the golf trip, it would not be a gift").

Likewise, it appears that the GSA-OIG closed its investigation into whether Mr. Safavian accepted a gift from lobbyists based on its conclusion that Mr. Safavian did not accept such a gift.[33]  Once it was determined that the trip was paid for, whether or not Abramoff had business with the GSA was irrelevant.  See 5 C.F.R. § 2635.202(a)(1) ("an employee shall not, directly or indirectly, accept a gift [f]rom a prohibited source"); 05/09/03 GSA-OIG ROI at DOJ-DS001431

---

[32]     Notably, the problem of government "adjustments" to agent's notes in subsequent 302s and the Indictment with respect to the defendant's actionable statements is not limited to Count One.  It rather pervades the entire Indictment.  See 01/27/06 Motion to Inspect the Grand Jury Record and Attachment A.

[33]     The GSA-OIG also closed an unrelated investigation submitted by the same hotline complainant.  Insp. Ex. 1 at DOJ-DS-001432.

(Insp. Ex. 1) (investigating whether Mr. Safavian "participated in an international golfing trip *provided by lobbyists*") (emphasis added). And even if the government had made such a claim, by definition, there can be no obstruction of justice under § 1505 for statements based on immaterial matters. United States v. Buckley, 192 F.3d 708, 710 (7th Cir. 1999) (holding that even if defendant had perjured himself on an immaterial matter, even in court, there could be no obstruction of justice under § 1505). In any event, as explained above, Abramoff *did not* have any business with the GSA at the time of the trip. See supra at I.B.

Third, the Indictment does not state how or why Mr. Safavian's statement that he had "fully paid for the cost of the trip" did "knowingly and corruptly influence or impede the then pending inquiry" into whether the trip was accepted as a gift in violation of ethics rules. Indictment ¶ 26-27. See Kanchanalak, 37 F. Supp. 2d at 4-5 (dismissing obstruction charge where government did not adequately establish § 1505 elements). There is no suggestion that Mr. Safavian's representation as to trip payment was inaccurate. Indeed, the government does not bring a § 1001 charge against this representation in Count Three, let alone plead the necessary intent to "corruptly" obstruct under 18 U.S.C. § 1505.[34]

The GSA-OIG report and notes do not give any indication that Mr. Safavian inaccurately represented the destination of the trip; the fact that he was on annual leave for its duration, or its cost. Indictment ¶¶ 22-27. Mr. Safavian presented a copy of the August 3, 2002 cancelled check in the amount of $3,100 and gave the GSA-OIG Abramoff's contact number if they wanted to check for additional details. See 05/09/03 ROI (Insp. Ex. 1); 03/27/03 ROI Notes (Insp. Ex. 12).

---

[34]    Notably, General Counsel McKenna's post-opinion representation to Mr. Safavian would work to negate the possibility that Mr. Safavian had the requisite specific intent to violate the statute. See United States v. Browning, 630 F.2d 694, 700-01 (10th Cir. 1980). As the Supreme Court recently ruled in Arthur Andersen, LLP v. United States, 125 S. Ct. 2129, 2135 (2005), because the term "corruptly" must be read in conjunction with the term "knowingly," only a person who acts with the knowledge that he is acting corruptly and not benignly can be liable under Section 1505. See id. at 2135.

In sum, there is simply no support for a § 1505 charge against Mr. Safavian for the 2003 GSA-OIG inquiry.

### III.    COUNT THREE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT ESTABLISH THAT MR. SAFAVIAN DID KNOWINGLY OR WILLFULLY FALSIFY OR CONCEAL ANY MATERIAL FACTS DURING THE GSA-OIG INVESTIGATION

Count Three alleges that Mr. Safavian violated § 1001(a)(1) by concealing: a) "his assistance to Lobbyist A in GSA-related activities" and b) "Lobbyist A's business relationships with GSA." Indictment ¶ 31. The charge must be dismissed because the government does not establish what Mr. Safavian affirmatively said, let alone that he concealed material facts through a "trick, scheme, or device" during the GSA-OIG investigation. Second, even if the government were able to establish active concealment through trickery, they cannot demonstrate that the GSA-OIG inquiry provided Mr. Safavian with an unambiguous legal duty to disclose.

### A.    Mr. Safavian Did Not Use a Trick, Scheme, or Device to Conceal Material Information.

#### 1.    The Indictment Alleges No Affirmative Acts to Conceal

As explained in I.C, the government must establish that the defendant affirmatively concealed a material fact by "trick, scheme or device." 18 U.S.C. § 1001(a)(1); see supra at I.C (citing Woodward, 469 U.S. at 108; Shannon, 836 F.2d at 1129-30; London, 550 F.2d at 212-14 .

As with Count Two, this charge does not set forth any allegation that Mr. Safavian employed any such means in responding to any of the questions posed by the GSA-OIG during its investigation. Indictment ¶¶ 30-31. It simply incorporates by reference paragraphs reflecting the statements that Mr. Safavian allegedly made during the course of the GSA-OIG investigation, and blithely asserts that this amounts to a concealment by trick or scheme. Id. (referencing Indictment ¶¶ 25-26). The Indictment does not allege that Mr. Safavian was ever asked about the allegedly concealed information and the GSA-OIG report confirms that no such

questions were asked.  See Insp. Ex. 1.  Courts have uniformly rejected § 1001 actions where the defendant "is never asked" about the allegedly concealed material facts, since "[a] person could, without employing a 'trick, scheme, or device,' simply and willfully fail to disclose information."  Woodward, 469 U.S. at 108; see also London, 550 F.2d at 212-13 (holding that "full effect must be given to the 'trick, scheme, or device' language").

