# Exhibit 1

3/01/05  11:33 FAX 20▓▓▓▓▓▓▓▓    GEN. COUNSEL/ETHICS LAW    ☑002

*Safavian*

 David H. Safavian

07/25/2002 10:19 AM

To: Raymond.Mckenna▓▓▓▓▓▓
cc:
Subject: Ethics Guidance

I am in need of an ethics opinion. I (along with wto members of Congress and a few Congressional staff) have been invited by a friend and former colleague on a trip to Scotland to play golf for four days. I will be paying for all of my hotels, meals, and greens fees. The issue is airfare.

The host of the trip is chartering a private jet to take the eight of us from BWI to Scottland and back. He is paying the cost for the aircraft regardless of whether I go or not. In fact, none of the other guest will be paying a proportional share of the aircraft costs. I need to know how to treat this activity.

One other point of relevance: the host is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill).

DHS

David H. Safavian
Chief of Staff
General Services Administration
1800 F Street, N.W., Room 6137
Washington, D.C. 20405
Tel: (2▓▓▓▓▓▓▓
Fax: (2▓▓▓▓▓▓▓▓▓▓
Email: david.safavian▓▓▓▓▓▓

# Exhibit 2

3/01/05  11:33 FAX                    GEN. COUNSEL/ETHICS LAW                    ☒003

This is in response to your inquiry on whether you can accept a gift of free air transportation from a friend to attend an golf trip. You stated that a friend and former colleague, Jack Abramhoff, invited you, along with several members of Congress and a few Congressional staff, to Scotland to play golf for four days. You stated that you will be paying for all of your hotel expenses, meals and greens fees. You noted, however, that your friend would be providing the air transportation at no cost to you and the other guests attending the event. You stated that your friend, who is a lawyer and lobbyist with Greenberg and Traurig, is chartering a private jet to take you and the other participants from BWI to Scotland and back. You stated that neither Mr. Abramhoff nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend.

Section 2635.202 of the Standards of Ethical Conduct for Employees of the Executive Branch states that an employee shall not solicit or accept a gift from a prohibited sources or a gift given because of the employee's official position. 5 C.F.R. 2635.202. A prohibited source is any person who:

    "(1) Is seeking official action by the employee's agency;
    (2) Does business or seeks to do business with the employee's agency;
    (3) Conducts activities regulated by the employee's agency;
    (4) Has interests that may be substantially affected by performance or nonperformance of the employee's official duties; or
    (5) Is an organization a majority of whose members are described in paragraphs (1) and (4) above.

5 C.F.R. 2635.203 (d).

A gift is solicited or accepted because of an employee's official position "if it is from a person other than an employee and would not have been solicited, offered or given had the employee not held the status, authority or duties associated with his Federal position. 5 C.F.R. 2635.203(e).

Since the gift is not being offered by a prohibited source and the it is not being given because of your official position, the gift acceptance restrictions under 5 C.F.R. 2635.202 do not apply to you. Consequently, you may accept the gift of free air transportation.

You are reminded that you must report the gift of free transportation on Schedule B, Part II of your next Public Financial Disclosure Report if the gift totals more than $260.

If you have any questions, please feel free to contact Eugenia Ellison or Dan Ross on 5

# **Exhibit 3**

From:        Abramoff, Jack ███████████████████████████ on behalf
             of Abramoff, Jack ██████
Sent:        Thursday, July 25, 2002 2:04 PM
To:          van Horne, Jon (Shld-DC-Legis)
Subject:     RE: Old Post Office and leases

Thanks.

-----Original Message-----
From:    van Horne, Jon ██████
Sent: Thursday, July 25, 2002 2:10 PM
To:   Abramoff, Jack ████████
Subject:   RE: Old Post Office and leases

The Haun chain of command will be ready shortly; the legislative history is being
assembled and some stuff should be available today.

-----Original Message-----
From: Abramoff, Jack ████████
Sent: Thursday, July 25, 2002 8:42 AM
To: van Horne, Jon ████████
Subject: FW: Old Post Office and leases


This might get interesting.  Can you get someone to put together all the legislative
history on this outlease so we are ready to pounce from the Hill, and find out who are
Haun's bosses, and where he fits into the chain at OMB.  Thanks.

-----Original Message-----
From:    david.safavian███████████████
Sent: Thursday, July 25, 2002 8:30 AM
To:   abramoffj███████
Subject:   Fw: Old Post Office and leases

Fyi, Haun is our examiner at OMB. "A" is the administrator. I suspect we'll end up having
to bring some Hill pressure to bear on OMB. David

-----------------------------
Sent from my BlackBerry Wireless Handheld

    From:    Joseph Moravec
    Sent:    07/25/2002 08:21 AM
    To:      David H. Safavian████████████
    Cc:      Paul E. Chistolini████████████; Lea J. Uhre███████████
    Subject:    Old Post Office and leases

OMB has indicated that they will not approve the Section 111 outlease of the Old Post
Office despite our direction from Congress,the expectations of the marketplace (this is a
highly anticipated event) and that it's the right thing to do. I spoke directly to Haun a
month ago ,telling him in no uncertain terms that A and I supported the outlease.Their
alternative suggested directions are stupid.We believe that Haun, a very independent
minded careerist who opposes the outlease for his own peculiar reasons,has acted
unilaterally. I want to reverse this decision and will probably need A's support .I will
be in touch today on this.


CREATING A SUCCESSFUL FUTURE AT GSA by living our values everyday and working together to
achieve our goals.  ----- Forwarded by Joseph Moravec████████████ on 07/25/2002 08:12 AM
-----

DOJ-DS-001018

GTG-E000093120

Moravec ████████   Paul E.          To:   Anthony Costa ███████, Joseph
                   Chistolini       DC Williams ███████
                                    cc:
07/24/2002         Subject:   Old Post Office and leases
06:13 PM

I just spoke to Julie about the Old Post Office. She stated that Haun had passed on to her the following: that the "policy" people had decided that there are only two choices for this building. Either fix it up for a federal tenant or sell it. I asked if selling it could mean that we would do a sec 111 outlease as that would preserve the asset to the government but not require an investment or re-occupancy by the Feds. She said his notes said no outlease. So, it makes you wonder who in the policy office made this decision and how that was arrived at. Of course it could just be David Haun being David Haun. I think we need a leapfrog strategy that goes to the highest necessary, "political" person at OMB and turns it around. The argument needs to be made that fixing up this building would be very expensive and as a result would take a long time to get through a priority queue. By that time it would be in much worst shape. Rather than sell it and receive immediate gratification from some small amount of income, an outlease (for a long period of time) that preserves the asset and provides income is a better solution. Understanding that argument shouldn't be hard.

We need to get some more information together and we need a strategy session immediately.

2

DOJ-DS-001019

GTG-E000093121

# Exhibit 4

**From:** Abramoff, Jack ████████████████████████████ on behalf of Abramoff, Jack █
**Sent:** Thursday, August 01, 2002 1:36 PM
**To:** 'David Safavian home'
**Subject:** FW: OPO

Good stuff.

----Original Message----
**From:** van Horne, Jon █████████
**Sent:** Thursday, August 01, 2002 1:19 PM
**To:** Abramoff, Jack ███████
**Subject:** OPO

This was on the GSA website today:

The General Services Administration will not be issuing the Request for Qualifications (RFQ) for the Old Post Office (OPO) on July 31, 2002 because of additional, internal reviews. In the mean time, we encourage you to submit your contact information, using the email sign-up form on this website, so that we can notify you when the RFQ is posted on the website. GSA anticipates issuing the RFQ, shortly.

I assume this is good news.

1

DOJ-DS-001063

GTG-E000093172

# **Exhibit 5**

(1-4)



GSA National Capital Region

# Old Post Office Fact Sheet

The Old Post Office (OPO), completed in 1899 as the Post Office Headquarters and the city's post office, is the only major 19th century building remaining in the Federal Triangle. Its massing, unique design and significant height make it a central component of the Federal Triangle and Washington's skyline. Numerous plans have been made to demolish the building, but the 1970's local preservationists saved the building from destruction. In response to these efforts, Congress enacted the Public Buildings Cooperative Use Act of 1976 (CUA), that allowed both Government and commercial enterprises to share federally owned buildings.

September 2003

1

DOJ-DS006182

GSA National Capital Region

# Old Post Office Fact Sheet

- The redevelopment of the OPO, in the early 1980's, grew out of the CUA. GSA entered into a 55 year outlease of the OPO with the Post Office Pavilion Joint Venture (POPJV). The upper floors continued to be used by federal agencies. This reuse of the OPO, and the addition of the Annex, was not financially successful. In 1993, POPJV defaulted on its private financing. Its lender assumed control of the leasehold improvements and experienced many of the same financial challenges in achieving a sustainable commercial venture. Some of the reasons for the failure of the retail include:

  – Poor tenant satisfaction and constant retail turnover;

  – No clear destination identify led to poor financial performance;

  – Overall deterioration of the downtown retail market; and

  – Failure to utilize the whole of the building in a unified manner where all the building elements contributed to a comprehensive development strategy.

September 2003

2.

GSA

DOJ-DS006183



GSA National Capital Region

# Old Post Office Fact Sheet

The Omnibus Consolidation and Emergency Supplemental Appropriation Act of 1999, Public Law 105-277, required the General Services Administration (GSA) to submit a development plan for the OPO. This plan had to be submitted before Federal funds could be used to convert the OPO from office to another use or Federal funds could be made available to buyout the existing leasehold. GSA's plan also had to be approved by the Senate Committee on Environment and Public Works and the House Committee on Transportation and Infrastructure.

In response to the requirement, GSA submitted a development plan, first to the Office of Management and Budget (OMB) in May 1999. GSA's plan proposed to relocate the existing Federal tenants and outlease the entire structure under provisions of Section 111 of the National Historic Preservation Act. After input from OMB, a revised plan was submitted to Congress in December 2000.

September 2003

3

DOJ-DS006184

GSA National Capital Region

# Old Post Office Fact Sheet

- The revised plan required that the building be redeveloped as a hotel and that GSA receive a $12.5 payment at the commencement of the outlease term. In 2001, the aforementioned Congressional committees approved the revised plan, but with two major exceptions. The first being that end use could not be restricted to hotels and the second being that GSA could not require a minimum upfront fee.

**September 2003**



4

DOJ-DS006185

# Exhibit 6

| From: | Abramoff, Jack ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓on behalf |
|-------|------|
|       | of Abramoff, Jack ▓▓▓▓▓▓▓ |
| Sent: | Friday, July 26, 2002 12:19 PM |
| To: | 'David Safavian home' |
| Subject: | FW: Naval Weapons Facility |

Maybe we should not focus on the Jewish part?

-----Original Message-----
From:      david.safavian▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Sent: Friday, July 26, 2002 9:13 AM
To:   abramoffj▓▓▓▓▓▓
Subject:   Fw: Naval Weapons Facility

This is the type of bureaucracy I'm dealing with.  I am still running the traps on the 1 year lease. Dhs

--------------------------
Sent from my BlackBerry Wireless Handheld

        From:     David H. Safavian
        Sent:     07/26/2002 09:10 AM
        To:       Shawn McBurney▓▓▓▓▓▓▓▓▓
        Subject:      Re: Naval Weapons Facility

Shawn- it doesn't matter that they aren't at the disposal stage, as I understand that Capitol Sports wants to do this using legislation (evidently, it is a Jewish high school and sports academy). Dhs

--------------------------
Sent from my BlackBerry Wireless Handheld

        From:     Shawn McBurney
        Sent:     07/26/2002 08:33 AM
        To:       Sharon R. Jenkins▓▓▓▓▓▓▓▓
        Cc:       Anthony Costa▓▓▓▓▓▓▓▓▓▓▓ David H. Safavian▓▓▓▓▓▓▓▓
        Subject:      Re: Naval Weapons Facility

Thanks.
Shawn McBurney
Associate Administrator, Congressional and Intergovernmental Affairs U.S. General Services Administration 1800 F Street, NW, Room 6105 Washington, DC 20405
(2▓▓▓▓▓▓▓    Fax (2▓▓▓▓▓▓▓▓
shawn.mcburney▓▓▓▓▓▓▓▓
www.gsa.gov

|  |  |
|--|--|
| Sharon R. Jenkins | To:  Shawn McBurney▓▓▓▓▓▓▓▓ |
|  | cc:  Anthony Costa▓▓▓▓▓▓▓▓David H. Safavian▓▓▓ |
| 07/26/2002 | Subject:    Re: Naval Weapons Facility(Document |
| 08:09 AM | link: Shawn McBurney) |

1

DOJ-DS-001034

GTG-E000093105

Shawn, we can't accommodate their request because we're not considering disposal at this time. However, we will be assessing federal needs in the fall. After the assessment is completed we'll know whether or not disposal is recommended. It's also important to note that if we determine to dispose, we're required to following disposal procedures. If you have questions on this please call me.
Sharon Jenkins - 2███████████

Shawn McBurney        To:    Sharon R. Jenkins████████
                              cc:    Anthony Costa████████████        David H.
                      07/25/2002              Safavian████████
                      01:00 PM        Subject:        Re: Naval Weapons Facility(Document
link: Sharon R. Jenkins)

Sharon,
Thanks for all your help with this. Here's the requirement for the folks that are looking for space at the facility: Identify a 50 acre section, ideally with buildings on it, within the White Oak site for potential use as a school for about 200 children. Can this be accommodated? The Hill would like to know ASAP. Thanks. Shawn McBurney Associate Administrator, Congressional and Intergovernmental Affairs U.S. General Services Administration 1800 F Street, NW, Room 6105 Washington, DC 20405
(2███████████    Fax (2████████
shawn.mcburney██████████
www.gsa.gov

                      Sharon R.        To:    Shawn McBurney███████████
                      Jenkins          cc:    Anthony Costa███████
                                       Subject:        Re: Naval Weapons Facility(Document
link: Shawn McBurney)
07/24/2002
06:57 AM

o.k.  We will confirm what we can release and get back to you today.

Shawn McBurney        To:    Sharon R. Jenkins███████████
                              cc:    Anthony Costa████████████
07/23/2002            Subject:    Naval Weapons Facility
06:12 PM

The group that would like the info is the National Capital Athletic Association (evidently they organize sports activities for disadvantaged children). They understand that space is available and, if so, they would like to know if the could occupy it. Thanks. Shawn McBurney Associate Administrator, Congressional and Intergovernmental Affairs U.S. General Services Administration 1800 F Street, NW, Room 6105 Washington, DC 20405
(2███████████    Fax (2████████
shawn.mcburney██████████
www.gsa.gov

                                       2                    DOJ-DS-001035

                                                            GTG-E000093106

3

DOJ-DS-001036

GTG-E000093107

# Exhibit 7

**From:**       Abramoff, Jack ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
                of Abramoff, Jack ▉▉▉▉
**Sent:**       Friday, August 02, 2002 2:28 PM
**To:**         'Pam Abramoff'
**Subject:**    RE: Message from pam

I agree with all of this.

    -----Original Message-----
**From:**       Pam Abramoff ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Friday, August 02, 2002 3:12 PM
**To:**   Dad Office
**Subject:** RE: Message from pam

Well, we have signed an agreement with Bill Miller and I'm not sure what it says except I
do know that he has been earning over $100 per hour for several weeks (maybe even two
months) for time spent locating a property. I just want to make sure that WE don't have to
pay him a commission on the Chestnut Hill place on top of what he's already "earned".
Hopefully Jon Van Horn will demand that the Waldorf school pay his commission. In the
agreement, all fees he earns from us will be deducted from the commission. We have to
figure out how to work that so we aren't out of pocket so much.

I'm so bummed out by the huge amount of money being sucked out of us for Eshkol,
especially now that the White Oak property is dead. Honestly, if Dov (and by default you
and I) hadn't made all these promises to so many people, I would say we should just dump
this money pit. Two ways we CAN reduce the outlay by $250K is to fire Boncek and Dov.
There HAS to be other ways, too. I don't trust Colin to find ways, either, because he
wants his people to stay loyal to him, but we HAVE to trim the budget.

Did you know that we're charging boarders only $3000 more for tuition than regular
students? Colin is going to check what other prep schools charge but it's a lot more than
we are. Dov has been criminally irresponsible for all of this money mess.

    -----Original Message-----
**From:**       abramoffj▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Friday, August 02, 2002 1:58 PM
**To:**   Pam▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Subject:**    FW: Message from pam

I am confused. Am I or am I not able to raise this with Colin?

    -----Original Message-----
**From:**       Litwack, Maury ▉▉▉▉▉▉▉▉
**Sent:** Friday, August 02, 2002 11:39 AM
**To:**   Abramoff, Jack ▉▉▉▉▉▉▉▉▉
**Subject:** Message from pam

Bill miller is being paid a hundred an hour and we need to know **exactly how many hours** he
has/will work,
-------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

The information contained in this transmission may contain
privileged and confidential information. It is intended only
for the use of the person(s) named above. If you are not the
intended recipient,  you are hereby notified that any review,
dissemination, distribution or duplication of this
communication is strictly prohibited. If you are not the

1

GTG-E000098983

DOJ-DS007062

intended recipient, please contact the sender by reply email
and destroy all copies of the original message.

To reply to our email administrator directly, please send an
email to postmaster ▮▮▮▮▮▮▮▮

2

GTG-E000098984

DOJ-DS007063

# Exhibit 8

MAR-26-2003  10:04      GSA/OIG/DC                          2█████  P.02/02

untitled

GSA mspector General

Fax (2█████████

suject: David safavian

It has recently come to my attention that David safavian engaged in activity in violation
of federal law.

