UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES of AMERICA,

v.

DAVID HOSSEIN SAFAVIAN,                                Criminal No. 05-370 (PLF)

Defendant

**DEFENDANT'S MOTION TO INSPECT THE GRAND JURY RECORD
AND SUPPORTING MEMORANDUM OF LAW**

Defendant David H. Safavian moves this Court, pursuant to Federal Rule of Criminal

Procedure 6(e)(3)(E), to permit his counsel to inspect the record of the grand jury, including any

testimony, instructions to the jury, and closing remarks.  Mr. Safavian needs access to these

materials to support a possible motion to dismiss the indictment on the grounds that the

government a) submitted summary evidence to the grand jury that misrepresented and

embellished the actionable statements Mr. Safavian allegedly made to the GSA and the Senate

Committee on Indian Affairs; b) overstated the impact of Mr. Safavian's statements on both

investigations; and c) improperly instructed the jury as to the elements of each offense.  Material

discrepancies exist between the investigators' notes of witness interviews, the corresponding FD-

302 reports, and the indictment.  These distortions may have misled the grand jury to believe that

there was sufficient evidence to indict, when in fact there was not.  However, Mr. Safavian

cannot know the full extent of these irregularities without access to the grand jury record.[1]

---

[1] In an earlier attempt to ascertain the scope of the discrepancies between the interviews of
Senate Investigative Counsel Bryan Parker and Pablo Carrillo, Mr. Safavian requested the notes
of the Department of Justice attorney who attended the interviews.  This request, as well as an
informal request for Special Agent Reising's transcript was denied by the Department.

## I.    RULE 6(e)(3)(E) ALLOWS DISCLOSURE OF THE GRAND JURY TRANSCRIPT WHERE, AS HERE, JUSTICE REQUIRES IT.

The Court may authorize disclosure of a grand jury matter "preliminarily to or in connection with a judicial proceeding" or "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E). To access grand jury materials, a defendant must show a "particularized need" that outweighs justifications for secrecy. See Dennis v. United States, 384 U.S. 855, 868 (1966).

"[T]he invocation of grand jury [secrecy] is not some talisman that dissolves all constitutional protections." Butterworth v. Smith, 494 U.S. 624, 630 (1990) (quotation omitted). "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." Douglas Oil Co. of Calif. v. Petrol Stops, 441 U.S. 211, 223 (1979). Moreover, "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 234 (1940).

## II.    THE INDICTMENT IS LIKELY THE RESULT OF SUMMARY TESTIMONY BY A GOVERNMENT INVESTIGATOR, WHICH IS INHERENTLY SUSPECT.

Mr. Safavian believes that the primary, and perhaps sole witness, in the grand jury was FBI Agent Jeffrey Reising. The D.C. Circuit has recognized that "grand jury minutes should be even more readily available in the case of the testimony of a police official." Bradley v. U.S., 420 F.2d 181, 185 (D.C. Cir. 1969). Furthermore, "the use of summaries of testimony in grand jury proceedings is inherently suspect. Stated another way, a defendant's motion for disclosure based on a claim that summaries were used, states a 'particularized need,' and justifies disclosure

should the equities so permit." United States v. Mahoney, 495 F. Supp. 1270, 1276 (D. Pa. 1980).

As this Court has recognized, the precise terms used by Mr. Safavian in his conversations with the various government officials at issue in this case are "crucial" to both the government's case and the defense. See Slip Op. at 11-12 (Dec. 23, 2005). Thus, the use of summary testimony—often several degrees removed from Mr. Safavian's actual statements—is particularly problematic in this case.

## III.  NUMEROUS MATERIAL DISCREPANCIES BETWEEN THE INDICTMENT, THE INTERVIEW NOTES, AND THE INTERVIEW REPORTS SUGGEST MISREPRESENTATIONS OCCURRED DURING THE GRAND JURY PROCEEDING.

