UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Cr. No 05-370 (PLF) |
| | : | |
| v. | : | |
| | : | |
| DAVID HOSSEIN SAFAVIAN | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS INDICTMENT

The United States of America, by and through its undersigned attorneys, hereby

respectfully submits its Opposition to Defendant's Motion to Dismiss Indictment.  As explained

in the accompanying Memorandum of Points and Authorities, because the Indictment clearly and

properly alleges that Defendant committed the offenses charged, and because it is for the jury –

after hearing the evidence at trial – to decide the sufficiency of the evidence, Defendant's Motion

to Dismiss the Indictment should be denied.

Respectfully submitted,

NATHANIEL B. EDMONDS
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

PETER R. ZEIDENBERG
Trial Attorney, Public Integrity Section
Criminal Division
United States Department of Justice

# TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................................... 2

RELEVANT LEGAL STANDARDS ............................................................................. 16

RESPONSE TO DEFENDANT'S ARGUMENT ........................................................ 19

I. COUNT TWO SHOULD NOT BE DISMISSED BECAUSE THE INDICTMENT
   FAIRLY INFORMS DEFENDANT OF THE CHARGES ........................................... 19

   I.A  Count Two fairly informs the Defendant of the charges .............................................. 19

   I.B  Defendant made a false statement through a trick, scheme or device. ......................... 21

      I.B.1  Jury should determine the literal truth of Defendant's statements ................ 21

      I.B.2  No fundamental ambiguities exist. ................................................................. 24

   I.C  Defendant concealed material information that he had a legal duty to disclose. ........ 27

      I.C.1  Indictment sufficiently alleges affirmative acts for concealment. ................ 28

      I.C.2  Defendant had a duty to make full disclosure to the ethics officer. ............. 30

   I.D  Defendant's Statements Were Material to GSA Ethics Officer's Official Decision. .. 32

II. COUNT ONE SHOULD NOT BE DISMISSED BECAUSE THE INDICTMENT
    ALLEGES OBSTRUCTION OF THE GSA-OIG INVESTIGATION ............................. 34

III. COUNT THREE SHOULD NOT BE DISMISSED BECAUSE THE INDICTMENT
     ALLEGES THAT DEFENDANT KNOWINGLY AND WILLFULLY FALSIFIED AND
     CONCEALED MATERIAL FACTS DURING THE GSA-OIG INVESTIGATION ....... 38

   III.A  Indictment sufficiently alleges a trick, scheme or device. ......................................... 38

      III.A.1  Indictment alleges affirmative acts ............................................................ 38

      III.A.2  Defendant had a duty to disclose ................................................................ 39

   III.B  Alleged Concealed Assistance Was Material ............................................................ 39

   III.C  Defendant Falsified Material Facts .......................................................................... 40

IV. COUNT FOUR SHOULD NOT BE DISMISSED BECAUSE THE STATEMENTS
    ARE PERTINENT TO THE SENATE COMMITTEE ON INDIAN AFFAIRS
    INVESTIGATION OF FRAUD AND INFLUENCE PEDDLING ................................... 41

    IV.A  SCIA's jurisdiction included Defendant's involvement in the Scotland trip ........... 41

    IV.B  Defendant's false statements were corruptly designed to obstruct ........................... 45

V. COUNT FIVE SHOULD NOT BE DISMISSED BECAUSE INDICTMENT ALLEGES
   DEFENDANT'S FALSIFICATION AND CONCEALMENT OF MATERIAL FACTS . 46

    V.A  Indictment alleges affirmative acts sufficient to establish a trick scheme or device. . 46

    V.B  Defendant made inaccurate representations to SCIA ................................................ 48

    V.C  Defendant's statements were material and within the SCIA's jurisdiction ............... 48

VI.  AIDING AND ABETTING SHOULD NOT BE DISMISSED AT THIS TIME ................... 48

CONCLUSION ......................................................................................................................... 50

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arthur Andersen LLP v. United States*, 125 S.Ct. 2129 (2005) ...................................... 36

*United States v. Adler*, 623 F.2d 1287 (8th Cir. 1980) ...................................... 18

*Bronston v. United States*, 409 U.S. 352 (1973) ............................................... 25

*United States v. Carter*, 917 F. Supp. 1(D.D.C. 1995) ................................... 16

*United States v. Chapin*, 515 F.2d 1274 (D.D.C. 1975) .................................. 18

*United States v. Cisneros*, 26 F. Supp.2d 24 (D.D.C. 1998) ................................... passim

*United States v. Cisneros*, 169 F.3d 763 (D.C. Cir. 1997) ....................................... passim

*United States v. Conlon*, 628 F.2d 15 (D.C. Cir. 1980) .................................. 16

*Costello v. United States*, 350 U.S. 359 (1956) ........................................... 2, 17

*United States v. Crop Growers Corp.*, 954 F.Supp. 335 (D.D.C. 1997) .................. 21, 31

*United States v. Culliton*, 328 F.3d 1074 (9th Cir. 2003) .......................................... 24, 25

*United States v. Curran*, 20 F.3d 560 (3d Cir. 1994) ....................................... 31

*United States v. Dale*, 782 F.Supp. 615 (D.D.C. 1991) ........................................... passim

*United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) ........................................ 22, 37, 48

*United States v. Gaudin*, 515 U.S. 506 (1995) ..................................:...... 32, 41

*United States v. Gimbel*, 830 F.2d 621(7th Cir. 1987) .................................... 31

*United States. v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) ........................... 16

*United States v. Hamblin*, 911 F.2d 551(11th Cir. 1990) ................................ 49

*Hamling v. United States*, 418 U.S. 87 (1974) ....................................... 16, 20

*United States v. Hansen,* 772 F.2d 940 (D.C. Cir. 1985) .................................... 20, 33, 40

*United States v. Hess*, 124 U.S. 483 (1866) ....................................... 49

*United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994) ............................................... 35, 36

*United States v. Lattimore*, 127 F. Supp. 404 (D.D.C. 1955) ................................... 24, 25

*United States v. London*, 550 F.2d 206 (5th Cir. 1977) ........................................ 29, 38, 46

*United States v. Manapat*, 928 F.2d 1097 (11th Cir. 2001) ..................................... 24, 25

*United States v. McBride*, 362 F.3d 360 (6th Cir. 2004) .......................................... 46

*United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994) .......................................... 27

*United States v. Milton*, 8 F.3d 39 (D.C. Cir. 1993) .................................... 18, 20, 21, 22

*United States v. Moses*, 94 F.3d 182 (5th Cir. 1996) ........................................ 27

*United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979) .............................................. 23

*United States v. North*, 708 F. Supp. 364 (D.D.C. 1988) ............................................... 20

*United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) ................................................. 36

*United States v. Poindexter*, 725 F. Supp. 13 (D.D.C. 1989) ...................... 20, 25, 37, 46

*Rice v. United States*, 356 F.2d 709 (8th Cir. 1966) .......................................... 35

*United States v. Rodgers*, 466 U.S. 475 (1984) ...................................................... 20

*United States v. Self*, 2 F.3d 1071 (10th Cir. 1993) ........................................... 49

*United States v. Shah*, 44 F.3d 285 (5th Cir. 1995) ........................................... 20

*United States v. Shannon*, 836 F.2d 1125 (8th Cir. 1988) ................................................ 28

*United States v. Shorter*, 608 F. Supp. 871 (D.D.C. 1985) .............................................. 16

*United States v. Sinskey*, 119 F.3d 712 (8th Cir. 1997) ...................................... 49

*United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990) ............................................. 24

*United States v. Tonelli*, 577 F.2d 194 (3d Cir. 1978) ........................................ 25

*United States v. Torkington*, 812 F.2d 1347 (11th Cir. 1987) .......................................... 17

-iv-

*United States v. Trie*, 23 F. Supp.2d 55 (D.D.C. 1998) ............................................. 17, 27

*United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005) .................................................. 17

*Watkins v. United States*, 354 U.S. 178 (1957) ................................................................ 42

*Woodward v. United States* , 469 U.S. 105 (1985) .......................................................... 29

## FEDERAL STATUTES

5 C.F.R. § 2635 ................................................................................................................ 31

5 C.F.R. § 2635.101 ............................................................................................... 31, 34, 39

5 C.F.R. § 2635.107 ......................................................................................... 20, 21, 31, 34

5 C.F.R. § 2635.203 .......................................................................................................... 34

5 U.S.C. App. 3 § 6(a) ...................................................................................................... 36

18 U.S.C. § 1001 ........................................................................................................ passim

18 U.S.C. § 1505 ................................................................................................... 35, 42, 49

18 U.S.C. § 1515 ............................................................................................................... 36

18 U.S.C. § 2 ..................................................................................................................... 49

28 U.S.C. §535 ............................................................................................................ 21, 32

## FEDERAL CRIMINAL RULES

Federal Rule of Criminal Procedure 12(b)(3)(B) ........................................................... 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No 05-370 (PLF)** |
| | : | |
| v. | : | |
| | : | |
| **DAVID HOSSEIN SAFAVIAN** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss Indictment. In his motion, Defendant postulates what he believes the Government's evidence will be at trial, and, finding this evidence lacking, argues that the Indictment should be dismissed for lack of evidence. In advancing this argument, Defendant references snippets of notes, portions of selective e-mails, and heavily edited investigative reports that he believes will comprise the Government's evidence. Defendant then makes wishful assumptions and strained inferences while disregarding the fact that it will up to the jury to decide the strength of the Government's evidence. Because the Indictment clearly and properly alleges that Defendant committed the offenses charged, and because it is for the jury – after hearing the evidence at trial – to decide the sufficiency of the evidence, Defendant's Motion to Dismiss should be denied.

## **FACTUAL BACKGROUND**[1]

Defendant became the Chief of Staff for the General Services Administration ("GSA") in

May, 2002. Within days of becoming Chief of Staff, Defendant began communicating with an

old friend and former colleague, Jack Abramoff, a well-known and very successful lobbyist in

Washington, D.C. Abramoff advised Defendant that he was interested in acquiring or leasing the

Old Post Office Building ("OPO") located on Pennsylvania Avenue, N.W. for some of his

clients. Abramoff revealed to Defendant that he wanted to buy or lease the OPO and turn it over

to a developer who could convert it into a luxury hotel. Abramoff also expressed to Defendant

his interest in acquiring or leasing a portion of the Naval Surface Warfare Center-White Oak

("White Oak"), a property consisting of approximately 600 acres in Silver Spring, Maryland.

Abramoff was interested in obtaining the White Oak property to house a private school that he

had started. Both the OPO and White Oak were managed and their fates controlled by GSA.

Many, but by no means all, of the communications between Defendant and Abramoff

were by e-mail. The most significant and relevant e-mails were sent by Abramoff to Defendant's

home e-mail account, even ones sent during normal business hours. See, e.g., G. Exh. 3 (titled

"Leasing of Historic Buildings"). This e-mail traffic reveals the extent and nature of Abramoff's

business interest in both the OPO and White Oak, as well as the advice and assistance Defendant

provided Abramoff to help him obtain control of the properties.

---

[1]Typically, a full factual recitation would not be necessary in a motion to dismiss because all that is necessary is to review the allegations in the Indictment. Costello v. United States, 350 U.S. 359, 364 (1956) (An indictment "valid on its face [] is enough to call for trial of the charge on the merits."). Nevertheless, to the extent that the Court agrees with the Defendant's contention that it is appropriate to consider the likely evidence at trial, the Defendant's view of what will comprise the evidence against him ignores the most compelling evidence of Defendant's guilt. We take this opportunity to correct Defendant's incomplete description of the record.

2

On May 24, 2002, Abramoff sent an e-mail (G. Exh. 1) to Defendant's home e-mail address:

> There is a facility which is under the control of the GSA in silver Spring, Maryland, which is the former Naval Surface Weapons center (off New Hampshire Avenue). They are now going to put the FDA there. it is a huge property. I was wondering if it is possible get some of that property for a school. Do you know if that is doable and how?

