## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

## DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT

As this Court recognized in its December 23, 2005 Order compelling the government to turn over statements by the defendant, the "centerpiece" of the Indictment is the allegations regarding the GSA ethics opinion request.  United States v. Safavian, Case No. 1:05-cr-370, Opinion at 2 (Dec. 23, 2005); id. at 11-12 (requiring disclosures of statements related to ethics opinion).  Furthermore, the Court recognized that "[s]tatements of the defendant are particularly important in this case."  Id. at 5.  In its opposition brief, the government has now dropped the equivalent of a legal bombshell that explains its vigorous opposition to Mr. Safavian's motion to compel defendant's statements.  Buried in a footnote at page 26 of its brief, the government now advises the Court that it seeks to premise its Indictment on *inferred conversations, statements and omissions* by Mr. Safavian leading to the ethics opinion.  Gov't Opp'n at 26 n.12.

This admission by the government, confirmed by the failure to provide discovery related to these alleged conversations, reveals that the government cannot say when these conversations occurred, who the conversations were with, what Mr. Safavian allegedly said, what Mr. Safavian allegedly did not say, what questions were asked, what answers were given, what information allegedly was concealed, what questions he allegedly did not answer truthfully, or, in fact,

*anything* about these conversations. The government further suggests that the jury should simply "infer" that the ethics opinion "incorporated Defendant's response to specific questions about whether Abramoff had business with or was seeking to do business with GSA." Id. The attempt to hold a defendant accountable for undefined, undisclosed, and inferred statements or omissions is flatly inconsistent with the law, and offends fundamental notions of fairness, due process, fair notice, and his Sixth Amendment right to confront the witnesses and evidence against him.

The government attempts to blunt the force of its admission by suggesting that this is simply a matter of "factual disputes" that a jury should resolve. See id. That argument would have superficial appeal if this was not a case where the statements and alleged omissions are the very basis of the alleged crime. Here, under black letter law, the government is *required* to turn over all statements of the defendant, and the Court has ordered it to do so. The government has also said that it has now completed discovery. See Gov't Notice of Compliance with Discovery Order of Dec. 23, 2005 (Jan. 27, 2005). Accordingly, the government cannot hide behind an assertion of a "factual dispute" to fill the void, nor is there any basis for a jury to conduct sheer speculation as to what questions were asked, what Mr. Safavian said, and then attempt to draw conclusions about what he did not say or should have said. This is not a matter of simply needing a verbatim transcription of his statements—this is a matter of the government's inability to say anything about the questions, the statements, or the context. The government cites no legal support for the proposition that such an untenable theory may be maintained under 18 U.S.C. § 1001 or § 1505.

The government also fails to address the extensive arguments that defendant has made with respect to the meaning of "doing business" or "seeking to do business." In perhaps the most dramatic example of this, the government never addresses the Office of Government Ethics

opinion discussed by the defendant, or any of the other arguments related to these terms. <u>See</u>, <u>e.g.</u>, Def.'s Mot. to Dismiss at 17-21 (citing Letter to a Federal Employee from Marilyn L. Glynn, Acting Director, Office of Government Ethics (Jan. 7, 2004)). In bypassing these arguments, the government essentially asks the Court to abdicate its role in scrutinizing this case by saying that these matters are simply factual disputes, or should be simply submitted to a jury. In essence, with respect to this example, the government apparently would have the jury either interpret the legal opinion from Marilyn Glynn (or evaluate the other legal arguments we have made about the terms), or jettison these sources in favor of a dictionary.

Not only is this argument nonsensical given the ethics context of the alleged statements, but it highlights an argument that the government simply has not addressed—the lack of any notice that a request for legal advice or ethics advice may be parsed by the government as it has done here to prosecute. This plain violation of fundamental notions of fairness and due process is further enhanced by the government's inability to say what was asked, what was said, and what was not said. Indeed, in light of the fact that Mr. Safavian was seeking legal advice and ethics advice, the complete lack of any information on the conversations is breathtaking here since the purpose for seeking advice is to provide the employee guidance on the nuances of ethics questions. That inquiry necessarily involves detailed questions and answers, none of which the government can give the Court, the defendant, or a jury, which would be left to speculate.

The government's approach here also suffers from another serious flaw. Because the government cannot say what alleged statements or omissions underlie the ethics opinion, the Court cannot permit a jury to substitute its own opinion or speculate on the basis for the opinion. Furthermore, because the government can say nothing about the foundation for the opinion, the

subsequent bald allegations that Mr. Safavian somehow continued his concealment before the

Office of Inspector General and the Senate also must fail because these allegations all flow from

the same legal flaws.  As detailed in defendant's Motion to Dismiss and this Reply, there are also

significant additional legal arguments as to why this Indictment should be dismissed.

## I.    THE COURT CAN RULE ON THIS MOTION AND DISMISS THIS INDICTMENT AS A MATTER OF LAW.

The government repeatedly asserts that Mr. Safavian's motion is premature, that it raises

issues more properly decided by a jury or a Rule 29 motion.  Rule 12(b), however, allows a

defendant to raise "by pretrial motion any defense . . . that the court can determine without a trial

of the general issue" and requires a defendant to raise "any motion alleging a defect in instituting

the prosecution" or "in the indictment."  Fed. R. Crim. P. 12(b)(2) & (3).

In deciding Rule 12(b) motions, courts may dismiss indictments before trial based on

questions of law where the facts are not in dispute.  See, e.g., United States v. Yakou, 428 F.3d

241, 246-47 (D.C. Cir. 2005); United States v. Oakar, 111 F.3d 146, 147-50 (D.C. Cir. 1997);

United States v. Trie, 23 F. Supp. 2d 55, 62-63 (D.D.C. 1998) (Friedman, J.); United States v.

Crop Growers Corp., 945 F. Supp. 335, 345 (D.D.C. 1997).  As explained below, each of the

defects that Mr. Safavian highlights in this motion is a matter of law.  Furthermore, for the

purposes of this motion, Mr. Safavian does not challenge the veracity of any of the factual

allegations of the indictment, and his arguments do not turn on a lack of credibility in the

documents produced by the government.  This motion merely takes the Indictment, as supported

by the factual allegations and the statements themselves, and shows its fatal deficiencies.

Even where the motion considers the statements made, however, the Court should not be

tempted by the government's argument that such considerations are necessarily factual questions

for the jury to decide.  For in this case, there is no question that the defendant's statements (or

failure to make statements) are the essence of the alleged crime. Furthermore, Rule 16(a)(1) of the Federal Rules of Criminal Procedure requires the government to disclose all of the defendant's statements. The Court has compelled production here. United States v. Safavian, No. 1:05-cr-370, Order at 1-2 (Dec. 23, 2005). Moreover, the government has stated that it has complied with that Order. See Gov't Notice of Compliance with Discovery Order of Dec. 23, 2005 (Jan. 27, 2005). Thus, there is no factual question that all of defendant's alleged statements, indeed all of the essential evidence of this case, are before the Court, and the Court can consider them in ruling on the arguments raised in this motion.

## II.   THE GOVERNMENT'S ARGUMENT FOR THE SUFFICIENCY OF COUNT TWO FAILS AS A MATTER OF LAW.

Mr. Safavian's motion to dismiss highlighted a number of fatal flaws with Count Two of the Indictment, and the government's opposition does nothing to contest these insufficiencies. The government not only fails to provide any precedent for application of 18 U.S.C. § 1001 to a request for ethics advice, but also cites no case in which a defendant was prosecuted with this little notice, on the basis of ambiguous and inferred statements, and with no duty to disclose material facts. For these reasons, the Court should dismiss Count Two of the Indictment.

### A.   The Government's Claim to Fair Notice Is Without Merit.

The Motion to Dismiss established that, as a matter of law, the Due Process Clause of the Fifth Amendment prohibits prosecution where a defendant lacks "fair warning," at the time of the alleged action, that his conduct is criminal. See Def.'s Mot. to Dismiss at 14-17. In opposition, the government fails to provide a valid basis upon which Mr. Safavian should have known that his request for an advisory opinion could be subject to prosecution under 18 U.S.C. §

1001.[1]  Indeed, the government's attempt to apply the statute to the specific circumstances of this case would frustrate the purpose of seeking ethics advice, and would chill the framework for such requests.  Here, the government has charged the defendant based upon a cursory e-mail request (which does not even mention Mr. Abramoff at all), and seeks to hold the defendant accountable for alleged subsequent conversations that the government cannot describe at all, let alone with any particularity.

Notably, the government cites no precedent for application of 18 U.S.C. § 1001 to such an informal context, much less a voluntary request for ethics advice.  See United States v. Lanier, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.").  The government's closest example is United States v. Shah, 44 F.3d 285, 287 (5th Cir. 1995), in which the defendant made statements in a much more formal setting—a competitive bid in response to a GSA solicitation—than a voluntary request for ethics advice.  Moreover, as with many of the cases cited by the government,[2] the Shah defendant

---

[1] As a threshold matter, the government cites Hamling v. United States, 418 U.S. 87, 117-18 (1974), to illustrate a relatively liberal standard for criminal pleadings.  Hamling, however, involved an obscenity indictment, and the Supreme Court considers obscenity indictments to fall under a "well recognized exception to [the] usual indictment rules."  Russell v. United States, 369 U.S. 749, 765 n.12 (1962) (internal quotation marks and citations omitted).  Indictments must contain allegations that remove any uncertainty or ambiguity regarding the facts and circumstances that constitute each element of the offense.  Id. at 764-65.

[2] Although Shah is the only example cited in this section by the government, a brief review of its other primary false statements cases reveals a consistent pattern of prosecuting defendants who, through a certification, form, or interview, were clearly aware that their statements were subject to prosecution, something that is sorely lacking in the instant case.  See United States v. Gaudin, 515 U.S. 506, 508 (1995) (defendant made misrepresentations on a HUD/FHA form); United States v. Cisneros, 26 F. Supp. 2d 24, 31-32 (D.C. Cir. 1998) (defendant certified statements on a Questionnaire for Sensitive Positions for National Security (SF-86)); United States v. Milton, 8 F.3d 39, 41 (D.C. Cir. 1994) (defendants aided and abetted applicants who, in exchange for payment, signed a release form claiming to be victims of discrimination), cert. denied, 513 U.S. 919 (1994); United States v. Hansen, 772 F.2d 940, 942 (D.C. Cir. 1985) (Congressional Representative omitted information about certain loans and transactional profits on annual financial disclosure report required to be filed by Ethics in Government Act of 1978), cert. denied, 475 U.S. 1045 (1986); United States v. Muntain, 610 F.2d 964, 971 (D.C. Cir. 1979) (defendant concealed information required by two Confidential Statements of Employment and Financial Interests (HUD Form 844)); United States v. London, 550 F.2d 206, 208 (5th Cir. 1977) (defendant made false statements in loan application to

signed a written certification as part of his bid, and the false statements occurred when the defendant violated that certification.  Id.  This Indictment, by contrast, makes no allegations that Mr. Safavian certified his statements; nor does it allege that Mr. Safavian had any notice that his statements were prosecutable.  Indeed, the prosecution's theory would require an employee to seek independent legal or ethics advice to ensure that a request for an ethics opinion from the agency is framed without ambiguity.

