# Exhibit 1

Standard Form 86
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

Form approved:
OMB No. 3206-0007
NSN 7540-00-634-4036
86-111

# Questionnaire for National Security Positions

Follow instructions fully or we cannot process your form. Be sure to sign and date the certification statement on Page 9 and the release on Page 10. *If you have any questions,* call the office that gave you the form.

**Purpose of this Form**
The U.S. Government conducts background investigations and reinvestigations to establish that military personnel, applicants for or incumbents in national security positions, either employed by the Government or working for Government contractors, licensees, certificate holders, and grantees, are eligible for a required security clearance. Information from this form is used primarily as the basis for investigation for access to classified information or special nuclear information or material. Complete this form only after a conditional offer of employment has been made for a position requiring a security clearance.

Giving us the information we ask for is voluntary. However, we may not be able to complete your investigation, or complete it in a timely manner, if you don't give us each item of information we request. This may affect your placement or security clearance prospects.

**Authority to Request this Information**
Depending upon the purpose of your investigation, the U.S. Government is authorized to ask for this information under Executive Orders 10450, 10865, 12333, and 12356; sections 3301 and 9101 of title 5, U.S. Code; sections 2165 and 2201 of title 42, U.S. Code; sections 781 to 887 of title 50, U.S. Code; and parts 5, 732, and 736 of Title 5, Code of Federal Regulations.

Your Social Security number is needed to keep records accurate, because other people may have the same name and birth date. Executive Order 9397 also asks Federal agencies to use this number to help identify individuals in agency records.

**The Investigative Process**
Background investigations for national security positions are conducted to develop information to show whether you are reliable, trustworthy, of good conduct and character, and loyal to the United States. The information that you provide on this form is confirmed during the investigation. Investigation may extend beyond the time covered by this form when necessary to resolve issues. Your current employer must be contacted as part of the investigation, even if you have previously indicated on applications or other forms that you do not want this.

In addition to the questions on this form, inquiry also is made about a person's adherence to security requirements, honesty and integrity, vulnerability to exploitation or coercion, falsification, misrepresentation, and any other behavior, activities, or associations that tend to show the person is not reliable, trustworthy, or loyal.

**Your Personal Interview**
Some investigations will include an interview with you as a normal part of the investigative process. This provides you the opportunity to update, clarify, and explain information on your form more completely, which often helps to complete your investigation faster. It is important that the interview be conducted as soon as possible after you are contacted. Postponements will delay the processing of your investigation, and declining to be interviewed may result in your investigation being delayed or canceled.

You will be asked to bring identification with your picture on it, such as a valid State driver's license, to the interview. There are other documents you may be asked to bring to verify your identity as well. These include documentation of any legal name change, Social Security card, and/or birth certificate.

You may also be asked to bring documents about information you provided on the form or other matters requiring specific attention. These matters include alien registration, delinquent loans or taxes, bankruptcy, judgments, liens, or other financial obligations, agreements involving child custody or support, alimony or property settlements, arrests, convictions, probation, and/or parole.

**Organization of this Form**

This form has two parts. Part 1 asks for background information, including where you have lived, gone to school, and worked. Part 2 asks about your activities and such matters as firings from a job, criminal history record, use of illegal drugs, and abuse of alcohol.

In answering all questions on this form, keep in mind that your answers are considered together with the information obtained in the investigation to reach an appropriate adjudication.

**Instructions for Completing this Form**
1. Follow the instructions given to you by the person who gave you the form and any other clarifying instructions furnished by that person to assist you in completion of the form. Find out how many copies of the form you are to turn in. You must sign and date, in black ink, the original and each copy you submit. You should retain a copy of the completed form for your records.

2. Type or legibly print your answers in black ink (if your form is not legible, it will not be accepted). You may also be asked to submit your form in an approved electronic format.

3. All questions on this form must be answered. If no response is necessary or applicable, indicate this on the form (for example, enter "None" or "N/A"). If you find that you cannot report an exact date, approximate or estimate the date to the best of your ability and indicate this by marking "APPROX." or "EST."

4. Any changes that you make to this form after you sign it must be initialed and dated by you. Under certain limited circumstances, agencies may modify the form consistent with your intent.

5. You must use the State codes (abbreviations) listed on the back of this page when you fill out this form. Do not abbreviate the names of cities or foreign countries.

6. The 5-digit postal ZIP codes are needed to speed the processing of your investigation. The office that provided the form will assist you in completing the ZIP codes.

7. All telephone numbers must include area codes.

8. All dates provided on this form must be in Month/Day/Year or Month/Year format. Use numbers (1-12) to indicate months. For example, June 8, 1978, should be shown as 6/8/78.

9. Whenever "City (Country)" is shown in an address block, also provide in that block the name of the country when the address is outside the United States.

10. If you need additional space to list your residences or employments/self-employments/unemployments or education, you should use a continuation sheet, SF 86A. If additional space is needed to answer other items, use a blank piece of paper. Each blank piece of paper you use must contain **your name and Social Security Number at the top of the page.**

**Final Determination on Your Eligibility**

Final determination on your eligibility for access to classified information is the responsibility of the Federal agency that requested your investigation. You may be provided the opportunity personally to explain, refute, or clarify any information before a final decision is made.

**Penalties for Inaccurate or False Statements**

The U.S. Criminal Code (title 18, section 1001) provides that knowingly falsifying or concealing a material fact is a felony which may result in fines of up to $10,000, and/or 5 years imprisonment, or both. In addition, Federal agencies generally fire, do not grant a security clearance, or disqualify individuals who have materially and deliberately falsified these forms, and this remains a part of the permanent record for future placements. Because the position for which you are being considered is a sensitive one, your trustworthiness is a very important consideration in deciding your eligibility for a security clearance.

Your prospects of placement or security clearance are better if you answer all questions truthfully and completely. You will have adequate opportunity to explain any information you give us on the form and to make your comments part of the record.

**Disclosure of Information**

The information you give us is for the purpose of investigating you for a national security position; we will protect it from unauthorized disclosure. The collection, maintenance, and disclosure of background investigative information is governed by the Privacy Act. The agency which requested the investigation and the agency which conducted the investigation have published notices in the Federal Register describing the systems of records in which your records will be maintained. You may obtain copies of the relevant notices from the person who gave you this form. The information on this form, and information we collect during an investigation may be disclosed without your consent as permitted by the Privacy Act (5 USC 552a(b)) and as follows:

## PRIVACY ACT ROUTINE USES

1. To the Department of Justice when: (a) the agency or any component thereof; or (b) any employee of the agency in his or her official capacity; or (c) any employee of the agency in his or her individual capacity where the Department of Justice has agreed to represent the employee; or (d) the United States Government, is a party to litigation or has interest in such litigation, and by careful review, the agency determines that the records are both relevant and necessary to the litigation and the use of such records by the Department of Justice is therefore deemed by the agency to be for a purpose that is compatible with the purpose for which they were collected the records.

2. To a court or adjudicative body in a proceeding when: (a) the agency or any component thereof; or (b) any employee of the agency in his or her official capacity; or (c) any employee of the agency in his or her individual capacity where the Department of Justice has agreed to represent the employee; or (d) the United States Government, is a party to litigation or has interest in such litigation, and by careful review, the agency determines that the records are both relevant and necessary to the litigation and the use of such records is therefore deemed by the agency to be for a purpose that is compatible with the purpose for which they were collected the records.

3. Except as noted in Question 24, when a record on its face, or in conjunction with other records, indicates a violation or potential violation of law, whether civil, criminal, or regulatory in nature, and whether arising by general statute, particular program statute, regulation, rule, or order issued pursuant thereto, the relevant records may be disclosed to the appropriate Federal, foreign, State, local, tribal, or other public authority responsible for enforcing, investigating or prosecuting such violation or charged with enforcing or implementing the statute, rule, regulation, or order.

4. To any source or potential source from which information is requested in the course of an investigation concerning the hiring or retention of an employee or other personnel action, or the issuing or retention of a security clearance, contract, grant, license, or other benefit, to the extent necessary to identify the individual, inform the source of the nature and purpose of the investigation, and to identify the type of information requested.

5. To a Federal, State, local, foreign, tribal, or other public authority the fact that this system of records contains information relevant to the retention of an employee, or the retention of a security clearance, contract, license, grant, or other benefit. The other agency or licensing organization may then make a request supported by written consent of the individual for the entire record if it so chooses. No disclosure will be made unless the information has been determined to be sufficiently reliable to support a referral to another office within the agency or to another Federal agency for criminal, civil, administrative, personnel, or regulatory action.

6. To contractors, grantees, experts, consultants, or volunteers when necessary to perform a function or service related to this record for which they have been engaged. Such recipients shall be required to comply with the Privacy Act of 1974, as amended.

7. To the news media or the general public, factual information the disclosure of which would be in the public interest and which would not constitute an unwarranted invasion of personal privacy.

8. To a Federal, State, or local agency, or other appropriate entities or individuals, or through established liaison channels to selected foreign governments, in order to enable an intelligence agency to carry out its responsibilities under the National Security Act of 1947 as amended, the CIA Act of 1949 as amended, Executive Order 12333 or any successor order, applicable national security directives, or classified implementing procedures approved by the Attorney General and promulgated pursuant to such statutes, orders or directives.

9. To a Member of Congress or to a Congressional staff member in response to an inquiry of the Congressional office made at the written request of the constituent about whom the record is maintained.

10. To the National Archives and Records Administration for records management inspections conducted under 44 USC 2904 and 2906.

11. To the Office of Management and Budget when necessary to the review of private relief legislation.

## STATE CODES (ABBREVIATIONS)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | AL | Hawaii | HI | Massachusetts | MA | New Mexico | NM | South Dakota | SD |
| Alaska | AK | Idaho | ID | Michigan | MI | New York | NY | Tennessee | TN |
| Arizona | AZ | Illinois | IL | Minnesota | MN | North Carolina | NC | Texas | TX |
| Arkansas | AR | Indiana | IN | Mississippi | MS | North Dakota | ND | Utah | UT |
| California | CA | Iowa | IA | Missouri | MO | Ohio | OH | Vermont | VT |
| Colorado | CO | Kansas | KS | Montana | MT | Oklahoma | OK | Virginia | VA |
| Connecticut | CT | Kentucky | KY | Nebraska | NE | Oregon | OR | Washington | WA |
| Delaware | DE | Louisiana | LA | Nevada | NV | Pennsylvania | PA | West Virginia | WV |
| Florida | FL | Maine | ME | New Hampshire | NH | Rhode Island | RI | Wisconsin | WI |
| Georgia | GA | Maryland | MD | New Jersey | NJ | South Carolina | SC | Wyoming | WY |
| | | | | | | | | | |
| American Samoa | AS | Dist. of Columbia | DC | Guam | GU | Northern Marianas | CM | Puerto Rico | PR |
| Trust Territory | TT | Virgin Islands | VI | | | | | | |

## PUBLIC BURDEN INFORMATION

Public burden reporting for this collection of information is estimated to average 90 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Reports and Forms Management Officer, U.S. Office of Personnel Management, 1900 E Street, N.W., Room CHP-500, Washington, D.C. 20415. Do not send your completed form to this address.

Standard Form 86 (EG)
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

**QUESTIONNAIRE FOR**
**NATIONAL SECURITY POSITIONS**

Form approved:
OMB No. 3206-0007
NSN 7540-00-634-4036
86-111

| **Part 1** | Investigating Agency Use Only | Codes | Case Number |
|---|---|---|---|

**Agency Use Only (Complete items A through P using instructions provided by the Investigating agency).**

| A Type of Investigation | B Extra Coverage | C Sensitivity Level | D Access | E Nature of Action Code | F Date of Action | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|

| G Geographic Location | H Position Code | I Position Title |
|---|---|---|

| J SON | K Location of Official Personnel Folder | None / NPRC / At SON | Other Address | ZIP Code |
|---|---|---|---|---|

| L SOI | M Location of Security Folder | None / At SOI / NPI | Other Address | ZIP Code |
|---|---|---|---|---|

| N OPAC-ALC Number | O Accounting Data and/or Agency Case Number |
|---|---|

| P Requesting Official | Name and Title | Signature | Telephone Number ( ) | Date |
|---|---|---|---|---|

**Persons completing this form should begin with the questions below.**

**1 FULL NAME**
• If you have only initials in your name, use them and state (IO).
• If you have no middle name, enter "NMN".
• If you are a "Jr.," "Sr.," "II," etc., enter this in the box after your middle name.

**2 DATE OF BIRTH**

| Last Name | First Name | Middle Name | Jr., II, etc. | Month | Day | Year |
|---|---|---|---|---|---|---|

**3 PLACE OF BIRTH** - Use the two letter code for the State.

| City | County | State | Country (if not in the United States) |
|---|---|---|---|

**4 SOCIAL SECURITY**

**5 OTHER NAMES USED**
Give other names used and the period of time you used them (for example: your maiden name, name(s) by a former marriage, former name(s), alias(es), or nickname(s)). If the other name is your **maiden name**, put "**nee**" in front of it.

| Name #1 | Month/Year To Month/Year | Name #3 | Month/Year To Month/Year |
|---|---|---|---|
| Name #2 | Month/Year To Month/Year | Name #4 | Month/Year To Month/Year |

**6 OTHER IDENTIFYING INFORMATION**

| Height (feet and inches) | Weight (pounds) | Hair Color | Eye Color | Sex (Mark one box) Female / Male |
|---|---|---|---|---|

**7 TELEPHONE NUMBERS**

| Work (Include Area Code and extension) Day ( ) Night | Home (Include Area Code) Day ( ) Night |
|---|---|

**8 CITIZENSHIP**

**a** Mark the box at the right that reflects your current citizenship status, and follow its instructions.

- I am a U.S. citizen or national by birth in the U.S. or U.S. territory/possession. (Answer items b and d)
- I am a U.S. citizen, but was NOT born in the U.S. (Answer items b, c and d)
- I am not a U.S. citizen. (Answer items b and e)

**b** Your Mother's Maiden Name

**c** UNITED STATES CITIZENSHIP   If you are a U.S. citizen, but were not born in the U.S., provide information about one or more of the following proofs of your citizenship.

Naturalization Certificate (Where were you naturalized?)

| Court | City | State | Certificate Number | Month/Day/Year Issued |
|---|---|---|---|---|

Citizenship Certificate (Where was the certificate issued?)

| City | State | Certificate Number | Month/Day/Year Issued |
|---|---|---|---|

State Department Form 240 - Report of Birth Abroad of a Citizen of the United States

| Give the date the form was prepared and give an explanation if needed. | Month/Day/Year | Explanation |
|---|---|---|

U.S. Passport

| This may be either a current or previous U.S. Passport. | Passport Number | Month/Day/Year Issued |
|---|---|---|

**d** DUAL CITIZENSHIP   If you are (or were) a dual citizen of the United States and another country, provide the name of that country in the space to the right.   Country

**e** ALIEN   If you are an alien, provide the following information:

| Place You Entered the United States: | City | State | Date You Entered U.S. Month Day Year | Alien Registration Number | Country(ies) of Citizenship |
|---|---|---|---|---|---|

Exception to SF85, SF85P, SF85P-S, SF86, and SF86A approved by GSA September, 1995.
Designed using Perform Pro, WHS/DIOR. Sep 95

**9** WHERE YOU HAVE LIVED

List the places where you have lived, beginning with the most recent (#1) and working back 7 years. All periods must be accounted for in your list. Be sure to indicate the actual physical location of your residence: do not use a post office box as an address, do not list a permanent address when you were actually living at a school address, etc. Be sure to specify your location as closely as possible: for example, do not list only your base or ship, list your barracks number or home port. You may omit temporary military duty locations under 90 days (list your permanent address instead), and you should use your APO/FPO address if you lived overseas.

For any address in the last 5 years, list a person who knew you at that address, and who preferably still lives in that area (do not list people for residences completely outside this 5-year period, and do not list your spouse, former spouses, or other relatives). Also for addresses in the last five years, if the address is "General Delivery," a Rural or Star Route, or may be difficult to locate, provide directions for locating the residence on an attached continuation sheet.

| Month/Year Month/Year | Street Address | | Apt. # | City (Country) | | | State | ZIP Code |
|---|---|---|---|---|---|---|---|---|
| **#1** To Present | | | | | | | | |
| Name of Person Who Knows You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) | |
| Month/Year Month/Year | Street Address | | Apt. # | City (Country) | | | State | ZIP Code |
| **#2** To | | | | | | | | |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) | |
| Month/Year Month/Year | Street Address | | Apt. # | City (Country) | | | State | ZIP Code |
| **#3** To | | | | | | | | |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) | |
| Month/Year Month/Year | Street Address | | Apt. # | City (Country) | | | State | ZIP Code |
| **#4** To | | | | | | | | |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) | |
| Month/Year Month/Year | Street Address | | Apt. # | City (Country) | | | State | ZIP Code |
| **#5** To | | | | | | | | |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) | |

**10** WHERE YOU WENT TO SCHOOL

List the schools you have attended, beyond Junior High School, **beginning with the most recent (#1) and working back 7 years**. List College or University degrees and the dates they were received. If all of your education occurred more than 7 years ago, list your most recent education beyond high school, no matter when that education occurred.

• Use one of the following codes in the "Code" block:

   **1** - High School        **2** - College/University/Military College        **3** - Vocational/Technical/Trade School

• For schools you attended in the past 3 years, list a person who knew you at school (an instructor, student, etc.). Do not list people for education completely outside this 3-year period.

• For correspondence schools and extension classes, provide the address where the records are maintained.

| Month/Year Month/Year | Code | Name of School | | Degree/Diploma/Other | | | Month/Year Awarded |
|---|---|---|---|---|---|---|---|
| **#1** To | | | | | | | |
| Street Address and City (Country) of School | | | | | | State | ZIP Code |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) |
| Month/Year Month/Year | Code | Name of School | | Degree/Diploma/Other | | | Month/Year Awarded |
| **#2** To | | | | | | | |
| Street Address and City (Country) of School | | | | | | State | ZIP Code |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) |
| Month/Year Month/Year | Code | Name of School | | Degree/Diploma/Other | | | Month/Year Awarded |
| **#3** To | | | | | | | |
| Street Address and City (Country) of School | | | | | | State | ZIP Code |
| Name of Person Who Knew You | Street Address | Apt. # | City (Country) | | State | ZIP Code | Telephone Number ( ) |

**Enter your Social Security Number before going to the next page**————————————————➤

**11** **YOUR EMPLOYMENT ACTIVITIES**

List your employment activities, beginning with the present (#1) and working back 7 years. You should list all full-time work, part-time work, military service, temporary military duty locations over 90 days, self-employment, other paid work, and all periods of unemployment. The entire 7-year period must be accounted for without breaks, but you need not list employments before your 16th birthday. EXCEPTION: Show all Federal civilian service, whether it occurred within the last 7 years or not.

- **Code.** Use one of the codes listed below to identify the type of employment:

| | | |
|---|---|---|
| 1 - Active military duty stations | 5 - State Government (Non-Federal employment) | 7 - Unemployment (Include name of person who can verify) |
| 2 - National Guard/Reserve | | 9 - Other |
| 3 - U.S.P.H.S. Commissioned Corps | 6 - Self-employment (Include business name and/or name of person who can verify) | 8 - Federal Contractor (List Contractor, not Federal agency) |
| 4 - Other Federal employment | | |

- **Employer/Verifier Name.** List the business name of your employer or the name of the person who can verify your self-employment or unemployment in this block. If military service is being listed, include your duty location or home port here as well as your branch of service. You should provide separate listings to reflect changes in your military duty locations or home ports.

- **Previous Periods of Activity.** Complete these lines if you worked for an employer on more than one occasion at the same location. After entering the most recent period of employment in the initial numbered block, provide previous periods of employment at the same location on the additional lines provided. For example, if you worked at XY Plumbing in Denver, CO, during 3 separate periods of time, you would enter dates and information concerning the most recent period of employment first, and provide dates, position titles, and supervisors for the two previous periods of employment on the lines below that information.

| Month/Year  Month/Year | Code | Employer/Verifier Name/Military Duty Location | | Your Position Title/Military Rank | | |
|---|---|---|---|---|---|---|
| #1    To    Present | | | | | | |
| Employer's/Verifier's Street Address | | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Street Address of Job Location (if different than Employer's Address) | | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Supervisor's Name & Street Address (if different than Job Location) | | | City (Country) | State | ZIP Code | Telephone Number ( ) |

| PREVIOUS PERIODS OF ACTIVITY (Block #1) | Month/Year  Month/Year  To | Position Title | Supervisor |
|---|---|---|---|
| | Month/Year  Month/Year  To | Position Title | Supervisor |
| | Month/Year  Month/Year  To | Position Title | Supervisor |

| Month/Year  Month/Year | Code | Employer/Verifier Name/Military Duty Location | | Your Position Title/Military Rank | | |
|---|---|---|---|---|---|---|
| #2    To | | | | | | |
| Employer's/Verifier's Street Address | | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Street Address of Job Location (if different than Employer's Address) | | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Supervisor's Name & Street Address (if different than Job Location) | | | City (Country) | State | ZIP Code | Telephone Number ( ) |

| PREVIOUS PERIODS OF ACTIVITY (Block #2) | Month/Year  Month/Year  To | Position Title | Supervisor |
|---|---|---|---|
| | Month/Year  Month/Year  To | Position Title | Supervisor |
| | Month/Year  Month/Year  To | Position Title | Supervisor |

| Month/Year  Month/Year | Code | Employer/Verifier Name/Military Duty Location | | Your Position Title/Military Rank | | |
|---|---|---|---|---|---|---|
| #3    To | | | | | | |
| Employer's/Verifier's Street Address | | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Street Address of Job Location (if different than Employer's Address) | | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Supervisor's Name & Street Address (if different than Job Location) | | | City (Country) | State | ZIP Code | Telephone Number ( ) |

| PREVIOUS PERIODS OF ACTIVITY (Block #3) | Month/Year  Month/Year  To | Position Title | Supervisor |
|---|---|---|---|
| | Month/Year  Month/Year  To | Position Title | Supervisor |
| | Month/Year  Month/Year  To | Position Title | Supervisor |

**Enter your Social Security Number before going to the next page ⟶**

**YOUR EMPLOYMENT ACTIVITIES** *(CONTINUED)*

| #4 | Month/Year    Month/Year To | Code | Employer/Verifier Name/Military Duty Location | | Your Position Title/Military Rank | |
|---|---|---|---|---|---|---|

| Employer's/Verifier's Street Address | | City (Country) | State | ZIP Code | Telephone Number ( ) |
|---|---|---|---|---|---|
| Street Address of Job Location (if different than Employer's Address) | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Supervisor's Name & Street Address (if different than Job Location) | | City (Country) | State | ZIP Code | Telephone Number ( ) |

| PREVIOUS PERIODS OF ACTIVITY (Block #4) | Month/Year    Month/Year To | Position Title | Supervisor |
|---|---|---|---|
| | Month/Year    Month/Year To | Position Title | Supervisor |
| | Month/Year    Month/Year To | Position Title | Supervisor |

| #5 | Month/Year    Month/Year To | Code | Employer/Verifier Name/Military Duty Location | | Your Position Title/Military Rank | |
|---|---|---|---|---|---|---|

| Employer's/Verifier's Street Address | | City (Country) | State | ZIP Code | Telephone Number ( ) |
|---|---|---|---|---|---|
| Street Address of Job Location (if different than Employer's Address) | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Supervisor's Name & Street Address (if different than Job Location) | | City (Country) | State | ZIP Code | Telephone Number ( ) |

| PREVIOUS PERIODS OF ACTIVITY (Block #5) | Month/Year    Month/Year To | Position Title | Supervisor |
|---|---|---|---|
| | Month/Year    Month/Year To | Position Title | Supervisor |
| | Month/Year    Month/Year To | Position Title | Supervisor |

| #6 | Month/Year    Month/Year To | Code | Employer/Verifier Name/Military Duty Location | | Your Position Title/Military Rank | |
|---|---|---|---|---|---|---|

| Employer's/Verifier's Street Address | | City (Country) | State | ZIP Code | Telephone Number ( ) |
|---|---|---|---|---|---|
| Street Address of Job Location (if different than Employer's Address) | | City (Country) | State | ZIP Code | Telephone Number ( ) |
| Supervisor's Name & Street Address (if different than Job Location) | | City (Country) | State | ZIP Code | Telephone Number ( ) |

| PREVIOUS PERIODS OF ACTIVITY (Block #6) | Month/Year    Month/Year To | Position Title | Supervisor |
|---|---|---|---|
| | Month/Year    Month/Year To | Position Title | Supervisor |
| | Month/Year    Month/Year . To | Position Title | Supervisor |

**12 PEOPLE WHO KNOW YOU WELL**

List three people who know you well and live in the United States. They should be good friends, peers, colleagues, college roommates, etc., whose combined association with you covers as well as possible the last 7 years. Do not list your spouse, former spouses, or other relatives, and try not to list anyone who is listed elsewhere on this form.

| Name #1 | Dates Known Month/Year    Month/Year To | Telephone Number Day ( ) Night |
|---|---|---|
| Home or Work Address | City (Country) | State | ZIP Code |

| Name #2 | Dates Known Month/Year    Month/Year To | Telephone Number Day ( ) Night |
|---|---|---|
| Home or Work Address | City (Country) | State | ZIP Code |

| Name #3 | Dates Known Month/Year    Month/Year To | Telephone Number Day ( ) Night |
|---|---|---|
| Home or Work Address | City (Country) | State | ZIP Code |

**Enter your Social Security Number before going to the next page**———————————►

**13  YOUR SPOUSE**

Mark one box to show your current marital status and provide information about your spouse(s) in items a. and/or b.

| | | |
|---|---|---|
| ☐ **1** - Never married | ☐ **3** - Separated | ☐ **5** - Divorced |
| ☐ **2** - Married | ☐ **4** - Legally Separated | ☐ **6** - Widowed |

**a**  Current Spouse   Complete the following about your current spouse only.

| Full Name | Date of Birth | Place of Birth *(Include country if outside the U.S.)* | Social Security Number |
|---|---|---|---|
| | | | |

| Other Names Used *(Specify maiden name, names by other marriages, etc., and show dates used for each name)* | Country(ies) of Citizenship |
|---|---|
| | |

| Date Married | Place Married *(Include country if outside the U.S.)* | State |
|---|---|---|
| | | |

| If Separated, Date of Separation | If Legally Separated, Where is the Record Located?  City *(Country)* | State |
|---|---|---|
| | | |

| Address of Current Spouse, if different than your current address *(Street, city, and country if outside the U.S.)* | State | ZIP Code |
|---|---|---|
| | | |

**b**  Former Spouse(s).  Complete the following about your former spouse(s), use blank sheets if needed.

| Full Name | Date of Birth | Place of Birth *(Include country if outside the U.S.)* | State |
|---|---|---|---|
| | | | |

| Country(ies) of Citizenship | Date Married | Place Married *(Include country if outside the U.S.)* | State |
|---|---|---|---|
| | | | |

| Check one, Then Give Date  ☐ Divorced  ☐ Widowed | Month/Day/Year | If Divorced, Where is the Record Located?  City *(Country)* | State |
|---|---|---|---|
| | | | |

| Address of Former Spouse *(Street, city, and country if outside the U.S.)* | State | ZIP Code | Telephone Number ( ) |
|---|---|---|---|
| | | | |

**14  YOUR RELATIVES AND ASSOCIATES**

Give the full name, correct code, and other requested information for each of your relatives and associates, living or dead, specified below.

| | | | |
|---|---|---|---|
| **1** - Mother *(first)* | **5** - Foster parent | **9** - Sister | **13** - Half-sister | **17** - Other Relative* |
| **2** - Father *(second)* | **6** - Child *(adopted also)* | **10** - Stepbrother | **14** - Father-in-law | **18** - Associate* |
| **3** - Stepmother | **7** - Stepchild | **11** - Stepsister | **15** - Mother-in-law | **19** - Adult Currently Living With You |
| **4** - Stepfather | **8** - Brother | **12** - Half-brother | **16** - Guardian | |

*Code 17 (Other Relative) - include only foreign national relatives not listed in 1 - 16 with whom you or your spouse are bound by affection, obligation, or close and continuing contact.  Code 18 (Associates) - include only foreign national associates with whom you or your spouse are bound by affection, obligation, or close and continuing contact.

| Full Name *(If deceased, check box on the left before entering name)* | Code | Date of Birth Month/Day/Year | Country of Birth | Country(ies) of Citizenship | Current Street Address and City *(country)* of Living Relatives | State |
|---|---|---|---|---|---|---|
| | 1 | | | | | |
| | 2 | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Enter your Social Security Number before going to the next page** ——————⟶

**15  CITIZENSHIP OF YOUR RELATIVES AND ASSOCIATES**

If your mother, father, sister, brother, child, or current spouse or person with whom you have a spouse-like relationship is a U.S. citizen by other than birth, or an alien residing in the U.S., provide the nature of the individual's relationship to you (Spouse, Spouse-like, Mother, etc.), and the individual's name and date of birth on the first line *(this information is needed to pair it accurately with information in items 13 and 14)*.

On the second line, provide the individual's naturalization certificate or alien registration number and use one of the document codes below to identify proof of citizenship status. Provide additional information on that line as requested.

1 - Naturalization Certificate:  Provide the date issued and the location where the person was naturalized (Court, City and State).
2 - Citizenship Certificate:  Provide the date and location issued (City and State).
3 - Alien Registration:  Provide the date and place where the person entered the U.S. (City and State).
4 - Other:  Provide an explanation in the "Additional Information" block.

| #1 | Association | Name | | Date of Birth *(Month/Day/Year)* |
|---|---|---|---|---|
| | Certificate/Registration # | Document Code | Additional Information | |

| #2 | Association | Name | | Date of Birth *(Month/Day/Year)* |
|---|---|---|---|---|
| | Certificate/Registration # | Document Code | Additional Information | |

**16  YOUR MILITARY HISTORY**

| | | Yes | No |
|---|---|---|---|
| **a** | Have you served in the United States military? | | |
| **b** | Have you served in the United States Merchant Marine? | | |

List all of your military service below, including service in Reserve, National Guard, and U.S. Merchant Marine.  Start with the most recent period of service (#1) and work backward.  If you had a break in service, each separate period should be listed.

• **Code.**  Use one of the codes listed below to identify your branch of service:
1 - Air Force    2 - Army    3 - Navy    4 - Marine Corps    5 - Coast Guard    6 - Merchant Marine    7 - National Guard

• **O/E.**  Mark "O" block for Officer or "E" block for Enlisted.
• **Status.**  "X" the appropriate block for the status of your service during the time that you served.  If your service was in the National Guard, do not use an "X":  use the two-letter code for the state to mark the block.
• **Country.**  If your service was with other than the U.S. Armed Forces, identify the country for which you served.

| Month/Year   Month/Year | Code | Service/Certificate # | O | E | Status | | | | Country |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Active | Active Reserve | Inactive Reserve | National Guard *(State)* | |
| To | | | | | | | | | |
| To | | | | | | | | | |

**17  YOUR FOREIGN ACTIVITIES**

| | | Yes | No |
|---|---|---|---|
| **a** | Do you have any foreign property, business connections, or financial interests? | | |
| **b** | Are you now or have you ever been employed by or acted as a consultant for a foreign government, firm, or agency? | | |
| **c** | Have you ever had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, whether inside or outside the U.S., other than on official U.S. Government business?  *(Does not include routine visa applications and border crossing contacts.)* | | |
| **d** | In the last 7 years, have you had an active passport that was issued by a foreign government? | | |

If you answered "Yes" to a, b, c, or d above, explain in the space below: provide inclusive dates, names of firms and/or governments involved, and an explanation of your involvement.

| Month/Year   Month/Year | Firm and/or Government | Explanation |
|---|---|---|
| To | | |
| To | | |

**18  FOREIGN COUNTRIES YOU HAVE VISITED**

List foreign countries you have visited, except on travel under official Government orders, beginning with the most current (#1) and working back 7 years.  (Travel as a dependent or contractor must be listed.)
• Use one of these codes to indicate the purpose of your visit:  **1** - Business    **2** - Pleasure    **3** - Education    **4** - Other
• Include short trips to Canada or Mexico.  If you have lived near a border and have made short (one day or less) trips to the neighboring country, you do not need to list each trip.  Instead, provide the time period, the code, the country, and a note ("Many Short Trips").
• Do not repeat travel covered in items 9, 10, or 11.

| | Month/Year   Month/Year | Code | Country | | Month/Year   Month/Year | Code | Country |
|---|---|---|---|---|---|---|---|
| #1 | To | | | #3 | To | | |
| #2 | To | | | #4 | To | | |

This concludes Part 1 of this form.  If you have used Page 9, continuation sheets, or blank sheets to complete any of the questions in Part 1, give the number for those questions in the space to the right:

**Enter your Social Security Number before going to the next page  ⟶**

Standard Form 86
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

**QUESTIONNAIRE FOR**
**NATIONAL SECURITY POSITIONS**

Form approved:
OMB No. 3206-0007
NSN 7540-00-634-4036
86-111

**Part 2** OFFICIAL USE ONLY

| **19** YOUR MILITARY RECORD | Yes | No |
|---|---|---|
| Have you ever received other than an honorable discharge from the military? If "Yes," provide the date of discharge and type of discharge below. | | |

| Month/Year | Type of Discharge |
|---|---|
| | |

| **20** YOUR SELECTIVE SERVICE RECORD | Yes | No |
|---|---|---|
| **a** Are you a male born after December 31, 1959? If "No," go to 21. If "Yes," go to b. | | |
| **b** Have you registered with the Selective Service System? If "Yes," provide your registration number. If "No," show the reason for your legal exemption below. | | |

| Registration Number | Legal Exemption Explanation |
|---|---|
| | |

| **21** YOUR MEDICAL RECORD | Yes | No |
|---|---|---|
| In the last 7 years, have you consulted with a mental health professional (psychiatrist, psychologist, counselor, etc.) or have you consulted with another health care provider about a mental health related condition? | | |

If you answered "Yes," provide the dates of treatment and the name and address of the therapist or doctor below, unless the consultation(s) involved only marital, family, or grief counseling, not related to violence by you.

| Month/Year | Month/Year | Name/Address of Therapist or Doctor | State | ZIP Code |
|---|---|---|---|---|
| To | | | | |
| To | | | | |

| **22** YOUR EMPLOYMENT RECORD | Yes | No |
|---|---|---|
| Has any of the following happened to you **in the last 7 years**? If "Yes," begin with the most recent occurrence and go backward, providing date fired, quit, or left, and other information requested. | | |

Use the following codes and explain the reason your employment was ended:

**1** - Fired from a job
**2** - Quit a job after being told you'd be fired
**3** - Left a job by mutual agreement following allegations of misconduct
**4** - Left a job by mutual agreement following allegations of unsatisfactory performance
**5** - Left a job for other reasons under unfavorable circumstances

| Month/Year | Code | Specify Reason | Employer's Name and Address (Include city/Country if outside U.S.) | State | ZIP Code |
|---|---|---|---|---|---|
| | | | | | |

| **23** YOUR POLICE RECORD | Yes | No |
|---|---|---|
| For this item, report information regardless of whether the record in your case has been "sealed" or otherwise stricken from the court record. The single exception to this requirement is for certain convictions under the Federal Controlled Substances Act for which the court issued an expungement order under the authority of 21 U.S.C. 844 or 18 U.S.C. 3607. | | |
| **a** Have you ever been charged with or convicted of any felony offense? (Include those under Uniform Code of Military Justice.) | | |
| **b** Have you ever been charged with or convicted of a firearms or explosives offense? | | |
| **c** Are there currently any charges pending against you for any criminal offense? | | |
| **d** Have you ever been charged with or convicted of any offense(s) related to alcohol or drugs? | | |
| **e** In the last 7 years, have you been subject to court martial or other disciplinary proceedings under the Uniform Code of Military Justice? (Include non-judicial, Captain's mast, etc.) | | |
| **f** In the last 7 years, have you been arrested for, charged with, or convicted of any offense(s) not listed in response to a, b, c, d, or e above? (Leave out traffic fines of less than $150 unless the violation was alcohol or drug related.) | | |

If you answered "Yes" to a, b, c, d, e, or f above, explain below. Under "Offense," do not list specific penalty codes, list the actual offense or violation (for example, arson, theft, etc.).

| Month/Year | Offense | Action Taken | Law Enforcement Authority/Court (Include City and county/country if outside U.S.) | State | ZIP Code |
|---|---|---|---|---|---|
| | | | | | |

**Enter your Social Security Number before going to the next page** ⟶

**24** **YOUR USE OF ILLEGAL DRUGS AND DRUG ACTIVITY**

| | | Yes | No |
|---|---|---|---|
| | The following questions pertain to the illegal use of drugs or drug activity. You are required to answer the questions fully and truthfully, and your failure to do so could be grounds for an adverse employment decision or action against you, but neither your truthful responses nor information derived from your responses will be used as evidence against you in any subsequent criminal proceeding. | | |
| **a** | Since the age of 16 or in the last 7 years, whichever is shorter, have you illegally used any controlled substance, for example, marijuana, cocaine, crack cocaine, hashish, narcotics (opium, morphine, codeine, heroin, etc.), amphetamines, depressants (barbiturates, methaqualone, tranquilizers, etc.), hallucinogenics (LSD, PCP, etc.), or prescription drugs? | | |
| **b** | Have you ever illegally used a controlled substance while employed as a law enforcement officer, prosecutor, or courtroom official; while possessing a security clearance; or while in a position directly and immediately affecting the public safety? | | |
| **c** | In the last 7 years, have you been involved in the illegal purchase, manufacture, trafficking, production, transfer, shipping, receiving, or sale of any narcotic, depressant, stimulant, hallucinogen, or cannabis for your own intended profit or that of another? | | |

If you answered "Yes" to a or b above, provide the date(s), identify the controlled substance(s) and/or prescription drugs used, and the number of times each was used.

| Month/Year Month/Year | Controlled Substance/Prescription Drug Used | Number of Times Used |
|---|---|---|
| To | | |
| To | | |

**25** **YOUR USE OF ALCOHOL**

| | Yes | No |
|---|---|---|
| In the last 7 years, has your use of alcoholic beverages (such as liquor, beer, wine) resulted in any alcohol-related treatment or counseling (such as for alcohol abuse or alcoholism)? | | |

If you answered "Yes," provide the dates of treatment and the name and address of the counselor or doctor below. Do not repeat information reported in response to item 21 above.

| Month/Year Month/Year | Name/Address of Counselor or Doctor | State | ZIP Code |
|---|---|---|---|
| To | | | |
| To | | | |

**26** **YOUR INVESTIGATIONS RECORD**

| | | Yes | No |
|---|---|---|---|
| **a** | Has the United States Government ever investigated your background and/or granted you a security clearance? If "Yes," use the codes that follow to provide the requested information below. If "Yes," but you can't recall the investigating agency and/or the security clearance received, enter "Other" agency code or clearance code, as appropriate, and "Don't know" or "Don't recall" under the "Other Agency" heading, below. If your response is "No," or you don't know or can't recall if you were investigated and cleared, check the "No" box. | | |

Codes for Investigating Agency
1 - Defense Department          4 - FBI
2 - State Department            5 - Treasury Department
3 - Office of Personnel Management  6 - Other (Specify)

Codes for Security Clearance Received
0 - Not Required      3 - Top Secret                              6 - L
1 - Confidential      4 - Sensitive Compartmented Information     7 - Other
2 - Secret            5 - Q

| Month/Year | Agency Code | Other Agency | Clearance Code | Month/Year | Agency Code | Other Agency | Clearance Code |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

| | | Yes | No |
|---|---|---|---|
| **b** | To your knowledge, have you ever had a clearance or access authorization denied, suspended, or revoked, or have you ever been debarred from government employment? If "Yes," give date of action and agency. Note: An administrative downgrade or termination of a security clearance is not a revocation. | | |

| Month/Year | Department or Agency Taking Action | Month/Year | Department or Agency Taking Action |
|---|---|---|---|
| | | | |
| | | | |

**27** **YOUR FINANCIAL RECORD**

| | | Yes | No |
|---|---|---|---|
| **a** | In the last 7 years, have you filed a petition under any chapter of the bankruptcy code (to include Chapter 13)? | | |
| **b** | In the last 7 years, have you had your wages garnished or had any property repossessed for any reason? | | |
| **c** | In the last 7 years, have you had a lien placed against your property for failing to pay taxes or other debts? | | |
| **d** | In the last 7 years, have you had any judgments against you that have not been paid? | | |

If you answered "Yes" to a, b, c, or d, provide the information requested below:

| Month/Year | Type of Action | Amount | Name Action Occurred Under | Name/Address of Court or Agency Handling Case | State | ZIP Code |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

**Enter your Social Security Number before going to the next page** ⟶

| **28** | **YOUR FINANCIAL DELINQUENCIES** | | | | | | Yes | No |
|---|---|---|---|---|---|---|---|---|
| **a** | In the last 7 years, have you been over 180 days delinquent on any debt(s)? | | | | | | | |
| **b** | Are you currently over 90 days delinquent on any debt(s)? | | | | | | | |

If you answered "**Yes**" to a or b, provide the information requested below:

| Incurred Month/Year | Satisfied Month/Year | Amount | Type of Loan or Obligation and Account Number | Name/Address of Creditor or Obligee | State | ZIP Code |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| **29** | **PUBLIC RECORD CIVIL COURT ACTIONS** | Yes | No |
|---|---|---|---|
| | In the last 7 years, have you been a party to any public record civil court actions not listed elsewhere on this form? | | |

If you answered "Yes," provide the information about the public record civil court action requested below.

| Month/Year | Nature of Action | Result of Action | Name of Parties Involved | Court *(include City and county/country if outside U.S.)* | State | ZIP Code |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| **30** | **YOUR ASSOCIATION RECORD** | | Yes | No |
|---|---|---|---|---|
| **a** | Have you ever been an officer or a member or made a contribution to an organization dedicated to the violent overthrow of the United States Government and which engages in illegal activities to that end, knowing that the organization engages in such activities with the specific intent to further such activities? | | | |
| **b** | Have you ever knowingly engaged in any acts or activities designed to overthrow the United States Government by force? | | | |

If you answered "Yes" to a or b, explain in the space below.

**Continuation Space**

Use the continuation sheet(s) (SF86A) for additional answers to items 9, 10, and 11. Use the space below to continue answers to all other items and any information you would like to add. If more space is needed than is provided below, use a blank sheet(s) of paper. Start each sheet with your name and Social Security Number. Before each answer, identify the number of the item.

After completing Parts 1 and 2 of this form and any attachments, you should review your answers to all questions to make sure the form is complete and accurate, and then sign and date the following certification and sign and date the release on Page 10.

### Certification That My Answers Are True

My statements on this form, and any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both. (See section 1001 of title 18, United States Code).

| Signature *(Sign in ink)* | Date |
|---|---|
| | |

**Enter your Social Security Number before going to the next page** ⟶

Standard Form 86
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

Form approved:
OMB No. 3206-0007
NSN 7540-00-634-4036
86-111

# UNITED STATES OF AMERICA

## AUTHORIZATION FOR RELEASE OF INFORMATION

Carefully read this authorization to release information about you, then sign and date it in ink.

**I Authorize** any investigator, special agent, or other duly accredited representative of the authorized Federal agency conducting my background investigation, to obtain any information relating to my activities from individuals, schools, residential management agents, employers, criminal justice agencies, credit bureaus, consumer reporting agencies, collection agencies, retail business establishments, or other sources of information. This information may include, but is not limited to, my academic, residential, achievement, performance, attendance, disciplinary, employment history, criminal history record information, and financial and credit information. I authorize the Federal agency conducting my investigation to disclose the record of my background investigation to the requesting agency for the purpose of making a determination of suitability or eligibility for a security clearance.

**I Understand** that, for financial or lending institutions, medical institutions, hospitals, health care professionals, and other sources of information, a separate specific release will be needed, and I may be contacted for such a release at a later date. Where a separate release is requested for information relating to mental health treatment or counseling, the release will contain a list of the specific questions, relevant to the job description, which the doctor or therapist will be asked.

**I Further Authorize** any investigator, special agent, or other duly accredited representative of the U.S. Office of Personnel Management, the Federal Bureau of Investigation, the Department of Defense, the Defense Investigative Service, and any other authorized Federal agency, to request criminal record information about me from criminal justice agencies for the purpose of determining my eligibility for access to classified information and/or for assignment to, or retention in a sensitive National Security position, in accordance with 5 U.S.C. 9101. I understand that I may request a copy of such records as may be available to me under the law.

**I Authorize** custodians of records and sources of information pertaining to me to release such information upon request of the investigator, special agent, or other duly accredited representative of any Federal agency authorized above regardless of any previous agreement to the contrary.

**I Understand** that the information released by records custodians and sources of information is for official use by the Federal Government only for the purposes provided in this Standard Form 86, and that it may be redisclosed by the Government only as authorized by law.

Copies of this authorization that show my signature are as valid as the original release signed by me. This authorization is valid for five (5) years from the date signed or upon the termination of my affiliation with the Federal Government, whichever is sooner. Read, sign and date the release on the next page if you answered "Yes" to question 21.

| Signature *(Sign in ink)* | Full Name *(Type or Print Legibly)* | Date Signed |
|---|---|---|
| Other Names Used | | Social Security Number |

| Current Address *(Street, City)* | State | ZIP Code | Home Telephone Number *(Include Area Code)* ( ) |
|---|---|---|---|

Standard Form 86
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

Form approved:
OMB No. 3206-0007
NSN 7540-00-634-4036
86-111

# UNITED STATES OF AMERICA

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

Carefully read this authorization to release information about you, then sign and date it in ink.

**Instructions for Completing this Release**

This is a release for the investigator to ask your health practitioner(s) the three questions below concerning your mental health consultations. Your signature will allow the practitioner(s) to answer only these questions.

I am seeking assignment to or retention in a position with the Federal government which requires access to classified national security information or special nuclear information or material. As part of the clearance process, **I hereby authorize** the investigator, special agent, or duly accredited representative of the authorized Federal agency conducting my background investigation, to obtain the following information relating to my mental health consultations:

Does the person under investigation have a condition or treatment that could impair his/her judgment or reliability, particularly in the context of safeguarding classified national security information or special nuclear information or material?

If so, please describe the nature of the condition and the extent and duration of the impairment or treatment.

What is the prognosis?

I understand the information released pursuant to this release is for use by the Federal Government only for purposes provided in the Standard Form 86 and that it may be redisclosed by the Government only as authorized by law.

Copies of this authorization that show my signature are as valid as the original release signed by me. This authorization is valid for 1 year from the date signed or upon termination of my affiliation with the Federal Government, whichever is sooner.

| Signature *(Sign in ink)* | Full Name *(Type or Print Legibly)* | Date Signed |
|---|---|---|
| Other Names Used | | Social Security Number |

| Current Address *(Street, City)* | State | ZIP Code | Home Telephone Number *(Include Area Code)* ( ) |
|---|---|---|---|

# Exhibit 2



# RANDOM HOUSE
# WEBSTER'S
# *unabridged*
# *dictionary*

## SECOND EDITION

RANDOM HOUSE
REFERENCE

NEW YORK   TORONTO   LONDON   SYDNEY   AUCKLAND

Case 1:05-cr-00370-PLF    Document 53-2    Filed 02/22/2006    Page 17 of 254
1127
local area network

...mistakenly identified as an American verb meaning "to lend" has been for nearly 800 years; *Nearby villages and other supplies to the flood-ravaged city.* All objections to LOAN as a verb refer rather than money, are comparatively irrelevant in all contexts but is perhaps a financial one: *The government has farmers to purchase seed.*

**lo·bar** (lō′bər), *adj.* **1.** that can be loaned. **2.** for a fee or at interest. —*n.* **3.** something loaned. [1830–40; LOAN¹ + -ABLE]

**lo·band**(lōnd′), *n.* a compound word or expression of both native and foreign elements. [BLEND]

**lo·an·da** An′-; Port. lōō än′də), *n.* Luanda.

**loan shark**, *n.* **1.** a person or thing that loans. **2.** an automobile or appliance, that is lent when an item being serviced or repaired. Also [brackets]

**loan office**, *n.* an office for making loans or receiving loans. **2.** a public office for receiving government loan. **3.** a pawnbroker's

**loan·er** *Informal.* a person who lends money at high rates of interest; usurer. [1900–05, Amer.]

**loan·ing** (lō′shär′king), *n.* the practice of excessive rates of interest. Also, [1965–70, *Amer.*; LOAN SHARK +]

**loan·word**(lōn′wûrd′), *n.* change or extension caused through the influence of a foreign word calling through the influence... a word created by loanshift. [hurt!]

**loan translation**, *n.* the process whereby a compound is created by literal translations of a compound of foreign words or language, as *marriage of convenience* ‹ Fr. *calque*. [1930–35]

**loan·ance**, the highest amount of money borrowed against a life-insurance policy value of the policy.

**loanword**, *n.* a word in one language taken from another language and usually taken into Old English from words taken into Modern English from word calling. Also called loan. [1870–75; ]

**loath** (lōth), *adj.* **1.** unwilling; reluctant; disinclined; admit a mistake. Also, loth. [before 900; ME loth(e); OE lāth hostile, hateful; c. D leed, G hateful] —**loath′ness,** *n.* —**Ant. eager.**

**loathe** (lōth), *v.t.*, **loathed, loath·ing.** to feel disgust or abhor: *I loathe people who spread gossip.* 900; ME loth(ien), OE lāthian] —**loath′er,** *n.* Ant. like.

**loath·ful** **1.** *Scot.* bashful; reluctant. **2.** [1400–50; late ME lothfull. See...

**loath·ing** strong dislike or disgust; indignant; ME lathynge. See LOATHE, -ING

**loath·ly** (lōth′-), *adv.* reluctantly; unwillingly. 900; ME lothliche, OE lāthlīce. See LOATH, -LY

**loath·ly**(lōth′-), *adj.* Archaic. loathsome; 900; ME lothlic(e), OE lāthlic. suffix)]

**loath·some** (lōth′-), *adj.* causing feelings of revolting; repulsive: *a loathsome*... 1300; ME lothsom. See LOATH, -ly, adv. —**loath′some·ness,** *n.* repellent, detestable, abhorrent, attractive.

**lob**¹ ... a leaf¹.

**lob·bing,** *n.* —*v.t.* **1.** ¶ *Tennis.* to return a ball by hitting it over the head of the opponent's racket, as a shell) in a high trajectory into a target. **3.** *Cricket.* to bowl underhand motion. **4.** to throw an arc. —*v.i.* **5.** *Tennis.* to lob a ball hit in a high arc to the back. **7.** *Cricket.* a ball bowled in such an arc. **8.** *Brit. Dial.* a slow, heavy. 75; in earlier sense, to behave as lumpkin, clumsy person, orig... a sense, something pendulous); c. part, stockfish, etc.] —**lob′**...

...chef?akə; Russ. la bu chyef′... no·vich (nyi ku lī′ ə vä′na...man formation.

... of or pertaining to a lobe, as NL lobāris. See LOBE, -AL]

Pathol. pneumonia (def. 2).

... having a lobe or lobes; lobed. **3.** Ornith. noting or pertaining to a foot in which the individual toes have membranous flaps along the sides. Also, **lo′bat·ed.** [1750–60; < NL lobātus. See LOBE, -ATE¹] —**lo′bate·ly,** *adv.*

**lo·ba·tion** (lō bā′shən), *n.* **1.** lobate formation. **2.** a lobe. [1830–40; LOBATE + -ION]

**lob·ber** (lob′ər), *n.* Inland North. clabber. Also called **lob′bered milk′** (lob′ərd). D. CLABBER and LOPPER²] ——**Regional Variation. See clabber.**

**lob·by** (lob′ē), *n., pl.* -bies, *v.,* -bied, -by·ing. —*n.* **1.** an entrance hall, corridor, or vestibule, as in a public building, often serving as an anteroom; foyer. **2.** a large public room or hall adjacent to a legislative chamber. **3.** a group of persons who work or conduct a campaign to influence members of a legislature to vote according to the group's special interest. —*v.i.* **4.** to solicit or try to influence the votes of members of a legislative body. —*v.t.* **5.** to try to influence the actions of (public officials, esp. legislators). **6.** to urge or procure the passage of (a bill), by lobbying. [1545–55; < ML lobia, laubia covered way < OHG *lauba* (later *lauba*) arbor, deriv. of *laub* LEAF] —**lob′by·er,** *n.*

**lob·by·gow** (lob′ē gou′), *n. Slang.* an errand boy, as formerly in the Chinatown section of a city. [1905–10, Amer.; orig. obscure]

**lob·by·ist** (lob′ē ist), *n.* a person who tries to influence legislation on behalf of a special interest; a member of a lobby. [1860–65; LOBBY + -IST] —**lob′by·ism,** *n.*

**lobe** (lōb), *n.* **1.** a roundish projection or division, as of an organ or a leaf. **2.** earlobe. [1515–25; < ML lobus (LL: hull, husk, pod) < Gk lobós, akin to L legula lobe of the ear]

**lo·bec·to·my** (lō bek′tə mē), *n., pl.* -mies. Surg. excision of a lobe of an organ or gland. [1910–15; LOBE + -ECTOMY]

**lobed** (lōbd), *adj.* **1.** having a lobe or lobes; lobate. **2.** Bot. (of a leaf) having lobes or divisions extending less than halfway to the middle of the base. [1780–90; LOBE + -ED²]

**lobe′-finned fish′** (lōb′find′), any fish that has rounded scales and lobed fins, as the coelacanth. Also called **lobe′fin′.**

**lo·be·li·a** (lō bēl′yə), *n.* any herbaceous or woody plant of the genus *Lobelia,* having long clusters of blue, red, yellow, or white flowers. Cf. **lobelia family.** [1730–40; < NL; named after Matthias de L'Obel (1538–1616), Flemish botanist, physician to James I of England; see -IA]

**lo·be·li·a·ceous** (lō bē′lē ā′shəs), *adj.* belonging to the plant family Lobeliaceae. Cf. **lobelia family.** [1820–30; < NL Lobeliace(ae) (see LOBELIA, -ACEAE) + -OUS]

**lobel′ia fam′ily,** the plant family Lobeliaceae (sometimes considered a subfamily, Lobelioideae, of the Campanulaceae, or bellflower family), typified by usually herbaceous plants having milky sap, simple alternate leaves, irregular two-lipped flowers, and fruit in the form of a capsule or berry, and including the cardinal flower, Indian tobacco, and lobelia.

**lo·be·line** (lō′bə lēn′, -lin), *n. Pharm.* a crystalline, poisonous alkaloid, $C_{22}H_{27}NO_2$, obtained by extraction from lobelia: used chiefly in the form of its sulfate or hydrochloride as a respiratory stimulant and, because of its nicotinelike pharmacological action, as an agent to discourage tobacco smoking. [1835–45; LOBEL(IA) + -INE²]

**lob·fig** (lob′bi), *n. pl.* of **lobus.**

**Lo·bi·to** (lōō be′tōō), *n.* a seaport in W Angola. 65,000.

**lob·lol·ly** (lob′lol′ē), *n., pl.* -lies. **1.** South Midland and Southern U.S. a mire; mudhole. **2.** a thick gruel. [1590–1600; cf. dial. (Yorkshire) lob (of porridge) to bubble while boiling; second element, as in LOBSCOUSE, is obscure]

**lob′lolly bay′,** an evergreen tree, *Gordonia lasianthus,* of the tea family, having fragrant, long-stalked white flowers and egg-shaped fruit. [1720–30]

**lob′lolly boy′,** Obs. an assistant to the surgeon on board a ship. [1740–50]

**lob′lolly pine′,** **1.** a coniferous tree, *Pinus taeda,* of the southeastern U.S., having bundles of stout often twisted needles and blackish-gray bark. **2.** the wood of this tree, used for timber and pulpwood. [1750–60, Amer.]

**lo·bo** (lō′bō), *n., pl.* -bos. the gray or timber wolf of the western U.S. [1830–40; < Sp < L lupus wolf]

**lo·bo·la** (lō′bə lə), *n., or* -los. a bride price, typically of cattle, paid to a bride's father among Bantu-speaking tribes of southern Africa. Also, **lo′bo·la.** [1815–25; < Zulu (ili)bolo(a), (i)lobolo (with implosive -b), or a cognate Nguni word]

**lo·bose** (lō′bōs), *adj. Zool.* having broad, thick pseudopodia, as certain ameboid protozoans. [1880–85; < NL lobōsus. See LOBE, -OSE]

**lo·bot·o·mize** (lə bot′ə miz′, lō-), *v.t.,* -mized, -miz·ing. **1.** to perform a lobotomy on. **2.** to make (someone or something) abnormally tranquil or sluggish. Also, *esp. Brit.,* **lo·bot′o·mise′.** [1940–45; LOBOTOM(Y) + -IZE] —**lo·bot′o·mist,** *n.* —**lo·bot′o·mi·za′tion,** *n.*

**lo·bot·o·mized** (lə bot′ə mizd′, lō-), *adj.* **1.** Surg. having undergone a lobotomy. **2.** stupefied; benumbed. [1940–45; LOBOTOMIZE + -ED²]

**lo·bot·o·my** (lə bot′ə mē, lō-), *n., pl.* -mies. Surg. **1.** the operation of cutting into a lobe, as of the brain or the lung. **2.** See prefrontal lobotomy.

**lob·scouse** (lob′skous), *n.* a stew of meat, potatoes, onions, ship biscuit, etc. Also, **lob·scourse** (lob′skôrs, -skōrs). [1700–10; cf. LOBLOLLY; Norw lapskaus, Dan lapskaus, G labskaus alt ult. < E]

**lob·ster** (lob′stər), *n., pl.* (esp. collectively) **-ster,** (esp. referring to two or more kinds or species) **-sters. 1.** any of various large, edible, marine, usually dull-green, stalk-eyed decapod crustaceans of the family Homari-dae, esp. of the genus *Homarus,* having large, asymmetrical pincers on the first pair of legs, one used for crushing and the other for cutting and tearing: the shell turns bright red when cooked. **2.** See **spiny lobster. 3.** any of various similar crustaceans, as certain crayfishes. **4.** the edible meat of these animals. [bef. 1000; ME lopster, OE loppestre lit., spidery creature (*loppe* spider (see LOB¹) + -stre -STER); cf. LOP¹]



lobster,
*Homarus americanus,*
length to 3 ft.
(0.9 m)

**lob′ster·back′** (lob′stər bak′), *n.* (esp. during the American Revolution) redcoat. [LOBSTER + BACK¹; in reference to the red color of cooked lobsters]

**lob·ster·ing** (lob′stər ing), *n.* the act, process, or business of capturing lobsters. [1880–85; LOBSTER + -ING¹]

**lob′ster·man** (lob′stər man), *n., pl.* -men. a person who traps lobsters. [1880–85; LOBSTER + MAN] ——**Usage.** See -man.

**lob′ster New′burg,** (*sometimes l.*) lobster cooked in a thick seasoned cream sauce made with sherry or brandy. Also, **lob′ster New′burgh.** Also called **lob′ster à la New′burg, lob′ster à la New′burgh.** [1910–15; Newburg is unexplained]

**lob′ster pot′,** a trap for catching lobsters, typically a box made of wooden slats with a funnellike entrance to the bait. Also called **lob′ster trap′.** [1755–65]

**lob′ster roll′,** lobster salad served on a frankfurter roll or the like.

**lob′ster shift′,** *Informal.* **1.** Also called **lob′ster trick′.** dogwatch (def. 2). **2.** See **graveyard shift.**

**lob′ster·tail hal′met** (lob′stər tāl′), *Armor.* a burgonet fitted with a long, articulated tail of lames for protecting the nape of the neck, worn by cavalry in the 17th century.

**lob′ster ther′midor,** a dish of cooked lobster meat placed back in the shell with a cream sauce, sprinkled with grated cheese and melted butter, and browned in the oven. Also, **lob′ster Ther′midor.** [1930–35; allegedly named by Napoleon after the month it was first served to him; see THERMIDOR]

**lob·stick** (lob′stik′), *n.* Canadian. lopstick.

**lob·tail** (lob′tāl′), *v.i.* (of a whale) to slap the flukes against the surface of the water. [1865–70 (as ger.); appar. LOB¹ in sense "to move heavily" + TAIL¹]

**lob·u·lar** (lob′yə lər), *adj.* composed of, having the form of, or pertaining to lobules or small lobes. [1815–25; LOBULE + -AR¹]

**lob′u·lar pump′,** a blower or pump displacing air or liquid by means of rotors having meshing lobes that act as a seal at their place of mesh. Also called **gear pump.**

**lob·u·late** (lob′yə lit, -lāt′), *adj.* consisting of, divided into, or having lobes. Also, **lob′u·lat·ed.** [1860–65; LOBULE + -ATE¹] —**lob′u·la′tion,** *n.*

**lob·u·lus** (lob′yə ləs), *n., pl.* -li (-li′). Anat. a lobule. [1725–35; < NL. See LOBULE]

**lob·ule** (lob′yōōl), *n.* **1.** a small lobe. **2.** a subdivision of a lobe. [1675–85; < NL lobulus. See LOBE, -ULE]

**lob·u·lus** (lob′yə ləs), *n., pl.* -li (-li′). Anat. a lobule. [1725–35; < NL. See LOBULUS]

**lo·bus** (lō′bəs), *n., pl.* -bi (-bi). Anat. a lobe. [< NL; see LOBE]

**lob·worm** (lob′wûrm′), *n.* the lugworm. Also called **lob.** [1645–55; dial. lob, earlier lobbe orig., something pendulous (see LOB¹) + WORM]

**loc.,** locative.

**lo·ca** (lō′kə), *n.* a pl. of **locus.**

**lo·cal** (lō′kəl), *adj.* **1.** pertaining to or characterized by place or position in space; spatial. **2.** pertaining to, characteristic of, or restricted to a particular place or particular places: *a local custom.* **3.** pertaining to a city, town, or small district rather than an entire state or country: *local transportation.* **4.** stopping at most or all stations: *a local train.* **5.** pertaining to or affecting a particular part or particular place: *a local disease.* **6.** Med. (of anesthesia or an anesthetic) affecting only a particular part or area of the body, without concomitant loss of consciousness, as distinguished from general anesthesia. —*n.* **7.** a local train, bus, etc. **8.** a newspaper item of local interest. **9.** a local branch of a union, fraternity, etc. **10.** a local anesthetic. **11.** Often, **locals.** a. a local person or resident: *primarily of interest to locals.* b. a local athletic team: *the locals versus the state champions.* **12.** stamp (def. 22). **13.** Brit. Informal. a neighborhood pub. —*v.i.* **14.** Informal. to travel by or take a local train or the like. [1400–50; late ME < LL localis. See LOCUS, -AL¹] —**lo′cal·ness,** *n.*

**lo·cal** (lō′kəl′, -kəl′), *adj.* low-cal.

**lo′cal ar′ea net′work,** a system for linking private telecommunications equipment, as in a building or cluster of buildings. **2.** Computers. a system for linking

CONCISE PRONUNCIATION KEY: act, cāpe, dâre, pärt; set, ēqual; if, īce; ox, ōver, ôrder, oil, bŏŏk, ōōze; out, ŭp, ûrge; child; sing; shoe; thin, that; zh as in treasure. ə = a as in alone, e as in system, i as in easily, o as in gallop, u as in circus; * as in fire (fī′ər), hour (ou′ər). ɪ and n can serve as syllabic consonants, as in cradle (krād′ɪ), and button (but′n). See the full key inside the front cover.

# Exhibit 3

# Webster's New World™ Dictionary

## Fourth Edition

### MICHAEL AGNES

#### Editor in Chief



POCKET BOOKS
New York   London   Toronto   Sydney

le ALIVE] **1** having life **2**
rest /a *live* issue/ **3** still
e spark/ **4** unexploded /a
rrying electrical current
t a) in person b) broad-
t, etc. during the actual
/ *Sports* in play /a *live*

/'ber'er) *n.* any of various
l, American, freshwater
uppy and molly
d) *combining form* having
d of) life /long-*lived*/
ving in someone's resi-
estic, lover, etc.
v'lē hood') *n.* [< OE *lif*,
rael means of living or of

by') *adj.* [ME *lefe longe*,
ef is merely intens.] long
ole /the *livelong* day/
adj. -li·er, -li·est [OE *liflic*]
vigorous **2** full of spirit;
imated, cheerful, viva-
vivid; keen **5** bounding
it resilience /a *lively* ball/
t.

t., *vi.* to make or become
ften with *up*
[OE *lifer*] **1** the largest
in in vertebrate animals:
le and is important in
the liver of cattle, fowl,
ood

'er pool') seaport in NW
ty district pop. 452,000
liv'or wurst') *n.* [< Ger
urst, sausage] a sausage
und liver

) *n.*, *pl.* -er·ies [ME, gift
servant] **1** an identify-
s of a servant **2** a) the
ng of horses for a fee b)
f horses or vehicles for
le for this (usually *livery*
lace where boats can be

l. of LIFE
'atik') *n.* domestic ani-
r use and sale

/. [< L *lividus*] **1** discol-
uise; black-and-blue **2**
sometimes taken to mean
livid with rage/ **3** very

adj. **1** alive; having life **2**
tion or use /a *living* insti-
rsons alive /within *living*
e; lifelike **5** of life /*liv-
/ —*n.* **1** a being alive **2**
anner of existence —the
at are still alive

room in a home, with
tc., used for social activ-
ing guests, etc.
wage sufficient to main-
ble level of comfort
document directing that
e not be artificially sup-
a terminal illness

*n.* [< L *lacerta*] any of
r, scaly reptiles with four
l, as the chameleon and

---

|| *abbrev.* lines
**LL** *abbrev.* Late Latin
**-'ll** (əl) *suffix* will or shall: used in con-
tractions /*she'll* sing/
**lla·ma** (lä'mə) *n.* [Sp < Amind (Peru)] a
South American beast of burden
related to the camel but smaller
**lla·no** (lä'nō) *n.*, *pl.* -nos [Sp < L *planus*,
plain] any of the level, grassy plains of
Spanish America
**LLB** or **LL.B.** *abbrev.* Bachelor of Laws
**LLD** or **LL.D.** *abbrev.* Doctor of Laws
**lo** (lō) *interj.* [OE *la*] look! see!
**load** (lōd) *n.* [< OE *lad*, a course, jour-
ney] **1** an amount carried at one time
**2** something borne with difficulty; bur-
den **3** /*often pl.*/ [Inf.] a great amount
or number **4** *Finance* an amount added
to the price of mutual fund shares to
cover costs, etc. —*vt.* **1** to put (a load)
into or upon (a carrier) **2** to burden;
oppress **3** to supply in large quantities
**4** to put a charge of ammunition into (a
firearm) **5** *Comput.* to transfer (a pro-
gram or data) into main memory from a
disk, etc. —*vi.* to take on a load —**load'ing** *n.*
**load·star** (lōd'stär') *n.* LODESTAR
**load·stone** (lōd'stōn') *n.* LODESTONE
**loaf¹** (lōf) *n.*, *pl.* **loaves** (lōvz) [OE *hlaf*]
**1** a portion of bread baked in one piece
**2** any food baked in this shape
**loaf²** (lōf) *vi.* [prob. < fol.] to spend time
idly; idle, dawdle, etc.
**loaf'er** *n.* [prob. < Ger *landläufer*, a
vagabond] one who loafs; idler
**Loaf'er** *trademark for* a casual shoe like
a moccasin —*n.* [l-] a shoe similar to
this
**loam** (lōm) *n.* [OE *lam*] a rich soil, esp.
one composed of clay, sand, and some
organic matter —**loam'y**, -i·er, -i·est,
*adj.*
**loan** (lōn) *n.* [< ON *lān*] **1** the act of
lending **2** something lent, esp. money
at interest —*vt.*, *vi.* to lend
**loan'er** *n.* **1** one who loans something
**2** an automobile, TV, etc. lent in place
of one left for repair
**loan shark** [Inf.] one who lends money
at illegal rates of interest
**loan'word'** *n.* a word of one language
taken into and used in another
**loath** (lōth) *adj.* [< OE *lath*, hostile]
reluctant /*to be loath* to depart/
**loathe** (lōth) *vt.* **loathed**, **loath'ing** [<
OE *lathian*, be hateful] to feel intense
dislike or disgust for; abhor
**loath'ing** *n.* intense dislike, disgust, or
hatred; abhorrence
**loath'some** *adj.* causing loathing; dis-
gusting
**loaves** (lōvz) *n. pl. of* LOAF¹
**lob** (läb) *vt.*, *vi.* **lobbed**, **lob'bing** [< ME
*lobbe*, heavy] to toss or hit (a ball) in a
high curve —**lob'ber** *n.*
**lob·by** (läb'ē) *n.*, *pl.* -bies [LL *lobia*] **1**
an entrance hall, as of a hotel or thea-
ter **2** a group of lobbyists representing
the same interest —*vi.* -bied, -by·ing to
act as a lobbyist
**lob'by·ist** *n.* a person, acting on behalf
of a group, who tries to get legislators
to support certain measures

---

**379**  ◄ **lock**

**lobe** (lōb) *n.* [< Gr *lobos*] a rounded pro-
jecting part, as the lower part of the ear
or any of the divisions of the lung
**lo·bot·o·my** (lō bät'ə mē) *n.*, *pl.* -mies
[< prec. + -TOMY] a surgical incision
into a lobe of the brain: now rarely used
as a treatment
**lob·ster** (läb'stər) *n.* [< OE *loppe*, spider
+ -estre, -ster] an edible sea crustacean
usually with four pairs of legs and a
pair of large pincers



LOBSTER

**lobster tail** the tail of any of various
crustaceans, prepared as food
**lo·cal** (lō'kəl) *adj.* [< L *locus*, a place] **1**
of, characteristic of, or confined to a
particular place **2** of or for a particular
part of the body /*local* anesthesia/ **3**
making all stops along its run /a *local*
bus/ —*n.* **1** a local train, bus, etc. **2** a
branch, as of a labor union —**lo'cal·ly**
*adv.*
**lo·cale** (lō kal'') *n.* [OFr *local*] a place or
locality, esp. with reference to events,
etc. associated with it
**lo·cal·i·ty** (lō kal'ə tē) *n.*, *pl.* -ties a
place; district; neighborhood
**lo·cal·ize** (lō'kəl iz') *vt.* -ized', -iz'ing to
limit, confine, or trace to a particular
place —**lo'cal·i·za'tion** *n.*
**lo·cate** (lō'kāt', lō kāt') *vt.* -cat'ed,
-cat'ing [< L *locus*, a place] **1** to estab-
lish in a certain place /offices *located*
downtown/ **2** to discover the position of
**3** to show the position of /to *locate*
Guam on a map/ —*vi.* [Inf.] to settle
/she *located* in Ohio/
**lo·ca'tion** *n.* **1** a locating or being
located **2** position; place —**on location**
*Film* in an outdoor setting, away from
the studio
**loc. cit.** *abbrev.* [L *loco citato*] in the
place cited
**loch** (läk, läkh) *n.* [< Gael & Old Ir]
[Scot.] **1** a lake **2** an arm of the sea
**lock¹** (läk) *n.* [< OE *loc*, a bolt] **1** a
mechanical device for fastening a door,
strongbox, etc. as with a key or combi-
nation **2** an enclosed part of a canal,
etc. equipped with gates for changing
the water level to raise or lower boats
**3** the mechanism of a firearm that
explodes the charge —*vt.* **1** to fasten
with a lock **2** to shut (*up*, *in*, or *out*) by
means of a lock **3** to link /to *lock* arms/
**4** to jam together so as to make immov-
able —*vi.* **1** to become locked **2** to
interlock

# Exhibit 4



# RANDOM HOUSE
# WEBSTER'S
# *unabridged*
# *dictionary*

## SECOND EDITION

### RANDOM HOUSE
### REFERENCE

NEW YORK   TORONTO   LONDON   SYDNEY   AUCKLAND

**wool′ sta′pler, 1.** a dealer in wool. **2.** a person who sorts wool, according to the staple or fiber. [1700–10] —**wool′-sta′pling,** adj.

**Wool·wich** (wŏŏl′ij, -ich), n. a former borough of Greater London, England, now part of Greenwich and Newham: royal military academy and arsenal.

**Wool·worth** (wŏŏl′wûrth′), n. **Frank Win·field** (win′-fēld′), 1852–1919, U.S. merchant.

**wool·y** (wŏŏl′ē), adj., **wool·i·er, wool·i·est,** n., pl. **wool·ies.** woolly. —**wool′i·ness,** n.

**woo·mer·a** (wŏŏm′ər ə), n. a notched stick used by Australian Aborigines to propel spears or darts. Also, **womera.** [1810–20; < Dharuk wu-ma-ra]

**woom·er·ang** (wŏŏ′mə rang′), n. Australian Obs. boomerang. [1840–50; < Dharuk wu-ma-rāŋ]

**Woon·sock·et** (wŏŏn sok′it), n. a city in NE Rhode Island. 45,914.

**woops** (wŏŏps, wŏŏps), interj. whoops.

**Woop Woop** (wŏŏp′ wŏŏp′), Australian Slang (disparaging). an imaginary remote town or district symbolizing isolation and backwardness. Also, **Woop′ woop′.** [1925–30; jocular coinage mimicking placenames of Aboriginal orig.]

**woo·ra·li** (wŏŏ rä′lē), n. curare.

**woosh** (wŏŏsh, wŏŏsh), n., v.i., v.t. whoosh.

**Woos·ter** (wŏŏs′tər), n. **1. David,** 1711–77, American Revolutionary War general. **2.** a city in N Ohio. 19,289.

**wooz·y** (wŏŏ′zē, wŏŏz′ē), adj., **wooz·i·er, wooz·i·est. 1.** stupidly confused; muddled: woozy from a blow on the head. **2.** physically out of sorts, as with dizziness, faintness, or slight nausea: He felt woozy after the flu. **3.** drunken. [1895–1900; Amer.; perh. short for boozy-woozy, rhyming compound based on boozy] —**wooz′i·ly,** adv. —**wooz′i·ness,** n.

**wop** (wop), n. Slang (disparaging and offensive). an Italian or a person of Italian descent. [1910–15; Amer.; < It (Neapolitan dial.) guappo swaggerer < Sp guapo pimp, ruffian, via dial. F < L vappa wine that has gone flat, worthless person; initial w perh. by assoc. with a related Gmc word]

**Worces·ter** (wŏŏs′tər), n. **1. Joseph Emerson,** 1784–1865, U.S. lexicographer. **2.** a city in central Massachusetts. 161,799. **3.** a city in Hereford and Worcester, in W England, on the Severn: cathedral; Cromwell's defeat of the Scots 1651. 74,300. **4.** Worcestershire.

**Worces′ter chi′na,** Trademark. a soft-paste porcelain containing very little clay or none at all, made at Worcester, England, since 1751. Also called **Royal Worcester, Worces′ter por′celain.** [1795–1805]

**Worces·ter·shire** (wŏŏs′tər shər′, -shər), n. a former county in W central England, now part of Hereford and Worcester.

**Worces′tershire sauce′,** a sharp sauce made with soy, vinegar, etc., originally made in Worcester, England. [1680–90]

**word** (wûrd), n. **1.** a unit of language, consisting of one or more spoken sounds or their written representation, that functions as a principal carrier of meaning. Words are composed of one or more morphemes and are either the smallest units susceptible of independent use or consist of two or three such units combined under certain linking conditions, as with the less of primary accent that distinguishes black²bird² from black² bird². Words are usually separated by spaces in writing, and are distinguished phonologically, as by accent, in many languages. **2. words,** a. speech or talk: to express one's emotion in words; Words mean little when action is called for. b. the text or lyrics of a song as distinguished from its music. c. contentious or angry speech; a quarrel: We had words and she walked out on me. **3.** a short talk or conversation: Marston, I'd like a word with you. **4.** an expression or utterance: a word of warning. **5.** warrant, assurance, or promise: I give you my word I'll be there. **6.** news; tidings; information: We received word of his death. **7.** a verbal signal, as a password, watchword, or countersign. **8.** an authoritative utterance, or command: His word was law. **9.** Also called **machine word.** Computers. a string of bits, characters, or bytes treated as a single entity by a computer, particularly for numeric purposes. [10. (cap.) Also called the **Word, the Word of God.** a. the Scriptures; the Bible. b. the Logos. c. the message of the gospel of Christ. **11.** a proverb or motto. **12.** at a word, in immediate response to an order or request; in an instant: At a word they came to take the situation in hand. **13. be as good as one's word,** to hold to one's promises. **14. eat one's words,** to retract one's statement, esp. with humility: They predicted his failure, but he made them eat their words. **15. have a word,** to talk briefly: Tell your aunt that I would like to have a word with her. **16. have no words for,** to be unable to describe: She had no words for the sights she had witnessed. **17. in a word,** in summary; in short: In a word, there was no comparison. Also, **in one word. 18.** in so many words, in unequivocal terms; explicitly: She told them in so many words to get out. **19. keep one's word,** to fulfill one's promise: I said I'd meet the deadline, and I kept my word. **20. man of his word or woman of her word,** a person who can be trusted to keep a promise; a reliable person. **21. of few words,** laconic; taciturn: a woman of few words but of profound thoughts. **22. of many words,** talkative; loquacious; wordy: a person of many words but of little wit. **23. put in a good word for,** to speak favorably of; commend: He put in a good word for her with the boss. Also, **put in a word for. 24. take one at one's word,** to take a statement to be literal and true. **25. take the words out of one's mouth,** to say exactly

what another person was about to say. **26. weigh one's words,** to choose one's words carefully in speaking or writing: It was an important message, and he was weighing his words. —v.t. **27.** to express in words; select words to express; phrase: to word a contract with great care. —interj. **28. my word!** or **upon my word!** (used as an exclamation of surprise or astonishment). [bef. 900; ME, OE c. D woord, G Wort, ON orth, Goth waurd; akin to OPruss wirds, L verbum word, Lith varðas name] —**Syn. 4.** statement, declaration. **5.** pledge. **6.** message, report, account. **7.** catchword, shibboleth.

**word′ ac′cent,** Phonet. See **word stress.** [1900–05]

**word·age** (wûr′dij), n. **1.** words collectively. **2.** quantity or amount of words: The wordage of the document exceeds a million. **3.** verbiage; wordiness. **4.** choice of words; wording: His wordage betrayed his lack of knowledge on the subject. [1820–30; WORD + -AGE]

**word′ associa′tion,** stimulation of an associative pattern by a word.

**word′ associa′tion test′,** Psychol. a technique for determining a subject's associative pattern by providing a verbal stimulus to which a verbal response is required. [1845–50]

**word-blind** (wûrd′blind′), adj. having alexia. [1895–1900]

**word′ blind′ness,** alexia. [1880–85]

**word-book** (wûrd′bŏŏk′), n. **1.** a book of words, usually with definitions, explanations, etc.; a dictionary. **2.** the libretto of an opera. [1590–1600; WORD + BOOK]

**word′ class′,** Gram. a group of words all of which are members of the same form class or part of speech. [1920–25]

**word′ deaf′ness,** Pathol. inability to comprehend the meanings of words though they are heard, caused by lesions of the auditory center of the brain. [1885–90] —**word′-deaf′,** adj.

**word′ for word′, 1.** in exactly the same words; verbatim. **2.** one word at a time, without regard for the sense of the whole: She translated the book word for word. [1350–1400; ME] —**word′-for-word′,** adj.

**word′ game′,** any game or contest involving skill in using, forming, guessing, or changing words or expressions, such as anagrams or Scrabble.

**word-hoard** (wûrd′hôrd′, -hōrd′), n. a person's vocabulary. [1890–95; literal mod. rendering of OE word-hord]

**word-ing** (wûr′ding), n. **1.** the act or manner of expressing in words; phrasing. **2.** the particular choice of words, with regard to meaning or effect; the exact wording: I liked the idea, but I objected to the wording. [1555–65; WORD + -ING¹] —**Syn.** See **diction.**

**word-less** (wûrd′lis), adj. **1.** speechless, silent, or mute. **2.** not put into words; unexpressed. [1150–1200; ME; see WORD, -LESS] —**word′less·ly,** adv. —**word′less·ness,** n.

**word-lore** (wûrd′lôr′, -lōr′), n. **1.** a study of words and derivations. **2.** the vocabulary of a particular language and the history of its words. Also, **word′lore′.** [1865–70]

**word·mon·ger** (wûrd′mung′gər, -mong′-), n. a writer or speaker who uses words pretentiously or with careless disregard for meaning. [1580–90; WORD + MONGER] —**word′mon′ger·ing,** n.

**Word′ of God′, the,** word (def. 10). [1520–30]

**word′ of hon′or,** a pledge of one's honor that a specified condition, bargain, etc., will be fulfilled; oath; promise. [1805–15]

**word′ of mouth′,** informal oral communication: The rumor spread rapidly by word of mouth. [1545–55] —**word′-of-mouth′,** adj.

**word′ or′der,** the way in which words are arranged in sequence in a sentence or smaller construction: In Latin, word order is freer than in English. [1890–95]

**word′ paint′ing, 1.** an effective verbal description. **2.** See **tone painting.** [1870–75] —**word′ paint′er.**

**word′ pic′ture,** a description in words, esp. one that is unusually vivid: She drew a word picture of a South Pacific sunset. [1855–60]

**word·play** (wûrd′plā′), n. **1.** clever or subtle repartee; verbal wit. **2.** a play on words; pun. [1870–75; WORD + PLAY]

**word′ proc′essing,** writing, editing, and production of documents, as letters, reports, and books, through the use of a computer program or a computer system designed to facilitate rapid and efficient manipulation of text. Abbr.: WP Also, **word′-proc′ess·ing.** [1970–75]

**word′ proc′essor,** **1.** a computer program or computer system designed for word processing. **2.** a person who performs word processing. [1975–80]

**word′ sal′ad,** incoherent speech consisting of both real and imaginary words, lacking comprehensive meaning, and occurring in advanced schizophrenic states. [1910–15]

**word·smith** (wûrd′smith′), n. an expert in the use of words. **2.** a person, as a journalist or novelist, whose vocation is writing. [1895–1900; WORD + SMITH]

**word′ square′,** a set of words such that when arranged one beneath another in the form of a square they read alike horizontally and vertically. [1875–80]

**word′ stress′,** the stress pattern or patterns associated with the words of a particular language when they are considered in isolation. Also called **word accent. Cf. sentence stress.** [1910–15]

**Words·worth** (wûrdz′wûrth′), n. **William,** 1770–1850, English poet: poet laureate 1843–50. —**Words·worth′i·an,** adj., n. —**Words·worth′i·an·ism,** n.

**word′ time′,** Computers. the time required to transfer a machine word, esp. one stored serially, from one memory unit to another. Cf. **access time.**

**word′ wrap′,** a feature of word-processing systems and some electronic typewriters that automatically moves a word to a new line to avoid overrunning the margin. Also called **wraparound.** [1975–80]

**word·y** (wûr′dē), adj., **word·i·er, word·i·est. 1.** characterized by or given to the use of many, or too many, words; verbose: She grew impatient at his wordy reply. **2.** pertaining to or consisting of words; verbal. [bef. 1100; ME, OE wordig. See WORD, -Y¹] —**word′i·ly,** adv. —**word′i·ness,** n. —**Syn. 1.** diffuse, talkative, loquacious, voluble. WORDY, PROLIX, REDUNDANT, PLEONASTIC all mean using more words than necessary to convey a desired meaning. WORDY, the broadest and least specific of these terms, may, in addition to indicating an excess of words, suggest a garrulousness or loquaciousness: a wordy, gossipy account of a simple incident. PROLIX refers to speech or writing extended to great and tedious length with inconsequential details: a prolix style that tells you more than you need or want to know. REDUNDANT and PLEONASTIC both refer to unnecessary repetition of language. REDUNDANT has also a generalized sense of "excessive" or "no longer needed": the dismissal of redundant employees. In describing language, it most often refers to overelaboration through the use of expressions that repeat the sense of other expressions in a passage: a redundant text crammed with amplifications of the obvious. PLEONASTIC, usually a technical term, refers most often to expressions that repeat something that has been said before: "A true fact" and "a free gift" are pleonastic expressions.

**wore** (wôr, wōr), v. pt. of **wear.**

**wore-out** (wôr′out′, wōr′-), adj. Chiefly Midland and Southern U.S. worn-out.

**work** (wûrk), n., adj., v., **worked** or (Archaic except for 35, 37, 40) **wrought; working.** —n. **1.** exertion or effort directed to produce or accomplish something; labor; toil. **2.** something on which exertion or labor is expended; a task or undertaking: The students finished their work in class. **3.** productive or operative activity. **4.** employment, as in some form of industry, esp. as a means of earning one's livelihood: to look for work. **5.** one's place of employment: Don't phone him at work. **6.** materials, things, etc., on which one is working or is to work. **7.** the result of exertion, labor, or activity; a deed or performance. **8.** a product of exertion, labor, or activity: musical works. **9.** an engineering structure, as a building or bridge. **10.** a building, wall, trench, or the like, constructed or made as a means of fortification. **11. works,** a. (used with a singular or plural v.) a place or establishment for manufacturing (often used in combination): ironworks. b. the working parts of a machine: the works of a watch. c. Theol. righteous deeds. **12.** Physics. force times the distance through which it acts; specifically, the transference of energy equal to the product of the component of a force that acts in the direction of the motion of the point of application of the force and the distance through which the point of application moves. **13. at work,** a. working, as at one's job: He's at work on a new novel. b. in action or operation: to see the machines at work. **14. gum up the works,** Slang. to spoil something, as through blundering or stupidity: The surprise party was all arranged, but her little brother gummed up the works and told her. **15. in the works,** in preparation or being planned: A musical version of the book is in the works. **16. make short work of,** to finish or dispose of quickly: We made short work of the chocolate layer cake. **17. out of work,** unemployed; jobless: Many people in the area were out of work. **18. shoot the works,** Slang. to spend all one's resources: Let's shoot the works and order the crêpes suzette. **19. the works,** Informal. a. everything; all related items or matters: a hamburger with the works. b. harsh or cruel treatment: to give someone the works. —adj. **20.** of, for, or concerning work: work clothes. **21.** working (def. 18). —v.i. **22.** to do work; labor. **23.** to be employed, esp. as a means of earning one's livelihood: He hasn't worked for six weeks. **24.** to be in operation, as a machine. **25.** to act or operate effectively: The pump will not work. The plan works. **26.** to attain a specified condition, as by repeated movement: The nails worked loose. **27.** to have an effect or influence, as on a person or on the mind or feelings of a person. **28.** to move in agitation, as the features under strong emotion. **29.** to make way with effort or under stress: The ship works to windward. **30.** Naut. to give slightly at the joints, as a vessel under strain at sea. **31.** Mach. to move improperly, as from defective fitting of parts or from wear. **32.** to undergo treatment by labor in a given way: This dough works slowly. **33.** to ferment, as a liquid. —v.t. **34.** to use or manage (an apparatus, contrivance, etc.): She can work many business machines. **35.** to bring about (any result) by or as by work or effort: to work a change. **36.** to manipulate or treat by labor: to work butter. **37.** to put into effective operation. **38.** to operate (a mine, farm, etc.) for productive purposes: to work a coal mine. **39.** to carry on operations in (a district or region). **40.** to make, fashion, or execute by work. **41.** to achieve or win by work or effort: to work one's passage. **42.** to keep (a person, a horse, etc.) at work: She works her employees hard. **43.** to influence or persuade, esp. insidiously: to work other people to one's will. **44.** Informal. to exploit (someone or something) to one's advantage: See if you can work your uncle for a new car. **45.** to make or decorate by needlework or embroidery: She worked a needlepoint cushion. **46.** to cause fermentation in. **47. work in** or **into,** a. to bring or put in; add, merge, or blend: The tailor worked in the patch

**CONCISE ETYMOLOGY KEY:** <, descended or borrowed from; >, whence; b., bared of, blended; c., cognate with; cf., compare; deriv., derivative; equiv., equivalent; imit., imitative; obl., oblique; r., replacing; s., stem; sp., spelling, spelled; resp., respelling, respelled; trans., translation; ?, origin unknown; *, unattested; ‡, probably earlier than. See the full key inside the front cover.

**word square**

```
S A T E D
A T O N E
T O A S T
E N S U E
D E T E R
```

skillfully. Work the cream into the hands until it is completely absorbed. **b.** to arrange a time or employment for: The dentist was very busy, but said she would be able to work me in late in the afternoon. They worked him into the new operation. **48.** work off, **a.** to lose or dispose of, as by exercise or labor: We decided to work off the effects of a heavy supper by walking for an hour. **b.** to pay or fulfill by working: He worked off his debt by doing odd jobs. **49.** work on or upon, to exercise influence on; persuade; affect: I'll work on her, and maybe she'll change her mind. **50.** work out, **a.** to bring about by effort, action, or action. **b.** to solve, as a problem. **c.** to arrive at by or as by calculation. **d.** to pay (a debt) by working instead of paying money. **e.** to exhaust, as a mine. **f.** to issue in a result. **g.** to evolve; elaborate. **h.** to amount to (a total or specified figure); add up (to): The total works out to 176. **i.** to prove effective or successful: Their marriage just didn't work out. **j.** to practice, exercise, or train, esp. in order to become proficient in an athletic sport: The boxers are working out in the gym tonight. **51.** work over, **a.** to study or examine thoroughly: For my term paper I worked over 30 volumes of Roman history. **b.** Informal. to beat unsparingly, esp. in order to obtain something or out of revenge: They threatened to work him over until he talked. **52.** work through, to deal with successfully; come to terms with: to work through one's feelings of guilt. **53.** work up, **a.** to move or stir the feelings; excite. **b.** to prepare; elaborate: Work up some plans. **c.** to increase in efficiency or skill: He worked up his typing speed to 70 words a minute. **54.** work up to, rise to a higher position; advance: He worked up to the presidency. [bef. 900; (n.) ME worke, OE weorc, worc; (v.) ME worken, OE weorc-an, wyrc-an, werc (G Werk), OH werk, (esp. fig.) G (v.) ME worken, deriv. of the n.; r. ME wyrchen, OE wyrc-ean; c. G wirken, ON verkja, Goth waurkjan]

—Syn. **1.** WORK, DRUDGERY, LABOR, TOIL refer to exertion of body or mind in performing or accomplishing something. WORK is the general word and may apply to exertion that is either easy or hard: fun work; heavy work. DRUDGERY suggests continuous, dreary, and dispiriting work, esp. of a menial or servile kind: the drudgery of household tasks. LABOR particularly denotes hard manual work: labor on a farm, in a steel mill. TOIL suggests wearying or exhausting labor: toil that breaks down the worker's health. **2.** enterprise, project, job, responsibility. **3.** industry, occupation, business. **4.** job, trade, calling, vocation, profession. **7.** product, achievement, feat. **22.** toil, drudge. **34.** operate, manipulate, handle. **35.** accomplish, effect, produce, achieve. **40.** finish, form, shape. **43.** move. —**Ant. 1.** play, rest.

**Work** (wûrk), n. **Henry Clay,** 1832–84, U.S. songwriter.

**work·a·ble** (wûr′kə bəl), adj. **1.** practicable or feasible: He needs a workable schedule. **2.** capable of or suitable for being worked. [1535–45; WORK + -ABLE] —**work′a·bil′i·ty, work′a·ble·ness,** n.

**work·a·day** (wûr′kə dā′), adj. **1.** of or befitting working days; characteristic of a workday and its occupations. **2.** ordinary; commonplace; everyday; prosaic. [1150–1200; alter. (prob. after NOWADAYS) of earlier worky-day workday, alter. (by assoc. with HOLIDAY) of ME werkday, obscurely derived from WORK and DAY]

**work·a·hol·ic** (wûr′kə hôl′ik, -hol′ik), n. a person who works compulsively at the expense of other pursuits. [1965–70; WORK + -AHOLIC] —**work′a·hol′ism,** n.

**work′bag′,** n. a bag for holding implements and materials for work, esp. needlework. [1765–75; WORK + BAG]

**work·bas·ket** (wûrk′bas′kit, -bä′skit), n. a basket used to hold needlework paraphernalia. [1735–45; WORK + BASKET]

**work·bench** (wûrk′bench′), n. a sturdy table at which an artisan works. [1775–85; WORK + BENCH]

**work·boat** (wûrk′bōt′), n. a boat used for work or trade rather than sport, public transportation, or military purposes. [1935–40; WORK + BOAT]

**work·book** (wûrk′bŏŏk′), n. **1.** a manual of operating instructions. **2.** a book designed to guide the work of a student by inclusion of questions, exercises, etc. **3.** a book in which a record is kept of work completed or planned. [1905–10; WORK + BOOK]

**work·box** (wûrk′boks′), n. a box to hold instruments and materials for work, esp. needlework. [1805–15; WORK + BOX]

**work′ camp′,** n. **1.** a camp for prisoners sentenced to labor, esp. to outdoor labor such as roadbuilding or farming. **2.** a volunteer project in which members of a church, service organization, etc. work together in aid of some worthy cause. [1930–35]

**work·day** (wûrk′dā′), n. **1.** a day on which work is done; working day. **2.** the part of a day during which one works. **3.** the length of time during a day on which one works: a seven-hour workday. — adj. **4.** workaday. [1400–50; late ME werkday, OE weorcdæg. See WORK, DAY]

**worked** (wûrkt), adj. that has undergone working. [1700–10; WORK + -ED²] —**Syn.** WORKED, WROUGHT both apply to something on which effort has been applied. WORKED implies expended effort of almost any kind: a worked silver mine. WROUGHT implies fashioning, molding, or making, esp. of metals: wrought iron.

**work-up** (wûrk′up′), adj. wrought-up. [1900–05]

**work·er** (wûr′kər), n. **1.** a person or thing that works. **2.** a laborer or employee: steel workers. **3.** a person engaged in a particular field, activity, or cause: a worker in psychological research; a worker for the Republican party. **4.** Entomol. **a.** a member of a caste of sexually underdeveloped, nonreproductive bees, specialized to collect food and maintain the hive. See illus. under bee. **b.** a similar member of a specialized caste of ants, termites, or wasps. **5.** Print. one of a set of electrotyped plates used to print from (contrasted with molder). **6.** any of several rollers covered with card clothing that work in combination with the stripper rollers and the cylinder in the carding of fibers. [1300–50; ME werker, worcher. See WORK. -ER¹]

**work·er-pri·est** (wûr′kər prēst′), n. (in France) a Roman Catholic priest who, in addition to his priestly duties, works part-time in a secular job. [1945–50]

**work′ers′ compensa′tion insur′ance,** insurance required by law from employers for the protection of employees while engaged in the employer's business. [1975–80]

**work′ eth′ic,** a belief in the moral benefit and importance of work and its inherent ability to strengthen character. [1950–55]

**work·fare** (wûrk′fâr′), n. a governmental plan under which welfare recipients are required to accept public-service jobs or to participate in job training. [1965–70; WORK + (WEL)FARE]

**work′ farm′,** a farm to which juvenile offenders are sent for a period to work, for disciplinary purposes or rehabilitation. [1950–55]

**work·flow** (wûrk′flō′), n. the flow or amount of work to and from an office, department, or employee. [1945–50; WORK + FLOW]

**work·folk** (wûrk′fōk′), n. pl. people who work for a wage, salary, commission, etc., esp. rural or agricultural employees. Also, **work′folks′.** [1425–75; late ME; see WORK, FOLK]

**work′ force′, 1.** the total number of workers in a specific undertaking: a holiday for the company's work force. **2.** the total number of persons employed or employable: a sharp increase in the nation's work force. Also, **work′force′.** Also called **labor force.** [1945–50; WORK + FORCE]

**work func′tion, 1.** Physics. the least energy necessary to free an electron from a metal surface. **2.** Thermodynam. See Helmholtz function.

**work-fur·lough** (wûrk′fûr′lō), adj. work-release. [1955–60]

**work·horse** (wûrk′hôrs′), n. **1.** a horse used for plowing, hauling, and other heavy labor, as distinguished from a riding horse, racehorse, etc. **2.** a person who works tirelessly at a task, assumes extra duties, etc. [1535–45; WORK + HORSE]

**work·hour** (wûrk′our′, -ou′ər), n. any of the hours of a day during which work is done, as in an office, usually between 9 A.M. and 5 P.M. Also, **work′ hour′, working hour.** [1840–50]

**work·house** (wûrk′hous′), n., pl. **-hous·es** (-hou′ziz). **1.** a house of correction. **2.** Brit. (formerly) a poorhouse in which paupers were given work. **3.** Obs. a workshop. [bef. 1100; ME werkhous, OE weorchūs workshop. See WORK, HOUSE]

**work·ing** (wûr′king), n. **1.** the act of a person or thing that works. **2.** operation; action: the involved workings of his mind. **3.** the process of shaping a material: the working of damp clay. **4.** the act of manufacturing or building a thing. **5.** Usually, **workings. a.** part of a mine, quarry, or the like, in which work is carried on. **6.** the process of fermenting, as of yeast. **7.** a slow advance involving exertion. **8.** disturbed or twisting motions: The working of his limbs revealed the strain. **9.** repeated movement or strain tending to loosen a structural assembly or part. —adj. **10.** that works. **11.** doing some form of work, esp. manual, mechanical, or industrial work, as for a living: a working person. **12.** operating; producing effects, results, etc. **13.** pertaining to, connected with, or used in operating or working. **14.** serving to permit or facilitate continued work: a working model; a working majority. **15.** adequate for usual or customary needs: a working knowledge of Spanish. **16.** large enough for working or being worked: a working sample. **17.** done, taken, etc., while conducting or discussing business: a working lunch. **18.** Also, **work. 19.** of a face or edge, as of a timber or a metal casting) shaped and planed as a reference for further shaping and planing. [1250–1300; ME werking. See WORK, -ING¹, -ING²]

—**Syn. 15.** usable, practical, operative, functioning.

**work′ing as′set,** Accounting. invested capital that is comparatively liquid. [1910–15]

**work′ing cap′ital, 1.** the amount of capital needed to carry on a business. **2.** Accounting. current assets minus current liabilities. **3.** liquid capital assets to be distinguished from fixed capital assets. [1900–05]

**work′ing-cap′i·tal fund′** (wûr′king kap′i tl), a fund established to finance operating activities in an industrial enterprise.

**work′ing class′, 1.** those persons working for wages, esp. in manual labor. **2.** the social or economic class composed of these workers. [1805–15] —**work′ing-class′,** adj.

**work′ing day′, 1.** the amount of time that a worker must work for an agreed daily wage. **2.** a day ordinarily given to working (distinguished from holiday). **3.** the daily period of hours for working. [1525–35]

**work·ing-day** (wûr′king dā′), adj. everyday. [1470–80]

**work′ing dog′,** one of any of several breeds of usually large dogs developed to perform a practical function, as herding, guarding, or pulling heavy loads, as the collie, Doberman pinscher, and Siberian Husky. [1890–95]

**work′ing draw′ing,** an accurately measured and detailed drawing of a structure, machine, detail, etc. used as a guide to workers in constructing it. [1825–55]

**work′ing face′,** Mining. face (def. 18).

**work′ing flu′id,** Mech. a liquid or gaseous working substance. [1900–05]

**work′ing girl′, 1.** a woman who works. **2.** Slang. a prostitute. [1860–65; for def. 1; 1965–70, for def. 2] —**Usage.** See girl.

**work′ing hour′,** workhour.

**work′ing hypoth′esis.** See under hypothesis (def. 1).

**work·ing·man** (wûr′king man′), n., pl. **-men.** a man

of the working class; a man, whether skilled or unskilled, who earns his living at some manual or industrial work. [1630–40; WORKING + MAN¹]

**work′ing or′der,** the condition of a mechanism when it is functioning properly: a stove in working order. [1815–25]

**work′ing pa′pers, 1.** legal papers often required for employment, as by an alien. **2.** legal papers enabling a minor in the U.S. to work under certain conditions. [1925–30]

**work·ing-per·son** (wûr′king pûr′sən), n. a working-man or workingwoman. —**Usage.** See -PERSON.

**work′ing rail′,** See fly rail (def. 2).

**work′ing sub′stance,** a substance, usually a fluid, that undergoes changes in pressure, temperature, volume, or form as part of a process for accomplishing work. [1895–1900]

**work·ing·wom·an** (wûr′king wŏŏm′ən), n., pl. **-wom·en.** a woman who is regularly employed. [1865–70; WORKING + WOMAN]

—**Usage.** See -woman.

**work′ load′,** the amount of work that a machine, employee, or group of employees can be or is expected to perform. [1940–45]

**work·man** (wûrk′mən), n., pl. **-men. 1.** a man employed or skilled in some form of manual, mechanical, or industrial work. **2.** a male worker. [bef. 900; ME werkman, OE weorcman. See WORK, MAN¹]

—**Usage.** See -man.

**work·man·like** (wûrk′mən līk′), adj. **1.** like or befitting a workman. **2.** skillful; well executed: a workmanlike piece of writing. Also, **work′man·ly.** [1400–50; late ME workmanlike. See WORKMAN, -LIKE]

**work·man·ship** (wûrk′mən shĭp′), n. **1.** the art or skill of a workman or workwoman. **2.** the quality or mode of execution, as of a thing made. **3.** the product or result of labor and skill; work executed. [1325–75; ME werkmanschipe. See WORKMAN, -SHIP]

**work′men's compensa′tion insur′ance.** See workers' compensation insurance.

**work′ of art′, 1.** a piece of creative work in the arts, esp. a painting or sculpture. **2.** a product that gives aesthetic pleasure and that can be judged separately from any utilitarian considerations. [1825–35]

**work′ or′der,** an order authorizing specific work, repairs, etc., to be done.

**work-out** (wûrk′out′), n. **1.** a trial or practice session in athletics, as in running, boxing, or football. **2.** a structured regimen of physical exercise: She goes to the gym for a workout twice a week. **3.** any trial or practice session. **4.** an act or instance of working something out. [1890–95; n. use of v. phrase work out]

**work·peo·ple** (wûrk′pē′pəl), n.pl. people employed at work or labor; workers; employees. [1700–10; WORK + PEOPLE]

**work·piece** (wûrk′pēs′), n. a piece of work being machined. [1925–30; WORK + PIECE]

**work·place** (wûrk′plās′), n. **1.** a person's place of employment. **2.** any or all places where people are employed: a bill to set safety standards for the workplace. [1820–30; WORK + PLACE]

**work·print** (wûrk′print′), n. Motion Pictures. the first positive print of a film, assembled from the dailies used in the editing process. [1935–40; WORK + PRINT]

**Work′ Proj′ects Adminis·tra′tion.** See WPA.

**work-re·lease** (wûrk′ri lēs′), adj. of or pertaining to a program under which prisoners may work outside of prison while serving their sentences. [1955–60]

**work·room** (wûrk′rŏŏm′, -rōōm′), n. a room in which work is carried on. [1820–30; WORK + ROOM]

**work′ rules′,** a set of rules, usually established by one or more unions in an agreement with management, specifying the tasks to be done by each employee. [1960–65]

**works′ coun′cil,** Chiefly Brit. **1.** an elected body of employee representatives that deals with management regarding grievances, working conditions, wages, etc. **2.** a joint council or committee representing employer and employees that discusses working conditions, wages, etc., within a plant or business. [1925–30]

**work′ sheet′, 1.** a sheet of paper on which schedules, working time, special instructions, etc., are recorded. **2.** a piece of scrap of paper on which problems, ideas, or the like, are set down in tentative form. **3.** Also, **work′sheet′.** Accounting. a sheet of paper on which is printed a series of columns and into which tentative figures are entered as a preliminary step in preparing the adjusted or final statement. [1920–25]

**work·shop** (wûrk′shop′), n. **1.** a room, group of rooms, or building in which work, esp. mechanical work, is carried on. **2.** a seminar, discussion group, or the like, that emphasizes exchange of ideas and the demonstration and application of techniques, skills, etc.: a theater workshop; opera workshop. [1555–65; WORK + SHOP]

**work·shop·per** (wûrk′shop′ər), n. Informal. a person who has a workshop, esp. in a home, for working with tools, usually as a hobby. [WORKSHOP + -ER]

**work′ song′,** a folk song sung by workers, with a rhythm like that of their work. [1920–25]

**work·space** (wûrk′spās′), n. space used or required for one's work, as in an office or home. [1955–60; WORK + SPACE]

CONCISE PRONUNCIATION KEY: act, cāpe, dâre, pärt; set, ēqual; if, īce; ox, ōver, ôrder, oil, bŏŏk, bōōt, out; up, ûrge; child; sing; shoe; thin, that; zh as in treasure. ə = a as in alone, e as in system, i as in easily, o as in gallop, u as in circus; ' as in fire (fī'ər), hour (ou'r); n and η can serve as syllable consonants, as in cradle (krād'l), and button (but'n). See the full key inside the front cover.

# Exhibit 5



**\*\*This order was not published except electronically.**

GENERAL SERVICES ADMINISTRATION
Washington, DC 20405

CIO 2160.2
September 24, 1998

### GSA ORDER

SUBJECT: GSA Electronic Messaging Policy

1. <u>Purpose</u>. This order sets forth GSA's policy on electronic messaging and the appropriate use of the GSA Enterprise Messaging Services (GEMS).

2. <u>Background</u>. GEMS is a set of messaging services consisting of a nationwide network of centrally administered and managed electronic mail servers, electronic messaging gateways, message switches, and virus firewalls, making up GSA's single, agency-wide electronic mail system. GEMS are shared resources that have been procured, implemented, and are maintained for the conduct of the agency's business. These resources are both scarce and expensive, and the misuse of these resources can severely hamper the agency's ability to conduct business and accomplish the mission.

3. <u>Policy</u>. Authorized users must use the GEMS resources appropriately. Users must learn how to use electronic mail efficiently, effectively, and courteously, practicing good security and using email in a responsible, professional, and lawful manner. All use must comply with Federal Laws and regulations. Unlawful or malicious activities, activity that would result in a denial of service to other users, and abuse of resources are prohibited. Additionally, users have an obligation to be aware of computer security and privacy concerns and to guard against computer viruses.

4. <u>Applicability</u>. This order applies to all authorized users who are granted access to the GEMS and to all communications sent or received with the use of GEMS.

5. <u>Violations</u>. All suspected violations of this order shall be reported to a supervisor in the chain of command above the employee who suspects or discovers a violation. The supervisor, or designee will review the facts, and if it is determined that a violation has occurred, the matter will be referred to the supervisor(s) of the individual(s) involved for appropriate action. Employees and supervisors needing assistance in determining whether a violation occurred may contact the GSA Postmaster via email at postmaster@gsa.gov.

(signed)
Shereen G. Remez
Chief Information Officer

ATTACHMENT

1. __Definitions.__

__Authorized Users.__ Authorized users are employees of GSA and other Government organizations who are supported by GSA, and those contractors, consultants, or other third parties who are specifically granted access for the conduct of business on behalf of or with GSA or other Government organizations supported by GSA. Only those contractor, consultant, or other third party personnel located on-site in GSA space, using GSA furnished hardware and software, will be authorized use if sponsored by a GSA Service or Staff Office.

__Abuse of Resources.__ Use that results in no benefit to the Agency or Government, and causes the Agency additional expenses through increased load on networks, systems, and staff. Abuse of resources frequently results in denial of service for the Agency.

__Classified Information.__ Information classified as national security information (as defined by ADM P 1025.2D).

__Denial of Services.__ Use that interferes with official GSA or Government business by overloading resources, or blocking access to any resources.

__Malicious Use.__ Use designed to harm others or cause others to suffer without just cause or reason.

__Message Encryption.__ Use of software to render a message unreadable to everyone except the intended recipient.

__Prohibited Use.__ Use which is forbidden by or fails to comply with Federal laws or regulations or GSA policy.

__Sensitive Information.__ Information such as that protected by the Privacy Act, information that would be withheld under the Freedom of Information Act, procurement sensitive information, proprietary information, and other sensitive or confidential information.

2. __Electronic message control.__

   a. __Message privacy.__

GSA provides electronic messaging services to authorized users, at GSA expense, for their use on GSA or other Government business. All electronic communications sent or received using Agency resources are owned by the Government and may be considered Government records. The Agency may access any message sent over its electronic services for a legitimate Governmental purpose. Occasional personal use of the electronic services which involves minimal expense to the Government and does not interfere with Government business is authorized under GSA ORDER ADM 7800.11. However, authorized users have no expectation of privacy with regard to electronic messages, official or personal, they send through the government-provided electronic messaging services. The Agency reserves the right to limit employee or other authorized users electronic messaging access following evidence that shows inappropriate use of the system, or such use that creates an appearance of impropriety in the public view.

Note: The use of passwords to 'logon' to the electronic mail system or to access electronic services does not guarantee personal privacy. Use of the integral encryption capabilities of the electronic mail software of the GEMS to encrypt one's electronic mail does NOT mean that the encryption cannot or will not be removed by appropriate authority. See section IV below regarding the limitation on the use of personal

DOJ-DS007396

encryption.

b.  **Monitoring.**

(1)   System administrators/managers regularly monitor electronic messaging services in the performance of their routine duties to ensure system reliability and efficiency. System administrators/managers review the system logs created by the various electronic messaging services in the performance of their routine duties to assist in the analysis of service delivery problems. The logs usually contain information on each message such as; sender address, receiver address, and size of message, date and time of day, but not content. These logs are retained locally for 90 days and then destroyed if not actively in use for problem analysis purposes. System administrators/managers normally do not open messages and review them for content. If system administrators/managers come across messages that appear to be private and personal in nature, and that do not appear to involve any violation of law or agency rules, they will desist from inspection of such messages and will not disclose them to others.

(2)   If system administrators/managers find indications of illegal activity or violations of agency policy or security, they will report their findings to an official in their supervisory chain of command.

(3)   Supervisors may review the electronic messages of the employees they supervise to determine whether there have been any breaches of security, violations of GSA policy, or other misconduct on the part of the employees. Supervisors may inspect the contents of electronic messages disclosed in the course of such monitoring or any follow up investigation, if such inspection is necessary to serve an official purpose.

(4)   It is a misuse of Government time and resources and a violation of this policy for any employee, including system administrators, managers, and supervisors, to peruse electronic mail or other electronic messages, or use Agency computer systems in any fashion to satisfy idle curiosity about the affairs of others, with no substantial business purpose for obtaining access to the files or communications of others. Employees engaging in "snooping" are subject to disciplinary action, up to and including removal.

c.  **Disclosure.**

(1)   Electronic messages may be agency records for purposes of the Freedom of Information Act, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. As such, electronic messages or portions of them may be required to be disclosed upon a proper request. Additionally, they may be disclosed pursuant to discovery in a legal proceeding or upon request by the Congress. The contents of electronic messages, properly obtained for Government purposes, may be disclosed within the agency for an official purpose without the permission of the authorized user who created the message. Whenever practicable, however, the author of the message will be informed regarding further dissemination of the message.

(2)   The Agency may use information regarding the number, sender, recipient and addresses of electronic communications sent over the electronic messaging services for any official purpose.

d.  **Message encryption.**

(1)   In order to ensure GSA's and the Governments' continuous access to information in the Agency's systems authorized users shall **not** use any message encryption other than that integral **to the** email system. Users are prohibited from using any personal hardware or software to encrypt any electronic mail, files, or any other data communicated by the Agency's electronic services unless specifically authorized to do so by appropriate authority. Non-standard encryption of electronic mail shall only be used if explicitly authorized by a Head of the Service or Staff Office, or Regional Administrator, and only after obtaining the concurrence of the Office of the CIO.

(2)   Note: The compression of file attachments for the purpose of reducing the file size for

transmission is not encryption, and it is a preferred method of handling large messaging attachments.

e.  Official records storage.  The GSA electronic mail system is not an authorized official records storage system for GSA records management purposes (ADM IL-95-6).  Any official records created in the GSA electronic mail system must be moved to a file that is maintained according to the GSA Records Schedules (OAD P 1820.2A) by the originator and the recipient.

3.  Appropriate use.

a.  Responsible use.

(1)  When using GEMS, users are doing so as employees and/or representatives of GSA and the Government.  Users should at all times seek to promote a positive image for GSA and the Government. They should be careful about how they represent themselves, given that what they say or do could be interpreted as GSA or Government opinion or policy.  Users should be aware that their conduct could reflect on the reputation of GSA, the Government, and its employees.

(2)  All users have an obligation to learn about mail etiquette, customs, and courtesies.  Certain procedures and guidelines should be followed when using electronic mail communications, participating in electronic mail discussion groups, and sending attachments.  On-line Internet training sources, such as http://www.learnthenet.com, are available to help with understanding proper mail etiquette.  This information is also available on the GSA Intranet, "Insite", at http://internotes.gsa.gov/insite/gsad.nsf.

(3)  All users have an obligation to be aware of computer  and privacy concerns and to guard against computer viruses.  Users who load files brought in from outside sources on government computers, then send the files as mail attachments, present a heightened risk in this area unless the users first virus-scan all outgoing attachments before the mail is sent out.  Because there are non-Agency electronic services users, always use care in addressing messages to make sure you do not inadvertently send a message meant only for GSA employees and authorized users to outsiders, and never use email for classified data.

(4)  Users must exercise caution in conveying sensitive or nonpublic information.  Such information should be treated with the same care as paper documents conveying the same information.

b.  Federal laws and regulations.  Use of GEMS must comply with Federal laws and regulations. Applicable laws and regulations include but are not limited to:

(1)  5 U.S.C. § 552, the Freedom of Information Act

(2)  5 U.S.C. § 552a, the Privacy Act

(3)  44 U.S.C. § 2901, et seq., the Federal Records Act

(4)  44 U.S.C. § 3301, the Federal Records Disposal Act

(5)  17 U.S.C. § 101 et seq., Copyright Act of 1976

(6)  Public Law 99-474, The Computer Fraud and Abuse Act of 1986

(7)  18 U.S.C. § 798, and 50 U.S.C. § 783(b) regarding protection of Classified Information

(8)  18 U.S.C. § 1905, which prohibits disclosure of proprietary information and certain other confidential information

(9)  41 U.S.C. § 423(a), which prohibit unauthorized disclosure of certain procurement sensitive

DOJ-DS007398

information, including proprietary or source selection information

(10)  5 C.F.R. Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch, particularly subpart G, which deals with misuse of position

(11)  36 C.F.R. Parts 1220, 1222, 1228 and 1234, National Archives and Records Administration regulations on management of e-mail messages

c.  **Additional agency policy.** Agency policy is promulgated via GSA Instructional Letters, and GSA Orders.  The applicable GSA Instructional Letters and GSA Orders currently in effect that provide additional policy guidance in the use of Government IT resources and messaging are:

(1)  GSA ORDER - ADM2100.6, Subject: Protection of Microcomputers from Malicious Software; Use of Public Domain Software and Shareware

(2)  GSA ORDER - ADM 2100.1C, Subject:  Security of Automated Information systems

(3)  GSA ORDER - ADM7800.11, Subject: Personal Use of Agency Office Equipment

(4)  GSA INSTRUCTIONAL LETTER-OAD-IL-95-6, Subject: Recordkeeping Policy for E-Mail Messages

All GSA policy is available to all authorized users and posted to the GSA Intranet, "InSite", at http://internotes.gsa.gov/insite/gsad.nsf.

4.  **Inappropriate use.**

a.  **Conveying of classified data or information.**  The GEMS is not a secure system in the context of providing adequate protection for classified data or information.  Users shall never convey classified data or information in any messages sent over the electronic mail system.

b.  **Unlawful or malicious use.**  Unlawful or malicious activities are prohibited.  The activities include, but are not limited to:

(1)  Use of offensive, abusive, discriminatory or objectionable language or graphics in either public or private messages.

(2)  Use of lewd or sexually explicit language or graphics that are inappropriate or offensive to co-workers or the public, such as the use of sexually explicit materials, or materials or remarks that ridicule others on the basis of race, creed, religion, color, sex, handicap, national origin, or sexual orientation.

(3)  Using GEMS to misrepresent oneself or GSA or the Government.

(4)  Using GEMS to "snoop" on or invade another person's privacy merely to satisfy idle curiosity and with no legitimate Governmental purpose

(5)  Any use that reflects adversely on GSA or the Government.

c.  **Denial of service.**  Denial of service is any activity that interferes with official GSA or Government business.  Examples are:

(1)  Mass mailings, the sending of any "broadcast email messages" or any other similar activity that could cause congestion and disruption of networks and systems or interfere with the work of others.

(2)  Any use involving chain letters, initiating them, or forwarding them to others is an abuse of

resources and is forbidden. Any non-business correspondence that requests the recipient to forward it on to others is a chain letter. Forwarding copies of hoaxes relating to email viruses, jokes, cookie recipes, and get-rich-quick schemes fall into this category and are also an abuse of resources.

(3)    Sending large attachments that are not business related, especially the ill-advised practice of emailing your friends and co-workers attachments of holiday or special event greetings, or an animated cartoon, music or video clip is an abuse of scarce and expensive resources.

d.  **Abuse of resources.**  Any use that uses Government time or resources and results in no benefit to the Government. Examples include but are not limited to:

(1)    Joining electronic discussion groups (listservs, newsgroups, etc.) that are not Government business related and result in mailings to an authorized user at work.

(2)    Signing up for services that are not Government related and results in any data, sound, graphics, reports, etc., being mailed to an authorized user at work.

(3)    Any use for an authorized user's own private gain, for the endorsement of any product, service, or enterprise, or for the private gain of friends, relatives or persons with whom the authorized user is affiliated in a nongovernmental capacity, including nonprofit organizations of which the authorized user is an officer or member, and persons with whom the authorized user has or seeks employment or business relations.

(4)    The use of the electronic messaging services to solicit Agency employees for any purpose not related to official Government business.

5.  **Order maintenance.**

a.  Change Management.  Comments, questions, or recommendations for changes regarding this Policy may be directed by electronic mail to postmaster@gsa.gov.

b.  Waivers.  Request for waivers to this order must be submitted to the CIO for review and approval.

Validation - Signed by William H. Sims III/CAID/CO/GSA/GOV on 10/13/98 03:59:04 PM, according to /GS.

DOJ-DS007400

# Exhibit 6



GSA Office of the Chief Information Officer

July 26, 2005

MEMORANDUM FOR HEADS OF SERVICES AND STAFF OFFICES AND
REGIONAL ADMINISTRATORS

FROM:          MICHAEL W. CARLETON
               CHIEF INFORMATION OFFICER (I)

SUBJECT:       CIO 2160.2A, GSA Electronic Messaging Policy

This memorandum transmits the revised GSA Order CIO 2160.2A, "GSA Electronic
Messaging Policy." The purpose of this revision is to set forth the General Services
Administration's (GSA) policy on electronic messaging. Specifically, this policy
addresses rules relating to recordkeeping of e-mail messages, e-mail deletion and the
appropriate use of the GSA Enterprise Messaging Services (GEMS). Finally, this order
combines separate e-mail policies currently published as GSA order, GSA Electronic
Messaging Policy (CIO 2160.2), and instructional letter, Recordkeeping Policy for E-mail
Messages (OAD IL-95-6).

In reaching this stage, this GSA Order has been presented to both the Information
Technology Architecture Planning Committee (ITAPC) and the Information Technology
Council (ITC). Comments received through these reviews have already been
incorporated. This Order has also been sent through the official GSA clearance
process.

We appreciate your continued cooperation in assisting to implement information
technology improvements and standardization to provide more efficient IT capability for
all GSA associates. Should you have any questions regarding this matter, contact me
on (202) 501-1000.

Attachment

U.S. General Services Administration
1800 F Street, NW
Washington, DC  20405-0002
www.gsa.gov

DOJ-DS007381

GENERAL SERVICES ADMINISTRATION
WASHINGTON, DC 20405

July 26, 2005
CIO 2160.2A

GSA ORDER

SUBJECT: GSA Electronic Messaging

1. Purpose. This Order sets forth GSA's directive on electronic messaging. Specifically, this directive addresses rules relating to recordkeeping of e-mail messages, e-mail deletion and the appropriate use of the GSA Enterprise Messaging Services (GEMS). Finally, this Order combines separate e-mail directives currently published as GSA Order, CIO 2160.2, "GSA Electronic Messaging Policy," and Instructional Letter (IL), OAD IL-95-6, "Recordkeeping Policy for E-mail Messages."

2. Cancellation. This Order cancels CIO 2160.2.

3. Substance. GEMS is a set of messaging services consisting of a nationwide network of centrally administered and managed electronic mail servers, electronic messaging gateways, message switches, and virus firewalls, making up GSA's single, Agencywide electronic mail system. GEMS is a shared resource that has been procured, implemented, and is maintained to conduct the Agency's business. The National Archives and Records Administration (NARA) has issued governmentwide regulations governing the way agencies manage e-mail messages (36 CFR Parts 1220, 1222, 1228, and 1234). The regulations direct agencies to issue implementing guidance.

4. Directive. Authorized users must use the GEMS resources appropriately. The misuse of these resources can severely hamper the Agency's ability to conduct business and accomplish its mission. Users must learn how to use electronic mail efficiently, effectively, and courteously, practicing good security and using e-mail in a responsible, professional, and lawful manner. All users must comply with Federal laws and regulations. Unlawful or malicious activities that would result in a denial of service to other users and abuse of resources are prohibited. Additionally, users have an obligation to be aware of computer security and privacy concerns and to guard against computer viruses.

GSA e-mail messages should be treated the same way as paper documents which serve the same purpose. E-mail is no more and no less important than other information used to transact business. Authorized users must apply the same decision-making process to e-mail for record maintenance and disposition that they apply to other documentary materials, regardless of the media used to create them. E-mail may be archived to another server, the user's workstation, or a printed copy may be made. Each organization will establish e-mail archival procedures. Finally, e-mail messages older than 60 days will be automatically deleted from the GEMS mail servers.

DOJ-DS007382

5. Applicability. This Order applies to all authorized users who are granted access to GEMS and to all communications sent or received with the use of GEMS.

6. Violations. All suspected violations shall be reported to the local Information System Security Officer (ISSO) and/or Information System Security Manager (ISSM). The ISSO/ISSM will review the facts to determine and validate whether or not a violation has occurred. If it is determined that a violation has occurred, the ISSO/ISSM will report the incident to the appropriate parties (i.e., supervisor, Office of the CIO Security Division, Office of Inspector General) for further action or disposition. Anyone needing assistance in determining whether a violation has occurred may contact their local ISSO/ISSM for assistance. A current list of ISSOs/ISSMs is maintained at: http://insite.gsa.gov/_cio/issmo.doc.

7. Definitions.

    a. Authorized Users. Authorized users are associates of GSA and other Government organizations who are supported by GSA, and those contractors, consultants, or other third parties who are specifically granted access for the conducting of business on behalf of or with GSA or other Government organizations supported by GSA. Contractors, consultants, or other third party personnel meeting these requirements will be authorized use only if sponsored by a GSA Service or Staff Office.

    b. System Administrator/Manager. The associate or support contractor who has been designated as having the responsibility for ensuring the continued operation, maintenance, availability and accessibility of assigned system(s).

    c. Abuse of Resources. Use that results in no benefit to GSA or the Government, and causes the Agency additional expenses through increased load on networks, systems and staff.

    d. Classified Information. Information defined by GSA Order, ADM P 1025.2D, "Classified National Security Information," as national security information.

    e. Denial of Services. Use that interferes with official GSA or Federal Government business by overloading resources, or blocking access to any resources.

    f. E-Mail Account. An account established between an authorized user and GEMS for the purpose of creating, sending and receiving electronic mail messages. E-mail accounts require a login and password and may also be associated with access to other databases, in addition to e-mail and calendaring services.

    g. E-Mail File. The physical e-mail data file consisting of an Inbox, Sent, Trash and other user-created folders for use in the creation, sending, receiving and organization of electronic mail messages. This file may also provide calendaring functionality and

2

DOJ-DS007383

contain related information such as meetings, appointments and reminders. An e-mail account is required to access an e-mail file.

h.  Malicious Use.  Use designed to embarrass, harm or otherwise cause others to suffer.  Denial of service is one type of malicious use.

i.  Message Encryption.  Use of software to render a message unreadable to everyone except the sender and its intended recipient.

j.  Official Records.  All books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an Agency of the United States Government under Federal law, or in connection with the transaction of public business, and preserved, or appropriate, for preservation by that Agency, or its legitimate successor, as evidence of the organization, functions, policies, decisions, procedures, operations or other activities of the Government, or because of the informational value of the data in them (44 U.S.C. 3301).

k.  Prohibited Use.  Use which is forbidden by, or fails to comply with Federal laws, regulations or GSA directives.

l.  Sensitive Information.  Information protected by the Privacy Act.  Information that would be withheld from disclosure under the Freedom of Information Act, procurement-sensitive information, proprietary information of GSA service partners and suppliers, or other information deemed sensitive by the Agency.

m. Signature Block.  The part of an e-mail message that contains the sender's contact information. This information usually consists of at least the sender's name and phone number.  A signature block might also include additional information, such as job title, department/organization, mailing/office address, e-mail address, fax or cell phone numbers, business web site address, business slogan, etc.  A signature block is typically located at the end of an e-mail message.

n.  Transitory Material.  Documents of short-term interest having no documentary or evidential value and which normally need not be kept more than 60 days.  Examples of transitory material are:

(1)  Routine requests for information or publications and copies of replies that require no administrative action, no directive decision and no special compilation or research for reply.  Freedom of Information requests are not considered transitory material.

(2)  Originating office copies of letters of transmittal that do not add any information to that contained in the transmitted material, and the receiving office copy, if

3

DOJ-DS007384

filed separately from transmitted material.

(3)   Quasi-official notices, including memoranda and other records, that do not serve as the basis of official actions, such as notices of holidays or charity and welfare fund appeals, bond campaigns and similar correspondence.

(4)   Copies of documents issued to multiple recipients. Usually, copies of documents received by recipients of e-mail are copies, not records, and should be thrown away as soon as they are not needed for reference. However, multiple copies of the same document may meet the definition of records, if any copy is used by the recipient to transact Agency business. Copies that have such record status are usually filed in different record-keeping systems and are used for different purposes.

(5)   Drafts circulated for comment. In general, draft copies are not records. However, draft documents or working papers that propose or evaluate high-level policies or decisions and provide unique information that contribute to the understanding of major decisions, must be preserved as Federal records, whether they are in printed or e-mail form.

(6)   Records used or issued to conduct or transact official business. Any document that would be classified as a record if it were issued in paper form is a record if issued via e-mail. Normally, only the originator copy is the record copy. However, as noted in subparagraph 7.n above, recipient copies may be records under certain circumstances.

8. Electronic message control.

a. Message privacy. GSA provides electronic messaging services to authorized users, at GSA expense, for their use on GSA or other Government business. All electronic communications sent or received using Agency resources are owned by the Government. The Agency may access any message sent over its electronic services for a legitimate Governmental purpose. Occasional personal use of the electronic services that involves minimal expense to the Government and does not interfere with Government business is authorized under GSA Order ADM 7800.11, "Personal Use Of Agency Office Equipment." However, authorized users have no expectation of privacy with regard to electronic messages, official or personal, sent through the Government-provided electronic messaging services. The use of passwords to "log on" to the electronic mail system or to access electronic services does not guarantee personal privacy. The Agency reserves the right to limit authorized users' electronic messaging access following evidence that shows inappropriate use of the system, or such use that creates an appearance of impropriety in the public view.

4

b.  Monitoring.

(1)  In the performance of their duties to ensure system reliability, the GEMS system administrators/managers regularly monitor the efficient functioning of electronic messaging services, not the content of messages . These system administrators/managers review the system logs created by the various electronic messaging services to analyze service delivery problems.  The logs usually contain information about each message, including sender address, receiver address, size of message, and date and time of day, but not the content of the message.  These logs are retained locally for 14 days and then destroyed, if they are not being used for problem analysis. System administrators/managers only open e-mail messages and review their content when attempting to locate a message, as requested by an approved official request or during authorized official investigation(s), in suspected violations of using the messaging system.

(2)  If system administrators/managers find indications of illegal activity, violations of Agency policy or security, they will report their findings to the appropriate ISSO/ISSM for further action or disposition.

(3)  Supervisors may request the review of the electronic messages of anyone they supervise, if they have reason to suspect there has been any breach of security, violations of GSA policy or other misconduct on the part of the associate.  This may include inspection of the contents of electronic messages disclosed in the course of such monitoring or any follow up investigation, if such inspection is necessary to serve an official purpose.  The supervisor should express the need to gain access to the suspected individual's message files in writing along with the purpose for seeking access to the content of the individual's messages.  The request must go to the GSA Office of the CIO Division Director responsible for the GEMS operation.  The next level of authority to whom the requesting supervisor reports within GSA, if any, will instruct or authorize further investigatory steps and actions based upon findings of the request and seek the advice of the General Counsel and Chief People Officer.

It is a misuse of Federal Government time and resources and a violation of this directive for anyone, including system administrators, managers, and supervisors, to peruse electronic mail or other electronic messages, or use Agency computer systems in any fashion to satisfy idle curiosity about the affairs of others, with no business purpose for obtaining access to the files or communications of others.  Anyone engaging in "snooping" is subject to disciplinary action, up to and including removal.

c.  Disclosure.

(1)  Electronic messages may be treated as Agency records for purposes of the Freedom of Information Act, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a.  As such, electronic messages or portions of them may be required to be disclosed upon a proper request.  Additionally, they may be disclosed pursuant to discovery in a legal

5

proceeding or upon request by Congress. The contents of electronic messages, properly obtained for Federal Government purposes, may be disclosed within the Agency for an official purpose without the permission of the authorized user who created the message. Whenever practicable, however, the author of the message will be informed regarding further dissemination of the message.

(2) The Agency may disclose information regarding the number, sender, recipient and addresses of electronic communications sent over the electronic messaging services as authorized by law.

d. Message encryption.

(1) In order to ensure GSA's and the Federal Government's continuous access to information in the Agency's systems, authorized users shall not use any message encryption beyond the default settings provided in GEMS. Users are prohibited from using any personal hardware or software to encrypt any electronic mail, files, or any other data communicated by the Agency's electronic services, unless specifically authorized to do so by an appropriate authority. Non-standard encryption of electronic mail shall only be used if explicitly authorized by the Designated Approving Authority (DAA) and only after obtaining the concurrence of the Office of the CIO. Requests for further guidance or information regarding encryption and its use within the Agency may be sent to: itsecurity@gsa.gov.

(2) The compression of file attachments for the purpose of reducing the file size for transmission is not encryption, and it is a preferred method of handling large messaging attachments.

e. Maintenance and disposition of e-mail messages.

(1) Non-record material (transitory documents, copies, and drafts) may be retained in an e-mail file for short periods. Delete all such material as soon as it has served its purpose.

(2) Official records may not be retained solely in the form of an electronic message file in GEMS. Any document that may be classified as a record should be transferred to a file that is maintained according to OAD P 1820.2A, "GSA Records Maintenance and Disposition System." Record documents may be retained in word processing directories or in hard copy files as long as they can be maintained in accordance with approved record schedules. The GSA electronic mail system is not an authorized official records storage system for GSA records management purposes. Any official records created in the GSA electronic mail system must be moved to a file that is maintained according to "GSA Records Maintenance and Disposition System" by the originator and the recipient.

6

(3) E-mail files on the e-mail server will be purged routinely of material that is more than 60 days old. Every weekend, e-mail messages older than 60 days, which are located in the following areas within a mail file, will be deleted from the mail server during the weekly mail file maintenance process: (a) Inbox; (b) Sent; (c) Trash; and, (d) any user-created e-mail folders. All e-mail users must archive or print out any messages they wish to keep longer than 60 days.

(4) All messages and their associated attachments sent and received via the Internet will be scanned for viruses. Messages containing viruses will be cleaned and forwarded to the intended recipient(s) electronically. If a message is unable to be cleaned, that message will be quarantined and not forwarded.

(5) Messages coming into GSA from the Internet larger than 5 million bytes (MB), or messages going to the Internet larger than 10MB will be deferred for delivery until after normal business hours (8:00 p.m. Eastern Time). Large messages can negatively impact the processing and delivery of other messages. Deferring large messages until non-business hours allows for faster, more reliable service. When a message is deferred, a notification message will be sent to the recipient stating why delivery has been delayed. The notification message will provide a point of contact to call, if there is an urgent business need to release the message immediately.

f. E-mail account and file disposition.

(1) Any authorized user of GEMS who fails to complete the annual security training will have their e-mail account disabled. Accounts will be reinstated upon verification of the completion of the annual security training.

(2) GEMS systems administrators will monitor all e-mail files for indication of inactivity. An "inactivity warning" notification will be sent to the user of any e-mail file not accessed in a 30 day period and designated points of contact. If an e-mail file has not been accessed in a 45 day period, the e-mail file will be considered "inactive" and the e-mail account disabled. Any e-mail file that has not been accessed in a 60 day period will be deleted and the associated e-mail account terminated.

9. Appropriate use.

a. Responsible use.

(1) When using GEMS, users are doing so as associates and/or representatives of GSA and the Federal Government. Users should at all times seek to promote a positive image for GSA and the Federal Government. They should be careful about how they represent themselves, given that what they say or do could be interpreted as GSA or Federal Government opinion. Users should be aware that their conduct could reflect on the reputation of GSA, the Federal Government, and its associates.

DOJ-DS007388

(2) All users have an obligation to learn about e-mail etiquette, customs, and courtesies. Certain procedures and guidelines should be followed when using electronic mail communications, participating in electronic mail discussion groups, and sending attachments. On-line Internet training sources, such as: http://www.learnthenet.com, are available to help with understanding proper mail etiquette. This information is also available on the GSA Intranet, "Insite", at: http://insite.gsa.gov/tutor/help.htm.

(3) All users have an obligation to be aware of computer security and privacy concerns and to guard against computer viruses. Users who load files brought in from outside sources on Federal Government computers, then send the files as e-mail attachments, present a heightened risk in this area, unless the users first virus-scan all outgoing attachments before the e-mail is sent out. Always exercise caution when addressing e-mail messages, as there are users of the Agency's services who are not Agency associates. This will help to avoid inadvertently sending a message meant for GSA associates and authorized users to outsiders. Finally, never use e-mail for transmitting or storing classified data.

(4) Users must exercise caution in conveying sensitive or non-public information. Such information should be treated with the same care as paper documents conveying the same information.

b. Federal laws and regulations. Use of GEMS must comply with Federal laws and regulations. Applicable laws and regulations include but are not limited to:

(1) 5 U.S.C. § 552, the Freedom of Information Act;

(2) 5 U.S.C. § 552a, the Privacy Act;

(3) 44 U.S.C. § 2901, *et seq.*, the Federal Records Act;

(4) 44 U.S.C. § 3301, the Federal Records Disposal Act;

(5) 17 U.S.C. § 101 *et seq.*, Copyright Act of 1976;

(6) Public Law 99-474, The Computer Fraud and Abuse Act of 1986;

(7) 18 U.S.C. § 798, and 50 U.S.C. § 783(b) regarding protection of Classified Information;

(8) 18 U.S.C. § 1905, which prohibits disclosure of proprietary information and certain other confidential information;

8

DOJ-DS007389

(9)  41 U.S.C. § 423(a), which prohibits unauthorized disclosure of certain procurement-sensitive information, including proprietary or source selection information;

(10) 5 C.F.R. Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch, particularly subpart G, which deals with misuse of position; and

(11) 36 C.F.R. Parts 1220, 1222, 1228 and 1234, National Archives and Records Administration regulations on management of e-mail messages.

c. Additional Agency directives.  Additional directive guidance in the use of Government IT resources and messaging is found in GSA Order, ADM 7800.11, "Subject Personal Use of Agency Office Equipment."

d. E-mail messages.  GSA directives regarding e-mail use is available to authorized users and posted to the GSA Intranet, "InSite", at: http://hydra.gsa.gov/staff/c/ca/Directives/gsad.htm.

10. Inappropriate use.

a. Conveying of classified data or information.  The GEMS is not a secure system in the context of providing adequate protection for classified data or information. Users shall never convey classified data or information in any messages sent over the GSA electronic mail system.

b. Unlawful or malicious use.  Unlawful or malicious activities are prohibited. The activities include, but are not limited to:

(1)  Use of offensive, abusive, discriminatory or objectionable language or graphics in either public or private messages;

(2)  Use of lewd or sexually explicit language or graphics that are inappropriate or offensive to co-workers or the public, such as the use of sexually explicit materials, or materials or remarks that ridicule others on the basis of race, creed, religion, color, sex, handicap, national origin, or sexual orientation;

(3)  Using GEMS to misrepresent oneself, GSA or the Federal Government;

(4)  Using GEMS to "snoop" on or invade another person's privacy merely to satisfy idle curiosity and with no legitimate Federal Governmental purpose; and

(5)  Any use that reflects adversely on GSA or the Federal Government.

c. Denial of service.  Denial of service is any activity that interferes with official GSA or Federal Government business.  Examples are:

9

DOJ-DS007390

(1) Mass mailings, the sending of any "broadcast e-mail messages," or any other similar activity that could cause congestion and disruption of networks and systems or interfere with the work of others.

(2) Any use involving chain letters, by initiating them or forwarding them to others, is an abuse of resources and is forbidden. Any non-business correspondence that requests the recipient to forward it on to others is a chain letter. Forwarding any copies of hoaxes relating to e-mail viruses, jokes, cookie recipes, and get-rich-quick schemes falls into this category and is also an abuse of resources.

(3) Sending large attachments that are not business-related, especially the ill-advised practice of e-mailing friends and co-workers attachments of holiday or special event greetings, or an animated cartoon, music or video clip is an abuse of resources.

d. Abuse of resources. Any use of Federal Government time or resources that results in no benefit to the Federal Government. Examples include but are not limited to:

(1) Joining electronic discussion groups (listservs, newsgroups, etc.) that are not Federal Government business-related and result in mailings to an authorized user at work;

(2) Signing up for services that are not Federal Government-related and results in any data, sound, graphics, reports, etc., being mailed to an authorized user at work;

(3) Any use for an authorized user's own private gain, for the endorsement of any product, service, or enterprise, or for the private gain of friends, relatives or persons with whom the authorized user is affiliated in a non-governmental capacity, including nonprofit organizations of which the authorized user is an officer or member, and persons with whom the authorized user has, or seeks employment or business relations;

(4) The use of the electronic messaging services to solicit Agency associates for any purpose not related to official Federal Government business.

e. Inappropriate Signature Block Content. Signature blocks are intended to be used as a method of providing sender contact information to message recipients. Signature blocks should not include quotes, sayings, or slogans that express any personal opinions, views, or beliefs. Only GSA and GSA business-related slogans may be used as part of a message signature block. In addition, use of graphics in the signature block should be limited and is restricted to GSA and GSA business-related logos, such as the GSA logo/seal.

DOJ-DS007391

11. Order maintenance.

a. Comments. Comments, questions or recommendations for changes regarding this directive may be directed by electronic mail to: notesmail.issues@gsa.gov.

b. Waivers. Request for waivers to this Order must be submitted to the GSA Chief Information Officer for review and approval.

Michael W. Carleton
Chief Information Officer

11

DOJ-DS007392

MEMORANDUM FOR HEADS OF SERVICES AND STAFF OFFICES AND
REGIONAL ADMINISTRATORS

FROM:    MICHAEL W. CARLETON
         CHIEF INFORMATION OFFICER (I)

SUBJECT:    GSA Orders, CIO 2160.2A GSA Electronic Messaging

This memorandum transmits the revised GSA Order CIO 2160.2A, "GSA Electronic
Messaging Policy." The purpose of this revision is to set forth the General Services
Administration's (GSA) directive on electronic messaging. Specifically, this Order
addresses rules relating to recordkeeping of e-mail messages, e-mail deletion and the
appropriate use of the GSA Enterprise Messaging Services (GEMS). Finally, this Order
combines separate e-mail policies currently published as GSA Order CIO 2160.2, "GSA
Electronic Messaging Policy," and Instructional Letter OAD IL-95-6, "Recordkeeping
Policy for E-mail Messages."

In reaching this stage, this GSA Order has been presented to both the Information
Technology Architecture Planning Committee (ITAPC) and the Information Technology
Council (ITC). Comments received through these reviews have already been
incorporated. This Order has also been sent through the official GSA clearance
process.

We appreciate your continued cooperation in assisting to implement information
technology improvements and standardization to provide more efficient IT capability for
all GSA associates. Should you have any questions regarding this matter, contact me
on (202) 501-1000.

Attachment

cc: Official & reading file – IPE
    I, IA, IP, IPE (Sansotta)

IEP _Marc C. Wolff (t)_ Date _21 July 2005_

IE _City S X (W_ Date _22 July 2005_

II:/IE/IEP/Policy\2160-2 Electronic Messaging\Memofor CIO2160.2Av1
Revised 7/21/2005 mwolfe

DOJ-DS007393

## GSA DOCUMENT SUMMARY
### (Instructions on reverse)

| 1. TO: HSSO | 2. FOR SIGNATURE OF Michael W. Carleton | 3. DATE DUE |
|---|---|---|

| 4. SUBJECT CIO 2160.2A, Electronic Messaging Policy | 5. [X] BASIC DOCUMENT  [ ] RESPONSE | 6. CORRESPONDENCE CONTROL IP-M-2003-0019 IP-CC-2003-0001 |
|---|---|---|

### 7. CONCURRENCES

| ITEM | CORRES. SYMBOL | SIGNATURE (Sign full name) | DATE | ITEM | CORRES. SYMBOL | SIGNATURE (Sign full name) | DATE |
|---|---|---|---|---|---|---|---|
| A. | IEP | M. Jane Morgan    *Marc A. Wolfe for* | 21 July 2005 | H. | | | |
| B. | IE | Phil Klokis | 22 July 2005 | I. | | | |
| C. | IA | Chris Fornecker | 7/22/05 | J. | | | |
| D. | IO | Mike Seckar | 7/22/05 | K. | | | |
| E. | I | Jim Kearns | 7-22-05 | L. | | | |
| F. | | | | M. | | | |
| G. | | | | N. | | | |

| 8. NAME OF ACTION OFFICER Marc Wolfe | 9. CORRES. SYMBOL IEP | 10. TELEPHONE NO. 202-501-2514 | 11. TYPIST | 10. TELEPHONE NO. |
|---|---|---|---|---|

NOTE: NUMBER OF SIGNATURES REQUIRED BY FINAL SIGNING OFFICIAL ▶

14. SUMMARY

Enclosed is the revised GSA Order CIO 2160.2A, GSA Electronic Messaging Policy.

*Mike,*
*This package was lost a few months ago and Phil's group has recreated it.*

*Jim*

| 15. AUTHOR ▶ | TYPED NAME AND SIGNATURE Marc A. Wolfe  *Marc A. Wolfe* | SYMBOL IEP | TELEPHONE NO. 202-501-2514 | DATE 21 July 2005 |
|---|---|---|---|---|

GENERAL SERVICES ADMINISTRATION

GSA FORM 3401 (REV. 7-80)

DOJ-DS007394

# Exhibit 7



General Services Administration
Office of Management Services and Human Resources
Washington, DC 20405

December 5, 1995

INSTRUCTIONAL LETTER OAD IL-95-6

MEMORANDUM FOR HEADS OF SERVICES AND STAFF OFFICES
                REGIONAL ADMINISTRATORS
                REGIONAL FREEDOM OF INFORMATION
                ACT (FOIA) OFFICERS

FROM:       MARCELLA BANKS
            ACTING ASSOCIATE ADMINISTRATOR FOR
            MANAGEMENT SERVICES AND HUMAN RESOURCES (C)

SUBJECT:    Recordkeeping Policy for E-Mail Messages

1.  Purpose.  This letter issues new General Services
Administration (GSA) policy on maintaining and disposing of
e-mail messages.

2.  Background.  The National Archives and Records
Administration (NARA) has recently issued government-wide
regulations governing the way agencies manage e-mail
messages (36 CFR Parts 1220, 1222, 1228, and 1234).
Agencies are directed to issue implementing guidance.

3.  Policy.  GSA e-mail messages should be treated the same
way as paper documents that do the same things.  E-mail is
no more and no less important than other information used to
transact business.  Agency personnel must apply the same
decision-making process to e-mail that they apply to other
documentary materials regardless of the media used to create
them.

4.  Definitions:  In general, e-mail falls into the
following categories:

    a.  Transitory material:  Documents of short-term
interest which have no documentary or evidential value and
normally need not be kept more than 90 days are not defined
as records.  Examples of transitory material are:

        (1) Routine requests for information or
publications and copies of replies which require no
administrative action, no policy decision, and no special
compilation or research for reply.

Distribution:  A; B; C; D; F; G; H; I

Federal Recycling Program    Printed on Recycled Paper

DOJ-DS 0013306

(2) Originating office copies of letters of transmittal that do not add any information to that contained in the transmitted material, and receiving office copy if filed separately from transmitted material.

(3) Quasi-official notices including memoranda and other records that do not serve as the basis of official actions, such as notices of holidays or charity and welfare fund appeals, bond campaigns, and similar correspondence.

b. Copies of documents issued to multiple recipients: Usually, copies of documents received by RECIPIENTS of e-mail are copies, not records, and should be thrown away as soon as they are not needed for reference. However, multiple copies of the same document may meet the definition of records if each of them is used to transact agency business. Copies that have such record status are usually filed in different recordkeeping systems and are used for different purposes.

c. Drafts circulated for comment: In general, draft copies are not records. However, draft documents or working papers that propose or evaluate high-level policies or decisions and provide unique information that contributes to the understanding of major decisions should be preserved as Federal records. Apply the same criteria to drafts that are circulated on e-mail systems as to drafts circulated by other means.

d. Records used or issued to conduct or transact official business: Any document that would be classified as a record if it were issued in paper is a record if issued via e-mail. Normally, only the ORIGINATOR copy is the record copy; however, as noted in par. b., recipient copies may be records under certain circumstances.

5. <u>Maintenance and Disposition of E-Mail Messages</u>.

a. Nonrecord material (transitory documents, copies and drafts) may be retained in an e-mail directory for short periods. Delete all such material as soon as it has served its purpose.

b. Records may not be retained in an e-mail directory. Any document that may be classified as a record should be transferred to a file that is maintained according to the GSA Records Schedules (OAD P 1820.2A). Record documents may be retained in word processing directories or in hard copy files, as long as they can be maintained in accordance with approved record schedules. For example, most routine administrative records are filed as General Administrative Subject Files (Schedule Category 1B002).

2

DOJ-DS 0013307

    c.  E-mail directories should be purged routinely of
material that is more than 90 days old.  System
administrators should accomplish this deletion after notice
to system users that record material must be transferred
from e-mail files to appropriate scheduled files or
directories.

6.  <u>Effective date</u>.  Immediately upon signature.

5.  <u>Expiration date</u>.  One year after signature.

7.  <u>Coverage</u>.  This policy applies to all organizational
units of GSA in the Central Office and regional offices.

8.  <u>Reference to directives</u>.  This instructional letter
contains policies affecting the GSA Order OAD P 1820.2A,
GSA Records Maintenance and Disposition System.

9.  <u>Filing instructions</u>.  File this letter with the OAD 1820
series of directives.

DOJ-DS 0013308

# Exhibit 8

☐ *Original*    ☐ *Amendment*

## U.S. House of Representatives

### *MEMBER/OFFICER TRAVEL DISCLOSURE FORM*

This form is for disclosing the receipt of travel expenses from private sources for meetings, speaking engagements, fact-finding trips or similar events in connection with official duties. You need not disclose government-funded or political travel on this form, or travel that is unrelated to official duties. This form does not eliminate the need to report all privately funded travel on the annual Financial Disclosure Statements of those persons required to file them. In accordance with clause 5 of House Rule 25, complete this form and file it with the Clerk of the House of Representatives, B-106 Cannon House Office Building, within 30 days after travel is completed. The Clerk is to make these forms available to the public as soon as possible after they are filed. *Obtain the dollar amounts from the sponsor; if exact dollar amounts are unavailable, provide a good faith estimate.*

NAME OF MEMBER OR OFFICER (PRINT OR TYPE): **Bob Ney**

NAME OF ACCOMPANYING FAMILY MEMBER (if any): _____

RELATIONSHIP TO MEMBER/OFFICER (check one): _____ spouse _____ child

DATES OF TRAVEL: **Aug 3 – Aug 9, 2002**

DATES AT PERSONAL EXPENSE: _____

ITINERARY: **Visit United Kingdom - travel to Scotland & leave London**

SPONSOR (WHO PAID FOR THE TRIP): **National Center for Public Policy**

PURPOSE OF TRIP: **Speech to Scottish parliamentarians; attend Edinburgh Military Tattoo; visit British Parliament**

TOTAL TRANSPORTATION EXPENSES:

    For Member or Officer: **$1500.00**

    For accompanying spouse or child: _____

TOTAL LODGING EXPENSES:

    For Member or Officer: **1,200.00**

    For accompanying spouse or child: _____

TOTAL MEAL EXPENSES:

    For Member or Officer: **$500.00**

    For accompanying spouse or child: _____

OTHER EXPENSES (specify):

    For Member or Officer: _____

    For accompanying spouse or child: _____

*[Stamp: LEGISLATIVE RESOURCE CENTER, OFFICE OF THE CLERK, U.S. HOUSE OF REPRESENTATIVES, 2002 SEP -3 AM 11: 24]*

I have determined that all of the expenses listed above were necessary and that the travel was in connection with my duties as a Member or Officer of the U.S. House of Representatives and would not create the appearance that I am using public office for private gain.

SIGNATURE OF MEMBER OR OFFICER: *[signature]*    DATE: **9/9/02**

*Version date 1/2001*

# Exhibit 9

Order Code RL30240

# CRS Report for Congress
### Received through the CRS Web

# Congressional Oversight Manual

## Updated October 21, 2004

Louis Fisher, Frederick M. Kaiser, and Walter J. Oleszek
Government and Finance Division

Morton Rosenberg
American Law Division

# Congressional Oversight Manual

## Summary

The *Congressional Oversight Manual* was developed about 25 years ago following a three-day December 1978 Workshop on Congressional Oversight and Investigations. The workshop was organized by a group of House and Senate committee aides from both parties and the Congressional Research Service (CRS) at the request of the bipartisan House leadership. The *Manual* was produced by CRS with the assistance of a number of House committee staffers. In subsequent years, CRS sponsored and conducted various oversight seminars for House and Senate staff and updated the *Manual* as circumstances warranted. The last revision occurred in 2002. Worth noting is the bipartisan recommendation of the House members of the 1993 Joint Committee on the Organization of Congress (Rept. No. 103-413, Vol. I):

> [A]s a way to further enhance the oversight work of Congress, the Joint Committee would encourage the Congressional Research Service to conduct on a regular basis, as it has done in the past, oversight seminars for Members and congressional staff and to update on a regular basis its *Congressional Oversight Manual*.

Over the years, CRS has assisted Members, committees, party leaders, and staff aides in the performance of various oversight functions. Understandably, given the size, reach, and cost of the modern executive establishment, Congress's oversight role is even more significant than when Woodrow Wilson wrote in his classic *Congressional Government* (1885): "Quite as important as lawmaking is vigilant oversight of administration." Today's lawmakers and congressional aides understand that Congress's work does not end when it passes laws. They have to make sure that the laws work and are being administered in an effective, efficient, and economical manner. Oversight, then, seems certain to remain one of Congress's principal assignments as it grapples with the complexities of the 21st century.

To revise a document of this size and scope requires the contributions of many people. Four CRS specialists, listed on the title page, were responsible for organizing and writing this version of the *Manual*. In addition, numerous other CRS personnel assisted in the preparation and publication of this report, as well as staff of the Congressional Budget Office (CBO) and the Government Accountability Office (GAO). Daphne Bigger of the Government and Finance Division assumed primary responsibility in the secretarial production of this report.

# Contents

I. Purposes, Authority, and Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A.  Ensure Executive Compliance with Legislative Intent  . . . . . . . . . . . . . 2
   B.  Improve the Efficiency, Effectiveness, and Economy of
       Governmental Operations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   C.  Evaluate Program Performance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   D.  Prevent Executive Encroachment on Legislative Prerogatives and
       Powers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   E.  Investigate Alleged Instances of Poor Administration, Arbitrary
       and Capricious Behavior, Abuse, Waste, Dishonesty, and Fraud  . . . . 2
   F.  Assess Agency or Officials' Ability to Manage and Carry out
       Program Objectives  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   G.  Review and Determine Federal Financial Priorities  . . . . . . . . . . . . . . . 3
   H.  Ensure That Executive Policies Reflect the Public Interest . . . . . . . . . . 3
   I.  Protect Individual Rights and Liberties  . . . . . . . . . . . . . . . . . . . . . . . . . 3
   J.  Other Specific Purposes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Authority to Conduct Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   A.  United States Constitution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   B.  Principal Statutory Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   C.  Responsibilities in House and Senate Rules  . . . . . . . . . . . . . . . . . . . . 11

Congressional Participants in Oversight  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   A.  Members and Committees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   B.  Staff of Member Offices and Committees  . . . . . . . . . . . . . . . . . . . . . 16
   C.  Congressional Support Agencies and Offices  . . . . . . . . . . . . . . . . . . . 17

Selected Readings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.  Oversight Coordination and Processes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Oversight Coordination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   A.  General Techniques of Ensuring Oversight Coordination Include  . . . . 20
   B.  Specific Means of Ensuring Oversight Coordination Include  . . . . . . . . 20

Oversight Processes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   A.  The Budget Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   B.  The Authorization Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   C.  The Appropriations Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   D.  The Investigatory Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   E.  The Confirmation Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   F.  The Impeachment Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Selected Readings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.  Investigative Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A. The Legal Basis for Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
B. The Tools of Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   1. The Subpoena Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   2. Staff Depositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   3. Congressional Grants of Immunity . . . . . . . . . . . . . . . . . . . . . . . . 35
C. Enforcement of the Investigative Power . . . . . . . . . . . . . . . . . . . . . . . 36
   1. The Contempt Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   2. Perjury and False Statements Prosecutions . . . . . . . . . . . . . . . . . 37
D. Executive Privilege and Common Law Testimonial Privileges . . . . . . 38
   1. The Presidential Communications Privilege . . . . . . . . . . . . . . . . . 38
   2. Common-Law Testimonial Privileges . . . . . . . . . . . . . . . . . . . . . . 40
E. Investigative Oversight Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   1. Jurisdiction and Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   2. Rules Applicable to Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   3. Conducting Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
F. Specialized Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
G. Role of Minority-Party Members In the Investigative Process . . . . . . 51

Selected Readings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Appendix B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Appendix C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

IV. Selected Oversight Techniques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
A. Determine Laws, Programs, Activities, Functions, Advisory
   Committees, Agencies, and Departments Within Each Committee's
   Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
B. Orientation and Periodic Review Hearings With Agencies . . . . . . . . . 70
C. Casework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
D. Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
E. Monitoring the *Federal Register* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
F. Special Studies and Investigations by Staff, Support Agencies,
   Outside Contractors, and Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
G. Communicating with the Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
   a.   Wire Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
   b.   Daily Newspapers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
   c.   Magazines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
   d.   Trade Periodicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
   e.   Television . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
   f.   Radio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
   g.   Press Conferences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
   h.   News Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
   i.   The Internet and the Media . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
H. Statutory Offices of Inspector General:  Establishment and
   Evolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
   Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
   Authority and Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
   Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
   Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Coordination and Controls ................................. 83
Establishment ........................................... 83
I. Reporting, Consultation, and Other Sources of Information ......... 86
  1. Reporting Requirements ................................. 86
  2. Prior Consultation ..................................... 87
  3. Other Significant Sources of Information .................. 87
    a.   Chief Financial Officers Act of 1990 (104 Stat. 2838) ........ 87
    b.   Government Performance and Results Act (107 Stat. 285) ..... 88
    c.   Small Business Regulatory Enforcement Fairness Act of 1996
      (110 Stat. 857-874) ................................... 89
    d.   Paperwork Reduction Act of 1995 (109 Stat. 163) ........... 89
    e.   Federal Managers' Financial Integrity Act (FMFIA) of 1982
      (96 Stat. 814) ....................................... 89
    f.   Cash Management Improvement Act of 1990 (104 Stat. 1058) . 90
    g.   Information Technology Management Reform Act of 1996
      (110 Stat. 679) ...................................... 90
    h.   Federal Advisory Committee Act ........................ 90
    i.   Federal Information Security Management Act of 2002 ....... 91
    j.   Accountability of Tax Dollars Act of 2002 ................. 91
    k.   Federal Financial Management Improvement Act of 1996 ..... 91
    l.   Unfunded Mandates Reform Act of 1995 .................. 91
J. Resolutions of Inquiry ..................................... 92
K. Limitations and Riders on Appropriations ...................... 93
L. Legislative Veto and Advance Notice .......................... 94
M. Independent Counsel ...................................... 96

Selected Readings .............................................. 99

V. Oversight Information Sources
  and Consultant Services ..................................... 104
A. Congressional Research Service (CRS) ....................... 104
  Analytical and Research Services ........................... 104
  CRS Products ........................................... 106
  Divisions .............................................. 108
  Offices ................................................ 110
B. Congressional Budget Office (CBO) .......................... 116
  1. Helping Congress Develop a Plan for the Budget ........... 117
  2. Helping Congress Stay Within Its Budget Plan ............. 118
  3. Helping Congress Assess Federal Mandates ............... 119
  4. Helping Congress Consider Budget and Economic Policy
    Issues .............................................. 120
C. Offices of Senate Legal Counsel and House General Counsel ...... 121
  A. Senate Legal Counsel ................................... 122
  B. House General Counsel .................................. 124
D. Government Accountability Office (GAO) ...................... 127
  1. Accountability ....................................... 127
  2. Integrity ............................................ 128
  3. Reliability ........................................... 129
  4. Additional Services ................................... 129
  5. Obtaining GAO Services ................................ 130
E. Office of Management and Budget (OMB) ...................... 131
  Capabilities ............................................ 131

    Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  F.  Budget Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  G.  Beneficiaries, Private Organizations, and Interest Groups . . . . . . . . . 135

Selected Readings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Appendix D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
  Congressional Oversight Video Series . . . . . . . . . . . . . . . . . . . . . . . 139

## List of Tables

Table 1.  Special Investigative Authorities of Selected Investigating
    Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Table 2.  Statutes Establishing Inspectors General Nominated by the
    President and Confirmed by the Senate, 1976-Present . . . . . . . . . . . . . . 84
Table 3.  Designated Federal Entities and Other Agencies with Statutory
    IGs Appointed by the Head of the Entity or Agency . . . . . . . . . . . . . . . 85
Table 4. Tabulation of Existing Federal Establishments, Entities, or Agencies
    with Statutory IGs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

# Congressional Oversight Manual

## I.  Purposes, Authority, and Participants

Throughout its history, Congress has engaged in oversight of the executive branch — the review, monitoring, and supervision of the implementation of public policy.  The first several Congresses inaugurated such important oversight techniques as special investigations, reporting requirements, resolutions of inquiry, and use of the appropriations process to review executive activity. Contemporary developments, moreover, have increased the legislature's capacity and capabilities *to check on and check the Executive.*  Public laws and congressional rules have measurably enhanced Congress's implied power under the Constitution to conduct oversight.

Despite its lengthy heritage, oversight was not given explicit recognition in public law until enactment of the Legislative Reorganization Act of 1946.  That act required House and Senate standing committees to exercise "*continuous watchfulness*" over programs and agencies within their jurisdiction.

Since the late 1960s, according to such scholars as political scientist Joel Aberbach, Congress has shown increasing interest in oversight for several major reasons.  These include the expansion in number and complexity of federal programs and agencies; increase in expenditures and personnel, including contract employees; the rise of the budget deficit; and the frequency of divided government, with Congress and the White House controlled by different parties.  Major partisan disagreements over priorities and processes also heighten conflict between the legislature and the executive.

Oversight occurs in virtually any congressional activity and through a wide variety of channels, organizations, and structures.  These range from formal committee hearings to informal Member contacts with executive officials, from staff studies to support agency reviews, and from casework conducted by Member offices to studies prepared by noncongressional entities, such as statutory commissions and offices of inspector general.

CRS-2

# Purposes

Congressional oversight of the Executive is designed to fulfill a number of purposes:

## A. Ensure Executive Compliance with Legislative Intent

Congress, of necessity, must delegate discretionary authority to federal administrators. To make certain that these officers faithfully execute laws according to the intent of Congress, committees and Members can review the actions taken and regulations formulated by departments and agencies.

## B. Improve the Efficiency, Effectiveness, and Economy of Governmental Operations

A large federal bureaucracy makes it imperative for Congress to encourage and secure efficient and effective program management, and to make every dollar count toward the achievement of program goals. A basic objective is strengthening federal programs through better managerial operations and service delivery. Such steps can improve the accountability of agency managers to Congress and enhance program performance.

## C. Evaluate Program Performance

Systematic program performance evaluation remains a relatively new and still-evolving technique in oversight. Modern program evaluation uses social science and management methodologies, such as surveys, cost-benefit analyses, and efficiency studies, to assess the effectiveness of ongoing programs.

## D. Prevent Executive Encroachment on Legislative Prerogatives and Powers

Beginning in the late 1960s, many commentators, public policy analysts, and legislators argued that Presidents and executive officials overstepped their authority in various areas such as impoundment of funds, executive privilege, war powers, and the dismantling of federal programs without congressional consent. Increased oversight — as part of the checks and balances system — was called for to redress what many in the public and Congress saw to be an executive arrogation of legislative prerogatives.

## E. Investigate Alleged Instances of Poor Administration, Arbitrary and Capricious Behavior, Abuse, Waste, Dishonesty, and Fraud

Instances of fraud and other forms of corruption, the breakdown of federal programs, incompetent management, and the subversion of governmental processes arouse legislative and public interest in oversight.

## F.  Assess Agency or Officials' Ability to Manage and Carry out Program Objectives

Congress's ability to evaluate the capacity of agencies and managers to carry out program objectives can be accomplished in various ways.  For example, numerous laws require agencies to submit reports to Congress; some of these are regular, occurring annually or semi-annually, for instance, while others are activated by a specific event, development, or set of conditions.  The report requirement may promote self-evaluation by the agency.  Organizations outside of Congress, such as offices of inspector general and study commissions, also advise Members and committees on how well federal agencies are working.

## G.  Review and Determine Federal Financial Priorities

Congress exercises some of its most effective oversight through the appropriations process, which provides the opportunity to review recent expenditures in detail.  In addition, most federal agencies and programs are under regular and frequent reauthorizations — on an annual, two-year, four-year, or other basis — giving the authorizing committees the same opportunity.  As a consequence of these oversight efforts, Congress can abolish or curtail obsolete or ineffective programs by cutting off or reducing funds or it may enhance effective programs by increasing funds.

## H.  Ensure That Executive Policies Reflect the Public Interest

Congressional oversight can appraise whether the needs and interests of the public are adequately served by federal programs, and thus lead to corrective action, either through legislation or administrative changes.

## I.  Protect Individual Rights and Liberties

Congressional oversight can help to safeguard the rights and liberties of citizens and others.  By revealing abuses of authority, for instance, oversight hearings can halt executive misconduct and help to prevent its recurrence, either directly through new legislation or indirectly by putting pressure on the offending agency.

## J.  Other Specific Purposes

The general purposes of oversight — and what constitutes this function — can be stated in more specific terms.  Like the general purposes, these unavoidably overlap because of the numerous and multifaceted dimensions of oversight.  A brief list includes:

1.  review the agency rulemaking process;

2.  monitor the use of contractors and consultants for government services;

3.  encourage and promote mutual cooperation between the branches;

CRS-4

    4.  examine agency personnel procedures;

    5.  acquire information useful in future policymaking;

    6.  investigate constituent complaints and media critiques;

    7.  assess whether program design and execution maximize the delivery of services to beneficiaries;

    8.  compare the effectiveness of one program with another;

    9.  protect agencies and programs against unjustified criticisms; and

    10.  study federal evaluation activities.

---

**THOUGHTS ON OVERSIGHT AND ITS RATIONALE FROM . . .**

James Wilson (The Works of James Wilson, 1896, vol. II, p. 29), an architect of the Constitution and Associate Justice on the first Supreme Court:

> The house of representatives . . . form the grand inquest of the state.  They will diligently inquire into grievances, arising both from men and things.

Woodrow Wilson (Congressional Government, 1885, p. 297), perhaps the first scholar to use the term "oversight" to refer to the review and investigation of the executive branch:

> Quite as important as legislation is vigilant oversight of administration.

> It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees.  It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents.

> The informing function of Congress should be preferred even to its legislative function.

John Stuart Mill (Considerations on Representative Government, 1861, p. 104), British utilitarian philosopher:

> . . . the proper office of a representative assembly is to watch and control the government; to throw the light of publicity on its acts; to compel a full exposition and justification of all of them which any one considers questionable . . .

CRS-5

# Authority to Conduct Oversight

## A. United States Constitution

The Constitution grants Congress extensive authority to oversee and investigate executive branch activities. The constitutional authority for Congress to conduct oversight stems from such explicit and implicit provisions as:

1. *The power of the purse.* The Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Each year the Committees on Appropriations of the House and Senate review the financial practices and needs of federal agencies. The appropriations process allows the Congress to exercise extensive control over the activities of executive agencies. Congress can define the precise purposes for which money may be spent, adjust funding levels, and prohibit expenditures for certain purposes.

2. *The power to organize the executive branch.* Congress has the authority to create, abolish, reorganize, and fund federal departments and agencies. It has the authority to assign or reassign functions to departments and agencies, and grant new forms of authority and staff to administrators. Congress, in short, exercises ultimate authority over executive branch organization and generally over policy.

3. *The power to make all laws for "carrying into Execution" Congress's own enumerated powers as well as those of the executive.* Article I grants Congress a wide range of powers, such as the power to tax and coin money; regulate foreign and interstate commerce; declare war; provide for the creation and maintenance of armed forces; and establish post offices. Augmenting these specific powers is the so-called "Elastic Clause," which gives Congress the authority "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Clearly, these provisions grant broad authority to regulate and oversee departmental activities established by law.

4. *The power of impeachment, removal, and confirmation.* Impeachment offers Congress a powerful tool to investigate alleged executive (and judicial) misbehavior, and to eliminate such behavior through the conviction and removal from office of the offending individual. The confirmation process not only involves the determination of a nominee's suitability for an executive (or judicial) position, but also provides an opportunity to examine the current policies and programs of an agency along with those policies and programs that the nominee intends to pursue.

5. *The power of investigation and inquiry.* A traditional method of exercising the oversight function, an implied power, is through investigations and inquiries into executive branch operations. Legislators need to know how

CRS-6

effectively and efficiently programs are working, how well agency officials are responding to legislative directives, and how the public perceives the programs. The investigatory method helps to ensure a more responsible bureaucracy, while supplying Congress with information needed to formulate new legislation.

---

**THE SUPREME COURT ON CONGRESS'S POWER TO OVERSEE AND INVESTIGATE**

*McGrain* v. *Daugherty*, 273 U.S. 135, 177, and 181-182 (1927):

    Congress, investigating the administration of the Department of Justice during the Teapot Dome scandal, was considering a subject "on which legislation could be had or would be materially aided by the information which the investigation was calculated to elicit." The "potential" for legislation was sufficient. The majority added, "We are of [the] opinion that the power of inquiry — with the process to enforce it — is an essential and appropriate auxiliary to the legislative function."

*Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 509 (1975):

    Expanding on its holding in *McGrain*, the Court declared, "To be a valid legislative inquiry there need be no predictable end result."

---

# B. Principal Statutory Authority

    A number of laws directly augment Congress's authority, mandate, and resources to conduct oversight, including assigning specific duties to committees. Among the most important, listed chronologically, are

    1.   *1912 Anti-Gag Legislation and Whistleblower Protection Laws for Federal Employees.*

        a.    The 1912 act countered executive orders, issued by Presidents Theodore Roosevelt and William Howard Taft, which prohibited civil service employees from communicating directly with Congress.

        b.    It also guaranteed that "the right of any persons employed in the civil service . . . to petition Congress, or any Member thereof, or to furnish information to either House of Congress, or to any committee or member thereof, shall not be denied or interfered with." 37 Stat. 555 (1912) codified at 5 U.S.C. 7211 (1994).

        c.    The Whistleblowers Protection Act of 1978, as amended, makes it a prohibited personnel practice for an agency employee to take (or not take) any action against an employee that is in retaliation for disclosure of information that the employee believes relates to violation of law, rule or regulation or which evidences gross mismanagement, waste, fraud or abuse of authority (5 U.S.C. 2302 (b) (8)). The prohibition is explicitly intended to protect disclosures to Congress: "This subsection shall not be construed to authorize the withholding of information from the Congress or the taking of any

personnel action against an employee who discloses information to the Congress."

    d.    Intelligence Community Whistleblower Protection Act (P.L. 105-272) establishes special procedures for personnel in the Intelligence Community, to transmit urgent concerns involving classified information to inspectors generals and the House and Senate Select Committees on Intelligence.

    e.    Section 618 of the Consolidated Appropriations Act of 2004, P.L. 108-199, 118 Stat. 354, prohibits the payment of the salary of any officer or employee of the Federal Government who prohibits or prevents or attempts or threatens to prohibit or prevent, any other Federal officer or employee from having direct oral or written communication or contact with any Member, committee or subcommittee. This prohibition applies irrespective of whether such communication was initiated by such officer or employee or in response to the request or inquiry of such Member, committee or subcommittee. Further, any punishment or threat of punishment because of any contact or communication by an officer or employee with a Member, committee, or subcommittee is prohibited under the provisions of this act.

    f.    Section 620 of the Consolidated Appropriations Act of 2004, P.L. 108-199, 118 Stat. 355, prohibits the expenditure of any appropriated funds for use in implementing or enforcing agreement in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy form, or agreement if such policy, form, or agreement that does not contain a provision that states that the restrictions are consistent with and do not supercede, conflict with, or otherwise alter the employee obligation, rights and liabilities created by E.O. 12958; 5 U.S.C. 7211 (Lloyd-LaFollette Act); 10 U.S.C. 1034 (Military Whistleblower Act); 5 U.S.C. 2303 (b)(8) (Whistleblower Protection Act); 50 U.S.C. 421 et seq. (Intelligence Identities Protection Act); and 18 U.S.C. 641, 793, 794, 798, and 952 and 50 U.S.C. (783)(b).

2.    *1921 Budget and Accounting Act Establishing the General Accounting Office (GAO), renamed the Government Accountability Office in 2004.*

    a.    Insisted that GAO *"shall be independent of the executive* departments and under the control and direction of the Comptroller General of the United States."  (Emphasis added.) 42 Stat. 23 (1921)

    b.    Granted authority to the Comptroller General to "*investigate, at the seat of government or elsewhere*, all matters relating to the receipt, disbursement, and application of public funds."  (Emphasis added.) 42 Stat. 26 (1921)

CRS-8

3.   *1946 Legislative Reorganization Act*

   a.   Mandated House and Senate committees to exercise *"continuous watchfulness"* of the administration of laws and programs under their jurisdiction.  (Emphasis added.) 60 Stat. 832 (1946)

   b.   Authorized for the first time in history, *permanent professional and clerical staff* for committees.  60 Stat. 832 (1946)

   c.   Authorized and directed the *Comptroller General* to make administrative management analyses of each executive branch agency.  60 Stat. 837 (1946)

   d.   Established the Legislative Reference Service, renamed the Congressional Research Service by the 1970 Legislative Reorganization Act (see below), as a separate department in the Library of Congress and called upon the Service "to advise and assist any committee of either House or joint committee in the analysis, appraisal, and evaluation of any legislative proposal . . . and *otherwise to assist in furnishing a basis for the proper determination of measures* before the committee."  (Emphasis added.) 60 Stat. 836 (1946)

4.   *1968 Intergovernmental Cooperation Act*

   a.   Required that House and Senate committees having jurisdiction over *grants-in-aid* conduct studies of the programs under which grants-in-aid are made.  82 Stat. 1098 (1968)

   b.   Provided that studies of these programs are to determine whether: (1) their purposes have been met, (2) their objectives could be carried on without further assistance, (3) they are adequate to meet needs, and (4) any changes in programs or procedures should be made.  82 Stat. 1098 (1968)

5.   *1970 Legislative Reorganization Act*

   a.   Revised and rephrased in more explicit language the oversight function of House and Senate standing committees: ". . . each standing committee shall *review and study, on a continuing basis, the application, administration, and execution* of those laws or parts of laws, the subject matter of which is within the jurisdiction of that committee."  (Emphasis added.) 84 Stat. 1156 (1970)

   b.   Required most House and Senate committees to issue *biennial* oversight reports.  84 Stat. 1156 (1970)

   c.   Strengthened the *program evaluation* responsibilities and other authorities and duties of the Government Accountability Office.  84 Stat. 1168-1171 (1970)

    d.   Redesignated the Legislative Reference Service as the *Congressional Research Service*, strengthening its *policy analysis* role and expanding its other responsibilities to Congress.  84 Stat. 1181-1185 (1970)

    e.   Recommended that House and Senate committees ascertain whether *programs* within their jurisdiction could be *appropriated for annually*.  84 Stat. 1174-1175 (1970)

    f.   Required most House and Senate committees to include in their committee reports on legislation *five-year cost estimates* for carrying out the proposed program.  84 Stat. 1173-1174 (1970)

    g.   *Increased by two the number of permanent staff for each standing committee, including provision for minority party hirings*, and provided for hiring of *consultants* by standing committees.  84 Stat. 1175-1179 (1970)

6.   *1972 Federal Advisory Committee Act*

    a.   Directed House and Senate committees to make a *continuing review* of the activities of each advisory committee under its jurisdiction.  86 Stat. 771 (1972)

    b.   The studies are to determine whether: (1) such committee should be abolished or merged with any other advisory committee, (2) its responsibility should be revised, and (3) it performs a necessary function not already being performed.  86 Stat. 771 (1972) (Advisory committee charters and reports can generally be obtained from the agency or government organization being advised.)

7.   *1974 Congressional Budget Act, as amended*

    a.   *Expanded* House and Senate committee *authority for oversight*. Permitted committees to appraise and evaluate programs themselves "or by contract, or (to) require a Government agency to do so and furnish a report thereon to the Congress."  88 Stat. 325 (1974)

    b.   Directed the Comptroller General to "*review and evaluate the results of Government programs and activities*," on his own initiative, or at the request of either House or any standing or joint committee and to assist committees in analyzing and assessing program reviews or evaluation studies. (Emphasis added.)  Authorized GAO to establish an Office of Program Review and Evaluation to carry out these responsibilities.  88 Stat. 326 (1974)

    c.   Strengthened GAO's role in *acquiring fiscal, budgetary, and program-related information*.  88 Stat. 327-329 (1974)

CRS-10

    d.   Required any House or Senate legislative committee report on a public bill or resolution to include an *analysis* (prepared by the Congressional Budget Office) providing an *estimate and comparison of costs* which would be incurred in carrying out the bill during the next and following four fiscal years in which it would be effective. 88 Stat. 320 (1974)

    e.   Established House and Senate Budget Committees and the Congressional Budget Office. The CBO director is authorized to "*secure information, data, estimates, and statistics directly* from the various departments, agencies, and establishments" of the government. 88 Stat. 302 (1974)

8.   *Other noteworthy statutory provisions*

Separate from expanding its own authority and resources directly, Congress has strengthened its oversight capabilities *indirectly*, by, for instance, establishing study commissions to review and evaluate programs, policies, and operations of the government. In addition, Congress has created various *mechanisms, structures, and procedures within the executive* that improve the executive's ability to monitor and control its own operations and, at the same time, provide additional information and oversight-related analyses to Congress. These statutory provisions include

    a.   Establishing offices of inspector general in all cabinet departments, larger agencies and numerous boards, commissions, and government corporations — *Inspector General Act of 1978*, as amended, 5 U.S.C. Appendix 3

    b.   Establishing chief financial officers in all cabinet departments and larger agencies — *Chief Financial Officers Act of 1990*, 107 Stat. 2838 (1990)

    c.   Improving the government's ability to manage its programs — *Federal Managers' Financial Integrity Act of 1982*, 96 Stat. 814-815 (1982)

    d.   Improving the efficiency, effectiveness, and equity in the exchange of funds between the federal government and state governments — *Cash Management Improvement Act of 1990,* 104 Stat. 1058 (1990)

    e.   Increasing efficiency, effectiveness, and accountability within the government — *Government Performance and Results Act of 1993,* 107 Stat. 285-296 (1993)

    f.   Improving the executive's stewardship of federal resources and accountability — *Government Management and Reform Act of 1994*, 108 Stat. 3410 (1994)

    g.   Controlling federal paperwork requirements — *Paperwork Reduction Act of 1995*, 109 Stat. 163 (1995)

    h.   Establishing the position of chief information officer in federal agencies to provide relevant advice for purchasing the best and most cost-effective information technology available — *Information Technology Improvement Act*, 110 Stat. 679 (1996)

    i.   Establishing uniform audit requirements for state and local governments and nonprofit organizations receiving federal financial assistance — *Single Audit Act of 1984*, as amended, 98 Stat. 2327 (1984) and 110 Stat. 679 (1996)

    j.   Creating a mechanism by which Congress can review and disapprove virtually any federal rule or regulation — *Small Business Regulatory Enforcement Fairness Act of 1996*, 110 Stat. 857-874 (1996)

## C.  Responsibilities in House and Senate Rules

    1.   *House Rules*

        a.   House rules grant the *Committee on Government Reform* a broad role in oversight activities  (Rule X, clause 4).  For example, pertinent review findings and recommendations of this committee are to be considered by the authorizing committees, if presented to them in a timely fashion.  In addition, the authorizing committees are to indicate on the cover of their reports on public measures that they contain a summary of such findings when that is the case (Rule XIII, clause 3).

        b.   The Committee on Government Reform has *additional* oversight duties to

            (1)   review and study on a continuing basis, the operation of government activities at all levels to determine their economy and efficiency (Rule X, clause 3);

            (2)   receive and examine reports of the Comptroller General and submit recommendations thereon to the House (Rule X, clause 4);

            (3)   evaluate the effects of laws enacted to reorganize the legislative and executive branches of the government (Rule X, clause 4);

            (4)   study intergovernmental relationships between the United States and states, municipalities, and international organizations of which the United States is a member (Rule X, clause 4); and

            (5)   *report an oversight agenda*, not later than March 31 of the first session of a Congress, based upon oversight plans submitted by

CRS-12

each standing committee and after consultation with the Speaker of the House, the majority leader, and the minority leader. The oversight agenda is to include the oversight plans of each standing committee together with any recommendations that it or the House leadership group may make to ensure the most effective coordination of such plans (Rule X, clause 2).

c. House rules mandate or provide authority for other oversight efforts by *standing committees*:

(1) Each standing committee (except Appropriations and Budget) shall review and study on a *continuing basis* the application, administration, and execution of all laws within its legislative jurisdiction (Rule X, clause 2).

(2) Committees have the authority to *review the impact of tax policies* on matters that fall within their jurisdiction (Rule X, clause 2).

(3) Each committee (except Appropriations and Budget) has a responsibility for futures research and forecasting (Rule X, clause 2).

(4) Specified committees have *special oversight authority* (i.e., the right to conduct comprehensive reviews of specific subject areas that are within the legislative jurisdiction of other committees). Special oversight is akin to the broad oversight authority granted the Committee on Government Reform, by the 1946 Legislature Reorganization Act, except that special oversight is generally limited to named subjects (Rule X, clause 3).

(5) Each standing committee is authorized to require its subcommittees, if any, *to conduct oversight* in their jurisdictional areas or to create an *oversight subcommittee*; a committee that establishes such a subcommittee may add it as a sixth subcommittee, beyond the usual limit of five (Rule X, clauses 2 and 5).

(6) Committee reports on measures are to include *oversight findings* separately set out and clearly identified (Rule XIII, clause 3).

(7) Costs of stenographic services and transcripts for *oversight hearings* are to be paid "from the applicable accounts of the House" (Rule XI, clause 1).

(8) *Each standing committee is to submit its oversight plans* for the duration of a Congress by February 15 of the first session to the Committee on Government Reform and the Committee on House Administration. Not later than March 31, the Government Reform Committee must report an oversight

CRS-13

agenda (discussed above).  In developing such plans, each standing committee must, to the extent feasible (Rule X, clause 2):

(a) consult with other committees of the House that have jurisdiction over the same or related laws, programs, or agencies within its jurisdiction, with the objective of ensuring that such laws, programs, or agencies are reviewed in the same Congress and that there is a maximum of coordination between such committees in the conduct of such reviews; and such plans shall include an explanation of what steps have been and will be taken to ensure such coordination and cooperation;

(b) give priority consideration to including in its plans the review of those laws, programs, or agencies operating under permanent budget authority or permanent statutory authority; and

(c) have a view toward ensuring that all significant laws, programs, or agencies within its jurisdiction are subject to review at least once every 10 years.

(9) *Each committee* must submit to the House, not later than January 2 of each odd-numbered year, *a report on the activities of that committee* for the Congress (Rule XI, clause 1):

(a) Such report must include *separate sections summarizing the legislative and oversight activities* of that committee during that Congress.

(b) The *oversight section* of such report must include a summary of the oversight plans submitted by the committee at the beginning of the Congress, a summary of the actions taken and recommendations made with respect to each such plan, and a summary of any additional oversight activities undertaken by that committee, and any recommendations made or actions taken thereon.

d. *The Speaker*, with the approval of the House, is given additional authority to "appoint *special ad hoc oversight committees* for the purpose or reviewing specific matters within the jurisdiction of two or more standing committees." (Emphasis added.) (Rule X, clause 2)

2. *Senate Rules*

a. Each standing committee (except for Appropriations and Budget) must *review and study on a continuing basis, the application, administration, and execution of all laws within its legislative jurisdiction* (Rule XXVI, clause 8).

CRS-14

b. "*Comprehensive policy oversight*" responsibilities are granted to specified standing committees. This duty is similar to special oversight in the House. The Committee on Agriculture, Nutrition, and Forestry, for example, is authorized to "study and review, on a comprehensive basis, matters relating to food, nutrition, and hunger, both in the United States and in foreign countries, and rural affairs, and report thereon from time to time (Rule XXV, clause 1a)."

c. All standing committees, except Appropriations, are required to *prepare regulatory impact evaluations* in their committee reports accompanying each public bill or joint resolution (Rule XXVI, clause 11). The evaluations are to include:

   (1) an estimate of the numbers of individuals and businesses to be affected;

   (2) a determination of the measure's economic impact and effect on personal privacy; and

   (3) a determination of the amount of additional paperwork that will result.

d. The Committee on Governmental Affairs (renamed the Committee on Homeland Security and Government Affairs in 2004, S.Res. 445), has the following *additional oversight duties* (Rule XXV, clause 1k):

   (1) review and study on a continuing basis the operation of government activities at all levels to determine their economy and efficiency;

   (2) receive and examine reports of the Comptroller General and submit recommendations thereon to the Senate;

   (3) evaluate the effects of laws enacted to reorganize the legislative and executive branches of the government; and

   (4) study intergovernmental relationships between the United States and states, municipalities, and international organizations of which the United States is a member.

# Congressional Participants in Oversight

## A.  Members and Committees

1.  *Members*.  Oversight is generally considered a committee activity.  However, both casework and other project work conducted in a Member's personal office can result in findings about bureaucratic behavior and policy implementation; these, in turn, can lead to the adjustment of agency policies and procedures and to changes in public law.

    (a)  *Casework* — responding to constituent requests for assistance on projects or complaints or grievances about program implementation provides an opportunity to examine bureaucratic activity and operations, if only in a selective way.

    (b)  Sometimes *individual Members* will conduct their own investigations or  ad hoc hearings, or direct their staffs to conduct oversight studies.  Individual Members have no authority to issue compulsory process or conduct official hearings.  The Government Accountability Office or some other legislative branch agency, a specially created task force, or private research group might be requested to conduct an investigation of a matter for a Senator or Representative.

2.  *Committees*.  The most common and effective method of conducting oversight is through the committee structure.  Throughout their histories, the House and Senate have used their standing committees as well as select or special committees to investigate federal activities and agencies along with other matters.

    (a)  The House Committee on *Government Reform* and the Senate Committee on *Governmental Affairs*, which have oversight jurisdiction over virtually the entire federal government, have been vested with broad investigatory powers over government-wide activities.

    (b)  The House and Senate Committees on *Appropriations* have similar responsibilities when reviewing fiscal activities.

    (c)  Each *standing* committee of Congress has oversight responsibilities to review government activities within their jurisdiction.  These panels also have authority on their own to establish oversight and investigative *subcommittees*.  The establishment of such subcommittees does *not preclude* the *legislative* subcommittees from conducting oversight.

    (d)  Certain House and Senate committees have *"special oversight"* or *"comprehensive policy oversight"* of designated subject areas as explained in the previous subsection.

CRS-16

## B.  Staff of Member Offices and Committees

1.  *Personal Staff.*  Constituent letters, complaints, and requests for projects and assistance frequently bring problems and deficiencies in federal programs and administration to the attention of Members and their personal office staffs.  The casework performed by a Member's staff for constituents can be an effective oversight tool.

    (a)  Casework can be an important vehicle for pursuing both the oversight and legislative interests of the Member.  The Senator or Representative and the staff may be attuned to the *relationship* between *casework* and the *oversight* function.  This is facilitated by a regular exchange of ideas among the Member, legislative aides, and caseworkers on problems brought to the office's attention by constituents, and of possible legislative initiatives to resolve those problems.

    (b)  If casework is to be useful as an oversight technique, *effective staffing and coordination are needed*.  Casework and legislative staffs maximize service to their Member's constituents when they establish a relationship with the staff of the subcommittees and committees that handle the areas of concern to the Member's constituents.  Through this interaction, the panel's staff can be made aware of the problems with the agency or program in question, assess how widespread and significant they are, determine their causes, and recommend corrective action.

    (c)  *Office procedures* enable staff in some offices to identify cases that represent a situation in which *formal* changes in agency procedure could be an appropriate remedy.  Prompt congressional inquiry and follow up enhance this type of oversight.  Telephone inquiries reinforced with written requests tend to ensure agency attention.

2.  *Committee Staff.*  As issues become more complex and Members' staffs more overworked, professional staffs of committees can provide the expert help required to conduct oversight and investigations.  Committee staff typically have the experience and expertise to conduct effective oversight for the committees and subcommittees they serve.  Committees may also call upon *legislative support agencies* for assistance, hire *consultants*, or *"borrow" staff* from federal departments.

    Committee staff, in summary, occupy a central position in the conduct of oversight.  The informal contacts with executive officials at all levels constitute one of Congress's most effective devices for performing its "continuous watchfulness" function.

CRS-17

## C.  Congressional Support Agencies and Offices

1.  Of the agencies in the legislative branch, three directly assist Congress in support of its oversight function. (See "Section V" below for further detail on each):

    (a)  Congressional Budget Office (CBO),

    (b)  Congressional Research Service (CRS) of the Library of Congress, and

    (c)  Government Accountability Office (GAO), formerly the General Accounting Office.

2.  Additional offices that can assist in oversight are

    (a)  House General Counsel's Office,

    (b)  Senate Legal Counsel's Office, and

    (c)  Senate Historian's Office and Senate Library.

CRS-18

# Selected Readings

Aberbach, Joel D.  Keeping a Watchful Eye:  The Politics of Congressional Oversight. Washington:  Brookings Institution, 1990.          JK585.A63

Congressional Oversight: Methods and Techniques.  Committee Print, Prepared for the Subcommittee on Oversight Procedures of the Senate Committee on Government Operations by the Congressional Research Service and the General Accounting Office, 94th Congress, 2nd session.  Washington:  GPO, 1976.

Ehlke, Richard.  Congressional Access to Information From the Executive:  A Legal Analysis.  CRS Report 86-50A, March 10, 1986.

Fisher, Louis.  Constitutional Conflicts between Congress and the President.  Lawrence, Kansas:  University Press of Kansas, 1997, 4th Revised Edition.
KF4565.F57 1997

Foreman, Christopher H.  Signals from the Hill:  Congressional Oversight and the Challenge of Social Regulation.  New Haven:  Yale University Press, 1988.
JK585.F68

Harris, Joseph P.  Congressional Control of Administration.  Washington: Brookings Institution, 1964.          JK1061.H3

History of the United States House of Representatives, 1789-1994.  H.Doc. 103-324, 103rd Congress, 2nd session.  Washington:  GPO, 1994.  Chapter XI, "Oversight," pp. 233-266.

Kaiser, Frederick M.  Congressional Oversight.  CRS Report 97-936, January 2, 2001.

——.  Congressional Oversight of the Presidency.  Annals, vol. 499, September 1988, pp. 75-89.

Leading Cases on Congressional Investigatory Power (Compiled by the Joint Committee on Congressional Operations).  Committee Print, 94th Congress, 2nd session.  Washington:  GPO, 1976.

Maskell, Jack H. and Morton Rosenberg.  Congressional Intervention in the Administrative Process: Legal and Ethical Considerations. CRS Report 90-440 A, September 7, 1990.

Mayhew, David R.  Divided We Govern: Party Control, Lawmaking, and Investigations, 1946-1990.  New Haven: Yale University Press, 1991.
JK2261.M36

McCubbins, Mathew D. and Thomas Schwartz. Congressional Oversight Overlooked:  Police Patrol Versus Fire Alarms.  American Journal of Political Science, vol. 2, February 1984, pp. 165-79.

CRS-19

National Academy of Public Administration. Panel on Congress and the Executive. Beyond Distrust: Building Bridges Between Congress and the Executive. Washington: NAPA, 1992.

Ogul, Morris S. Congress Oversees the Bureaucracy: Studies in Legislative Supervision. Pittsburgh: University of Pittsburgh Press, 1976.     JK585.O48

Oleszek, Walter J. Congressional Procedures and the Policy Process, 6th ed. Washington: Congressional Quarterly Press, 2004. Chapter 10, Legislative Oversight.                                            KF4937.O44

——. A Perspective on Congress's Oversight Function. CRS Report RL32617, September 30, 2004.

Rosenberg, Morton. Congress's Prerogative Over Agencies and Agency Decisionmakers: The Rise and Demise of the Reagan Administration's Theory of the Unitary Executive. George Washington Law Review, vol. 57, January 1989, pp. 627-703.

——. Congressional Review of Agency Rulemaking: A Brief Overview and Assessment After Five Years. CRS Report RL30116, March 6, 2001.

——. Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry. CRS Report 95-464 A, April 7, 1995.

Rosenbloom, David H. Building a Legislative-Centered Public Administration: Congress and the Administrative State, 1946-1999. Tuscaloosa, Ala.: The University of Alabama Press, 2000.                     KF1601.R58

Schlesinger, Arthur M. and Roger Bruns, eds. Congress Investigates: A Documented History, 1792-1974 (5 vols.) New York: Chelsea House Publishers, 1975.
                                                      JK1123.A2S34

Study on Federal Regulation: Congressional Oversight of Regulatory Agencies. Senate Doc. 95-26, 95th Congress, 1st session. Washington: GPO, 1977.

U.S. General Accounting Office. Investigators' Guide to Sources of Information. GAO Report OSI-97-2. Washington: GAO, 1997.

West, William F. Controlling the Bureaucracy: Institutional Constraints in Theory and Practice. Armonk, New York and London, England: M.E. Sharpe: 1995.
                                                      JK421.W44

CRS-20

# II.  Oversight Coordination and Processes

A persistent problem for Congress in conducting oversight is coordination among committees, both within each chamber as well as between the two houses. As the final report of the House Select Committee on Committees of the 93rd Congress noted, "Review findings and recommendations developed by one committee are seldom shared on a timely basis with another committee, and, if they are made available, then often the findings are transmitted in a form that is difficult for Members to use."  Despite the passage of time, this statement remains relevant today.  Oversight coordination between House and Senate committees is also uncommon.

Intercommittee cooperation on oversight can prove beneficial for a variety of reasons.  It should, for example, minimize unnecessary duplication and conflict and inhibit agencies from playing one committee off against another.  There are formal and informal ways to achieve oversight coordination among committees.

# Oversight Coordination

## A.  General Techniques of Ensuring Oversight Coordination Include

1.  The House and Senate can establish select or special committees to probe issues and agencies, to promote public understanding of national concerns, and to coordinate oversight of issues that overlap the jurisdiction of several standing committees.

2.  House rules require the findings and recommendations of the Committee on Government Reform to be considered by the authorizing committees if presented to them in a timely fashion.  Such findings and recommendations are to be published in the authorizing committees' reports on legislation. House rules also require the oversight plans of committees to include ways to maximize coordination between and among committees that share jurisdiction over related laws, programs, or agencies.

## B.  Specific Means of Ensuring Oversight Coordination Include

1.  Joint oversight hearings on programs or agencies.

2.  Informal agreement among committees to oversee certain agencies and not others.  For example, the House and Senate Committees on Commerce agreed to hold oversight hearings on certain regulatory agencies in alternate years.

3.  Consultation between the authorizing and appropriating committees.  The two Committees on Commerce have worked closely and successfully with

their corresponding appropriations subcommittees to alert those panels to the authorizing committees' intent with respect to regulatory ratemaking by such agencies as the Federal Communication Commission.

# Oversight Processes

## A. The Budget Process

1. The Congressional Budget and Impoundment Control Act of 1974, as amended, enhanced the legislative branch's capacity to shape the federal budget. The act has major institutional and procedural effects on Congress:

   a. *Institutionally*, Congress created three new entities:

      (1) the Senate Committee on the Budget;
      (2) the House Committee on the Budget; and
      (3) the Congressional Budget Office.

   b. *Procedurally*, the act established methods that permit Congress to:

      (1) determine budget policy as a whole;
      (2) relate revenue and spending decisions;
      (3) determine priorities among competing national programs; and
      (4) ensure that revenue, spending, and debt legislation are consistent with the overall budget policy.

2. The new budget process coexists with the established authorization and appropriation procedures and significantly affects each.

   a. On the *authorization side*, the Budget Act requires committees to submit their budgetary "views and estimates" for matters under their jurisdiction to their Committee on the Budget within six weeks after the President submits a budget.

   b. On the *appropriations side*, new contract and borrowing authority must go through the appropriations process. Subcommittees of the Appropriations Committees are assigned a financial allocation that determines how much may be included in the measures they report, although less than one-third of federal spending is subject to the annual appropriations process. (The tax and appropriations panels of each house also submit budgetary views and estimates to their respective Committee on the Budget.)

   c. In deciding spending, revenue, credit, and debt issues, Congress is sensitive to trends in the overall composition of the annual federal budget (expenditures for defense, entitlements, interest on the debt, and domestic discretionary programs).

3. In short, the Budget Act has the potential of strengthening oversight by enabling Congress better to relate program priorities to financial claims on the national budget. Each committee, knowing that it will receive a fixed amount of the total to be included in a budget resolution, has an incentive to scrutinize existing programs to make room for new programs or expanded funding of ongoing projects or to assess whether programs have outlived their usefulness.

## B. The Authorization Process

1. Through its authorization power, Congress exercises significant control over any government agency.

2. The entire authorization process may involve a host of oversight tools — hearings, studies, and reports — but the key to the process is the *authorization statute*.

   a. An authorization statute creates and shapes government programs and agencies and it contains the statement of legislative policy for the agency.

   b. Authorization is the *first* lever in congressional exercise of the power of the purse; it usually allows an agency to be funded, but it does *not* guarantee financing of agencies and programs. Frequently, authorizations establish dollar ceilings on the amounts that can be appropriated.

3. The authorization-reauthorization process is an important oversight tool.

   a. Through this process, Members are educated about the work of an agency and given an opportunity to direct the agency's effort in light of experience.

   b. Expiration of an agency's program provides an excellent chance for in-depth oversight:

      (1) In recent decades, there has been a mix of permanent and periodic (annual or multi-year) authorizations, although some reformers are now pressing for *biennial budgeting* (acting on a two-year cycle for authorizations, appropriations, and budget resolutions).

      (2) Periodic authorizations improve the likelihood that an agency will be scrutinized systematically.

4. In addition to formal amendment of the agency's authorizing statute, the authorization process gives committees an opportunity to exercise informal, nonstatutory controls over the agency.

    a.    Knowledge by an agency that it must come to the legislative committee for renewed authority increases the influence of the committee.

    b.    This condition helps to account for the appeal of short-term authorizations.

    c.    *Nonstatutory controls* used by committees to exercise direction over the administration of laws include statements made in:

        (1)   committee hearings;
        (2)   committee reports accompanying legislation;
        (3)   floor debates; and
        (4)   committee contacts and correspondence with the agency.

5.    If agencies fail to comply with these informal directives, the authorization committees can apply sanctions or move to convert the informal directive to a statutory command.

## C.  The Appropriations Process

1.    The appropriations process is one of Congress's most important forms of oversight.

    a.    Its strategic position stems from the constitutional requirement that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

    b.    Congress's power of the purse allows the House and Senate Committees on Appropriations to play a prominent role in oversight.

2.    The oversight function of the Committees on Appropriations derives from their responsibility to examine and pass on the budget requests of the agencies as contained in the President's Budget.

    a.    The decisions of the committees are conditioned on their assessment of the agencies' need for their budget request as indicated by past performance.

    b.    In practice, the entire record of an agency is fair game for the required assessment.

    c.    This comprehensive overview and the "carrot and stick" of the appropriations recommendations make the committees significant focal points of congressional oversight and is a key source of their power in Congress and in the federal government generally.

3.    Enacted appropriations legislation frequently contains at least five types of *statutory controls* on agencies:

a. Such legislation specifies the *purpose* for which funds may be used.

b. It defines the specified *funding level* for the agency as a whole as well as for programs and divisions within the agency.

c. It sets *time limits* on the availability of funds for obligation.

d. Appropriations legislation may contain *limitation* provisions. For example, in appropriating $350 million to the Environmental Protection Agency for research and development, Congress added this condition: "Provided, That not more than $55,000,000 of these funds shall be available for procurement of laboratory equipment, supplies, and other operating expenses in support of research and development." 108 Stat. 2319 (1994).

e. Appropriations measures and committee reports also stipulate how an agency's budget can be *reprogrammed* (shifting funds within an appropriations account; see box below).

4. *Nonstatutory controls* are a major form of oversight. Legislative language in committee reports and in hearings, letters to agency heads, and other communications give detailed instructions to agencies regarding committee expectations and desires. Agencies are not legally obligated to abide by non-statutory recommendations, but failure to do so may result in a loss of funds and flexibility the following year. Agencies ignore nonstatutory controls at their peril (see box).

---

The conference report for the Omnibus Consolidated and Emergency Supplemental Appropriations for FY 1999 provides guidelines for the reprogramming and transfer of funds for the Treasury and General Government Appropriations Act, 1999. Each request from an agency to the review committee "shall include a declaration that, as of the date of the request, none of the funds included in the request have been obligated, and none will be obligated, until the Committees on Appropriations have approved the request." H. Rept. No. 105-825, p. 1472 (1998).

---

## D. The Investigatory Process

1. Congress's power of investigation is *implied* in the Constitution.

a. Numerous Supreme Court decisions have upheld the legislative branch's right of inquiry, provided it stays within its legitimate legislative sphere.

b. The roots of Congress's authority to conduct investigations extend back to the British Parliament and colonial assemblies.

c. In addition, the Framers clearly perceived the House of Representatives to function as a "grand inquest." Since the Framers expected lawmakers to employ the investigatory function, based upon

parliamentary precedents, it was unnecessary to invest Congress with an explicit investigatory power.

    d.    From time to time, legal questions have been raised about the investigative authority of Congress. However, numerous Supreme Court decisions have upheld the legislative branch's right of inquiry, provided it serves a legitimate legislative interest.

2.    Investigations and related activities may be conducted by:

    a.    individual Members;

    b.    committees and subcommittees;

    c.    staff or outside organizations and personnel under contract; or

    d.    congressional support agencies.

3.    Investigations serve several purposes:

    a.    they help to ensure honesty and efficiency in the administration of laws;

    b.    they secure information that assists Congress in making informed policy judgments; and

    c.    they may aid in informing the public about the administration of laws.

[See Section III for greater detail and analysis]

## E.  The Confirmation Process

By establishing a public record of the policy views of nominees, congressional hearings allow lawmakers to call appointed officials to account at a later time. Since at least the Ethics in Government Act of 1978, which encouraged greater scrutiny of nominations, Senate committees are setting aside more time to probe the qualifications, independence, and policy predilections of presidential nominees, seeking information on everything from physical health to financial assets. Confirmation can assist in oversight in several ways.

1.    The Constitution provides that the President "shall nominate, and by and with the *Advice and Consent of the Senate*, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." (Emphasis added.)

    a.    The consideration of appointments to executive branch leadership positions is a major responsibility of the Senate and especially of Senate committees.

CRS-26

      b.   Panels review the qualifications of nominees for public positions.

2.    The confirmation hearing provides a forum for the discussion of the policies and programs the nominee intends to pursue; this is a classic opportunity for senatorial oversight and influence.  The confirmation process as an oversight tool can be used to:

      a.   provide policy direction to nominees;

      b.   inform nominees of congressional interests; and

      c.   extract future commitments.

3.    Once a nominee has been confirmed by the Senate, oversight includes following up to ensure that the nominee fulfills any commitments made during confirmation hearings.  Subsequent hearings and committee investigations can explore whether such commitments have been kept.

4.    *Recess Appointments.*  The Constitution provides that the President "shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."  When Presidents relied on this power to circumvent Senate confirmation, Congress responded with legislation that prohibits, with certain exceptions, the payment of salaries to recess appointees.  54 Stat. 751 (1940); 5 U.S.C. § 5503 (2004).  Also, in the annual Treasury-Postal Service appropriations act, Congress enacts an additional funding restriction on recess appointees (see box).

> No part of any appropriation for the current fiscal year contained in this or any other Act shall be paid to any person for the filling of any position for which he or she has been nominated after the Senate has voted not to approve the nomination of said person. 114 Stat. 2763A-157, sec. 609 (2000).

5.    *Vacancies Act.*  In addition to making recess appointments, Presidents make other temporary or interim appointments.  Since 1795, Congress has legislated limits on the time a temporary officer may occupy a vacant advice and consent position.  In 1868, Congress established a procedure for filling vacancies in advice and consent positions through the Vacancies Act.  When the head of an executive department dies, resigns, or is sick or absent, the next in command may perform the duties until a successor is appointed or the absence ceases.  The President may also direct someone else (previously appointed with the advice and consent of the Senate) to perform the duties.  These acting officials, under the Vacancies Act, were restricted by law to a period of not to exceed 30 days.  That limit was violated with such frequency that Congress in 1988 increased it to 120 days.  102 Stat. 988, sec. 7 (1988); 5 U.S.C. §§ 3345-48 (2004).

The Justice Department took the position that some executive officials were not restricted by the Vacancies Act and could serve beyond the 120-

CRS-27

day period.  Under that interpretation, the Administration selected Bill Lann Lee to head the Justice Department's Civil Rights Division, and argued that he could serve longer than had he been a recess appointee. Congress responded by passing legislation in 1998 to make the Vacancies Act the exclusive vehicle for temporarily filling vacant advice and consent positions.  The new Vacancies Act, included in the FY1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act (P.L. 105-277), rejects the Justice Department position and established procedures for the appointment of executive officials who temporarily hold an office. With various exceptions, the 120-day period has been replaced by a 210-day period.

## F.  The Impeachment Process

1.  The impeachment power of Congress is a unique oversight tool, reserved for unusual circumstances and as a technique of last resort when conventional forms of oversight fail.  Impeachment applies also to the judiciary, but the focus here is on efforts by Congress to impeach executive officials.  Impeachment offers Congress:

    a.  a constitutionally mandated method for obtaining information that might otherwise not be made available by the executive; and

    b.  an implied threat of punishment for an executive official whose conduct exceeds acceptable boundaries.

2.  Impeachment procedures differ from those of conventional congressional oversight.

    a.  The most significant procedural differences center on the *roles* played by each house of Congress.

    b.  The House of Representatives has the sole power to impeach.  A majority is required to impeach.

    c.  If the House votes to impeach, the person is tried by the Senate, which has the sole power to try an impeachment.  A two-thirds majority is required to convict and remove the individual.  Should the Senate deem it appropriate in a given case, it may, by majority vote, impose an additional judgment of disqualification from further federal offices of honor, trust, or profit.

    d.  In *Nixon v. United States*, 506 U.S. 226 (1993), the Supreme Court held nonjusticiable a constitutional challenge to the use by the Senate in an impeachment proceeding of a 12-member committee appointed to take testimony and gather evidence.  Such a committee makes no recommendations as to the ultimate question before the Senate.  Nor does the committee rule on questions of relevancy, materiality, and competency.  Rather, it reports a certified copy of the transcript of the proceedings before the committee and any evidence received by the

committee to the full Senate for its consideration.  The full Senate may take further testimony or evidence, or it may hold the entire trial in open Senate.  In either event, the full Senate determines whether to convict on one or more of the articles of impeachment involved and, upon conviction, decides the appropriate judgment to be imposed.

3.  The impeachment process is cumbersome and infrequently used.  The House has voted to impeach in only 17 cases, 16 of which have reached the Senate, and 15 of which have gone to a vote on one or more articles of impeachment.  Seven cases, all pertaining to federal judges, have resulted in conviction and removal; two of these also resulted in disqualification.  The most recent impeachment trial was that of President Clinton in 1998-99; the most recent judicial impeachment trials were those of Judges Claiborne, Hastings, and Nixon in 1986, 1988 and 1989, respectively.  A number of issues were addressed in the Clinton impeachment trial and other past impeachment proceedings, although the answers to some still remain somewhat ambiguous.  For example:

a.  An impeachment may be continued from one Congress to the next, although the procedural steps vary depending upon the stage in the process.

b.  The Constitution defines the grounds for impeachment as "Treason, Bribery, or other high Crimes and Misdemeanors."  However, the meaning and scope of "high Crimes and Misdemeanors" remains in dispute and depends on the interpretation of individual legislators.

c.  The Constitution provides for impeachment of the "President, Vice President, and all civil Officers of the United States." While the outer limits of the "civil Officers" language are not altogether clear, past precedents suggest that it covers at least federal judges and executive officers subject to the Appointments Clause.

d.  Members of the House and Senate are not subject to impeachment because they are not "civil officers."  William Blount, a U.S. Senator from Tennessee, was impeached by the House in 1797, but the Senate chose to *expel* him instead of conducting an impeachment trial.

CRS-29

# Selected Readings

**The Budget Process**

Fisher, Louis.  Presidential Spending Power.  Princeton, N.J.: Princeton University Press, 1975.  345 p.                                    HJ257.2.F57

Keith, Robert and Allen Schick.  Manual on the Federal Budget Process.  CRS Report 98-720, August 25, 1998.

Schick, Allen.  Congress and Money.  Washington, D.C.: Urban Institute, 1980. 604 p.                                    HJ2051.S34

Wilmerding, Lucius, Jr.  The Spending Power: A History of the Efforts of Congress to Control Expenditures.  New Haven, Conn.: Yale University Press, 1943. 317 p.                                    HJ2013.U5W5

**Authorization and Appropriation Processes**

Devins, Neal E. "Regulation of Government Agencies Through Limitation Riders," Duke Law Journal, v. 1987, 1987:456.

Fisher, Louis.  "Annual Authorizations: Durable Roadblocks to Biennial Budgeting," Public Budgeting & Finance, v. 3, Spring 1983: 24.

——.  "The Authorization-Appropriation Process in Congress: Formal Rules and Informal Practices," Catholic University Law Review, v. 29, 1979: 51.

Fenno, Richard F., Jr. The Power of the Purse.  Boston, Mass.: Little, Brown, 1966. 704 p.                                    JK1074.F4

LeBoeuf, Jacques B.  "Limitations on the Use of Appropriations Riders by Congress to Effectuate Substantive Policy Changes," Hastings Constitutional Law Quarterly, v. 19, Winter 1992: 457.

LeLoup, Lance T.  "Appropriations Politics in Congress: The House Appropriations Committee and the Executive Agencies," Public Budgeting & Finance, v. 4, Winter 1984: 78.

U.S. General Accounting Office, Office of the General Counsel.  Principles of Federal Appropriations Law. Vols. I, II, and III.  2004.

**The Investigatory Process [See Section III]**

**The Confirmation Process**

Carter, Stephen L.  The Confirmation Mess: Cleaning Up the Federal Appointments Process.  New York: Basic Books, 1994.  252 p.                    JK736.C37

CRS-30

Fisher, Louis.  Recess Appointments of Federal Judges.  CRS Report RL3112, September 5, 2001.

Gerhardt, Michael J.  The Federal Appointments Process.  Durham and London: Duke University Press, 2000.  400 p.                    JK731.G47

——.  "Toward a Comprehensive Understanding of the Federal Appointments Process," Harvard Journal of Law and Public Policy, v. 21, no. 4, 1998:  468.

Harris, Joseph P.  The Advice and Consent of the Senate: A Study of the Confirmation of Appointments by the United States Senate.  Berkeley, Cal.: University of California Press, 1953.  457 p.                    JK1274.H3

Hogue, Henry.  "The Law: Recess Appointments to Article III Courts," Presidential Studies Quarterly, v. 34, 2004:  656.

Haynes, George H.  The Senate of the United States: Its History and Practice. Boston, Mass.: Houghton Mifflin Co., 1938.  2 vols.  1118 p.    JK1161.H28

Kim, Haeryon. "Congressional Influence on the FCC: An Analysis of Confirmation Hearings for Commission Chairmen, 1969-1989," Communications and the Law, v. 15, 1993: 37.

Mackenzie, G. Calvin.  The Politics of Presidential Appointments.  New York: The Free Press, 1981.  298 p.                    JK736.M33

Palmer, Betsy.  9/11 Commission Recommendations: The Senate Confirmation Process for Presidential Nominees.  CRS Report RL32551, August 30, 2004.

Rosenberg, Morton.  The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative.  CRS Report 98-892, November 2, 1998.

Ross, William G.  "The Senate's Constitutional Role in Confirming Cabinet Nominees and Other Executive Officials," Syracuse Law Review, vol. 48, 1998: 1123.

**The Impeachment Process**

Bazan, Elizabeth B.  Impeachment: An Overview of Constitutional Provisions, Procedure, and Practice.  CRS Report 99-186, February 27, 1998.

Black, Charles L., Jr.  Impeachment: A Handbook.  New Haven, Conn.: Yale University Press, 1974.  80 p.                    LC 73-92315

Bushnell, Eleanor.  Crimes, Follies, and Misfortunes: The Federal Impeachment Trials.  Urbana, Ill.: University of Chicago Press, 1992.  380 p.  KF8781.B87

CRS-31

Gerhardt, Michael J.    The Federal Impeachment Process: A Constitutional and
    Historical Analysis.  Princeton, N.J.: Princeton University Press, 1996.  233 p.
                                                                    KF4958.G47


Labowitz, John R.  Presidential Impeachment.  New Haven: Yale University Press,
    1978.  257 p.                                                   KF5075.L33


Maskell, Jack.  Censure of the President by the Congress.  CRS Report 98-343,
    December 8, 1998.


Posner, Richard A. An Affair of State: The Investigation, Impeachment, and Trial of
    President Clinton. Cambridge, Mass.: Harvard University Press, 1999. 276 p.
                                                                    KF5076.C57P67


Rae, Nicol C. and Colton C. Campbell.  Impeaching Clinton: Partisan Strife on
    Capitol Hill.  Lawrence: University Press of Kansas, 2004.  234 p.
                                                                    E886.2.R435


Rehnquist, William H.  Grand Inquests: The Historic Impeachments of Justice
    Samuel Chase and President Andrew Johnson.  New York: William Morrow
    and Co., 1992.  303 p.                                          E302.6C4R44


U.S. Congress. "Impeachment: Selected Materials," Committee on the Judiciary,
    House of Representatives, 93rd Congress, 1st session, October 1973.  718 p.


——.  "Impeachment: Selected Materials on Procedure," Committee on the
    Judiciary, House of Representatives, 93rd Congress, 2nd session, January 1974.
    900 p.


——.  "Constitutional Grounds for Impeachment: Modern Precedents," Committee
    on the Judiciary, House of Representatives, 105th Congress, 2nd session, Ser. No.
    9, November 1998.  94 p.


——.  "Impeachment: Selected Materials," Committee on the Judiciary, House of
    Representatives, 105th Congress, 2nd session, Ser. No. 10, November 1998.
    1854 p.

CRS-32

# III.  Investigative Oversight

Congressional investigations, often adversarial and confrontational, sustain and vindicate Congress's role in our constitutional scheme of separated powers.  The rich history of congressional investigations, from the failed St. Clair expedition in 1792 through Teapot Dome, Watergate, Iran-Contra, and Whitewater, has established, in law and practice, the nature and contours of congressional prerogatives necessary to maintain the integrity of the legislative role in that constitutional scheme.

This section provides a brief overview of some of the more common legal, procedural, and practical issues that committees face in the course of an investigation.  Following a summary of the case law developing the scope and limitations of the power of inquiry, the essential tools of investigative oversight — subpoenas, staff interviews and depositions, grants of immunity, and the contempt power — are described.  Next, some of the special problems of investigating the executive branch are detailed, with particular emphasis on claims of presidential executive privilege and agency assertions of common law testimonial privileges.  The section concludes with a discussion of the role of the minority in the investigatory process.

## A.  The Legal Basis for Oversight

Numerous Supreme Court precedents recognize a broad and encompassing power in Congress to engage in oversight and investigation that would reach all sources of information necessary for carrying out its legislative function.  In the absence of a countervailing constitutional privilege or a self-imposed statutory restriction upon its authority, Congress and its committees have plenary power to compel information needed to discharge its legislative function from executive agencies, private persons, and organizations.  Within certain constraints, the information so obtained may be made public.

Although there is no express provision of the Constitution that specifically authorizes Congress to conduct investigations and take testimony for the purposes of performing its legitimate functions, numerous decisions of the Supreme Court have firmly established that the investigatory power of Congress is so essential to the legislative function as to be implied from the general vesting of legislative power in Congress.[1]  Thus, in *Eastland v. United States Servicemen's Fund*, the Court explained that "[t]he scope of its power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."[2]  In *Watkins v. United States,* the Court described the breadth of the power of inquiry:  "The power of the Congress to conduct investigations is inherent in the legislative process.  That power is broad.  It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes."[3]  The Court went on to emphasize that Congress's investigative power is at its peak

---

[1] *McGrain v. Daugherty,* 272 U.S. 135 (1927).

[2] 421 U.S. at 504, n. 15 (quoting *Barenblatt v. United States*, 360 U.S. 109, 111).

[3] 354 U.S. 178, 187 (1957).

when the subject is alleged waste, fraud, abuse, or maladministration within a government department. The investigative power, it stated, "comprehends probes into departments of the Federal Government to expose corruption, inefficiency, or waste."[4]

But while the congressional power of inquiry is broad, it is not unlimited. The Supreme Court has admonished that the power to investigate may be exercised only "in aid of the legislative function"[5] and cannot be used to expose for the sake of exposure alone. The *Watkins* Court underlined these limitations: "There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress . . . nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress."[6] Moreover, an investigating committee has only the power to inquire into matters within the scope of the authority delegated to it by its parent body.[7] But once having established its jurisdiction and authority and the pertinence of the matter under inquiry to its area of authority, a committee's investigative purview is substantial and wide-ranging.

## B.  The Tools of Oversight

### 1.  The Subpoena Power.

The power of inquiry, with the accompanying process to enforce it, has been deemed "an essential and appropriate auxiliary to the legislative function."[8]  A properly authorized subpoena issued by a committee or subcommittee has the same force and effect as a subpoena issued by the parent House itself. To validly issue a subpoena, individual committees or subcommittees must be delegated this authority. Senate Rule XXVI(1) and House Rule XI(2)(m)(1) presently empower all standing committees and subcommittees to require the attendance and testimony of witnesses and the production of documents. Special or select committees must be specifically delegated that authority by Senate or House resolution. The rules or practices of standing committees may restrict the issuance of subpoenas only to full committees or in certain instances allow issuance by a committee chairman alone, with or without the concurrence of the ranking minority member.[9]

Congressional subpoenas are most frequently served by the U.S. marshal's office or by committee staff, or less frequently by the Senate or House Sergeants-At-

---

[4] Id.

[5] *Kilbourn v. Thompson,* 103 U.S. 168, 204 (1880).

[6] *Watkins v. United States*, 354 U.S. at 187.

[7] *United States v. Rumely,* 345 U.S. 41, 42, 44 (1953); *Watkins v. United States,* 354 U.S. at 198.

[8] *McGrain v. Daugherty,* 273 U.S. at 174-75.

[9] See, e.g., House Committee on Government Reform Rule 18 (d); Senate Committee on Governmental Affairs Rule 5.C.

Arms.  Service may be effected anywhere in the United States.  The subpoena power reaches aliens in the United States.  Securing compliance of United States nationals and aliens living in foreign countries presents more complex problems.

A witness seeking to challenge the legal sufficiency of a subpoena has only limited remedies to raise objections.  The Supreme Court has ruled that courts may not enjoin the issuance of a congressional subpoena, holding that the Speech or Debate Clause of the Constitution[10] provides "an absolute bar to judicial interference" with such compulsory process.[11]  As a consequence, a witness's sole remedy generally is to refuse to comply, risk being cited for contempt, and then raise the objections as a defense in a contempt prosecution.

Challenges to the legal sufficiency of subpoenas must overcome formidable judicial obstacles.  The standard to be applied in determining whether the congressional investigating power has been properly asserted was articulated in *Wilkinson v. United States*:[12]  (1)  the committee's investigation of the broad subject matter area must be authorized by Congress; (2)  the investigation must be pursuant to "a valid legislative purpose"; (3) and the specific inquiries must be pertinent to the broad subject matter areas which have been authorized by the Congress.  As to the requirement of "valid legislative purpose," the Supreme Court has made it clear that Congress does not have to state explicitly what it intends to do as a result of an investigation.[13] (See model subpoena at **Appendix A**.)

## 2.  Staff Depositions.

Committees normally rely on informal staff interviews to gather information preparatory to investigations hearings.  However, with more frequency in recent years, when specially authorized congressional committees have utilized staff-conducted depositions as a tool in exercising the investigatory power.  Staff depositions afford a number of significant advantages for committees engaged in complex investigations.  Staff depositions may assist committees in obtaining sworn testimony quickly and confidentially without the necessity of Members devoting time to lengthy hearings that may be unproductive because witnesses do not have the facts needed by the committee or refuse to cooperate.  Depositions are conducted in private and may be more conducive to candid responses than would be the case at a public hearing.  Statements made by witnesses that might defame or even tend to incriminate third parties can be verified before they are repeated in an open hearing.  Depositions can prepare a committee for the questioning of witnesses at a hearing or provide a screening process that can obviate the need to call some witnesses.  The deposition process also allows questioning of witnesses outside of Washington, thereby avoiding the inconvenience of conducting field hearings requiring the presence of Members.

---

[10] U.S. Constitution, Art. I, Sec. 6, cl. 1.

[11] *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503-07 (1975).

[12] 365 U.S. 399, 408-09 (1961).

[13] *In re Chapman,* 166 U.S. 661, 669 (1897).

Moreover, Congress has enhanced the efficacy of the staff deposition process by re-establishing the applicability of 18 U.S.C. 1001 to false statements made during congressional proceedings, including the taking of depositions.[14]

Certain disadvantages may also inhere. Unrestrained staff may be tempted to engage in tangential inquiries. Also, depositions present a "cold record" of a witness's testimony and may not be as useful for Members as in-person presentations.

At present, neither house of Congress has rules that expressly authorize staff depositions. On a number occasions such specific authority has been granted pursuant to Senate and House resolutions.[15] When granted, a committee will normally adopt procedures for taking depositions, including provisions for notice (with or without a subpoena), transcription of the deposition, the right to be accompanied by counsel, and the manner in which objections to questions are to be resolved.

### 3. Congressional Grants of Immunity.

The Fifth Amendment to the Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself . . ." The privilege against self-incrimination is available to a witness in a congressional investigation.[16] When a witness before a committee asserts this testimonial constitutional privilege, the committee may, upon a two-thirds vote of the full committee, obtain a court order that compels and grants immunity against the use of testimony and information derived from that testimony in a subsequent criminal prosecution. The witness may still be prosecuted on the basis of other evidence. Grants of immunity have figured prominently in a number of major congressional investigations, including Watergate (John Dean and Jeb Magruder) and Iran-Contra (Oliver North and John Poindexter). The decision to grant immunity involves a number of complex issues (see box below), but is ultimately a political decision that Congress makes. As observed by Iran-Contra Independent Counsel Lawrence E. Walsh, "The legislative branch has the power to decide whether it is more important perhaps even to destroy a prosecution than to hold back testimony they need. They make that decision. It is not a judicial decision or a legal decision but a political decision of the highest importance."[17]

---

[14] False Statements Accountability Act of 1996, P.L. 104-292. Congress acted in response to the Supreme Court's decision in *Hubbard* v. *United States*, 514 U.S. 695 (1995), holding that 18 U.S.C. 1001 applied only to false statements made in executive branch department and agency proceedings.

[15] See CRS Report 95-949, *Staff Depositions in Congressional Investigations*, by Jay R. Shampansky, at notes 16 and 18.

[16] *Watkins v. United States,* 354 U.S. 178 (1957); *Quinn v. United States,* 349 U.S. 155 (1955).

[17] Lawrence E. Walsh, The Independent Counsel and the Separation of Powers, 25 Hous. L. Rev. 1, 9 (1988).

---

**Granting Immunity**

In determining whether to grant immunity to a witness, a committee might wish to consider, on the one hand, its need for the witness's testimony in order to perform its legislative, oversight, and informing functions, and on the other, the possibility that the witness' immunized congressional testimony could jeopardize a successful criminal prosecution. If a witness is prosecuted after giving immunized testimony, the burden is on the prosecutor to establish that the case was not based on the witness's previous testimony or evidence derived therefrom. Kastigar v. United States, 406 U.S. 441, 460 (1972).

Appellate court decisions reversing the convictions of key Iran-Contra figures Lt. Colonel Oliver North and Rear Admiral John Poindexter appear to have made the prosecutorial burden substantially more difficult, if not insurmountable, in high-profile cases. Despite extraordinary efforts by the independent counsel and his staff to avoid being exposed to any of North's or Poindexter's immunized testimony, and the submission of sealed packets of evidence to the district court to show that the material was obtained independently of any immunized testimony to Congress, the appeals court in both cases remanded the cases for a further determination whether the prosecution had directly or indirectly used immunized testimony. Upon remand in both cases, the independent counsel moved to dismiss the prosecutions upon his determination that he could not meet the strict standards set by the appeals court in its decisions. See *United States* v. *North*, 910 F. 2d 843 (D.C. Cir.), *modified*, 920 F. 2d 940 (D.C. Cir. 1990), *cert denied*, 500 U.S. 941 (1991); *United States* v. *Poindexter*, 951 F. 2d 369 (D.C. Cir. 1991). It is unclear whether a consequence of the ruling was to engender a reluctance on the part of committees to issue immunity grants. Since the enactment of the 1970 statute, congressional committees have obtained approximately 345 immunity orders. Of these, almost half (165) were obtained in connection with the 1978 investigation into the assassinations of President Kennedy and Martin Luther King, Jr. Since 1990, House committees have obtained 31 immunity orders, and Senate committees have obtained 20.

---

## C. Enforcement of the Investigative Power

### 1. The Contempt Power.

While the threat or actual issuance of a subpoena normally provides sufficient leverage to ensure compliance, it is through the contempt power, or its threat, that Congress may act with ultimate force in response to actions that obstruct the legislative process in order to punish the contemnor and/or to remove the obstruction. The Supreme Court early recognized the power as an inherent attribute of Congress's legislative authority, reasoning that if it did not possess this power, it "would be exposed to every indignity and interruption that rudeness, caprice or even conspiracy may mediate against it."[18]

There are three different kinds of contempt proceedings. Both the House and Senate may cite a witness for contempt under their inherent contempt power or under a statutory criminal contempt procedure. The Senate also has a third option, enforcement by means of a statutory civil contempt procedure.[19]

(a) Inherent Contempt

---

[18] *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204 (1821).

[19] A more comprehensive treatment of the history and legal development of the congressional contempt power is discussed in CRS Report 86-83, *Congress' Contempt Power*, by Jay R. Shampansky (archived; out of print).

CRS-37

Under the inherent contempt power, the individual is brought before the House or Senate by the Sergeant At Arms, tried at the bar of the body, and can be imprisoned. The purpose of the imprisonment or other sanction may be either punitive or coercive. Thus, the witness can be imprisoned for a specified period of time as punishment, or for an indefinite period (but not, at least in the case of the House, beyond the end of the Congress) until he agrees to comply. The inherent contempt power has not been exercised by either House in over 60 years because it has been considered to be too cumbersome and time consuming.

(b) Statutory Contempt

Recognizing the problems with use of the inherent contempt process, a statutory criminal contempt procedure was enacted in 1857 that, with only minor amendments, is codified today as 2 U.S.C. §§192 and 194. A person who has been subpoenaed to testify or produce documents before the House or Senate or a committee and who fails to do so, or who appears but refuses to respond to questions, is guilty of a misdemeanor, punishable by a fine of up to $100,000 and imprisonment for up to one year. A contempt citation must be approved by the subcommittee, the full committee, and the full House or Senate (or by the presiding officer if Congress is not in session). After a contempt has been certified by the President of the Senate or the Speaker of the House, it is the "duty" of the U.S. attorney "to bring the matter before the grand jury for its action."

(c) Civil Contempt

As an alternative to both the inherent contempt power of each house and criminal contempt, a civil contempt procedure is available in the Senate. Upon application of the Senate, the federal district court issues an order to a person refusing, or threatening to refuse, to comply with a Senate subpoena. If the individual still refuses to comply, he may be tried by the court in summary proceedings for contempt of court, with sanctions imposed to coerce compliance. Civil contempt can be more expeditious than a criminal proceeding, and it also provides an element of flexibility, allowing the subpoenaed party to test legal defenses in court without necessarily risking a criminal prosecution. Civil contempt is not authorized for use against executive branch officials refusing to comply with a subpoena except in certain limited circumstances.[20]

## 2. Perjury and False Statements Prosecutions.

(a) Testimony Under Oath

A witness under oath before a congressional committee who willfully gives false testimony is subject to prosecution for perjury under section 1621 of title 18 of the United States Code. The false statement must be "willfully" made before a "competent tribunal" and involve a "material matter." For a legislative committee

---

[20] 2 U.S.C. 288 d.

to be competent for perjury purposes a quorum must be present.[21]  The problem has been ameliorated in recent years with the adoption of rules establishing less than a majority of members as a quorum for taking testimony, normally two members for House committees[22] and one member for Senate committees.[23]  The requisite quorum must be present at the time the alleged perjurious statement is made, not merely at the time the session convenes.  No prosecution for perjury will lie for statements made only in the presence of committee staff unless the committee has deposition authority and has taken formal action to allow it.

(b)   Unsworn Statements

Most statements made before Congress, at both the investigatory and hearing phases of oversight, are unsworn.  The practice of swearing in all witnesses at hearings is infrequent.  Prosecutions may be brought to punish congressional witnesses for giving willfully false testimony not under oath.  Under 18 U.S.C. 1001, false statements by a person in "any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House and Senate" are punishable by a fine of up to $250,000 or imprisonment for not more than five years, or both.

# D.   Executive Privilege and Common Law Testimonial Privileges

When Congress directs its investigatory powers at executive branch departments and agencies, and at times at the White House itself, such probes have often become contentious, provoking the executive to assert rights to shield from disclosure information Congress deems essential to carry out its oversight functions.  The variety of grounds proffered are often lumped in an undifferentiated manner under the rubric "executive privilege." The courts recently have distinguished between claims of executive privilege based on whether it has been made by the President ("presidential communications privilege") or by a department or agency ("agency" or "executive privilege"). The distinction reflects the judicial recognition of the differing legal bases of the privileges (i.e., constitutional as opposed to common law) and the difference that makes in the evaluation of claims.

## 1. The Presidential Communications Privilege.

In rare instances the executive response to a congressional demand to produce information may be an assertion of presidential executive privilege, a doctrine which, like Congress' powers to investigate and cite for contempt, has constitutional roots. No decision of the Supreme Court has yet resolved the question whether there are any circumstances in which the executive branch can refuse to provide information

---

[21] *Christoffel v. United States,* 378 U.S. 89 (1949).

[22] House Rule XI(2)(h)(2).

[23] Senate Rule XXVI(7)(a)(2) allows its committees to set a quorum requirement at less than the normal one-third for taking sworn testimony.  Almost all Senate committees have set the quorum requirement at one member.

sought by the Congress is on the basis of executive privilege. Indeed, most such disputes are settled short of litigation through employment of the political process and negotiations,[24] and the few that reach a judicial forum find the courts highly reluctant to rule on the merits. However, in *United States v. Nixon* (1974), involving a judicial subpoena issued to the President at the request of the Watergate special prosecutor,[25] the Supreme Court found a constitutional basis for the doctrine of executive privilege in "the supremacy of each branch within its own assigned area of constitutional duties" and in the separation of powers. Although it considered presidential communications to be "presumptively privileged," the Court rejected the President's contention that the privilege was absolute, precluding judicial review whenever it is asserted. The Court held in that case that the judicial need for the tapes outweighed the President's "generalized interest in confidentiality." The Court was careful to limit the scope of its decision, noting that "we are not here concerned with the balance between the President's generalized interest in confidentiality . . . and congressional demands for information."[26]

In *In re Sealed Case (Espy)*, involving a grand jury subpoena for documents to the White House Counsel's Office during an independent counsel's investigation of allegations of improprieties by the Secretary of Agriculture, an appeals court elaborated on several important issues left unresolved by *U.S.* v. *Nixon* and other Watergate-related cases: the precise parameters of the presidential executive privilege; how far down the chain of command the privilege reaches; whether the President has to have seen or had knowledge of the existence of the documents for which he claims privilege; and what showing is necessary to overcome a valid claim of privilege. The court held that the presidential communications privilege extended to communications authored by or solicited and received by presidential advisers that involved information regarding governmental operations that ultimately call for direct decision making by the President, but he does not have to actually have seen the documents for which he claims privilege. However, the privilege was held to be

---

[24] Neal Devins, "Congressional-Executive Information Access Disputes: A Modest Proposal: Do Nothing," *Administrative Law Review*, vol. 48, 109-137: winter 1996; Joel D. Bush, Congressional-Executive Access Disputes: Legal Standards and Political Settlements, *Journal of Law and Politics*, vol. 9, 717:1993; Stephen W. Stathis, "Executive Cooperation: Presidential Recognition of the Investigatory Authority of Congress and the Courts," *Journal of Law and Politics*, vol. 3, 183:1986.

[25] The subpoena was for certain tape recordings and documents relating to the President's conversations with aides and advisors. The materials were sought for use in a criminal trial.

[26] 418 U.S. 683, 712 n. 19 (1974). In *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F. 2d 725 (D.C. Cir. 1974), decided prior to *U.S.* v. *Nixon*, the appeals court denied the Watergate Committee's access to five presidential tapes because the committee had not met its burden of showing that "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's function." The court noted that its denial was based upon the initiation of impeachment proceedings by the House Judiciary Committee, the overlap of the investigative objectives of both committees, and the fact that the impeachment committee already had the tapes in question, concluding that "The Select Committee's immediate oversight need for the subpoenaed tapes is, from a congressional perspective, merely cumulative." The unique and confining nature of the case's factual and historical context likely makes this an uncertain precedent for limiting a committee's investigatory power in the face of a presidential claim of privilege.

CRS-40

confined to White House staff, and not staff in agencies, and then only to White House staff that has "operational proximity" to direct presidential decision making. The claim of privilege may be overcome by a demonstration that each discrete group of subpoenaed materials likely contains important evidence, and that the evidence was not available with due diligence elsewhere, a showing which the court held the independent counsel had made.[27]

Since the Kennedy Administration, executive policy directives establish that presidential executive privilege may be asserted only by the President personally. The latest such directive, issued by President Reagan in November 1982, and still in effect, requires that when agency heads believe that a congressional information request raises substantial questions of executive privilege they are to notify and consult with the attorney general and the counsel to the President. If the matter is deemed to justify invocation of the privilege, it is reported to the President who makes his decision (See Reagan memo at **Appendix B**).

However, a memorandum of September 28, 1994, from White House Counsel Lloyd Cutler to all department and agency general counsels modified the Reagan policy by requiring agency heads directly to notify the White House Counsel of any congressional request for "any document created in the White House . . . or in a department or agency, that contains deliberations of, or advice to or from, the White House" that may raise privilege issues. The White House counsel is to seek an accommodation and, if that does not succeed, he is to consult the attorney general to determine whether to recommend invocation of privilege to the President. The President then determines whether to claim privilege, which is then communicated to the Congress by the White House Counsel. Thus, it would appear that decision making with respect to claims of presidential privilege is now fully centralized in the White House, but that the President must still personally assert the claim. (See Cutler memo at **Appendix C**.) The current Bush Administration has as yet taken no public position on the Reagan memorandum or the Cutler modification, but President Bush's sole assertion of executive privilege in December 2001 was issued over his signature.

### 2. Common-Law Testimonial Privileges.

More common are claims by departments and agencies (and at times by the White House), and by private persons, that common law testimonial privileges, such as the attorney-client, work-product, and deliberative-process privileges, afford a shield to congressional investigative inquiries. Although there has never been a definitive Supreme Court ruling on the question, the strong constitutional underpinnings of the legislative investigatory power, long-standing congressional practice, and recent appellate court rulings casting doubt on the viability of common-law privilege claims by executive officials in the face of grand jury investigations, support the position that committees may determine, on a case-by case basis, whether to accept a claim of privilege.

---

[27] 121 F. 3d 729 (D.C. Cir. 1997).

CRS-41

Thus it is well established by congressional practice that acceptance of a claim of attorney-client, work product or other common law testimonial privilege before a committee rests in the sound discretion of that committee. Such common-law privileges cannot be claimed as a matter of right by a witness, and a committee can deny them simply because it believes it needs the information sought to be protected in order to accomplish its legislative functions.[28] In actual practice, all committees that have denied claims of privilege have engaged in a process of weighing considerations of legislative need, public policy, and the statutory duties of congressional committees to engage in continuous oversight of the application, administration, and execution of the laws that fall within its jurisdiction, against any possible injury to the witness. Committees, among other factors, have considered whether a court would have recognized the claim in the judicial forum.[29] Moreover, the conclusion that recognition of nonconstitutionally based privileges is a matter of congressional discretion is consistent with both traditional British parliamentary and the Congress's historical practice.[30]

The legal basis for Congress's prerogative in this area is based upon its inherent constitutional prerogative to investigate, which has been long recognized by the Supreme Court as extremely broad and encompassing, and which is at its peak when the subject is fraud, abuse, or maladministration within a government department.[31] Common-law privileges are, on the other hand, judge-made exceptions to the normal principle of full disclosure in the adversary process, which are to be narrowly construed and have been confined to the judicial forum. These privileges have no constitutional basis.[32] Recent appellate court rulings have cast substantial doubt

---

[28] Glenn A. Beard, "Congress v. The Attorney-Client Privilege: A "Full and Frank" Discussion," *American Criminal Law Review*, vol. 35, 119: 1997; CRS Report 95-464, *Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry*, Morton Rosenberg.

[29] See, e.g., "Contempt of Congress Against Franklin L. Haney," H.Rept. 105-792, 105th Cong., 2nd sess. 11-16 (1998); "Proceedings Against John M. Quinn, David Watkins, and Matthew Moore (Pursuant to Title 2, United States Code, Sections 192 and 194)," H.Rept. 104-598, 104th Cong., 2nd sess. 50-54 (1996); "Refusal of William H. Kennedy, III, To Produce Notes Subpoenaed By The Special Committee to Investigate Whitewater Development and Related Matters," S.Rept. 104-191, 104th Cong. 1st sess. 9-19 (1995); "Proceedings Against Ralph Bernstein and Joseph Bernstein," H.Rept. 99-462, 99th Cong. 2nd sess. 13, 14 (1986); Hearings, "International Uranium Control," Before the Subcommittee on Oversight and Investigations, House Committee on Interstate and Foreign Commerce, 95th Cong., 1st sess. 60, 123 (1977).

[30] See CRS Report, *supra* note 28, at 44-49.

[31] *McGrain v. Daugherty*, 272 U.S. 135, 177 (1926); *Watkins v. United States*, 354 U.S. 178, 187 (1957); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 n. 15 (1975).

[32] *Westinghouse Electric Corp.* v. *Republic of the Philippines*, 951 F. 2d 1414, 1423 (3d Cir. 1991) ("Because the attorney-client privilege obstructs the truth-finding process, it is narrowly construed."); *Moran v. Burbine* 475 U.S. 412, 430 (1986) (Sixth Amendment not a source for attorney-client privilege); *Fisher v. United States*, 425 U.S. 391, 396-97 (1976) (compelling on attorney to disclose client communications does not violate the client's Fifth Amendment privilege against self-incrimination); *Hannah v. Larche*, 363 U.S. 420, 425

(continued...)

CRS-42

whether executive branch officials may claim attorney-client, work product or deliberative process privileges in the face of investigative demands of a grand jury.[33]

While no court has as yet recognized the inapplicability of common law testimonial privileges in congressional proceedings,[34] an advisory opinion directly addressing the issue,[35] by Legal Ethics Committee of the District of Columbia Bar in February 1999 provides substantial support for the longstanding congressional practice. The occasion for the ruling arose as a result of an investigation of a Subcommittee of the House Commerce Committee into the circumstances surrounding the planned relocation of the Federal Communications Commission to the Portals office complex.[36] During the course of the inquiry, the Subcommittee sought certain documents from the Portals developer, Mr. Franklin L. Haney. Mr. Haney's refusal to comply resulted in subpoenas for those documents to him and the law firm representing him during the relocation efforts. Haney and the law firm asserted attorney-client privilege in their continued refusal to comply. The law firm sought an opinion from the D.C. Bar's Ethics Committee as to its obligations in the

---

[32] (...continued)
(1960) ("Only infrequently have witnesses [in congressional hearings] been afforded rights normally associated with an adjudicative proceeding"); *United States v. Fort*, 443 U.S. 932 (1971) (rejecting contention that the constitutional right to cross-examine witnesses applied to congressional investigations); *In re Sealed Case (Espy)*, 121 F. 3d 729 (D.C. Cir. 1997) (the deliberative process privilege is a common law privilege which, when claimed by executive officials, is easily overcome, and "disappears" altogether upon the reasonable belief by an investigating body that government misconduct has occurred).

[33] *In re Grand Jury Subpoena Duces Tecum*, 112 F. 3d 910 (8th Cir. 1997), *cert. denied sub. nom. Office of the President* v. *Office of the Independent Counsel*, 521 U.S. 1105 (1997) (claims of First Lady of attorney-client and work-product privilege with respect notes taken by White House Counsel Office attorneys rejected); *In re Bruce R. Lindsey (Grand Jury Testimony)*, 158 F. 3d 1263 (D.C. Cir. 1998), *cert. denied* 525 U.S. 996 (1998) (White House attorney may not invoke attorney-client privilege in response to grand jury subpoena seeking information on possible commission of federal crimes); *In re Sealed Case (Espy)*, 121 F. 3d 729 (D. C. Cir. 1997) (deliberative process privilege is a common law agency privilege which easily overcome by showing of need by an investigating body); *In re: A Witness Before the Special Grand Jury*, 288 F. 3d 289 (7th Cir. 2002) (attorney-client privilege not applicable to communications between state government counsel and state office holder).

[34] The Supreme Court has recognized that "only infrequently have witnesses . . . [in congressional hearings] been afforded the procedural rights normally associated with an adjudicative proceeding." *Hannah* v. *Larche*, 363 U.S. 420, 425 (1960); see also, *United States* v. *Fort*, 443 F. 2d 670 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 932 (1971) (rejecting the contention that the constitutional right to cross-examine witnesses applied to a congressional investigation); *In the Matter of Provident Life and Accident Co.*, E.D. Tenn., S.D., CIV-1-90-219, June 13, 1990 (per Edgar, J.) (Noting that the court's earlier ruling on an attorney-client privilege claim was "not of constitutional dimensions, and is certainly not binding on the Congress of the United States".).

[35] Opinion No. 288, "Compliance With Subpoena from Congressional Committee to Produce Lawyers' Files Containing Client Confidences or Secrets," Legal Ethics Committee, District of Columbia Bar, February 16, 1999. (D.C Ethics Committee Opinion).

[36] See H.Rept. 105-792, *supra* note 29, at 1-6, 7-8, 15-16.

CRS-43

face of the subpoena and a possible contempt citation, but the Bar Committee notified the firm that the question was novel and that no advice could be given until the matter was considered in a plenary session of the committee.[37]  The firm continued its refusal to comply until the Subcommittee cited it for contempt, at which time the firm proposed to turn over the documents if the contempt citation was withdrawn.  The subcommittee agreed to the proposal.[38]

Subsequently, on February 16, 1999, the D.C. Bar's Ethics Committee issued an opinion  vindicating the action taken by the firm.  The Ethics Committee, interpreting D.C. Rule of Professional conduct 1.6(d)(2)(A),[39] held that an attorney faced with a congressional subpoena that would reveal client confidences or secrets

> has a professional responsibility to seek to quash or limit the subpoena on all available, legitimate grounds to protect confidential documents and client secrets.  If, thereafter, the Congressional subcommittee overrules these objections, orders production of the documents and threatens to hold the lawyer in contempt absent compliance with the subpoena, then, in the absence of a judicial order forbidding the production, the lawyer is permitted, but not required, by the D.C. Rules of Professional Conduct to produce the subpoenaed documents.  A directive of a Congressional subcommittee accompanied by a threat of fines and imprisonment pursuant to federal criminal law satisfies the standard of "required by law" as that phrase is used in D.C. Rule of Professional conduct 1.6(d)(2)(A).

The D.C. Bar opinion urges attorneys to press every appropriate objection to the subpoena until no further avenues of appeal are available, and even suggests that clients might be advised to retain other counsel to institute a third-party action to enjoin compliance,[40] but allows the attorney to relent at the earliest point when he is put in legal jeopardy.  The opinion represents the first (and thus far the only) bar in the nation to directly and definitively address the merits of the issue.  It is likely to arouse a controversial and sensitive debate,[41] particularly if congressional committees choose to subpoena client documents from attorneys as a matter of course.

---

[37] See "Meeting on Portals Investigation (Authorization of Subpoenas; Receipt of Subpoenaed Documents and Consideration of Objections; and Contempt of Congress Proceedings Against Franklin L. Haney)," H. Comm. On Commerce, 105th Cong., 2nd sess. 48-50 (1998).

[38] *Id.*, at 101-105.

[39] Under Rule 1.6(d)(2)(A) a lawyer may reveal client confidences or secrets only when expressly permitted by the D.C. rules or when "required by law or court order."

[40] A direct suit to enjoin a committee from enforcing a subpoena has been foreclosed by the Supreme Court's decision in *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 501 (1975), but that ruling does not appear to foreclose an action against a "third party," such as the client's attorney, to test the validity of the subpoena or the power of a committee to refuse to recognize the privilege.  See, e.g., United States v. *AT&T*, 567 F. 2d 121 (D.C.Cir. 1977) (entertaining an action by the Justice Department to enjoin AT&T from complying with a subpoena to provide telephone records that might compromise national security matters).

[41] See, e.g., W. John Moore, "First Save All The Lawyers," *National Law Journal*, July 24, 1999 at 2170.

CRS-44

Assertions of deliberative process privilege by agencies have not been uncommon in the past. In essence it is argued that congressional demands for information as to what occurred during the policy development process of an agency would unduly interfere, and perhaps "chill," the frank and open internal communications necessary to the quality and integrity of the decisional process. It may also be grounded on the contentions that it protects against premature disclosure of proposed policies before they are fully considered or actually adopted by the agency, and to prevent the public from confusing matters merely considered or discussed during the deliberative process with those on which the decision was based. However, as with claims of attorney-client privilege and work product immunity discussed previously, congressional practice has been to treat their acceptance as discretionary with the committee. Moreover, a recent appellate court decision underlines the understanding that the deliberative process privilege is a common law privilege of agencies that is easily overcome by a showing of need by an investigatory body, and other court rulings and congressional practice have recognized the overriding necessity of an effective legislative oversight process.

The recent appeals court ruling in *In re sealed Case (Espy)*[42] is of special note. The case involved, *inter alia*, White House claims of executive and deliberate process privileges for documents subpoenaed by an independent counsel. At the outset of the appeals court's unanimous ruling it carefully distinguished between the "presidential communications privilege" and the "deliberative process privilege." Both, the court observed, are executive privileges designed to protect the confidentiality of executive branch decisionmaking. But the deliberative process privilege applies to executive branch officials generally, is a common law privilege which requires a lower threshold of need to be overcome, and "disappears altogether when there is any reason to believe government misconduct has occurred."[43] The court's recognition of the deliberative process privilege as a common law privilege which, when claimed by executive department and agency officials, is easily overcome, and which "disappears" upon the reasonable belief by an investigating body that government misconduct has occurred, may severely limit the common law claims of agencies against congressional investigative demands. A demonstration of need of a jurisdictional committee would appear to be sufficient, and a plausible showing of fraud, waste, abuse or maladministration would be conclusive.

# E.  Investigative Oversight Hearings

## 1.  Jurisdiction and Authority.

A congressional committee is a creation of its parent house and only has the power to inquire into matters within the scope of the authority that has been delegated to it by that body. Thus, the enabling rule or resolution which gives the committee life is the charter that defines the grant and limitations of the committee's

---

[42] 121 F. 3d 729 (D.C. Cir. 1997).

[43] 121 F. 3d at 745, 746; see also *id.* at 737-738("[W]here there is reason to believe the documents sought may shed light on government misconduct, the [deliberative process] privilege is routinely denied on the grounds that shielding internal government deliberations in this context does not serve 'the public interest in honest, effective government'").

power.  In construing the scope of a committee's authorizing charter, courts will look to the words of the rule or resolution itself, and then, if necessary, to the usual sources of legislative history such as floor debate, legislative reports, past committee practice, and interpretation.  Jurisdictional authority for "special" investigations may be given to a standing committee, a joint committee of both houses, or a special subcommittee of a standing committee, among other vehicles.  In view of the specificity with which Senate and House rules now confer jurisdiction on standing committees, as well as the care with which most authorizing resolutions for select committees have been drafted in recent years, sufficient models exist to avoid a successful judicial challenge by a witness that his noncompliance was justified by a committee's overstepping its delegated scope of authority.

## 2.  Rules Applicable to Hearings.

House Rule XI(2) and Senate Rule XXVI(2) require that committees adopt written rules of procedure and publish them in the *Congressional Record*.  The failure to publish has resulted in the invalidation of a perjury prosecution.[44]  Once properly promulgated, such rules are judicially cognizable and must be strictly observed.  The House and many individual Senate committees require that all witnesses be given a copy of a committee's rules.

Both the House and the Senate have adopted rules permitting a reduced quorum for taking testimony and receiving evidence.  House hearings may be conducted if at least two members are present; most Senate committees permit hearings with only one member in attendance.  Although most committees have adopted the minimum quorum requirement, some have not, while others require a higher quorum for sworn rather than unsworn testimony.  For perjury purposes, the quorum requirement must be met at the time the allegedly perjured testimony is given, not at the beginning of the session.  Reduced quorum requirement rules do not apply to authorizations for the issuance of subpoenas.  Senate rules require a one-third quorum of a committee or subcommittee while the House requires a quorum of a majority of the members, unless a committee delegates authority for issuance to its chairman.[45]

Senate and House rules limit the authority of their committees to meet in closed session.  A House rule provides that testimony "shall" be held in closed session if a majority of a committee or subcommittee determines it "may tend to defame, degrade, or incriminate any person."  Such testimony taken in closed session is normally releasable only by a majority vote of the committee.  Similarly, confidential material received in a closed session requires a majority vote for release.

## 3.  Conducting Hearings.

The chair usually makes an opening statement.  In the case of an investigative hearing, it is an important means of defining the subject matter of the hearing and

---

[44] *United States v. Reinecke,* 524 F.2d 435 (D.C. Cir. 1975)(failure to publish committee rule setting one Senator as a quorum for taking hearing testimony held a sufficient ground to reverse a perjury conviction).

[45] Senate Rule XXVI(7)(a)(1); House Rule XI(2)(m)(3).

thereby establishing the pertinence of questions asked the witnesses. Not all committees swear in their witnesses; a few committees require that all witnesses be sworn. Most committees leave the swearing of witnesses to the discretion of the chair. If a committee wishes the potential sanction of perjury to apply, it should swear its witnesses, though false statements not under oath are subject to criminal sanctions.

A witness does not have a right to make a statement before being questioned but that opportunity is usually accorded. Committee rules may prescribe the length of such statements and also require written statements be submitted in advance of the hearing. Questioning of witnesses may be structured so that members alternate for specified lengths of time. Questioning may also be conducted by staff. Witnesses may be allowed to review a transcript of their testimony and to make nonsubstantive corrections.

The right of a witness to be accompanied by counsel is recognized by House rule and the rules of Senate committees. The House rule limits the role of counsel as solely "for the purpose of advising them concerning their constitutional rights." Some committees have adopted rules specifically prohibiting counsel from "coaching" witnesses during their testimony.[46] A committee has complete authority to control the conduct of counsel. Indeed, House Rule XI(2)(k)(4) provides that "[t]he chairman may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure or exclusion from the hearings; and the Committee may cite the offender for contempt." Some Senate committees have adopted similar rules.[47] There is no right of cross-examination of adverse witnesses during an investigative hearing. Witnesses are entitled to a range of constitutional protections (see box).

---

[46] See, e.g., Senate Permanent Committee on Investigations Rule 8.

[47] See, e.g., Senate Aging Committee Rule V. 8; Senate Permanent Subcommittee on Investigations Rule 7.

---

**Constitutional Rights of Witnesses**

It is well established that the protections of the Bill of Rights extend to witnesses at legislative inquiry and thus may pose significant limitations on congressional investigations.  The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself."  The privilege protects a witness against being compelled to testify subject to a grant of immunity (see pages 35 and 36) but not against a subpoena for existing documentary evidence.  However, where compliance with a subpoena *duces tecum* would constitute an implicit testimonial authentication of the documents produced, the privilege may apply.  There is no particular formulation of words necessary to invoke the privilege.  All that is required is that the witness's objection be stated in a manner that the committee may reasonably expected to understand as an attempt to invoke the privilege.

Although the First Amendment, by its terms, is expressly applicable only to *legislation* that abridges freedom of speech, press, or assembly, the Court has held that the amendment also restricts Congress in conducting investigations.  In the leading case involving the application of First Amendment rights in a congressional investigation, *Barenblatt v. United States*, the Court held that "where first amendment rights are asserted to bar government interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown."  360 U.S. 109, 162 (1959).  Thus, unlike the Fifth Amendment privilege against self-incrimination, the First Amendment does not give a witness an absolute right to refuse to respond to congressional demands for information.

*Dicta* in opinions of the Supreme Court indicate that the Fourth Amendment's prohibition against unreasonable searches and seizures is applicable to congressional committees.  It appears that there must be probable cause for the issuance of a congressional subpoena.  The Fourth Amendment protects a congressional witness against a subpoena that is unreasonably broad or burdensome.

---

## F.  Specialized Investigations

Oversight at times occurs through specialized, temporary investigations of a specific event or development.  These are often dramatic, high profile endeavors, focusing on scandals, alleged abuses of authority, suspected illegal conduct, or other unethical behavior.  The stakes are high, possibly even leading to the end of individual careers of high ranking executive officials.  Indeed, congressional investigations can induce resignations, firings, and impeachment proceedings, as the Senate Watergate Committee investigation did in the Nixon Administration and as occurred as a result of the multiple investigations during the Clinton Administration.  As a consequence, interest — in Congress, the executive, and the public — is frequently intense and impassioned.

CRS-48

---

### Prominent Select Investigative Committees

**Senate Watergate Committee (1973-74),** S.Res. 60, 93rd Congress, 1st session.

> "To establish a select committee of the Senate to conduct an investigation and study of the extent, if any, to which illegal, improper, or unethical activities were engaged in by any persons, acting individually or in combination with others, in the presidential election of 1972, or any campaign, canvass, or other activity related to it."

**House Select Committee on the Iran-Contra Affair (1987),** H.Res. 12, 100th Congress, 1st session.

> "The select committee is authorized and directed to conduct a full and complete investigation and study, and to make such findings and recommendations to the House as the select committee deems appropriate," regarding the sale or transfer of arms, technology, or intelligence to Iran or Iraq; the diversion of funds realized in connection with such sales and otherwise, to the anti-government forces in Nicaragua; the violation of any law, agreement, promise, or understanding regarding the reporting to and informing of Congress; operational activities and the conduct of foreign and national security policy by the staff of the National Security Council; authorization and supervision or lack thereof of such matters by the President and other White House personnel; the role of individuals and entities outside the government; other inquiries regarding such matters, by the Attorney General, White House, intelligence community, and Departments of Defense, Justice, and State; and the impact of such matters on public and international confidence in the United States Government.

---

1.  These investigative hearings may be *televised* in the contemporary era, and often result in *extensive news media coverage*.

2.  Such investigations may be undertaken by *different organizational arrangements*. These include temporary select committees, standing committees and their subcommittees, specially created subcommittees, or specially commissioned task forces within an existing standing committee.

3.  Specially created investigative committees usually have a *short life span*: e.g., six months, one year, or at the longest until the end of a Congress, at which point the panel would have to be reapproved if the inquiry were to continue.

4.  The investigative panel often has to *employ additional and special staff* — including investigators, attorneys, auditors, and researchers — because of the added work load and need for specialized expertise in conducting such investigations and in the subject matter. Such staff can be hired under contract from the private sector, transferred from existing congressional offices or committees, transferred from the congressional support agencies, or loaned by executive agencies, including the Federal Bureau of Investigation. The staff would require appropriate security clearances if the inquiry looked into matters of national security.

5.   Such special panels have often been vested with investigative authorities not ordinarily available to standing committees.  Staff deposition authority is the most commonly given, but given the particular circumstances, special panels have been vested with the authority to obtain tax information, to seek international assistance in information gathering efforts abroad, and to participate in judicial proceedings (see **Table 1**).

## Table 1.  Special Investigative Authorities of Selected Investigating Committees

| | Deposition Authority | International Information Gathering Authority | Tax Information Access Authority | Authority to Participate In Judicial Proceedings |
|---|---|---|---|---|
| **Sen. Select Committee on Watergate**[a] | Member/ Staff | No | No | Yes |
| **Nixon Impeachment Proceedings**[b] | Member/ Staff | Yes | No | No |
| **Billy Carter Investigation**[c] | Staff | No | Yes | No |
| **House Assassinations Inquiry**[d] | Member/ Staff | Yes | No | No |
| **Church Committee**[e] | Member/ Staff | Yes | No | No |
| **Koreagate**[f] | Member/ Staff | Letters Rogatory | No | Yes, by special counsel |
| **ABSCAM (House)**[g] | Member | Letters Rogatory | No | Yes, by special counsel |
| **ABSCAM (Senate)**[h] | Member/ Staff | No | No | No |
| **Iran-Contra House**[i] **and Senate**[j] | Member/ Staff | Letters Rogatory, Commissions, Depositions | Yes | Yes |
| **Judge Hastings Impeachment**[k] | Staff | No | No | No |
| **Judge Nixon Impeachment**[l] | Staff | No | No | No |

CRS-50

| | Deposition Authority | International Information Gathering Authority | Tax Information Access Authority | Authority to Participate In Judicial Proceedings |
|---|---|---|---|---|
| **October Surprise[m]** | Member/ Staff | Letters Rogatory, Commissions, Depositions | No | Yes |
| **Senate Whitewater(I)[n]** | Staff | No | No | No |
| **Senate Whitewater (II)[o]** | Staff | Letters Rogatory, Commissions | Yes | No |
| **White House Travel Office[p]** | Member/ Staff | No | No | No |
| **House Campaign Finance[q]** | Member/ Staff | Letters Rogatory, Commissions | No | No |
| **Senate Campaign Finance[r]** | Staff | No | No | No |
| **Select Committee on National Security Commercial Concerns[s]** | Member/ Staff | Letters Rogatory, Depositions | Yes | Yes, by House General Counsel |
| **Teamsters Election Investigation[t]** | Member/ Staff | No | No | No |

**Note:** More comprehensive compilations of authorities and rules of Senate and House special investigatory committees may be found in Senate Committee on Rules and Administration, "Authority and Rules of Senate Special Investigatory Committees and Other Senate Entities, 1973-97," S.Doc. 105-16, 105th Cong., 1st sess. (1998), and CRS Report 95-949, *Staff Depositions in Congressional Investigations*, by Jay Shampansky., at notes 16 and 18.

a. S.Res. 60 and S.Res. 194, 93rd Cong., (1973).
b. H.Res. 803, 93rd Cong., (1974).
c. 126 Cong. Rec. 19544-46 (1980) (unanimous consent agreement); S.Res. 495, 96th Cong., (1980) (staff deposition authority); S.Res. 496, 96th Cong., (1980) (tax access authority).
d. H.Res. 222, 95th Cong., (1974).
e. S.Res. 21, 94th Cong., (1974).
f. H.Res. 252 and H.Res. 752, 95th Cong., (1977).
g. H.Res. 67, 97th Cong., (1981).
h. S.Res. 350, 97th Cong., (1982).
i. H.Res. 12, 10th Cong., (1987).
j. S.Res. 23, 100th Cong., (1987).
k. H.Res. 320, 100th Cong., (1987).
l. H.Res. 562, 100th Cong., (1988).

CRS-51

m. H.Res. 258, 102nd Cong., (1991).
n. S.Res. 229, 103rd Cong., (1994).
o. S.Res. 120, 104th Cong., (1995).
p. H.Res. 369, 104th Cong., (1996).
q. H.Res. 167, 105th Cong., (1997).
r. S.Res. 54, 105th Cong., (1997)).
s. H.Res. 463, 105th Cong., (1998).
t. H.Res. 507, 105th Cong., (1998).

# G.  Role of Minority-Party Members In the Investigative Process

The role of members of the minority in the investigatory oversight process is governed by the rules of each house and its committees.  While minority members are specifically accorded some rights (e.g., in the House of Representatives, whenever a hearing is conducted on any measure or matter, the minority may, upon the written request of a majority of the minority members to the chairman before the completion of the hearing, call witnesses selected by the minority, and presumably request documents[48]), no House or committee rules authorize either ranking minority members or individual members on their own to institute official committee investigations, hold hearings, or issue subpoenas.  Individual members may seek the voluntary cooperation of agency officials or private persons.  But no judicial precedent has directly recognized a right in an individual member, other than the chair of a committee,[49] to exercise the authority of a committee in the context of oversight without the permission of a majority of the committee or its chair.  Moreover, a 1994 federal district court ruling dismissed the attempt of the then-ranking minority member of the House Banking [now titled Financial Services] Committee to compel disclosure of documents from two agencies under the Freedom of Information Act and the Administrative Procedure Act.  The court held that the case was one "in which a congressional plaintiff's dispute is primarily with his or her fellow legislators" and that the ranking minority member's "complaint derives solely from his failure to persuade his colleagues to authorize his request for the documents in question, and that Plaintiff thus has a clear 'collegial remedy' capable of affording him substantial relief."[50]

That court also suggested that the possibility that a "collegial remedy" for the minority exists already, pointing to 5 U.S.C. 2954, under which small groups of members of the House Government Reform and Senate Governmental Affairs Committees can request information from executive agencies without the need of

---

[48] House Rule XI 2(j)(1); see, e.g., House Banking Committee Rule IV. 4.

[49] *Ashland Oil Co., Inc.*, v. *FTC*, 548 F. 2d 977, 979-80 (D.C. Cir. 1976), *affirming* 409 F. Supp. 297 (D.D. C. 1976).  See also *Exxon* v. *Federal Trade Commission*, 589 F. 2d 582, 592-93 (D.C. Cir. 1978)(acknowledging that the "principle is important that disclosure of information can only be compelled by members . . ."); and *In re Beef Industry Antitrust Litigation*, 589 F. 2d 786, 791 (5th Cir. 1979)(refusing to permit two Congressmen from intervening in private litigation because they "failed to obtain a House Resolution or any similar authority before they sought to intervene.")

[50] *Leach* v. *Resolution Trust Corporation*, 860 F. Supp. 868, 874-76 (D.D.C. 1994).

CRS-52

formal committee action.[51] However, the precise scope and efficacy of this provision is uncertain.

5 U.S.C. 2954 is derived from section 2 of the act of May 29, 1928,[52] which originally referred not to the current committees generally overseeing government agency operations but their predecessors, the House and Senate Committees on Expenditures in the Executive Departments. The principal purpose of the 1928 act, embodied in its first section, was to repeal legislation that required the submission to the Congress of some 128 reports, many of which had become obsolete in part, and which, in any event, were deemed at the time to have no value, serve no useful purpose, and were not printed by the House of Representatives.[53]

Section 2 of the 1928 act contains the language that has been codified in 5 U.S.C. 2954. The legislative history, is somewhat mixed on the purpose of that language. The Senate report indicated a limited purpose: to make "it possible to require any report discontinued by the language of this bill to be resubmitted to either House upon its necessity becoming evident to the membership of either body."[54] The House report agreed on that point, but added: "If any information is desired by any Member or Committee upon a particular subject that information can be better secured by a request made by an individual Member or Committee, so framed as to bring out the special information desired."[55]

It is uncertain, then, on how closely 5 U.S.C. 2954 is tied to the 128 reports abolished by section 1 of the 1928 legislation.[56] Moreover, the provision lacks an explicit enforcement component. Agency refusals to comply would not be subject to existing contempt processes, and the outcome of a civil suit to compel production on the basis of the provision is problematic despite the *Leach* court's suggestion. Further, the provision applies only to the named committees; thus members of all other committees would still face the *Leach* problem. Finally, even members of the named committees are still likely to have to persuade a court that their claim is more than an intramural dispute, that a court has jurisdiction to hear the suit, and that

---

[51] *Id.* at 876 note 7. 5 U.S.C. 2954 provides: "An Executive agency, on request of the Committee on Government [Reform] of the House of Representatives, or of any seven members thereof, or on request of the Committee on Government Operations of the Senate, or any five members thereof, shall submit any information requested of it relating to any matter within the jurisdiction of the committee."

[52] 45 Stat. 996.

[53] H.R. 1757, 70th Cong., 1st Sess., pp. 2-3 (1928). A study of the Bureau of Efficiency had recommended their elimination. H.R. 1757, at p. 2; S.Rept. 1320, 70th Cong., 1st sess., p. 1 (1928).

[54] S.Rept. 1320, *supra*, at 4.

[55] H.R. 1757, *supra*, at 6. For House and Senate floor debates, see 69 Cong. Rec. 9413-17, 10613-16 (1928).

[56] In codifying Title 5 in 1966, Congress made it clear that it was effecting no substantive changes in existing laws: "The legislative purpose in enacting sections 1-6 of this act is to restate, without substantive change, the laws replaced by those sections on the effective date of this Act." P.L. 89-544, Sec. 7(a).

committee members have standing to sue within the narrow parameters set by the Supreme Court in *Raines* v. *Byrd*.[57]

The first attempt to secure court enforcement of a document demand under Section 2954 was brought in 2001 in a federal district court.[58] That case involved a request of 16 minority party members of the House Government Reform Committee for information from the Secretary of Commerce for data concerning the 2000 census. The congressional plaintiffs sought declaratory and injunction relief, arguing that the plain language of Section 2954 unambiguously directs agency compliance with information requests and that while resort to the legislative history of the provision is not necessary in such clear language situations, that history is supportive. They were entitled to judicial relief because of the agency's direct and particularized rejection of an entitlement specifically granted to them by law. The government argued that because the case had arisen out of a political dispute between the Congress and the Executive concerning access to information, the court should refrain from hearing the case in accordance with the doctrine of equitable discretion. Alternatively, the government argued that Section 2954 should be construed, in light of its legislative history, and to avoid doubts about its constitutionally, as preserving Congress' access to the information formerly contained in the reports abolished by Section 1 of the 1928 Act, but not as guaranteeing an unqualified right of access to information possessed by the executive branch. The district court rejected these arguments and ordered release of the requested census data. The government thereafter moved for reconsideration, raising for the first time the questions whether plaintiffs, as individual legislators, lacked standing under the Supreme Court's ruling in *Raines* v. *Byrd* to sue for institutional injuries and whether the plaintiffs had a right of action under Section 2954, the Administrative Procedure Act, or the Mandamus statute to bring suit against the Executive Branch for access to information. The court declined to consider these arguments on the ground that the government could have presented them in support of its original motion to dismiss but did not do so.[59]

On appeal to the Ninth Circuit, the case was argued together with a separate Freedom of Information Act (FOIA) suit for the same census data brought by two Washington State legislators. After oral argument, the appeals court withdrew the submission of *Waxman* v. *Evans*, deferring the case pending its decision in the FOIA suit. The appeals court ruled in favor of the plaintiffs in the FOIA case on October 8, 2002,[60] and on December 6, 2002, declared that the action in *Waxman* was mooted by its FOIA decision and issued an order reversing and vacating the district court's decision, and remanding the case to the district court with instructions to dismiss.[61] On motion of the plaintiffs, the court of appeals modified this order on January 9, 2003, striking its reversal of the district court's ruling, but leaving in effect its order to vacate and dismiss.

---

[57] 521 U.S. 811 (1997).

[58] *Waxman, et al.* v. *Evans*, Civ. Action No. 01-14530-LGB (AJWx) (D.C. CD Calif., May 21, 2001).

[59] *Waxman* v. *Evans*, Case No. CV 01-14530-LGB (AJWx) at 3 (March 25, 2002).

[60] *Carter* v. *U.S. Department of Commerce*, 307 F. 3d 1084 (9th Cir. 2002).

[61] *Waxman* v. *Evans*, No. 02-55825 (9th Cir. Dec. 6, 2002).

CRS-54

A second attempt to secure judicial enforcement of a Section 2954 document demand is now pending before the same district court. That case, *Waxman* v. *Thompson*,[62] is a suit by 19 Members of the House Government Reform Committee to compel release release by the Department of Health and Human Services (HHS) of cost estimates prepared by its Office of Actuary during congressional consideration of Medicare reform legislation in 2003. In addition to asserting a right of access under Section 2954, the congressional plaintiffs allege a violation of 5 U.S.C. 7211, which provides that "[t]he right of employees . . . to furnish information to either House of Congress, or to a committee or member thereof, may not be interfered with or denied." The government opposes the claims, raising the issues of standing under *Raines* v. *Byrd*, jurisdiction of the court to enforce either statute, and the doctrine of equitable discretion. Oral argument is scheduled for early December 2004.

The rules of the Senate provide substantially more effective means for individual minority-party members to engage in "self-help" to support oversight objectives than afforded their House counterparts. Senate rules emphasize the rights and prerogatives of individual Senators and, therefore, minority groups of Senators.[63] The most important of these rules are those that effectively allow unlimited debate on a bill or amendment unless an extraordinary majority votes to invoke cloture.[64] Senators can use their right to filibuster, or simply the threat of filibuster, to delay or prevent the Senate from engaging in legislative business. The Senate's rules also are a source of other minority rights that can directly or indirectly aid the minority in gaining investigatory rights. For example, the right of extended debate applies in committee as well as on the floor, with one crucial difference: the Senate's cloture rule may not be invoked in committee. Each Senate committee decides for itself how it will control debate, and therefore a filibuster opportunity in a committee may be even greater than on the floor. Also, Senate Rule XXVI prohibits the reporting of any measure or matter from a committee unless a majority of the committee is present, another point of possible tactical leverage. Even beyond the potent power to delay, Senators can promote their goals by taking advantage of other parliamentary rights and opportunities that are provided by the Senate's formal procedures and customary practices, such as are afforded by the processes dealing with floor recognition, committee referrals, and the amending process.[65]

---

[62] No. CV-04-3467 MMM (Manx) (D.C. C.D. Calif., W.D., May 17, 2004).

[63] See CRS Report RL30850, *Minority Rights and Senate Procedures*, by Stanley Bach.

[64] Senate Rules XIX and XXII.

[65] See Bach, *supra* note 63 at pp. 8-11.

CRS-55

# Selected Readings

Beard, Glenn A.  Congress v. The Attorney-Client Privilege: A "Full and Frank" Discussion, American Criminal Law Review, v. 35, 1997: 119.

Berger, Raoul.  Congressional Subpoenas to Executive Officials.  Columbia Law Review, v. 75, 1975: 865.

Berger, Raoul.  Executive Privilege:  A Constitutional Myth. Cambridge: Harvard University Press, 1974.

Brand. Stanley M.  Battle Among the Branches: The Two Hundred Year War.  North Carolina Law Review, v. 65, 1987: 901.

Brand, Stanley M. and Connelly, Sean.  Constitutional Confrontations:  Preserving a Prompt and Orderly Means By Which Congress May Enforce Investigative Demands Against Executive Branch Officials.  Catholic University Law Review, v. 36, 1986: 71.

Bush, Joel D.  Congressional Executive Access Disputes:  Legal Standards and Political Settlements.  Journal of Law and Politics, v. 9, Summer 1993: 719.

Clavelaux, Ronald L. The Conflict Between Executive Privilege and Congressional Oversight:  The Gorsuch Controversy.  Duke Law Journal, v. 1983, No. 6: 1333.

Cole, Lance.  The Fifth Amendment and Compelled Production of Personal Documents after United States v. Hubbell — New Protection for Private Papers?  American Journal of Criminal Law, v. 29, Spring 2002: 123.

Devins, Neal.  Congressional-Executive Information Disputes: A Modest Proposal — Do Nothing.  Administrative Law Review, vol. 48, Winter 1996: 109.

Dimock, Marshall E.  Congressional Investigating Committees.  Baltimore: Johns Hopkins University Press, 1929.                          JK1123.A2E2

Fisher, Louis.  Congressional Access to Executive Branch Information: Legislative Tools.  CRS Report RL30966.  May 17, 2001.

——. Congressional Investigations: Subpoenas and Contempt Power.  CRS Report RL31836.  April 2, 2003.

——. The Politics of Executive Privilege.  Durham, N.C.: Carolina Academic Press, 2004.  272 p.                                JK468.S4F57

Ghio, R.S.  The Iran-Contra Prosecutions and the Failure of Use Immunity.  Stanford Law Review, v. 45, 1992:  229.

CRS-56

Grabow, John C.  Congressional Investigations:  Law and Practice.  New Jersey:  Prentice Hall Law and Business, 1988.                         KF4942.G73

Hamilton, James.  The Power to Probe:  A Study in Congressional Investigations.  New York:  Vintage Books, 1976.                         KF4942.H34

Iraola, Roberts.  Congressional Oversight, Executive Privilege, and Requests for Information Relating to Federal Criminal Investigations and Prosecutions.  Iowa Law Review, v. 87, 2002: 1559.

Hamilton, James and Grabow John C.  A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas.  Harvard Journal Legislation, v. 21, Winter 1984:  145.

Moreland, Allen B.  Congressional Investigations and Private Persons.  Southern California Law Review, v. 40, Winter 1967:  189.

Peterson, Todd D.  Prosecuting Executive Branch Officials For Contempt Of Congress.  New York University Law Review, v. 66, 1991: 563.

——. Congressional Oversight of Open Criminal Investigations.  Notre Dame Law Review, v. 75, 2002: 1373.

Relyea, Harold and Shampansky, Jay.  Presidential Advisors' Testimony Before Congressional Committees: An Overview.  CRS Report RL31351.  October 6, 2004.

Roberts, John C.  Are Congressional Committees Constitutional?  Radical Textualism, Separation of Powers, and the Enactment Process, and the Enactment Process.  Case Western Rescue Law Review, v. 52, 2001: 489.

Rosenberg, Morton.  Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry.  CRS Report 95-464 A, April 7, 1995.

——. Presidential Claims of Executive Privilege: History, Law, Practice and Recent Developments.  CRS Report RL30319, September 21, 1999.

Rosenthal, Paul C. and Grossman, Robert S. Congressional Access to Confidential Information Collected by Federal Agencies.  Harvard Journal of Legislation, v. 15, 1977:  74.

Rozell, Mark J.  Executive Privilege: Presidential Power, Secrecy, and Accountability.  Lawrence: University Press of Kansas, 2002 (2d edition, revised).                         JK468.S4 R67

Schlesinger, Arthur M., Jr., and Bruns, Rogers (eds.).  Congress Investigates: 1792-1974.  New York: Chelsea House Publishers.  1975 (5 Vols. ).
                         JK 1123.A2 S34

CRS-57

Shampansky, Jay R.  Staff Depositions in Congressional Investigations.  CRS Report 95-949 A, December 3, 1999.

——.  Congress' Contempt Power.  CRS Report 86-83A, February 28, 1986.

Shane, Peter M.  Legal Disagreement and Negotiation in a Government of Laws: The Case of Executive Privilege Claims Against Congress.  Minnesota Law Review, v. 71, February 1987:  461.

Shane, Peter M.  Negotiation for Knowledge:  Administrative Responses to Congressional Demands For Information.  Administrative Law Review, v. 44, Spring 1992:  197.

Sklamberg, Harold.  Investigation Versus Protection: The Constitutional Limits on Congress' Power to Immunize Witnesses.  North Carolina Law Review, v. 78: November 1999: 153.

Stathis, Stephen W.  Executive Cooperation:  Presidential Recognition of the Investigative Authority of Congress and the Courts.  Journal of Law and Politics, v. 3, Fall 1986:  187.

Taylor, Teleford.  Grand Inquest:  The Story of Congressional Investigations.  New York:  Simon and Schuster, 1995.                    KF4942.T38

Tiefer, Charles.  Congressional Oversight of the Clinton Administration and Congressional Procedure.  Administrative Law Review, v. 50, 1998: 199.

——.  The Law: President Bush's First Executive Privilege Claim: The FBI/Boston Investigation. Presidential Studies Quarterly, v. 33, March 2003: 201.

Vermeule, Adrian.  The Constitutional Law of Congressional Procedure.  University of Chicago Law Review, v. 71, Spring 2004: 361.

Walsh, Lawrence E.  The Independent Counsel and the Separation of Powers. Houston Law Review, v. 25, January 1988: 1.

Wald, Patricia and Siegel, Jay.  The D.C. Circuit and the Struggle for Control of Presidential Information.  Georgetown Law Journal, v. 90, March 2002: 737.

Wright, Ronald F.  Congressional Use of Immunity Grants After Iran-Contra. Minnesota Law Review, v. 80, December 1995: 407.

CRS-58

# Appendix A
## Illustrative Subpoena

Subpena Duces Tecum

## By Authority of the House of Representatives of the Congress of the United States of America

To ..Custodian of Documents International Brotherhood of Teamsters...............

You are hereby commanded to produce the things identified on the attached schedule before the Subcommittee on Oversight and Investigations. Committee on ...Education and the Workforce............................. of the House of Representatives of the United States, of which the Hon. ..Pete.Hoekstra.......... ................................... is chairman, by producing such things in Room ....B-346A.... of the ..........Rayburn.............. Building ......................................., in the city of Washington, on ..........March.17,.1998......, at the hour of ..........5:00.p.m................

To ..Any.staff.member.or.agent.of.the.Committee.on.Education.and.the.Workfor of the age of 18 years or older or to any United States Marshal to serve and make return.

Witness my hand and the seal of the House of Representatives

of the United States, at the city of Washington, this

.....10th..... day of .......March................., 19..98..

*Peter Hoekstra*
........................................................
The Honorable Pete Hoekstra    *Chairman.*

Attest:
........................................................
*Clerk.*

CRS-59

Subpena for..Custodian.of.Documents....

International.Brotherhood.of.Teamsters

.25.Louisiana.Avenue,.N.W................

Washington,.D.C..20001..................

before the Committee on the.Education....

.and.the.Workforce,.Subcommittee.on.

.Oversight.and.Investigations...........

Served........ ...................................

............................................................

............................................................

............................................................

............................................................

............................................................

.............................House of Representatives

CRS-60

## GENERAL INSTRUCTIONS

1. In complying with this Subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You are also required to produce documents that you have a legal right to obtain, documents that you have a right to copy or have access to, and documents that you have placed in the temporary possession, custody, or control of any third party. No records, documents, data or information called for by this request shall be destroyed, modified, removed or otherwise made inaccessible to the Committee.

2. In the event that any entity, organization or individual denoted in this subpoena has been, or is also known by any other name than that herein denoted, the subpoena shall be read to also include them under that alternative identification.

3. Each document produced shall be produced in a form that renders the document susceptible of copying.

4. Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when this subpoena was served. Also identify to which  paragraph from  the  subpoena that such documents are responsive.

5. It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same document.

6. If any of the subpoenaed information is available in machine-readable form (such as punch cards, paper or magnetic tapes, drums, disks, or core storage), state the form in which it is available and provide sufficient detail to allow the information to be copied to a readable format. If the information requested is stored in a computer, indicate whether you have an existing program that will print the records in a readable form.

7. If the subpoena cannot be complied with in full, it shall be complied with to the extent possible, which shall include an explanation of why full compliance is not possible.

8. In the event that a document is withheld on the basis of privilege, provide the following information concerning any such document: (a) the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author and addressee; and (e) the relationship of the author and addressee to each other.

9. If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, identify the document (stating its date, author, subject and recipients) and explain the circumstances by which the document ceased to be in your possession, or control.

10. If a date set forth in this subpoena referring to a communication, meeting, or other event is inaccurate, but the actual date is known to you or is otherwise

CRS-61

apparent from the context of the request, you should produce all documents which would be responsive as if the date were correct.

11. Other than subpoena questions directed at the activities of specified entities or persons, to the extent that information contained in documents sought by this subpoena may require production of donor lists, or information otherwise enabling the re-creation of donor lists, such identifying information may be redacted.

12. The time period covered by this subpoena is included in the attached Schedule A.

13. This request is continuing in nature. Any record, document, compilation of data or information, not produced because it has not been located or discovered by the return date, shall be produced immediately upon location or discovery subsequent thereto.

14. All documents shall be Bates stamped sequentially and produced sequentially.

15. Two sets of documents shall be delivered, one set for the Majority Staff and one set for the Minority Staff. When documents are produced to the Subcommittee, production sets shall be delivered to the Majority Staff in Room B346 Rayburn House Office Building and the Minority Staff in Room 2101 Rayburn House Office Building.

CRS-62

## GENERAL DEFINITIONS

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra office communications, electronic mail (E-mail), contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, discs, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disc, or videotape. A documents bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face to face, in a meeting, by telephone, mail, telexes, discussions, releases, personal delivery, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information which might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neuter genders.

4. The term "White House" refers to the Executive Office of the President and all of its units including, without limitation, the Office of Administration, the White House Office, the Office of the Vice President, the Office of Science and Technology Policy, the Office of Management and Budget, the United States Trade Representative, the Office of Public Liaison, the Office of Correspondence, the Office of the Deputy Chief of Staff for Policy and Political Affairs, the Office of the Deputy Chief of Staff for White House Operations, the Domestic Policy Council, the Office of Federal Procurement Policy, the Office of Intergovernmental Affairs, the Office of Legislative Affairs, Media Affairs, the National Economic Council, the Office of Policy Development, the Office of Political Affairs, the Office of Presidential Personnel, the Office of

CRS-63

the Press Secretary, the Office of Scheduling and Advance, the Council of Economic Advisors, the Council on Environmental Quality, the Executive Residence, the President's Foreign Intelligence Advisory Board, the National Security Council, the Office of National Drug Control, and the Office of Policy Development.

March 10, 1998

Custodian of Documents
International Brotherhood of Teamsters
25 Louisiana Avenue, N.W.
Washington, D.C. 20001

## SCHEDULE A

1.  All organizational charts and personnel rosters for the International Brotherhood of Teamsters ("Teamsters" or "IBT"), including the DRIVE PAC, in effect during calendar years 1991 through 1997.

2.  All IBT operating, finance, and administrative *manuals* in effect during calendar years 1991 through 1997, including, but not limited to those that set forth (1) operating policies, practices, and procedures; (2) internal financial practices and reporting requirements; and (3) authorization, approval, and review responsibilities.

3.  All annual audit reports of the IBT for the years 1991 through 1996 performed by the auditing firm of Grant Thornton.

4.  All IBT annual reports to its membership and the public for years 1991 through 1997, including copies of IBT annual audited financial statements certified to by independent public accountants.

5.  All books and records showing receipts and expenditures, assets and liabilities, profits and losses, and all other records used for recording the financial affairs of the IBT including, journals (or other books of original entry) and ledgers including cash receipts journals, cash disbursements journals, revenue journals, general journals, subledgers, and workpapers reflecting accounting entries.

6.  All Federal Income Tax returns filed by the IBT for years 1991 through 1997.

7.  All minutes of the General Board, Executive Board, Executive Council, and all Standing Committees, including any internal ethics committees formed to investigate misconduct and corruption, and all handouts and reports prepared and produced at each Committee meeting.

8.  All documents referring or relating to, or containing information about, any contribution, donation, expenditure, outlay, in-kind assistance, transfer, loan, or grant (from DRIVE, DRIVE E&L fund, or IBT general treasury) to any of the following entities/organizations:

    a.  Citizen Action
    b.  Campaign for a Responsible Congress
    c.  Project Vote
    d.  National Council of Senior Citizens
    e.  Vote Now '96
    f.  AFL-CIO

      g.    AFSCME
      h.    Democratic National Committee
      i.    Democratic Senatorial Campaign Committee ("DSCC")
      j.    Democratic Congressional Campaign Committee ("DCCC")
      k.    State Democratic Parties
      1.    Clinton-Gore '96
      m.   SEIU

9.   All documents referring or relating to, or containing information about any of the following individuals/entities:

      a.    Teamsters for a Corruption Free Union
      b.    Teamsters for a Democratic Union
      c.    Concerned Teamsters 2000
      d.    Martin Davis
      e.    Michael Ansara
      f.    Jere Nash
      g.    Share Group
      h.    November Group
      i.    Terrence McAuliffe
      j.    Charles Blitz
      k.    New Party
      1.    James P. Hoffa Campaign
      m.   Delancy Printing
      n.    Axis Enterprises
      o.    Barbara Arnold
      p.    Peter McGourty
      q.    Charles McDonald
      r.    Theodore Kheel

10.  All documents referring or relating to, or containing information on about, communications between the Teamsters and the White House regarding any of the following issues:

      a.    United Parcel Service Strike
      b.    Diamond Walnut Company Strike
      c.    Pony Express Company organizing efforts
      d.    Davis Bacon Act
      e.    NAFTA Border Crossings
      f.    Ron Carey reelection campaign
      g.    IBT support to 1996 federal election campaigns.
      i.    All documents referring or relating to, or containing information about, communications between the Teamsters and the Federal Election Commission.

12.  All documents referring or relating to, or containing information about, communications between the Teamsters and the Democratic National Committee, DSCC, or DCCC.

CRS-66

13. All documents referring or relating to, or containing information about, communications between the Teamsters and the Clinton-Gore '96 Campaign Committee.

14. All documents referring or relating to, or containing information about, policies and procedures in effect during 1996 regarding the approval of expenditures from the IBT general treasury, DRIVE E&L fund, and DRIVE PAC.

15. All documents referring or relating to, or containing information about the retention by the IBT of the law firm Covington & Burling and/or Charles Ruff.

16. All documents referring or relating to, or containing information about work for the IBT performed by the firm Palladino & Sutherland and/or Jack Palladino.

17. All documents referring or relating to, or containing information about work for the IBT performed by Ace Investigations and/or Guerrieri, Edmund, and James.

18. All documents referring or relating to, or containing information about IBT involvement in the 1995-1996 Oregon Senate race (Ron Wyden vs. Gordon Smith).

19. All documents referring or relating to, or containing information about, Ron Carey's campaign for reelection as general president of the Teamsters.

20. All documents referring or relating to, or containing information about organization, planning, and operation of the 1996 IBT Convention.

21. All documents referring or relating to, or containing information about the following:

    a.  Trish Hoppey
    b.  John Latz
    c.  any individual with the last name of "Golovner".
    d.  Convention Management Group.

22. All documents referring or relating to, or containing information about the Household Finance Corporation.

23. All documents referring or relating to, or containing information about, any "affinity credit card" program or other credit card program sponsored by or participated in by the IBT.

24. A list of all bank accounts held by the International Brotherhood of Teamsters including the name of the bank, account number, and bank address.

25. All documents referring or relating to, or containing information about, payments made by the IBT to any official or employee of the Independent Review Board.

CRS-67

26. Unless otherwise indicated, the time period covered by this subpoena is between January 1991 and December 1997.

CRS-68

# Appendix B

### THE WHITE HOUSE

#### November 4, 1982

**MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES**

SUBJECT:   Procedures Governing Responses to
        <u>Congressional Request for Information</u>

The policy of this administration is to comply with Congressional Requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch. While this Administration, like its predecessors, has an obligation to protect the confidentiality of some communications, executive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary. Historically, good faith negotiations between Congress and the executive branch has minimized the need for invoking executive privilege, and this tradition of accommodation should continue as the primary means of resolving conflicts between the Branches. To ensure that every reasonable accommodation is made to the needs of Congress, executive privilege shall not be invoked without specific Presidential authorization.

The Supreme Court has held that the Executive Branch may occasionally find it necessary and proper to preserve the confidentiality of national security secrets, deliberative communications that form a part of the decision-making process, or other information important to the discharge of the Executive Branch's constitutional responsibilities. Legitimate and appropriate claims of privilege should not thoughtlessly be waived.  However, to ensure that this Administration acts responsibly and consistently in the exercise of its duties, with due regard for the responsibilities and prerogatives of Congress, the following procedures shall be followed whenever Congressional requests for information raise concerns regarding the confidentiality of the information sought:

1.  Congressional requests for information shall be complied with as promptly and as fully as possible, unless it is determined that compliance raises a substantial question of executive privilege. A "substantial question of executive privilege" exists if disclosure of the information requested might significantly impair the national security (including the conduct of foreign relations), the deliberative processes of the Executive Branch or other aspects of the performance of the Executive Branch's constitutional duties.

2.  If the head of an executive department or agency ("Department Head") believes, after consultation with department counsel, that compliance with a Congressional request for information raises a substantial question of executive privilege, he shall promptly notify and consult with the Attorney General through the Assistant Attorney General for the Office of Legal Counsel, and shall also promptly notify and consult with the Counsel to the President. If the information requested of a department or agency derives in whole or in part or from information received from another department or agency, the latter entity shall also be consulted as to whether disclosure of the information raises a substantial question of executive privilege.

3.  Every effort shall be made to comply with the Congressional request in a manner consistent with the legitimate needs of the Executive Branch.  The Department Head, the Attorney "General and the Counsel to the President may, in the exercise of their discretion in the circumstances, determine that executive privilege shall not be invoked and release the requested information.

    4.  If the Department Head, the Attorney General or the Counsel to the President believes, after consultation, that the circumstances justify invocation of executive privilege, the issue shall be presented to the President by the Counsel to the President, who will advise the Department Head and the Attorney General of the President's decision.

    5.  Pending a final Presidential decision on the matter, the Department Head shall request the Congressional body to hod its request for the information in abeyance. The Department Head shall expressly indicate that the purpose of this request is to protect the privilege pending a Presidential decision, claim of privilege.

    6.  If the President decides to invoke executive privilege, the Department Head shall advise the requesting Congressional body that the claim of executive privilege is being made with the specific approval of the President.

Any questions concerning these procedures or related matters should be addressed to the Attorney General, through the Assistant Attorney General for the Office of Legal Counsel, and to the Counsel to the President.

Ronald Reagan

# Appendix C

**THE WHITE HOUSE**

**September 28, 1994**

**MEMORANDUM FOR ALL EXECUTIVE DEPARTMENT AND AGENCY GENERAL COUNSELS**

**FROM:    LLOYD N. CUTLER, SPECIAL COUNSEL TO THE PRESIDENT**

**SUBJECT:    Congressional Requests to Departments and Agencies for Documents Protected by Executive Privilege**

The policy of this Administration is to comply with congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch.  While this Administration, like its predecessors, has an obligation to protect the confidentiality of core communications, executive privilege will be asserted only after careful review demonstrates that assertion of the privilege is necessary to protect Executive Branch prerogatives.

The doctrine of executive privilege protects the confidentiality of deliberations within the White House, including its policy councils, as well as communications between the White House and executive departments and agencies. Executive privilege applies to written and oral communications between and among the White House, its policy councils and Executive Branch agencies, as well as to documents that describe or prepares for such communications (e.g. "talking points"). This has been the view expressed by all recent White House Counsels. In circumstances involving communications relating to investigations of personal wrongdoing by government officials, it is our practice not to assert executive privilege, either, in judicial proceedings or in congressional investigations and hearings. Executive privilege must always be weighed against other competing governmental interests, including the judicial need to obtain relevant evidence, especially in criminal proceedings, and the congressional need to make factual findings for legislative and oversight purposes.

In the last resort, this balancing is usually conducted by the courts. However, when executive privilege is asserted against a congressional request for documents, the courts usually decline to intervene until after the other two branches have exhausted the possibility of working out a satisfactory accommodation. It is our policy to work out such an accommodation whenever we can, without unduly interfering with the President's need to conduct frank exchange of views with his principal advisors.

Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege.

Executive privilege belongs to the President, not individual departments or agencies. It is essential that all requests to departments and agencies for information of the type described above be referred to the White House Counsel before any information is furnished. Departments and agencies receiving such request should therefore follow the procedures set forth below, designed to ensure that this Administration acts responsibly and consistently with respect to executive privilege issues, with due regard for the responsibilities and prerogatives of Congress:

<u>First</u>, any document created in the White House, including a White House policy council, or in a department or agency, that contains the deliberations of, or advice to or from, the White House, should be presumptively treated as protected by executive privilege. This is so regardless of the document's location at the time of the request or whether it originated in the White House or in a department or agency.

<u>Second</u>, a department or agency receiving a request for any such document should promptly notify the White House Counsel's Office, and direct any inquiries regarding such a document to the White House Counsel's Office.

<u>Third</u>, the White House Counsel's Office, working together with the department or agency (and, where appropriate, the Department of Justice), will discuss the request with appropriate congressional representatives to determine whether a mutually satisfactory recommendation is available.

<u>Fourth</u>, if efforts to reach a mutually satisfactory accommodation are unsuccessful, and if release of the document would pass a substantial question of executive privilege, the Counsel to the President will consult with the Department of Justice and other affected agencies to determine whether to recommend that the President invoke the privilege.

We believe this policy will facilitate the resolution of issues relating to disclosures to Congress and maximize the opportunity for reaching mutually satisfactory accommodations with Congress.  We will of course try to cooperate with reasonable congressional requests for information in ways that preserve the President's ability to exchange frank advice with his immediate staff and the heads of the executive departments and agencies.

# IV. Selected Oversight Techniques

Many oversight techniques are self-explanatory. There are several techniques, however, for which explanation or elaboration may prove helpful for a better understanding of their utility.

## A. Determine Laws, Programs, Activities, Functions, Advisory Committees, Agencies, and Departments Within Each Committee's Jurisdiction

A basic step in oversight preparation is to determine the laws, programs, activities, functions, advisory committees, agencies, and departments within a committee's jurisdiction. This is essential if a committee is to know the full range of its oversight responsibilities. To accomplish this general goal, House and Senate committees might:

1. Prepare a document, as needed, which outlines for each subcommittee of a standing committee the agencies, laws, programs activities, functions, advisory committees, and required agency reports that fall within its jurisdictional purview.

2. Publish, as needed, a compilation of the all the basic statutes in force within the jurisdiction of each subcommittee or for the committee itself if it has no subcommittees.

3. Request the assistance of the various legislative support agencies (the Congressional Budget Office, the Congressional Research Service, or the Government Accountability Office) in identifying the full range of federal programs and activities under a committee's jurisdiction.

## B. Orientation and Periodic Review Hearings With Agencies

1. Oversight hearings (or even "pre-hearings") may be held for the purposes of briefing Members and staff on the organization, operations, and programs of an agency, and determining how an agency intends to implement any new legislation. The hearings can also be used as a way to obtain information on the administration, effectiveness, and economy of agency operations and programs.

2. Agency officials can be noticeably influenced by the knowledge and expectation that they will be called before a congressional committee regularly to account for the activities of their agencies.

3. Such hearings benefit the committee by, for example:

   a. helping committee members keep up-to-date on important administrative developments;

    b.   serving as a forum for exchanging and communicating views on pertinent problems and other relevant matters;

    c.   providing background information which could assist members in making sound legislative and fiscal judgments;

    d.   identifying program areas within each committee's jurisdiction that may be vulnerable to waste, fraud, abuse, or mismanagement; and

    e.   determining whether new laws are needed or whether changes in the administration of existing laws will be sufficient to resolve problems.

4.   The ability of committee members during oversight hearings to focus on meaningful issues and to ask penetrating questions will be enhanced if staff have accumulated, organized, and evaluated relevant data, information, and analyses about administrative performance.

    a.   Ideally, each standing committee should regularly monitor the application of laws and implementation of programs within its jurisdiction. A prime objective of the "continuous watchfulness" mandate (Section 136) of the Legislative Reorganization Act of 1946 is to encourage committees to take an active and ongoing role in administrative review and not wait for public revelations of agency and program inadequacies before conducting oversight. As Section 136 states in part: "each standing committee of the Senate and House of Representatives shall exercise continuous watchfulness of the execution by the administrative agencies concerned of any laws, the subject matter of which is within the jurisdiction of such committee."

    b.   Committee personnel could be assigned to maintain active liaison with appropriate agencies and to record their pertinent findings routinely.

    c.   Information compiled in this fashion will be useful not only for regular oversight hearings, but also for oversight hearings called unexpectedly with little opportunity to conduct an extensive background study.

5.   It is important that specific letters be directed by the committee to the agency witnesses so that they will be on notice about what they will have to answer. In this way witnesses will be responsive in providing worthwhile testimony at hearings; testify "to the point" and avoid rambling and/or evasive statements; and restrict their use of this kind of answer to questions: "I didn't know you wanted that information. . ."

## C. Casework

An important check against bureaucratic indifference or inefficiency is "casework," as noted in Section I. Typically, Members of Congress hear from

CRS-72

individual constituents and communities about problems they are having with various federal agencies and departments.  As a House member once said:

> Last year, one of my constituents, a 63-year old man who requires kidney dialysis, discovered that he would no longer be receiving Medicare because the Social Security Administration thought he was dead.  Like many residents who have problems dealing with the federal bureaucracy, this man contacted my district office and asked for help.  Without difficulty, he convinced my staff that he was indeed alive, and we in turn convinced the Social Security Administration to resume sending him benefits.[66]

Casework is important not only in resolving problems that constituents are having with bureaucrats but also in identifying limitations in the law.  As a scholar of constituency service explained: "Casework allows ad hoc correction of bureaucratic error, impropriety, and laxity, and can lead a senator or representative to consider changes in laws because of particularly flagrant or persistent problems that casework staff discovered."[67]

## D. Audits

1. *Periodic auditing* of executive departments is among the strongest techniques of legislative oversight.  Properly utilized, the audit enables Congress to hold executive officers to a strict accounting for their use of public funds and the conduct of their administration.

2. *Government auditing* encompasses more than checking and verifying accounts, transactions, and financial statements.  Many federal, state, and some foreign audit agencies are moving in the direction pioneered by GAO (the chief audit agency of Congress) of including an evaluation of:

   a. whether claimed *achievements* are *supported* by adequate and reliable evidence and data and are in compliance with legislatively established objectives; and

   b. whether resources are being used efficiently, effectively, and economically.

3. In reviewing the agencies' own evaluations, or in undertaking an initial evaluation, auditors are advised by GAO to ask questions such as the following:

   a. How successful is the program in *accomplishing the intended results?* Could program objectives be achieved at less cost?

---

[66] Lee H. Hamilton, "Constituent Service and Representation," *The Public Manager*, summer 1992, p. 12.

[67] John R. Johannes, "Constituency Service," in Donald Bacon, et. al., eds., *The Encyclopedia of the United States Congress* (New York: Simon and Schuster, 1995), p. 544.

CRS-73

    b.   Has agency management clearly defined and promulgated the objectives and goals of the program or activity?

    c.   Have *performance standards been developed?*

    d.   Are *program objectives* sufficiently clear to permit agency management to accomplish effectively the desired program results? Are the objectives of the component parts of the program consistent with overall program objectives?

    e.   Are program costs reasonably commensurate with the benefits achieved?

    f.   *Have alternative programs or approaches been examined*, or should they be examined to determine whether objectives can be achieved more economically?

    g.   Were all studies, such as cost-benefit studies, appropriate for analyzing costs and benefits of alternative approaches?

    h.   Is the program producing benefits or detriments that were not contemplated by Congress when it authorized the program?

    i.   Is the *information furnished* to Congress by the agency *adequate and sufficiently accurate* to permit Congress to monitor program achievements effectively?

    j.   Does top management have *the essential and reliable information* necessary for exercising supervision and control and for ascertaining directions or trends?

    k.   Does management have *internal review or audit facilities* adequate for monitoring program operations, identifying program and management problems and weaknesses, and insuring fiscal integrity?

4.   In addition to GAO and other governmental audits, Congress may have access to the internal audit reports of agency audit teams.

    a.   Internal audit reports are designed to meet the needs of *executive* officials.

    b.   This information is useful in conducting oversight; executive agencies are sometimes reluctant to provide internal audit reports to Congress.

    c.   A large number of governmental and private organizations conduct audits of expenditures. Every major federal agency, for example, has its own statutory Inspector General and each of the 50 states plus hundreds of local governments have their own audit offices. Many government agencies also contract with public accounting firms to

CRS-74

perform financial audits.  For assistance in finding audit reports or in learning how to commission audit reports, congressional staff might consult with officials at the GAO, which is the auditing arm of the Congress.

## E.  Monitoring the *Federal Register*

1.    The Federal Register is published daily, Monday through Friday, except official holidays by the Office of the Federal Register, National Archives and Records Administration.  It provides a uniform system for making available to the public regulations and legal notices issued by Federal agencies.  These include presidential proclamations and executive orders, federal agency documents having general applicability and legal effect, documents required to be published by act of Congress, and other Federal agency documents of public interest.  Final regulations are codified by subject in the Code of Federal Regulations.

2.    Documents are on file for public inspection in the Office of the Federal Register the day before they are published, unless the issuing agency requests earlier filing.  The list of documents on file for public inspection can be accessed via [http://www.nara.gov/fedreg].

3.    Regular scrutiny of the Federal Register by committees and staff may help them to identify proposed rules and regulations in their subject areas that merit congressional review as to need and likely effect.

4.    The Federal Register is now available and searchable online (see [http://www.acess.gpo.gov/nara]).  The Regulatory Information Service Center of the General Services Administration annually issues two publications — the *Unified Agenda of Federal Regulatory and Deregulatory Actions* in April and *The Regulatory Plan and the Unified Agenda of Federal Regulatory and Deregulatory Actions* in October — that provide a wealth of information about proposed and completed regulatory actions of federal agencies.  Both documents are available online at [http://reginfo.gov].  Further information about these two publications can be obtained from the center.  The center's telephone number is (202) 482-7350 and its e-mail address is RIS@gsa.gov.

## F.   Special Studies and Investigations by Staff, Support Agencies, Outside Contractors, and Others

1.    *Staff Investigations.*  The staffs of committees and individual Members play a vital role in the legislative process.

   a.    Committee staffs, through field investigations or on-site visits for example, can help a committee develop its own independent evaluation of the effectiveness of laws.

CRS-75

2. *Support Agencies.* The legislative support agencies, directly or indirectly, can assist committees and Members in conducting investigations and reviewing agency performance. (See "Section V" for a discussion of CRS, GAO, and CBO capabilities.)

   a. The Government Accountability Office is the agency most involved in investigations, audits, and program evaluations. It has a large, professional investigative staff and produces numerous reports useful in oversight.

3. *Outside Contractors.* The 1974 Budget Act, as amended, and the Legislative Reorganization Act of 1970 authorize House and Senate committees to enlist the services of individual consultants or organizations to assist them in their work.

   a. A committee might contract with an independent research organization or employ professional investigators for short-term studies.

   b. Committees may also utilize, subject to appropriate approvals, federal and support agency employees to aid them in their oversight activities.

   c. Committees might also establish a voluntary advisory panel to assist them in their work.

## G. Communicating with the Media

1. Public exposure of a problem is an effective oversight technique, and will often help bring about a solution to that problem. Public officials often seem much more responsive to correcting deficiencies *after* the issue has been described in widely circulated news stories.

2. Effective communication with the media is based on knowledge and understanding of each of the media forms and the *advantages* and *disadvantages* of each.

### a. Wire Services.

   (1) Timeliness, brevity, and accuracy are the main criteria for dealing with the wire service.

   (2) Personal contact with wire service reporters gets the best results.

### b. Daily Newspapers.

   (1) Obtain information on the operational procedures and deadlines of daily newspapers, and how they are affected by time.

CRS-76

(2) Since regular news for Monday is usually low, it may be useful to issue statements and releases for "Monday a.m." use.

(3) Saturday usually has the lowest circulation and Sunday has the widest.

(4) Stories for weekend publication should be given to reporters during the middle of the week or earlier.

**c. Magazines.**

(1) Magazines and other periodicals are generally wider ranging and focus on why something happens, not *what* happened.

(2) Weeklies do not ordinarily respond to Member press conferences and releases in the same manner as the other media; personal meetings and telephone conversations are usually more effective.

(3) *Deadlines Vary*

    (a) Obtain information on operational procedures.

    (b) Weekends are generally production periods for most magazines.

**d. Trade Periodicals.**

Many of these topically oriented magazines and newsletters are produced by publishing firms which utilize the services of the periodical press galleries in the Capitol.

**e. Television.**

(1) House and Senate rules identify procedures for radio and television broadcasting of committee hearings. (See House Rule XI and Senate Rule XXVI).

(2) News of a committee's oversight activities may appear in diverse forms on television. For example, it could appear on the networks as a brief report on the morning or evening news, air on a cable news channel, or arise in the course of live House or Senate floor debate telecast over C-SPAN (the Cable Satellite Public Affairs Network).

Washington-based news organizations may also provide daily television coverage of Congress to independent television stations. Public television and cable news organizations occasionally broadcast live coverage of committee oversight hearings.

(3) To encourage television coverage of a committee's oversight activities, the following checklist might be helpful to staff.

CRS-77

(a) Alert correspondents and Washington bureau chiefs of upcoming hearings several days in advance via press releases; follow up with personal or telephone notification of certain "must-contact" correspondents.

(b) Notify the Associated Press, Reuters, and other news services of a scheduled hearing or meeting at least a day in advance. Allow enough lead time to permit inclusion of the committee activity in the wire services' calendar of daily events for the next day.

(c) If widespread media interest is anticipated, reserve at least a week in advance a hearing room large enough to accommodate television cameras.

(d) Alert interested correspondents or assignment editors when House or Senate floor action is likely on a matter related to the committee's oversight function.

(e) Provide or have available for the media background information on oversight issues awaiting committee action or consideration by the House or Senate.

(f) Consider making committee members readily available for television cameras either before or after any executive sessions (e.g., allowing television crews in briefly at the start to take video footage of the committee, or arranging for a press conference after the committee session).

(g) Videotape, where appropriate committee members discussing topical oversight issues for distribution to interested television stations.

(h) Keep the contact person of each of the network news interview programs ("Meet the Press," etc.) apprized of a committee's oversight activities, and their relevance to topical national issues. Suggest the appearance of committee members on interview programs when a committee oversight issue becomes especially newsworthy.

(i) Be alert to live television interview possibilities for committee members that can be arranged on relatively short notice, e.g., newsmaker interviews on cable news channels.

**f.   Radio.**

(1) Time is of the essence. Radio newsmen want congressional reaction *immediately*, not hours later when the story breaks in the newspaper or on television.

CRS-78

(2) Members who are readily available for quick interviews are frequently broadcast within minutes or the next morning coast-to-coast on hundreds of radio stations. In most cases an interview will be aired repeatedly over a period of several hours.

(3) Congressional offices should contact radio reporters *directly* through the House and Senate press galleries.

**g.  Press Conferences.**

(1) *Time*

(a) The periods between 10 a.m. and 2 p.m. are often preferable.

(b) *Early* morning press conferences usually have low attendance because reporters on daily papers do not start work until mid-morning.

(c) Late afternoon press conferences are often unattended because reporters begin to lose news time for that particular day.

(d) Check with the press galleries. They keep a running log of most scheduled news events and can provide information on possible competition at any time on any day.

(2) *Place*

(a) Committee rooms are good, but they are frequently in use at the best time for a conference.

(b) A Member's office or the press galleries can be adequate, but keep in mind that the reporters and cameramen need room to operate.

(c) It might be wise to go to the radio-TV galleries after the conference and do a repeat to get electronic coverage.

(3) *Notification*

(a) Notify the press galleries in *writing* as far in advance as possible.

(b) Also notify the wire services and television networks *directly* at their downtown offices.

(4) *Form*

(a) A press conference should be viewed as an open house with *everybody* invited and *everybody* welcome.

(b) A brief *opening* statement should be read or summarized. After copies of it have been distributed, the questioning should begin.

    (1) Leave plenty of time for questions.

    (2) Do not restrict the areas of questioning.

    (3) Anticipate the questions and have answers prepared.

(c) The normal time for a routine press conference is about one-half hour.

## h. News Releases.

(1) A good news release answers in *one page* or less the questions where, when, who, what, how, why, and, for some topics, how much (e.g., cost) or how many (e.g., beneficiaries).

(2) A good news release should:

    (a) contain the name, *telephone number*, and e-mail of your *press contact*;

    (b) be for *immediate* release (better than embargo);

    (c) quote the Member *directly*;

    (d) avoid excessive use of the Member's name;

    (e) avoid needless big words, *long* sentences, and *long* paragraphs; and

    (f) make the point quickly, clearly, directly, and then end.

## i. The Internet and the Media.

(1) Members and committees can use the Internet to communicate with media representatives and constituents to explain their views and positions with respect to oversight activities. The Internet permits lawmakers and committees to rely less on traditional journalistic sources for coverage and more on direct communication with the citizenry.

(2) The Internet can be employed in a variety of ways to mobilize public interest in congressional oversight. For example, lawmakers can conduct on-line discussions with interested citizens or committees can establish their own World Wide Web sites to solicit input from individuals and organizations about executive branch departments and programs.

## H. Statutory Offices of Inspector General: Establishment and Evolution

Statutory offices of inspector general (OIGs) consolidate responsibility for audits and investigations within a federal department, agency, or other organization. Established by public law as permanent, nonpartisan, independent offices, they now exist in nearly 60 federal establishments and entities, including all departments and the largest agencies as well as numerous boards and commissions. Under two major enactments — the Inspector General Act of 1978 and amendments of 1988 — inspectors general (IGs) have been granted substantial independence and authority to carry out their basic mandate to combat waste, fraud, and abuse.[68] Recent statutes, moreover, have added three OIGs: for Tax Administration in Treasury, in Homeland Security, and in the Coalition Provisional Authority (CPA) in Iraq. Other laws have codified Justice IG jurisdiction over the entire department and granted law enforcement powers to OIGs in establishments.

### Responsibilities.

Inspectors general have three principal responsibilities under the Inspector General Act of 1978, as amended:

- conducting and supervising audits and investigations relating to the programs and operations of the establishment;
- providing leadership and coordination and recommending policies for activities designed to promote the economy, efficiency, and effectiveness of such programs and operations, and preventing and detecting fraud and abuse in such programs and operations; and
- providing a means for keeping the establishment head and Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations, and the necessity for and progress of corrective action.

---

[68] 5 U.S.C. Appendix 3, which covers all but three statutory OIGs. These three operate under similar but not identical guidelines: in the Central Intelligence Agency (CIA); the Coalition Provisional Authority (CPA) in Iraq; and the Government Printing Office (GPO), a legislative branch entity. For further information, see the inspector general website at [http://www.ignet.gov]; CRS Report 98-141, *Statutory Offices of Inspector General: A 20th Anniversary Review*, by Diane T. Duffy and Frederick M. Kaiser; Frederick M. Kaiser, "The Watchers' Watchdog: The CIA Inspector General," *International Journal of Intelligence and Counterintelligence*, vol. 3, 1989, pp. 55-75; Paul C. Light, *Monitoring Government: Inspectors General and the Search for Accountability* (Washington: Brookings Institution, 1993); U.S. General Accounting Office, *Inspectors General: Office Consolidation and Related Issues*, GAO Report GAO-02-575 (August 2002); and numerous congressional hearings, including U.S. Congress, House Subcommittee on Government Efficiency, *25th Anniversary of the Inspector General Act*, hearings, 108th Cong., 1st sess. (Washington: GPO, 2003); House Subcommittee on Government Management, *The Inspector General Act of 1978: Twenty Years After Passage, Are The Inspectors General Fulfilling Their Mission?*, hearings, 105th Cong., 2nd sess. (Washington: GPO, 1999); and Senate Committee on Governmental Affairs, *The Inspector General Act: 20 Years Later,* hearings, 105th Cong., 2nd sess. (Washington: GPO, 1998).

## Authority and Duties.

To carry out the purposes of the Inspector General Act, IGs have been granted broad authority to conduct audits and investigations; access directly all records and information of the agency; request assistance from other federal, state, and local government agencies; subpoena information and documents; administer oaths when taking testimony; hire staff and manage their own resources; and receive and respond to complaints from agency employees, whose confidentiality is to be protected.  In addition, the Homeland Security Act of 2002 gave law enforcement powers to criminal investigators in offices headed by presidential appointees.  Following the terrorist attacks on the Pentagon and World Trade Center on September 11, 2001, moreover, some IG staff were redeployed to assist in airline security and in terrorist investigations by the FBI and other agencies.

Notwithstanding these powers and duties, IGs are *not* authorized to take corrective action or make any reforms themselves.  Indeed, the Inspector General Act, as amended, prohibits the transfer of "program operating responsibilities" to an IG (5 U.S.C. Appendix 3, Section 9(a)(2)).  The rationale for this prohibition is that it would be difficult, if not impossible, for IGs to audit or investigate programs and operations impartially and objectively if they were directly involved in carrying them out.

## Reporting Requirements.

IGs also have important obligations concerning their findings, conclusions, and recommendations for corrective action.  These include reporting (1) suspected violations of federal criminal law directly and expeditiously to the Attorney General; (2) semiannually to the agency head, who must submit the IG report (along with his or her comments) to Congress within 30 days; and (3) "particularly serious or flagrant problems" immediately to the agency head, who must submit the IG report (along with comments) to Congress within seven days.  The IG for the Central Intelligence Agency (CIA), operating under a different statute, must also report to the House and Senate Select Committees on Intelligence if the Director (or Acting Director) of Central Intelligence is the focus of an investigation, audit, or inspection.

By means of these reports and "otherwise," IGs are to keep the agency head and Congress fully and currently informed.  Other means of communication include testifying at congressional hearings; meeting with legislators, officials, and staff; and responding to congressional requests for information and reports.

## Independence.

In addition to having their own powers (e.g., to hire staff and issue subpoenas), the IGs' independent status is reinforced in a number of other ways: protection of their budgets, qualifications on their appointment and removal, prohibitions on interference with their activities and operations, and a proscription on operating responsibilities.

*Appropriations.*  Presidentially appointed IGs in the larger federal agencies have a separate appropriations account (a separate budget account in the case of the

CRS-82

CIA) for their offices.  This situation prevents agency administrators from limiting, transferring, or otherwise reducing IG funding once it has been specified in law.

**Appointment and Removal.**  Under the Inspector General Act, as amended, IGs are to be selected without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial and management analysis, law, public administration, or investigations.  The CIA IG, who operates under a different statute, is to be selected under these criteria as well as prior experience in the field of foreign intelligence and in compliance with the security standards of the agency.

Presidentially appointed IGs in the larger federal establishments who are confirmed by the Senate can be removed only by the President.  When so doing, the President must communicate the reasons to Congress.  However, IGs in the (usually) smaller, designated federal entities are appointed by the agency head and can be removed by this officer, who must notify Congress in writing when exercising the power.  In the U.S. Postal Service, by comparison, the governors appoint the inspector general — the only statutory IG with a set term (7 years).  This IG can be removed with the written concurrence of at least seven of the nine governors, but only for cause — again, the only statutory IG having such a qualification governing removal.

**Supervision.**  IGs serve under the "general supervision" of the agency head, reporting exclusively to the head or to the officer next in rank if such authority is delegated.  With only a few specified exceptions, neither the agency head nor the officer next in line "shall prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation."

Under the IG Act, as amended, the heads of only five agencies — the Departments of Defense, Homeland Security, Justice, and Treasury, plus the U.S. Postal Service — may prevent the IG from initiating, carrying out, or completing an audit or investigation, or issuing a subpoena, in order to preserve national security interests or to protect on-going criminal investigations, among other specified reasons.  When exercising this power, the department head must transmit an explanatory statement for such action to the House Government Reform Committee, the Senate Governmental Affairs Committee, and other appropriate congressional panels within 30 days.  Under the CIA IG Act, the Director of Central Intelligence may similarly prohibit the CIA IG from conducting investigations, audits, or inspections and then must notify the House and Senate Intelligence Committees of the reasons for such action within seven days.

CRS-83

### Coordination and Controls.

Several presidential orders have been issued to improve coordination among the IGs and provide a means for investigating charges of wrongdoing by the IGs themselves and other top echelon officers. In early 1981, President Ronald Reagan established the President's Council on Integrity and Efficiency (PCIE) to coordinate and enhance efforts at promoting integrity and efficiency in government programs and to detect and prevent waste, fraud, and abuse (E.O. 12301). Chaired by the Deputy Director of the Office of Management and Budget, the PCIE is composed of the existing statutory IGs plus other officials from relevant agencies, now including the Departments of Defense and Justice as well as the Office of Personnel Management, the Controller of the Office of Federal Financial Management, the Director of the Office of Government Ethics, and the Special Counsel. In 1992, following the establishment of new IG offices in designated federal entities, a parallel Executive Council on Integrity and Efficiency (ECIE) was created for these new IGs and other appropriate officials. Both the PCIE and the ECIE currently operate under E.O. 12805, issued by President George H.W. Bush in 1992. A separate Intelligence Community Inspectors General Forum — a coordinative body of the inspectors general from the IC agencies along with observers from the FBI and several Defense units — has been established in the meantime. Co-chaired by the IGs from DoD and CIA, it meets quarterly to promote information sharing and enhance coordination.

Investigations of alleged wrongdoing by IGs themselves or other high-ranking officials in an office of inspector general (under the IG act) are conducted by a special Integrity Committee, composed of PCIE and ECIE members and chaired by the FBI representative (E.O. 12993, issued by President Clinton in 1966). If deemed warranted, the panel refers complaints to be investigated to an executive agency with appropriate jurisdiction, usually the FBI, or a special investigative unit composed of council members.

### Establishment.

Statutory offices of inspector general currently exist in 59 federal establishments and entities, including all 15 cabinet departments; major executive branch agencies; independent regulatory commissions; various government corporations and foundations; and one legislative branch agency: the Government Printing Office (GPO). All but three of the OIGs — in the CIA, CPA, and GPO — are directly and explicitly under the Inspector General Act of 1978, as amended.

Each office is headed by an inspector general, who is appointed in one of two ways:

(1)    30 are nominated by the President and confirmed by the Senate in the federal establishments: all cabinet departments and the larger agencies. (See **Table 2**.)

(2)    29 are appointed by the head of the entity in the 27 designated federal entities — usually smaller foundations, boards, and commissions — and in two other agencies, where the IGs operate under separate but parallel authority: CPA, whose IG is appointed by the Secretary of Defense after

CRS-84

consultation with the Secretary of State; and GPO, a legislative branch office, whose IG is appointed by the Public Printer.  (See **Table 3**.)

### Table 2.  Statutes Establishing Inspectors General Nominated by the President and Confirmed by the Senate, 1976-Present
(current offices are in *italic*)[a]

| Year | Statute | Establishment |
|------|---------|---------------|
| 1976 | P.L. 94-505 | *Health, Education, and Welfare (now Health and Human Services)* |
| 1977 | P.L. 95-91 | *Energy* |
| 1978 | P.L. 95-452 | *Agriculture, Commerce*, Community Services Administration,[b] *Housing and Urban Development, Interior, Labor, Transportation, Environmental Protection Agency, General Services Administration, National Aeronautics and Space Administration, Small Business Administration, Veterans Administration (now the Veterans Affairs Department)* |
| 1979 | P.L. 96-88 | *Education* |
| 1980 | P.L. 96-294 | U.S. Synthetic Fuels Corporation[b] |
| 1980 | P.L. 96-465 | *State*[c] |
| 1981 | P.L. 97-113 | *Agency for International Development*[d] |
| 1982 | P.L. 97-252 | *Defense* |
| 1983 | P.L. 98-76 | *Railroad Retirement Board* |
| 1986 | P.L. 99-399 | U.S. Information Agency[b,c] |
| 1987 | P.L. 100-213 | Arms Control and Disarmament Agency[b,c] |
| 1988 | P.L. 100-504 | *Justice*,[e] *Treasury*, Federal Emergency Management Administration,[b,f] *Nuclear Regulatory Commission, Office of Personnel Management* |
| 1989 | P.L. 101-73 | Resolution Trust Corporation[b] |
| 1989 | P.L. 101-193 | *Central Intelligence Agency*[a] |
| 1993 | P.L. 103-82 | *Corporation for National and Community Service* |
| 1993 | P.L. 103-204 | *Federal Deposit Insurance Corporation* |
| 1994 | P.L. 103-296 | *Social Security Administration* |
| 1994 | P.L. 103-325 | Community Development Financial Institutions Fund[b] |
| 1998 | P.L. 105-206 | *Treasury Inspector General for Tax Administration*[g] |
| 2000 | P.L. 106-422 | *Tennessee Valley Authority*[h] |
| 2002 | P.L. 107-189 | *Export-Import Bank* |
| 2002 | P.L. 107-296 | *Homeland Security*[f] |

a. All except the CIA IG are directly under the 1978 Inspector General Act, as amended.
b. CSA, Synfuels Corporation, USIA, ACDA, RTC, CDFIF, and FEMA have been abolished or transferred.
c. The State Department IG had also served as the IG for ACDA.  In 1998, P.L. 105-277 abolished ACDA and USIA and transferred their functions to the State Department.  The act also brought the Broadcasting Board of Governors and the International Broadcasting Bureau under the jurisdiction of the State Department Inspector General.
d. The Inspector General in AID may also conduct reviews, investigations, and inspections of the Overseas Private Investment Corporation (22 U.S.C. 2199(e)).
e. In 2002, P.L. 107-273 expanded the jurisdiction of the Justice OIG to cover all department components, including DEA and the FBI.
f. P.L. 107-296, which established the Homeland Security Department, transferred FEMA's functions to it and also granted law enforcement powers to OIG criminal investigators in establishments.
g. The OIG for Tax Administration in Treasury now is the only case where a separate statutory OIG exists within an establishment or entity that is otherwise covered by its own statutory office.
h. P.L. 106-422, which redesignated TVA as an establishment, also created, in the Treasury Department, a Criminal Investigator Academy to train IG staff and an Inspector General Forensic Laboratory.

CRS-85

## Table 3. Designated Federal Entities and Other Agencies with Statutory IGs Appointed by the Head of the Entity or Agency

(current offices are in *italic*)[a]

| | |
|---|---|
| ACTION[b] | *Federal Trade Commission* |
| *Amtrak* | *Government Printing Office*[a] |
| *Appalachian Regional Commission* | Interstate Commerce Commission[f] |
| *Board of Governors of the Federal Reserve System* | *Legal Services Corporation* |
| Board for International Broadcasting[c] | *National Archives and Records Administration* |
| *Coalition Provisional Authority (in Iraq)*[a] | *National Credit Union Administration* |
| *Commodity Futures Trading Commission* | *National Endowment for the Arts* |
| *Consumer Product Safety Commission* | *National Endowment for the Humanities* |
| *Corporation for Public Broadcasting* | *National Labor Relations Board* |
| *Equal Employment Opportunity Commission* | *National Science Foundation* |
| *Farm Credit Administration* | Panama Canal Commission[g] |
| *Federal Communications Commission* | *Peace Corps* |
| Federal Deposit Insurance Corporation[d] | *Pension Benefit Guaranty Corporation* |
| *Federal Election Commission* | *Securities and Exchange Commission* |
| Federal Home Loan Bank Board[e] | *Smithsonian Institution* |
| *Federal Housing Finance Board*[e] | Tennessee Valley Authority[h] |
| *Federal Labor Relations Authority* | *United States International Trade Commission* |
| *Federal Maritime Commission* | *United States Postal Service*[i] |

a. All agencies — except CPA (P.L. 108-106) and GPO (P.L. 100-504) — are considered "designated federal entities" and placed directly under the 1978 IG Act by the 1988 Amendments (P.L. 100-504) or subsequent enactments. The CPA Office is authorized to remain in effect for six months after the dissolution of the full CPA, which occurred on June 28, 2004.

b. In 1993, P.L. 103-82 merged ACTION into the new Corporation for National and Community Service.

c. The BIB was abolished by P.L. 103-236 and its functions transferred to the International Broadcasting Bureau within USIA, which was later abolished and its functions transferred to the State Department.

d. In 1993, P.L. 103-204 made the IG in FDIC a presidential appointee, subject to Senate confirmation.

e. In 1989, P.L. 101-73 abolished the FHLBB and placed the new FHFB the 1988 IG Act Amendments.

f. The ICC was abolished in 1995 by P.L. 104-88.

g. The Panama Canal Commission, replaced by the Panama Canal Commission Transition Authority, was phased out, when United States responsibility for the Canal was transferred to the Republic of Panama (22 U.S.C. 3611).

h. P.L. 106-422 redesignated TVA as a federal establishment.

i. In 1996, the U.S. Postal Service Inspector General was separated from the Chief Postal Inspector and now exists as an independent position. The IG is appointed by, and can be removed by, the governors.

## Table 4. Tabulation of Existing Federal Establishments, Entities, or Agencies with Statutory IGs

| Controlling Statute | IGs Nominated by President and Confirmed by Senate | IGs Appointed by Head of Entity or Agency | Total |
|---|---|---|---|
| 1978 IG Act, as amended | 29 | 27 | 56 |
| Other statutes | 1[a] | 2[b] | 3 |
| Total | 30 | 29 | 59 |

a. CIA IG, P.L. 101-193.

b. CPA IG, P.L. 108-106, and GPO IG, P.L. 100-504.

CRS-86

# I.  Reporting, Consultation, and Other Sources of Information

Congressional oversight of the executive is dependent to a large degree upon *information supplied by the agencies being overseen*.  In the contemporary era, reporting and prior consultation provisions have increased in an attempt to ensure congressional access to information, statistics, and other data on the workings of the executive.  The result is that *approximately 4,000 reports arrive annually* on Capitol Hill.  Concerns about unnecessary, duplicative, and wasteful reports, however, have prompted efforts to eliminate these.  One such initiative, in part stimulated by earlier recommendations from the Vice President's National Performance Review and from the GAO,  resulted in the Federal Reports Elimination and Sunset Acts of 1995 and 1998.  Nonetheless, reductions in the number of required reports have not kept pace with new or continuing requirements, such as those identified in the 2001 act to Prevent the Elimination of Certain Reports (P.L. 107-74).

## 1.  Reporting Requirements.

Reporting requirements affect executive and administrative agencies and officers, including the President; independent boards and commissions; and federally chartered corporations (as well as the judiciary).  These statutory provisions vary in terms of the specificity, detail, and type of information that Congress demands. Reports may be required at periodic intervals, such as semiannually or at the end of a fiscal year, or submitted only if and when a specific event, activity, or set of conditions exists.   The reports may also call upon an agency, commission, or officer to

a.    make a study and recommendations about a particular problem or concern;

b.    alert Congress or particular committees and subcommittees in advance about a proposed or planned activity or operation;

c.    provide information about specific on-going or just-completed operations, projects, or programs; or

d.    summarize an agency's activities for the year or the prior six months.

---

**Examples of Reporting Requirements in Law**

**Initial Requirement in the 1789 Treasury Department Act:**

"That it shall be the duty of the Secretary of the Treasury . . . to make report, and give information to either branch of the legislature, in person or in writing (as he may be required), respecting all matters referred to him by the Senate or House of Representatives, or which shall appertain to his office . . . ." 1 Stat. 65-66 (1789)

**Reporting on Covert Action in the 1991 Intelligence Oversight Act:**

"The President shall ensure that the intelligence committees are kept fully and currently informed of the intelligence activities of the United States, including any significant anticipated intelligence activity . . .

(1) The President shall ensure that any finding [authorizing a covert action] shall be reported to the intelligence committees as soon as possible after such approval and before the initiation of the covert action, except as otherwise provided in paragraph (2) and paragraph (3).

(2) If the President determines that it is essential to limit access to the finding to meet extraordinary circumstances affecting the vital interests of the United States, the finding may be reported to the chairmen and ranking minority members of the intelligence committees, the Speaker and minority leader of the House of Representatives, the majority and minority leaders of the Senate, and such other members of the congressional leadership as may be included by the President.

(3) Whenever a finding is not reported [in advance to the committees], the President shall fully inform the intelligence committees in a timely fashion and shall provide a statement of the reasons for not giving prior notice." 105 Stat. 441-443 (1991)

---

## 2. Prior Consultation.

In the past, explicit prior consultation provisions were rarely incorporated into law. However, there appears to be an increase in statutory provisions as well as in committee reports that accompany legislation specifying conditions for such discussion (see box).

---

A provision in the Conference Committee report on the 1978 Ethics in Government Act illustrates this development: "The conferees expect the Attorney General to *consult* with the Judiciary Committees of both Houses of Congress *before* substantially expanding the scope of authority or mandate of the Public Integrity Section of the Criminal Division."

---

## 3. Other Significant Sources of Information.

A number of general management laws provide for additional sources of information, data, and material that can aid congressional oversight endeavors.

### a. Chief Financial Officers Act of 1990 (104 Stat. 2838). The CFO act is designed to improve financial management throughout the federal government, through various procedures and mechanisms.

CRS-88

1. The act created two new posts within OMB, along with a new position of chief financial officer in 23 major federal agencies, including all Cabinet departments; a 24th agency has since been added. Sixteen of these posts are filled by presidential appointees *subject to Senate confirmation*; these are in the 14 Cabinet departments plus the Environmental Protection Agency and the National Aeronautics and Space Administration. The remaining eight CFO positions are in: the Agency for International Development, Federal Emergency Management Agency, General Services Administration, National Science Foundation, Nuclear Regulatory Commission, Office of Personnel Management, Small Business Administration, and the Social Security Administration.

2. The CFO act also provides for improvements in agency systems of accounting, financial management, and internal controls to assure the *issuance of reliable financial information* and to deter fraud, as well as waste and abuse of government resources.

3. The enactment, furthermore, calls for the production of *complete, reliable, timely, and consistent financial information for use by both the executive and the legislature* in the financing, management, and evaluation of federal programs.

**b. Government Performance and Results Act (107 Stat. 285).** This act — commonly known by the acronym GPRA or the Results Act — requires federal agencies to submit long-range strategic plans and follow-up annual performance plans.

1. Strategic Plans. The strategic plans specify five-year goals and objectives for agencies, based on their basic missions and underlying statutory or other authority of the agency. These plans, initially required in 1997, were to be developed *in consultation with relevant congressional offices* and with information from "stakeholders" and then *submitted to Congress*.

2. Annual Performance Plans and Goals. Based on these long-term plans, which may be modified if conditions and agency responsibilities change, the agencies are directed to set annual performance goals and to measure the results of their programs in achieving these goals. The objective of GPRA is to focus on *outcomes* — i.e., the results and accomplishments of a program, such as a decline in the use of illegal drugs for an anti-drug abuse program — rather than outputs, i.e. other measures of agency activity and operations, such as the number of anti-drug agents in the field. The annual plans, which are also *available to Congress*, began with FY1999; the follow-up reports, which began in 2000, are required six months after the end of the fiscal year.

   **c. Small Business Regulatory Enforcement Fairness Act of 1996 (110 Stat. 857-874).** Subtitle E of this act established, for the first time, a mechanism by which *Congress can review and disapprove virtually any federal rule or regulation*. It requires that:

      1. All agencies promulgating a covered rule must submit a report *to each house of Congress and the Comptroller General,* containing specific information about the rule before it can go into effect.

      2. Rules designated by the Office of Management and Budget as "major" may normally not go into effect *until 60 days after submission,* while non-major rules may become effective "as otherwise allowed in law," usually 30 days after publication in the *Federal Register*.

      3. All covered rules are subject to *fast-track disapproval by passage of a joint resolution*, even if they have already gone into effect, for a period of at least 60 days. Upon enactment of such a joint resolution, no new rule that is "substantially the same" as the disapproved rule may be issued until it is *specifically authorized by a law* enacted subsequent to the disapproval of the original rule.

      4. There can be *no judicial review of actions taken (or not taken) by Congress, the Comptroller General, or OMB*; but the failure of an agency to submit a covered rule for congressional review may be subject to sanction by a federal court.

   **d. Paperwork Reduction Act of 1995 (109 Stat. 163).** This most recent version of paperwork reduction legislation builds on a heritage of statutory controls over government paperwork that dates to 1940.

      1. Among other things, the current act and its 1980 predecessor more clearly defined the oversight responsibilities of OMB's Office of Information and Regulatory Affairs (OIRA); it is authorized to develop and administer uniform information policies in order to ensure *the availability and accuracy of agency data collection.*

      2. Congressional oversight has been strengthened through its subsequent *reauthorizations* and the requirement for *Senate confirmation* of OIRA's administrator.

   **e. Federal Managers' Financial Integrity Act (FMFIA) of 1982 (96 Stat. 814).** FMFIA is designed to improve the government's ability to manage its programs by strengthening internal management and financial controls, accounting systems, and financial reports.

CRS-90

1.  The internal accounting systems are to be consistent with standards that the *Comptroller General* prescribes, including a requirement that all assets be safeguarded against waste, fraud, loss, unauthorized use, and misappropriation.

2.  FMFIA also provides for *ongoing evaluations* of the internal control and accounting systems that protect federal programs against waste, fraud, abuse, and mismanagement.

3.  The enactment further mandates that the head of each agency *report annually to the President and Congress* on the condition of these systems and on agency actions to correct any material weakness which the reports identify.

4.  FMFIA is also connected to the Chief Financial Officers Act of 1990, which calls upon the director of OMB to submit a financial management *status report to appropriate congressional committees*; part of this report is to be a summary of reports on internal accounting and administrative control systems as required by FMFIA.

**f.  Cash Management Improvement Act of 1990 (104 Stat. 1058).**  This enactment is intended to *improve efficiency, effectiveness, and equity in the exchange of funds* between the federal government and state governments.  Its fundamental objective is to prevent either level of government from engaging in cash management practices that allow it to earn interest on cash reserves at the expense of the other.

**g.  Information Technology Management Reform Act of 1996 (110 Stat. 679).**  This act requires that agencies buy the *best and most cost-effective information technology* available.  To do so, the act gave more responsibility to individual agencies, revoking the primary role that the General Services Administration had played previously, and established the position of chief information officer (CIO) in federal agencies to provide relevant advice to agency heads.

**h.  Federal Advisory Committee Act.**  Congress formally acknowledged the merits of using advisory committees to obtain expert views drawn from business, academic, government, and other interests when it enacted the Federal Advisory Committee Act (FACA) in 1972 (5 U.S.C. Appendix; 86 Stat. 700).  Congressional enactment of FACA established the first requirements for the management and oversight of federal advisory committees to ensure impartial and relevant expertise. As required by FACA, the General Services Administration (GSA) administers and provides management guidelines for advisory committees. GSA also submits an annual report to the President and Congress, based on the information provided by the federal agencies concerning the meetings, costs, and membership of advisory committees. During

CRS-91

FY2003, GSA reported a total of 953 advisory committees, with 31,385 individuals serving as members during the year. On March 14, 2000, GSA announced the elimination of its annual report on advisory committees, relying instead on its website to make available the detailed reports covering each committee's activities during the fiscal year [http://fido.gov/facadatabase]. GSA also issues an annual summary report for Congress pertaining to advisory committee management and performance.

**i.    Federal Information Security Management Act of 2002.** The Federal Information Security Management Act of 2002 (FISMA) replaced what has been commonly referred to as the Government Information Security Reform Act (GISRA),which expired at the end of the 107th Congress. Both GISRA and FISMA represent an effort by Congress to improve federal agency compliance with information security standards and guidelines. Congress put into statute certain requirements, including a directive that federal agencies submit their information security programs to an annual independent review, along with a requirement that the Director of the Office of Management and Budget report the results of these reviews to Congress.

**j.    Accountability of Tax Dollars Act of 2002.** The Accountability of Tax Dollars Act (ATDA) of 2002 (P.L. 107-289; 116 Stat. 2049) was intended "to expand the types of Federal agencies that are required to prepare audited financial statements to all executive branch agencies in the federal government." In fact, ATDA brings almost all executive branch agencies under the requirement for preparation of annual audited financial statements that previously applied only to the 24 major departments and agencies covered by the Chief Financial Officers (CFO) Act. Specifically, Section 2(a) changes the list of agencies covered by the audited annual financial statements requirement in 31 U.S.C. § 3515 by deleting the cross-reference to CFO Act agencies and inserting "each covered executive agency."

**k.    Federal Financial Management Improvement Act of 1996.** The Federal Financial Management Improvement Act of 1996 (FFMIA) (110 Stat. 3009-389; 31 U.S.C. § 3512 note) incorporates in statute certain financial management system requirements already established as executive branch policy. The law also requires auditors to report on agency compliance with these requirements, and agency heads and management to correct deficiencies within certain time periods. (FFMIA) reflects an ongoing effort to reform financial management in the federal government. The 1996 law builds upon prior legislation, including the Chief Financial Officers Act of 1990, the Government Performance and Results Act of 1993, and the Government Management Reform Act of 1994.

**l.    Unfunded Mandates Reform Act of 1995.** After considerable debate, the Unfunded Mandates Reform Act (P.L. 104-4; 109 Stat.

48-71; 2 U.S.C. §§ 1501-1571) was enacted early in the 104th Congress. Generally, unfunded intergovernmental mandates include responsibilities or duties that federal programs, standards, or requirements impose on governments at other levels without providing for the payment of the costs of carrying out these responsibilities or duties. The intent of the mandate legislation was to limit the ability of the federal government to impose costs on state and local governments through unfunded mandates. The enactment has three components: revised congressional procedures regarding future mandates; new requirements for federal agency regulatory actions; and authorization for a study of existing mandates to evaluate their current usefulness. The primary objective was to create procedures that would retard and spotlight, if not stop, congressional authorization of new unfunded mandates on state and local governments.

## J. Resolutions of Inquiry

The House of Representatives can call upon the executive for factual information through resolutions of inquiry.

1.  This is a *simple resolution*, approved by only the House.

2.  Resolutions of inquiry are addressed to either the President or heads of departments and agencies to supply specific factual information to the chamber. The resolutions usually "*request*" the President or "*direct*" administrative heads to supply such information. In calling upon the President for information, especially about foreign affairs, the qualifying phrase — "if not incompatible with the public interest" — is often added.

3.  Such resolutions are to ask for facts, documents, or specific information; these devices are *not* to request an opinion or require an investigation (see box).

4.  Even when a committee of jurisdiction reports a resolution of inquiry adversely, or succeeds in tabling the resolution on the House floor, it is often the case that the Administration has substantially complied with the resolution.

5.  Resolutions of inquiry can be instrumental in triggering other congressional methods of obtaining information, such as through supplemental hearings or the regular legislative process.

| Resolutions of Inquiry in Practice |
|---|

**The initial resolution of inquiry** was approved on March 24, 1796, when the House sought documents in connection with the Jay Treaty negotiations:

> *Resolved*, That the President of the United States be requested to lay before this House a copy of the instructions to the minister of the United States, who negotiated the treaty with the King of Great Britain . . . together with the correspondence and other documents relative to the said treaty; excepting such of the said papers as any existing negotiation may render improper to be delivered. (*Journal of the House of Representatives*, 4th Cong., 1st sess., March 24, 1796. p. 480.)

**A contemporary illustration** occurred on March 1, 1995, when the House adopted H. Res. 80, as amended (104th Cong., 1st sess.), 407-21. The resolution sought information about the Mexican peso crisis at the time and an Administration plan to use up to $20 billion in resources from the Exchange Stabilization Fund to help stabilize the Mexican currency and financial system. The resolution read:

> "*Resolved*, That the President, is hereby requested to provide the House of Representatives (consistent with the rules of the House), not later than 14 days after the adoption of this resolution, the following documents in the possession of the executive branch, if not inconsistent with he public interest . . ." The House request then specified the matters that the documents were to cover: The condition of the Mexican economy; consultations between the Government of Mexico, on the one hand, and the U.S. Secretary of the Treasury and/or the International Monetary fund, on the other; market policies and tax policies of the Mexican Government; and repayment agreements between Mexico and the United States; among other things.

# K.  Limitations and Riders on Appropriations

Congress uses a two-step legislative procedure: authorization of programs in bills reported by legislative committees followed by the financing of those programs in bills reported by the Committees on Appropriations. Congressional rules generally keep the two stages distinct and sequential. Authorizations should not be in general appropriation bills, nor appropriations in authorization measures. However, there are various exceptions to the general principle that Congress should not make policy through the appropriations process. One exception is the practice of permitting "limitations" in an appropriations bill. "Riders" (language extraneous to the subject of the bill) are also added to control agency actions.

1.  **Limitations**. Although House rules forbid in any general appropriations bill a provision "changing existing law," certain "limitations" may be admitted. "Just as the House under its rules may decline to appropriate for a purpose authorized by law, so it may by limitation prohibit the use of the money for part of the purpose while appropriating for the remainder of it." Constitution, Jefferson's Manual, and Rules of the House of

CRS-94

Representatives, H. Doc. No. 106-320, 106th Cong., 2d Sess. §1053 (2001). Limitations can be an effective device in oversight by strengthening Congress's ability to exercise control over federal spending and to reduce unnecessary or undesired expenditures. Under House Rule XXI, no provision changing existing law can be reported in any general appropriation bill "except germane provisions that retrench expenditures by the reduction of amounts of money covered by the bill" (the Holman rule). Rule XXI was amended in 1983 in an effort to restrict the number of limitations on appropriations bills. The rule was changed again in 1995 by granting the majority leader a central role in determining consideration of limitation amendments. The procedures for limitation in the House are set forth in the *Congressional Record* for January 6, 1999, p. H29. A well-known limitation is the Hyde amendment, which since the 1970s has restricted the use of Medicaid funds to fund abortions for indigent women (see box).

---

"None of the funds appropriated under this Act shall be expended for any abortion ... [except] (1) if the pregnancy is the result of an act of rape or incest; or (2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed." Labor-HHS Appropriations Act for fiscal 1998, 111 Stat. 1516, sec. 509 & 510 (1997).

---

2.  **Riders**. Unlike limitations, legislative riders are extraneous to the subject matter of the bill to which they are added. Riders appear in both authorization bills and appropriations bills. In the latter, they may be subject to a point of order in the House on the ground that they are attempts to place legislation in an appropriations bill. In the Senate, Rule XVI prohibits on a point of order the addition to general appropriations bills of amendments that are legislative or nongermane. Both chambers have procedures to waive these prohibitions.

## L.  Legislative Veto and Advance Notice

Many acts of Congress have delegated authority to the executive branch on the condition that proposed executive actions be submitted to Congress for review and possible disapproval before they can be put into effect. This way of ensuring continuing oversight of policy areas follows two paths: the legislative veto and advance notification.

1.  **Legislative Veto**

Beginning in 1932, Congress delegated authority to the executive branch with the condition that proposed executive actions would be first submitted to Congress and subjected to disapproval by either house or disapproval by both houses acting through a concurrent resolution. Over the years, other types of legislative veto were added, allowing Congress to control executive branch actions without having to enact a law. In 1983, the Supreme Court ruled that the legislative veto was unconstitutional on

CRS-95

the ground that all exercises of legislative power that affect the rights, duties, and relations of persons outside the legislative branch must satisfy the constitutional requirements of bicameralism and presentment of a bill or resolution to the President for his signature or veto. *INS v. Chadha*, 462 U.S. 919 (1983). Despite this ruling, Congress has continued to enact proscribed legislative vetoes and it has also relied on informal arrangements to provide comparable controls.

a.  **Legislative Vetoes in Statute**

Congress responded to *Chadha* by converting some of the one-house and two-house legislative vetoes to joint resolutions of approval or disapproval, thus satisfying the requirements of bicameralism and presentment. However, Congress continues to rely on legislative vetoes. Since the *Chadha* decision, more than 400 legislative vetoes have been enacted into public law, usually in appropriations acts. These legislative vetoes are exercised by the Appropriations Committees. Typically, funds may not be used or an executive action may not begin until the Appropriations Committees have approved or, at least, not disapproved the planned action, often within a specified time limit (see box).

---

For the appropriation account "Transportation Administrative Service Center," no assessments may be levied against any program, budget activity, subactivity or project funded by this statute "unless notice of such assessments and the basis therefore are presented to the House and Senate Committees on Appropriations and are approved by such Committees." Department of Transportation and Related Agencies Appropriations Act 2001, 114 Stat. 1356A-2 (2000).

---

b.  **Informal Legislative Vetoes**

Unlike a formal legislative veto, where the arrangement is spelled out in the law, the informal legislative veto occurs where an executive official pledges not to proceed with an activity until Congress or certain committees agree to it. An example of this appeared during the 101st Congress; in the "bipartisan accord" on funding the contras in Nicaragua, the Administration pledged that no funds would be obligated beyond November 30, 1989, unless affirmed by letter from the relevant authorization and appropriations committees and the bipartisan leadership of Congress.

2.  **Advance Notification or Report-and-Wait**

Statutory provisions may stipulate that before a particular activity can be undertaken by the executive branch or funds obligated, Congress must first be advised or informed, ordinarily through a full written statement, of what is being proposed. These statutory provisions usually provide for a period of time during which action by the executive must be deferred, giving Congress an opportunity to pass legislation prohibiting the pending action or using political pressure to cause executive officials to retract or modify

CRS-96

the proposed action. This type of "report and wait" provision has been upheld by the Supreme Court. The Court noted: "The value of the reservation of the power to examine proposed rules, laws and regulations before they become effective is well understood by Congress. It is frequently, as here, employed to make sure that the action under the delegation squares with the Congressional purpose." *Sibbach* v. *Wilson*, 312 U.S. 1 (1941). An example appeared in the Comprehensive Anti-Apartheid Act of 1986, which was directed toward South Africa's political persecution of Nelson Mandela and other dissidents (see box).

---

"The President may suspend or modify any of the measures required by this title or section 501(c) or section 504(b) thirty days after he determines, and so reports to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate, that the Government of South Africa has [taken certain actions] unless the Congress enacts within such 30-day period, in accordance with section 602 of this Act, a joint resolution disapproving the determination of the President under this subsection." 100 Stat. 103, sec. 311 (1986).

---

## M. Independent Counsel

The statutory provisions for the appointment of an independent counsel (formerly called "special prosecutor") were originally enacted as Title VI of the Ethics in Government Act of 1978, and codified at 28 U.S.C. §§ 591-599. The independent counsel was reauthorized in 1983, 1987, and 1994. It expired on June 30, 1999. The mechanisms of the independent counsel law were triggered by the receipt of information by the Attorney General that alleged a violation of any federal criminal law (other than certain misdemeanors or "infractions") by a person covered by the act. Certain high-level federal officials, including the President, Vice President, and heads of departments, were automatically covered by the law. In addition, the Attorney General had discretion to seek an independent counsel for any person for whom there may exist a personal, financial or political conflict of interest for Justice Department personnel to investigate; and the Attorney General could seek an independent counsel for any Member of Congress when the Attorney General deemed it to be in the "public interest."

After conducting a limited review of the matter (a 30-day threshold review of the credibility and specificity of the charges, and a subsequent 90-day preliminary investigation, with a possible 60-day extension), the Attorney General, if he or she believed that "further investigation is warranted", would apply to a special "division of the court," a federal three-judge panel appointed by the Chief Justice of the Supreme Court, requesting that the division appoint an independent counsel. The Attorney General of the United States was the *only* officer in the government authorized to apply for the appointment of an independent counsel. The special division of the court selected and appointed the independent counsel, and designated his or her prosecutorial jurisdiction, based on the information provided the court by the Attorney General. The independent counsel had the full range of investigatory and prosecutorial powers and functions of the Attorney General or other Department of Justice employees.

---

### Collisions between Congress and Independent Counsels

"The Congress' role here is terribly important. It is for them to present to the public as soon as possible a picture of the actual facts as to the Iran/Contra matter. This is so because there has been so much exposed without sufficient clarity to clear up the questions. There is a general apprehension that this is damaging. Congress properly wants to bring this to an end soon and that gives them a real feeling of urgency for their investigation.

"[The House and Senate Iran-Contra Committees] are trying to provide a factual predicate which will enable Congress to decide intelligently whether there is a need for a statutory amendment or for a closer oversight over covert activities and other matters . . . As they quite properly point out, they cannot wait for Independent Counsel to satisfy himself as to whether a crime may or may not have been committed. They have a problem of their own.

". . . We are proceeding with much greater detail than Congress would think necessary for their purposes. We come into collision when the question of immunity arises.

". . . There is a greater pressure on Congress to grant immunity to central figures than there is for Independent Counsel. Over the last three months, we have had long negotiations over this question of immunity . . .

"If the Congress decides to grant immunity, there is no way that it can be avoided. They have the last word and that is a proper distribution of power. . . .

". . .The reason why Congress must have this power to confer immunity is because of the importance of their role. The legislative branch has the power to decide whether it is more important perhaps even to destroy a prosecution than to hold back testimony they need."

Lawrence E. Walsh, "The Independent Counsel and the Separation of Powers," Houston Law Review, v. 25 (1988):1.

---

There was no specific term of appointment for independent counsels. They could serve for as long as it took to complete their duties concerning that specific matter within their defined and limited jurisdiction. Once a matter was completed, the independent counsel filed a final report. The special division of the court could also find that the independent counsel's work was completed and terminate the office. A periodic review of an independent counsel for such determination was to be made by the special division of the court. An independent counsel, *prior* to the completion of his or her duties, could be removed from office (other than by impeachment and conviction) only by the Attorney General of the United States for good cause, physical or mental disability, or other impairing condition, and such removal could be appealed to the court. The procedures for appointing and removing the independent counsel were upheld by the Supreme Court in *Morrison* v. *Olson*, 487 U.S. 654 (1988).

Investigation by the independent counsel could compete with parallel efforts by congressional committees to examine the same issue. Congress could decide to accommodate the needs of the independent counsel, such as delaying a legislative investigation until the independent counsel completed certain phases of an inquiry (see box on previous page).

Although Congress could call on the Attorney General to apply for an independent counsel by a written request from the House or Senate Judiciary Committee, or a majority of members of either party of those committees, the Attorney General is not required to begin a preliminary investigation or to apply for an independent counsel in response to such a request. However, in such cases the Justice Department was required to provide certain information to the requesting committee.

CRS-98

The independent counsel was directed by statutory language to submit to Congress an annual report on the activities of such independent counsel, including the progress of investigations and any prosecutions. Although it was recognized that certain information would have to be kept confidential, the statute stated that "information adequate to justify the expenditures that the office of the independent counsel has made" should be provided. 28 U.S.C. § 595(a)(2).

The conduct of an independent counsel was subject to congressional oversight and an independent counsel was required to cooperate with that oversight. 28 U.S.C. § 595(a)(1). In addition, the independent counsel was required to report to the House of Representatives any "substantial and credible" information that may constitute grounds for any impeachment. 28 U.S.C. § 595(c). On September 11, 1998, Independent Counsel Kenneth W. Starr forwarded to the House a report concluding that President Clinton may have committed impeachable offenses. The House passed two articles of impeachment (perjury and obstruction of justice), but the Senate voted only 45 to 55 on the perjury charge and 50 to 50 on the obstruction of justice charge, both votes short of the two-thirds majority required under the Constitution.

The independent counsel statute expired in 1992, partly because of criticism directed at Lawrence Walsh's investigation of Iran-Contra. The statute was reauthorized in 1994, but objections to the investigations conducted by Kenneth Starr into Whitewater, Monica Lewinsky, and other matters, put Congress under pressure to let the statute lapse on June 30, 1999.

Unless Congress in the future reauthorizes the independent counsel, the only available option for an independent counsel is to have the Attorney General invoke existing authority to appoint a special prosecutor to investigate a particular matter. For example, when the independent counsel statute expired in 1992 and was not reauthorized until 1994, Attorney General Janet Reno appointed Robert Fiske in 1993 to investigate the Clintons' involvement in Whitewater and the death of White House aide Vincent Foster. On July 9, 1999 Attorney General Reno promulgated regulations concerning the appointment of outside, temporary counsels, to be called "Special Counsels," in certain circumstances to conduct investigations and possible prosecutions of certain sensitive matters, or matters which may raise a conflict for the Justice Department (28 C.F.R. Part 600). Such special counsels will have substantially less independence than the statutory independent General, including removal for "misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Department policies."

# Selected Readings

**Statutory Offices of Inspector General**

Hendricks, Michael, et al. Inspectors General: A New Force in Evaluation. San Francisco: Jossey-Bass, Inc., 1990.

Kaiser, Frederick M. Statutory Offices of Inspector General: Establishment and Evolution. CRS Report 98-379 GOV, Regularly Updated.

——. "The Watchers' Watchdog: The CIA Inspector General." International Journal of Intelligence and Counterintelligence, v.3, 1989. pp. 55-75.

Light, Paul C. Monitoring Government: Inspectors General and the Search for Accountability. Washington: Brookings, 1993.          HJ9801.L54

Newcomer, Kathryn E. The Changing Nature of Accountability: The Role of the Inspectors General in Federal Agencies. Public Administration Review, vol. 58, March/April, 1998.

U.S. Congress. House Subcommittee on Government Efficiency. 25th Anniversary of the Inspector General Act. Hearings, 108th Congress, 1st session. Washington: GPO, 2003.

U.S. Congress. Senate Committee on Governmental Affairs. The Inspector General Act: 20 Years Later. Hearings, 105th Congress, 2nd session. Washington: GPO, 1998.

U.S. General Accounting Office. Inspector General: Office Consolidation and Related Issues. GAO Report GAO-02-575, Washington: GAO, 2002.

**Reporting, Consultation, and Other Sources of Information**

Beth, Richard S. Disapproval of Regulations by Congress: Procedure Under the Congressional Review Act. CRS Report RL31160, October 10, 2001.

Brass, Clinton T., coordinator. General Management Laws: A Compendium. CRS Report RL30795, May 19, 2004.

Copeland, Curtis W. Federal Regulations: Efforts to Estimate Total Costs and Benefits of Rules. CRS Report RL32339, May 14, 2004.

Collier, Ellen C. "Reporting Requirements." In Joint Committee on the Organization of Congress. Congressional Reorganization: Proposals for Change. Senate Print 103-19, 103rd Congress, 1st session. Washington: GPO, 1993. p. 135.

——. "Foreign Policy by Reporting Requirement." The Washington Quarterly, vol. 11, Winter 1988.

CRS-100

Johannes, John.  "Statutory Reporting Requirements:  Information and Influence for Congress."  In Abdo Baaklini, ed., Comparative Legislative Reforms and Innovations.  New York:  SUNY Press, 1977.  pp. 33-60.

Kerwin Cornelius.  Rulemaking: How Government Agencies Write Laws and Make Policy, 2nd ed.  Washington, D.C.: CQ Press, 1999.

Rosenberg, Morton.   Congressional Review of Agency Rulemaking: A Brief Overview and Assessment After Five Years.  CRS Report RL30116,  March 6, 2001.

U.S.  General Accounting Office.  Investigators' Guide to Sources of Information.  GAO Report OSI-97-2.  Washington: GAO, 1997.

U.S.  General Accounting Office.  A Systematic Management Approach Is Needed for  Congressional  Reporting  Requirements.    GAO  Report  PAD-82-12.  Washington:  GAO, 1981.

U.S.  House of Representatives.  Clerk.  Reports To Be Made to Congress. House Document 108-14, 108th Congress, 1st session.  Washington: GPO, 2003.

U.S.  Vice  President Al Gore.   National  Performance  Review.   Creating a Government That Works Better & Costs Less: Streamlining Management Control.  Washington: Office of the Vice President, 1993 (Reduce the Burden of Congressionally Mandated Reports, pp. 33-36).

## Resolutions of Inquiry

Fisher, Louis.  House Resolutions of Inquiry.  CRS Report RL31909, May 12, 2003.

History of the United States House of Representatives, 1789-1994, H. Doc. 103-324, 103rd  Congress, 2nd session.  Washington:  GPO, 1994 (Resolutions of Inquiry, pp. 260-262).

## Methods and Techniques

Art, Robert J. "Congress and the Defense Budget:  Enhancing Policy Oversight," Political Science Quarterly, v. 100, Summer 1985:  227-248.

Bowers, James R.  Regulating the Regulators:  An Introduction to the Legislative Oversight of Administrative Rulemaking.  New York:  Praeger, 1990.  140p.
                                                                      KF5411.B69

Hill, James P.   "The Third House of Congress Versus the Fourth Branch of Government:   The  Impact  of  Congressional  Committee  Staff  on  Agency Regulatory Decision-Making," John Marshall Law Review, v. 19, Winter 1986: 247-273.

CRS-101

Kaiser, Frederick M. "Congressional Oversight of the Presidency," Annals of the American Academy of Political and Social Science, v. 499, September 1988: 75-89.

U.S. Congress. Senate. Committee on Government Operations [now titled Homeland Security and Government Affairs]. Subcommittee on Oversight Procedures. Committee Print. Congressional Oversight: Methods and Techniques. 94th Congress, 2nd session, July 1976. Washington: GPO, 1976. 254p.

**Special Studies and Investigations by Staff and Others**

Johannes, John R. To Serve the People: Congress and Constituency Service. Lincoln, University of Nebraska Press, 1984.                JK1071.J63

Kaiser, Frederick M. A Congressional Office of Constituent Assistance: Proposals, Rationales, and Possible Objections. CRS Report 91-893 GOV, December 18, 1991.

Pontius, John S. Casework in a Congressional Office. CRS Report 98-878, September 9, 2004.

**The Press and Media**

Cook, Timothy E. Making Laws and Making News. Washington. The Brookings Institution, 1989. 210 p.                JK1447.C66

Hess, Stephen. Live From Capitol Hill. Washington: The Brookings Institution, 1991. 178 p.                PN4888.P6H48

Mann, Thomas and Norman Ornstein, eds. Congress, the Press, and the Public. Washington: The American Enterprise Institute and The Brookings Institution, 1994. 212 p.                JK1140.C62

Ritchie, Donald A. Press Gallery: Congress and the Washington Correspondents. Cambridge, Mass.: Harvard University Press, 1991.                PN4899.W3R58

**Specialized Investigations**

Congressional Quarterly. Guide to Congress. Washington: Congressional Quarterly, Inc., 2000, 5th ed. Vol. I, pp. 249-280.

Dimock, Marshall E. Congressional Investigating Committees. Baltimore: Johns Hopkins Press, 1929.                KF4942.D5

Eberling, Ernest J. Congressional Investigations. New York: Columbia University Press, 1929.                JK1123.A2E2

Fisher, Louis. Constitutional Conflicts between Congress and the President. Lawrence, Kansas: University Press of Kansas, 1997, 4th revised ed. pp. 160-195.                KF4565.F57

CRS-102

——. Congressional Access to Executive Branch Information: Legislative Tools. CRS Report RL30966, May 17, 2001.

——. Congressional Investigations: Subpoenas and Contempt Power. CRS Report RL31836, April 2, 2003.

Hamilton, James. The Power To Probe: A Study of Congressional Investigations. New York: Vintage Books, 1976.                     KF4942.H34

Kaiser, Frederick M. "Impact and Implications of the Iran-contra Affair on Congressional Oversight of the Executive." International Journal of Intelligence and Counterintelligence, vol. 7, Summer 1994, pp. 205-234.

Mayhew, David R. Divided We Govern: Party Control, Lawmaking, and Investigations, 1946-1990. New Haven: Yale University Press, 1991.
                                                                JK2261.M36

Schlesinger, Arthur M. Jr. and Roger Bruns. Congress Investigates: A Documented History. New York: Chelsea House, 1975 (5 vols.).
                                                                JK1123.A2S34

Taylor, Telford. The Grand Inquest: The Story of Congressional Investigations New York: Simon and Schuster, 1955.                  KF4942.T38

## Appropriations Limitations and Riders

Banks, William C. and Peter Raven-Hansen. National Security Law and the Power of the Purse. New York, Oxford University Press, 1994. 260 p.
                                                                KF4651.B36

Devins, Neal. "Regulation of Government Agencies Through Limitation Riders," Duke Law Journal, v. 1987: 456.

Fisher, Louis. "The Authorization-Appropriation Process in Congress: Formal Rules and Informal Practices," Catholic University Law Review, v. 29, 1979:5.

LeBoeuf, Jacques B. "Limitations on the Use of Appropriations Riders by Congress to Effectuate Substantive Policy Changes," Hastings Constitutional Law Quarterly, v. 19, 1992: 457.

## The Legislative Veto

Biden, Joseph R., Jr. "Who Needs the Legislative Veto?" Syracuse Law Review, v. 35, 1984: 685.

Breyer, Stephen. "The Legislative Veto After *Chadha*." Georgetown Law Journal, v. 72, 1984: 785.

Craig, Barbara Hinson. Chadha: The Story of an Epic Constitutional Struggle. New York: Oxford University Press, 1988.                     KF228.C43C73

CRS-103

Fisher, Louis.  "The Legislative Veto: Invalidated, It Survives," Law & Contemporary Problems, v. 56, 1993: 273.

Gibson, Martha Liebler.  Weapons of Influence: the Legislative Veto, American Foreign Policy, and the Irony of Reform.  Boulder, Colo., Westview Press, 1992. 188p.                                                                    JX1706.G53

Kaiser, Frederick M.  "Congressional Action to Overturn Agency Rules: Alternatives to the 'legislative veto.'"  Administrative Law Review, v. 32, 1980: 667.

Korn, Jessica.  The Power of Separation: American Constitutionalism and the Myth of the Legislative Veto.  Princeton, N.J.: Princeton University Press, 1996. 178p.                                                                      JK305.K67

**Independent Counsel**

Eastland, Terry.  Ethics, Politics and the Independent Counsel.  Washington, National Legal Center for the Public Interest, 1989. 180 p.
                                                                    KF4568.E17 1989

Harriger, Katy J.  The Special Prosecutor in American Politics, 2d ed. revised. Lawrence: University Press of Kansas, 2000. 325 p.
                                                                    KF4568.H37

Jost, Kenneth.  "Independent Counsels: Should Congress make major changes in the law?"  CQ Researcher, v. 7, no. 7, February 21, 1997: 145-167.

Koukoutchos, Brian Stuart.  Constitutional Kinetics: the Independent Counsel Case and the Separation of Powers.  Wake Forest law review, v. 23, 1988: 635.

Maskell, Jack.  The Independent Counsel Law.  The Federal Lawyer, July 1998: 28-39.

Nolan, Beth.  " Removing Conflicts from the Administration of Justice: Conflicts of Interest and Independent Counsels Under the Ethics in Government Act." Georgetown Law Journal,  v. 79, 1990: 1-80.

Walsh, Lawrence E.  The Independent Counsel and the Separation of Powers. Houston Law Review, v. 25, 1988: 1.

# V.  Oversight Information Sources and Consultant Services

Congress calls upon a variety of sources for information and analysis to support its oversight activities.  Most of this assistance is provided by legislative support agencies:  Congressional Research Service, the Congressional Budget Office, and the Government Accountability Office.  In addition, the Offices of Senate Legal Counsel and House General Counsel are valuable oversight resources.  A range of outside interest groups and research organizations also provide rich sources of information.

## A.  Congressional Research Service (CRS)

### 1.  CRS Mission Statement

"The Congressional Research Service provides the Congress, throughout the legislative process, comprehensive and reliable legislative research, analysis, and information services that are timely, objective, nonpartisan, and confidential, thereby contributing to an informed national legislature."

### 2.  Organization

CRS is organized into six research divisions and five specialized offices. The research divisions are American Law; Domestic Social Policy; Foreign Affairs, Defense and Trade; Government and Finance; Information Research; and Resources, Science, and Industry.

### 3.  Staff of CRS

CRS has 700 authorized full-time equivalents (FTEs) on its permanent staff. The professional staff are diverse, including, among others, attorneys, economists, engineers, social science analysts, information scientists, librarians, defense and foreign affairs analysts, political scientists, public administrators, and physical and biological scientists.

### 4.  CRS Work for Congress

CRS provides the following services:

### Analytical and Research Services.

#### a.  Policy analysis and research

CRS staff anticipates and responds to congressional needs for policy analysis, research and information in an interdisciplinary, integrated manner.  CRS provides timely and objective responses to congressional inquiries for policy analysis, research and information at every stage of the legislative process.

Legislative attorneys and paralegal staff respond to congressional needs for legal information and analysis to support the legislative, oversight, and representational functions of Congress.

b.    **Information research**

Expert information research specialists and resource specialists are available to provide information research and reference assistance. The staff also provides copies of articles in newspapers, journals, legal and legislative documents and offers assistance with a wide variety of electronic files.

c.    **Briefings, seminars, and workshops**

CRS conducts briefings, seminars, and workshops for Members of Congress and their staffs. On these occasions CRS analysts and other experts discuss public policy issues, international concerns, and the legislative process.

**Briefings**.  CRS analysts and specialists are available to give one-on-one briefings to Members and staff on public policy issues, the legislative process, congressional office operations, committee matters, or general orientation to CRS.

**Issue seminars and workshops**.  In anticipation of congressional interest or at the request of a Member or committee, CRS organizes and conducts seminars and workshops on issues of current interest to Members and staff of Congress. CRS and outside experts participate in these events with Members and staff.

**Federal Law Update**.  This series, offered twice yearly by the American Law Division, focuses on developments in federal law and issues before the Supreme Court.  The series can meet continuing legal education (CLE) requirements in some states.

**CRS Legislative Institutes**.  This three-part series provides training in the work of Congress and the legislative process.  Topics include the federal budget process, committee system and procedures, floor procedures, amendments, and resolutions.   In the Graduate Legislative Institute, participants simulate congressional proceedings as "members of the CRS Congress" and gain experience in procedures by moving bills through the legislative process.

**Public Policy Issues Institute**.  Held at the beginning of each session of the Congress, this program provides introductory briefings and discussions by CRS staff on issues of legislative significance to the Congress.

**District and Staff Institutes**.  These institutes provide orientation for staff of district offices that include discussions of CRS services, the legislative and budget processes, casework, Member allowances, ethics, and franking.  The program is supported by the House and Senate.

**New Member Seminar**. Every two years CRS offers new Members an orientation seminar on public policy issues. These sessions are held in January at the beginning of each new Congress.

For additional information about CRS seminars and events, call 7-7904.

## CRS Products.

a.   **Customized Memoranda**

Confidential memoranda prepared for a specific office are a major form of CRS written communication. These memoranda are solely for the use of the requesting office and are not distributed further unless permission has been given by that office. Memoranda are often used by CRS attorneys and analysts to respond to inquiries focused on legislative and policy matters of individual Member interest.

b.   **CRS Reports and Issue Briefs**

Reports for Congress on specific issues take many forms: policy analyses, statistical reviews, economic studies, legal analyses, historical studies, chronological reviews, and bibliographies. Issue Briefs are concise briefing papers on legislative issues before Congress and are updated to reflect legislative action. Issue briefs and reports are available on the CRS website at [http://www.crs.gov]; by telephone at 202-707-7132; and in-person at the Product Distribution Center (Madison Building LM-206).

CRS prepares concise briefing papers on issues before the Congress. Updated regularly, Issue Briefs are available both in printed form and on the CRS website.

c.   **Congressional Distribution Memoranda**

Matters that are not suitable for treatment in a CRS report or issue brief, but that may be of interest to more than one congressional office, can be the subject of general distribution memoranda provided to a congressional office upon request. The memoranda differ from Reports because they are tailored, or written for a single requester; are directed to a specific question or concern; or are more technical or focused in nature.

d.   **The La Follette Congressional Reading Room, the CRS Research Centers and the Jefferson Congressional Reading Room**

Staff in the congressional reading rooms and research centers provide telephone reference assistance and in-person consultation on resources and research for congressional staff. A selected research collection, newspapers and journals, and assistance with online searching is available.

CRS-107

> La Follette Congressional Reading Room
> Rayburn Research Center
> Russell Senate Research Center
> Hours: Monday-Friday, 9:00 a.m.-6:00 p.m.
> (Hours may change when Congress is not in session.)

The Jefferson Congressional Reading Room is a Members only facility staffed by CRS research librarians providing in-person service.

e. **Electronically Accessible Products and Services**

**CRS website [http://www.crs.gov].** The CRS website provides 24-hour access to an array of CRS services including full text of issue briefs and reports, a weekly "Legislative Alert," updates and analyses of the annual appropriations legislation, an interactive guide to the legislative process, online registration for CRS seminars, and complete information on other CRS services. In operation since the 104th Congress, the CRS website is accessible only to House and Senate offices and other legislative branch agencies. A linked format allows the user to move easily within a CRS online document and link to the text and summary of relevant legislation and other CRS products on the topic.

**Legislative Information System [http://www.congress.gov].** The Legislative Information System (LIS) was available for the first time on Capnet at the beginning of the 105th Congress. The system provides Members of Congress and their staff with access to the most current and comprehensive legislative information available. It can be accessed only by the House and Senate and the legislative support agencies. The LIS has been developed under the policy direction of the Senate Committee on Rules and Administration and the House Committee on House Administration. It has been a collaborative project of the offices and agencies of the legislative branch, including the Secretary of the Senate and the Clerk of the House; House Information Resources and the Senate Sergeant at Arms; the Government Printing Office; the Government Accountability Office; the Congressional Budget Office; the Congressional Research Service; and the Library of Congress. CRS has responsibility for the overall coordination of the retrieval system; the Library of Congress is responsible for its technical development and operation.

**Floor Agenda.** The "Floor Agenda: CRS Products" page, a weekly compendium of CRS products relevant to scheduled or expected floor action in the House and Senate, was available on the CRS website and through e-mail subscription to all Members, committees, subcommittees, and congressional staff. All CRS products listed on the Floor Agenda were linked for electronic delivery to subscriber desktops.

**CRS Programs Listserv.** Launched in fiscal 2001, this e-mail notification system provides subscribers with descriptions of current CRS programs and links to online registration forms.

**Current Legislative Issues**. The Current Legislative Issues (CLI) system, accessible to the Congress from the CRS Home Page, reflects policy areas identified by CRS research staff as active and of current importance to the Congress. All

products presented as CLIs are maintained to address significant policy developments. On occasion the system is used to facilitate the contribution of CRS expertise in situations requring immediate attention of the Congress on an unanticipated basis. In FY2003 CRS developed and maintained 160 CLIs

**Appropriations**. The CRS appropriations Web page continued to provide comprehensive legislative tracking and access to legislative analysis of each of the 13 annual appropriations bills. The appropriations status table included an online guide to the FY2003 Consolidated Appropriations Act (P.L. 108-7), which offered access and short cuts to notable sections from the end-of-session measure that combined 11 appropriations acts into one bill.

### f.   **Audiovisual Products and Services**

***Audiovisual Products and Services.*** CRS provides a variety of audiovisual products and technical assistance in support of its service to the Congress. These include producing video or audio copies of CRS institutes and seminars that congressional staff can request for viewing in tape format or at their desktops from the Web. The Web versions are broken out into subtopics so that individual viewers can go directly to the portions that are of greatest interest to them. Working with the Library's Office of Information Technology Services the Section also provides live Webcasts of selected CRS seminars. In addition, CRS provides two hours of television programming each weekday for the house and Senate closed-circuit systems.

***Language Support.*** The Foreign Affairs, Defense, and Trade Division provides limited translation services for Members and committees. Languages covered in-house include French, German, Greek, Italian, Latin, and Portuguese. For translations pertaining to legislative business into or from other languages, the division can make arrangements to contract the work to outside vendors.

### 5.   **CRS Divisional Responsibilities**

CRS has adopted an interdisciplinary and integrative approach as it responds to requests from the Congress. The Service seeks to define complex issues in clear and understandable ways, identify basic causes of the problems under consideration, and highlight available policy choices and potential effects of action. CRS is organized into the following divisions and offices to support the analysis, research, and information needs of the Congress.

### Divisions.

### American Law Division

The American Law Division provides the Congress with legal analysis and information on the range of legal questions that emerge from the congressional agenda. Division lawyers and paralegals work with federal, state, and international legal resources in support of the legislative, oversight, and representational needs of Members and committees of Congress. The division's work involves the constitutional framework of separation of powers, congressional-executive relations

CRS-109

and federalism; the legal aspects of congressional practices and procedures; and the myriad questions of administrative law, constitutional law, criminal law, civil rights, environmental law, business and tax law, and international law that are implicated by the legislative process. In addition, the division prepares *The Constitution of the United States of America — Analysis and Interpretation* (popularly known as the Constitution Annotated).

### Domestic Social Policy Division

The Domestic Social Policy Division offers the Congress research and analysis in the broad area of domestic social policies and programs. Analysts use multiple disciplines in their research, including program and legislative expertise, quantitative methodologies, and economic analysis. Issue and legislative areas include education and training, health care and medicine, public health, social security, public and private pensions, welfare, nutrition, housing, immigration, civil rights, drug control, crime and criminal justice, border security and domestic intelligence, labor and occupational safety, unemployment and workers compensation, and issues related to the aging of the U.S. population, to children, persons with disabilities, the poor, veterans, and minorities.

### Foreign Affairs, Defense, and Trade

The Foreign Affairs, Defense, and Trade Division is organized into seven regional and functional sections. Analysts follow worldwide political and economic and security developments for the Congress, including U.S. relations with individual countries and transnational issues such as terrorism, narcotics, refugees, international health, global economic problems, and global institutions such as the United Nations, World Bank, International Monetary Fund and the World Trade Organization. They also address U.S. foreign aid programs, strategies, and resource allocations; State Department budget and functions; international debt; public diplomacy; and legislation on foreign relations. Other work includes national security policy, military strategy, weapons systems, military compensation, the defense budget, and U.S. military bases. Trade-related legislation, policies, and programs and U.S. trade performance and investment flows are covered, as are trade negotiations and agreements, export promotion, import regulations, tariffs, and trade policy functions.

### Government and Finance Division

The Government and Finance division is responsible for meeting the analytic and research needs of Congress on matters relating to government operations and oversight, intergovernmental relations, congressional organization and procedures, public finance, financial regulation, and macroeconomic policy. Issue areas related to government include the operations and history of Congress; the legislative process; the congressional budget and appropriations processes; federal executive and judicial branch organization and management; government personnel; government information policy; statehood, territories and the District of Columbia; disaster assistance and homeland security; census and reapportionment; elections and political parties; lobbying; and constitutional amendments and history. Issue areas related to finance and economics include financial institutions and market structure; financial markets and securities regulation; insurance; consumer finance, including banking,

credit reporting, and financial privacy; government-sponsored enterprises and housing finance; debt and taxation; economic development; international finance, including foreign exchange and financial flows; monetary and fiscal policy; and macroeconomic conditions and indicators, such as gross domestic product, price indexes, and saving.

### Information Research Division

The Information Research Division responds to requests for information research and reference assistance. The division serves the Congress by extending research techniques beyond the limitations of traditional library tools and drawing on automated files, the wide range of the Internet, local and state governments, private organizations and institutions, as well as the resources of the Library of Congress. Responses are tailored and may include preparing written reports, selecting authoritative materials, creating electronic files, as well as Web pages designed to meet the needs of Congress for continuous access to information and research. The staff in the congressional reading room and research centers provides telephone reference service and in-person consultation on resources and research strategies for congressional staff. The Product Distribution Center provides document delivery service for CRS products.

### Resources, Science, and Industry Division

The Resources, Science, and Industry Division covers an array of legislative issues for the Congress involving natural resources and environmental management, science and technology, and industry and infrastructure. Resources work includes policy analysis on public lands and other natural resources issues; environment; agriculture, food, and fisheries; and energy and minerals. Science coverage includes policy analysis on civilian and military research and development issues, information and telecommunications, space, earth sciences, and general science and technology. Support on industry issues includes policy analysis on transportation and transportation infrastructure issues, industrial market structure and regulation, and sector-specific industry analysis.

### Offices.

### Office of Finance and Administration

The Office of Finance and Administration maintains oversight of the Service's planning, management controls, financial management, and administrative activities. This includes coordinating development of the Service's strategic planning goals and annual program plans and conducting quarterly performance reviews. This office directs a full range of fiscal operations to achieve the Director's program objectives, including development of long-range budgetary requirements and associated appropriations requests, budget execution, contracting, and fund-raising. The office also performs facilities management and asset control activities and co-chairs the Services Contract Review Board, conducts a business analysis of all proposals for external research capacity, and makes recommendations to the Director.

CRS-111

### Office of Information Resources Management

The Office of Information Resources Management develops and maintains information services that support both the Congress and CRS staff.  The office provides information support to CRS staff through its management of three Information Resource Centers, reference services, procurement of electronic and print resources, training in the use of electronic resources, and Intranet resource development.

### Office of the Congressional Affairs and Counselor to the Director

The Office of Congressional Affairs and Counselor to the Director provides counsel to the Director and Deputy Director on matters of law and policy — planning, developing, and coordinating matters relating to internal CRS policies, particularly as they affect the Service's relationships with congressional clients and other legislative support agencies.  The office provides final CRS review and clearance of all CRS products; ensures that the Service complies with applicable guidelines and directives contained in the Reorganization Act, in statements by appropriations and oversight committees, and in Library regulations and CRS policy statements.  This office receives, assigns to the research divisions, and tracks congressional inquiries; works with the divisions to plan and carry out institutes, seminars, and briefings for Members, committees, and their staffs, and takes the lead in developing, strengthening, and implementing outreach to congressional offices; records, tracks, and reports data on congressional inquiries and CRS responses; and develops and refines systems designed to provide managers with statistical information needed to analyze subject coverage, client service, and the use of resources.  The office also provides a co-chair of the External Research Review Board, which reviews contract proposals and makes recommendations to the Director, and provides the CRS representative to the Interagency Liaison Group of legislative support agencies.

### Office of Legislative Information

The Office of Legislative Information develops and maintains information services that support both the Congress and CRS staff, including the CRS website and the congressional legislative information retrieval system (LIS); provides summaries and status information for all bills introduced each Congress; builds and maintains the technology infrastructure of the Service as a whole; develops and applies new technologies to enhance CRS research capability and productivity; develops and implements information technology to enhance communication of CRS research to its clients; edits, produces, and distributes CRS products in both print and electronic format; and represents the Director in dealing with other organizations and agencies on issues regarding legislative information technology.

CRS-112

### The Office of Workforce Development

The Office of Workforce Development administers the Service's human resources programs and activities to include the following: staffing, recruitment, position classification, diversity, upward mobility, performance management, mentoring, special recognition, and training and professional development. This office represents the Director on issues involving the Service's status, role, activities, and interaction with other Library entities in relevant areas of human resources administration, management, and development. Overall the goal of the office is to enhance the Service's ability to attract and retain the human resources talent it needs to respond to the dynamic research, analysis, and information needs of the Congress.

### 6.    Interdisciplinary Teams

### a.    Identification of Major Issues

As part of Service-wide planning efforts, CRS managers attempt to anticipate major congressional issues. The program identifies and defines major issues, structures them for more effective scrutiny by the Congress, and provides effective, timely, and comprehensive products and services to the Congress, that usually require multi-disciplinary and interdivisional contributions. The issues chosen are national in scope, receive widespread public attention, have significant effects on the federal budget, economy, or social fabric of the Nation, and are virtually certain to be the subject of congressional hearings and legislative action.

### 7.    Limitations

The Legislative Reorganization Act of 1970 and specific provisions in various other acts direct and authorize CRS to provide a great range of products and services to the Congress. However, pursuant to these statutory authorities and understandings reached over time in consultation with the relevant oversight committees, the Service has developed the following policies limiting or barring certain types of assistance. When it appears that a congressional request should be declined on these policy grounds, that decision and notification to the requestor is to be made only after consultation with the appropriate division chief or the Associate Director for Policy Compliance.

a.    CRS cannot prepare reports, issue briefs, seminars or undisclosed products which are of a partisan nature or advocate bills or policies. But CRS will respond to requests for "directed writing" — statement drafts, casemaking or other disclosed products clearly identified as prepared at the direction of the client and not for attribution as CRS analysis or opinion. In no case is excessive partisanship, incorrect factual data, moral denigration of opponents, or personal research damaging to Members permissible.

b.    CRS cannot provide researched information focusing on individual Members or living former Members of Congress (other than holders of, or nominees to, federal appointive office), except at the specific request or with permission of the Member concerned.

c.   Members of the CRS staff shall not appear as witnesses before committees of Congress in their capacity as CRS employees or on matters relating to their official duties without the express consent of the Director.

d.   CRS does not draft bills (a function of the office of the legislative counsels), but will assist with the preparation of legislative proposals.

e.   CRS cannot meet deadlines or demands that could only be met by dropping or jeopardizing the quality of responses to urgent legislative requests related to the public policy work of the Congress, but the Service will respond to all requests as rapidly as is feasible under prevailing workload conditions.

f.   CRS cannot accept "rush" or priority deadlines on constituent inquiries but will respond as expeditiously as is possible without compromising the quality of responses relating to current legislative business.

g.   CRS cannot undertake casework or provide translating services or briefings for constituents, but can lend assistance in responding to constituent matters, including identification of the appropriate agency or private entity to contact for further pursuit of the matter.

h.   CRS cannot give personal legal or medical advice, but will assist in the provision of background information, the identification of relevant issues for further scrutiny, and advice on sources of additional assistance.

i.   CRS cannot undertake scholastic or personal research for office staff, but can, on a nonpriority basis, help with bibliographic and reference services.

j.   CRS assistance for former Members of Congress should be limited to use of the La Follette Reading Room and reference centers, the hotline service, the provision of readily available information and previously prepared CRS congressional distribution products.   CRS cannot undertake original research for former Members, but on a nonpriority basis responds to requests for reference services and research guidance.

k.   CRS is not authorized to provide congressional offices with clerical assistance (e.g., typing, duplication, maintenance of mailing lists, continuing clipping services, etc.).

l.   CRS must not use its staff to index hearings or congressional documents other than those prepared by the Service itself.

m.   The Library of Congress is not authorized to subscribe to or lend on a regular basis current issues of periodicals and newspapers for the purpose of furnishing them regularly to individual congressional offices.

n.   CRS must not use its staff to support executive or other commissions that are not funded through the Legislative Branch Appropriations Act. In those

CRS-114

instances where Members of Congress are official members of a commission not served by CRS, the Service may supply customary assistance to the Members, but queries should be placed through the Members' offices by their official staffs, and the replies should be sent to the Members' offices, not to the office of the commission.

o.  CRS does not conduct audits or field investigations.

p.  CRS is not authorized to provide its services in support of political campaign organizations.

q.  While CRS reference and research specialists serve all Members and committees of Congress, the director has the authority to assign staff to work temporarily for particular committees on request.  In current circumstances, however, no full time assignments may be approved, and staff assigned to close support of a committee must be available to serve other clients.  When staff is adequate to permit the loan of subject specialists for short periods, the director may approve formal requests without reimbursement; staff loans for periods of over 60 days must be reimbursed.  No full-time assignment of staff is approved if the assignment leaves the Service unable to adequately serve the Congress.

r.  As a general rule, the services of CRS are provided exclusively to the Congress and, to the extent provided by law, to other congressional support agencies.  Because of the benefits derived from the exchange of information with other governmental bodies (including elected and appointed officials of foreign governments), the Service may also at the discretion of the Director exchange courtesies and services of a limited nature with such organizations, so long as such assistance benefits CRS services to Congress.

s.  CRS does not provide its services to congressional member organizations and informal caucuses not funded by legislative branch appropriations but will provide its normal services to the offices of Members who belong to such entities and to formal congressional party organizations.  Current lists of organizations that may place requests directly are available from the Inquiry Unit.

t.  Offer services to former Members of Congress, other than providing copies of current CRS publications or limited brief reference assistance.

CRS-115

***Fast Access to all CRS services***
Phone  7-5700 (Press 1-5 to speak to an information specialist)

Website  [http://www.crs.gov]
Fax  7-6745

TTY  7-7154

***[http://www.crs.gov]***
-mail lists select Services

Navigation assistance 7-7100

***CRS Experts***
Phone 7-5700 (press 1-5 to request an expert)

Dial by name 7-5700 (press 1-4 and spell last name then first name)

***CRS Products***
Website (retrieve full text or order) [http://www.crs.gov]
Product Line (order by product number) 7-7132
Product Distribution Center Madison 206
    (pick-up products)

***In-Person Services and CRS Products***
(*Note: Hours may change when Congress is not in session.*)

Hotline (quick facts, statistics and Web assistance) 7-7100

La Follette Congressional Reading Room Madison 204  7-7100
    Monday - Thursday  8:30 a.m. - 8:00 p.m.
    Friday  8:30 a.m. - 6:00 p.m.
    Saturday  8:30 a.m. - 5:00 p.m.
    *(Closed Saturdays when Congress is not in session.)*

Longworth Research Center B2215-2030
    Monday - Friday  9:00 a.m. - 5:30 p.m.

Rayburn Research Center B3355-6958
    Monday - Friday  9:00 a.m. - 5:30 p.m.

Senate Research Center Russell B074-3550
    Monday - Friday  9:00 a.m. - 5:30 p.m.

Product Distribution Center LM 206  7-7132
    Monday - Friday  8:30 a.m. - 6:00 p.m.

CRS-116

Jefferson Congressional Reading Room  Jefferson 159
*Members of Congress Only*
Monday - Friday  8:30 a.m. - 5:00 p.m.

**Programs and Training**
Information                              7-7904 or [http://www.crs.gov] (select Events)

**To borrow books from the Library of Congress Collection**
Fax                                      7-5986
E-mail                                   loanref@loc.gov
Phone (also to open a loan account)      7-5441
To request book pick-up                  7-5717

**Mailing Address**

Daniel P. Mulhollan, Director
Congressional Research Service
The Library of Congress, LM 213
Washington, DC 20540-7210
(Note: Hill offices may use Inside Mail)

For questions, comments or problems about CRS services, please call Robert Newlen, Legislative Relations Office, 7-3915.

# B.  Congressional Budget Office (CBO)

The Congressional Budget Office (CBO) was created by the Congressional Budget and Impoundment Control Act of 1974. It began operating on February 24, 1975, with the appointment of its first director, Alice M. Rivlin. CBO's mission is to provide Congress with objective, timely, nonpartisan analyses needed for economic and budget decisions and with the information and estimates required for the congressional budget process. Compared with the missions of the Congress's other support agencies — the Congressional Research Service and the Government Accountability Office — CBO's mandate is relatively narrow. But its subject matter gives it a broad reach, reflecting the wide array of activities that the federal budget covers and the major role the budget plays in the U.S. economy.

A substantial part of what CBO does is to support the work of the House and Senate Committees on the Budget, which were also created by the 1974 act. Those committees are in charge of the process, spelled out in the act, by which the Congress sets its own targets for the federal budget, including the overall levels of revenues and spending, the surplus or deficit that results, and the distribution of federal spending by broad functional categories. Each spring Congress adopts the end result of that process, the congressional budget plan, in the form of a concurrent resolution. The resolution imposes an overall framework and discipline on the consideration of appropriations, other spending measures, and tax legislation.

CRS-117

The policies and principles that have shaped CBO since its inception are a key factor in its effectiveness. CBO is a professional, nonpartisan staff office, it does not make recommendations on policy. That nonpartisan stance has been instrumental in preserving the agency's reputation for professionalism and has enhanced the credibility of its products. CBO prepares independent analyses and estimates relating to the budget and the economy and presents options and alternatives for Congress to consider. It routinely discloses the assumptions and methods it uses, which enhances the general perception of its products as objective and impartial.

Some of CBO's activities are statutory tasks; others are carried out at the request of congressional committees or individual Members. According to the Budget Act, CBO must give priority first to requests for services from the House and Senate Budget Committees; second, to requests from the two Appropriations Committees, the House Committee on Ways and Means, and the Senate Committee on Finance; and finally, to requests from all other congressional committees. CBO prepares various type of analyses for Congress, including cost estimates for bills that individual Members have introduced or plan to introduce. But, committee requests always take priority. CBO handles requests from individual Members only to the extent that its resources permit.

CBO's services can be grouped in four categories: helping Congress formulate a budget plan, helping it stay within that plan; helping it assess the impact of federal mandates, and helping it consider issues related to the budget and to economic policy.

## 1. Helping Congress Develop a Plan for the Budget.

The House and Senate Budget Committees prepare the annual congressional budget plan, drawing on the "views and estimates" of the other committees. A major part of CBO's role in that process is to prepare an annual report, which provides economic and budget projections for the next 10 years. Typically, it also includes a discussion of some current economic or budget policy issues, such as the effects of the federal deficit on economic growth or recent changes in the budget process. CBO customarily updates its economic and budget projections in midyear.

### Economic Forecasts and Projections

CBO is the only part of the legislative branch whose mandate includes making economic forecasts and projections. Its forecasts cover 18 to 24 months and involve the major economic variables — gross domestic product (GDP), unemployment, inflation, and interest rates. CBO does not attempt to forecast cyclical fluctuations in the economy more than two years ahead; instead, its longer-term projections are based on trends in the labor force, productivity, and savings.

CBO draws the information for its forecasts from the major econometric models and commercial economic forecasting services. It also relies on the advice of a distinguished panel of advisers that meets twice a year. Usually, CBO's forecasts are fairly close to the consensus of private forecasters. CBO regularly publishes an evaluation of its economic forecasting record.

CRS-118

**Baseline Budget Projections**

The purpose of CBO's budget projections is to give Congress a baseline for measuring the effects of proposed changes in tax and spending laws.  The projections show what would happen to the federal budget if current spending or revenue policies were unchanged over the projection period.  The Budget Committees use the projections to develop their annual budget resolutions and directives to other committees.  CBO uses them to produce cost estimates for proposed legislation and in scorekeeping tabulations.

For revenues and entitlement programs, such as Social Security or Medicare, the baseline projections generally assume that current laws will continue without change.  For discretionary spending, which is controlled by annual appropriation bills, CBO bases its projections on the most recent appropriations, adjusted for the projected rate of inflation.

**Analysis of the President's Budget and Other Assistance**

Each year, at the request of the Senate Committee on Appropriations, CBO analyses the President's budget to see how its revenue and spending proposals would affect CBO's baseline budget projections.  In the analysis, CBO uses its own economic assumptions and estimating techniques to recast the budget the President has proposed and submitted to the Congress.  In addition, as Congress moves towards its annual budget resolution, CBO helps the budget and other committees estimate the effects of alternative budget plans.  Frequently, CBO officials are asked to testify before congressional committees about the outlook for the economy and the budget and about other matters related to developing the annual budget plan.

**Long-Term Budgetary Pressures and Policy Options**

The 10-year time frame CBO uses for preparing budget projections is not sufficient to show the dramatic effects that the projected demographic changes in the U.S. population over the next three decades will have on the federal budget.  The upcoming retirement of the large baby-boom generation and the continuing growth of per-enrollee health care costs will place growing pressure on the budget, largely because they will increase spending on Social Security, Medicare, and other programs that serve the elderly.  Since 1996, CBO has periodically prepared a report on the long-term budgetary outlook and on some of the policy options for controlling the growth of spending in those programs.

## 2.   Helping Congress Stay Within Its Budget Plan.

Once Congress adopts the annual budget resolution, the Budget Committees take the lead in enforcing its provisions.  To help them, CBO supplies estimates of the budgetary impact of bills reported by the different committees and up-to-date tabulations (referred to as scorekeeping) of the status of congressional actions on legislation that affects the budget.

CRS-119

### Cost Estimate for Bills

CBO is required to develop a cost estimate for virtually every bill reported by congressional committees to show how it would affect spending or revenues over the next five years or more. For most tax legislation, CBO uses estimates provided by the Joint Committee on Taxation, a separate congressional analytic group that works closely with the two tax-writing committees. CBO also prepares cost estimates for use in drafting bills (especially in the early stages), formulating floor amendments, and working out the final form of legislation in conference committees. To the extent that its resources permit, CBO estimates the cost of bills at the request of individual Members. In the past, where appropriate, CBO estimates contained the projected costs to state and local governments of carrying out the proposed legislation. In March 1995, enactment of the Unfunded Mandates Reform Act greatly expanded CBO's responsibilities in that area (see below).

CBO's cost estimates have become an integral part of the legislative process and committees increasingly refer to them at every stage of drafting bills. The estimates may also have an impact on the final outcome of legislation because they are used to determine whether committees are complying with the annual budget resolutions and reconciliation instructions.

Another CBO responsibility is providing estimates to the Appropriations Committees of the Congress. The numbers contained in appropriation bills usually represent budget authority, and the resulting outlays must be estimated. (Outlays are generally checks issued by the Treasury or cash-equivalent transactions that, when subtracted from receipts, are used to calculate the budget surplus or deficit.) CBO's estimates may be critical in determining whether a bill complies with allocations in the annual budget resolution.

### Scorekeeping

One of CBO's most important functions is to keep track of all spending and revenue legislation considered each year so Congress can know whether it is acting within the limits set by the annual budget resolution. CBO provides the Budget and Appropriations Committees with frequent tabulations of congressional action on both spending and revenue bills — although the bulk of CBO's scorekeeping involves spending legislation. The scorekeeping systems keep track of all bills that affect the budget from the time they are reported out of committee to the time they are enacted into law.

## 3.   Helping Congress Assess Federal Mandates.

To assess better the impact of its laws on state, local, and tribal governments and the private sector, Congress passed the Unfunded Mandates Reform Act of 1995. The act amends the Congressional Budget Act to require CBO to give authorizing committees a statement about whether reported bills contain federal mandates. If the direct costs of an intergovernmental or private-sector mandate exceed specified thresholds in any of the first five years after the mandate takes effect, CBO must provide an estimate of those costs (if feasible) and the basis of the estimate.

CRS-120

CBO's statement must also include an assessment of what funding is authorized in the bill to cover the costs of the mandates and, for intergovernmental mandates, an estimate of the appropriations needed to fund such authorizations for up to 10 years after the mandate is effective. When requested, CBO is also required to assist committees by preparing studies of legislative proposals containing federal mandates. The law took effect January 1, 1996.

## 4. Helping Congress Consider Budget and Economic Policy Issues.

CBO's responsibilities also entail analyzing specific program and policy issues that affect the federal budget and the economy. For the most part, requests for those analyses come from the chairman or ranking minority member of a full committee or subcommittee. The leadership of either party in the House or Senate may also request CBO analysis.

The analysis cover a variety of federal activities, examining current policies, suggesting other approaches, and projecting how the alternatives would affect current programs, the federal budget, and the economy. In keeping with its nonpartisan mandate, CBO does not offer recommendations on policy in those reports.

Some of the analyses take nine to 12 months, or sometimes longer, to complete. Other analyses may be conducted in a much shorter time frame, usually appearing as papers or memorandums. Many CBO reports have helped shape public discussion of the issues they address, not only on Capitol Hill but in the nation at large. A list of CBO's recent publications shows the broad range of their subject matter.

### Employing Staff and Budgetary Resources

CBO's annual appropriation limits the number of staff the agency may employ. The appropriation for FY1976 authorized 193 positions. Since 1977, the agency's staffing limit has grown to the present level of 235 full-time equivalent positions. Of those, 215 are designated professional and 20 are support positions.

CBO is an agency dominated by economists and policy analysts. All of its directors have held Ph.D.'s, most in economics, and about 60 percent of its professional staff hold advanced degrees in either economics, public policy, or a related field. Nearly all of CBO's professional staff have completed four or more years of college; three out of four have graduate degrees.

CBO's FY2004 appropriation was $33.6 million. Of its total expenditures, the largest share — 88 percent — is allotted to personnel. The second largest component is computer costs. Today, those expenditures make up about six percent of total spending.

Services and offices are conveniently located on the fourth floor of the Ford House Office Building (formerly House Annex II) at Second and D Streets, SW, in Washington, DC. The building is served by the Blue and Orange Lines of the Washington Metrorail system; the Federal Center SW station is across from the Third

CRS-121

Street side of the building. A shuttle bus service operated on Capitol Hill by the Architect of the Capitol serves the Ford Building.

### How to Contact CBO

For general information, call 202-226-2600. The fax number is (202) 226-2714. CBO is open weekdays from 9:00 a.m. to 5:30 p.m.

### How to Obtain CBO Products

*Congressional Distribution.* Members of Congress receive copies of all CBO reports and studies. The fax number is (202) 226-3040. CBO is open weekdays from 9:00 a.m. to 5:30 p.m.

*Public Distribution.* Single copies of CBO's reports, studies, papers, and memorandums are available to the public at no charge. Those documents are also available on CBO's website (www.cbo.gov). To request a list of publications or a specific document, call the Publications Office at (202) 226-2809 weekdays between 9:00 a.m. and 5:30 p.m. or write to the following:

CBO Publications Office
Management, Business, and Information Services Division
Ford House Office Building
Second and D Streets, SW
Washington, DC 20515

To obtain multiple copies, contact the U.S. Government Printing Office, which sells many of CBO's reports and studies. For information about availability, exact costs, and ordering, call (202) 275-3030 or write to the following:

Superintendent of Documents
U.S. Government Printing Office
Washington, DC 20402

CBO cost estimates are available to the public on the website and are generally included in Senate and House committee reports that accompany reported legislation. The Publications Office does not distribute copies of cost estimates.

## C. Offices of Senate Legal Counsel and House General Counsel

For over two decades the offices of Senate Legal Counsel and House General Counsel have developed parallel yet distinctly unique and independent roles as institutional legal "voices" of the two bodies they represent. Familiarity with the structure and operation of these offices and the nature of the support they may provide committees in the context of an investigative oversight proceeding is essential.

CRS-122

### A. Senate Legal Counsel.

The Office of Senate Legal Counsel[69] was created by Title VII of the Ethics in Government Act of 1978[70] "to serve the institution of Congress rather than the partisan interests of one party or another."[71] The counsel and deputy counsel are appointed by the president pro tempore of the Senate upon the recommendation of the majority and minority leaders. The appointment of each is made effective by a resolution of the Senate, and each may be removed from office by a resolution of the Senate. The term of appointment of the counsel and deputy counsel is two Congresses. The appointment of the counsel and deputy counsel and the counsel's appointment of assistant Senate Legal Counsel are required to be made without regard to political affiliation. The office is responsible to a bipartisan Joint Leadership Group, which is comprised of the majority and minority leaders, the president pro tempore, and the chairman and ranking minority member of the Committees on the Judiciary and on Rules and Administration.[72]

The act specifies the activities of the office, two of which are of immediate interest to committee oversight concerns: representing committees of the Senate in proceedings to aid them in investigations, and advising committees and officers of the Senate.[73]

### (1) Proceedings to Aid Investigations by Senate Committees

The Senate Legal Counsel may represent committees in proceedings to obtain evidence for Senate investigations. Two specific proceedings are authorized.

The first proceeding is under the law providing committees the authority to grant witness immunity (18 U.S.C. § 6005). It provides that a committee or subcommittee of either house of Congress may request an immunity order from a U.S. district court when the request has been approved by the affirmative vote of two-thirds of the members of the full committee. By the same vote, a committee may direct the Senate

---

[69] A full description of the Office of Senate Legal Counsel and its work may be found in Floyd M. Riddick and Alan S. Frumin, Riddick's Senate Procedure, S.Doc. 28, 101st Cong., 2nd sess. 1236 (1992). For a more recent discussion of the history, development and work of both the Senate and House counsels' offices, see Charles Tiefer, The Senate and House Counsel Offices: Dilemmas of Representing in Court the Institutional Congressional Client, Law and Contemporary Problems, vol. 61: no. 2, spring 1998:48-63.

[70] P.L. 95-520, secs. 701 et seq., 92 Stat. 1824, 1875 (1978), codified principally in 2 U.S.C. §§ 288, et seq.

[71] S.Rept. 95-170, 95th Cong., 2nd sess. 84 (1978).

[72] 2 U.S.C. 288(a) and (b), 288a.

[73] In addition, the office is called upon to defend the Senate, its committees, officers and employees in civil litigation relating to their official responsibilities or when they have been subpoenaed to testify or to produce Senate records; and to appear for the Senate when it intervenes or appears as amicus curiae in a lawsuit to protect the powers or responsibilities of Congress.

CRS-123

Legal Counsel to represent it or any of its subcommittees in an application for an immunity order.[74]

The second proceeding involves authority under the Ethics in Government Act of 1978 which permits the Senate Legal Counsel to represent a committee or subcommittee of the Senate in a civil action to enforce a subpoena. Prior to the Ethics Act, subpoenas of the Senate could be enforced only through the cumbersome method of a contempt proceeding before the bar of the Senate or by a certification to the U.S. attorney and a prosecution for criminal contempt of Congress under 2 U.S.C. §§ 192, 194. The Ethics Act authorizes the Senate to enforce its subpoenas through a civil action in the U.S. District Court for the District of Columbia.[75] The House chose not to avail itself of this procedure and this enforcement method applies only to Senate subpoenas. Senate subpoenas have been enforced in several civil actions. See, for example proceedings to hold in contempt a recalcitrant witness in the impeachment proceedings against Judge Alcee L. Hastings[76] and proceedings to enforce a subpoena *duces tecum* for the production of diaries of Senator Bob Packwood.[77]

The statute details the procedure for directing the Senate Legal Counsel to bring a civil action to enforce a subpoena. In contrast to an application for an immunity order, which may be authorized by a committee, only the full Senate by resolution may authorize an action to enforce a subpoena.[78] The Senate may not consider a resolution to direct the counsel to bring an action unless the investigating committee reports the resolution by a majority vote. The statute specifies the required contents of the committee report; among other matters, the committee must report on the extent to which the subpoenaed party has complied with the subpoena, the objections or privileges asserted by the witness, and the comparative effectiveness of a criminal and civil proceeding.[79] A significant limitation on the civil enforcement remedy is that it excludes from its coverage actions against officers or employees of the federal government acting within their official capacities, except where the refusal to comply is based on the assertion of a personal privilege or objection and not on a governmental privilege or objection that has been authorized by the executive branch.[80] Its reach is limited to natural persons and to entities acting or purporting to act under the color of state law.[81]

---

[74] 2 U.S.C. 288b(d)(2), 288f.

[75] 28 U.S.C. 1365.

[76] See S.Rept. 98, 101st Cong., 1st sess. (1989).

[77] See, *Senate Select Committee on Ethics v. Packwood,* 845 F.Supp 17 (D.D.C. 1994), *petition for stay pending appeal denied,* 510 U.S. 1319 (1994).

[78] 2 U.S.C. 288d and 28 U.S.C. 1365.

[79] 2 U.S.C. 288 d(c).

[80] See 28 U.S.C. 1365 (a).

[81] Id.

CRS-124

(2)  Advice to committees and officers of the Senate and other duties

The Ethics act details a number of advisory functions of the Office of Senate Legal Counsel.  Principal among these are the responsibility of advising Members, committees, and officers of the Senate with respect to subpoenas or requests for the withdrawal of Senate documents, and the responsibility of advising committees about their promulgation and implementation of rules and procedures for congressional investigations.  The office also provides advice about legal questions that arise during the course of investigations.[82]

The act also provides that the counsel shall perform such other duties consistent with the nonpartisan purposes and limitations of Title VII as the Senate may direct.[83] Thus, in 1980,  the office was used in the investigation relating to President Carter's brother, Billy, and his connection to Libya.  The office worked under the direction of the chairman and vice-chairman of the subcommittee charged with the conduct of that investigation.[84] Members of the office have also undertaken special assignments such as the Senate's investigation of "Abscam" and other undercover activities,[85] the impeachment proceedings of Judge Harry Claiborne,[86] Judge Walter L. Nixon, Jr.,[87] and Judge Alcee L. Hastings Jr., [88] and the confirmation hearings of Justice Clarence E. Thomas.  The office was called upon to assist in the Senate's conduct of the impeachment trial of President Clinton.

In addition, the counsel's office provides information and advice to Members, officers, and employees on a wide range of legal and administrative matters relating to Senate business.  Unlike the House practice, the Senate Legal Counsel plays no formal role in the review and issuance of subpoenas.  However, since it may become involved in civil enforcement proceedings, it has welcomed the opportunity to review proposed subpoenas for form and substance prior to their issuance by committees. The Office of Senate Legal Counsel can be reached at 224-4435.

## B.  House General Counsel.

The House Office of General Counsel has evolved since the mid-1970s, from its original role as a legal advisor to the Clerk of the House on a range of matters that fell within the jurisdiction of the Clerk's office, to that of counsel for the institution. At the beginning of the 103rd Congress, it was made a separate House office, reporting directly to the Speaker, charged with the responsibility "of providing legal

---

[82] 2 U.S.C. 288g(a)(5) and (6).

[83] 2 U.S. 288g(c).

[84] See S.Rept. 1015, 96th Cong., 2nd sess. (1980).

[85] See S.Rept. 682, 97th Cong., 2nd sess. (1982).

[86] See S.Rept. 812, 99th Cong., 2nd sess. (1986).

[87] See S.Rept. 164, 101st Cong., 1st sess. (1989).

[88] See S.Rept. 156, 101st Cong., 1st sess. (1989).

CRS-125

assistance and representation to the House."[89]  While the function and role of the House Office of General Counsel and Senate Legal Counsel with respect to oversight assistance to committees and protection of institutional prerogatives are similar, there are some differences that will be noted below.

The General Counsel, Deputy General Counsel, and other attorneys of the office are appointed by the Speaker and serve at his pleasure.[90]  The office "function[s] pursuant to the direction of the Speaker, who shall consult with a Bipartisan Legal Advisory Group," which consists of the Speaker himself, the Majority Leader, Majority Whip, Minority Leader, and Minority Whip.[91]  The office has statutory authority to appear before state or federal courts in the course of performing its functions.  2 U.S.C. § 130f.  The office may appear as amicus curiae on behalf of the Speaker and the Bipartisan Legal Advisory Group in litigation involving the institutional interests of the House.[92]  Where authorized by statute or resolution, the office may represent the House itself in judicial proceedings.[93]  The office also represents House officers in litigation affecting the institutional interests and prerogatives of the House.[94]  Finally, the office defends the House, its committees, officers, and employees in civil litigation relating to their official responsibilities, or when they have been subpoenaed to testify or to produce House records (*see* House Rule VIII).

Unlike Senate committees, House committees may only issue subpoenas under the seal of the Clerk of the House.  In practice, committees often work closely with the Office of General Counsel in drafting subpoenas and every subpoena issued by a committee is reviewed by the office for substance and form.  Committees frequently seek the advice and assistance of the Office of General Counsel in dealing with various asserted constitutional, statutory, and common-law privileges,[95] in

---

[89] See H. Res. 5, Sec. 11, 139 Cong. Rec. H5 (daily ed. Jan. 5, 1993).

[90] House Rule II(8) of the Rules of the 108th Congress.

[91] Id.

[92] See, e.g., *Elk Grove Unified School District v. Newdow*, 124 S. Ct. 2301 (2004); *Raines v. Byrd*, 521 U.S. 811 (1997); *Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183 (3d Cir. 1999); *United States v. McDade*, 28 F.3d 283 (3d Cir. 1994); *Cano v. Davis*, No. 01-8477 (C.D. Cal. March 28, 2002) (unpublished order granting motions to quash subpoenas to Members).

[93] See, e.g., *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (litigation in which the General Counsel was authorized by statute, P.L. 105-119, § 209(b) (1997), to represent the House in a challenge to the legality of the Department of Commerce's plan to use statistical sampling in the 2000 census).

[94] See, e.g., *Adams v. Clinton*, 90 F. Supp. 2d 35, *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940, 941 (2000); *Schaffer v. Clinton*, 240 F.3d 878 (10th Cir. 2001); *Skaggs v. Carle*, 110 F.3d 831 (D.C. Cir. 1997); *Newdow v. Eagen*, No. 02-01704 (D.D.C. filed March 24, 2004).

[95] See, e.g., H.Rep. 105-797, *In the Matter of Representative Jay Kim*, Committee on Standards of Official Conduct, 105th Cong., 2nd sess. 84-85 (Oct. 8, 1998)

CRS-126

responding to executive agencies and officials that resist congressional oversight,[96] and in navigating the statutory process for obtaining a contempt citation with respect to a recalcitrant witness.[97]

The Office of General Counsel represents the interests of House committees in judicial proceedings in a variety of circumstances. The office represents committees in federal court on applications for immunity orders pursuant to 18 U.S.C. § 6005; appears as amicus curiae in cases affecting House committee investigations;[98] defends against attempts to obtain direct or indirect judicial interference with congressional subpoenas or other investigatory authority;[99] represents committees seeking to prevent compelled disclosure of non-public information relating to their investigatory or other legislative activities;[100] and appears in court on behalf of committees seeking judicial assistance in obtaining access to documents or information such as documents that are under seal or materials which may be protected by Rule 6(e) of the Federal Rules of Criminal Procedure.[101]

Like the Senate Legal Counsel's office, the House General Counsel's office also devotes a large portion of its time to rendering informal advice to individual Members and committees. The office can be reached at (202) 225-9700. Its website address is [http://generalcounsel.house.gov/], which is available only to House offices.

---

[96] See, e.g., Hearing, "The Attorney General's Refusal to Provide Congressional Access to 'Privileged' Inslaw Documents," before the Subcommittee on Economic and Commercial Law, Committee on the Judiciary, 101st Cong., 2nd sess. 77-104 (Dec. 5, 1990).

[97] See, e.g., 132 Cong Rec. 3036-38 (1986) (floor consideration of contempt citation against two witnesses who refused to testify concerning alleged assistance provided to former Philippines President Ferdinand E. Marcos and his wife).

[98] See, e.g., *Dornan v. Sanchez*, 978 F. Supp. 1315, 1317 n.1 (C.D. Cal. 1997).

[99] See, e.g., *Harris v. Board of Governors*, 938 F.2d 720 (7th Cir. 1991); *United States v. United States House of Representatives*, 556 F. Sup.. 150 (D.D.C. 1983).

[100] See, e.g., *Pentagen Technologies Int'l, Ltd. v. Committee on Appropriations of the United States House of Representatives*, 20 F. Supp. 2d 41 (D.D.C. 1998), *aff'd* 194 F.3d 174 (D.C. Cir. 1998); *United States v. McDade*, No. 96-1508 (3d Cir. July 12, 1996) (unpublished order quashing subpoena to the Committee on Standards of Official Conduct); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995); *United States v. Arthur Andersen, LLP*, No. 02-121 (S.D. Tex. filed May 15, 2002) (unpublished order quashing subpoena to the Committee on Energy and Commerce).

[101] See, e.g., *In re Harrisburg Grand Jury*, 638 F. Supp. 43 (M.D. Pa. 1986). *Cf. United States v. Moussaoui*, No. 01-455-A, 2002 WL 1990900 (E.D. Va. Aug. 29, 2002) (order denying the "Expedited Motion of the United States for Clarification Regarding the Applicability of the Protective Order for Unclassified But Sensitive Material and Local Rule 57 to Information That May Be Made Public in Congressional Proceedings")

## D. Government Accountability Office (GAO)

The Government Accountability Office, formerly called the General Accounting Office (GAO), was established by the Budget and Accounting Act of 1921 (31 U.S.C. § 702) as an independent auditor of government agencies. Over the years, Congress has expanded GAO's audit authority, added new responsibilities and duties, and strengthened GAO's ability to perform independently of the executive branch. GAO is under the control and direction of the Comptroller General of the United States, who is appointed by the President with the advice and consent of the Senate for a term of 15 years.

GAO's core values define the organization and its people. These core values are accountability, integrity, and reliability.

### 1. Accountability.

Most GAO reviews are made in response to specific congressional requests. GAO is required to do work requested by committee chairmen and, as a matter of policy, assigns equal status to requests from ranking minority members. To the extent possible, GAO also responds to individual member requests. Other assignments are initiated pursuant to standing commitments to congressional committees, and some reviews are specifically required by law. Finally, some assignments are undertaken in accordance with GAO's basic legislative responsibilities. GAO staff are located in Washington and in offices across the United States.

**Types of Questions GAO Answers**

Is a federal program achieving the desired results, or are changes needed in government policies or management?

Are there better ways of accomplishing the objectives of a federal program at lower costs?

Is a government program being carried out in compliance with applicable laws and regulations, and are data furnished to Congress on the program accurate?

Do opportunities exist to eliminate waste and inefficient use of public funds?

Are funds being spent legally, and is accounting for them accurate?

## 2.  Integrity.

Integrity describes the high standards that GAO sets for itself in the conduct of its work.  GAO seeks to take a professional, objective, fact-based, fair and balanced approach to all of its activities.  Integrity is the foundation of its reputation and GAO's approach to its work.

### Products

GAO provides oral briefings, testimony, and written reports.  Written reports vary in format and content depending on the complexity of the assignment.  If agreements reached during early discussions differ substantially from the original request, GAO often confirms changes in writing to ensure a mutual understanding about the assignment.  Sometimes, agreements need to be altered as an assignment progresses.  For example, a requester's needs may change, the required data may be unavailable or unobtainable in the time allowed, or the methodology may need to be changed.  In these cases, GAO works with the requester to revise the assignment.  Again, substantial changes from previous agreements are often confirmed in writing.

Early communication with the requester also is important because:

> Similar or duplicate requests may be received.  GAO tries to consolidate assignments and provide copies of a report to each requester.

> An ongoing review may address (or may be revised to address) a requester's needs.  GAO works with the requester to ensure a satisfactory and prompt response.

> A recently completed review may adequately address a requester's concerns and make starting a new assignment unnecessary.

> GAO may not be the most appropriate agency to perform the assignment.  In those cases, GAO will suggest referring the assignment to the Congressional Budget Office, the Congressional Research Service, the inspector general of a particular agency, or the agency itself.  GAO remains available to help a requester if the information provided does not meet the requester's needs.

GAO strives to use its budget and staff resources effectively.  On occasion, the resources required by congressional requests exceed the supply of talent available within GAO.  Also, in some cases, the GAO staff most knowledgeable of a request's subject matter are engaged on other assignments and are not immediately available.  In either case, GAO will do everything possible to respond to a new congressional request.  However, it may be necessary to delay starting some requests.  In those cases, GAO seeks the requesters' help in setting priorities.

### 3. Reliability.

Reliability describes GAO's goal for how its work is viewed by Congress and the American public. GAO's objective is to produce high quality reports, testimony, briefings, legal opinions, and other products and services that are timely, accurate, useful, clear, and candid.

The effectiveness of GAO products derives from their quality and the way requesters and agency officials use them to improve government operations. GAO offers a range of products to communicate the results of its work. The type of product resulting from a particular assignment depends on the assignment's objectives and/or a requester's needs. In selecting a type of product, tradeoffs may be necessary in scope, detail, or time. GAO's products include written reports to Congress, committees, or individual members; testimony; and oral briefings.

### 4. Additional Services.

In addition to its audits and evaluations, GAO offers a number of other services.

a. **Office of Special Investigations**.

The Office of Special Investigations (OSI) conducts investigations for Congress and the Government Accountability Office (GAO). OSI's primary mission is to support the Congress by investigating allegations of illegal and improper conduct relating to federal funds, programs, and activities. OSI typically investigates allegations of fraud, corruption, abuse, ethics violations and conflicts of interest. Additionally, OSI performs security tests and reviews to determine whether security vulnerabilities exist in federal systems and facilities. OSI conducts it work in accordance with the standards established by the President's Council on Integrity and Efficiency (PCIE).

b. **Legal Services**

GAO provides various legal services. For example, upon request, GAO may render a legal decision or opinion on questions involving the use of, and accountability for, public funds or on other legal issues of interest to congressional committees. In addition, under a variety of statutes, GAO (1) oversees executive branch compliance with the Impoundment Control Act of 1974 and reviews and reports to Congress on proposed rescissions and deferrals of federal funds; (2) reviews all major rules proposed by federal agencies and provides reports to Congress; and (3) receives agency reports about vacancies in Presidentially appointed, Senate confirmed positions and issues legal opinions under the Federal Vacancies Reform Act of 1998. GAO publishes Principles of Federal Appropriations Law (known as the Red Book) and teaches a class that provides an orientation to

CRS-130

federal fiscal laws. GAO attorneys are available for informal technical assistance. Also, GAO, under the Competition in Contracting Act, provides an objective, independent, and impartial forum for the resolution of bid protests of awards of federal contracts.

c.    **Accounting and Financial Management Policy**

GAO prescribes accounting principles and standards for the executive branch. It also advises federal agencies on fiscal and other policies and procedures and prescribe standards for auditing government programs.

d.    **Audit/Evaluation Community Support**

GAO also provides other services to help the audit and evaluation community improve and keep abreast of current developments. For example, it publishes and distributes papers on current audit and evaluation methodologies and approaches; assists in various training programs sponsored by these organizations; and sponsors an international auditor fellowship program to help other nations achieve an effective audit/evaluation organization.

e.    **Committee Support**

Occasionally, GAO assigns staff to work directly for congressional committees. In these cases, the staff assigned represent a committee and not GAO.

## 5.    Obtaining GAO Services.

Congressional requesters are encouraged to contact GAO on an informal basis prior to submitting a written request. GAO staff are pleased to consult with requesters or their staffs and help them frame questions and issues and formulate strategies and approaches even before a request letter is written.

GAO encourages the continuation of close working relationships between requesters or their staffs and GAO. GAO's Office of Congressional Relations (512-4400) can help requesters identify an appropriate GAO point for contact. To request formally GAO assistance, write to:

The Honorable David M. Walker
Comptroller General of the United States
441 G Street NW
Washington, DC 20548

Information about GAO and the materials it produces can be obtained from its website at [http://www.gao.gov].

## E.  Office of Management and Budget (OMB)

The Office of Management and Budget, [http://www.omb.gov], came into existence in 1970; its predecessor agency, the Bureau of the Budget, dated back to 1921. Initially established as a unit in the Treasury Department, since 1939 the budget agency has been a part of the Executive Office of the President.

1. **Capabilities.**

   a. OMB is the *President's* agent for the management and implementation of policy, including the federal budget.

   b. OMB's *major* responsibilities include:

      1. Assisting the President in the preparation of the budget and development of a fiscal program.

      2. Supervising and controlling the administration of the budget, including transmittal to Congress of proposals for deferrals and rescissions .

      3. Keeping the President informed about agencies' activities (proposed, initiated, and completed), in order to coordinate efforts, expend appropriations economically, and minimize overlap and duplication.

      4. Administering the process of review of proposed and final agency files established by Executive Order 12866.

      5. Administering the process of review and approval of collections of information by federal agencies and reducing the burden of agency information collection on the public under the Paperwork Reduction Act of 1995.

      6. Overseeing the manner in which agencies disseminate information to the public (including electronic dissemination); how agencies collect, maintain, and use statistics; how agencies archives are maintained; how agencies develop systems for insuring privacy, confidentiality, security, and the sharing of information collected by the government; and how the government acquires and uses information technology, pursuant to the Paperwork Reduction Act of 1995.

      7. Studying and promoting better governmental management, including making recommendations to agencies regarding their administrative organization and operations.

CRS-132

8. Helping the President by clearing and coordinating the advice of agencies regarding legislative proposals and making recommendations about presidential action on legislation.

9. Assisting in the preparation, consideration, and clearance of executive orders and proclamations.

10. Planning and developing information systems that provide the President with program performance data.

11. Establishing and overseeing implementation of financial management policies and requirements for the federal government as required by the Chief Financial Officers Act of 1990.

12. Assisting in development of regulatory reform proposals and programs for paperwork reduction, and then the implementation of these initiatives.

13. Improving the economy and efficiency of the federal procurement process by providing overall direction for procurement policies, regulations, procedures, and forms.

14. Establishing policies and methods that reduce fraud, waste, and abuse, and coordinating the work of the inspectors general through the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency.

2. **Limitations.**

OMB is inevitably drawn into institutional and partisan struggles between the President and Congress. Difficulties for Congress notwithstanding, OMB is the central clearinghouse for executive agencies and is, therefore, a rich source of information for investigative and oversight committees.

## F. Budget Information

Since enactment of the 1974 Budget Act, as amended, Congress has more budgetary information than ever before. Extensive budgetary materials are also available from the executive branch. Some of the major sources of budgetary information are available on and off Capitol Hill. They include (1) the President and executive agencies (recall that under the Budget and Accounting Act of 1921, the President presents annually a national budget to Congress); (2) the Congressional Budget Office; (3) the House and Senate Budget Committees; (4) the House and Senate Appropriations Committees; and (5) the House and Senate legislative committees. In addition, the Government Accountability Office and the Congressional Research Service prepare fiscal and other relevant reports for the legislative branch.

Worth mention is that discretionary spending, the component of the budget that the Appropriations Committees oversee through the appropriations process, accounts for about one-third of federal spending. Other House and Senate committees, particularly Ways and Means and Finance, oversee more than $1 trillion in spending through reauthorizations, direct spending measures, and reconciliation legislation. In addition, Ways and Means and Finance oversee a diverse set of programs, including tax collection, tax expenditures, and some user fees, through the revenue process. The oversight activities of all of these committees is enhanced through the use of the diverse range of budgetary information that is available to them.

1. **Executive Branch Budget Products**

*Budget of the United States Government, Fiscal Year 2005* contains the Budget Message of the President and information on the President's 2005 budget proposals by budget function.

*Analytical Perspectives, Budget of the United States Government, Fiscal Year 2005* contains analyses that are designed to highlight specified subject areas or provide other significant presentations of budget data that place the budget in perspective.

The *Analytical Perspectives* volume includes economic and accounting analyses; information on Federal receipts and collections; analyses of federal spending; detailed information on Federal borrowing and debt; the Budget Enforcement Act preview report; current services estimates; and other technical presentations. It also includes information on the budget system and concepts and a listing of the federal programs by agency and account.

*Historical Tables, Budget of the United States Government, Fiscal Year 2005* provides data on budget receipts, outlays, surpluses or deficits, federal debt, and federal employment covering an extended time period — in most cases beginning in FY1940 or earlier and ending in FY2009. These are much longer time periods than those covered by similar tables in other budget documents. As much as possible, the data in this volume and all other historical data in the budget documents have been made consistent with the concept and presentation used in the 2001 budget, so the data series are comparable over time.

*Budget of the United States Government, Fiscal Year 2005 — Appendix* contains detailed information on the various appropriations and funds that constitute the budget and is designed primarily for the use of the Appropriations Committee. The Appendix contains more detailed financial information on individual programs and appropriation accounts than any of the other budget documents. It includes for each agency: the proposed text of appropriations language, budget schedules for each account, new legislative proposals, explanations of the work to be performed and the funds needed, and proposed general provisions applicable to the appropriations of entire agencies or groups of agencies. Information is also provided on certain activities whose outlays are not part of the budget totals. The *Appendix* is perhaps the most useful product in the President's initial budget submission for obtaining programmatic detail.

*Automated Sources of Budget Information.* The information contained in the above-listed documents is available in electronic format from the following sources: (1) CD-ROM. The CD-ROM contains all of the budget documents and software to support reading, printing, and searching for documents. The CD-ROM also has many of the tables in the budget in spreadsheet format. (2) Internet. All budget documents, including documents that are released at a future date, will be available for downloading in several formats from the Internet. To access documents through the website, use the following address: [http://www.gpo.gov/usbudget].

Several other points about the President's budget and executive agency budget products are worth noting. First, the President's budgetary communications to Congress continue after the January/February submission and usually include a series of budget amendments and supplementals, the Mid-Session Review, Statements of Administration Policy (SAPs) on legislation, and even revised budgets on occasion. Second, most of these additional communications are issued as House documents and are available on the Web from GPO Access or the OMB homepage (in the case of SAPs). Third, the initial budget products often do not provide sufficient information on the President's budgetary recommendations to enable committees to begin developing legislation, and that further budgetary information is provided in the "justification" materials (see below) and the later submission of legislative proposals. Finally, the internal executive papers (such as agency budget submissions to OMB) often are not made available to Congress.

## 2.  **Some Other Sources of Useful Budgetary Information**

a. *Committees on Appropriations.* The subcommittees of the House and Senate Appropriations Committees hold extensive hearings on the fiscal year appropriations requests of federal departments and agencies. The Appropriations Subcommittees typically print agency *justification material* with the hearing record of the federal officials concerning these requests.

Each federal department or agency submits *justification material* to the Committees on Appropriations. Their submissions can run from several hundreds of pages to over two thousand pages.

b. *Budget Committees.* House and Senate Budget Committees, in preparing to report the annual concurrent budget resolution, conduct hearings on overall federal budget policy. These hearings and other fiscal analyses made by these panels address various aspects of federal programs and funding levels which can be useful sources of information.

c. *Other Committees.* To assist the Budget Committees in developing the concurrent budget resolution, other committees are required to prepare "views and estimates" of programs in their jurisdiction. Committee views and estimates, usually packaged together and issued as a committee print, also may be a useful source of detailed budget data.

d. *Internal Agency Studies and Budget Reviews.* These agency studies and reviews are often conducted in support of budget formulation and can yield useful

information about individual programs. The budgeting documents, evaluations, and priority rankings of individual agency programs can provide insights into executive branch views of the importance of individual programs.

## G. Beneficiaries, Private Organizations, and Interest Groups

Committees and Members can acquire useful information about executive branch programs and performance from the beneficiaries of those programs, private organizations, and interest groups. An effective oversight device, for example, is to ask beneficiaries how well federal programs and services are working. A variety of methods might be employed to solicit the views of those on the receiving end of federal programs and services, including investigations and hearings, field and on-site meetings, surveys and opinion polls, and websites. The results of such efforts can assist committees in obtaining policy-relevant information about program performance and in evaluating the problems people might be having with federal administrators and agencies.

There are numerous think tanks, universities, or associations, for instance, that periodically conduct studies of public policy issues and advise Members and others on how well federal agencies and programs are working. Similarly, numerous interest groups are active in monitoring areas such as civil rights, education, or health and they are not reluctant to point out alleged bureaucratic failings to committees and Members. Some of these groups may also assist committees and Members in bringing about improvements in agencies and programs.

There are also scores of social, political, scientific, environmental, and humanitarian nongovernmental organizations (NGOs) located around the world. Working with governments, corporations, foundations, and other entities are such NGOs as Greeenpeace, Amnesty International, the World Resources Institute, the Red Cross, and the Save the Children Fund. Many NGOs might provide valuable assistance to congressional overseers because they "do legal, scientific, technical, and policy analysis; provide services; shape, implement, monitor, and enforce national and international commitments; and change institutions and norms."[102]

---

[102]    Jim Bencivenga, "Critical Mass," *Christian Science Monitor*, February 3, 2000, p. 15. Also see "NGOs," *The Economist*, January 29, 2000, pp. 25-27.

CRS-136

# Selected Readings

**General**

Bimber, Bruce. "Information as a Factor in Congressional Politics," Legislative Studies Quarterly, v. XVI, November 1991: 585-605.

Carnegie Commission on Science, Technology, and Government. Science, Technology, and Congress: Analysis and Advice from the Congressional Support Agencies. Washington: The Carnegie Commission, 1991. 70p.

Chubb, John E. Interest Groups and the Bureaucracy. Stanford, Calif.: Stanford University Press, 1983. 319p.

Gilmour, Robert S. and Alexis A. Halley, eds. Who Makes Public Policy? Chatham, N.J.: Chatham House Publishers, Inc., 1994. 390p.          JK585.W48

Heinz, John P., et al. The Hollow Core: Private Interests in National Policy Making. Cambridge, Mass.: Harvard University Press, 1993. 450p.
                                                                JK1118.H55

U.S. Congress. Joint Committee on the Organization of Congress. Support Agencies. Hearing before the Joint Committee on the Organization of Congress. 103rd Congress, 1st session, June 10, 1993, Washington: GPO, 1993. 1577p.                                                          KF25.O7

**Congressional Research Service [http://www.crs.gov]**

Carney, Eliza Newlin. "Billington's Book Wars," National Journal, v. 24, March 21, 1992: 695- 698.

Cole, John Y. "Jefferson's Legacy: A Brief History of the Library," Library of Congress Bulletin, v. 50, April 8, 1991: 124-130.

Dalrymple, Helen. "Congressional Research Service: Think Tank, Policy Consultant and Information Factory," Library of Congress Information Bulletin, v. 49, September 24, 1990: 319-326.

Gude, Gilbert. "Congressional Research Service: the Research and Information Arm of Congress," Government Information Quarterly, v. 2, January 1985: 5-11.

Robinson, William H. "The Congressional Research Service: Policy Consultant, Think Tank, and Information Factory," In Organizations for Policy Analysis: Helping Government Think. edited by Carol H. Weiss. Newbury Park, Calif.: Sage Publications, 1992, pp. 181-200.

CRS-137

**General Accounting Office [http://www.gao.gov]**

Abikoff, Kevin T.  "The Role of the Comptroller General in Light of Bowsher v. Synar," Columbia Law Review, v. 87, November 1987:  1539-1563.

Kaiser, Frederick M.  GAO: Government Accountability Office and General Accounting Office.  CRS Report RL30349, updated regularly.

——.  GAO Versus the CIA: Uphill Battles Against an Overpowering Force. International Journal of Intelligence and Counterintelligence, v. 15, 2002: 330-389.

Mosher, Frederick C.  A Tale of Two Agencies:  A Comparative Analysis of the General Accounting Office and the Office of Management and Budget.  Baton Rouge, La.:  Louisiana State University Press, 1984.  219 p.

HJG802.M682

Rozell, Mark J. "The Role of General Accounting Office Evaluation in the Post Reform Congress:  The Case of General Revenue Sharing," International Journal of Public Administration, v. 7,   September 1985:  267-290.

U.S.  Congress.  House. Committee on the Budget.  Addressing Government Waste, Fraud, and Abuse. 108th Congress, 1st session. Washington: GPO, 2003.  421 p.

U.S.  Congress.  Senate.  Committee on Governmental Affairs.  The Roles, Mission and Operation of the U.S. General Accounting Office.  Report Prepared by the National Academy of Public Administration. Senate Print 103-87, 103 Congress, 2nd session. Washington: GPO, 1994.  106 p.

U.S. Congress.  House.  Committee on Rules.  Congressional Oversight: A "How-To" Series of Workshops.  Committee Print.  106th Congress, 1st session. Washington: GPO, 2000.  See pp. 90-143.

U.S.  General Accounting Office.  GAO History, 1921-1991, by Roger R. Trask. GAO Report OP-3-MP.  (Washington: GAO, 1991).

U.S. Government Accountability Office.  Strategic Plan [http://www.GAO.GOV].

**Congressional Budget Office [http://www.cbo.gov]**

Howard, James A. "Government Economic Projections:  A Comparison Between CBO and OMB,"  Public Budgeting & Finance, v. 7, Autumn 1987:  14-25.

Keith, Robert and Allen Schick.  Manual on the Federal Budget Process, CRS Report 98-720. GOV, August 28, 1998.

——and Mary Francis Bley.  Congressional Budget Office: Appointment and Tenure of the Director and Deputy Director.  CRS Report RL31880, October 29, 2003.

CRS-138

Schick, Allen. Congress and Money. Washington, D.C.: The Urban Institute, 1980. 604p.                                                                                     HJ2051.S34

Twogood, R. Philip. "Reconciling Politics and Budget Analysis: The Case of the Congressional Budget Office," Public Budgeting and Financial Management, v. 3, no. 1, 1991: 65-87.

**Offices of Senate Legal Counsel and House General Counsel**

Salokar, Rebecca Mae. "Legal Counsel for Congress: Protecting Institutional Interests," Congress and the Presidency. vol. 20, No. 2, Autumn 1993: 131-155.

Tiefer, Charles. "The Senate and House Counsel Offices: Dilemmas of Representing in Court the Institutional Congressional Client," Law and Contemporary Problems, v. 61, Spring 1998: 48-63.

# Appendix D

## Congressional Oversight Video Series

**Oversight: A Key Congressional Function.** Former Representative Lee Hamilton delivered the keynote address to a 1999 series of CRS programs examining various aspects of congressional oversight. In this program, Mr. Hamilton emphasizes the importance of traditional oversight and reviews factors that contribute to successful oversight.
Program Length: 60 minutes. Product No.: MM70003.

**The Constitutional Context of Oversight.** Michael Stern, senior counsel with the House General Counsel's Office, and Michael Davidson, former Senate Legal Counsel, discuss the constitutional context of oversight. In addition, the two attorneys address a variety of oversight topics, including congressional investigations. Taped as part of a 1999 series of CRS programs examining various aspects of congressional oversight.
Program Length: 60 minutes. Product No.: MM70004.

**The "Rules & Tools" of Oversight.** This program focuses on the formal institutional rules that committees must follow to insure the legitimacy and fairness of oversight proceedings. The nature of the formidable powers of inquiry available to congressional committees and the practicalities of their effective utilization are also explored. Taped as part of a 1999 series of CRS programs examining various aspects of congressional oversight.
Program Length: 60 minutes. Product No.: MM70005.

**Sources of Oversight Assistance.** This session focuses on where congressional committees can obtain assistance in conducting oversight. Especially relevant are inspectors general, chief financial officers, and Congress's own support agencies, the Congressional Budget Office, Congressional Research Service, and General Accounting Office. Taped as part of a 1999 series of CRS programs examining various aspect of congressional oversight.
Program Length: 46 minutes. Product No.: MM70006.

**Fiscal Oversight: "Follow the Money."** This seminar examines congressional oversight of fiscal and budgetary activities, focusing on the role of the House and Senate Appropriations Committees in the annual budget cycle and key support activities of the Congressional Budget Office to Congress on budgetary matters generally. Taped as part of a 1999 series of CRS programs examining various aspects of congressional oversight.
Program Length: 45 minutes. Product No.: MM70007.

**Outside Actors in the Oversight Process.** This program addresses how non-congressional individuals can assist in the investigative process and in monitoring executive branch performance. The panel includes a journalist, members of public

CRS-140

and private interest groups, and a former counsel with the House Commerce Committee, Subcommittee on Oversight and Investigations. Taped as part of a 1999 series of CRS programs examining various aspects of congressional oversight.
Program Length: 50 minutes. Product No.: MM70008.

**Preparing for an Oversight Investigation.** This program probes the "ins and outs" of how to prepare for Congressional Investigations from the perspective of both the investigator and those being investigated Taped as part of a 1999 series of CRS programs examining various aspects of congressional oversight.
Program Length: 59:50. Product No.: MM70009.

VHS copies of CRS video programs are available on loan to congressional offices. The soundtracks of many television programs are also available on audio cassettes. For the schedule of CRS Programs on Channel 6 of the House and Channel 5 of the Senate, call 7-7009. For further information about any of these programs, please call 7-7547.

# Exhibit 10

# CRS Report for Congress

*Redistributed as a Service of the <u>National Library for the Environment</u>\**

# Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry

**Morton Rosenberg,**

Specialist in American Public Law
American Law Division

**April 7, 1995**

**95-464 A**

**CONTENTS:**

Summary
Introduction
The Legal Basis for Oversight
The Tools of Oversight

-The Subpoena Power
-Staff Depositions
-Congressional Grants of Immunity

Enforcement of the Investigative Power

-The Contempt Power
    -Inherent Contempt
    -Statutory Contempt
    -Civil Contempt
    -Alternatives to Contempt

        -Perjury and False Statements Prosecutions
        -Testimony Under Oath
        -Unsworn Statements

Investigating the Executive Branch

-Presidential Claims of Executive Privilege
-Effect of Statutory Prohibitions on Public Disclosure on Congressional Access
-Accessing Information in Open and Closed Civil and Criminal Proceedings: The Special Problem of Overseeing the Justice Department
-Access to Grand Jury Materials

Investigative Oversight Hearings

-Jurisdiction and Authority
-Rules Applicable to Hearings
-Conducting Hearings
-Constitutional and Common Law Testimonial Privileges of Witnesses
        -Constitutional Privileges
            -Fifth Amendment
            -First Amendment
            -Fourth Amendment

                -The Common Law Attorney-Client and Work Product
                Privileges
                -The Nature and Development of Congress' Discretionary
                Control Over Witness' Claims of Privilege
                -Requirements for Assertion of the Attorney-Client
                Privilege
                -Waiver of the Attorney-Client Privilege
                -Exceptions to the Attorney-Client Privilege

Rights of Minority Party Members in the Investigatory Process
Role of the Office of Senate Legal Counsel and House General Counsel

        -Senate Legal Counsel
            -Proceedings to Aid Investigations by Senate Committees
            -Advice to Committees and Officers of the Senate and Other Duties

            -House General Counsel

SELECTED READINGS

**Summary**

The adversarial, often confrontational, and sometimes high profile nature of congressional investigations sets it apart from the more routine, accommodative facets of the oversight process experienced in authorization, appropriations or confirmation exercises. While all aspects of legislative oversight share the common goals of informing Congress so as to best accomplish its tasks of developing legislation, monitoring the implementation of public policy, and of disclosing to the public how its government is performing, the inquisitorial process also sustains and vindicates Congress' role in our constitutional scheme of separated powers and checks and balances. The rich history of congressional investigations from the failed St. Clair expedition in 1792 through Teapot Dome, Watergate, Iran-Contra and Whitewater has established, in law and practice, the nature and contours of congressional prerogatives necessary to maintain the integrity of the legislative role in that constitutional scheme.

This report will provide an overview of some of the more common legal, procedural and practical issues, questions, and problems that committees have faced in the course of an investigation. Following a summary of the case law developing the scope and limitations of the power of inquiry, the essential tools of investigative oversight--subpoenas, staff interviews and depositions, grants of immunity, and the contempt power -- are described. Next, some of the special problems of investigating the executive are detailed, with particular emphasis on claims of presidential executive privilege, the problems raised by attempts to access information with respect to open or closed civil or criminal investigative matters, or to obtain information that is part of the agency

deliberative process, and the effect on congressional access of statutory prohibitions on public disclosure. The discussion then focuses on various procedural and legal requirements that accompany the preparation for, and conduct of, an investigative hearing, including matters concerning jurisdiction, particular rules and requirements for the conduct of such proceedings, and the nature, applicability and scope of certain constitutional and common law testimonial privileges that may be claimed by witnesses. The case law and practice respecting the rights of minority party members during the investigative process is also reviewed. The report concludes with a description of the roles played by the offices of House General Counsel and Senate Legal Counsel in such investigations.

## I. INTRODUCTION

The adversarial, often confrontational, and sometimes high profile nature of congressional investigations sets it apart from the more routine, accommodative facets of the oversight process experienced in authorization, appropriations or confirmation exercises.[1] While all aspects of legislative oversight share the common goals of informing Congress so as to best accomplish its tasks of developing legislation, monitoring the implementation of public policy, and of disclosing to the public how its government is performing, the inquisitorial process also sustains and vindicates Congress' role in our constitutional scheme of separated powers and checks and balances. The rich history of congressional investigations from the failed St. Clair expedition in 1792 through Teapot Dome, Watergate, Iran-Contra and Whitewater has established, in law and practice, the nature and contours of congressional prerogatives necessary to maintain the integrity of the legislative role in that constitutional scheme.

This report will provide an overview of some of the more common legal, procedural and practical issues, questions, and problems that committees have faced in the course of an investigation. Following a summary of the case law developing the scope and limitations of the power of inquiry, the essential tools of investigative oversight--subpoenas, staff interviews and depositions, grants of immunity, and the contempt power -- are described. Next, some of the special problems of investigating the executive are detailed, with particular emphasis on claims of presidential executive privilege, the problems raised by attempts to access information with respect to open or closed civil or criminal investigative matters, or to obtain information that is part of the agency deliberative process, and the effect on congressional access of statutory prohibitions on public disclosure. The discussion then focuses on various procedural and legal requirements that accompany the preparation for, and conduct of, an investigative hearing, including matters concerning jurisdiction, particular rules and requirements for the conduct of such proceedings, and the nature, applicability and scope of certain constitutional and common law testimonial privileges that may be claimed by witnesses. The case law and practice respecting the rights of minority party members during the investigative process is also reviewed. The report concludes with a description of the roles played by the offices of House General Counsel and Senate Legal Counsel in such investigations.

## II. THE LEGAL BASIS FOR OVERSIGHT

Numerous Supreme Court precedents establish and support a broad and encompassing power in the Congress to engage in oversight and investigation that reaches all sources of information that enable it to carry out its legislative function. In the absence of a countervailing constitutional privilege or a self-imposed statutory restriction upon its authority, Congress and its committees, have virtually, plenary power to compel information needed to discharge its legislative function from executive agencies, private persons and organizations, and within certain constraints, the information so obtained may be made public.

More particularly, although there is no express provision of the Constitution which specifically authorizes the Congress to conduct investigations and take testimony for the purposes of performing its legitimate functions, numerous decisions of the Supreme Court have firmly established that the investigatory power of Congress is so essential to the legislative function as to be implicit in the general vesting of legislative power in Congress.[2] Thus, in *Eastland v. United States Servicemen's Fund* the Court explained that "[t]he scope of its power of inquiry ... is as penetrating and far-reaching as the potential power to enact and appropriate under the

Constitution."[3] In *Watkins v. United States* the Court further described the breadth of the power of inquiry: "The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statues."[4] The Court went on to emphasize that Congress' investigative power is at its peak when the subject is alleged waste, fraud, abuse, or maladministration within a government department. The investigative power, it stated, "comprehends probes into departments of the Federal Government to expose corruption, inefficiency, or waste."[5] "[T]he first Congresses", it continued, held "inquiries dealing with suspected corruption or mismanagement of government officials"[6] and subsequently, in a series of decisions, "[t]he Court recognized the danger to effective and honest conduct of the Government if the legislative power to probe corruption in the Executive Branch were unduly hampered."[7] Accordingly, the Court stated, it recognizes "the power of the Congress to inquire into and publicize corruption, maladministration, or inefficiencies in the agencies of Government."[8]

But while the congressional power of inquiry is broad, it is not unlimited. The Supreme Court has admonished that the power to investigate may be exercised only "in aid of the legislative function"[9] and cannot be used to expose for the sake of exposure alone. The *Watkins* Court underlined these limitations: "There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress ... nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself, it must be related to, and in furtherance of, a legitimate task of the Congress."[10] Moreover, an investigating committee has only the power to inquire into matters within the scope of the authority delegated to it by its parent body.[11] But once having established its jurisdiction and authority, and the pertinence of the matter under inquiry to its area of authority, a committee's investigative purview is substantial and wide-ranging.[12]

The foundation cases establishing Congress' broad power to probe are illustrative and illuminating. They arose out of the Teapot Dome investigations, the 1920's scandal regarding oil company payoffs to officials in the Harding Administration. A major concern of the congressional oversight investigation was the failure of Attorney General Harry M. Daugherty's Justice Department to prosecute the alleged government malefactors. When congressional committees attempting to investigate came up against refusals by subpoenaed witnesses to provide information, the issue went to the Supreme Court and provided it with the opportunity to issue a seminal decision describing the constitutional basis and reach of congressional oversight. In *McGrain v. Daugherty,* [13] the Supreme Court focused specifically on Congress' authority to study "charges of misfeasance and nonfeasance in the Department of Justice." The Court noted with approval that "the subject to be investigated" by the congressional committee "was the administration of the Department of Justice -- whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes ...."[14] In its decision, the Court sustained the contempt arrest of the Attorney General's brother for withholding information from Congress, since Congress "would be materially aided by the information which the investigation was calculated to elicit."[15] Thus, the Supreme Court unequivocally precluded any blanket claim by the Executive that oversight could be barred regarding "whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings."[16]

In another Teapot Dome case that reached the Supreme Court, *Sinclair v. United States,*[17] a different witness at the congressional hearings refused to provide answers, and was prosecuted for contempt of Congress. The witness had noted that a lawsuit had been commenced between the government and the Mammoth Oil Company, and declared, "I shall reserve any evidence I may be able to give for those courts. ... and shall respectfully decline to answer any questions propounded by your committee."[18] The Supreme Court upheld the witness's conviction for contempt of Congress. The Court considered and rejected in unequivocal terms the witness's contention that the pendency of lawsuits gave an excuse for withholding information. Neither the laws directing that such lawsuits be instituted, nor the lawsuits themselves, "operated to divest the Senate, or the committee, of power further to investigate the actual administration of the land

laws."[19]

The Court further explained: "It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits."[20] In other words, those persons having evidence in their possession, including officers and employees of executive agencies, can not lawfully assert that because lawsuits are pending involving the government, "the authority of [the Congress], directly or through its committees, to require pertinent disclosures" is somehow "abridged."

The Supreme Court in the Teapot Dome cases therefore enunciated in the clearest manner the independence of Congress' power to probe. The coincidental focus on the Justice Department and the ability of committees to look deeply into all aspects of its sensitive law enforcement function underlines the potential breadth of that power with respect to other Executive Branch agencies and private sector entities as well.

## III. THE TOOLS OF OVERSIGHT

### A. The Subpoena Power

The power of inquiry, with the accompanying process to enforce it, has been deemed "an essential and appropriate auxiliary to the legislative function."[21] A properly authorized subpoena issued by a committee or subcommittee has the some force or effect as a subpoena issued by the parent House itself.[22] To validly issue a subpoena, individual committees or subcommittees must be delegated this authority. Both Senate[23] and House[24] rules presently empower all standing committees and subcommittee to require the attendance and testimony of witnesses and the production of documents. Special or select committees must be specifically delegated that authority by Senate or House resolution.[25] The rules or practices of standing committees may restrict the issuance of subpoenas only to full committees or in certain instances allow issuance by a committee chairman alone, with or without the concurrence of the ranking minority member.

As previously indicated, committees may issue subpoenas in furtherance of an investigation within their subject matter jurisdiction as defined by Senate[26] and House[27] rules which confer both legislative and oversight jurisdiction. Subpoenas may be issued on the basis of either source of authority.

Congressional subpoenas are most frequently served by the U.S. Marshal's office or by committee staff, or less frequently by the Senate or House Sergeants-at-Arms. Service may be effected anywhere in the United States. The subpoena power reaches aliens present in the United States. [28] Securing compliance of United States nationals and aliens residing in foreign countries presents more complex problems.[29]

A witness seeking to challenge the legal sufficiency of a subpoena, *i.e.*, the committee's authority, alleged constitutional rights violations, subpoena breadth, has only limited remedies available to raise such objections. The Supreme Court has ruled that courts may not enjoin the issuance of a congressional subpoena, holding that the Speech or Debate Clause of the Constitution[30] provides "an absolute bar to judicial interference" with such compulsory process.[31] As a consequence, a witness' sole remedy generally is to refuse to comply, risk being cited for contempt, and then raise objections as a defense in a contempt prosecution.

Challenges to the legal sufficiency of subpoenas must overcome formidable judicial obstacles. The standard to be applied in determining whether the congressional investigating power has been properly asserted was articulated in *Wilkinson* v. *United States*: (1) the committee's investigation of the broad subject matter area must be authorized by Congress; (2) the investigation must be pursuant to "a valid legislative purpose"; and (3) the specific inquiries must be pertinent to the

broad subject matter areas which have been authorized by the Congress.[32]

With respect to authorization, a committee's authority derives from the enabling rule or resolution of its parent body. In construing the scope of such authorizations, the Supreme Court has adopted a mode of analysis not unlike that ordinarily followed in determining the meaning of a statute: it looks first to the words of the authorizing rule or resolution itself, and then, if necessary, to the usual sources of legislative history, including floor statements, reports and past committee practice.[33]

As to the requirement of "valid legislative purpose," the Supreme Court has made it clear that Congress does not have to state explicitly what it intends to do as a result of an investigation.[34] When the purpose asserted is supported by reference to specific problems which in the past have been, or in the future may be, the subject of appropriate legislation, it has been held that a court cannot say that a committee of Congress exceeds its power when it seeks information in such areas.[35]

Finally, in determining the pertinency of questions to the subject matter under investigation, the courts have required only that the specific inquiries be reasonably related to the subject matter under investigation.[36] An argument that pertinence must be shown "with the degree of explicitness and clarity required by the Due Process Clause" has been held to confuse the standard applicable in those rare cases when the constitutional rights of individuals are implicated by congressional investigations with the far more common situation of the exercise of legislative oversight over the administration of the law which does not involve an individual constitutional right or prerogative. It is, of course, well established that the courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members.[37] But "[w]here constitutional rights are not violated, there is no warrant to interfere with the internal procedures of Congress."[38]

## B. Staff Depositions

Committees normally rely on informal staff interviews to gather information preparatory to investigatory hearings. However, with more frequency in recent years, congressional committees have utilized staff conducted depositions as a tool in exercising the investigatory power.[39] Staff depositions afford a number of advantages for committees engaged in complex investigations. Staff depositions may assist committees in obtaining sworn testimony quickly and confidentially without the necessity of Members devoting time to lengthy hearings which may be unproductive because witnesses do not have the facts needed by the committee or refuse to cooperate. Depositions are conducted in private and may be more conducive to candid responses than would be the case at a public hearing. Statements made by witnesses that might defame or even tend to incriminate third parties can be verified before they are repeated in an open hearing. Depositions can enable a committee to prepare for the questioning of witnesses at a hearing or provide a screening process which can obviate the need to call some witnesses. The deposition process also allows questioning of witnesses outside of Washington thereby avoiding the inconvenience of conducting field hearings requiring the presence of Members.

Certain disadvantages may also inhere. Unrestrained staff may be tempted to engage in tangential inquiries. Also depositions present a "cold record" of a witness's testimony and may not be as useful for Members as in person presentations. Finally, in the current absence of any definitive case law precedent, legal questions may be raised concerning the ability to enforce a subpoena for a staff deposition by means of contempt sanctions, and to the applicability to such a deposition of various statutes that proscribe false material statements.[40]

At present neither House has rules that expressly authorize staff depositions. On a number of occasions such specific authority has been granted pursuant to Senate and House resolutions.[41] When granted, a committee will normally adopt procedures for taking depositions, including provisions for notice (with or without a subpoena), transcription of the deposition, the right to be accompanied by counsel, and the manner in which objections to questions are to be resolved.[42]

## C. Congressional Grants of Immunity

The Fifth Amendment to the Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself ... " The privilege against self-incrimination is available to a witness in a congressional investigation.[43] When a witness before a committee asserts his constitutional privilege, the committee may obtain a court order which compels him to testify and grants him immunity against the use of his testimony and information derived from that testimony in a subsequent criminal prosecution. He may still be prosecuted on the basis of other evidence.

The privilege against self-incrimination is an exception to the public's right to every person's evidence. However, a witness' Fifth Amendment privilege can be restricted if the government chooses to grant him immunity. Immunity is considered to provide the witness with the constitutional equivalent of his Fifth Amendment privilege.[44] Immunity grants may be required in the course of an investigation because "many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime."[45] Such grants may be militated when a committee is convinced that the testimony elicited will produce new or vital facts that would otherwise be unavailable or to allow a witness to implicate persons of greater rank or authority. Grants of immunity have figured prominently in a number of major congressional investigations, including Watergate (John Dean and Jeb Magruder) and Iran-Contra (Oliver North and John Poindexter).

The scope of the immunity which is granted, and the procedure to be employed, are outlined in 18 U.S.C. §§ 6002, 6005. If a witness before the House or Senate or a committee or subcommittee of either body asserts his privilege, or if a witness who has not yet been called is expected to assert his privilege, an authorized representative of the House or of the committee may apply to a federal district court for an order directing the individual to testify or provide other information sought by the Congress.[46] If the testimony is to be before the full House or Senate, the request for the court order must be approved by an affirmative vote of a majority of the Members present of the House or Senate. If the testimony is to be given before a committee or subcommittee, the request for the order must be approved by an affirmative vote of two-thirds of the Members of the full committee. [47]

At least ten days prior to applying to the court for the order, the Attorney General[48] must be notified of the Congress' intent to seek the order,[49] and issuance of the order will be delayed by the court for as much as twenty additional days at the request of the Attorney General.[50] Notice to the Attorney General is required so that he can identify in his files any information which would provide an independent basis for prosecuting the witness, and place that information under seal. Neither the Attorney General nor an independent counsel would have a right to veto a committee's application for immunity.[51] The role of the court in issuing the order is ministerial and therefore, if the procedural requirements under the statutes are met, the court may not refuse to issue the order or impose conditions on the grant of immunity.[52] However, although the court lacks power to review the advisability of granting immunity, it might be able to consider the jurisdiction of Congress and the committee over the subject area and the relevance of the information that is sought to the committee's inquiry.[53]

After an immunity order has been issued by the court and communicated to the witness by the chairman, the witness can no longer decline to testify on the basis of his privilege, "but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."[54] The immunity that is granted is "use" immunity, not "transactional" immunity.[55] That is, neither the immunized testimony that the witness gives to the committee, nor information derived from that testimony, may be used against him in a subsequent criminal prosecution, except one for falsely testifying to the committee or for contempt. However, he may be convicted of the crime (the "transaction") on the basis of evidence independently obtained by the prosecution and sealed before his congressional testimony, and/or on the basis of information obtained after his

congressional appearance but which was not derived, either directly or indirectly, from his congressional testimony.

In determining whether to grant immunity to a witness, a committee may consider, on the one hand, its need for his testimony in order to perform its legislative, oversight, and informing functions, and on the other, the possibility that the witness' immunized congressional testimony could jeopardize a successful criminal prosecution against him. If a witness is prosecuted after giving immunized testimony, the burden is on the prosecutor to establish that the case was not based on the witness' previous testimony or evidence derived therefrom.[56]

Recent appellate court decisions reversing the convictions of key Iran-Contra figures Lt. Colonel Oliver North[57] and Rear Admiral John Poindexter[58] appear to make the prosecutorial burden substantially more difficult, if not insurmountable, in high profile cases. Despite extraordinary efforts by the Independent Counsel and his staff to avoid being exposed to any of North's or Poindexter's immunized congressional testimony, and the submission of sealed packets of evidence to the district court to show that the material was obtained independently of any immunized testimony to Congress, the appeals court in both cases remanded the cases for a further determination whether the prosecution had directly or indirectly used immunized testimony.

The court of appeals in *North* emphasized that the insulation of the prosecution from exposure to the immunized congressional testimony does not automatically prove that this testimony was not used against the defendant.[59] The court held that "*Kastigar* is instead violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of how or by whom he was exposed to that compelled testimony."[60] From this the court reasoned that "the use of immunized testimony . . . to augment or refresh recollection is an evidentiary use" and must therefore be strictly scrutinized under the *Kastigar* standard.[61] Thus, the court of appeals held that the presentation of "testimony of grand jury or trial witnesses that has been derived from or influenced by the [defendant's] immunized testimony" was a forbidden use of the compelled testimony under the Fifth Amendment and *Kastigar*.[62]

Upon remanding the case to the district court, the court of appeals insisted that a strict application of the *Kastigar* test be applied to the government's evidence if the prosecution of *North* was to continue. The lower court was required to hold a full *Kastigar* hearing that would:

> inquire into the content as well as the sources of the grand jury and trial witnesses' testimony. That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item. For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the Office of Independent Counsel in questioning the witness. This burden may be met by establishing that the witness was never exposed to North's immunized testimony, or that the allegedly tainted testimony contains no evidence not "canned" by the prosecution before such exposure occurred.[63]

Similarly, in *Poindexter*, the D.C. Circuit Court of Appeals reversed all five of Poindexter's convictions because the Independent Counsel failed to show that Poindexter's compelled testimony was not used against him at his trial, in violation of 18 U.S.C. § 6002 and the Fifth Amendment.[64] Relying on the *North* standards outlined above, the appeals court held that the testimony of many of the prosecution's key witnesses, including that of Oliver North himself, was impermissibly influenced by the witnesses' exposure to Poindexter's immunized testimony for purposes of refreshment.[65] Upon remand in both cases, the Independent Counsel moved to dismiss the prosecutions upon his determination that he could not meet the strict standards set by the appeals court in its decisions.

While the *North* and *Poindexter* rulings in no way diminish a committee's authority to immunize testimony or the manner in which it secures immunity pursuant to the statute, it does alter the calculus as to whether to seek such immunity. Independent Counsel Lawrence E. Walsh observed

that "[t]he legislative branch has the power to decide whether it is more important perhaps even to destroy a prosecution than to hold back testimony they need. They make that decision. It is not a judicial decision or a legal decision but a political decision of the highest importance."[66] It has been argued that the constitutional dimensions of the crisis created by the Iran-Contra affair required the type of quick, decisive disclosures that could result from a congressional investigation but not from the slower, more deliberate criminal investigation and prosecution process.[67] Under this view, the demands of a national crisis may justify sacrificing the criminal prosecution of those involved in order to allow Congress to uncover and make public the truth of the matter at issue. The role of Congress as overseer, informer, and legislator arguably warrants this sacrifice. The question becomes more difficult as the sense of national crisis in a particular circumstance is less acute, and the object is, for example, to trade-off a lesser figure in order to reach someone higher up in a matter involving "simple" fraud, abuse or maladministration at an agency. In the end, case-by-case assessments by congressional investigators will be needed, guided by the sensitivity that these are political judgments.

## IV. ENFORCEMENT OF THE INVESTIGATIVE POWER

### A. The Contempt Power

While the threat or actual issuance of a subpoena often provides sufficient leverage for effective compliance with investigative information demands, it is through the contempt power that Congress may act with ultimate force in response to actions which obstruct the legislative process in order to punish the contemnor and/or to remove the obstruction. The Supreme Court early recognized the power as an inherent attribute of Congress' legislative authority, reasoning that if it did not possess this power, it "would be exposed to every indignity and interruption that rudeness, caprice or even conspiracy may mediate against it."[68]

There are three different kinds of contempt proceedings available. Both the House and Senate may cite a witness for contempt under their inherent contempt power or under a statutory criminal contempt procedure. The Senate also has a third option, enforcement by means of a statutory civil contempt procedure. The three proceedings may be briefly described.[69]

### (1) Inherent Contempt

Under the inherent contempt power, the individual is brought before the House or Senate by the Sergeant-at-Arms, tried at the bar of the body, and can be imprisoned in the Capitol jail. The purpose of the imprisonment or other sanction may be either punitive or coercive. Thus, the witness can be imprisoned for a specified period of time as punishment, or for an indefinite period (but not, at least in the case of the House, beyond the end of the Congress) until he agrees to comply. When a witness is cited for contempt under the inherent contempt process, prompt judicial review is available by means of a petition for a writ of *habeas corpus*. In an inherent contempt proceeding, although Congress would not have to afford the contemnor the whole panoply of procedural rights available to a defendant in a criminal case, notice and an opportunity to be heard would have to be granted. Also, some of the requirements imposed by the courts under the statutory criminal contempt procedure might be mandated by the due process clause in the case of inherent contempt proceedings.[70]

The inherent contempt power has not been exercised by either House in over sixty years because it has been considered to be too cumbersome and time consuming for a modern Congress with a heavy legislative workload that would be interrupted by a trial at the bar.

### (2) Statutory Contempt

Recognizing the problems with use of the inherent contempt process, a statutory criminal contempt procedure was enacted in 1857 which, with only minor amendments, is codified today at 2 U.S.C. §§192 and 194. Under 2 U.S.C. § 192, a person who has been subpoenaed to testify or produce documents before the House or Senate or a committee and who fails to do so, or who appears but

refuses to respond to questions, is guilty of a misdemeanor, punishable by a fine of up to $1,000 and imprisonment for up to one year. Section 194 establishes the procedure to be followed if the House or Senate refers a witness to the courts for criminal prosecution. A contempt citation must be approved by the subcommittee, the full committee, and the full House or Senate (or by the presiding officer if Congress is not in session). The criminal procedure is punitive in nature. It is not coercive because a witness generally will not be able to purge himself by testifying or supplying subpoenaed documents after he has been voted in contempt by the committee and the House or the Senate. Under the statute, after a contempt has been certified by the President of the Senate or the Speaker of the House, it is the "duty" of the U.S. Attorney "to bring the matter before the grand jury for its action." It remains unclear whether the "duty" of the U.S. Attorney to present the contempt to the grand jury is mandatory or discretionary, since the sparse case law that is relevant to the question provides conflicting guidance.[71]

This potential conflict between the statutory language of §194 and the U.S. Attorney's prosecutorial discretion was highlighted by the inability of the House of Representatives in 1982 to secure a contempt prosecution against the Administrator of the Environmental Protection Agency, Ann Burford. Burford, at the direction of President Reagan, had asserted executive privilege as grounds for refusing to respond to a subpoena demand for documents. She was cited for contempt by the full House and the contempt resolution was certified by the Speaker and forwarded to the U.S. Attorney for the District of Columbia for presentment to the grand jury. Relying on his prosecutorial discretion he deferred doing so.

The Burford controversy may be seen as unusual, involving highly sensitive political issues of the time. In the vast majority of cases there is likely to be no conflict between the interests of the two political branches, and the U.S. Attorney can be expected to initiate prosecution in accordance with § 194.

**(3) Civil Contempt**

As an alternative to both the inherent contempt power of each House and criminal contempt, Congress enacted a civil contempt procedure which is applicable only to the Senate.[72] Upon application of the Senate,[73] the federal district court is to issue an order to a person refusing, or threatening to refuse, to comply with a Senate subpoena. If the individual still refuses to comply, he may be tried by the court in summary proceedings for contempt of court, with sanctions being imposed to coerce his compliance. Civil contempt might be employed when the Senate is more concerned with securing compliance with the subpoena or with clarifying legal issues than with punishing the contemnor. Civil contempt can be more expeditious than a criminal proceeding and it also provides an element of flexibility, allowing the subpoenaed party to test his legal defenses in court without necessarily risking a criminal prosecution. Civil contempt is not authorized for use against executive branch officials refusing to comply with a subpoena.

**(4) Alternatives to Contempt**

When an executive branch official refuses to comply with a congressional subpoena and the dispute cannot be resolved by negotiation and compromise, none of the three types of contempt proceedings may be completely satisfactory. The statutory civil contempt procedure in the Senate is inapplicable in the case of a subpoena to an executive branch official. Inherent contempt has been described as "unseemly" and cumbersome. And if the criminal contempt method is utilized, the U.S. Attorney, who is an executive branch appointee may, as occurred in the Burford case, rely on the doctrine of prosecutorial discretion as grounds for deferring seeking an indictment. There are, however, various alternatives to the three modes of contempt in the case of an executive branch official. (1) The contemnor could be cited for criminal contempt and be prosecuted by an independent counsel, rather than by the U.S. Attorney, if the standards under the law governing the appointment of such counsels are satisfied; (2) the committee can seek declaratory or other relief in the courts; (3) the appropriations for the agency or department involved can be cut off or reduced when requested information has not been supplied; and (4) in an exceptional case, the official might be impeached.

### B. Perjury and False Statements Prosecutions

#### (1) Testimony Under Oath

A witness under oath before a congressional committee who willfully gives false testimony is subject to prosecution for perjury under 18 U.S.C. 1621 of the United States Code. The essential elements for such prosecution are: (1) a false statement, (2) "willfully" made, (3) before a "competent tribunal", (4) involving a "material matter." The requirement of a competent tribunal is important to note because it is an element of the offense within the particular control of committees.

For a legislative committee to be competent for perjury purposes a quorum must be present.[74] The problem has been ameliorated in recent years with the adoption of rules establishing less than a majority of Members as a quorum for taking testimony, normally two members for House committees[75] and one member for Senate committees.[76] The requisite quorum must be present at the time the alleged perjurious statement is made, not merely at the time the session convenes. No prosecution for perjury will lie for statements made only in the presence of committee staff unless the committee has deposition authority and has taken formal action to allow it.

#### (2) Unsworn Statements

Most statements made before Congress, at both the investigatory and hearing phases of oversight, are unsworn. The practice of swearing in all witnesses at hearings is a rare practice. But prosecutions may be brought to punish congressional witnesses for giving willfully false testimony not under oath. Under 18 U.S.C. 1001 false statements before a "department or agency of the United States" are punishable by a fine of up to $10,000 or imprisonment up to five years, or both. The courts have held that section 1001 is applicable to false statements made to congressional committees.[77]

Until recently it was thought that 18 U.S.C. 1505, which proscribes attempts to obstruct congressional proceedings, was applicable to unsworn false statements. However, the Court of Appeals for the District of Columbia Circuit ruled in 1991 that section 1505 applies only to corrupt efforts to obstruct congressional inquiries by subverting witnesses, not to false statements by the defendant himself in such proceedings.[78]

### V. INVESTIGATING THE EXECUTIVE BRANCH

When Congress directs its investigatory powers at Executive Branch departments and agencies, and at times at the White House itself, such probes have often become contentious, provoking the Executive to assert rights to shield from disclosure information Congress deems essential to carry out its oversight functions. The variety of grounds proffered are often lumped in an undifferentiated manner under the rubric "executive privilege". However, in order to evaluate and assess the weight of such withholding claims, it is more useful, and accurate, to distinguish between claims that have a constitutional basis and those that do not, and then to separate out amongst the non-constitutional claims those based on law from those resting on executive policy preferences.

### A. Presidential Claims of Executive Privilege

In some, rare, instances the executive response to a congressional demand to produce information may be an assertion of presidential executive privilege, a doctrine which, like Congress' powers to investigate and cite for contempt, has constitutional roots. No decision of the Supreme Court has yet resolved the question whether there are any circumstances in which the Executive Branch can refuse to provide information sought by the Congress on the basis of executive privilege. Indeed, most such disputes are settled short of litigation through employment of the political process and negotiations,[79] and the few that reach a judicial forum find the courts highly reluctant to rule on the merits.[80] However, in *United States v. Nixon*,[81] involving a judicial subpoena issued to the President at the request of the Watergate Special Prosecutor,[82] the Supreme Court found a

constitutional basis for the doctrine of executive privilege in "the supremacy of each branch within its own assigned area of constitutional duties" and in the separation of powers,[83] and although it considered presidential communications with close advisors to be "presumptively privileged," the Court rejected the President's contention that the privilege was absolute, precluding judicial review whenever it is asserted.[84]

Having concluded that in the case before it the claim of privilege was not absolute, the Court resolved the "competing interests" (the President's need for confidentiality vs. the judiciary's need for the materials in a criminal proceeding) "in a manner that preserves the essential functions of each branch,"[85] and held that the judicial need for the tapes outweighed the President's "generalized interest in confidentiality ..." [86] The Court was careful to limit the scope of its decision, noting that "we are not here concerned with the balance between the President's generalized interest in confidentiality ... and congressional demands for information".[87]

Although *United States v. Nixon* did not involve a presidential claim of executive privilege in response to a congressional subpoena, in *Senate Select Committee on Presidential Campaign Activities v. Nixon*,[88] the court of appeals, prior to the *Nixon* ruling, reviewed the President's assertion of executive privilege as grounds for not complying with a Senate committee subpoena for tape recordings.[89] The appeals court found that "the presumption that the public interest favors confidentiality [in presidential communications] can be defeated only by a strong showing of need by another institution of government--a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations . . . ." According to the court, "the showing required to overcome the presumption favoring confidentiality" rests "on the nature and appropriateness of the function in the performance of which the material [is] sought, and the degree to which the material [is] necessary to its fulfillment . . . . [T]he sufficiency of the committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the committee's functions."[90] The court found that, in the circumstances of that case, the need for the tapes was "merely cumulative" in light of the fact that the House Judiciary Committee had begun an inquiry, with express constitutional authority, into impeachment of the President, and the fact that the Judiciary Committee already had copies of the tapes subpoenaed by the Senate Committee.[91]

Since the Kennedy Administration it has been established by executive policy directives that presidential executive privilege may be asserted only by the President personally. The latest such directive, issued by President Reagan in November 1982,[92] and still in effect, requires that when an agency head believes that a congressional information request raises substantial questions of executive privilege he is to notify and consult with the Attorney General and the Counsel to the President. If the matter is deemed to justify invocation of the privilege, it is reported to the President who makes his decision. If the President invokes the privilege, the agency head advises the requesting committee.

There has been only one instance in which the full House or Senate has voted a contempt citation against the head of an executive department or agency, that of Anne Gorsuch Burford, Administrator of the Environmental Protection Agency, in 1982.[93] Several cabinet members have been found in contempt by committees or subcommittees, although these disputes were resolved before contempt votes by the parent body. In two instances, cabinet members were cited for contempt by full committees.[94] Five other cabinet secretaries have been cited for contempt by subcommittees.[95]

## B. Effect of Statutory Prohibitions on Public Disclosure on Congressional Access

Upon occasion Congress has found it necessary and appropriate to limit its access to information it would normally be able to obtain by exercise of its constitutional oversight prerogatives.[96] But where a statutory confidentiality or non-disclosure provision barring public disclosure of information is not explicitly applicable to the Congress, the courts have consistently held that agencies and private parties may not deny Congress access to such information on the basis of such provisions.

[97] Release to a congressional requestor is not deemed to be disclosure to the public generally.[98] Moreover, courts may not require agencies to delay the surrender of documents to Congress in order to give advance notice to affected parties, "for the judiciary must refrain from slowing or otherwise interfering with the legitimate investigating functions of Congress".[99] Once documents are in congressional hands, the courts have held they must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties.[100] Nor may a court block congressional disclosure of information obtained from an agency or private party, at least when disclosure would serve a valid legislative purpose.[101] Finally, the legal obligation to surrender requested documents has been held to arise from the official request[102]

Executive agencies have in the past unsuccessfully raised several statutes of general applicability as potential barriers to the disclosure of information to congressional committees. Agencies have attempted to withhold documents on the basis of the deliberative process exemption incorporated by Exemption 5 of the Freedom of Information Act (FOIA).[103] But the courts have made it plain that the agency privileges made applicable to public requesters by Exemption 5, as well as all the other exemptions of the FOIA, are expressly inapplicable to the legislature: "This section is not authority to withhold information from Congress."[104] In Murphy v. Department of the Army an appeals court explained that FOIA exemptions were no basis for withholding from Congress because of "the obvious purpose of the Congress to carve out for itself a special right of access to privileged information not shared by others. Congress, whether as a body, through committees, or otherwise, must have the widest possible access to executive branch information, if it is to perform its manifold responsibilities effectively. If one consequence of the facilitation of such access is that some information will be disclosed to congressional authorities but not to private persons, that is but an incidental consequence of the need for informed and effective lawmakers".[105] A similar provision in the Privacy Act also prevents its use as a withholding vehicle against Congress.[106]

A frequently cited statute used to justify non-disclosure is the Trade Secrets Act, 18 U.S.C. 1905, a criminal provision which generally proscribes the disclosure of trade secrets and confidential business information by a federal officer or employee "unless otherwise authorized by law." There is no indication in the legislative history of its revision and codification that it was intended to prevent agency disclosures to committees or to have it apply to Congress and its employees or any other legislative branch support agency or its employees,[107] and as a matter of statutory construction it would have been unusual for Congress to have subjected, sub silento, its staff to criminal sanctions for such disclosures, particularly in light of its well-established oversight and investigative prerogatives, and its speech or debate privilege. In any event, there appears little doubt that disclosure to Congress of proprietary information covered by § 1905 would be deemed to be "authorized by law". The Supreme Court in Chrysler v. Brown[108] held that disclosure authorization can stem from both congressional enactments and agency regulations. In this instance, there are at least two potential sources of disclosure authorization. The first is 2 U.S.C. 190d, which directs all standing committees of the Congress to engage in continuous legislative oversight of the administration and application of laws within their respective jurisdictions, and "may require a Government agency" to assist in doing so. In 1955, the Attorney General of the United States opined that the authorization required by the Trade Secrets Act was "reasonably implied" under § 190d.[109] A second source is the rules of each House authorizing committee oversight.

## C. Accessing Information in Open and Closed Civil and Criminal Cases: The Special Problem of Overseeing the Justice Department

Congressional oversight of the conduct of civil and criminal enforcement matters by agencies, and most particularly the Department of Justice (DOJ), has raised sensitive questions respecting the exercise of prosecutorial discretion by the executive and interference with protected rights of individuals who may be the subject of such enforcement actions. However, a review of congressional investigations that have implicated DOJ or DOJ investigations over the past 70 years, from the Palmer Raids and Teapot Dome to Watergate and through Iran-Contra and Rocky Flats,[110] demonstrates that DOJ has been consistently obliged to submit to congressional

oversight, regardless of whether litigation is pending, so that Congress is not delayed unduly in investigating misfeasance, malfeasance, or maladministration in DOJ or elsewhere. A number of these inquiries spawned seminal Supreme Court rulings that today provide the legal foundation for the broad congressional power of inquiry.[111] All were contentious and involved Executive claims that committee demands for agency documents and testimony were precluded on the basis of constitutional or common law privilege or policy.

In the majority of instances reviewed, the testimony of subordinate DOJ employees, such as line attorneys and FBI field agents, was taken formally or informally, and included detailed testimony about specific instances of the Department's failure to prosecute alleged meritorious cases. In all instances, investigating committees were provided with documents respecting open or closed cases that included prosecutorial memoranda, FBI investigative reports, summaries of FBI interviews, memoranda and correspondence prepared during the pendency of cases, confidential instructions outlining the procedures or guidelines to be followed for undercover operations and the surveillance and arrests of suspects, and documents presented to grand juries not protected from disclosure by Rule 6(e) of the Federal Rules of Criminal Procedure, among other similar "sensitive" materials.

The reasons advanced by the Executive for declining to provide information to Congress about civil proceedings have included avoiding prejudicial pre-trial publicity, protecting the rights of innocent third parties, protecting the identity of confidential informants, preventing disclosure of the government's strategy in anticipated or pending judicial proceedings, the potentially chilling effect on the exercise of prosecutorial discretion by DOJ attorneys, and precluding interference with the President's constitutional duty to faithfully execute the laws.[112]

As has been recounted previously, the Supreme Court has repeatedly reaffirmed the breadth of Congress' right to investigate the government's conduct of criminal and civil litigation.[113] The courts have also explicitly held that agencies may not deny Congress access to agency documents, even in situations where the inquiry may result in the exposure of criminal corruption or maladministration of agency officials. The Supreme Court has noted, "[B]ut surely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding . . . or when crime or wrongdoing is exposed."[114] Nor does the actual pendency of litigation disable Congress from the investigation of facts which have a bearing on that litigation, where the information sought is needed to determine what, if any, legislation should be enacted to prevent further ills.[115]

Although several lower court decisions have recognized that congressional hearings may have the result of generating prejudicial pre-trial publicity, they have not suggested that there are any constitutional or legal limitations on Congress' right to conduct an investigation during the pendency of judicial proceedings. Instead, the cases have suggested approaches, such as granting a continuance or a change of venue, to deal with the publicity problem.[116] For example, the court in one of the leading cases, *Delaney v. United States,* entertained "no doubt that the committee acted lawfully, within the constitutional powers of Congress duly delegated to it" but went on to describe the possible consequences of concurrent executive and congressional investigations:

> We think that the United States is put to a choice in this matter: If the United States, through its legislative department, acting consciously pursuant to its conception of the public interest, chooses to hold a public hearing inevitably resulting in such damaging publicity prejudicial to a person awaiting trial on a pending indictment, then the United States must accept the consequences that the judicial department, charged with the duty of assuring the defendant a fair trial before an impartial jury, may find it necessary to postpone the trial until by lapse of time the danger of the prejudice may reasonably be thought to have been substantially removed.[117]

The *Delaney* court distinguished the case of a congressional hearing generating publicity relating to an individual not under indictment at the time (as was Delaney):

Such a situation may present important differences from the instant case. In such a situation the investigative function of Congress has its greatest utility: Congress it is informing itself so that it may take appropriate legislative action; it is informing the Executive so that existing laws may be enforced; and it is informing the public so that democratic processes may be brought to bear to correct any disclosed executive laxity. Also, if as a result of such legislative hearing an indictment is eventually procured against the public official, then in the normal case there would be a much greater lapse of time between the publicity accompanying the public hearing and the trial of the subsequently indicted official than would be the case if the legislative hearing were held while the accused is awaiting trial on a pending indictment.[118]

The absence of indictment and the length of time between congressional hearing and criminal trial have been factors in courts rejecting claims that congressionally generated publicity prejudiced defendants.[119] Finally, in the context of adjudicatory administrative proceedings, courts on occasion have held that pressures emanating from questioning of agency decisionmakers by Members of Congress may be sufficient to undermine the impartiality of the proceeding. [120] But the courts have also made clear that mere inquiry and oversight of agency actions, including agency proceedings that are quasi-adjudicatory in nature, will not be held to rise to the level of political pressure designed to influence particular proceedings that would require judicial condemnation.[121]

Thus, the courts have recognized the potentially prejudicial effect congressional hearings can have on pending cases. While not questioning the prerogatives of Congress with respect to oversight and investigation, the cases pose a choice for the Congress: congressionally generated publicity may result in harming the prosecutorial effort of the Executive; but access to information under secure conditions can fulfill the congressional power of investigation and at the same time need not be inconsistent with the authority of the Executive to pursue its case. Nonetheless, it remains a choice that is solely within Congress' discretion to make irrespective of the consequences.[122]

In the past the executive frequently has made a broader claim that prosecution is an inherently executive function and that congressional access to information related to the exercise of that function is thereby limited. Prosecutorial discretion is seen as off-limits to congressional inquiry and access demands are viewed as interfering with the discretion traditionally enjoyed by the prosecutor with respect to pursuing criminal cases.

Initially, it must be noted that the Supreme Court has rejected the notion that prosecutorial discretion in criminal matters is an inherent or core executive function. Rather, the Court noted in *Morrison v. Olson*, [123] sustaining the validity of the appointment and removal conditions for independent counsels under the Ethics in Government Act, that the independent counsel's prosecutorial powers are executive in that they have "typically" been performed by Executive Branch officials, but held that the exercise of prosecutorial discretion is in no way "central" to the functioning of the Executive Branch.[124] The Court therefore rejected a claim that insulating the independent counsel from at-will presidential removal interfered with the President's duty to "take care" that the laws be faithfully executed. Interestingly, the *Morrison* Court took the occasion to reiterate the fundamental nature of Congress' oversight function (" . . . receiving reports or other information and oversight of the independent counsel's activities . . . [are] functions that we have recognized as generally incidental to the legislative function of Congress," citing *McGrain v. Daugherty*.)[125]

The breadth of *Morrison's* ruling that the prosecutorial function is not an exclusive function of the Executive was made clear in a recent decision of the Ninth Circuit Court of Appeals in United States ex rel Kelly v. The Boeing Co.,[126] which upheld, against a broad based separation of powers attack, the constitutionality of the *qui tam* provisions of the False Claims Act vesting enforcement functions against agencies by private parties.[127]

Prosecution, not being a core or exclusive function of the Executive, cannot claim the constitutional stature of Congress' oversight prerogative. In the absence of a credible claim of encroachment or

aggrandizement by the legislature of essential Executive powers, the Supreme Court has held the appropriate judicial test is one that determines whether the challenged legislative action "'prevents the Executive Branch from accomplishing its assigned functions'," and, if so, "'whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress'." [128]

Congressional oversight and access to documents and testimony, unlike the action of a court, cannot stop a prosecution or set limits on the management of a particular case. Access to information by itself would not seem to disturb the authority and discretion of the Executive Branch to decide whether to prosecute a case. The assertion of prosecutorial discretion in the face of a congressional demand for information is arguably akin to the "generalized" claim of confidentiality made in the Watergate executive privilege cases. That general claim -- lacking in specific demonstration of disruption of Executive functions -- was held to be overcome by the more focused demonstration of need for information by a coordinate branch of government. [129]

Given the legitimacy of congressional oversight and investigation of the law enforcement agencies of government, and the need for access to information pursuant to such activities, a claim of prosecutorial discretion by itself would not seem to be sufficient to defeat a congressional need for information. The congressional action itself does not and cannot dictate prosecutorial policy or decisions in particular cases. Congress may enact statutes that influence prosecutorial policy and information relating to enforcement of the laws would seem necessary to perform that legislative function. Thus, under the standard enunciated in *Morrison v. Olson* and *Nixon v. Administrator of General Services*, the fact that information is sought on the Executive's enforcement of criminal laws would not in itself seem to preclude congressional inquiry.

In light of the Supreme Court's consistent support of the power of legislative inquiry, and in the absence of a countervailing constitutional prerogative of the Executive, it is likely that a court will be "sensitive to the legislative importance of congressional committees on oversight and investigations and recognize that their interest in the objective and efficient operation of ... agencies serves a legitimate and wholesome function with which we should not lightly interfere." [130]

## D. Access to Grand Jury Materials

Rule 6(e) of the Federal Rules of Criminal Procedure provides that members of the grand jury and those who attend the grand jury in its proceedings may not "disclose matters occurring before the grand jury, except as otherwise provided in these rules." [131] The prohibition does not ordinarily extend to witnesses. [132] Violations are punishable as contempt of court. [133]

There is some authority for the proposition that Rule 6(e), promulgated as an exercise of congressionally delegated authority and reflecting pre-existing practices, is not intended to address disclosures to Congress. [134] As a general rule, however, neither Congress nor the courts appear to have fully embraced the proposition.

But, not all matters presented to a grand jury are embraced by the secrecy rule. Thus, "when testimony or data is sought for its own sake - for its intrinsic value in the furtherance of a lawful investigation - rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same information was revealed to a grand jury or that the same documents had been, or were presently being, examined by a grand jury." [135] Congressional committees have gained access to documents under this theory, the courts ruling that the committee's interest was in the documents themselves and not in the events that transpired before the grand jury. [136] However, with respect to matters that "reflect exactly what transpired in the grand jury," such as transcripts of witness testimony, Rule 6(e) has been held to be a bar to congressional access. [137]

The case law would appear to indicate that Rule 6(e) would not preclude disclosure of the following types of documents:

1. Documents within the possession of the Department of Justice concerning a particular case or investigation, other than transcripts of grand jury proceedings and material indicating "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." Material that would not otherwise be identifiable as grand jury material does not become secret by Department of Justice identification.[138]
2. Immunity letters, draft pleadings, target letters, and draft indictments.[139]
3. Plea agreements as long as particular grand jury matters are not expressly mentioned.[140]
4. Third party records which pre-exist the grand jury investigation even if they are in the possession of the Department of Justice as custodian for the grand jury.[141]
5. Memoranda, notes, investigative files, and other records of FBI agents or other government investigators except to the extent those documents internally identify or clearly define activities of the grand jury.[142]

## VI. INVESTIGATIVE OVERSIGHT HEARINGS

### A. Jurisdiction and Authority

A congressional committee is a creation of its parent House and only has the power to inquire into matters within the scope of the authority that has been delegated to it by that body. Thus, the enabling rule or resolution which gives the committee life is the charter which defines the grant and limitations of the committee's power.[143] In construing the scope of a committee's authorizing charter, courts will look to the words of the rule or resolution itself, and then, if necessary to the usual sources of legislative history such as floor debate, legislative reports, past committee practice and interpretations.[144] Jurisdictional authority for a "special" investigation may be given to a standing committee,[145] a joint committee of both houses,[146] or a special subcommittee of a standing committee,[147] among other vehicles. In view of the specificity with which Senate[148] and House[149] rules now confer jurisdiction on standing committees, as well as the care with which most authorizing resolutions for select committees have been drafted in recent years, sufficient models exist to avoid a successful judicial challenge by a witness that noncompliance was justified by a committee's overstepping its delegated scope of authority.

### B. Rules Applicable to Hearings

Rules of both Houses [150] require that committees adopt written rules of procedure and publish them in the Congressional Record. The failure to publish has resulted in the invalidation of a perjury conviction.[151] Once properly promulgated, such rules are judicially cognizable and must be "strictly observed.[152] The House[153] and many individual Senate committees require that all witnesses by given a copy of the committee's rule.

Both the House and Senate have adopted rules permitting a reduced quorum for taking testimony and receiving evidence. House hearings may be conducted if at least two members are present; [154] the Senate permits hearings with one only member in attendance.[155] Although most committees have adopted the minimum quorum requirement, some have not, while others require a higher quorum for sworn rather than unsworn testimony. For perjury purposes, the quorum requirement must be met at the time the allegedly perjured testimony is given, not at the beginning of the session.[156] Reduced quorum requirement rules do not apply to authorization for the issuance of subpoenas. Senate rules require a one-third quorum of a committee or subcommittee and the House a quorum of a majority of the members, unless a committee delegates authority for issuance to its chairman.[157]

Senate and House rules limit the authority of their committees to meet in closed session.[158] A House rule provides, however, that testimony "shall" be held in closed session if a majority of a committee or subcommittee determines it "may tend to defame, degrade, or incriminate any person".[159] Such testimony taken in closed session is normally releasable only by a majority vote

of the committee.[160] Similarly, confidential material received in a closed session requires a majority vote for release.[161] A release of confidential materials in accordance with applicable rules effectively minimizes objections by a submitting witness.[162] Moreover, the Speech or Debate clause[163] will protect a member who discloses such information on the floor from legal redress, although not from the possibility of internal discipline.[164]

House Rule XI(3)(e) provides that the broadcast of open committee hearings may be permitted by a majority vote of the committee in accordance with written rules adopted by the committee. Individual committees have adopted a variety of rules with respect to such coverage. House Rule XI(3)(f)(2) affords an absolute right to a subpoenaed witness to demand no broadcast or photographic coverage of his testimony. There is comparable rule in the Senate, that body allowing each committee to adopt its own policy.[165]

## C. Conducting Hearings

The chairman of a committee or subcommittee, or in his or her absence, the ranking majority member present, normally presides over the conduct of a hearing. An opening statement by the chair is usual, and in the case of an investigative hearing is an important means of defining the subject matter of the hearing and thereby establishing the pertinence of questions asked the witnesses. Not all committees swear in their witnesses; some committees require that all witnesses be sworn. Most leave it to the discretion of the chair. If a committee wishes the potential sanction of perjury to apply, it should swear its witnesses, though false statements not under oath are subject to criminal sanctions.[166]

A witness does not have a right to make a statement before being questioned,[167] but that opportunity is usually accorded. Committee rules may prescribe the length of such statements and may also require that written statements be submitted in advance of the hearing. Questioning of witnesses may be structured so that members alternate for specified length of time. Questioning may also be done by staff. Witnesses may be allowed to review a transcript of their testimony and to make non-substantive corrections.

The right of a witness to be accompanied by counsel is recognized by House rule[168] and the rules of Senate committees. The House rule limits the role of counsel as solely "for the purpose of advising them [witnesses] concerning their constitutional rights." Some committees have adopted rules specifically prohibiting counsel from "coaching" witness during their testimony.[169] A committee has complete authority to control the conduct of counsel. Indeed, House Rule XI(2)(k)(4) provides that "[t]he chairman may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure or exclusion from the hearings; and the committee may cite the offender for contempt." Some Senate committees have adopted similar rules.[170] There is no right of cross-examination of adverse witnesses during an investigative hearing.[171]

## D. Constitutional and Common Law Testimonial Privileges of Witnesses

## (1) Constitutional Privileges

It is well established that the protections of the Bill of Rights extend to witnesses before a legislative inquiry.[172] and thus may pose significant limitations on congressional investigations. The scope of the protections of the Fifth, First and Fourth amendments and the manner of the their invocation are briefly reviewed.

## (a) Fifth Amendment

The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself." The privilege is personal in nature,[173] and may not be invoked on behalf of a corporation,[174] small partnership,[175] labor union,[176] or other artificial entity.[177] The

privilege protects a witness against being compelled to testify but not against a subpoena for existing documentary evidence.[(178)] However, where compliance with a subpoena *duces tecum* would constitute an implicit testimonial authentication of the documents produced, the privilege may apply.[(179)]

There is no particular formulation of words necessary to invoke the privilege. All that is required is that the witness' objection be stated in a manner that the "committee may be reasonably expected to understand as an attempt to invoke the privilege".[(180)] To the extent there is any doubt about the witness' intent, it is incumbent on the committee to ask the witness whether he or she is in fact invoking the privilege.[(181)] But a witness before a congressional committee may not remain silent. The privilege must be invoked in response to a specific question that might incriminate him. Nor may a witness refuse to take the oath on Fifth Amendment grounds.[(182)]

A witness may plead the Fifth Amendment not only to questions whose answers would in themselves support a conviction, but also to those questions which, if answered, would serve as a "link in the chain of evidence" that would tend to incriminate him.[(183)]

The committee can review the assertion of the privilege by a witness to determine its validity, but the witness is not required to prove the precise hazard that he fears. In regard to the assertion of the privilege in judicial proceedings, the Supreme Court has advised:

> To sustain the privilege, it need only be evident, from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result .... To reject a claim, it should be perfectly clear from a careful consideration of all the circumstances of the case that the witness is mistaken and that the answers cannot possibly have a tendency' to incriminate.[(184)]

The basis for asserting the privilege was elaborated upon in a lower court decision:

> The privilege may only be asserted when there is reasonable apprehension on the part of the witness that his answer would furnish some evidence upon which he could be convicted of a criminal offense... or which would reveal sources from which evidence could be obtained that would lead to such conviction or to prosecution therefor.... Once it has become apparent that the answers to a question would expose a witness to the danger of conviction or prosecution, wider latitude is permitted the witness in refusing to answer other questions.[(185)]

The privilege against self-incrimination may be waived by declining to assert it, specifically disclaiming it, or testifying on the same matters as to which the privilege is later asserted. However, because of the importance of the privilege, a court will not construe an ambiguous statement of a witness before a committee as a waiver.[(186)]

Finally it should be noted that the due process clause of the Fifth Amendment requires that "the pertinency of the interrogation to the topic under the ...committee's inquiry must be brought home to the witness at the time the questions are put to him."[(187)] "Unless the subject matter has been made to appear with undisputable clarity, upon objection of the witness on grounds of pertinency, to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto."[(188)] Additionally, to satisfy both the requirement of due process as well as the statutory requirement that a refusal to answer be "willful", a witness should be informed of the committee's ruling on any objections he raises or privileges which he asserts.[(189)]

### (b) First Amendment

Although the First Amendment, by its terms, is expressly applicable only to *legislation* that abridges

freedom of speech, press, or assembly, the Court has held that the amendment also restricts Congress in conducting investigations.[190] In the leading case involving the application of First Amendment rights in a congressional investigation, *Barenblatt v. United States*,[191] the Court held that "where first amendment rights are asserted to bar government interrogation, resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." Thus, unlike the Fifth Amendment privilege against self-incrimination, the First Amendment does not give a witness an absolute right to refuse to respond to congressional demands for information.[192]

The Court has held that in balancing the personal interest in privacy against the congressional need for information, "the critical element is the existence of, and the weight to be ascribed to, the interest of the Congress in demanding disclosure from an unwilling witness."[193] In order to protect the rights of witnesses, in cases involving the First Amendment the courts have emphasized the requirements discussed above concerning authorization for the investigation, delegation of power to investigate to the committee involved, and the existence of a legislative purpose.[194]

The Supreme Court has recognized the application of the First Amendment to congressional investigations, and although the Amendment has frequently been asserted by witnesses as grounds for not complying with congressional demands for information, the Court has never relied on the First Amendment as grounds for reversing a criminal contempt of Congress conviction.[195] However, the Court has narrowly construed the scope of a committee's authority so as to avoid reaching a First Amendment issue.[196] And the Court has ruled in favor of a witness who invoked his First Amendment rights in response to questioning by a state legislative committee.[197]

**(c) Fourth Amendment**

*Dicta* in opinions of the Supreme Court indicate that the Fourth Amendment's prohibition against unreasonable searches and seizures is applicable to congressional committees.[198] It appears that there must be probable cause for the issuance of a congressional subpoena.[199] The Fourth Amendment protects a congressional witness against a subpoena which is unreasonably broad or burdensome.[200] The Court has delineated the test be used in judging the reasonableness of a congressional subpoena:

> Petitioner contends that the subpoena was so broad as to constitute an unreasonable search and seizure in violation of the Fourth Amendment.... `Adequacy or excess in the breath of the subpoena are matters variable in relation to the nature, purposes, and scope of the inquiry' . . . The subcommittee's inquiry here was a relatively broad one ... and the permissible scope of materials that could reasonably be sought was necessarily equally broad. It was not reasonable to suppose that the subcommittee knew precisely what books and records were kept by the Civil Rights Congress, and therefore the subpoena could only `specify ... with reasonable particularity, the subjects to which the documents...relate....' The call of the subpoena for `all records, correspondence and memoranda' of the Civil Rights Congress relating to the specified subject describes them `with all of the particularity the nature of the inquiry and the [subcommittee's] situation would permit' ....' The description contained in the subpoena was sufficient to enable [petitioner] to know what particular documents were required and to select them accordingly.'[201]

If a witness has a legal objection to a subpoena *duces tecum* or is for some reason unable to comply with a demand for documents, he must give the grounds for his noncompliance upon the return of the subpoena. As a court of appeals stated in one case:

> If [the witness] felt he could refuse compliance because he considered the subpoena so broad as to constitute an unreasonable search and seizure within the prohibition of the Fourth Amendment, then to avoid contempt for complete noncompliance he was under [an] obligation to inform the subcommittee of his position. The subcommittee would then have had the choice of adhering to the subpoena as

formulated or of meeting the objection in light of any pertinent representations made by [the witness].[202]

Similarly, if a subpoenaed party is in doubt as to what records are required by a subpoena or believes that it calls for documents not related to the investigation, he must inform the committee. Where a witness is unable to produce documents he will not be held in contempt "unless he is responsible for their unavailability... or is impeding justice by not explaining what happened to them . . ."[203]

The application of the exclusionary rule to congressional committees is in some doubt and will depend on the precise facts of the situation. It seems that documents which were unlawfully seized at the direction of a congressional investigating committee may not be admitted into evidence in a subsequent unrelated criminal prosecution because of the command of the exclusionary rule.[204] In the absence of a Supreme Court ruling, it remains unclear whether the exclusionary rule bars the admission into evidence in a contempt prosecution of a congressional subpoena which was issued on the basis of documents obtained by the committee following their unlawful seizure by another investigating body (such as a state prosecutor).[205]

## (2) The Common Law Attorney-Client and Work Product Privileges

The precedents of the Senate and the House of Representatives, which are founded on Congress' inherent constitutional prerogative to investigate, establish that the acceptance of a claim of attorney-client or work product privilege rests in the sound discretion of a congressional committee regardless of whether a court would uphold the claim in the context of litigation. In practice, committee resolutions of claims of these privileges have involved a pragmatic assessment of the needs of the individual committee to accomplish its legislative mission and the potential burdens and harms that may be imposed on a claimant of the privilege if it is denied.

Thus the exercise of committee discretion whether to accept a claim of attorney-client work product privilege has turned on a "weighing [of] the legislative need for disclosure against any possible resulting injury."[206] More particularly, the process of committee resolution of claims of privilege has traditionally been informed by weighing considerations of legislative need, public policy, and the statutory duty of congressional committees to engage in continuous oversight of the application, administration, and execution of laws that fall within its jurisdiction,[207] against any possible injury to the witness. In the particular circumstances of any situation, a committee may consider and evaluate the strength of a claimant's assertion in light of the pertinency of the documents or information sought to the subject of the investigation, the practical unavailability of the documents or information from any other source, the possible unavailability of the privilege to the claimant if it were to be raised in a judicial forum, and the committee's assessment of the cooperation of the witness in the matter, among other considerations. A valid claim of privilege, free of any taint of waiver, exception or other mitigating circumstance, would merit substantial weight. But any serious doubt as to the validity of the asserted claim would diminish its compelling character.

The discussion will begin with a brief overview of the constitutional origins and basis for Congress' discretionary control over such claims of privilege and recent examples of committee exercises of that discretion, followed by a review of the requirements for assertion of the attorney-client and work product privileges. Next the law with respect to waiver of the privilege and exceptions to assertion of the privilege is detailed.

## (a) The nature and development of Congress' discretionary control over witness' claims of privilege

As with the legislature's inherent authority to investigate,[208] the discretion to entertain claims of privilege traces back to the model of the English Parliament. Erskine May's Treatise on the Law, Privileges, Proceedings and Usage of Parliament, the definitive authority on English parliamentary procedure, specifically notes:

A witness is, however, bound to answer all questions which the committee sees fit to put to him, and cannot excuse himself, for example, on the ground that he may thereby subject himself to a civil action, or because he has taken an oath not to disclose the matter about which he is required to testify, or because the matter was a privileged communication to him, as where a solicitor is called upon to disclose the secrets of his client ... some of which would be sufficient grounds of excuse in a court of law.[209]

The rare instances of the exercise of the prerogative to deny use of the privileges have been consistent in the rejection of the applicability of the privileges. In the nineteenth century, Charles W. Woolley, an attorney, was found in contempt of the House and imprisoned for refusal to answer questions about a scheme for bribing senators during Andrew Johnson's impeachment proceeding despite a claim of attorney-client privilege.[210] Also, in the notable investigation into the financing of the Union Pacific Railroad and the activities of the Credit Mobilier, a House Committee held Joseph B. Stewart in contempt notwithstanding his assertion of attorney-client privilege.[211] More recently, a Subcommittee of the House Energy and Commerce Committee has on a number of occasions rejected claims of attorney-client privilege.[212] No court has ever questioned the assertion of the prerogative, and both Houses of Congress have rejected opportunities to impose the attorney-client privilege as a binding rule for committee investigations.[213] Contemporary congressional practice has, in fact, evolved a delicate balancing process to ensure its fair application. Thus the exercise of committee discretion has been held to turn on a "weighing [of] the legislative need against any possible injury" to one asserting the privilege and the application of this test has involved painstaking examinations of potential detriment and relevant judicial precedents.[214]

Perhaps the most emphatic and authoritative assertion of the committee prerogative in this area is the 1986 House action holding Ralph and Joseph Bernstein in contempt for refusal to give the Subcommittee on Asian and Pacific Affairs of the House Committee on Foreign Affairs requested information pertaining to their relations with Ferdinand and Imelda Marcos. Their refusal rested primarily on the assertion of attorney-client privilege.[215] The Subcommittee rejected these claims on two grounds: "That the claim of privilege would not be upheld even in a court, and that a congressional committee was obliged to decide whether to accept such claims of privilege apart from whether a court would uphold the claim."[216] The full Committee, bowing to the concerns and preferences of some members that it was not necessary under the circumstances of the matter to rely equally on the broader second ground, recommended that "the U.S. attorney, in presenting this matter, proceed primarily and strongly with emphasis on the primary ground relied on by the Subcommittee that this claim of privilege would not have been upheld even in a court."[217] Thus it is clear that the recommendation to the full House, which was adopted by an overwhelming vote of 352-34,[218] encompassed full recognition of the prerogative to deny assertions of attorney-client privilege.

Senate practice and precedent are in strong and complementary accord with that of the House. Two denials by Senate committees of claims of privilege serve to illustrate. In March of 1989, the Subcommittee on Nuclear Regulation of the Senate Committee on Environment and Public Works commenced investigating claims that settlement agreements were being entered between employers and employees of nuclear facilities which placed restrictions on an employee's ability to testify in Nuclear Regulatory Commission proceedings relating to licensing and safety matters with respect to such facilities. The Subcommittee was seeking to determine the nature and extent of such restrictive agreements at a particular facility and the prevalence and potential impact of such agreements in the industry generally. Subpoenas were issued and several were not complied with on the grounds of the attorney-client and work product privileges. On July 19, 1989, the Subcommittee issued a formal opinion rejecting the claim of privilege. The opinion asserted that

> [W]e start with the jurisdictional proposition that this Subcommittee possesses the authority to determine the validity of any attorney-client privilege that is asserted before the Subcommittee. A committee's or subcommittee's authority to receive or compel testimony derives from the constitutional authority of the Congress to conduct investigation and take testimony as necessary to carry out its legislative powers. As an independent branch of government with such constitutional authority, the

Congress must necessarily have the independent authority to determine the validity of non-constitutional evidentiary privileges that are asserted before the Congress. (219)

The opinion continued by observing that while it recognized its "independent authority to rule on an assertion of the attorney-client privilege... the Subcommittee will nonetheless look to judicial and other rulings in this area to guide the Subcommittee's determination." (220) Finding that the holder of the privilege (the employee in question) "has made extensive disclosures concerning communications between himself and his attorneys [the claimants of the privilege] regarding the agreement, and has called the competence of his former attorneys into question," the Subcommittee ruled that the privilege would have been deemed waived by a court, denied the claim, and ordered the attorneys to testify. (221)

More recently, the Senate Permanent Subcommittee on Investigations of the Governmental Affairs Committee denied a claim of attorney-client privilege under unusual circumstances. The Subcommittee was investigating allegations that under the Medicare Secondary Payer (MSP) program insurance companies, including Provident Life and Accident Company (Provident), had failed to comply with their obligations to pay certain claims as the primary payer with Medicare being the secondary payer, which resulted in sizeable overpayments by Medicare. The Subcommittee subpoenaed many documents, including one from Provident which it refused to give up upon the ground that it was cloaked by the attorney-client privilege. Provident also argued that the Subcommittee was bound by a ruling to that effect made by a Federal district court in a pending civil suit. In order to prevent the author of the document from testifying before the Subcommittee, Provident sought an injunction from the district court to prevent her testimony. The court denied the injunction, ruling that Provident had failed to allege a case or controversy, that the issue was not ripe for judicial determination, and that Provident had failed to fulfill the equitable requirements for preliminary injunctive relief. The court also noted that its earlier ruling on the attorney-client privilege "which is not of constitutional dimensions, is certainly not binding on the Congress of the United States."(222) Subsequently, the Chairman heard testimony and arguments on the claim in executive session. He noted that "[t]he burden, then, as I see it, is on you as the party claiming the privilege to demonstrate that the privilege exists and to tell us why." On June 15, 1990 the Chairman ruled that Provident had waived any privilege that might have attached to the document in question when it provided the document to the Department of Justice.(223)

This historic congressional practice appears reflective of the widely divergent nature of the judicial and legislative forums. The attorney-client privilege is a product of a judicially developed public policy designed to foster an effective and fair adversary system. The courts view the privilege as a means to foster client confidence and encourage full disclosure to an attorney. It is argued that free communication facilitates justice by promoting proper case preparation.(224) It is also suggested that frivolous litigation is discouraged when, based on full factual disclosure, an attorney finds that his client's case is not a strong one.(225) Of critical importance here is the understanding that the role of attorney-client privilege is designed for, and properly confined to: the adversary process: the adjudicatory resolution of conflicting claims of individual obligations in a civil or criminal proceeding. But the necessity to protect the individual interest in the adversary process is less compelling in an investigative setting where a legislative committee is not empowered to adjudicate the liberty or property interests of a witness. This is the import of those cases which have recognized that "only infrequently have witnesses ... [in congressional hearings] been afforded procedural rights normally associated with an adjudicative proceeding."(226)

Indeed, the suggestion that the investigatory authority of the legislative branch of government is subject to non-constitutional, common law rules developed by the judicial branch to govern its proceedings is arguably contrary to the concept of separation of powers. It would, in effect, permit the judiciary to determine congressional procedures and is therefore difficult to reconcile with the constitutional authority granted each House of Congress to determine its own rules.(227) Moreover, importation of the privileges and procedures of the judicial forum is likely to have a paralyzing effect on the investigatory process of the legislature. Such judicialization is antithetical to the consensus, interest oriented approach to policy development of the legislative process.

Finally, an assertion that the denial of the privilege in the congressional setting would destroy the privilege elsewhere appears neither supported by experience nor reason. Parliament's rule has not impaired the practice of law in England nor has its limited use here inflicted any apparent damage on the practice of the profession. Congressional investigations in the face of claims of executive privilege or the revelations of trade secrets have not diminished the general utility of these privileges nor undermined the reasons they continue to be recognized by the courts. Moreover, the assertion implies that current law is an impregnable barrier to disclosure of confidential communications when in fact the privilege is, of course, an exception to the general rule of disclosure and, is riddled with qualifications and exceptions, and has been subject as well as to the significant current development of the waiver doctrine. Thus, there can be no absolute certainty that communications with an attorney will not be revealed.[228]

Moreover, with respect to the work-product privilege, it has always been recognized that it is a qualified privilege which may be overcome by a sufficient showing of need. The Supreme Court indicated, in the very case in which it created the doctrine, that "[w]e do not mean to say that all [ ] materials obtained or prepared ... with an eye toward litigation are necessarily free from discovery in all cases."[229] Thus, the courts have repeatedly held that the work product privilege is not absolute, but rather is only a qualified protection against disclosure.[230] As one court has indicated, "its immunity retreats as necessity and good cause is shown for its production in a balance of competing interests."[231]

In fact, because the work product doctrine is so readily overcome when production of material is important to the discovery of needed information, some courts have refused to call the doctrine a privilege. For instance, in *City of Philadelphia v. Westinghouse Corp.*,[232] the court stated that the work product principle "is not a privilege at all; it is merely a requirement that very good cause be shown if the disclosure is made in the course of a lawyer's preparation of a case."

### (b) Requirements for Assertion of the Attorney-Client Privilege

In making the assessment whether to accept a claim of attorney-client privilege, committees often have reference to whether a court would accept the claim had it been in that forum. This section and those that follow detail the judicial requirements for a proper assertion of the claim, how the privilege may be waived, and circumstances under which it may not be claimed at all.

Although the attorney-client privilege today is seen to rest on the theory that encouraging clients to make the fullest disclosure to their attorneys enables them to act more effectively, justly, and expeditiously, and that these benefits outweigh the risks posed by not allowing full disclosure in court,[233] even its leading proponent, Dean Wigmore, concedes the unverifiability of the assumption and advises that its use be strictly limited.

> Its benefits are all indirect and speculative, its obstruction is plain and concrete...It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.[234]

The courts have heeded Wigmore's admonition.[235]

One important manifestation of the judicial policy of strict confinement is the universal recognition that the burden of establishing the existence of the privilege rests with the party asserting the privilege.[236] Moreover, blanket assertions of the privilege have been deemed "unacceptable"[237], and are "strongly disfavored."[238] The proponent must conclusively prove each element of the privilege. Thus a claimant must reveal specific facts which would establish that the relationship was one of attorney and client. Conclusory assertions are insufficient. And it must demonstrate that the privilege has not expressly or impliedly waived.

Finally, it should be noted that the assertion that the disclosure of privileged material to a

congressional committee would waive the privilege in any future litigation was specifically considered, and rejected, by the D.C. Circuit Court of Appeals in *Murphy v. Department of the Army*.[239] Indeed, there appears to be no case holding otherwise and several which have followed *Murphy*.[240]

### (c) Waiver of the Attorney-Client Privilege

Because of the privilege's inhibitory effect on the truth-finding process and its impairment of the public's "right to every man's evidence,"[241] modern liberal discovery rules have taken a narrow view of the privilege.[242] This tendency toward limiting the privilege is most clearly manifested in the strict standard of waiver.[243] Thus the voluntary disclosure of privileged information, whether by the client or the attorney with the client's consent, waives the privilege[244] because it destroys the confidentiality of a communication and thereby undermines the justification for preventing compelled disclosures.[245] Waiver need not be express,[246] nor is it necessary that the client waive the privilege knowingly.[247] Waiver may be evidenced by word or act,[248] but may be inferred from a failure to speak or act when words or action would be necessary to preserve confidentiality.[249] Courts regularly hold that the privilege is waived as to the material disclosed when the client or his attorney deliberately discloses the contents of a privileged communication, such as when answering interrogatories, testifying in court or at examination before trial, submitting affidavits or pleadings to the Court, or in transacting business with a third party.[250]

Furthermore, the courts have held that less than full disclosure will often cause a waiver, not only as to disclosed communications, but also as to communications relating to the same subject matter that were not themselves disclosed.[251] By partial disclosure, the client may be voluntarily waiving the privilege as to that which he considers favorable to his position, but attempting to invoke the privilege as to the remaining material, which he considers unfavorable.[252] Selective assertion or disclosure usually involves a material issue in the proceeding, and there is a great likelihood that the information disclosed is false or intended to mislead the other party.[253] Thus, pleading an "advice of counsel" defense, which puts the attorneys advice in issue,[254] has been held to waive the privilege as to all communications relating to that advice. The rationale for the subject matter waiver rule is one of fairness. Professor Wigmore has stated the principle as follows: "[W]hen [the client's] conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. It is therefore designed to prevent the client from using the attorney-client privilege offensively, as an additional weapon."

The courts also have severely limited the attorney-client privilege through the development of an implied waiver doctrine. Thus where a client shares his attorney-client communications with a third party, the communications between attorney and client are no longer strictly "confidential", and the client has waived his privilege over them.[255] Even if the client attempts to keep communications confidential by having the third party agree not to disclose the communications to anyone else the courts will still consider "confidentiality" between attorney and client breached and the communication no longer privileged.[256] Courts have applied this concept of confidentiality narrowly to prevent corporations from sharing an attorney-client communication with an ally and then shielding the communication from a grand jury or adversary.[257] As a general rule, courts also apply the waiver rule to disclosures made to government agencies.[258] Thus a person or corporation who voluntarily discloses confidential attorney-client communications to a government agency loses the right to later assert privilege for those communications.

While some lower courts have adopted a "limited waiver" rule, which allows corporations to share their confidential attorney-client communications with agencies such as the SEC without having to waive the privileged status of these documents against other parties,[259] it is a distinctly minority view. The prevailing view, enunciated in decisions of the Second[260], Fourth[261], and District of Columbia Circuits,[262] hold that "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information, as well as `the

details underlying the data which was to be published', will not enjoy the privilege."[263]

The facts and circumstances of *In re Martin Marietta Corporation*[264] illustrate the strict manner in which the courts have applied the waiver doctrine. In that case a mail fraud defendant sought documents, and the underlying factual details for statements made in them, submitted by his former employer to the United States Attorney and the Department of Defense in its efforts to settle criminal and administrative proceedings then pending against it. The court noted that in a Position Paper to the U.S. Attorney describing why the company should not be indicted, it was asserted: "of those consulted within the Company all will testify that any qualms they had about the arrangement had nothing to do with worries about fraud" and "there is no evidence, testimonial or documentary, that any company officials in the meeting [of November 17, 1983] except Mr. Pollard and his Maxim employees, understood that Maxim had departed from the strict procedures of its IVI contract."[265] The appeals court held that these, and similar disclosures made to the Defense Department in an Administrative Settlement Agreement, waived whatever privilege it had with respect to the submitted documents and their underlying details.

### (d) Exceptions to the Attorney-Client Privilege

Absent waiver, the attorney-client privilege generally protects from disclosure communications from a client to his lawyer or his lawyer's agent relating to the lawyers rendering of legal advice which was made with the expectation of confidentiality, but not in furtherance of a future crime, fraud, or tort. However, the courts have strictly confined the privilege and developed a number of important qualifications and exceptions.

First, the case law has consistently emphasized that one of the essential elements of the attorney-client privilege is that the attorney be acting as an attorney and that the communication be made for the purpose of securing legal services. The privilege therefore does not attach to incidental legal advice given by an attorney acting outside the scope of his role as attorney. "`Acting as a lawyer' encompasses the whole orbit of legal functions. When he acts as an advisor, the attorney must give *predominantly* legal advice to retain his client's privilege of non-disclosure, not solely, or even largely, business advice."[266]

In order to ascertain whether an attorney is acting in a legal or business advisory capacity the courts have held it proper to question either the client or the attorney regarding the general nature of the attorney's services to his client, the scope of his authority as agent and the substance of matters which the attorney, as agent, is authorized to pass along to third parties.[267] Indeed, invocation of the privilege may be predicated on revealing facts tending to establish the existence of an attorney-client relation.

A further manifestation of the judicial proclivity to confine the scope of the privilege is the general rule requiring disclosure of the fact of employment, the identity of the person employing him or the name of the real party in interest, the terms of the employment, and such related facts as the client's address, occupation or business and the amount of the fee and who paid it.[268] The courts have reasoned that the existence of the relation of attorney and client is not a privileged communication. The privilege pertains to the subject matter and not to the fact of the employment as attorney.

Another significant exception to the privilege occurs when a communication between client and attorney is for the purpose of committing a crime or perpetuating a fraud at some future time.[269] The policy reasons for this exception are obvious. Society has an interest in protecting the confidences of a client to his lawyer even concerning already committed crimes, frauds and torts. The harm from nondisclosure is limited because the past event can no longer be prevented. Society also has an interest in protecting the confidence of a client who seeks legal advice about neutral acts. But society has no interest in facilitating the commission of contemplated but not yet committed crimes, torts or frauds. On the contrary, society has every interest in forestalling such acts. Therefore, the attorney-client privilege has been held not to attach to such acts.

## VII. RIGHTS OF MINORITY PARTY MEMBERS IN THE INVESTIGATORY PROCESS

The role of members of the minority party in the investigatory oversight process is governed by the rules of each House and its committees. While minority members are specifically accorded some rights (*e.g.,* whenever a hearing is conducted on any measure or matter, the minority may, upon the written request of a majority of the minority members to the chairman before the completion of the hearing, call witnesses selected by the minority, and presumably request documents[270]), no House or committee rules authorize ranking minority members or individual members on their own to institute official committee investigations, hold hearings or to issue subpoenas. Individual members may seek the voluntary cooperation of agency officials or private persons. But no judicial precedent has recognized a right in an individual member, other than the chair of a committee,[271] to exercise the authority of a committee in the context of oversight without the permission of a majority of the committee or its chair.

The question of the nature and scope of the rights of minority party members in the investigatory process came into sharp focus in the 103d Congress. Then, for the first time in over a decade, both Houses and the White House were in the control of one party, while at the same time the Whitewater matter began to emerge as a matter of serious political importance. Principal jurisdiction over many of the areas of concern fell within mandates of the House and Senate Banking Committees.

The Ranking Minority Member of the House Banking Committee was particularly aggressive in seeking to obtain documents and testimony from the Office of Thrift Supervision (OTS) and the Resolution Trust Corporation (RTC), the agencies handling the investigation of the failure of the Madison Guarantee Savings & Loan Association and related matters. The agencies refused to turn over what were claimed by the Ranking Minority Member to be key documents and were supported by the chairman of the Banking Committee who directed the agencies not to cooperate on the grounds that no investigation had been authorized by the committee nor were hearings on the matter contemplated. The Ranking Minority Member brought suit to compel disclosure of the documents.[272]

An obstacle to the suit was a 1983 court ruling in *Lee v. Kelley.* [273] There a court held, *inter alia,* that an attempt by Senator Jesse Helms to intervene in the case in order to unseal FBI tapes and transcripts concerning Martin Luther King to enable him to utilize the information as part of the debate on legislation proposing to establish a national holiday commemorating King's birth, would be dismissed as an exercise of the courts "equitable discretion" because Senator Helms' action was an effort to enlist the court in his dispute with fellow legislators. Helms had argued that because no committee hearings were being conducted to inform Senators of facts to justify or defeat the passage of the legislation, he was seeking to fill that void by performing the investigative function the Senate leadership had decided to forego.[274] The district court ruled that "[i]t is not for this court to review the adequacy of the deliberative process of the Senate leadership .... [T]o conclude otherwise would represent an obvious intrusion by the judiciary into the legislative arena. In any event, the proper forum for this [dispute] is the Senate, `for [i]t would be unwise to permit the federal courts to become a higher legislature where a congressman who has failed to persuade his colleagues can always renew the battle.'"[275]

In an attempt to avoid the adverse consequences of *Lee,* the Ranking Minority Member sought to compel disclosure of the documents under the Freedom of Information Act (FOIA),[276] which explicitly exempts Congress from its withholding provisions, [277] and under the Administrative Procedure Act (APA),[278] alleging that the documents were arbitrarily and capriciously withheld. It was not successful. While finding the claims "technically justiciable",[279] the district court held that it had to invoke the District of Columbia Circuit's doctrine of equitable or remedial discretion and dismiss the claims since this was a case "in which a congressional plaintiff's dispute is primarily with his or her fellow legislators." The court concluded that "[i]t is clear . . . that Representative Leach's complaint derives solely from his failure to persuade his colleagues to authorize his request for the documents in question, and that Plaintiff thus has a clear `collegial remedy' capable of affording him substantial relief."[280]

Despite the apparent difficulty in obtaining judicial redress, some measure of practical success was achieved as a result of intense public pressure brought to bear by the minority and its supporters on the majority party and the White House. A Justice Department investigation into the handling of the RTC recommendation to the United States Attorney's office for a further criminal investigation was commenced in November 1993; the White House in December, 1993 authorized turning over Whitewater documents to the Justice Department team investigating the handling of the matter; in January 1994 the White House agreed to the appointment by the Attorney General of an independent counsel with broad authority to investigate Whitewater matters; both Houses agreed in principle in March 1994 to hold hearings; and in July and August 1994 hearings were held by the House and Senate Banking Committees. The legal challenge thus may be viewed as part the overall strategy to force public hearings by Congress, although in the long run the precedent established may have virtually foreclosed future resort to the courts under analogous circumstances.

The *Leach* court also suggested that the possibility of a "collegial remedy" for the minority exists, pointing to 5 U.S.C. 2954 under which small groups of members of the House Government Reform and Oversight and Senate Governmental Affairs Committees can request information from executive agencies without the need of formal committee action. [281] However, the precise scope and efficacy of this provision is uncertain.

5 U.S.C. 2954 is derived from section 2 of the Act of May 29, 1928, [282] which originally referred not to the current committees generally overseeing government agency operations but their predecessors, the House and Senate Committees on Expenditures in the Executive Departments. The principal purpose of the 1928 Act, embodied in its first section, was to repeal legislation which required the submission to the Congress of some 128 reports, many of which had become obsolete in part, and which, in any event, had no value, served no useful purpose, and were not printed by the House of Representatives. [283]

Section 2 of the 1928 Act contains the language which has been codified in 5 U.S.C. 2954. The legislative history, however, indicates that the purpose of the 1928 Act was not to assert a sweeping right of Congress to obtain any information it might desire from the executive branch. Rather, the aim of the section was far more limited. Thus, the Senate Report stated that its purpose was to make "it possible to require any report discontinued by the language of this bill to be resubmitted to either House upon its necessity becoming evident to the membership of either body." [284] Or, in the words of the House Report: "To save any question as to the right of the House of Representatives to have furnished any of the information contained in the reports proposed to be abolished, a provision has been added to the bill requiring such information to be furnished to the Committee on Expenditures in the Executive Departments or upon the request of any seven members thereof." [285]

It would appear, then, that the scope of 5 U.S.C. 2954 is closely tied to the 128 reports abolished by section 1 of the 1928 legislation. [286] Moreover, the provision lacks a compulsory component. Agency refusals to comply would not be subject to existing contempt processes, and the outcome of a civil suit to compel production on the basis of the provision is problematic despite the *Leach* court's suggestion. Further, the provision applies only to the named committees; thus members of all other committees would still face the *Leach* problem. Finally, even members of the named Committees are still likely to have to persuade a court that their claim is no more than an intramural dispute.

The rules of the Senate provide substantially more effective means for individual minority party members to engage in "self-help" to support oversight objectives than their House counterparts. Senate rules emphasize the rights and prerogative of individual Senators and, therefore, minority groups of Senators. [287] The most important of these rules are those that effectively allow unlimited debate on a bill or amendment unless an extraordinary majority vote to invoke cloture. [288] Senators can use their right to filibuster, or simply the threat of filibuster, to delay or prevent the Senate from engaging in legislative business. The Senate's rules also are a source of other minority rights that can directly or indirectly aid the minority in gaining investigatory rights. For example, the right of extended debate applies in committee as well as on the floor, with one crucial

difference: the Senate's cloture rule may not be invoked in committee. Each Senate committee decides for itself how it will control debate, and therefore a filibuster opportunity in a committee may be even greater than on the floor. Also, <u>Senate Rule XXVI</u> prohibits the reporting of any measure or matter from a committee unless a majority of the committee are present, another point of possible tactical leverage. Even beyond the potent power to delay, Senators can promote their goals by taking advantage of other parliamentary rights and opportunities that are provided by the Senate's formal procedures and customary practices such as are afforded by the processes dealing with floor recognition, committee referrals, and the amending process.[289]

## VIII. ROLE OF THE OFFICES OF SENATE LEGAL COUNSEL AND HOUSE GENERAL COUNSEL

For almost two decades the offices of Senate Legal Counsel and House General Counsel have developed parallel yet distinctly unique and independent roles as institutional legal "voices" of the two bodies they represent. Familiarity with the structure and operation of these offices and the nature of the support they may provide committees in the context of an investigative oversight proceeding is essential.

### A. Senate Legal Counsel

The Office of Senate Legal Counsel[290] was created by Title VII of the Ethics in Government Act of 1978[291] "to serve the institution of congress rather than the partisan interests of one party or another."[292] The Counsel and Deputy Counsel are appointed by the President pro tempore of the Senate upon the recommendation of the Majority and Minority Leaders. The appointment of each is made effective by a resolution of the Senate, and each may be removed from office by a resolution of the Senate. The term of appointment of the Counsel and Deputy Counsel is two Congresses. The appointment of the Counsel and Deputy Counsel and the Counsel's appointment of Assistant Senate Legal Counsel are required to be made without regard to political affiliation. The office is responsible to a bipartisan Joint Leadership Group, which is comprised of the Majority and Minority Leaders, the President pro tempore, and the chairman and ranking minority member of the Committees on the Judiciary and on Rules and Administration.[293]

The Act specifies the activities of the office, two of which are of immediate interest to committee oversight concerns: representing committees of the Senate in proceedings to aid them in investigations and advising committees and officers of the Senate.[294]

### (1) Proceedings to Aid Investigations by Senate Committees

The Senate Legal Counsel may represent committees in proceedings to obtain evidence for Senate investigations. Two specific proceedings are authorized.

18 U.S.C. § 6005 provides that a committee or subcommittee of either House of Congress may request an immunity order from a United States district court when the request has been approved by the affirmative vote of two-thirds of the Members of the full committee. By the same vote, a Committee may direct the Senate Legal Counsel to represent it or any of its subcommittees in an application for an immunity order.[295]

The Senate Legal Counsel may also be directed to represent a committee or subcommittee of the Senate, and also the Office of Senate Fair Employment Practices,[296] in a civil action to enforce a subpoena. Prior to the Ethics in Government Act of 1978, subpoenas of the Senate could be enforced only through the cumbersome method of a contempt proceeding before the bar of the Senate or by a certification to the United States attorney and a prosecution for criminal contempt of Congress under 2 U.S.C. §§ 192, 194. The Ethics Act authorizes a third method to enforce Senate subpoenas, through a civil action in the United States District Court for the District of Columbia.[297] The House chose not to avail itself of this procedure and this enforcement method applies only to Senate subpoenas. Senate subpoenas have been enforced in several civil actions. See, for example proceedings to hold in contempt a recalcitrant witness in the impeachment proceedings

against Judge Alcee L. Hastings[298] and proceedings to enforce a subpoena *duces tecum* for the production of diaries of Senator Bob Packwood.[299]

The statute details the procedure for directing the Senate Legal Counsel to bring a civil action to enforce a subpoena. In contrast to an application for an immunity order, which may be authorized by a committee, only the full Senate by resolution may authorize an action to enforce a subpoena. [300] The Senate may not consider a resolution to direct the Counsel to bring an action unless the investigating committee reports the resolution by a majority vote. The statute specifies the required contents of the committee report; among other matters, the committee must report on the extent to which the subpoenaed party has complied with the subpoena, the objections or privileges asserted by the witness, and the comparative effectiveness of a criminal and civil proceeding.[301] A significant limitation on the civil enforcement remedy is that it excludes from its coverage actions against officers or employees of the federal government acting within their official capacities. Its reach is limited to natural persons and to entities acting or purporting to act under the color of state law.[302]

**(2) Advice to committees and officers of the Senate and other duties.**

The Ethics Act details a number of advisory functions of the Office of Senate Legal Counsel. Principal among these are the responsibility of advising officers of the Senate with respect to subpoenas or requests for the withdrawal of Senate documents, and the responsibility of advising committees about their promulgation and implementation of rules and procedures for congressional investigations. The office also provides advice about legal questions that arise during the course of investigations.[303]

The Act also provides that the Counsel shall perform such other duties consistent with the non-partisan purposes and limitations of Title VII as the Senate my direct.[304] Thus in 1980 the Office was used in the investigation relating to Billy Carter and Libya and worked under the direction of the chairman and vice-chairman of the subcommittee charged with the conduct of that investigation.[305] Members of the Office have also undertaken special assignments such as the Senate's investigation of Abscam and other undercover activities,[306] the impeachment proceedings of Judge Harry Claiborne,[307] Judge Walter L. Nixon, Jr.,[308] and Judge Alcee L. Hastings, Jr., [309] and the confirmation hearings of Justice Clarence E. Thomas.

In addition, the Counsel's office provides information and advice to Members, officers and employees on a wide range of legal and administrative matters relating to Senate business. Unlike the House practice, the Senate Legal Counsel plays no formal role in the review and issuance of subpoenas. However, since it may become involved civil enforcement proceedings, it has welcomed the opportunity to review proposed subpoenas for form and substance prior to their issuance by committees.

**B. House General Counsel**

A non-statutory office, the House General Counsel has evolved in an ad hoc, incremental manner since the mid-1970's, from its historic role as a legal advisor to the Clerk of the House on a range of administrative matters that fell within the jurisdiction of the Clerk's office, to that of lawyer for the institution. At the beginning of the 103d Congress it was made a separate House office, reporting directly to the Speaker, charged with the responsibility "of providing legal assistance and representation to the House."[310] However, as a consequence of administrative restructuring at the start of the 104th Congress, the Office was again placed in the Clerk's Office. While the function and role of the House General Counsel and the Senate Legal Counsel with respect to oversight assistance to committees and protection of institutional prerogatives are similar,[311] there are significant differences that need be noted.

The General Counsel and the Deputy General Counsel are appointed by the Speaker and serve at his pleasure. Traditionally the General Counsel has tendered his resignation to a new incoming

Speaker. Authorization for actions by the General Counsel to represent the interests of the House in court is often given by the Joint Leadership Group, consisting of the Speaker, Majority Leader, Majority Whip, Minority Leader and Minority Whip.[312] On other occasions, the Office will act pursuant to the direction of the majority leadership or the Speaker alone.[313]

Unlike the Senate, subpoenas may only be issued over the seal of the Clerk of the House. In practice, committees work closely with the General Counsel in drafting subpoenas and every subpoena issued by a committee or officer is reviewed by the Office for substance and form. Similarly, in the absence of civil enforcement authority, committees often seek the assistance of the General Counsel in navigating the statutory contempt process in instances of witness non-compliance with a subpoena which may culminate in a floor proceeding to authorize a contempt citation. For example, during a committee investigation into the real estate holdings in the United States of the Philippines President Ferdinand E. Marcos and his wife, two brothers who allegedly assisted the Marcos's in their dealings were called to testify. They declined to answer numerous questions, claiming attorney-client privilege. The General Counsel was called in to evaluate the claims and to render an opinion whether contempt proceedings would be appropriate. His findings served as the basis for the resolution passed by the House holding the brothers in contempt.[314]

Like the Senate Legal Counsel's office, the House General Counsel's office devotes a large portion of its time rendering informal advice to individual members and committees. Unlike its Senate counterpart, however, the General Counsel will often provide formal advice in the form of memorandum opinions[315] and, at times, testimony at hearings.[316]

Finally, the Office also takes on special tasks as, for example, when the deputy general counsel served as special counsel to the joint committee investigation the Iran-Contra affair and played an active role in establishing procedures for the investigation.

## SELECTED READINGS

Beck, Carl. Contempt of Congress: A Study of the Prosecutions Initiated by the Committee on In-American Activities, 1945-1957. New Orleans: The Hauser Press, 1959.

Berger, Raoul. Congressional Subpoenas to Executive Officials. Cambridge: Harvard University Press, 1974

Brand, Stanley M. Battle Among the Branches: The Two Hundred Year War. North Carolina Law Review, v. 65, 1987:901

Brand, Stanley M. and Connell, Sean. Constitutional Confrontations: Preserving a Prompt and Orderly Means By Which Congress May Enforce

Investigative Demands Against Executive Branch Officials. Catholic University Law Review, v. 36, 1986: 71

Bush, Joel D. Congressional Executive Access Disputes: Legal Standards and Political Settlements. Journal of Law Politics, v. 9, Summer 1993: 719

Clavelaus, Ronald L. The Conflict Between Executive Privilege and Congressional Oversight: The Gorsuch Controversy. Duke Law Journal, v. 1983, No. 6: 1333.

Dimock, Marshall E. Congressional Investigating Committees. Baltimore Johns University Press, 1929 JK1123.A2E2

Fitzpatrick, James F. Enduring a Congressional Investigation. Litigation, v. 18, Summer 1992:16

Ehlke, Richard. Congressional Access To Information From The Executive: A Legal Analysis. CRS

Report 86-50A, Congressional Research Service, March 10, 1986.

Ghio, R.S. The Iran Contra Prosecution and the Failure of Use Immunity. Stanford Law Review, v. 45, 1992: 229.

Gilbert, Michael. The Future of Congressional Use Immunity after United States v. North. American Criminal Law Review, vol. 30, 1993: 417.

Grabow, John C. Congressional Investigations: Law Practice. Prentice Hall Law and Business, 1988 KF4942.G73

Hamilton, James. The Power to Probe: A Study in Congressional Investigations. New York: Vintage Books, 1976 KF4942.H34

Hamilton, James and Grabow, John C. A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas. Harvard Journal Legislation, v. 21, Winter 1984: 145

Moreland, Allen B. Congressional Investigations and Private Persons. Southern California Law Review, v. 40, Winter 1967: 189

Peterson, Todd D. Prosecuting Executive Branch Officials For Contempt of Congress. New York University Law Review, v. 66, 1991: 563

Rosenthal, Paul C. and Grossman, Robert S. Congressional Access to Confidential Information Collected by Federal Agencies. Harvard Journal of Legislation, v. 15, 1977: 74

Rozell, Mark J. Executive Privilege in the Bush Administration: Constitutional Problems, Bureaucratic Responses. Miller Center Journal, v. 1, Spring 1984: 63.

Schlesinger, Arthur M., Jr., and Bruns, Rogers (editors). Congress Investigates: 1972-1974. New York: Chelsea House Publishers. 1975 (5 Vols). JK 1123.A2 S34

Solokar, Rebecca Mae. Legal Counsel for Congress: Protecting Institutional Interests. Congress and the Presidency, v. 20 Autumn 1993: 131.

Shampansky, Jay R. Staff Depositions in Congressional Investigations. CRS Report 91-679 A, Congressional Research Service, August 1991.

Shampansky, Jay R. Congress' Contempt Power. CRS Report 86-83A, Congressional Research Service, February 28, 1986

Shane, Peter M. Legal Disagreement and Negotiation in a Government of Laws: The Case of Executive Privilege Claims Against Congress. Minnesota Law Review, v. 71, February 1987: 461.

Shane, Peter M. Negotiating for Knowledge: Administrative Responses to Congressional Demands for Information. Administrative Law Review, v. 44, Spring 1992: 197

Stathis, Stephen W. Executive Cooperation: Presidential Recognition of the Investigative Authority of Congress and the Courts. Journal of Law and Politics, v. 3, Fall 1986: 1987.

Taylor, Teleford. Grand Inquest: The Story of Congressional Investigations. New York: Simon and Schuster, 1995. KF4942.T38

Walsh, Lawrence E. The Independent Counsel and the Separation of Powers. Houston Law Review, v. 25, January 1988: 1 ENDNOTES

1. For a general overview of the oversight process see Congressional Research Service, Congressional Oversight Manual (February 1995).

2. *E.g., McGrain v. Daugherty,* 272 U.S. 135 (1927); *Watkins v. United States,* 354 U.S. 178 (1957); *Barenblatt v. United States,* 360 U.S. 109 (1950); *Eastland v. United States Servicemen's Fund,* 421 U.S. 491 (1975); *Nixon v. Administrator of General Services,* 433 U.S. 425 (1977); see also, *United States v. A.T.T.,* 551 F.2d 384 (D.C. Cir. 1976) and 567 F.2d 1212 (D.C. Cir. 1977).

3. 421 U.S. at 504, n. 15 (quoting *Barenblatt, supra,* 360 U.S. at 111).

4. 354 U.S. at 187.

5. *Id.*

6. *Id.* at 182.

7. *Id.* at 194-95

8. *Id.* at 200 n. 33.

9. *Kilbourn v. Thompson,* 103 U.S. 168, 204 (1880).

10. *Watkins v. United States, supra,* 354 U.S. at 187.

11. *United States v. Rumely,* 345 U.S. 41, 42, 44 (1953); *Watkins v. United States, supra,* 354 U.S. at 198.

12. *Wilkinson v. United States,* 365 U.S. 408-09 (1961).

13. 273 U.S. 135, 151 (1927).

14. *Id.* at 177.

15. *Id.*

16. *Id.*

17. 279 U.S. 263 (1929).

18. *Id.,* at 290.

19. *Id.* at 295.

20. *Id.* at 295.

21. *McGrain v. Daugherty, supra,* 273 U.S. at 174-75.

22. *Id.* at 158.

23. Senate Rule XXVI(1)(All Senate rules hereinafter cited were in effect as of 1993 unless otherwise indicated and may found in Sen. Doc. No. 103-3 compiled by the Senate Committee on Rules and Administration).

24. House Rule XI(2)(m)(1)(All House rules hereinafter cited were in effect as of 1993 unless

otherwise indicated and may be found in "Rules Adopted By The Committee of the House of Representatives", compiled by the House Rules Committee as a committee print).

25. See, e.g., S.Res. 23, 100th Cong. (Iran-Contra); Sen. Res. 495, 96th Cong. (Billy Carter/Libya).

26. Senate Rule XXV.

27. House Rule X.

28. *Eisler v. United States,* 170 F.2d 273, 279 (D.C. Cir. 1948), *cert. dismissed,* 338 U.S. 883 (1949).

29. See generally, Gary E. Davidson, Congressional Extraterritorial Investigative Powers: Real or Illusory ?, 8 Emory International Law Review 99 (1994).

30. U.S. Const., Art. I, sec. 6, cl. 1.

31. *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503-07 (1975).

32. 365 U.S. 399, 408-09 (1961).

33. *Barenblatt v. United States,* 360 U.S. 109, 117 1959); *Watkins v. United States, supra,* 354 U.S. at 209-215.

34. *In re Chapman,* 166 U.S. 661, 669 (1897).

35. *Shelton v. United States,* 404 F.2d 1292, 1297 (D.C. Cir. 1968), *cert. denied,* 393 U.S. 1024 (1969).

36. *Sinclair v. United States, supra,* 279 U.S. at 299; *Ashland Oil, Inc. v. F.T.C.,* 409 F.Supp. at 305.

37. *See, e.g., Yellin v. United States,* 374 U.S. 109, 143, 144 (1969); *Watkins v. United States, supra; United States v. Ballin,* 144 U.S. 1, 5 (1892).

38. *Exxon Corporation v. F.T.C.,* 589 F.2d 582, 590 (D.C. Cir. 1978). The issues raised by witness claims of constitutional and common law privileges are more fully discussed below at pp. 53-85. On claims that a committee subpoena is overbroad or burdensome see discussions, *infra,* at pp. 40-42.

39. *E.g.,* S. Res. 229, 103d Cong. (Whitewater); S. Res. 23, 100th Cong. (Iran-Contra); H. Res. 12, 100th Cong. (Iran-Contra); H. Res. 320, 100th Cong. (impeachment proceedings of Judge Alcee Hastings); S. Res. 495, 96th Cong. (Billy Carter/Libya).

40. See Jay R. Shampansky, Staff Depositions in Congressional Investigations, CRS Report No. 91-679, August 27, 1991 (suggesting that the criminal contempt procedure would be available if a committee adopted rules of procedure providing for Member involvement if a witness raises objections and refuses to answer; and that analogous case law under false statements and obstruction of Congress statutes would support prosecutions for false statements made during a deposition.).

41. See examples cited at note 39, *supra.*

42. See, *e.g.,* Senate Permanent Committee on Investigations Rule 9; House Iran-Contra Committee Rule 6, H. Res. 12, 133 Cong. Rec. 822 (1987).

43. See *Watkins v. United States,* 354 U.S. 178 (1957); *Quinn v. United States,* 349 U.S. 155 (1955).

44. See generally *Kastigar v. United States*, 406 U.S. 441 (1972).

45. *Kastigar v. United States,* 406 U.S. at 446.

46. 18 U.S.C. § 6005(a); See also *Application of Senate Permanent Subcommittee on Investigations,* 655 F.2d 1232 (D.C. Cir.), *cert. denied,* 454 U.S. 1084 (1981).

47. 18 U.S.C. § 6005(b).

48. Notice should be given to an independent counsel where one has been appointed, since he would have the powers usually exercised by the Justice Department. See 28 U.S.C. § 594.

49. 18 U.S.C. § 6005(b). The Justice Department may waive the notice requirement. *Application of Senate Permanent Subcommittee on Investigations,* 655 F.2d at 1236.

50. 18 U.S.C. § 6005(c).

51. See H.R. Rept. No. 91-1549, 91st Cong., 2d Sess. 43 (1970).

52. *Id.* See also S.Rept. No. 91-617, 91st Cong., 1st Sess. 145 (1969); *Application of U.S. Senate Select Committee on Presidential Campaign Activities*, 361 F.Supp. 1270 (D.D.C. 1973).

53. *Application of U.S. Senate Select Committee,* 361 F.Supp. at 1278-79.

54. 18 U.S.C. § 6002.

55. The constitutionality of granting a witness only use immunity, rather than transactional immunity, was upheld in *Kastigar v. United States, supra.*

56. *Kastigar v. United States, supra,* 406 U.S. at 460.

57. *United States v. North,* 910 F.2d 843 (D.C. Cir.), *modified,* 920 F.2d 940 (D.C. Cir. 1990) cert. denied, 111 S.Ct. (1991).

58. 951 F.2d 369 (D.C. Cir. 1991).

59. *United States v. North*, 920 F.2d at 942.

60. *Id.* ( emphasis in original).

61. *United States v. North,* 910 F.2d at 860. Because several years passed between the events at issue and the trial of North, the Independent Counsel had allowed potential witnesses to refresh their recollection with North's immunized testimony before they testified at the grand jury and at trial. *Id.*

62. *Id.* at 865. See also *id.* at 869 ("Where immunity testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed, they are one and the same."). The court of appeals criticized the district court for failing to inquire into "the extent to which the substantive content of the witnesses' testimony may have been shaped, altered, or affected by the [defendant's] immunized testimony." *Id.* at 863. The court further noted that it was legally irrelevant under *Kastigar* if the witnesses themselves, rather than the government, presented the immunized testimony. *Id.* at 871.

63. *Id.* at 872.

64. *United States v. Poindexter, supra,* 951 F.2d at 375-77.

65. *Id.*

66. Lawrence E. Walsh, The Independent Counsel and the Separation of Powers, 25 Hous. L. Rev. 1, 9 (1988).

67. Michael Gilbert, The Future of Congressional Use Immunity After *United States, v. North,* 30 Amer. Crim.L.Rev. 417, 430-31 (1993). See also, Arthur L. Limon and Mark A. Belnick, Congress Had to Immunize North, Wash. Post, July 29, 1990, at p. C7.

68. *Anderson v. Dunn,* 19 U.S. (6 Wheat) 204 (1821).

69. For a more comprehensive treatment of the history and legal development of the congressional contempt power, see Jay R. Shampansky, Congress' Contempt Power, CRS Report No. 86-83A, February 28, 1986.

70. See, *Groppi v. Leslie,* 404 U.S. 496 (1972).

71. See Todd D. Peterson, Prosecuting Executive Branch Officials for Contempt of Congress, 66 NYUL Rev. 563 (1991); Hearing, "Prosecution of Contempt of Congress", Before the Subcomm. on Administrative Law and Governmental Relations, House Comm. on the Judiciary, 98th Cong. 1st Sess. 21-35 (1983) (Statement and Testimony of Stanley Brand).

72. See 2 U.S.C. 288d and 28 U.S.C. 1364.

73. Usually brought by the Senate Legal Counsel. 2 U.S.C 288 d(a).

74. *Christoffel v. United States,* 378 U.S. 89 (1949).

75. House Rule XI (2) (h) (1).

76. Senate Rule XXVI (7) (a) (2).

77. *United States v. Bramlett,* 348 U.S. 503, 509 (1955); *United States v. Poindexter,* 951 F.2d 369, 386-88 (D.C. Cir. 1991).

78. *United States v. Poindexter, supra,* 951 F.2d at 377-86.

79. Joel D. Bush, Congressional-Executive Access Disputes: Legal Standards and Political Settlements, 9 J. of Law and Politics, 717, 735-46(1993); Peter M. Shane, Legal Disagreements and Negotiation in a Government of Laws, 71 Minn. L. Rev. 461 (1987); Stephen W. Stathis, Executive Cooperation: Presidential Recognition of the Investigatory Authority of Congress and the Courts, 3 J. of Law and Politics 183 (1986); Richard Ehlke, Congressional Access To Information From The Executive: A Legal Analysis, CRS Report No. 86-50A, March 10, 1986.

80. See, *e.g., United States v. AT&T,* 551 F.2d 784 (D.C. Cir. 1976) and 567 F.2d 121 (D.C. Cir 1977), where the appeals court twice refused to balance the asserted constitutional interests, instead remanding the case for further negotiations under the supervision of the district court; and *United States v. U.S. House of Representatives,* 556 F.2d 150, 152 (D.D.C. 1983), where the district court refused to enjoin transmission by the House of Representatives of a contempt citation of the Administrator of the EPA to the United States Attorney on grounds alleging constitutional executive privilege, stating that when "constitutional disputes arise concerning the separation of powers of the legislative and executive branches, judicial intervention should be delayed until all

possibilities for settlement have been exhausted . . . judicial restraint is essential to maintain the delicate balance of powers among the branches established by the Constitution." In both instances negotiated resolutions ultimately ended the immediate disputes.

81. 418 U.S. 683 (1974).

82. The subpoena was for certain tape recordings and documents relating to the President's conversations with aides and advisors. The materials were sought for use in a criminal trial.

83. 418 U.S. at 705, 706. See also id. at 708, 711.

84. Id. at 705, 708. Citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), the Court held that it had the authority to review the President's claim of executive privilege. 418 U.S. at 703-05. The materials in question in United States v. Nixon related to confidential communications between the President and his advisors. The Court indicated that it might proceed differently and accord more deference to the executive's claims in a case involving military or diplomatic matters. Id. at 706.

85. Id. at 707.

86. Id. at 713.

87. Id. at 712, n. 19.

88. 498 F.2d 725 (D.C. Cir. 1974).

89. The subpoena was for tapes of conversations between the President and presidential counsel John Dean. The committee sought a declaratory judgment that its subpoena was lawful and that the President's refusal to comply with it, on the basis of executive privilege, was unlawful.

90. 498 F.2d at 730.

91. Id at 732-33.

92. Memorandum from the President to the Heads of Executive Departments and Agencies on Procedures Governing Responses to Congressional Requests for Information (November 4, 1982), reprinted in Congressional Oversight Manual, supra note 1, at pp. 197-98. The Department of Justice Office of Legal Counsel lists 64 instances of presidential invocation of executive privilege in the face of congressional requests for information between 1792 and October 1981. 6 OLC 751 (1982). President Reagan invoked the privilege in November 1982 in the EPA investigation. See, "Contempt of Congress", H. Rept. No. 97-968, 97th Cong., 2d Sen. 1982. The last recorded invocation was by President Bush in August 1991. See Congressional Oversight Manual at pp. 199-204; and Mark J. Rozell, Executive Privilege in the Bush Administration: Constitutional Problems, Bureaucratic Responses, 1 Miller Center Journal 63, 71-72 (1994).

93. H. Res. 632, 97th Cong., 128 Cong. Rec. 31746-76 (1982).

94. H.R. Rept. No. 94-693, 94th Cong., 1st Session (1975)(Secretary of State Henry R. Kissinger); H.R. Rept. No. 97-898, 97th Cong. 2d Sess. (1982)(Secretary of the Interior James G. Watt).

95. Secretary of Commerce Rogers C.B. Morton (1975); Secretary of Health Education and Welfare Joseph Califano (1978); Secretary of Energy Charles Duncan (1980); Secretary of Energy James Edwards (1980); and Attorney General William French Smith (1984).

96. See, e.g., 1 U.S.C. 112b limiting congressional access to international agreements, other than treaties, where, in the opinion of the President, public disclosure would be prejudicial to the

national security, to the foreign relations committees of each House under conditions of secrecy removable only by the President; 26 U.S.C. 6103(d), 6104(a)(2) limiting inspection of tax information to the Senate Finance Committee, House Ways and Means Committee, and the Joint Committee on Taxation, or any committees "specifically authorized by a resolution of the House or Senate"; 10 U.S.C. 1582, which provides that in reporting to Congress on certain sensitive positions created in the Defense Department, "the Secretary may omit any item if he considers a full report on it would be detrimental to the national security"; and under 50 U.S.C. 402g, j(b), the Congress' ability to obtain information about the Central Intelligence Agency, particularly with regard to expenditures, is very limited.

97. See, *e.g.*, *F.T.C. v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980); *Exxon Corp. v. F.T.C.*, 589 F.2d 582, 585-86 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 943 (1979); *Ashland Oil Co., Inc. v. F.T.C.* 548 F.2d 977, 979 (D.C. Cir. 1976).

98. *F.T.C. v. Owens-Corning Fiberglass Corp.* 626 F.2d at 970; *Exxon Corp. v. F.T.C.*, 589 F.2d at 589; *Ashland Oil Co., Inc. v. F.T.C.*, 548 F.2d at, 979; *Moon v. CIA*, 514 F.Supp. 836, 840-41 (SDNY 1981).

99. *F.T.C. v. Owens-Corning Fiberglass Corp.*, 626 F.2d at 970; *F.T.C. v. Anderson*, 631 F.2d 741, 747 (D.C. Cir. 1970); *Exxon Corp. v. F.T.C.*, 589 F.2d at 588-9.

100. *F.T.C. v. Owens-Corning Fiberglass Corp.*, 626 F.2d at 970; *Exxon Corp. V. F.T.C.*, 589 F.2d at 589; *Ashland Oil Corp. v. F.T.C.*, 548 F.2d at 979; *Moon v. CIA*, 514 F.Supp at 849-51.

101. *Doe v. McMillan*, 412 U.S. 306 (1973); *F.T.C. v. Owens-Corning Fiberglass Corp.* 626 F.2d at 970.

102. *Ashland Oil Co., Inc. v. F.T.C.*, 548 F.2d at 980-81.

103. 5 U.S.C. 552(b)(5).

104. 5 U.S.C. 552(d).

105. 612 F.2d 1151, 1155-58 (D.C. Cir. 1979).

106. 5 U.S.C. 552a (b)(9).

107. See discussion of legislative history in *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1144-52 (D.C. Cir. 1987).

108. 441 U.S. 281, 301-16 (1979).

109. 41 Op. Atty. Gen. 221 (1955).

110. See Morton Rosenberg, "Legal and Historical Substantiality of Former Attorney General Civilette's Views as to the Scope and Reach of Congress' Authority to Conduct Oversight of the Department of Justice," CRS, October 15, 1993, *reprinted in* Hearing, "EPA's Criminal Enforcement Program", before the Subcommittee on Oversight and Investigations, House Committee on Energy and Commerce, 103d Cong., 1st Sess. 12-41 (1993). For an in-depth description of the most recent investigation of the DOJ, see Staff Report, Damaging Disarray: Organizational Breakdown and Reform in the Justice Department's Environmental Crimes Program, House Subcomm. on Oversight and Investigations, Comm. on Energy and Commerce, 103rd Congress., 2d Session (Dec. 1994) (Comm. Print No. 103-T).

111. See notes, 13-20, *supra*, and accompanying text for a review of *McGrain v. Daugherty* and *Sinclair v. United States*.

112. A leading statement of the executive branch position is found in an opinion of Attorney General Robert Jackson. 40 Op. A.G. 45 (1941).

113. See discussion of case law, *supra* at notes 2-8 and 13-20, and accompanying text.

114. *Hutcheson v. United States,* 369 U.S. 599, 617 (1962).

115. *Sinclair v. United States,* 279 U.S. 263, 294 (1929).

116. See e.g., *Delaney v. United States,* 199 F.2d 107 (1st Cir. 1952); *United States v. Mitchell,* 372 F.Supp. 1239, 1261 (S.D.N.Y. 1973). For discussion of issues in addition to prejudicial publicity that have been raised in regard to concurrent congressional and judicial proceedings, including allegations of violation of due process, see, Contempt of Congress, H.R. Rpt. No. 97-968, 97th Cong., 2d Sess. 58 (1982; and the discussion of the potential consequences of congressional grants of testimonial immunity on criminal trials, *supra,* at notes 57-67 and accompanying text.

117. 199 F.2d 107, 114 (1st Cir. 1952). The court did not fault the committee for holding public hearings, stating that if closed hearings were rejected "because the legislative committee deemed that an open hearing at that time was required by overriding considerations of public interest, then the committee was of course free to go ahead with its hearing, merely accepting the consequence that the trial of Delaney on the pending indictment might have to be delayed." 199 F.2d at 114-5. It reversed Delaney's conviction because the trial court had denied his motion for a continuance until after the publicity generated by the hearing, at which Delaney and other trial witnesses were asked to testify, subsided. See also, *Hutcheson v. United States,* 369 U.S. 599, 613 (1962)(upholding contempt conviction of person who refused to answer committee questions relating to activities for which he had been indicted by a state grand jury, citing *Delaney.*)

118. 199 F.2d at 115.

119. See, *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968), *cert. denied,* 400 U.S. 102 (1971)(claim of prejudicial pretrial publicity rejected because committee hearings occurred five months prior to indictment); *Beck v. United States,* 298 F.2d 622 (9thCir. 1962)(hearing occurred a year before trial); *United States v. Haldeman,* 559 F.2d 31, 63 (D.C. Cir. 1976), *cert. denied,* 433 U.S. 933 (1977); *United States v. Ehrlichman,* 546 F.2d 910, 917 (D.C. Cir. 1976), *cert. denied,* 429 U.S. 1120 (1977); *United States v. Mitchell,* 372 F.Supp. 1239, 1261 (S.D.N.Y. 1973)(post-indictment Senate hearing but court held that lapse of time and efforts of committee to avoid questions relating to indictment diminished possibility of prejudice); *United States v. Mesarosh,* 223 F.2d 449 (3rd Cir. 1955)(hearing only incidentally connected with trial and occurred after jury selected).

120. See, *e.g., Pillsbury Co. v. FTC,* 354 F.2d 952 5th Cir. (1968).

121. See *e.g., ATX, Inc. v. Department of Transportation* 41 F.3d 1522 (D.C. Cir. 1994); *State of California v. FERC,* 966 F.2d 154 (9th Cir. 1992); *Peter Kiewet Sons' v. U.S. Army Corps of Engineers,* 714 F.2d 163 (D.C. Cir. 1983); *Gulf Oil Corp. v. FPC,* 563 F.2d 588 (3d Cir. 1977), *cert. denied,* 434 U.S. 1062 (1978); *United States v. Armada Petroleum Corp.,* 562 F.Supp 43 (S.D. Tex. 1982). See also, Morton Rosenberg and Jack Maskell, Congressional Intervention in the Administrative Process: Legal and Ethical Considerations (CRS Report No 90-440A, Sept. 7, 1990).

122. See remarks of Independent Counsel Lawrence E. Walsh, *supra n.*66 and accompanying text.

123. 487 U.S. 654 (1988).

124. *Id.* at 691-92.

125. *Id.* at 694.

126. 9 F.3d 743 (9th Cir. 1993).

127. Boeing argued, *inter alia*, that Congress could not vest enforcement functions outside the Executive Branch in private parties. Applying *Morrison* the appeals court emphatically rejected the contention.

> Before comparing the *qui tam* provisions of the FCA to the independent counsel provisions of the Ethics in Government Act, we must address Boeing's contention that only the Executive Branch has the power to enforce laws, and therefore to prosecute violations of law. *It is clear to us that no such absolute rule exists. Morrison* itself indicates otherwise because that decision validated the independent counsel provisions of the Ethics in Government Act even though it recognized that "it is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity." 487 U.S. at 695. The Court also stated in *Morrison* that "there is no real dispute that the functions performed by the independent counsel are `executive' in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch." 487 U.S. at 692 (emphasis added). Use of the world "typically" in that sentence, considered in light of the Court's ultimate conclusion upholding the independent counsel provisions, must mean that prosecutorial functions need not always be undertaken by Executive Branch officials. See Stephanie A.J. Dangel, Note, Is Prosecution a Core Executive Function? Morrison v. Olson and the Framers' Intent, 99 Yale L.J. 1069, 1070 (1990)(Framers intended that prosecution would be undertaken by but not constitutionally assigned to executive officials, and that such officials would typically but not always prosecute). *Thus, we reject Boeing's assertion that all prosecutorial power of any kind belongs to the Executive Branch.*

9 F.3d at 751 (emphasis supplied).

128. *Nixon v. Administration of General Services*, 433 U.S. 425,433 (1977); *Commodity Futures Trading Commission v. Schor*, 487 U.S. 833, 851 (1986); *Morrison v. Olson*, 487 U.S. 654, 693-96 (1988).

129. *U.S. v. Nixon,* 418 U.S. 683, 705-706, 711-712 (1974).

130. *Gulf Oil Corp. v. FPC*, 563 F.2d 588, 610 (3d Cir. 1977).

131. Fed. R. Crim. Pro. 6 (e) (2).

132. *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 425 (1983); *In re Sealed Motion*, 880 F.2d 1367, 1373 (D.C. Cir. 1989).

133. Fed. R. Crim. Pro. 6(e) (2).

134. See *In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*, 669 F.Supp. 1072, 1074-75 (S.D. Fla. 1987), *aff'd on other grounds*, 833 F.2d 1438 (11th Cir. 1987); *In re Report and Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives*, 370 F.Supp. 1219, 1230 9D.C.C. 1974), *petitions for writs of prohibition and mandamus den'd sub nom., Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974); *In re Grand Jury Investigation of Ven-Fuel*, 441 F.Supp. 1299, 1304-308 (M.D. Fla. 1977).

135. *United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Circ. (1960)). See also, *SEC v. Dresser Industries, Inc.,* 628 F.2d 1368 (D.C.C. Cir. 1980); *In re Grand Jury Investigation (New Jersey State Commission of Investigation),* 630 F.2d 996 (3rd Cir. 1980); *Davis v. Romney,*

55 F.R.D. 337 (E.D. Pa. 1972).

136. In re Grand Jury Impanelled October 2, 1978, 510 F.Supp. 112, 115 (D.C.C. 1981); *In re Grand Jury Proceedings, Newport News Drydock & Shipbuilding Co., Mem. Opinion* (E.D. Va. Nov. 12, 1984); In re Senate Banking Committee Hearings, 19 F.R.D. 410 (N.D. Ill. 1956).

137. In re Grand Jury Investigation Uranium Industry, 1979-2 Trade Cas. 78, 639 (D.D.C. (1979)); In re Grand Jury Impanelled October 2, 1978, 510 F.Supp. 112 (D.D.C. 112 (D.D.C. 1981).

138. Senate of Puerto Rico v. U.S. Department of Justice, 823 F.2d 574, 583, 583n. 30 (D.C. Cir. 1987); In Grand Jury Impanelled October 2, 1978 (79-2), 510 F.Supp. 112, 114-15 (D.D.C. 1981).

139. In re Harrisburg Grand Jury -- 83-2, 638 F.Supp. 43, 47 n.4 (M.D. Pa. 1986); *In re Grand Jury Matter (Catania),* 682 F.2d 61, 64 n.4 (3d Cir. 1982)

140. Washington Post v. Robinson, 935 F.2d 282, 290-91 (D.C. Cir. 1991).

141. S.E.C. v. Dresser Industries, Inc., 628 F.2d 1368, 1382-83 (D.C. Cir. 1980); *United States ex rel Woodard v. Tynan,* 757 F.2d 1085, 1087-88 (10th Cir. 1985).

142. Anaya v. United States, 815 F.2d 1373, 1380-81 (10th Cir. 1987).

143. United States v. Rumely, 345 U.S. 41, 44 (1957); *Watkins v. United States,* 354 U.S. 178, 201 (1957); Gojack v. United States, 384 U.S. 202, 208 (1966).

144. Barenblatt v. United States, 360 U.S. 109, 117 (1959); Watkins v. United States, supra, 209-215.

145. See Senate Resolution 229, 103d Cong., 2d Sess., directing the Senate Banking, Housing and Urban Affairs Committee to conduct a limited hearing on the Whitewater affair. 140 Cong. Rec. S 6675 (daily ed. June 9, 1994).

146. See Sen. Res. 23 and 147. A Senate Judiciary Subcommittee to Investigate Individuals Representing the interests of Foreign Governments was created by unanimous consent agreement of the Senate. 126 Cong. Rec. 19544-46 (1980).

148. Senate Rule XXV.

149. House Rule X.

150. House Rule XI(2); Senate Rule XXVI(2).

151. United States v. Reinecke, 524 F.2d 435 (D.C. Cir 1975)(failure to publish committee rule setting one Senator as a quorum for taking hearing testimony held sufficient ground to reverse perjury conviction).

152. Gojack v. United States 384 U.S. 702, 708 (1966); *Yellin v. United States,* 374 U.S. 109 (1963).

153. House Rule XI(2)(k)(2).

154. House Rule XI(2)(h)(1).

155. Senate Rule XXVI(7)(a)(2).

156. *Christoffel v. United States,* 338 U.S. 84 (1949).

157. Senate Rule XXVI(7)(a)(2); House Rule XI(2)(h)(1).

158. Senate Rule XXVI(5)(b); House Rule X1(2)(g)(2).

159. House Rule XI(2)(k)(5).

160. House Rule XI(2)(k)(7).

161. *Id.*

162. *Doe v. McMillan,* 566 F.2d 713, 713-16 (D.C. Cir. 1977), *cert. denied,* 435 U.S. 969 (1978).

163. Art. I, sec. 6, cl. 2.

164. The purposes of the Speech or Debate Clause are to assure the independence of Congress in the exercise of its legislative functions and to reinforce the separation of powers established in the Constitution. *Eastland v. United States Servicemen's Fund,* 421 U.S. 502-03 (1975). The Supreme Court has read the Clause to broadly effectuate its purposes. *Id.; United States v. Swindall,* 971 F. 2d 1531, 1534 (11th Cir. 1992). The Clause protects "purely legislative activities", including those inherent in the legislative process. *Chastain v. Lundquist,* 833 F. 2d 311, 314 (D.C. Cir. 1987) (quoting *U.S. v. Brewster,* 408 U.S. 501, 512 (1972), *cert. denied* 487 U.S. 1240 (1988). Actions protected under the provisions include those taken in the regular course of the legislative process and the motivations of the legislators for their actions. *United States v. Helstoski,* 442 U.S. 477, 489 (1979). In addition to shielding "words spoken in debate", *Kilbourn v. Thompson,* 103 U.S. 168, 204 (1880), the Clause encompasses such activity integral to lawmaking as voting, *id.,* circulation of information to other members, *Doe v. McMillan* 412 U.S. 306 (1973), *Gravel v. United States,* 408 U.S. 606, 625 (1972), and participation in committee investigative proceedings, and reports. *Id., Eastland v. U.S. Servicemen's Fund, supra; Dombrowski v. Eastland,* 387 U.S. 82 (1967); *Tenney v. Brandhove,* 341 U.S. 367 (1951).

However, activities only casually or incidentally related to legislative affairs are outside the ambit of Speech or Debate protection. Thus newsletter and press releases circulated by a member to the public are not shielded because they are "primarily means of informing those outside the legislative forum". *Hutchinson v. Proxmire,* 443 U.S. 111 (1979). Also a member may be prosecuted for accepting a bribe or for other unlawful conduct so long as the prosecution "does not draw in question the legislative act of the defendant Member of Congress". *United States v. Brewster, supra,* 408 U.S. at 510 (quoting *United States v. Johnson,* 383 U.S. at 185). The key consideration is the act presented for examination, not the actor. Activities integral to the legislative process may not be examined, but peripheral activities not closely connected to the business of legislating do not enjoy the protection of the Clause. *Walker v. Jones,* 733 F. 2d, 927, 929 (D.C. Cir. 1984).

165. Senate Rule XXVI(3)(c).

166. See discussion, *supra* at notes 77-78 and accompanying text.

167. 2 U.S.C. 191.

168. House Rule XII(2)(k)(3).

169. See, *e.g.,* Senate Permanent Committee on Investigations Rule 8.

170. See, e.g., Senate Aging Committee Rule V. 8; Senate Permanent Subcommittee on Investigations Rule 7.

171. *United States v. Fort*, 443 F.2d 620, 678-79 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 932 (1971).

172. 2 U.S.C. 191.

173. See *McPhaul v. United States*, 364 U.S. 372 (1960).

174. *Hale v. Henkel*, 201 U.S. 43 (1906).

175. *Bellis v. United States*, 417 U.S. 85 (1974).

176. See *United States v. White*, 322 U.S. 694 (1944).

177. *Bellis v. United States*, 417 U.S. at 90. See also *Rogers v. United States*, 340 U.S. 367 (1951) (Communist Party).

178. *Fisher v. United States*, 425 U.S. 391, 409 (1976); *Andresen v. Maryland*, 427 U.S. 463 (1976). These cases concerned business records and there may be some protection available in the case of a subpoena for personal papers. However, in *Senate Select Committee on Ethics v. Packwood*, 845 F.Supp 17, 22-23 (D.D.C, 1994), *stay pending appeal denied*, 114 S.Ct. 1036 (1994), the court upheld disclosure to the Senate Ethics Committee of a Senator's diaries, holding that the Fifth Amendment "does not protect against [the diaries'] incriminating *contents* voluntarily committed to paper before the government makes demand for them" (emphasis in original).

179. *United States v. Doe*, 465 U.S. 605 (1984); *Fisher v. United States*, 425 U.S. 391 (1976). But *c.f.*, *Doe v. United States*, 487 U.S. 201 (1988), where the Court upheld a lower court order compelling the target of a grand jury investigation to sign a consent directive authorizing foreign banks to disclose records of any and all accounts over which he had a right of withdrawal, holding it not to be testimonial in nature.

180. *Emspak v. United States, supra*, 349 U.S. at 194.

181. *Quinn v. United States, supra*, 349 U.S. at 164.

182. *Eisler v. United States*, 170 F.2d 273 (D.C. Cir. 1948), *cert denied*, 338 U.S. 887 (1949).

183. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Where a witness asserts the privilege, a committee may seek a court order under 18 U.S.C. 6002, 6005 which directs him to testify and grants him immunity against use of his testimony, or other evidence derived from his testimony, in a subsequent criminal prosecution. See discussion of procedure to obtain such an immunity order, *supra* at notes 45-56 and accompanying text.

184. *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951).

185. *United States v. Jaffee*, 98 F.Supp. 191, 193-94 (D.D.C. 1951). See also *Simpson v. United States*, 241 F.2d 222 (9th Cir. 1957)(privilege inapplicable to questions seeking basic identifying information such as the witness' name and address).

186. *Emspak v. United States*, 349 U.S. 190 (1955). See also *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

187. *Deutch v. United States*, 367 U.S. 456, 467-68 (1961). As the court explained in that case, there is a separate *statutory* requirement of pertinency.

188. *Watkins v. United States*, 354 U.S. 178, 214-15 (1957).

189. *Id.; Deutch v. United States*, 367 U.S. 456 (1961).

190. *Watkins v. United States*, 354 U.S. 178, 197 (1957).

191. 360 U.S. 109, 126 (1959).

192. *Id.*

193. *Watkins v. United States*, 354 U.S. at 198. A balancing test was also used in *Branzburg v. Hayes*, 408 U.S. 665 (1972), the leading case on the issue of the claimed privilege of newsmen not to respond to demands of a grand jury for information. In its 5-4 decision, the Court concluded that the need of the grand jury for the information outweighed First Amendment considerations, but there are indications in the opinion that "the infringement of protected first amendment rights must be no broader than necessary to achieve a permissible governmental purpose," and that "a State's interest must be `compelling' or `paramount' to justify even an indirect burden on first amendment rights." *Id.* at 699-700. For application of the compelling interest test in a legislative investigation, see *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963). See also, James J. Mangan, Contempt for the Fourth Estate: No Reporter's Privilege Before a Congressional Investigation, 83 Geo. L.J. 129 (1994) (arguing that bases for reporter's privilege are outweighed by governmental interests in a congressional investigation).

194. *Barenblatt v. United States*, 360 U.S. 109 (1959); *Watkins v. United States*, 354 U.S. 178 (1957); *United States v. Rumely*, 345 U.S. 41 (1953).

195. Although it was not in the criminal contempt context, one court of appeals has upheld a witness' First Amendment claim. In *Stamler v. Willis*, 415 F.2d 1365 (7th Cir. 1969), *cert. denied*, 399 U.S. 929 (1970), the court ordered to trial a witness' suit for declaratory relief against the House Un-American Activities Committee in which it was alleged that the committee's authorizing resolution had a "chilling effect" on plaintiff's First Amendment rights. In other cases for declaratory and injunctive relief brought against committees on First Amendment grounds, relief has been denied although the courts indicated that relief could be granted if the circumstances were more compelling. *Sanders v. McClellan*, 463 F.2d 894 (D.C. Cir. 1972); *Davis v. Ichord*, 442 F.2d 1207 (D.C. Cir. 1970); *Ansara v. Eastland*, 442 F.2d 751 (D.C. Cir. 1971). However, in *Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975), the Supreme Court held that the Constitution's Speech or Debate clause (art. I, sec. 6, cl. 1) generally bars suits challenging the validity of congressional subpoenas on First Amendment or other grounds. Thus, a witness generally cannot raise his constitutional defenses until a subsequent criminal prosecution for contempt unless, in the case of a Senate committee, the statutory civil contempt procedure is employed. See *United States v. House of Representatives*, 556 F.Supp. 150 (D.D.C. 1983).

196. *United States v. Rumely*, 345 U.S. 41 (1953).

197. *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963). In the majority opinion, Justice Goldberg observed that "an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition [is] that the State convincingly show a substantial relation [or nexus] between the information sought and a subject of overriding and compelling state interest". *Id.* at 546.

198. *Watkins v. United States*, 354 U.S. 178, 188 (1957); *McPhaul v. United States*, 364 U.S. 372 (1960).

199. Fourth Amendment standards apply to subpoenas, such as those issued by committees, as well as to search warrants. See *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946). A congressional subpoena may not be used in a mere "fishing expedition." See *Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936), quoting, *Federal Trade Commission v. American Tobacco Co.*, 264 U.S. 298, 306 (1924) ("It is contrary to the first principles of justice to allow a search through all the record, relevant or irrelevant, in the hope that something will turn up."). *Cf. United States v. Groves*, 188 F.Supp. 314 (W.D. Pa. 1937) *(dicta)*. But see *Eastland v. United States Servicemen's*

*Fund,* 421 U.S. 491, 509 (1975), in which the Court recognized that an investigation may lead "up some `blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result".

200. *McPhaul v. United States,* 364 U.S. 372 (1960); *Shelton v. United States,* 404 F.2d 1292 (D.C. Cir. 1968), cert. denied, 393 U.S. 1024 (1969). In *Senate Select Committee on Ethics v. Packwood,* 845 F.Supp. 17, 20-21 (D.D.C. 1994), *stay pending appeal denied,* 114 S.Ct. 1036 (1994), the court rejected a claim of overbreadth with regard to a subpoena for a Senator's personal diaries, holding that committee's investigation was not limited in its investigatory scope to its original demands "even though the diaries might prove compromising in respects the committee has not yet foreseen".

201. *McPhaul v. United States,* 364 U.S. at 382.

202. *Shelton v. United States,* 404 F.2d at 1299-1300.

203. *McPhaul v. United States,* 364 U.S. at 378.

204. *Nelson v. United States,* 268 F. 505 (D.C. Cir.), *cert. denied,* 346 U.S. 827 (1953)

205. In *United States v. McSurely,* 473 F.2d 1178, 1194 (D.C. Cir. 1972), the court of appeals reversed contempt convictions where the subcommittee subpoenas were based on information "derived by the subcommittee through a previous unconstitutional search and seizure by [state] officials and the subcommittee's own investigator." The decision of the court of appeals in the contempt case was rendered in December, 1972. In a civil case brought by the criminal defendants, Alan and Margaret McSurely, against Senator McClellan and the subcommittee staff for alleged violations of their constitutional rights by the transportation and use of the seized documents, the federal district court in June, 1973, denied the motion of the defendants for summary judgment. While the appeal from the decision of the district court in the civil case was pending before the court of appeals, the Supreme Court held in *Calandra v. United States,* 414 U.S. 338 (1974), that a grand jury is not precluded by the Fourth Amendment's exclusionary rule from questioning a witness on the basis of evidence that had been illegally seized. A divided court of appeals subsequently held in *McSurely v. McClellan,* 521 F.2d 1024, 1047 (D.C. Cir. 1975), that under *Calandra* "a congressional committee has the right in its investigatory capacity to use the product of a past unlawful search and seizure."

The decision of the three-judge panel in the civil case was vacated and on rehearing by the full District of Columbia Circuit, five judges were of the view that *Calandra* was applicable to the legislative sphere and another five judges found it unnecessary to decide whether *Calandra* applies to committees but indicated that, even if it does apply to the legislative branch, the exclusionary rule may restrict a committee's use of unlawfully seized documents if it does not make mere "derivative use" of them but commits an independent Fourth Amendment violation in obtaining them. *McSurely v. McClellan,* 553 F.2d 1277, 1293-94, 1317-25 (D.C. Cir. 1976) *(en banc).* The Supreme Court granted *certiorari* in the case, 434 U.S. 888 (1977), but subsequently dismissed *certiorari* as improvidently granted, with no explanation for this disposition of the case, *sub nom. McAdams v. McSurely,* 438 U.S. 189 (1978). Jury verdicts were eventually returned against the Senate defendants, but were reversed in part on appeal. 753 F.2d 88 (D.C. Cir. 1985), *cert. denied,* U.S. (1985).

More recently, in a contextually relevant situation, a district court quashed subpoenas issued on behalf of tobacco companies against two members of Congress for testimony and production of documents relating to a congressional investigation of the company's knowledge of the health hazards and addictiveness of tobacco. *Maddox v. Williams,* 855 F. Supp. 406 (D.D.C. 1994), *appeal pending in the D.C. Circuit.* The companies had contended that the documents had been stolen and disclosed in violation of the attorney-client privilege. The court held that "use by a congressional committee of information that is gathered illegally is nevertheless protected by the Speech or Debate Clause, provided the use occurs in the course of a legitimate congressional investigation, and Congressmen were not personally involved in the criminal activity." 855 F. Supp. at 411-12 (citing, *inter alia, Dombroski v. Eastland,* 387 U.S. 82,85,87 (1967) and *Eastland v.*

*United States Servicemen's Fund, supra*, 421 U.S. at 501). The court also rejected the companies' reliance on *McSurely* as "misplaced". Its opinion described *McSurely* as "holding that, even if material comes to a legislative committee by means that are unlawful, subsequent committee use of that material is nevertheless privileged", 855 F. Supp at 412 note 18, 417.

206. Hearings, "International Uranium Cartel", Subcomm. on Oversight and Investigations, House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess., Vol. 1, 123 (1977).

207. *See* 2 U.S.C. 190d.

208. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927); *Watkins v. United States*, 354 U.S. 178, 187 (1957); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).

209. Erskine May's Treatise at 746-747 (20th ed. 1983). May's Treatise has been relied upon as an authoritative guide to parliamentary and congressional investigatory authority. *See, e.g., McGrain v. Daugherty, supra*, 273 U.S. at 161 note 15.

210. Millet, The Applicability of Evidentiary Privileges For Confidential Communications Before Congress, 21 John Marshall L. Rev. 309, 312-313 (1988)(Millet).

211. Millet, *ibid.*, at 313-314. See also, *Stewart v. Blaine*, 1 MacArthur 453 (D.C. 1874); Eberling, Congressional Investigations 349-350 (1928); Proceedings Against Ralph Bernstein and Joseph Bernstein. H.Rept. No. 99-462, 99th Cong., 2d Sess. 13 notes 12-14 (1986)(Bernstein Contempt Report.).

212. See, Attorney-Client Privilege, Memoranda Opinions of the American Law Division, Library of Congress, Committee Print 98-I, (98th Cong. June 1983)(CRS Memoranda). See also Hearings, International Uranium Cartel, before Subcommittee on Oversight and Investigations, House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. Vol. 1 (1977).

213. See, S. Rept. No. 2, 84th Cong., 1st Sess. 27-28 (1954); CRS Memoranda, *supra* note 212, at 24-26.

214. See, *e.g.*, Hearings on the International Uranium Cartel Before the Subcomm. on Oversight and Investigations of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 60, 123 (1977); see also CRS Memoranda, *supra*, at 1-2, 27-36, 108-115.

215. 132 Cong. Rec. 3028-3062 (1986); Bernstein Contempt Report, *supra* note 211, at 1.

216. Bernstein Contempt Report, at 14.

217. *Id.* at 14-15.

218. 132 Cong. Rec. at 3061-62.

219. "Subcommittee on Nuclear Regulation [Senate Committee on Environment and Public Works] Ruling on Claims of Attorney-Client Privilege," to Ms. Billie P. Garde from Chairman John Breaux and Senator Alan K. Simpson, dated July 19, 1989, at pp. 12-13 (Copy on file in the American Law Division, CRS).

220. *Id.* at 14.

221. *Id.* at 15, 18-19.

222. *In the Matter of Provident Life & Accident Co.*, E.D. Tenn., S.D., CIV-1-90-219, June 13, 1990 (per Edgar, J.).

223. See, Hearings before the Senate Permanent Subcomm. on Investigations, Committee on Governmental Affairs, "Health Care Fraud/Medicare Secondary Payee Program," 101st Cong., 2d Sess., July 11 and 12, 1990, at pp. 3-10.

224. See, e.g., Upjohn v. United States, 449 U.S., 382, 389 (1981).

225. Id.

226. Hannah v. Larche, 363 U.S. 420, 425 (1960); see also, United States v. Fort, 443 F.2d 670 (D.C. Cir. 1970), cert. denied, 403 U.S. 932 (1971) (rejecting contention that the constitutional right to cross-examine witnesses applied to a congressional investigation).

227. U.S. Const., Art. I, Sec. 5, cl. 2.

228. For example, see discussion of difficulties in corporate confidentiality and the development of the doctrine of waiver, in CRS Memoranda, supra note 212 at 26-32, 102-107. See also Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), cert. denied, 401 U.S. 974 (1971) (In shareholder derivative suits "the availability of the privilege [should] be subject to the right of stockholders to show cause why it should not be invoked in the particular instance.").

229. Hickman v. Taylor, 329 U.S. 495, 511 (1974).

230. See, e.g., Central National Insurance Co. v. Medical Protective Co. of Fort Wayne, Indiana, 107 F.R.D. 393, 395 (E.D. Mo. 1985); Chepanno v. Champion International Corp., 104 F.R.D. 395, 396 (D. Or. 1984); American Standard, Inc. v. Bendix Corp. 71 F.R.D. 443, 446 (W.D. Mo. 1976).

231. Kirkland v. Morton Salt Co., 46 F.R.D. 28, 30 (N.D. Ga. 1968).

232. 210 F.Supp. 483, 485 (E.D. Pa. 1962), cert. denied sub. nom. General Electric Co. v. Kirkpatrick, 372 U.S. 943 (1963).

233. Fisher v. United States, 425 U.S. 391 (1976).

234. 8 Wigmore, Evidence, §2291 at 554 (McNaughton rev. 1961).

235. In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 451 (6th Cir. 1983). See also, In re Shargel, 742 F.2d 61, 62 (2d Cir. 1984); U.S. v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983); U.S. v. Goldfarb, 328 F.2d 280 (6th Cir.) cert denied 370 U.S. 976 (1964).

236. See, e.g., In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 450-51 (6th Cir. 1983); U.S. V. Lawless, 709 F.2d 485, 487 (7th Cir. 1983); In re Grand Jury Witness (Salas), 695 F.2d 359, 362 (9th Cir. 1982); In fe Walsh, 623 F.2d 489, 493 (7th Cir.), cert denied, 449 U.S. 994, 101 S. Ct. 531, 66 L.Ed. 2d 291 (1980); Liew v. Breen 640 F. 2d 1046, 1049 (9th Cir. 1981); United States v. Stern 511 F.2d 1364, 1367 (2nd Cir. 1975); United States v. Landof 591 F.2d 36, 38 (9th Cir. 1978); In re Grand Jury Empaneled February 14, 1978 (Markowitz), 603 F.2d 469, 474 (3d Cir. 1979); United States v. Hodgson, 492 F.2d 1175 (10th Cir. 1974); United States v. Tratner, 511 F.2d 248, 251 (7th Cir. 1975); United States v. Demauro, 581 F.2d 50, 55 (2d Cir. 1978); United States v. Ponder, 475 F.2d 37, 39 (5th Cir. 1973); United States v. Bartlett, 449 F.2d 700, 703 (8th Cir. 1971), cert. denied, 405 U.S. 932 (1972); In re Application of John Doe, Esq., 603 F.Supp. 1164, 1166 (E.D.N.Y. 1985); In re Grand Jury Subpoena December 18, 1981, 561 F.Supp. 1247, 1251 (E.D.N.Y. 1981).

237. SEC v. Gulf and Western Industries, Inc., 518 F.Supp. 675, 682 (D.D.C. 1981).

238. In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 454 (6th Cir. 1983); U.S. v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983); In re Grand Jury Witness (Salas), 695 F.2d 359, 382 (9th Cir. 1982); U.S. v. Davis, 636 F.2d 1028, 1044 n. 20 (5th Cir. 1981); U.S. v. Cromer, 483 F.2d 99, 102

(9th Cir. 1973); *Colton v. U.S.*, 306 F.2d 633, 639 (2d Cir. 1962).

239. 613 F.2d 1151, 1155 (D.C. Cir. 1979).

240. See, *In re Sunrise Securities Litigation*, 109 Bankr. 658, 1990 U.S. Dist. Lexis 168, U.S.D.C. E.D.Pa., Jan. 9, 1990; *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, 9 E.B.C. 1929, 1987 U.S. Dist. Lexis 10912, U.S.D.C. N.D. Ill.

241. 8 J. Wigmore §2192, at 70.

242. *Magida ex rel. Vilcon Detinning Co. v. Continental Can Co.*, 12 F.R.D. 74, 77 (S.D.N.Y. 1951).

243. See, *e.g.*, *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir. 1981); *United States v. AT & T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).

244. 8 J. Wigmore, §2327, at 632-39.

245. *United States v. AT & T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980); *In re Horowitz*, 482 F.2d 72, 82 (2d Cir.) *cert. denied*, 414 U.S. 867 (1973).

246. *Blackburn v. Crawford*, 70 U.S. (3 Wall.) 175, 194 (1965).

247. *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672 (D.C. Cir.), *cert. denied*, 444 U.S. 915 (1979).

248. *Magida ex rel. Vulcan Determining Co. v. Continental Can Co.*, 12 F.R.D. 74, 77 (S.D.N.Y. 1951).

249. *Id.*

250. 8 J. Wigmore, §2327.

251. *Teachers Ins. & Annuity Assn. of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638, 641 (S.D.N.Y. 1981); *R.J. Hereley & Sons Co. v. Stotler & Co.*, 87 F.R.D. 358, 359 (N.D. Ill. 1980); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 156 (D. Del. 1977); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1161-62 (D.S.C. 1974).

252. *Perrigrion v. Bergen Brunswick Corp.*, 77 F.R.D. 455, 461 (N.D. Calif. 1978); *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D. Eel. 1977); *Duplan v. Deering Milliken*, 397 F.Supp. 1146, 1161-62 (D.S.C. 1974); *IT &T v. United Tel. Co.*, 60 F.R.D. 177, 188-86 (M.D. Gla. 1973).

253. *United States v. Aronoff*, 466 F.Supp. 855, 862 (S.D.N.Y. 1979).

254. *E.g.*, *United States v. Woodall*, 438 F.2d 1317, 1323-24 (5th Cir. 1970), *cert. denied*, 403 U.S. 933 (1971); *Transworld Airlines v. Hughes*, 332 F.2d 602, 615 (2d Cir. 1964), *cert. dismissed*, 380 U.S. 248 (1965); *Barr Marine Prods. v. Borg-Warner Corp.*, 84 F.R.D. 631, 635 (E.D. Pa. 1979); *Hangards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 929 (N.D. Calif. 1976).

255. See, *e.g.*, *United States v. El Paso Co.*, 682 F.2d 530, 539, 540 (5th Cir. 1982) (documents created with knowledge that independent accountants may need access to them to complete audit waives privilege.); *Permian Corp. v. United states*, 665 F.2d 1214, 1219 (D.C. Cir. 1981)(disclosure of documents to SEC waives privilege); *United States v. Miller*, 660 F.2d 563, 567-68 (5th Cir. 1981)(previous delivery of accounting books to IRS vitiates privilege.); *United States v. Kelsey-Hayes Wheel Co.*, 15 F.R.D. 461, 464 (E.D. Mich. 1954)(privilege waived on disclosure to Justice Department).

256. 8 J. Wigmore, Evidence, §2367 at 636 (McNaughton rev. ed. 1961).

257. *Permian Corp. v. U.S.*, 665 F.2d 1214, 1221-22 (D.C. Cir. 1981).

258. *See, e.g., United States v. Miller*, 660 F.2d 563, 567-68 (5th Cir. 1981)(disclosure to IRS); *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672 (D.C. Cir. 1979), *cert. denied*, 444 U.S. 915 (1979)(to Antitrust Div. of Dept. of Justice); *Donovan v. Fitzsimmons*, 90 F.R.D. 583, 585 (N.D. Ill. 1981)(to Dept. of Labor); *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 27 Fed. R. Serv. 2d (Callaghan) 819 (S.D.N.Y. 1979)(to district attorney); *In re Penn. Cent. Commercial Paper Litig.*, 61 F.R.D. 453, 462-64 (S.D.N.Y. 1973)(to SEC); *D'Ippolito v. Cities Serv. Co.*, 39 F.R.D. 610 (S.D.N.Y. 1965)(to Antitrust Div. of Dept. of Justice).

259. *See, e.g., Diversified Industries v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977); *Byrnes v. IDS Realty Trust Co.*, 85 F.R.D. 679, 687-89 (S.D.N.Y. 1980); *In re Grand Jury Subpoena*, 478 F.Supp. 368, 372-73 (E.D. Wisc. 1979).

260. *In re John Doe Corporation*, 675 F.2d 482 (2d Cir. 1982).

261. *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988); *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir. 1984); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984).

262. *In re Subpoena Duces Tecum*, 738 F.2d 1367 (D.C. Cir. 1984); *In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982); *Permian Corp. v. United States*, 665 F.2d 1214 (D.C. Cir. 1981).

263. *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988).

264. *Id.*

265. 856 F.2d at 623.

266. *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792, 794 (D. Del. 1954) (emphasis supplied); *SCM Corp. v. Xerox Corp.*, 70 FRD 508, 517 (D. Conn. 1976).

267. *Colton v. U.S.*, 306 F.2d 633, 636, 638 (2d Cir. 1962); *U.S. v. Tellier*, 255 F.2d 441 (2d Cir. 1958); *J.P. Foley & Co., Inc. v. Vanderbilt*, 65 FRD 523, 526-27 (S.D.N.Y. 1974).

268. *In re Shargel*, 742 F.2d 61, 62 (2d Cir. 1984); *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451-52 (6th Cir. 1983); *In re Grand Jury Proceedings in Matter of Freeman*, 208 F.2d 1581, 1575 (11th Cir. 1983); *In re Grand Jury Proceedings (Robert Twist, Sr.)*, 689 F. 2d 1351, 1352 (11th Cir. 1982); *Colton v. United States*, 306F.2d 633, 637-38 (2d Cir. 1962), *cert. denied*, 371 U.S. 951 (1963); *United States v. Pape*, 144 F.2d 778, 783 (2d Cir.), *cert. denied*, 323 U.S. 752 (1944).

269. See, *e.g., In re John Doe Corporation*, 675 F.2d 482 (2d Cir. 1982); *Union Camp Corp. v. Lewis*, 385 F.2d 143, 144-45 (4th Cir. 1967); *United States v. Bob*, 106 F.2d 37, 40 (2d Cir.), *cert. denied*, 308 U.S. 589 (1939).

270. House Rule XI 2(j)(1); House Banking Committee Rule IV. 4.

271. *Ashland Oil Co., Inc., v. FTC*, 548 F.2d 977, 979-80 (D.C. Cir. 1976), *affirming* 409 F.Supp. 297 (D.D.C. 1976). See also *Exxon v. Federal Trade Commission*, 589 F.2d 582, 592-93 (D.C. Cir. 1978) (acknowledging that the "principle is important that disclosure of information can only be compelled by authority of Congress, its committees or subcommittees, not solely by individual members ..."); and *In re Beef Industry Antitrust Litigation*, 589 F.2d 786, 791 (5th Cir. 1979) (refusing to permit two congressmen from intervening in private litigation because they "failed to obtain a House Resolution or any similar authority before they sought to intervene.")

272. *Leach v. Resolution Trust Corporation,* 860 F.Supp 868 (D.D.C. 1994). Unless otherwise indicated, the factual context of the suit is as described in court's opinion and the briefs submitted by the parties.

273. *Lee v. Kelley,* 99 F.R.D. 340 (D.D.C. 1983), *aff'd sub. nom. Southern Christian Leadership Conference v. Kelley,* 747 F.2d 777 (D.C. Cir. 1984),

274. 99 F.R.D. at 342.

275. *Id.* at 343. The appeals court affirmed on the ground that Senator Helms lacked standing because he had not asserted any interest protected by the Constitution, and that his complaint was actually with his fellow Senators. 747 F.2d at 779-81.

276. 5 U.S.C. 552 (1988).

277. See 5 U.S.C. 552(d) stating that "This section is not authority to withhold information from Congress."

278. 5 U.S.C. 702, 706 (1988).

279. 860 F.Supp. at 871-72.

280. *Id.* at 874-76.

281. *Id.* at 876 note 7. 5 U.S.C 2954 provides: " An Executive agency, on request of the Committee on Government Operations of the House of Representatives, or of any seven members thereof, or on request of the Committee on Government Operations of the Senate, or any five members thereof, shall submit any information requested of it relating to any matter within the jurisdiction of the committee."

282. 45 Stat. 996.

283. H.R. Rep. No. 1757, 70th Cong., 1st Sess., pp. 2 - 3 (1928). A study of the Bureau of Efficiency had recommended their elimination. H.R. Rep. 1757, at p. 2; S. Rep. No. 1320, 70th Cong., 1st Sess., p. 1 (1928).

284. S. Rep. No. 1320, *supra,* at 4.

285. H.R. Rep. No. 1757, *supra,* at 1.

286. In codifying Title 5 in 1966, Congress made it clear that it was effecting no substantive changes in existing laws: "The legislative purpose in enacting sections 1-6 of this Act is to restate, without substantive change, the laws replaced by those sections on the effective date of this Act." Pub. L. 89-544, sec. 7(a).

287. See Stanley Bach, Minority Rights and Senate Procedures, Congressional Research Service, Report No. 94-978, December 5, 1994.

288. Senate Rule XIX.

289. See Bach, supra note 287 at pp. 8-11.

290. A full description of the work of the Office of Senate Legal Counsel and its work may be found in Floyd M. Riddick and Alan S. Frumin, Riddick's Senate Procedure, S.Doc. No. 28, 101st Cong., 2d Sess. 1236 (1992).

291. Pub. L. No. 95-520, secs. 701 *et seq.,* 92 Stat. 1824, 1875 (1978), *codified principally in* 2 U.S.C. secs. 288, *et seq.*

292. S.Rep. No. 95-170, 95th Cong., 2d Sess. 84 (1978).

293. 2 U.S.C. 288(a) and (b), 288a.

294. In addition, the Office is called upon to defend the Senate, its committees, officers and employees in civil litigation relating to their official responsibilities or when they have been subpoenaed to testify or to produce Senate records; and to appear for the Senate when it intervenes or appears as amicus curiae in lawsuits to protect the powers or responsibilities of the Congress.

295. 2 U.S.C. 288b(d),(e), 288f.

296. 2 U.S.C. 1207(f).

297. The procedure for applying for an immunity order is detailed, *supra,* at notes 47-56 and accompanying text.

298. See S.Rep. No. 98, 101st Cong., 1st Sess. (1989).

299. See, *Senate Select Committee on Ethics v. Packwood,* 845 F.Supp 17 (D.D.C. 1994), *petition for stay pending appeal denied,* 114 S.Ct. 1036 (1994).

300. 2 U.S.C. 288d and 28 U.S.C. 1365.

301. See R.Rep. No. 98, 101st Cong., 1st Sess. (1989).

302. See, *Senate Select Committee on Ethics v. Packwood,* 845 F.Supp 17 (D.D.C. 1994), *petition for stay pending appeal denied,* 114 S.Ct. 1036 (1994).

303. 2 U.S.C. 288g(a)(5) and (6).

304. 2 U.S. 288g(c).

305. See S.Rep. No. 1015, 96th Cong., 2d Sess. (1980).

306. See S.Rep. No. 682, 97th Cong., 2d Sess. (1982).

307. See S.Rep. No. 812, 99th Cong., 2d Sess. (1986).

308. See S.Rep. No. 164, 101st Cong., 1st Sess. (1989).

309. See S.Rep. No. 164, 101st Cong., 1st Sess. (1989).

310. See H.Res. 5, sec. 11, 139 Cong. Rec. H5 (daily ed. Jan. 5, 1993).

311. Thus, like the Senate Legal Counsel, the House General Counsel may be called upon to defend the House, its committees, officers, and employees in civil litigation relating to their official responsibilities, or when they have been subpoenaed to testify or to produce House records (see House Rule 50); and to appear for the House when it intervenes or appears as amicus curiae in lawsuits to protect the powers or responsibilities of the Congress.

312. See, *e.g., U.S. v. McDade,* 28 F.3d 283 (3th Cir. 1994).

313. See, *e.g., Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994).

314. See, 132 Cong. Rec. 3036-38 (1986).

315. See, e.g., 131 Cong. Rec. 25793-95 (1985)(opinion on the constitutionality of the Competition in Contracting Act.)

316. See, *e.g.,* Hearings, "Environmental Crimes at the Rocky Flats Nuclear Facility", before the Subcommittee on Investigation and Oversight, Committee on Science, Space and Technology, 101st Cong., 2d Sess. 1645-67 (1992) (Statement of Deputy General Counsel Charles Tiefer on requiring the President to claim executive privilege.)

**◄■CRS Reports Home**

*\* These CRS reports were produced by the Congressional Research Service, a branch of the Library of Congress providing nonpartisan research reports to members of the House and Senate. The National Council for Science and the Environment (NCSE) has made these reports available to the public at large, but the Congressional Research Service is not affiliated with the NCSE or the National Library for the Environment (NLE). This web site is not endorsed by or associated with the Congressional Research Service. The material contained in the CRS reports does not necessarily express the views of NCSE, its supporters, or sponsors. The information is provided "as is" without warranty of any kind. NCSE disclaims all warranties, either express or implied, including the warranties of merchantability and fitness for a particular purpose. In no event shall NCSE be liable for any damages.*



**National Council for Science and the Environment**
1725 K Street, Suite 212 - Washington, DC 20006
202-530-5810 - info@NCSEonline.org



# Exhibit 11

Interview with DAVID H. SAFAVIAN (DS)
3/27/03
PLACE: WIFO @ approx 2:00pm

— GOLF TRIP    JULY/AUG 2002
         SCOTLAND, BI

WITH JACK ABRAMOFF, ATTORNEY &
                              FRIEND

WORKS @ GREENBERG & TRAURIG. W.D.C
         (202) ███ - ███
         (can call)

NO BUSINESS WITH GSA

TRIP pre-paid by DS
HOTEL, AIR, GOLF $3100. check provided

ABRAMOFF first supervisor, 1995, @
PRESTON, GATES & ELLIS

8 people including congressman &
   Dicks/staffer

DOJ-DS-001528