UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No 05-370 (PLF)** |
| | : | |
| v. | : | |
| | : | |
| **DAVID HOSSEIN SAFAVIAN** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S MOTION IN LIMINE FOR PRETRIAL
DETERMINATION OF ADMISSIBILITY OF CERTAIN EVIDENCE**

The United States of America, by and through its undersigned attorneys, hereby respectfully move this Court for a pretrial ruling on the admissibility of certain evidence that the government intends to introduce at trial. The government's motion concerns the following categories of evidence: i) emails and ii) business records. The government contends that the relevant emails are admissible pursuant to the following theories:  (A) the e-mails in and of themselves constitute doing "business" or "work;" (B) co-conspirators' statements pursuant to Fed. R. Evid. 801(d)(2)(E); (C) statements of defendant pursuant to Fed. R. Evid. 801(d)(2)(A); (D) adoptive admissions by defendant pursuant to Fed. R. Evid. 801(d)(2)(B); (E) admissible non-hearsay statements offered for defendant's state of min; and (F) e-mails sent after the Scotland trip are relevant to show defendant's state of mind.  In addition, the government seeks a pretrial ruling on admissibility of domestic business records pursuant to Fed. R. Evid. 803(6) and 902(11) and certified foreign business records pursuant to 18 U.S.C. § 3505 and 902(12).

**INTRODUCTION**

Under Fed. R. Evid. 104(a), the Court may, subject to the provisions of Rule 104(b), determine whether a matter proffered may be admitted in evidence.  In making a Rule 104(a)

determination, the court is not bound by the rules of evidence except with respect to privileges.[1] The categories of evidence on which the government is requesting a pretrial ruling do not depend upon the fulfillment of a condition of fact, and therefore the Court may make its determination pursuant to Fed. R. Evid. 104(a). The government submits that ruling pretrial on the admissibility of the e-mails and business records pre-trial, as well as deciding whether and what type of any limiting instructions or redactions may be necessary, will streamline the presentation of evidence at trial and help avoid lengthy bench conferences during trial while, with the jury impaneled and otherwise ready to hear testimony, the court is forced to entertain argument as to the admissibility of each particular e-mail or business record.

The Government proposes to introduce at trial various e-mails and business records. The e-mails[2] were, with few exceptions[3], sent to and from Mr. Safavian and Jack Abramoff. These e-mails were sent to and from Mr. Abramoff's Greenberg Traurig e-mail account and both Mr. Safavian's GSA and home e-mail accounts. These e-mails will establish that 1) Mr. Abramoff was in fact "doing business" with GSA at the time Mr. Safavian claimed otherwise; 2) Mr. Safavian knew and understood that Mr. Abramoff was seeking to obtain several GSA properties

---

[1] In contrast, should the Court decide that any of these proposed exhibits require a preliminary determination on admissibility pursuant to Rule 104(b), the rules of evidence do apply, and the evidence considered by the Court in making its determination must be part of the record.

[2] The e-mails the government will be seeking to admit at trial are attached hereto as Exhibits A, B, C and D. The multiple attachments are used solely because of the size of the files to be attached.

[3] The exceptions are eight e-mails sent by Mr. Abramoff to either his wife or business associates that discuss his conversations with Mr. Safavian. As indicated infra, the government submits that these e-mails are admissible as statements of a co-conspirator made in furtherance of the conspiracy.

for his own purposes (and those of his clients); and 3) Mr. Abramoff solicited, and Mr. Safavian provided, specific and timely assistance to Mr. Abramoff in an attempt to ensure that Mr. Abramoff would succeed in his goal of obtaining control over two particular GSA properties.  In addition, the e-mails establish Mr. Safavian's intent and motive in providing false and misleading information to the GSA ethics officer, the GSA-OIG and the United States Senate.  The e-mails demonstrate that Mr. Safavian's relationship with Mr. Abramoff was highly inappropriate and that therefore Mr. Safavian had a strong motive to mislead investigators when they began to look into this relationship by falsely claiming that Mr. Abramoff did no business with GSA, "he did all of his work on Capitol Hill."

