
PROVIDED BY
FindLaw
WWW.FINDLAW.COM

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal Number:** |
| | : | |
| | : | **VIOLATIONS:** |
| | : | |
| | : | **Count One:** |
| | : | **18 U.S.C. § 371** |
| v. | : | **(Conspiracy)** |
| | : | |
| JACK A. ABRAMOFF, | : | **Count Two:** |
| | : | **18 U.S.C. §§ 1341, 1346 and 2** |
| Defendant. | : | **(Honest Services Mail Fraud)** |
| | : | |
| | : | **Count Three:** |
| | : | **26 U.S.C. § 7201** |
| | : | **(Tax Evasion)** |

### PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America and the defendant, JACK A. ABRAMOFF, agree as follows:

1.     The defendant is entering into this agreement and is pleading guilty freely and voluntarily without promise or benefit of any kind, other than contained herein, and without threats, force, intimidation, or coercion of any kind.

2.     The defendant knowingly, voluntarily and truthfully admits the facts contained in the attached Factual Basis for Plea.

3.     The defendant agrees to waive indictment and plead guilty to the offenses charged in the attached Information which are:

> A.     one count of conspiracy to violate the following federal laws in violation of
>
> 18 U.S.C. § 371:

       (1)     honest services wire and mail fraud, in violation of Title 18 U.S.C. §§ 1341, 1343 and 1346;

       (2)     mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343;

       (3)     bribery and honest services fraud of public officials, in violation of 18 U.S.C. §§ 201(b), 1341, 1343 and 1346;

       (4)     post-employment restrictions for former Congressional staff members, in violation of 18 U.S.C. § 207(e);

    B.     one count of honest services mail fraud, in violation of 18 U.S.C. §§ 1341, 1346 and 2; and

    C.     one count of evasion of federal income tax, in violation of 26 U.S.C. § 7201.

The defendant admits that he is guilty of these crimes, and the defendant understands that he will be adjudicated guilty of these offenses if the Court accepts his guilty plea.

    4. The defendant understands the nature of the offenses to which he is pleading guilty, and the elements thereof, including the penalties provided by law. The maximum penalty for violating the law specified in the Information is:

    A.     Count 1 (Conspiracy): five years of imprisonment, a fine of $250,000 or not more than the greater of twice the gross gain or twice the gross loss, and a mandatory special assessment of $100;

    B.     Count 2 (Honest Services Mail Fraud): twenty years of imprisonment, a fine of $250,000 or not more than the greater of twice the gross gain or twice the gross loss, and a mandatory special assessment of $100;

C.    Count 3 (Tax Evasion):  five years of imprisonment, a fine of $250,000 or

not more than the greater of twice the gross gain or twice the gross loss, the

costs of prosecution, and a mandatory special assessment of $100;

The parties understand that the statutory maximum term of imprisonment for the three offenses

charged in the Information is 30 years.  The defendant understands that the Court may impose a

term of supervised release to follow any incarceration, in accordance with 18 U.S.C. § 3583.  The

authorized term of supervised release for each of the counts is not more than three years.  The

defendant also understands that the Court will impose restitution, and may impose costs of

incarceration, supervision and prosecution.

5. The defendant understands and agrees that restitution to victims in the offense described

in Count 1 of the Information is mandatory.  The loss to the victims as a result of crimes charged in

Count 1 of the Information is estimated to be approximately $25,000,000.  The defendant agrees not

to transfer or otherwise encumber his assets except with notice to, and consent of, the undersigned

representatives of the United States until such time as this agreement is filed with the Court, at

which point the defendant must seek leave of Court to transfer or otherwise encumber his assets.

The parties agree that the defendant will not be required to obtain the consent of the United States

for property transfers necessary to pay ordinary living expenses, ordinary business expenses and

attorneys fees. The defendant agrees as part of this agreement that he will provide to the United

States detailed and accurate information identifying all of his income, assets, expenses and

liabilities within 45 days of the date of this agreement in a format requested by the United States

and will truthfully answer all questions relative to his finances.  Thereafter, the defendant will

3

provide on a monthly basis or as otherwise requested a report of all financial transactions valued at $2,500 or more, including all income, expenditures and transfers of funds or property.

