UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Cr. No 05-370 (PLF) |
| | : | |
| v. | : | |
| | : | |
| **DAVID HOSSEIN SAFAVIAN** | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE TO PRECLUDE ADMISSION OF 404(b) EVIDENCE AND TO EXCLUDE EVIDENCE OF UNALLEGED FALSE STATEMENTS, GRATUITIES, BRIBERY, OR GIFTS FROM PROHIBITED SOURCES

The United States of America, by and through its undersigned attorneys, hereby respectfully submits this Response to Defendant's Motion In Limine to Preclude Admission of 404(b) Evidence and to Exclude Evidence of Unalleged False statements, Gratuities, Bribery, or Gifts from Prohibited Sources (Docket Nos. 64 and 69):

In his motions, defendant seeks to preclude the government from introducing a wealth of evidence that is directly relevant to establishing defendant's guilt. The evidence defendant seeks to exclude establishes defendant's motive for committing the charged offenses and also refutes any suggestion that the false statements made in this case were the result of accident or mistake. Moreover, the evidence regarding the true costs of the Scotland is directly relevant to Count One of the Indictment, which alleges that defendant's claim that he "fully paid for his cost of the trip" was one of the reasons that the GSA closed its investigation and constituted obstructive conduct. Ind., ¶¶ 21, 25-26. While it is entirely understandable that defendant would seek to prevent the jury from learning about the true nature of his relationship with Jack Abramoff, defendant's

attempt to preclude the government from introducing evidence that is directly relevant to his guilt – under the claim that this introduction is somehow barred by the rules of evidence – is completely without merit and should be denied.

### The TYCO Evidence

The government previously gave notice that it intended to introduce at trial evidence that in November, 2003, defendant provided Mr. Abramoff with advance warning that the GSA was about to suspend four TYCO entities from doing business with the federal government.  In addition, defendant, who knew that TYCO was a lobbying client of Mr. Abramoff's, provided Abramoff with sensitive and confidential information regarding internal GSA deliberations about the circumstances surrounding the TYCO suspension, including information that some GSA officials were concerned about whether TYCO had been treated fairly in relation to other similarly situated companies.  All of this information was both sensitive and non-public and should not have been shared with anyone outside the government.  After advising Abramoff about these internal deliberations, defendant suggested to Abramoff what arguments TYCO should make when it appealed the suspension decision to GSA officials.

### The Cost of the Scotland Trip

The defense has also sought to preclude the government from introducing any evidence concerning the true cost of the Scotland trip.  Defendant argues that the Indictment fails to "allege that Mr. Safavian lied to the GSA-OIG about making a full payment for the trip, or that Mr. Safavian's payment was in any way insufficient." Mot. to Exclude, p. 3.  Despite the fact that the Indictment alleges that the total cost of the Scotland trip "for nine people exceeded $130,000" (Ind. ¶ 21) and that after defendant provided the GSA-OIG with a copy of a $3,100

check that purported to cover the "total cost" of his trip the OIG closed its investigation (Ind., ¶¶ 25-26), defendant now argues that the introduction of evidence that Mr. Safavian paid far less than his share of the true cost of the Scotland trip is tantamount to alleging an uncharged crime, i.e., an illegal gratuity or a bribe, or possibly yet another false statement, and therefore should not be admitted at trial.  Mot. to Exclude, p. 3.

### Other Evidence Implicating Gratuities, Bribery or Gifts from Prohibited Sources

Finally, defendant also asks the Court to "exclude any other arguments or evidence[1] implicating gratuities, bribery, or gifts from prohibited sources."  Def. Mot. to Exclude, p. 1.  The introduction of this evidence, defendant argues, would result in unfair prejudice to him and its admission would result in jury confusion and delay.

