## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

### DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION FOR PRE-TRIAL ADMISSIBILITY OF CERTAIN EVIDENCE

Defendant, David H. Safavian, by counsel, hereby opposes the United States' motion for a pre-trial ruling allowing the admissibility of hundreds of unauthenticated and unreliable documents and e-mails as substantive evidence in its case-in-chief.

The government wants to transform this case into a trial about the appropriateness of the relationship between Mr. Safavian and Jack Abramoff. It packed the motion with loaded terms, such as "inappropriate," "unethical," and "unsavory," to describe the relationship between Mr. Safavian and Abramoff. <u>See</u> Gov't Mot. at 3, 9, 11, 13, 15, 16. Notably, the government does not claim that the relationship violated any governing standards or codes. It also fails to discuss with the Court the genesis of their relationship as co-workers at Preston Gates in 1995, or their history of recreational activity and friendship in the period well-before Mr. Safavian entered government service.

In any event, this case is not about the relationship between Mr. Safavian and Abramoff—nowhere in the Indictment is Mr. Safavian charged with receiving bribes, gratuities, or kickbacks or violating government ethics rules. Rather, this case is about a narrow issue: whether Mr. Safavian was truthful when he said Abramoff did not have any business with the

GSA. This is true both for the false statement charges and the obstruction charges, because the indictment alleges obstruction through the making of a false statements about Abramoff's business with GSA—not Mr. Safavian's relationship with Abramoff. See Indictment at ¶ 25.

Under the guise of seeking to promote judicial economy, the government has proffered different – and often contradictory theories – to admit the e-mails and records from Greenberg Traurig without the need to present testimony as to the relevance and reliability of the documents. Mr. Safavian reserves objection to the admissibility of any proposed exhibit until it is offered at trial. See Fed. R. Evid. 104.[1] Moreover, Mr. Safavian objects to the manner in which the government has requested bulk admission of this evidence. The government expects Mr. Safavian to identify each e-mail, guess which of the five reasons for admissibility fits the e-mail and then give his reasons for objecting to the document's admissibility. It is the government's burden to persuade the Court that each document is relevant, non-cumulative and more probative than prejudicial, not the Defendant's.

Considering the sheer number of e-mails with which the Government is attempting to inundate the jury, there is a clear danger that at some point the jury will become deaf to the substance of the e-mails, and as a result, be confused into blurring any distinction between the evidence that is appropriate for deliberation and that which is irrelevant to the counts for which Mr. Safavian was actually indicted.

Unless the government is proffering the e-mails to avoid putting the writer on the stand, the hearsay documents are cumulative. If Mr. Abramoff testifies, introduction of these e-mails would serve only to confuse the issues and waste judicial resources. United States v. Miles, 207

---

[1]    Mr. Safavian disagrees with the government's basic assumption that a pre-trial determination of admissibility does not depend on the existence of a fulfillment of a condition of fact. See Fed. R. Evid. 104(b) and advisory committee's note ("The admissibility of evidence will turn upon the answer to the question of the existence of a condition" such as relevancy or hearsay.").

F.3d 988, 992-93 (7th Cir. 2000) (affirming exclusion of documents about which a witness testified at length where introducing the underlying documents would have served no purpose other than to repeat the testimony given). Indeed, this Court has already ruled on a related issue (i.e., Abramoff's statements to the F.B.I.) that such out-of-court statements are "inadmissible hearsay" that can only be admitted if Abramoff testifies, and even then only for the limited purpose of impeachment. February 22, 2006 Mem. Opinion and Order at 2 (Docket #55).

Nevertheless, the government requests a blanket stamp of admissibility for irrelevant and hearsay documents via three tenuous propositions. First, it contends, citing no evidentiary governing principle, that the hearsay should be admitted simply because the e-mails themselves constitute "doing business" with the GSA. However, not only is the government mistaken as to what constitutes "doing business" as a matter of law, but for purposes of this motion in limine, the documents are still *inadmissible* evidence. Second, the government then contends that it can admit the Abramoff hearsay through Fed. R. Evid. 801(d)(2)(E) by introducing for the first time the unindicted, unrelated offense of "conspiracy to commit honest services fraud." Third, the government argues that if the Court does not accept its first two grounds for admitting hearsay, it should embrace the representation that the e-mails are not hearsay at all, that is, that they will not be offered for the truth of the matter asserted.

The government's attempts to admit other e-mails that Mr. Safavian forwarded under the adoptive admission provision in Rule 801(d)(2)(B), and to have Rule 902 certifications substitute for in court assessments of authenticity are also without merit.

Finally, the government's attempt to admit e-mail communications regarding the White Oak and Old Post Office properties are not only without merit but disingenuous in light of the government's previous position in pre-trial discovery. On October 28, 2005, Mr. Safavian filed a

Motion to Compel Discovery, in which he sought, *inter alia*, "e-mail correspondence between business associates of [Abramoff] and GSA officials relating to [Abramoff]'s expressions of interest in the Old Post Office Building and NSWC-White Oak Property, as well as Mr. Safavian and his participation in the Scotland trip." Def. Motion to Compel Discovery, at 16 (Docket # 9). The government opposed this request on the ground that Mr. Safavian could not "demonstrate by any logic" how these e-mails, sent "in the three years **after** he allegedly lied to the GSA," "could have any bearing on what his state of mind was when he sought an ethics opinion in 2002, was interviewed by the GSA-OIG in 2003, or sent a letter to the Senate committee in 2005." Gov't Opp. to Motion to Compel at 19 (Docket # 11) (emphasis in original). As the Government readily conceded then, the e-mails concerning the Old Post Office Building and White Oak that were written after Mr. Safavian sought the GSA ethics opinion in 2002 are not related to the government's case-in-chief.[2]

On January 23, 2006, the government informed the Court it had produced all documents relating to this Court's December 23, 2005 Order. Now, approximately one month before trial, the government finds the documents Mr. Safavian requested in October 2005 and requests permission to introduce them in its case-in-chief. The government should not be entitled to reap the benefits of delayed production. See United States v. Anderson, 416 F. Supp.2d 110, 114 (D.D.C. 2006) (noting that "broad discovery under Rule 16 'contributes to the fair and efficient administration of criminal justice by providing Mr. Safavian with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at the trial; and by otherwise contributing to an accurate determination of the issue of guilt or

---

[2]    Mr. Safavian had requested the information relating to White Oak and the Old Post Office not for the purpose of demonstrating lack of intent, but rather as "material to the defense" that the properties were not available for "doing business" before or after the Scotland trip under Fed. R. Crim. P. 16(a)(1)(E). Def. Reply In Support of Motion to Compel Discovery, at 11-12 (Docket # 13).

innocence'") (quoting Fed. R. Crim. P. 16 Advisory Committee's Note to 1974 Amendment).

For reasons stated below, the Court should reject the government's attempt to deprive Mr. Safavian of fundamental evidentiary protections enshrined in the Sixth Amendment and the Federal Rules before trial even begins.  The promotion of open court testimony and the enforcement of the rules against hearsay are a "vital feature" of the criminal justice system, see 1972 Rule 801 advisory committee's note, and as the Supreme Court recently affirmed, the privileges guaranteed in the Confrontation Clause even supersede these regulations of out of court statements.  Crawford v. Washington, 541 U.S. 36, 50-51 (2004) ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.").

## I.    The Government's Belief That Certain Hearsay E-mails Support Their Case In Chief Is Erroneous and Not A Ground For Admissibility

Mr. Safavian has been charged with making a false statement in his representation that the intended host of the August 3, 2002 Scotland trip, "ha[d] no business before the GSA, (he does all of his work on Capitol Hill)." in his request for ethics advice to the GSA General Counsel in July 2002.  Indictment ¶¶ 18, 29.  He has also been charged with making false statements and obstructing the GSA-OIG investigation into whether he participated in "an international golfing trip provided by lobbyists," Id. ¶¶ 24, 27, 31, and to Senate Committee on Indian Affairs ("SCIA") staff investigators in his response to their request for documents pertaining to this August 2002 Scotland trip.  Id. ¶¶ 38, 40.

The government's leading argument for the admission of an unspecified set of e-mails generated by Abramoff's Greenberg Traurig, LLP account is that it thinks the e-mails themselves "constitute 'doing business.'"  The government offers no basis for this assertion.  Gov't Motion

at 4.[3]  Taken as a whole, the e-mails the government now seeks to introduce demonstrate that Abramoff asked about the availability of two pieces of property controlled by the GSA.  One of the properties, White Oak, was for the Eshkols School.  There is nothing in the Indictment that indicates that anyone knew in 2002 that Abramoff was the main, if not sole benefactor, of Eshkols.  An equally valid conclusion from the e-mails suggests that Abramoff was making a personal inquiry on behalf of his son's school and not related to his business.

As for the Old Post Office property, there is nothing in the e-mails to suggest that Abramoff's requests were anything more than a preliminary inquiry regarding the status of the building.  The government's conclusion that the e-mails constitute evidence of "doing business" belies the definition of the phrase as it is used in the Standards of Ethical Conduct for Employees of the Executive Branch.  5 C.F.R. § 2635.202 et seq.  The Office of Government Ethics has established that the term "doing business" means having "existing arrangements."  Letter to a Federal Employee from Marilyn L. Glynn, Acting Director, Office of Government Ethics (Jan. 7, 2004).

In its rush to admit these e-mails, the government has skipped a rather crucial step in a pre-trial motion in limine: actually demonstrating codified grounds to authenticate and admit this hearsay material.  As the Federal Rules ordain: "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."  Fed. R. Evid. 802.

Absent any *evidentiary* theory, the government's first argument appears to be an invitation for the Court to authorize a document dump on the jury to allow the government to argue its inferences and innuendos from the documents in closing argument.  This scheme must

---

[3]       In fact, taken to its logical conclusion, the government's argument would mean that anyone who e-mails a federal employee would be considered "doing business" with that employee's agency.

be rejected.   The Sixth Amendment guarantees Mr. Safavian the right "to be confronted with the witnesses against him," U.S. Const. amend. VI.   And while as the Supreme Court has recently explained, "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices," Crawford, 541 U.S. at 51, notably, the federal rules clearly prohibit the use of out of court statements offered in evidence to prove the truth of the matter asserted.   Fed. R. Evid. 801, 802.

## II.    Abramoff's E-mails Are Not Admissible Under the Co-Conspirator Exception

Recognizing that the vast majority of the proffered Abramoff e-mails cannot be readily authenticated, or otherwise admitted under common hearsay exceptions, the government has at this late date ginned up an argument for wholesale pre-trial admission for all Abramoff e-mails under Fed. R. Evid. 801(d)(2)(E).   See Gov't Mot. at 5.

Since the Indictment lacks a conspiracy charge, the government cleverly requests the Court to make a pre-trial determination that there is a preponderance of evidence to prove Abramoff and Mr. Safavian conspired to commit honest services fraud, thus paving the way for the e-mails' admissions as co-conspirator statements.

The government cannot utilize Rule 801(d)(2)(E) to admit Abramoff's hearsay e-mails, because it cannot prove via independent evidence that there was a conspiracy between Messrs. Abramoff and Safavian. There is no evidence whatsoever of any agreement or any overt acts committed in furtherance of the alleged conspiracy.   United States v. Beckham, 968 F.2d 47, 51 (D.C. Cir. 1992) (finding insufficient independent evidence to support charge that defendants had the specific intent to further a commom unlawful objective).

The government tries to use a series of black letter parentheticals to mask its insufficient evidence concerning these requirements.   For instance, after citing the unremarkable proposition

- 7 -

that a conspiracy requires proof of an agreement, it never gets around to establishing when this agreement occurred. Gov't Mot at 9. And as discussed below, there is a complete absence of independent evidence of manifest intent to deceive or defraud in a conspiratorial fashion.[4]

Furthermore, the government casts this section, indeed the entire motion, as if it is the Defendant's and the Court's burden to tell the government which hearsay documents are not inadmissible. That is not the case. Rather, it is the government's burden to prove, for example, which, if any, of the three hundred e-mails contain statements that were actually *in furtherance* of the conspiracy. See generally United States v. Doerr, 886 F.2d 944, 951 (7th Cir. 1989) ("We recently emphasized that the 'in furtherance' requirement of Rule 801(d)(2)(E) is a *limitation* on the admissibility of coconspirators' statements that is meant to be taken seriously") (citing Garlington v. O'Leary, 879 F.2d 277, 283 (7th Cir. 1989) (explaining that statements "in furtherance" of a conspiracy do not include narrative declarations, mere "idle chatter," and superfluous casual conversations)).

In sum, the government's request for pre-trial admissions of all Abramoff e-mails under Rule 801(d)(2)(E) must be denied.

### A.   The Government Cannot Introduce Hearsay E-Mails under 801(d)(2)(E) for an Unindicted Conspiracy Based on an Unrelated Factual Predicate

To be sure, courts have recognized that where a defendant has already been indicted before a grand jury for a given offense, the government may seek to admit vicarious admissions pursuant to the hearsay exception for conspiracy to commit *those offenses*. United States v.

---

[4]    The government concludes its argument with a blithe reference to a civil employment discrimination case string cite and contends that it supports the theory that "subsequent false statements about the Scotland trip as well as his relationship with Mr. Abramoff can also be considered consciousness of guilt." Gov't Motion at 11 (citing Aka v. Washington Hospital Center, 156 F.3d 1284, 1292 (D.C. Cir. 1998). The government is, in the kindest light, putting the cart before the horse. It is trying to use the unproven indicted charges, i.e. false statements under 18 U.S.C. § 1001, to support the admission of hearsay under an unindicted, unrelated conspiracy charge, to ultimately try to convict Mr. Safavian on the false statement counts.

Lyles, 593 F.2d 182, 194 (2d Cir. 1979) (holding that a conspiracy relied upon for Rule 801(d)(2)(E) purposes must be "factually intertwined" with the crime charged); see also Gov't Motion at 6 (citing Beckham, 968 F.2d at 51 n.2) (rejecting government's 801(d)(2)(E) motion based on conspiracy for possession and intent to distribute crack cocaine because the record disclosed no evidence independent from the hearsay itself that demonstrated conspiracy where defendant *had already been indicted* for the underlying offense)).[5]

However, the government cannot under Rule 801(d)(2)(E), seek to introduce hearsay material for an unindicted conspiracy that is not "factually intertwined" with the offense for which the defendant is being tried. Lyles, 593 F.2d at 194. To do so would be to violate fundamental notions of due process enshrined in the grand jury process as well as the Sixth Amendment. See id.; see also Crawford, 541 U.S. at 61 (holding that the Sixth Amendment imposes an "absolute bar to [hearsay] statements that are testimonial, absent a prior opportunity to cross-examine"); Lilly v. Virginia, 527 U.S. 116, 134 (1999) (plurality opinion) (barring the admission of accomplices out of court confessions as a violation of the Sixth Amendment).[6]

---

[5]    The government's reliance on Beckham for the proposition that the government need not charge the defendant with conspiracy in order to admit hearsay statements into evidence under Rule 801(d)(2)(E) is overstated. That proposition came in a footnote and *in the context of* a conspiracy theory based on the underlying drug count. United States v. Beckham, 968 F.2d 47, 51 n.2 (D.C. Cir. 1992). The court in Beckham cited United States v. Perholtz, 842 F.2d 343, 352-53 (D.C. Cir. 1988) for the proposition, which had simply held that due to Congress' express imperatives to construe RICO statutes liberally and to ensure that the statute reached beyond defendants who failed to form corporate shells, the government did not have to choose between charging an individual, partnership, or corporation, on the one hand, and an association-in-fact on the other hand under that statute. There is no support in these cases for the manipulative use of an unrelated, uncharged conspiracy theory that the government advances here.

[6]    The Court in Crawford declined to define the parameters of "testimonial" hearsay but noted that it had already rejected the argument that "the Confrontation Clause [applied] only to testimonial statements, leaving the remainder to regulation by hearsay law." Crawford v. Washington, 541 U.S. 36, 61 (2004) (citing White v. Illinois, 502 U.S. 346, 352-53 (1992)). In any event, the government's attempt to use an unindicted, unrelated conspiracy theory to admit unauthenticated e-mails maintained on a third-party server (Greenberg Traurig's) would not fall within the since abrogated standard for exception articulated in Ohio v. Roberts, 448 U.S. 56, 66 (1980). The e-mails are not those of an *unavailable* witness and do not bear an adequate indicia of reliability.

**B.    The Government Cannot Demonstrate via Independent Evidence the Existence of a Conspiracy to Commit Honest Services Fraud**

The government "simply discloses no evidence -- and certainly no evidence independent from the hearsay statement itself -- that would satisfy Rule 801(d)(2)(E)'s threshold requirement that [Abramoff and Mr. Safavian] be co-conspirators" in honest services fraud.  Beckham, 968 F.2d at 51 (affirming that while the "hearsay statement may be considered in finding that a conspiracy existed, [] the statement may not be the sole basis for such a ruling . . . there must be independent evidence of a conspiracy as well") (citing United States v. Boujelay, 483 U.S. 171, 181 (1987) (internal citation omitted)).

1.    The Government Does Not Demonstrate Gratuities with the Intent to Influence

In order to demonstrate honest services fraud through the influence prong of 18 U.S.C. § 1346, the government must demonstrate that Mr. Safavian accepted gratuities "with the intent to perform official acts to favor" Abramoff through "a pattern of repeated, intentional gratuity *offenses* in order to coax ongoing favorable official action in derogation of the public's right to impartial official services."    United States v. Woodward, 149 F.3d 46, 55 (1st Cir. 1998) (emphasis added) (citing United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996)).  Any intent to influence or failure to disclose must be material to official action.  Neder v. United States, 527 U.S. 1, 25 (1999).  However, the government has not established, even by the "preponderance of the evidence" standard, *any* evidence in the hearsay itself or independent thereof, of *any* gratuities at all, let alone a repeated pattern of *intentional offenses*.

There is no quid pro quo between the two men.  To the contrary, the e-mails, taken as a whole, clearly demonstrate a series of unilateral social offers from one friend to another.  Indeed, in almost three hundred e-mails filed with the government's motion, not a single one suggests

that Mr. Safavian accepted anything from Abramoff for free.[7]   The government even tacitly

admits to this lack of evidence, by arguing that mere "_offers_ of expensive trips, golfing fees and

tickets, . . . and _offers_ of free meals for both Mr. Safavian and his wife," somehow demonstrate a

"pattern of repeated, intentional gratuity offenses."   Gov't Mot. at 8, 10 (emphasis added).[8]

Needless to say, the government does not cite any authority for the proposition that merely

receiving _offers_, without any evidence that the offer was an offer of a gift, or even that the offer

was accepted, can constitute sufficient evidence to establish intent to commit honest services

fraud.[9]   To the contrary, Mr. Safavian explicitly told Abramoff that it was not proper for him to

accept gratuities. See DOJ-DS-000896.

---

[7]      A review of the nearly three hundred e-mails demonstrates that there are a few instances where
Abramoff asked Mr. Safavian if he wanted to go to certain sporting events.  See, e.g., DOJ-DS-001140,
DOJ-DS-001150.  However, nowhere in these e-mails is there evidence that Mr. Safavian accepted any of
these invitations, let alone that he accepted them _as gifts_.  Notably, almost all of these invitations came
after Mr. Safavian sought the ethics request from McKenna and have nothing to do with the charges of
the Indictment.  In addition, there are a number of e-mails indicating that Abramoff wanted to get together
with Mr. Safavian to play golf.  See, e.g., DOJ-DS-001088.  The government insinuates, again without
any evidence, that these golf outings were actually gifts from Abramoff of golf fees.  In the process, it
fails to note that Mr. Safavian and Abramoff alternated between their respective golf courses, such that
Mr. Safavian would pay for Abramoff at Safavian's home course one day, and Abramoff would
reciprocate. See, e.g., DS-0015123, Sept. 23, 2002 e-mail from Safavian to Abramoff ("Its my turn to
host."); DS-0015110, Aug. 25, 2002 e-mail from Safavian to Abramoff ("We're on for 3PM today.
Directions [to Safavian's course] below. See you there.")

As for "offers of free meals for both Mr. Safavian and his wife," the only such offer was rejected
by Mr. Safavian.  See DOJ-DS-001110.  In any event, the government takes these e-mails out of context
and neglects to inform that Mr. Safavian and Abramoff had known each other, dined together, and played
golf and racquetball regularly since 1995, well-before Mr. Safavian held any government position.  See,
e.g., DOJ-DS-000418; (a Jan. 25, 1999 e-mail, one of several discussing regular racquetball meetings
between Abramoff and Mr. Safavian).

[8]      As further indication of the dearth of evidence for gratuities, the government even tries to twist
Mr. Safavian's decision not to attend a second trip to Scotland with Abramoff in July 2003 as being
indicative of an intent to be influenced.  See Gov't Mot. at 10 n.12.

[9]      The government's cited references actually demonstrate, through comparison, the insufficient
evidence of honest service fraud in this case, particularly at this pre-trial stage.  In United States v.
Woodward, 149 F.3d 46 (1st Cir. 1998), and United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996), the
evidence _adduced at trial_ showed that Sawyer gave Woodward over $9,000 in gratuities, including over
$1,800 for a trip to the Super Bowl in New Orleans covering airfare, hotel, and tickets for Woodward and
his wife.  Woodward, 149 F.3d at 52-53.  Sawyer and Woodward had no personal relationship prior to
Woodward's service on the Insurance Committee.  Id. at 53.  In return, Woodward voted in favor of the

Although the government states that "independent evidence" exists to establish a conspiracy, Gov't Motion at 10-11, it does not cite any. Instead it simply promises, for example, that the evidence "*will show* that Mr. Safavian left to go to Scotland to play golf with Mr. Abramoff *the very next day* after the meeting" between Mrs. Abramoff, GSA officials, and the headmaster and rabbi of Eshkol Academy. Id. at 11 (first emphasis added). For this reason alone the pre-trial request for an exception does not attach. Beckham, 968 F.2d at 51; accord United States v. Tamez, 941 F.2d 770, 774-75 (9th Cir. 1991) (stating that under *Bourjaily*, an accused's knowledge and participation in an alleged conspiracy are "preliminary facts that must be established before extra-judicial statements of a co-conspirator can be introduced into evidence" and that "there must be evidence, beyond the statements, to demonstrate by a preponderance of the evidence the conspiracy and defendant's connection to it").

Nevertheless, there is no need to admit e-mails to show the coincidence regarding the date of the meeting. The attendees can testify to when it took place.[10] Moreover, the forecasted

---

insurance industry's position on almost six hundred bills over the course of his tenure as the co-chair of the Insurance Committee. Id. at 61. Furthermore, Woodward had made incriminating statements such as "After all I did for Bill Sawyer . . . I can't believe he's not—he can't get me a job." Id. at 59. In United States v. Panarella, 277 F.3d 678 (3d Cir. 2002), Panarella paid a Pennsylvania Senator more than $330,000 for consulting services during the course of his tenure on the Senate, which the Senator failed to disclose. Id. at 681. To conceal the payments, Panarella directed third parties to make the payments to the Senator on his behalf. Id. When confronted by a reporter, the Senator lied about the sources of this income. Id. In return, the Senator made personal appearances before local governments on Panarella's behalf, invited Panarella to meetings with agency heads, and spoke and voted against legislation that would have significantly harmed Panarella's business interests. Id. In United States v. Brumley, 116 F.3d 728 (5th Cir. 1997), Brumley was the Regional Associate Director of the Texas agency that oversees workers compensation. Over the course of five years, Brumley received $112,156 from eleven workers compensation attorneys, including $86,730 from a single attorney, Cely, who had a substantial workers compensation practice. Id. at 731. In return, Brumley attempted to stop an investigation of Cely by the agency, and instructed Cely how to alter documents subpoenaed by the agency to make detection of Cely's wrongdoing difficult. Id. at 735. The government in this case does not come close to presenting independence evidence of this nature in its motion.

[10]    The government's insinuation that the date of the meeting had any bearing on the day of the trip is inconsistent with its own charging document, which states that Abramoff had invited Mr. Safavian to attend the August golf trip in June 2002, well in advance of the planning for any August 2, 2002 meeting. Indictment ¶ 17.

evidence does not establish any connection between Abramoff's request for a "tour" of the White Oak facility, see Abramoff July 21, 2002 e-mail, (DOJ-DS-000990), and the GSA's independent suggestion to meet with the groups that have made an "expressions of interest" in the land.  See July 30, 2002 Anthony Costa e-mail (DOJ-DS007376) (stating to several GSA officials that "[y]ou all have received a couple of expressions of interest regarding possible use of White Oak . . .  we might want to get together with the folks who are asking just to provide some information on the site").

Assuming *arguendo* that the government could prove that Mr. Safavian received gifts from Abramoff, it must also demonstrate that Mr. Safavian received these gifts with the intent to be influenced in his official actions at GSA.  See Sawyer, 85 F.3d at 728.  As the court in Sawyer explained:

> A violation of the Massachusetts gift statute does not necessarily entail any improper motive to influence, or otherwise affect, the official *duties* of the recipient.  It is possible for a lobbyist to give a legislator items falling within the statute's definition of "gift," or for a legislator to accept such gifts, without an accompanying intent to cause the legislator to deviate from the honest performance of official duties.  While such gifts would constitute a gift statute violation, not every such circumstance would necessarily amount to a deviation from the official's performance of honest services to the public.

Id. (emphasis added); see also Woodward, 149 F.3d at 55 ("The government must prove that the defendant intended to deprive the public of its right to the honest services."); see also United States v. Sun-Diamond Growers, 526 U.S. 398, 406-07 (1999) (concluding that official's mere "ability to favor the donor in executing the functions of his office" is not sufficient for "official act" within the meaning of the statute) (internal quotation marks omitted).

Here, by contrast, even if there were gifts exchanged between Abramoff and Mr. Safavian, Mr. Safavian would have thought they were tendered because of the personal relationship between the two, not for any illicit business purposes.  See Beckham, 968 F.2d at 51

- 13 -

(holding that the independent evidence of "mere physical proximity and friendship-does not provide support for inferring that Monroe and Beckham 'had the specific intent to further [a] common unlawful objective'") (citation omitted); see also July 25, 2002 e-mail (DOJ-DS-006972 ("I . . . have been invited by a friend and former colleague on a trip to Scotland."); July 26, 2002 Response, DOJ-DS-007004 ("Since the gift is not being offered by a prohibited source and the [sic] it is not being given because of your official position, the gift acceptance restrictions under 5 C.F.R. 2635.202 do not apply to you."); 5 C.F.R. § 2635.204(b) ("An employee may accept a gift given under circumstances which make it clear that the gift is motivated by a family relationship or personal friendship rather than the position of the employee.").[11]  Furthermore, it is not Abramoff's intent in offering a gift that is relevant, but rather Mr. Safavian's perception of the gift that matters.  See Woodward, 149 F.3d at 56 ("The central question is whether by accepting [the gifts] Woodward intended to be influenced.") (internal quotation marks omitted).

In addition, the government must prove an intent to be influenced in the performance of "official acts."  See id. at 55.[12]  The only acts that the government alleges were influenced by Abramoff are: providing advice on how best to compete for GSA property, forwarding GSA e-mails to Abramoff, offering Abramoff advice on a draft letter to GSA, and setting up a meeting with representatives of the Eshkol Academy and GSA officials.  See Gov't Mot. at 4-5, 9-10

---

[11]     The personal relationship exception applies regardless of whether the donor is a prohibited source.  See 5 C.F.R. § 2635.204(b).

[12]     The government states that it only has to prove that "by accepting Mr. Abramoff's largesse, he intended to be influenced *to support Mr. Abramoff's interests*."  See Gov't Mot. at 8 (emphasis added). Not so.  The government has to prove that: (1) Mr. Safavian actually accepted Mr. Abramoff's "largesse;" and (2) Mr. Safavian intended to be influenced to support Mr. Abramoff's interests *through official action*.  To hold otherwise would mean that any government employee who helped a friend get a job in his agency would be guilty of honest services fraud.  See Neder v. United States, 527 U.S. 1, 25 (1999) (finding that materiality is a necessary element of mail and wire fraud).

(citing DOJ-DS 001048; 007050). These actions do not constitute "official acts" within the contemplation of the honest services fraud statute. Rather, the caselaw makes clear that an official act must be a decision or action that "*directly affects [a] formal government decision made in fulfillment of government's public responsibilities.*" United States v. Valdes, 437 F.3d 1276, 1280 (D.C. Cir. 2006) (emphasis added); see also Sun-Diamond Growers, 526 U.S. at 406-07; Woodward, 149 F.3d at 60 (finding "official acts" requirement met where member of Massachusetts House of Representatives cast votes in favor of legislation that benefited lobbyist almost six hundred times over six years); United States v. Panarella, 277 F.3d 678, 690 (3d Cir. 2002) (finding honest services fraud where member of Pennsylvania Senate voted against legislation that would have significantly harmed lobbyist's business); United States v. Czubinski, 106 F.3d 1069, 1077 (1st Cir. 1997) (finding no official action when IRS employee conducted unauthorized searches of IRS database because it did not "call into question the proper or impartial performance of that public servant's official duties"); cf. Neder v. United States, 527 U.S. 1, 25 (1999) (finding that materiality is a necessary element of mail and wire fraud).

## III.    **The Government's Fallback Argument that the Abramoff E-Mails Are Not Hearsay Must Also Be Rejected**

After furnishing several pages of argument as to why Abramoff's e-mails are hearsay that fit within exceptions to the hearsay rule, including the primary argument that the Abramoff e-mails should be admitted because they prove the truth of the matter that Abramoff was "doing business" with the GSA at the time of the Scotland trip, Gov't Motion at 4-5, the government then reverses and appears to contend that if the first argument does not work for the Court, the same e-mails from Abramoff to Mr. Safavian are not even hearsay in the first place. Id. at 13-14. That is, the government essentially argues that *any* e-mail Abramoff sent to Mr. Safavian is *per se* probative of Mr. Safavian's state of mind in any conversation relevant to the Indictment, even

if Mr. Safavian never responded to the e-mail.  In reality then, the government is trying to prove Mr. Safavian's state of mind from his silence.  The absence of a response from Mr. Safavian in many of these e-mails and Abramoff's availability makes the government's reference to <u>United States v. Lemonakis</u>, 485 F.2d 941, 947 (D.C. Cir. 1973) particularly inappropriate.  In that case, the court admitted a *deceased* third party's tape recorded statements to clarify the context of certain tape discussions implicating burglary and grand larceny.  Here, the government has not defined *any* ambiguous statements from Mr. Safavian here that need clarification.  In any event, Abramoff is available as a witness.

A.  <u>**E-mails Not Sent To or Acknowledged by Mr. Safavian Are Inadmissible Hearsay**</u>

There are a number of e-mails in the government's submission that are not sent to or from Mr. Safavian.  In addition, many of the undistilled catalog of Abramoff e-mails proffered by the government via Greenberg Traurig, LLP, including the two primary examples cited in their motion, <u>see</u> July 21, 2002 (DOJ-DS00989) and July 25, 2002 (DOJ-DS001009), do not even include a response or acknowledgement of receipt by Mr. Safavian.[13]  These e-mails cannot possibly relate to Mr. Safavian's state of mind at the time Abramoff sent them, let alone discussions with other individuals on subsequent occasions.

---

[13]    This last resort to admit the documents should be summarily rejected because it directly contradicts the government's earlier representations to this Court.  <u>See</u> supra at 3-4.  The argument also glosses over the fact that the government cannot attest to the trustworthiness of the content and storage of the e-mails.  The GSA did not keep any of Mr. Safavian's e-mails and Greenberg Traurig can only attest to keeping the e-mails that Mr. Abramoff decided not to delete. <u>See</u> <u>infra</u> Part VI.A and Defendant's April 14, 2006 Motion to Deny Government's Rule 902(11) Certifications (Docket # 68) at n.1.  Moreover, Greenberg Traurig cannot reliably attest to the actual content of the e-mails sent by Mr. Safavian, since those received may be subsequently modified by the recipient.

**B.** **The Government's Offering Is Necessarily Related to the Truth of the Matter Asserted**

Because the issue presented in the Indictment is the veracity of Mr. Safavian's representation to the GSA General Counsel that Abramoff "ha[d] no business before GSA (he does all of his work on Capitol Hill)," Indictment ¶ 29, those Abramoff e-mails that are relevant and otherwise admissible are inextricably linked to the truth of the matter asserted. That is, they can only be significant to discern what inquiries Abramoff was making and the significance thereof, rather than, as the government stretches to claim, Safavian's state of mind.

When a party attempts to introduce evidence for state of mind purposes, but the finder of fact would have to find the statement is true in order for the impact of the statement on the listener's state of mind to be relevant, the evidence is inadmissible. United States v. Gaertner, 705 F.2d 210, 214 (7th Cir. 1983) (rejecting argument that out of court statements were only being offered to demonstrate defendant's state of mind and not the asserted truth because "before the jury could believe that the alleged loan/collateral transaction took place they would necessarily have had to have found credible the truthfulness of [declarant's] alleged statements").

Here, the government is seeking to introduce numerous e-mails from Abramoff to Mr. Safavian for the claimed purpose of showing Mr. Safavian's knowledge. However, in order for these e-mails to be able to show Mr. Safavian's knowledge, the jury would have to assume, and find credible, the truth of the matters asserted in the Abramoff e-mails. For instance, the government's two examples, the July 2002 e-mails from Abramoff to Mr. Safavian asking Safavian if he could get "any info as to which land is still available at White Oak, and whether there are buildings there. . . ." and whether the GSA "ha[s] the ability to give a short term (one year) lease on property," Gov't Motion at 13-14 (citing DOJ-DS-0000989, DOJ-DS-001009), demonstrate Abramoff's state of mind, not Mr. Safavian's. Clearly, the e-mails are nothing more

than a prior recorded statement by Abramoff incorporating general questions about whether he could prove "any info" about land at White Oak and whether, as a general proposition, the GSA "has the ability" to short-term lease the property.  Hence, the proffered Abramoff e-mails are inextricably linked to the truth of the matter asserted and are thereby hearsay under Fed. R. Evid. 801, 802.[14]  Even if certain Abramoff e-mails were probative of Mr. Safavian's state of mind, and the government has not actually specified the ones that would, many of the government's proffered Abramoff e-mails are irrelevant and inadmissible under Fed. R. Evid. 402.

## IV.  The E-Mails Written and Received After the 2002 Scotland Trip are Irrelevant and Unfairly Prejudicial

The conclusion that the e-mails written and received after the 2002 Scotland trip are irrelevant is consistent with the limited scope of the investigations conducted by both the GSA-OIG and the Senate investigators.  The scope of the OIG's investigation focused on Mr. Safavian's relationship with Abramoff prior to the Scotland trip.  The OIG inquired as to the propriety of Mr. Safavian's attendance on the trip based on the circumstances as they existed in July and August of 2002.  The government cannot point to any evidence in the record demonstrating that the OIG's questioning extended beyond that time period to include information stemming from any continuing relationship Mr. Safavian may have had with Abramoff after the Scotland trip.  Likewise, the government fails to identify where within the

---

[14]    For the same reasons, the government's reliance on United States v. Daniels is inapt.  Gov't Motion at 13-14.  The unpublished decision acknowledged that the government must demonstrate that any statement or inquiry does not assert the existence of facts and is not being offered for the truth of the matter.  48 Fed.Appx. 409, 412 (3d Cir. 2002) (noting that in that case the government did not offer either the declarant's statements regarding his drug business to prove the truth of the matters asserted).  Here, as explained above, the utility of the government examples of Abramoff inquiries, DOJ-DS—000989, 1009, are necessarily linked to the facts asserted (e.g. that Abramoff *was asking* Mr. Safavian questions about whether GSA had the ability to give short term leases etc. before Mr. Safavian made the ethics request).  It is also not clear how United States v. Norman T., 129 F.3d 1099, 1107-08 (10th Cir. 1997) relates at all.  In Norman T., the Tenth Circuit admitted the statements of the victim of a juvenile sexual assault and the victim's grandmother as non-hearsay because the statements helped show the extent of improper influence by the defendant on the victim.

SCIA's investigation the Senate sought any information relating to Mr. Safavian's relationship with Abramoff after the Scotland trip. Rather, the SCIA limited its inquiry to the source of the funding for the trip. Any additional information the government hopes to glean from e-mails written subsequent to the Scotland trip has no bearing on what Mr. Safavian's motive and intent were in 2002.[15]

Even assuming this Court determines the e-mails written after the Scotland trip are relevant in establishing Mr. Safavian's motive and intent as they relate to his responses to the GSA-OIG and SCIA, Rule 403 nevertheless precludes the admission of such evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The admission of the e-mails at issue here would be unfairly prejudicial to Mr. Safavian insofar as the e-mails constitute cumulative evidence – evidence this Court has made clear is improper. United States v. Duran, 884 F. Supp. 534, 536 (D.D.C. 1995) (ruling evidence inadmissible as being unfairly prejudicial and cumulative under Rule 403).

**V.** **The Government's Request for Wholesale Pre-Trial Determinations Under 801(d)(2) for Must be Denied**

    **A.** **E-Mails Sent by Mr. Safavian**

The government declares that "any e-mail sent by Mr. Safavian is admissible against [him]" as a statement of a party opponent under Rule 801(d)(2)(A). While it is true that Rule 801(d)(2)(A) recognizes that a "party's own statement, in either an individual or a representative

---

[15]    The Government's lone citation in support of its argument to admit post-Scotland trip e-mails, United States v. Shulman, 624 F.2d 384, 391 (2d Cir. 1980), is completely misplaced. In that case, the defendant's recorded conversations in December *referred explicitly* to *his* alleged IRS bribe conversation in October. Here, the government is trying to suggest that communications between Abramoff and Safavian in 2003 and 2004, whatever they amounted to, imply that Abramoff was doing the same things on July 25, 2002 when Safavian wrote to the GSA general counsel about the Scotland trip.

capacity" is not hearsay, the government has requested a blanket pre-trial determination for *every e-mail sent* by Mr. Safavian. This request is premature. The government needs to delineate which e-mails it is referring to meet its evidentiary burden. The defense preserves all other objections, including authenticity, the prohibition against cumulative or vague evidence, and those pursuant to Fed. R. Evid. 403.

### B.    E-Mails Forwarded by Mr. Safavian to Abramoff

The government cannot admit e-mail chains that Mr. Safavian forwarded to Abramoff as adoptive admissions pursuant to Rule 801(d)(2). First, many of these documents, such as the July 26, 2002 e-mail that the government highlights, are actually statements by Abramoff—not, as the government suggests, statements by Mr. Safavian, and hence constitute inadmissible hearsay. See Fed. R. Evid. 805; DOJ-DS-001034 – 001035.

Second, the attached e-mails of Mr. Safavian are not adoptive admissions under Rule 801(d)(2)(B). "When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." United States v. Williams, No. 04-5126, 2006 WL 998107, at *9 (4th Cir. Apr. 18, 2006). Thus, statements of other individuals can be imputed to a defendant only "if it clearly appears that the accused understood and unambiguously assented to those statements." Naples v. United States, 344 F.2d 508, 512 (D.C. Cir. 1964), overruled in part on other grounds, Fuller v. United States, 407 F.2d 1199, 1221-22, 1230 n. 42 (D.C. Cir. 1967). Here, Mr. Safavian has merely forwarded a series of e-mails to Mr. Abramoff, commenting on government process and stating that he was still trying to do something. See DOJ-DS-001034. It does not, as the rule requires, "manifest an

adoption or belief in its truth," because Mr. Safavian never adopts the substance of the attached e-mails or agrees that those statements are true.[16]

Other forwarded e-mails, such as when Mr. Safavian forwarded the July 26, 2002 ethics response to Mr. Abramoff, also fail to indicate unambiguous assent to every statement contained therein. See DOJ-DS-001037. A brief response to a "lengthy statement . . . gives little assurance that [the defendant] adopted, as his own admission, every detail of the statement." Naples, 344 F.2d at 512; see also Garcia-Martinez v. City and County of Denver, 392 F.3d 1187, 1195 (10th Cir. 2004) (accepting legal penalty without admitting to the facts underlying it does not constitute an adopted admission of the factual recitation). Clearly, in a § 1001 prosecution, where the details are so critically important, the mere act of forwarding the document to another person provides no assurance that Mr. Safavian adopted every detail as his own.[17]

Finally, in a number of instances, Mr. Safavian merely forwards an e-mail to Mr. Abramoff without any comment. See, e.g., DOJ-DS-001025 to 1026. Silence in the face of an accusatory statement can be admitted as an adoption, but where, as here, the statements are not

---

[16]    The government relies primarily on one out-of-circuit case, Sea-Land Svc., Inc. v. Lozen Int'l, LLC, 285 F.3d 808, 821 (9th Cir. 2002), which is not on point. First, the evidence in that case was being offered as non-hearsay under a completely different rule, Fed. R. Evid. 801(d)(2)(D). Second, Sea-Land is a civil case. The Advisory Committee Notes to Rule 801(d)(2) distinguish between civil cases, in which the results of adoptive admissions "have generally been satisfactory," and criminal cases, in which the "inference is a weak one." Finally, the author of the Sea-Land e-mail explicitly agreed with the conclusion of the original e-mail—i.e., that the "rail screwed us up." Sea-Land, 285 F.3d at 821. Here, Mr. Safavian is not manifesting any level of agreement with the conclusions of the original GSA e-mails, but merely commenting on the nature of the process.

[17]    The government is well-aware that Mr. Safavian has not adopted the contents of the July 26, 2002 response to his ethics request. According to the FBI 302, Mr. Safavian has told the government that, contrary to the representation in Ray McKenna's July 26, 2002 e-mail, he (Safavian) never said that Greenberg Traurig had no business with GSA and that he (Safavian) assumed, but did not know whether, the firm did at the time. See May 26, 2005 Safavian 302 at p. 6. The very nature of the 302 colloquy between Mr. Safavian and the government in May 2005 illustrates why adoptive admissions are inappropriate here. If the government wants to know whether Mr. Safavian or any other witness has adopted another's statements, it can ask at trial.

accusatory, such silence is not an adopted admission.  See Williams, at *9 (refusing to admit as

an adoptive admission the defendant's silence in the face of non-accusatory question).

## VI.  The Government's Request For Admissibility Of Documents Pursuant To Rule 902 Certifications Should Be Denied

### A.  Domestic Business Records under Rule 902(11)

The government has not even received certifications from all of its requested domestic

entities, yet it requests that the Court render the certifications sufficiently trustworthy under Rule

902(11).  While Mr. Safavian has informed the government that several of the 902(11)

certifications are sufficient,[18] others contained in the government's April 12, 2006 proposed

902(11) certifications do not include sufficient facts to ascertain whether the purported records

(or duplicates of electronically filed records) meet the requisite indicia of trustworthiness to meet

the Business Records hearsay exception under Fed. R. Evid. 803(6).

As discussed more extensively in Mr. Safavian's April 14, 2006 Motion in Limine to

Deny the Government's Rule 902(11) certifications, the use of Rule 902(11) certifications to

circumvent authenticity determinations at a criminal trial violates the Sixth Amendment.  See

April 14, 2006 Motion to Deny Government 902(11) Certifications (citing Crawford v.

Washington. 541 U.S. 36 (2004)); United States v. Wittig, No. 03-40142JAR, 2005 WL

1227790, at *2 (D. Kan. May 23, 2005) (holding that Rule 902(11) is unconstitutional and citing

Crawford).  Furthermore, the government's April 12, 2006 proposed 902(11) certifications do

not include sufficient facts to ascertain whether the purported records (or duplicates of

---

[18]    Mr. Safavian does not contest the authenticity of the certification of Laura Leussing covering the GSA ethics and disclosure reports (DOJ-DS-005795 – DOJ-DS-0014904); Gina Steinke's CitiBank (Diners club) statements ( DOJ-DS-012058 – DOJ-DS-01260), the Tami Ware certification regarding the Verizon bills (DOJ-DS-01858 – DOJ-DS-010880); the Timothy Jansen certification regarding the Cap One/FSB records (DOJ-DS-011590 – DOJ-DS-011677), the Lynn Colson certification regarding the Etrade statements (DOJ-DS-008727 – DOJ-DS-009232), and the Steve Boose certification regarding the GSA Sign in sheet (DOJ-DS-013489).

electronically filed records) meet the requisite indicia of trustworthiness to meet the Business Records hearsay exception under Fed. R. Evid. 803(6).

Many of the certifications submitted by the government fail to allege that the purported custodian is "familiar with the creation and maintenance of records" or that they have "knowledge . . . of the record-keeping practices of the company that produced the documents." Rambus v. Infineon Techs. AG, 348 F. Supp. 2d 698, 702-04 (E.D. Va. 2004) (finding certifications insufficient under Rule 902(11) that on their face failed to make reference to the declarant's knowledge of the business's record-keeping practices). In addition, they fail to certify that the originator of the record (as well as all other parties involved) was under a business duty for that record under Rule 803(6). See Microsoft, No. Civ A. 98-1233, 2002 WL 649951, at *3-4 (D.D.C. Apr. 12, 2002) (finding e-mails sent by employees of third-party companies inadmissible under Rule 803(6) where the business practices of those companies had not been established); see also Rambus, 348 F. Supp. 2d at 706-07 (same). Moreover, because GSA failed to preserve any of the e-mails sent by Mr. Safavian (as it is required to do under GSA regulations), GSA is unable to authenticate them. As such, it is unclear how a certification from Greenberg Traurig can be used to authenticate e-mails sent by Safavian using the GSA e-mail system

Rather than address the trustworthiness of the content of record, the proffered certifications really attempt to address the alleged trustworthiness of the electronic storage of the records. See In re Vinhnee, 336 B.R. 437, 448-49 (B.A.P. 9th Cir. 2005) (requiring evidence of the procedures and safeguards related to the storage of electronic records in order to be admissible under Rule 803(6)).[19]

---

[19]    As discussed further in Mr. Safavian's separate motion, the government's certifications fail for other reasons. For example, the certification of George Elzey purports to authenticate the GSA-OIG

B.      **Foreign Business Records under Rule 902(12)**

As discussed in the Defendant's April 14, 2006 Motion in Limine to Exclude Evidence of Unalleged False Statements, Gratuities, Bribery, or Gifts, the Government cannot introduce evidence regarding the cost of the Scotland trip. Therefore, the issue concerning the Rule 902(12) certifications is moot.

Nevertheless, the government's attempt to use Rule 902(12) certifications is even more egregious than its attempt to deny Mr. Safavian's Sixth Amendment rights under 902(11). The rule itself limits application to "civil case[s]." Fed. R. Evid. 902(12). Notably, even if the Rule's drafters had dropped a stitch, the attempt to use 902(12) would fail to satisfy the dictates of the Sixth Amendment for the same reasons that Rule 901(11) certifications are violative. They are "testimonial" statements and the "functional equivalent of ex parte in-court testimony that defendants cannot cross-examine." Wittig, at *2 (citing Crawford, 541 U.S. at 51) (holding that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability'").

Even if the government was able to use such mechanisms in the criminal context, the government has not even produced the certifications, let alone established their trustworthiness. The government's lone sample, a certification from Gordon Thomas, Gov't Ex. F, does not attest

---

Inspector Rowe report of investigation, which is not admissible under Rule 803(6). See United States v. Smith, 521 F.2d 957, 965-66 (D.C. Cir. 1975) (holding that police records are not admissible in a criminal trial by the prosecution as a business record). In addition, the OIG report contains Inspector Rowe's handwritten notes. This court has already held that similar evidence (i.e. 302 summaries and notes of 302s) is only admissible for impeachment purposes. See Mem. Opin. and Order at 2 (Feb. 22, 2006) (acknowledging that the Abramoff 302 and notes of his 302 are hearsay documents).

to *even one* of the requirements of Rule 902(12).[20]  In short, the attempt at using 902(12) certifications to admit evidence of foreign business records must be rejected.

## CONCLUSION

For the reasons stated herein, and where applicable, the Defendant's April 14, 2006 Motions in Limine, Mr. Safavian respectfully requests that the Court deny the Government's Motion for Pre-trial Admissibility of Certain Evidence.

Respectfully submitted,


By:   /s/ Barbara Van Gelder
      Barbara Van Gelder (D.C. Bar # 265603)
      Roderick L. Thomas (D.C. Bar # 433433)
      Albert C. Lambert (D.C. Bar # 489562)
      WILEY REIN & FIELDING LLP
      1776 K Street NW
      Washington, DC  20006
      TEL: 202.719.7032

Dated: April 25, 2006                  *Attorneys for David H. Safavian*

---

[20]     Rule 902(12) provides, in relevant part, that:

In a *civil* case, the original or a duplicate of a foreign record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration by its custodian or other qualified person certifying that the record—

**(A)** was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
**(B)** was kept in the course of the regularly conducted activity; and
**(C)** was made by the regularly conducted activity as a regular practice.

Fed. R. Evid. 902(12) (emphasis added).

- 25 -