## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No 05-370 (PLF)** |
| | : | |
| v. | : | |
| | : | |
| **DAVID HOSSEIN SAFAVIAN** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S REPLY IN SUPPORT OF GOVERNMENT'S MOTION (DOCKET #  66) FOR PRE-TRIAL DETERMINATION OF ADMISSIBILITY OF CERTAIN EVIDENCE

The United States of America, by and through its undersigned attorneys, hereby respectfully submits this Reply in support of Government's Motion for Pre-trial Admissibility of Certain Evidence (hereinafter "Docket # 66").

Defendant objects to the very idea of having the Court rule on the admissibility of this evidence pre-trial and, instead, seeks to "reserve[] [his] objection[s] to the admissibility of any proposed exhibit until it is offered at trial." Def. Opposition to Government's Motion for Pre-trial Admissibility of Certain Evidence (hereinafter, "Docket # 82"), p. 2.

Defendant's objection has no merit. Permitting defendant to wait until trial to voice his objections to the admission of the proffered evidence would cause enormous delay during the trial. The e-mails will make up the bulk of the government's case against the defendant. Arguing over the admissibility of each and every e-mail while a witness is on the stand and a jury is in the box will result in innumerable – and otherwise avoidable – time-consuming bench

1

conferences.[1]  Because the Court is already well-aware of what the Indictment alleges and has

had the opportunity to review the proffered e-mails, and can, through these pleadings, entertain

arguments from both sides as to the admissibility of the e-mails, it is in as good a position now to

make evidentiary rulings on hearsay or relevance grounds as it will be at trial.

In addition, a pre-trial ruling on admissibility, made pursuant to Fed. R. Evid. 104, will

better enable the parties to prepare for trial, as both sides will know in advance what evidence

will be admitted at trial, and for what purposes.

Moreover, defendant's claim that the government's request for a "pre-trial determination

for *every e-mail sent* by" defendant is "premature [] [because] [t]he government needs to

delineate which e-mails it is referring to meet its evidentiary burden"  Docket # 82, p. 20

(emphasis in original) evinces a fundamental misunderstanding of the government's prior

pleadings.  The government does not know how it can be more clear: the government will be

seeking to introduce *all* of the proffered e-mails.  See (Docket # 66), fn. 2 ("The e-mails the

government will be seeking to admit at trial are attached hereto as Exhibits A, B, C, and D.")

Thus, out of the thousands of e-mails provided in pre-trial discovery, we have identified the

several hundred e-mails we are seeking to introduce.[2]

Defendant also complains that he is being put in a position where he must "guess which

_____

[1]Indeed, the government's previous estimates on the length of trial was premised on the
assumption that these evidentiary issues would be resolved prior to the jury being sworn.

[2]At the scheduled May 5, status hearing the government will provide defense counsel and the
Court with a binder containing the proffered e-mails (comprising both the government's initial and
supplemental submissions) in chronological order, with exhibit numbers attached.
    While the government may seek to admit other e-mails at trial, we will not seek to do so under any
of these particular legal theories.

of the five reasons for admissibility fits the e-mail." Def. Oppos., p. 2. No such guesswork is necessary. Every e-mail drafted and sent by defendant is admissible as a statement of a party opponent, pursuant to Rule 801(d)(2)(A). In addition, the e-mails written by Jack Abramoff and sent to defendant are admissible under two distinct legal theories: as a statement of a co-conspirator, or, in the alternative, as non-hearsay statements which are admissible to show their effect on defendant.[3]

The most efficient way to discuss the precise grounds of admissibility is to group the e-mails by category and to articulate why each category of e-mails should be admitted.[4]

I.      **E-Mails Written and Sent by Defendant**

A.      Admissions of Party Opponent Pursuant to Fed.R.Evid. 801(d)(2)

The government will be seeking to admit all of the proffered e-mails written by defendant as admissions of a party opponent (Fed. R. Evid. 801(d)(2)). Defendant appears to concede this theory of admissibility. Docket # 82, p. 19 - 20. To the extent that defendant's e-mail responses can only be understood when read in conjunction with the questions that spurred them, the questions must also be admitted.[5] See United States v. Lemonakis, 485 F.2d 941, 948 (D.C. Cir.

---

[3]The government's argument that the e-mails, in and of themselves, constitute "doing business" or "work" is merely a subset of the argument that the e-mails are not hearsay because they are not being introduced to prove the truth of the matter asserted. See Docket 66, pp. 4-5.

[4]The government understands that defendant is claiming that none of the e-mails have been authenticated. The government argues at some length in its previously filed 902(11) pleading (Docket No. 78), as well as infra, why we believe authentication is not a legitimate bar to the admissibility of these e-mails. We will not repeat those arguments here.

[5]For example, on July 2, 2002, Abramoff e-mailed defendant with the following message (DOJ DS-007439): "We met on the other project yesterday. can I hook up with you this week to discuss? On the White Oak, that is great. what can we do to get in position? Any sense as to whether there are any buildings not already allocated, in addition to land?" Defendant's response: "I don't have

1973) (statements of non-defendant admissible not for the truth of what was being asserted, "but, to the extent to which the [defendant's] responses constituted incriminating admissions of his own, to make those responses intelligible to the jury and recognizable as admissions.")

      B.     <u>Adoptive Admissions Pursuant to Fed.R.Evid. 801(d)(2)(D)</u>

      The government also seeks admission of a number of e-mails as adoptive admissions pursuant to Fed.R.Evid. 801(d)(2)(D).  Defendant objects to the admission into evidence of the e-mail chains that defendant forwarded on to Abramoff as adoptive admissions (Docket # 82, p. 20) because, he claims, there is insufficient indication that defendant adopted these particular e-mails.  This argument is baseless, and these e-mails should also be admitted.

      On a number of occasions, defendant forwarded to Abramoff internal GSA e-mail traffic that had been sent to defendant by his GSA colleagues.  Generally, defendant would forward these e-mail chains with a message[6] of some sort, although on some occasions defendant simply

---

the answers to these questions.  But I will come Thursday night.  Dhs" Obviously, defendant's response is meaningless without knowing the questions to wich he is referring.  Another example occurs on July 21, 2002 (DOJ-DS-000990), where Abramoff e-mails defendant: "The facility is secured, as I understand.  Any thoughts on how we could get a tour there without giving a heads up to too many folks?" and defendant responds, "Let me make a couple of calls on Monday from Utah. I will get back to you either way."  Defendant's response is nonsensical without the antecedent e-mail from Abramoff.

  [6]For example, on July 23, 2002 (DOJ-DS-000996), defendant requested information from someone in the GSA administration, and then forwarded the information on to Abramoff with the message: "Fyi."  Later that same day, defendant again forwards an update with the same e-mail chain (DOJ-DS-001002 - 1003), this time with the message, "Havent [sic] seen the paperwork yet.  I assume I wil [sic] get something tomorrow morning.  Sorry.  Bureaucracy strikes again."  On July 26, 2002, defendant forwarded an e-mail chain (DOJ-DS-001034-1035) to defendant with the message, "This is the type of bureaucracy I'm dealing with.  I am still running the traps on the I [sic] year lease.  Dhs."

forwarded to Abramoff the e-mail chain without comment.[7]

Defendant argues that e-mail chains forwarded by defendant – be they with or without comment – lack sufficient indication to "indicate unambiguous assent to every statement contained therein," and that "the mere act of forwarding [a] document to another person provides no assurance that [defendant] adopted *every detail* as his own" (Def. Oppos., p. 21, (emphasis supplied)).  This argument is groundless.  Read literally, it would mean that a statement could not be deemed an adoptive admission under Fed.R.Evid. 801(d)(2)(D) unless the putative adoptee *explicitly* endorsed each and every factual assertion sought to be introduced.  Such a requirement would eviscerate the rule: there would be no need for the doctrine of adoptive admissions if it were required that the adoptee spell out the fact that he believes the information to be introduced is true and accurate; such a statement would be admissible simply as a statement of a party opponent pursuant to Rule 801(d)(2).

Defendant's argument goes to the weight these statements should be accorded by the jury, not to their admissibility.  Clearly, what is happening in these particular e-mails is that defendant is sharing with Abramoff the answers to relevant questions that Abramoff has asked defendant. Forwarding these e-mails on with just a brief – or even no – comment  is simply a shorthand method of conveying that information to Abramoff, rather than paraphrasing the information in defendant's own e-mail.  Defendant would not have forwarded this information had he thought the information was false, incorrect or misleading.  Indeed, the editorial comments to the attachments, although often expressing frustration with the bureaucratic process, in no way indicate that defendant has any misgivings about the accuracy of the information he was

---

[7]E.g., July 26, 2002 (DOJ-DS-001025).

forwarding.  Given the obviously close relationship between defendant and Abramoff, it seems almost inconceivable that defendant would deliberately forward to him information that defendant knew was inaccurate or misleading.  See advisory committee notes, Fed. R. Evid. 801(d)(2)(B) ("Under established principles an admission may be made by adopting or acquiescing in the statement of another.  While knowledge of contents would ordinarily be essential, this is not inevitably so ....Adoption or acquiescence may be manifested in any appropriate manner.  When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue.  The decision in each case calls for an evaluation in terms of probable human behavior.")

In this case, "probable human behavior" supports the notion that defendant would not have silently forwarded on to Abramoff e-mails he believed to be untrue; rather, he would have not sent them at all or sent them with a note indicating his disbelief in the attached message.[8]

## II.    E-Mails Written and Sent by Jack Abramoff

A.    Co-Conspirator Statements

The government has argued that all of Abramoff's e-mails can be admitted as a coconspirator's statement made in furtherance of a conspiracy, pursuant to Fed.R.Evid. 801(d)(2)(E), because defendant and Abramoff were engaged in an uncharged conspiracy to

---

[8]Moreover, the e-mail chains are also admissible not to prove the truth of the matters asserted therein but as non-verbal conduct that demonstrates that defendant provided internal GSA information to Abramoff.  An analogy would be if there were evidence that defendant hand-delivered GSA documents to Abramoff, and the government later recovered these documents from Abramoff. The government would then introduce those documents at trial, not to prove what was stated therein, but to demonstrate the fact that defendant was providing GSA materials to Abramoff.

commit honest services fraud.  See, Docket # 66, pp. 5-11.[9]  Defendant argues against this

theory, claiming that there is insufficient independent evidence to support the conspiracy

argument (Def. Oppos., p. 8); that the e-mails cannot be shown to have been made "in

furtherance" of the alleged conspiracy; and because the coconspirator theory fails where, as here,

the alleged conspiracy is not a conspiracy to commit the charged offenses, i.e., the government

has alleged defendant conspired to commit honest services fraud, but defendant has been charged

substantively only with making false statements and obstruction of justice (Docket 82).   None of

these arguments are meritorious.

    1.    There is Sufficient Independent Evidence to Establish to Establish a
          Conspiracy to Commit Honest Services Fraud

    While the government agrees that there must be some independent evidence separate and

apart from the co-conspirator's statements to establish the existence of a conspiracy, the

government strongly disagrees that such independent evidence is lacking in this case.

    At the outset, is should be emphasized that this Court, when determining whether or not a

conspiracy existed, can consider the putative coconspirator's statements.  United States v.

Beckham, 968 F.2d 47, 51 (D.C. Cir. 1992) ("The hearsay statement may be considered in

finding that a conspiracy existed, but the statement may not be the sole basis for such a

ruling....there must be independent evidence of a conspiracy as well.") (citation omitted.)  "The

court must consider in addition to the circumstances surrounding the statement, such as the

---

[9]Given that the government has argued that defendant and Abramoff were engaged in a criminal conspiracy to commit honest services fraud (see, Docket # 66, pp. 5-11), the government is puzzled by defendant's statement that "[n]otably, the government does not claim that the [defendant-Abramoff] relationship violated any governing standards or codes."  Def. Oppos., p. 1.  On the contrary, the government has clearly argued that the relationship violated the United States criminal code.

identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question." Advisory Committee notes to Rule 801(d)(2).  Thus, in determining whether or not defendant and Abramoff were engaged in a conspiracy to defraud the public of defendant's honest services, the Court may properly consider all of Abramoff's e-mails.

Coupled with this evidence is a wealth of  independent evidence that the Court can consider.  First, the Court may properly consider all of defendant's e-mails *to* Abramoff, which, as demonstrated above, are substantive evidence against defendant as statements of a party opponent (Fed. R. Evid. 801(d)(2)).  Therefore, for example, the Court may properly consider as independent evidence the e-mail defendant sent to Abramoff on July 23, 2002 (DOJ-DS-0015102), in which, in response to Abramoff's query, "David, can you push this guy, or what else should we do?", defendant responds, "I spoke with our Congressional Affairs guy.  He has reservations, but i have overruled him.  What I am trying to get a hold of is an actual map of the land and facilities.  I hope to have something this afternoon for you...uh...I mean...for Ms. Capito. Dhs."

A review of the preceding e-mails reveals that defendant was trying to assist Abramoff by using the name of Ms. Capito, a West Virginia congresswoman, to help pry information from defendant's colleagues at GSA.  It is also clear from this e-mail, which, although sent on a Tuesday afternoon, was sent from defendant's home e-mail account rather than his GSA e-mail account, that defendant used his official position to "overrule" a subordinate in order to get Abramoff the information he requested.

Additional compelling and independent evidence of the conspiracy can be found in the e-

mails sent by defendant in which he assisted Abramoff in drafting letters which were obviously

to be used in lobbying defendant's his own agency.  For example, in an e-mail dated July 28,

2002 (DOJ-DS-001043), defendant helped Abramoff draft a letter that was addressed to the GSA

Commissioner of Public Buildings (with a cc to defendant), seeking to acquire GSA land.  In

defendant's response, he spells out for Abramoff the precise arguments and language that should

be used and pointing out what language should be avoided in order to accomplish Abramoff's

goals.

      Moreover, on June 19, 2002, Abramoff forwarded to defendant (DOJ-DS-0015091) an e-

mail from Jon van Horne which stated in part:

> Recently the General Post Office Building, also known as the US Tariff
> Commission Building was leased to a developer for conversion into a luxury hotel
> under the authority of section 111 of the National Historic Preservation Act
> (NHPA).  It would be very helpful if we could obtain a copy of the solicitation
> that was used in that case (without any full size architectural drawings) to select
> the developer.

      Abramoff attached to the van Horne e-mail the following query: "David, can you get us

this stuff so we can put together the bid specs?"

      Defendant responded later that same day (June 19): "Jack – I have some materials in my

office that i will get over to you.  David"

      As exemplified in that and other e-mail exchanges, defendant provided to Abramoff GSA

materials in order to assist Abramoff in his efforts to obtain control over the Old Post Office

Building.

      In addition, as pointed out in our prior submission, Docket # 66, the Court can and should

consider the fact that even during normal business hours defendant and Abramoff e-mailed one

another primarily via defendant's home e-mail account rather than his GSA account, and that defendant made explicit to Abramoff the fact that it was important that the non-public GSA information defendant provided to Abramoff not be traced back to defendant.[10]  It would be hard to imagine more clear evidence of consciousness of guilt.  If defendant was providing this information in the normal course of his duties as a public servant, there obviously would have been no need to insist on such secrecy.

There will also be independent evidence that on August 2, 2002, defendant arranged a meeting between high-ranking GSA officials representatives of the Eshkol Academy, including Mrs. Abramoff.   Defendant chaired the meeting, which took place in the GSA Administrator's office.[11]  At this meeting, there were discussions about the White Oak facility and its suitability as a location for a school.

Finally, there will be introduced at trial independent evidence of the fact that defendant was invited by Abramoff to go on the Scotland golf trip, and that the trip cost many times more than what defendant paid for it.  The government will also introduce direct and independent evidence that defendant attempted to lie about the circumstances surrounding his trip to Scotland.[12]

---

[10]In a July 23, 2003 e-mail (DOJ-DS-0015014), defendant wrote: "Feel free to share this information – but of course, not the email directly." On January 13, 2003 (DOJ-DS-0015213) defendant wrote: "Please don't forward the email onward.  Rather if you can let them know via phone, or put it into a separate email as though it came from you, that would be more appropriate. David."

[11]The GSA Administrator was out of the office and did not attend this meeting.

[12]The Court can permit the statements in at trial "subject to connection."  United States v. Gantt, 617 F.2d 831, 845 (D.C. Cir. 1980) ("[a]s a practical matter, to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of coconspirators

Thus, the Court will have before it independent evidence that defendant provided to Abramoff a wealth of information, advice and assistance and received a week's vacation, including four days of golf in Scotland, capped off by three nights in London at a luxury hotel. For this trip, defendant paid a fraction of the true cost. When coupled with the Abramoff statements, the government has clearly met its burden of establishing, by a preponderance of the evidence, that defendant and Abramoff were engaged in a conspiracy and that the statements were made in furtherance thereof." United States v. Bourjaily, 483 U.S. 171, 175 (1987).

2.    The Statements Were Made In Furtherance of the Conspiracy

_____By definition, a statement of a coconspirator can only be admitted as substantive evidence if it is made in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). See United States v. Edmond, 52 F.3d 1080, 1110-1111 (D.C. Cir. 1995) ("a statement is admissible under Rule 801(d)(2)(E) if it 'can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy.'" (citations omitted). Under this definition, all of the e-mails written by Abramoff to defendant were made in furtherance of the conspiracy. Whether Abramoff wrote seeking advice, information or assistance from defendant, or whether Abramoff was offering defendant invitations for golf, racquetball, dinner or sporting events, all of these e-mails were designed to "encourage" or "advance" the conspiracy between defendant and Abramoff whereby defendant provided Abramoff assistance on GSA issues and Abramoff provided Safavian with things of value.

In addition to the e-mails between defendant and Abramoff, the government is seeking to

_____

'subject to connection.'")

11

introduce eight e-mails (attached at Ex. "A") between Abramoff and third-parties, which also constitute statements made in furtherance of the conspiracy. For example, on July 30, 2002, (DOJ-DS-007050) when Abramoff tells his wife, "When you are in the room with David and the other GSA folks, identify yourself as Pam Alexander or Pam Clarke. David does not want Abramoff used in the meeting ... David and I don't want to take a chance." he is conveying this information so that the scheme to defraud the public can more likely succeed; Abramoff and defendant did not want Abramoff's involvement in the White Oak property to become known, as it would cause too much attention.

The same arguments apply to all of this subset of e-mails; they were written by Abramoff to third-parties in order to advance and further the ends of the conspiracy.

3.    Coconspirator's Statements Admissible Where Alleged, Uncharged Conspiracy Differs From Charged Offenses

Finally, defendant argues that the government may only seek to admit coconspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E) where the statements were made in furtherance of a conspiracy to commit the charged offenses. This is not an accurate statement of the law.

No federal Court of Appeals has held that the conspiracy in furtherance of which the statements are made need be one to commit the crime or crimes charged in the indictment. "[T]he objective of the joint venture need not be the crime charged in the indictment." United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002). Indeed, several circuits, including the D.C. Circuit, have held that the conspiracy need not even have an illegal objective. See United States v. Weisz, 718 F.2d 413, 433 (D.C. Cir. 1983) ("Although Rule 801(d)(2)(E) refers to

'conspiracy' and statements of a 'coconspirator,' its use of those terms is not intended to limit applicability of the doctrine to unlawful combinations . . . ."); <u>United States v. Layton</u>, 855 F.2d 1388, 1398 (9th Cir. 1988) ("[T]he common enterprise need not have an illegal objective."), <u>overruled in part on other grounds by</u> <u>United States v. George</u>, 960 F.2d 97 (9th Cir. 1992); <u>United States v. Coe</u>, 718 F.2d 830, 835-36 & n.3 (7th Cir. 1983).

The general rule, contorted by defendant in his response, "requires only that the conspiracy introduced into evidence by the Government be factually intertwined with the offense for which the defendant is being tried." <u>United States v. Kendall</u>, 665 F.2d 126, 131 (7th Cir. 1981) (quotation marks omitted); <u>accord</u> <u>United States v. Stratton</u>, 779 F.2d 820, 829 (2d Cir. 1985). The "factually intertwined" language "is essentially a restatement of ordinary relevancy principles." <u>United States v. Ellis</u>, 156 F.3d 493, 497 (3d Cir. 1998).

Here, defendant and Abramoff conspired to deprive the public of defendant's honest services. This conspiracy is factually intertwined with the obstruction and false statement charges because, as the government contends, defendant lied and obstructed justice so that his boss and the public would not learn of the existence of the conspiracy to commit honest services fraud. For theses reasons, defendant's contention is meritless, and Abramoff's emails are admissible under Rule 801(d)(2)(E).

     <u>B. Admissible Because Not Hearsay</u>

     Defendant claims that the e-mails written and sent by Abramoff to defendant are barred by the rule against hearsay. Defendant's argument is incorrect. The e-mails sent by Abramoff are not hearsay because they are not factual assertions being introduced to prove the truth of the matter asserted. Therefore, they are admissible.

This Circuit has previously considered, and rejected, hearsay arguments strikingly similar to those advanced here by defendant. In <u>United States v. (Keith) Long</u>, 905 F.2d 1572 (D.C. Cir. 1990), police officers were executing a search warrant at defendant's apartment when the telephone rang. <u>Id.</u> at 1579. When a police officer answered the phone, an unidentified female voice asked to speak to "Keith." <u>Id.</u> When told that he was busy, the caller "asked if Keith 'still had any stuff.' The officer asked the caller what she meant, and the caller responded 'a fifty.' The officer said 'yeah.' The caller then asked whether 'Mike' could come around to pick up the 'fifty.' Again, the officer answered yes.'" <u>Id.</u> In his ensuing trial on narcotics charges, Long sought pre-trial to preclude admission of the telephone conversation, making virtually the identical arguments as defendant in this case:

> Although Long concedes the caller did not expressly assert that he was involved in drug distribution, he argues that her questions contain *implicit* assertions about his involvement. Long contends that it is irrelevant that these alleged assertions were couched in question form, since the questions plainly revealed assumptions that are the functional equivalent of direct assertions. Long maintains that the caller, through her questions, in effect asserted that 'Keith has crack and sells it out of Mayfield's apartment.' He argues that the government introduced this testimony to prove the truth of precisely these assertions, and that the testimony, thus, should have been excluded as hearsay.

<u>Id.</u> (emphasis in original). In rejecting this argument, the Court noted that the hearsay prohibition applies only to "assertions" and that "'nothing is an assertion unless *intended* to be one.'" <u>Id.</u>, quoting Fed. R. Evid. 801 advisory committee note (emphasis in original). Under this analysis, the unknown caller's words "cannot be characterized as an 'assertion,' even an implied one, unless the caller intended to make such an assertion." <u>Id.</u> "When a declarant does not intend to communicate anything, [] his sincerity is not in question and the need for cross-examination is

14

sharply diminished. Thus, an unintentional message is presumptively more reliable. ... Evidence of unintended implicit assertions is '[a]dmittedly ... untested with respect to the perception, memory, and narration (or their equivalents) of the actor,' but 'these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds.'" <u>Id</u>. at 1580, quoting Fed. R. Evid. 801 advisory committee note.

The <u>Long</u> Court's analysis of the telephone caller's *intent* is equally apt when considering Abramoff's *intent* when he sent the proffered e-mails to defendant:

> With our inquiry focused on the *intent* of the caller, we have little trouble disposing of Long's theory about implied assertions. Long has not provided any evidence to suggest that the caller, thorough her questions, intended to assert that he was involved in drug dealing. The caller may indeed have conveyed messages about Long through her questions, but any such messages were merely incidental and not intentional. ... Long thus fails to satisfy the intent component of rule 801, which 'places[s] the burden upon the party claiming that the intention existed.' Fed.R.Evid. 801 advisory committee note; <u>accord</u> <u>United States v. Hensel</u>, 699 F.2d 18, 31 (1st Cir.), <u>cert</u>. <u>denied</u>, 461 U.S. 958 (1983). Because the caller's questions were nonassertive, they fall outside the scope of the hearsay rule, and the trial judge did not err in admitting the testimony concerning the questions.

<u>Id</u>. at 1580 (emphasis in original).[13]

Using this analytical framework, a review of the e-mails sent by Abramoff to defendant makes clear that the e-mails are not barred by the hearsay rule because the government is not

---

[13] <u>See</u> <u>also</u>, <u>United States v. Oguns</u>, 921 F.2d 442, 448-449 (2d. Cir. 1990) (call to apartment by an unknown caller during police search asking "have the apples arrived there" admissible as non-hearsay circumstantial evidence of defendant's 'knowledge and intent regarding the importation and distribution charges;" "Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present."); <u>United States v. Daniels</u>, 48 Fed.Appx. 409, 412 (3rd Cir. 2002) (unpublished) 2002 WL 31255451, ("the federal courts of appeal are in agreement that interrogative statements cannot constitute hearsay because they do not assert the existence of facts and thus cannot be used to 'prove the truth' of any matter."); <u>Inc. Pub. Corp. v. Manhattan Magazine, Inc.</u>, 616 F. Supp. 370, 388 (S.D.N.Y. 1985) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement.").

seeking to admit these statements to prove the truth of the matters asserted therein. Thus, when Abramoff asks, "Do you guys have the ability to give a short term (one year) lease on property at your discretion? We are in a real bind on the school and I was wondering if there was a way to lease part of the White Oak site for a year?"[14], the government is not admitting this e-mail to prove that Abramoff is truly "in a real bind on the school." It does not matter why Abramoff is seeking this particular information. The relevance is simply to explain defendant's subsequent conduct and to show defendant's state of mind.

An analysis of the Abramoff e-mails reveal that they fall into a number of broad categories. A significant number are invitations to defendant for golf, racquetball, sporting events or meals. For example, on September 29, 2002, Abramoff e-mails (DOJ-DS-001104) defendant: "Unfortunately, I have plans already for that day. are you out of town all week? How about a meal at least? I miss our fun!" These e-mails are not hearsay because, once again, they are not being admitted to prove the truth of the matter asserted; that is, it is irrelevant that Abramoff truly wants to share defendant's company at a meal or sporting event, or that he truly misses defendant or enjoys his company. It may be the case that the opposite is true, and that Abramoff did not like defendant at all and was only giving him an invitation because of defendant's position at GSA. These e-mails are non-hearsay because they are not offered for their truth, but are relevant simply to show that these invitations were offered to defendant, a fact that cannot be disputed. See advisory committee notes to Fed.R.Evid. 801.

A second broad category of e-mails are requests from Abramoff to defendant in which Abramoff specifically asks defendant for advice, help or information on GSA operations. For

---

[14]July 25, 2002 (DOJ-DS-001009).

example, on May 24, 2002 (DOJ-DS-00907 ), Abramoff wrote: "I have a gsa question.  There is

a facility which is under the control of the GSA in silver Spring Maryland, which was the former

Naval Surface Weapons center (off New Hampshire Avenue).  They are now going to put the

FDA there.  it is a huge property.  I was wondering if it is possible get some of that property for a

school.  Do you know if that is doable and how?  Thanks."  None of the factual assertions in this

particular e-mail are being admitted for the truth of the matter asserted.  The government will not

be using this e-mail to establish that "there is a facility under the control of the GSA in Silver

Spring;" that this property was "former[ly] the Naval Surface Weapons center;" that the FDA

was going to build there; or that "it is a huge property."[15]  The e-mail is relevant because it

explains defendant's subsequent conduct, i.e., why defendant was motivated to find out about the

property and provide the information he acquired to Abramoff.[16]  There are, obviously, many

_____

[15]Factual information about the relevant GSA properties will be established by witness testimony.

[16]The same is true for a large number of other e-mails.  For example, the June 18, 2002 e-mail (DOJ-DS-0015093) ("Let me know if you want me to send someone over to get the materials on our favorite building.  We are working away at that one."); June 19, 2002 (DOJ-DS-000927), ("David, can you get us this stuff so we can put together the bid specs?"); June 30, 2002 (DOJ-DS-000954)("Can you find out if you guys have control of any part of a huge federal property called the White Oak Federal Research Center ...?  I want to try to get 40 acres of that tract if possible for a non-profit.  Is it doable?"); June 30, 2002 (DOJ-DS007437) ("Thanks David.  Yes, that is the one.... Let me know if you  think we can do it.  thanks so much!!"); July 2, 2002 (DOJ-DS-007544), (in which Abramoff forwards to defendant a message from Jon van Horne with the one-word message, "Possible?"); July 17, 2002 (DOJ-DS-000969) ("How about we bring him [GSA Administrator Steve Perry] with us?"); July 21, 2002 (DOJ-DS-000989) ("If you can get me any info as to which land is still available at White Oak, and whether there are buildings there, that would be huge. Thanks so much."); July 21, 2002 (DOJ-DS-000991), ("I think we can move the legislation.  I have some quick questions.); July 22, 2002 (DOJ-DS-000993) ("Does this work, or do you want it to be longer?  It's the letter from Young, Latourette et al to Steve Perry."); July 24, 2002 (DOJ-DS-001006) (What do you advise?"); July 25, 2002 (DOJ-DS-001017) ("Any word on the possibility of a quick short term rental as we discussed this morning?  How can I thank you for all you do for me!"); July 25, 2002 (DOJ-DS-001020) ("Any thoughts on the short term rental at White Oak? Thanks David."); July 26, 2002 (DOJ-DS-001022) ("Does this work?  I put in 3 years just to be safe.

17

more examples of these types of queries. But in all of these instances, the e-mails are admissible because they are not being admitted for the truth of the matter asserted. In his queries to defendant, it was not Abramoff *intention* to express a factual assertion about the history or status of the Old Post Office or White Oak. Abramoff's *intention* was simply to get information, advice and assistance out of defendant. While Abramoff's questions "may indeed have conveyed messages about [himself] through [his] questions, [] any such messages were merely incidental and not intentional." United States v. Long, 905 F.2d at 1580. And it is the *opponent* of the proffered statements that bears the burden of establishing that the speaker *intended* to make the factual assertion at issue. Id. at 1579. Thus, these statements are not barred by the hearsay rule.

This same rationale applies to a series of e-mails between defendant and Abramoff that pertain to the possibility of defendant joining Abramoff's firm. For example, on February 7, 2002 (DOJ-DS-000851), defendant forwards Abramoff an e-mail that originally came from Neil Volz, indicating that Volz was leaving his job on Capitol Hill and joining Abramoff's firm, Greenberg Traurig, and Abramoff responds, "You're next!!!" Abramoff's response is not being introduced to literally prove that defendant is the next person who will join Greenberg Traurig. It is being introduced to show that defendant and Abramoff communicated with one another about

_____

Once we are set on the draft of the letter, should I courier it over today, or wait until Monday (I don't want it lost in the mix)?"); January 12, 2003 (DOJ-DS-001211) ("We are moving forward fast, but in order to get around the need for the 8a company to be in business a few years, we need to involve in the company those with relevant skill sets and government experience. Consequently, my guys are asking me to find out the first four or five contracts we might be competing for. Can you get me that info really fast? Thanks David. Rb this week?")

the subject of future employment at Greenberg Traurig.[17]  Whether or not Abramoff *truthfully* wanted defendant to join the firm is not the point; indeed, it may have been the case that Abramoff did not actually want Safavian to join him at Greenberg Traurig, and that he really saw major advantages to having defendant ensconced as GSA Chief of Staff.  What is relevant is that Abramoff *indicated* to defendant Abramoff's interest in having him join the firm.  Thus, the e-mails are relevant to show defendant's state of mind and his motivation for wanting to please Abramoff.

### III.     The E-Mails Are, In and Of Themselves, Non-Hearsay Evidence of "Doing Business," "Seeking to Do Business" or "Work"

The government has alleged that defendant made a false statement when he informed his ethics officer that Abramoff "did not have any business with and was not seeking to do business[18] with GSA and that [Abramoff] did all his work on Capitol Hill."  Ind., ¶ 29.  The proffered e-mails establish the falsity of defendant's claim, in that their very existence establish that defendant and Abramoff were in fact engaged in business at the very time defendant was denying the same.  The proffered e-mail traffic can be viewed as non-verbal conduct that is not barred by the hearsay rule.  See advisory committee notes to Rule 801 ("If the significance of an offered

---

[17]This same rationale applies to the following e-mails: February 26, 2002 (DOJ-DS-000858) ("You need to meet with Bagett, who is primed.  He'll be here next week.  I'll get some times from him for you"); April 9, 2002 (DOJ-DS-000880) ("Let me know what I need to do to make this move forward."); April 17, 2002 (DOJ-DS-00881) ("Oy vey!  Where/when should I call u?"); April 30, 2002 (DOJ-DS-00893) ("OK, but please tell me what I can do to help.  I don't want this to slip.").  All of these e-mails are probative of the fact that defendant and Abramoff repeatedly discussed defendant coming to work at Greenberg Traurig.

[18]In his recitation of the facts, defendant omits the fact that the government has alleged defendant falsely claimed to his ethics officer that Abramoff was "not seeking to do business with GSA."  Def. Oppos., p. 5.

statement lies solely in the fact that it was made, no issue is raised as to the truth of anything

asserted, and the statement is not hearsay.")

The advisory committee notes to Rule 801 point out that

> [n]o class of evidence is free of the possibility of fabrication, but the likelihood is
> less with nonverbal than with assertive verbal conduct. The situations giving rise
> to the nonverbal conduct are such as virtually to eliminate questions of sincerity.
> Motivation, the nature of the conduct, and the presence or absence of reliance will
> bear heavily upon the weight to be given the evidence. [] Similar considerations
> govern nonassertive verbal conduct and verbal conduct which is assertive but
> offered as a basis for inferring something other than the matter asserted, also
> excluded from the definition of hearsay by the language of subdivision (c).

Thus, putting aside the true reasons why Abramoff wanted the White Oak or Old Post

Office properties; whether Abramoff was truly under severe pressure or time constraints; or what

his true intentions were for the ultimate dispensation of the property, the fact that Abramoff was

asking the questions he was asking and seeking the advice and information he was seeking is

evidence of "work" and of "business" and, as such, is relevant, probative and non-assertive

conduct that should not be barred by the hearsay rule.

## IV.  E-Mails Written and Received After the 2002 Scotland Trip Are Relevant and Admissible

The government seeks to admit e-mails through March, 2004. Defendant wants to

exclude from evidence the e-mails written between himself and Abramoff in the time frame after

the 2002 Scotland trip because, he claims, "[t]he scope of the OIG's investigation focused on

[defendant's] relationship with Abramoff prior to the Scotland trip." Defendant fails to explain

why the original OIG investigation, as opposed to the Indictment, should define what is relevant

at trial.

The Indictment alleges that defendant obstructed the Senate "[f]rom in or about February

2005 to in or about March 2005." As the government explained at length in Docket # 77, the e-mails post-dating the Scotland trip are relevant to show motive, intent, and the absence of mistake. The government will not repeat those arguments here.[19]

### V.   Government Properly Requested Admissibility Determinations Based on Sufficient Records Certifications

The Government has already responded at length to Defendant's arguments regarding the admissibility of documents pursuant to business records certifications, including arguments related to <u>Crawford</u> and the confrontation clause. <u>See</u> (Docket 78).[20] As with other parts of defendant's response with respect to e-mails, defendant does not object with particularity to a particular certification, but instead argues on a theoretical basis. When applied to the actual facts of the certifications, which have all been provided to the Defendant and the Court,[21] Defendant's arguments are unpersuasive.

_____

[19]Defendant's claim that the government is being "disingenuous" (Def. Oppos., pp. 3-4) because it is now seeking to introduce e-mails written between he and Abramoff long after the 2002 Scotland trip where we previously objected to discovery requests for e-mails sent "'in the three years **after** [defendant] allegedly lied to the GSA'" because such e-mails were irrelevant is baseless. Defendant only partially quotes from the government's pleading and thereby distorts its meaning. The government previously argued that it should not be compelled to disclose "emails, reports, documents and correspondence 'sent to or emanating from GSA Commissioner Joseph Moravec' [] **regardless of whether or not they were ever seen by Defendant Safavian."** Docket 11, p. 19 (emphasis supplied). We have never suggested to defendant or the Court that any e-mails between defendant and Abramoff were non-discoverable. Indeed, we have turned over to the defense e-mails between defendant and Abramoff dating back to 1995, regardless of subject matter.

[20]Government notes that it misidentified the basis for admission for the foreign business records certificates. The proper basis of admission, as explained in Docket 78, is 18 U.S.C. § 3505.

[21]The Government provided the certifications to the Defendant on April 12, 2006 and April 14, 2006. In addition, they were provided to the Court as Attachments A and B to Docket 78 Attachments A and B.
    The Government is attaching the 902(11) certification from Jay Nogle for the emails produced by Greenberg Traurig to the Government on April 17, 2006. See Attachment "B."

Defendant argues that the declarants who signed the 902(11) certificates are not familiar with the record-keeping practices of the business, yet the certification specifically states that the declarant is a "custodian of the records" whose "duties include certifying the authenticity of records which truly and accurately reflect - as a matter of business practice - the information recorded on the corresponding records in the normal course of business."  See Docket 78, Attachment A.[22]

Moreover, defendant seems to be applying inconsistent positions to the sufficiency of the certifications.  On the one hand, defendant claims that "several of the 902(11) certifications are sufficient," Docket 82, p. 22, and, yet, defendant claims that "others... do not include sufficient facts to ascertain whether the purported records (or duplicates of electronically filed records) meet the requisite indicia of trustworthiness...."  Id.  When examining the 902(11) certificates,[23] however, there is no difference between the "facts" provided in the 902(11) certificates that the Defendant has found "sufficient" and those that defendant contests as "not sufficient."  The language in each of the 902(11) certificates is identical.

Defendant's argument that Greenberg Traurig cannot be used to authenticate emails sent by defendant using the GSA email server is illogical.  Obviously a business can certify the documents it receives.  For example, checks received by a credit card company or correspondence about why the payment to the credit card company was late, are admissible business records even if the business itself does not possess the computer upon which they were

---

[22]As discussed previously, the Government will amend the 902(11) certification if the Court deems it necessary.

[23]See also Docket 78, Attachment A.

prepared.  In order to be admissible, the information that originates from entities outside the

business, such as e-mails,  must fall into another hearsay exception.  Docket # 78 provides further

analysis on this issue which the government will not reiterate here.

## **CONCLUSION**

_____For the foregoing reasons, and the arguments contained in Dockets 77 and 78,

Defendant's the government Motion for Pre-trial Determination of Admissibility of Certain

Evidence should be granted.

Respectfully submitted,


___/s/ Nathaniel Edmonds____          _/s/ Peter Zeidenberg___
NATHANIEL B. EDMONDS                  PETER R. ZEIDENBERG
Trial Attorney, Fraud Section         Trial Attorney, Public Integrity Section
Criminal Division                     Criminal Division
United States Department of Justice   United States Department of Justice
Bond Building                         Bond Building
1400 N.Y. Avenue, N.W.                1400 N.Y. Avenue, N.W.
Washington, D.C.  20005               Washington, D.C.  20005
(202)307-0629                         (202)514-2042

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2d day of May, 2006, a copy of the foregoing was served on

the following counsel by electronic service to:


Barbara Van Gelder, Esq.
Wiley Rein & Fielding
1776 K Street NW
Washington, DC 20006
Tel: 202-719-7032
Facsimile: 202-719-7049


Nathaniel Edmonds
NATHANIEL B. EDMONDS
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice