## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

### DEFENDANT'S CONSOLIDATED REPLY IN SUPPORT OF HIS MOTIONS IN LIMINE

In anticipation of trial, defendant David H. Safavian made several motions in limine to prevent the government from placing its thumb on the scales of justice by introducing prejudicial, speculative, irrelevant and/or unauthenticated evidence in its case-in-chief. Two principal concerns underly Mr. Safavian's effort to exclude this evidence. First, the government is attempting to preclude Mr. Safavian from confronting the government's witnesses—in violation of Mr. Safavian's Confrontation Clause rights under the Sixth Amendment—by using testimonial evidence against him without affording him the opportunity to test its reliability in the crucible of cross-examination. To address this concern—and force the government to present its case through witness testimony that can be cross-examined—Mr. Safavian filed motions seeking to reject Rule 902(11) certifications of key documents and exclude hearsay documents, including portions the July 26, 2002 ethics response. See Documents # 67, 68 (filed Apr. 14, 2006).

Second, Mr. Safavian seeks to prevent the government from impermissibly expanding the scope of its prosecution to encompass previously uncharged and prejudicial allegations of conflicts of interest, ethics violations, gratuities or false statements in violation of principles of

due process and the Federal Rules of Evidence.  These arguments will tempt the jury to decide

Mr. Safavian's guilt on grounds different from those alleged in the indictment, and confuse the

jury as to which charges Mr. Safavian actually faces.  Accordingly, Mr. Safavian has filed

motions to limit the type of evidence and nature of arguments the government can put forth to

those that are directly related to the charges in the indictment.  See Documents # 64, 65, 69, 70

(filed Apr. 14, 2006).

   To protect Mr. Safavian's constitutional rights and ensure him a fair trial, this Court

should grant all of his Motions in Limine.

I.    **THE GOVERNMENT'S MOTION FOR SELF-AUTHENTICATION OF
      HEARSAY DOCUMENTS THROUGH RULE 902(11) CERTIFICATIONS
      SHOULD BE REJECTED.**

   The government has requested that the Court allow the self-authentication of business

records pursuant to Rule 902(11) ("certification(s)").  To be clear, Mr. Safavian is not contesting

the authenticity of the credit card and bank statements or foreign receipts.  Moreover, the

government has indicated that it will not seek to authenticate or prove the admissibility of the

GSA-OIG investigative file through the GSA records.  This leaves two categories of

certifications:  the Greenberg Traurig emails ("emails") and the Ellison ethics response.  Mr.

Safavian objects to both proposed certifications because neither includes sufficient facts to

ascertain whether the purported records (or duplicates of electronically filed records) meet the

requisite indicia of trustworthiness to meet the business records hearsay exception under Rule

803(6).

   A.    **The Greenberg Traurig Emails**

   The Court should not allow the prosecution to circumvent the Confrontation Clause

through preliminary determination of admissibility.  See Gov't Resp. to Mot. in Limine to Deny

the Gov't's Rule 902(11) Certifs. 7-8 (Document #78).  The government is attempting to use the

certifications to admit the documents without calling the authors of the emails.[1]  The government

does not want to put Mr. Abramoff, Mr. Rudy, or anyone else associated with Greenberg Traurig

on the witness stand.  This procedural ploy is in direct violation of the Sixth Amendment's

Confrontation Clause, especially in light of <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  It is

not just the certifications that are testimonial; it is the emails themselves.  Both the certifications

and the underlying emails are testimonial evidence, (1) offered without proof of the declarant's

unavailability and (2) without any opportunity for the defendant to cross-examine the declarant.

"They are the functional equivalent of ex parte in-court testimony that defendants cannot cross-

examine.  Indeed, the Rule 902(11) procedure itself takes the place of live, sworn testimony of a

witness."  <u>United States v. Wittig</u>, No. 03-40142JAR, 2005 WL 1227790, at *2 (D. Kan. May

23, 2005).

     The idea that generic[2] certifications can vouch for the reliability of email messages is also

particularly troubling.  First, "[e]-mail is far less of a systematic business activity than a monthly

inventory printout.  E-mail is an ongoing electronic message and retrieval system whereas an

---

[1]       If Rule 104(a) allows the consideration of Rule 902(11) certifications to determine admissibility, it would have likewise permitted admissibility determinations on the basis of declarations and affidavits before the enactment of Rule 902(11).  But, before Rule 902(11), the federal courts did not permit such practices.  <u>United States v. Wittig</u>, No. 03-40142JAR, 2005 WL 1227790, at *2 (D. Kan. May 23, 2005).

[2]       The certifications are just conclusory statements purporting to satisfy Rule 902(11).  <u>See, e.g.</u>, Nogle Certif., Ex. 1 to Def.'s Mot. in Limine to Deny the Gov't's Rule 902(11) Certifs. ("My name is Jay Nogle.  I am an official custodian of records for Greenberg Traurig, LLP. . . . [I]n my capacity as records custodian, I certify that each of the following documents meet[s] the requirements listed above and set forth by Fed. R. Evid. 902(11).").  Clearly, Mr. Nogle cannot say that he looked at over 400,000 emails.  This cannot suffice.  <u>See</u> <u>Rambus v. Infineon Tech. AG</u>, 348 F. Supp. 2d 698, 702-04 (E.D. Va. 2004) (explaining that a custodian who testifies merely that exhibits are gathered from company records which the company is in the regular practice of keeping is not qualified).

     Moreover, each certification fails to demonstrate that the records were "relied upon by the business in the performance of its functions."  <u>United States v. Wells</u>, 262 F.3d 455, 463 n.8 (5th Cir. 2001).  Business records are considered trustworthy because "businesses depend on such records to conduct their own affairs; accordingly, the employees who generate [and maintain] them have a strong motive to be accurate and none to be deceitful."  <u>Certain Underwriters at Lloyd's, London v. Sinkovich</u>, 232 F.3d 200, 204-05 (4th Cir. 2000).  Because the certifications do not show that the relevant businesses relied upon the records sought to be authenticated, the records lack this important indicium of reliability

electronic inventory recording system is a regular, systematic function of a bookkeeper prepared in the course of business." Monotype Corp, PLC v. Inter. Typeface Corp., 43 F.3d 443, 450 (9th Cir. 1994) (affirming the exclusion of email messages). Much of the evidence the government wants to introduce are emails buried multiple layers deep in email chains that have been edited and re-edited multiple times by different authors. This creates its own admissibility problems: authenticity and hearsay within hearsay. See Fed. R. Ev. 805.

As this Court is likely aware, when forwarding or responding to emails, a sender can completely alter the text of the previous email(s) and make it appear that the original author made statements that he in fact did not. Many of the Greenberg Traurig emails in this case have been edited and re-edited, and the government therefore has the obligation to establish the authenticity of each layer of the email chain before they can be introduced. See New York v. Microsoft Corp., No. Civ A. 98-1233, 2002 WL 649951, at *5 (D.D.C. 2002) ("[T]he multiple authors and forwarded nature of this series of emails undercuts the reliability of the information contained therein."). The appearance of these email messages also undermines their authenticity. For example, several of the Greenberg Traurig email messages appear to have inconsistent time stamps or otherwise appear to have been altered. See, e.g., DS-007437 (inconsistent time stamps); DS-007439 (same); DOJ-DS-001125 (appears to be missing part of an email chain; unclear who drafted which text). It is simply untenable to contend that this Court should accept as authentic some 467,000 pages of emails that (1) are not properly authenticated by an appropriate custodian, and (2) do not appear facially reliable.

### B. The Ellison Ethics Response

Count Two of the Indictment charges Safavian with making a false statement in connection with "seeking and obtaining a GSA ethics opinion regarding his travel" to Scotland with Mr. Abramoff. Indictment ¶ 29. The factual predicate for this charge alleges that "[y]ou

stated that neither Jack Abramhoff [sic] or his firm does business or is seeking to do business

with the GSA.  Based upon the information you have provided, you may accept the gift of free

transportation from your friend."  See id.; Def. Motion to Exclude Ethics Response Ex. A.

Unlike the Greenberg Traurig emails, this is not a case of the government not wanting to

put on an authenticating witness.  Here, the government has conceded that it does not have a

competent witness who can testify that Mr. Safavian made the above-referenced statement.

Thus, the statement is inadmissible hearsay.  The government asserts two alternative theories of

admissibility for the hearsay statement:  it is either admissible under Rule 803(6) as a business

record or under Fed. R. Evid. 801(d)(2)(B) as an adoptive statement by Mr. Safavian.  However,

neither of these exceptions to the general rule banning hearsay is applicable, and this Court

should exclude the document, unless the hearsay statement is redacted, from being introduced as

evidence at trial.

## 1.     The July 26, 2002 Ethics Response Is Not a Business Record of the GSA.

First, the government has not shown that either copy of the ethics response is a "business

record" pursuant to Rule 803(6).  It is axiomatic that a business record must be maintained in the

regular course of a business.  See United States v. Wells, 262 F.3d 455, 460 n.3 (5th Cir. 2001)

(noting that a business practice of regularly destroying weekly ledgers might not satisfy the "kept

in the regular course" requirement of Rule 803(6)).  There is no record from the GSA

memorializing the request or response, despite Mr. Safavian's early discovery request for any

information regarding GSA's practice of responding to ethics inquiries.  See Letter from Barbara

Van Gelder, Defense Counsel, to Peter Zeidenberg and Nathaniel Edmonds, U.S. Dep't of

Justice, at 6, item 27 (Sept. 26, 2005) (requesting "all records, documents and information

relating to any and all ethics opinions"); Letter from Peter Zeidenberg and Nathaniel Edmonds to Barbara Van Gelder, at 1, item 2(b) (Oct. 19, 2005).

Instead of producing a GSA Office of General Counsel ("OGC") file, the government is relying on a Greenberg Traurig-stored email to be a GSA business record. If the ethics response were truly a GSA business record, it would have been maintained by the GSA Office of General Counsel and retained pursuant to GSA's document retention policy. United States v. Humphrey, 279 F.3d 372, 378 (6th Cir. 2002) (finding memo inadmissible as business record of SunTrust Bank in the absence of evidence the memo was filed in SunTrust's records). However, the government has not produced a GSA copy of the actual email ethics response sent from Mr. McKenna to Mr. Safavian, because both persons' emails were destroyed pursuant to a GSA official policy to destroy transient, non-evidentiary material after 90 days. See Motion to Exclude Hearsay in the July 26, 2002 GSA Ethics Response at 7 n.4 and accompanying text (Document # 67).[3]

Moreover, Ms. Ellison's draft response is not a GSA business record. While there is no dispute that Ms. Ellison kept a personal copy of what *she wrote*—a prudent move for any employee—her cover letter clearly indicates that she does not know what Mr. McKenna did with her draft. It is "a copy of a response that I gave Ray. I don't know if he ever sent it to you or just telephoned the response." See Document # 67 Ex. B.

The government's proffer that "it was Ms. Ellison's job to provide such opinions as part of her duties as the GSA ethics adviser . . . and to keep a record of it for future reference" is still inadequate to deem the ethics response as a business record. See, e.g., Gov't Resp. at 9

---

[3]     The reliance on Greenberg Traurig's email to memorialize communications within the GSA hampers the defense. Because of the GSA's email deletion, we will never know if there was additional email communication between Mr. McKenna, Mr. Safavian and/or Ms. Ellison.

(Document #80, filed Apr. 25, 2006).  It is unclear from this proffer, whether the GSA OGC

maintained a copy of the opinion or Ms. Ellison kept her own personal file.  See Hertz v.

Luzenac Am., Inc., 370 F.3d 1014, 1018 (10th Cir. 2004) (finding memo of a meeting

inadmissible without evidence it was the business's regular practice to prepare such memos).[4]

Notably, there is no affidavit from Ms. Ellison or offer to produce Ms. Ellison in a pre-trial

hearing to support the government's contentions.

　　　　The uncertainty surrounding the trustworthiness of the hearsay statement of Mr. Safavian

is evident by the lack of a witness who can testify that Mr. Safavian actually said the words

recorded in the response.  Thus, the government is left with a hearsay statement within a hearsay

record or, as it is commonly referred, double hearsay.  There is no evidence that the statement

ascribed to Mr. Safavian in the response is accurate.[5]  Indeed, the need for trustworthiness is

significantly heightened here, where the words that form the basis for criminal liability are at

issue.  The government does not allow for the fact that at some point during the drafting of the

response, the facts became distorted.  See Ricciardi v. Children's Hosp. Med. Ctr., 811 F.2d 18,

---

[4]　　　　In addition, the government also makes numerous speculative inferences that have no support in the record.
For example, the government asserts that "after receiving defendant's written inquiry, it was clear to [Ms. Ellison]
that there was inadequate information in it to provide the requested guidance."  See Gov't Opp. at 2.  However, there
is no proffer from the government to explain what, if anything, Ms. Ellison did to get additional information.  The
government also claims that Ms. Ellison followed "standard practice" with respect to this ethics opinion but does not
explain what "standard practice" is or where it is maintained.  See Gov't Opp. at 3.  In addition, the government
speculates that, "Ms. Ellison could not have drafted her ethics opinion without knowing whether or not Abramoff or
his firm was 'seeking to do business' with GSA."  See Gov't Opp. at 11.  This completely ignores the possibilities
that Ms. Ellison mistakenly believed Mr. Safavian said "seeking to do business," or that information was relayed to
her inaccurately.  It is these very probabilities that make the ethics response unreliable.

[5]　　　　The government further argues that the "seeking to do business" language is reliable because the ethics
response is "accurate on all other points."  See Gov't Opp. at 11-12.  However, the government inadvertently
provides further support for the unreliability of this attribution.  A close comparison of the ethics response with Mr.
Safavian's original email request for the opinion reveals that every fact recited therein comes directly out of Mr.
Safavian's email request except for the following three things: (1) the words "Jack Abramoff" in the second
sentence; (2) the words "Greenberg and Traurig" in the fifth sentence; and (3) the entire sentence "You stated that
neither Mr. Abramoff nor his firm does business with or is seeking to do business with GSA."  Compare July 26,
2002 Ethics Response, Def. Mot. to Exclude Ethics Response Ex. A, B, with July 25, 2002 Ethics Request, Def.
Mot. to Exclude Ethics Response Ex. B.

23 (1st Cir. 1987) ("Although . . . there is no indication that the patient himself provided the information, the note suffers from the same critical deficiency as the entries in Petrocelli:  the source of the information is unknown.").

One of the cases[6] cited by the government does provide a useful comparison.  In United States v. Jacoby, 955 F.2d 1527 (11th Cir. 1992), a court admitted as a business record a memo memorializing statements made by the defendant, Jacoby, during a telephone conversation.  The court made an extensive inquiry into the process by which the memo was created.  However, the circumstances surrounding the record in Jacoby are quite different from this case:  first, the exact words used by the defendant were not at issue in Jacoby; second, there were no personal knowledge or error-in-transmission problems in Jacoby because the procedure used to create the memo and the source of information were known.  See Jacoby, 955 F.2d at 1536.  Furthermore, the Jacoby court recognized that, while not dispositive, whether the creation of a record is "routine" is a factor to be considered in an 803(6) analysis.  See id. at 1537.

Accordingly, the chances are too great that Ms. Ellison was merely tracking the language of the C.F.R.—out of habit, because she misunderstood Mr. Safavian, or because information was relayed to her incorrectly.  Moreover, the potential prejudice that would result from introducing hearsay evidence of such questionable reliability is particularly great here, where the hearsay at issue is the sole basis of criminal liability for making the allegedly false statement of "seeking to do business."

---

[6]     The remainder of cases cited by the government merely stand for the proposition that in most cases concerning business records, there is no reason to question the trustworthiness *solely* on the basis that it is unknown who actually made the record or transmitted the information.  This is not the case here, where we know who wrote the record that contains the out-of-court statement, but do not know who heard the alleged statement or whether the statement was ever made, and the statement is inconsistent with other evidence in this case.  See Fed. R. Evid. 803(6) advisory committee's note (1972) ("[T]he assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.").

### 2.    The Transmittal of an Ethics Response Is Not Admissible As An Adoptive Admission.

Many of the issues raised in the government's argument on this point are addressed in the Defendant's Opposition to Government's Motion for Pre-Trial Admissibility.  See Def. Opp. to Mot. for Admissibility at 20-21.  The government's argument that Mr. Safavian adopted the language in the ethics opinion through silence has no support in the law.[7]  The government has a high burden to introduce a statement against a defendant on the grounds that the statement was adopted by silence.  In criminal matters, silence by the defendant in the face of a non-accusatory statement is not sufficient for adoption under Rule 801(d)(2)(B).  See United States v. Williams, No. 04-5126, 2006 WL 998207, at *9 (4th Cir. Apr. 18, 2006) (finding that when a statement is not an accusation of wrongdoing, silence is not an adoption).[8]

Furthermore, Mr. Safavian did not adopt every fact recited in the ethics opinion through words or conduct.  Forwarding the email to Abramoff along with the statement, "Jack – fyi.  It looks like Scotland is a go," is not sufficient to show that Mr. Safavian "understood and unambiguously assented to" the statements at issue, namely the language "seeking to do business."  United States v. Beckham, 968 F.2d 47, 51 (D.C. Cir. 1992) (quoting Naples v.

---

[7]     Nor does it have support in fact.  During a May 26, 2005 meeting between Safavian and the FBI, an agent read the July 26, 2002 ethics response to him.  The Safavian 302 states, "Safavian stated that the ethics opinion said that Greenberg Traurig had *no business* with GSA.  Safavian never told McKenna that Greenberg Traurig did not have business with GSA."  See Safavian 302 at 6 (May 26, 2005) (DOJ-DS-001367) (emphasis added).  First, this excerpt demonstrates that Safavian did not realize that the ethics response added the language "seeking to do business" to his initial request, and therefore Safavian could never have adopted that language pursuant to Rule 801(d)(2)(B) because his lack of knowledge negates the possibility that at any point in time he "understood and unambiguously assented" to that language.  United States v. Beckham, 968 F.2d 47, 51 (D.C. Cir. 1992).  Second, it also shows that the ethics response did put words in Safavian's mouth that were never said, and therefore the circumstances of its preparation indicate a lack of trustworthiness and can not be admitted pursuant to Rule 803(6).  Furthermore, if the government had wanted to know for sure if Mr. Safavian said "seeking to do business," it should have asked him during that interview—it did not.  The government should not now be unjustly enriched by its failure to definitively resolve the issue when it had the opportunity.

[8]     The sole case cited by the government on this point, United States v. Ward, 377 F.3d 671 (7th Cir. 2004), does not change this analysis.  In Ward, the statement adopted by the defendant was "the money they got when they robbed the bank."  Id. at 675.  This statement is accusatory because it implies wrongdoing.

United States, 344 F.2d 508, 512 (D.C. Cir. 1964), overruled in part on other grounds, Fuller v.

United States, 407 F.2d 1199, 1221-22, 1230 n.42 (D.C. Cir. 1967)) (alterations omitted).

Nothing in Mr. Safavian's words or conduct indicate understanding and unambiguous assent to

every statement contained therein.  See Naples, 344 F.2d at 512 (holding that a brief response to

a "lengthy statement . . . gives little assurance that [the defendant] adopted, as his own

admission, every detail of the statement"); see also Garcia-Martinez v. City and County of

Denver, 392 F.3d 1187, 1195 (10th Cir. 2004) (accepting legal penalty, without admitting to the

underlying facts, does not constitute an adopted admission of the factual recitation).  The burden

on the government to show both understanding and unambiguous assent is particularly relevant

here, where the "seeking to do business" language is buried at the end of a rather lengthy

paragraph.[9]

     The government also argues that Mr. Safavian adopted the contents of the ethics response

by simply including it in his response to the Senate Committee on Indian Affairs' ("SCIA")

document request.  However, SCIA clearly requested "all records reflecting, referring or relating

to the 2002 Scotland golf trip."  See Ex 11 to Def.'s Mot. to Dismiss (Document #32, filed Jan.

27, 2006).  Mr. Safavian included the July 26, 2002 ethics response in his reply because it was

clearly responsive to their request, not—as the government argues—because it would deceive the

Committee.  Moreover, although Mr. Safavian's letter to Chairman McCain referred to the ethics

response, it merely restated the document's conclusions.  See Ex. 13 to Def.'s Mot. to Dismiss.

---

[9]     The cases cited by the government are inapplicable.  In Pilgrim v. Trustees of Tufts College, 118 F.3d 864 (1st Cir. 1997)—a civil case—the court held that Tufts University adopted a report, prepared by three Tufts faculty members, when the report made three specific recommendations, all of which were implemented by the President of Tufts.  See id. at 867, 870.  In contrast, the July 26, 2002 ethics response made only one recommendation, which Mr. Safavian did not implement because he chose not to accept the gift.  Furthermore, Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264 (10th Cir. 1998), is irrelevant for the same reasons.  In Wright-Simmons, another civil case, the Court found that the city adopted a report prepared by a city employee, when the City Manager implemented the recommendations of the report.

It did not indicate unambiguous assent to the underlying facts.  See Garcia-Martinez, 392 F.3d at

1195.  Finally, the letter made clear to the Committee that Mr. Safavian did not implement the

recommendations of the ethics response.  See Ex. 13 to Def.'s Mot. to Dismiss.

## II.    THE COURT SHOULD REJECT THE GOVERNMENT'S ATTEMPTS TO EXPAND THE INDICTMENT THROUGH FRE 404(B).

Rule 404(b) specifically requires the government to "provide reasonable notice in

advance of trial" of the general nature of any evidence it seeks to admit under the rule.  Although

the government filed one Rule 404(b) notice, see Rule 404(b) Notice Regarding TYCO

(Document # 31, filed Jan. 27, 2006), it failed to provide prior notice of its recent claims that

evidence of unalleged gratuities and other offenses is admissible under Federal Rule of Evidence

404(b).[10]  This latest attempt to expand the case beyond the Indictment, as well as the prior

attempt to introduce post-Indictment activity regarding TYCO, distorts the Indictment and will

"lure the factfinder into declaring guilt on a ground different from proof specific to the offense

charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997).  Moreover, the government has

failed to consider that the introduction of such a wide range of arguments will confuse the jury

and necessitate a "trial within a trial."

### A.    TYCO

The government contends that in November 2003, Mr. Safavian provided Jack Abramoff,

who was purportedly working as a lobbyist for TYCO at the time, with confidential GSA

---

[10]      These new accusations include committing ethics violations and facing uncharged criminal prosecution for conduct at GSA.  See Gov't Resp. to Mot. to Preclude Admission of 404(b) Evidence and to Exclude Evidence of Uncharged Offenses at 3 ("unethical and inappropriate relationship with Abramoff"); id. at 4 ("improper, unethical relationship"); id. at 6 ("relationship with Abramoff . . . would have been fatal to defendant's career"); id. at 10 ("long history of illegal or, at the very least, highly unethical conduct"); id. at 11 ("pattern of unethical conduct engaged in by defendant"); id. ("defendant could have faced criminal exposure").

Even more troubling is the government's accusation that Mr. Safavian and Mr. Abramoff engaged in *quid pro quo* gratuities and bribery.  See id. at 4 ("Abramoff provided to defendant a commensurate stream of gifts, including tickets for professional sporting events either court-side or in Abramoff's luxury boxes, countless free rounds of golf, [and] meals at Abramoff's restaurants . . ."); id. at 3 ("The evidence will show that . . . defendant began providing Abramoff with a steady stream of sensitive and confidential GSA information.").

information relating to the agency's deliberations concerning the possible suspension of four

TYCO subsidiaries.  In its Rule 404(b) Notice, the government suggests that alleged

communications between Mr. Safavian and Mr. Abramoff are proof of Mr. Safavian's "motive

and intent" when he made certain representations to the GSA ethics officer in 2002, the GSA-

OIG in the spring of 2003, and Senate investigators in 2005, as well as proof that Mr. Safavian's

representations "were not made by mistake or accident."  Jan. 27, 2006 Gov't Rule 404(b)

Notice.  However, beyond these conclusory statements, the government provides this Court with

no legal bases to admit this evidence at trial.

The government fails to explain how the TYCO evidence has any bearing on the

elements of either 18 U.S.C. § 1001 or 18 U.S.C. § 1505.  Instead, the government elects to use

its opportunity to respond to Mr. Safavian's specific arguments by making general statements

regarding a supposed "improper" and "unethical" relationship that serve only to recast the TYCO

communications as character evidence; Rule 404(b) expressly prohibits such evidentiary

gamesmanship.  Fed. R. Evid. 404(b) (prohibiting the introduction of evidence "to prove the

character of a person in order to show that he acted in conformity therewith").

Rather than respond directly to the temporal disconnect that exists between the November

2003 TYCO e-mails and the July/August 2002 GSA ethics request, the government summarily

cites a case that stands for the proposition that "other crimes evidence" can be relevant "whether

the conduct occurs before or after the offense charged."  United States v. Latney, 108 F.3d 1446,

1450 (D.C. Cir. 1997).   What the government fails to reconcile, however, is how the TYCO

evidence is "fairly recent" or "in some significant way connected with prior material events."

Watson, 894 F.2d at 1349.

The government suggests that excluding the TYCO evidence would allow Mr. Safavian to "argue to the jury that he simply had no motive to lie to anyone."  Gov't Resp. to Mot. to Preclude Admission of 404(b) Evidence and to Exclude Evidence of Uncharged Offenses at 11 (Document # 77, filed Apr. 25, 2006).  The TYCO evidence, however, contains no misstatement upon which a jury could infer a motive or intent to make false statements or obstruct a governmental investigation.  Rather, the government wants to use the fact that "TYCO was a lobbying client of Mr. Abramoff's" to show that Mr. Safavian had a propensity for favoring Mr. Abramoff.  Id. at 2.  The government should not be allowed to gloss over the fact that the TYCO evidence is unrelated to this case and use it to sully Mr. Safavian's character by casting his relationship with Abramoff as being "unethical and inappropriate."  Id. at 3.  The truth in Mr. Safavian's statements as it relates to the TYCO evidence necessarily undermines the very basis for the government's Rule 404(b) Notice.  Mr. Safavian has never contested the fact that he knew Mr. Abramoff or that their relationship extended as far back as 1995.  What Mr. Safavian does refute is the government's insistence on casting Mr. Safavian's friendship in such a light that it becomes improper character evidence.

The government's improper attempt to introduce this impermissible character evidence is revealed in its argument that additional e-mails, wholly unrelated to the TYCO evidence, establish Mr. Safavian's motive and intent to lie.  The government maintains that Mr. Safavian's desire to keep his communications with Mr. Abramoff from the public view is supported by the fact that Mr. Safavian often sent and received e-mails from his home e-mail account, hoping  that these e-mails "would not ever be captured by the GSA computer system."  Gov't Resp., at 12.  The government cites to a January 13, 2003 e-mail to Mr. Abramoff in which Mr. Safavian writes, "Hope this helps.  Please don't forward this email onward.  Rather if you can let them

know via phone, or put it into a separate email as though it came from you, that would be more appropriate." Id. n.12.  This e-mail, written over nine months *before* the TYCO e-mails, has nothing to do with the TYCO evidence—evidence that serves as the sole basis for the government's Rule 404(b) Notice.  Yet this argument demonstrates the government's insistence on inundating this Court and the jury with seemingly unlimited e-mails that cast a negative light on Mr. Safavian's character.  Whether Mr. Safavian received or sent e-mails from his home account has absolutely no relevance to the TYCO evidence.  To allow this irrelevant evidence to be considered by the trier of fact would lead to jury confusion and a trial within a trial—a result this Court has specifically prohibited.  United States v. Linares, 367 F.3d 941, 945-46 (D.C. Cir. 2004).

Finally, the government never addresses this Court's requirement that there be a "clear and logical connection" between the TYCO evidence and the "the case being tried."  United States v. Watt, 911 F. Supp. 538, 558 (D.D.C. 1995).  The government also ignores the "fundamental tenet in our criminal jurisprudence . . . that a jury should not premise its verdict upon a general evaluation of the defendant's character but rather upon an assessment of the evidence *relevant to the particular crime with which the defendant is presently charged*."  United States v. Nicely, 922 F.2d 850, 856 (D.C. Cir. 1991) (emphasis added).  The government is left only with its shallow contention that an allegedly inappropriate relationship is sufficient to allow for the introduction of numerous e-mails and additional fact witnesses relating to the TYCO suspension, none of which bears any relevance to § 1001 or § 1505.

### B.    Other Unindicted Crimes or Ethical Violations

The government recognizes that admission under Rule 404(b) requires a sufficient basis for the jury to reasonably conclude that the act occurred and involved Mr. Safavian.  Gov't Resp. at 6-7 n.7 (citing Huddleston v. United States, 485 U.S. 681, 689 (1988)).  Meeting this burden

requires two showings by the government:  1) Mr. Safavian knew how much the Scotland trip cost and therefore understood that $3,100 was less than the full amount of his pro rata share; and 2) Mr. Safavian accepted other gifts offered by Mr. Abramoff.

The government views the valuations of the trip as a simple exercise in arithmetic (divide the total cost by the number of passengers), but its basis for doing so is flawed.  First, the government relies on a regulation that does not govern acceptance of gifts.  See Gov't Resp. at 13 n.15 (citing 41 C.F.R. § 304-6.6(d) (explaining how to calculate the value of payment-in-kind to the GSA)).  Next, the government fails to realize that the calculation of the cost of Mr. Safavian's trip, as well as the valuation of the newly alleged offers of "luxury boxes, countless free rounds of golf, [and] meals at Abramoff's restaurants," requires determination of the fair market value of any alleged gifts, or a good faith estimate of the "retail cost of similar items of like quality." 5 C.F.R. § 2635.205.  Consequently, the valuation of the trip and other alleged gifts will require the admission of retail costs of each of these items and testimony on which parts of the trip and other outings Mr. Safavian participated in.  This will create a trial within the trial merely on what Mr. Abramoff offered, what Mr. Safavian accepted, what Mr. Safavian paid for himself, the value of these offerings, and whether any of these gifts were tied to any official acts.  See United States v. Sun-Diamond Growers, 526 U.S. 398, 406-07 (1999).

### C.     The Government's 404(b) Evidence Fails the Rule 403 Balancing Test.

Any evidence introduced under Rule 404(b) must also pass a Rule 403 balancing test.  As explained above, arguments accusing Mr. Safavian of unalleged offenses will be unfairly prejudicial and confusing to the jury.  See United States v. Melia, 691 F.2d 672, 676-77 (4th Cir. 1982) (ruling that trial court abused its discretion by admitting testimony that defendant planned other burglaries, even assuming such evidence was relevant and necessary to show intent,

because, among other reasons, it was unnecessary to show "such a wide range of 'other bad acts'").

More important, there is no evidence to suggest that Mr. Safavian accepted the "stream of gifts" offered by Mr. Abramoff, and therefore, there is no factual prerequisite to support the unalleged "other crimes."  See Huddleston, 485 U.S. at 689 ("The strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing.").  Also, the government has never alleged that Mr. Safavian knew the total cost of the trip.  See United States v. Linares, 367 F.3d 941, 948 (D.C. Cir. 2004) (Rule 404(b) evidence offered for intent does not show knowledge).  Indeed, it is uncontested that Mr. Abramoff told Mr. Safavian that his portion of the trip cost $3,100.  Finally, the government never explains how Mr. Safavian "concealed" the total cost of the trip from the ethics officials, when the facts set forth in the Indictment reveal that he did not know what the cost of the trip was until after he received ethics approval.  Compare Gov't Resp. to Def.'s Mot. to Preclude Admission of 404(b) Evidence at 6, 12 with Indictment ¶ 37.

At essence, the government is using "motive" as a ruse to admit rampant speculation. See Fed. R. Evid. 602 (requiring a witness to have personal knowledge of matters testified to) & 701 (limiting a lay witness's opinion testimony to opinions "rationally based on the perception of the witness"); Coles v. Perry, 217 F.R.D. 1, 8 (D.D.C. 2003) ("While Love might be able to testify as to what she saw and heard, her divination of why Dutton acted crosses the line from a legitimate opinion based on a perception to a speculation as to a witness's motives.  It is the difference between a witness testifying that a man was drunk and that a man was drunk because he was drowning his sorrows ever since his wife left him."); United States v. Ruppel, 666 F.2d

-16-

261, 270 (5th Cir. 1982) ("The admission of opinion testimony about a defendant's state of mind is highly prejudicial and must be avoided.").

Particularly disturbing is the government's suggestion that a witness might be permitted to testify that, had Mr. Safavian provided information he did not disclose, he might have been subject to a criminal referral for violating federal bribery and wire-fraud statutes. Gov't Resp. to Def.'s Mot. to Preclude Admission of 404(b) Evidence at 4 n.5. Such testimony would be devoid of probative value, and its implication that Mr. Safavian committed crimes not charged in the indictment is highly and unfairly prejudicial and would likely mislead the jury. Fed. R. Evid. 403. The government has not charged Mr. Safavian with criminal acts insofar as his underlying relationship with Mr. Abramoff is concerned. Yet permitting a witness to suggest that Mr. Safavian's relationship with Mr. Abramoff was potentially criminal would certainly muddy the waters with respect to what precisely Mr. Safavian is on trial for—going on the golf trip or (according to the government) concealing Mr. Abramoff's inquiries.

The government also appears to concede the rule that its witnesses cannot offer opinions as to legal conclusions, but immediately thereafter suggests that its witnesses should, nonetheless, be permitted to do just that.[11] The government's brief makes its intention clear. The government intends to have at least some of its witnesses offer their opinion that Mr. Abramoff's contact with the GSA amounted to "work,"[12] seeking official action,[13] or doing or

---

[11] Such questioning is particularly inappropriate insofar as Raymond McKenna and Eugenia Ellison are concerned. Both have stated in witness interviews that they do not recall speaking to Safavian concerning his request for an ethics opinion. The government intends to have one or both speculate as to the impact of a conversation neither can remember having. Further, the government presumably intends to have one or both speculate as to the impact of *hypothetical* statements or actions on a conversation that neither can remember having.

[12] Contrary to the government's suggestion, Mr. Safavian does not concede that a government witness may offer their opinion as to whether Mr. Abramoff was doing "work" with the GSA.

[13] The government appears to suggest for the first time that Mr. Abramoff was a "prohibited source" because he was "seeking official action." 5 C.F.R. § 2635.203(d)(1).

seeking to do business with the GSA and, therefore, that Mr. Abramoff was a "prohibited source" as that term is defined in federal regulations.[14]  Such conclusions are necessarily legal conclusions—they involve an understanding, interpretation, and application of federal law to reach a legal opinion as to Mr. Abramoff's status as a "prohibited source."  Nothing in the government's response provides any reason why the bar on legal opinions by witnesses should be relaxed because it might be beneficial to the prosecution.

Respectfully submitted,

By: /s/ Barbara Van Gelder
    Barbara Van Gelder (D.C. Bar # 265603)
    Roderick L. Thomas (D.C. Bar # 433433)
    Albert C. Lambert (D.C. Bar # 489562)
    WILEY REIN & FIELDING LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032

Dated: May 2, 2006                    *Attorneys for David H. Safavian*

---

[14]    From that conclusion, the government would then seek to have the witness speculate as to their likely response had they "known" about Mr. Abramoff's interaction with the GSA or his alleged status as a "prohibited source."