# Exhibit 1

# "Gimme Five"— Investigation of Tribal Lobbying Matters

# CONTENTS

|  | Page |
|---|---|
| Table of Names | vi |
| Table of Entities | ix |
| Investigation Hearings | xii |
| Investigation Staff List | xv |
| Introduction | 1 |
| Executive Summary and Findings | 9 |

## Part One - Fact Summary by Tribe

| | Page |
|---|---|
| I. Mississippi Band of Choctaw Indians | 15 |
|   A. Introduction | 15 |
|   B. Background on Tribe | 16 |
|   C. Background on Abramoff and the Tribe's Relationship | 18 |
|   D. Substantial Fees and Conduit Organizations | 23 |
|   E. Abramoff Brings Scanlon to the Choctaw | 31 |
|   F. Abramoff Directs Choctaw to Make Contributions | 36 |
|     1. 2000 Scotland Golf Trip | 36 |
|     2. Sports Suites | 36 |
|     3. Liberty Consulting Services | 37 |
|   G. Conclusion | 38 |
| II. Coushatta Tribe of Louisiana | 40 |
|   A. Introduction | 40 |
|   B. Background on Tribe | 42 |
|   C. Abramoff and Scanlon Get the Coushatta's Business | 44 |
|   D. Scanlon's Grassroots Projects for the Tribe | 52 |
|   E. Conclusion | 58 |
| III. Saginaw Chippewa Tribe of Michigan | 59 |
|   A. Introduction | 59 |
|   B. Background on Tribe | 60 |

C. Christopher Petras—Abramoff and Scanlon's Access to the Tribe ............ 62
D. "Slate of Eight"—Abramoff and Scanlon's Trojan Horse ........................ 65
E. The Tribe Hires Abramoff and Scanlon ................................................ 74
F. Abramoff on Client Management—"keeping our people in power" ......... 79
G. Christopher Petras' Hearing Testimony Is Not Credible ........................ 86
    1. Petras' Relationship With Abramoff and Scanlon .......................... 87
    2. Problems With Petras' Testimony ................................................ 90
H. Abramoff and Scanlon Privately Express Contempt for the Tribe ............ 94
I. Conclusion ...................................................................................... 97
IV. AGUA CALIENTE BAND OF CAUHILLA INDIANS ........................................ 99
A. Introduction ..................................................................................... 99
B. Background on Tribe ......................................................................... 100
C. Abramoff and Scanlon Offer the Promised Land .................................. 102
D. Scanlon Works on Patencio's and Siva's 2002 Elections ........................ 109
    1. Mail .......................................................................................... 112
    2. Door-to-Door ............................................................................. 113
    3. Telephone ................................................................................. 114
    4. Candidates' Meeting .................................................................. 114
E. The Tribe Hires Abramoff and Scanlon .............................................. 115
F. Abramoff and Scanlon Seek Additional Money From the Tribe ............... 125
G. Abramoff and Scanlon's Work for the Tribe ......................................... 127
H. 2003 Elections ................................................................................. 129
I. Chapman and Sierra Dominion ........................................................... 130
    1. Payments to Chapman ................................................................ 131
    2. Payments to Sierra Dominion ...................................................... 136
J. Conclusion ....................................................................................... 139
V. YSLETA DEL SUR PUEBLO (TIGUA) .......................................................... 140
A. Introduction ..................................................................................... 140
B. Background on Tribe ......................................................................... 141
C. Abramoff, Scanlon, and Reed Work Against the Tigua .......................... 143
D. Abramoff and Scanlon Seek the Tribe's Money ................................... 147
E. Secrecy and Contributions ................................................................ 160
F. Abramoff and His Colleagues Set Their Plan in Motion in the House ........ 162
G. Scanlon Purportedly Sets the Plan in Motion in the Senate ................... 165
H. Things Begin to Unravel .................................................................... 169
I. Abramoff Asks the Tigua to Finance a Golfing Junket to Scotland ............ 172
J. The Tribe Meets Congressman Ney ..................................................... 175
K. Election Reform Passes Without the Tigua Provision ............................. 177
L. The Elder Legacy Project ................................................................... 180
M. Abramoff and Scanlon Attempt to Obstruct the Investigation ................. 181
N. Conclusion ...................................................................................... 182
VI. PUEBLO OF SANDIA OF NEW MEXICO ...................................................... 183
A. Introduction ..................................................................................... 183

B. Background on Tribe ................................................. 183
C. The Search for a New Lobbyist ................................. 185
D. Implementing the Plan ........................................... 188
E. The Database ........................................................ 190
F. Happy Ending in Spite of ... ..................................... 193

**Part Two - "Gimme Five" - Analysis by Entity**

INTRODUCTION ............................................................. 195
I. CAPITOL CAMPAIGN STRATEGIES ................................. 202
  A. Background ......................................................... 202
  B. Abramoff Conceals His Financial Relationship with Scanlon ...... 204
  C. Abramoff Induces the Tribes Into Hiring and Paying Scanlon ...... 207
  D. What Happened to the Money that the Tribes Paid Scanlon? ...... 213
    1. Snapshots of CCS' Representation of the Tribes .......... 213
      a. Transaction #1 (Miscellaneous) – Huge Profit Margins ....... 214
      b. Transaction #2 (August 2002) – Louisiana Coushatta and Agua
        Caliente Pay CCS a Total of $5,000,000 ............. 216
      c. Transaction #3 (October 2001 - January 2002) –
        Louisiana Coushatta Pays CCS $2,170,000 ............. 218
      d. Transaction #4 (January - April 2002) – Several Tribes Pay
        CCS over $22,000,000 ............................. 224
      e. Transaction #5 (October 16, 2002) – Louisiana Coushatta Pays
        CCS $950,000 and the Agua Caliente Pays CCS
        $1,745,000 to CCS ................................ 230
      f. Transaction #6 (January - March 2003) – Louisiana Coushatta
        Pays CCS $5,000,000 ............................. 232
    2. The "Database" .................................................. 235
      a. The Pitch .................................................... 236
      b. The Facts ................................................... 244
    3. CCS' Use of Fictitious Grassroots Organizations ......... 248
  E. Conclusion ......................................................... 253
II. AMERICAN INTERNATIONAL CENTER .............................. 255
  A. Introduction ....................................................... 255
  B. A Day at the Beach—How the AIC was started ............. 256
  C. Making It Look Real—Abramoff Has the AIC Post a Website ...... 262
  D. How Abramoff and Scanlon Used Conduits to Represent the Tribes ...... 268
  E. AIC as a "Gimme Five" Entity ................................. 273
  F. Conclusion ......................................................... 277
III. CAPITOL ATHLETIC FOUNDATION ............................... 278
  A. Introduction ....................................................... 278
  B. General Background on CAF ..................................... 279
  C. Abramoff Attempts to Secure Federal Funding for the CAF, and Fails ..... 281

D. Abramoff and Scanlon Misappropriate Tribal Funds for CAF Seed
   Money in 2001 ........................................................................... 282
   1. Abramoff and Scanlon Divert Coushatta Money to CAF ................ 282
   2. Abramoff's Misuse of CAF Money in 2001 ................................ 287
E. In 2002, Abramoff and Scanlon Scam Other Tribes Into Paying CAF ......... 289
   1. Abramoff Deceives the Saginaw Chippewa into Partially Funding
      a Golf Trip to Scotland – June through November 2002 ................. 290
   2. Abramoff and Scanlon Deceive the Choctaw Into Sending
      $1 Million to CAF – January and August 2002 .............................. 295
   3. Abramoff and Scanlon Misappropriate Another $1 Million from
      the Choctaw – October 2002 ........................................................ 299
   4. Abramoff's Misuse of CAF Funds in 2002 ........................................ 305
F. In 2003 Abramoff Funnels Tribal Money Through Conduits to CAF .......... 314
   1. Kaygold Sends Tribal Funds to CAF ............................................... 315
   2. Abramoff and Scanlon Use ARA as a Conduit to Funnel
      Coushatta Money to CAF ............................................................. 315
   3. Abramoff's Misuse of CAF Money in 2003 ........................................ 319
G. Conclusion .................................................................................... 321

**Part Three - Other**

I. COUNCIL OF REPUBLICANS FOR ENVIRONMENTAL ADVOCACY ....................................... 322
   A. Background ................................................................................ 322
      1. Abramoff Has His Tribal Clients Pay CREA ....................................... 324
      2. Federici Promises to Help Abramoff in Exchange for, or
         Because of, CREA Contributions .................................................... 328
   B. Abramoff and Federici Start Working Together ................................... 329
   C. Contributions in Exchange for Access? ............................................... 333
   D. What Did Federici Do For Abramoff's Clients at Interior? ...................... 338
   E. What, If Anything, Griles Did for Abramoff's Clients Is Unclear ............... 342
   F. Conclusion ................................................................................ 350

**Part Four - Recommendations**

A. Introduction ................................................................................ 352
B. Contracting for Legal, Lobbying and Other Professional Services ............... 352
   1. No New or Revised Federal Legislation Needed ................................. 352
   2. Best Practices Recommendations ...................................................... 353
      a. Contracting for legal, lobbying and other services should
         follow a specific, open and competitive process ............................ 353
      b. Contracting rules should be structured to prevent conflicts of
         interest ............................................................................... 353

      c.  Contracting and conflicts of interest rules should include appropriate
          sanctions ................................................................................. 354
      d.  Tribes should consider working with tribal organizations
          or with universities, colleges and law schools to develop
          model codes and education programs addressing contracting
          and conflicts of interest rules ................................................ 354

C.  Integrity of Tribal Elections ................................................................ 354

D.  Tribal Political Contributions ............................................................... 355

E.  Referrals to Other Committees ............................................................. 357
    1.  Possible Misuse of Tax Exempt Organizations ................................. 357

# "GIMME FIVE"— INVESTIGATION OF TRIBAL LOBBYING MATTERS

## FINAL
## REPORT

BEFORE THE

# COMMITTEE ON
# INDIAN AFFAIRS

ONE HUNDRED AND NINTH CONGRESS

SECOND SESSION

JUNE 22, 2006

PRINTED FOR THE USE OF THE COMMITTEE ON INDIAN AFFAIRS

# INTRODUCTION

Etched in the history of our great nation is a long and lamentable chapter about the exploitation of Native Americans. It began with the sale of Manhattan, and has continued ever since. Every kind of charlatan and every type of crook has deceived and exploited America's native sons and daughters. While these accounts of unscrupulous men are sadly familiar, the tale we hear today is not. What sets this tale apart, what makes it truly extraordinary, is the extent and degree of the apparent exploitation and deceit.

> Opening Statement of Committee Chairman John McCain, during the Committee's September 29, 2004, hearing on the allegations made by Tribes against Jack Abramoff and Michael Scanlon

[It] [n]eeds to have a bit more about how the tribes in the past were left helpless at the whims and good will of non-tribal members. Some reference to the past and how they were always given the [short] end of the stick would be pretty important, I think.

> Email from Jack Abramoff to associate Todd Boulanger, "Maynard letter to both Post and McCain," February 26, 2004 (critiquing draft letter intended for *Washington Post* and Senate Indian Affairs Committee regarding Committee investigation)

Yes, I did wrong, but I did a hell of a lot right too. Basically, I was the best thing they had going. I knew it, they knew it. My mistake was not informing them (about Scanlon).

> Jack Abramoff to contributing editor David Margolick, *Vanity Fair*, "Washington's Invisible Man," April 2006

## Factual Background

On the afternoon of June 18, 2001, in Washington, D.C., racquetball was the order of the day.[1] Having brought former congressional communications director Michael Scanlon with him to the lobbying shop at Greenberg Traurig for what ended up as a brief stint, Jack Abramoff wanted to get together with Scanlon for a round.

---

[1] Email between Michael Scanlon, Capitol Campaign Strategies, and Jack Abramoff, Greenberg Traurig (GTG-E000011945) (June 18, 2001).

But, Scanlon, who was now out on his own, wanted to talk shop: "A few weeks ago you mentioned something to me—I took the concept and have put together a plan that will make serious money. We also talked briefly about it in the beginning of the year but I think we can really move it now."[2]

Scanlon went on to describe "the broad strokes": "I have been making contacts with some larger Public Affairs companies in town for a few months. I have two solid relationships that will seriously consider acquiring Capitol Campaign Strategies. The problem is that there is not much in CCS right now."[3]

"However," he continued, "if we build up Capitol Campaign Strategies enough I can get it acquired by a large firm by the end of next year at 3x [sic] the firm revenue. Bottom line: If you help me get CCS a client base of $3 million a year, I will get the clients served, and the firm acquired at $9 million. We can then split the [sic] up the profits. What do you think?"[4]

Abramoff's response was brief: "Sounds like a plan, but let's discuss when we are together."[5]

This appears to be the genesis of a partnership the two would infamously label later as "gimme five"—their secret plan "to put in $5[million] revenue/yr [in fees from tribes, into] CCS."[6] Later, the term "gimme five" came to mean kickbacks to Abramoff from payments made by any of Scanlon's Tribal clients to Scanlon.

By Spring 2003, Abramoff and Scanlon's secret financial arrangement was apparently straining. The two had failed to get a Tribal client's casino reopened. And, Scanlon, apparently awash in cash, seemed to have outgrown the partnership and appeared more interested in putting his ill-gotten gains to work.

He offered Abramoff, "I have a few real estate developments in the pipeline—One really big one—and a couple of small ones that I may need to raise outside capital for. I can guarantee

---

[2]*Id.*

[3]*Id.*

[4]*Id.*

[5]*Id.*

[6]Email from Jack Abramoff, Greenberg Traurig, to Rodney Lane (GTG-E000011577) (March 15, 2002).

the returns on rate and time, and if you wanted to do more down the road taking a run at the upside potential you could get into some of the longer term stuff ... (I'm turning a 100% return on a one year project next month)."[7]

Abramoff responded, "OK, let's chat when we are next together. Meanwhile, let's get some more fucking money!"[8]

Making money was certainly nothing new to Abramoff. When he left the premier Washington, D.C. offices of the lobbying firm Preston Gates Ellis & Rouvelas Meed in December 2000 for a relatively new Washington lobbying group at Greenberg Traurig, Abramoff brought with him a book of business worth more than $6 million annually, according to Abramoff's own estimates.[9] This helped Greenberg Traurig generate a 500 percent increase in lobbying fees over the previous year.[10] With that increase, Greenberg Traurig reportedly vaulted into the top ten Washington lobbying firms—jumping from sixteenth place to fourth.[11] While Abramoff's impact on "K Street"[12] during this period is generally well-known, the precise nature of his relationship with Scanlon has been, until recently, a closely-held secret—concealed, most importantly from Abramoff and Scanlon's Tribal clients.

By February 5, 2004, time was running out for Abramoff and Scanlon's secret business

---

[7]Email from Michael Scanlon, Capitol Campaign Strategies, to Jack Abramoff, Greenberg Traurig (GTG-E000012012) (March 25, 2003). Scanlon might have been referring to his resale of an expensive five-bedroom canal-front home near Rehoboth, Delaware, he had bought in November 2001, apparently with Tribal proceeds, in one of that area's most prestigious neighborhoods—reportedly for $1,200,000 more that he paid. *See* Cris Barrish, *Abramoff cohort spent millions on Sussex homes—As a Rehoboth lifeguard last year, he made $11.35 an hour*, The News Journal, May 14, 2006. Early in 2003, Scanlon also reportedly paid $1,600,000 in cash for a home on Baltimore Avenue (across the street from where he ran his supposed international think tank, the American International Center) where he later opened offices. *Id.*

[8]Email between Michael Scanlon, Capitol Campaign Strategies, and Jack Abramoff, Greenberg Traurig (GTG-000012012) (March 25, 2003).

[9]John Bresnahan, *Jack Doubles Down*, Washington Business Forward, November/December 2002 (citing estimates provided by Abramoff).

[10]*Id.*

[11]*Id.*

[12]"K Street" is a commonly used term for the numerous think tanks, lobbying firms, law firms and associations located on and around this major thoroughfare in Washington, D.C.

3

arrangement. In a conference room at Greenberg Traurig, *Washington Post* reporter Susan Schmidt interviewed Abramoff on allegations that he and Scanlon may have bilked several Tribes out of millions of dollars in fees.[13] With Abramoff were Greenberg Traurig spokesperson Jill Perry and associates Todd Boulanger, Kevin Ring, Allen Foster, and Jon van Horne.[14] Things apparently heated-up quickly.

Schmidt began, "As I'm sure you know I'm working on a story about your work with some of these gaming tribes and your relationship with Mike Scanlon and his company and the work that the two of you have done in tandem for some of the tribes and so that's what I want to talk to you about ... So, I want to ask you, basically what your relationship is with his firm, well he's got several firms. As I understand it from the tribes that I've talked to, you guys work together and you recommend that they hire him."[15]

Abramoff deftly answered—truthfully but non-responsively: "In terms of Mike or any other third party, you know the firm does not have any formal relationship, to my knowledge, with any third party vendor used by any of the tribes for some of their activities and so probably best to have you go ahead and check directly with him and if you have specific questions again, we'll take them and we'll look at them, but in general I think we feel at liberty to discuss in general our practice, which we're delighted to do, with the tribes."[16]

Schmidt pushed: "Okay, but you basically recommend to these tribes that they hire him?"[17]

Once again, Abramoff strained to avoid answering the question, but was quickly running out of wiggle room: "We have recommended that different tribes hire different vendors for different needs that they might have. Again, I'm going to defer in terms of any discussion of Scanlon or his company or any specific third party vendor."[18]

---

[13]*See* Email from Linsey Crisler, Greenberg Traurig, to Jack Abramoff, Greenberg Traurig (GTG-E000010599-614) (February 3, 2004).

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]*Id.*

[18]*Id.*

Schmidt pushed more: "Well, do you recommend his company and do you know what they are doing for the tribes and do you endorse what he's doing?"[19]

Abramoff offered, "Well, again I think that some of this gets into the area of our confidential dealings with our clients so I'm happy, we'll go back and look at that question."[20]

Schmidt finally cut to the chase: "Do you have an ownership stake in Capitol Campaign Strategies or Scanlon Gould or any of Mike Scanlon's other ventures?"[21]

Even a pregnant pause here might be looked on with some suspicion. So, Abramoff had no choice: "No. No, I don't ...."[22]

As future events would soon reveal, this of course was a lie.

Perhaps mindful of his actual financial arrangement with Scanlon, which he withheld from Schmidt, Abramoff was very concerned about how the interview went. Among others, he wrote to Candace Patencio, an ally at the Agua Caliente Band of Cahuilla Indians.[23] The next race for chairman was the topic of conversation. Abramoff wrote, "I think you are right that we really need Richard [Milanovich] to beat [his opponent]. [His opponent] is poison. She has been feeding the *Washington Post* a hit piece about Scanlon and me. It's going to be horrible. It is so obvious it's her doing this too. Can't wait to see you on the 23rd."[24]

A couple of days later, on February 5, 2004, Abramoff's most senior associate, Todd Boulanger reached out to Abramoff and colleague Kevin Ring: "Someone on the [Saginaw Chippewa Tribal] council trashed us, our work, and [S]canlon .... We are going to get smoked here."[25] He added, "[Abramoff] should [file suit for slander] .... after what happened a couple of

---

[19]*Id.*

[20]*Id.*

[21]*Id.*

[22]*Id.*

[23]Email from Jack Abramoff, Greenberg Traurig, to Candace Patencio, Agua Caliente of Cauhilla Band (GTG-E000057926) (February 3, 2004).

[24]*Id.*

[25]Email between Todd Boulanger, Greenberg Traurig, and Jack Abramoff, Greenberg Traurig, and Kevin Ring, Greenberg Traurig (GTG-E000028537) (February 5, 2004).

months ago.  We are dead."[26]

Likely appreciating that the thrust of the pending *Post* story was true, Abramoff could only offer, "Where are you now?"[27]

Boulanger answered, "Going to bed.  I'mreally [sic] in a terrible mood."[28]

Abramoff could only reply, "Me too."[29]

### The Conduct of the Investigation and the Report

On February 22, 2004, *The Washington Post* published Schmidt's article, entitled "A Jackpot From Indian Gaming Tribes; Lobbying, PR Firms Paid $45 Million Over 3 Years." Based on the allegations of misconduct made by several Tribes, documented in the *Post* article, the Senate Committee on Indian Affairs initiated an investigation.  Ultimately, the Committee would examine Abramoff and Scanlon's dealings with six tribes:  the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, the Saginaw Chippewa Indian Tribe, the Agua Caliente Band of Cahuilla Indians, Ysleta del Sur Pueblo of Texas and the Pueblo of Sandia of New Mexico.

While a Department of Justice task force reportedly began a parallel inquiry into related matters, the Committee sought to answer several questions, including but not limited to the following: (1) are the Tribes' allegations of misconduct regarding Abramoff and Scanlon true; (2) if so, how much did those Tribes pay Abramoff and Scanlon's partnership, as well as third-parties at their direction, as a result of that misconduct; and (3) did those Tribes receive the intended benefit of the tens of millions of dollars that they paid Scanlon and Abramoff.  With this Report, the Committee attempts to set forth definitive conclusions and the bases for those conclusions regarding each of those areas, and others.

After an intensive two-year investigation—consisting of five hearings, 70 formal requests for documents, including subpoenas, resulting in the production of about 750,000 pages; and

---

[26]Email from Todd Boulanger, Greenberg Traurig, to Jack Abramoff, Greenberg Traurig, and Kevin Ring, Greenberg Traurig (GTG-E000028537) (February 5, 2004) (ellipses in original).

[27]*Id.*

[28]*Id.*

[29]*Id.*

6

about 60 depositions and witness interviews,[30] the Committee found that, as Scanlon's secret partner, Abramoff received about half of the profit that Scanlon collected from the $66 million in fees he obtained from six of his Tribal clients from 2001 through 2003.

Principally, this Report focuses on allegations of misconduct made by the Tribes covered in it. Generally, those allegations relate to the activities of entities owned or controlled by Abramoff and/or Scanlon, including Capitol Campaign Strategies, the American International Center and the Capital Athletic Foundation. This Report also addresses payments that those Tribes made at Abramoff or Scanlon's direction to particular third parties—payments that were apparently used by third parties, like the Council of Republicans for Environmental Advocacy, for purposes unintended by the Tribes. While some of the Tribes have expressed concern about discreet billing anomalies, those Tribes have generally not alleged wrongdoing arising from the federal lobbying activities of Greenberg Traurig, the firm with which Abramoff was associated. Therefore, this Report does not address those activities.

Also beyond the scope of this Report is an in depth discussion of the internal political or organizational conditions within each of the Tribes that may have rendered them susceptible to exploitation by Abramoff and Scanlon. Those are internal Tribal matters.

Part I of this Report, presented in chapters relating to each Tribe, provides the factual background as to how each Tribe came to hire Abramoff and Scanlon and discusses how Abramoff and Scanlon's representation of those Tribes caused unique harm to each of them. After the these chapters, the Report explicates Abramoff and Scanlon's "gimme five" arrangement and how it injured the Tribes generally. Each chapter in Part II addresses these issues by focusing on the relevant "gimme five" entity. Part III of this Report discusses ancillary issues that have arisen during the course of the investigation, namely, the Tribes' payment of money to a non-profit called the Council of Republicans for Environmental Advocacy

---

[30]Where witnesses who the Committee interviewed were not put under oath, they were reminded of the applicability of the False Statements Act, 18 U.S.C. sec. 1001, and the federal criminal statute prohibiting the obstruction of congressional investigations, under 18 U.S.C. sec. 1505. Because all witness interviews and depositions were conducted in executive session, the Committee will not release summaries or transcripts of those proceedings *in toto* unless said release is duly authorized.

In the course of the Committee's investigation, several witnesses declined to provide the Committee with important information under oath, citing their right against self-incrimination under the Fifth Amendment of the U.S. Constitution, or indicated that they intended to assert their Fifth Amendment right if called to testify. These witnesses include not only Abramoff and Scanlon but also former Abramoff associates Todd Boulanger, Kevin Ring, Shawn Vassell, and Neil Volz as well as former Scanlon associate Chris Cathcart. Cathcart did, however, submit to several informal interviews with staff.

("CREA"). Finally, Part IV of the Report contains the Committee's recommendations flowing from its investigation.

**Committee Action**

On June 12, 2006, the Committee invited Members and any duly designated staff to review a completed draft of the Report in anticipation of a business meeting to be convened for the purpose of voting the Report out of Committee and filing it with the Senate. It also gave Members the opportunity to accept a confidential copy of the draft in their offices on June 20, 2006. On June 22, 2006, the Committee held a business meeting, at which time it voted _____ to _____ to approve this Report and file it with the Senate. Voting with the majority were _____ . Voting in the negative were _____. Senators _____ were not present for the vote but did **[did not]** submit additional views.

# EXECUTIVE SUMMARY AND FINDINGS

After (or at the same time when) several Tribes hired Abramoff as their federal lobbyist, Abramoff urged some of them to hire Scanlon to provide grassroots support. Abramoff, however, failed to disclose that he and Scanlon were partners. Evidence obtained over the course of a two-year investigation indicates that Abramoff and Scanlon had agreed to secretly split, between themselves, fees that the Tribes paid Scanlon from 2001 through 2003. Abramoff and Scanlon referred to this arrangement as "gimme five."

As a general proposition, the scheme involved the following: getting each of the Tribes to hire Scanlon as their grassroots specialist; dramatically overcharging them for grassroots and related activities; setting aside for themselves an unconscionable percentage of what the Tribes paid at a grossly inflated rate—a rate wholly unrelated to the actual cost of services provided; and using the remaining fraction to reimburse scores of vendors that could help them maintain *vis-a-vis* the Tribes a continuing appearance of competence. One example of this fee-splitting arrangement arises from a payment of $1,900,000 from the Saginaw Chippewa Tribe of Michigan. On or about July 9, 2002, Scanlon assured Abramoff, "800 for you[,] 800 for me[,] 250 for the effort the other 50 went to the plane and misc expenses. We both have an additional 500 coming when they pay the next phasem [sic]." Indeed, on July 12, 2002, after that payment arrived, Scanlon made three payments to Abramoff, including a payment of $800,000.

In some cases, Abramoff and Scanlon obtained lobbying and grassroots contracts by insinuating themselves into Tribal council elections and assisting with the campaigns of candidates who were calculated to support their proposals. In other cases, Abramoff and Scanlon were even more aggressive, for example, helping to shut down the casino of one Tribe, only to pitch their services—for millions of dollars—to help that same, now desperate Tribe reopen its casino.

Typically, the most expensive element of Scanlon's proposals to the Tribes related to a purportedly elaborate political database. But, in all cases, it appears that the degree to which Scanlon marked-up his actual costs was unconscionable. For example, while Scanlon told the Coushatta Tribe of Louisiana that their "political" database would cost $1,345,000, he ended up paying the vendor that actually developed, operated and maintained that database about $104,560. The dramatic mark-ups were intended to accommodate Scanlon's secret 50/50 split with Abramoff.

In total, six tribes paid Scanlon's companies, in particular a company called Capitol Campaign Services ("CCS") (which also did business as Scanlon Gould Public Affairs and Scanlon Public Affairs), at least $66,000,000 over the three-year period. By the Committee's reckoning, each Tribe paid CCS as follows: the Mississippi Band of Choctaw Indians

9

("Choctaw"), $15,900,000; the Coushatta Tribe of Louisiana ("Louisiana Coushatta"), $26,695,500; the Saginaw Chippewa Tribe of Michigan ("Saginaw Chippewa"), $10,000,000; the Agua Caliente Band of Cahuilla Indians ("Agua Caliente"), $7,200,000; the Ysleta del Sur Pueblo of Texas ("Tigua"), $4,200,000; and the Pueblo of Sandia of New Mexico ("Pueblo of Sandia"), $2,750,000. Of that $66,000,000, Abramoff secretly collected from Scanlon, through (among other entities) an entity called Kaygold, about $21,000,000. This constituted about one-half of Scanlon's total profit from the Tribes.

The $66,000,000 figure includes only those payments made by the Tribes to Scanlon for grassroots activities. The total cost of doing business with Abramoff and Scanlon was actually much higher. To determine that cost, one must add to the $66,000,000 figure, payments made by the Tribes to the lobbying firms with which Abramoff was associated and payments made by the Tribes directly to other entities owned or controlled by Abramoff, such as the Capital Athletic Foundation ("CAF"), or by Scanlon, such as the American International Center ("AIC").

Most of the money that the Tribes paid Scanlon appears to have been used by Scanlon and Abramoff for purely personal purposes—purposes unintended by the Tribes. Generally, Abramoff seems to have used his share of the proceeds he received from Scanlon to float his restaurant ventures and, through CAF, operate his Jewish boys' school in Maryland. Likewise, Scanlon seems to have used his share to purchase real estate and other investments. The Committee, therefore, finds that most of the Tribes received little of the intended benefit for the significant sums they paid to Scanlon and that most of the money paid by the Tribes was used for purposes unintended by the Tribes. Against that backdrop, understanding under what circumstances the Tribes paid Scanlon becomes important.

Probably Abramoff's most valued Tribal client was the Choctaw. Since 1995, when the Choctaw first hired Abramoff, a history of dramatic victories emerged, with Abramoff successfully advocating the Tribe's sovereignty and anti-tax interests before Congress. In many instances, Abramoff had the Tribe use conduits to conceal its grassroots activities from the world—activities often conducted by former Christian Coalition Executive Director Ralph Reed. After this history of success, in early 2001, things changed. Following Abramoff's guidance, the Tribe hired Scanlon. And, to implement its grassroots strategies, the Tribe, at Abramoff and Scanlon's direction, paid to or through conduits owned or controlled by Abramoff and Scanlon. As an example of how much Scanlon sought from the Choctaw, he had the Tribe pay him $4,500,000 for efforts related to a single program—a grandiose idea Scanlon called "Operation Orange." During the relevant period, Abramoff manipulated the Tribe into funding, among other things, a much reported golfing trip to Scotland. The Tribe thought that its money, which it paid to a non-profit on whose board Abramoff sat, would be used for anti-tax and other policy work. At the end of the day, having collected about $15,000,000 from the Choctaw during the relevant period, Scanlon secretly kicked back to Abramoff about $6,364,000—about 50 percent of his total profit from the Tribe.

Specifically citing the work he had done for the Choctaw, Abramoff subsequently secured contracts for himself and Scanlon from the Louisiana Coushatta. Regrettably, of all the Tribes that hired Scanlon, the Louisiana Coushatta ended up paying Scanlon the most. Initially, the Tribe hired Scanlon to help with its compact renegotiations with the State of Louisiana. But, after having successfully done so, Scanlon dramatically expanded his scope of work, which ranged from squelching supposedly ubiquitous threats to the Tribal casino's customer market share to supposedly getting the "right" candidates elected to the Louisiana State Legislature. To its detriment, the Tribe trusted Abramoff and Scanlon's expertise in Indian gaming and were captured by their lure of making the Coushatta "the Choctaw of Louisiana." Accordingly, it deferred to Abramoff and Scanlon's judgment when they recommended that it fund very expensive grassroots campaigns. Ultimately, having collected about $30,000,000 from the Louisiana Coushatta during the relevant period, Scanlon secretly kicked back to Abramoff about $11,450,000—about 50 percent of his total profit from the Tribe. This includes a payment of $1,000,000 that Abramoff and Scanlon manipulated the Tribe into paying to Abramoff's private charity, the Capital Athletic Foundation ("CAF").

Abramoff and Scanlon's efforts to sign on the Saginaw Chippewa and the Agua Caliente as clients are notable. With both Tribes, Abramoff and Scanlon insinuated themselves into Tribal Council elections to maximize their chance of getting hired afterwards. In particular, they provided, among other things, strategic advice and material support to some of the candidates. Those who ran in the Saginaw Chippewa election called themselves the "Slate of 8." The weight of evidence obtained by the Committee indicates that, in both the Saginaw Chippewa and Agua Caliente cases, those candidates who were elected to the Council with Abramoff and Scanlon's assistance ultimately supported Abramoff and Scanlon's contract proposals because of, or in exchange for, the assistance that Abramoff and Scanlon provided them.

Key to Abramoff and Scanlon's success in getting contracts with the Saginaw Chippewa and the Agua Caliente was the assistance of non-Tribal Members Christopher Petras and Michael Chapman, respectively. In the course of the Tribe's dealings with Abramoff and Scanlon, Abramoff and Scanlon apparently provided each things of value. Evidence indicates that, over the course of Abramoff and Scanlon's representation of the Saginaw Chippewa, Abramoff and Scanlon provided Petras with a great deal of attention during his frequent trips to Washington, D.C. (which, with private cars, tickets to sporting events and concerts, meals at posh restaurants, and meetings with prominent personalities, one former Abramoff associate described as a "dog and pony show") and some favors. Likewise, for the services that Chapman provided Abramoff and Scanlon over the course of the Agua Caliente retainer, Chapman received about $271,482.

From June 2002 through October 2003, the Saginaw Chippewa paid Scanlon about $3,500,000 for among other things "a strategy for making [the Tribe] the most dominant political entity in Michigan" that Scanlon called "Operation Redwing." Of those proceeds, Scanlon secretly kicked back to Abramoff about $540,000—about 50 percent of his total profit from the Tribe during this period. Similarly, from the Agua Caliente, Scanlon collected about $7,200,000

from the Agua Caliente during the relevant period and appears to have secretly split about 50 percent of his total profit from that Tribe with Abramoff.

How Abramoff and Scanlon had the Tigua hire them was particularly aggressive. In late 2001 through early 2002, (largely with the assistance of Ralph Reed) Abramoff and Scanlon successfully helped Texas authorities shut the Tigua's casino down, as violating federal law. Despite the fact that the Louisiana Coushatta's casino was in southwest Louisiana and the Tigua's was in El Paso, Texas, Abramoff and Scanlon succeeded in persuading the Louisiana Coushatta that the Tigua posed a threat to its customer market share. So, the Louisiana Coushatta largely funded the grassroots effort to help close their casino.

Having succeeded in helping shut down the Tribe's casino, Abramoff and Scanlon then pitched their services to help reopen it. In pitching their services, Abramoff offered to represent the Tribe on a *pro bono* basis if it hired Scanlon for millions of dollars to provide grassroots support for his federal lobbying effort. He did so without telling the Tribe of his financial arrangement with Scanlon.

After they signed the Tigua on as a client, Abramoff and Scanlon promised to, among other things, insert language allowing the Tribe to re-open its casino. Cumulatively, Scanlon called this plan "Operation Open Doors." Abramoff and Scanlon were ultimately unsuccessful, despite that they collected (and split between themselves) millions of dollars from the Tribe. Having collected about $4,200,000 from the Tigua during the relevant period, Scanlon secretly kicked back to Abramoff about $1,850,000—about 50 percent of his total profit from the Tribe.

The Pueblo of Sandia hired Abramoff and Scanlon to help them with the lobbying aspects of a legal dispute related to Sandia Mountain, revered by the Tribe as sacred. Abramoff pitched his and Scanlon's services as a "package deal," actually insisting that the Tribe hire Scanlon as its public relations specialist. He even offered to reduce Greenberg Traurig's retainer in contemplation of the Tribe's hiring Scanlon, but insisted that Scanlon's asking price could not be reduced further because his 10 percent profit margin was "locked in." After having paid Scanlon about $2,750,000 for grassroots work intended to support Abramoff's federal lobbying effort, the Tribe became dissatisfied with the quality of Scanlon's effort and ceased the representation. From those proceeds that Scanlon collected from the Pueblo Sandia during the relevant period, on information and belief, Scanlon secretly split about 50 percent of his total profit from the Tribe, with Abramoff.

A couple of "gimme five" entities—entities owned or controlled by Abramoff or Scanlon that they used in their kickback scheme—are especially worth noting. One is an "international think tank" called the American International Center ("AIC"). With two of Scanlon's beach buddies sitting on its board, AIC's purpose was actually to collect fees associated with activities conducted by others and, in some cases, divert those fees to entities owned or controlled by Scanlon or Abramoff. In other words, AIC was a sham. From 2001 through 2003, the Choctaw

and the Coushatta paid AIC about $6,308,854. While much of this money went to vendors such as Reed, to conduct grassroots activities supportive of the Tribes' gaming interests, as intended, millions did not.

CAF, Abramoff's private charity, is a particularly interesting "gimme five" entity. In total, four of the Tribes paid CAF about $2,075,000. The totals for each Tribe is as follows: the Louisiana Coushatta, $1,000,000; the Choctaw, $1,000,000; the Saginaw Chippewa, $25,000; and the Alabama Coushatta, $50,000, which was not even a client. Evidence obtained by the Committee indicates that Abramoff treated CAF as his own personal slush fund, using CAF for a number of activities wholly unrelated to its charitable mission and tax-exempt status. Such activities included, for example, evading taxes, financing lobbying activities and purchasing military-related equipment.

In 2001, the single largest contributor to CAF was the Louisiana Coushatta, supposedly giving CAF $1,000,000. However, the Tribe never intended to make a charitable contribution to CAF. While it thought that its money was going to fund its grassroots activities, the money simply padded the coffers of CAF for Abramoff's discretionary use.

In 2002, Abramoff and Scanlon manipulated the Choctaw into sending directly and indirectly $2,000,000 to CAF, making the Choctaw CAF's largest donor that year. However, the Choctaw never intended to contribute to CAF. The Tribe thought that its payments to CAF were going to pass through to grassroots organizations working to oppose the expansion of gaming in the Tribe's customer market. The Tribe's money was not used for its intended purpose.

As described above, Abramoff also deceived the Saginaw Chippewa into paying $25,000 to CAF that year. While the Tribe was led to believe that CAF "create[d] programs that teach leadership skills to disadvantaged youth in the D.C.-area in an effort to keep them off the streets and enhance their educational opportunities" and was a charity important to an important Member of Congress, the Tribe's "donation" was used to partially fund a widely publicized golf trip to Scotland for then-Congressman Tom DeLay and others.

For 2003, CAF's tax records do not list any Tribe as a donor. However, substantial evidence indicates that a $47,891 contribution to CAF listed as having been made by Abramoff's corporate alter ego, Kaygold, and a $950,000 contribution from a Scanlon-controlled entity called Atlantic Research & Analysis ("ARA") were actually funds from some of the Tribes, paid as a result of Abramoff and Scanlon's manipulation.

Among the third parties that Abramoff had some of his Tribal clients pay money was an environmental organization called the Council of Republicans for Environmental Advocacy ("CREA"). From 2001 through 2003, Abramoff managed to have these Tribes "contribute" at least $250,000 to CREA, sometimes under false pretenses. The Coushatta, for example, paid CREA $25,000 to help the Department of the Interior with a "national park study," which was

13

apparently never conducted.  Likewise, the Saginaw Chippewa made a $25,000 donation, having been told that former Interior Secretary Gale Norton was "involved" with and supported CREA and that supporting such "a project" that the Secretary was involved with would "look good" for the Tribe.  In both cases, the Tribes were deceived.

In any event, with the possible exception of the Choctaw, the Committee found no evidence that those Tribes that gave to CREA did so because of any interest in CREA's mission. In fact, Abramoff apparently had his clients contribute to CREA, whose president Italia Federici described as a "mom and pop" operation, because he believed that Federici would help him possibly influence tribal issues pending at the Department of the Interior.  Ample evidence indicates that she repeatedly told Abramoff that she would talk with a particular senior Interior official to help ensure that the concerns of Abramoff's clients were addressed.  However, what she, or her working contact at Interior, former Deputy Secretary J. Steven Griles, actually did at Interior for the benefit of Abramoff's tribal clients, remains unclear.

# PART I

## CHAPTER I

### MISSISSIPPI BAND OF CHOCTAW INDIANS

Lets [sic] do this, lets [sic] plan a swing to the big three [Choctaw, Coushatta, and Saginaw] as soon as is convenient to go over existing operations and hit them for new ones - Ill [sic] start working gup [sic] the reports (choctas [sic] is almost done) and the new proposals. We will take two maybe three days and take no prisoners - we are coming home with a bag of cash.

> Email from Michael Scanlon to Jack Abramoff, May 31, 2002

You know, it's the lack of care for people and just the personal greed. And who knows? I don't understand that point of view.

> Nell Rogers on Jack Abramoff and Michael Scanlon, April 29, 2005

### A.     Introduction

When the Committee first began this investigation in February 2004, many of Jack Abramoff's and Michael Scanlon's long-time friends and clients came to their defense. Among them were Chief Phillip Martin and the Mississippi Band of Choctaw Indians ("Choctaw"). Six months into the Committee's investigation, however, Chief Martin wrote to Senators John McCain and Ben Nighthorse Campbell, who were leading the investigation:

> In light of information we have recently obtained from various sources, it now appears that our Tribe may in fact have been the victim of serious wrongdoing by Abramoff and Scanlon. Thus, despite my prior concerns, I appreciate your Committee's work on this matter.[1]

Indeed, of all the Tribes that Abramoff and Scanlon betrayed, their misdeeds were perhaps most painful for the Choctaw, which Abramoff had represented for nearly a decade. Nell Rogers, the Tribal planner who had dealt most closely with Abramoff and Scanlon, gave an impassioned, tearful account during her interview with Committee staff:

> STAFF:          If Jack Abramoff and Michael Scanlon were sitting in this room today and you had a chance to look them in

---

[1]Letter from Chief Phillip Martin, Mississippi Band of Choctaw Indians, to Chairman Ben Nighthorse Campbell, and Ranking Majority Member John McCain, Committee on Indian Affairs (no Bates number) (August 9, 2004).

the eye, what would you tell them?

ROGERS:  I would tell them that – there are a lot of things that I could say about being angry or bitter. But I think the worst is that they betrayed the tribe. They betrayed the Chief who had a great deal of confidence in them. They betrayed me ... But I think at the end of the day, it's the betrayal that's worse. And I think of the people whose lives they've destroyed. I think of all those young kids who worked at Greenberg and Preston Gates with them, who, fairly or unfairly, are going to have to bear that burden.

And I think about the other tribes. I mean, you know, let's face it. The tribes they dealt with were not the poorest of the poor tribes. Of all those tribes, Choctaw, though, probably has the greatest needs, the biggest tribe, was the poorest tribe. And they used the success they had with Choctaw to gain entree with the other tribes.

You know, not only did they betray Choctaw but they betrayed the tribe's good name and Chief's reputation. And, you know, Phillip Martin has spent his life working for not only this tribe but for Indian people. And for him to have to be smeared like this is intolerable. I've spent my whole life working. You know, it's the lack – it's the lack of care for people and just the personal greed. And who knows? I don't understand that point of view.[2]

## B.     Background on the Tribe

The Mississippi Band of Choctaw Indians is a federally recognized Indian tribe of nearly 10,000 members, most of whom reside on eight reservation communities located on trust lands

---

[2]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005). During his interview, Chief Phillip Martin expressed similar feelings of betrayal caused by Abramoff and Scanlon. Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005).

scattered over a five-county area in East-Central Mississippi.[3] The Tribal capital is in Choctaw, Mississippi.[4] The majority of Tribal members are full-blood, Choctaw language speaking.[5]

The Choctaw Indians are the descendants of those Choctaw people who resisted efforts by the Federal Government around 1830-1840 to remove them to Oklahoma, then known as Indian Territory.[6] Although the Choctaw chose to stay in Mississippi, they did not receive their initial reservation lands until 1944 and it was not until the following year that they were federally recognized.[7]

The Tribe has developed a stable governmental structure providing a full panoply of governmental services.[8] These include a school system, police and fire protection services, courts, hospitals, clinics, and housing.[9]

For many years the Choctaw struggled to survive. By 1964, ninety percent of the Tribe's population lived in poverty.[10] The Choctaw's situation improved when Chief Phillip Martin began a campaign to bring economic development to the reservation.[11] The Choctaw are unusual in their development because they first gained economic success through their non-gaming business ventures, before opening the Silver Star Hotel and Casino in 1994.[12] In 2000, the Tribe

---

[3]"Tribal Lobbying Matters," *Hearings Before the Committee on Indian Affairs*, 109th Cong. at 52 (June 22, 2005) (prepared statement of Phillip Martin, Chief, Mississippi Band of Choctaw Indians).

[4]*Id.*

[5]*Id.*

[6]*Id.*

[7]*Id.*

[8]*Id.*

[9]*Id.*

[10]*Choctaw Chronology* (visited March 21, 2006) <http://www.choctaw.org/history/chronology.htm> (providing a detailed chronology of Choctaw history).

[11]*Id.*

[12]*Id.*

17

announced an expansion to include another casino, the Golden Moon, and a shopping complex.[13]

The Tribe now is the third largest employer in Mississippi, employing nearly 9,200 people in 25 different enterprises including greeting card manufacturing, wiring harness production for the automotive industry, a nursing home, and a world renowned golf course, the Dancing Rabbit.[14]  The annual Tribal payroll is over $1,237,000 and covers many non-member employees.[15]

### C.    Background on Abramoff and the Tribe's Relationship – Building Trust and Confidence

The Choctaw have long enjoyed a government-to-government relationship with the Federal Government, particularly with the United States Congress.[16]  In the beginning, Chief Martin of the Choctaw preferred to lobby Congress himself.[17]

That changed in 1994.  Either through retirement or defeat, many of the Members of Congress who provided the institutional memory on American Indian issues were gone.[18]  At the same time, the opening of the Choctaw's Silver Star Hotel and Casino in 1994 gave rise to an array of new issues and concerns that required the Tribe to track and address them at the federal

---

[13]*Id.*

[14]"Tribal Lobbying Matters," *Hearings Before the Committee on Indian Affairs*, 109th Cong. at 52 (June 22, 2005) (testimony of Chief Phillip Martin, Mississippi Band of Choctaw Indians); *Economic Development History How We Got Here* (visited March 21, 2006) <http://www.choctaw.org/economics/tribal_business_overview.htm> (providing an overview of the Choctaw's economic development).

[15]*Economic Development History How We Got Here* (visited March 21, 2006) <http://www.choctaw.org/economics/tribal_business_overview.htm> (providing an overview of the Choctaw's economic development).

[16]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[17]Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005); Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[18]*Id.*

18

level.[19]

Moreover, tribes apparently began to see a slew of proposed legislation they believed were inimical to their interests.[20]  One of the first major initiatives came from the U.S. House of Representatives, in a bill seeking to apply the unrelated business income tax ("UBIT") to Tribal enterprises.[21]  Confronted with this legislation and a sea of unknown faces in Congress, the Choctaw decided to hire outside lobbyists.[22]

Coincidentally, around the same time, Nell Rogers, the Tribe's planner responsible for legislative affairs, was speaking with a friend in California who knew Abramoff's father.[23] Aware that Abramoff had once been a Republican activist, Rogers' friend suggested she speak with Abramoff.[24]

Through further due diligence, Chief Martin and Rogers learned that Abramoff worked for Preston Gates Ellis & Rouvelas Meeds ("Preston Gates"), and that Meeds was former Congressman Lloyd Meeds from Washington State.[25]  The Choctaw had known and respected Meeds during his tenure in Congress, as a member of at least one House committee that had jurisdiction over Indian issues.[26]  The Tribe decided to contact Preston Gates.[27]

After a brief telephone call, Meeds and Abramoff traveled to the Choctaw reservation.[28]

---

[19]"Tribal Lobbying Matters," *Hearings Before the Committee on Indian Affairs*, 109th Cong. at 12 (June 22, 2005) (testimony of Nell Rogers, planner, Mississippi Band of Choctaw Indians).

[20]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[21]*Id.*

[22]*Id.*

[23]*Id.*  Rogers' friend had actually attended a fundraiser that Abramoff's father had thrown in support of Abramoff's bid for the Chair of the College Republican National Committee. *Id.*

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Id.*

[28]*Id.*

19

There they made a presentation about their firm's capabilities and connections, and discussed the Tribe's legislative concerns.[29] Rogers was extremely fascinated by how Abramoff proposed mobilizing other groups to assist the Choctaw in its legislative battle: "I came away thinking this is really different and unusual. It was. It was an unusual approach that you would engage other groups to help you in a campaign to say 'these are good guys.'"[30]

After the meeting, Chief Martin and Rogers concluded that the Choctaw needed to educate the new members of Congress about Indian Country and the issues it faced.[31] They therefore hired Preston Gates.[32] The issues on which Preston Gates would lobby were not limited to the UBIT. At the time, Rogers recalled, there seemed to be daily issues emerging that adversely affected tribes, a "sea change of proposals" that were "hostile to the tribes."[33]

To help the Choctaw in its campaign to educate the new Members of Congress, Abramoff mobilized his friends and colleagues at various think tanks and grassroots organizations. The Preston Gates team recast the issue from an Indian issue into a tax issue.[34] Abramoff then enlisted the aid of his long term friend and anti-tax activist Grover Norquist and his organization Americans for Tax Reform ("ATR"), which, according to its website, "opposes all tax increases as a matter of principle" and serves as "a national clearinghouse for the grassroots taxpayers movement."[35]

According to one document in the Committee's possession, Abramoff described ATR as "an effective conduit of support for other groups which have provided assistance to Indian gaming's efforts to fight the tax proposal."[36] There were a number of anti-tax grassroots groups in various states, and "it was ATR's job to make contacts with those groups, to assist them in making contacts with members of the Ways and Means Committee or other committee

---

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]*See* Jim Vandehei, *Rain Dance, Mississippi's Choctaw Find an Unlikely Ally In a GOP Stalwart*, The Wall Street Journal, July 3, 2000.

[35]*ATR opposes all tax increases as a matter of principle.* (visited May 21, 2006) <http://www.atr.org/home/about/index.html>.

[36]*Id.*

members."[37]  The Choctaw apparently paid ATR a total of $60,000 in 1996 to oppose the UBIT tax.[38]

Abramoff and his colleagues at Preston Gates eventually succeeded in their efforts, and the UBIT tax failed in the Senate.[39]

Three years later, however, the Choctaw were still battling congressional attempts to tax its Tribal revenue.  In so doing, in September 1999, the Choctaw paid ATR another $25,000.[40]  Rogers believed that the payment was in furtherance of ATR's opposition to a sales tax issue at the time.[41]  According to Rogers: "Well, we did not support the general work of ATR unless we had a tax issue.  That's what I mean by saying general work.  We would have expected them to

---

[37]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[38]Id.  This apparently was not the only time that Abramoff and his clients had sought to hire Norquist and ATR.  During the UBIT battle for the Choctaw, Abramoff discussed with a colleague the possibility of Brown Forman, a company in the wine and spirits business, retaining Norquist as a lobbyist:

> I spoke this evening with Grover.  He said that, if they want the taxpayer movement, including him, involved on this issue and anything else which will come up over the course of the year or so, they need to become a major player with ATR.  He recommended that they make a $50,000 contribution to ATR.  It seems that, on another "sin tax" matter, he is getting a similarly large contribution to get involved. . . . He would prefer donations to ATR.

Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Mark Ruge, Preston, Gates, Ellis & Rouvelas Meeds (Greenberg Traurig production) (Bates number 883167) (October 22, 1995).  Abramoff said that keeping the arrangement with Norquist and ATR secret was important.  After all, Abramoff wrote, "[w]e do not want opponents to think that we are trying to buy the tax payer [sic] movement."  Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Pamela Garvie, Preston, Gates, Ellis & Rouvelas Meeds (Greenberg Traurig production) (Bates no. 883166) (October 24, 1995).

[39]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[40]Id.

[41]Id.

21

take a position opposing – we did expect them to take a position opposing the sales tax."[42]

On this issue, Abramoff enlisted other allies. The Choctaw paid Americans for Economic Growth ("AEG") $45,000 in 1999 for its work opposing the sales tax.[43] The payments were intended for grassroots work and the anti-tax program in 1999.[44] Rogers understood that AEG would be "contacting their supporters, contacting members of Congress" and "staffers that they might have known to talk to them about the tribe – this was after they had been to visit [the Choctaw reservation] – to let them know what the tribe was about. That was our understanding of what they would do."[45]

The outside groups were not limited to grassroots organizations. Abramoff put together visits to the Choctaw reservation for reporters and public policy groups, with the goal of demonstrating the Tribe's success in an environment unfettered by unnecessary government regulation.[46] One group that visited the reservation was the National Center for Public Policy Research ("NCPPR"), which was headed by long-time Abramoff friend Amy Ridenour. Ridenour visited the Tribe, "wrote some articles about the tribe, the tribe's economic development, cultural preservation of the tribal community. And we had made a contribution – had said that we would make a contribution to the National Center."[47] The Tribe paid NCPPR $5,000 in 1999.[48] Others who attended were representatives from think tanks including Doug Bandow from the Cato Institute.[49]

The Choctaw's campaign against the sales tax was ultimately successful.

The UBIT and sales tax issues were only two among the many issues on which Abramoff and his team lobbied for the Choctaw. As time passed, and Abramoff and his team repeatedly

---

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]*Id.*

[46]*Id.*

[47]*Id.*

[48]*Id.*

[49]*Id.* According to one news article, Bandow resigned from the Cato Institute, after admitting he received money from Abramoff to write between 12 and 24 articles in the mid '90s addressing topics important to Abramoff's clients. Eamon Javers, *Op-Eds for Sale*, BusinessWeek Online, December 16, 2005.

succeeded in their lobbying efforts for the Choctaw, the Tribe developed a great deal of trust and confidence in Abramoff and his capabilities.[50]  Another Abramoff trait that engendered trust with the Choctaw was that he "always presented himself as a deeply religious person ... his conversations were spiked with references to a good cause or working for a good cause.  And he talked quite a bit about his religious beliefs and what he could and what he couldn't do."[51]

It was during the UBIT battle that Abramoff assumed primary responsibility for the Choctaw account.[52]  In fact, he remained ultimately responsible for the account throughout his tenure at Preston Gates and, later, at Greenberg Traurig.[53]


## D.    Substantial Fees and Conduits – Setting the Stage for Scanlon

As the Tribe's trust and confidence in Abramoff grew, Rogers would often discuss with Abramoff issues affecting the Tribe, both at a local and national level.[54]  In 1999, Rogers and Abramoff discussed various legislative proposals in Mississippi and elsewhere that threatened the market share of the Choctaw's casino operations, and which the Tribe wanted to somehow counter.[55]  It just so happened that a few months earlier, Ralph Reed, the former executive director of the Christian Coalition and one of Abramoff's long-time friends, had reached out to Abramoff: "Hey, now that I'm done with electoral politics, I need to start humping in corporate accounts!  I'm counting on you to help me with some contacts."[56]  Abramoff saw an opportunity: he suggested a grassroots effort and recommended the Choctaw hire Reed to orchestrate an anti-gaming effort.[57]

The Tribe agreed to hire Reed to mobilize grassroots opposition to various legislative

---

[50]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[51]*Id.*

[52]*Id.*

[53]*Id.*

[54]*Id.*

[55]*Id.*

[56]Email from Ralph Reed, Century Strategies, to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000079102) (November 12, 1998).

[57]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

23

proposals throughout the Gulf Coast[58] that would have increased gaming, thereby diminishing the Choctaw casino's market share.[59]  No one from the Choctaw had any direct contact with Reed; rather, Abramoff served as the liaison with Reed and his firm, which eventually became a subcontractor to Preston Gates.[60]

In March 1999, Abramoff and his associate, Shawn Vasell, spoke with Reed about the Choctaw's grassroots needs.[61]  According to a draft engagement letter from Reed to Abramoff, Reed was hired to defeat a bill that had passed the Alabama House of Representatives "authorizing dog tracks in the state to install video poker and other casino-style games on their sites."[62]  Reed promised to "build a strong grassroots network across the state against the extension of video poker and [REDACTION]."[63]  He claimed that no firm had better relationships than his with the grassroots conservatives in Alabama, including the Alabama Christian Coalition, the Alabama Family Alliance, the Alabama Eagle Forum, the Christian Family Association, and "leading evangelical pastors such as Frank Barker of Briarwood Presbyterian Church in Birmingham."[64]  Reed boasted that "Century Strategies has on file over 3,000 pastors and 90,000 religious conservative households in Alabama that can be accessed in this effort."[65]

Reed promised to leverage his contacts for the Tribe:

> Working closely with your existing team at Preston Gates, we can play on [sic] operational role in building a strong anti-video poker grassroots structure that will leverage the considerable contacts and reputation of our principals within Alabama, the conservative faith

---

[58]The Committee has seen no evidence that the Choctaw undertook or authorized any work by Abramoff or Scanlon, or anyone else, to oppose gaming in other Southern states, such as Louisiana and Texas.

[59]*Id.*

[60]*Id.*

[61]Email from Ralph Reed, Century Strategies, to Shawn Vasell, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000111956) (March 26, 1999).

[62]Ralph Reed document production (Bates numbers 5908-09) (March 26, 1999) (letter from Ralph Reed to Jack Abramoff).

[63]*Id.*

[64]*Id.*

[65]*Id.*

community, and state elected officials.[66]

Reed proposed a $20,000 monthly retainer for his services, and ended his letter by writing, "We look forward to bringing about the desired results for you."[67]

After receiving Reed's proposed engagement agreement, Abramoff responded, "Ralph, I spoke with Nell this evening. She wants much more specifics. They are not scared of the number, but want to know precisely what you are planning to do for this amount."[68]

When Reed told Abramoff he was devoting half his staff to the project for two weeks, but needed the green light to begin, Abramoff directed:

> Please page me with a page of no more than 90 words ... informing me of your completion of the budget and giving me a total budget figure with category breakdowns. Once I get this, I will call Nell at Choctaw and get it approved.[69]

On April 6, 1999, Abramoff informed Reed that he "spoke with our managing partner [at Preston Gates] and he has approved the subcontractor arrangement" and instructed Reed to "get me invoices as soon as possible so I can get Choctaw to get us checks asap."[70]

When Abramoff believed he could not get money quickly enough to Reed, Abramoff suggested that the Choctaw pay Reed directly: "Ralph, I am not sure that I can get this wire moving fast enough today. Give me your wire info and I'll do what I can."[71] Abramoff then asked, "Any chance that a wire from Choctaw directly would be OK?"[72] Reed's response is unknown; however, the Committee has seen no evidence that the Choctaw paid Reed or his firms

---

[66]*Id.*

[67]*Id.*

[68]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000111956) (March 29, 1999).

[69]Email between Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, and Ralph Reed, Century Strategies (GTG-E000111992) (April 4, 1999).

[70]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (Bates number 7029) (April 6, 1999) (Ralph Reed document production).

[71]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000111977) (April 9, 1999).

[72]*Id.*

25

directly.

By mid-April, things were moving. In an e-mail entitled "Disbursement on behalf of Choctaw Indians," Abramoff assured Reed that the money was on its way.[73] Using the Choctaw's money, Reed paid for grassroots activities including, telemarketing (patch-through, tape-recorded messages and call-to-action phone calls), targeted mail, legislative counsel and local management, rallies, petitions, "voter contact, television and radio production, the remainder of phones, the statewide fly-around, the pastor's and activist rally, the church bulletin inserts, and other items."[74]

Reed also claimed that he was leveraging his contacts within the Christian community for the Choctaw's benefit. Reed reported to Abramoff that there would be "a saturation statewide radio buy with a new ad by Jim Dobson that he will record tomorrow."[75] Reed assured Abramoff, "We are opening the bomb bay doors and holding nothing back. If victory is possible, we will achieve it,"[76] and, one day later, again promised, "All systems are go on our end and nothing is being held back."[77]

By May 10, 1999, the Choctaw had paid Reed $1,300,000 through Preston Gates, with another $50,000 outstanding.[78] For reasons unclear to the Committee, in late 1999 the Tribe discontinued paying Reed through Preston Gates. Rogers recalled that there came a time when either Reed or Preston Gates (or both) became uneasy about money being passed through Preston Gates to Reed.[79] Abramoff thus searched for another conduit.

Abramoff turned to his long-time friend Norquist to have his group ATR serve as a

---

[73]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000111974) (April 12, 1999).

[74]Email from Ralph Reed, Century Strategies, to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000112006) (April 21, 1999).

[75]*Id.*

[76]*Id.*

[77]Email from Ralph Reed, Century Strategies, to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000112006) (April 22, 1999).

[78]Email from [REDACTED] to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E00018933) (May 10, 1999).

[79]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

conduit for the Choctaw money.[80]  Earlier, on May 20, 1999, Norquist had asked Abramoff, "What is the status of the Choctaw stuff.  I have a $75K hole in my budget from last year.  ouch [sic]."[81]  Thus, in the fall of 1999, Abramoff reminded himself to "call Ralph re Grover doing pass through."[82]  When Abramoff suggested the Choctaw start using ATR as a conduit, the Tribe agreed.[83]

In late 1999, the Choctaw paid ATR $325,000.[84]  In a 2005 interview with *The Boston Globe*, Norquist said that ATR had sent $300,000 of that $325,000 to Citizens Against Legalized Lottery ("CALL").[85]  Norquist explained that he sent the money to CALL because the Tribe wanted to block gambling competition in Alabama.[86]

Out of the Choctaw's $325,000, ATR apparently kept $25,000 for its services.  According to Rogers, Norquist demanded that he receive a management fee for letting ATR be used as a conduit:

> But I remember when we discussed needing a vehicle for doing the
> pass-through to Century Strategies that Jack had told me that Grover
> would want a management fee.  And we agreed to that, frankly didn't
> know any other way to do it at that time.[87]

On a similar project in early 2000, Reed and Abramoff discussed using four groups instead of one as conduits to pay Reed: NCPPR, ATR, Toward Tradition and one unidentified

---

[80]*See* Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to himself (GTG-E000079255) (September 24, 1999).

[81]Email from Grover Norquist, Americans for Tax Reform, to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000114915) (May 20, 1999).

[82]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to himself (GTG-E000079255) (September 24, 1999).

[83]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[84]*Id.*

[85]Michael Kranish, *Antitax Activist Says He got $1.5M from Tribes,* The Boston Globe, May 13, 2005.

[86]*Id.*

[87]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

group.[88]  Abramoff later advised Reed that "Rabbi Lapin [head of Toward Tradition] does not have a c4'[89] and asked Reed for "the name of the c4 you want to use (include address) and we'll divide it among the three groups."[90]  Within days, Abramoff advised Reed that Amy Ridenour, president of NCPPR, "does not have a c4, only a c3, so we are back to ATR only."[91]  Abramoff asked Reed, "Let me know if it will work just to do this through ATR until we can find another group."[92]

Though Reed did not respond, on February 2, 2000, Abramoff informed Reed, "We'll have $300K for Monday and more shortly thereafter."[93]  This project apparently was centered on opposing a video poker initiative.[94]  The Choctaw made the first of three $300,000 payments to ATR on February 7, 2000.  Abramoff warned Reed, however, that "I need to give Grover something for helping, so the first transfer will be a bit lighter."[95]

During this time, Abramoff advised Reed that the Choctaw might be limited in the amount of money it could devote to his activities.[96]  In response, Reed assured Abramoff that he

---

[88]*See* Email from Ralph Reed, Century Strategies, to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000020203) (January 27, 2000) (listing the names of the heads of the groups they contemplated using as conduits).

[89]Abramoff's designation of groups as a c4 or c3 group apparently refers to their tax exempt status under either subsection (c)(3) or (c)(4) of section 501 of the Internal Revenue Code.

[90]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000020287) (January 28, 2000).

[91]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (Bates number 7096) (February 2, 2000) (Ralph Reed document production).

[92]*Id.*

[93]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000020517) (February 3, 2000).

[94]*See* Email from Ralph Reed, Century Strategies, to Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000020467) (February 17, 2000); *see also* Michael Kranish, *Antitax Activist Says He got $1.5M from Tribes*, The Boston Globe, May 13, 2005.

[95]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000020508) (February 7, 2000).

[96]*See* Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (Bates number 7096) (February 2, 2000) (Ralph Reed document production).

was also seeking money from "national anti-gambling groups, Christian CEOs, and national pro-family groups."[97]

The Tribe was nevertheless able to continue funding Reed's efforts. On February 17, 2000, Abramoff advised Reed that "ATR will be sending a second $300K today."[98] This money, too, came from the Choctaw.[99] Norquist kept another $25,000 from the second transfer, which apparently surprised Abramoff.[100]

On March 2, 2000, Abramoff told Rogers he needed "more money asap" for Reed, and requested "a check for $300K for Americans for Tax Reform asap."[101]

Abramoff's executive assistant Susan Ralston asked him, "Once ATR gets their check, should the entire $300k be sent to the Alabama Christian Coalition again?"[102]

Abramoff replied, "Yes, but last time they sent $275K, so I want to make sure that before we send it to ATR I speak with Grover to confirm."[103]

Rogers did not speak with anyone at ATR about using ATR as a conduit.[104] As far as Rogers knew, ATR was not involved and was not considering getting involved in any of the efforts the Choctaw ultimately paid Reed and others to oppose.[105] Based on everything Rogers

---

[97]*Id.*

[98]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies (GTG-E000020467) (February 17, 2000).

[99]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[100]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to himself (GTG-E000078903) (February 22, 2000).

[101]Email from Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds, to Nell Rogers, Mississippi Band of Choctaw Indians (GTG-E000110996) (March 2, 2000).

[102]Email between Susan Ralston, Preston, Gates, Ellis & Rouvelas Meeds, and Jack Abramoff, Preston, Gates, Ellis & Rouvelas Meeds (GTG-E000110996) (March 3, 2000).

[103]*Id.*

[104]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[105]*Id.*

knew, ATR simply served as a conduit to disguise the source of the Choctaw money ultimately paid to grassroots groups and Reed.[106]  Rogers told Committee staff that she understood from Abramoff that ATR was willing to serve as a conduit, provided it received a fee.[107]

The Choctaw's intent and understanding was that the money would pass through ATR and ultimately reach either Reed or a grassroots organization engaging in anti-gaming activities.[108]  It was never intended as a contribution to support ATR's general anti-tax work.[109]  As far as Rogers was concerned, ATR was serving as a conduit on a project that had nothing to do with taxes and that was designed to oppose gaming.[110]

At some point, Rogers recalled that Norquist apparently began getting nervous about his role as a pass-through.[111]  Rogers thought that part of Norquist's discomfort derived from press accounts reporting that ATR was one of the largest contributors to an organization that was fighting against the expansion of gaming.[112]

The question arises why the Choctaw paid money to Reed through various conduits, such as Preston Gates and ATR, rather than directly.  Rogers told Committee staff, "I always assumed it's because Ralph was more comfortable with that."[113]  Rogers understood from Abramoff that "Ralph Reed did not want to be paid directly by a tribe with gaming interests.  It was our understanding that the structure was recommended by Jack Abramoff to accommodate Mr. Reed's political concerns."[114]  Nevertheless, the work Reed and his company Century Strategies performed and for which they were paid through Preston Gates and ATR was on the Tribe's

---

[106]*Id.* Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005)

[107]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Washington, D.C. (June 16, 2005).  Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005)

[108]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[109]*Id.*

[110]*Id.*

[111]*Id.*

[112]*Id.*

[113]*Id.*

[114]*Id.*

behalf and for its benefit.[115]  The Tribe has no complaints about the quality of work Reed undertook on its behalf.[116]

Once ATR ceased serving as a conduit, Abramoff and Reed looked for other conduits for the Tribe to route money to Reed's Century Strategies.  After he left Preston Gates for Greenberg Traurig in 2001, Abramoff suggested the Tribe pay into entities owned or controlled by Michael Scanlon.  In 2001, the Choctaw paid money into American International Center ("AIC"), which Abramoff described as vehicle for passing money through to Reed.[117]  By the Committee's accounting, the Tribe paid AIC $1,485,656 in 2001, and $1,170,000 in 2002.[118]

### E.     Abramoff Brings Scanlon to the Choctaw

In late 2001, the Choctaw were again looking for a grassroots specialist to help with certain state issues.[119]  Because of the Tribe's and Rogers' relationship with and trust in Abramoff, they asked him to recommend a grassroots specialist.[120]  This time, Abramoff did not turn to Reed; he instead introduced the Tribe to Scanlon.[121]

Abramoff and Scanlon traveled together to Mississippi to meet with the Choctaw.[122]  Abramoff introduced Scanlon as an independent consultant and an expert in grassroots operations.[123]  Abramoff claimed that Scanlon worked with the Christian community in grassroots campaigns, get out the vote campaigns and public relations campaigns.[124]  He also said Scanlon was Congressman Tom DeLay's former staffer and later described him as "DeLay's

---

[115]*Id.*

[116]*Id.*

[117]*Id.*

[118]*Id.*

[119]*Id.*

[120]*Id.*

[121]*Id.*

[122]*Id.*

[123]*Id.*

[124]*Id.* Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005).

dirty tricks guy."[125]

Abramoff recommended that the Tribe hire Scanlon.[126] Abramoff did not recommend anyone else.[127] Trusting in and relying on Abramoff, the Tribe did so.[128] From the outset, the Tribe understood that Scanlon would hire vendors to perform much of the work, and that Scanlon and his company Capitol Campaign Strategies would provide the strategy, hire and coordinate the vendors, and make the contacts.[129] Although the Tribe expected Scanlon would take a reasonable fee for his work, it intended that most of its payments to Scanlon would be used for grassroots activities such as polling, surveying, media, and analysis.[130] The Choctaw never intended that any of the money it paid Scanlon would go to Abramoff.[131]

The Tribe, and in particular Chief Martin, were always concerned about how high Scanlon's fees were.[132] Rogers sometimes asked Scanlon for a reduced budget.[133] To justify Scanlon's charges, both Abramoff and Scanlon explained that the cost of Scanlon's work was consistent with the cost of the work Reed had done for the Choctaw.[134] They also explained that it was "the cost of operating under the radar."[135] In some instances, Scanlon did reduce his

---

[125]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[126]*Id.*

[127]Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005).

[128]*Id.* Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[129]*Id.*

[130]*Id.*

[131]Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005).

[132]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[133]*Id.*

[134]*Id.*

[135]*Id.*

original, proposed budget, but not often.[136]

In addition to combating market threats, Scanlon promised to turn the Choctaw into a political powerhouse at the state level. And so, on October 16, 2001, Abramoff asked Scanlon, "By the way, even with this [project] done, don't we have a large longer term project to do for them there? Remember we promised when we had dinner with the Chief that we would make them the most powerful folks in the state."[137]

Scanlon was referring to a grandiose plan he called Operation Orange. The Tribe did not agree to Operation Orange in its entirety, but instead directed Scanlon to pursue discreet parts of it aimed at threats to its casino's market share.[138] Contemporaneously, the Tribe saw evidence that Scanlon was carrying out parts of Operation Orange it had commissioned.[139] The Tribe paid roughly $4,500,000 over two years for Scanlon's efforts related to Operation Orange.[140]

Over the same two years, the Tribe also paid Scanlon another $1,000,000 for a separate project.[141] Rogers understood that Scanlon and his companies were conducting polls, performing research, including opposition research, directly lobbying opinion makers, using third parties, and engaging in letter campaigns.[142] Scanlon told the Choctaw he was mobilizing Christian grassroots groups, such as Global Christian Outreach Network and Concerned Citizens Against Gaming Expansion.[143]

In earlier grassroots efforts to protect its market share, the Tribe had grown accustomed to

--------------------------------

[136]*Id.*

[137]Email between Jack Abramoff, Greenberg Traurig, and Michael Scanlon, Capitol Campaign Strategies (1131592) (October 16, 2001).

[138]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[139]*Id.*

[140]*Id.*

[141]*Id.*

[142]*Id.*

[143]*See* Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005). Unknown to the Choctaw was that these organizations were bogus. A full explanation about how Scanlon apparently used such bogus organizations as a part of his and Abramoff's "gimme five" scheme is set forth below in Part 2, Chapter 1, "Capitol Campaign Strategies" section, Page 3, "CCS' Use of Fictitious Grassroots Organizations."

sending payments through conduits at Abramoff's direction. Abramoff and Scanlon continued the practice of directing the Tribe to route money through conduits. Abramoff and Scanlon identified the following as pass-through vehicles for the Choctaw: American International Center, Capital Athletic Foundation, Scanlon-Gould Public Affairs, and, National Center for Public Policy Research.[144] Common among all of them was that they were all entities over which Abramoff or Scanlon exercised considerable control.

Ultimately, the Choctaw paid approximately $16,500,000 to companies owned or controlled by Scanlon. Unknown to the Choctaw, Scanlon secretly kicked back to Abramoff about $6,364,000—about 50% of his total profit from the Tribe. Additionally, at Abramoff and Scanlon's direction, the Tribe paid another $2,000,000 to non-profit organizations where Abramoff was a director.[145] The payments from the Tribe to Abramoff and Scanlon-related entities is as follows:

### PAYMENTS BY CHOCTAW TO ABRAMOFF/SCANLON ENTITIES
*Payments by Tribe to Capitol Campaign Strategies (CCS)*

| | |
|---|---|
| • 06/29/01 | $200,000 |
| • 07/18/01 | $43,650 |
| • 07/31/01 | $50,000 |
| • 08/29/01 | $1,500,000 |
| • 09/27/01 | $1,000,000 |
| • 10/18/01 | $207,000 |
| • 11/02/01 | $1,670,000 |
| • 11/13/01 | $2,350,000 |
| • 12/31/01 | $250,000 |
| • 02/22/02 | $1,600,000 |
| • 10/15/02 | $800,000 |
| • 12/11/02 | $330,000 |
| • 12/11/02 | $600,000 |
| • 09/03/03 | $48,333 |
| • 09/03/03 | $48,334 |
| • 09/03/03 | $48,333 |
| • 09/11/03 | $500,000 |
| • 10/16/03 | $450,000 |

---

[144]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[145]Discussion and analysis of how Abramoff and Scanlon successfully perpetrated their "gimme five" scheme on the Tribe, on an entity-by-entity basis, is contained in Part 2 of the this Report.

34

- 10/16/03          $300,000
- 11/18/03          $300,000
- 11/18/03          $150,000
- 12/10/03          $300,000

Total          **$12,745,650**

*Payments by Tribe to Scanlon Gould Public Affairs (SGPA)*

- 04/29/02          $1,000,000
- 10/15/02          $1,000,000

Total          **$2,000,000**

*Payments by Tribe to American International Center (AIC)*

- 02/27/01          $200,000
- 04/09/01          $150,000
- 05/02/01          $175,000
- 05/11/01          $960,654
- 02/22/02          $1,000,000
- 12/11/02          $170,000

Total          **$2,655,654**

*Payments by Tribe to Capital Athletic Foundation (CAF)*

- 01/03/02          $500,000
- 08/05/02          $500,000

Total          **$1,000,000**

*Payments by Tribe to National Center for Public Policy Research (NCPPR)*

- 10/15/02          $1,000,000

Total          **$1,000,000**

The Tribe would not discover, until after this Committee started its investigation, the scam that

Abramoff and Scanlon were running on it.

## F.    Abramoff Has The Choctaw Fund His Pet Projects

### 1.    2000 Scotland Golf Trip

In 2000, Abramoff had the Choctaw pay twice to the NCPPR: $25,000 on May 19 and $40,000 on June 27.[146] It has been widely reported that the NCPPR used those funds to finance partially a golf trip to Scotland for Abramoff, Congressman DeLay and his staff, and others.[147] The Tribe never intended for those funds to be used to finance a trip for any member of Congress; rather, it was intended as a donation for some anti-tax and anti-NACS [National Association of Convenience Stores] work.[148] Any use of the funds to finance that Scotland trip was done without the Choctaw's knowledge or authorization.[149]

### 2.    Sports Suites

For three years, the Choctaw paid into what Abramoff labeled the "Sports Suites" program: $170,374 in 1999, $233,679 in 2000, and $223,679 in 2001.[150] Rogers understood that "Sports Suites company to be a company basically that was a Jack Abramoff company but that several tribes paid shares into so that the suites could be used for fundraisers or similar kinds of events."[151] Abramoff told Rogers that he would represent the tribal participants as the owners of the Sports Suites.[152] Rogers said she would find it objectionable if Abramoff used the Sports Suites boxes for the benefit of other clients or his family, unless they paid for their use of the Sports Suites.[153]

_____

[146]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[147]*Id.*

[148]*Id.* Interview of Phillip Martin, Chief, Mississippi Band of Choctaw Indians, in Washington, D.C. (May 17, 2005).

[149]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[150]*Id.*

[151]*Id.*

[152]*Id.*

[153]*Id.*

36

Rogers believed that Choctaw derived benefit from participating in the Sports Suites program:

> In some regards I do [believe the Tribe derived a benefit] because the box had copies of the Choctaw Revolution.[154] It had the tribal profile. It had information about manufacturing opportunities or economic development opportunities on the reservation. And we actually had calls or ran into people who had picked up information about the tribe and who had contacted the tribe because of that. And there were fundraisers held for members of Congress there, including some in our delegation as well as other members who had interest in Indian issues or who had responsibility for Indian issues. So in that regard, I think that the tribe did have some benefit.[155]

### 3.    Liberty Consulting Services, LLC

On January 30, 2002, Abramoff instructed his assistant Illisa Gertner to send an invoice for Liberty Consulting Services ("Liberty") in the amount of $5,000 for "Consulting Services."[156] Abramoff instructed Gertner to include a cover sheet saying, "Per my email about Alexander Strategy Group, attached please find the invoice for Liberty."[157] Abramoff told the Tribe that Liberty "was another lobbying group that was going to oppose NACS [National Association of Convenience Stores] ...."[158] The Choctaw paid Liberty Consulting a total of $25,000 in 2002.[159]

Unknown to the Choctaw, Liberty was actually a company set up by Tony Rudy, while he

---

[154]*The Choctaw Revolution: Lessons for Federal Indian Policy* was a book written about the success of the Choctaw in 1998 by Peter Ferrara and published by ATR. The Choctaw reportedly paid Ferrara for his work on the book. Eamon Javers, *"Op-Eds for Sale,"* BusinessWeek Online (December 16, 2005).

[155]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[156]*See* Email from Jack Abramoff, Greenberg Traurig, to Illisa Gertner, Greenberg Traurig (GTG-E000107717-18) (January 30, 2002) (attaching Liberty Consulting Services invoice).

[157]*Id.*

[158]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[159]*Id.*

was serving on Congressman DeLay's staff, as his Deputy Chief of Staff.[160]  When Rudy pled guilty to committing conspiracy on March 31, 2006, he admitted, among other things, that Liberty performed no services to justify receipt of the payments from the Choctaw:

> From February 2002 through July 2002, Abramoff, with Rudy's knowledge and consent, arranged for payments totaling $25,000 to be made to Liberty Consulting by one of Firm B's [Greenberg Traurig] clients, a Native American Tribe in Mississippi [Choctaw].  The payments were made in five monthly installments, which were usually sent by mail.  Rudy knew that no additional services were being provided to the client for payments.[161]

## G.    Conclusion

All the money that Scanlon and Abramoff bilked from the Choctaw had very significant consequences for the Tribe.  During her interview, Rogers identified numerous unmet needs of the Tribe, where the lost money would have been critical: "[s]cholarships; health care, in particular; education; courts; police."[162]

Nonetheless, after the first few *The Washington Post* articles ran, Abramoff attempted to have the Choctaw dissuade the Committee from investigating.  Rogers said Abramoff "asked me if I would ask the Chief to approach Senator McCain and suggest that each of the tribes, since they had their own police departments and courts, conduct their own internal investigations."[163]

Even as details of his and Scanlon's "gimme five" scheme began to emerge, Abramoff attempted to conceal his and Scanlon's wrongdoing from the Tribe.  In a telephone conversation with Rogers, Abramoff claimed that he used his school as a conduit to pass Choctaw money to grassroots organizations.  According to Rogers:

> He [Jack] said that he – he said, 'Well, Nell, I have to tell you, I took some of the money Mike had' -- yeah.  He said, 'I took some of the

---

[160]Plea Agreement, Factual Basis for the Plea at para. 7, *U.S. v. Tony C. Rudy* (D.C. District Court, March 31, 2006) (CR-06-082).

[161]*Id.*

[162]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

[163]Interview of Nell Rogers, planner, Mississippi Band of Choctaw Indians, in Choctaw, Mississippi (April 27-29, 2005).

# PART IV

## Recommendations

### A.     Introduction

Over the past two years, the Committee on Indian Affairs (the "Committee") has developed a robust legislative record on the facts and circumstances surrounding Jack Abramoff and Michael Scanlon's relationship with and representation of the Mississippi Band of Choctaw Indians ("Choctaw"), the Coushatta Tribe of Louisiana ("Louisiana Coushatta"), the Saginaw Chippewa Indian Tribe ("Saginaw Chippewa"), the Agua Caliente Band of Cahuilla Indians ("Agua Caliente"), the Ysleta del Sur Pueblo of Texas ("Tigua"), and the Pueblo of Sandia (collectively, "Tribes") .  After careful consideration of that record, the Committee makes the following observations and recommendations.

### B.     Contracting for Legal, Lobbying and Other Professional Services

#### 1.     No New or Revised Federal Legislation Needed

The Committee has exhaustively examined Abramoff and Scanlon's "gimme five" scheme, by which the two bilked the Tribes out of tens of millions of dollars.  Without doubt, the depth and breadth of their misconduct was astonishing.  Nevertheless, with respect solely to the kickbacks from Scanlon to Abramoff, the Committee concludes that existing federal criminal statutes are sufficient to deter and punish such misconduct.

Indeed, there is no better support for the Committee's conclusion than Abramoff's and Scanlon's guilty pleas.  On November 17, 2005, Scanlon pled guilty to, among other things, conspiracy (1) to defraud some of the Tribes under 18 U.S.C. §§ 1341 and 1343; and, (2) to defraud and deprive some of the Tribes of Abramoff's honest services under 18 U.S.C. §§ 1341, 1343, and 1346.  On January 3, 2006, Abramoff pled guilty to, among other things, (1) conspiracy to commit mail and wire fraud under 18 U.S.C. §§ 1341 and 1343; (2) conspiracy to commit honest services wire and mail fraud, under 18 U.S.C. §§ 1341, 1343, and 1346; (3) honest services mail fraud under 18 U.S.C. §§ 1341 and 1346.

That Abramoff and Scanlon perpetrated their kickback scheme against Indian tribes does not change the applicability or effectiveness of those statutes as tools to deter and punish such misconduct.  The Committee sees no basis for treating Indian tribes differently than other similarly aggrieved parties in this respect.  The Committee thus finds no reason or basis to carve out or create a special category for fraud against Indian tribes under federal law.

2.     **Best Practices Recommendations**

Although the Committee does not believe that additional federal legislation is required to address Abramoff and Scanlon's misconduct, it does recommend that tribes consider adopting their own laws to help prevent a similar tragedy. Over many years and innumerable scandals, the federal and state governments learned difficult lessons regarding appropriate decision-making processes when contracting for services. From these lessons a consensus has developed around core good governance principles. These principles embody a philosophy that focuses on providing sufficient information to constituents regarding the basis for decisions made by government officials, thereby fostering trust and confidence that governmental decisions are being made based on the best interests of the government and not of the individual decisionmakers. Accordingly, the federal and state governments have enacted laws and regulations addressing issues relating to contracting for services and conflicts of interests.

Some Indian tribes have already adopted laws and regulations addressing some or all of these matters, while a significant number have not. The Committee strongly encourages those tribes that have not adopted such laws and regulations to enact laws and regulations that embrace the principles contained in the following recommendations. The Committee notes, however, that it is *not* recommending that Congress enact legislation mandating tribes to enact laws dealing with these subjects, but that the tribal governments themselves consider the following recommendations and determine for themselves whether enacting such laws might benefit the tribe and its members. Tribal governments, as the government closest and most responsive to tribal members, are best able to develop laws and regulations that appropriately take into account the unique history, cultural and legal authorities of a particular tribe.

a.     **Contracting for legal, lobbying and other services should follow a specific, open and competitive process**

Tribal governments should consider adopting laws applicable to contracting for legal, lobbying or other professional services, at least when the cost of the services will exceed, or has the potential of exceeding, a certain threshold amount. Contracting for these services should not be an *ad hoc* decision of the tribal council or a tribal official but instead should follow a *process* that requires decision-makers to assess what it is that the tribe needs; determine the kinds of skills, experience and expertise the contractor must have in order to meet those needs; solicit contracting proposals from the applicable community of contractors or providers, based on a clearly articulated set of requirements; evaluate the responsive proposals in light of the stated requirements; perform appropriate background checks on responding contractors and providers; and document the contracting decision in writing.

b.     **Contracting rules should be structured to prevent conflicts of interest**

Even a fair and open contracting process can be abused. Accordingly, contracting rules

353

should include provisions calculated to prevent improper considerations in the contracting process – such as prohibitions against contracting decision-makers from receiving anything of value from persons or firms seeking to obtain or renew contracts with the tribe; requirements that tribal campaign contributions (including contributions of services or assistance) at or above a certain threshold dollar amount be publicly disclosed; or rules prohibiting tribal council members from voting on any measure relating to a contract where the contractor has contributed to his or her campaign for office. Tribes should consider examining whether, under any circumstances, a firm that provides legal, lobbying or other professional services to the tribe should ever be allowed to contribute money, services or anything of value to the campaign of anyone running for tribal office, or to provide professional services to a tribal official in his or her personal capacity apart from the services being provided to the tribe or to the official in his or her official capacity.

### c.    Contracting and conflict of interest rules should include appropriate sanctions

To ensure an adequate level of compliance with contracting and conflict of interest rules, there should be appropriate sanctions in place for violations of the rules. Apart from laws criminalizing the receipt of kickbacks and fraud (which many, if not most, tribes have already enacted), tribes should consider enacting laws that would render professional contracts awarded in violation of the contracting or conflict of interest rules to be void or voidable; subject a contractor found to have violated the rules to a contracting bar period or for egregious violations even a permanent bar; and make violation of the conflict of interest rules by a tribal official grounds for civil sanctions such a fines, suspension or even removal from office.

### d.    Tribes should consider working with tribal organizations and educational institutions to develop model codes and education programs addressing contracting and conflicts of interest.

Tribes should consider working with their regional or national tribal organizations or with universities, colleges and law schools to develop model codes or laws to address contracting and conflict of interest issues, as well as "good government" education programs for elected and non-elected tribal officials designed to improve decision-making and avoid conflicts of interest in general but in the contracting process in particular.

## C.    Integrity of Tribal Elections

In its investigation, the Committee determined that certain non-tribal members insinuated themselves into and influenced tribal governmental elections. These non-tribal members did so with the intent or understanding that should their allies prevail, they would receive lucrative lobbying contracts from the respective tribe. Examples of these egregious actions include recruiting candidates for tribal governmental positions, organizing and funding comprehensive electioneering efforts, and providing monetary and other assistance to recall successful

354

candidates who were unfavorable to the non-tribal members.

Tribal elections are internal tribal governmental matters that are governed by the laws of each tribe. The Committee, however, is concerned that the economic success of certain tribes and the increasing number of contracts tribes enter into with outside entities may lead to an increase in the efforts of non-tribal members to interfere with or influence tribal elections.

Based on these concerns, the Committee recommends that tribal governments should consider adopting or revising laws applicable to their elections that govern the scope of involvement by non-tribal members and entities. Tribal governments should consider adopting laws that address the following issues:

- Whether, and to what extent, non-members may contribute to campaigns for tribal office.
- Whether, and to what extent, non-members may provide non-monetary support in campaigns for tribal office.
- Limitations on the amount of monetary contributions any person or entity can make to a tribal campaign.
- Reporting requirements for donors and recipients of monetary contributions in tribal elections.
- Prohibiting persons or entities that make monetary contributions to candidates in tribal elections from entering into contracts with the tribe for a specific period of time after the election.

The Committee is aware that some tribes already have comprehensive election laws that address these issues, including prohibiting non-tribal members from making monetary contributions to tribal elections. The Committee commends these efforts as further examples of strong tribal governance and encourages tribes that have not yet adopted laws governing tribal elections to do so.


**D.     Tribal Political Contributions**

Integral to Jack Abramoff's lobbying practice were the substantial political contributions that he requested or directed his Tribal clients to make, and for which he and his team members attempted to take credit. Whenever he pitched his services, he would discuss the need for the Tribe to make substantial political contributions.

Whether following Abramoff's advice or not, Abramoff's tribal clients made substantial political contributions during the time he represented them. The sizeable aggregate campaign contributions by some of Abramoff's tribal clients has focused attention on the treatment of Indian tribes under campaign finance law. This has resulted in calls to restrict tribal campaign contributions. Proposals to limit contributions range from treating Indian tribes like

"individuals" for purposes of imposing aggregate caps on their contributions from tribal funds, to treating tribes like corporations, which cannot use treasury funds for contributions but can instead establish separate segregated funds, also known as political action committees ("PACs"), to receive limited voluntary contributions.

Many tribes object to these proposed restrictions on their political contributions, arguing that they are truly unique entities that should not be equated to individuals or corporations. They further argue that they are particularly impacted by Congressional actions, and must be afforded the opportunity to participate in the political process by using tribal funds for political contributions.

On February 8, 2006, the Committee held an Oversight Hearing on Indian Tribes and the Federal Election Campaign Act to examine this issue. The Federal Election Commission ("FEC") testified at this hearing that Indian tribes are subject to the same contribution limitations and prohibitions in the federal campaign law as are other unincorporated associations. In instances where a tribe is acting through a corporation or federal government contractor, those tribal entities are governed by the same rules generally applicable to corporations and federal government contractors. Additionally, the FEC informed the Committee that political committees, including candidate and general party committees, must report contributions from Indian tribes.

Concerns were raised by many of the witnesses testifying before the Committee about difficulties in researching and monitoring tribal political contributions. These difficulties do not appear to be unique to Indian tribes, but also exist with respect to researching and monitoring contributions from individual donors and other entities.

The Committee believes that it is prudent to increase the level of transparency with regards to all political contributions, including those from Indian tribes. Thus, after considering the record before it, the Committee recommends, at a minimum, the following either be implemented by rule by the Federal Election Commission or law enacted by Congress.

- Tribes should be required to register with the FEC, which will assign each tribe a unique identifier, for the purpose of better tracking tribal campaign contributions.
- Contributions should be made only in the tribe's name as it appears on its registration on file with the FEC.
- The contributions must be reported by the recipient in the Tribe's name.

In the opinion of the Committee, based on the extensive legislative record and the February 8, 2006, hearing, these public disclosure recommendations adequately protect the public trust and confidence in the Federal election system, without unduly excluding Indian tribes from participating in that system.

E.      **Referrals to Other Committees**


1.      **Possible Misuse of Tax Exempt Organizations**

In the course of its investigation, this Committee uncovered numerous instances of nonprofit organizations that appeared to be involved in activities unrelated to their mission as described to the Internal Revenue Service.  In addition, the Committee observed that a number of nonprofit organizations were used as instruments to channel money from one entity to another in an effort to obscure the source of funds, the eventual use of funds, and to evade tax liability on funds.  Finally, the Committee also observed tax exempt organizations apparently serving as or being used as extensions of for-profit lobbying operations.

Recognizing that oversight of nonprofit organizations under the Internal Revenue Code is not within the jurisdiction of the Senate Committee on Indian Affairs, the Committee, at the request of the Senate Committee on Finance, transmitted a number of relevant documents pertaining to this issue to the Senate Committee on Finance on February 9, 2006.  Those documents are included in this Report in the supporting documents following the text of the Report.

The Committee believes that the evidence it uncovered raises serious issues involving nonprofit organizations, not only with regard to compliance with existing federal revenue laws, but also with regard to whether existing federal revenue laws should be altered to prevent or discourage such activity.  The Committee therefore recommends that the Senate Committee on Finance investigate, hold hearings, and report to the Senate on its findings and recommendations on these issues.