### 2.     The Indictment Sets Forth No Unambiguous Duty to Disclose

Even if this court were to find that Mr. Safavian took affirmative acts of trickery and device to conceal material facts, there is no allegation or documentation to support the notion that the circumstances imposed a duty to disclose the information.  See supra at I.C.2 (citing Crop Growers Corp., 954 F. Supp. at 345; Curran, 20 F.3d at 566; Gimbel, 830 F.2d at 624 n.2).

Neither the Indictment, nor the GSA-OIG interview notes and report suggests that Mr. Safavian was asked about whether Abramoff had ever expressed interest in GSA-related activities.  Furthermore, there are no relevant statutes or regulations in the instant case that impose an unambiguous duty upon Mr. Safavian to volunteer such information not directly requested by GSA-OIG officials.  Crop Growers, 954 F. Supp. at 348 (holding that disclosure regulations and circumstances must be specific and unambiguous before the defendant can be said to have had a duty to disclose) (citing, inter alia, Matthews, 787 F.2d at 48).  In the absence of an unequivocal duty to disclose the allegedly concealed information, Mr. Safavian cannot be criminally liable under § 1001(a)(1).

### B.     The Allegedly Concealed Assistance Was Immaterial

Even if the government were able to demonstrate that Mr. Safavian had a duty to disclose the information regarding Abramoff's expressions of interest in GSA-held properties, this information was not a "material" fact; that is, it could not have influenced the GSA-OIG's

decision to close the investigation into Mr. Safavian's participation in the Scotland trip. Weinstock, 231 F.2d at 701-02.

The GSA-OIG determined that Mr. Safavian had not accepted an international trip as a gift given that Mr. Safavian provided documentation demonstrating that he had paid for the trip and taken a leave of absence for its duration.  See 05/09/03 ROI (Insp. Ex. 1).  Consistent with GSA-General Counsel McKenna's advice in their post-opinion conversation, see Insp. Ex. 4 at DOJ-DS006970 (summarizing McKenna as "advis[ing] Safavian that if he paid for the golf trip, it would not be a gift"), the GSA-OIG closed its investigation into whether Mr. Safavian accepted a gift from lobbyists based on its conclusion that Mr. Safavian paid for his own trip. See Insp. Ex. 1.  Once the office reached that conclusion, all other considerations became moot to the determination of whether he accepted a gift.

The Indictment's other alleged concealment, Abramoff's purported "business relationships with GSA," Indictment ¶ 31, was not "material," much less a "fact."  See supra at I.B.1 (explaining that Abramoff had no existing contractual arrangements with the GSA) (citing Jan. 7, 2004 OGE Letter (Ex. 18)).

### C.    Mr. Safavian Did Not Knowingly or Willfully Falsify Any Material Facts During the GSA-OIG Investigation

Count Three also alleges that Mr. Safavian violated § 1001(a)(1) by falsely stating to OIG investigators that "Lobbyist A did not have any business with GSA."  Indictment ¶ 31.  As stated above, the ROI report and March 2003 notes do not support the government's  assertion that he made such statement.  See supra at 25 (comparing Indictment ¶ 26 with Insp. Ex. 1 at DOJ-DS001432).  For this reason alone, the charge must be dismissed.  See supra at I.B.2 & n. 18 (citing, inter alia, Culliton, 328 F.3d at 1078; Manapat, 928 F.2d at 1099-1102; Lattimore,

127 F. Supp. at 409-10) (holding that the government is precluded from bringing § 1001 claims in such fundamentally ambiguous contexts).

Even assuming, however, that the documentation did establish that Mr. Safavian represented that Abramoff "did not have any business with GSA" at the time of the August 2002 trip, that representation was accurate. See supra at I.B.1. (explaining that Abramoff had no existing contractual arrangements with the GSA and citing cases holding that an indictment for a false statement cannot survive if it is premised on a statement that on its face is not false).

Finally, even if Abramoff did have existing contractual arrangements with the GSA, it would not have had any bearing on the OIG's determination as to whether or not Mr. Safavian *accepted a gift* "provided by" Abramoff because Mr. Safavian paid for his own trip. See 05/09/03 ROI (Insp. Ex. 1); Weinstock, 231 F.2d at 701-02; McKenna 302 (Insp. Ex. 4) at DOJ-DS006970.

## IV. COUNT FOUR MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO DEMONSTRATE THAT THE ALLEGED FALSE STATEMENTS WERE PERTINENT TO THE SENATE COMMITTEE ON INDIAN AFFAIRS' INVESTIGATION

Count Four alleges Mr. Safavian did "knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry" of the SCIA investigation into fraudulent actions against Indian tribes in violation of 18 U.S.C. §§ 1505 and 2.[35]    Indictment ¶¶ 36-38.  The allegations proffered to support this Count are (1) that Mr. Safavian told SCIA investigative counsel Parker[36] that "he had received approval for the Scotland golf trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics officer who prepared the opinion."  Indictment ¶

---

[35]    The § 2 allegations also fail.  See infra at VI.

[36]    The Indictment does not reveal the identity of the investigator.  It was later determined that the investigator was Bryan David Parker, Deputy Chief Investigative Counsel to the SCIA.

26, and (2) that Mr. Safavian's March 17, 2005 cover letter response to the document request authorized by SCIA Chairman John McCain contained false statements, which impeded the investigation. Indictment ¶¶ 37-38.

The 302 interview of Pablo Carrillo, SCIA Chief Investigative Counsel, however, tells another story. Mr. Carrillo explains that at some point in the SCIA investigation, the Capital Athletic Foundation became a "concern" because "CAF, a private charity, was an instrumental part of the scheme to defraud the tribes." Insp. Ex. 9 at DOJ DS-001618. Mr. Carrillo further explained that "[a]ny information on the trip would be probative. [Senator] McCain was aware that Safavian and others had attended the 2002 trip…The letter to Safavian is specific and simple. It reflects instructions provided by McCain, which was to get information about the 2002 trip."[37]

As the Supreme Court stated in Sacher v. United States, 356 U.S. 576, 577 (1958), "the broad scope of authority vested in Congress to conduct investigations as an incident to the 'legislative Powers' granted by the Constitution is not questioned. But when Congress seeks to enforce its investigating authority through the criminal process administered by the federal judiciary, the safeguards of criminal justice become operative."

In this action, Mr. Safavian has been denied any safeguards of criminal justice when the Department of Justice unilaterally determined that the SCIA's investigation was impeded. The SCIA did not make any determination that its investigation was impeded, nor did it ever take any affirmative actions, such as referral of its findings to the Department of Justice for further

---

[37]    Mr. Carrillo also opines that "they [although it is unclear whether he means him and his deputy, Bryan Parker or the SCIA] requested the information from Safavian to determine his involvement and his participation in this trip. Their query goes to the overarching influence peddling review because, at the time of the trip, Safavian was working at GSA. They wanted to know if Abramoff was influencing pendling with Safavian at GSA." Carrillo Notes (Insp. Ex. 8) at DOJ-DS007023. The SCIA does not have oversight of the GSA.

review.[38]   Indeed, persons who refuse to appear or produce information pursuant to a duly authorized Congressional subpoena have greater Constitutional protections than that afforded Mr. Safavian in this matter.[39]   Had Mr. Safavian contemptuously refused to cooperate with Mr. Parker's request for information, he would have been afforded an opportunity for the full SCIA and later the full Senate to determine whether Mr. Parker's questions were pertinent to the duly authorized congressional inquiry.  See generally, Watkins v. United States, 354 U.S. 178 (1957); United States v. Rumely, 345 U.S. 41 (1952);  Wilkerson v. United States, 365 U.S. 399 (1961).

It is clear from the face of the Indictment that the SCIA was investigating "fraudulent actions against Indian Tribes," Indictment ¶ 38, and Mr. Parker concedes that "issues of tribal fraud and policies about tribes are the exclusive focus" at the time of the document request and production.  Parker 302 (Insp. Ex. 11) at DOJ-DS-001620.  Therefore, any questions regarding what Mr. Safavian did or did not disclose to the GSA ethics officer is, per se, not pertinent to the SCIA's inquiry.  Therefore, Count Four must be dismissed.

---

[38]     See Request That The Department Of Justice Investigate Whether Ms. Martha Stewart Knowingly Caused Materially False Representations To Be Made To the U. S. House Of Representatives, Letter to The Honorable John Ashcroft, U.S. Department of Justice, September 10, 2002,  http://energycommerce.house.gov/107/Letters/09102002_714.htm

[39]     Section 194 provides that: "[w]henever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported to and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the said President of the Senate or Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate  United States attorney, whose duty it shall be to bring the matter before the grand jury for its action."  2 U.S.C. § 194.

A.     The SCIA Did Not Have Jurisdiction to Investigate Whether Mr. Safavian
       Made  False Statements to the GSA

Even if the Senate staff's questions went to "influence peddling," the SCIA does not have

oversight regarding influence peddling unrelated to Indian tribes or the Department of Interior.

An important element of § 1505 is that the acts of a defendant must "influence, obstruct, or

impede *the due and proper exercise of the power of inquiry*" (emphasis added) of (in this case)

the SCIA.   The Fourth Circuit has held that an investigation by a congressional committee is a

"due and proper exercise of the power of inquiry," and is protected by § 1505 "[i]f it is apparent

that the investigation is a legislative exercise of the investigative authority [of a congressional

committee] *in an area within the committee's purview*."  United States v. Mitchell, 877 F.2d 294,

300 (4th Cir. 1989) (emphasis added).  This Court has quoted this view favorably and added its

own codicil: "The questions raised by committees *must of course be within their jurisdiction*. . .

."  United States v. Poindexter, 725 F. Supp. 13, 22 (D.D.C. 1989) (emphasis added); see also

United States v. Cisneros, 26 F. Supp. 2d 24, 39 (D.D.C. 1998) ("This Court will follow the

standard set forth in Mitchell.").

Whether or not Mr. Safavian, a government official whose duties did not regularly (if at

all) involve Indian affairs, acted improperly in attending a golf outing with Abramoff was simply

not an "area within the committee's purview" as a matter of law.  Mitchell, 877 F.2d at 300.

There has been no allegation, nor is there any evidence, nor any suggestion of evidence, that Mr.

Safavian was involved in any efforts to defraud Indian tribes.  The Indictment does not indicate

how an investigation into Abramoff's bilking of Indian tribes would have been affected by any

of Mr. Safavian's statements in his document response or follow up phone call.

It should be noted that the issue here is not the general investigative authority of the

Senate.  Such authority "is inherent in the legislative process."  Watkins v. United States, 354

U.S. 178 (1957).    Further, the investigative authority of the Senate "comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." Id.

The issue here is the investigative authority of a specific committee of the Senate.  The SCIA is a permanent Senate Committee.  The SCIA's jurisdiction includes "all matters pertaining to problems and opportunities of Indians, including but not limited to, Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States."  S. Res. 4, § 105(b)(2), 95th Cong. (1977) as amended by S. Res. 127, 98th Cong. (1984).    The SCIA is empowered "to make investigations into any matter within its jurisdiction[.]" Id. § 105(c)(1)(A).

The SCIA's jurisdiction, decided upon by the full Senate, does not include alleged misconduct by government officials when such alleged conduct does not involve "Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States" or other similar issues.  S. Res. 4, § 105(b)(2), 95th Cong. (1977) as amended by S. Res. 127, 98th Cong. (1984).  The SCIA's investigative authority, again, decided upon by the full Senate,[40] is limited to matters within its jurisdiction.  Id. § 105(c)(1); cf. Watkins, 354 U.S. at 200 ("An essential premise [to a committee inquiry] is that the House or Senate shall have instructed the committee members on what they are to do with the power delegated to them.  It is the responsibility of the Congress, in the first instance, to insure that compulsory process is used only in furtherance of a legislative purpose.

---

[40]    The limits of the SCIA's jurisdiction were reconfirmed by Senate at the beginning of the 109th Congress.  In a resolution introduced by Rules Committee Chairman Senator Lott, the Senate authorized expenditures by the SCIA to "carry[] out its powers, duties, and functions imposed by section 105 of S. Res. 4, agreed to February 4, 1977 (95th Congress), and in exercising the authority conferred on it by that section . . . ."  Senate Resolution 4, as mentioned above, limits the jurisdiction of the SCIA to "Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States" and other similar issues.

That requires that the instructions to an investigating committee spell out that group's jurisdiction and purpose with sufficient particularity. Those instructions are embodied in the authorizing resolution.").

Accordingly, the SCIA does not have *carte blanche* to investigate alleged government corruption. An investigating committee has only the power to inquire into matters within the scope of authority delegated to it by its parent body. See Investigative Oversight: Legal Basis, Congressional Research Service, American Law Division (Jan. 17, 2002) ("A congressional committee is a creation of its parent House and only has the power to inquire into matters within the scope of the authority that been delegated to it by that body. This, the enabling rule or resolution which gives the committee life is the charter which defines the grant and limitations of the committee's [investigative oversight] power."); see also Rumely, 345 U.S. at 42, 44 (1953); Watkins, 354 U.S. at 198; Morton Rosenberg, Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry, Congressional Research Service Report for Congress, April 7, 1995 at 31 (hereinafter "Rosenberg"), citing  United States v. Rumely, 345 U.S. 41, 44 (1953); Watkins v. United States, 354 U.S. 178, 201 (1957); Gojack v. United States, 384 U.S. 702, 708 (1966).

Notably, the Indictment does not allege that the Senate or the SCIA expanded its investigative powers of inquiry into the Scotland trip beyond its relation to matters involving fraud against Indian tribes.[41]  Indictment ¶¶ 33-34.  The hearing referred to in paragraph 34 was

---

[41]     Insofar as the government may argue that SCIA was appropriately concerned with the disposition of public lands managed by the GSA, it should be noted that under Senate Rule 25(h)(1), the Senate Committee on Environment and Public Works (and not the SCIA) has jurisdiction over "all proposed legislation, messages, petitions, memorials, and other matters related to… (12) Public buildings and improved grounds of the United States generally…." Similarly, the Senate Committee on Energy and Natural Resources (and not the SCIA) has jurisdiction over public lands. See Standing Rules of the Senate, Rule XXV(g)(1)(14).  Further, the Senate Committee Homeland Security and Government Affairs' Permanent Subcommittee on Investigations has jurisdiction over matters involving "[t]he compliance or noncompliance of

entitled "Oversight Hearing In re Tribal Lobbying Matters, et al" and the statements of the

Chairman, Vice Chairman, and Senator McCain at this first hearing also make clear the scope

and purpose of the investigation was limited to improprieties against Indian tribes.

> The Committee today is launching the first in a planned series of
> hearings into allegations of improprieties by Mr. Jack Abramoff
> and Mr. Michael Scanlon involving lobbying and so-called
> grassroots political activities on behalf of Indian tribes.

Oversight Hearing Before the Senate Comm. on Indian Affairs In Re Tribal Lobbying Matters, et

al., 108th Cong. 1 (2004) (statement of Sen. Ben Nighthorse Campbell, Chairman, SCIA),

available at <http://indian.senate.gov/2004hrgs/092904hrg/092904wit_list.htm>.

> For the past seven months, newspapers and journals of national
> renown have been reporting on the findings of their research into
> allegations that Indian tribal governments have engaged the
> services of professional lobbyists and so-called grass roots
> organizations and the costs associated with those contracts.
> Some have asserted that the amounts charged to tribes have been
> excessive, or that revenues received by those employed by the
> tribal governments far exceeded the value of the products and
> services provided to the tribes.
>         . . . .
> I join my colleagues on the Committee today to listen and to learn
> what may have taken place, and whether the activities described
> constitute a pattern and practice of dealings that are either
> inappropriate or illegal.

Id. at 1-2 (statement of Sen. Daniel Inouye, Vice Chairman, SCIA).

> In the seven months since the [February 22 Washington Post]
> article ran, the Committee on Indian Affairs has worked with my
> staff on the Commerce Committee to examine the relationship
> between Abramoff and Mr. Scanlon, and their relationship with the
> Indian tribes they represented.
>         . . . .

---

corporations, companies, or individual or other entities with the rules, regulations, and laws
governing the various governmental agencies and their relationships with the public."
http://hsgac.senate.gov/index.cfm?Fuseaction=About.Jurisdiction. There is no apparent reason
why the SCIA could not have referred matters involving alleged improprieties committed by Mr.
Safavian or the disposition of public lands to these committees.

> Despite Abramoff's and Mr. Scanlon's obstinance, the Committee
> has begun to unravel the complex and tangled web they wove. In
> the case of both tribes testifying today, the documents show that
> Jack Abramoff and Michael Scanlon systematically sought out
> impressionable tribal leaders and representatives, seduced them
> with promises of power and prestige, and helped them attain
> positions of power within their tribes.

Id. at 1-2 (statement of Sen. John McCain, member, SCIA).

The SCIA investigative staff had a similar understanding of the scope and purpose of their work.  See Carrillo 302 (Insp. Ex. 9) at DOJ-DS001617 ("investigating allegations of misconduct by Indian tribes against Jack Abramoff and Michael Scanlon"); Parker 302 (Insp. Ex. 11) at DOJ-DS001610 (to "investigat[e] allegations of fraud against the Indian tribes").  Parker advised Mr. Safavian of this purpose -- "to investigate fraud against the tribes" -- in a March 1, 2005 conversation concerning the response to the February 23, 2005 document request.  Id. at DOJ-DS001612.

Only inquiries directed to that topic represent "the due and proper exercise of the power of inquiry" of the SCIA.  18 U.S.C. § 1505.  Count Four must be dismissed.

### B.     Mr. Safavian's Statements Were Not False Let Alone Corruptly Designed to Obstruct.

The alleged actions underlying the obstruction of justice charge are twofold: (1)  Mr. Safavian's document production and cover letter and (2) follow up phone calls initiated by Mr. Safavian requesting additional time to produce the documents and to ascertain whether the staff had received the documents and wanted to interview him.  For the purposes of § 1505, "corruptly" is defined as "acting with an improper purpose, personally or by influencing another" and includes "making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information."  18 U.S.C. § 1515(b).

The government has not, and cannot, demonstrate that Mr. Safavian's statements impeded an investigation into allegations of fraud committed by Jack Abramoff and Michael Scanlon against Indian tribes. The SCIA requested documents not testimony.[42]

Mr. Parker, according to his 302, recalls a conversation with Mr. Safavian on March 1, 2005, when Mr. Safavian called to ask for additional time to respond to the request. At that time, Mr. Parker informed Mr. Safavian that the investigation was about fraud against the tribes and that the Committee was "cognizant" that the 2002 trip to Scotland was paid for by tribe funds. After being informed that the Committee was interested in the source of payment for the trip, Mr. Safavian explained that he had "vetted the trip with GSA's ethics counsel before the trip." Parker 302 (Insp. Ex. 11) at DOJ-DS001612. It was then that Mr. Parker requested a copy of the opinion. Mr. Safavian complied. There is nothing false in that exchange.

As for the contents of the documents received, it appears that neither Chief Counsel Carrillo nor Dep. Counsel Parker believed that Mr. Safavian's letter impeded the investigation. The notes of the FBI agent[43] who interviewed Chief Counsel Carrillo include a topic heading titled "Impact on investigation." Under that heading is the note "letter no impact on fraud element, but would have to come back to and flush out." The notes of the FBI interview with Dep. Counsel Parker include the notation: "Impact of Saf[avian] letter on invest[igation]? *[N]o impact. [N]o deter from wanting to interview, unless info he has failed to produce."* Parker

---

[42]    The letter from United States Senate Committee On Indian Affairs to David Safavian, February 23, 2005, is a document request asking for "records reflecting, referring or relating to the 2002 Scotland golf trip that you attended with Mr. Jack Abramoff and others. Feb. 23, 2005 Ltr. (Ex. 11). For the purposes of this request, the terms "records" includes but is not limited to, all communications (including e-mails), notes, memoranda, itineraries, receipts, invoices, canceled checks, banking statements, reports, etc." Id.

[43]    The interviews of Mssrs. Parker and Carrillo were both conducted on September 30, 2005. The notes of the interviews were prepared by FBI Special Agent Leanna L. Saler. The notes were transcribed on October 5, 2005.

Notes (Insp. Ex. 10) at DOJ-DS007034 (emphasis added).[44]   The term "obstruction of justice" refers to efforts to impede the processes of legal justice.  See, e.g.,  United States v. Aguilar, 515 U.S. 593, 598-602 (1995).  When the government officials themselves indicate that a statement was immaterial to their process of justice, there can be no potential interference with it.  See United States v. Barrett, 111 F.3d 947, 953 (D.C. Cir. 1997); United States v. Surasky, 976 F.2d 242, 246 n. 5 (5th Cir. 1992).  Hence, even if Mr. Safavian had actually made a falsity or concealment on a material matter, there can be no obstruction.  See Buckley, 192 F.3d at 710.

## V.   COUNT FIVE MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO DEMONSTRATE THAT MR. SAFAVIAN DID FALSIFY OR CONCEAL ANY MATERIAL FACTS IN HIS RESPONSE TO THE SENATE COMMITTEE ON INDIAN AFFAIRS

As support for its § 1001 violation to the SCIA, the Indictment alleges that Mr. Safavian purportedly concealed from the Committee "his assistance to Lobbyist A in GSA-related activities" and "Lobbyist A's business relationships with GSA."   Indictment ¶ 40.   The Indictment also charges Mr. Safavian with falsely stating in his letter to the Committee "that Lobbyist A did not have any business with GSA" at the time Mr. Safavian was invited to attend the Scotland trip and that he provided documentation that falsely stated that "Lobbyist A did all of his work on Capitol Hill," when Mr. Safavian purportedly knew at the time of the Scotland trip that "Lobbyist A was seeking to lease or purchase GSA-controlled property."  Id.

### A.   Mr. Safavian Did Not Conceal Any Material Information Nor Did the Circumstances Create a Duty to Disclose Such Information

The government has not alleged that Mr. Safavian committed an affirmative act of trickery, scheme, or device to conceal material facts or that Mr. Safavian had a duty to disclose such facts.

---

[44]   None of this was included in the final typed summary of the interviews.  These material omissions are the subject of a separate Motion to Inspect the Grand Jury Record, filed on January 27, 2006.

     1.       **The Indictment Does Not Set Forth An Affirmative Act of Trick, Scheme, or Device**

As requested by the February 23, 2005 letter, Mr. Safavian provided (1) the e-mail to the GSA ethics officer requesting an ethics opinion; (2) the subsequent response from the Associate General Counsel at GSA approving the trip; (3) the relevant fax cover sheets for these two communications; (4) a copy of the canceled check for $3,100 that was made payable to Abramoff; (5) a copy of the check register identifying the check to Abramoff; and (6) a copy of a promotional brochure for a Scotland hotel where the trip attendees stayed while overseas.

Thus, Mr. Safavian provided the Committee with all documents responsive to the Committee's request. The Indictment, however, provides nothing in terms of what steps Mr. Safavian took to affirmatively conceal information.[45] In the absence of an "affirmative act by which a material fact is actively concealed," and without additional information putting Mr. Safavian on notice as to what "trick, scheme, or device" was used, the government has failed to allege facts sufficient to support the concealment charge under Count Five.

One of the government's principle contentions underlying Count Five is that Mr. Safavian failed to reveal his alleged assistance to Abramoff in his March 17, 2005 letter. This assistance purportedly came in the form of providing Abramoff with information regarding the status of certain properties then under the control of the GSA. What the government is unable to assert, much less establish, is the "trick, scheme, or device" by which Mr. Safavian actively concealed these alleged activities. This is insufficient to fairly inform the defendant of the charge against which he must defend. See supra at I.C.1. (citing cases).

---

[45]      The government cannot imply that Mr. Safavian's mere act of sending his March 17, 2005 letter to the Committee is the requisite "affirmative act." See Woodward, 469 U.S. at 108 (rejecting the argument that filling out a currency disclosure report by itself constitutes an affirmative act).

###### 2.    The Indictment Does Not Establish An Unambiguous Duty to Disclose Information Beyond that Requested by the February 23, 2005 Letter

Beyond production of the documents requested in the Feb. 23, 2005 letter from Senator McCain ("all records reflecting, referring, or relating to the 2002 Scotland golf trip that you attended with Mr. Jack Abramoff and others"), 02/23/05 Letter (Ex. 14), and Parker's March 1, 2005 request for a copy of the July 26, 2005 Ellison e-mail, Parker Notes (Insp. Ex. 10) at DOJ-DS007031, Mr. Safavian had no duty to disclose additional information. Nothing else was asked for in the letter, and as Parker has explained to the government, he did not ask Mr. Safavian for Abramoff information in their March 1, 2005 conversation. Id. In addition, the document request informed Mr. Safavian that the Senator needed these records to aid in the SCIA investigation of "allegations of misconduct made by several Indian tribes against their lobbyists and other representatives." Id. Mere silence on Abramoff in the face of unasked questions does not violate § 1001. See supra at I.C.2 (citing London, 550 F.2d at 213-14).

In any event, a material concealment can only exist when the information is offered in response to an executive department or agency request for information within its general authority or that which is required by statute. See Rodgers, 466 U.S. at 479 (stating that "[a] department or agency has jurisdiction" for purposes of § 1001 "when it has the power to exercise authority in a particular situation ... as differentiated from matters peripheral"). As explained above, see supra at IV.A, and as investigator Parker told Mr. Safavian directly on March 1, 2005, the authority and purpose of the inquiry was "to investigate fraud against the tribes." Parker Notes (Insp. Ex. 10) at DOJ-DS001612. Accordingly, Count Five charges of concealment must be dismissed. Indictment ¶ 40 (A-B).

B.    **Mr. Safavian Accurately Represented to the Committee that Abramoff Had No Business Before the GSA**

As discussed extensively in Part I.B, the identified discussions between Mr. Safavian and Abramoff did not rise to the level of "doing business" as that term is defined by relevant government agencies and the existing case law.  Moreover, Abramoff could not have been "doing business" with the GSA because the properties in which he expressed an interest were not even available for procurement from the agency.  Because Mr. Safavian's statements in this regard were true on their face, and a reasonable interpretation of those statements render them factually correct, the government has failed to allege falsity by "trick, scheme, or device" under § 1001(a)(1).  Indictment ¶ 40 (C).  Count Five must therefore be dismissed.  See supra at I.B.1 (citing cases).

The government also charges that Mr. Safavian's inclusion of a copy of the ethics opinion with his March 17, 2005 letter constituted a "trick, scheme, or device" in violation of § 1001(a)(1).  Indictment ¶ 40 (D).  The government is not clear as to whether it believes the production endeavored to falsify, or conceal, material facts.  And for that reason alone the Indictment fails.  See Hess, 124 U.S. at 487 (requiring that indictment "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense" with which he is charged); Kanchanalak, 192 F.3d at 1042-43.  But either way, its charge is meritless and is again based on a mischaracterization of events.

As Parker himself told the government, the Feb. 23, 2005 document request did not ask for the ethics opinion or for information about Abramoff.  See 02/23 Ltr. (Ex. 12); Parker Notes (Insp. Ex. 10) at DOJ-DS007031.  And in the March 1, 2005 follow up conversation, *it was Parker himself* who "did ask for [the] ethics opinion."  Insp. Ex. 10 at DOJ-DS007031.  Responding to the direction of a Senate investigator can simply not, under any reasonable

reading, constitute an affirmative act of "trick, scheme, or device" under § 1001(a)(1). See supra at I.C.1 (citing cases holding that § 1001(a)(1) requires an affirmative act of falsification or concealment).

In any event, Mr. Safavian's July 25, 2002 ethics request did not knowingly and willfully falsify or conceal material facts. See supra at I.B.

### C.    Mr. Safavian's Statements Regarding Abramoff Were Immaterial to, and Were Not Within the Jurisdiction of, the Committee's Investigation into Alleged Fraud Against Indian Tribes

Even assuming Mr. Safavian's statements to the Committee outlined in Count Five contained a knowing and willful concealment or falsification of certain facts, these facts were not "material" to the Committee's limited investigation into alleged fraud against Indian tribes.

Mr. Safavian's statements were not capable of affecting the Committee's investigation. The purpose of the Committee's investigation was to gather information regarding misconduct by certain lobbyists, including Abramoff, with respect to certain Indian tribes. As discussed below, the government cannot demonstrate, and the Indictment fails to allege, how such an investigation would be furthered had Mr. Safavian revealed certain alleged facts concerning Abramoff's dealings with the GSA. Accordingly, Count Five must be dismissed.

### 1.    The Scope of the SCIA's Investigation Was Limited to Investigating Fraud Against Indian Tribes

Section 1001(c)(2) provides that a matter within "the jurisdiction of the legislative branch" applies only to "any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate." 18 U.S.C. § 1001(c)(2). For the same reason the SCIA's inquiries into Mr. Safavian's activities at GSA were not "a due and proper exercise of the power of inquiry" in

the context of § 1505, see supra at IV.A, the SCIA's "investigation" was likewise not conducted pursuant to its limited authority under § 1001.

   2.   **Senate Investigators Carrillo and Parker Have Already Informed the Government that Mr. Safavian's Statements Had No Impact or Influence on Their Investigation**

Even if the SCIA inquiry did extend to Mr. Safavian's activities at GSA, the very government officials that requested documents from Mr. Safavian told the Department that the Defendant's statements had no impact on their investigation.  Importantly, in the notes taken of the FBI's interview with Senate Investigator Parker (yet conspicuously absent from the transcribed 302), Parker revealed that Mr. Safavian's March 17, 2005 letter to the Committee had "no impact" on its investigation into the fraud allegations relating to the Indian tribes. Parker Notes (Insp. Ex. 10) at DOJ-DS007034.  The notes of Carrillo's interview with the FBI (but again strikingly absent from the transcribed 302), reveal he felt likewise: "no impact [on the] fraud element."  DOJ-DS007026.  Thus, the Committee investigators, in their own words, admit that Mr. Safavian's letter had no bearing on its investigation into alleged fraud against Indian tribes.

Determining whether a statement is "material" implicates two subsidiary questions: "(a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'"  United States v. Gaudin, 515 U.S. 506, 511 (1995).  Parker informed the FBI in September 2005 that he was tasked with "investigating allegations of fraud against the Indian tribes."  Parker 302 (Insp. Ex. 11) at DOJ-DS-001610.  Parker readily admits that in the middle of March, the Committee "decided that they needed to advance the ball on the *investigation of fraud against the tribes*, so they never did an interview" with Mr. Safavian.  Parker Notes (Insp. Ex. 10) at DOJ-DS007030 (emphasis added).  Indeed, Parker told Mr. Safavian directly that he was nothing more than a "check the box" subject because of his attendance at the 2002 Scotland trip.  Parker Notes (Insp.

Ex. 10) at DOJ-DS007031.  Parker has never contacted Mr. Safavian again.  The Department of Justice *solicited* their interview on September 30, 2005, seven months after these communications and two weeks *after* the complaint had been filed, to *ask them whether they would agree* that Mr. Safavian had materially influenced and impeded their investigation.

In light of this underpinning, the government's contention that Mr. Safavian made statements that materially influenced the SCIA investigation into allegations of fraud against the Indian tribes borders on the frivolous.  The question of whether Mr. Safavian accepted a gift from a prohibited source was clearly not the subject of the Committee inquiry.  The failure of the government to connect Mr. Safavian's representations to the Committee with the Indictment's explicit language regarding the precise scope of the investigation – "allegations of misconduct by Lobbyist A and others that had been made by several Native American tribes" – is fatal.  Russell v. United States, 369 U.S. 749, 752-53 (1962) (concluding that the government's failure to present an Indictment that alleges the subject under inquiry by a congressional subcommittee is insufficient).  Without more, the government has failed to allege how Mr. Safavian's representations regarding the 2002 trip are material, much less actionable under § 1001.  Accordingly, Count Five must be dismissed.

## VI.  COUNTS ONE AND FOUR MUST ALSO BE DISMISSED WITH RESPECT TO THE 18 U.S.C. § 2 CHARGES

Counts One and Four of the Indictment allege that Mr. Safavian violated 18 U.S.C. § 2, the aiding and abetting statute.[46]  Indictment ¶¶ 27, 38.  However, neither charge specifies

---

[46]    Section 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

whether the violation pertains to § 2(a) or § 2(b) or provides *any* factual basis for an aiding and abetting offense. Indictment ¶¶ 22-27; 32-38. It is well-settled that an Indictment must provide specific facts that put the defendant on notice as to how the conduct alleged constitutes the essential elements of the offense charged. United States v. Hess, 124 U.S. 483, 487 (1888) (determining that an Indictment "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged"); see also FED. R. CRIM. P. 7(c) ("The Indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). A criminal Indictment "not framed to apprise the defendant 'with reasonable certainty, of the nature of the accusation against him . . . is defective, although it may follow the language of the statute.'" Russell, 369 U.S. at 765 (citation omitted); see also Kanchanalak, 37 F. Supp. 2d at 5 (dismissing count where Indictment did not follow the actual language of § 1505). The Indictment in this case fails to even track the statutory language of § 2, much less provide facts supporting such a charge. For this reason alone, Counts One and Four as they pertain to charges under § 2, must be dismissed.

In addition, the § 2 charges run headlong into the longstanding principle that one cannot aid and abet in the commission of a crime unless there is another who has committed the offense. Nye & Nissen v. United States, 336 U.S. 613, 620 (1949) ("Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one *assists another* in performing.") (emphasis added); United States v. Garrett, 720 F.2d 705, 716 (D.C. Cir. 1983) (recognizing criminal liability under § 2 for a person who "*assists the perpetrator of the crime while sharing the requisite criminal intent*") (emphasis added) (citation omitted); Morgan v.

---

18 U.S.C. § 2.

United States, 159 F.3d 85, 87 (10th Cir. 1947) (concluding that "one cannot be found guilty under a charge of aiding and abetting in the commission of an offense unless there is satisfactory evidence not only of his participation *but also that another for whom he was acting was connected with the offense*") (emphasis added).  The Indictment utterly fails to allege for whom Mr. Safavian was acting, or for that matter, what offense this unnamed person allegedly committed.  Simply stated, Mr. Safavian cannot have aided and abetted himself.  There cannot be criminal liability under § 2 in the absence of an alleged person that the aider or abettor purportedly assisted in committing the underlying crime.

Accordingly, because the § 2 charges asserted against Mr. Safavian are neither supported by facts alleged in the Indictment nor based on any cognizable legal theory, they must be dismissed.

## **CONCLUSION**

For the aforementioned reasons, Defendant Safavian requests that all counts of the October 5, 2005 Indictment be dismissed.

Respectfully submitted,

WILEY REIN & FIELDING LLP


By: /s/ Barbara Van Gelder

    Barbara Van Gelder, Esq.
    Bar No. 265603
    Roderick L. Thomas, Esq.
    Bar No. 433433
    Albert Lambert, Esq.
    Bar No. 489562
    Wiley Rein & Fielding LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032
    FASCIMILE: 202.719.7049

    Attorneys for David H. Safavian

Dated: January 27, 2006