It is my understanding that short?  after his appointment to GSA he participared *in*
an international golfing trip provrded by lobbyists.

In November of *2002* h@ participated in political campaigns in other States.   During these
activities he used his gavernmeng cellphone. computer and Blackberry.
Those of us who work in the federal government expect mare from those who are appoinred
and would like to make sure resources aren't misused.

Page 1

TOTAL P.02

DOJ-DS-001470

# **Exhibit 9**

FOR OFFICIAL USE ONLY

May 15, 2003

MEMORANDUM FOR     STEPHEN A. PERRY
                       ADMINISTRATOR (A)

FROM:                 DANIEL R. LEVINSON
                       INSPECTOR GENERAL (J)

SUBJECT:         REPORT OF INVESTIGATION RE:
                       David H. Safavian

Attached for your information is a report detailing an investigation of David H. Safavian, Chief of Staff, GSA. The investigation was initiated based on a Hotline complaint received by my office alleging improper conduct. Our investigation did not substantiate any of the allegations.

Should you require any additional information regarding this subject, please do not hesitate to contact me.

Attachment

cc: Official File
    copy JI – J
JID:CJAUGONE:cel:5/15/03

Concurrence:
JI _____ Date 1/15/03
JD _____ Date 5/16/03

DOJ-DS-001479

FOR OFFICIAL USE ONLY

# Exhibit 10

7 of 14 DOCUMENTS

Copyright 2004 The Washington Post
The Washington Post

February 22, 2004 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 2576 words

**HEADLINE:** A Jackpot From Indian Gaming Tribes;
Lobbying, PR Firms Paid $45 Million Over 3 Years

**BYLINE:** Susan Schmidt, Washington Post Staff Writer

**BODY:**

A powerful Washington lobbyist and a former aide to House Majority Leader Tom DeLay (R-Tex.) persuaded four newly wealthy Indian gaming tribes to pay their firms more than $45 million over the past three years for lobbying and public affairs work, a sum that rivals spending to influence public policy by some of the nation's biggest corporate interests.

Touting his ties to conservatives in Congress and the White House, lobbyist Jack Abramoff persuaded the tribes to hire him and public relations executive Michael Scanlon to block powerful forces both at home and in Washington who have designs on their money, according to tribe members.

Under Abramoff's guidance, the four tribes -- Michigan's Saginaw Chippewas, the Agua Caliente of California, the Mississippi Choctaws and the Louisiana Coushattas -- have also become major political donors. They have loosened their traditional ties to the Democratic Party, giving Republicans two-thirds of the $2.9 million they have donated to federal candidates since 2001, records show.

The payday for the GOP is small though, compared with the $15.1 million the tribes have paid Abramoff and his law firm, Greenberg Traurig, which has rocketed to the ranks of top lobbyists on the fees it has charged gaming tribes, lobbying records show.

And those fees -- 10 or 20 times what the tribes paid their former lobbyists -- are about half of what Scanlon has taken in. Scanlon, 33, himself a former Greenberg lobbyist who was recommended by Abramoff, has been paid $31.1 million, according to documents and interviews with tribal members.

The fees are all the more remarkable because there are no major new issues for gaming tribes on the horizon, according to lobbyists and congressional staff. The tribes' payments for lobbying and public affairs work are comparable to what large corporations spend on lobbying in Washington: General Electric Co. paid more than two dozen lobbying firms $30.4 million over the same three-year period, according to federal records. The nation's top four pharmaceutical companies paid dozens of lobbying and law firms $34.8 million between mid-2002 and mid-2003, according to the records.

"Those fees would certainly stand out as greater in magnitude than what rank-and-file tribes pay," said Phil Hogen, chairman of the National Indian Gaming Commission, which regulates Indian gaming. "I guess they have been persuaded there is some value or return for that, but what that is, I'm not aware," Hogen said.

Abramoff has also advised tribes to give hundreds of thousands of dollars to obscure groups whose connections to Indian concerns are unclear, according to documents and numerous tribe members. One of those organizations, located at a Scanlon property in Rehoboth Beach, Del., paid $1.5 million in lobbying fees to Greenberg Traurig over a recent two-year period.

A Jackpot From Indian Gaming Tribes; Lobbying, PR Firms Paid $45 Million

The spending by tribal leaders has spawned passionate battles within the tribes. Audrey Falcon, newly elected chief of the Saginaw Chippewas, told tribe members in a letter last week that "$14 million of your dollars was spent for lobbyists that yielded little or no results for our tribe."

Her predecessor, Maynard Kahgegab, defended the spending in an interview. Abramoff won federal funds for the tribe and Scanlon built a database "market protection program" to try to defeat the slot machines of other tribes and at racetracks, he said.

Chris Petras, who was ousted last month from his job as legislative director of the Saginaw Chippewas, said Greenberg Traurig "really established the tribe in Washington as a serious entity in terms of being a policy player." He said Abramoff got funding for several projects earmarked for the tribe, including a $1.2 million residential treatment facility and $3 million for a new school.

Abramoff declined to catalogue the accomplishments he has brought the tribes. Asked what he provides the tribes for the fee of $180,000 a month that each pays, he said: "I think we bring an order of magnitude in terms of our success and our approach on behalf of the tribes. A lot of these tribes who have thrown off the relatively inexpensive lobbyists basically come to us with the comment of 'you get what you pay for.' "

Scanlon declined to be interviewed, but he said in a faxed statement that some newly elected tribal leaders have criticized him because they "want to send business to their own guys."

"The bottom line is that my firm delivers. We provide expensive services, in an expensive industry and we get the job done," his statement said.

Abramoff's lobbying fees must be publicly reported under federal laws, but Scanlon's revenue is largely hidden from public scrutiny. Nowhere must Scanlon disclose his fees for public relations and grass-roots organizing. Copies of some of the contracts he has entered into with the tribes have been provided to The Washington Post by tribal members and sources close to the tribes who are outraged by the fees they are paying.

Tribal spending is seldom scrutinized by federal law enforcement authorities, who regulate gaming but must be careful about trampling on tribal sovereignty. In recent months, however, the FBI has stepped up an investigation into alleged spending irregularities by one of Abramoff's clients -- the 800-member Louisiana Coushatta tribe, which takes in hundreds of millions of dollars yearly from its casino. Last week, FBI agents in Michigan also interviewed members of the Saginaw Chippewas, tribal sources there said.

Abramoff's work for the tribes is not the first time he has encountered controversy in connection with gaming interests. In 2001, a federal magistrate ruled that a $23 million down payment put up by Abramoff and a partner as part of the $147 million purchase of Florida-based SunCruz Casinos was never actually paid. Abramoff declined to comment on SunCruz, citing ongoing litigation.

The rise of Indian gaming over the past 15 years has brought riches to some tribes long mired in poverty. Democrats were the first to make inroads in courting tribal leaders often unfamiliar with Washington politics. More recently, Republicans have tapped into growing tribal largess. In 1990, Indian tribes gave no money to Republicans; now tribes are giving much more overall, and almost half of it goes to Republicans.

Abramoff's conservative-movement credentials date back more than two decades to his days as a national leader of the College Republicans, along with Grover Norquist, an anti-tax activist close to the Bush White House, and Ralph Reed, former head of the Christian Coalition. He spent nearly a decade as a Hollywood producer before finding his niche in the 1990s as a Washington lobbyist, with entree to the conservatives who were taking control of Congress. He enjoys a close bond with DeLay.

Abramoff counts as a major success his 1995 efforts to persuade DeLay and other Republicans to defeat a proposed tax on Indian gaming. Tribes don't want to be taxed, he said, and in that sense they are "engaged in the same ideological and philosophical efforts that conservatives are -- basically saying, 'Look, we want to be left alone.' "

Abramoff currently represents seven gaming tribes. Scanlon represents four of the wealthiest in that group.

But some members of the tribes in Louisiana and California have begun to complain that they are getting little for their money.

New members of Michigan's Saginaw Chippewa tribal council have gone a step further. They canceled Abramoff's contract two months ago and have just terminated a contract with Scanlon that would have paid him another $2.7 mil-

A Jackpot From Indian Gaming Tribes; Lobbying, PR Firms Paid $45 Million

lion this quarter. In just over two years, the tribe paid $3.9 million to Greenberg Traurig and $10 million to Scanlon's firm, according to lobbying reports, contracts and tribal documents obtained by The Post. The fees accounted for 25 percent of the tribe's entire budget in 2002.

"Tribes are gullible," said Bernard Sprague, a Saginaw Chippewa tribal council member who has led the effort to cancel the contracts. "These guys come in and say, 'They are going to take your sovereignty or your land or your livelihood unless you pay us outrageous amounts of money.' They need to be exposed because tribes don't know."

The Agua Caliente Band of Cahuilla Indians in Palm Springs, Calif., hired Abramoff's firm in mid-2002, and a year later had paid $1.68 million in lobbying fees. At Abramoff's direction, tribe members said, the tribe hired Scanlon to build a database of political supporters and to conduct a $7.4 million letter-writing campaign designed to win support from then-Gov. Gray Davis (D) for more slot machines. That unsuccessful effort generated about 2,000 letters, according to sources close to the tribe -- at a cost of $3,700 per letter.

"There are people here, just like at other tribes, concerned about the fees and whether they are appropriate for what they are getting for the tribes," said Barbara Gonzales Lyons, vice chairman of the Agua Caliente tribal council.

In Michigan and in Louisiana, a few tribal council leaders sometimes made spending decisions without disclosing the details to others, according to the minutes of council meetings and interviews with tribe members. "We were dishing out huge amounts of money for campaigning and lobbying. We're trying to find out what we were paying for," said David Sickey, who was elected in June to Louisiana's Coushatta Choctaw tribal council.

That tribe has spent $32 million on unspecified "lobbying" costs since 2001, according to an internal memo prepared in May by outgoing tribe comptroller Erick LaRocque. Complaining that "documentation of the nature of these expenditures is very limited," LaRocque's memo said that "approximately $24 million of these funds were taken from the funds designated for health, housing and education of tribal members," and that the council had obtained a $10 million line of credit to cover other expenditures.

"It's disturbing -- it is a huge sum," said Sickey, adding that the "lion's share" of the money went to Scanlon's Capital Campaign Strategies public affairs firm. The Daily Town Talk newspaper in Alexandria, La., has reported that an internal tribe audit shows that the firm received $13.7 million during a one-year period ending in 2002. "Tribal members were not aware of this, not at all," Sickey said.

"We got involved with them around 2000 when we had to get a gaming compact renewed with the state of Louisiana," said Bert Langley, who then served as the Coushattas' secretary-treasurer. "Scanlon and Jack were around for a few meetings. They said they had a good network going. They would mention Tom DeLay and all that bunch, but I'm not sure what they did or who they talked to."

Langley said that Abramoff and Scanlon dealt primarily with tribal council member William Worfel.

Worfel issued a statement praising Scanlon's database and public relations work, saying he helped the Coushattas win a potentially costly compact fight with another tribe seeking to build a casino nearby. "The reports of how much the tribe paid Capital Campaign Strategies and other firms are completely inaccurate," the statement said. He did not return calls seeking an interview.

A fourth tribe, the Mississippi Choctaws, has paid Greenberg Traurig $4.5 million since 2001. A spokeswoman said the tribe also employs one of Scanlon's firms, but she declined to say how much it has been paid.

In addition to recommending political contributions, Abramoff advised the tribes to give hundreds of thousands of dollars to groups whose connection to Indian issues is unclear, according to tribe members. One of those, American International Center (AIC), described itself on its Web site as an "international think tank" that "seeks to expand the parameters of international discourse in an effort to leverage the combined power of world intellect."

The Coushatta audit cited by the Louisiana paper found that AIC received $566,000 in tribal funds. The AIC address listed in Delaware corporate records is a property owned by Scanlon in Rehoboth Beach. AIC's telephone has been disconnected. Reports filed in Congress show that AIC was one of Greenberg Traurig's biggest lobbying clients from 2001 to 2003, paying the law firm fees totaling $1.5 million.

Abramoff declined to comment, citing client confidentiality both for the tribes and AIC. He also declined to comment on a $25,000 donation that tribe documents show the Saginaw Chippewas made to the Capital Athletic Foundation, a local charity he supports.

A Jackpot From Indian Gaming Tribes; Lobbying, PR Firms Paid $45 Million

Tribes have given to two political organizations associated with Norquist; one of the groups, the Council for Republican Environmental Advocacy, was founded by Interior Secretary Gale A. Norton, whose department oversees Indian affairs. Norton is no longer part of the organization. Abramoff said he recommends that tribes contribute to conservative groups.

Scanlon was still paying off student loans when he left his job as a DeLay press spokesman to join the lobbying world of K Street three years ago, court records show. He worked with Abramoff first at the Preston Gates law firm, then followed him to Greenberg Traurig, where he was a registered lobbyist for the Coushattas before establishing two public affairs firms, Capital Campaign Strategies and Scanlon-Gould Public Affairs. The address on company correspondence is a mail drop on Pennsylvania Avenue.

Property and divorce records reveal that Scanlon or his companies have purchased at least $14 million worth of real estate since 2001, including a $6.3 million Delaware office park and a seaside mansion in Rehoboth Beach that he bought for $4.7 million in cash. In 2002, he took a $17,000-a-month apartment at the Ritz Carlton in Washington's West End.

Abramoff said in an interview that he does not have an ownership interest in any of Scanlon's firms. He refused to discuss his business dealings with Scanlon, or respond to tribal members' assertions that he advised the tribes to hire Scanlon. In an interview attended by five colleagues from Greenberg Traurig, Abramoff said the firm has no official ties to Scanlon's companies.

"In terms of Mike or any other third party, the firm does not have any formal relationship to my knowledge with any third-party vendor used by any of the tribes for some of their activities," he said.

Scanlon's companies are incorporated in Delaware, where privacy laws shield corporations from disclosing ownership.

Asked whether Greenberg Traurig knew of Abramoff's work with Scanlon, Jill Perry, a spokeswoman for the law firm, said: "At this time we have no comment."

Sprague, a Saginaw Chippewa tribal council member, and David Otto, a former member, contend that in 2001, before Scanlon was hired, his firm provided mailings for council members facing election.

"Michael Scanlon's company sent out election mailers to tribal members promoting the election of the 'Slate of Eight,' " said Otto, who was on the slate. "It was kind of like, 'We'll do this for you, and we'll talk about -- once you get in office -- doing work for you.' "

Federal law bars the use of tribe resources for election campaigns. "If we have evidence that the fees are for activities that benefit individuals rather than the tribe as a whole, we would investigate that as a possible misuse of gaming revenues," said Alan Fedman, director of enforcement for the National Indian Gaming Commission.

Research editor Margot Williams contributed to this report.

**LOAD-DATE:** February 22, 2004

# Exhibit 11

JOHN McCAIN, ARIZONA, CHAIRMAN
BYRON L. DORGAN, NORTH DAKOTA, VICE CHAIRMAN

PETE V. DOMENICI, NEW MEXICO          DANIEL K. INOUYE, HAWAII
CRAIG THOMAS, WYOMING                 KENT CONRAD, NORTH DAKOTA
GORDON SMITH, OREGON                  DANIEL K. AKAKA, HAWAII
LISA MURKOWSKI, ALASKA                TIM JOHNSON, SOUTH DAKOTA
MICHAEL D. CRAPO, IDAHO               MARIA CANTWELL, WASHINGTON
RICHARD BURR, NORTH CAROLINA
TOM COBURN, M.D., OKLAHOMA

          JEANNE BUMPUS,
     MAJORITY STAFF DIRECTOR
       PATRICIA M. ZELL,
MINORITY STAFF DIRECTOR/CHIEF COUNSEL

# United States Senate

### COMMITTEE ON INDIAN AFFAIRS
WASHINGTON, DC 20510–6450
http://indian.senate.gov

February 23, 2005

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

David H. Safavian

Dear Mr. Safavian:

As you may know, the Senate Committee on Indian Affairs ("the Committee") is investigating allegations of misconduct made by several Indian tribes against their lobbyists and other representatives. In furtherance of its investigation, the Committee requests that you provide no later than Wednesday, March 23, 2005, all records reflecting, referring, or relating to the 2002 Scotland golf trip that you attended with Mr. Jack Abramoff and others. For purposes of this request, the term "records" includes, but is not limited to, all communications (including e-mails), notes, memoranda, itineraries, receipts, invoices, canceled checks, banking statements, reports, etc.

After you have completed producing all responsive records, please certify that you have completed your search for and production of all responsive records. If you invoke a privilege as to any responsive record as a ground for withholding such record, please list each such record by date, type, addressee, author (and if different, the preparer and signatory), general subject matter, and indicated or known circulation. Also, indicate the privilege asserted with respect to each record, document, compilation of data or information in sufficient detail for the Committee to ascertain the validity of the claim of privilege.

David H. Safavian
February 23, 2005
Page 2

Finally, in light of this congressional investigation, please assure that all pertinent records, and records reasonably calculated to lead to discovery of pertinent records, are preserved, subject to additional requests that you produce them.

If you have any questions, please contact Deputy Chief Investigative Counsel Bryan D. Parker at (2███████████ Thank you for your cooperation.

Sincerely,

John McCain
Chairman

# Exhibit 12



**GSA Office of General Counsel**

DATE: __2/1/05__

FROM: __Eugenia D. Ellison__

TO: David Safavian
OFPP/OMB

Office of General Counsel
    General Law Division
    Ethics Law Staff (LG)

FAX NUMBER: ___(2███████___

PHONE NUMBER: ___(2███████___

LOCATION: __GSA/OGC/LG  Room 4███__

FAX NUMBER: (2███████████

PHONE NUMBER: (2███████████

LOCATION: OFPP/OMB

TOTAL NUMBER OF PAGES
INCLUDING COVER SHEET: __3__

CORRESPONDENCE
SYMBOL: _____

COMMENTS:

Attached is a copy of The email message That you sent to Ray McKenna pertaining to The Scotland trip.

I have also attached a copy of a response that I gave to Ray. I don't Know if he ever sent it to you or just telephoned you the response.

                                    _LO Ellison_

**U.S. General Services Administration**
1800 F Street, NW
Washington, DC 20405-0002
www.gsa.gov

*Safavian*



**David H. Safavian**

07/25/2002 10:19 AM

To: Raymond.Mckenna█████████
cc:
Subject: Ethics Guidence

I am in need of an ethics opinion. I (along with wto members of Congress and a few Congressional staff) have been invited by a friend and former colleague on a trip to Scotland to play golf for four days. I will be paying for all of my hotels, meals, and greens fees. The issue is airfare.

The host of the trip is chartering a private jet to take the eight of us from BWI to Scottland and back. He is paying the cost for the aircraft regardless of whether I go or not. In fact, none of the other guest will be paying a proportional share of the aircraft costs. I need to know how to treat this activity.

One other point of relevance: the host is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill).

DHS

David H. Safavian
Chief of Staff
General Services Administration
1800 F Street, N.W., Room 6137
Washington, D.C. 20405
Tel: (2█████████
Fax: (2█████████
Email: david.safavian█████████

This is in response to your inquiry on whether you can accept a gift of free air transportation from a friend to attend an golf trip. You stated that a friend and former colleague, Jack Abramhoff, invited you, along with several members of Congress and a few Congressional staff, to Scotland to play golf for four days. You stated that you will be paying for all of your hotel expenses, meals and greens fees. You noted, however, that your friend would be providing the air transportation at no cost to you and the other guests attending the event. You stated that your friend, who is a lawyer and lobbyist with Greenberg and Traurig, is chartering a private jet to take you and the other participants from BWI to Scotland and back. You stated that neither Mr. Abramhoff nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend.

Section 2635.202 of the Standards of Ethical Conduct for Employees of the Executive Branch states that an employee shall not solicit or accept a gift from a prohibited sources or a gift given because of the employee's official position. 5 C.F.R. 2635.202. A prohibited source is any person who:

> "(1) Is seeking official action by the employee's agency;
> (2) Does business or seeks to do business with the employee's agency;
> (3) Conducts activities regulated by the employee's agency;
> (4) Has interests that may be substantially affected by performance or nonperformance of the employee's official duties; or
> (5) Is an organization a majority of whose members are described in paragraphs (1) and (4) above.

5 C.F.R. 2635.203 (d).

A gift is solicited or accepted because of an employee's official position "if it is from a person other than an employee and would not have been solicited, offered or given had the employee not held the status, authority or duties associated with his Federal position. 5 C.F.R. 2635.203(e).

Since the gift is not being offered by a prohibited source and the it is not being given because of your official position, the gift acceptance restrictions under 5 C.F.R. 2635.202 do not apply to you. Consequently, you may accept the gift of free air transportation.

You are reminded that you must report the gift of free transportation on Schedule B, Part II of your next Public Financial Disclosure Report if the gift totals more than $260.

If you have any questions, please feel free to contact Eugenia Ellison or Dan Ross on 5▓▓▓▓▓▓▓

# Exhibit 13



March 17, 2005

The Honorable John McCain
Chairman
Committee on Indian Affairs
United States Senate
Washington, D.C. 20510

RE:    *Information Request Regarding Mr. Jack Abramoff*

Dear Chairman McCain:

This letter is in response to your correspondence of February 23, 2005 regarding a trip to Scotland I took with Mr. Jack Abramoff in August, 2002. Thank you for the opportunity to work with the Committee on this matter.

As you may know, I was invited by Mr. Abramoff to join his trip to Scotland in August, 2002. Mr. Abramoff and I have had a relationship since 1994, when I worked as a new associate at the Preston, Gates & Ellis Rouvelas Meeds law firm where he was a partner.

When the invitation was made, I was the chief of staff to the U.S. General Services Administration ("GSA"). Mr. Abramoff did not have any business before the agency at that time. Prior to departure, I consulted the GSA Office of General Counsel to obtain guidance on the propriety of this trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a "gift from a prohibited source" under the applicable regulations, nor was it considered a gift given because of my official position. Nevertheless, in the exercise of discretion, I gave Mr. Abramoff a check for the value of the trip prior to departure. In addition, I took leave without pay to travel.

Per your request, I have conducted a search of all possibly responsive records, as defined in your correspondence of February 23, 2005. Attached, please find the following:

- A copy of an email I sent on July 25, 2002 to Mr. Ray McKenna, then-GSA General Counsel, asking for an ethics opinion as to the propriety of the invitation;

- A response from Ms. Eugenia Ellison, Associate General Counsel at GSA, indicating that I could attend the trip *gratis*;

- A fax cover sheet from GSA Office of General Counsel transmitting the above two documents;

DOJ-DS-001557

- A copy[1] of cancelled check #844, dated August 3, 2002, and cashed by Mr. Abramoff on August 21, 2002; and

- A copy of my 2002 bank statement[2] showing images of checks written between July 27, 2002 and August 27, 2002 (#833-#851), including check #844.

I am aware of no other information in my possession concerning the August 2002 trip to Scotland. Should you have any further questions, please feel free to contact me.

Very truly yours,

David H. Safavian

Attachments

---

[1] Please note that I consider banking data confidential and personal information, and thus, have redacted my account number.

[2] Please note that I consider banking data confidential and personal information, and thus, have redacted account numbers, amounts and, payees on images of checks written for purposes unrelated to Mr. Abramoff or the trip.

DOJ-DS-001558

# Exhibit 14

PATRICIA MACK BRYAN
COUNSEL

MORGAN J. FRANKEL
DEPUTY COUNSEL

GRANT R. VINIK
ASSISTANT COUNSEL

THOMAS E. CABALLERO
ASSISTANT COUNSEL

**United States Senate**

OFFICE OF SENATE LEGAL COUNSEL
WASHINGTON, DC 20510-7250

September 28, 2005

Nathaniel Edmonds, Esq.
Trial Attorney
Criminal Division
Department of Justice
1400 New York Avenue, NW
Washington, DC 20005

Re: *United States v. David H. Safavian* (D.D.C.)

Dear Mr. Edmonds:

I am writing in response to Assistant Attorney General William E. Moschella's September 23, 2005 letter to the Senate Legal Counsel, and following up on our recent telephone conversations, regarding the Department's request to interview two staff members of the Senate Committee on Indian Affairs in connection with the Department's continuing investigation in the above-referenced matter.

Specifically, you are seeking, in conjunction with the Federal Bureau of Investigation, to interview informally in our office Bryan Parker and Pablo Carrillo, two Committee counsel. As you have described it, the intended focus of the interview is to inquire into the purpose of the Committee's document request letter to Mr. Safavian of February 23, 2005 as it relates to the scope of the Committee's investigation, and the effect of Mr. Safavian's March 17, 2005 response on the Committee's investigation. You have described the scope of these interview requests as narrow and focused on these matters.

Based on this description, and consistent with the Committee's strong interest in assisting the Department's and Bureau's law enforcement efforts, the Committee is pleased to make its counsel available to you for these interviews, with the participation of our office to safeguard the Committee's privileges where any should be asserted.

We understand that you are not seeking formal testimony from the Committee at this time and that, if there comes a time when you do seek such testimony, or the ability to use documents produced by the Committee in an evidentiary proceeding, you will notify the Committee, through our office, in sufficient time to enable the Committee to seek authorization from the Senate, consistent with Rule XI.1 of the Standing Rules of the Senate, for such testimony and documentary production and use.

Sincerely,

Morgan J. Frankel

cc: The Honorable William E. Moschella

DOJ-DS-001621

# **Exhibit 15**

**OFFICE OF GOVERNMENT ETHICS**

**04 x 1**

**Letter to a Federal Employee**
**dated January 7, 2004**

This is in response to your verbal request on December 19, 2003, for guidance concerning the executive branch's rules pertaining to gifts from outside sources. In particular, you wanted to know whether a senior procurement official for [your department] and his spouse may accept meals from a contractor that is competing for a Government contract following a solicitation of bids. More specifically, you asked whether exceptions to any general prohibition might permit the official to accept such meals if the purpose of the meetings at which the contractor pays for the meals is either: (1) to discuss the official's prospective employment with the contractor, or (2) to discuss the contractor's future business opportunities with [your department].

The Standards of Ethical Conduct for Executive Branch Employees (Standards of Conduct) at 5 C.F.R. part 2635 regulate the conduct of employees of the Federal executive branch. 5 C.F.R. § 2635.102(h). With regard to gifts from outside sources, the Standards of Conduct provide that an employee may not solicit or accept any gift that is given because of the employee's official position or that is given by a prohibited source. 5 C.F.R. §§ 2635.201, 2635.202. As defined in the Standards of Conduct, a gift is almost anything of monetary value, such as cash, meals, trips or services. 5 C.F.R. § 2635.203(b). The definition of a gift excludes certain items, such as modest items of food that are not part of a meal. 5 C.F.R. § 2635.203(b)(1). The gift prohibitions also apply to gifts given to an employee's spouse, with the employee's knowledge and acquiescence, because of the spouse's relationship to the employee. 5 C.F.R. § 2635.203(f)(1).

A meal that the procurement official or his spouse accepts from a contractor could be covered by this rule, depending on the facts. Prohibited sources include any person seeking official action by the agency, seeking to do business with the agency or actually doing business with the agency. 5 C.F.R. § 2635.203(d). A competing contractor is a prohibited source because it seeks to do business with the agency. Even a contractor that is not presently competing for new business with the agency is a prohibited source if it is actually doing business with the agency pursuant to existing arrangements. If the contractor were neither seeking to do business nor doing business with the agency, the rule would still apply if the procurement official is accepting the gift

because of his official position. A gift is "accepted because of the employee's official position if it is from a person other than an employee and would not have been solicited, offered, or given had the employee not held the status, authority or duties associated with his Federal position." 5 C.F.R. § 2635.203(e).

There are limited exceptions that permit acceptance of gifts under certain circumstances, notwithstanding the prohibitions discussed above. 5 C.F.R. § 2635.204. One exception does permit employees to accept gifts from a prospective employer in conjunction with bona fide employment discussions. 5 C.F.R. § 2635.204(e)(3). However, in addition to other limitations that 5 C.F.R. § 2635.202(c) imposes generally on all of the gift exceptions, this exception is subject to two specific limitations. The first limitation requires that any meals provided to the procurement official must be of a sort customarily provided to prospective employees.[1] The second limitation would require the procurement official to observe regulatory disqualification requirements if the contractor's financial interests could be affected by the performance or nonperformance of the procurement official's duties. Whenever this limitation is applicable, an executive branch employee must undertake the affirmative measures prescribed by 5 C.F.R. Part 2635, Subpart F, which describes the circumstances in which employees must recuse themselves from matters affecting the financial interests of persons with whom they are seeking employment.

The Standards of Conduct contain no regulatory exception for a meal provided at a meeting to discuss future business opportunities with the employee's agency. Despite the absence of any such exception, an employee may accept a gift, including a meal, that has a value of $20 or less on a single occasion, provided that the aggregate value of all gifts from a given source does not exceed $50 within a period of one year.[2] 5 C.F.R. § 2635.204(a). Because the source is deemed to be the entire organization, an employee may not exceed this limitation by accepting gifts from different employees or representatives of the same organization. 5 C.F.R. § 2635.102(k). Moreover, the gift may never be in the form of

---

[1] A distinct factual issue would also be whether meals are customarily provided to a spouse in such circumstances.

[2] Although this exception permits the acceptance of gifts of *de minimis* value, the Standards of Conduct remind employees that "it is never inappropriate and frequently prudent for an employee to decline a gift offered by a prohibited source or because of his official position." 5 C.F.R. § 2635.204.

2

cash, and the employee may not pay the difference for gifts exceeding the $20 limit. 5 C.F.R. § 2635.204(a).

It bears emphasizing another important limitation on all of the exceptions for gifts from outside sources. During your conversation with a member of my staff, you mentioned the criminal prohibition at 18 U.S.C. § 201. The relationship between the criminal prohibition and the Standards of Conduct is such that the regulatory exceptions relate to only part of 18 U.S.C. § 201. 18 U.S.C. § 201 prohibits both illegal gratuities at section 201(c) and bribery at section 201(b). The exceptions in the Standards of Conduct relate only to the acceptance of gratuities addressed in 18 U.S.C. § 201(c).[3]   5 C.F.R. § 2635.202(b). They do not relate to bribery addressed in 18 U.S.C. § 201(b). As explained in the body of the Standards of Conduct, an employee may not rely upon the regulatory exceptions when accepting a gift in return for being influenced in the performance of an official act, when soliciting or coercing a gift, or when accepting gifts from the same or different sources so frequently as to create the appearance of using public office for private gain. 5 C.F.R. § 2635.202(c). Therefore, conduct violating 18 U.S.C. § 201(b) will not qualify for any of the regulatory exceptions.

On a topic related to your inquiry, both the Standards of Conduct and a criminal statute prohibit an employee from participating personally and substantially in a particular matter in which any person or organization with whom the employee is negotiating concerning prospective employment has a financial interest.[4]   5 C.F.R. §§ 2635.601-2635.606, 18 U.S.C. § 208(a)(1). If the procurement official is meeting with the contractor for the purpose of employment discussions, he must comply with applicable regulatory disqualification requirements or receive a waiver under 18 U.S.C. § 208(b). See 5 C.F.R. §§ 2635.604, 2635.605.

This discussion has focused on the Office of Government Ethics regulatory Standards of Ethical Conduct and related provisions in

---

[3]  Note that this discussion focuses specifically on the acceptance of a gratuity, rather than on the offer of one. This distinction is made because the Standards of Conduct, including the regulatory exceptions discussed herein, address only the conduct of covered employees and not that of any outside sources offering gifts.

[4]  The Standards of Conduct cover a broader range of activity than the criminal statute covers--including an employee's unilateral expression of interest in employment, under certain circumstances--but both cover negotiations concerning employment.

18 U.S.C. § 208. You may wish to consult the appropriate [department] officials with responsibility for procurement integrity to determine whether additional authorities are applicable to your inquiry.

Sincerely,

Marilyn L. Glynn
Acting Director

4

# Exhibit 16

Westlaw.

56 FR 33778-01                                                    Page 1
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

PROPOSED RULES

OFFICE OF GOVERNMENT ETHICS

5 CFR Part 2635

RIN 3209-AA04

Standards of Ethical Conduct for Employees of the Executive Branch

Tuesday, July 23, 1991

AGENCY: Office of Government Ethics.

ACTION: Proposed rule.

SUMMARY: The Office of Government Ethics proposes to issue uniform standards of
ethical conduct for officers and employees of the executive branch of the Federal
Government (hereinafter, Government) that will supersede most of subparts A, B and
C of 5 CFR part 735 and agency regulations issued thereunder, as well as 5 CFR
2635.101 of the Office of Government Ethics regulations.    The new standards issued
by the Office of Government Ethics will be published at revised 5 CFR part 2635,
consistent with the earlier transfer and redesignation of other Office of
Government Ethics regulations. See 54 Federal Register 50229-50231 (December 5,
1989).

 The proposed rule establishes standards relating to the receipt of gifts, whether
from prohibited sources, because of official position, or between employees.    It
establishes standards for dealing with the employee's own and other financial
interests that conflict with the performance of an employee's official duties.
These include disqualification requirements that apply when a matter to which the
employee is assigned affects a person with whom he is seeking employment.    In
addition to standards relating to use of official position and time, Government
property, and nonpublic information, it establishes specific standards for
application to outside activities in which an employee may participate, including
fundraising and outside employment.

DATES: Comments by agencies and the public are invited and are due September 20,
1991.

ADDRESSES: Office of Government Ethics, Suite 500, 1201 New York Avenue, NW.,
Washington, DC 20005-3917, Attention Ms. Wilcox.

FOR FURTHER INFORMATION CONTACT: Leslie Wilcox or Julie Loring, Office of
Government Ethics, telephone (202/FTS) 523-5757, FAX (202/FTS) 523-6325.

SUPPLEMENTARY INFORMATION:

SUBSTANTIVE DISCUSSION, TABLE OF CONTENTS

I. Summary of Legal Background

        ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                              Page 2
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

II. General Provisions

III. Gifts from Outside Sources

IV. Gifts between Employees

V. Conflicting Financial Interests

VI. Impartiality in Performing Official Duties

VII. Seeking Other Employment

VIII. Misuse of Position

IX. Outside Activities

X. Revocation by OPM of Superseded Portions of 5 CFR Part 735 and by OGE of Current
5 CFR 2635.101

XI. Matters of Regulatory Procedure

I. Summary of Legal Background

 Since 1965, officers and employees of the executive branch (employees) have been
subject to individual agency regulations setting forth standards of conduct.
Underlying standards common to all existing executive department and agency
regulations are contained in parts I and II of Executive Order 11222 of May 8,
1965, as amended, and are implemented by Office of Personnel Management regulations
at 5 CFR part 735, subparts A-C.

 Consistent with the decentralized regulatory scheme established by the 1965
Executive order, subpart A of 5 CFR part 735 required each executive agency to
issue regulations implementing part 735 and prescribing additional standards of
ethical conduct appropriate to its particular functions and activities, including
exceptions to the restrictions on solicitation or acceptance of gifts from
prohibited sources.

 In early 1989, as part of a comprehensive review of the ethics laws applicable to
all three branches of Government, the President's Commission on Federal Ethics Law
Reform recommended that the standards of conduct be updated and that the Office of
Government Ethics (OGE) be given authority to issue uniform regulations applicable
to all agencies within the executive branch. Thereafter, on April 12, 1989,
President Bush issued Executive Order 12674 revoking the 1965 Executive order.
Executive Order 12674 was modified by Executive Order 12731, October 17, 1990.
The modified Executive order is hereinafter referred to as Executive Order 12674.

 Section 201(a) of the new Executive order authorizes OGE, in consultation with the
Attorney General and the Office of Personnel Management, to issue regulations that
"establish a single, comprehensive, and clear set of executive-branch standards of
conduct that shall be objective, reasonable, and enforceable." Section 201(c) of
the new Executive order further authorizes OGE, with the concurrence of the
Attorney General, to issue regulations interpreting 18 U.S.C. 207-209.

 Part I of Executive Order 12674 incorporates most of the concepts contained in the
1965 Executive order and imposes additional standards, including a prohibition in

                    © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                        Page 3
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

Section 102 on receipt of outside earned income by Presidential appointees to full-time noncareer positions.   Under the Executive order, special Government employees are subject to the same basic principles of ethical conduct that apply to other executive branch employees.

 Section 502(a) of Executive Order 12674 provides that, except insofar as irreconcilable with its provisions, regulations issued under the 1965 Executive order shall remain in effect until properly amended, modified, or revoked. Under this savings provision, individual agency regulations remain in effect until the uniform regulations, which are the subject of this notice, take effect.   Because existing standards cannot be reconciled with the prohibition on receipt of outside earned income applicable to Presidential appointees to full-time noncareer positions, that provision became effective on April 12, 1989.

 As did its predecessor, Executive Order 12674 prohibits employees from soliciting or accepting gifts from specified categories of persons.   Title III of the Ethics Reform Act of 1989 amended title 5 of the U.S. Code to add a new section 7353 which contains virtually identical language restricting the solicitation or acceptance of gifts.   In its statutory form, this prohibition applies to personnel in all three branches of Government.   It authorizes OGE to issue implementing regulations for the executive branch, including "reasonable exceptions as may be appropriate."   Thus, the draft regulations contained in subpart B of the proposed rule implement 5 U.S.C. 7353 as well as Section 101(d) of Executive Order 12674.

 Under current part 735 and § 2635.101 of 5 CFR and implementing agency regulations, employees are prohibited from giving gifts to official superiors and from accepting gifts from employees receiving less pay than themselves.   This prohibition at 5 CFR 735.202(d) is based on the longstanding statutory prohibition against gifts to superiors at 5 U.S.C. 7351.   The Ethics Reform Act of 1989 amended section 7351 to give OGE authority to issue implementing regulations applicable to employees of the executive branch.   These are contained in subpart C of the proposed rule.

 Title VI of the Ethics Reform Act of 1989 added three other provisions that impact directly upon the outside activities of employees, other than special Government employees.   One prohibits receipt of honoraria (payment for an appearance, speech, or article) by any individual while serving as an *33779 officer or employee.   Another limits receipt of outside earned income by certain noncareer employees paid at or above the basic rate for a position above GS-15.   The third prohibits those same noncareer employees from engaging in certain outside employment activities. These three provisions are implemented by 5 CFR part 2636, which was issued by OGE as an interim rule at 56 FR 1721-1730 (January 7, 1991).   Relevant provisions of that interim rule are cross-referenced in the outside activities provisions at subpart H of this proposed rule to ensure the review of relevant regulations by covered noncareer employees and by other employees who wish to receive compensation for an appearance, speech, or article.

 This proposed rule is published by the Office of Government Ethics (OGE) in consultation with the Department of Justice and the Office of Personnel Management pursuant to Section 201(a) and (c) of Executive Order 12674 of April 12, 1989, as modified by E.O. 12731 of October 17, 1990, and authorities contained in titles I and IV of the Ethics in Government Act of 1978, Public Law 95-521, October 26, 1978, as amended, 5 U.S.C. appendixes III and IV, and 5 U.S.C. 7351(d)(1) and 7353(b)(1) as added by the Ethics Reform Act of 1989, Public Law 101-194, November 30, 1989, as amended.   Formerly a part of the Office of Personnel Management, the Office of Government Ethics became a separate executive branch agency on October 1,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                          Page 4
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

1989 pursuant to Sections 3 and 10 of the 1988 OGE reauthorization legislation, Public Law 100-598.    Hence, OGE is issuing this proposed rule as revised part 2635 in OGE's chapter XVI of 5 CFR.

II. General Provisions

 Subpart A of the proposed rule includes initial sections setting forth the basic obligation of public service and definitions that apply throughout the subpart.

 Section 2635.101 of subpart A, as drafted, restates the principles of ethical conduct set forth at section 101 of Executive Order 12674 and the obligation to adhere to the standards set forth in the proposed rule and supplemental agency regulations.    With the exception of paragraphs (b)(4), (b)(6) and (b)(14), the general principles set forth in § 2635.101(b) are restated verbatim from Executive Order 12674.    These principles and the conflict of interest statutes contained in Chapter 11 of title 18 of the United States Code are the basis for the more specific standards set forth in subsequent subparts of the proposed rule.    The final sentence of § 2635.101(b) would require employees to apply the principles of ethical conduct in determining whether conduct not otherwise addressed in the proposed rule is proper.

 The three paragraphs contained in proposed § 2635.101(b) that are not restated verbatim from Executive Order 12674 warrant specific comment. Paragraph (b)(4) is reworded simply to clarify that subpart B contains the applicable exceptions referred to in section 101(d) of Executive Order 12674.    The other two paragraphs are reworded to amplify the meaning of the respective principles.

 Section 2635.101(b)(6), as proposed, would add a knowledge standard to the principle at section 101(f) of Executive Order 12674 that employees "shall make no unauthorized commitments or promises of any kind purporting to bind the Government." The knowledge requirement is proposed because employees frequently deal with complex laws and regulations and must make decisions that fall within the gray areas of those authorities.    An employee who acts in good faith and without knowledge that he or she is exceeding official authority will not be found to have violated the standards of ethical conduct simply because his or her judgment proves faulty.

 The first sentence of proposed § 2635.101(b)(14) is a verbatim restatement of the principle at section 101(n) of Executive Order 12674 that employees shall try to avoid any action that creates an appearance that they are violating the law or the standards set forth in the proposed rule.    This appearance standard is one of long standing, derived from the 1965 Executive order.    An additional sentence has been added to § 2635.101(b)(14) to reflect case law and longstanding practice, both of which temper the appearance standard by reference to the perspective of a reasonable person with knowledge of the relevant facts.    This is intended to ensure that the conduct of employees is judged by a standard of reasonableness.

 Section 2635.101(c) is proposed to caution employees that there are conflict of interest statutes that must be considered in conjunction with the standards of ethical conduct in determining whether particular conduct is appropriate. Synopses of the basic conflict of interest statutes at chapter 11 of title 18 of the U.S. Code are contained in relevant portions of the proposed rule and references to these and other generally applicable statutes are included in subpart I of the proposed rule.

 While the definitions set forth in § 2635.102 of the proposed rule are largely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                                           Page 5
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

self-explanatory, the term agency designee warrants specific comment. The proposed
rule includes provisions that require the agency designee to make certain
determinations or authorize certain conduct.  Because the proposed rule is
intended for broad application throughout the entire executive branch, OGE has not
undertaken to identify which employees within the various agencies should be
delegated those responsibilities.  Their designation is left to the individual
agencies.  Most agencies will find it advantageous to designate a number of
individuals as agency designees and there is nothing in the proposed rule that
limits designations to individuals who are agency ethics officials. Many agencies
will find it appropriate to designate supervisors as agency designees for
determinations and authorizations affecting their subordinates.

 Consistent with the definition of the term employee at section 503(b) of Executive
Order 12674, proposed § 2635.103 clarifies that the proposed rule would not apply
to enlisted members of the uniformed services.  It would, however, apply to
officers of the uniformed services.  For employees detailed within the Federal
Government for periods in excess of 30 days, proposed § 2635.104(a) would provide
guidance intended to reconcile any differences in the nonstatutory ethical
standards that may exist between agencies or between branches of the Government.
And proposed § 2635.104(b) would give designated agency ethics officials authority
to exempt from the gift standards in proposed subpart B those employees detailed
for more than 6 months to international organizations or to State or local
governments under statutory authorities, such as 5 U.S.C. 3343 and 3371.  This
exemption authority would be limited to cases in which the organization or
governmental entity to which the employee is detailed has its own written gift
standards.

 Proposed § 2635.104(c) would eliminate any differences in ethical standards that
might result from application of different supplemental agency regulations to
employees posted overseas.  While posted abroad, most employees of civilian
agencies and some uniformed officers are subject to the direction, coordination and
supervision of the Chiefs of the United States Mission.  With the exception of
those detailed to international organizations, all others posted abroad are under
the **33780** command of the United States area military commander.  The proposed
section would subject those so attached to the respective supplemental agency
regulations of the Department of State or the Department of Defense.  Others while
abroad, including most employees in a temporary duty travel status, would remain
subject to the supplemental agency regulations of their respective employing
agencies.  The Office of the Legal Adviser, Department of State, has advised that
the proposed section would enable the Department of State to use its own
supplemental agency regulation in combination with the Department's gift acceptance
statute to ensure consistency in the conduct of Federal personnel attached to the
mission.

 As proposed, subpart A contains authority for agencies to issue regulations
supplementing the proposed rule.  Other than as contemplated by proposed § §
2635.203(a), 2635.403(a) and 2635.803, most agencies should not find it necessary
to issue supplemental agency regulations.  However, OGE recognizes that some
agencies will need to augment the proposed rule with standards tailored to their
operations.  As proposed, § 2635.105 would provide a means by which the uniform
regulations may be supplemented by agency-specific regulations consistent with the
purposes and format of the proposed rule.

 Pursuant to section 301(a) of Executive Order 12674, supplemental agency
regulations become effective only upon concurrence by and joint issuance with OGE
and publication at agency expense in title 5 of the Code of Federal Regulations.

                    ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                    Page 6
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

Under proposed § 2635.105(c) agencies may, without issuing a supplemental
regulation, delegate authority to agency designees and establish certain procedures
necessary to comply with the uniform regulations.   Agencies are also free to issue
handbooks or similar aids to explain the standards contained in the proposed rule
and to issue regulations under authorities other than the Executive order.   In the
past, some agency standards of conduct have included regulatory provisions that
derive from authorities other than Executive Order 11222, such as regulations
implementing the Hatch Act. In anticipation of the issuance of this proposed rule
as a final regulation, agencies should consult with OGE concerning their authority
to preserve any such regulatory provisions.

 Section 2635.106 of the proposed rule gives general guidance on disciplinary and
corrective action and incorporates the concept set forth in section 504 of
Executive Order 12674 that the standards issued under the Executive order are not
intended to create any right or benefit, substantive or procedural, enforceable at
law by a party against the United States, its agencies, its officers, or any
person.   Thus, as noted regarding complaints of discrimination, nothing in the
proposed rule makes OGE or an agency ethics official an alternate forum for
adjudicating or deciding matters for which other procedures are established.

 Section 2635.107 of the proposed rule explains that employees may obtain guidance
from agency ethics officials regarding their particular responsibilities under the
standards of ethical conduct.   It provides assurance that those who obtain and
follow that guidance will not be subject to disciplinary action.   Although it
cannot provide this degree of assurance when the conduct involved violates a
criminal statute, it reflects the longstanding practice of the Department of
Justice in selecting cases for prosecution to take into consideration an employee's
good faith reliance on the advice of agency ethics officials.

III. Gifts From Outside Sources

 Subpart B of the proposed rule implements 5 U.S.C. 7353, as added by the Ethics
Reform Act of 1989, and section 101(d) of Executive Order 12674. Both provide that
an employee shall not solicit or accept gifts from certain (prohibited) sources
unless permitted by a regulatory exception.   The Executive order and the statute
both augment the list of prohibited sources contained in the 1965 Executive order
by adding a fourth category--any person or entity seeking official action from the
employee's agency.

 Section 2635.202(a) of subpart B, as drafted, would prohibit an employee from
soliciting or accepting a gift from a prohibited source or a gift given because of
the employee's official position, unless the item is excluded from the definition
of a gift or falls within one of the exceptions in proposed § 2635.204.   While
this may appear to expand the scope of the gift prohibitions presently contained in
5 CFR 735.202(a), it reflects OGE's longstanding interpretation of the current
requirement at 5 CFR 735.201(a) that an employee avoid any action which might
result in or create the appearance of using public office for private gain.   This
prohibition continues to apply under section 101(g) of Executive Order 12674, as
restated at § 2635.101(b)(7) of the proposed rule.   Accepting a gift offered
because of one's official position creates an appearance of using public office for
private gain.

 Section 2635.202(b), as drafted, explains the relationship between the standards
set forth in proposed subpart B and 18 U.S.C. 201(c)(1)(B).   Frequently referred to
as the illegal gratuities statute, section 201(c)(1)(B) makes it a crime for a
public official "otherwise than as provided by law for the proper discharge of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                          Page 7
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

official duty" to demand, seek, receive, accept or agree to receive or accept
anything of value "for or because of any official act performed or to be performed
by such official or person." As drafted, the language of § 2635.202(b) reflects
congressional intent that the acceptance of a gift in accordance with the
exceptions and other standards set forth in subpart B will not subject an employee
to prosecution for violation of the illegal gratuities statute. Congressional
Record for November 16, 1989, at page H8758. By cross-reference to §
2635.202(c)(1) of the proposed rule, § 2635.202(b) balances that purpose with the
statutory proviso at 5 U.S.C. 7353(b)(1)(B) that an employee may not accept a gift,
even pursuant to a regulatory exception, in return for being influenced in the
performance of any official act. While such a gift, if corruptly sought or
accepted, would constitute a bribe prosecutable under 18 U.S.C. 201(b)(2)(A), the
language of § 2635.202(b) preserves the possibility of prosecution under the
illegal gratuities statute where the element of corruption cannot be established.

Section 2635.202(c), as drafted, sets forth five limitations on the use of the
exceptions contained in § 2635.204, other than § 2635.204(h). The first
reflects the statutory proviso at 5 U.S.C. 7353(b)(1)(B) that a gift may not be
accepted in return for being influenced in the performance of an official act. The
second makes it clear that any gift that is coerced is improper notwithstanding
that it otherwise would come within one of the proposed exceptions at § 2635.204.
And the fifth makes it clear that, except as provided in proposed § 2635.202(b),
subpart B does not sanction the solicitation or acceptance of any gift that would
violate a statute. For clarification, paragraph (5) of the section includes
synopses of 18 U.S.C. 201(b), 18 U.S.C. 209 and 41 U.S.C. 423(b)(2).

The limitations in paragraphs (3) and (4) of § 2635.202(c) are derived from the
principles of ethical conduct restated at § § 2635.101 (b)(7) and (b)(8). The
acceptance of gifts on a recurring or frequent basis, whether from the same or
different sources, gives rise to an appearance of use of public office for private
gain. And there are circumstances under which an employee *33781 should decline
even an unsolicited gift that falls within the gift exceptions to avoid an
appearance of loss of impartiality. While these proposed limitations may appear
to leave employees vulnerable to criticism for accepting gifts that fall within the
gift exceptions, OGE believes it is inappropriate to authorize the de minimis gift
exception discussed below without requiring employees to exercise a degree of
judgment in accepting and declining gifts.

Section 2635.203 of the proposed rule contains six definitions applicable to
subpart B. One of the more significant is the definition of the term prohibited
source at § 2635.203(d). While the first four paragraphs of § 2635.203(d)
merely restate language in the statute and Executive Order 12674, the fifth is an
application of those definitions to certain organizations whose members are
prohibited sources. The extension of the prohibited source definition to include
an organization, the majority of whose members are themselves prohibited sources,
is consistent with OGE informal advisory opinion 84 x 5 issued May 1, 1984 and
amended August 24, 1984, as published in The Informal Advisory Letters and
Memoranda and Formal Opinions of the United States Office of Government Ethics
(1979-1988).

As contemplated by Executive Order 12674 and 5 U.S.C. 7353, the proposed
definition of the term gift at § 2635.203(b) is expansive. Minor differences
between the language of Executive Order 12674 and the statute have been reconciled
by adopting the language from the Executive order which limits the definition of a
gift to anything of monetary value. The proposed definition includes seven
specific exclusions. Some, such as the exclusions for loans from financial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                              Page 8
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

institutions, broadly available commercial discounts, and rewards and prizes
parallel exceptions currently found in the model regulations at 5 CFR 735.202(b)
and in most agency standards of conduct regulations.  One effect of treating these
as exclusions from the definition of a gift, rather than as exceptions under
proposed § 2635.204, is to permit employees to accept these items without regard
to the appearance limitations at proposed § 2635.202(c).

 Greeting cards, plaques, certificates, trophies, and similar items which have only
nominal intrinsic value are excluded from the proposed definition of the term gift
to enable employees to accept such items without having to consider whether their
market value falls within the de minimis exception at § 2635.204(a).  Plaques and
certificates are frequently presented to an employee in a public forum.  Because
they are ordinarily engraved, embossed or otherwise adorned with the employee's
name, they ordinarily are of value to no one other than the employee and the
declination of such items causes needless discomfort to both the employee and the
donor.  A plaque or trophy which is itself an art object or utilitarian item, such
as a clock, or which incorporates materials of significant value would not come
within this exclusion.

 The exclusions for anything "paid for by the Government or secured by the
Government under Government contract" and for items "accepted by the Government
under specific statutory authority" are intended simply to clarify that items
provided to the employee by the Government are not gifts from outside sources and,
thus, are not covered by subpart B.

 The proposed definition of the term agency at § 2635.203(a) warrants comment.
For use throughout the proposed rule, the term agency is defined at proposed §
2635.102(a) to have the meaning set forth in 5 U.S.C. 105. That definition
incorporates the definition at 5 U.S.C. 101 of executive departments.  Thus, the
agency of an employee of the Department of the Army is the entire Department of
Defense and, as to that Army employee, a Navy contractor is a prohibited source.
For purposes of subpart B, proposed section 2635.203(a) gives the fourteen
departments authority, by supplemental agency regulation, to designate agencies
within the department as separate agencies.  Thus, for example, the Department of
Defense could establish the Army, Navy and Air Force as separate agencies for
purposes of subpart B. This designation would not be effective, for example, as to
the Secretaries of the three services or to any Department level employee.

 Section 2635.204, as proposed, sets forth exceptions to the basic prohibition
against solicitation or acceptance of a gift from a prohibited source or given
because of official position.  Under present 5 CFR 735.202 and 2635.101, as well
as agency standards of conduct regulations currently in effect, the gift exceptions
are narrowly drawn.  For example, they have permitted acceptance of promotional
items of nominal value and food and refreshments of nominal value on infrequent
occasions in the course of a luncheon or dinner meeting.  While the limited nature
of these exceptions has ensured that employees do not accept gifts in circumstances
that would subject them to criticism, the exceptions have themselves been a source
of criticism.  Many have complained that the exceptions are so overly technical
and difficult to apply to specific situations that they tend to trivialize agency
ethics programs.

 One of the more significant features of the draft rule is the proposal at §
2635.204(a) to adopt a de minimis exception which would allow employees to accept
unsolicited gifts having an aggregate market value of $25 or less per occasion.
Within any calendar year, an employee could not use this particular exception to
accept gifts with an aggregate market value in excess of $100 from any single

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                          Page 9
56 FR 33778-01, 1991 WL 303963 (F.R.)
(Cite as: 56 FR 33778)

source.   This de minimis exception has the virtue of establishing a standard that
can be easily understood and applied to any gift situation. While it represents a
significant departure from prior gift rules applicable to executive branch
employees, OGE believes it is a reasonable and simple standard that reduces the
need for employees to become aware of a number of technical exceptions dealing with
specific situations.

 The underlying statute, 5 U.S.C. 7353, was added by the Ethics Reform Act of 1989
and applies to individuals serving in all three branches of Government.   Titles
VIII and IX of the Reform Act concurrently amended the rules of the House of
Representatives and Senate to create a $75 de minimis exception applicable to
Members, as well as to employees, of both houses of Congress.   The rules of the
House of Representatives allow the acceptance of gifts with a fair market value of
$75 or less from prohibited sources.    The Senate rules allow acceptance of gifts
less than $75.    While the rules of both houses restrict the aggregate amount
Members and employees may accept from any single source, gifts within the de
minimis amount established for the respective house are disregarded in determining
the aggregate value of gifts received from a single source.    Unlike the
legislative branch rules, §  2635.204(a) of this proposed rule for the executive
branch would require the aggregation of every de minimis gift, whatever its value,
received from a single source for purposes of applying the annual $100 aggregate
limitation.

 Section 2635.204(b), as proposed, is similar to the exception for gifts from
friends and relatives that has long been permitted under most agency standards of
conduct regulations currently in effect.

 *33782 Section 2635.204(c) is a proposed new exception that is necessary to
accommodate the expansion of the basic gift prohibitions to cover gifts given
because of an employee's official position.   Under this section, an employee could
accept certain benefits or discounts even though they are available because of his
or her status as a Federal employee.    Opportunities available to the general
public or to all Government employees or all uniformed personnel are excluded from
the proposed definition of a gift at §  2635.203(b)(2) of this subpart.    The
exception at proposed §  2635.204(c) is addressed to discounts and other benefits
offered to a more limited class.    Where such an offer is extended by someone other
than a prohibited source to a class encompassing a smaller group of Federal
employees, such as a discount offered to all employees of a particular agency, the
offer may be accepted if its availability is not limited in a manner that
discriminates on the basis of rank, rate of pay, or type of official
responsibility.    For example, this exception would not permit the acceptance of a
discounted membership rate offered only to employees of an agency who are members
of the Senior Executive Service.    It would, however, permit a discount offered by
someone other than a prohibited source to all employees of an agency or to all
employees of an agency in a particular city or county.

 Section 2635.204(d)(1), as proposed, would allow employees to accept certain
awards for public service or individual achievement.   Many such awards are given
for accomplishments that relate to an employee's official responsibilities and,
thus, in the absence of this exception, would be prohibited by §  2635.202(a)(2),
even when bestowed by someone other than a prohibited source.    The exception
allows an employee to accept such an award, other than cash or an investment
interest, having a market value of $200 or less when given by someone other than a
person whose interests may be substantially affected by the performance or
nonperformance of the employee's official duties.    Other awards given by such
persons, including any award of cash or any noncash award worth more than $200 may

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                    Page 10
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

be accepted when approved in writing by an agency ethics official in accordance
with the standards specified.   Regardless of the value of other gifts given in
connection with the award, meals and entertainment for the employee and for members
of his or her family at any event at which presentation or recognition takes place
may be accepted.    Such acceptance is not limited to meals and entertainment
extended to members of the employee's immediate family.   Acceptance would be
appropriate, for example, if there is a family relationship in the nature of that
encompassed by the definition of a relative at 5 U.S.C. app. 109(16). When approved
in writing by an agency ethics official in accordance with the standards specified
in § 2635.204(d)(2), employees also may accept honorary degrees and personal
tributes, as well as meals and entertainment for themselves and their families at
the event at which the presentation or tribute takes place.

   Section 2635.204(e), as proposed, contains three exceptions that relate to the
outside business and employment relationships of employees and their spouses. Under
Executive Order 12674, special Government employees are subject to the same basic
principles of ethical conduct that apply to regular employees. Because special
Government employees serve the Government only temporarily, often on an
intermittent basis, it is expected that many will have other employment and
business relationships.   The proposed exception at § 2635.204(e)(2) is intended
to ensure that the gift prohibitions do not interfere with proper non-Federal
employment and business pursuits of special Government employees.   Proposed §
2635.204(e)(1) would create a similar exception for benefits which result from the
business or employment relationships of any employee's spouse.   Section
2635.204(e)(3), as proposed, covers employees seeking employment with prohibited
sources.   After the employee has complied with the disqualification requirements
of subpart F of the proposed rule, the employee may accept transportation,
entertainment or any similar gift customarily provided by the prospective employer
in connection with its conduct of employment discussions.

   Section 2635.204(f) relating to gifts from political organizations is proposed to
ensure that the standards of conduct do not hamper the political activities of the
relatively small class of higher-level employees who are exempt from the Hatch Act
restrictions.    It is limited to items provided by political organizations.    While
these organizations ordinarily will not be prohibited sources, invitations to speak
or attend political fundraising events may be extended to these employees because
of the positions they hold with the Federal Government.

   Where attendance is determined to be in the interest of the agency, proposed §
2635.204(g) would allow an employee to accept a sponsor's offer of all or part of a
gift of free attendance at widely-attended gatherings concerning subjects of mutual
interest to a number of parties that the employee attends on his own time and at
events at which the employee is a speaker or panel participant.   Where the
employee's acceptance of free attendance is authorized, proposed § 2635.204(g)(5)
would provide limited authority for attendance by an accompanying spouse.   The
limitation proposed at § 2635.204(g)(4) regarding the source of funds used to
finance the employee's attendance is added to ensure that the invitation is from
the sponsor of the event and that a nominal sponsor is not used to disguise an
invitation from another source.

   With an exception for days on which the employee is invited to serve as a speaker
or panel participant, proposed § 2635.204(g)(2) would require a written
determination by the agency designee that the employee's attendance at the event is
in the interest of the Government.   If the sponsor has interests that would be
substantially affected by performance of the employee's duties, that determination
must include an appearance analysis.   The fact that an employee is invited to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                                    Page 11
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**

serve as a speaker on one of several days of an event does not necessarily permit the employee's acceptance of waiver of the attendance fee for the entire event. Without a written determination of agency interest, the employee may only accept free attendance at substantive portions of the event that take place on the day he or she speaks.   Even though a sponsor offers free attendance at an entire event, speakers and others should only be authorized to accept free attendance at those portions of the event that are in the agency's interest.

The exception for widely-attended gatherings at § 2635.204(g)(1)(ii) is one that has been incorporated into the standards of conduct regulations of many agencies. While these events are often sponsored by associations, the exception is not limited to events for which there is an association or other group sponsor.   The exception for speakers and panel participants at § 2635.204(g)(1)(i) merely recognizes what has become customary practice-- individuals invited as speakers are frequently invited to participate without charge in portions or all of the events at which they are speaking.

Section 2635.204(h), as proposed, is applicable only to gifts to the President or Vice President and to members of their families.   The President and Vice **\*33783** President are not subject to the Standards of Ethical Conduct for Government Officers and Employees imposed by Executive Order 12674.   With the exception of 18 U.S.C. 201, they are not subject to the conflict of interest statutes of Chapter II of title 18 of the United States Code. However, 5 U.S.C. 7353, added by the Ethics Reform Act, adopted a broad definition of the term employee that, for the first time, results in the gift prohibitions being made applicable to individuals holding elected positions in all three branches of Government, including the President and Vice President.

The ceremonial and other public duties of the President and Vice President make it impractical to subject them to standards that require an analysis of every gift offered.   They are required to file an SF 278 public financial disclosure statement listing gifts aggregating $100 or more from any one source ($250 or more in the case of gifts or reimbursements of transportation, lodgings, food or entertainment).   They need not aggregate gifts of $75 or less.   In the case of an elected official of the stature of the President or Vice President whose personal conduct is closely scrutinized by the public and the press, this requirement for public disclosure provides sufficient restraint on their acceptance of gifts.   To the extent that it does not permit scrutiny of gifts worth less than the amount that triggers the reporting requirement, it is tantamount to an extension to the President and Vice President of an exception not unlike the $75 de minimis exception applicable to Members of Congress.   OGE anticipates that, as their predecessors have done in the past, the President and Vice President and their successors will establish their own discretionary standards for acceptance of gifts.

Paragraphs (i) and (j) of § 2635.204, as proposed, are crossreferences.   The former refers employees to additional exceptions, if any, contained in applicable agency supplemental regulations.   Section 2635.204(j) is a reference to additional authorities under which employees may accept gifts; it is not, itself, authority to accept any gift.

Section 2635.205 of the proposed rule deals with the proper disposition of gifts that cannot be accepted, and makes it clear that an employee has a responsibility to return or pay for such gifts.   However, perishable gifts, such as food or flowers, may be given to charity or may be used or consumed when shared with others within the recipient's office.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 33778-01                                                    Page 12
56 FR 33778-01, 1991 WL 303963 (F.R.)
**(Cite as: 56 FR 33778)**


  Upon final adoption of the proposed rule, the temporary OGE and Office of
Personnel Management rule at 5 CFR 2635.101 continuing the effectiveness of
existing agency gift restrictions and exceptions will be revoked.    See 54 FR
53310-53311 (December 28, 1989) and the discussion at part X of this preamble,
below.

IV. Gifts Between Employees

  Subpart C of the proposed rule is intended to supersede 5 CFR 735.202(d), which
implements the statutory prohibitions in 5 U.S.C. 7351, Gifts to Superiors.    The
amendment to that statute by the Ethics Reform Act of 1989 brings the penalties for
improper gifts into line with those for violation of the standards of ethical
conduct and gives OGE authority to issue implementing regulations applicable to
officers and employees of the executive branch.

  Because of the statutory definition of the term employee in 5 U.S.C. 7351, the
statute does not apply to officers of the uniformed services.    In exercising its
general rulemaking authority under Executive Order 12674 and title IV of the Ethics
in Government Act, OGE nevertheless has determined that the prohibitions on gifts
between employees should be applied to officers of the uniformed services to avoid
issues of misuse of public office and lack of impartiality that arise when gifts
are accepted by superiors from their subordinates.    Thus, as a matter of
regulation, subpart C of the proposed rule would extend to officers of the
uniformed services the same prohibitions as are contained in 5 U.S.C. 7351.

  As drafted, proposed § 2635.302(a)(1) amplifies the statutory prohibitions
against giving or soliciting for gifts to superiors by adding the phrase directly
or indirectly to ensure that the prohibitions are not circumvented by gifts given
by the subordinate's family members or by others at the behest of the subordinate.
The term indirectly is defined at proposed § 2635.303(b).    Proposed §
2635.302(a)(2) amplifies the statutory prohibition against soliciting contributions
for gifts to superiors to make it clear that the prohibition applies regardless of
whether the gift is solicited for an individual who is the superior of the employee
making the solicitation or of the employee from whom a contribution is sought.

  Proposed § 2635.302(b) amplifies the statutory language prohibiting any employee
from accepting a gift from an employee receiving less pay by adding the phrase
"directly or indirectly" to ensure that the prohibition is not circumvented by
gifts to family members or to persons designated by the employee receiving the
greater amount of pay.    For this purpose, the term indirectly is defined at
proposed § 2635.303(b) by cross-reference to the definition of that term in
subpart B, Gifts from Outside Sources.    The statutory prohibition on acceptance of
gifts does not precisely mirror the restrictions on giving gifts to superiors.    It
is broader in scope, prohibiting gifts from any employee receiving less pay,
regardless of whether there is a superior-subordinate relationship between donor
and recipient. Proposed § 2635.302(b) addresses the unnecessarily broad reach of
this prohibition by permitting gifts based on a personal relationship where there
is no superior-subordinate relationship between donor and recipient.

  Proposed § 2635.302(c) provides that, notwithstanding any exception at proposed §
2635.304, an official superior shall not coerce the offering of a gift from a
subordinate.

  The definitions of the terms gift and market value in proposed § 2635.303 (a) and
(c) include cross-references to the definitions of those terms in subpart B, Gifts

                    ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>Exhibit 17</u>**

Executive Order 12674 of April 12, 1989
(as modified by E.O. 12731)

"PRINCIPLES OF ETHICAL CONDUCT FOR
GOVERNMENT OFFICERS AND EMPLOYEES"

"By virtue of the authority vested in me as President by the
Constitution and the laws of the United States of America, and in
order to establish fair and exacting standards of ethical conduct
for all executive branch employees, it is hereby ordered as follows:

"Part I    Principles of Ethical Conduct

"Section 101. Principles of Ethical Conduct.  To ensure that
every citizen can have complete confidence in the integrity of the
Federal Government, each Federal employee shall respect and adhere to
the fundamental principles of ethical service as implemented in
regulations promulgated under sections 201 and 301 of this order:

"(a) Public service is a public trust.  requiring employees to
place loyalty to the Constitution, the laws, and ethical principles
above private gain.

"(b) Employees shall not hold financial interests that conflict
with the conscientious performance of duty.

"(c) Employees shall not engage in financial transactions using
nonpublic Government information or allow the improper use of such
information to futher any private interest.

"(d) An employee shall not, except pursuant to such reasonable
exceptions as are provided by regulation, solicit or accept any gift
or other item of monetary value from any person or entity seeking
official action from.  doing business with, or conducting activities
regulated by the employee's agency, or whose interests may be
substantially affected by the performance or nonperformance of the
employee's duties.

"(e) Employees shall put forth honest effort in the performance of
their duties.

"(f) Employees shall make no unauthorized commitments or promises
of any kind purporting to bind the Government.

"(g) Employees shall not use public office for private gain.

"(h) Employees shall act impartially and not give preferential treatment to any private organization or individual.

"(i) Employees shall protect and conserve Federal property and shall not use it for other than authorized activities.

"(j) Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that confiict with official Government duties and responsibIlities.

"(k) Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities.

"(l) Employees shall satisfy In good faith their obligations as citizens, including all just financial obligations, especially those such as Federal, State, or local taxes-that are imposed by law.

"(m) Employees shall adhere to all laws and regulations that provide equal opportunity for all Arnericaas reger:lless of race, color, religion, sex, national origin. age, or handicap.

"(n) Employees shall endeavnor to avoid any actions creating the appearance that they are violating the law or the ethical standards promulgated pursuant to this order.

"Sec. 102. Limitations on Outside Earned Income.

"(a) No employee who is appointed by the President to a full-time noncar reer position in the executive branch (including full-time noncareer employees in the White House Office, the Office of Policy Development, and the Office of Cabinet Affairs), shall receive any earned income for any outside employment or activity performed during that Presidential appointment.

"(b) The prohibition set forth in subsection (a) shall not apply to any full-time noncareer employees employed pursuant to 3 U.S.C. 105 and 3 U.S.C. 107(a) at salaries below the minimum rate of basic pay then paid for GS-9 of the General Schedule. Any outside employment must comply with relevant agency standards of conduct, including any requirements for approval of outside employment.
"Part II   Office of Government Ethics Authority

"Sec. 201. The Office of Government Ethics. The Office of Government Ethics shall be responsible for administering this order by:

" (a) Promulgating, in consultation with the Attorney General and the Office of Personnel Management, regulations that establish a single, comprehensive, and clear set of executive-branch standards of conduct that shall be objective, reasonable, and enforceable.

" (b) Developing, disseminating, and periodically updating an ethics manual for employees of the executive branch describing the applicable statutes, rules, decisions, and policies.

" (c) Promulgating, with the concurrence of the Attorney General, regulations interpreting the provisions of the post-employment statute, section 207 of title 18, United States Code; the general conflict-of-interest statute, section 208 of title 18, United States Code; and the statute prohibiting supplementation of salaries, section 209 of title 18, United States Code.

" (d) Promulgating, in consultation with the Attorney General and the Office of Personnel Management, regulations establishing a system of non-public (confidential) financial disclosure by executive branch employees to complement the system of public disclosure under the Ethics in Government Act of 1978.  Such regulations shall include criteria to guide agencies in determining which employees shall submit these reports.

" (e) Ensuring that any implementing regulations issued by agencies under this order are consistent with and promulgated in accordance with this order.

"Sec. 202. Executive Office of the President.  In that the agencies within the Executive Office of the President (EOP) currently exercise functions that are not distinct and separate from each other within the meaning and for the purposes of section 207(e) of title 18, United States Code, those agencies shall be treated as one agency under section 207(c) of title 18, United States Code.

"Part III  Agency Responsibilities

"Sec. 301. Agency Responsibilities. Each agency head is directed to:

" (a) Supplement, as necessary and appropriate the comprehensive executive branch-wide regulations of the Office of Government Ethics, with regulations of special applicability to the particular functions and activities of that agency.  Any supplementary agency regulations shall be prepared as addenda to the branch-wide regulations and promulgated jointly with the Office of Government

Ethics, at the agency's expense, for inclusion in Title 5 of the Code
of Federal Regulations.

"(b) Ensure the review by all employees of this order and
regulations promulgated pursuant to the order.

"(c) Coordinate with the Office of Government Ethics in developing
annual agency ethics training plans.  Such training shall include
mandatory annual briefings on ethics and standards of conduct for all
employees appointed by the President, all employees in the Executive
Office of the President, all officials required to file public or
nonpublic financial disclosure reports, all employees who are
contracting officers and procurement officials, and any other
employees designated by the agency head.

"(d) Where practicable, consult formally or informally with the
Office of Government Ethics prior to granting any exemption under
section 208 of title 18, United States Code, and provide the Director
of the Office of Government Ethics a copy of any exemption granted.

"(e) Ensure that the rank, responsibilities, authority, staffing,
and resources of the Designated Agency Ethics Official are sufficient
to ensure the effectiveness of the agency ethics program.  Support
should include the provision of a separate budget line item for ethics
activities, where practicable.

"Part IV    Delegations of Authority

"Sec. 401. Delegations to Agency Heads. Except in the case of
the head of an agency, the authority of the President under sections
203(d), 205(e), and 208(b) of title 18, United States Code, to grant
exemptions or approvals to individuals is delegated to the head of the
agency in which an individual requiring an exemption or approval is
employed or to which the individual (or the committee, commission
board, or similar group employing the individual) is attached for
purposes of administration.

"Sec. 402. Delegations to the Counsel to the President.

"(a) Except as provided in section 401, the authority of the Presi-
dent under sections 205(d), 205(e), end 208(b) of title 18, United States
Code, to grant exemptions or approvals for Presidential appointees to
committees, commissions, boards, or similar groups establIshed by the
President is delegated to the Counsel to the President.

"(b) The authority of the President under sections 208(d), 205(e), and
208(b) of title 18, United States Code, to grant exemptions or approvals

for·individuals appointed pursuant to 3 U.S.C. 105 and 3 U.S.C. 107(a), is delegated to the Counsel to the President.

"Sec. 403. Delegation Reguarding Civil Service. The Office of Personnel Management and the Office of Government Ethics, as appropriate, are delegated the authority vested in the President by 5 U.S.C. 7301 to establish general regulations for the implementation of this Executive order.

Part V    General Provisions

"Sec. 501. Revocations. The following Executive orders are hereby revoked:

  "(a) Executive Order No. 11222 of May 8, 1965.

  "(b) Executive Order No. 12565 of September 25, 1986.

"Sec. 502. Savings Provision.

    "(a) All actions already taken by the President or by his delegates concerning matters affected by this order and in force when this order is issued, including any regulations issued under Executive Order 11222, Executive Order 12565, or statutory authority, shall, except as they are irreconcilable with the provisions of this order or terminate by operation of law or by Presidential action, remain in effect until properly amended, modified, or revoked pursuant to the authority conferred by this order or any regulations promulgated under this order.  Notwithstanding anything in section 102 of this order, employees may carry out preexisting contractual obligations entered into before April 12, 1989.

    "(b) Financial reports filed in confidence (pursuant to the authority of Executive Order No. 11222, 5 C.F.R. part 735, and individual agency regulations) shall continue to be held in confidence.

"Sec 503. Definitions. For purposes of this order, the term:

    "(a) Contracting officers and procurement officials' means all such officers end officials as defined in the Office of Federal Procurement Policy Act Amendments of 1988.

    "(b) Employee' means any officer or employee of an agency, including a special Government employee.

    "(c) `Agency' means any executive agency as defined in 5 U.S.C.

105; 'including any executive department as defined in 5 U.S.C. 101,
Government corporation as defined in 5 U.S.C. 103, or an independent
establishment in the executive branch as defined in 5 U.S.C. 104
(other then the General Accounting Office), and the United States
Postal Service end Postal Rate Commission.

   "(d) `Head of en agency' means, in the case of as agency headed by
more then one person, the chair or comparable member of such agency.

   "(e) `Special Government employee' means a special Government em-
ployee as defined in 18 U.S.C. 202(a).


"Sec. 504. Judicial Review.  This order is intended only to
improve the internal management of the executive brench end is not
intended to create any right or benefit, substantive or procedural,
enforceable at law by a party against the United States, its agencies,
its officers, or any person.".

                                         GEORGE BUSH

THE WHITE HOUSE,
October 17, 1990.

# **<u>Exhibit 18</u>**

Executive Order 12731 of October 17, 1990

"PRINCIPLES OF ETHICAL CONDUCT
FOR GOVERNMENT OFFICERS AND EMPLOYEES"

By virtue of the authority vested in me as President by the Constitution
and the laws of the United States of America, and in order to establish
fair and exacting standards of ethical conduct for all executive branch
employess, it is hereby ordered that Executive Order 12674 of April 12,
1989, is henceforth modified to read as follows:

"EXECUTIVE ORDER

"

"principles of ethical conduct for government officers and employees

"By virtue of the authority vested in me as President by the Constitution
and the laws of the United States of America, and in order to establish
fair and exacting standards of ethical conduct for all executive branch
employees, it is hereby ordered as follows:

"Part 1 -- PRINCIPLES OF ETHICAL CONDUCT

    "Section 101.  Principles of Ethical Conduct. To ensure that every
citizen can have complete confidence in the integrity of the Federal
Government, each Federal employee shall respect and adhere to the
fundamental principles of ethical service as implemented in regulations
promulgated under sections 201 and 301 of this order:

    "(a) Public service is a public trust, requiring employees to place
loyalty to the Constitution, the laws, and ethical principles above
private gain.

    "(b) Employees shall not hold financial interests that conflict
with the conscientious performance of duty.

    "(c) Employees shall not engage in financial transactions using
nonpublic Government information or allow the improper use of such
information to further any private interest.

    "(d) An employee shall not, except pursuant to such reasonable
exceptions  as are provided by regulation, solicit or accept any gift
or other item of monetary value from any person or entity seeking
official action from, doing business with, or conducting activities
regulated by the employee's agency, or whose interests may be
substantially affected by the performance or nonperformance of the

employee's duties.

   "(e) Employees shall put forth honest effort in the performance of their duties.

   "(f) Employees shall make no unauthorized commitments or promises of any kind purporting to bind the Government.

   "(g) Employees shall not use public office for private gain.

   "(h) Employees shall act impartially and not give preferential treatment to any private organization or individual.

   "(i) Employees shall protect and conserve Federal property and shall not use it for other than authorized activities.

   "(j) Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

   "(k) Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities.

   "(l) Employees shall satisfy in good faith their obligations as citizens, including all just financial obligations, especially those -- such as Federal, State, or local taxes -- that are imposed by law.

   "(m) Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

   "(n) Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards promulgated pursuant to this order.

   "Sec. 102.  Limitations on Outside Earned Income.

   "(a) No employee who is appointed by the President to a full-time noncareer position in the executive branch (including full-time noncareer employees in  the White House Office, the Office of Policy Development, and the Office of Cabinet Affairs), shall receive any earned income for any outside employment or activity performed during that Presidential appointment.

   "(b) The prohibition set forth in subsection (a) shall not apply to any full-time noncareer employees employed pursuant to 3 U.S.C. 105 and 3 U.S.C. 107(a) at salaries below the minimum rate of basic pay then paid for GS-9 of the General Schedule.  Any outside employment must comply with relevant agency standards of conduct, including any

requirements for approval of outside employment.

"PART II -- OFFICE OF GOVERNMENT ETHICS AUTHORITY

   "Sec. 201.   The Office of Government Ethics.   The Office of Government
Ethics shall be responsible for administering this order by:

   "(a) Promulgating, in consultation with the Attorney General and the
Office of Personnel Management, regulations that establish a single,
comprehensive, and clear set of executive-branch standards of conduct
that shall be objective, reasonable, and enforceable.

   "(b) Developing, disseminating, and periodically updating an ethics
manual for employees of the executive branch describing the applicable
statutes, rules, decisions, and policies.

   "(c) Promulgating, with the concurrence of the Attorney General,
regulations interpreting the provisions of the post-employment statute,
section 207 of title 18, United States Code; the general
conflict-of-interest statute, section 208 of title 18, United States
Code; and the statute prohibiting supplementation of salaries, section 209
of title 18, United States Code.

   "(d) Promulgating, in consultation with the Attorney General and the
Office of Personnel Management, regulations establishing a system of
nonpublic (confidential) financial disclosure by executive branch
employees to complement the system of public disclosure under the Ethics
in Government Act of 1978. Such regulations shall include criteria to
guide agencies in determining which employees shall submit these reports.

   "(e) Ensuring that any implementing regulations issued by agencies
under this order are consistent with and promulgated in accordance with
this order.

   "Sec. 202.   Executive Office of the President.   In that the agencies
within the Executive Office of the President (EOP) currently exercise
functions that are not distinct and separate from each other within the
meaning and for the purposes of section 207(e) of title 18, United States
Code, those agencies shall be treated as one agency under section 207(c)
of title 18, United States Code.

"PART III -- AGENCY RESPONSIBILITIES

   "Sec. 301.   Agency Responsibilities.   Each agency head is directed to:

   "(a) Supplement, as necessary and appropriate, the comprehensive
executive branch-wide regulations of the Office of Government Ethics,
with regulations of special applicability to the particular functions
and activities of that agency. Any supplementary agency regulations shall

be prepared as addenda to the branch-wide regulations and promulgated jointly with the Office of Government Ethics, at the agency's expense, for inclusion in Title 5 of the Code of Federal Regulations.

"(b) Ensure the review by all employees of this order and regulations promulgated pursuant to the order.

"(c) Coordinate with the Office of Government Ethics in developing annual agency ethics training plans.  Such training shall include mandatory annual briefings on ethics and standards of conduct for all employees appointed by the President, all employees in the Executive Office of the President, all officials required to file public or nonpublic financial disclosure reports, all employees who are contracting officers and procurement officials, and any other employees designated by the agency head.

"(d) Where practicable, consult formally or informally with the Office of Government Ethics prior to granting any exemption under section 208 of title 18, United States Code, and provide the Director of the Office of Government Ethics a copy of any exemption granted.

"(e) Ensure that the rank, responsibilities, authority, staffing, and resources of the Designated Agency Ethics Official are sufficient to ensure the effectiveness of the agency ethics program.  Support should include the provision of a separate budget line item for ethics activities, where practicable.

"PART IV -- DELEGATIONS OF AUTHORITY

"Sec. 401.  Delegations to Agency Heads.  Except in the case of the head of an agency, the authority of the President under sections 203(d), 205(e), and 208(b) of title 18, United States Code, to grant exemptions or approvals to individuals, is delegated to the head of the agency in which an individual requiring an exemption or approval is employed or to which the individual (or the committee, commission, board, or similar group employing the individual) is attached for purposes of administration.

"Sec. 402.  Delegations to the Counsel to the President.

"(a) Except as provided in section 401, the authority of the President under sections 203(d), 205(e), and 208(b) of title 18, United States Code, to grant exemptions or approvals for Presidential appointees to committees, commissions, boards, or similar groups established by the President is delegated to the Counsel to the President.

"(b) The authority of the President under sections 203(d), 205(e), and 208(b) of title 18, United States Code, to grant exemptions or approvals for individuals appointed pursuant to 3 U.S.C. 105 and 3 U.S.C. 107(a), is delegated to the Counsel to the President.

"Sec. 403.   Delegation Regarding Civil Service.   The Office of Personnel Management and the Office of Government Ethics, as appropriate, are delegated the authority vested in the President by 5 U.S.C. 7301 to establish general regulations for the implementation of this Executive order.

"PART V -- GENERAL PROVISIONS

"Sec. 501.   Revocations.   The following Executive orders are hereby revoked:

"(a) Executive Order No. 11222 of May 8, 1965.

"(b) Executive Order No. 12565 of September 25, 1986.

"Sec. 502.   Savings Provisions.

"(a) All actions already taken by the President or by his delegates concerning matters affected by this order and in force when this order is issued, including any regulations issued under Executive Order 11222, Executive Order 12565, or statutory authority, shall, except as they are irreconcilable with the provisions of this order or terminate by operation of law or by Presidential action, remain in effect until properly amended, modified, or revoked pursuant to the authority conferred by this order or any regulations promulgated under this order.   Notwithstanding anything in section 102 of this order, employees may carry out preexisting contractual obligations entered into before April 12, 1989.

"(b) Financial reports filed in confidence (pursuant to the authority of Executive Order No. 11222, 5 C.F.R. Part 735, and individual agency regulations) shall continue to be held in confidence.

"Sec. 503.   Definitions.   For purposes of this order, the term:

"(a) 'Contracting officers and procurement officials' means all such officers and officials as defined in the Office of Federal Procurement Policy Act Amendments of 1988.

"(b) 'Employee' means any officer or employee of an agency, including a special Government employee.

"(c) 'Agency' means any executive agency as defined in 5 U.S.C. 105, including any executive department as defined in 5 U.S.C. 101, Government corporation as defined in 5 U.S.C. 103, or an independent establishment in the executive branch as defined in 5 U.S.C. 104 (other than the General Accounting Office), and the United States Postal Service and Postal Rate Commission.

"(d) 'Head of an agency' means, in the case of an agency headed by more than one person, the chair or comparable member of such agency.

"(e) 'Special Government employee' means a special Government employee as defined in 18 U.S.C. 202(a).

"Sec. 504.  Judicial Review.  This order is intended only to improve the internal management of the executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.".

George Bush

The White House,
October 17, 1990.

# Exhibit 19



U.S. General Services Administration



ROCKY MOUNTAIN REGION
PUBLIC BUILDINGS SERVICE

PBS Home      Map      RMR Home      BSC      FTS      FSS      GSA

▶ Our Mission

▶ Menu of Services

▶ Contacts

▶ Organization

▶ Property Portfolio

▶ News & Information

▶ Other Resources

▶ Business With Us

▶ Commercial Real Estate

▶ Important Numbers

▶ Search

## GSA Ethics

GSA's code of ethics helps promote high standards of practice. It serves as a framework for professional behaviors and responsibilities. These fundamental principles create a benchmark for GSA associates to use for self-evaluation.

1. Public Service is public trust, requiring employees to place loyalty to the constitution, the laws and ethical principles above private gain.

2. Employees shall not hold financial interests that conflict with the conscientious performance of duty.

3. Employees shall not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interest.

4. An employee shall not, except as permitted by the standards of Ethical Conduct, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.

5. Employees shall put forth honest effort in the performance of their duties.

6. Employees shall not knowingly make authorized commitments or promises of any kind purporting to bind the Government.

7. Employees shall not use public office for private gain.

8. Employees shall act impartially and not give preferential treatment to any private organization or individual.

9. Employees shall protect and conserve Federal property and shall not use it for other than authorized activities.

10. Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

11. Employees shall disclose waste, fraud, abuse, and corruption to appropriate

authorities.

12. Employees shall satisfy in good faith their obligations as citizens, including all financial obligations, especially those- - such as Federal, State, or local taxes- - that are imposed by law.

13. Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

14. Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in the Standards of Ethical Conduct. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the prospective of a reasonable person with knowledge of the relevant truth.

# Exhibit 20


President George W. Bush


Click to Print
this document

For Immediate Release
Office of the Press Secretary
January 20, 2001

## Memorandum
January 20, 2001

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

SUBJECT:     Standards of Official Conduct

Everyone who enters into public service for the United States has a duty to the American people to maintain the highest standards of integrity in Government.  I ask you to ensure that all personnel within your departments and agencies are familiar with, and faithfully observe, applicable ethics laws and regulations, including the following general principles from the Standards of Ethical Conduct for Employees of the Executive Branch:

(1)  Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws, and ethical principles above private gain.

(2)  Employees shall not hold financial interests that conflict with the conscientious performance of duty.

(3)  Employees shall not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interest.

(4)  An employee shall not, except as permitted by applicable law or regulation, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.

(5)  Employees shall put forth honest effort in the performance of their duties.

(6)  Employees shall not knowingly make unauthorized commitments or promises of any kind purporting to bind the Government.

(7)  Employees shall not use public office for private gain.

(8)  Employees shall act impartially and not give preferential treatment to any private organization or individual.

(9)  Employees shall protect and conserve Federal property and shall not use it for other than authorized activities.

(10) Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

(11)  Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities.

(12) Employees shall satisfy in good faith their obligations as citizens, including all just financial obligations, especially those -- such as Federal, State, or local taxes -- that are imposed by law.

(13) Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

(14) Employees shall endeavor to avoid any actions creating the appearance that they are violating applicable law or the ethical standards in applicable regulations.

Executive branch employees should also be fully aware that their post-employment activities with respect to lobbying and other forms of representation will be bound by the restrictions of 18 U.S.C. 207.

Please thank the personnel of your departments and agencies for their commitment to maintain the highest standards of integrity in Government as we serve the American people.

GEORGE W. BUSH

### #

**Return to this article at:**
http://www.whitehouse.gov/news/releases/20010124-2.html

**Click to Print**
**this document**

# Exhibit 21

# CHAPTER II. CODES OF CONDUCT FOR JUDICIAL EMPLOYEES

A. Code of Conduct for Judicial Employees.

## Introduction

This Code of Conduct applies to all employees of the Judicial Branch except Justices; judges; and employees of the United States Supreme Court, the Administrative Office of the United States Courts, the Federal Judicial Center, the Sentencing Commission, and Federal Public Defender offices.[1] As used in this code in canons 3F(2)(b), 3F(5), 4B(2), 4C(1), and 5B, a member of a judge's personal staff means a judge's secretary, a judge's law clerk, and a courtroom deputy clerk or court reporter whose assignment with a particular judge is reasonably perceived as being comparable to a member of the judge's personal staff.[2]

Contractors and other nonemployees who serve the Judiciary are not covered by this code, but appointing authorities may impose these or similar ethical standards on such nonemployees, as appropriate.

The Judicial Conference has authorized its Committee on Codes of Conduct to render advisory opinions concerning the application and interpretation of this code. Employees should consult with their supervisor and/or appointing authority for guidance on questions concerning this code and its applicability before a request for an advisory opinion is made to the Committee on Codes of Conduct. In assessing the propriety of one's proposed conduct, a judicial employee should take care to consider all relevant canons in this code, the Ethics Reform Act, and other applicable statutes and regulations[3] (e.g., receipt of a gift may implicate canon 2 as well as canon 4C(2) and the Ethics Reform Act gift regulations). Should a question remain after this consultation, the affected judicial employee, or the chief judge, supervisor, or appointing authority of such employee, may request an advisory opinion from the Committee. Requests for advisory opinions may be addressed to the Chairman of the Committee on Codes of Conduct in care of the General Counsel, Administrative Office of the United States Courts, One Columbus Circle, N.E., Washington, D.C. 20544.

Adopted September 19, 1995
by the Judicial Conference of the United States
Effective January 1, 1996[4]

---

[1] Justices and employees of the Supreme Court are subject to standards established by the Justices of that Court. Judges are subject to the Code of Conduct for United States Judges. Employees of the AO and the FJC are subject to their respective agency codes. Employees of the Sentencing Commission are subject to standards established by the Commission. Federal public defender employees are subject to the Code of Conduct for Federal Public Defender Employees. When Actually Employed (WAE) employees are subject to canons 1, 2, and 3 and such other provisions of this code as may be determined by the appointing authority.

[2] Employees who occupy positions with functions and responsibilities similar to those for a particular position identified in this code should be guided by the standards applicable to that position, even if the position title differs. When in doubt, employees may seek an advisory opinion as to the applicability of specific code provisions.

[3] See Guide to Judiciary Policies and Procedures, Volume II, Chapter VI, Statutory and Regulatory Provisions Relating to the Conduct of Judges and Judicial Employees.

(ii) an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) the proprietary interest of a policy holder in a mutual insurance company, or a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(5) A member of a judge's personal staff should inform the appointing judge of any circumstance or activity of the staff member that might serve as a basis for disqualification of either the staff member or the judge, in a matter pending before the judge.

**CANON 4:    IN ENGAGING IN OUTSIDE ACTIVITIES, A JUDICIAL EMPLOYEE SHOULD AVOID THE RISK OF CONFLICT WITH OFFICIAL DUTIES, SHOULD AVOID THE APPEARANCE OF IMPROPRIETY, AND SHOULD COMPLY WITH DISCLOSURE REQUIREMENTS**

A. Outside Activities. A judicial employee's activities outside of official duties should not detract from the dignity of the court, interfere with the performance of official duties, or adversely reflect on the operation and dignity of the court or office the judicial employee serves. Subject to the foregoing standards and the other provisions of this code, a judicial employee may engage in such activities as civic, charitable, religious, professional, educational, cultural, avocational, social, fraternal, and recreational activities, and may speak, write, lecture, and teach. If such outside activities concern the law, the legal system, or the administration of justice, the judicial employee should first consult with the appointing authority to determine whether the proposed activities are consistent with the foregoing standards and the other provisions of this code.

B. Solicitation of Funds. A judicial employee may solicit funds in connection with outside activities, subject to the following limitations:

(1) A judicial employee should not use or permit the use of the prestige of the office in the solicitation of funds.

(2) A judicial employee should not solicit subordinates to contribute funds to any such activity but may provide information to them about a general fund-raising campaign. A member of a judge's personal staff should not solicit any court personnel to contribute funds to any such activity under circumstances where the staff member's close relationship to the judge could reasonably be construed to give undue weight to the solicitation.

(3) A judicial employee should not solicit or accept funds from lawyers or other persons likely to come before the judicial employee or the court or office the judicial employee serves, except as an incident to a general fund-raising activity.

C. Financial Activities.

(1) A judicial employee should refrain from outside financial and business dealings that tend to detract from the dignity of the court, interfere with the proper performance of official duties, exploit the position, or associate the judicial employee in a substantial financial manner with lawyers or other persons likely to come before the judicial employee or the court or office the judicial employee serves, provided, however, that court reporters are not prohibited from providing reporting services for compensation to the extent permitted by statute and by the court. A member of a judge's personal staff should consult with the appointing judge concerning any financial and business activities that might reasonably be interpreted as violating this code and should refrain from any activities that fail to conform to the foregoing standards or that the judge concludes may otherwise give rise to an appearance of impropriety.

(2) A judicial employee should not solicit or accept a gift from anyone seeking official action from or doing business with the court or other entity served by the judicial employee, or from anyone whose interests may be substantially affected by the performance or nonperformance of official duties; except that a judicial employee may accept a gift as permitted by the Ethics Reform Act of 1989 and the Judicial Conference regulations thereunder. A judicial employee should endeavor to prevent a member of a judicial employee's family residing in the household from soliciting or accepting any such gift except to the extent that a judicial employee would be permitted to do so by the Ethics Reform Act of 1989 and the Judicial Conference regulations thereunder.

Note: See 5 U.S.C. § 7353 (gifts to federal employees). See also 5 U.S.C. § 7342 (foreign gifts); 5 U.S.C. § 7351 (gifts to superiors).

(3) A judicial employee should report the value of gifts to the extent a report is required by the Ethics Reform Act, other applicable law, or the Judicial Conference of the United States.

Note: See 5 U.S.C. App. §§ 101 to 111 (Ethics Reform Act financial disclosure provisions).

(4) During judicial employment, a law clerk or staff attorney may seek and obtain employment to commence after the completion of the judicial employment. However, the law clerk or staff attorney should first consult with the appointing authority and observe any restrictions imposed by the appointing authority. If any law firm, lawyer, or entity with whom a law clerk or staff attorney has been employed or is seeking or has obtained future employment appears in any matter pending before the appointing authority, the law clerk or staff attorney should promptly bring this fact to the attention of the appointing authority.

D. Practice of Law. A judicial employee should not engage in the practice of law except that a judicial employee may act pro se, may perform routine legal work incident to the management of the personal affairs of the judicial employee or a member of the judicial employee's family, and may provide pro bono legal services in civil matters, so long as such pro se, family, or pro bono legal work does not present an appearance of impropriety, does not take place while on duty or in the judicial employee's workplace, and does not interfere with the judicial employee's primary responsibility to the office in which the judicial employee serves, and further provided that:

(1) in the case of pro se legal work, such work is done without compensation (other than such compensation as may be allowed by statute or court rule in probate proceedings);

# Exhibit 22



**GSA** U.S. General Services Administration

Customize Your Visit  |  MyGSA

[SEARCH]

| HOME | BUILDINGS | PRODUCTS | SERVICES | TECHNOLOGY | POLICY |

Northeast & Caribbean (2)

**Overview**

**Key Contacts**

**How to Get. . .**

**Buildings/Facilities**

**Small Business Assistance**

   **FAQ**

   **Small Business News**

   **Small Business Publications**

   **Small Business Resources**

**Emergency Preparedness**

**Jobs**

**News & Notices**

**About Region 2**

Home > About GSA > Regions > Northeast & Caribbean (2) > Small Business Assistance > Office of Small Business Utilization (FAQ)

# Frequently Asked Questions

### Small Business Utilization Center

1.  What is a GSA Number?

2.  What's the advantage of having a GSA Number?

3.  How long will it take me to get a GSA Number?

4.  Once I get a contract, how will I know where to sell my products and/or services?

___

### Small Business Utilization Center

1.  What is a GSA Number?

    You may have gone into the office of a Federal agency to try to sell your products or services to them, and the first thing they asked you was, "Do you have a GSA number?" A GSA number is a GSA Federal Supply Schedule contract number. You can get a GSA number by downloading a solicitation, which is an invitation to submit an offer, from the FedBizOpps web site (http://www.fbo.gov). Then you will need to send your offer to the GSA Contracting Officer listed in the solicitation package. The Contracting Officer will review your offer and let you know if additional information is required. If you meet all the requirements, you may be awarded a GSA Federal Supply Schedule Contract, which means you have been approved by that Contracting Officer to sell your products or services to the Federal Government.

2.  What's the advantage of having a GSA Number?

    GSA's Federal Supply Schedules program is the preferred method of procurement for the Federal government. Federal agencies prefer to buy from GSA Schedules because they know they are getting an approved product. Also, it means GSA has done all the legwork for them and negotiated the best price and the best value for their dollar.

3.  How long will it take me to get a GSA Number?

    In many cases, the average time is 90 days. However, in some cases, due to the volume of offers received, it

**CONTACTS**

**Office of Small Business Utilization**
(212) 264-1234
Fax (212) 264-2760
r2.sbuc@gsa.gov
View Contact Details

**ACQUISITION SOLUTIONS**

For Vendors - Getting on Schedule

**e-TOOLS**

GSA Advantage!
eOffer/eMod
e-Buy
Schedules e-Library
FedBizOpps
Vendor Support Center
Federal Procurement Data Center

**GSA EVENTS**

How to get a GSA Schedule Contract - NYC Feb 2006
OSBU National Calendar of Events

**REFERENCE**

Freedom of Information Act (FOIA)
GSA Acquisition Manual (GSAM)

**RELATED GSA TOPICS**

Subcontracting Directory
Service-Disabled Veteran Small Business
Forecast of Contracting Opportunities
Office of Small Business Utilization

**FEDERAL LINKS**

Central Contractor Registration
Federal Acquisition Regulations (FAR)
FirstGov.gov
Grants.gov
North American Industrial Classification System (NAICS) Codes

may take a bit longer to evaluate. This is generally true for the Information Technology schedule, where the contracting staff may receive up to a hundred offers per week!

4. Once I get a contract, how will I know where to sell my products and/or services?

As a contract holder, you will be required to upload information about your awarded products and/or services onto the GSA Advantage web site (http://www.gsaadvantage.gov). GSA Advantage is the worldwide shopping network that any Federal agency can access and browse to locate and buy a wide variety of products and services from GSA Schedule contracts, and you will be listed along with these vendors. GSA also has a Small Business Utilization Center in all of its eleven national Regions. Each Center maintains its own Procurement Directory, which is a listing of all the Federal agencies in the region who have buying authority. Listings for each Agency include a point of contact, phone number, and the type of items and/or services they are authorized to buy. You can find a complete listing of the Small Business Utilization Centers at the Office of Small Business Utilization web site (http://www.gsa.gov/smallbusiness/).

Back to Top

Add to MyGSA

Printer Friendly format

U.S. Small Business Administration (SBA)
SBA Loans
SBA Small Business Development Centers (SBDC)

**NON-FEDERAL LINKS**

Procurement Technical Assistance Centers (PTAC)
SCORE

Contact Us
GSA Staff Directory

GSA Organizations
Choose... [ GO ]
Abbreviation Look-up

GSA Regions by State
Choose State: AK [ GO ]

QuickLinks
A-Z Links to GSA Topics

Help | Sitemap | Accessibility Aids | Linking | Privacy and Security
Also of Interest: Whitehouse.gov | FirstGov.gov | E-Gov.gov | Other Suggested Sites

http://www.gsa.gov/Portal/gsa/ep/contentView.do?faq=yes&pageTypeId=8199&contentId...   1/27/2006

# **Exhibit 23**

**General Services Administration**

**Annual Performance Report**

**Fiscal Year 2001**

**Prepared by the Office of the Chief Financial Officer**

**U.S. GENERAL SERVICES ADMINISTRATION**
**FY 2001 PERFORMANCE REPORT**

**TABLE OF CONTENTS**

I.  Introduction                                            1

II.  GSA Annual Report Matrix                               7

III.  GSA Management Challenges                            15

IV. Public Buildings Service                               21

V. Federal Supply Service                                  75

VI. Federal Technology Service                            107

VII. Office of Governmentwide Policy                      123

VIII. Other                                               153

IX. Staff Support Offices                                 157

## GSA FY 2001 ANNUAL PERFORMANCE REPORT

### I. Introduction

The mission of GSA is strategically important to providing good government service to the American people by helping federal agencies better serve the public by offering, at best value, superior workplaces, expert solutions, acquisition services and management policies. GSA is the central management policy agency of the federal government responsible for regulating administrative services other than information technology, personnel, and financial management. The administrative services under GSA's regulatory purview include the management of real and personal property, travel and transportation, motor vehicles and aircraft, and mail. GSA is also a significant, provider of procurement and property management services to other Federal agencies.

The GSA organization includes three major units that provide property management and procurement services to Federal agencies: the GSA Public Buildings Service (PBS), the GSA Federal Supply Service (FSS) and the GSA Federal Technology Service (FTS), and one unit providing management policy development, the GSA Office of Governmentwide Policy (OGP). GSA provides PBS, FSS and FTS services through the coordinated efforts of eleven regional offices and its central office in Washington D.C.

During FY 2001, the General Services Administration took steps to create a successful future at the agency. We began by reexamining GSA's mission, values and goals. After considerable discussion by GSA stakeholders, beginning with the administrative leadership and cascading down to every associate, we reassessed our purpose. New mission values and goals statements emerged from these discussions and were adopted by the agency. The fruits of this effort do not appear in this performance report, which focuses on performance goals that were in place at the start of the year. Nevertheless, the establishment of a new mission, values and goals, and the new emphasis on performance, speaks well for the future success of the agency.

This document, the General Services Administration's Annual Performance Report for FY 2001, is part of the Agency's overall implementation of the Government Performance and Results Act of 1993 (GPRA or the Results Act). The Chief Financial Officers Act and the Reports Consolidation Act also impact the drafting of this report. In the preparation, we have benefited from the insights of the General Accounting Office and the GSA Inspector General.

This report provides detailed information on how GSA performed against its performance goals for FY 2001. Overall approximately 62 of 79 or 78 % were met or exceeded. Certainly we are proud of this record. But we recognize that we can and must do better. The material that follows discusses our failures as well as our successes. Where we have fallen short we explain what future actions we will undertake to improve future results.

### Performance Highlights for Key Performance Measures

To accomplish its mission GSA established five strategic goals for FY 2001. The FY 2001 goals were as follows.

Goal 1:  Promote Responsible Asset Management
Goal 2:  Compete Effectively for the Federal Market
Goal 3:  Excel at Customer Service
Goal 4:  Meet Federal Social and Environmental Objectives
Goal 5:  Anticipate Future Workforce Needs

## VII.  OFFICE OF GOVERNMENTWIDE POLICY

The Federal Property and Administrative Services Act of 1949 authorizes GSA to provide a governmentwide system for procurement and supply of personal property and management services, use of available property, disposal of surplus property, and records management.  By the same authority, GSA develops, facilitates, and interprets governmentwide policies in these areas.

GSA's Office of Governmentwide Policy (OGP) shapes and maintains a governmentwide framework that helps agencies better serve the public by improving management in the Federal government.  OGP's policy authority covers 12 key areas — Acquisition, Aircraft, Committee Management, Electronic Government, Information Technology, Mail Management, Motor Vehicles, Personal Property, Real Property and the Workplace, Regulatory Information Services Center, Transportation, and Travel.

OGP associates in each of these policy areas have been working with agencies and other stakeholders to facilitate the changes needed for this changing world.  The increased customer emphasis, the Internet explosion, and a collaborative model for policy development have transformed how OGP does business.   OGP has re-engineered the traditional policy development model to one that stresses collaboration.  This new model calls for involvement of other Federal agencies, the private sector, and other stakeholders from the very onset of policy review and/or formulation.  Such collaborative efforts offer numerous advantages, not the least of which is to ensure "buy-in" from the policy customers.

**Performance Goals**

Throughout these new efforts, OGP wants to ensure a positive impact on helping Federal agencies better serve the public and improving Federal management.  To quantify and determine the impact, OGP measures its efforts against 16 performance goals focusing on two main areas —

Office of Governmentwide Policy
Governmentwide Improvement Initiatives

The Governmentwide Policy framework provides for more effective government management by establishing and updating laws and policies, sharing information, partnering with customers, measuring progress, and enhancing the workforce as follows.

- Implementing Federal Laws and Executive orders
- Maintaining up-to-date policies and guidelines
- Identifying and publishing leading practices
- Improving accessibility to shared databases and information
- Developing partnerships (new)
- Developing and promoting performance measurement systems
- Improving customer satisfaction (new)
- Investing in the competencies of the workforce (new)
- Increasing the satisfaction and effectiveness of the workforce (new)

Among the changes featured include four new performance goals.  These goals are part of OGP's internal performance measurement system called the Balanced Score Card.  Two of the new goals increase the focus on customers.

Improving customer satisfaction
Developing partnerships

And, two of the new Goals in the Governmentwide Policy framework emphasize the most important asset — OGP's experienced workforce. The goals are as follows.

Invest in the competencies of the workforce
Increase the satisfaction and effectiveness of the workforce

OGP recognizes the need to develop and replenish associates' skills to support GSA's strategic goals in a rapidly changing environment which include an aging workforce.

In addition the measures from two previous goals, "Identify and publish best practices," and "Develop and promote performance measurement systems for governmentwide use," have been refined and expanded. This change enhances management's ability to target and evaluate program performance in the Governmentwide Policy area.

The second category against which OGP measures its efforts is Governmentwide Improvement Initiatives. These Initiatives focus on specific OGP programs that can improve Federal management and help agencies better serve the public and include the following.

- Helping develop a single face for Government electronic transactions, OGP has developed several active user communities of practice including Extensible Markup Language (XML), an active Working Group Federal Public Key Infrastructure (PKI) Steering Committee, and SmartCard Program Managers forums.

- Working with the Accessibility Forum, an outgrowth of the issues surrounding the implementation of Section 508, two projects are the focus — an interoperability project and an effort to identify what objective measures may already exist that can be used.

- Helping agencies create a barrier free IT workplace by working with the IT Industry Council OGP has launched an improved Web site, an interactive Web-based training module, and the Buy Accessible portal. OGP also hosted numerous presentations at conferences nationwide.

- Developing an Electronic Performance Support System (EPSS) to include instructional materials and mentoring for acquisition personnel. OGP teamed with Defense Acquisition University to share responsibilities and resources.

- Reaching the goals to improve IT leaders professional skills, OGP focuses on improved and increased marketing, improved content of programs, and improved inclusion of affinity groups.

- Providing a "single-point-of-entry" for doing business with the government, OGP developed the FedBizOpps System, (formerly the Electronic Posting System). OGP's goal involves enhancing and expanding the utility of FedBizOpps, which allows industry to search and download solicitations, register for e-mail notification of applicable opportunities, and eventually submit proposals electronically.

- Promoting a single-face e-Government, OGP developed FirstGov. The FirstGov search database now contains 22,000 links to Federal Government Web sites containing 35 million Web pages.

In total OGP performance goals focus on establishing and updating laws and policies, partnering with customers, measuring progress, enhancing the workforce, developing a single face for government electronic transactions, helping provide barrier free IT workplaces, establishing and maintaining Internet based courses, improving the skills of IT leaders, providing a single point of entry for industry to do business with the government, and prototyping a Federal gateway to the Internet. In FY 2001, OGP met or exceeded all of its key goals. OGP will continue working on these goals to ensure success in FY 2002.

**Conclusion/Sphere of Influence**

124

OGP exercises GSA's authority as one of the central management organizations of the Federal government.  OGP's sphere of influence covers the following

All Federal procurement actions — 33.3 million actions obligating $231.1 billion
A total of 280,000 Federal Contracting Officers
Many foreign, State, and local governments
Total government space inventory — 3.3 billion gross square feet
Total Federal fleet activities — nearly 600,000 vehicles and 1,200 civilian agency aircraft
Disposal of over $11 billion of Federal excess and surplus property (real and personal) each year
Portal for government information under FirstGov
Procurement opportunities using FedBizOpps
Establishing a policy framework for public key technology

With this scope of influence, OGP must continue to operate effectively and efficiently.  Performance goals serve as a guidepost to ensure that OGP successfully helps Federal agencies better serve the public by improving management in the Federal Government, now and in the future.

# Exhibit 24

# Doing Business with GSA

Do you sell environmental products or services? GSA contracts for recycled content paper, carpet, furniture, alternative fueled vehicles, retread tires, energy-efficient products and environmental services. GSA's concern for the environment goes beyond contracting. Our Affirmative Procurement Program (APP) promotes the purchase of recycled content items designated by the Environmental Protection Agency (EPA) and the purchase and use of environmental products and services by GSA associates. GSA has a program to recycle its construction waste, and we seek to earn the U.S. Green Building Council "LEED (Leadership in Energy and Environmental Design) Certified" rating for our new and modernized buildings. Contractors are requested (where feasible) to identify items with pro-environmental characteristics, such as recycled content, energy efficiency and/or reduced pollutants. This information will appear on the Schedule contract brochures and in GSA's online shopping service, GSA Advantage! to assist customers who need to purchase EPA designated items.

**Need more copies of this publication?**
Download a copy of the manual electronically at any time. Visit http://www.gsa.gov/smallbusinesss and click on "Publications". Call the headquarters Office of Small Business Utilization (OSBU) at (202) 501-1021 or your Regional Small Business Utilization Center (SBUC) representative (see Chapter 7).
*Printed 2003*
*Made with 30% Recycled Content Paper*

# Message to New and Prospective Contractors

The United States Federal Government is the world's largest market place. Every 20 seconds of each working day, the Government awards a contract. As the Government's chief acquisition agency, the U.S. General Services Administration (GSA) spends billions of dollars annually on products and services offered to all Federal Agencies. Because we buy and leverage so much and use taxpayer dollars, GSA has a special responsibility to obtain the best quality and value possible for money spent. GSA awards a majority of its contracts to small businesses since they generate the majority of new jobs and contribute substantially to the Nation's economy. As GSA's small business advocate, the Office of Small Business Utilization will continue to engage in strategies that provide opportunities in Government procurement for small businesses (including small disadvantaged businesses, veteran-owned, women-owned small, and small businesses located in Historically Underutilized Business Zones). Accordingly, the Office of Small Business Utilization is please to provide you with this guide --- Doing Business With GSA --- to help you understand and participate in a wide world of contracting opportunities. This publication is also made available on our website at http://www.gsa.gov/smallbusiness. GSA wants to do business with you; therefore, we want to provide you with the information that will make the process of awarding prime contracts, subcontracts and getting on GSA schedule, an easy task. GSA Small Business Utilization Centers are located nationwide to help you get started. Please contact your Regional Small Business Utilization Center (see Chapter 7) for guidance.

Felipe Mendoza
Associate Administrator
Office of Small Business Utilization
**GSA Office of Small Business Utilization**
**U.S. General Services Administration**
1800 F Street, NW
Washington, DC 20405-0002
www.gsa.gov

# Table of Contents

### Introduction
Where to Start ...............................................................................................................5

### Chapter 1
**Small Business Contacts and Programs** ...........................................................6
Office of Small Business Utilization ......................................................................... 6
Regional Small Business Utilization Centers........................................................... 6
Small Business Technical Advisors (SBTAs)........................................................... 7
Small Business Programs ......................................................................................... 7
Who Is Eligible for Small Business Programs? ....................................................... 9
Small Business Administration Programs............................................................... 10

### Chapter 2
**About GSA** ...........................................................................................................11
GSA's Mission ........................................................................................................ 11
How GSA Is Organized........................................................................................... 11
What GSA Buys ...................................................................................................... 11
How GSA Buys........................................................................................................ 12

**GSA's Major Buying Activities** ........................................................................12
Federal Supply Service (FSS).................................................................................. 12
Federal Technology Service (FTS) ......................................................................... 15
Public Buildings Service (PBS) .............................................................................. 15

**What GSA Sells** .................................................................................................16

### Chapter 3
**Strategic Marketing for Government Contracting** .......................................18
Steps to Success in Contracting with the Federal Government................................. 18
Tips on Obtaining a GSA Schedules Contract........................................................ 20

### Chapter 4
**Marketing Tools for Small Businesses** ...........................................................21
Focus your Marketing Efforts ................................................................................. 21
Seek Subcontracting Opportunities ........................................................................ 22
Participate in Small Business Activities ................................................................. 23
Use Existing Resources ........................................................................................... 24
Consider Other Resources ...................................................................................... 24

### Chapter 5
**Electronic Commerce (EC)** ..............................................................................26
Electronic Data Interchange (EDI) ......................................................................... 26
Sources of Information for EC/EDI......................................................................... 26
Electronic Funds Transfer ...................................................................................... 27
Federal Acquisition Computer Network ................................................................. 27

## Chapter 6

**Procurement Procedures** ...........................................................................................**28**
Procurement Regulations............................................................................. 28
General Contracting Requirements.............................................................. 29
Simplified Acquisition Purchases................................................................ 30
Sealed Bid Purchases................................................................................... 32
Sealed Bid Purchases................................................................................... 33
Requesting an Invitation for Bid (IFB) ....................................................... 32
Negotiated Procurement .............................................................................. 35
Architect/Engineer Selection Process ......................................................... 36
Contract Performance and Completion........................................................ 37
Operating Requirements.............................................................................. 37
Performance Review ................................................................................... 37
Submitting Your Invoice ............................................................................. 38
Contract Appeals ........................................................................................ 38
Alternative Dispute Resolution................................................................... 38
Contract Award Tips ................................................................................... 38

## Chapter 7

**Contacts** ............................................................................................................**39**
OSBU........................................................................................................... 39
OSBU/SBUCs.............................................................................................. 39
Regional map............................................................................................... 40
SBTAs.......................................................................................................... 41
FSS............................................................................................................... 42
FTS............................................................................................................... 42
PBS .............................................................................................................. 43

## Appendices

**A. Websites** ......................................................................................................**45**
**B. Glossary of Terms** ......................................................................................**46**
**C. Answers to Frequently Asked Questions**.....................................................**48**

# Exhibit 25

# Public Financial Disclosure:
## A Reviewer's Reference

### Second Edition

U.S. Office of Government Ethics

November 2004

The Office of Government Ethics originally developed this reference manual in March 1994. We are pleased to reissue it now, with all changes that have been made to date.

This manual's purpose is to ensure the consistent, comprehensive and accurate review of executive branch employees' public financial disclosure reports. It aims to increase Government efficiency by providing uniform guidance and interpretation to agency ethics officials.

We have designed this guide primarily for the beginning and intermediate-level reviewer. The detailed summaries of review procedures and optional model documents should ease administration of the financial disclosure system. As you use this reference manual, you may have suggestions for revision. We welcome your ideas and urge you to contact us.

While this book provides a needed resource for ethics counselors, your review work must stand on your own judgment and analysis. The intention is not to create additional requirements but to specify the boundaries within which conflict of interest analysis may occur. Financial disclosure review should not be limited to satisfying technical disclosure requirements. Rather, ethics officials must focus on the research and analysis necessary to identify and resolve conflicts of interest.

The efforts of agency ethics officials, together with the Office of Government Ethics, are crucial in achieving the goals of maintaining the Government's integrity and fostering excellence in public service. This guide will play a significant role in that process.

## 1.0 INTRODUCTION

The Ethics in Government Act of 1978, as amended, requires senior officials in the executive, legislative and judicial branches to file public reports of their finances as well as other interests outside the Government. The statute and the Office of Government Ethics's (OGE) regulations specify which officials in the executive branch file a Standard Form 278 (SF 278). Unlike confidential financial statements filed by some mid-level employees, the SF 278 is available to the public. Reviewing officials within each agency certify and maintain these reports. Agencies do, however, forward reports of Presidential appointees requiring Senate confirmation and certain other reports to OGE for additional review and certification.

Although a financial disclosure report sometimes reveals a violation of law or regulation, the primary purpose of disclosure is to assist agencies in identifying *potential* conflicts of interest between a filer's official duties and her private financial interests and affiliations. Once a reviewing official identifies a potential conflict of interest and consults with the filer's supervisor as necessary, several remedies are available to avoid an actual or apparent violation of Federal ethics laws and regulations.

---

### A Caveat: Uses and Misuses

OGE has developed this reference manual on public financial disclosure for use by ethics officials at executive branch agencies. While it is a comprehensive reference, the statutes and regulations serve as the ultimate authorities. **If this *Reference's* language and format differ from the underlying statutes, regulations, or the instructions accompanying the standard reporting form, then reviewers must follow those primary sources.** Other cautions:

- All of the forms in Chapters 1 through 10 are sample forms only and they may have been altered to focus on particular aspects of disclosure review. Filers may use only the official standard forms.

- This work does not directly offer advice on Confidential Financial Disclosure Reports (OGE Form 450). Reviewers of the confidential form may, however, find the detailed information in *Part II: Reviewing Common Entries* to be a useful supplement to *OGE Form 450: A Review Guide* (September 1996).

- While some examples use the names of actual investment companies or funds, OGE expresses no opinion about the quality of any specific private entity or investment.

---

The Employee Standards of Ethical Conduct fully lists these exceptions.

5 C.F.R. § 2635.204

The Standards of Conduct bans receipt of gifts given by PROHIBITED SOURCES or because of one's official position. The following list summarizes the exceptions to this gift prohibition:

- Gifts clearly motivated by a family relationship or private friendship;
- Commercial discounts and similar benefits offered to groups in which membership is not related to Government employment or, if membership is related to Government employment, where the same offer is broadly available to the public through similar groups; and certain benefits offered by professional associations or by persons who are not prohibited sources;
- Certain awards and honorary degrees;

  NOTE: Such awards greater than $200 require approval, in writing, by the agency ethics official. When such a gift is reported on an SF 278 that is forwarded to OGE for certification, the written approval should be included with the form.
- Gifts resulting from the outside business activities of employees and their spouses (totally independent of the relationship to the filer);
- Gifts in connection with political activities permitted by the Hatch Act Reform Amendments of 1993 (5 U.S.C. § 7323);
- Free attendance that the sponsor of a conference or other event provides for the day on which an employee is speaking or presenting information officially;
- Free attendance provided by the sponsor of a widely-attended gathering of mutual interest to a number of parties where the ethics official has made any necessary agency-interest determinations;
- Certain gifts of food and entertainment in foreign areas;
- Gifts accepted by the employee under a specific statute, such as the Government Employees Training Act (5 U.S.C. § 4111) with agency approval, or the Foreign Gifts and Decorations Act (5 U.S.C. § 7342);
  or
- Gifts permitted by a supplemental agency standards of conduct regulation.

Note that an employee may not use any of the exceptions listed above to solicit or coerce the offering of a gift. Nor may an employee accept gifts:

- for being influenced in the performance of official duties or
- so frequently as to appear to be using public office for private gain.

Analysis of Private
Acceptances is Similar
to Non-Travel Gifts
Analysis
18 U.S.C. §§201&209
5 C.F.R. § 2635.201 to 205

### Private Capacity Acceptances

As with other gifts, if a filer receives a travel gift or reimbursement in a private capacity, the reviewer should first consider the criminal prohibitions on bribes, gratuities and supplementation of salary. Assuming no criminal issues are present, the reviewer should:

- analyze the circumstances to determine whether the gift may have been given because of the filer's official position, and
- determine if the donor was a PROHIBITED SOURCE by consulting the agency's listings of contractors, grantees or other similar listing.

### Standards of Conduct

If the gift or reimbursement was given because of official position or received from a PROHIBITED SOURCE, the reviewer should determine if the exceptions in the Standards of Conduct listed below allow its receipt:

The Employee Standards of
ethical conduct fully lists
these exceptions.
5 C.F.R. § 2635.204

- Gifts based on a family relationship or a personal friendship;
- Commercial discounts and similar benefits offered to groups in which membership is not related to Government employment or, if membership is related to Government employment, where the same offer is broadly available to the public through similar groups; and certain benefits offered by professional associations or by persons who are not prohibited sources;
- Gifts resulting from the outside business activities of employees and their spouses (totally independent of the relationship to the filer);
- Customary travel and entertainment in connection with employment discussions;
- Gifts in connection with political activities permitted by the Hatch Act Reform Amendments of 1993 (5 U.S.C. § 7323);
- Free attendance that the sponsor of a conference or event provides for the day on which an employee is speaking or presenting information officially;
- Free attendance provided by the sponsor of a widely-attended gathering of mutual interest to a number of parties where the necessary determination of agency interest has been made; or
- Gifts accepted by the employee under a supplemental agency standards of conduct regulation or a specific statute, such as 5 U.S.C. §§ 4111 (Government Employee Training Act) or 5 U.S.C. § 7342 (Foreign Gifts and Decorations Act).