Compounding the concern over summary testimony is the existence of material discrepancies between the interview notes, the corresponding FD-302 reports, and the indictment. For example, the government appears to have inserted key terms of art, such as "seeking to do business," and unfairly pejorative phrases, such as "secretly" assisting, that embellish—and in some instances, contradict—the rough interview notes.[2]  These discrepancies suggest that misrepresentations of Mr. Safavian's statements occurred during the grand jury proceedings, and as a result, Mr. Safavian needs access to the grand jury transcripts.[3]  The Fifth Amendment protects Mr. Safavian's right to have a grand jury consider and find all elements of

---

[2] Attached is a list of significant discrepancies between the interview notes and FD-302 reports for the interviews of Senate Investigative Counsel Pablo Carrillo and Bryan Parker, former GSA General Counsel Raymond McKenna, and GSA Associate General Counsel Eugenia Ellison. See Attachment A.

[3] The Supreme Court ruling in United States v. Williams, 504 U.S. 36 (1992), does not apply to this case.  Williams held that an indictment can not be dismissed simply because the prosecutor failed to submit exculpatory evidence to the jury. See id. at 55. However, Williams did not modify the requirement that the government has the burden to show probable cause to support an indictment, and that this evidence can not be based on false or misleading evidence. See United States v. O'Shea, 447 F. Supp. 330 (S.D. Fl. 1978).

an offense. <u>See</u> <u>Hooker v. United States</u>, 841 F.2d 1225, 1230 (4th Cir. 1988); <u>see also</u> <u>Russell v. United States</u>, 369 U.S. 749, 760 (1962). When it becomes evident, prior to trial, that an indictment is based on misleading evidence or inflammatory arguments, dismissal of the indictment is warranted. <u>See</u> <u>United States v. Hogan</u>, 712 F.2d 757 (2d Cir. 1983) (dismissing indictment for prosecutor's extensive reliance on hearsay and secondary evidence, use of inflammatory argument, and introduction of misleading evidence to grand jury).

### A.    <u>The Indictment Makes Allegations Inconsistent with the Evidence.</u>

The first material discrepancy between the indictment and the evidence involves Mr. Safavian's alleged statements to the GSA-OIG. Count One of the indictment alleges that obstruction occurred because the GSA-OIG closed its investigation "[b]ased in part on defendant Safavian's statement that Lobbyist A had no business with GSA *at the time of the golf trip* [August 2002]." Indictment ¶ 26 (emphasis added). Similarly, Count Three of the indictment alleges that Mr. Safavian "falsely stated to the GSA-OIG . . . that Lobbyist A did not have any business with GSA; when in truth and in fact, as defendant Safavian well knew, *prior to the August 2002 Scotland trip* Lobbyist A was seeking to lease or purchase GSA-controlled property." Indictment ¶ 31 (emphasis added).

Nowhere, however, does the memorandum of GSA Inspector General (IG) Gregory Rowe ascribe such a statement to Mr. Safavian, much less attribute the decision to close the investigation to such a statement. IG Rowe's memo—written in May 2003 and based on interviews in March and April 2003—merely states that Abramoff "*[c]urrently*. . . does not have any business relationship with GSA." <u>See</u> Ex. 1 (DOJ-DS-001432) (emphasis added). It makes no statement about the relationship in 2002. This discrepancy is critical, because the timing of Abramoff's business with the GSA is likely to determine the truth or falsity of Mr. Safavian's actual statement in the March interview.

**B.    The Indictment Is Based on Reports That Appear Prejudicially Altered or Embellished.**

Count Two of the indictment alleges that Mr. Safavian "falsely stated to the GSA ethics officer that Lobbyist A did not have any business with and *was not seeking to do business with GSA*." Indictment ¶ 29 (emphasis added). Yet, as the evidence suggests, the government appears to have injected these key terms of art and other pejorative language after the fact into statements by McKenna and Ellison.

First, the government seems to have significantly embellished its evidence of Mr. Safavian's statements to GSA General Counsel Ray McKenna. When McKenna was interviewed, the interviewer noted McKenna as recollecting "DS – say J.A. has no business with GSA → not prohibited source." Ex. 2 (DOJ-DS006992). The indictment, however, leaps forward to allege that Mr. Safavian told McKenna that Abramoff "was not seeking to do business with GSA." In fact, Mr. Safavian made no such representation in the July 25, 2002 request to McKenna for an ethics opinion—the only communication between Messrs. McKenna and Safavian prior to the issuance of the ethics opinion. See Ex. 3 (DOJ-DS-007001) (e-mail from Safavian to McKenna asking for ethics opinion); Ex. 4 (DOJ-DS-006968) (Rowe's writeup of his interview with McKenna, explaining that McKenna did not speak with Defendant about the issue until after the ethics opinion issued).[4]

In addition, the government appears to have expanded or altered its evidence of Mr. Safavian's statements in the ethics inquiry. For the interview of Eugenia Ellison, author of the

---

[4] Curiously, the first report of McKenna recollecting that Mr. Safavian had stated that Abramoff "was not seeking to do business with the GSA" came into existence on November 7, 2005— more than a month after the indictment and shortly after Mr. Safavian filed a motion to compel discovery, thereby revealing his intent to challenge the nature of Abramoff's relationship with the GSA before the trip to Scotland. See Ex. 4 (DOJ-DS-006969) ("McKenna stated that since Safavian advised that Abramoff did not have business with GSA *or was seeking to business with GSA* [sic], Abramoff was not a prohibited source.") (emphasis added).

July 26, 2002 ethics opinion for Mr. Safavian, the government provided two different versions of

its report. One version contains handwritten edits by Ellison (the "Marked Up 302") apparently

entered on June 28, 2005. Ex. 5 (DOJ-DS007019). The other, meanwhile, appears to be a

redraft of the original that has incorporated some of Ellison's edits and inserted additional

language (the "Revised 302"). Ex. 6 (DOJ-DS006998). Despite the fact that Ellison indicated

she made her edits on June 28, 2005, both versions of the 302 indicate a June 21, 2005

transcription date, and both versions indicate they are "Grand Jury Material." Ex. 6 (DOJ-

DS006998), Ex. 5 (DOJ-DS007019).

    The Revised 302 manifests expansion on the part of the government. The key phrases in

the passage "Ellison stated that Abramoff clearly was a prohibited source since he was *seeking*

*official action* by GSA and *seeking to do business* with GSA," Ex. 6 (DOJ-DS-006999 to DOJ-

DS-007000) (emphasis added), do not appear *anywhere* in the rough notes. See Ex. 7 (DOJ-DS-

007014 to DOJ-DS-007018).

    Even the edits to the Marked Up 302 strike at the heart of the indictment, suggesting the

government may have misunderstood Ellison—and therefore misrepresented her in summary

testimony to the grand jury. For example, Ellison struck out the following language, which bears

directly on statements that are alleged to be false: "Ellison stated that Abramoff clearly ~~had or~~

was seeking to do business with GSA when Safavian requested his ethics request." Ex. 5 (DOJ-

DS007020) (strikethrough in original). According to Ellison, the next statement in the report

was also inaccurate: "Safavian's statement that 'the host is a lawyer and lobbyist, but one that

has no business before GSA (he does all his work on Capitol Hill)' was ~~not true~~." Id. at DOJ-

DS007021 (strikethrough in original). Finally, she struck the entirety of the sentence: "~~Ellison~~

~~stated that Safavian was not being truthful with the Committee on Indian Affairs investigation with his statement.~~" Id. (strikethrough in original).

In addition, the government has used conclusory, pejorative terms in its summaries that may have inflated the grand jury's finding. For example, both versions of the Ellison 302 say that "Ellison was not aware that Safavian was *secretly* assisting Abramoff . . . ." Ex. 6 (DOJ-DS-006999), Ex. 5 (DOJ-DS007020) (emphasis added). However, the word "secretly" does not appear anywhere in the interview notes. The closest references are notes that Ellison "[w]as not aware that DS had arrangement JA," Ex. 7 (DOJ-DS007016), and was "[n]ot aware that DS was assisting JA with letters." Id. at DOJ-DS-007017. Indeed, where Ellison qualified one of these statements with a follow-up point that the relationship "[c]ould have met the personal relationship requirement," id. at DOJ-DS-007016, the author of report unilaterally added that the trip "may have had the appearance of being improper," Ex. 6 (DOJ-DS-006999), a conclusion that does not appear in the notes. See Ex. 7 (DOJ-DS-007014-18).

As these discrepancies demonstrate, the government's written reports of the interviews were far more expansive and condemning of Mr. Safavian than McKenna and Ellison were willing to be. Thus, testimony presented to the grand jury that was based upon these reports, rather than the rough notes, likely was misrepresentative and unfairly prejudicial to Mr. Safavian. Since such embellishments go to the very core of the indictment and the elements of the offenses, any suggestion of misrepresentation necessitates disclosure of the grand jury testimony.

Count Four of the indictment alleges that Mr. Safavian "did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry . . . into allegations of misconduct by lobbyists for Native American tribes." Indictment ¶ 38. It appears, however, that summary testimony may have

enhanced the degree, if any, to which Mr. Safavian impeded the investigation of Senate

Investigative Counsel Pablo Carrillo and Bryan Parker. At the outset, it is important to consider

how far removed this summary testimony was from Mr. Safavian's original statements. Special

Agent Reising apparently testified in the grand jury as to what he learned from a report written

by Special Agent Saler, who interviewed Senate counsel Parker and Carrillo, who investigated

what Mr. Safavian had told the GSA ethics officers three years earlier.

The effect of these multiple layers of recitation and interpretation are that material

evidence was likely altered or omitted. For example, the rough notes taken at the Carrillo

interview indicate that Carrillo knew at some point that he had evidence showing that Abramoff

was "*seeking to do business* at GSA." Ex. 8 (DOJ-DS007025) (emphasis added). Yet, the

corresponding 302 report states that "Carrillo knew at some point they had evidence showing

Abramoff *was doing business* with GSA." Ex. 9 (DOJ-DS001619) (emphasis added).

Furthermore, the Carrillo notes clearly state that Mr. Safavian's letter did "not impact

[the] fraud element." Ex. 8 (DOJ-DS007026). Likewise, the notes to the Parker interview state:

"Impact of Safavian Letter on investigation? *no impact*. No deter from wanting to interview,

unless additional info he has failed to produce." Ex. 10 (DOJ-DS007034) (emphasis added).

Neither of these exculpatory statements, however, is reflected anywhere in the written reports

drafted by Special Agent Leanna Saler. See Exs. 9 (DOJ-DS001617-20) and 11 (DOJ-

DS001610-15). The decision to omit statements from *both* Senate counsel officials to the effect

that Mr. Safavian's representations "had no impact" on their investigation—which by that time

was focused on whether tribes paid for the trip, not whether Abramoff was seeking to do

business with the GSA, see Ex. 11 (DOJ-DS-001611)—is pivotal in an obstruction of justice

case. Consequently, it is substantially likely that these mischaracterizations of Mr. Safavian's

statements misled the grand jury into believing probable cause existed to indict Mr. Safavian.

## IV.    THE LACK OF PROPER FACTUAL AND LEGAL BASES FOR OFFENSES IN THE INDICTMENT SUGGEST THE JURY WAS IMPROPERLY INSTRUCTED.

For each of the charges, the indictment lacks necessary factual or legal bases, which

suggests the government may have incorrectly instructed the jury as to the requirements of the

charged offenses.  Improper instruction of a grand jury, when combined with other misleading

evidence from the government, is a ground for dismissal of an indictment.  See, e.g., U.S. v.

Breslin, 916 F. Supp. 438, 445 (E.D. Pa. 1996) (dismissing indictment for, among other things,

improper instruction to grand jury that it did not have to agree with everything in the indictment,

only the "critical" parts).  More importantly, it suggests that the grand jury failed to consider and

find all elements of the offense, as required by the Fifth Amendment.  See Hooker, 841 F.2d at

1230; see also Russell, 369 U.S. at 760.

For instance, Counts One and Four of the indictment allege that Mr. Safavian violated 18

USC § 2, the aiding and abetting statute.  However, neither charge specifies whether the

violation pertains to § 2(a) or § 2(b).  Furthermore, neither Count One nor Count Four provides

*any* factual basis for an aiding and abetting offense.  This failure alone should be a basis to

inspect the grand jury materials.

Beyond that failure, there is also a conspicuous omission of any evidence that Mr.

Safavian said anything about whether Abramoff was "seeking to do business with the GSA"—let

alone a knowing and willful false statement that Abramoff was doing so.  Whenever the

government proceeds on a basis that an action was "knowing or willful," the meaning of the

words—i.e., that the action requires actual knowledge of and a specific intent to violate the

law—has to be explained to the grand jury.  Since there is no evidence in the indictment to base

an inference that Mr. Safavian knew his conduct was illegal, there is no basis to conclude that the grand jury was properly instructed and properly found probable cause that Mr. Safavian violated §1001.

Furthermore, there is nothing false in Mr. Safavian's actual statement to the GSA-OIG. The GSA-OIG asked Mr. Safavian who paid for the trip, and Mr. Safavian responded that he did. To support his claim, Mr. Safavian gave the GSA-OIG a copy of the check he gave to Abramoff, which was cashed in August 2002. If the government's theory is that Mr. Safavian had a duty to disclose all aspects of his relationship with Abramoff when he was asked who paid for the trip to Scotland, the present indictment does not allege a duty to disclose. Even if the government could identify such a duty, the issue is whether the grand jury understood that it had to find such a duty. Without the proper instruction, it is unlikely that the grand jury made the proper finding of probable cause to believe that Mr. Safavian obstructed or provided a false statement to the GSA-OIG investigation.

Finally, since no standard jury instruction exists for 18 U.S.C. § 1505, disclosure of the instructions to the grand jury is even more important to determine whether Mr. Safavian's Fifth Amendment right to an indictment by an independent and informed grand jury has been violated. More than a reasonable probability exists that the government instructed the grand jury that mere submission of the request for an advisory opinion, which the government contends contained a false statement, met the definition of "corruptly" pursuant to the definitional statute, 18 U.S.C. § 1515(a)(6). When the government proceeds on a § 1505 theory, however, it must show that the defendant has the specific intent to violate the statute. See United States v. Browning, 630 F.2d 694, 700-01 (10th Cir. 1980). As the Supreme Court recently ruled in Arthur Anderson, LLP v. United States, 125 S. Ct. 2129, 2135 (2005), "corruptly" must be read in conjunction with the

term "knowingly." Thus a person must act with the knowledge that he is acting corruptly and not benignly. See id. at 2135 ("Only persons conscious of wrongdoing can be said to 'knowingly corruptly persuade.'"). Thus, given the likelihood that the government failed to provide proper instruction to the grand jury, Mr. Safavian needs disclosure of the grand jury record.

## V.    MR. SAFAVIAN'S NEED FOR DISCLOSURE OF THE GRAND JURY TRANSCRIPT OUTWEIGHS THE DIMINISHED REASONS FOR SECRECY.

The reasons for grand jury secrecy are to (1) prevent the escape of prospective indictees; (2) prevent targets of grand jury investigations from attempting to influence grand jurors to vote against an indictment; (3) encourage prospective witnesses to voluntarily testify before the grand jury; (4) prevent targets from intimidating or tampering with witnesses; and (5) ensure that targets who are exonerated by the grand jury will not be held up to public ridicule. Douglas Oil, 441 U.S .at 219.

Now that Mr. Safavian has been indicted and arraigned, however, the first, second, and fifth policy reasons for secrecy are not applicable. "When an investigation ends, there is no longer a need to keep information from the targeted individual in order to prevent his escape— that individual presumably will have been exonerated, on the one hand, or arrested or otherwise informed of the charges against him, on the other. There is also no longer a need to prevent the importuning of grand jurors since their deliberations will be over." Butterworth, 494 U.S. at 632-33 (footnote omitted); Mahoney, 495 F. Supp. at 1273 ("When the grand jury has completed its work, obviously the policy reasons for secrecy are lessened."). This reflects "the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." Dennis, 384 U.S. at 870; cf. Pittsburgh Plate Glass, 360 U.S. at 406-07 (Brennan, J., dissenting) (finding the policy inapplicable when the only embarrassment could be existence of prior inconsistent statements).

Furthermore, the third and fourth reasons, which seek to encourage and protect private citizens that serve as grand jury witnesses, are greatly diminished, where, as here, the grand jury witnesses are government officers.  See Allen v. United States, 390 F.2d 476, 482 (D.C. Cir. 1968) (ruling that "it is difficult to see a valid reason for secrecy" where the defendant sought the grand jury testimony of a police officer testifying about statements made by the defendant); see also Bradley, 420 F.2d at 185.

## CONCLUSION

For the reasons stated above, and in light of the strong, particularized need of Mr. Safavian for these materials and the comparatively insignificant interest in grand jury secrecy at this stage, Defendant Safavian respectfully requests that counsel should be permitted to inspect the grand jury record in the manner requested.

Respectfully submitted,

WILEY REIN & FIELDING LLP

By: _____
    Barbara Van Gelder (D.C. Bar # 265603)
    Roderick L. Thomas (D.C. Bar # 433433)
    Albert C. Lambert (D.C. Bar # 489562)
    Wiley Rein & Fielding LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032
    FAX: 202.719.7049

    *Attorneys for David H. Safavian*

Dated: January 27, 2006

Tab A

## ATTACHMENT A

## To Defendant's Motion to Inspect the Grand Jury Record

## INTERVIEW-BY-INTERVIEW COMPARISON OF INVESTIGATORS'

## ROUGH NOTES WITH THE CORRESPONDING FD-302s

### Interview of Senate Investigative Counsel Pablo Carrillo

| Rough Notes (DOJ-DS007022 to 27, Ex. 8) | FD-302 (DOJ-DS-001617 to 20, Ex. 9) |
|---|---|
| "Letter **no impact** fraud element, but would have to come back to flush out." P. 5. | Not included. |
| "Know at some [point] had evid[ence] showing JA **seeking to do bus[iness]** with GSA." P. 4. | "He knows at some point they had evidence showing ABRAMOFF **was doing business** with GSA." P. 3. |

### Interview of Senate Investigative Counsel Bryan Parker

| Rough Notes (DOJ-DS007028 to 36, Ex. 10) | FD-302 (DOJ-DS-001610 to 15, Ex. 12) |
|---|---|
| "Probably made the decision to focus on fraud pre-Safavian letter." P. 4. | "In the middle of March 2005, it was decided that they needed to advance the ball on the investigation of fraud against the tribes, so they never did an interview of SAFAVIAN." P. 2. |
| Reference to Roll Call article in which McCain says he was not targeting colleagues. P. 4. | Not included. |
| "Impact of Safavian Letter on investigation? **no impact**. No deter from wanting to interview, unless additional info he has failed to produce." P. 7. | Not included. |

**Interview of Former GSA General Counsel Raymond McKenna**

| Rough Notes<br>(DOJ-DS006988 to 97, Ex. 2) | FD-302<br>(DOJ-DS006968 to 71, Ex. 4) |
|---|---|
| No mention of McKenna's familiarity with ethics rules, ethics training. | "McKenna stated that he was very familiar with the ethics rules. McKenna stated he had held positions on Capitol Hill and at the Department of Defense which specialized [sic] in ethics advice." P. 2. |
| No mention of McKenna assuming DS spoke to Ellison. | "McKenna stated that he recalled speaking to Ellison about the matter and assumed that Safavian had spoken to her about this request." P. 2. |
| "DS say J.A. has **no business** with GSA → not prohibited source." P. 5. | "McKenna stated that Safavian told them that his friend Jack Abramoff had no business with GSA. McKenna stated that since Safavian advised that Abramoff did not have business with GSA **or was seeking to business** with GSA [sic], Abramoff was not a prohibited source." P. 2. |

A-3

**Interview of GSA Associate General Counsel Eugenia Ellison**

| Rough Notes[1] (DOJ-DS007014 to 18, Ex. 7) | Marked Up 302 (DOJ-DS007019 to 21, Ex. 5) |
|---|---|
| "Was not aware that that DS had **arrangement** JA. Could have met the personal relationship requirement." P. 3. | "Ellison stated that she was unaware that Safavian was assisting Jack Abramoff with **business matters** before GSA. Ellison stated that Safavian, had he reported it, still could have gone on the golf trip based on his personal relationship with Abramoff. Ellison explained that if Safavian and Abramoff were long time friends who wanted to vacation together it would have been possible, **but it may have had the appearance of being improper.**" P. 2. |
| "Not aware that DS was assisting JA write letters." P. 5. | "Ellison was not aware that Safavian was **secretly** assisting Abramoff in trying to obtain 40 to 50 acres of GSA land in Montgomery County, Maryland for his school or obtain business contracts related to the Old Post Office renovation." P. 2. |
| No mention. | "Having reviewed these documents, Ellison stated that Abramoff clearly ~~had or~~ was seeking to do business with GSA when Safavian requested his ethics request." P. 2. |
| Regarding DS's 7/25/2002 email: "Not sure if RMcK forwarded the email or if Ray printed it out." P. 2. | "McKenna forwarded Safavian's request to her." P. 1. |
| Ellison said: "No one has ever discussed how to obtain property." P. 5. | No mention. |

---

[1] Page 4 of the notes appears to be missing, but the government has indicated that the note-taker mistakenly skipped from page 3 to page 5, and that page 4 never existed.

A-4

**Interview of GSA Associate General Counsel Eugenia Ellison[2]**

| Marked Up 302<br>(DOJ-DS007019 to 21, Ex. 5) | Revised 302<br>(DOJ-DS006998 to 7000, Ex. 6) |
|---|---|
| "Ellison stated that she was unaware that Safavian was assisting Jack Abramoff with business matters before GSA. **Ellison stated that Safavian, had he reported it, still could have gone on the golf trip based on his personal relationship with Abramoff.** Ellison explained that if Safavian and Abramoff were long time friends who wanted to vacation together it would have been possible, but it may have had the appearance of being improper." P. 2. | "Ellison stated that she was unaware that Safavian was assisting Jack Abramoff with business matters before GSA. **Ellison stated that there was an exception to the prohibitions to the gifts from a prohibited source, an individual having or seeking to do business with GSA. If the gift was based on a personal relationship, Safavian, had he reported it, still could have gone on the golf trip,** but it may have had the appearance of being improper." P. 2. |
| "Having reviewed these documents, Ellison stated that Abramoff clearly ~~had or~~ was seeking to do business with GSA when Safavian requested his ethics request." P. 2. | "Having reviewed these documents, Ellison stated that Abramoff **clearly was a prohibited source**, since he was **seeking official action** by GSA and **seeking to do business** with GSA." P. 2. |
| "Ellison stated that Safavian's statement that 'host is a lawyer and lobbyist but one that has no business before GSA (he does all his work on Capitol Hill)' was ~~not true.~~" PP. 2-3. | "Additionally, Safavian was not forthcoming with his statement to McKenna that the 'host is a lawyer and lobbyist but one that has no business before GSA (he does all his work on Capitol Hill)'" P. 3. |
| "~~Ellison stated that Safavian was not being truthful with the Committee on Indian Affairs investigation with his statement.~~" P. 3. | "Ellison said that Abramoff was a prohibited source based on the series of emails that she reviewed." P. 3. |

---

[2] The government has provided two different FD-302 reports for the interview of Eugenia Ellison. One report contains annotations, apparently by Ms. Ellison, marking out certain language. *See* DOJ-DS-007019-7021 ("Marked Up 302"). The second report appears to be a redrafted version, incorporating the annotations of the Marked Up 302 and adding additional text. *See* DOJ-DS-006998-7000 ("Revised 302"). Both reports are labeled as grand jury materials, and both have a 6/21/05 transcription date, even though Ellison apparently made her edits on 6/28/05.

Tab 1

## INDEX OF EXHIBITS TO MOTION TO INSPECT

### (FILED SEPARATELY UNDER SEAL)

| Exhibit | Description |
|---------|-------------|
| 1 | May 9, 2003 Report (DOJ-DS001431-33) |
| 2 | McKenna Notes (DOJ-DS006988-97) |
| 3 | July 25, 2002 e-mail request (DOJ-DS007001) |
| 4 | McKenna 302 (DOJ-DS006968-71) |
| 5 | Ellison Marked Up 302 (DOJ-DS007019-21) |
| 6 | Ellison Revised 302 (DOJ-DS006998-7000) |
| 7 | Ellison Notes (DOJ-DS007014-18) |
| 8 | Carrillo Notes (DOJ-DS007022-27) |
| 9 | Carrillo 302 (DOJ-DS001617-20) |
| 10 | Parker Notes (DOJ-DS007028-36) |
| 11 | Parker 302 (DOJ-DS001610-15) |

## CERTIFICATE OF SERVICE

I certify that on January 27, 2006, I caused Defendant's Motion to Inspect the Grand Jury Record, Sealed Exhibits to the Motion to Inspect, Proposed Order, and Motion to Seal the Exhibits to be delivered by hand to:


Peter Zeidenberg
U.S. Department of Justice
Office of Special Counsel
The Bond Building
1400 New York Ave., N.W.
Ninth Floor
Washington, DC 20530

Mark B. Sweet