On or about June 14, 2002, Abramoff invited Defendant to join him and others for a week-long golf trip to Scotland in early August, where they would play golf at St. Andrews and then, at the end of the week, spend several nights in London. On that same date, Abramoff e-mailed an associated (G. Exh. 2), informing him that Defendant was "going to join us in Scotland." The associate replied, "Why dave? I like him but didn't know u did as much. Business angle?" Abramoff responded on the next day: "Total business angle. He is new COS of GSA."

On June 19, 2002, Abramoff forwarded an e-mail to Defendant's home e-mail account entitled "Leasing of Historic Buildings," (G. Exh. 3) in which it is noted that the

> General Post Office Building, also known as the US Tariff Commission Building was leased to a developer for conversion into a luxury hotel under the authority of section 111 of the National Historic Preservation Act (NHPA). It would be very helpful if we could obtain a copy of the solicitation that was used in that case (without any full size architectural drawings) to select the developer. ... It would be useful to know wither there has been such a consultation with respect to the Old Post Office Building at 12th and Pennsylvania NW and whether a MOA has been issued and whether we can get a copy of it.

In a message attached to this e-mail, Abramoff wrote: "David, can you get us this stuff so we can put together the bid specs?"

3

On June 30, 2002, Abramoff sent another e-mail (G. Exh. 4) to Defendant's home e-mail

address. Abramoff wrote:

> Can you find out if you guys have control of any part of a huge
> federal property called the White Oak Federal Research Center, off
> New Hampshire Ave in Silver Spring? I want to try to get 40 acres
> of that tract if possible for a non-profit. Is it doable?

On July 2, 2002, Defendant e-mailed Abramoff (G. Exh. 5):

> We have not fully allocated all of the acreage at White Oak. We
> are still surveying whether any other federal agencies are
> interested. If not, we would begin disposal (i.e., sale or donation)
> proceedings. As for the other project, you should know that aside
> from section 8a preferences, Indian tribes also have "hub zone"
> status, which provides for enterprise zone-like tax benefits. You
> will need to ramp up on this as it is progressing. Let's discuss.
> Dhs.

On July 6, 2002, Abramoff received an e-mail from one of his Greenberg Traurig ("GT")

lobbying staffers, related to the OPO. The staffer stated in the e-mail (G. Exh. 6):

> Whichever tribe goes with this needs a new entity asap. Suggest
> __(tribe)_____ Historic Property Development. LLC, or some
> such. Then we need to get it certified as a hubzone business by
> sba; that may take some pushing. this would need to be done in
> July. we need to put together a team.
>
> ***
>
> GSA has the authority to limit bids (at least initially) to hubzone
> businesses. The statute says that can lease historic buildings
> "notwithstanding any other provision of law"; I doubt that limiting
> the bids to Indian owned tribes would work politically without
> congressional direction. Hubzone set aside should be saleable
> politically, especially if they say, hey if no one bids or we don't get
> a good bid, we open it up for everyone.

On July 16, 2002, Abramoff sent an e-mail to the same GT lobbyist (G. Exh. 7).

Abramoff wrote, "Can you join me and David Safavian, the COS of GSA at Signatures?" The

GT lobbyist responded, "Of course. Topic is OPO? Preparation?" Abramoff responded, "Yes,

OPO. We need to go meet the [GSA] Administrator so this is a prep/question/answer meeting."

On July 21, 2002, Abramoff sent an e-mail (G. Exh. 8) to Defendant's GSA account:

> Thanks so much for today's round. It was really fun. Perhaps we
> can go out Friday? I'll be in touch mid week. If you can get me
> any info as to which land is still available at White Oak, and
> whether there are any buildings there, that would be huge. Thanks
> so much.

A few minutes later on July 21, 2002, Abramoff sent an e-mail (G. Exh. 9) titled "White

Oak"to Defendant's home address:

> The facility is secured, as I understand. Any thoughts on how we
> could get a tour there without giving a heads up to too many folks?

On the same day, July 21, 2002, Abramoff e-mailed one of his GT staff (G. Exh. 10):

> I just got done seeing David Safavian, CoS of GSA now. there is a
> federal property (used to be the Naval Research facility, no[w] part
> of it is the FDA) in Silver Spring. The property would be perfect
> for our school and David is totally supportive. He said that the
> quickest way to get this done is to slip something into a moving
> bill, which directs the GSA to transfer the property to the school, or
> even better to lease it to the school for long term? If we were to
> craft something oblique, any chance of slipping into the election
> reform bill? I know we are loading that up, but I thought I'd ask.
> Needless to say, it would be the greatest thing in the world to me.

On July 21, 2002, Abramoff sent an e-mail (G. Exh. 11) to a GT lobbyist, with the subject

"urgent matter - GSA." Abramoff wrote:

> They have control of a federal property in Silver Spring. It is in
> White Oak and it was the site of the Naval Surface Warfare Center.
> It is approximately 200 acres and approximately 60 of them are
> going to be the new headquarters of the FDA. The rest of the
> property is not being used right now. I was with David Safavian
> today and we discussed this, and my getting it for our school. He
> said that one way to do this (quickly) is to get something in

> legislation which mandates that the GSA lease the property for 99
> years for a nominal amount to the school (or foundation, perhaps?).
> I spoke with Neil this afternoon and we have a chance to slip this
> into the Election Reform bill, but have to move mega fast. Can
> you get language for us to get approximately 50 acres in this
> property (not sure which acres we want - ideally those with some
> buildings on them - I hope to have some more info on the property
> tomorrow)? We have to move fast because they are locking this
> bill within the next day or so. Also, can we have it so that the
> county has no say on how the property is used etc? can we keep it
> in fed control with the greatest of latitude being given to the
> school? Call me on this and the rest of this. we need to move
> mega fast on this one. thanks!!!

On July 22, 2002, the GT lobbyist sent an e-mail (G. Exh. 12) to Abramoff containing a

draft U.S. Representative letter to the Administrator of GSA related to the OPO and requesting

special consideration for HUBZone businesses. The letter stated:

> I note that the General Service Administration's National Capital Region
> on July 15th issued a draft Request for Qualifications for redevelopment of
> the Old Post Office Building located in the Federal Triangle.

> As GSA proceeds with this important historic reuse project, I urge you to
> give consideration to providing additional opportunities for Hubzone
> businesses in the redevelopment process. Specifically, I would like you to
> consider giving Hubzone businesses an advance opportunity to provide
> redevelopment proposals that could be given priority if they otherwise
> meet the RFQ and RFP requirements.

Abramoff forwarded the e-mail to Defendant's home e-mail address and wrote, "Does

this work, or do you want it to be longer? It's the letter from [U.S. Representative A], [U.S.

Representative B], et al to [GSA Administrator] Perry."

On July 23, 2002, Defendant sent an e-mail (G. Exh. 13) to a GSA Congressional Affairs

employee responsible for handling the request for a third U.S. Representative. Defendant

received a response that he forwarded to Abramoff and stated:

6

> Havent [sic] seen the paperwork yet.  I assume I wil[l] get
> something tomorrow morning.  Sorry.  Bureaucracy strikes again.

Later that same day, Abramoff sent an e-mail (G. Exh. 14) to Defendant's home e-mail

account that contained a draft schedule for the August 2002 Scotland trip.

On July 24, 2002, another GT lobbyist sent an e-mail (G. Exh. 15) to Abramoff regarding

the problems that the lobbyist was encountering getting the information from GSA on NSWC-

White Oak and the resulting difficulties due to the timing of Congressional bills.  Abramoff

forwarded the message to Defendant's home e-mail address and wrote, "What do you advise?"

On July 25, 2002 at 4:31 A.M., Abramoff e-mailed (G. Exh. 16) Defendant's office e-

mail and stated:

> Do you guys have the ability to give a short term (one year) lease
> on the property at your discretion?  We are in a real bind on the
> school and I was wondering if there was a way to lease part of the
> White Oak site for a year?

On July 25, 2002 at 8:30 A.M., Defendant forwarded an internal GSA e-mail (G. Exh.

17) entitled "Old Post Office and Leases" to Abramoff.

In an e-mail dated July 25, 2002 at 10:19 A.M., (G. Exh. 18), Defendant sought advice

from a GSA ethics officer regarding the proposed August 2002 trip to Scotland that he hoped to

take with Abramoff.  Specifically, Defendant wrote to GSA's General Counsel the following e-

mail:

> I am in need of an ethics opinion.  I (along with wto [sic] members
> of Congress and a few Congressional staff) have been invited by a
> friend and former colleague on a trip to Scotland to play golf for
> four days.  I will be paying for all my hotels, meals, and greens
> fees.  The issue is airfare.
>
> The host of the trip is chartering a private jet to take the eight of us

7

> from BWI to Scottland [sic] and back. He is paying the cost for the
> aircraft regardless of whether I go or not. In fact, none of the other
> guest [sic] will be paying a proportional share of the aircraft costs.
> I need to know how to treat this activity.
>
> One other point of relevance: the host is a lawyer and lobbyist, but one that
> has no business before GSA (he does all of his work on Capitol Hill).

At no point did Defendant reveal to the ethics adviser, or anyone else working at GSA, that

Abramoff had enlisted his help in attempting to obtain leases at both the OPO and at White Oak.

Nor did Defendant reveal that he, in fact, provided Abramoff assistance and advice in order to

help Abramoff achieve his objectives.

On July 26, 2002 at 5:06 P.M., GSA's General Counsel sent Defendant an email

containing ethics opinion drafted by a GSA lawyer, (G. Exh. 19) that stated:

> This is in response to your inquiry on whether you can accept a gift
> of free air transportation from a friend to attend a[] golf trip. You
> stated that a friend and former colleague, Jack Abramoff, invited
> you, along with several members of Congress and a few
> Congressional staff, to Scotland to play golf for four days. You
> stated that you will be paying for all of your hotel expenses, meals
> and greens fees. You noted, however, that your friend would be
> providing the air transportation at no cost to you and the other
> guests attending the event. You stated that your friend, who is a
> lawyer and lobbyist with Greenberg and Traurig, is chartering a
> private jet to take you and the other participants from BWI to
> Scotland and back. You stated that neither Mr. Abramoff nor his
> firm does business with or is seeking to do business with GSA.
> Based upon the information you have provided, you may accept the
> gift of free transportation from your friend.
>
> Section 2635.202 of the Standards of Ethical Conduct for
> Employees of the Executive Branch states that an employee shall
> not solicit or accept a gift from a prohibited sources [sic] or a gift
> given because of the employee's official position. A prohibited
> source is any person who:
>
> (1) Is seeking official action by the employee's agency;
> (2) Does business or seeks to do business with the employee's agency;

(3) Conducts activities regulated by the employee's agency;
(4) Has interests that may be substantially affected by performance or nonperformance of the employee's official duties; and
(5) Is an organization a majority of whose members are described in paragraphs (1) and (4) above.

Since the gift is not being offered by a prohibited source and the it [sic] is not being given because of your official position, the gift acceptance restrictions under 5 C.F.R. 2635.202 do not apply to you. Consequently, you may accept the gift of free air transportation.

On that same day, July 26, 2002 at 9:05pm, Defendant forwarded the GSA's General Counsel's e-mail, which included Defendant's "representations" Abramoff and stated: "Jack - fyi. It looks like Scotland is a go." Abramoff's response: "Superb!"

Earlier that same day at 9:13 A.M., Defendant forwarded an internal GSA e-mail (G. Exh. 20) to Abramoff discussing alternatives of how to transfer NSWC-White Oak to "a Jewish high school and sports academy." Defendant also wrote to Abramoff: "This is the type of bureaucracy I'm dealing with. I am still running the traps on the [one] year lease." Abramoff responded back not to Defendant's GSA address but instead to Defendant's home e-mail address and wrote, "Maybe we should not focus on the Jewish part?"

On the same day Defendant received the ethics opinion, July 26, 2002 at 4:07 P.M., Abramoff sent an e-mail (G. Exh. 21) to Defendant's home e-mail address with a draft letter to the GSA Commissioner of Public Buildings requesting a lease of NSWC-White Oak for Eshkol. As an introduction to the attachment, Abramoff wrote: "Does this work? I put in 3 years just to be safe. Once we are set on the draft of the letter, should I courier it over today, or wait until Monday (I don't want it lost in the mix)?

On July 28, 2002, Defendant sent an e-mail (G. Exh. 22) from his home e-mail account to

9

Abramoff.  Defendant provided suggestions of how to draft the letter to GSA regarding the

NSWC-White Oak lease.  Defendant wrote:

> You will see that I added comments in a middle paragraph.  I think
> you need to lay out a case for this lease.  It doesnt [sic] have to be
> detailed.  But you do need to explain what, why, where, and when.
> See the bracketed commentary below.
>
> ***
>
> [I would add a couple of paragraphs concerning the school's history
> (if there is some), its mission, its annual budget, etc.  How is this
> unique or different than schools currently available to students
> from the area.  If you are comfortable with it, I would also add a
> paragraph explaining what happened with Montgomery County in
> order to drive home the urgency of this issue.  You need the
> property access sooner rather than later.  Finally, I would include a
> short graph about your long term plans -- to acquire land in the area
> -- since so many students  come from Montgomery County -- and
> build a permanent institution.  In this section, I would NOT raise
> the possibility of obtaining GSA land from White Oak.  That could
> be seen as an unofficial reason to deny your request for use of the
> property this year (i.e., once they get here, it wil[l] []be hard to
> deny them a conveyance of property later).]

On July 28, 2002, Abramoff edited his original letter to the GSA Commissioner of Public

Buildings regarding NSWC-White Oak and incorporated some of Defendant's suggestions.

Abramoff sent an e-mail to Defendant containing the second draft of the letter (G. Exh. 23).

Abramoff then sent an e-mail, G. Exh. 24 to his personal assistant at GT and wrote:

> Please note that the letter is edited.  I also fixed the spelling of
> [Eshkol Head Master's] name, and removed the rabbinic titles.  We
> still need the address/phone/website at bottom, and [GT staffer] is
> supposed to email that to you and me before 8 am.  Once you get it,
> make sure it is done right (full text on full letterhead - call me if
> there are ANY questions) and then put [Eshkol Head Master's]
> signature in the right place, and then courier all copies to the
> precise rooms at GSA for each of the Cc people.  Do not allow our
> firm's name or my name to appear anywhere.  Call me as soon as
> this is done, and once the courier is sent, please email David

10

Safavian that it is on the way.

On July 30, 2002, Abramoff sent an e-mail (G. Exh. 25) to Defendant's GSA e-mail account stating: "Please let me know as soon as you can regarding Friday's meeting. afterwards, do you want to do a special field examination at a site near Fed Ex Field? :-)"

On that same day, Defendant sent an e-mail (G. Exh. 26) with the subject line, "Eschkol [sic] Academy & White Oak," to the Assistant Regional Administrator for GSA's Public Building Service for the National Capital Region, and the Deputy Regional Administrator for the DC Capital Region. Defendant wrote: "Per our conversation, how do you folks look for a meeting on this issue and possibly a quick trip to White Oak on Friday morning?"

In response to Defendant's e-mail, on July 30, 2002, the Assistant Regional Administrator for GSA's Public Building Service for the National Capital Region sent Defendant an e-mail (G. Exh. 27) that outlined how GSA land could be used and indicated that it was unlikely that Eshkol could receive any land from NSWC-White Oak. Defendant forwarded that e-mail from his work e-mail address to Abramoff. Abramoff responded not to Defendant's work address but instead to Defendant's home e-mail address. Abramoff's e-mail stated, "The religious proscription makes me think we should have gone with Cap Athletic. What do you think?"

On July 30, 2002, Abramoff sent an e-mail (G. Exh. 28) to his wife and two Eshkol representatives. Abramoff wrote:

> I just went to David Safavian's office. He is the Chief of staff of the GSA and my good friend. I saw a map of the White Oak property. We identified some potential sites. They want to meet downtown on Friday at 11:30 am at the GSA building (1800 F Street, NW, room 6137). David does not think that I should be there, given my high profile politically. I agree. the three of you can go, though.

11

On July 30, 2002, Abramoff sent another e-mail (G. Exh. 29) to his wife.  Abramoff wrote:

> When you are in the room with David [Safavian] and the other
> GSA folks, identify yourself as Pam Alexander or Pam Clarke.
> David does not want Abramoff used in the meeting.  when you
> check in at the door, however, you'll need your driver's license,
> and it's OK for you to be Abramoff there, since that won't get up
> to the guy in the meeting (who probably does not know me, but
> David and I don't want to take a chance).  OK?

On or about August 2, 2002, the Assistant Regional Administrator for GSA's Public Building Service for the National Capital Region and Defendant had a meeting with the two Eshkol representatives, Mrs. Abramoff and another GT lobbyist in the GSA Administrator's office to discuss the possibility of leasing NSWC–White Oak to Eshkol.  Ind. ¶ 16.

On the next day, August 3, 2002, Defendant, Abramoff, Abramoff's son, and six other invited guests boarded a chartered jet and flew to Scotland.  The group stayed at the St. Andrew's Inn and primarily golfed from Sunday afternoon to Thursday morning.  The group then flew aboard the chartered jet to London.  After spending Thursday night in London, some guests returned to the United States via commercial aircraft.  Defendant remained in London on Friday and Saturday nights, staying for three nights at the Mandarin Oriental Hotel.  Defendant returned to the United States with Abramoff via chartered jet on Sunday, August 11, 2002.  The total cost of the trip, which was paid for by funds Abramoff obtained from his Indian tribe lobbying clients, was in excess of $130,000.  Defendant gave Abramoff a check for $3,100 which, ostensibly, covered Defendant's full share of expenses associated with the trip.

On the Scotland trip, Defendant and Abramoff communicated about Abramoff acquiring an interest in GSA properties.  For example, on August 12, 2002, Abramoff forwarded  a June

29, 2002 message from Defendant on the OPO project to a lobbying associate at GT.  G. Exh. 30.

Abramoff commented: "Had good chats with David during the trip.  He wants us to push hard on

this project [OPO] and he thinks we can get it."

After the Scotland trip, Defendant and Abramoff continued to communicate about

Abramoff acquiring an interest in White Oak and OPO.  For instance, on November 18, 2002,

Abramoff forwarded to Defendant's home e-mail account an e-mail (G. Exh. 31) with a subject

line that read: "OPO BUILDING PROJECT."  The e-mail message read: "David, just wanted to

let you see the team we have on the OPO, as well as the Chitimacha tribe.  Let me know if you

think there are any problems.  See you soon."  Attached to the e-mail was a list of the "team" that

Abramoff had put together on the OPO project, including the names of a developer, contractor,

architects, designers, and hotel.

On December 8, 2002, Abramoff received an e-mail (G. Exh. 32) from a GT lobbying

associate.  The e-mail had "OPO" in the subject line and read: "We need to figure out what info

we can get from GSA.  Groh [the developer] wants plans, etc., Could your contact determine

what might be reasonably available and what their new time frame is?"  Abramoff forwarded this

e-mail to Defendant's home e-mail account with the query, "Any ideas on this one?  our

developer wants to get info if possible.  thanks David."

### The GSA-OIG Investigation

In the Spring of 2003, GSA Office of Inspector General ("GSA-OIG") received an

anonymous hotline complaint regarding Defendant's participation in an "international golfing

trip provided by lobbyists."  As a result of this complaint, GSA-OIG opened an administrative

investigation.  Ind. ¶ 24.  The investigation sought to determine, inter alia, the nature of

13

Defendant's relationship with Abramoff. On both March 27 and April 25, 2003, the GSA-OIG

Regional Inspector General for Investigations interviewed Defendant about his golf trip with

Abramoff. Ind. ¶ 25.

During these interviews, Defendant stated that at the time he took the trip with Abramoff,

Abramoff had no business with GSA. Ind. ¶ 25. Defendant also stated that he had paid

Abramoff for the total cost of the trip including airfare, hotels and golf green fees. Id. Defendant

provided to GSA-OIG a $3,100 check to Abramoff dated August 3, 2002, which is the date

Defendant boarded the chartered jet to Scotland. Id. At no point did Defendant reveal to the

GSA-OIG agent that Abramoff had sought Defendant's assistance in obtaining a lease for either

the OPO or White Oak. Nor did Defendant reveal that he had provided assistance and advice to

Abramoff both before and after the golf trip in order to help Abramoff achieve his objectives.

Based in part on Defendant's statement that Abramoff had no business with GSA at the

time of the golf trip and that Defendant had fully paid for his cost of the trip, GSA-OIG closed its

investigation. Ind. ¶ 26.

**The Senate Investigation**

In March 2004, the Senate Committee on Indian Affairs ("SCIA") began an investigation

into allegations of misconduct by Abramoff and others that had been made by several Native

American tribes. Ind. ¶ 33. As a member of SCIA, Senator John McCain and his staff had the

responsibility to gather materials related to those allegations. Id. SCIA held public hearings on

this matter on September 29, 2004 and November 17, 2004. Ind. ¶ 34. During the course of the

hearings, it was learned that tribal funds were used by Abramoff to pay for a portion of the

August 2002 Scotland trip. Id. SCIA was investigating both the misuse of Indian tribal funds as

well as allegations of influence peddling by Abramoff.

Acting in his capacity as Chairman of SCIA, Senator McCain authorized his staff to send to Defendant a letter dated February 23, 2005 requesting information about the August 2002 Scotland trip with Abramoff. Ind. ¶ 35.

In March 2005, Defendant spoke by telephone with an investigator from SCIA and represented that he had received approval for the Scotland golf trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics officer who prepared the opinion. Ind. ¶ 36.

On March 17, 2005, Defendant responded to Chairman McCain's request for information about his golf trip with Abramoff with a letter in which he stated in part:

> [w]hen the invitation was made, I was the chief of staff to the U.S. General Services Administration ("GSA"). Mr. Abramoff did not have any business before the agency at that time. Prior to departure, I consulted with the GSA Office of General Counsel to obtain guidance on the propriety of this trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a 'gift from a prohibited source' under the applicable regulations, nor was it considered a gift given because of my official position.

Ind. ¶ 37. Defendant enclosed with his letter to SCIA his July 25, 2002 email to the GSA ethics officer, the GSA ethics opinion regarding the August 2002 Scotland trip and a copy of his $3,100 check to Abramoff dated August 3, 2002. Ind. ¶ 37.

Defendant never revealed to anyone on SCIA that both before and after the golf trip Abramoff had been attempting to gain control of both OPO and White Oak. Nor did Defendant reveal to Senate staffers that Abramoff had enlisted Defendant's help and advice in gaining control of these properties, or that Defendant had actually provided Abramoff this help and

15

assistance.  Finally, Defendant never revealed to the Senate staffers that he had also withheld this information from the GSA ethics officer at the time he obtained the ethics opinion.

## RELEVANT LEGAL STANDARDS

An indictment should be a "plain, concise and definite statement of the essential facts constituting the offense charged."  Fed. Cr. Crim. P. 7(c).  An indictment is sufficiently specific (and not subject to dismissal) if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead acquittal or conviction in bar of future prosecutions for the same offense.  Hamling v. United States, 418 U.S. 87, 117-18 (1974).  See also United States v. Conlon, 628 F.2d 150, 155-56 (D.C. Cir. 1980), cert. denied, 454 U.S. 1149 (1982) ("[a]n indictment is sufficient if it clearly informs the Defendant of the precise offense of which he is accused so that he may prepare his defense.")  United States. v. Haldeman, 559 F.2d 31, 123 (D.C. Cir. 1976), cert. denied, 454 U.S. 1149 (1977)  ("the Supreme Court has recognized that the indictment as a charging instrument has two central purposes – to apprise the accused of the charges against him so that he may adequately prepare his defense, and to describe the crime with which he is charged with sufficient specificity to enable him to protect against future jeopardy for the same offense"); United States v. Shorter, 608 F. Supp. 871, 874 n.2 (D.D.C. 1985), aff'd, 809 F.2d 54 (D.C. Cir.), cert. denied, 484 U.S. 817 (1987).[2]

---

[2]Courts in the D.C. Circuit have concluded that "[p]ractical, not technical, considerations govern the validity of an indictment and the test of the validity of an indictment is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." United States v. Carter, 917 F. Supp. 1, 2 (D.D.C. 1995); United States v. Cisneros, 26 F. Supp. 2d 24, 49 (D.D.C. 1998) (discussing cases in which notice based on the statute alone was found to be sufficient because practical, rather than technical considerations govern the validity of an indictment).

16

Defendant's arguments plainly go to the sufficiency of the evidence on the charges, and that is not a matter for consideration at this stage in the proceedings. See, e.g., United States v. Trie, 23 F. Supp 2d 55, 62 (D.D.C. 1998) ("To the extent that [defendant] is arguing that the grand jury may not have heard any evidence relating to [the crime], that would be an argument about the sufficiency of the government's evidence, an argument best reserved for trial. The sufficiency of the evidence presented to the grand jury may not be challenged if the indictment is facially valid,[] and the indictment in this case is facially valid.") citing Costello v. United States, 350 U.S. 359, 363-64 (1956). In considering a motion to dismiss, the court does not attempt to determine whether sufficient evidence exists to support the allegations made therein. See United States v. Torkington, 812 F.2d 1347, 1354 (11th Cir. 1987) (insufficient indictments may only be dismissed, pursuant to Rule 12 (b) of the Federal Rules of Criminal Procedure, based on a legal infirmity in the indictment, and not upon a determination of the facts that may or may not be developed at trial). Rather, if there are disputed facts, the Government is "usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure." United States v. Yakou, 428 F.3d 241, 247 (D.C. Cir. 2005). The Supreme Court in Costello v. United States, 350 U.S. 359, 363-64 (1956) describes why a Court should not review the adequacy of the evidence prior to trial:

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

17

Petitioner urges that this Court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.

(citations omitted).

Defendant's motion is actually a request that the Court to review the sufficiency of the evidence at this pre-trial stage, rather than at the close of the Government's case. Although Defendant states that he is "relying on the government's allegations, documents and witness statements as true," Def. Mem. 4, his reliance on selected potions of documents and witness statements is an attempt to bypass the typical pre-trial challenges to an Indictment and instead improperly attack the sufficiency of the evidence. Defendant's intent and the meaning of what he said to, for example, the GSA ethics officer, is a matter not for the court to decide pre-trial, but rather for the jury to resolve. United States v. Milton, 8 F.3d 39, 45-46 (D.C. Cir. 1993) (jury to decide meaning of defendant's statements in section 1001 prosecution); United States v. Chapin, 515 F.2d 1274, 1279-81 (D.C. Cir.), cert. denied, 423 U.S. 1015 (1975) (jury to decide meaning of defendant's statement in perjury prosecution).  As discussed infra, the Indictment fairly informs Defendant of the charges, and that is the end of the inquiry at this stage in the proceedings. See, e.g., United States v. Adler, 623 F.2d 1287, 1289 (8th Cir. 1980) ("This language [in the indictment] was sufficient to put him on notice of the nature of the charges against him; therefore the challenge to the sufficiency of the indictment in this regard must fail.").

18

Faced with an Indictment that is legally sufficient on its face, Defendant attempts to reach beyond the Indictment to predict what proof the Government will offer at trial. Defendant struggles to find some ambiguities and what he anticipates will be shortcomings in the Government's proof at trial. Defendant notably ignores the basis of an appropriate motion to dismiss - Federal Rule of Criminal Procedure 12(b)(3)(B) - "a motion alleging a defect in the indictment." In doing so, Defendant invites the Court not just to undertake a legal analysis of facial validity of the Indictment, but to perform the jury's task of evaluating the evidence on the issue of whether Defendant knowingly and willfully made false statements and obstructed both a GSA-OIG investigation and Senate proceeding. Defendant's motion to dismiss suffers from numerous mischaracterizations of the state of the evidence and the law. We address each of the Defendant's arguments infra.

## RESPONSE TO DEFENDANT'S ARGUMENT

### I. COUNT TWO SHOULD NOT BE DISMISSED BECAUSE THE INDICTMENT FAIRLY INFORMS DEFENDANT OF THE CHARGES

Defendant moves to dismiss Count Two on numerous grounds. In order to assist the Court in addressing all of the Defendant's concerns, the Government responds point by point.

### I.A  Count Two fairly informs the Defendant of the charges

Defendant claims that Count Two is an unprecedented application of 18 U.S.C. § 1001 that "utterly fails to satisfy the strictures of fair notice, due process and the rule of lenity." Def. Mem. 14. Defendant misapplies the appropriate legal standards and misstates the factual record..[3]

---

[3]Defendant invokes the rule of lenity, Def. Mem. 3-4, but neglects D.C. case law that finds the rule of lenity inapplicable to unambiguous statutes such as 18 U.S.C. § 1001. See, e.g., United

19

Count Two fairly informs the Defendant that he is charged with making false statements and misleading the GSA ethics officer regarding Abramoff's relationship with GSA, and consequently, should not be dismissed on that ground. Because the Indictment clearly and concisely informs Defendant of the precise nature of the charge against him, it suffers from no infirmities and should not be dismissed. See, e.g., Hamling v. United States, 418 U.S. 87, 117-118 (1974).

18 U.S.C. § 1001(a)(1) makes it a crime if one "knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact" in any matter within the jurisdiction of the executive branch. Courts have upheld convictions in cases where the false statements at issue were to officials of GSA. See, e.g., United States v. Shah, 44 F.3d 285 (5th Cir. 1995) (affirming conviction of false statement under §1001 made to GSA). Moreover, the Supreme Court has stated that jurisdiction within the meaning of 18 U.S.C. § 1001 should not be narrowly or technically defined. United States v. Rodgers, 466 U.S. 475, 480 (1984). The D.C. Circuit has found that jurisdiction in an 18 U.S.C. § 1001 indictment is sufficient if "there is a 'statutory basis' for the agency's request for the information alleged to contain the false statement." United States v. Milton, 8 F.3d 39, 45 (D.C. Cir. 1993).

Federal statutes require that each Executive Agency maintain an ethics official to answer questions of employees regarding proper conduct. See G. Exh. 33 (5 C.F.R. § 2635.107). As part of the duties in the GSA General Counsel's office, the ethics officer was required to opine

_____

States v. Hansen, 772 F.2d 940, 948-49 (D.C. Cir. 1985); United States v. North, 708 F. Supp. 364, 369 (D.D.C. 1988). Similarly, Defendant's reliance on due process fails because "due process does not require that the government cite a 'litigated fact pattern directly on point' as a prerequisite to the institution of criminal proceedings." United States v. Poindexter, 725 F. Supp. 13, 28 (D.D.C. 1989).

20

on the appropriateness of situations identified in employee's ethics requests, including questions

about the receipts of gifts.  Without truthful information, ethics officials are unable to correctly

analyze the situation and provide appropriate guidance to GSA employees.  Additionally, an

agency ethics official is required by 28 U.S.C. § 535 to report any information received relating

to a violation of the criminal code.  G. Exh. 33 (5 C.F.R. § 2635.107(b)).[4]  Consequently,

Defendant was on fair notice that statements he made to ethics officials could serve as the basis

of criminal prosecution.

**I.B  Defendant made a false statement through a trick, scheme or device**

Defendant seeks to dismiss Count Two as a matter of law because he argues 1)

government cannot show that his statements were not truthful and 2) fundamental ambiguity,

including a fundamental ambiguous regulatory framework.  Def. Mem. 17.  Because 1) a "literal

truth" defense is a defense for the jury to decide, 2) the statements were not "literally true," and

3) there was no fundamental ambiguity, Defendant's motion should be denied.

I.B.1  Jury should determine the literal truth of Defendant's statements

Falsity is an essential element of a case brought under Section 1001.  United States v.

Crop Growers Corp., 954 F. Supp. 335, 354 (D. D.C. 1997).  A statement's "literal truth" can be

a defense to a 18 U.S.C. § 1001 prosecution.  United States v. Milton, 8 F.3d 39, 45 (D.C. Cir.

1993).  However, the question of "literal truth" is a matter for the jury for the jury to determine.

Crop Growers, 954 F. Supp. at 354; see also Milton, 8 F.3d at 45-46 ("[H]ow might its meaning

here be discovered? Only by considering the term in context, taking into account the setting in

---

[4]5 C.F.R. § 2635.107(b) also discusses an individual's duty of full disclosure when seeking
an ethics opinion.  See section I.C.2 infra.

which it appeared and the purpose for which it was used. This was a matter for the jury.").

Consequently, Defendant's argument of "literal truth" is premature.

Moreover, Defendant's statements to the GSA ethics officers were not literally true.

Defendant provides a lengthy analysis of possible definitions of "business" relying on numerous

technical and legal sources. See Def. Mem. 19-21; 23-30. But Courts have found that legalistic

definitions of terms may be too restrictive and instead defer to common usage of a term. United

States v. Dale, 991 F.2d 819, 833 (D.C. Cir. 1993) (rejecting defense of "literal truth" if

Defendant's definition is "too restrictive" and accepting "common usage" as found in dictionary

definitions).

While the Government contends that Abramoff's activity would fall within the

Defendant's overly legalistic definition of "business or seeking to do business,"[5] Abramoff's

activity with GSA clearly falls within a common dictionary definition of "business."[6] Because of

the numerous possible interpretations of what Defendant meant when he stated "business," the

question should go to the jury to determine at the appropriate time. See, e.g., United States v.

Milton, 8 F.3d 39, 45-46 (D.C. Cir. 1993) (holding that in a 18 U.S.C. § 1001 prosecution, when

a word has several meanings, its definition must be determined by "considering the term in

context, taking into account the setting in which it appeared and the purpose for which it was

---

[5] A jury could consider, for example, Abramoff's request on June 19, 2002 request that Defendant provide him with information on the conversion of another government-owned building to a luxury hotel so that Abramoff could prepare "bid specs" for the Old Post Office. See G. Exh. 3.

[6] "business: The occupation, work, or trade in which a person is engaged: the wholesale food business; A specific occupation or pursuit: the best designer in the business." The American Heritage Dictionary of the English Language, Fourth Edition Copyright 2000 by Houghton Mifflin Company.

22

used," and this is a "question for the jury."); see also United States v. Muntain, 610 F.2d 964,

971-73 (D.C. Cir. 1979) (affirming 18 U.S.C. § 1001(a)(1) convictions by jury based on possible

broad definition of "business enterprises").[7]

Moreover, in the lengthy analysis discussing the question of falsity, Defendant ignores the

second phrase of Defendant's statement in the email to the GSA ethics officer - that Abramoff

"does all of his work on Capitol Hill." See G. Exh. 18. Unlike his parsing of "business,"

Defendant fails to analyze any Office of Governmental Ethics opinions that define "work" –

perhaps because there is no analysis that would support the position that Defendant's statement

that Abramoff "does all his work on Capitol Hill" was not false and misleading. Abramoff's

activities with respect to acquiring property from GSA fall squarely within the common

dictionary definition of "work."[8]

Finally, a jury could still find criminal liability under 18 U.S.C. § 1001(a)(1)  if

_____

[7]Defendant also claims that it was an impossibility for GSA to dispose of the White Oak property. Def. Mem. 19. Again, this is an argument based on inferences that a jury will eventually have to decide. We only point out that on July 21, 2002, four days prior to Defendant's request for an ethics opinion, Abramoff sent Defendant an email in which he requested of Defendant to "get me any info as to which land is still available at White Oak, whether there are any buildings there." G. Exh. 8. On July 24, 2002, one day prior to Defendant seeking the ethics opinion, Abramoff forwarded to Defendant an email in which an associate of Abramoff expressed his frustration over a proposed legislative fix and the inability to get desired information from GSA regarding White Oak. Abramoff sought Defendant's advice: "what do you advise." G. Exh. 15.

While Defendant will be free to argue to a jury that it would have been "impossible" for Abramoff to have obtained the White Oak property, the Government anticipates showing that one day prior to making his claim to his ethics advisory that Abramoff "does all his work on Capitol Hill," Abramoff was actively seeking Defendant's assistance in obtaining a lease for the White Oak property.

[8]work:  Physical or mental effort or activity directed toward the production or accomplishment of something; A job; employment; A trade, profession, or other means of livelihood."  The American Heritage Dictionary of the English Language, Fourth Edition Copyright 2000 by Houghton Mifflin Company.

defendant's statement, although "literally true," was designed to mislead and conceal. In United

States v. Stephenson, 895 F.2d 867 (2d Cir. 1990), the Second Circuit reviewed a false

statements conviction based upon the defendant's statement that a third party had "offered him a

bribe." The court affirmed the conviction because while the statement could be construed as

"literally true," "it was meant to conceal his own initiation of the bribery scheme." Id. at 873.

Consequently, the court found that he was "actively seeking to mislead," and that a jury could

find that the defendant's statement "falsified, concealed or covered up the fact of the solicitation

of his bribe." Id. at 874. Similarly, it is for the jury to determine whether Defendant's statement

regarding Abramoff's "business" before GSA was "literally true" or if Defendant was "actively

seeking to mislead."

     For the foregoing reasons, Defendant's motion on this ground should be denied.

     I.B.2  No fundamental ambiguities exist

     Defendant claims that Count Two should be dismissed because of the fundamental

ambiguity of the questions asked to Defendant and the lack of a definition of "business" in the

applicable regulations. Def. Mem. 21 to 30. Defendant's argument should be rejected.

     Defendant cites United States v. Culliton, 328 F.3d 1074 (9th Cir. 2003), United States v.

Manapat, 928 F.2d 1097 (11th Cir. 2001) and United States v. Lattimore, 127 F. Supp. 405, 409-

10 (D.D.C. 1955) for the proposition that questions of fundamental ambiguity can be dismissed

as a matter of law.[9]  What Defendant fails to note, even though it is mentioned in one of the

---

[9]Notably, none of the cases cited by Defendant appear to be charged under 18 U.S.C. §
1001(a)(1), but instead focus upon a specific false statement under 1001(a)(2) or a specific exchange
in a perjury prosecution. As evident in the plain language of the statute, 18 U.S.C. 1001(a)(1) does
not require an exact false statement like 1001(a)(2) or a perjury charge. Rather, merely alleging a
material omission or misleading statement is sufficient for a valid indictment under 18 U.S.C. §

primary cases he cites, is that "when a question is arguably ambiguous, the defendant's understanding of the question is a matter for the jury to decide." United States v. Manapat, 928 F.2d 1097, 1099 (11th Cir. 1991) (citations omitted). Moreover, Defendant fails to cite the relevant D.C. case law, United States v. Dale, 782 F. Supp. 615 (D.D.C. 1991)[10] and United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998),[11] that find that questions of ambiguity are best left for a jury to determine. Consequently, Defendant's motion based upon the fundamental ambiguity is premature, and should be denied.

Moreover, as Defendant notes, the doctrine of "fundamental ambiguity" is primarily applied in perjury prosecutions. Def. Mem. 22 citing Bronston v. United States, 409 U.S. 352, 362 (1973). In perjury cases, the exact question and answer are transcribed with a precise understanding of what questions were asked and what was answered. Defendant cites three cases involving perjury for the proposition that an indictment can be dismissed if the question was ambiguous. United States v. Tonelli, 577 F.2d 194 (3d Cir. 1978), United States v. Lattimore, 127 F. Supp 404 (D.D.C. 1955), United States v. Culliton, 328 F.3d 1074 (9th Cir. 2003). In each of the cases, the transcribed question could be specifically considered because it was undisputed

_____

1001(a)(1). United States v. Dale, 782 F. Supp. 615, 626 (D.D.C. 1991) ("a person's deliberate failure to disclose to the government material facts, in the face of a duty to disclose such facts, constitutes an 'affirmative act' within the contemplation of the statute."). Consequently, the lack of specific transcribed questions and answers is not fatal to a 18 U.S.C. § 1001(a)(1) prosecution.

[10] In Dale, 782 F. Supp. at 627, the Court reviewed a motion to dismiss based upon the ambiguity of questions for charges of false statements on an application for security clearance. Dale held that the question of ambiguity should not be determined by a motion to dismiss indictment pre-trial, but by a motion made at the close of the Government's case. Id.

[11] In Cisneros, 26 F. Supp. 2d at 42, the Court reviewed a motion to dismiss for false statements with respect to questions about defendant's past. Cisneros held that it presented a factual question that should be determined by the jury. Id.

evidence of the question posed. In the instant case, there is a question of fact about what questions were asked by the ethics officer and the response generated.[12]

Defendant also claims that because the regulations defining "business" and "seeking to do business" are unclear, the Indictment should be dismissed as a matter of law without consideration by the jury. Defendant spends several pages discussing the various definitions of "business" and "seeking to do business," Def. Mem. 24 - 30, but, as noted supra, he fails to discuss the second phrase of Defendant's false statement - "he does all of his work on Capitol Hill." Defendant never even attempts to discusses what "work" means. Defendant cannot make an argument regarding a particularized and narrow definition of "work" because there are no regulations defining "work." Indeed, it is impossible to define every aspect of a false statements case, and the defendant's understanding of arguably ambiguous words are matters to be left to the jury. See, e.g., United States v. Cisneros, 26 F. Supp. 2d 24, 441-42 (D.D.C. 1998).

As shown by the e-mails between Defendant and Abramoff, Defendant was actively assisting Abramoff in his attempts to do business with GSA. Indeed, as described in the Indictment, and in the factual summary supra, the e-mails show that Abramoff began contacting

---

[12]For example, a jury might reasonably infer that the ethics opinion incorporated Defendant's response to specific questions about whether Abramoff had business with or was seeking to do business with GSA. G. Exh. 19 ("You stated that neither Mr. Abramhoff nor his firm does business with or is seeking to do business with GSA."). Other facts were included in the response from Ellison that were not in Defendant's initial email. For example, the unnamed lobbyist in the initial email becomes "Jack Abramhoff" [sic] and the unnamed lobbying firm becomes "Greenberg Traurig." One logical inference is that there were additional conversations between a GSA ethics official and the Defendant, and consequently, additional information was disclosed - such as the name of the lobbyist, where he worked and whether he did "business" or "was seeking to do business." Consequently, factual disputes persist that prevent an analysis of fundamental ambiguity as a matter of law.

Defendant about acquiring White Oak land for Eshkol as early as May 24, 2002, a mere eight days after Defendant began as COS of GSA. G. Exh. 1. In several e-mails, Defendant actively assists Abramoff in his pursuits. For example, on July 28, Defendant gives Abramoff suggestions to improve a draft letter to the GSA Commission of Public Buildings. G. Exh. 22.

Defendant seems to be arguing that because he believes that he will be able to make a persuasive reasonable doubt" argument to the jury,[13] the Court should just dismiss the indictment immediately. In making this argument, Defendant once again confuses the role of the court - which must decide whether the Indictment properly informs the Defendant of the offenses charged - and the role of the jury, which will decide whether the Government has proven its case beyond a reasonable doubt. Defendant's argument is premature. If it were true that Indictments could be dismissed if a defendant believed the Government's evidence at trial would be weak, trials would be few and far between.

## I.C  Defendant concealed material information that he had a legal duty to disclose

Defendant claims that he did not 1) conceal any information and 2) that he did not have a duty to disclose information to the GSA ethics officer. Both of these arguments should be rejected.

---

[13]Defendant argues that that "the government certainly cannot negate any reasonable interpretation that would make the defendant's statement factually correct." Def. Mem. 28 citing United States v. Migliaccio, 34 F.3d 1517, 1525 (10th Cir. 1994); United States v. Moses, 94 F.3d 182, 188 (5th Cir. 1996). Defendant, however, confuses the burden of a review post-trial with that of a motion to dismiss pre-trial. Defendant is improperly asking the court to review the sufficiency of the evidence rather than the allegations in the Indictment. See, e.g., United States v. Trie, 23 F. Supp 2d 55, 62 (D.D.C. 1998) (rejecting defendant's motion to, in effect, review the sufficiency of the evidence prior to trial).

I.C.1 <u>Indictment sufficiently alleges affirmative acts for concealment</u>

As to the first, Defendant claims that the Indictment should be dismissed because it does not allege any affirmative acts of concealment. In Defendants' view, his statement to the GSA ethics officer is, at most, "a mere failure to disclose" information and, as such, cannot constitute the affirmative act necessary for a "trick, scheme or device" under 18 U.S.C. § 1001(a)(1). Def. Mem. at 30-32. Defendant's argument should be rejected because in the D.C. Circuit, a failure to disclose can constitute an "affirmative act" under 18 U.S.C. §1001(a)(1), and Defendant committed numerous affirmative acts outside his omission to the GSA ethics officer.

Defendant cites an out of circuit case for the argument that "the government must allege and prove more than just a 'passive failure on the part of the Defendant to reveal a material fact." Def. Mem. at 30 citing <u>United States v. Shannon</u>, 836 F.2d 1125, 1129-30 (8th Cir. 1988). Defendant fails to mention the D.C. case law that holds exactly the opposite of what Defendant portrays the case law to be: a deliberate failure to disclose information **can** constitute an affirmative act. <u>United States v. Dale</u>, 782 F. Supp. 615, 626 (D.D.C. 1991) ("a person's deliberate failure to disclose to the government material facts, in the face of a duty to disclose such facts, constitutes an 'affirmative act' within the contemplation of the statute.") In <u>Dale</u>, the defendant moved to dismiss the indictment because the trick, scheme or device charged was the intentional failure to disclose information. The court in <u>Dale</u> found that such an omission was sufficient to meet the "affirmative act" necessary for the trick, scheme or device in 1001(a)(1). <u>Id</u>. In the instant case, in communications regarding Abramoff's involvement with GSA, Defendant omitted a description of Abramoff's business interests in GSA properties. The Court should follow <u>Dale</u> and find that allegation of an omission is sufficient for this charge to proceed to the

28

jury.[14]

Defendant cites <u>Woodward v. United States</u>, 469 U.S. 105, 108 (1985) for the

proposition that if one is never asked a question, then there can be no "trick, scheme or device"

that triggers criminal liability.  The defendant in <u>Woodward</u> never conversed with an executive

official, but instead passed through customs without being questioned by anyone. The Court

found an omission in the absence of any interaction could not constitute an affirmative act. The

facts of <u>Woodward</u> stand in contrast with what is alleged in the Indictment where Defendant

sought an ethics opinion and provided information to the GSA ethics officials. <u>See</u> discussion

<u>supra</u> at I.B.2 n. 13 (regarding reasonable inference that additional material in Ellison's ethics

opinion was derived from further conversations with Defendant).

Moreover, Defendant neglects relevant case law in this Circuit that discuss a factual

situation similar to the instant case.  In <u>United States v. Cisneros</u>, 26 F. Supp. 2d 24 (D.D.C.

1998), the defendant provided some information to the FBI, but omitted material facts. <u>Cisneros</u>,

however, found that once an individual begins speaking on a topic, that individual gains

additional responsibilities:

> [W]hile there is an option of silence, once a defendant volunteers information, he has an
> obligation to refrain from telling half-truths or from excluding information necessary to
> make the statements accurate. Since Cisneros responded to the questions, he had a duty to
> include all information necessary to make his statements truthful.

---

[14] At Def. Mem. 30-31, Defendant cites <u>United States v. London</u>, 550 F.2d 206 (5th Cir. 1977)
for the proposition that "[i]n the absence of any allegation establishing an 'affirmative act by which
a material fact is actively concealed,' the government has failed to allege facts sufficient to support
the concealment charge under Count Two." Def. Mem. 32.  Defendant ignores the actual holding of
<u>London</u> in which the trial court's dismissal of indictment was reversed because the circuit court
found that the indictment **need not provide factual elaboration** on the specific "trick, scheme or
device" as long as the indictment tracked the statutory language. <u>London</u>, 550 F.2d at 211.

Cisneros, 26 F. Supp. 2d at 42.  Given the Defendant sought out an ethics opinion, his failure to

fully inform the GSA ethics officer of Abramoff's relationship with GSA is an active act of

concealment.  Additionally, Defendant's other statements regarding the Scotland trip, his

relationship with Abramoff and Abramoff's relationship to GSA also are affirmative acts that

meet the requirements of "trick, scheme or device."

Additionally, as alleged in the Indictment, Defendant took other affirmative acts as part of

the concealment from the GSA ethics officer.  Defendant seeks to focus the charge on the

specific exchange on July 25, 2002.  Def. Mem. at 17.  The Indictment, however, alleges acts of

concealment and falsity from May 2002 to August 2002.  Ind. ¶ 7.  During that time period,

Defendant took numerous affirmative acts to conceal his relationship with Abramoff and

Abramoff's interest in properties controlled by GSA.  For example, Defendant and Abramoff

utilized the Defendant's home e-mail address rather than his GSA address.  See Ind. ¶ 11, 13; see

also G. Exhs. 1, 3, 4,9, 12, 15, 20, 21, 22, 23, 27 and 30. Defendant and Abramoff concealed the

Defendant's involvement in editing a letter that Abramoff sent to GSA asking for land to be

given to Eshkol.  See Ind. ¶ 12 and 14; see also G. Exhs. 22-24.   Additionally, Defendant

informed Abramoff not to let anyone mention Abramoff's name at a meeting with other GSA

officials because of Abramoff's political profile.  See G. Exh. 28-29.  Such actions meet the

requirements of an "affirmative act."

I.C.2  Defendant had a duty to make full disclosure to the ethics officer.

Defendant argues that the Defendant lacked any duty to disclose relevant and material

facts to the GSA ethics officer for the preparation of an ethics opinion.  Def. Mem. 33.

Defendant neglects relevant D.C. case law and applicable federal regulations.

30

United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998) is a significant D.C. case discussing the 1001(a)(1) false statements prong. Cisneros found that Executive Order 10450 created a legal duty for a federal job applicant to be truthful to questions posed by the FBI in conducting a background examination. Id. at 42. Executive Order 10450 states that "all persons privileged to be employed in the departments and agencies of the Government, shall be reliable, trustworthy, of good conduct and character." 18 FR 2489 (1953 WL 5976). Consequently, according to Cisneros, a high-level employee who has undergone a background check has greater disclosure responsibilities in administrative inquiries than a private individual.

This duty to be "reliable, trustworthy, of good conduct and character" is additionally reflected in the Code of Federal Regulations laying out the duties of a public service. 5 C.F.R. 2635.101. (requiring, among other duties "honest efforts in the performance of their duties." See, e.g., G. Exh. 34 (5 C.F.R. § 2635.101 stating in relevant part: "(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.*** (5) Employees shall put forth honest effort in the performance of their duties.")[15]

In addition, the Code of Federal Regulations specifically identifies the duty of disclosure for a public servant when seeking an ethics opinion. Once an individual has sought an opinion, they must make full disclosure of all relevant circumstances. See G. Exh. 33; 5 C.F.R. §

---

[15]The defendants in the cases cited by Defendant were not public servants, like Defendant, but instead private individuals. See Def. Mem. 33 citing United States v. Gimbel, 830 F.2d 621 (7th Cir. 1987) (defendant was a private lawyer representing narcotics traffickers); United States v. Curran, 20 F.3d 560 (3rd Cir. 1994) (defendant was lawyer and executive of private company); United States v. Crop Growers Corp, 954 F. Supp. 335 (D.D.C. 1997) (defendants were a private holding company and two of its executives). As set forth in 5 C.F.R. § 2635, a public servant has greater responsibilities with respect to the public trust than does a private individual.

2635.107(b)) which states in relevant part:

> Employees who have questions about the application of this part or any supplemental
> agency regulations to particular situations should seek advice from an agency ethics
> official. Disciplinary action for violating this part or any supplemental agency regulations
> will not be taken against an employee who has engaged in conduct in good faith reliance
> upon the advice of an agency ethics official, provided that the employee, **in seeking such
> advice, has made full disclosure of all relevant circumstances**. ... Disclosures made by
> an employee to an agency ethics official are not protected by an attorney-client privilege.
> An agency ethics official is required by 28 U.S.C. 535 to report any information he
> receives relating to a violation of the criminal code.

(emphasis added). This obligation parallels that described in <u>Cisneros</u>: "while there is an option

of silence, once a Defendant volunteers information, he has an obligation to refrain from telling

half-truths or from excluding information necessary to make the statements accurate." <u>Cisneros</u>,

26 F. Supp. 2d at 42. Consequently, once Defendant sought an ethics opinion, he had a duty to

disclose all relevant facts in order to allow the ethics officer to provide an accurate opinion.

## I.D  <u>Defendant's statements were material to GSA ethics officer's official decision</u>

Defendant argues that Count 2 should be dismissed because his statements to the Ethics

officer were not material. This contention should be rejected summarily.

It is the province of the jury to determine materiality. The Supreme Court decided in

<u>United States v. Gaudin</u>, 515 U.S. 506, 522-23 (1995) that the materiality of a false statement

under 18 U.S.C. § 1001 must be decided by the jury rather than the court.[16] <u>See also</u> <u>United</u>

---

[16]This is one of the clearest examples of Defendant's failure to cite relevant controlling case
law. Defendant does cite <u>Gaudin</u>, but not for the proposition that the question of materiality in a §
1001 prosecution should be determined by the jury, but rather for peripheral aspects of <u>Gaudin</u>. <u>See</u>
Def. Mem. 36 ("The central object of any materiality inquiry is whether the misrepresentation or
concealment had a 'natural tendency to influence, or [was] capable of influencing, the decision
making body to which it was addressed."); Def. Mem. 36 ( "Determining whether a statement is
'material' implicates two subsidiary questions: '(a) what statement was made?' and (b) 'what

States v. Cisneros, 169 F.3d 763, 767-68 (D.C. Cir. 1999) ("In § 1001 prosecutions, it is up to the jury to decide whether the materiality element has been proven"; concluding that deciding materiality on the motion to dismiss stage was premature because "much will depend on the trial evidence and on the [] proposed [jury] instructions"). Consequently, such a motion is foreclosed by controlling law and should be rejected.

Moreover, even if the court chose to review the factual allegations, the alleged facts support a finding of materiality. "The central object of any materiality inquiry is whether the misrepresentation or concealment was predictably capable of affecting, i.e., had a natural tendency to affect, the official decision." Cisneros, 169 F.3d at 766. Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects. United States v. Hansen, 772 F.2d 940, 949 (D.C. Cir. 1985). "Materiality is not concerned with whether the alleged omission would have affected the ultimate agency determination." United States v. Dale, 782 F. Supp. 615, 625-26 (D.D.C. 1991).

With the facts alleged in the Indictment, a jury could conclude that a Defendant's statement was material to the GSA ethics officer.[17] Defendant attempts to shoehorn the idea that GSA as "the Government landlord," Def. Mem. 36, cannot possibly be interested in the propriety

_____

decision was the agency trying to make.'"). Defendant devotes almost a quarter of his memorandum to assessing the materiality of Defendant's statements, but neglects to mention relevant Supreme Court precedent on whether materiality should be considered by the jury or the judge.

[17]Moreover, Defendant's lie was material because it prevented the ethics officer from opening an investigation into potential bribery or illegal gratuity. See, e.g., United States v. Hansen, 772 F.2d 940, 949 (D.C. Cir. 1985) ("A lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress.").

of Defendant accepting a gift from Abramoff. That narrow interpretation is incorrect. Every

Executive Agency is required to have an Ethics Office as required by C.F.R. Sec. 2635.107. An

Ethics Office is there to ensure that those in public service "place loyalty to the Constitution,

laws and ethical principles above private gain," G. Exh. 34 (5 C.F.R. § 2635.101(a)), and "not

allow the improper use of [nonpublic government information] to further any private interest."

C.F.R. Sec. 2635.101(b)(3). In this case, the GSA ethics officer was attempting to evaluate the

propriety of Defendant's acceptance of free airfare from a lobbyist who was seeking strategic

advice and internal non-public government information regarding his attempts to acquire

government property for his personal benefit and to the benefit of his clients.[18]

For the foregoing reasons, Defendant's argument to dismiss Count Two should be denied.

## II. COUNT ONE SHOULD NOT BE DISMISSED BECAUSE THE INDICTMENT ALLEGES OBSTRUCTION OF THE GSA-OIG INVESTIGATION

Defendant argues that Count One should be dismissed because the "government does not

establish beyond conclusory statements that Mr. Safavian intentionally endeavored corruptly to

---

[18]Defendant also contends that his statements were not material because he did not accept the offered gift. Def. Mem. 37. He argues that by paying $3,100, he paid for the trip. Defendant again uses selected evidence from the discovery provided to paint the most favorable scenario and ignores the allegations as stated in the Indictment. Indictment ¶ 21 alleges that the trip for nine people cost at least $130,000, or a per capita cost of over $14,000. Indictment ¶ 25 alleges that the Defendant wrote a check to Abramoff for only $3,100. From what is alleged in the indictment, the Defendant paid $10,000 less for the Scotland trip than it was worth. Paying less than full value for an item is considered a gift according to the Code of Federal Regulations. 5 C.F.R. 2635.203 ("Gift includes any gratuity, favor, **discount**, entertainment, hospitality, loan, forbearance, or other item having monetary value. It includes services as well as gifts of training, **transportation, local travel, lodging and meals**, whether provided in-kind, by purchase of a ticket, payment in advance, or reimbursement after the expense has incurred.") (emphasis supplied). Moreover, even if Defendant paid full cost of the trip, the ethics officer was still required to know all relevant facts in order to issue the opinion, i.e. Abramoff had business or was seeking to do business with GSA at the time that Defendant accepted the offer of the trip.

influence, obstruct or imped the pending investigation." D. Mem. 38. Defendant's Header "COUNT ONE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT **DEMONSTRATE** OBSTRUCTION OF THE GSA-OIG INVESTIGATION," (emphasis supplied), Def. Mem. 38., illustrates Defendant's misunderstanding of the legal standard appropriate for a motion to dismiss. At this stage, the Government does not "demonstrate" the facts supporting the charge, but must simply "allege" the facts surrounding the charge. See discussion supra at Section "Relevant Legal Standards" at pp. 16. A review of Indictment ¶¶ 1-27 provides detailed notice to Defendant of the precise offense and the circumstances surrounding the offense and allows him notice to prepare his defense.

Defendant has identified the three elements of an 18 U.S.C. § 1505 charge: 1) pending proceeding before a department or agency of the United States, 2) defendant's awareness of the proceeding; and 3) defendant must intentionally endeavor corruptly to influence, obstruct or impede the pending proceeding. The Indictment's allegations are sufficient, and consequently Count Two should not be dismissed.

Courts have found that the term "pending proceeding" is broad in scope and includes all steps and stages in the proceeding, from start to finish. Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966). It encompasses both the investigative and adjudicative functions of the department or agency. Id. Furthermore, both preliminary and informal inquiries, as well as formal proceedings are covered by the statute. United States v. Poindexter, 725 F. Supp. 13, 22 (D.D.C. 1989). The case law under 18 U.S.C. § 1505 makes clear that agency investigations, including those conducted by an Inspector General, constitute a proceeding for purposes of section 1505. United States v. Kelley, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (AID Inspector

35

General investigation is a proceeding under section 1505). In <u>Kelley</u>, the D.C. Circuit relied

upon the fact that the AID Inspector General "was charged with the duty of supervising

investigations relating to the proper operation of the agency," and was authorized to issue

subpoenas and compel sworn testimony. Similarly, the GSA-OIG has the same authority derived

from 5 U.S.C. App. 3 § 6(a)(4) and (5) (defining the authority of an agency Inspector General).

Pursuant to a hotline complaint, GSA-OIG opened an investigation into whether Defendant

attended a golfing trip provided by lobbyists. As part of that investigation, GSA-OIG

interviewed Defendant and notified him that there was a hotline complaint. Consequently, the

Defendant would have knowledge of an appropriate proceeding for § 1505.

A cursory overview illustrate numerous deficiencies in the Defendant's analysis of this

Count.[19] First, Defendant again relies on the "fundamental ambiguity" argument discussed <u>supra</u>

at Section I.B.2. Defendant contorts the record in an effort to show apparent differences in the

discovery provided and the allegations in the Indictment. Such challenges to the indictment are

---

[19]It is simply premature to engage in what amounts to a legal argument about what should be the appropriate jury instructions in this case. As is hopefully clear by now, the Indictment properly alleges each element of the offenses charged. Nevertheless, we feel compelled to point out that knowledge of unlawfulness is not required in order to convict a defendant of corruptly obstructing a congressional investigation. <u>United States v. North</u>, 910 F.2d 843 (D.C. Cir. 1990). Similarly, a defendant need not be aware of the exact details of § 1505 if a reasonable person would have realized that their conduct was unlawful. <u>United States v. Browning</u>, 630 F.2d 694 (10th Cir. 1980). "Corruptly" as used in §1505 is defined in 18 U.S.C. § 1515(b) as "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." Defendant cites the recent Supreme Court decision in <u>Arthur Andersen LLP v. United States</u>, 125 S.Ct. 2129 (2005), for the proposition that only one "conscious of wrongdoing can be said to 'knowingly corruptly persuade." Def. Mem. at 39. <u>Andersen</u>'s reasoning is inapplicable for a 18 U.S.C. § 1505 prosecution. <u>Andersen</u> held that the language "knowingly...corruptly persuade" in 18 U.S.C. § 1512 requires proof of consciousness of wrongdoing, but the analysis focused on the statutory language of "knowingly" when joined in the statute with "corruptly persuade." Because § 1505 lacks the term "knowingly" any comparison is not persuasive.

inappropriate at this stage of litigation. See discussion supra at Section "Relevant Legal Standards" at p. 16.

Second, the Defendant claims that his representations to the GSA-OIG are irrelevant because the standard of ethics prohibits gifts not by "lobbyists" but by "prohibited sources." Def. Mem. 40. Such parsing is irrelevant because an individual could be both a lobbyist and a prohibited source. In this case, Abramoff was both. Moreover, such a distinction, were it to exist, is not one that would allow for dismissal of the Count as a matter of law. United States v. Dale, 991 F.2d 819 (D.C. Cir. 1993) (rejecting defense of "literal truth" if Defendant's definition is "too restrictive" and accepting "common usage").

Third, Defendant points to the closure of the investigation by GSA-OIG once it learned that Defendant had paid $3,100 for the trip as an additional reason that Defendant's statement that Abramoff had no business before GSA was "irrelevant." D. Mem. 40. Defendant would contend that the closure of the GSA-OIG investigation supports dismissal. The opposite is true. The fact that GSA-OIG closed the investigation based upon Defendant's statement is strong evidence that Defendant's statements had a material impact on the investigation - it ended the GSA-OIG investigation into whether Defendant received gifts from a lobbyists.[20] Finally, Defendant's claim that he did not pay for the full cost of the trip is inaccurate, because, as the Indictment ¶ 21 alleges, the full cost of the trip was over $130,000, resulting in a per person cost

_____

[20]Moreover, as discussed in § IV.B, infra, it is not required that Defendant's actions actually obstructed the investigation at issue. See, e.g., United States v. Poindexter, 725 F. Supp. 13, 23 (D.D.C. 1989) (§1505 "prohibits an 'endeavor to' obstruct as well as a completed obstruction. It follows that an obstructive effect is not a prerequisite to a violation.") (citations omitted).

of over $14,000. Defendant bases his argument on isolated facts culled out of the discovery

provided to the Defendant rather than an analysis of the allegations in the Indictment.

Defendant's motion to dismiss Count One should be denied.

### III.  COUNT THREE SHOULD NOT BE DISMISSED BECAUSE THE INDICTMENT ALLEGES THAT DEFENDANT KNOWINGLY AND WILLFULLY FALSIFIED AND CONCEALED MATERIAL FACTS DURING THE GSA-OIG INVESTIGATION

Defendant argues that Count Three of the Indictment should be dismissed because the

Indictment fails to establish knowing and willful falsification and concealment of material facts.

Def. Mem. 42.  Defendant's argument should be rejected.

### III.A  Indictment sufficiently alleges a trick, scheme or device

As discussed supra at Sections I.B and I.C, the Government must allege that the

Defendant acted affirmatively in concealing a material fact by a trick, scheme or device.

Defendant apparently believes that the Government must somehow **"establish"**prior to trial that

the Defendant concealed a material fact through a trick scheme or device. Def. Mem. 42 (header)

However, an Indictment is facially valid if it alleges that the Defendant employed a trick scheme

or device to falsify and conceal material information.  See, e.g., United States v. London, 550

F.2d 206 (5th Cir. 1977) (reversing district court and finding an indictment valid when it tracked

the statutory language in alleging a "trick, scheme or device" even though the indictment

provided no factual elaboration).

### III.A.1  Indictment alleges affirmative acts

As discussed supra at Section I.C., courts in this circuit have held that an omission to

state a material fact can be an affirmative act.  See, e.g., United States v. Dale, 782 F. Supp. 615,

38

626 (D.D.C. 1991). Moreover, Defendant's statements to GSA-OIG regarding the Scotland trip,

his relationship with Abramoff, and Abramoff's relationship to GSA, were affirmative acts that

meet the requirements of "trick, scheme or device." Similarly, Defendant's statements regarding

Abramoff's business relationship with GSA is an affirmative act sufficient to meet the

requirements of concealment under 18 U.S.C. § 1001(a)(1).[21]

### III.A.2 Defendant had a duty to disclose

As discussed supra in Section I.C.2, a high level public servant who enjoys the public

trust is obligated to put the public's interest before his own and has a duty of disclosure to answer

questions posed by officials from his agency. See G. Exh. 34 (5 C.F.R. § 2635.101 discussing

ethical responsibilities of public officials). During the GSA-OIG interviews, Defendant was

asked directly about the Scotland trip, his relationship with Abramoff and Abramoff's

relationship to GSA. Once Defendant began volunteering information on those topics, he had an

ongoing duty of disclosure to be fully forthcoming on those areas and to not mislead the

investigators. See, e.g., United States v. Cisneros, 26 F. Supp. 2d 24, 42 (D.D.C. 1998).

## III.B  Alleged concealed assistance was material

Defendant argues that Count Three should be dismissed because the information

regarding Abramoff's interest in GSA properties was not a material fact. D. Mem. 43. As

discussed supra in Section I.D, materiality of a statement in § 1001 prosecution is a fact to be

determined by the jury.

---

[21] Another affirmative act stems from Defendant's statement to GSA-OIG that he had paid for the total cost of the trip, and provided a $3,100 check purporting to be his share. Indictment ¶ 25. In fact, the total cost of the trip exceeded $130,000. Indictment ¶ 21. Defendant's pro-rated share was far in excess of $3,100.

In any event, Defendant's contention that the Defendant's falsity and concealment was immaterial is unfounded. As identified in a hotline complaint, GSA-OIG was investigating whether a lobbyist provided Defendant a golfing trip to Scotland. The fact that Abramoff had interests in GSA properties was a critical fact that GSA-OIG could have considered in determining whether Abramoff influenced Defendant in his official acts through the trip or other gifts. Any assistance that Defendant provided to Abramoff would be material in allowing GSA-OIG to determine if the Defendant was bribed by Abramoff, violated the honest services Defendant owed to the people of the United States, or in other ways used his official position for personal gain. See

Defendant attacks the materiality of Defendant's falsity and concealment by claiming that Defendant provided documentation showing that he paid for the trip. D. Mem. 44. Defendant merely demonstrated to GSA-OIG that he paid $3,100 to Abramoff. By so doing, Defendant succeeded in misleading GSA-OIG that he had paid the full cost of the trip. If GSA-OIG had been aware that Abramoff had interests before GSA, then GSA-OIG could have continued its investigation and determined the total value of the trip and whether Defendant had paid fair market value. If provided with truthful information, GSA-OIG could have uncovered the assistance that Defendant was providing to Abramoff in violation of Defendant's ethical responsibilities. See, e.g., United States v. Hansen, 772 F.2d 940, 949 (D.C. Cir. 1985) ("A lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress.").

## III.C **Defendant Falsified Material Facts**

Defendant also argues that Count Three should be dismissed because the information

provided to GSA-OIG was not false and material. As discussed supra at I.D, Defendant's

argument that his statements are immaterial is a question for the jury. See United States v.

Gaudin, 515 U.S. 506, 522-23 (1995). Defendant's attempts to draw inferences from selected

facts provided in the discovery to prove that his statements were not false is really an attempt to

advance a sufficiency of the evidence argument, that is inappropriate at this stage of litigation.

## IV. COUNT FOUR SHOULD NOT BE DISMISSED BECAUSE THE STATEMENTS ARE PERTINENT TO THE SENATE COMMITTEE ON INDIAN AFFAIRS INVESTIGATION OF FRAUD AND INFLUENCE PEDDLING

Defendant claims that Count Four should be dismissed because A) the Senate Committee

on Indian Affairs ("SCIA") did not have authority to investigate Defendant's actions, and B)

Defendant's statements were not false or designed to obstruct the SCIA investigation.

Defendant's argument is without merit and his motion to dismiss Count Four should be denied.[22]

### IV.A  SCIA's jurisdiction included Defendant's involvement in the Scotland trip

Defendant's contention of whether SCIA had authority to investigate Defendant's

involvement in the Scotland trip should not be examined in light of all the surrounding

circumstances. United States v. Cisneros, 26 F. Supp.2d 24 (D.D.C. 1998) provides an extensive

analysis of the broad reading that courts should give to defining the scope of inquiry in a § 1505

---

[22]Defendant cites to reports from the Congressional Research Service. Def. Mem. 50. Congressional Research Service reports are only available to Members of Congress and their staff. See What is the Congressional Research Services, (last modified December 29, 2005) <http://www.loc.gov/crsinfo/whatscrs.html#about> ("The Congressional Research Service is the public policy research arm of the United States Congress. As a legislative branch agency within the Library of Congress, CRS works exclusively and directly for Members of Congress, their Committees and staff on a confidential, nonpartisan basis."). Consequently, the Government and the Court do not have easy access to those reports. The Government respectfully requests that the Defendant attach as exhibits all cited Congressional Research Service Reports.

inquiry.

> In an effort to uphold the intent of Congress, courts have interpreted broadly the "due and proper" requirement included within 18 U.S.C. § 1505. The statutory purpose of § 1505 is to prevent any endeavor, whether successful or not, which is made for the purpose of corruptly influencing, obstructing or impeding an agency proceeding or congressional inquiry. [T]his statute should not be interpreted so narrowly as to defeat the purpose and intent of the legislative body that enacted it.

> As a result, courts have been unwilling to pardon defendants based on technicalities or formalities.... The question of whether a congressional investigation is due and proper cannot be answered by a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances.

The investigative authority of the Senate comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." Watkins v. United States, 354 U.S. 178, 187 (1957):

> The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress.

The Senate's committees are "restricted to the missions delegated to them, i.e., to acquire certain data to be used by [] the Senate in coping with a problem that falls within its legislative sphere." Id.. at 206.[23] Consequently, any analysis should center on whether SCIA in contacting Defendant

---

[23]Watkins v. United States, 354 U.S. 178, 187 (1957), reversed the conviction of an individual who refused to answer questions of the House Committee on Un-American Activities because the questions were outside of their jurisdiction. The Court noted: "The legislature is free to determine the kinds of data that should be collected.  It is only those investigations that are conducted by use of compulsory process that give rise to a need to  protect the rights against illegal encroachment." Id. at 215. In this case, Defendant was not compelled to testify, but voluntarily responded to SCIA's letter.

was trying to gather data to assist in a problem within its legislative sphere.

Defendant mischaracterizes the SCIA inquiry as an investigation into whether Defendant lied to the GSA, Def. Mem. 45, or possible influence peddling only at the Department of Interior, Def. Mem. 48. Defendant argues that SCIA's jurisdiction was limited to Abramoff's defrauding of the Indian tribes, and that Defendant's conduct falls outside their jurisdiction because "SCIA does not have *carte blanche* to investigate alleged government corruption." D. Mem. 50. Defendant cites selected portions of Senators' statements for two pages for the proposition that the hearings focused solely on the fraud against the Indians, and spends only one short paragraph discussing what the SCIA investigative staff understood their purpose to be. Def. Mem. 50-52.

Defendant mischaracterizes SCIA's investigatory purpose. The title of the hearings were "Oversight Hearing In re Tribal Lobbying Matters, et al." Def. Mem. 51. SCIA was investigating not just whether Indian tribes were defrauded by Abramoff in terms of kickbacks paid by Michael Scanlon, but also trying to gather data regarding payments by Indian tribes to Abramoff and Scanlon. Tribal funds solicited by Abramoff were used to pay for the trip to Scotland in 2002 that Defendant attended. SCIA was gathering information on the flow of funds, the activities on the trip, and who paid for the activities on the trip. Consequently, even in Defendant's narrowly defined scope of SCIA's investigation of just "fraud against Indian tribes," Defendant's participation in the Scotland trip was a legitimate inquiry into misuse of tribal funds by Abramoff.

However, SCIA had jurisdiction to pursue a broader inquiry than simply Abramoff's defrauding of the Indian tribes. The understanding of the SCIA staff's purpose of the investigation is clearly illustrated in the 302s and stands in marked contrast with what the

43

Defendant's selective excerpts.[24] Throughout the investigation, SCIA was investigating not simply fraud against the Indians, but also "influence peddling" among public officials. During the investigation, they came across evidence of an entity controlled by Abramoff. Tribal money went into the entity and, among other things, funded the 2002 Scotland trip. Based upon the list of attendees, SCIA began looking into whether there was any improper influence peddling among the public officials on the trip resulting from tribal funds. Consequently, SCIA sent a letter requesting information from Defendant for the purpose of 1) obtaining records of the 2002 trip, 2) determining if Defendant had paid his own way; 3) determining if Abramoff had business before GSA at the time of the trip; and 4) determining if the trip was just a vacation. See Docket # 34 (Motion to Inspect Grand Jury Record), Def. Exhs. 9 and 11.

Defendant was provided the full 302s of both Parker and Carillo, but Defendant, at Def. Mem. 52, has failed to provide an accurate representation of the SCIA's staff's own understanding of their investigative purpose. As noted in their interviews, Docket # 34 (Motion to Inspect Grand Jury Record), Def. Exhs. 9 and 11, the scope of the inquiry was not limited to funds defrauded from the Indian tribes, but also whether Abramoff used those tribal funds to influence Defendant's actions at GSA. Such an inquiry is within "the due and proper exercise of inquiry" of SCIA.

--------

[24]In general, this type of factual briefing is unnecessary at this stage of litigation. Additionally, the Government does not acknowledge that a 302 is a statement of the interviewee, but rather a statement of the agent preparing the report. Nevertheless, the Defendant has represented that he is relying on the facts provided in the 302 in seeking to dismiss Counts Four and Five. Because Defendant has misrepresented the facts in the record, the Government seeks to clarify the record and refers the Court to the 302s of Parker and Carillo included as Docket # 34 (Motion to Inspect Grand Jury Record), Def. Exhs. 9 and 11.

44

**IV.B  Defendant's false statements were corruptly designed to obstruct**

Defendant claims that Defendant's statements were not false or designed to obstruct, and that, as a matter of law, Count 4 should be dismissed. First, any interpretation of the falsity of the statement is a matter for the determination of the jury. See discussion supra I.B.1. Similarly, the impact of the statements on the SCIA investigation should similarly be decided by the jury because it is a factual analysis that cannot be determined as a matter of law based upon the allegations in the Indictment. Moreover, Defendant blatantly misrepresents the record before him in arguing that Defendant's statements had no impact on the SCIA investigation. Any factual review regarding the materiality of the statement to SCIA's investigation, which should only considered by the jury, strongly supports the allegations that the Defendant's statements to SCIA were false and corruptly designed to obstruct the SCIA investigation.

With respect to the Defendant's statement impact on the SCIA investigation, Defendant once again ignores available facts that are detrimental to his position. Defendant claims that "neither Chief Counsel Carillo nor Dep. Counsel Parker believed that Defendant's letter impeded the investigation," D. Mem. 53. Defendant overlooks references in other portions of their 302s. For example, Parker believed that Defendant was trying to get the focus off of him and was trying to parse words to get out of the investigation. Similarly, Carillo thought that Defendant made a knowing misrepresentation material to SCIA's investigation. Docket # 34 (Motion to Inspect Grand Jury Record), Def. Exhs. 9 and 11.

In any event, it is irrelevant whether Defendant's obstruction attempt was ultimately successful in achieving its goals. A defendant must "undertake action from which an obstruction

45

of justice was a reasonably foreseeable result, but he need not be successful in his endeavor."

United States v. McBride, 362 F.3d 360, 372 (6th Cir. 2004); see also United States v. Poindexter

725 F. Supp. 13, 23 (D.D.C. 1989) (§1505 "prohibits an 'endeavor to' obstruct as well as a

completed obstruction. It follows that an obstructive effect is not a prerequisite to a violation.")

(citations omitted).

## V.  COUNT FIVE SHOULD NOT BE DISMISSED BECAUSE INDICTMENT ALLEGES DEFENDANT'S FALSIFICATION AND CONCEALMENT OF MATERIAL FACTS

Defendant claims that Count Five should be dismissed because Defendant A) did not

conceal by means of a trick, scheme or device, nor was there a duty to disclose information to

SCIA, B) accurately represented that Abramoff had no business before GSA; C) made statements

that were immaterial to SCIA and not within SCIA's jurisdiction.  Defendant's arguments are

without merit, and his motion to dismiss Count Five should be denied.

### V.A  Indictment alleges affirmative acts sufficient to establish a trick scheme or device

The fact that the Government has alleged that Defendant employed a trick scheme or

device is sufficient, and the Court should look no further.  See discussion supra at I.C; see, e.g.,

United States v. London, 550 F.2d 206 (5th Cir. 1977) (reversing district court and finding an

indictment valid when it tracked the statutory language in alleging a "trick, scheme or device"

even though the indictment provided no factual elaboration).

Even if the court were to look to the facts, in the D.C. Circuit, as discussed supra at I.C,

an omission to state a material fact can be an affirmative act.  See, e.g., United States v. Dale,

782 F. Supp. 615, 626 (D.D.C. 1991).  Defendant was sent a letter regarding his attendance on

46

the Scotland 2002 trip and asking for any records relating to the trip. Defendant represented to

SCIA staff that he had fully paid for the trip, that he had received approval for the Scotland golf

trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics

officer who prepared the opinion. Ind. ¶ 36. Based upon Defendant's volunteering of that

information, Parker requested a copy of the ethics request, which included Defendant's statement

"the host is a lawyer and lobbyist, but one that has no business before GSA (he does all of his

work on Capitol Hill)." Ind. ¶ 37. Defendant responded to SCIA's request with a letter saying, in

part, that Abramoff "did not have business before [GSA] at that time." Id. Defendant failed to

inform SCIA that Abramoff had numerous business interests before GSA. A jury could conclude

that such an omission constitutes an affirmative act sufficient to establish a "trick, scheme or

device" in violation of 18 U.S.C. § 1001(a)(1) and that by forwarding a copy of the ethics letter -

a letter obtained through deceit - Defendant was attempting to mislead SCIA.

Defendant also bases his argument for a lack of duty to disclose to SCIA upon the fact

that the SCIA letter to Defendant merely asks for documents, and thus, Defendant argues, he had

no further duty to disclose additional information. D. Mem. 56. As discussed supra at I.C, once

Defendant provided some information to SCIA, he "had a duty to include all information

necessary to make his statements truthful." Cisneros, 26 F. Supp. 2d at 42. Defendant's failure

to provide full and accurate information regarding not only the true costs of the Scotland trip, but

also the circumstances surrounding his acquiring the ethics opinion, supports the allegations of

Count Five, and consequently, Count Five should not be dismissed.

Additionally, Defendant claims that he could not have concealed any information because

the request was outside of SCIA's purview. As discussed supra at IV.A, SCIA's investigation

47

was not only "to investigate fraud against the tribes," D. Mem. 56, but also to investigate "influence peddling" in the Executive Branch, including GSA.

## V.B  Defendant made inaccurate representations to SCIA

Defendant further claims that Count Five should be dismissed because Defendant's statements to SCIA were "true on their face" and Defendant did not employ a "trick scheme or device." D. Mem. 57. As discussed supra at I.B.1, the Defendant's reliance on technical definitions of "business" are not appropriate in the D.C. Circuit, see, e.g., United States v. Dale, 991 F.2d 819 (D.C. Cir. 1993) (rejecting defense of "literal truth" if Defendant's definition is "too restrictive" and accepting "common usage"), or in an 18 U.S.C. § 1001(a)(1) prosecution where misleading statements are sufficient for a criminal violation.  Moreover, as the Indictment alleges, Ind. ¶ 36, Defendant volunteered that he had received an ethics opinion approving the trip and that he had fully disclosed everything to the GSA ethics officer.  A jury could conclude that such a statement was designed to mislead.

## V.C  Defendant's statements were material and within SCIA's jurisdiction

Defendant moves to dismiss Count Five on the basis that Defendant's statements were immaterial to SCIA and outside of SCIA's jurisdiction.  D. Mem. 58.  These arguments have been previously discussed supra at I.D (materiality) and IV.A (SCIA's jurisdiction). Defendant's motion on these arguments should be denied.

## VI.  AIDING AND ABETTING SHOULD NOT BE DISMISSED AT THIS TIME

Counts One and Four alleged that the Defendant violated 18 U.S.C. § 2, aiding and abetting statute, with respect to the 18 U.S.C. § 1505 charges.  Under 18 U.S.C. § 2, "whoever

commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Id. "To prove aiding and abetting, the government must demonstrate that a substantive offense was committed, that the defendant associated himself with the criminal venture, and that he committed some act which furthered the crime." United States v. Hamblin, 911 F.2d 551, 557 (11th Cir. 1990). "Encouraging" a violation and "discouraging" the reporting of the violation, United States v. Sinskey, 119 F.3d 712, 718 (8th Cir. 1997), and "personally attempting to avoid [a violation's] detection," United States v. Self, 2 F.3d 1071, 1089 (10th Cir. 1993), have been held sufficient to show that a defendant aided and abetted the commission of a crime.

Defendant prematurely moves for dismissal because the Indictment alleges with sufficient particularity for the Defendant to be put on notice as to how the conduct alleged constitutes the elements of the offense charged. United States v. Hess, 124 U.S. 483, 487 (1888). In the instant case, Defendant is informed of the actions that he took and caused others to take. If the Court were inclined to dismiss the aiding and abetting charges, the proper time would be at the Rule 29 stage after the evidence has been received.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny

Defendant's motion to dismiss the Indictment.


                                        Respectfully submitted,



NATHANIEL B. EDMONDS                    PETER R. ZEIDENBERG
Trial Attorney, Fraud Section           Trial Attorney, Public Integrity Section
Criminal Division                       Criminal Division
United States Department of Justice     United States Department of Justice

50

CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February, 2006, a copy of the foregoing was served on the following counsel by electronic service and first class mail to:

> Barbara Van Gelder, Esq.
> Roderick L. Thomas, Esq.
> Albert C. Lambert, Esq.
> Mark B. Sweet, Esq.
> Wiley Rein & Fielding
> 1776 K Street NW
> Washington, DC 20006
> Tel: 202-719-7032
> Facsimile: 202-719-7049

NATHANIEL B. EDMONDS
Trial Attorney, Fraud Section
United States Department of Justice