One case frequently cited by the government, United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998), illustrates the notice that must be afforded to defendants in a § 1001 prosecution.  In Cisneros, the indictment alleged that the defendant completed and signed a Questionnaire for Sensitive Positions for National Security ("SF-86"), id. at 32, a form that requires applicants to certify understanding that a "knowing and willful false statement on this form can be punished by fine or imprisonment or both."  See SF-86, Ex. 1 at 9.  If there were any doubt, the form specifically refers to § 1001 in both the instructions and certification.  Id. at instructions and 9.  Beyond the form, though, the Cisneros indictment alleged that in follow-up interviews, the FBI "repeatedly informed Cisneros of his right not to speak and of the implications of making false statements."  Cisneros, 26 F. Supp. 2d at 43.  In contrast, this case involves no form, certification, warning, or anything else that would suggest Mr. Safavian had fair notice that his request or statements to the ethics officer were subject to prosecution.  In short, Mr. Safavian had none of the protections Mr. Cisneros enjoyed, and therefore lacked notice sufficient to satisfy his Fifth Amendment rights.

The government's other argument against the dismissal of Count Two—that criminal treatment of statements made in advisory opinions are "within the jurisdiction" of the GSA—is

_____

the Farmers Home Administration); United States v. Dale, 782 F. Supp. 615, 624-25 (D.D.C. 1991) (defendants completed Department of Defense Personnel Security Questionnaires).

equally without merit.  As recognized in a case cited by the government, the "jurisdiction" requirement in § 1001 limits application of the statute to statements made in relation to "official, authorized functions of an agency."  United States v. Rodgers, 466 U.S. 475, 479 (1984).  The Supreme Court was clear to differentiate official functions from those "matters peripheral to the business of that body."  Id.  Moreover, "[m]ere access to information is not enough to establish jurisdiction.  To establish jurisdiction, the information received must be directly related to an authorized function of the federal agency.  Otherwise, the scope of § 1001 jurisdiction would be virtually limitless."  United States v. Holmes, 111 F.3d 463, 466 (6th Cir. 1997) (holding that Department of Labor did not have jurisdiction over false statements that enabled an individual to obtain benefits to which he or she was not entitled, because the Department lacked authority to take action against that individual); United States v. Facchini, 874 F.2d 638, 642 (9th Cir. 1989) (en banc) (statements do not fall within the jurisdictional reach of department where Secretary "not empowered to act on the fraudulent claims of applicants.").  An agency has "jurisdiction," therefore, "when it has the power to exercise authority in a particular situation."  Rodgers, 466 U.S. at 479.

The government relies on Rodgers and United States v. Milton, 8 F.3d 39, 46 (D.C. Cir. 1994), cert. denied, 513 U.S. 919 (1994), to suggest that a broad reading of "jurisdiction" would make ethics advice an authorized, official function of the GSA, but the relatively limited holdings in these cases do not support the sweeping application of § 1001 that the government advocates here.  In Rodgers, the Supreme Court merely ruled that criminal investigations are within the jurisdiction of the FBI and Secret Service.  466 U.S. at 479.  Likewise, in Milton, the D.C. Circuit merely held that the means of settling employment discrimination cases are "within the jurisdiction" of the EEOC.  8 F.3d at 46.  In both cases, the agencies were taking necessary

steps directly related to their official functions.  Here, giving advice to employees on voluntary

ethics requests is not directly related to the acquisition, procurement, or disbursement of

government equipment, supplies, and property.[3]

The government also argues that statements are within the jurisdiction of an agency

where the agency has a statutory basis for requesting the information.  See Gov't Opp'n at 20

(citing Milton, 8 F.3d at 45).  Here, however, the Indictment does not allege that the ethics

official ever requested the information.  In fact, it alleges just the opposite—that Mr. Safavian

voluntarily provided it.  See Indictment ¶ 18.  Thus, at most, the GSA ethics official had access

to information provided voluntarily by Mr. Safavian.   Furthermore, the government clearly

failed to preserve key information related to the ethics request.[4]  Accordingly, the government

provides nothing to dispute that the ethics request related to a peripheral matter.[5]  Nor has the

government provided any other basis for providing fair warning to the defendant.[6]

---

[3] The GSA's official function is to serve as "the government's 'landlord,' meeting office and other space requirements of the federal workforce."  See GSA Organization Overview at http://www.gsa.gov.  The GSA also acquires and procures equipment, supplies, telecommunications, and information technology for other government agencies and oversees disbursement of government-controlled properties.  Id.

[4] The document that the government relies upon for the ethics opinion transmittal to Mr. Safavian is a document actually obtained from the law firm associated with Jack Abramoff.  See Gov't Opp'n at Exhibit 19.  The government has not turned over any such e-mail to Mr. Safavian from GSA's files.  The failure to preserve the e-mail that Mr. McKenna allegedly sent to Mr. Safavian (or any other unknown e-mails following the request), suggests that the GSA viewed these records as transitory and non-evidentiary.  See infra note 9 (discussing GSA's orders related to retention of electronic records).  Such treatment of the documents undermines the government's suggestion that the statements were not peripheral.  See Rodgers, 466 U.S. at 479 (finding matters "within the jurisdiction" of the agency are directly related to their official function and not peripheral).  This view is further demonstrated by the government's failure to preserve, and inability to provide, any information about the alleged conversations related to the ethics opinion itself.

[5] Nor was the ethics official empowered to exercise authority over Mr. Safavian for criminal statements made in the ethics request.  The regulation cited by the government, 5 C.F.R. § 2635.107, merely grants agency ethics officials the responsibility "for coordinating and managing the agency's ethics program."  Section 2638 grants ethics officials a limited power to take corrective action, but explicitly states that "[n]othing contained in this part gives . . . any agency official authority to make a finding that any criminal statute relating to conflicts of interest is being or has been violated."  5 C.F.R. § 2638.501(c).  One of the statutes that relates to conflict of interests is 18 U.S.C. § 1001.  See 5 C.F.R. § 2635.902(v).  Thus, since the provision of ethics advice is not directly related to the official functions of GSA and findings of criminal false statements are beyond the authority of an ethics advisor, then the alleged

-9-

### B.    The Government Fails to State a Claim Under § 1001

Even if the government had shown that Mr. Safavian was fairly warned, the Indictment

fails to allege the falsity of his statements by trick, scheme, or device with sufficient certainty for

a jury to try the case.  See Def.'s Mot. to Dismiss at 17-20.

### 1.    Mr. Safavian's Alleged Statement Cannot Be Shown to Be False.

The Indictment only alleges one statement by Mr. Safavian with respect to the ethics

request:  that Mr. Abramoff "has no business before GSA (he does all of his work on Capitol

Hill)."  Indictment ¶ 18.  As explained in the motion, the primary part of this statement—that Mr.

Abramoff had no business before the GSA—cannot satisfy the falsity element of § 1001 as a

matter of law because the Indictment does not allege that Mr. Abramoff had any existing

contracts with the GSA at the time.  See Letter to a Federal Employee from Marilyn Glynn,

Acting Director, Office of Gov't Ethics (Jan. 7, 2004), Ex. 15 to Mot. to Dismiss (illustrating

"prohibited source" as a contractor who is "doing business with the agency pursuant to existing

arrangements").  The government sidesteps this analysis entirely, complaining that parsing Mr.

Safavian's words—the same words it is using to try to convict him—is somehow inappropriate.

Regardless, given that neither of the properties about which the government alleges that Mr.

---

statements were not "within the jurisdiction" of GSA and Mr. Safavian did not have fair notice that his statements to
the ethics official could be criminally prosecuted under § 1001.

[6] The government also cites 5 C.F.R. § 2635.107(b), which obligates the ethics official to report any underlying
offense communicated to him or her.  At most, these provisions put Mr. Safavian on notice that communications
with an ethics official are not privileged communications and the ethics official can report underlying conduct
believed to be criminal.  However, this provision does not warn a defendant that the statements to the ethics official
themselves could be subject to prosecution under § 1001, nor is it even intended to subject employees making ethics
requests to this additional liability.

Abramoff was expressing interest was available for disposal, doing business with GSA was not even a possibility.  See Mot. to Dismiss at 19-20.[7]

  2.  **The Government Has Not Resolved the Ambiguities of the Indictment, and Inferred Statements Cannot Be the Basis of a False Statements Indictment.**

  The motion to dismiss also argued in great detail that the Indictment suffered from fundamental ambiguities, which as a matter of law, were fatal.  See Def. Mot. to Dismiss at 21-30.  Specifically, Mr. Safavian argued that the Indictment's characterization of—and indeed the rather scant evidence of—his alleged statements left the Court and the jury with no basis to assess the content or context of the questions and answers, the meaning of terms, or any other circumstances related to the alleged statements.  Id. at 21-23.  In addition, the terms of art, "business" and "seeking to do business," lacked sufficient definition for a jury to apply and their use had reasonable interpretations that the government could not negate.  Id. at 24-30.

  Again, the government fails to address these arguments squarely.  Instead, the government, recognizing the insufficiency of its allegation, argues that these statements are "arguably ambiguous," and a factual question must arise because a "jury might reasonably infer

---

[7] Prosecution of Mr. Safavian on the second part of this statement—a parenthetical comment about where a "lobbyist" works—would be absurd, particularly where the request does not even identify Mr. Abramoff.  The term "lobbyist" is repeatedly used by the government to describe Mr. Abramoff.  Indeed, the Indictment repeatedly characterizes Mr. Abramoff as "Lobbyist A."  See Indictment, ¶¶ 2, 3, 7-14, 16-21, 24-27, 29, 31, 33-35, 37-38, 40.  The government also refers to Mr. Abramoff as "a well-known and very successful *lobbyist*" in its brief.  Gov't Opp'n, at 2 (emphasis supplied).  Reference to a dictionary, as the government repeatedly suggests elsewhere, reveals that Mr. Safavian's statement is a truism because the term "lobbyist" is defined as someone who seeks to influence legislation.  See Ex. 2, Random House Webster's Unabridged Dictionary (2d ed. 2001) (defining a "lobbyist" as a "person who tries to influence legislation on behalf of a special interest"); see Ex. 3, Webster's New World Dictionary (4th ed. 2003) (providing a sole definition of  "lobbyist" as "a person, acting on behalf of a group, who tries to get legislators to support certain measures").  Of course, "lobbying" often has a broader meaning, as does "work," which has more than 50 definitions to cherry-pick from, including "employment, as in some form of industry."  See Ex. 4, Random House Webster's Unabridged Dictionary.  Therefore, a statement that a lobbyist does all his work on Capitol Hill is literally true by definition--even under the government's standard of avoiding "overly legalistic definitions," Gov't Opp'n at 22--and thus cannot be the basis for a § 1001 prosecution.  See United States v. Gahagan, 881 F.2d 1380, 1383 (6th Cir. 1989).

that the ethics opinion incorporated Defendant's response to specific questions." See Gov't

Opp'n at 25-26 & n.12.[8]  Because the government has simply side-stepped the "doing business"

or "seeking to business" arguments without rebuttal, this alone should be a basis for dismissal.

    Moreover, reliance on an inference for the very essence of the alleged offense flies in the

face of Supreme Court requirements for criminal pleading.  "Where guilt depends so crucially

upon such a specific identification of fact, our cases have uniformly held that an indictment must

do more than simply repeat the language of the criminal statute."  Russell v. United States, 369

U.S. 749, 764 (1962) (dismissing indictment for failing to respond to questions of Congress

where indictment did not allege the "very core of criminality," which was the subject under

inquiry); see Charles Alan Wright, et al, Federal Practice and Procedure: Criminal 3d § 125

---

[8] This document also is of dubious evidentiary value considering the multiple layers of hearsay that make up the document relied upon by the government. See Gov't Opp'n at Exhibit 19. This document – an e-mail forwarded multiple times – is in essence a statement from some unknown person purporting to relate what Mr. Safavian said. Id. (beginning with "you said ….). The government has already confirmed that they cannot say who he talked to, or anything related to the conversations. Furthermore, both Mr. McKenna and Ms. Ellison have no recollection of talking to Mr. Safavian before the e-mail was sent. See Def. Mot. to Dismiss, at 18.  Moreover, the lack of a clear record is troubling given that the government cannot even provide the actual e-mail from GSA to Mr. Safavian (or any other possible e-mails that followed Mr. Safavian's request).  The government indicated to the Court at the motions hearing on the Motion to Compel, and in its Notice of Compliance With Discovery Order of December 23, 2005, Exhibit 1, at page 1 (filed 1/27/06),  that GSA is simply permitted to destroy electronic documents after sixty days because they are not "an official record" of the GSA.  That is not accurate.  GSA's official policy during the period of the ethics request events directs that "[a]ny official records created in the GSA electronic mail system **must be** moved to a file that is maintained according to the GSA Records Schedules (OAD P 1820.2A) by the originator and the recipient."  See Ex. 5, GSA Order, CIO 2160.2 (Sept. 24, 1998) (DOJ-DS007398) (emphasis in original).  GSA Order 2160.2 remained in effect until July 26, 2005 (well after the events here), when it was cancelled and superseded by a virtually identical order; except that the new order shortened the time period for retention of "transitory material" from 90 to 60 days.  See Ex. 6, GSA Order, CIO 2160.2A at 3, 6 (July 26, 2005) (DOJ-DS007384, 87) ("Official records may not be retained solely in the form of an electronic message file in GEMS.  Any document that may be classified as a record should be transferred to a file that is maintained according to OAD P 1820.2A.").  In any event, during the period applicable here, GSA's policy distinguished between "Record" and "Nonrecord" material, and required that "Records may not be retained in an e-mail directory.  Any document that may be classified as a record should be transferred to a file that is maintained according to the GSA Records Schedules (OAD P 1820.2A)."  See Ex. 7, GSA Instructional Letter, OAD IL-95-6, Recordkeeping Policy for E-Mail Messages (Dec. 5, 1995) (DOJ-DS0013307).  "Nonrecord material" is transitory, or "[d]ocuments of short-term interest which have no documentary or evidential value and normally need not be kept more than 90 days are not defined as records."  For example, nonrecord material includes "[r]outine requests for information or publications and copies of replies which require no administrative action, no policy decision, and no special compilation or research for reply."  See Ex. 7, Instructional Letter (DOJ-DS0013306).  The Instructional Letter further states that GSA's policy is that "GSA e-mail messages should be treated the same way as paper documents that do the same things."  Id.

(Westlaw 2005) ("The indictment . . . must be specific in its charges and necessary allegations cannot be left to inference.").

In particular, a criminal indictment for false statements cannot infer the actionable statements. "[W]hat is actually said by a defendant becomes a critically important part of any prosecution under § 1001." United States v. Poutre, 646 F.2d 685, 688 (1st Cir. 1980). Therefore, as a matter of law, a false statement prosecution cannot occur where there is "no basis, other than pure speculation upon which a reasonable juror could determine what question was asked and what response was given. Without knowing the question asked or answer given, a finding that a false statement was made is unreasonable." United States v. Clifford, 426 F. Supp. 696, 703 (E.D.N.Y. 1976); see also United States v. Ehrlichman, 379 F. Supp. 291, 292 (D.D.C. 1974) (setting aside conviction for false statements in which defendant was forced to defend the truth of his statements on the basis of an FBI agent's "sketchy notes, which do not purport to be a verbatim record of either the questions or the answers at issue"); cf. Bronston v. United States, 409 U.S. 352, 359 (1973) (finding in the context of a perjury charge under 18 U.S.C. § 1621 that "[a] jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner").

Thus, where, as here, the indictment does not—and cannot—allege with sufficient particularity what questions were asked, what statements were made, and what facts were or were not concealed—leaving the Court, the defendant, and the prospective jury to "infer" the "very core of criminality"—the Court should dismiss the Indictment as a matter of law. See United States v. Trie, 23 F. Supp. 2d 55, 62-63 (D.D.C. 1998) (Friedman, J.) (dismissing § 1001 count in indictment that required an "Alice-in-Wonderland-like maze of logical leaps and tangled inferences").

### C.   The Government Fails to Identify a Duty to Disclose or Allege Affirmative Acts for Concealment.

#### 1.   The Indictment and the Opposition Do Not Allege a Specific, Unambiguous Duty to Disclose.

As a matter of law, a prosecution for concealment under § 1001 may only proceed if a specific, unambiguous duty to disclose the material facts exists at the time the defendant was alleged to have concealed them.  See United States v. Crop Growers Corp., 945 F. Supp. 335, 345 (D.D.C. 1997) (dismissing concealment charge as a "matter of law" pursuant to Rule 12(b) motion, where defendant had no duty to disclose the allegedly concealed information).  The government does not contest that an unambiguous duty is essential, but does contend that Mr. Safavian had such a duty.  Neither the Indictment nor the government's opposition, however, identifies any such duty.

"The duty to disclose arises when disclosure is required by government statute, regulation, or form."  United States v. Dollar, 25 F. Supp. 2d 1320, 1325 (N.D. Ala. 1998).  Where, as the government contends here, the duty to disclose arises from statute or regulation, the "specific statutes and regulations" governing the ethics request must "unambiguously require[] disclosure."  Crop Growers Corp., 954 F. Supp. at 347.  The Indictment alleges no statutes or regulations that specifically relate to requests for government ethics.  In its opposition, the government relies on generic, unalleged expectations of public employees to be trustworthy, honest, and "loyal[] to the Constitution."  Gov't Opp'n, at 31.  These principles, while noble, are neither specifically related to ethics requests nor sufficient to impose an unambiguous duty here.  See Crop Growers Corp., 954 F. Supp. at 348 (holding general disclosure regulations and professional standards not codified in criminal statutes were, "quite simply, too vague and amorphous" to impose a legal duty to disclose information).

The government's second basis for a duty to disclose, 5 C.F.R. § 2635.107(b), is misconstrued and inapplicable. A careful reading of § 2635.107(b) reveals that it imposes no obligation on a government employee. Indeed, the words "duty" and "obligation" appear nowhere in the text of the regulation. Rather, the regulation serves as an affirmative *defense* for employees who rely on ethics opinions and are later prosecuted for their underlying offenses, and merely states that full disclosure is a condition of the defense. In short, the regulation provides a shield upon which employees may rely, not, as the government argues, a sword by which they may be prosecuted. Moreover, Mr. Safavian did not rely on this ethics opinion—he paid for the trip himself—making this provision entirely inapplicable.

Relying on United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998), the government argues that Executive Order 10450, which governs investigations of federal employees for national security issues, imposed a general duty to disclose upon Mr. Safavian. Gov't Opp'n at 31. Executive Order 10450 is wholly inapplicable to the circumstances of the instant case. The government cites an excerpt from the order which states that "all persons privileged to be employed in the departments and agencies of the Government, shall be reliable, trustworthy, of good conduct and character." Gov't Opp'n at 31 (citing 18 FR 2489). In Cisneros, the Order was relevant because the court was addressing statements by a cabinet officer about whether a basis existed for someone to coerce or blackmail him, thereby implicating national security. Cisneros, 26 F. Supp. 2d at 32. Count Two of this Indictment alleges no such investigation and never suggests the national security credentials of Mr. Safavian were at issue. Moreover, nowhere in Executive Order 10450 is there any specific mention of an affirmative duty to disclose information in situations such as those present here. Surely the general and broad nature

of the executive order cannot be deemed to set forth with "clarity that an ordinary person can understand what conduct is prohibited." Crop Growers Corp., 954 F. Supp. at 345.

Moreover, the context in which Cisneros was decided involved facts so completely dissimilar to those here that any meaningful analogy cannot be drawn. As a preliminary matter, among the questions posed to the defendant in Cisneros included those found in the Standard Form-86 Questionnaire for National Security Positions—the purpose of which is to determine whether to grant national security clearance for high level military personnel or applicants for national security positions. The form itself contains an explicit warning at the beginning that falsifying or concealing any material information subjects the applicant to penalties under 18 U.S.C. § 1001. See Ex. 1 at instructions. The final section of the form also requires the applicant to certify that the answers provided are "true, complete, and correct" to the best of their knowledge, and again includes a warning that a "knowing and willful" false statement is punishable by fine, imprisonment, or both under § 1001. See Ex. 1 at 9. Clearly, this Court's determination that the defendant had a duty to disclose certain information was made in light of the express and unequivocal directive contained in the questionnaire, including the numerous references to potential liability under § 1001. In contrast, the government provides nothing to show that there was a form, certification, regulation, warning or anything else that would suggest Mr. Safavian had a duty or had fair notice that his ethics request to the ethics officer was subject to prosecution.

The government's reliance on Cisneros is further misplaced insofar as the indictment itself included additional express language imposing a duty to disclose. Specifically, the indictment asserted that the purpose of the FBI's interview with the defendant "'was to ensure that complete, current, and accurate information would be available and obtained concerning

[defendant]'s background,' and that [defendant] had 'to be completely truthful and forthcoming during the background investigation.'" <u>Cisneros</u>, 26 F. Supp. 2d at 42 (citation omitted). The FBI also warned Mr. Cisneros that he had a right to remain silent. <u>Id.</u> Importantly, the Indictment in this case contains no such language, distinguishing <u>Cisneros</u> in a critical way. It is far too slim a reed upon which to infer an unambiguous duty to disclose where there is nothing in the Indictment revealing any such obligation, and the government can point to nothing to suggest fair warning here.

Thus, given the ill-defined bases from which the government seeks to impose a legal duty on Mr. Safavian and the sharp contrast with the pronounced duties in <u>Cisneros</u>, this Court should dismiss Count Two of this Indictment as a matter of law. <u>See</u> <u>United States v. Anzalone</u>, 766 F.2d 676, 682 (1st Cir. 1985) ("If the government wishes to impose a duty . . . let it require so in plain language. It should not attempt to impose such a duty by implication, expecting the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation.") (superseded by statute on other grounds).

### 2. The Indictment Fails to Allege Affirmative Acts of Concealment.

Even if some duty did exist, the Indictment fails to allege affirmative acts that constitute deliberate concealment of material facts by Mr. Safavian. In an indictment, the "'language of the statute . . . must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offence . . . with which he is charged.'" <u>United States v. Nance</u>, 533 F.2d 699, 701 (D.C. Cir. 1976) (citation omitted). Furthermore, as with the pleading of any false statements count, the indictment must identify the "crucial" facts that form the "very core of criminality." <u>Russell</u>, 369 U.S. at 764.

Nowhere in the factual section of this Indictment does the government allege any affirmative acts taken by Mr. Safavian with respect to the ethics request. Instead, the Indictment

alleges pages of facts about the communications between Mr. Safavian and Mr. Abramoff, as well as the communications between Mr. Abramoff and others. These allegations, which are largely a distraction from the ultimate issue, attempt to portray communications between Mr. Safavian and Mr. Abramoff as illicit, in hope of establishing a basis or motivation for an alleged misstatement to the GSA Ethics Official, the GSA-OIG, and the Senate Committee on Indian Affairs. The government fails, however, to identify anything that would support its argument that there was something improper in responding to expressions of interest in properties, particularly where doing business with GSA on those properties was not even a possibility. See Mot. to Dismiss at 19-20.

Regarding the ultimate issue of Count Two, however, the Indictment only alleges that Mr. Safavian requested ethics advice, and in the request stated that Mr. Abramoff "ha[d] no business before GSA (he does all of his work on Capitol Hill)." Indictment ¶ 18. Beyond that statement, the Indictment merely concludes, without factual support, that Mr. Safavian "concealed" material facts.[9]

Not only does the government fail to allege any acts of concealment, but it cannot deny that e-mails during this time period were deleted. See Ex. 2 to Gov't Notice of Compliance with Discovery Order of Dec. 23, 2005 (noting e-mails are deleted off the GSA server and all personal e-mail directories after 60 days); see also supra note 8. Thus, from scant allegations—and without any suggestion of what might have been said in other e-mails—Mr. Safavian is left to infer what statements allegedly were made and what material facts allegedly were concealed. As argued above in Part II.B.2, a criminal indictment for false statements cannot infer the actionable

---

[9] Tellingly, in the 15 pages devoted to factual background in its opposition, the only two sentences in which the government claims Mr. Safavian concealed his relationship with and assistance to Mr. Abramoff have no citations—to either the Indictment or an exhibit. Gov't Opp'n at 8.

concealments that form the "very core of criminality." <u>Russell</u>, 369 U.S. at 764; <u>see</u> <u>Poutre</u>, 646

F.2d at 688; <u>Clifford</u>, 426 F. Supp. at 703; <u>United States v. Ehrlichman</u>, 379 F. Supp. at 292; <u>cf.</u>

<u>Bronston v. United States</u>, 409 U.S. at 359.

The government cites <u>United States v. London</u>, 550 F.2d 206 (5th Cir. 1977), for the

proposition that the Indictment is facially valid simply because it asserts that Mr. Safavian

employed a trick, scheme, or device to conceal or falsify material information.  The <u>London</u>

court, however, also recognized that "the mere omission of failing truthfully to disclose a

material fact, which is simply the negative aspect of the affirmative act of falsely stating the

same material fact, does not make out an offense under the conceal or cover up clause of section

1001." <u>Id.</u> at 214.  In <u>London</u>, the court sustained the indictment only because it alleged, for

each concealment count, a "specific transaction, the date of that transaction, the parties

participating, the fact concealed, and . . . the materiality of the concealed fact." <u>Id.</u> at 210.  Here,

in contrast, the Indictment pleads no such details regarding conversations in which facts were

allegedly concealed.  The Indictment leaves Mr. Safavian and the jury to "infer" that such a

conversation took place, the date of this inferred conversation, the identification of the ethics

official who participated, and the fact or facts that were concealed.  <u>See</u> Gov't Opp. at n.12.

Thus, Count Two of the Indictment falls far short of the amount of detail alleged in <u>London</u>, and

therefore only alleges "a mere failure to disclose" information that cannot constitute a "trick,

scheme or device."

The government's other case citation likewise recognizes that in the absence of a duty to

disclose, the government, at most, can allege that Mr. Safavian passively failed to disclose facts

about his relationship with Mr. Abramoff.[10]  <u>See</u> <u>Dale v. United States</u>, 785 F. Supp. 615, 626

---

[10] As it does repeatedly in its opposition, the government wrongly accuses the defense of failing "to mention the
D.C. case law that holds exactly the opposite of what Defendant portrays the case law to be." Gov't Opp'n at 28.

(D.D.C. 1991). In <u>Dale</u>, the defendants had a duty to disclose imposed by the Department of Defense Personnel Security Questionnaires, and intentionally failed to disclose information in response to questions on the form. <u>Id.</u> Here, however, Mr. Safavian was not responding to questions on a form, nor did he have any duty to disclose imposed by a specific statute or regulation. <u>See</u> Part II.C.1 <u>infra</u>. Furthermore, the indictment in <u>Dale</u> alleged specific questions and answers, whereas here, the Indictment fails to allege any affirmative acts to conceal that would suggest "deliberate failure."[11] Thus, the allegations in this case resemble the allegations of concealment in <u>United States v. Shannon</u>, 836 F.2d 1125, 1129-30 (8th Cir. 1988), where defendant's mere acquiescence to wrongful conduct did not constitute concealment, or <u>United States v. Woodward</u>, 469 U.S. 105, 108 (1985) (per curiam), where the government had no evidence of a question asked to the defendant.

Therefore, given the speculative inferences necessary to determine how Mr. Safavian concealed material information, and the failure of the government to allege any of the statements that allegedly led to the statements in the ethics opinion, the Court should dismiss Count Two of the Indictment. <u>See, e.g.</u>, <u>Trie</u>, 23 F. Supp. 2d at 62-63 (dismissing § 1001 counts in indictment,

---

First, defendant's motion to dismiss cited and distinguished <u>United States v. Dale</u>. <u>See</u> Def.'s Mot. to Dismiss at 35 n. 30. Second, while the motion relied more heavily on <u>United States v. Shannon</u>, the standard for concealment espoused in <u>Shannon</u> is consistent with that in <u>Dale</u>. Both cases recognized that a "deliberate failure to disclose to the government material facts" was "distinguishable from a 'passive failure to disclose' or 'mere silence in the face of an unasked question.'" <u>Dale</u>, 782 F. Supp. at 626; <u>Shannon</u>, 836 F.2d at 1129-30 (concealment violation requires "more than just a passive failure on the part of the defendant to reveal a material fact. Rather, the government must prove an affirmative act by which a material fact is actively concealed."). In short, both cases recognized the same legal principle; they merely reached different outcomes.

[11] The government's claim that a defendant who volunteers some information must make full disclosure only further illustrates the differences between <u>Cisneros</u> and this case. In <u>Cisneros</u>, the defendant made his initial statements on the SF-86 in the face of a clearly stated duty to be "true, complete, and correct." 26 F. Supp. 2d at 32. He made his statements to the FBI in the face of the option to remain silent and further warnings about the duty to give complete and accurate information. <u>See</u> discussion of <u>Cisneros</u>, <u>supra</u>.

where "quagmire of inferences is further complicated" by the indictment's silence as to precise conduct defendant was alleged to have taken).

     **D.**    **A Jury Cannot Determine Whether the Alleged False Statements Were Material If the Government Cannot Provide Statements Underlying The Ethics Opinion**

The government contends that United States v. Gaudin, 515 U.S. 506 (1995), precludes this Court from passing on the element of materiality in the context of § 1001. Gaudin is not dispositive on this issue. The Court in Gaudin focused on the right of a criminal defendant to have a jury determine each element of the crime with which he is charged. Id. at 522-23 ("The trial judge's refusal to allow the jury to pass on the 'materiality' of Gaudin's false statements infringed that right."). Mr. Safavian does not ask this Court to pass on his right to have a jury determine the materiality of any of the allegedly false statements he may have made to the GSA ethics official. Instead, he is simply asking this Court to: (1) note that the government has not asserted materiality sufficient to survive a Rule 12(b)(3)(b) motion; and then (2) dismiss Count Two on that basis. By doing so, this Court would not be imposing on the Due Process and Sixth Amendment protections the Gaudin Court sought to provide by requiring a jury determination on the materiality issue. 515 U.S. at 522-23. The dismissal of the charge would not only eliminate that count from the Indictment, but it would also necessarily eliminate the constitutional considerations that accompany a criminal charge to be brought before a jury.

Furthermore, as Gaudin recognized, the first step in determining "whether a statement is 'material' requires" an inquiry into "'what statement was made.'" Gaudin, 515 U.S. at 512. Here, in connection with the ethics opinion, the government has not alleged any facts that show what questions were asked of Mr. Safavian, what statements Mr. Safavian made, and what statements Mr. Safavian did not make. Thus, as a threshold matter, this case cannot reach the ultimate question of materiality, and the Court can dismiss the Indictment as a matter of law.

Accordingly, Gaudin has no bearing on this Court's ability to address the government's

complete failure to sufficiently assert facts supporting the materiality element of § 1001.

**III.    COUNT ONE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT ALLEGE FACTS SUFFICIENT TO SUPPORT A CHARGE THAT MR. SAFAVIAN OBSTRUCTED THE GSA-OIG INVESTIGATION**

Count One of the Indictment alleges that Mr. Safavian knowingly and corruptly

obstructed and impeded the GSA-OIG's investigation in violation of 18 U.S.C. § 1505.  Count

One must be dismissed because it suffers from numerous fatal flaws.

As an initial matter, the allegations related to GSA-OIG's investigation reveal only

fundamentally ambiguous statements that cannot serve as the basis for a § 1505 obstruction

charge.  See United States v. Lattimore, 127 F. Supp. 405, 409-10 (D.D.C. 1955) (dismissing

perjury indictment, *as a matter of law*, because the questioning was ambiguous and terms were

vague), aff'd per curiam, 232 F.2d 334 (D.C. Cir. 1956); see also Def's Mot. to Dismiss, at 20-

22.  Nor can the government negate interpretations that any statements were truthful.  Id.

Furthermore, as discussed above, the government simply cannot say what Mr. Safavian said, or

was asked, in connection with the request for the underlying ethics opinion.  Because the

government cannot assail the underpinnings of the ethics opinion itself, the government cannot

show that the concealment allegations related to the GSA-OIG are anything more than

reiterations of the legally flawed allegations of Count Two.

Furthermore, as the Indictment itself explains, the GSA-OIG's investigation focused on

Mr. Safavian's alleged participation in an "international golfing trip provided by lobbyists" that

was initiated pursuant to a March 26, 2003 anonymous hotline complaint.  Indictment ¶ 24.  The

Indictment states that during the March 27, 2003 OIG interview, Mr. Safavian "falsely stated in

substance" that Abramoff "had no business with GSA" prior to the August 2002 trip.  Id. ¶ 25.

The Indictment notes that the OIG closed its investigation because Mr. Safavian's participation

in the trip was not "provided by lobbyists."  <u>See</u> <u>id.</u> ¶ 26; <u>see also</u> Def's Mot. to Inspect Grand

Jury Record ("Insp. Ex."), Ex. 1 at DOJ-DS-001429.  Conspicuously absent from the May 9,

2003 OIG report, however, is any mention of Mr. Safavian's alleged representation that

Abramoff "had no business with GSA" ***prior to*** the August 2002 trip, as the Indictment alleges.

Instead, the report, which was based on a March 27, 2003 interview, simply states that

"***Currently***, Jack Abramoff is a professional lobbyist, however he ***does not have*** any business

relationship with GSA."  <u>See</u> (Insp. Ex. 1) at DOJ-DS-001432.  The temporal disconnect

between what the Indictment alleges and the written findings issued by the OIG is critical.

Furthermore, these allegations simply re-cast its flawed allegation about what is doing business

under the ethics framework.  The government simply relies on conclusory assertions founded on

fundamentally ambiguous statements, or true statements, which cannot serve as a proper basis

for a § 1505 prosecution as a matter of law.

   Furthermore, the regulations, by their own terms, preclude the government from asserting

a § 1505 obstruction charge against Mr. Safavian.  The Standards of Ethical Conduct for

Employees of the Executive Branch prohibit the acceptance of "gifts" from, among other things,

a "prohibited source."  5 C.F.R. § 2635.202(a)(1) ("[A]n employee shall not . . . solicit or accept

a gift [f]rom a prohibited source.").  Section 2635.203(b) details items that are considered gifts

for purposes of the regulations.  That same section also expressly denotes what is *not* considered

a gift, including "[a]nything for which market value is paid by the employee."  <u>Id.</u> §

2635.203(b)(9).  Mr. Safavian truthfully represented to the OIG during its investigation that he

paid the cost of the Scotland trip in full and provided a copy of a cancelled check verifying the

same.  Moreover, Mr. Safavian had previously been advised by GSA General Counsel McKenna,

after Mr. Safavian obtained the GSA ethics opinion but before he left for Scotland, that the trip

would not be considered a gift if Mr. Safavian paid for it. <u>See</u> McKenna 302 (Insp. Ex. 4) at

DOJ-DS006970 (summarizing McKenna as "advi[sing] Safavian that if he paid for the golf trip,

it would not be a gift"). The OIG closed its investigation based in part on its determination that

Mr. Safavian did not accept a gift, concluding that Mr. Safavian had in fact paid for the trip and

that the amount paid constituted payment in full. <u>See</u> (Insp. Ex. 1) at DOJ-DS-001432.

Importantly, nowhere does the Indictment allege that Mr. Safavian falsely represented

that he had paid for the trip, that the amount paid was insufficient, or that he accepted a gift from

a prohibited source. In its Opposition, the government now asserts that Mr. Safavian

inaccurately represented that the amount he paid constituted the full cost of the trip. Gov't

Opp'n at 37-38. The government's new argument is irrelevant, however, inasmuch as the

Indictment contains no such contention that he <u>falsely</u> stated that he had paid Mr. Abramoff for

the trip. <u>Contrast</u> Indictment ¶ 25 ("Defendant <u>further</u> stated . . . that he had paid [Mr. Abramoff]

for the total cost of the trip . . . .") (emphasis added);[12] <u>see also</u> <u>United States v. Hess</u>, 124 U.S.

483, 487 (1888) (requiring that indictment "must be accompanied with such statements of the

facts and circumstances as will inform the accused of the specific offense" with which he is

charged); <u>United States v. Kanchanalak</u>, 37 F. Supp. 2d 1, 4-5 (D.D.C. 1999) (dismissing

obstruction charge where prosecution failed to adequately allege elements of offense). It is

untenable for the government to charge Mr. Safavian with obstructing the OIG's investigation

---

[12] The government's position that Mr. Safavian's check for $3,100 did not constitute payment in full is based on its oversimplified and erroneous calculation in which it simply divides the total cost of the trip by the number of attendees. The government offers nothing, however, to substantiate its contention or mathematical rationale, rendering its argument meritless for purposes of this motion. More tellingly, the government does not contest that Mr. Abramoff told Mr. Safavian and others that $3,100 was his share of the cost of the trip. Mr. Abramoff estimated the cost of the trip, including airfare, hotels, and greens fees, to be $3,100, and Mr. Safavian presented Mr. Abramoff with a personal check for that amount before leaving for the trip. <u>See</u> (Insp. Ex. 1) at DOJ-DS-001432. Nor does the government contest the fact that Mr. Abramoff took Mr. Safavian's check and cashed it. Finally, Congressman Robert Ney's Travel Disclosure Form, which requires the Member to "[o]btain the dollar amounts from the sponsor," discloses $3,200 as the value of the trip. <u>See</u> Ex. 8.

when the count as alleged in the Indictment cannot and does not refute the undisputed facts that constituted the basis for the OIG's decision to close its investigation.

Count One of the Indictment alleges that Mr. Safavian "knowingly and corruptly" obstructed and impeded the GSA-OIG investigation. Indictment ¶ 27. In his Motion to Dismiss, Mr. Safavian argued GSA General Counsel McKenna's representation that the trip would not be a gift if Mr. Safavian paid for it negated any specific intent on the part of Mr. Safavian to violate § 1505. Mot. to Dismiss at 41 & n.34. Mr. Safavian relied on Arthur Andersen LLP v. United States, — U.S. —, 125 S. Ct. 2129 (2005), for the position that "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuad[e].'" Id. at 2136 (citation omitted). In its Opposition, the government argues that Arthur Andersen is inapplicable to the instant case because the discussion there involved 18 U.S.C. § 1512—a statute that joins "knowingly" with "corruptly persuade." Gov't Opp'n at 36 n.19; see also Arthur Andersen, 125 S. Ct . at 2135-36; 18 U.S.C. § 1512 (making it a crime to "knowingly . . . corruptly persuad[e] another person . . . with intent to . . . cause" that person to "withhold" documents from, or "alter" documents for use in, an "official proceeding"). While the Court in Arthur Andersen observed that § 1505 does not contain the modifier "knowingly," thus making any analogy "inexact," it had no opportunity to decide the *mens rea* requirement under § 1505. 125 S. Ct. at 2135 n.9. More importantly, here, the government specifically alleges "knowingly" in its § 1505 obstruction charge in Count One, Indictment ¶ 27. See generally United States v. Poindexter, 725 F. Supp. 13, 21 (D.D.C. 1989) (identifying the elements of a § 1505 obstruction charge as "knowingly and corruptly obstruct[ing] the due and proper exercise of the power of inquiry under which investigations were being had by congressional committees").

The government cannot have it both ways. The government attempts to escape the Supreme Court's determination that "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuad[e]'" by arguing "§ 1505 lacks the term 'knowingly,'" and thus "any comparison is not persuasive." Gov't Opp'n at 36 n.19. Yet its inclusion of the "knowingly" element in Count One precludes them from making such a distinction. This error becomes all the more important where the government has not asserted any facts suggesting that Mr. Safavian had knowledge that he was obstructing the OIG's investigation. Accordingly, Count One of the Indictment, by its own terms, fails to sufficiently allege that Mr. Safavian had the requisite knowledge to violate § 1505, and thus must be dismissed as a matter of law.[13]

In sum, Count One must be dismissed as a matter of law because it provides only conclusory and fundamentally ambiguous statements regarding Mr. Safavian's representations to the GSA-OIG, it fails to allege that Mr. Safavian's full payment for the trip was inaccurate, and it fails to assert facts sufficient to allege that Mr. Safavian knowingly violated § 1505.

## IV. COUNT THREE MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT SUFFICIENTLY ALLEGE THAT MR. SAFAVIAN KNOWINGLY OR WILLFULLY FALSIFIED OR CONCEALED ANY MATERIAL FACTS DURING THE GSA-OIG INVESTIGATION

Count Three of the Indictment charges Mr. Safavian with violating 18 U.S.C. § 1001(a)(1) by knowingly and willfully falsifying and concealing material facts with regard to the

---

[13] The government's reliance on United States v. Browning, 630 F.2d 694 (10th Cir. 1980), cert. denied, 451 U.S. 988 (1981), is also inapposite. The government cites Browning in support of its argument that Mr. Safavian "need not be aware of the exact details of § 1505 if a reasonable person would have realized that their conduct was unlawful." Gov't Opp'n at 36 n.19. The facts surrounding the defendant's § 1505 conviction in Browning differ substantially from those in the instant case. The defendant in Browning specifically counseled a French firearms manufacturer on a number of occasions and through different media as to how to avoid telling the truth to United States Customs officials in an effort to avoid paying custom duties. 630 F.2d at 699-701. The defendant himself also admittedly falsified information sought by Customs officials. The Browning court was in possession of taped phone calls and written memoranda memorializing these obstructive acts. Id. at 699-700. By contrast, there is no such evidence in the case at bar that would lead any reasonable person to conclude that Mr. Safavian "sought to mislead and did mislead the government" during the course of the OIG's investigation. Accordingly, the government's reliance on this Tenth Circuit case is inapplicable to the issues presented here.

GSA-OIG's investigation.  For the reasons detailed below, Count Three suffers from fatal

defects that require this Court to dismiss this count as a matter of law.

      **A.**    **<u>Mr. Safavian Did Not Use a Trick, Scheme, or Device to Conceal Material</u>**
              **<u>Information</u>**

           1.     **Mr. Safavian Did Not Have a Legal Duty to Disclose**

As explained in Part II.C.1, to succeed in a § 1001 prosecution, the government must,

among other things, identify a specific duty to disclose where concealment is alleged.  <u>Crop</u>

<u>Growers Corp.</u>, 954 F. Supp. at 345; <u>see</u> <u>also</u> <u>United States v. Curran</u>, 20 F.3d 560, 566 (3d Cir.

1994) (vacating conviction for concealment under § 1001 where there was no duty to disclose

source of contributions to Federal Election Commission).  In the absence of a specific duty, any

charge premised on concealment necessarily fails as a matter of law.  <u>Crop Growers Corp.</u>, 954

F. Supp. at 348 (dismissing § 1001 counts as a matter of law "because Defendants had no duty to

disclose the conduct alleged").

     The Indictment is completely silent on what specific duty Mr. Safavian was subject to

during the OIG's investigation.  The charging paper identifies no regulation or statutory

provision that obligated Mr. Safavian in any meaningful way.  Recognizing the due process

considerations inherent in a duty to disclose inquiry, this Court has previously determined that

regulations and statutes must "define criminal offenses with sufficient clarity that an ordinary

person can understand what conduct is prohibited." <u>Crop Growers Corp.</u>, 954 F. Supp. at 345.  In

its Opposition, the government argues three bases for its contention that Mr. Safavian had a duty

to disclose certain information to the OIG.  As explained in Part II.C.1 and below, none meet the

standards established by this Court's caselaw or the constitutional requirements of the Due

Process clause.

For the reasons stated in Part II.C.1, neither Executive Order 10450 nor <u>Cisneros</u> are applicable to the circumstances of the instant case, and therefore neither is sufficient to impose a legal duty on Mr. Safavian.[14]  Furthermore, the Code of Federal Regulations has absolutely no relevance in the context in Count Three, namely the OIG investigation. [15]

Again, to infer from these most general of principles a specific duty to disclose certain information stretches the outer limits of what this Court has considered adequate to satisfy Due Process considerations and to provide fair notice of what is criminalized conduct.  <u>Lanier</u>, 520 U.S. at 266; <u>Kanchanalak</u>, 192 F.3d at 1046 (noting that the "Due Process Clause of the Fifth Amendment prohibits punishing a criminal defendant for conduct 'which he could not reasonably understand to be proscribed'") (citation omitted); <u>Crop Growers Corp.</u>, 954 F. Supp. at 345.  At a basic level, the government failed to assert in the Indictment essential facts that now render it fatally flawed.  In its Opposition, the government now attempts to remedy this deficiency by manufacturing a duty through a patchwork assembly of unrelated regulations and executive orders that have no relevance to the specific facts of this case.

---

[14] In its discussion of Mr. Safavian's alleged duty to disclose, the government unwittingly highlights the very weakness undermining not only Count Three, but Count One as well.  The government maintains that "[d]uring the GSA-OIG interviews, Defendant was asked directly about the Scotland trip, his relationship with Abramoff and Abramoff's relationship to GSA."  Gov't Opp'n at 39.  Importantly, however, the government cannot point to anything supporting its assumption that it has knowledge of the specific questions asked by OIG investigators, much less the precise answers provided by Mr. Safavian.  The Government also cites <u>Cisneros</u> in support of its theory that once a defendant begins volunteering information, he has an ongoing duty to be fully forthcoming on those topics and to not mislead investigators.  Gov't Opp'n at 39.  Although <u>Cisneros</u> relies on <u>United States v. Calhoon</u>, 97 F.3d 518, 526 (11th Cir. 1996), <u>cert. denied</u>, 522 U.S. 806 (1997), for this position, there is nothing in <u>Calhoon</u> that so provides.  Moreover, <u>Cisneros</u> and <u>Calhoon</u> are distinguishable from the instant case in that both involved factual scenarios where explicit regulations and/or forms created specific duties to disclose.  In <u>Calhoon</u>, for example, the court found a duty to disclose where the Medicare cost report forms and the regulations explicitly required such disclosure.  97 F.3d at 526-27 (concluding that employee concealed material facts when seeking Medicare reimbursement for royalty fees and interest payments and in labeling advertising expenses).  Importantly, the government in this case cannot identify any relevant regulatory or statutory duty to disclose, thus rendering Count Three of the Indictment deficient as a matter of law.

[15] And, as discussed in Part II.C.1, Mr. Safavian did not rely on the GSA ethics officer's opinion, thus making the reliance/full disclosure issue moot.

In sum, in circumstances such as those present here, "where a statute or regulation imposes *no* duty whatever to disclose information, due process concerns require that criminal liability not be based on omission of such information." Id.  Accordingly, with regard to the government's contention that Mr. Safavian concealed material information, the absence of a duty to disclose certain information renders Count Three defective as a matter of law, and therefore the charge must be dismissed.

### 2.    The Indictment Alleges No Affirmative Act

Even if this Court were to identify a duty to disclose, the government nevertheless fails to assert what Mr. Safavian affirmatively said, let alone that he concealed material information through a "trick, scheme, or device" during the OIG's investigation.  18 U.S.C. § 1001(a)(1).  To prove the falsity element in a charge of concealment, the government must show a non-disclosure of a fact through a "trick, scheme, or device."  See Woodward, 469 U.S. at 108.  The Indictment does not sufficiently assert that Mr. Safavian was ever asked about the allegedly concealed information and the GSA-OIG report confirms no such questions were asked.  See Insp. Ex. 1.  Courts have uniformly rejected § 1001 actions where the defendant "is never asked" about the allegedly concealed material facts, since "[a] person could, without employing a 'trick, scheme, or device,' simply and willfully fail to . . . [disclose information]."  Woodward, 469 U.S. at 108.

The government now claims that the affirmative acts constituting the "trick, scheme, or device" include Mr. Safavian's relationship with Abramoff and Abramoff's alleged relationship with GSA.[16]  As argued in Part II.C.2, the Indictment's failure to provide any details of the

---

[16] In fact, as further evidence that Mr. Safavian did not employ a "trick, scheme, or device" to conceal material information, Mr. Safavian provided OIG, during his interview conducted as part of the OIG investigation, with Mr. Abramoff's contact information and invited OIG to follow up with Mr. Abramoff in the event they had any further

concealments or identify any duty to disclose render this, at most a "passive failure to disclose" or "mere silence in the face of an unasked question." Without more, the government's contention in this regard is nothing more than a blithe attempt to assert through conclusory statements that Mr. Safavian affirmatively used a "trick, scheme, or device" to allegedly conceal material facts. For this reason alone, Count Three fails as a matter of law.

**B.    Mr. Safavian Did Not Knowingly or Willfully Falsify Any Material Facts During the GSA-OIG Investigation**

**1.    The Government Fails to Refute the Truthfulness of Mr. Safavian's Statements to the GSA-OIG**

The Indictment charges that Mr. Safavian violated § 1001(a)(1) by falsely stating to OIG investigators that "Lobbyist A did not have any business with GSA." Indictment ¶ 31. The correlating OIG report and March 2003 302 notes, however, provide no basis for the government's assertion. As discussed earlier, this disconnect is fatal as a matter of law. See Part III (citing, inter alia, Lattimore, 127 F. Supp. at 409-10, and referring to cases in defendant's opening Motion, all for their holdings that the prosecution is precluded from bringing § 1001 claims in fundamentally ambiguous contexts). Nevertheless, Mr. Safavian's statements to OIG investigators were accurate. See Part II.B.1. The government's sole response is that Mr. Safavian is attempting to make a sufficiency of the evidence argument, Gov't Opp'n at 41, an argument that simply misses the mark and seeks to set aside this Court's role in reviewing the allegations and ruling on matters that may be resolved as a matter of law. What the government fails to do, however, is refute the truthfulness of Mr. Safavian's representations to the OIG investigators and, in fact, completely bypasses defendant's arguments that Mr. Abramoff was not doing business as a matter of law. In the absence of any dispute regarding the accuracy of Mr.

---

questions regarding the nature of the overseas trip. See First Page of Notes to GSA-OIG's Mar. 27, 2003 Interview with David Safavian, Ex. 11 at DOJ-DS001528.

Safavian's statements to the OIG during the course of its investigation, the government has failed to assert facts suggesting that Mr. Safavian falsified any material facts, thus rendering Count Three deficient as a matter of law.

> 2.    **The Government Fails to Sufficiently Address the Materiality of Mr. Safavian's Statement to the GSA-OIG**

As argued in Part II.D, <u>Gaudin</u> has no bearing on this Court's ability to address the government's complete failure to sufficiently assert facts supporting the materiality element of § 1001.  Mr. Safavian is not passing on his right to have a jury determine the materiality of any of the allegedly false statements he may have made to the GSA-OIG.  Instead, he is simply asking this Court to review whether the government has asserted materiality sufficient to survive a Rule 12(b)(3)(b) motion; and whether Count Three should be dismissed on that basis.  By doing so, this Court would not be imposing on the Due Process and Sixth Amendment protections the Supreme Court sought to provide by requiring a jury determination on the materiality issue. <u>Gaudin</u>, 515 U.S. at 522-23.

Furthermore, in addition to the other arguments that defendant made in his Motion to Dismiss, at 43-44, with respect to materiality, the government's admission that it cannot provide any information related to the statements leading to the ethics opinion further demonstrates the legal flaws in showing materiality.  The first step in determining "whether a statement is 'material' requires" an inquiry into "'what statement was made.'" <u>Gaudin</u>, 515 U.S. at 512. Here, because the government cannot say what statements were made leading to the ethics opinion, the jury would be required to engage in sheer speculation to assess materiality in connection with the derivative allegation about concealment in connection with the GSA-OIG.

## V.    COUNT FOUR MUST BE DISMISSED BECAUSE OF A LACK OF JURISDICTION AND BECAUSE MR. SAFAVIAN'S STATEMENTS WERE NEITHER FALSE NOR CORRUPTLY DESIGNED TO OBSTRUCT.

### A.    The SCIA Did Not Have Jurisdiction to Investigate Whether Mr. Safavian Made False Statements to the GSA.

Mr. Safavian has moved this Court to dismiss Count Four of the Indictment because the question of whether he made false representations to a GSA ethics officer was not within the Senate Committee on Indian Affairs' (the "SCIA") jurisdiction.  Nothing in the government's opposition to this motion suggests otherwise.

A defendant violates § 1505 when the defendant impedes (in this case) a Senate committee's "due and proper exercise of the power of inquiry . . . ."  An investigation by a congressional committee is a "due and proper exercise of the power of inquiry," and is protected by § 1505 "[i]f it is apparent that the investigation is a legislative exercise of the investigative authority [of a congressional committee] *in an area within the committee's purview*."  United States v. Mitchell, 877 F.2d 294, 300 (4th Cir. 1989) (emphasis added).  "The questions raised by committees *must of course be within their jurisdiction* . . . ."  United States v. Poindexter, 725 F. Supp. 13, 22 n.12 (D.D.C. 1989) (emphasis added).

The Senate has carefully spelled out the SCIA's jurisdiction.  The SCIA's jurisdiction includes "all matters pertaining to problems and opportunities of Indians, including but not limited to, Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States."  S. Res. 4, § 105(b)(2), 95th Cong. (1977) as amended by S. Res. 127, 98th Cong. (1984).[17]  This statement of the

---

[17] To this date, 53 bills or resolutions have been submitted to the SCIA during the 109th Congress.  See http://thomas.loc.gov/cgi-bin/bdquery/R?d109:FLD005:@3(Senate+Indian+Affairs) (collecting bills).  All 53 deal with some aspect of  "Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States."  S. Res. 4, § 105(b)(2), 95th Cong. (1977) as amended by S. Res. 127, 98th Cong. (1984).

Committee's jurisdiction represents the scope of its power. "A congressional committee is a creation of its parent house and only has the power to inquire into matters within the scope of the authority that been delegated to it by that body." Louis Fisher et al., Congressional Oversight Manual, Congr. Research Serv., at CRS-44 (updated October 21, 2004) at 44, available at http://www.fas.org/sgp/crs/misc/RL30240.pdf.[18]

The government quotes from United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998) to support its claim that the SCIA's investigative power is broad and freewheeling.[19] Unfortunately for the government, its quotation misses the mark. While it is true, as Cisneros states, that "courts have been unwilling to pardon defendants based on technicalities or formalities," 24 F. Supp. 2d at 39, the "technicalities and formalities" at issue in Cisneros and the cases it cites were related to whether the congressional investigations were formal or informal, preliminary to an investigation (rather than a part of the investigation) or whether they were the congressional equivalent of a "proceeding." Id. ("Cisneros claims that the Senate inquiry . . . was not 'due and proper' because the Senate committee initiated its inquiry prior to President Clinton officially sending the nomination to the Senate"); Mitchell, 877 F.2d at 300 ("[Appellant's] argument is based on the premise that for a congressional investigation to be a

_____

[18] In his Motion to Dismiss, Mr. Safavian cited two other CRS reports. For the Court's benefit, these reports are attached as exhibits to this filing. See Exs. 9 and 10. These reports are often available on-line including (in the case of Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry) from the Senate's official public website. See Morton Rosenberg, Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry, Congressional Research Service Report for Congress, April 7, 1995, available at http://www.senate.gov/reference/resources/pdf/95-464.pdf & http://www.ncseonline.org/nle/crsreports/government/gov-3.cfm.

[19] As noted in Mr. Safavian's memorandum accompanying his motion to dismiss, the question of the *Senate's* power to investigate alleged acts of corruption by government officials is not at issue. The government's cite to Watkins is unnecessary and, in fact, redundant of defendant's own citations to that case for the same proposition. Def's Mot. to Dismiss, at 49-50 (citing United States v. Watkins, 354 U.S. 178 (1957)). The question is to what extent does a particular *committee* – a committee charged with exploring "all matters pertaining to problems and opportunities of Indians, including but not limited to, Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States" – has the jurisdiction to explore matters unrelated to its mission.

'due and proper exercise' of the power of inquiry' under [§ 1505], it must first have been formally authorized pursuant to the letter of the investigating committee's rules."); Poindexter, 725 F. Supp. at 22 n. 11 ("Among the rules allegedly violated was House Rule XI which requires committee meetings to be open to the public, compels the committees to keep a public record of the proceedings, requires the chairman to announce the subject of the investigation at the start of any hearing, and allows each witness to obtain a transcript of the proceedings."). Mr. Safavian does not question whether the SCIA's Abramoff/Scanlon investigation was a formal proceeding of the Committee or whether the SCIA violated rules concerning the distribution of transcripts. The question is more important, and more basic: whether the investigation could, in accordance with the Committee's jurisdictional statement, reach an alleged act of corruption by a government official uninvolved in Indian affairs. It could not. The SCIA's statement of jurisdiction represents the total sphere of its investigative power, not a starting point. Count Four should be dismissed.

**B.    Mr. Safavian's Statements Were Not False Let Alone Corruptly Designed to Obstruct.**

At its core, Count Four relies on the conclusion that Mr. Safavian's statement to Ray McKenna and later to the GSA-OIG that Abramoff had no business before the GSA was false. As this filing and Mr. Safavian's Motion to Dismiss exhaustively demonstrate, that statement was not, as a matter of law, false. Mr. Safavian passed along to the SCIA the same information he told the GSA and the GSA-OIG: in July 2002, Mr. Abramoff had no business before the GSA. Nothing in that statement was false. Mr. Safavian did not conceal from the GSA, the GSA-OIG, or the SCIA any information pertinent to their requests. Ultimately, therefore, Count Four is derivative of Count Two. If the government cannot sustain Count Two (and this Reply and the Motion to Dismiss make it clear the government cannot), it cannot sustain Count Four.

Because and for the same reasons Count Two should be dismissed, Count Four should also be dismissed.

Even assuming, however, that Count Two is not dismissed, Count Four should be dismissed because the government cannot demonstrate that Mr. Safavian obstructed, or endeavored to obstruct, the SCIA's investigation. The reason the SCIA contacted Mr. Safavian was because he had attended the Scotland trip. Mr. Safavian's contact with the SCIA amounted to a letter to Senator McCain and three phone calls he made to a Committee investigator. Mr. Safavian acknowledged to the SCIA that he attended the Scotland trip and recalled his discussion with McKenna concerning an ultimately unused ethics opinion. The Committee investigator requested a copy of the ethics opinion and Mr. Safavian complied with the request.

Although the government's opposition recites the familiar standard for obstruction—an "action from which an obstruction of justice was a reasonably foreseeable result" Gov't Opp'n at 45-46 (quoting United States v. McBride, 362 F.3d 360, 372 (6th Cir. 2004))—the Opposition is notable only in that it is devoid of any effort to explain how Mr. Safavian obstructed or even endeavored to obstruct the SCIA's investigation. Section 1505 is a specific intent offense—the defendant must have acted knowingly, voluntarily, deliberately, and with a bad purpose. United States v. North, 910 F.2d 843, 884 (D.C. Cir.) (per curiam) superseded in other parts by 920 F.2d 940 (D.C. Cir. 1990). Mr. Safavian did not act with a bad purpose; he simply forwarded to the SCIA the same information he had passed along to the GSA and the GSA-OIG.

Even assuming for the purpose of this motion that Mr. Safavian's alleged statement was false (i.e., that Mr. Abramoff did have business before the GSA and Mr. Safavian knew about it), the government cannot demonstrate how this falsehood impeded or could have impeded an investigation described by the government as an inquiry into "the flow of funds, the activities on

the [Scotland] trip, and who paid for the activities on the trip." Gov't Opp'n at 43. Mr. Safavian

cooperated fully in this inquiry. He explained to the SCIA that he had, at first, considered

attending the trip as a guest of Mr. Abramoff but that he reconsidered and paid his own way.

The government does not dispute that Mr. Safavian gave Mr. Abramoff a check for his expenses

prior to departure. It is difficult to see, therefore, how Mr. Safavian's statement — in a request

for an ethics opinion that was voluntarily not utilized — that Mr. Abramoff had no business

before GSA, could have impeded a Senate investigation into who paid for the Scotland trip.

Count Four should be dismissed.

## VI. COUNT FIVE MUST BE DISMISSED, AS MR. SAFAVIAN'S STATEMENTS TO THE SCIA AT ISSUE WERE NEITHER FALSE NOR MATERIAL TO THE SCIA'S INVESTIGATION.

### A. Mr. Safavian Did Not Conceal Any Material Information From the SCIA Nor Did the Circumstances Create a Duty to Disclose Such Information.

Reading the government's opposition brief, one is tempted to believe that David Safavian

was at the heart of the SCIA's investigation. To the contrary (and as mentioned above), Mr.

Safavian's contact with the Committee amounted to a targeted record request from Senator

McCain and Mr. Safavian's reply, and a ministerial conversation with a committee staffer that

amounted to no more than a reiteration of Mr. Safavian's letter to Senator McCain. The purpose

of the SCIA's contact with Mr. Safavian was, as the government puts it, to "gather information

on the flow of funds, the activities on the [Scotland] trip, and who paid for the activities on the

trip." Gov't. Opp'n at 43.

Senator McCain's request for information was, consequently, very specific. The Senator

expected Mr. Safavian to produce to the Committee "all records reflecting, referring, or relating

to the 2002 Scotland golf trip you attended with Mr. Jack Abramoff and others." Feb. 23, 2005

SCIA Ltr. (attached as Exhibit 11 to the Motion to Dismiss) (hereinafter, "SCIA Letter"). The

letter was not a broad request that Mr. Safavian sit down with investigators or testify before the Committee and provide a complete rundown of his relationship with Mr. Abramoff.

In its opposition to the Motion to Dismiss, the government mischaracterizes Senator McCain's letter. The government states that Senator sent the letter for the purpose of, *inter alia*, "determining if Abramoff had business before the GSA at the time of the trip . . .." Gov't Opp'n at 44. There is nothing in the text of that letter that reveals this purpose. The letter was a brief and targeted request for "all records reflecting, referring, or relating to the 2002 Scotland golf trip you attended with Mr. Jack Abramoff and others." See SCIA Letter. There is no reference in the letter to information concerning whether Mr. Abramoff had business before the GSA in July or August 2002. The government's attempt to re-characterize the letter in such a manner as to infer criminal liability where none can fairly rest should be rejected.

Mr. Safavian accurately and completely replied to Senator McCain's request. Mr. Safavian provided Senator McCain with his correspondence with GSA counsel concerning his initial decision to attend the trip as a guest of Mr. Abramoff as well as a canceled check showing that ultimately Mr. Safavian paid for the trip himself. Mr. Safavian also disclosed in a cover letter his ten-year friendship with Mr. Abramoff. See Safavian Letter to SCIA, Ex. 13 to Def.'s Mot. to Dismiss at DOJ-DS001557-58.

The government does not allege that Mr. Safavian has other records from this trip, i.e., that Mr. Safavian withheld from the SCIA any record of the Scotland trip. Instead, the government alleges that Mr. Safavian did not disclose (or rather, more nefariously in the government's view, Mr. Safavian concealed) unrelated contacts between he and Mr. Abramoff and that his failure to disclose these contacts constituted concealment of facts material to the SCIA's investigation. Specifically, Count Five alleges "defendant Safavian . . . concealed his

assistance to Lobbyist A in GSA-related activities."[20]   Indictment ¶ 40.  Mr. Safavian did no such thing.

Mr. Safavian was asked for records regarding the Scotland trip—specifically, who attended the Scotland trip and who paid.  According to the 302 of Chief Investigative Counsel Carrillo, "[t]he purpose of the letter was to obtain information concerning the 2002 trip.  Specifically, *they were looking for itineraries and costs*, as well as facts that would illuminate them to what CAF is and the nature of the organization."  Carrillo 302, Ex. 9 to Def.'s Mot. to Inspect Grand Jury R. at DOJ-DS-001619 (emphasis added).  Mr. Safavian provided the SCIA with the information requested by the Committee.  The government does not explain how assistance to Mr. Abramoff in "GSA-related activities" is related to a record request for information about who paid and who attended the Scotland trip.  Put simply, there was no reason for Mr. Safavian to believe that this record request would have required him to set forth all manner of contacts between Mr. Abramoff and himself.  A defendant can only conceal what he has been asked for.  It is not concealment to fail to provide information you have not been asked for or do not have a duty to disclose.  Hubbard v. United States, 514 U.S. 695, 716-17 (1995) ("[Section] 1001's prohibition of concealment is violated only when there exists a duty to disclose."); see also United States v. Larson, 796 F.2d 244, 246 (8th Cir. 1986).  The terms of Mr. Safavian's duty to disclose should, in Count Five, be measured according to the terms of the letter sent to him by the SCIA.  As has been demonstrated, this letter was specific in its purpose

---

[20] The other means by which the government alleges at Count Five that Mr. Safavian violated § 1001 are equally invalid.  Mr. Safavian did not "conceal [Abramoff's] business relationships with GSA."  Indictment ¶ 40.  There was nothing to conceal.  Mr. Abramoff had no business relationship with the GSA in July or August 2002.   Likewise, Mr. Safavian did not *falsely* state that Mr. Abramoff had no business before the GSA in July or August 2002.  This brief and the Motion to Dismiss establish that, as a matter of law, Mr. Abramoff had no business before the GSA in July or August 2002.

and limited in its scope and did not require a blow-by-blow of Mr. Safavian's contacts with Mr.

Abramoff in the last ten years. Count Five should be dismissed.

**B.** **Mr. Safavian Accurately Represented to the Committee that Abramoff Had No Business Before the GSA. Mr. Safavian's Statement Was True and Immaterial to the SCIA's Investigation.**

Much, if not all, of the government's case relies on its assertion that Mr. Abramoff was

doing business before the GSA in July 2002. As a result, the government's case is predicated on

a legally fatal premise and cannot be supported. This holds true for Count Five as much as it

does for any other of the counts in the Indictment. Count Five alleges that Mr. Safavian's

statement in his letter to Senator McCain that "Mr. Abramoff did not have any business before

the [GSA in August 2002]" was false. Indictment ¶ 40. It was not false. As shown in Part I.B

of the Motion to Dismiss, Mr. Abramoff was not doing business with or before the GSA in July

2002 either under the "technical definition" of business the government attributes to Mr.

Safavian or any "common usage" of the term the government may wish to introduce. This Reply

Brief and the Motion to Dismiss leave no doubt that Mr. Abramoff was not doing business

before the GSA in July or August 2002.

The SCIA contacted Mr. Safavian for a limited purpose—to obtain information about the

Scotland trip. As has been discussed, Mr. Safavian complied with the request for records. In the

cover letter and in one of the records, Mr. Safavian stated that Mr. Abramoff had no business

before the GSA at the time of the trip. The statement was made in relation to Mr. Safavian's

request for an ethics opinion on the propriety of his attending the trip as a paid guest of Mr.

Abramoff.

It is undisputed, however, that Mr. Safavian ultimately did not need the ethics opinion—

in an abundance of caution he paid his own way and included unchallenged evidence to that

effect (a canceled check for $3,100 made out from Mr. Safavian to Mr. Abramoff and dated the

day of the flight to Scotland).[21]   The government has not demonstrated how Mr. Safavian's

statement, even assuming it was false, was material to the SCIA's inquiry.   Assuming the

SCIA's inquiry was limited to, as the government describes it, "information on the flow of funds,

the activities on the [Scotland] trip, and who paid for the activities on the trip," Gov't Opp'n at

43, the government cannot (and in fact does not in its Opposition to the Motion to Dismiss)

explain how a statement made in the context of seeking an ethics ruling that was never used was

material to the SCIA's inquiry.

### C.    The Propriety of Mr. Safavian's Attendance on the Scotland Trip was Not a Question Within the Jurisdiction of the SCIA.

Ultimately, the propriety (as opposed to the fact) of Mr. Safavian's attendance on the trip

was simply not a question within the jurisdiction of the SCIA.   As with Count Four, a  § 1001

offense is sustainable in this context only where the investigation by a Senate committee is

within the jurisdiction of that committee.[22]   As the Motion to Dismiss made clear, the SCIA does

not have *carte blanche* to investigate alleged government corruption.   The government has

offered no reason why the propriety of a public official's acceptance (or in this case, non-

acceptance) of a trip from a lobbyist was not a matter for another Committee of the Senate

including either the Full Committee on Homeland Security and Government Affairs, or the

Permanent Subcommittee on Investigations.   See Committee on Homeland Security and

Governmental Affairs Full Committee and Subcommittee Jurisdictions for the 109th Congress, at

http://hsgac.senate.gov/index.cfm?Fuseaction=About.Jurisdiction (describing Full Committee's

---

[21] As noted in footnote 14 *supra*, Mr. Safavian's payment of $3,100 was comparable to the payment by Congressman Ney of $3,200 as indicated on his Travel Disclosure Form.

[22] In the floor debate accompanying the adoption of the 1996 amendment to § 1001, Senator Specter, a sponsor of the amendment, noted that "[o]nly committee . . . investigations or reviews conducted pursuant to the authority of the particular committee . . ., meaning within its jurisdiction, will receive the protection of § 1001, and then only so long as the investigation or review is conducted in a manner consistent with the rules of the . . . Senate . . .." 142 Cong. Rec. S11605 (Sept. 27, 1996) (statement of Sen. Specter).

jurisdiction as involving, among other things, "Federal Civil Service," and "[S]tatus of officers

and employees of the United States," and stating that the Permanent Subcommittee on

Investigations' jurisdiction includes "[t]he compliance or noncompliance of corporations,

companies, or individual or other entities with the rules, regulations, and laws governing the

various governmental agencies and their relationships with the public.").  The SCIA, to the

contrary, has limited jurisdiction:  "Indian land management and trust responsibilities, Indian

education, health, special services, and loan programs, and Indian claims against the United

States" or other similar issues.  S. Res. 4, § 105(b)(2), 95th Cong. (1977), as amended by S. Res.

127, 98th Cong. (1984).  Whether or not it was proper for Mr. Safavian to attend the Scotland

trip as Mr. Abramoff's guest is not a question within the jurisdiction of the SCIA.  The

government has not indicated how an investigation of Mr. Abramoff's bilking of Indian tribes

would be helped had Mr. Safavian not made the allegedly false statements to the committee.

Count Five should be dismissed.

## VII.    THE COURT SHOULD DISMISS THE 18 U.S.C. § 2 CHARGES ALLEGED IN COUNTS ONE AND FOUR.

        Counts One and Four of the Indictment allege that Mr. Safavian violated 18 U.S.C. § 2,

the aiding and abetting statute.[23]  However, neither charge specifies whether the violation

pertains to § 2(a) or § 2(b).  Furthermore, neither Count One nor Count Four provides *any* factual

basis for an aiding and abetting offense.  An indictment must provide specific facts that put the

defendant on notice as to how the conduct alleged constitutes the essential elements of the

---

[23] Section 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

offense charged.  <u>United States v. Hess</u>, 124 U.S. 483, 487 (1888) (determining that an indictment "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged"); <u>see also</u> Fed. R. Crim. P. 7(c) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). It is well settled that an  "indictment not framed to apprise the defendant 'with reasonable certainty, of the nature of the accusation against him . . . is defective, although it may follow the language of the statute.'" <u>Russell</u>, 369 U.S. at  765 (citation omitted).  Importantly, the Indictment in this case fails to even track the statutory language of § 2, much less provide facts supporting such a charge.

In addition, the § 2 charges run headlong into the longstanding principle that one cannot aid and abet in the commission of a crime ***unless there is another*** who has committed the offense.  <u>Nye & Nissen v. United States</u>, 336 U.S. 613, 620 (1949) ("Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one *assists another* in performing.") (emphasis added); <u>United States v. Garrett</u>, 720 F.2d 705, 7136 (D.C. Cir. 1983) (recognizing criminal liability under § 2 for a person who "'*assists the perpetrator of the crime* while sharing the requisite criminal intent'") (emphasis added) (citation omitted), <u>cert. denied</u> 465 U.S. 1037 (1984); <u>Morgan v. United States</u>, 159 F.2d 85, 87 (10th Cir. 1947) (concluding that "one cannot be found guilty under a charge of aiding and abetting in the commission of an offense unless there is satisfactory evidence not only of his participation *but also that another for whom he was acting was connected with the offense*") (emphasis added).  The Indictment utterly fails to allege for whom Mr. Safavian was acting, or for that matter, what offense this unnamed person allegedly committed.  Simply stated, Mr. Safavian cannot have aided and abetted himself.

There cannot be criminal liability under § 2 in the absence of an alleged person that the aider or abettor purportedly assisted in committing the underlying crime.

The government cites United States v. Hamblin, 911 F.2d 551, 557 (11th Cir. 1990), cert. denied, 500 U.S. 943 (1991), for the proposition that the government must simply "demonstrate that a substantive offense was committed, that the defendant associated himself with the criminal venture, and that he committed some act which furthered the crime." Gov't Opp'n at 49. What the government conveniently omits is the next statement made in Hamblin, which provides that while "[i]t is not necessary to prove that the defendant was present at the scene when the crime occurred, or that he was an active participant, . . . *the government must show that the defendant shared the same unlawful intent as the actual perpetrator*." 911 F.2d at 557-58 (emphasis added). The Indictment is tellingly silent as to the identity of the actual perpetrator, or how Mr. Safavian shared any unlawful intent with this unnamed individual.

The government also relies on United States v. Sinskey, 119 F.3d 712, 718 (8th Cir. 1997), and United States v. Self, 2 F.3d 1071, 1089 (10th Cir. 1993), for its argument that "'[e]ncouraging' a violation and 'discouraging' the reporting of the violation . . . and 'personally attempting to avoid [a violation's] detection' . . . have been held sufficient to show that a defendant aided and abetted the commission of a crime." Gov't Opp'n at 49. Again, the government leaves out important and critically damaging portions of these quotes in order to serve its purposes. For example, in Sinskey, the full quotes provide that "[e]ncouraging *the perpetrators of a crime* in their efforts to effect that crime" and "discouraging [*his co-defendant*] from complaining about" the underlying offense "is therefore aiding and abetting the commission of a crime." 119 F.3d at 718 (emphases added). Likewise, the full quote in Self provides that the "evidence is abundantly sufficient to find that Defendant aided and abetted

*Miller's commission of the offense*." 2 F.3d at 1089 (emphasis added). The government simply cannot ignore hornbook law requiring that there be another person who has committed an underlying offense for there to be an aider and abettor.

The government also contends that this Court would be better served to entertain dismissal of the § 2 charges at the Rule 29 stage after the evidence has been received. Gov't Opp'n at 49. This argument is without merit. It is a well-settled principle that a district court may dismiss an indictment where the charging papers fail to allege the elements of the offense charged. United States v. Cruikshank, 92 U.S. 542, 558-59 (1875) (vacating conviction where indictment did not allege essential elements of the crime charged); London, 550 F.2d at 211 ("An indictment that fails to allege each material element of an offense fails to charge that offense."). Furthermore, the Indictment simply gives the defendant no notice of the facts or allegations that relate to § 2, and accordingly no basis for mounting a defense on such skeletal charges. It is undisputed that the Indictment fails to allege any of the elements outlined in § 2, thus rendering those charges in Counts One and Four defective as a matter of law.

Accordingly, because the § 2 charges asserted against Mr. Safavian are neither supported by the facts alleged in the Indictment nor based on any cognizable legal theory, they must be dismissed.

## **CONCLUSION**

Unable to allege the heart of this case, the government piles inference upon ambiguity in an effort to build a case against Mr. Safavian out of a request for advice that was, ultimately, not needed.  For the reasons argued herein, as well as those of the Motion to Dismiss, the Court should dismiss the entire Indictment.

Respectfully submitted,

By:  _/s/ Barbara Van Gelder
    Barbara Van Gelder (D.C. Bar # 265603)
    Roderick L. Thomas (D.C. Bar # 433433)
    Albert C. Lambert (D.C. Bar # 489562)
    WILEY REIN & FIELDING LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032

Dated: February 21, 2006            *Attorneys for David H. Safavian*