All of the e-mails sent between Mr. Safavian and Mr. Abramoff were recovered from the computers and servers of the law firm of Greenberg Traurig, Mr. Abramoff's former employer.[4]  The government has provided to the defense 902(11) certificates regarding the e-mails recovered from both GSA and Greenberg Traurig.[5]

Having established the proper evidentiary foundation for the authentication of the proffered e-mails, the government submits that the proffered e-mails are admissible against the

---

[4] The government may seek to admit a much smaller number of e-mails that were obtained through the computers and servers of the GSA.  None of these e-mails, however, involve e-mails sent between Mr. Safavian and Mr. Abramoff and the government is not seeking a pretrial ruling on admissibility of these e-mails at this time.

[5] We recognize that the fact that we have 902(11) certificates pertaining to the GSA and Greenberg Traurig e-mails does not relieve the government of establishing that the e-mails in question are otherwise admissible in evidence.  The 902(11) certificates in this context are meant only to establish that the e-mails themselves are authentic documents that were preserved in the normal course of business by both GSA and Greenberg Traurig.  By this pleading we seek to establish that these e-mails are not barred by any other evidentiary rule and are admissible as substantive evidence.

defendant under at least four distinct evidentiary theories.

## I. ADMISSIBILITY OF E-MAILS

**A.     The E-Mails Themselves Constitute "Doing Business" and/or "Work"**

The government has alleged that at the time Mr. Safavian sought an ethics opinion about whether he could accept a golf trip to Scotland from Jack Abramoff, he told his ethics officer that Mr. Abramoff, although a lobbyist, was not doing or seeking to do business with the GSA, and that Mr. Abramoff did all of his work on Capitol Hill.  The government submits that the proffered e-mails constitute evidence directly contrary to defendant's claim.  The fact that Mr. Safavian and Mr. Abramoff were repeatedly corresponding via e-mail concerning how Mr. Abramoff could obtain control over GSA properties is direct evidence that Mr. Safavian's claim that Mr. Abramoff was not doing business – much less, seeking to do business – with GSA was false.  The e-mails themselves constitute "doing business."  Likewise, the e-mails flatly refute Mr. Safavian's claim that Mr. Abramoff "does all of his work on Capitol Hill."  The e-mails demonstrate that Mr. Abramoff repeatedly expressed his interest in obtaining various GSA properties[6] and repeatedly sought Mr. Safavian's advice on how he should go about obtaining control over them.  Mr. Safavian responded by providing concrete advice, which included forwarding to Mr. Abramoff internal GSA e-mails pertaining to non-public GSA deliberations about how the property Mr. Abramoff sought should be disposed, as well as surreptitiously

---

[6]The e-mails make clear that Abramoff sought property at the White Oak facility to use as a private school that he ran, and sought control over the Old Post Office so that clients could convert it into a luxury hotel.

4

helping Mr. Abramoff draft letters that were addressed to GSA officials.[7] Thus, these e-mails are, in and of themselves, evidence that Mr. Abramoff was doing and seeking to do business with GSA, and that Mr. Safavian knew it.

      B.      **Admissions of Co-conspirator Pursuant to Fed.R.Evid. 801(d)(2)(E)**

In addition to being evidence, in and of themselves, of doing "work" or "business," the government submits that all of the proffered e-mails sent from Mr. Abramoff constitute statements of a co-conspirator, and should therefore be admitted against Mr. Safavian as statements of a co–conspirator – Mr. Abramoff – in furtherance of a conspiracy, pursuant to Fed.R.Evid. 801(d)(2)(E). The evidence in this case will establish by a preponderance of the evidence that Mr. Safavian and Mr. Abramoff conspired together to commit honest services fraud (in violation of 18 U.S.C. Sec. 1341, 1343 and 1346).

Statements by an alleged co-conspirator may be received in evidence against a defendant on trial if there is "evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" United States v. Bourjaily, 483 U.S. 171, 175 (1987). The government must establish these predicates by a preponderance of the evidence. Id. at 176. ("[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the court must apply the preponderance of evidence standard in resolving these questions.") The fact that no conspiracy has been alleged in this indictment is immaterial. "The government need not charge the defendant with conspiracy in order to admit hearsay statements into evidence under the co-

---

[7]These letters were ostensibly from members of Congress and, on one occasion, the headmaster of the school operated by Mr. Abramoff. They were ultimately sent to high-level GSA officials – sometimes with a carbon-copy to Mr. Safavian.

conspirator exception." United States v. Beckham, 968 F.2d 47, 51 (D.C. Cir. 1992).

In deciding whether or not proffered statements qualify as a co-conspirator's statements, the court may consider the proffered statements themselves. "We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy....It is sufficient for today to hold that a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." Bourjaily, 483 U.S. at 175.

18 U.S.C. Sections 1341 and 1343 prohibit transmitting or causing to be transmitted by mail or wire any item for purposes of executing a "scheme or artifice to defraud." Section 1346 sets out that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." To establish honest services fraud, the government must show: (1) that Mr. Safavian knowingly participated in a scheme to fraudulently deprive another of the intangible right of honest services; (2) that he did so with a specific intent to defraud; and (3) that he transmitted or caused to be transmit through the wires some matter for the purpose of executing the scheme to defraud. See United States v. Waymer, 55 F.3d 564, 568 (11th Cir. 1995); Eleventh Circuit Pattern Jury Instructions, Criminal § 41.2; Unites States v. Woodward, 149 F.3d 46, 54 (1st Cir. 1998). The proffered evidence satisfies these elements.

The conduct engaged in by Mr. Safavian meets the first prong of the test. As the Eleventh Circuit wrote:

> When a government officer decides how to proceed in an official endeavor . . . his constituents have a right have their best interests form the basis of that decision. If the official instead secretly makes his decision based on his own personal interests – as when

an official accepts a bribe or personally benefits from an undisclosed conflict of interest –
	the official has defrauded the public of his honest services.

United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997); see also United States v. Jain, 93 F.3d 436, 442 (8th Cir. 1996) ("In a democracy, citizens elect public officials to act for the common good. When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated."); United States v. Silvano, 812 F.3d 754, 759 (1st Cir. 1987) ("a public officials acts as trustee for the citizens and the State and thus owes the normal fiduciary duties of a trustee ... to them.") (citation omitted).

As courts have repeatedly noted, honest services fraud is concerned with the manner in which officials make their decisions and not the wisdom of the official action. United States v. Lopez-Lukis, 102 F.3d at 1169 n. 13. Once the decision-making process has been corrupted, it is of no moment whether a public official's actions actually benefitted his constituents. Put another way, it is not a defense to honest services fraud that a public official would have performed the same official action absent the stream of gratuities and things of value. See United States v. Antico, 275 F.3d 245, 263 (3d Cir. 2001) (§1346 violation is found if there is "undisclosed, biased decision making, whether or not tangible loss to the public is shown"); see also United States v. Quinn, 359 F.3d 666, 675 (4th Cir. 2004) (in a bribery conviction, it matters only whether a public official received a bribe with corrupt intent and not whether the bribe caused him to alter his conduct).

As to the specific intent requirement, "the government need only prove that the defendant[s] had the intent to deceive," not the intent to break the law. See United States v. Paradies, 98 F.3d 1266, 1285 (11th Cir. 1996). The government must show the intent to deprive

the public of honest services in addition to deceptive intent. United States v. Woodward, 149 F.3d 46, 55 n. 6. "'[A] pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action'" may constitute evidence of the intent to defraud the public of its right to a public official's honest services. United States v. Woodward, 149 F.3d 46, 55 (quoting Sawyer, 85 F.3d at 730). In essence, Mr. Safavian committed honest services fraud if, by accepting Mr. Abramoff's largesse, he intended to be influenced to support Mr. Abramoff's interests. Id. at 56; cf. United States v. Czubinski, 106 F.3d 1069, (1st Cir. 1997) (reversing honest services fraud conviction because the government did not prove that the public official, who searched IRS tax payer databases, broke IRS rules for any private purpose).

There are two ways in which a public official is ordinarily shown to have stolen his honest services from his public employer: (1) when the official was influenced or otherwise improperly affected in the performance of his duties, or (2) when the official failed to disclose a conflict of interest, resulting in personal gain. Woodward, 149 F.3d at 57. The evidence in the instant case will establish both. The government need not link a particular gratuity with a specific act in order to prove a scheme or artifice to defraud. Woodward, 149 F.3d at 60.

To prove a conspiracy existed, the Government need only show that the conspirators agreed on "'the essential nature of the plan,'" not that they "agreed on the details of their criminal scheme." United States v. Gatling, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (quoting United States v. Treadwell, 760 F.2d 327, 336 (D.C. Cir.1985)). It is axiomatic that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence. Id. (quoting United States v. Dean, 55 F.3d 640, 646-47 (D.C. Cir.1995), cert. denied, 516 U.S. 1184 (1996)).

The essence of a conspiracy is an agreement. United States v. Childress, 58 F.3d 693,

710 (D.C. Cir. 1995); United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990), cert. denied, 501 U.S. 1211 (1991).  In order to establish a conspiracy, the Government has to prove that the defendant "entered into an agreement with at least one other person and that the agreement had as its objective a violation of the law." United States v. Lam Kwong-Wah, 924 F.2d 298, 303 (D.C. Cir. 1991) (quoting United States v. Foote, 898 F.2d 659, 663 (8th Cir.), cert. denied, 498 U.S. 838 (1990)).

   The e-mails proffered in this case establish, by at least the preponderance of the evidence, that Mr. Safavian and Mr. Abramoff conspired to deprive the public of Mr. Safavian's honest services.  The proffered e-mails provide numerous examples of Mr. Safavian using his official position to advance Mr. Abramoff's interests.  To pick but two examples, on July 30, 2002,[8] Mr. Safavian set up a meeting with himself, two senior GSA officials and Jack Abramoff's wife, as well as the headmaster and rabbi of the Eshkol Academy for the purpose of determining the suitability of the White Oak location for Mr. Abramoff's school.  At no time did Mr. Safavian reveal to the other GSA officials the nature of his relationship with Jack Abramoff.  Indeed, just the opposite is true.  In another e-mail written the same day,[9] from Mr. Abramoff to his wife, he wrote: "When you are in the room with David and the other GSA folks, identify yourself as Pam Alexander or Pam Clarke.  David does not want Abramoff used in the meeting.  when you check in at the door, however, you'll need your driver's license, and it's OK for you to be Abramoff there, since that won't get up to the guy in the meeting (who probably does not know me, but David and I don't want to take a chance).  OK?"

---

[8] Bates number DOJ-DS-001048.

[9] Bates number DOJ-DS-00007050.

In addition to clandestinely using his influence to set up high-level meetings to benefit Mr. Abramoff, Mr. Safavian spent his energies looking out Mr. Abramoff's interests. For example, on February 7, 2003, Mr. Safavian writes the following e-mail to Mr. Abramoff[10]: Jack – four quick things. 1. We just went to ORANGE alert status for terrorism. Fyi. 2. My folks are set to brief your team on 8a contracting opportunities. Who is the best person to get that briefing? 3. **Still trying to find some space for Eschkol**. 4. I'm sitting at Sigs. I love those tempura rolls!"[11] (Emphasis added) This e-mail makes abundantly clear that rather than using his best efforts solely and exclusively on behalf of the general public, he maintained a constant lookout for ways he could benefit Mr. Abramoff.

Thus, the proffered evidence demonstrates that in exchange for offers of expensive trips,[12] golfing fees and tickets to professional sporting events,[13] and offers of free meals for both Mr. Safavian and his wife at Mr. Abramoff's restaurant, Mr. Safavian agreed and conspired with Mr. Abramoff to provide him with sensitive and confidential GSA information in order to assist Mr. Abramoff in his attempt to procure GSA properties for his own purposes.

In addition to the proffered e-mails, there is substantial independent evidence that

---

[10] Bates number DOJ-DS-001237.

[11] "Sigs" is a reference to Mr. Abramoff's restaurant, Signatures.

[12] The total cost of the Scotland trip was in excess of $130,000. Mr. Safavian's pro rated cost would have been approximately $15,000. He paid Mr. Abramoff a total of $3,100 for this trip. The proffered e-mails reveal that Mr. Abramoff also invited Mr. Safavian to return to Scotland on another golf outing in 2003. At the very last minute, after he had been interviewed by GSA-OIG regarding the 2002 trip, Mr. Safavian backed out, claiming he had a "conflict."

[13] In the proffered e-mails, Mr. Abramoff invited Mr. Safavian to watch the Redskins, the Baltimore Ravens, the Washington Wizards and the Capitals. Mr. Abramoff controlled a luxury box at Fed Ex Field, the MCI Center and the Baltimore Ravens Stadium.

establishes a conspiracy.  For example, the meeting Mr. Safavian discussed setting up in his e-mail between Mrs. Abramoff, GSA officials and the headmaster and rabbi of the Eshkol Academy did in fact take place, and it was chaired by Mr. Safavian.  Mr. Safavian did not reveal to anyone at GSA the fact that he had a close relationship with the founder of the Eshkol Academy – and, indeed, the evidence will show that Mr. Safavian left to go to Scotland to play golf with Mr. Abramoff *the very next day* after the meeting.  The fact that Mr. Abramoff primarily used Mr. Safavian's home e-mail address when he wished to discuss GSA business is also significant and probative independent evidence of a conspiracy to commit honest services fraud.  Most of the e-mails were sent to Mr. Safavian's home e-mail account during normal business hours, when Mr. Safavian was at work at the GSA.  Clearly, these e-mails were sent to Mr. Safavian's home e-mail account to help avoid the possibility that they could be discovered.[14]

The government will also establish that Mr. Safavian did in fact fly to Scotland with Mr. Abramoff to play golf.  Although the actual cost of the trip was in excess of $130,000, Mr. Safavian paid only $3,100.

Finally, Mr. Safavian's subsequent false statements about the Scotland trip as well as his relationship with Mr. Abramoff can also be considered consciousness of guilt, and further corroboration of the conspiracy.  See Aka v. Washington Hospital Center, 156 F.3d 1284, 1292 (D.C. Cir. 1998) (citing multiple criminal cases wherein the D.C. Circuit has affirmed the introduction of false statements as evidence of consciousness of guilt).

---

[14] We also note that many of these e-mails to Mr. Safavian's home e-mail account were preceded by e-mails to Mr. Safavian's GSA account in which Mr. Abramoff told Mr. Safavian that he just e-mailed Mr. Safavian's home account.

### C.      Admissions of Defendant Pursuant to Fed. R. Evid. 801(d)(2)(A)

Any e-mail sent by Mr. Safavian is admissible against Mr. Safavian as a statement of a party opponent (Fed.R.Evid. 801(d)(2)(A)), and is therefore not hearsay.

### D.      Admissions of Defendant Pursuant to Fed.R.Evid. 801(d)(2)(B)

The government will also be seeking to admit against defendant as the defendant's own admission the substance of e-mail chains that Mr. Safavian forwarded to Mr. Abramoff, as they are admissible against Mr. Safavian as adoptive admissions pursuant to Fed.R.Evid. 801(d)(2)(B).  Thus, for example, on July 26, 2002,[15] Mr. Safavian forwarded to Mr. Abramoff a series of e-mails authored by GSA officials who were discussing the hurdles that confronted the possible disposition of the White Oak property.  These e-mails were, in due course, forwarded to Mr. Safavian, who was the GSA Chief of Staff.  Mr. Safavian then forwarded all of these internal e-mails to Mr. Abramoff with the comment, "This is the type of bureaucracy I'm dealing with.  I am still running the traps on the l [sic] year lease.  Dhs."

By forwarding this chain of e-mails to Mr. Abramoff, Mr. Safavian was "manifest[ing] an adoption or belief in [the statements'] truth."  Sea-Land Service, Inc., v. Lozen International, LLC, 285 F.3d 808, 821 (9th Cir., 2002) (failure to admit e-mail held to be reversible error where first employee of company was forwarded an e-mail by a second employee, first employee copied entire e-mail and forwarded it on to third party with the message, "Yikes, Pls note the rail screwed us up . . . ."; in so doing, first employee was effectively adopting the contents of the original message, because her remark "'manifested an adoption or belief in [the] truth' of the information contained in the original e-mail."); See also, United States v. Beckham, 968 F.2d 47,

---

[15] Bates numbers DOJ-DS-001034 - 001035.

51-52 (D.C. Cir. 1992) (a defendant's manifestation of "assent may be established through his conduct as through words."). In this case, Mr. Safavian's manifestation in his belief in what he was forwarding to Mr. Abramoff was demonstrated in both words and conduct: his words suggested that the e-mails accurately described the obstacles Abramoff faced in obtaining the GSA property, and his conduct, in passing the e-mails on, manifested a belief that the content of the e-mails was true.

      E.      **The E-Mails Sent From Mr. Abramoff to Mr. Safavian Are Not Hearsay Because They Are Not Being Admitted For the Truth Asserted**

In the event that the Court does not find that Mr. Abramoff's e-mails to Mr. Safavian are admissible as a co-conspirator's statement, or as evidence, in and of themselves, of doing "work" or "business," these e-mails would, in the alternative, still be admissible as evidence to establish Mr. Safavian's state of mind when he spoke with his ethics officer, the GSA-OIG, and the Senate investigators. Because the government would not be introducing the e-mails to prove the truth of the matter asserted therein, but rather to show the effect these statements had on Mr. Safavian's state of mind – which is directly relevant to the issue of whether Mr. Safavian knowingly and intentionally concealed his relationship with Mr. Abramoff and lied when he spoke to his ethics officer, the GSA-OIG and the United States Senate – the e-mails are not hearsay. See, e.g., United States. v. Daniels, 48 Fed. Appx. 409, 414 (3d Cir. 2002) (finding that inquiries are admissible non-hearsay); United States v. Norman T., 129 F.3d 1107-08 (10th Cir. 1997) (answers to questions were admissible non-hearsay because they were admitted not for the truth but to demonstrate manner in which the individual was questioned). These e-mails will help demonstrate that Mr. Safavian's statements were willfully and deliberately false, and not the result of an innocent misunderstanding. Indeed, with few exceptions, Mr. Abramoff made no

13

factual assertions in his e-mails to Mr. Safavian. Rather, these e-mails were generally inquiries, in which Mr. Abramoff asked Mr. Safavian if Mr. Safavian could find out some information on Mr. Abramoff's behalf.

To cite but two of many examples, on July 21, 2002, (only four days before Mr. Safavian asked for his ethics opinion), Mr. Abramoff e-mailed[16] Mr. Safavian the following query: "If you can get me any info as to which land is still available at White Oak, and whether there are buildings there, that would be huge. Thanks so much."

On July 25, 2002, the day Mr. Safavian requested the ethics opinion, Mr. Abramoff e-mailed[17] Mr. Safavian with the following question: "Do you guys have the ability to give a short term (one year) lease on property at your discretion? We are in a real bind on the school and I was wondering if there was a way to lease part of the White Oak site for a year?"

These queries are relevant to show what Mr. Safavian's state of mind was when he responded to official queries as to what he understood was the nature of Mr. Abramoff's relationship, if any, with GSA.[18]

### F.  E-Mails Written and Received after the Scotland Trip are Relevant and Probative

Count Two of the indictment alleges that Mr. Safavian engaged in a scheme that lasted

---

[16]Bates number DOJ-DS-00989.

[17]Bates number DOJ-DS-001009.

[18]In addition, Mr. Abramoff's statements to Mr. Safavian "would be admissible as 'a reciprocal and integrated utterance between the two' parties." United States v. Lemonakis, 485 F.2d 941, 947 (D.C. Cir. 1973). In other words, Mr. Abramoff's statements would be admitted not for the truth of what was being asserted "but, to the extent to which the [defendant's] responses constituted incriminating admissions of his own, to make those responses intelligible to the jury and recognizable as admissions." Id. at 948.

from May, 2002 until August, 2002, to conceal certain material facts from his GSA ethics official. Therefore, all of the herein proffered e-mails dated up until the time of the August 2, 2002 Scotland trip are obviously relevant and material to the issues at trial. In addition, the government will be seeking to admit e-mails between Mr. Safavian and Mr. Abramoff after the conclusion of the Scotland trip through early 2004 when news stories surfaced and the U.S. Senate opened its investigation concerning Mr. Abramoff's illegal activities. These e-mails are relevant to show defendant's motive and intent when he spoke to the GSA OIG in March and April 2003 and the United States Senate in 2005. As these post-Scotland e-mails make clear, Mr. Safavian and Mr. Abramoff had, at the very least, an unethical and inappropriate business relationship for the entire period of time that Mr. Safavian was at GSA. Mr. Abramoff constantly and repeatedly sought – and Mr. Safavian reliably provided – sensitive and confidential internal GSA information. In exchange for providing Mr. Abramoff with this information, Mr. Safavian was provided with expensive and exclusive seats at various professional sporting events, free golf outings, and the opportunity to curry favor with a rich and powerful lobbyist who was in a position to help Mr. Safavian professionally.

It is within this context that Mr. Safavian's responses to the GSA-OIG and the Senate staffers must be understood. At the time of these official queries, Mr. Safavian knew that any digging into the details of his relationship with Mr. Abramoff would be extremely damaging, if not fatal, to his professional reputation and, quite possibly, his career. Therefore, it was essential that Mr. Safavian do whatever was necessary to downplay the significance of the Scotland trip and mislead investigators about his true relationship with Mr. Abramoff. See United States v. Shulman, 624 F.2d 384, 391 (2d. Cir.1980) (audiotapes between defendant and cooperating

witness evidencing possible illegal, uncharged conduct admissible because probative of issue of whether defendant was likely to have committed charged offense; "[i]f an agreement to offer a bribe had not been reached in October [the time frame of charged offense] between [CW] and [defendant], then it is unlikely [defendant] would have agreed so readily to a specific amount for the bribe and have delivered the money to [CW] in December.")

The proffered e-mails demonstrate that the relationship between Mr. Safavian and Mr. Abramoff did not suddenly change after the Scotland trip. Indeed, it continued on as it did before, with Mr. Safavian doling out advice and sensitive information, and Mr. Abramoff, in return, providing material benefits to Mr. Safavian. It is the evidence of this unsavory relationship that Mr. Safavian sought to hide from investigators when he spoke with them in Spring 2003 and the Winter 2005. Therefore, the government submits, all of the proffered e-mails are relevant to show the defendant's motive and intent when he allegedly made false statements and obstructed the GSA-OIG and United States Senate, and to defeat any suggestion that Mr. Safavian's misstatements were the result of an innocent misunderstanding.

## II. ADMISSIBILITY OF DOCUMENTS PURSUANT TO CERTIFICATIONS

By letter which was hand-delivered to defense counsel on April 12, 2006, and a letter hand-delivered on April 14, 2006, the government provided notice of its intention to introduce certified records of regularly conducted activity pursuant to Fed. R. Evid. 803(6) and 902(11) and 902(12).

### A.     Domestic Business Records Pursuant to Fed. R. Evid. 902(11) Certification

In particular, the United States notified Mr. Safavian that it will seek to introduce copies of the following domestic business records through Rule 902(11) certifications, an example is

included as Exhibit E:

1. American Express
2. Verizon Wireless
3. ETrade
4. Citibank
5. Capital One Bank/FSB
6. America Online Inc.
7. Air Travel Network
8. General Services Administration, Office of Inspector General
9. Wachenhut Services Inc.
10. General Services Administration, Office of General Counsel
11. General Services Administration, Office of Congressional Affairs
12. Greenberg Traurig, LLP
13. General Services Administration

The United States has not yet received the certification from all requested entities, but will provide it to the Court and defendant upon receipt. The underlying documents are voluminous and will be provided to the Court upon request. The underlying documents have been previously provided to the defendant and are specifically identified in the certifications.

The underlying documents are business records that are hearsay exceptions pursuant to Fed. R. Evid. 803(6). Fed. R. Evid. 902(11) provides that certified domestic records of regularly conducted activities can be self-authenticating and therefore admissible under Fed. R. Evid. 803(6) if accompanied by a written declaration from a records custodian or other qualified person certifying that the records:

a. were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
b. were kept in the course of a regularly conducted activity; and
c. were made by the regularly conducted activity as a regular practice.

The Advisory Committee Notes to the 2000 Amendments make it clear that a declaration that satisfies 28 U.S.C. § 1746 would satisfy the declaration requirements of Fed R. Evid.

902(11). The United States has provided Mr. Safavian written notice and has provided copies of both the records and the certification to him sufficiently in advance to provide a fair opportunity to challenge the records. The United States will also make the original declarations available for inspection by the defense should they choose.

The United States submits that the attached certifications satisfy the requirements of Rules 902(11) and 803(6), and requests that the Court make a pretrial ruling on the admissibility of these records. Such a ruling would allow the United States to avoid the need to subpoena and call records custodians from throughout the country to testify about these records at trial.

### B.  Foreign Business Records Pursuant to 18 U.S.C. 3505 and Fed. R. Evid. 902(12) Certification

By letter dated April 12, 2006, the United States provided Mr. Safavian with notice of its intention to introduce certified foreign records from pursuant to Fed. R. Evid 902(12) and 18 U.S.C. § 3505. The discovery provided to him by letter dated April 14, 2006 included documents received from businesses located in the United Kingdom. The original certifications are maintained at our office, and can be inspected upon request.
Pursuant to 18 U.S.C. § 3505(a),

> (1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that–
>
>> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
>> (B) such record was kept in the course of a regularly conducted business activity;
>> (C) the business activity made such a record as a regular practice; and

    (D) if such record is not the original, such record is a duplicate of the original;

      unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

  Attached at Exhibit F is an example of one of the certifications that the United States received from entities in the United Kingdom. The underlying documents are voluminous and copies will be provided to the Court upon request. This certification contains the attestations required in 18 U.S.C. §3505, and there is nothing about the source of information or method or circumstances of preparation that indicate lack of trustworthiness. Therefore, the United States requests that the Court determine that the records are admissible.

## CONCLUSION

  For the foregoing reasons, the government seeks a pretrial determination on the admissibility of evidence pursuant to Fed. R. Evid. 104(a).

                Respectfully submitted,

/s/ Nathaniel B. Edmonds         /s/ Peter R. Zeidenberg
NATHANIEL B. EDMONDS       PETER R. ZEIDENBERG
Trial Attorney, Fraud Section       Trial Attorney, Public Integrity Section
Criminal Division           Criminal Division
United States Department of Justice    United States Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2006, a copy of the foregoing was served on the following counsel by electronic service to:

>Barbara Van Gelder, Esq.
>Roderick Thomas, Esq.
>Albert Lambert, Esq.
>Wiley Rein & Fielding
>1776 K Street NW
>Washington, DC 20006
>Tel: 202-719-7032
>Facsimile: 202-719-7049

>/s/ Nathaniel B. Edmonds
>NATHANIEL B. EDMONDS
>Trial Attorney
>Fraud Section, Criminal Division
>United States Department of Justice