6. This agreement does not resolve the defendant's civil tax liability for any years and does not bind the Internal Revenue Service in any way regarding its efforts to examine or collect defendant's civil tax liabilities. The defendant agrees that he will cooperate fully with the Internal Revenue Service in determining any tax liabilities (civil or criminal) of any entities or persons for any years relating to this prosecution, including but not limited to his personal tax liabilities for the years 2000 through 2003, and in paying all appropriate tax liabilities, penalties and interest. To this end, the defendant specifically agrees to file complete and accurate amended individual income tax returns, Forms 1040X, for tax years 2000 through 2003, as soon as possible upon the signing of this plea agreement, and in any event, no later than the time of the defendant's sentencing. If for any reason complete and accurate returns, prepared in accordance with the revenue agent's report dated November 28, 2005, are not filed by the time of defendant's sentencing, the United States will no longer be bound by the terms of paragraph 11(c) below. The defendant further agrees to waive the statute of limitations with respect to the assessment and collection of his taxes due and owing for these tax years. The defendant also agrees to provide the Internal Revenue Service with all requested documents and information for purposes of any civil audits, examinations, collections, or other proceedings, and to waive any rights regarding disclosure to the Internal Revenue Service Examination and Collection Divisions of all documents obtained and reports produced during the criminal investigation, including but not limited to tax return related information and information obtained from the defendant pursuant to grand jury subpoena. Nothing in this agreement shall limit the Internal Revenue Service in its assessment and collection of any taxes, penalties and interest

4

due from the defendant or other parties. The defendant agrees to waive venue for any tax charges for purpose of this plea agreement and any rights he may have under 18 U.S.C. § 3237(b).

7. The defendant also agrees to pay restitution to the Internal Revenue Service pursuant to 18 U.S.C. § 3663(a)(3). The defendant further agrees that, pursuant to 18 U.S.C. § 3663(a)(3) and this agreement, the Court will order as restitution the amount of the criminal tax computation which the defendant agrees is $1,724,054, and which will be applied to the defendant's civil tax liability for the years 2001 through 2003, as later determined by the Internal Revenue Service.

8. If the Court accepts the defendant's plea of guilty and the defendant fulfills each of the terms and conditions of this agreement, the United States agrees that it will not further prosecute the defendant for crimes described in the factual basis attached as Exhibit A or disclosed by the defendant in debriefing sessions with the United States on or before January 3, 2006. Nothing in this agreement is intended to provide any limitation of liability arising out of any acts of violence.

9. The defendant understands and agrees that federal sentencing law requires the Court to impose a sentence which is reasonable and that the Court must consider the advisory U.S. Sentencing Guidelines in effect at the time of the sentencing in determining a reasonable sentence. Defendant also understands that sentencing is within the discretion of the Court and that the Court is not bound by this agreement. Defendant understands that facts that determine the offense level will be found by the Court at sentencing and that in making those determinations the Court may consider any reliable evidence, including hearsay, as well as provisions or stipulations in this plea agreement. Both parties agree to recommend that the sentencing guidelines should apply pursuant to United States v. Booker and the final Sentencing Guidelines offense level as calculated herein provides for a reasonable sentence. Defendant further understands the obligation of the United

5

States to provide all relevant information regarding the defendant, including charged and uncharged

criminal offenses, to the United States Probation Office. The United States agrees to recommend

that any sentence imposed in this case run concurrently to any sentence imposed in United States v.

Jack A. Abramoff, No. 05 CR 60204 (SDFL) ("SDFL Case"). Moreover, the United States agrees

to recommend that the conduct at issue in the SDFL Case is not relevant conduct for sentencing

purposes in the instant plea provided that the defendant is found guilty in the SDFL Case by plea or

otherwise. Defendant also states that he has had ample opportunity to discuss, and has in fact

discussed, the impact of the sentencing guidelines and the statutory maximum sentence with his

attorney and is satisfied with his attorney's advice in this case.

    10. Except to the extent it would be inconsistent with other provisions of this agreement,

the United States and the defendant reserve, at the time of sentencing, the right of allocution, that is

the right to describe fully, both orally and in writing, to the Court the nature, seriousness and impact

of the defendant's misconduct related to the charges against him or to any factor lawfully pertinent

to the sentence in this case. The United States will also advise the court of the nature, extent and

timing of the defendant's cooperation. The defendant further understands and agrees that in

exercising this right, the United States may solicit and make known the views of the law

enforcement agencies which investigated this matter.

    11. The defendant and the United States agree that the following United States Sentencing

Guidelines ("U.S.S.G.") apply based upon the facts of this case:

        a. The parties agree that the 2003 Sentencing Guidelines Manual governs the

guideline calculations in this case. All references in this agreement to the U.S.S.G. refer to that

manual.

6

b. The parties agree that the total offense level applicable to the defendant's offense conduct is Level 31. This level is calculated as follows:

I. Fraud Offenses:

| | |
|---|---|
| Base Offense level § 2B1.1 | 6 |
| § 2B1.1(b)(1)(L) loss of more than $20,000,000 | 22 |
| § 3B1.1(c) organizer or leader | 2 |
| § 3B1.3 abuse of trust | 2 |
| | 32 |

II. Corruption Offenses:

| | |
|---|---|
| Base Offense level § 2C1.1 | 10 |
| § 2C1.1(b)(1) more than one bribe | 2 |
| § 2C1.1(b)(2)(b) involving a high level public official | 8 |
| § 3B1.1(a) organizer or leader or was involving more than five participants or was otherwise extensive | 4 |
| | 24 |

III. Tax Offense

| | |
|---|---|
| Base Offense Level § 2T4.1 tax loss of more than $1,000,000 but less than $2,500,000 | 22 |
| § 2T1.1(b)(1) failure to identify the source of income from criminal activity | 2 |
| § 2T1.1(b)(2) sophisticated means | 2 |
| | 26 |

IV. Treatment of Multiple Counts/Objects

§3D1.4 (2 total)                                                 <u>2</u>
                                                                34

VII. Expected Adjustment under § 3E1.1              <u>- 3</u>

TOTAL                                              31 (108-135 months)


c.  As indicated above, the United States agrees that it will recommend that the Court reduce by three levels the sentencing guideline applicable to the defendant's offense, pursuant to U.S.S.G § 3E1.1, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility.  The United States, however, will not be required to make these recommendations if any of the following occurs: (1) defendant fails or refuses to make a full, accurate and complete disclosure to this office or the probation office of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) defendant is found to have misrepresented facts to the United States prior to entering this plea agreement; (3) defendant commits any misconduct after entering into this plea agreement, including but not limited to, committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official; or (4) defendant fails to comply with any terms of this plea agreement.

d.  The defendant understands that his Criminal History Category will be determined by the Court after the completion of a Pre-Sentence Investigation by the U.S. Probation Office.  The defendant acknowledges that the United States has not promised or agreed that the defendant will or will not fall within any particular criminal history category and that such determinations could affect his guideline range and/or offense level as well as his final sentence.  The parties understand

8

that the order in which the pleas are entered or sentences are imposed in the SDFL Case and the instant matter could result in the imposition of an additional criminal history category and an increased period of incarceration. Consequently, if a plea or sentence in the SDFL Case results in a criminal history category greater than I, and the defendant has fully complied with all provisions in this agreement, the United States agrees to recommend a downward departure based on U.S.S.G. Section 4A1.3(b).

12. The defendant and the United States agree that neither party will seek or advocate for or suggest in any way an adjustment to or a departure from the sentencing guidelines other than those explicitly set forth in this agreement or for a sentence outside of the range determined to be applicable under the advisory Sentencing Guidelines, provided that those guidelines are calculated as set forth above. In the event that the defendant breaches any term of the plea agreement, the United States may move for upward departures based on any grounds the United States deems appropriate.

13. The parties agree that U.S.S.G. § 5E1.2 provides that the Court shall impose a fine for a guideline offense at level 31 of $15,000 to $150,000, unless the Court finds that the defendant is unable to pay a fine. The defendant understands that the Court must order that the defendant make restitution to victims of these offenses for the full amount of the loss.

14. The defendant agrees to fully cooperate in this and any other case or investigation with attorneys for the United States of America, and federal and state law enforcement agencies by providing truthful and complete information, evidence and testimony, if required, concerning any matter. The defendant understands that if he makes material false statements intentionally to law enforcement, commits perjury, suborns perjury, or obstructs justice, he may be found to have

9

breached this agreement and nothing in this agreement precludes the United States of America or any other law enforcement authority from prosecuting him fully for those crimes or any other crimes of which he may be guilty and from using any of his sworn or unsworn statements against him. The defendant understands that this plea agreement is explicitly dependent upon his providing completely truthful testimony in any trial or other proceeding, whether called as a witness by the United States, the defense or the Court.

15. Further, in the event that the United States determines in its exclusive discretion that the defendant has fully complied with this agreement and provided "substantial assistance" to law enforcement officers in the investigation and prosecution of others, the United States agrees it will file a motion for a downward departure pursuant to Section 5K1.1 and 18 U.S.C. § 3553(e) of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, respectively. Such assistance by the defendant shall include his cooperation in providing truthful and complete testimony before any grand jury and at any trial as requested by the United States and in interviews by investigators. If the United States files a motion either under § 5K1.1 of the guidelines or Rule 35, both parties will have the right to present facts regarding Abramoff's cooperation in any judicial district and to argue for the extent of the departure that is appropriate based on the defendant's cooperation. However, the defendant further understands that the decision whether to depart, and the extent of any departure for substantial assistance is the exclusive province of the Court.

16. The United States cannot and does not make any promise or representation as to what sentence the defendant will receive or what fines or restitution the defendant may be ordered to pay. The defendant understands that the sentence in this case will be determined solely by the Court,

10

with the assistance of the United States Probation Office and that the Court may impose the maximum sentence permitted by the law. The Court is not obligated to follow the recommendations of either party at the time of sentencing. The defendant will not be permitted to withdraw his plea regardless of the sentence recommended by the Probation Office or the sentence imposed by the Court.

17. The defendant, knowing and understanding all of the facts set out herein, including the maximum possible penalty that could be imposed, and knowing and understanding his right to appeal the sentence as provided in 18 U.S.C. § 3742, hereby expressly waives the right to appeal any sentence within the maximum provided in the statutes of conviction or the manner in which that sentence was determined and imposed, including on the grounds set forth in 18 U.S.C. § 3742, in exchange for the concessions made by the United States in this plea agreement. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b). If the United States appeals the defendant's sentence, the defendant will be entitled to appeal his sentence as set forth in 18 U.S.C. § 3742(a) as to any aspects of his sentence inconsistent with the sentencing provisions of this agreement.

18. If the defendant fails to comply with any of the terms and conditions set forth in this agreement, the United States may fully prosecute the defendant on all criminal charges that can be brought against the defendant. With respect to such a prosecution:

   a. The defendant shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, or any other federal rule, that the defendant's statements pursuant to this agreement or any leads derived therefrom should be suppressed or are inadmissible;

11

b. The defendant waives any right to claim that evidence presented in such prosecution is tainted by virtue of the statements the defendant has made; and

c. The defendant waives any and all defenses based on the statute of limitations with respect to any such prosecution that is not time-barred on the date that this agreement is signed by the parties.

19. If a dispute arises as to whether defendant has knowingly committed any material breach of this agreement, and the United States chooses to exercise its rights under Paragraph 18, at the defendant's request, the matter shall be submitted to the Court for its determination in an appropriate proceeding. At such proceeding, the defendant's disclosures and documents shall be admissible and the United States shall have the burden to establish the defendant's breach by a preponderance of the evidence.

20. The parties agree that if the Court does not accept the defendant's plea of guilty, then this agreement shall be null and void.

21. The defendant understands that this agreement is binding only upon the Public Integrity Section and the Fraud Section of the Criminal Division, and the Tax Division of the United States Department of Justice. This agreement does not bind any other prosecutor's office or agency. It does not bar or compromise any civil claim that has been or may be made against the defendant.

22. This agreement and the attached Factual Basis for Plea constitute the entire agreement between the United States and the defendant. No other promises, agreements, or representations exist or have been made to the defendant or the defendant's attorneys by the Department of Justice

12

in connection with this case.  This agreement may be amended only by a writing signed by all

parties.


FOR THE DEFENDANT
Dated: ___1/3/06_____


_____
JACK A. ABRAMOFF
Defendant


_____
ABBE DAVID LOWELL, ESQ.
Counsel for Defendant

13

FOR THE UNITED STATES

Dated: 1 / 3 / 06

NOEL L. HILLMAN
Chief, Public Integrity Section

PAUL E. PELLETIER
Acting Chief, Fraud Section


Mary K. Butler
M. Kendall Day
Trial Attorneys
Criminal Division
U.S. Department of Justice

Guy D. Singer
Nathaniel B. Edmonds
Trial Attorneys
Criminal Division
U.S. Department of Justice


BRUCE M. SALAD
Chief, Southern Criminal Enforcement
Section

Stephanie D. Evans
Trial Attorney
Tax Division
U.S. Department of Justice

14

ATTACHMENT A

FACTUAL BASIS FOR THE PLEA
OF JACK A. ABRAMOFF

This statement is submitted to provide a factual basis for my plea of guilty to the charges

filed against me.

1. From 1994 to 2004, Abramoff was a Washington, D.C. lobbyist. In 1994, Abramoff

   joined a law and lobbying firm ("Firm A"). In January 2001, Abramoff joined a second

   law and lobbying firm ("Firm B").

2. At all relevant times, Abramoff solicited and obtained business with groups and

   companies throughout the United States, including Native American tribal governments

   operating, and interested in operating, gambling casinos. Abramoff sought to further his

   clients' interests by lobbying public officials, including Members of the United States

   Congress. Abramoff also sought to further his clients' interests by recommending

   vendors for grass roots work, public relations services and election campaign support.

   Typically, Abramoff communicated with his clients by interstate electronic mail,

   interstate telephone calls, and private or commercial interstate mail carriers.

3. From March 2000 through 2001, Michael Scanlon ("Scanlon") worked for Firm A and

   Firm B in Washington, D.C. as a public relations specialist engaged in providing public

   relations services to clients throughout the United States. At these firms, Scanlon worked

   on many matters, often together with, and at the direction of, Abramoff. Abramoff was

   influential in Scanlon being hired by both firms.

4. In or about January 2001, Scanlon established a business called Capital Campaign

   Strategies LLC which had its principal offices in Washington, D.C. Capital Campaign

1

Strategies LLC was formed to provide grass roots work, public relations services, and election campaign support. Scanlon also formed other companies that were used primarily to receive money for the services and work performed by others (collectively referred to as "CCS"). The services that CCS provided frequently involved use of interstate mail and telephone calls. Payments were often made by interstate wire transfer or checks that foreseeably caused interstate funds transfers between banks.

5. In May 2003, Abramoff established a business called GrassRoots Interactive ("GRI"), which had its principal offices in Silver Spring, Maryland. Abramoff represented that GRI would provide grass roots work, public relations services, and election campaign support.

6. In July 1999, Abramoff established a private foundation called Capital Athletic Foundation ("CAF") for which he sought and received federal tax-exempt status, in part to provide funding for a non-profit school. In November 2001, Abramoff organized a solely owned entity, Kaygold, LLC. Abramoff used these entities in part to receive funds for his personal benefit, to conceal the destination of the funds, and, with respect to CAF, to evade income taxes. Payments were often made by interstate wire transfer or checks involving interstate funds transfers.

**Fraud Based on Violations of Abramoff's Duty of Honest Services**

7. Abramoff was hired by at least four Native American tribes with gaming operations to provide professional services and develop programs to limit market competition or to assist in opening casinos. In 2001, Abramoff and Scanlon agreed that Abramoff would encourage his existing and potential clients to obtain grass roots and public relations

2

services as a critical part of the lobbying program and strategy that Abramoff had been hired to provide. Abramoff promoted and recommended primarily CCS to provide this grass roots and public relations work. The prices CCS charged for its services were significantly in excess of CCS's costs.

8.    Abramoff and Scanlon knew and agreed that Abramoff would receive fifty percent of the net profits received by CCS from those clients. Most of the payments from clients under the contracts with CCS were made to CCS. Scanlon then paid Abramoff his share of the net profits to various organizations that Abramoff controlled. The transfer of funds to Abramoff foreseeably involved the interstate transfer of funds.

9.    Abramoff and Scanlon understood that the payments to Abramoff would not be disclosed to Abramoff's and Scanlon's four clients. Abramoff and Scanlon understood that disclosure of the profit-sharing arrangement to the clients would likely jeopardize the contracts for services and/or the profit margins of both Abramoff's law firm and CCS because disclosure could encourage the clients to seek competitive proposals from other vendors. Abramoff knew that his clients could receive the same services at significantly reduced prices because the quoted prices incorporated the undisclosed fees Scanlon paid to Abramoff of approximately fifty percent of CCS's net profits.

10.    Abramoff promoted himself as having knowledge superior to his clients regarding lobbying and grass roots activity. Abramoff encouraged his clients to trust his judgment in these matters. Abramoff knew his clients did in fact trust and rely upon him in these matters. Abramoff further knew he had a duty to disclose all relevant facts to his lobbying clients, including conflicts of interest and any financial interest in fees paid to others.

3

Mississippi Tribe

11.    In 1995, Abramoff was hired by a Native American Indian tribal client based in Mississippi ("Mississippi Tribe") to hire him to provide lobbying services on various issues. Abramoff used his knowledge of lobbying and grass roots work, which was superior to the Mississippi Tribe's knowledge of these areas, to secure the trust and confidence of the Mississippi Tribe.

12.    In early 2001, Abramoff recommended and advised the Mississippi Tribe to hire CCS, while concealing the fact that Abramoff would receive approximately fifty percent of the net profits from the Mississippi Tribe's payments to Scanlon.

13.    From June 2001 until April 2004, the Mississippi Tribe paid Scanlon and related entities approximately $14,765,000. Abramoff and Scanlon concealed from the Mississippi Tribe that approximately fifty percent of the profit, approximately $6,364,000 including money not passed through CCS, was paid to Abramoff pursuant to their undisclosed arrangement.

Louisiana Tribe

14.    In March 2001, Abramoff and Scanlon successfully solicited a Native American Indian tribal client based in Louisiana ("Louisiana Tribe") to hire them to provide lobbying and grass roots services to the tribe. Abramoff used his knowledge of lobbying and grass roots work, which was superior to the Louisiana Tribe's knowledge of these areas, to secure the trust and confidence of the Louisiana Tribe.

15.    In March 2001, after CCS had been paid for the first project, Abramoff advised the Louisiana Tribe to rehire CCS, while concealing the fact that Abramoff would receive fifty percent of the profits from the Louisana Tribe's payments to CCS.

4

16.    From March 2001 to May 2003, the Louisiana Tribe paid CCS and related entities approximately $30,510,000. Abramoff and Scanlon concealed from the Louisiana Tribe that approximately fifty percent of the profit, approximately $11,450,000, was paid to Abramoff pursuant to their undisclosed arrangement.

Michigan Tribe

17.    In January 2002, Abramoff and Scanlon successfully solicited a Native American Indian tribal client based in Michigan ("Michigan Tribe") to hire them to provide lobbying and grass roots services. Abramoff used his knowledge of lobbying and grass roots work, which was superior to the Michigan Tribe's knowledge of these areas, to secure the trust and confidence of the Michigan Tribe.

18.    In June 2002, Abramoff advised the Michigan Tribe to expand its contract with CCS, while concealing the fact that Abramoff would receive approximately fifty percent of the profits from the Michigan Tribe's payments to CCS.

19.    From June 2002 to October 2003, the Michigan Tribe paid Scanlon and related entities approximately $3,500,000. Abramoff and Scanlon concealed from the Michigan Tribe that approximately fifty percent of the profit, approximately $540,000, was paid to Abramoff pursuant to their undisclosed arrangement.

Texas Tribe #1

20.    In February 2002, Abramoff and Scanlon successfully solicited a Native American Indian tribal client based in Texas ("Texas Tribe #1") to hire them to provide lobbying and grass roots services designed to reopen Texas Tribe #1's gaming operations that had been closed by Texas authorities because Texas Tribe #1 did not have federal or state authority to operate a casino. Specifically, Abramoff and Scanlon represented that they would

5

work first to open the casino as a Class II gaming facility and then work to expand Texas

Tribe #1's casino as a more lucrative Class III facility. Abramoff and Scanlon further

proposed that, in return for their work, Texas Tribe #1 would pay CCS $4,200,000 in fees

and make additional and substantial political campaign contributions at the direction of

Abramoff and Scanlon. Abramoff falsely represented that he would work for free to

represent Texas Tribe #1, all the while concealing from the Texas Tribe #1 that

approximately fifty percent of CCS's net profits, approximately $1,850,000, was paid to

Abramoff pursuant to his undisclosed arrangement with Scanlon.

21.    At no time did Abramoff, Scanlon, or others working with them disclose to Texas Tribe

#1 that, beginning in 2001, Abramoff, Firm B, and Scanlon had collected millions of

dollars in fees from the Louisiana Tribe to oppose all gaming in the Texas legislature.

Abramoff's conduct prevented consideration by Firm B of whether to disclose his

representation of Texas Tribe #1 pursuant to the Lobbying Disclosure Act.

22.    After being retained by Texas Tribe #1 in early 2002 to reopen its casino through federal

legislation, Abramoff continued representing the Louisiana Tribe for millions of dollars

in fees. Pursuant to this representation of the Louisiana Tribe, Abramoff failed to

disclose to Texas Tribe #1 that he opposed legislation in the 2003 Texas state legislative

session that would have provided a basis to reopen Texas Tribe #1's casino under state

law. Abramoff knew that Texas Tribe #1 supported and promoted this legislation while

he worked to prevent its passage for the benefit of his other client, the Louisiana Tribe.

6

Wireless Company

23. From January 2001 until April 2004, Abramoff was employed by Firm B. As an employee of Firm B, Abramoff had a duty to act in Firm B's best interests and not to divert lobbying fees owed to Firm B.

24. In 2001, Abramoff was hired by a wireless telephone company ("Wireless Company") to undertake a lobbying effort to assist Wireless Company in securing a license to install wireless telephone infrastructure for the United States House of Representatives. In 2001 and early 2002, Abramoff and his Firm B colleagues lobbied for the Wireless Company without any formal retainer agreement. Rather than make lobbying payments to Firm B, Abramoff directed Wireless Company to make payments totaling at least $50,000 to CAF.

25. At no time did Abramoff inform his employer, Firm B, of the $50,000 in payments to CAF, of which Firm B was entitled to a portion.

## Fraud Based on Abramoff's Affirmative Misrepresentations

Michigan Tribe

26. From June 2002 to November 2002, Abramoff and a former lobbying colleague, who was also a former congressional staffer ("Staffer A") successfully solicited the Michigan Tribe for a $25,000 payment to CAF. Instead of using the funds for CAF, Abramoff used this money for his personal and professional benefit to partially pay for a golfing trip to Scotland for himself, public officials, members of his staff and others.

Distilled Beverages Company

27.    On or about June 6, 2002, Abramoff and Staffer A successfully solicited one of Firm B's

clients, a distilled beverages company, for a $25,000 payment to CAF. Instead of using

the funds for CAF, Abramoff used this money for his personal and professional benefit to

partially pay for a golfing trip to Scotland for himself, public officials, members of his

staff and others.

New Mexico Tribe

28.    In February 2002, Abramoff and others successfully solicited a Native American Indian

tribal client based in New Mexico ("New Mexico Tribe") to hire them to provide

lobbying and grass roots services to the tribe.

29.    In March 2002, the New Mexico Tribe paid Scanlon and related entities approximately

$2,750,000. Abramoff and Scanlon materially understated to the New Mexico Tribe the

size of CCS's profit margins and concealed from the New Mexico Tribe that CCS's

profit margin was approximately eighty percent and that approximately fifty percent of

the net profit, $1,175,000, was paid to Abramoff pursuant to the undisclosed

arrangement. At no time prior to March 2004 did Abramoff or others inform Firm B or

the New Mexico Tribe of the undisclosed payments.

Manufacturing and Services Company

30.    On May 2, 2003, Abramoff sent a business proposal to a manufacturing and services

company ("Company A") to handle its lobbying effort regarding a tax issue. In addition

to his services, Abramoff recommended that Company A hire GRI, while concealing

from Company A his interest in GRI. In his proposal, Abramoff falsely advised that GRI

had no relationship with Abramoff's law and lobbying firm, even though GRI was controlled by Abramoff and paid the vast majority of its profits to Abramoff or entities he controlled. Additionally, Abramoff represented to Company A that he was negotiating on their behalf with GRI to try to save Company A money, when in fact he was simply setting a high price on services that he controlled and from which he would profit.

31.    In May and June 2003, Company A paid GRI, directly and through Firm B's bank account, approximately $1,841,429. Abramoff and entities he controlled received approximately $1,655,695 from GRI.

**Corruption of Public Officials**

32.    Beginning as early as January 2000, Abramoff, Scanlon and others engaged in a course of conduct through which one or both of them offered and provided a stream of things of value to public officials in exchange for a series of official acts and influence and agreements to provide official action and influence. These things of value included, but are not limited to, foreign and domestic travel, golf fees, frequent meals, entertainment, election support for candidates for government office, employment for relatives of officials, and campaign contributions. As one part of this course of conduct, things of value were offered to and given to a Member of the United States Congress ("Representative #1") and members of Representative #1's staff, including, but not limited to:

a.    All-expenses-paid trips, including a trip to the Commonwealth of the Northern Marianas Islands ("CNMI") in 2000, a trip to the Super Bowl in Tampa, Florida in 2001, and a golf trip to Scotland in 2002;

9

b.      Numerous tickets for entertainment, including concerts and sporting events;

c.      Fundraising events, including providing box suites and food at various sport and concert venues and at a restaurant in the Washington, D.C. area owned by Abramoff;

d.      Campaign contributions to campaign committees and to political action committees and organizations, including, but not limited to, the following:

      i.      $4,000 in contributions to Representative #1's campaign committee in 2000; and

      ii.     A $10,000 contribution to the National Republican Campaign Committee ("NRCC") in 2000 at Representative #1's request;

e.      Regular meals and drinks at an upscale restaurant owned by Abramoff in Washington, D.C.; and

f.      Frequent golf and related expenses at courses in the Washington, D.C area.

33.     As part of this course of conduct, Abramoff, Scanlon and others provided things of value to public officials in exchange for a series of official acts and influence, and agreements to provide official acts and influence, including, but not limited to, agreements to support and pass legislation, agreements to place statements in the Congressional Record, agreements to contact personnel in United States Executive Branch agencies and offices to influence decisions of those agencies and offices, meetings with Abramoff and CCS's clients, and awarding contracts for services with CCS and Abramoff's law firms. As one part of this course of conduct, Representative #1 and members of his staff agreed to use and did use their official positions and influence, including, but not limited to, the following:

10

a.    Travel by a senior staff member of Representative #1 with others in January 2000 to CNMI for the purpose of assisting Abramoff, his firm and others in obtaining and maintaining lobbying clients;

b.    Representative #1's agreement in March 2000 to place a statement drafted by Scanlon into the <u>Congressional Record</u> that was critical of the then-owner of a Florida gaming company, and was calculated to pressure the then-owner to sell on terms favorable to Abramoff and his partners;

c.    Representative #1's agreement in October 2000 with Scanlon to insert a statement into the <u>Congressional Record</u> which praised the new owner of the Florida gaming company, Abramoff's business partner;

d.    Representative #1's agreement in approximately August 2001 to use his position as Chairman of a Committee of the House to endorse and support a client of Abramoff as the provider of wireless telephone infrastructure to the House of Representatives;

e.    Representative #1's agreement in approximately March 2002 that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an existing federal ban against commercial gaming in order to benefit a client of Abramoff and CCS, Texas Tribe #1;

f.    Representative #1's agreement in approximately June 2002 that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an

11

existing federal ban against commercial gaming for another Native American Tribe in Texas ("Texas Tribe #2") at Abramoff's request;

g.    Representative #1 met in August 2002 with representatives of Texas Tribe #1 to assure them that they were effectively represented by Abramoff and that he continued to agree to work to pass the legislation they wanted;

h.    Representative #1's agreement in December 2002 to seek support from a Member of another Committee of the House of Representatives for passage of legislation to lift the federal gaming ban for Texas Tribe #1;

i.    Representative #1 met in 2002 with a Native American Tribal client of CCS and Abramoff from California ("California Tribe") to discuss Representative #1's agreement to assist in passing legislation regarding taxation of certain payments received by members of the California Tribe, and to assist in an issue relating to a post office of interest to the California Tribe;

j.    Representative #1 agreed to meet with some of Abramoff's clients and others in Russia while Representative #1 was there on official business in August 2003 to, among other things, influence the process of obtaining a visa for travel to the United States for the relative of one of Abramoff's clients; and

k.    Representative #1 at various times, directly and indirectly, contacted public officials at additional government agencies and offices on behalf of clients of Abramoff and CCS in an effort to influence decisions and actions by those officials.

34.    As one part of the same course of conduct outlined in paragraphs 32 and 33 above, in

June 2002, Abramoff informed Representative #1 that Texas Tribe #1 was raising funds

to pay for a golfing trip to Scotland that Representative #1 and members of his staff were

to, and did, attend. In August 2002, Texas Tribe #2, at the request of Abramoff and

Texas Tribe #1, sent a $50,000 check made out to CAF via private interstate mail

delivery to Abramoff at 1101 Pennsylvania Ave, N.W., Washington, D.C.

35.    As one part of the same conduct outlined in paragraphs 32 and 33 above, beginning at

least in 1999 through January 2001, Abramoff and others sought Staffer A's agreement to

perform a series of official acts, including assisting in stopping legislation regarding

internet gambling and opposing postal rate increases. With the intent to influence those

official acts, Abramoff provided things of value including, but not limited to, from June

2000 through February 2001, ten equal monthly payments totaling $50,000 through a

non-profit entity to the wife of Staffer A. The total amount paid to the wife of Staffer A

was obtained from clients that would and did benefit from Staffer A's official actions

regarding the legislation on internet gambling or opposing postal rate increases.

36.    As one part of the same course of conduct outlined in paragraphs 32 and 33 above,

beginning in March 2002, Abramoff and a former staffer to Representative #1 ("Staffer

B") contacted Representative #1, officials employed by the Office of Representative #1,

and officials employed by a House Committee ("Committee") of which Representative

#1 was the chairman. These contacts occurred within one year of Staffer B having served

as the Chief of Staff for Representative #1 and Staff Director of the Committee.

Abramoff intended that Staffer B communicate with Representative #1, his staff, and the

13

Committee staff for the purpose of influencing official action on behalf of Abramoff's and Staffer B's clients, including Texas Tribe #1 and Wireless Company.

**Tax Evasion Offense**

37.   During the calendar year 2002, Abramoff had and received a substantial amount of income from the conduct discussed in paragraphs 1 through 31. In order to conceal this income from the Internal Revenue Service and others, Abramoff used entities exempt from taxation under Title 26, United States Code Section 501(c), including a private foundation he created and a public policy organization for which he served as a director, to receive income and to make expenditures for his own personal benefit. To further conceal this income, Abramoff and others created, or caused to be created, false invoices and false entries to financial records, which made it appear as if the funds had been received and expended for tax-exempt purposes. In fact, Abramoff and others knew that these activities constituted a misuse of these tax-exempt entities. Through these activities, Abramoff and others intended to and did benefit Abramoff, the entities he controlled or financially supported, and the public policy organization.

38.   On or about October 15, 2003, Abramoff signed and filed a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, which underreported Abramoff's total income for 2002. Specifically, Abramoff willfully and intentionally failed to report the income received from the illegal schemes described in paragraphs 1 to 32 above resulting in the evasion of approximately $628,557 in individual income taxes for the 2002 tax year.

14

39.  Abramoff signed and filed false and fraudulent Returns of Private Foundations, Forms 990PF, which misrepresented the receipt of diverted funds as charitable donations and mischaracterized personal and business expenditures as being used for a tax exempt purpose.

40.  Furthermore, Abramoff caused false Returns of Organizations Exempt from Income Tax, Forms 990, to be filed by a public policy organization, which misrepresented the receipt of diverted funds as charitable donations and mischaracterized personal and business expenditures of Abramoff as being used for a tax exempt purpose.

41.  Abramoff engaged in similar evasive conduct for the tax years 2001 and 2003. Due to this and other evasive conduct, Abramoff attempted to evade approximately $1,724,054 in individual income taxes for the 2001 through 2003 tax years.


The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I or others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE:  1/3/06

JACK A. ABRAMOFF
Defendant

ABBE DAVID LOWELL, ESQ.
Attorney for Defendant

15