### ARGUMENT

Defendant's arguments are without merit.  As to the TYCO matter, this evidence is directly relevant to establishing that defendant had good reason to want the details of his unethical and inappropriate relationship with Abramoff to remain hidden from public view.  The evidence will show that for the entire length of his tenure at GSA – starting within days of his taking the post of Chief of Staff – defendant began providing Abramoff with a steady stream of sensitive and confidential GSA information.  All of this information was provided to Abramoff,

---

[1] Although defendant does not describe in his motion what he is referring to by this "other evidence," the government assumes he is referring to the stream of gifts Abramoff offered to him while defendant was employed at GSA.  These gifts included the Scotland trip (as well as an offer to go on a second Scotland trip planned for the summer of 2003), use of Abramoff's luxury boxes at professional sporting events, offers of free meals, and constant offers of golf.  The evidence will be focused solely and exclusively on defendant's inappropriate relationship with Abramoff and not with any other "prohibited sources" in general.

defendant's personal friend and former lobbying partner, so that Abramoff could benefit his clients. In exchange for this information, Abramoff provided to defendant a commensurate stream of gifts, including tickets for professional sporting events either court-side or in Abramoff's luxury boxes, countless free rounds of golf, meals at Abramoff's restaurants, and the Scotland trip.[2] E-mails between defendant and Abramoff make clear that defendant contemplated coming back to work with Abramoff at Greenberg Traurig.[3] The evidence at trial will show that defendant sought to stay in Abramoff's good graces by providing Abramoff with useful information that would benefit not only Abramoff but the Greenberg Traurig firm.[4] The proffered TYCO evidence is but one piece of the evidence that will establish this improper, unethical relationship. It was the nature of this relationship that defendant sought to keep hidden, and it explains defendant's motives when he provided false and misleading information to his ethics officer, the GSA-OIG and the Senate.

Defendant's argument about precluding the government from introducing evidence regarding the true cost of the Scotland trip is frivolous. As noted above, Count One of the

---

[2] In addition to the August 2002 Scotland trip, Abramoff and defendant also discussed defendant's attendance at another Scotland golf junket the summer of 2003.

[3] For example, on April 30, 2002, after defendant tentatively decided to accept the GSA Chief of Staff position, he e-mailed Abramoff the following (Bates number DOJ-DS-000893): "Just spoke with Fred. He asked what I am going to do. I told him that I was leaning towards GSA, but was waiting to hear back from GT. Unfortunately, he didn't talk any numbers, so I am unable to compare apples to apples. But I think that is just as well, as my gut is telling me to take the GSA job before joining up with you and your band of merry men."

[4] For example, on August 14, 2002, defendant e-mailed (Bates number DOJ-DS-001079) a colleague of Abramoff's, with a carbon-copy to Abramoff, the following message: "Jon – This afternoon, I met with [members of an architectural and engineering firm]. They are looking for some competent help in terms of getting on the GSA schedule. I recommended you for the work. Let me know if either one ends up calling you." The subject line on this e-mail was "Client Development."

Indictment alleges that defendant's misrepresentations to the OIG that he had fully reimbursed Abramoff for the cost of the trip was obstructive conduct. There is simply no legal basis for defendant to argue that proving this statement was untrue and should be prohibited because it is unduly prejudicial. Moreover, defendant has claimed repeatedly in his papers – and, no doubt, will do the same at trial – that any false statement to the ethics officer or GSA-OIG is immaterial because defendant ultimately did not accept the gift of the trip; rather, he paid the cost of the trip himself. See Def. Mot. To Dism., p.32 ("Mr. Safavian simply submitted an e-mail ethics request, received an advisory opinion in response, *and ultimately decided not to accept the gift, thus mooting any concern*"); p. 37 ("Regardless of whether Mr. Safavian fully disclosed his relationship with Abramoff, his statements were immaterial *because he did not accept the offered gift*. ... The General Counsel indicated that paying for the trip would close the door on the ethics issue given that there would be no 'gift' to accept from the source, prohibited or otherwise. [] Mr. Safavian ultimately did not accept the gift."); p. 40 ("GSA-OIG closed its investigation into whether Mr. Safavian accepted a gift from lobbyists *based on its conclusion that Mr. Safavian did not accept such a gift. Once it was determined that the trip was paid for, whether or not Abramoff had business with the GSA was irrelevant.*") and p. 44 ("The GSA-OIG determined that Mr. Safavian had not accepted an international trip as a gift *given that Mr. Safavian provided documentation demonstrating that he had paid for the trip*") (emphasis supplied).

     In fact, the evidence shows otherwise. The evidence at trial will show that the $3,100 defendant paid for the Scotland trip was but a small fraction of the true cost of the trip, and that had defendant truthfully revealed the true nature of his relationship with Abramoff, defendant would have been required to pay approximately $10,000 more than what he actually paid to

5

Abramoff.[5]  This $10,000 benefit gave defendant a strong motive to lie when he spoke to the ethics officer and to the GSA-OIG.[6]  And, having lied to the ethics adviser and the GSA-OIG, the die was cast and defendant apparently felt that he had little choice but to continue these misrepresentations when he spoke to the United States Senate.  There is no question that had defendant decided to "come clean" with the U.S. Senate investigators that the result would have been that defendant's entire relationship with Abramoff would have been uncovered, and that this result would have been fatal to defendant's career.

**The Proffered Evidence is Admissible Pursuant to Rule 404(b)**

To the extent that the proffered evidence is not intertwined with the charged offenses, evidence of other crimes, wrongs or acts is admissible under Fed. R. Evid. 404(b) if offered for a permissible purpose.  Federal Rule of Evidence 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident [.]

The D.C. Circuit has set forth a two-part analysis to determine whether 404(b) evidence is admissible.[7]  The court first must determine whether the evidence is probative of a material issue

---

[5] The Government anticipates trial testimony from the GSA ethics officials and GSA-OIG that had they known of Mr. Abramoff's interest in GSA properties, they would have done further investigation to determine the true cost of the Scotland trip and ultimately discovered that defendant significantly underpaid for the value of the trip.

[6] Had he admitted the truth to the GSA-OIG there is little doubt that defendant would have been required to pay his full, pro rata share of the trip.

[7] An additional requirement for admissibility of 404(b) evidence is that the evidence be sufficient for a jury to find by a preponderance of the evidence that the defendant committed the extrinsic act.  See Huddleston v. United States, 485 U.S. 681, 690 (1988); see also, United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994).  At trial, the government will present admissible evidence

other than character; if so, the evidence "is admitted unless it is otherwise prohibited under any of the other 'general strictures limiting admissibility,' such as Rule 403." United States v. Cassell, 292 F.3d 788, 792 (D.C. Cir. 2002) (internal citations omitted); see also, United States v. Miller, 895 F.2d 1431, 1435 (D.C. Cir. 1990), cert. denied, 498 U.S. 825 (1990) ("This two-step analysis–certification of a 'proper' and relevant purpose under Rule 404(b), followed by the weighing of probity and prejudice under Rule 403–is firmly rooted in the law of this circuit."); United States v. Washington, 969 F.2d 1073, 1080-81 (D.C. Cir. 1992),  United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994) ("[t]he first step requires that the evidence be probative of some material issue other than character.  The second step requires that the evidence not be inadmissible under Rule 403." (internal citations omitted)).  Additionally, the D.C. Circuit has held that "the principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged." United States v. Latney, 108 F.3d 1446, 1450 (D.C. Cir. 1997) (internal quotation omitted).

     For the first prong, the federal rule is one of inclusion, not exclusion; it prohibits the admission of evidence in only one circumstance: "for the purpose of proving that a person's actions conformed to his character." United States v. Bowie, 232 F.3d 923, 930 (D.C. Cir. 2000) quoting United States v. Crowder, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc); see also United States v. Lawson, 410 F.3d 735, 741(D.C. Cir. 2005); United States v. Long, 328 F.3d

---

in the form of e-mail messages to and from defendant and Abramoff and, if necessary, witness testimony, to prove the other acts described above.  In Huddleston, the Supreme Court held that the district court need not make a preliminary finding that the government has proven the extrinsic act by a preponderance of the evidence; rather, the court "simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact." Huddleston, 485 U.S. at 689-90.

665, 1180 (D.C. Cir. 2003) ("'Rule 404(b) is a rule of inclusion rather than exclusion,' and it is 'quite permissive,' excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." (quotations omitted).

If the Court deems the evidence to be relevant, the Court should exclude the evidence under the second prong *only* if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978); see also Huddleston v. United States, 485 U.S. 681, 687 (1988). In close cases, the rule tilts toward the admission of the prior misconduct evidence. See United States v. Cassell, 292 F.3d at 795 ("Rule 403 'tilts, as do the rules as a whole, toward the admission of evidence in close cases,' even when other crimes evidence is involved") (quoting United States v. Moore, 732 F.2d 983, 989 (D.C. Cir. 1984). The D.C. Circuit has recognized that "Rule 404(b) evidence will often have ... multiple utility, showing at once intent, knowledge, motive, preparation and the like." United States v. Crowder, 141 F.3d at 1208.

Notably, the danger that this Court must weigh when undertaking the Rule 403 analysis is not the danger that the other crimes evidence will weaken defendant's defense, but rather the danger that the jury will misuse the evidence by inferring that, merely because defendant engaged in these prior bad acts, he is more likely to have engaged in the charged offenses. See United States v. Mitchell, 49 F.3d 769, 777 (D.C. Cir.) cert. denied, 516 U.S. 926 (1995). The law in our Circuit is clear that in balancing the probativeness and prejudice of other crimes, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged." United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982) (quoting United v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978)). This Circuit

8

has also noted that "'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" United States v. Cassell, 292 F.3d at 796 (quotations omitted).

 Applying this legal framework to the facts in this case requires a finding that the evidence in question is clearly relevant for purposes other than *solely* demonstrating defendant's bad character. The government has alleged that one week prior to going on the August, 2002 Scotland golf trip, defendant falsely told his ethics officer that Abramoff "did not have any business with and was not seeking to do business with GSA and that [Abramoff] did all his work on Capitol Hill." Ind., ¶ 29. The government has alleged that in fact, defendant was fully aware that Abramoff was both doing and seeking to do work with GSA and that the claim that Abramoff "did all his work on Capitol Hill" was a deliberate falsehood. Ind. ¶ 29.

 The government has also alleged that in late March, 2003, defendant made a false statement and obstructed justice when he told the GSA-OIG that Abramoff had no business with GSA and that he (defendant) paid for the total cost of the trip, including airfare, hotels and golf green fees. Defendant provided the GSA-OIG with a copy of a check for $3,100 that he had previously provided to Abramoff and with which defendant purported to show that he in fact had paid for the full cost of the trip. Ind. ¶ 25. The government has alleged, however, that the full cost of the trip for nine people exceeded $130,000. Ind. ¶ 21.

 Finally, the government has alleged that in February, 2005, defendant was contacted by the United States Senate Committee on Indian Affairs (the "Committee") which requested that defendant provide the Committee certain information about the 2002 Scotland golf trip. Ind. ¶¶ 33, 35. In a March, 2005 telephone conversation with an investigator from the Committee,

9

defendant claimed that "he had received approval for the Scotland trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics officer who prepared the opinion." Ind. ¶ 36. Defendant then sent to the Committee a copy of his July 25 email to the GSA ethics officer, the GSA ethics opinion, and a copy of the $3,100 check that he had given to Abramoff. Ind. ¶ 37.

At trial, it will be the government's burden to establish, beyond a reasonable doubt, that when defendant made the allegedly false statements charged that he did so "knowingly and willfully." Pattern Jury Instr. of First Cir. Instr. No. 4.08. If defendant's charged statements were made accidentally, and without the requisite intent, defendant would not be guilty of the offense charged.

Thus, the evidence now challenged by defendant is directly relevant to perhaps the most central issue in this case: defendant's intent in making the statements at issue, i.e, whether the false statements were made knowingly and willfully.[8] Intent almost always must be proved by circumstantial evidence. In this case, the government will point to motive evidence to demonstrate defendant's intent. Defendant had a clear and strong motive to lie to the GSA-OIG and the Senate: he knew that his relationship with Abramoff would not bear close scrutiny, and that if he revealed the truth, an investigation would ensue that would uncover a long history of illegal or, at the very least, highly unethical conduct. The evidence regarding TYCO is but one

---

[8] In comparison to the issue of whether the statements were made "knowingly and willfully," there seems to be relatively little dispute that the statements at issue were false, material, and made in a matter within the jurisdiction of a federal agency. See United States v. Notarantonio, 758 F.2d 777, 785 (1st Cir. 1985).

part of the pattern of unethical conduct engaged in by defendant that he would have naturally wanted to keep hidden from public view.

Had defendant revealed to the GSA-OIG that Abramoff had been attempting to gain control of two GSA properties and that defendant had attempted to assist Abramoff in these attempts, an investigation which delved into defendant's past relationship with Abramoff would have inevitably ensued, revealing the very e-mails defendant now asks this Court to preclude. Had these e-mails become public, defendant could have faced criminal exposure.[9] At the very least, defendant could expect to lose his job if the GSA Administrator, defendant's boss, were to learn that defendant helped Abramoff draft letters to the GSA for Abramoff's clients who were seeking official action by GSA.[10]

Were this evidence to be excluded at trial, defendant would be free to argue to the jury that he simply had no motive to lie to anyone, and so that if any misstatements had been made, they obviously were made by inadvertence or mistake, and not knowingly and intentionally, as the law requires. Thus, defendant could effectively ask the jury the rhetorical question of what possible motive could he have to jeopardize his career and his liberty by repeatedly making false statements to investigators, when he had absolutely nothing to hide? This argument, of course,

---

[9] As the government explained in its previously filed Motion in Limine, these e-mails would appear to support a prosecution for conspiracy to commit honest services fraud, a gratuities or bribery charge.

[10] The government anticipates calling the former Administrator of GSA, who was defendant's boss, at trial. It is anticipated that he will testify that he made very clear to defendant and all other GSA employees that he expected all GSA employees to adhere to strict ethical guidelines, and that he would not have countenanced the conduct evidenced by the proffered e-mails. Thus, defendant was on notice that the type of behavior that he engaged in with Abramoff would, if it came to light, result in serious consequences for his career.

crumbles when viewed in light of the proffered e-mails, which illustrate clearly what defendant was trying to hide and provide a clear motive for defendant to lie.[11]

A similar analysis applies to the evidence concerning the true cost of the Scotland trip. Defendant claimed in his July 25, 2002 e-mail[12] to the GSA general counsel prior to his trip that he would be "paying for all of my hotels, meals and greens fees." As noted, the Indictment alleges that the true cost of the Scotland trip was $130,000 (Ind. ¶ 21). Defendant claimed to the OIG that he paid Abramoff for the total cost of his trip, providing a copy of a $3,100 check as proof.

The evidence at trial will show that defendant's claim that he paid his entire share of the cost of the trip was false, and that defendant knew it was false. A review of defendant's bank and credit card records reveal that he did not pay for all of his "hotels, meals and greens fees." Virtually all of these costs were picked up by Abramoff. Defendant's lodging costs alone for four nights at the Old Course at St. Andrews and three nights at the Mandarin Oriental Hotel in London totaled very nearly $3,000. This would have been exclusive of many expensive meals which were taken care of by Abramoff and his firm.[13] This total is also exclusive of the cost of

---

[11] Evidence of defendant's concern that these e-mails would ever become public can be seen in the fact that most of defendant's most damaging communications with Abramoff went to and from defendant's home e-mail account, and thus would not ever be captured by the GSA computer system. We also note defendant's January 13, 2003 e-mail to Abramoff (Bates number DOJ-DS 0015213) in which, after providing Abramoff with information Abramoff requested about a GSA property in California, states: "Hope this helps. Please don't forward this email onward. Rather if you can let them know via phone, or put it into a separate email as though it came from you, that would be more appropriate."

[12] Bates number DOJ-DS-001407.

[13] For example, defendant ate dinner in a London restaurant on August 9, 2002 where the total bill for defendant and four others came to approximately $800, which included a $375 bottle

golf, such as the greens and caddy's fees (which were also picked up by Abramoff and his firm), not to mention transportation costs. The cost of the chartered jet to the Royal Air Force Base[14] in Scotland, then to London, with a return to BWI was over $90,000.

Had defendant truthfully revealed to his ethics advisor that Abramoff was doing or seeking to do business with GSA at the time of the Scotland trip and that he was, therefore, a prohibited source, defendant would have had to have paid his **full** share of the cost of the trip. That requirement would not have been satisfied by simply asking Abramoff how much defendant owed for the trip. It would have required determining what a member of the general public would have had to have paid to get the same accommodations.[15] In other words, by falsely claiming that Abramoff was not a prohibited source and that, therefore, defendant could, if he wished, accept the Scotland trip as a gift, defendant saved himself thousands of dollars. Instead of paying his full share of the cost of the trip, defendant claimed in his letter to Senator John McCain that

> When the invitation was made, I was the chief of staff to the U.S. General Services Administration ("GSA"). Mr. Abramoff did not

---

of wine. The tab was paid by Abramoff's firm.

[14] The jet flew to an airforce base in Scotland that is not open to normal commercial air travel. It's advantage was its relative proximity to St. Andrews when compared to public airports.

[15] According to CFR Sec. 304-6.6(d), when determining the valuation for chartered aircraft–
"(1) When common carrier is available, you must report the first-class rate that would have been charged by a commercial air carrier at the time the event took place.
 (2) When a common carrier is not available, you must report the cost of chartering a similar aircraft using a commercially available service."

As noted, no commercial carrier flew to the air force base in Scotland the Abramoff party flew to. Thus, defendant would have been required to pay the pro rata share of the chartered costs.

> have any business before the agency at that time. Prior to departure I consulted the GSA Office of General Counsel to obtain guidance on the propriety of the trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a "gift from a prohibited source" under the applicable regulations, nor was it considered a gift given because of my official position. **Nevertheless, in the exercise of discretion, I gave Mr. Abramoff a check for the value of the trip prior to departure.**

(Emphasis added.) Thus, defendant sought to portray himself to the Senate as someone who went above and beyond the applicable ethical guidelines, using his "discretion" to pay the "value of the trip" even though not ethically bound to do so.

As noted, defendant has continued to argue in a similar vein in making his motion to dismiss, claiming that even if his statement to the ethics advisor was false, any false statement was immaterial because he paid for the cost of the trip. Def. Mot to Dism. p. 37. If this were true – or if the government were precluded from proving otherwise – this could be a powerful argument. But it is not true – defendant paid a mere fraction of the cost of the trip. His false statement was clearly material, because had it been known that Abramoff was a prohibited source, defendant would have had to pay approximately $15,000 in order to cover his pro rata share of expenses. In addition to materiality, this evidence establishes that defendant had a powerful motive to lie, as it saved him over $10,000. Finally, and most importantly, the government has alleged that this particular claim was obstructive conduct. Thus, evidence regarding its truthfulness will be directly at issue at trial.

## CONCLUSION

The law in this Circuit is clear that 404(b) evidence is admissible unless it is being admitted *solely* to show bad character. United States v. Long, 328 F.3d 665, 1180 (D.C. Cir.

2003). The evidence in question here is clearly not being offered for that forbidden purpose. Defendant's argument that "evidence regarding TYCO is more likely to arouse an emotional response than a rational decision by the jury" (Def. Mot. To Excl.404(b) Evid., p. 8) is without any basis in logic or reason. There is nothing inflammatory about this evidence. Indeed, defendant does not even argue that the evidence he seeks to preclude is evidence of criminal conduct. Any suggestion that the proffered evidence would result in "unfair prejudice"[16] is simply unsupportable. Indeed, given the type of evidence this Circuit has deemed properly admissible pursuant to 404(b), see, e.g., United States v. Gartmon, 146 F.3d 1015, 1020-21 (D.C. Cir. 1998) (evidence that defendant placed a gun inside witness's vagina and threatened to shoot if she did not do as defendant told her was deemed admissible pursuant to 404(b) because "not offered for an unfair purpose [] or to inflame the jury... it was offered as evidence of defendant's intent and controlling role in the fraud, and in direct rebuttal to his claim that he had neither" and to explain motivations of testifying witness), it is abundantly clear that any conceivable or incremental prejudice caused by the 404(b) evidence proffered in this case would not *substantially outweigh* the evidence's probative value.

---

[16] "Quoting the Advisory Committee's Notes to Rule 403, the Supreme Court has explained that the term 'unfair prejudice' means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Gartmon, 146 F.3d at 1021, quoting United States v. Old Chief, 519 U.S. 172, 179 (1997).

## CONCLUSION

Because the proffered evidence regarding defendant's dealings with Abramoff while defendant was at GSA is relevant to show defendant's motive and intent in committing the charged offense, and also to rebut any suggestion of accident or mistake, the evidence should be admissible at trial pursuant to Fed. R. Evid. 404(b).

Respectfully submitted,

_____          _____
NATHANIEL B. EDMONDS                     PETER R. ZEIDENBERG
Trial Attorney, Fraud Section            Trial Attorney, Public Integrity Section
Criminal Division                        Criminal Division
United States Department of Justice      United States Department of Justice

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of April, 2006, a copy of the foregoing was served on the following counsel by electronic service to:

>Barbara Van Gelder, Esq.
>Wiley Rein & Fielding
>1776 K Street NW
>Washington, DC 20006
>Tel: 202-719-7032
>Facsimile: 202-719-7049

_____
NATHANIEL B. EDMONDS
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice