# TABLE OF CONTENTS

**Page**

RELEVANT FACTS ............................................................................................... 3

    1. Scotland Trip and Ethics Request ....................................................... 3

    2. Old Post Office and White Oak Inquiries .......................................... 5

    3. GSA-OIG Inquiries .............................................................................. 6

    4. SCIA Document Request for Its Jack Abramoff Investigation ................... 8

ARGUMENT ..................................................................................................... 11

I.    CIRCUMSTANCES FOR ALL COUNTS FAIL TO SATISFY FIFTH
    AMENDMENT DUE PROCESS ............................................................... 11

II.   THE CONCEALMENT VERDICTS IN COUNTS TWO AND THREE MUST
    BE REVERSED AS A MATTER OF LAW BECAUSE THERE WAS NO
    SPECIFIC, LEGAL DUTY TO DISCLOSE THE ALLEGED CONCEALED
    INFORMATION.......................................................................................... 18

III.  THE SECTION 1001 CONVICTIONS MUST BE REVERSED BECAUSE THE
    GOVERNMENT CANNOT NEGATE A  REASONABLE INTERPRETATION
    THAT MAKES MR. SAFAVIAN'S STATEMENTS FACTUALLY CORRECT........ 25

IV.  COUNTS TWO AND THREE ARE MULTIPLICITOUS........................................... 30

V.   THE VERDICTS IN COUNTS TWO, THREE, AND FIVE MUST BE
    DISMISSED FOR INSUFFICIENT EVIDENCE........................................... 32

    A.    In Count Two, There is Insufficient Evidence that Mr. Safavian
        Knowingly or Willfully Made a False Statement or Concealed a Material
        Fact.......................................................................................................... 32

        1.    Specific Intent to Make a False Statement................................ 32

        2.    Materiality.................................................................................. 33

    B.    In Count Three, There is Insufficient Evidence that Mr. Safavian
        Knowingly and Willfully Concealed a Material Fact to Agent Rowe ............... 34

        1.    Specific Intent to Make a False Statement................................ 34

        2.    Materiality.................................................................................. 35

    C.    In Count Five, There is Insufficient Evidence That Mr. Safavian
        Knowingly and Willfully Falsified a Material Fact Within the Jurisdiction
        of the SCIA .............................................................................................. 36

        1.    Jurisdiction................................................................................ 36

        2.    Specific Intent to Make a False Statement................................ 39

        3.    Materiality.................................................................................. 39

**TABLE OF CONTENTS**
(continued)

Page

VI.    OBSTRUCTION OF JUSTICE IN COUNT ONE CANNOT BE SUSTAINED
       AS A MATTER OF LAW ............................................................................ 40

       A.    Count One Must Be Reversed For the Due Process Infirmities Stated in
             Section I ............................................................................................ 40

       B.    18 U.S.C. § 1505 is Unconstitutionally Vague As Applied to "False or
             Misleading" Statements in a Proceeding under 18 U.S.C. § 1515(b) ................. 40

       C.    Jury Acquitted Mr. Safavian as to the Only Alleged False Statement
             Alleged to Have Formed the Basis of Count One .................................. 46

       D.    An Obstruction Charge Cannot Be Predicated On Fundamentally
             Ambiguous Circumstances and Even It Could, Mr. Safavian's Responses
             Comported With a Reasonable Construction of the Questions Presented ........... 47

       E.    The Government Failed to Present Sufficient Evidence that Mr. Safavian
             Acted "Corruptly" ................................................................................ 50

       F.    Mr. Safavian's Statement Did Not Have the "Natural and Probable Effect"
             of Influencing the GSA-OIG Investigation .......................................... 51

# TABLE OF AUTHORITIES

## FEDERAL CASES

*City of Houston v. Hill*, 482 U.S. 451 (1987) ...................................................45

*Devine v. Goodstein*, 680 F.2d 243 (D.C. Cir. 1982) ...............................11, 15

*Duncan v. Walker*, 533 U.S. 167 (2001)...........................................................42

*Free Speech Coal. v. Reno*, 198 F.3d 1083 (9th Cir. 1999)..............................44

*Garrity v. New Jersey*, 385 U.S. 493 (1967).............................................. *passim*

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................42, 44

*In re Cisneros*, 255 F.3d 832 (D.C. Cir. 2001) ....................................12, 22, 32

*Kelso v. U.S. Department of State*, 13 F. Supp. 1 (D.D.C. 1998)......................42

*Kolender v. Lawson*, 461 U.S. 352 (1983)........................................................19

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004) ........................44

*United States v. Aguilar*, 515 U.S. 593 (1995) .................................................52

*United States v. Anderson*, 579 F.2d 455 (8th Cir. 1978)..................................29

*United States v. Anzalone*, 766 F.2d 676 (1st Cir. 1985)...................................21

*United States v. Barrett*, 111 F.3d 947 (D. C. Cir. 1997) ......................36, 39, 52

*United States v. Blaszak*, 349 F.3d 881 (6th Cir. 2003).....................................42

*United States v. Bok*, 156 F.3d 157 (2d Cir. 1998) ...........................................33

*United States v. Bucey*, 876 F.2d 1297 (7th Cir.1989) ................................19, 21

*United States v. Buckley*, 192 F.3d 708 (7th Cir.1999).....................................52

*United States v. Calhoon*, 97 F.3d 515 (11th Cir. 1996) ...................................19

*United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998).................... *passim*

*United States v. Cisneros*, 169 F.3d 763 (D.C. Cir. 1999)................................52

# TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Clifford*, 426 F. Supp. 696 (E.D.N.Y. 1976) ...........................................48

*United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997) ................................................21

*United States v. Crop Growers*, 954 F. Supp. 335 (D.D.C. 1997)............................ *passim*

*United States v. Culliton*, 328 F.3d 1074 (9th Cir. 2003) ...................................................22

*United States v. Curran*, 20 F.3d 560 (3d Cir. 1994)................................................18, 21

*United States v. Dale*, 140 F.3d 1054 (D.C. Cir. 1998) ...................................................19

*United States v. Dale*, 782 F. Supp. 615 (D.D.C. 1991) ............................................ *passim*

*United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) ......................................................29

*United States v. Davis*, 183 F.3d 231 (3d Cir. 1999) ......................................................41

*United States v. Diogo*, 320 F.2d 898 (2d Cir.1963) ......................................................29

*United States v. Dollar*, 25 F. Supp. 2d 1320 (N.D. Ala. 1998) .................................18, 21

*United States v. Ehrlichman*, 379 F. Supp. 291 (D.D.C. 1974).......................11, 12, 15, 17

*United States v. Friedrick*, 842 F.2d 382 (D.C. Cir. 1988).........................................11, 15

*United States v. Gahagan*, 881 F.2d 1380 (6th Cir. 1989) .............................28, 29, 35, 43

*United States v. Gatewood*, 173 F.3d 983 (6th Cir. 1999)................................................26

*United States v. Gaudin*, 515 U.S. 506 (1995)........................................................ *passim*

*United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987) ...................................................18

*United States v. Graham*, 60 F.3d 463 (8th Cir. 1995) ...................................................30

*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985).................................................17

*United States v. Irwin*, 654 F.2d 671 (10th Cir. 1981).........................................21, 32, 35

*United States v. Johnson*, 937 F.2d 392 (8th Cir. 1991)................................................29

*United States v. Kanchanalak*, 37 F. Supp. 2d 1 (D.D.C. 1999) ...............................41, 43

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United States v. Kelley*, 36 F.3d 1118 (D.C.Cir.1994)......................................................40

*United States v. Lanier*, 520 U.S. 259 (1997)................................................................17

*United States v. Larson*, 796 F.2d 244 (8th Cir. 1986)....................................................21

*United States v. Lattimore*, 127 F. Supp. 405 (D.D.C. 1955)......................................22, 48

*United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991)...........................21, 22, 48, 35

*United States v. Mastronardo*, 849 F.2d 799 (3d Cir. 1988) ...........................................21

*United States v. Matthews*, 787 F.2d 49þ...............................................................19, 21

*United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994).....................................*passim*

*United States v. Milton*, 8 F.3d 39 (D.C. Cir. 1994) .......................................................17

*United States v. Mitchell*, 877 F.2d 294 (4th Cir. 1989)..................................................37

*United States v. Moses*, 94 F.3d 182 (5th Cir. 1996)..........................................26, 29, 44

*United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979) ...............................................17

*United States v. Murphy*, 809 F.2d 1427 (9th Cir. 1987)......................................19, 21, 23

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987) ..............................................18

*United States v. Olsowy*, 836 F.2d 439 (9th Cir.1987) ....................................................30

*United States v. Pickett*, 353 F.3d 62 (D.C. Cir. 2004)...............................................37, 38

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ...................................*passim*

*United States v. Poindexter*, 725 F. Supp. 13 (D.D.C. 1989) ..........................................37

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006)................................................52

*United States v. Race*, 632 F.2d 1114 (4th Cir. 1980) .............................................*passim*

*United States v. Rowe*, 144 F.3d 15 (1998)............................................................28, 29

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United States v. Saunders*, 359 F.3d 874 (7th Cir. 2004) ................................52

*United States v. Trent*, 949 F.2d 998 (8th Cir.1991)...........................................31

*United States v. Varbel*, 780 F.2d 758 (9th Cir. 1986) ......................................21

*United States v. Vesaas*, 586 F.2d 101 (8th Cir. 1978)......................................29

*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) ................................21, 43, 49

*United States v. Williams*, 444 F.3d 1286 (11th Cir. 2006)...............................45

*United States v. Worthington*, 822 F.2d 315 (2d Cir. 1987)...........................32, 43

## FEDERAL STATUTES AND RULES

18 U.S.C. §§ 1001, 1505...................................................................... *passim*

18 U.S.C. § 1515(b) ..................................................................................... 40-43

18 U.S.C. § 1623(a) ...........................................................................................52

15 U.S.C. § 78m(a) ............................................................................................20

5 C.F.R. § 2635.107(b) ......................................................................................24

5 C.F.R. § 2635.202 <u>et</u> <u>seq</u>............................................................................ *passim*

Fed. R. Crim. P. 29(c) ...................................................................................1. 52

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF THE MOTION FOR A JUDGMENT OF ACQUITTAL

Defendant David H. Safavian, by and through undersigned counsel, hereby moves this Court for a judgment of acquittal under Fed. R. Crim. P. 29(c).

In response to the defendant's motion to dismiss the Indictment, the government repeatedly argued that the arguments set forth was best left for the Court to decide in the post-trial context. Notwithstanding the merits of the government's initial position, the timing is now ripe for the Court's resolution of the legal infirmities in the government's case.

As a threshold matter, minimum Fifth Amendment due process was not provided in any of the remaining counts at issue. Due process in the context of an 18 U.S.C. § 1001(a)(1) or 18 U.S.C. § 1505 charge concerning statements to government officials requires that the person be given adequate notice of the right not to speak and the potential criminal implications of making false statements if one does choose to speak. Garrity v. New Jersey, 385 U.S. 493, 498-500 (1967) (holding that government official's statements in administrative proceeding cannot be used in subsequent criminal prosecution without appropriate warnings). There is no evidence that Mr. Safavian was afforded such notice from the General Services Administration (GSA) ethics officer, the GSA Officer of Inspector General (GSA-OIG), or the Senate Committee on

Indian Affairs' (SCIA) staff.  Thus, his statements cannot be used as a basis for this case as a matter of law.

Even if the circumstances had satisfied these threshold requirements, the jury's verdict must still be reversed.  In Counts Two (A) and Three (A), there was no  form or filing at all in this instance, let alone a "specific statute[] [or] regulation[] governing each filing [that] *unambiguously* required disclosure" of the information alleged to have been concealed, namely "assistance to Mr. Abramoff in GSA-related activities."  United States v. Crop Growers, 954 F. Supp. 335, 345 (D.D.C. 1997).  The verdicts in Counts Two and Three should also be reversed because the Counts are multiplicitous, that is they are based on practically identical representations made to the same agency concerning Jack Abramoff.

In addition, a person cannot "*as a matter of law*, be found guilty of making a false statement" where the representation at issue is supported by a reasonable interpretation of the question posed.  United States v. Dale, 782 F. Supp. 615, 627 (D.D.C. 1991) (citing, *inter alia*, United States v. Race, 632 F.2d 1114, 1120 (4th Cir. 1980)); United States v. Migliaccio, 34 F.3d 1517, 1525 (10th Cir. 1994) (holding that it is the government's burden to negate any and all reasonable interpretations that would make a defendant's statement factually correct).  As such, the defendant's statements and his interpretations of the questions presented do not have to be the only or even the best construction to merit acquittal, merely reasonable.  In this case, Mr. Safavian's representations that Abramoff "had no business before GSA (he does all of his work on Capitol Hill")" (Count Two); "did not have any business with GSA" (Counts Three and Five) are indeed true, but certainly at the very least, constitute a construction that is reasonable, indeed supported by the most relevant authorities: a) the Office of Government Ethics (OGE); b) the

GSA Ethics Manual; and c) GSA ethics officer Eugenia Ellison.  The government thus has not and cannot possibly sustain its burden as a matter of law.

The verdict in Count One for obstruction of justice in the context of the GSA-OIG investigation suffers from an additional due process infirmity, namely that § 1505 is vague when predicated upon alleged "false and misleading statements," particularly as applied to the allegations in this case.  18 U.S.C. §§ 1505, 1515(b).  The term "misleading," which would not meet the definition of "false" in § 1001, fails to provide reasonable notice as to what conduct is prohibited and encourages arbitrary enforcement.

Beyond these constitutional prohibitions, the verdict should be reversed since no reasonable jury could have concluded that Mr. Safavian did not "falsely state[] to the GSA-OIG Regional Inspector General for investigations that Lobbyist A did not have any business with GSA," Verdict Form Count Three (C), under § 1001(a)(1), but that he obstructed justice under § 1505 with the same statement in Count One.  See Verdict Form Count One; Indictment ¶ 25 ("During these interviews [with Agent Rowe], defendant Safavian falsely stated in substance and in part that Lobbyist A had no business with GSA.").

Finally, the evidence was insufficient for several key elements of the remaining Counts, including the failure to establish requisite intent and materiality in all contexts, and proper jurisdiction for the Senate Committee over GSA affairs under § 1001(c)(2).

## RELEVANT FACTS

### 1.    Scotland Trip and Ethics Request

It is uncontested that Mr. Safavian and Jack Abramoff had maintained a friendship dating back to 1995, when Mr. Safavian was an associate at the law firm of Preston Gates & Ellis.  Trial Tr. Jun. 2, 2006 at 31:20-32:8.  Mr. Safavian and Abramoff continued to, among other things,

play golf, racquetball, and dine together years after Mr. Safavian left that firm.  See, e.g. Def. Exs. 3, 5.  Although Abramoff tried to persuade Mr. Safavian to come work with him at the law firm of Greenberg Traurig, LLP, in the spring of 2002, Mr. Safavian accepted the position of Deputy Chief of Staff at the GSA on May 15 of that year.  Def. Ex. 26.

Sometime in early to mid June 2002, Abramoff invited Mr. Safavian to attend an August trip to St. Andrews Golf Course in Scotland.  06.02.06 a.m. at 71:4-8.  One of the congressional invitees had cancelled, creating an open seat.  Id. at 12-16.  On July 25, 2002, Mr. Safavian sent an e-mail to GSA General Counsel Ray McKenna asking how to treat the trip.  Gov. Ex. 40. McKenna sent the e-mail request Eugenia Ellison, the associate general counsel and GSA's designated ethics officer, "for her to review, garner whatever additional information she needed, and get back to [him] a draft response to David."  05.31.06 p.m. at 26:15-20; 05.31.06 a.m. at 49. Ellison "had some additional questions" and "did speak with Mr. McKenna" about them.  Id. at 54:18-20. Neither Mr. McKenna nor Ellison went back to Mr. Safavian to get any additional information.  05.31.06 p.m. at 28:10; 05.31.06 a.m. at 54:21.  Ellison explained that the additional information contained in the July 26, 2002 response she drafted for McKenna came from McKenna.  Id. at 54:21-25.  Ellison sent the draft response to McKenna.  Id. at 58:17.

McKenna explained that typically there would be more of a "continuing discussion" between he and Ellison regarding these opinions before sending them on, but that in this case he quickly reviewed the draft, agreed with it, and forwarded it to Mr. Safavian.  05.31.06 p.m. at 29:2-7.  Regarding the substance of the opinion and the underlying regulations, Ms. Ellison explained that it is her custom when writing ethics opinions to "set forth the facts so that they mirror definitions," 05.31.06 a.m. at 60:11-13 (A. "Yes."), and that she did so in this instance. See id. at 60:11-61:5.  Ms. Ellison stated that while the Code of Federal Regulations themselves

do not define the term "doing business," the GSA ethics training manual, Def. Ex. 148, drafted by her colleague Mr. Ross, identified that the prohibited source phrase "does or seeks to do business with the employee's agency" means a "GSA contractor." Id. at 76:18-20. Ms. Ellison also stated that gifts may be accepted by executive employees, even from prohibited sources, if the source is also a "long-term" friend. Id. at 78:15-80:2.[1]

### 2.    Old Post Office and White Oak Inquiries

Later in June 2002, Abramoff also sent Mr. Safavian a number of e-mails requesting information on two properties managed by GSA, the Old Post Office Building (OPO) in Washington, D.C., and the White Oak Federal Research Center in Silver Spring, Maryland (White Oak). See, e.g. Gov. Exs. 112, 118.[2]

With regard to OPO, Mr. Safavian told Abramoff on July 25, 2002, that the Office of Management and Budget ("OMB"), consistent with a prior prospectus, decided not to open up the building for leasing or purchasing the property to non-federal tenants and that it was going to take legislation to override the OMB's position. Def. Ex. 42. For various reasons, even the initial stage in the process for opening up the property to non-government tenants, the Request for Information, did not occur until 2003 or 2004. 05.25.06 a.m. at 55:6-18; Def. Ex. 213. Today, no private entity has an existing arrangement with the GSA on this property through this process.

---

[1] Factors for evaluating whether a gift could be accepted in such a scenario would include whether the parties had a "history of exchanging gifts with each other, and how long they've known each other." 05.31.06 a.m. Tr. at 78:15-18. Other factors include "whether the friend personally paid for the gift." Id. at 78:5-8.

[2] Abramoff appeared to e-mail Mr. Safavian on May 24, 2002 to ask if it was "doable" to get some of the property at White Oak. Gov. Ex. 109. However, there is no indication that Mr. Safavian ever received or read the e-mail, as Abramoff asked Mr. Safavian over a month and a half later (June 30, 2002) even more cryptically, "[c]an you find out if you guys have control of any part of a huge federal property called the White Oak Federal Research Center." Gov. Ex. 118.

Abramoff also asked Mr. Safavian about property at White Oak for his son's school, the Eshkol Academy. Gov. Ex. 118. As with the OPO, Mr. Safavian informed Abramoff that the agency was not considering disposing the property and would not be fulfilling its obligations to consider federal agency use until the fall. Gov. Ex. 165. Abramoff also e-mailed Mr. Safavian for his thoughts on a draft letter that he was going to try to have a legislator deliver to GSA officials concerning the school. Gov. Exs. 171-72. On August 2, 2002, at a meeting with Tony Costa (Deputy Commissioner of the Public Building Service), representatives of the school, including Eshkol Headmaster Collin Stevens and Pam Abramoff, 05.25.06 a.m. at 67-68, were essentially informed that even if the property had been available for private use, the conditions were not appropriate for the school. 05.24.06 at 69:16-25; 70:1-7. The White Oak property has never gone on the market for disposal. 05.25.06 a.m. at 73:19-23.

### 3.    GSA-OIG Inquiries

On March 26, 2003, an anonymous hotline complaint was faxed to the GSA's Inspector General office making two allegations against Mr. Safavian. The first concerned his alleged use of a government cell phone and Blackberry during political campaign activities, and the other was an allegation that he had "participated in an international golfing trip provided by lobbyists." Gov. Ex. 52-53; 05.31.06 p.m. at 46:11-15. Rowe called Safavian and Mr. Safavian volunteered to come the very next day. 05.31.06 p.m. at 45.

At the meeting in Rowe's office they discussed personal issues, politics, and their mutual interest in law enforcement. Id. at 46:4-7, 57:23-58:1. Rowe gave Safavian a tour of the Inspector General's office, including the interrogation room where people are typically questioned. 06.02.06 p.m. at 28:24-29:9; 05.31 P.M. Tr. at 56:22-57:4. After about thirty minutes, Rowe pulled out the anonymous complaint and read it to Mr. Safavian. 05.31.06 p.m.

at 46:8-9.  There is no evidence that Rowe advised Mr. Safavian of: (1) the need to provide truthful and complete answers; (2) that anything he said could be used against him in a criminal proceeding; (3) his right to remain silent if the answers may tend to incriminate him; and (4) that he could not be disciplined for remaining silent.  Rowe did not read or otherwise inform Mr. Safavian about any ethical regulation or code that related to the inquiry into the Scotland trip. The discussion took place without any third-party notes, tapes, or recordings.  05/31/06 p.m. at 57:2-15.

Mr. Safavian voluntarily informed Agent Rowe that he went on the trip with Jack Abramoff, a long time friend and associate of his, and that he, Mr. Safavian, had paid for his portion of the trip.  Id. at 46:19-22.  Agent Rowe then asked: "Did Jack Abramoff have any business with GSA?" Mr. Safavian answered "no."  Id. at 46:23-25.[3]  Rowe recalls that Mr. Safavian informed him that the Scotland portion of the trip was four days and that he left out of London.  Id. at 46:25-47:4 ("it was a four-day trip to Scotland"); 82:3-7.  Rowe assumed that Safavian's mentioning of  London meant that he flew back out of Heathrow airport, more than five hundred mile away.  Rowe did not seek to confirm his assumption or ask for any further clarification.  Id. at 82:3-7.

Mr. Safavian provided a copy of the $3,100 check marked on a page listing all such checks.  Id. at 47:11-14.  Mr. Safavian informed Rowe that he had relied on Mr. Abramoff's calculation of the cost of the trip.  Id. at 47:17-19, 61:18-21.  Mr. Safavian gave Abramoff's telephone number to Rowe so that the Inspector could talk directly to Abramoff about the trip if

---

3 The official GSA-OIG report sent to Administrator Perry on May 15, 2003, records the question and answer in the present tense: "Currently, [Lobbyist A] is a professional lobbyist, however he does not have any business relationship with GSA." Def. Exs. 127-128.

he had any more questions.  Id. at 60:19-61:3.  The Inspector did not call Abramoff or otherwise ask Mr. Abramoff any questions about the trip.  Id. at 61:4-5.

After the first interview, the GSA-OIG headquarters requested only that Rowe follow up on the Hatch Act issue.  Id. at 68:11-13, 70:2-11, 73:25-74:8.   Then, after a second hotline complaint came in raising a third distinct allegation, as well as reiterating the allegation regarding the Scotland trip, the Inspector called Mr. Safavian for a second interview on April 25, 2002.  Id. at 49: 19-24.  Mr. Safavian provided documents Rowe had requested, i.e. his annual attendance record, Def. Ex. 126, and answered Rowe's additional questions pertaining to the other inquiries.  Accordingly, Rowe asked no follow-up questions related to the Scotland trip or any pertinent regulations on that issue, id. at 49:5-24, but went through all of the Hatch Act "Do's and Don'ts" in detail.  Id. at 69:10-70:1.

After this second interview, Rowe conducted independent research to verify Mr. Safavian's representations as to the third issue.  Id. 76:6-12.  Rowe did not ask any more questions about the substance of the complaint as it pertained to the Scotland trip and testified that Mr. Safavian answered all of his questions.  Id. at 59:4-5.  Rowe's final report (drafted by someone else) and notes confirm the brevity of the Scotland trip inquiry.  Def. Ex. 271.  The report concluded that all three allegations could not be substantiated and the investigations closed.  Id. at 51:2-7.  Agent Rowe forwarded the report to GSA-OIG headquarters and they forwarded the report to GSA Administrator Perry.  Id. at 78:2-19.  Mr. Perry testified he believed that "David cooperated fully with the [GSA-OIG] investigation."  05.24.06 a.m. at 19:19.

### 4.    SCIA Document Request for Its Jack Abramoff Investigation

The Senate Committee on Indian Affairs (SCIA) began investigating an alleged kickback scheme to defraud Indian tribal clients by Jack Abramoff and others in 2004.  06.01.06 a.m. at 9-

11.   On November 17, 2004, the SCIA conducted a hearing on Abramoff's use of the tribal funds, including allegations concerning his expenditures for the Scotland trip.  Id. at 13.  In January 2005, Bryan Parker became the Deputy Chief Investigative Counsel for the SCIA.  In February 2005, Mr. Parker began investigating a foundation Mr. Abramoff had established, the Capital Athletic Foundation, and the money that went into it.  Id. at 16:19-25.  Because Mr. Safavian attended the trip, Mr. Parker made the first contact with him, in a letter dated February 23, 2005, which requested "all records reflecting, referring, or relating to the 2002 Scotland golf trip that you attended with Mr. Jack Abramoff and others."  Gov. Ex. 80.

Mr. Safavian called Parker to acknowledge receipt of the letter and, according to Parker, was informed that he had received the letter in part because Mr. Abramoff had allegedly used Indian funds to partially finance the trip.  06.01.06 a.m. at 20:20-21.  Mr. Safavian indicated that he was unaware of the source of the funds.  Id. at 22.  During that conversation, Mr. Safavian volunteered that before the trip he had received an ethics compliance letter and provided Parker with the names of Ray McKenna and Eugenia Ellison for him to contact.  Id. at 21-22.  Mr. Parker did not contact them but asked Mr. Safavian to include a copy of the opinion in his response to the request.  Id.  Several days later, Mr. Safavian called Parker ask for additional time to produce the documents requested.  Id at 26.  Mr. Safavian obtained a copy of the ethics opinion from Eugenia Ellison who was not sure that Mr. Safavian had ever received it.  Def. Ex. 204.

Mr. Safavian sent his response to the document request on March 17, 2005 and attached, among other things, the July 26, 2002 ethics opinion.  Id.  Mr. Safavian then called to confirm that Parker had received it and offered to come in for an interview.  Parker told him that they were not prepared for that.  06.01.06 a.m. at 36:8-24.  Before Parker received the response, the

Committee's investigation had "prioritized" and narrowed its focus to "following the money" investigating specifically the nature of Abramoff's fraudulent dealings with his clients and was no longer investigating issues such as whether Abramoff was using tribe money to bribe government officials.  Id. at 34-35.  According to Parker, Mr. Safavian's response to the document request had "no impact" on the investigation.  Id. at 34:20-21.  Mr. Safavian was never contacted again for an informal interview, a subpoena, or a request to appear at an actual Committee hearing.

On June 22, 2006, the Committee released its Final Report, "Gimme Five – Investigation of Tribal Lobbying Matters."  Rule 29 Ex. 1.  The three-hundred fifty page report based on the two-year investigation concluded that Abramoff and [Mike] Scanlon had agreed to "secretly split, between themselves" dramatically overpriced fees for representation that the Tribes paid Scanlon from 2001 through 2003."  Id. at 6.  The report did not mention Mr. Safavian.

Importantly, the report also noted that "where witnesses who the Committee interviewed were not put under oath, they [the witnesses] were reminded of the applicability of the False Statements Act, 18 U.S.C. sec. 1001, and the federal criminal statute prohibiting the obstruction of congressional investigations, under 18 U.S.C. sec. 1505."  Report at 6 & n. 30.  It further advised that during the investigation, several witnesses exercised their right against self-incrimination under the Fifth Amendment or indicated that they intended to assert their Fifth Amendment right if called to testify, including Abramoff, Scanlon, and former associate Neil Volz.  Id.  Others were also called before the committee or submitted to "several informal interviews with staff" under such warnings.

**ARGUMENT**

I.     **CIRCUMSTANCES FOR ALL COUNTS FAIL TO SATISFY FIFTH AMENDMENT DUE PROCESS**

As recognized by several 18 U.S.C. §§ 1001, 1505 cases in this Circuit, minimum Fifth Amendment due process requires that a person be given adequate notice of the right not to speak and the potential criminal implications of making false statements if one does choose to speak when responding to government inquiries. United States v. Cisneros, 26 F. Supp. 2d 24, 42-43 (D.D.C. 1998) (holding due process satisfied as a pre-trial matter since the Indictment alleged that the FBI repeatedly informed Cisneros he had to be "truthful and forthcoming during the background investigation," his right not to speak and of the implications of making false statements if he did speak); (internal quotations omitted); United States v. Ehrlichman, 379 F. Supp. 291, 292 (D.D.C. 1974) (holding that § 1001 requires that government officials alert the interviewee to the danger that false statements may lead to a felony charge); see also Garrity v. New Jersey, 385 U.S. 493, 498-500 (1967) (government official's statements in administrative proceeding cannot be used in subsequent criminal prosecution without appropriate warnings); United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988) ("[O]ne may not be required to relinquish one's privilege [against self-incrimination] on threat of a penalty such as loss of job."); Devine v. Goodstein, 680 F.2d 243, 246 (D.C. Cir. 1982) (" '[P]ublic employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination'") (quoting Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of New York, 392 U.S. 280, 284-85 (1968)).  As the evidence at trial demonstrated, Mr. Safavian was not afforded such due process from the GSA ethics office, the GSA-OIG, or the SCIA.

In Ehrlichman, even in the elevated context of an FBI interview during the Watergate investigation, this Court held that since the FBI agents had not "sufficiently alert[ed]"

Ehrlichman of the "danger that false statements may lead to a felony conviction," the verdict must be reversed. 379 F. Supp. at 292. In <u>Cisneros</u>, again in the context of an FBI inquiry (background investigation), the defendant was charged with concealing and falsifying facts concerning an extramarital affair with a former employee and quid pro quos related to that affair on the Questionnaire for Sensitive Positions for National Security, commonly referred to as a Standard Form 86 ("SF-86"). The form, which included the Question 10S supplement, *specifically referred to* the prospects of a § 1001 charge and *required the applicant to certify* understanding that a "knowing and willful false statement on this form can be punished by fine or imprisonment or both." <u>See</u> SF-86, Rule 29 Ex. 2 at 9. Cisneros was also charged with falsifying and concealing these same material facts in subsequent FBI interviews about those SF-86 representations. As the Court emphasized, in each interview the FBI first informed Cisneros of the need to be "truthful and forthcoming during the background investigation," his "right not to speak" and of the "implications of making false statements if he did choose to speak."[4] <u>Cisneros</u>, 26 F. Supp.2d at 42-43. It is only because of this notice and warning for each written and oral statement that Cisneros was charged with under Sections 1001 and 1505 that the Court was satisfied, for pre-trial purposes, that there had been no violations of due process.

---

[4] Question 10S to the SF-86 form asked whether there was anything in Cisneros's personal life that could be used by someone to coerce or blackmail him. Cisneros answered that there was no basis upon which he would be subject to coercion or blackmail. On December 30, 1992 and January 7, 1993, FBI agents interviewed Cisneros in Washington, D.C., where Cisneros stated that the SF-86 and the supplement were accurate and correct and reiterated his response to Question 10S that he was unaware of anything that could be used to coerce or compromise him if he were to be nominated and confirmed as Secretary of HUD. According to the Indictment, Cisneros concealed from the FBI the following facts: that Medlar had threatened to go public about their relationship and about his payments to her; that he was, in fact, making payments to Medlar; and that despite making payments to Medlar substantially in excess of $10,000 per year since 1990, he had not filed informational Gift Tax Returns with the IRS. When confronted with this information in the January interview, Cisneros denied that the payments made to Medlar were "hush money" and that he was no longer making any payments to Medlar. He failed to disclose that he had directed others to conceal information regarding his relationship with and payments to Medlar. On September 9, 1999, in the face of these allegations and their national security implications, Mr. Cisneros pleaded guilty to a misdemeanor for these allegations and paid a fine of $10,000.00. <u>In re Cisneros</u>, 255 F.3d 832, 832 (D.C. Cir. 2001).

The three sets of circumstances in this case were far less formal than in the FBI interviews of Ehrlichman and Cisneros, and unlike the case in Cisneros, there is absolutely no evidence that Mr. Safavian was given any such notice regarding his statements in either written or verbal form.  Id. at 43.  This Court has already recognized the significance of this disparity.  06.12.06 p.m. at 16:18-25 ("the circumstances in Cisneros were very different from the circumstances in this case in terms of specifically telling the person, once you start talking you have to tell us, giving them Miranda type warnings and other warnings that he had to be truthful and forthcoming, repeatedly informing him of his right not to speak, and the implications of making false statements if he did choose to speak.  This is not that situation at all.").

Regarding Count Two, Mr. Safavian drafted an informal e-mail requesting ethics advice on July 25, 2002.  Gov. Ex. 40.  The representations in the July 25, 2002 request did not occur on an official government agency form, such as those used in background checks, security regulations, or customs or currency transactions.  Those forms explicitly notify the respondent, for instance, that "[f]ailure to file the required report or failure to report the *total* amount that you are carrying may . . . subject you to civil penalties and/or criminal prosecution." See, e.g., CBP Form 6059B (01.04) (Rule 29 Ex. 3).  Neither Ray McKenna nor Eugenia Ellison spoke with Mr. Safavian before sending an e-mail response to his inquiry the next day, let alone warned him of his right to remain silent and that representations in his request, if proven untrue, could result in criminal prosecution.  05.31.06 a.m. at 33:16-18; 50:15; 51:25; 52:12-13; 54:20-21 (Ellison); 05.31.06 p.m. at p.28:8-18; 37:12-20; (McKenna); see Cisneros, 26 F. Supp.2d at 31-32; 43.

Likewise, the circumstances for the March 27, 2003 discussion between Mr. Safavian and Gregory Rowe of the GSA-OIG (Counts One and Three) did not provide Fifth Amendment protections.  The discussion about the Scotland golf trip occurred after Safavian and Rowe had

- 13 -

talked about politics and other unrelated issues for some thirty minutes. Rowe showed Mr.
Safavian the *office where official questioning* took place but talked with Mr. Safavian in his own
office. Rowe did not advise Mr. Safavian of any regulations or statutes that were pertinent to the
Scotland trip inquiry, and by contrast spent a substantial amount of time in a subsequent
interview walking Mr. Safavian through the details of the Hatch Act for a separate investigation
raised by the hotline complainant. 05.31.06 p.m. at 49:5-24; 69:10-70:1. Agent Rowe asked
Mr. Safavian if Jack Abramoff "had any business with the GSA," and Mr. Safavian responded
that he did not. Id. at 46:23-25.

More fundamentally, however, Counts One and Three must be reversed because it is
well-settled that where government employees are compelled to answer questions in an
administrative proceeding under the prospects of discipline, the government may not use the
employees' statements or any evidence derived from those statements in any criminal
prosecution. Garrity, 385 U.S. at 498-99. In light of Garrity, the Offices of Inspector General
are advised that:

> Such statements are effectively "immunized." This type of immunity will be
> found if an employee has an objectively reasonable belief that he or she will be
> disciplined if he  or she refuses to answer questions. *The risk of creating such*
> *immunity is particularly acute when interviews are conducted by Inspector*
> *General agents because they handle both criminal investigations and*
> *investigations that lead to administrative discipline.* In  order to address these
> concerns, when a federal employees is interviewed *during the course of an*
> *investigation being conducted by an Office of Inspector General, the agents*
> *should provide the employee with an advice of rights form that is designed to*
> *preserve the government's ability to use the employee's statements by advising the*
> *employee that the interview is voluntary and that the employee will not be*
> *disciplined solely for refusing to answer questions.* This is commonly referred to
> as the "Garrity" warning.

Letter from Christopher Wray, Assistant Attorney General, to Federal Prosecutors, "Uniform Advice of Rights Forms for Interviews of Government Employees" (May 6, 2005) (emphasis added). (Rule 29 Ex. 4). [5]

Agent Rowe never advised Mr. Safavian of the voluntary nature of his appearance, the possible criminal action based on his statements, or his right to remain silent. That is, Rowe never provided Mr. Safavian with "Garrity" warnings. Due Process dictates that his statements cannot form the basis of a criminal prosecution and requires that the verdict be reversed for Counts One and Three. See Garrity, 385 U.S. at 498-99; Frederick, 842 F.2d at 395; Goodstein, 680 F.2d at 246 (same) (citing Garrity, 385 U.S. 493); see also Ehrlichman, 379 F. Supp. at 292; Cisneros, 26 F. Supp.2d at 31 -32.

Due process considerations also require the setting aside of the verdict in Count Five. Mr. Safavian was not given notice that his responses to the February 23, 2005 document request

---

[5] See also Inspector General Academy "Employee Rights and Advisements, available at http://www.igcia.gov/course_igitp.html (Rule 29 Ex. 5) (noting that examples of topics include "Employee Rights & Advisements (Kalkines, Garrity, & Weingarten).

For instance, the FCC Inspector General manual provides in relevant part that:

When applicable, a statement of the individual's rights with regard to, among other things, remaining silent and obtaining legal counsel or union representation is stated directly and personally at each interview. These statements of rights are referred to as "warnings." The four types of warnings that may be administered during investigations are Miranda, Kalkines, Garrity, and Weingarten. . . .

> Kalkines warnings are given when the possibility of criminal prosecution has been removed, usually by a declination to prosecute by the DOJ, and the employee is required to answer questions relating to the performance of his or her official duties or be subject to disciplinary action.

> Garrity warnings are given when an individual is requested to give information on a voluntary basis in connection with his or her own administrative misconduct, and the answers might also be used in a future criminal proceeding. The individual is apprised of his or her right to remain silent if the answers may tend to incriminate him or her; that anything said may be used against him or her in either a criminal or administrative proceeding; and he or she cannot be disciplined for remaining silent.

Federal Communications Commission Office of Inspector General Employee Rights and Warnings, available at http://www.fcc.gov/oig/oigrights.html. (Rule 29 Ex. 6).

or subsequent informal phone conversations with Senate counsel Parker (initiated by Mr. Safavian) would be subject to §§ 1001 and/or 1505.  06.01.06 a.m. at 36:13-25; 37:1-25;  38:1-5; Gov. Ex. 80.  The SCIA itself recently recognized that such warnings were constitutionally required in its June 22, 2006 Final Report, "Gimme Five – Investigation of Tribal Lobbying Matters."

> *Where witnesses who the Committee interviewed were not put under oath, they were reminded of the applicability of the False Statements Act, 18 U.S.C. sec. 1001, and the federal criminal statute prohibiting the obstruction of congressional investigations, under 18 U.S.C. sec. 1505.* Because all witness interviews and depositions were conducted in executive session, the Committee will not release summaries or transcripts of those proceedings in toto unless said release is duly authorized.  In the course of the Committee's investigation, several witnesses declined to provide the Committee with important information under oath, citing their right against self-incrimination under the Fifth Amendment of the U.S. Constitution, or indicated that they intended to assert their Fifth Amendment right if called to testify. These witnesses include not only Abramoff and Scanlon but also former Abramoff associates Todd Boulanger, Kevin Ring, Shawn Vassell, and Neil Volz as well as former Scanlon associate Chris Cathcart. Cathcart did, however, submit to several informal interviews with staff.

Report at n. 30 (emphasis added) (Rule 29 Ex. 1).

The report, which concluded that Abramoff and [Mike] Scanlon had agreed to "secretly split, between themselves" dramatically overpriced fees for representation that the Tribes paid Scanlon from 2001 through 2003," was based on the committee's "intensive two-year investigation—consisting of five hearings, 70 formal requests for documents, including subpoenas, resulting in the production of about 750,000 pages; and about 60 depositions and witness interviews."  Id. at 6.  The report did not mention Mr. Safavian at all, and as adduced at trial, at no time during the investigation did Mr. Safavian ever receive a subpoena.  In fact, Mr. Safavian did not even reach the step of what the SCIA has termed an "informal interview with staff," let alone an appearance before the Committee under oath and with the opportunity to assert a Fifth Amendment privilege like the witnesses noted in the report.   Mr. Safavian

- 16 -

complied with the February 23, 2005 request by giving Mr. Parker all the documents he had in his possession and was not asked to produce any additional papers.  06.01.06 a.m. at 37:1-24.

This Circuit has never sustained a § 1001 or § 1505 conviction under such constitutionally infirm circumstances.[6] That this case constitutes a novel and unprecedented extension of the application of these statutes provides an *additional* reason to hold that due process was not satisfied in this case.  United States v. Lanier, 520 U.S. 259, 266 (1997) (holding that the Fifth Amendment "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope") (citing H. Packer, The Limits of the Criminal Sanction 79-96 (1968) (discussing "principle of legality," "that conduct may not be treated as criminal unless it has been so defined by [a competent] authority ... before it has taken place").

Simply put, these threshold failures of due process require that the verdict be reversed for all remaining counts.

---

[6] Beyond the Garrity violations of the Counts (One and Three), there has never been a Section 1001(a)(1) case brought or sustained for an informal e-mail request to an agency's general counsel for ethics advice, or a cover letter response to a document request outside the context of a subpoena.  All cases the parties have been able to unearth have involved explicit notice of the required substantive information to be divulged in a written form and express warnings about possible criminal implications.  See, e.g., United States v. Gaudin, 515 U.S. 506, 508 (1995) (defendant made misrepresentations on a HUD/FHA form); United States v. Milton, 8 F.3d 39, 41 (D.C. Cir. 1994) (defendants aided and abetted applicants who, in exchange for payment, signed a release form claiming to be victims of discrimination); United States v. Hansen, 772 F.2d 940, 942 (D.C. Cir. 1985) (Congressional Representative omitted information about certain loans and transactional profits on annual financial disclosure report required to be filed by Ethics in Government Act of 1978); United States v. Muntain, 610 F.2d 964, 971 (D.C. Cir. 1979) (defendant concealed information required by two Confidential Statements of Employment and Financial Interests (HUD Form 844)); Cisneros, 26 F. Supp.2d at 31 -32; 42-43. United States v. Dale, 782 F. Supp. 615, 624-25 (D.D.C. 1991) (defendants completed Department of Defense Personnel Security Questionnaires); cf. Ehrlichman, 379 F. Supp. at 292.

## II.     THE CONCEALMENT VERDICTS IN COUNTS TWO AND THREE MUST BE REVERSED AS A MATTER OF LAW BECAUSE THERE WAS NO SPECIFIC, LEGAL DUTY TO DISCLOSE THE ALLEGED CONCEALED INFORMATION

The jury concluded that Mr. Safavian was guilty of a § 1001(a)(1) violation in Count Two for concealing "assistance to Mr. Abramoff in GSA-related activities." Verdict Form at 2. The jury also concluded that Mr. Safavian was guilty of concealing the same information, "assistance to Mr. Abramoff in GSA-related activities" in Count Three § 1001(a)(1). These conclusions must be reversed as a matter of law.

In any concealment action under § 1001(a)(1), "the Court must first decide as a matter of law" that a defendant was under a specific legal duty to disclose material facts he was alleged to have concealed. Crop Growers Corp., 954 F. Supp. at 344-45 (dismissing concealment charge where the government failed to identify a specific legal duty to disclose information); Dale, 782 F. Supp. at 626 (recognizing that "a defendant cannot be prosecuted under § 1001 for concealing material facts unless he had a duty to disclose the material facts at the time he was alleged to have concealed them") (quoting United States v. Nersesian, 824 F.2d 1294, 1312 (2d Cir. 1987); see also United States v. Curran, 20 F.3d 560, 567 (3d Cir. 1994) (vacating concealment conviction "because there was no duty on the part of defendant to disclose these facts to the [Federal Election] Commission, [therefore] he cannot be guilty of concealment"); United States v. Gimbel, 830 F.2d 621, 624 n.2 (7th Cir. 1987) (reversing concealment conviction, noting that in the absence of a legal duty to report currency transactions with the Treasury Department, defendant "therefore lacked the legal capacity to violate § 1001").

"The duty to disclose under § 1001 does not arise out of thin air. It is created by either a statute, an agency regulation, or an agency form." United States v. Dollar, 25 F. Supp. 2d 1320, 1326 (N.D. Ala. 1998) (reversing concealment conviction because the statutes and regulations proffered by the government were not unambiguous) (citing United States v. Calhoon, 97 F.3d

518, 526 (11th Cir. 1996) ("Falsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form.")).   There has yet to be a § 1001(a)(1) concealment case brought, let alone a conviction sustained, outside the context of statements made on an official government form where clear and unambiguous disclosure duties as to the underlying substantive information (and warnings that representations could be subject to criminal prosecution) are spelled out on the face of the form or regulation.  United States v. Dale, 140 F.3d 1054, 1056 (D.C. Cir. 1998) (observing that the three § 1001 convictions were premised on the defendant's "failure to disclose interests in and relationships with foreign corporations on forms he filed with the Department of Defense to obtain security clearance," noting, importantly, that "[i]n each case the filed form *specifically requested the information* withheld")) (emphasis added); Cisneros, 26 F. Supp.2d 24 (SF-86 form); Crop Growers, 954 F. Supp. 335 (annual SEC filings); see also Calhoon, 97 F.3d at 526 (medicare reimbursement form under 42 C.F.R. § 413.20).

"The rationale of these cases has rested, in large part, on due process considerations," including the requirement that prohibited conduct is defined with sufficient clarity and with a knowledgeable waiver of a Fifth Amendment privileges.  Crop Growers Corp., 954 F. Supp. at 345-46 (citing United States v. Murphy, 809 F.2d 1427, 1431 (9th Cir. 1987); United States v. Matthews, 787 F.2d 49 (noting that Fifth Amendment concerns merely added to the due process infirmities of an ambiguous disclosure requirement); United States v. Bucey, 876 F.2d 1297, 1307-08 (7th Cir.1989), cert. denied, 493 U.S. 1004 (1989); Kolender v. Lawson, 461 U.S. 352, 357 (1983) (holding that a statute must define a criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary enforcement).   It is only in such a context that there is a guarantee that the

person has been placed on sufficient notice of the information for which there is a specific legal duty to disclose and of the penalties for failing to provide this information in a truthful manner.

In <u>Crop Growers</u>, for instance, there were ten different Securities and Exchange Commission ("SEC") filings from which material facts were allegedly omitted.[7]  In support of its position in that case, the government cited multiple statutes and regulations, including the general disclosure provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), which required that issuers of registered securities file periodic and other reports containing the information prescribed in the SEC's rules, as well as the provisions of SEC Regulation S-K as set forth at 17 C.F.R. Part 229.  <u>Id</u>. at 347.  The government also argued that SEC Rule 12b-20, which stated that an issuer of securities has a duty to supply "such further information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading," essentially transformed all of the specific rules for disclosing certain information in Regulation S-K into affirmative duties to disclose.  <u>Id</u>. (internal quotations omitted).

The Court assumed that the government's view of the regulations was accurate, and still found "no basis in the *specific regulations* for requiring disclosure."  <u>Id</u>.  It explained that "[t]he specific forms at issue d[id] not specify that criminal liability can be imposed if the forms are not completed in compliance with law . . . [or] set forth required disclosures in precise terms."  <u>Id</u>.  Qualitative terms (e.g. "risk," "trend," and "uncertainty") are "quite simply, too vague and amorphous to give fair notice, required by the Due Process clause, of what disclosure is

---

[7] These material facts included: (a) that Crop Growers violated FECA by making illegal campaign contributions; (b) that a material contingent liability existed for potential criminal and civil fines because of said violations; (c) that Crop Growers' financial statements were misleading; (d) that Crop Growers maintained false books and records; and, (e) that Crop Growers, its subsidiaries, and their key officers faced criminal and civil sanctions under provisions other than FECA and that their ability to operate could be severely affected as a result.  954 F. Supp. at 344.

required." Id. (citing Matthews, 787 F.2d at 48). In addition, the Court rejected the argument that *general disclosure requirements* could "provide a basis for *criminal* liability." Id. (first emphasis added).

Similarly in Murphy, a case Judge Kessler relied upon in making the Crop Growers determination, the defendant had been charged with conspiring to conceal information from and falsify information to the Internal Revenue Service by submitting Currency Transaction Reports ("CTRs") that misidentified the source of funds deposited. 809 F.2d at 1429. The court found that because the CTR form did not "clearly require depositors to identify the source of their funds . . . the imposition of criminal sanctions on these facts would violate due process." Id. at 1431.

In the instant case, the concealment convictions are precariously perched on circumstances and a manufactured duty that does not even approximate the duties rejected in prior cases.[8] To begin, there is not even a form or filing at issue. Concealment charges have

---

[8] See, e.g., United States v. Whiteside, 285 F.3d 1345, 1351-52 (11th Cir. 2002) (reversing § 1001 conviction for submitting allegedly false Medicare/Medicaid cost reports where no regulation, administrative ruling, or judicial decision mandated the disclosure); United States v. Cochran, 109 F.3d 660, 665-66 (10th Cir. 1997) (reversing conviction where guaranteed investment contract submitted by defendant to a state agency did not set forth a duty to disclose); United States v. Curran, 20 F.3d 560, 566 (3d Cir. 1994); United States v. Manapat, 928 F.2d 1097, 1100-01 (11th Cir. 1991) (affirming dismissal of § 1001 convictions where Federal Aviation Administration medical form was ambiguous as a matter of law); Bucey, 876 F.2d at 1307-09 (reversing § 1001 convictions where the Department of the Treasury form submitted by the defendant to the Secretary did not contain a duty to disclose information about for whom the transaction was completed); United States v. Mastronardo, 849 F.2d 799, 804-05 (3d Cir. 1988) (reversing § 1001 convictions where Currency Reporting Act did not set forth an unambiguous duty to disclose structured transactions); Murphy, 809 F.2d at 1429-31; United States v. Larson, 796 F.2d 244, 247 (8th Cir. 1986); United States v. Anzalone, 766 F.2d 676, 681 (1st Cir. 1985) (reversing § 1001 conviction where "nothing on the face" of the relevant statutes or regulations created a legal duty to disclose); United States v. Varbel, 780 F.2d 758, 760-63 (9th Cir. 1986) (same); United States v. Irwin, 654 F.2d 671, 678-79 (10th Cir. 1981) (reversing § 1001 conviction where the Economic Development Administration grant application submitted by defendant to the government agency did not contain a legal duty to disclose the payments of certain bills to another entity); United States v. Dollar, 25 F. Supp. 2d at 1325-26 (dismissing § 1001 charges where defendant was under no legal duty to disclose knowledge or suspicion that actual purchasers of firearms were not the signatories on the forms prescribed by the Bureau of Alcohol, Tobacco and Firearms).

only been brought, let alone sustained, in the context of government forms and filings where the substantive information required and criminal implications are unambiguously noticed to the defendant, or at best in the <u>Cisneros</u> case, such notice is expressly given in follow up interviews about representations made in those forms.  <u>Cisneros</u>, 26 F. Supp.2d at 31-32.[9]

In addition, neither McKenna nor Ellison even spoke to Mr. Safavian about drafting the ethics request, let alone informed Mr. Safavian of the substance of the information that he had a specific, legal duty to disclose in his request.  In the context of the GSA-OIG investigation, Agent Rowe only asked whether Abramoff "had any business with the agency," and did not review any regulations relating to his Scotland trip inquiry.  05.31.06 p.m. at 46:23-25.  Indeed, the information alleged to have been concealed, "assistance to Abramoff in GSA related activities," is not found in *any* such government form or regulation, let alone ones specific enough to satisfy the demands of due process.

Thus, even if concealment charges were appropriate in such fundamentally ambiguous contexts outside of filings or forms, <u>see</u> <u>United States v. Culliton</u>, 328 F.3d 1074, 1078 (9th Cir. 2003) (acknowledging that excessive vagueness or fundamental ambiguity in questions may not, as a matter of law, form the basis of a prosecution for perjury or false statement) <u>cert. denied</u>, 540 U.S. 1111 (2004); <u>Manapat</u>, 928 F.2d at 1099-1102 (questions about traffic and criminal convictions on a medical history form were so fundamentally ambiguous as to preclude conviction under § 1001); <u>United States v. Lattimore</u>, 127 F. Supp. 405, 409-10 (D.D.C. 1955)

---

[9] Notably in <u>Cisneros</u>, while the trial court had decided that threshold pre-trial due process had been satisfied because of the specificity of the SF-86 form at issue and the warnings of that form and follow up interviews, neither the trial court nor the Court of Appeals had the opportunity to revisit this issue.  On September 9, 1999, in the face of these allegations and their national security implications, Mr. Cisneros pleaded guilty to a misdemeanor for these allegations and paid a fine of $10,000.00.  <u>In re Cisneros</u>, 255 F.3d 832, 832 (D.C. Cir. 2001).

(dismissing a perjury indictment because the questioning was ambiguous and terms were vague), aff'd by an equally divided court, 232 F.2d 334 (D.C. Cir. 1955), the circumstances under which the government seeks to convict Mr. Safavian of concealment fall far short of meeting the duty to disclose standard: "*specific* statutes and regulations governing each filing [that] *unambiguously required disclosure*" of the information alleged to have been concealed. Crop Growers, 954 F. Supp. at 345 (emphasis added); Dale, 140 F.3d at 1056 (noting that "[i]n each case the *filed form specifically requested the information withheld*") (emphasis added).

As in Crop Growers (referencing SEC Rule 12b-20), the government here attempted to create a duty at trial by relying on generic, non-specific duties that do not shed light on the precise conduct at issue.  First, the government argued at trial that a duty to fully disclose the information alleged in the Indictment  was imposed by the principles of ethical conduct espoused in a January 20, 2001 Presidential Memorandum to Heads of Executive Agencies.  Gov. Ex. 46. The Memorandum provides that, *inter alia*, "[e]veryone who enters into public service for the United States has a duty to the American people to maintain the highest standards of integrity in government." 05.31.06 a.m. at 16:13-15 (Ellison); Gov. Ex. 46.  The government argued at trial that a duty to disclose arose out of the generic expectations of employees to be trustworthy, honest, and loyal to the Constitution.  05.31.06 a.m. at 16:22-24; 17:13-14.

These principles adopted in the federal regulations, while noble, do not "unambiguously" inform a person as to what  substantive information must be revealed in a given context.  See Crop Growers Corp., 954 F. Supp. at 348 (holding general disclosure regulations and professional standards were "quite simply, too vague and amorphous" to impose a legal duty to disclose information); Murphy 809 F.2d at 1429; see supra note 8 (citing cases).[10]

---

[10]     In prior papers, the government had relied on Cisneros in support of this proposition.  However, as this Court has already noted, Cisneros is inapposite.  06.12.06 p.m. at 16.  ("[t]he defendant

The government's other suggested basis for a specific, legal duty to disclose (for Count Two), 5 C.F.R. § 2635.107(b), also fails to indicate what information was relevant to Mr. Safavian's specific ethics request, and in general the provision imposes no obligation on a government employee. The words "duty" and "obligation" appear nowhere in the text of the regulation. Rather, the regulation serves as a guideline as to when an affirmative *defense* exists for executive employees who have obtained an ethics opinions and are later prosecuted for their underlying offenses, and that full disclosure is a condition of the defense. In short, the regulation provides a shield upon which employees may rely, not, as the government argued at trial, a sword by which they may be prosecuted.

Ms. Ellison confirmed this understanding:

> Q. [T]he reason you stated earlier that you put [the opinion] in this form is so that when you later want to use this as a safe harbor or shield against a criminal prosecution, this [sic] is the facts that you can rely on. And if you didn't give all the facts, you can't rely on this opinion.
> A. Correct.

---

volunteered his first statement when he asked for the ethics opinion, and the informality of the interviews, phone calls, makes it a very different case from Cisneros, not to mention the specific printed form . . .the SF-86").

In <u>Cisneros</u>, the indictment alleged that the defendant completed and signed the SF-86 form that by supplement Question 10S instructed Cisneros that he needed to identify "anything in his personal life that could be used by someone to coerce or blackmail him." 26 F. Supp.2d at 31-32. The form itself explicitly referred to Section 1001 and required Cisneros to certify understanding that a "knowing and willful false statement on this form can be punished by fine or imprisonment or both." SF-86, Rule 29 Ex. 2 at 9; <u>see also</u> 26 F. Supp.2d at 37. In addition, as the Court noted, the Indictment alleged "that the FBI told Cisneros that the purpose of the interview 'was to ensure that complete, current, and accurate information would be available and obtained concerning Cisneros's background' and that Cisneros had "to be completely truthful and forthcoming during the background investigation." <u>Cisneros</u>, 26 F. Supp. 2d at 42. Thus, the forms and follow up interviews about those filings provided specific and unambiguous due process notice of the substantive information required, criminal implications for concealing or falsifying such information, and the right to remain silent at the time of the relevant representations. In that context, the court took note of Executive Order 10450, which governs investigations of federal employees for national security issues – a provision wholly inapplicable here – "require[d] that individuals seeking government employment possess such traits as reliability, trustworthiness, and loyalty." <u>Id</u>. As the Court noted in <u>Crop Growers</u>, with respect to SEC Rule 12b-20, such general provisions standing alone would not have set forth with sufficient clarity to satisfy due process considerations. <u>Crop Growers</u>, 954 F. Supp. at 345.

05.31.06 a.m. Tr. at 80:21-81:1; 82:11-17.  Furthermore, as McKenna testified, the entire process

of seeking ethics advice is a dialogue, often necessitating further communications between the

person seeking the ethics advice and the GSA ethics official.  05.31.06 p.m. at 42:6-7 ("[i]n some

instances the inquiry is very sparse.  It [the ethics request] just says, I have an issue of whatever,

and please guide me.")  At no point were GSA officials ever unsuccessful in their attempts to

contact Mr. Safavian to obtain additional information regarding his ethics request, nor did Mr.

Safavian refuse to answer any questions posed to him.  In fact, no questions were posed.  See

05.31.06 p.m. at 28:10 (McKenna); 05.31.06 a.m. at 54:21 (Ellison).

Even if these general provisions had actually identified what needed to be disclosed and

the penalties for not disclosing, the point in limiting concealment cases to "substantive,"

"specific," and "unambiguous" forms and regulations is that a person is placed on notice of the

substantive information required and the penalties for failing to accurately provide such

information *at the time of the representation.*  Crop Growers, 954 F. Supp. at 347 (SEC filings

did "not specify that criminal liability [could] be imposed if the forms are not completed in

compliance with law," nor did the forms "set forth required disclosures in precise terms"); see

supra note 8 (citing cases).

In sum, in the absence of a specific, legal duty to disclose, the § 1001(a)(1) convictions

for concealing "assistance to Abramoff in GSA related activities" in Counts Two and Three must

be reversed as a matter of law.

**III.    THE SECTION 1001 CONVICTIONS MUST BE REVERSED BECAUSE THE
          GOVERNMENT CANNOT NEGATE A  REASONABLE INTERPRETATION
          THAT MAKES MR. SAFAVIAN'S STATEMENTS FACTUALLY CORRECT**

It is well-settled that a defendant cannot "*as a matter of law*, be found guilty of making a

false statement" where the representation at issue is supported as a reasonable interpretation.

- 25 -

Dale, 782 F. Supp. at 627 (citing, *inter alia*, United States v. Race, 632 F.2d 1114, 1120 (4th Cir. 1980)). As the Court stated in Cisneros, a person – if given the adequate due process warnings, specific and unambiguous legal duty to disclose, and the "option of silence" not provided in this case – has an "obligation to refrain from telling half-truths or from excluding information necessary to make the statements accurate." Cisneros, 26 F. Supp.2d at 42. However, it is always the *government's burden to negate any reasonable interpretation* that would make the defendant's statement factually correct. Dale, 782 F. Supp. at 627 (noting that the reasonable construction legal argument is best decided at the post-trial stage) (emphasis added) (citing Race, 632 F.2d at 1120) (holding that a § 1001 conviction cannot stand whenever a defendant's statement accords with a reasonable construction of the question presented)); see also Migliaccio, 34 F.3d at 1525 (government has burden of "negat[ing] *any* reasonable interpretations that would make a defendant's statement factually correct") (emphasis added); United States v. Gatewood, 173 F.3d 983, 988 (6th Cir. 1999) (holding same and reversing conviction) (citation omitted); United States v. Moses, 94 F.3d 182, 188 (5th Cir. 1996) (vacating § 1001 conviction where the alleged statement forming the basis of the violation, making false statements on an INS form, was "true on its face").

In this case, Mr. Safavian's representations that Abramoff "had no business before GSA (he does all of his work on Capitol Hill")) (Count Two); and "did not have any business with GSA" (Counts Three and Five) are not only true on their face, but at the very least, constitute a reasonable construction of the question posited that is supported by definitions of: a) the OGE; b) the GSA Ethics Manual; and c) the GSA ethics officer Eugenia Ellison. The government thus has not and cannot possibly sustain its burden as a matter of law.

In his July 25, 2002 e-mail request for ethics advice, Mr. Safavian stated that the host [Abramoff] "ha[d] no business before GSA (he does all of his work on Capitol Hill)."  Gov. Ex. 40.  Ms. Ellison, when asked directly, stated that she interpreted the parenthetical "all work on Capitol Hill" as meaning that the host "ha[d] no business before GSA." 05.31.06 a.m. at 33:5-7.

The representation that Abramoff "had no business with the GSA" accords with the OGE's construction of the prohibited source definition in 5 C.F.R. § 2635.203(d)(2).  As OGE explained in response to a query as to "whether a senior procurement official and his wife could accept meals from a contractor that [was] competing for a government contract following a solicitation of bids," a "competing contractor is a prohibited source because it seeks to do business with the agency [and] [e]ven a contractor that is not presently competing for new business with the agency is a prohibited source if it is actually doing business with the agency pursuant to *existing arrangements*."   Letter to a Federal Employee from Marilyn L. Glynn, Acting Director, Office of Government Ethics (Jan. 7, 2004) (Rule 29 Ex. 7) (emphasis added). The GSA had already established that the definition of the operative terms "doing business," and even "seeking to do business" with the agency under 5 C.F.R. § 2635.203(d)(2) (defining a prohibited source) meant that the person or corporation was a present GSA "contractor." 06.20.03 GSA Ethics Manual ("Does or seeks to business with the employee's agency (i.e., GSA contractor)") (Def. Ex. 148 at DOJ-DS0013607).

In other words, according to the very agencies responsible for interpreting and implementing the underlying ethics provisions, a source only "does business" with the agency when it has "existing agreements."  See id.  It is undisputed that the government failed to present any evidence that Mr. Abramoff had any existing contracts with the GSA at the time Mr. Safavian sought ethics advice, or that he had at any time been a GSA contractor.  Hence, whether

or not Mr. Abramoff was actually "seek[ing] to lease or purchase GSA-controlled property," Verdict Form at Count Two(C); Five (C), is moot. Even if such activity did meet the definition of "seeking to do business" under the pertinent regulation, 5 C.F.R. § 2635.203(d)(2), and it does not, see Def. Ex. 148; Rep. Ex. 7, it surely does not negate the reasonable, objectively supported definition of "*doing* or *having* business" that "make[s] the defendant's statement factually correct." Race, 632 F.2d at 1120; United States v. Rowe, 144 F.3d 15, 21-23 (1998) (reversing § 1001 conviction where the government failed to negate "an objectively reasonable interpretation of the question under which the answer [was] not even false").

Similarly, for Count Three (A), Mr. Safavian's response to Agent Rowe's question "Does [Jack] Abramoff *have* any business with the GSA," notably the *only* point in the Indictment in which the question was *ever* presented to Mr. Safavian, was fully consistent with the interpretations of the terms of the relevant ethics officials. 05.31.06 p.m. at 46:23-25; see also supra note 2. Therefore Mr. Safavian cannot be guilty of concealment in Count Three. See United States v. Gahagan, 881 F.2d 1380, 1382-83 (6th Cir. 1989) (reversing § 1001 conviction for concealing from a probation officer the fact that he owned a certain automobile because defendant had transferred the car to his girlfriend prior to filing the financial report and it was a reasonable representation that the girlfriend was technically the "owner" of the automobile).

The same holds true for the identical March 17, 2005 cover letter representation to the SCIA, in which Mr. Safavian again stated that Mr. Abramoff "did not have any business before the Agency." Def. Ex. 204. Notably, the alleged false statement in Count Five, that Mr. Safavian said "Mr. Abramoff did not have any business with GSA *at the time Mr. Safavian was invited on the trip to Scotland*," when in truth and in fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled

property," Count Five Verdict Form (emphasis added), is particularly specious.  Not only is there

a material difference between seeking to lease property from an agency that was not available

and having "existing contractual arrangements" with the agency, but Mr. Safavian was invited on

the trip in "early to mid June 2002," before any evidence that he was receiving Abramoff's

requests for information.  06.02.06 a.m. at 71:4-8.[11]

As such, Mr. Safavian "cannot be convicted under § 1001" in Counts Two, Three, and

Five for concealment or falsification of material facts.  Race, 632 F.2d at 1120; Rowe, 144 F.3d

at 21-23; see also United States v. Johnson, 937 F.2d 392, 398-99 (8th Cir. 1991) (reversing §

1001 conviction where the government was unable to negate reasonable interpretations of

certification forms); Moses, 94 F.3d at 183-84 (reversing § 1001 conviction where representation

that defendant was living with and not separated from his wife was a reasonable construction of

the marriage question); see also Gahagan, 881 F.2d at 1382-83; United States v. Vesaas, 586

F.2d 101 (8th Cir. 1978) (reversing § 1001 conviction since "a prosecution for a false statement

under § 1001 or under the perjury statutes cannot be based on an ambiguous question where the

response may be literally and factually correct") (citing  Bronston v. United States, 409 U.S. 352,

366 (1973)).[12]

---

[11] The government made much of the fact that Abramoff e-mailed Mr. Safavian on May 24, 2002 and
asked if it was "doable" to get some of the property at the White Oak Center in Silver Spring, Md.  Gov.
Ex. 109.  Notably, there is no record of a response by Mr. Safavian to that e-mail, and Abramoff asked
Mr. Safavian an even more cryptic question, "[c]an you find out if you guys have control of any part of a
huge federal property called the White Oak Federal Research Center" over a month and a half later, on
June 30, 2002. Gov. Ex. 118.  The first Abramoff e-mail relating to the Old Post Office, simply
requesting information and certainly not addressing any existing arrangements with the GSA, is dated
June 18, 2002.  Gov. Ex. 112.

[12] Notably, in Dale, the Court of Appeals affirmed the principle that the government cannot sustain a §
1001(a)(1) concealment or falsification conviction where the defendant's statement comports with a
"reasonable interpretation of the forms cited."  United States v. Dale, 991 F.2d 819, 832-833 & n.22 (D.C.
Cir. 1993) (citing United States v. Gahagan, 881 F.2d 1380, 1382-83 (6th Cir. 1993); Race, 632 F.2d at
1120;  United States v. Vesaas, 586 F.2d 101, 104 (8th Cir. 1978); United States v. Anderson, 579 F.2d
455, 459-60 (8th Cir.), cert. denied,439 U.S. 980 (1978); United States v. Diogo, 320 F.2d 898, 906-07
(2d Cir.1963). However, the Court found that the expressions "foreign ··· business connections" in the

## IV.    COUNTS TWO AND THREE ARE MULTIPLICITOUS

The verdict as to Counts Two and Three must also be reversed because the § 1001 violations are based on the same representation by Mr. Safavian, that Jack Abramoff "ha[d] no business before GSA (he does all of his work on Capitol Hill)" (Count Two), Gov. Ex. 40; and "did not have any business with GSA" (Count Three) at the time of or before the August 2002 Scotland trip. 05.31.06 p.m. at 46:23-25.

Courts in this Circuit have recognized that counts of an indictment are multiplicitous "where identical false statements, in either oral or written form, are made in response to identical questions." Cisneros, 26 F. Supp. 2d at 44 (quoting United States v. Olsowy, 836 F.2d 439, 443 (9th Cir.1987) (dismissing multiple counts of § 1001 violations)). In Cisneros, the Court recognized the viability of the multiplicity for *both* the falsification and concealment sets of charges because all of those counts were "based on the same alleged lie: that Cisneros was not subject to coercion or blackmail by Medlar." Id. at 43. However, the Court decided to resolve potential multiplicity issues after trial (which never materialized). Id. at 43-45; In re Cisneros, 255 F.3d at 832.

In United States v. Graham, 60 F.3d 463, 467 (8th Cir. 1995), the court, also applying Olsowy, held multiplicitous "practically identical" statements concerning bankruptcy assets made to "three different individuals." One false statement was made to the United States

---

"Personnel Security Questionnaire" (count 6) and "foreign connections" in the "Statement of Full Disclosure of All Foreign Connections" (count 8) could not reasonably be interpreted to refer only to "actual status as an owner or director of a foreign company" and not, as was the case, ownership that had been practically conferred (she was on the board and voted in owners' meetings) but had not yet been officially stamped by the foreign government by omission. Unlike the case in Dale, where the defendant could not find support from any objective source, Mr. Safavian's interpretation of the regulations at issue are supported by definitions provided by the very agents responsible for interpreting and implementing the provisions. Moreover, unlike the defendant's interpretation in Dale, Abramoff had no "business" contracts with the GSA at the time of the 2002 Scotland trip under a "de jure" or "de facto" construction. Id. at 833 & n. 25.

Trustee, a second was made to two attorneys representing creditors, while the defendant was under oath. While the three employees belonged to different organizations, the court emphasized that they had the same objective: to ascertain all assets that should have been included in the bankruptcy estate. The jury found that Graham misled the creditors at the first creditors' meeting. However, his repetition of the same statement at the second and third creditors' meetings could not add further harm to the bankruptcy auction; the harm was done from the outset, and thus the subsequent counts for the second and third iterations were dismissed. Id; see also United States v. Trent, 949 F.2d 998, 1000 (8th Cir.1991) (defendant could not be convicted of multiple 18 U.S.C. § 1001 offenses for the repetition of the same false statement).

As in Graham, the GSA general counsel (Count Two) and the GSA-OIG's Office (Count Three) would have had the same objective in any dealings with Mr. Safavian: to ascertain whether Abramoff had any business with GSA at the time of the August 3, 2002 Scotland golf trip, and at most, to sanction Mr. Safavian if they had concluded that he had violated an agency regulation.[13] As such, Mr. Safavian cannot be charged more than once under § 1001 for those identical representations.

---

[13] The statement at issue in Count Five, that Mr. Abramoff "did not have any business with GSA" at the time of the Scotland golf trip is also identical to the presentations in Counts Two and Three. Def. Ex. 204. However, as the defense has maintained throughout, the Senate counsel did not have the same objective as the GSA General Counsel or the GSA Inspector General's office. The SCIA did not have any jurisdiction over and indeed was not looking into Mr. Safavian's conduct at the GSA at the time Mr. Safavian sent his March 17, 2005 cover letter response. See infra at Section V.C.1.

## V.    THE VERDICTS IN COUNTS TWO, THREE, AND FIVE MUST BE DISMISSED FOR INSUFFICIENT EVIDENCE

### A.    In Count Two, There is Insufficient Evidence that Mr. Safavian Knowingly or Willfully Made a False Statement or Concealed a Material Fact

#### 1.    Specific Intent to Make a False Statement

There is insufficient evidence in the record to support the notion that Mr. Safavian's statement that Abramoff "ha[d] no business before GSA (he does all his work on Capitol Hill)" was intentionally false.  The term "false statements" as used in § 1001 is defined as "*more than merely untrue or erroneous, [but rather]* . . . designedly untrue and made with intention to deceive the person to whom the false statement is made or exhibited."    United States v. Worthington, 822 F.2d 315, 319 (2d Cir. 1987) (quoting Black's Law Dictionary 725 (4th ed. 1968).  Ms. Ellison testified that she interpreted "all his work on Capitol Hill" as meaning "ha[d] no business before GSA," 05.31.06 a.m. at 33:5-7, implying that the relevant issue from the standpoint of an ethics official is whether the representation implicates the terms of an underlying regulation.   "Having business" before the GSA means that the person or corporation was a present GSA "contractor."  GSA Ethics Manual, Def. Ex. 148 at DOJ-DS0013607 ("Does or seeks to business with the employee's agency (i.e., GSA contractor)"); see also OGE Letter to a Federal Employee, Rule 29 Ex. 7 (emphasis added).  It has never even been suggested that Mr. Abramoff had existing contracts with the agency prior to the Scotland trip.

In addition, a person's act is willful only if it is done with an intention to do something the law forbids, or where the government alleges that the defendant concealed information, with the specific intent to fail to do something the law requires to be done.  See, e.g. United States v. Irwin, 654 F.2d 671, 679 & n.9 (10th Cir. 1981); United States v. Cochran, 109 F.3d 660, 665-66 (10th Cir. 1997).  Unlike the vast majority of § 1001(a)(1) actions, Mr. Safavian was not filling out an official government form where the requisite substantive information is highlighted on the

face of the filing.  Furthermore, neither Mr. McKenna nor Ellison went back to Mr. Safavian to

get any additional information about his request before drafting the opinion.  05.31.06 p.m. at

28:10; 05.31.06 a.m. Tr. at 54:21.  Hence, he did not even have an opportunity to answer a

question about the substance of his request.  In any event, providing "assistance" in the form of

answering e-mails and telling Abramoff that Congress was the ultimate authority in conferring

GSA related properties is not listed in any pertinent statute or regulation.  5 C.F.R. § 2635.202 et

seq.  Therefore, Mr. Safavian could not have knowingly and willfully concealed information that

he knew was forbidden under law.

2.    <u>Materiality</u>

Mr. Safavian's statements at issue in this Count are immaterial under § 1001 in two

important respects.  First, Mr. Safavian's statements were simply not capable of influencing or

affecting any GSA agency decision – i.e., disbursement of government controlled property.

<u>Gaudin</u>, 515 U.S. at 511 (determining whether a statement is "material" implicates two

subsidiary questions: "(a) what statement was made . . . (b) what decision was the agency trying

to make?") (internal quotations omitted); <u>United States v. Bok</u>, 156 F.3d 157, 165 (2d Cir. 1998)

(affirming district court's definition of  "material" to jury as requiring the capacity for impeding

or influencing an agency (IRS) in its official action (verifying and auditing a return)).  Even if

clearance by the general counsel's office to accept a gift could be considered agency action, it

only becomes material if it is utilized.

Second, as Ms. Ellison explained, even if Abramoff was actually a prohibited source –

and he was not – gifts may still be accepted if the source is also a "long-term" friend.  05.31.06

a.m. at 78:15-80:2; Def. Ex. 148 (GSA Ethics Manual) at DOJ-DS0013661 (explaining that the

"family and friend" exception could apply where the "long-time close friend[] performs contract

work for [the]agency and is therefore a prohibited source . . . as long as the circumstances make

- 33 -

it clear that the gift is motivated by a personal friendship rather than your position with the Government . . . [r]elevant facts to consider include the history of the relationship and whether the friend personally pays for the gift"). Based on the history of their relationship, dating back to 1995, their "history of exchanging gifts with each other," and the fact that as far as Mr. Safavian knew, Abramoff was personally paying for the trip, Mr. Safavian would have been able to accept any the Scotland trip as a gift under the friends and family exception. 05.31.06 a.m. Tr. at 78:13-80:2.

**B.    In Count Three, There is Insufficient Evidence that Mr. Safavian Knowingly and Willfully Concealed a Material Fact to Agent Rowe**

1.    Specific Intent to Make a False Statement

The government has not produced any evidence that Mr. Safavian was ever asked anything about Mr. Abramoff beyond the question "does he have any business with GSA." 05.31.06 p.m. at 46:23-25. Agent Rowe readily conceded in his testimony that Safavian answered all of the questions Rowe posed. Id. at 59:4-5. Rowe did not ask if Safavian had received an ethics opinion. Id. at 59:6-13. Rowe did recall Safavian giving him Abramoff's phone number and telling him "Jack would be happy to take your call if you want to call him." Id. at 60:19-23. Rowe never made that phone call. Id. at 61:4-5.

In follow up interviews, Mr. Safavian answered Agent Rowe's additional questions pertaining to the other inquiries during this interview, including a detailed series of questions regarding the Hatch Act "Do's and Don'ts." Id. at 69:10-70:1. However, Rowe asked no follow-up questions related to the Scotland trip or any pertinent regulations on that issue. Id. at 49:5-24. Rowe's final report concluded that all three allegations could not be substantiated and his investigation closed. Id. at 51:2-7; Def. Ex. 127.

Vagueness or fundamental ambiguity in the question put forth by Agent Rowe precludes, as a matter of law, a § 1001 prosecution in this context. For instance, Rowe testified that he asked Safavian, "Did Jack Abramoff *have* any business with the GSA?" 05.31.06 pm at 46:23-25. Mr. Safavian responded that he did not "have any business." Id. The May 9, 2003 Report of Investigation ("ROI"), however, records the question and answer as to Mr. Abramoff's conduct as occurring in the present tense: "*Currently*, [Lobbyist A] is a professional lobbyist, however he *does not have* any business relationship with GSA." Def. Ex. 127. Culliton, 328 F.3d at 1078; Manapat, 928 F.2d at 1101 ("[I]n order to successfully prosecute an indictment for making a false statement, the government must not remove questions from the context in which their answers were given in an attempt to prove their clarity.").

But even if the government could advance a § 1001 case under such circumstances, there is insufficient evidence to support the jury's conclusion that Mr. Safavian's knowingly and willfully concealed material information. A § 1001 charge cannot survive if it is premised on a statement that on its face is not false. Crop Growers Corp., 954 F. Supp. at 349; Gahagan, 881 F.2d at 1383 (reversing a concealment conviction because defendant's denial was "on its face not a false representation"). As explained above, the government has produced no evidence that Abramoff was a GSA contractor or that he had existing contractual agreements with the GSA. Hence, even if Count Three were able to survive the multiple layers of threshold deficiencies, Mr. Safavian cannot be said to have willfully concealed information that he knew was forbidden under law or with the specific intent to fail to do something that the law required to be done. See Irwin, 654 F.2d at 679 & n.9.

2.    Materiality

The "material" fact allegedly concealed in Count Three is purported "assistance to Abramoff in GSA related activities." Verdict Form at Count Three (A). Consistent with GSA-

General Counsel McKenna's advice in their post-opinion conversation, the GSA-OIG closed its investigation into whether Mr. Safavian "participated in an international golfing trip *provided by* lobbyists" based on its conclusion that Mr. Safavian paid for his own trip. Gov. Exs. 52, 53; Def. Exs. 127-28. Once the office reached that conclusion, all other considerations became moot to the determination of whether he accepted a gift. Thus, any "assistance to Mr. Abramoff in GSA related activities" could not have influenced the decision of the OIG to close the investigation. United States v. Barrett, 111 F.3d 947, 953 (D. C. Cir. 1997) (citations omitted) (holding that the central object of any materiality inquiry is whether the statement "'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination.'"); Gaudin, 515 U.S. at 509.

In any event, the term "assistance to Mr. Abramoff in GSA related activities," assuming *arguendo* is an accurate depiction of the course of conduct in this case, is not mentioned anywhere in the pertinent regulations, i.e. the definition of a prohibited source. 5 C.F.R. 2635.202 et seq.; Def. Ex. 148. And as explained above, even if the operative phrase was included in the definition of a prohibited source, or if Abramoff was a prohibited source under the actual definition in 5 C.F.R. § 2635.202, the history of Mr. Safavian's and Jack Abramoff's relationship as long-term friends would have entitled Mr. Safavian to accept the Scotland trip as a gift under the friends and family exception of the rules. 05.31.06 a.m. at 78:13-80:2; Def. Ex. 148 at DOJ-DS 0013661.

### C.    In Count Five, There is Insufficient Evidence That Mr. Safavian Knowingly and Willfully Falsified a Material Fact Within the Jurisdiction of the SCIA

#### 1.    Jurisdiction

Section 1001(c)(2) requires that, with specific reference to the legislative branch, § 1001 will apply only to an "investigation or review, conducted pursuant to the authority of any

committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate." 18 U.S.C. § 1001(c)(2); United States v. Pickett, 353 F.3d 62, 69 (D.C. Cir. 2004) (reversing conviction where Indictment did not properly allege that the statement was made in a matter within the jurisdiction of the legislative branch at the time the statement was made).

The SCIA did not have jurisdiction to investigate whether it was proper for Mr. Safavian to attend the Scotland trip under the GSA Standards of Ethical Conduct. The SCIA does not have *carte blanche* to investigate alleged government corruption. Rather, it is empowered only "to make investigations into any matter within its jurisdiction[.]" Def. Ex. 224; US v. Poindexter, 725 F. Supp. 13, 22 (D.D.C. 1989); United States v. Mitchell, 877 F.2d 294, 300 (4th Cir. 1989).

The SCIA's jurisdiction includes "all matters pertaining to problems and opportunities of Indians, including but not limited to, Indian land management and trust responsibilities, Indian education, health, special services, and loan programs, and Indian claims against the United States." S. Res. 4 § 105(b)(2), 95th Cong. (1977), as amended by S. Res. 127, 98th Cong. (1984); see also Def. Ex. 224. A Committee's jurisdiction represents the scope of its power: "[a] congressional committee is a creation of its parent house and only has the power to inquire into matters within the scope of the authority that been delegated to it by that body." Louis Fisher et al., Congressional Oversight Manual, Congr. Research Serv., at CRS-44 (updated October 21, 2004) at 44, available at http://www.fas.org/sgp/crs/misc/RL30240.pdf.

The SCIA was certainly authorized to inquire into whether tribal funds were used to pay for the Scotland trip in illicit fashion, since it "has jurisdiction to study the unique problems of American Indians, Native Hawaiian, and Alaska Native peoples and to propose legislation to

alleviate these difficulties."  Def. Ex. 272   Indeed, each and every bill referred to the SCIA during the 109th Congress has related exclusively to Indian Affairs.  Def. Ex. 225.  However, the SCIA does not have jurisdiction over GSA affairs, including the issue of whether it was proper for Mr. Safavian to attend the golf trip.[14]

The SCIA has frequently acknowledged the limits of its jurisdiction during its two-year Abramoff investigation.   In its June 22, 2006 Final Report, for instance, the Committee: "[r]ecogniz[ed] that oversight of nonprofit organizations under the Internal Revenue Code is not within the jurisdiction of the Senate Committee on Indian Affairs."  June 22, 2006 Report at 357, Rule 29 Ex. 1 at 357.  Therefore, the SCIA, "at the request of the Senate Committee on Finance, transmitted a number of relevant documents pertaining to this issue to the Senate Committee on Finance on February 9, 2006."  Id.; see also Def. Ex. 222 (Dec. 4, 2005 Interview of SCIA Chairman Sen. McCain at SAF00000305) ("We stopped in the Indian Affairs Committee with where the money went, and that was our—the extent of our responsibilities.").

Accordingly, the issue put before the jury in Count Five (C), whether the representation that Abramoff "did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland" was a material false statement, was not a statement regarding a matter within "the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate."  18 U.S.C. § 1001(c)(2); Pickett, 353 F.3d at 69  (a statement must be made in a matter within the jurisdiction of the legislative branch at the time the  statement was made).

_____

[14] Notably, the jury instructions on Count Five, unlike indictment paragraphs 33 and then charging paragraph 38, do not define the parameters of the committee investigation.  Specifically, the Indictment correctly identified that the inquiry being had was an investigation by Senator McCain into allegations of misconduct by lobbyists for Native American tribes.  Because of the jurisdiction and material elements of § 1001, this was a significant omission.

2.    Specific Intent to Make a False Statement

Mr. Safavian's statement that Abramoff "did not have any business with the GSA at the time he was invited on the Scotland trip" was not knowingly and willfully false for reasons stated above. See supra at 32-33.

3.    Materiality

The undisputed evidence demonstrates that the SCIA was not investigating the propriety of Mr. Safavian's attendance on the Scotland trip by the time the SCIA had received the cover letter at issue in Count Five (C). 06.01.06 a.m. at 69:20-25; 70:1-5. As Parker himself stated, Mr. Safavian's statements had absolutely "no impact" on the SCIA investigation. Id. at 34:20-21. After sending the documents as requested, neither Parker nor anyone else affiliated with the SCIA contacted Mr. Safavian: called him for an informal interview; subjected him to a deposition or subpoena; or examined him in front of the committee. The Committee's Final Report did not mention Mr. Safavian or the GSA at all. SCIA Report "Gimme Five" at 6-7, Rule 29 Ex. 1.[15]  As such, Mr. Safavian's statement was not only true but utterly incapable of influencing the committee investigation in the conclusions it was trying to reach. Barrett, 111 F.3d at 953; Gaudin, 515 U.S. at 509.

---

[15] The June 22, 2006 SCIA report explained the goal of its investigation:

> While a Department of Justice task force reportedly began a parallel inquiry into related matters, the Committee sought to answer several questions, including but not limited to the following: (1) are the Tribes; allegations of misconduct regarding Abramoff and Scanlon's partnership true; (2) if so, how much did those Tribes pay Abramoff and Scanlon's partnership, as well as third parties at their direction, as a result of that misconduct; and (3) did those Tribes receive the intended benefit of the tens of millions of dollars that they paid Scanlon and Abramoff. With this Report, the Committee attempts to set for definitive conclusions and the bases for those conclusions regarding each of those areas and others.... Principally, this Report focuses on allegations of misconduct made by the Tribes covered in it. Generally, those allegations related to the activities of entities owned or controlled by Abramoff and/or Scanlon, including Capitol Campaign Strategies, the American International Center, and the Capital Athletic Foundation. SCIA Report "Gimme Five" at 6-7.

## VI.   OBSTRUCTION OF JUSTICE IN COUNT ONE CANNOT BE SUSTAINED AS A MATTER OF LAW

### A.   Count One Must Be Reversed For the Due Process Infirmities Stated in Section I

The circumstances surrounding the GSA-OIG inquiry into Mr. Safavian's alleged participation in an "international golfing trip provided by lobbyists" failed to satisfy the demands of due process and therefore cannot result in conviction under 18 U.S.C. § 1505.  See supra Section I.

### B.   18 U.S.C. § 1505 is Unconstitutionally Vague As Applied to "False or Misleading" Statements in a Proceeding under 18 U.S.C. § 1515(b)

Section 1505 and its statutory predecessors, have historically been applied to "attempts to influence or to obstruct a congressional inquiry by influencing *another* to violate his legal duty." United States v. Poindexter, 951 F.2d 369, 386 (D.C. Cir. 1991) (holding that the term "corruptly" in § 1505 should be read in the transitive sense); see also United States v. Kelley, 36 F.3d 1118 (D.C.Cir.1994) (reaffirming the decision that "corruptly" requires that the defendant must have corrupted someone else).   Accordingly, this Circuit has held that § 1505 is unconstitutionally vague when predicated upon alleged false and misleading statements to the Congress, that is, as a *de facto* sentence enhancement to a 18 U.S.C. § 1001 claim.  Poindexter, 951 F.2d at 386 ("[e]ven if that statute may constitutionally be applied to all attempts to influence or to obstruct a congressional inquiry by influencing another to violate his legal duty, it would still not cover . . . making false and misleading statements to the Congress").

In 1996, Congress amended 18 U.S.C. § 1515(b).  It now reads:

> the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

18 U.S.C. § 1515 (b).  After the amendment, several courts continued to acknowledge that "[a]s defined by this Circuit,  'corruptly' means that the defendant influenced someone else to obstruct justice . . . [thus] § 1505 does not apply in situations where the defendant acts alone." Cisneros, 26 F. Supp. 2d at 48 (citing Poindexter, 951 F.2d at 379) (noting that "to read 'corruptly' in an intransitive sense as 'wickedly' or 'immorally' would appear to render the other methods of violating the statute superfluous")); United States v. Church, 11 F. App'x. 264, 268 (4th Cir. 2001) (acknowledging that the court in Poindexter found § 1505 vague if applied beyond corrupting another person by influencing them to violate a legal duty); United States v. Davis, 183 F.3d 231, 249 (3d Cir. 1999) (affirming validity of Poindexter reasoning and applying to "corruptly" definition in § 1512(b)).

In United States v. Kanchanalak, 37 F. Supp. 2d 1, 3-4 (D.D.C. 1999), this Court stated the amendment's phrase "acting with an improper purpose" did not alleviate the concerns expressed by the court of appeals, but that "corruptly" as defined by statute was not unconstitutionally vague as applied to the conduct alleged in that Indictment.  The allegations in Kanchanalak were more akin to the traditional line of § 1505 cases in that they involved *physical removal* of records and boxes from corporate offices, the erasure of computer hard drives from several computers, and the mutilation and/or discarding of documents responsive to a grand jury subpoena.  Id. at 2.  Thus, they were distinct from the allegations in Poindexter and Cisneros, which involved alleged "false and misleading statements."  18 U.S.C. § 1515(b).

Notwithstanding the 1996 amendments, § 1505 remains unconstitutionally vague, particularly as applied to the allegations of false or misleading statements in this case.  A statute can be held unconstitutionally vague for several reasons, including: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits;

(2) or if it authorizes or even encourages arbitrary and discriminatory enforcement.  Hill v. Colorado, 530 U.S. 703, 732 (2000).[16]

Section 1505 makes it a criminal offense for anyone who "corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or . . . either House, or any committee of either House or any joint committee of the Congress."  18 U.S.C. § 1505.  The term "corruptly" is followed by other terms, "by threats," "[by] force," and "by any threatening letter or communication," all of which are transitive and "take as their object a natural person."  Poindexter, 951 F.2d at 379.  In addition, as the Courts in Poindexter and Cisneros concluded, to read "corruptly" in an intransitive sense as "wickedly" or "immorally" would render the other methods of violating the statute superfluous, since the use of force to influence a congressional inquiry would certainly be "wicked" or at least "immoral." Id.; Cisneros, 26 F. Supp. 2d at 48; see also Duncan v. Walker, 533 U.S. 167, 175 (2001) (rejecting a construction that would render a word in a statute "insignificant, if not wholly superfluous"); Kelso v. U.S. Dep't of State, 13 F. Supp. 1, 8 (D.D.C. 1998) (noting that "statutes should not be interpreted as to make a provision 'either superfluous or meaningless'") (citation omitted).

The § 1515(b) amendment does not cure this problem.  The provision states that the term "corruptly" means "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or

[16] Even when a statute does not threaten constitutionally protected activity, if it imposes criminal sanctions, a facial analysis is appropriate and a "relatively strict test is warranted." United States v. Blaszak, 349 F.3d 881, 887-88 (6th Cir. 2003) (internal quotations and citation omitted); Kolender at 358 n.8 ("Where a statute imposes criminal penalties, the standard of certainty is higher.").

destroying and document or other information." 18 U.S.C. § 1515(b). The phrase "acting with an improper purpose" adds no additional clarity: "[r]eading 'corruptly' to prohibit one from influencing another to act 'immorally' or 'improperly' provides no more guidance than does reading it to prohibit one from acting 'immorally' or 'improperly' oneself." Poindexter, 951 F.2d at 379. Moreover, the added language "acting with an improper purpose, personally or by influencing another" does not alter the fact that a transitive interpretation of "corruptly"— requiring some action directed at "another person by influencing him *to violate his legal duty*"— is consistent with the context in which the term "corruptly" appears in § 1505. Id. at 379.

Unlike the circumstances in Kanchanalak, where the § 1515(b) descriptive "withholding, concealing, altering, or destroying a document or other information," 37 F. Supp. 2d at 4, comported with the allegations of the superseding indictment, the phrase "making a false or *misleading* statement" still renders §§ 1505, 1515(b) unconstitutionally vague. The term "misleading" in particular fails to provide reasonable notice as to what conduct is prohibited and inherently sanctions and encourages arbitrary and discriminatory enforcement. "Misleading" is not even used in 18 U.S.C. § 1001. Indeed, the term "false statements" as used in § 1001 is defined as "*more than* merely untrue or erroneous, [but rather] . . . designedly untrue and made with intention to deceive the person to whom the false statement is made or exhibited." Fed-JI 16.06 (emphasis added) (citing Worthington, 822 F.2d at 319). Accordingly, the literal truth and reasonable construction of the defendant's statements are well-established defenses to § 1001 charges. Whiteside, 285 F.3d at 1351-52 (holding that government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law); Migliaccio, 34 F.3d at 1525; Gahagan, 881 F.2d at 1383 (6th Cir. 1989) ("A prosecution for a false statement under § 1001 or under the perjury statutes cannot be

based on an ambiguous question where the response may be literally and factually correct. . . . An indictment premised on a statement which on its face is not false cannot survive."); Race, 632 F.2d at 1120 (same); Moses, 94 F.3d at 188 (vacating conviction where statement on INS form was "true on its face").

Yet in this case § 1505, as defined by § 1515(b), makes it a criminal offense for anyone to make a factually true but misleading statement with the intent to influence any pending proceeding in either the Executive or Legislative branches of government.  Hence, "misleading" fails to adequately inform a person of ordinary intelligence what conduct or statements that would still be illegal under the statute because: a) it does not comport with the reading of the term "corruptly" in its actual § 1505 context; b) it purports to parallel § 1001 but suggests criminality for conduct that is not prohibited by § 1001; and c) there is no objective, verifiable standard for what constitutes "misleading."  See Tucson Woman's Clinic v. Eden, 379 F.3d 531, 555 (9th Cir. 2004) (finding state regulations regarding abortion clinics were unconstitutionally vague because they subjected physicians to criminal sanctions "based not on their own objective behavior, but on the subjective viewpoints of others") (internal quotations and citation omitted); Free Speech Coal. v. Reno, 198 F.3d 1083, 1095 (9th Cir. 1999) (finding CPPA unconstitutionally vague because it imposed criminal penalties based on criteria that was "highly subjective" with no "explicit standard as to what the phrases mean[,] . . . whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution").

Section 1505 as applied to personally making false or misleading statements is also unconstitutional because it fails to give adequate guidance to law enforcement officers and therefore authorizes or even encourages arbitrary and discriminatory imposition.  Hill, 530 U.S.

at 733.  The only guide a law enforcement officer or prosecutor has as to what constitutes a true but "misleading" statement is his own subjective belief as to whether the suspect intended to mislead the investigator with his answers.  Indeed, it is difficult to imagine a single scenario where *any* suspect—no matter how honest and well intentioned—could be questioned by police and not be subject to prosecution for obstruction under the "misleading statement" prong of § 1505 so long as law enforcement officers or prosecutors continue to subjectively believe the suspect is guilty of the underlying offense.  United States v. Williams, 444 F.3d 1286, 1306 (11th Cir. 2006) (striking the application of a criminal statute restricting speech where the terms "in a manner that reflects the belief, or that is intended to cause another to believe" left no objective measure to which behavior can be conformed and led to a wholly subjective determination by law enforcement personnel of what the terms meant) (citing City of Chicago v. Morales, 527 U.S. 41, 62 (1999) (holding unconstitutionally vague an anti-loitering ordinance, which defined loitering as remaining in place with "no apparent purpose," finding that standard "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene")); City of Houston v. Hill, 482 U.S. 451 (1987) (finding unconstitutionally vague a city ordinance prohibiting speech that "in any manner" interrupts a police officer in the performance of his duties, without limitation to fighting words or to obscene or opprobrious language).

That the term "misleading" fosters unconstitutionally arbitrary and selective enforcement is not an ethereal proposition, as the trial testimony of Agent Rowe demonstrated.  On direct examination, Rowe stated that he "knew the difference between Scotland and England" and suggested that Mr. Safavian had not informed him during the March 27, 2003 that he had visited London during the trip.  05.31.06 Tr. at 46:25-47:4.  However, only upon cross-examination did

the inspector clarify that Mr. Safavian in fact told him that he returned home, or "left out of London." Id. at 82:3-7.[17] Therefore, whether or not Mr. Safavian's statements regarding the trip were "misleading" is subject solely to Agent Rowe's impressions and the questions he was asked at trial.

In sum, § 1505 remains unconstitutionally vague as applied to charges for "making false or misleading statements." Accordingly, Count One should be reversed as a matter of law.

### C.    Jury Acquitted Mr. Safavian as to the Only Alleged False Statement Alleged to Have Formed the Basis of Count One

Even if the § 1505 charge in this Indictment was permissible given the circumstances and the constitutional infirmities, the verdict should still be reversed as a matter of law. Count One charged that Mr. Safavian "did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede . . . the official investigation being conducted by the GSA-OIG." Indictment ¶ 27. There is only one alleged false statement in the charging language of Count One, namely that: "During these interviews [with Agent Rowe], defendant Safavian falsely stated in substance and in part that Lobbyist A had no business with GSA." Indictment ¶ 25. However, in Count Three (C), the jury *did not* find that Mr. Safavian "falsely stated to the GSA-OIG Regional Inspector General for Investigations that Lobbyist A did not have any business with GSA." Indictment ¶ 31; Verdict Form III(C). Accordingly, no reasonable jury could have concluded that Mr. Safavian did not make the false statement in Count Three. but that he obstructed justice with that statement in Count One.

---

[17] In addition, Agent Reising was forced to admit during cross-examination that material statements he made before the grand jury and upon direct examination in this trial -- that Mr. Safavian told him that Mr. Abramoff's request for information concerning the White Oak and Old Post Office properties occurred "significantly well after" the August 2002 Scotland trip -- was actually consistent with the e-mail documents in this case. Agent Reising also acknowledged that he had failed to provide to Mr. Safavian any of these exhibits during his May 2005 FBI interview. 5.26.06 PM Tr. at 99:10-101:16.

The only other statement even mentioned in Count One is that Mr. Safavian "further stated in substance that he had paid Lobbyist A for the total cost of the trip including airfare, hotels, and golf greens fees." Id. ¶ 25. However, nowhere does the Count One language allege that this statement is false, [18] Id. ¶¶ 22-27, and the representation is not listed as one of the allegedly "falsified" material facts in the Indictment's "list" in Count Three. Id. ¶¶ 30-31.

Even if this statement could be considered as a basis for the § 1505 charge, there was no way to assess whether the jury unanimously rendered a verdict concerning the truth or falsity of this statement. The verdict form spoke nothing about the cost of the trip. Assuming *arguendo* that this Circuit can entertain § 1505 cases predicated on "false or misleading statements," the failure to secure a unanimous agreement as to what the statement or act that supposedly obstructed justice in the GSA-OIG investigation requires acquittal. See Fed-JI 40.15 ("[u]nless the government has proven the same false statement or the same concealment to each of you, beyond a reasonable doubt, you must acquit the defendant.").

### D.     An Obstruction Charge Cannot Be Predicated On Fundamentally Ambiguous Circumstances and Even It Could, Mr. Safavian's Responses Comported With a Reasonable Construction of the Questions Presented

Assuming *arguendo* that the Indictment statement that Mr. Safavian "further stated in substance that he had paid Lobbyist A for the total cost of the trip including airfare, hotels, and golf greens fees" could initially be considered as a basis for the § 1505 charge, the evidence adduced at trial relating to the GSA-OIG investigation revealed only fundamentally ambiguous statements. Culliton, 328 F.3d at 1078 (finding that excessive vagueness or fundamental

---

[18] Paragraph 25 of the Indictment states "[D]efendant SAFAVIAN falsely stated in substance and in part that Lobbyist A had no business with GSA." However, the very next sentence states "Defendant SAFAVIAN further stated in substance that he had paid Lobbyist A for the total cost of the trip including airfare, hotels and golf green fees." Therefore the indictment itself distinguishes between the "false" statement that Mr. Abramoff had no business with GSA, and the "further" statement that Mr. Safavian paid the total cost of the trip.

ambiguity in questions may not, as a matter of law, form the basis of a prosecution for perjury or false statement; no ambiguity found on facts of case), cert. denied, 540 U.S. 1111 (2004); Manapat, 928 F.2d at 1099-1102 (affirming dismissal of § 1001 charge and holding that, as matter of law, questions about traffic and criminal convictions on a medical history form were so fundamentally ambiguous as to preclude conviction under § 1001); Lattimore, 127 F. Supp. at 409-10 (dismissing a perjury indictment, as a matter of law, because the questioning was ambiguous and terms were vague), aff'd by an equally divided court, 232 F.2d 334 (D.C. Cir. 1955)); United States v. Clifford, 426 F. Supp. 696, 705 (E.D.N.Y. 1976) (holding that in a prosecution for knowingly and willfully making a false statement, in the absence of evidence indicating question asked or answer given, a finding that a false statement was made is unreasonable and cannot stand.") (citing United States v. Lambert, 501 F.2d 943 (5th Cir. 1974)).

After the discussion turned to the issue in the hotline complaint, Gov't Ex. 53, Agent Rowe simply read or summarized the details of the anonymous note.  See 05.31.06 at 46; 58:7-16.  Mr. Safavian promptly informed Agent Rowe that he went on the trip with Jack Abramoff, and that Mr. Safavian had paid for the trip.  Id. at 46:19-22.  Agent Rowe then asked if "Jack Abramoff had business with GSA," and Mr. Safavian said "no."  Id. at 46:23-25; compare with Def. Ex. 127 (May 9, 2003 Report) ("*Currently*, Jack Abramoff is a professional lobbyist, however he *does not have* any business relationship with GSA.") (emphasis added).

The inspector also stated upon direct examination that he "knew the difference between Scotland and England" and suggested that Mr. Safavian had not informed him that he visited London during the trip.  05.31.06 Tr. at 46:25-47:4.  However, upon cross-examination, the inspector explained the issue differently, revealing that Mr. Safavian in fact told him that he returned home, that is "left out of London."  Id. at 82:3-7.  Rowe says that he assumed that

Safavian just meant he happened to fly out of Heathrow airport (London is almost 500 miles from Edinburgh, Scotland), but conceded that he did not seek to confirm his assumption or ask for any further clarification.  Id.

Mr. Safavian provided a copy of the $3,100 check during the interview.  Id. at 47:11-14. Mr. Safavian informed Agent Rowe that he had relied on Mr. Abramoff's calculation of the cost of the trip.  Id. at 47:17-19, 61:18-21.  Agent Rowe did not know how expensive the St. Andrews greens fees were, but did not ask.  Id. at 48:8-11.  Mr. Safavian gave Abramoff's telephone number to Agent Rowe so that the Inspector could talk directly to him about the trip if he had any more questions.  Id. at 60:19-61:3.  The Inspector did not call Abramoff or ask Mr. Abramoff any questions about the trip.  Id. at 61:4-5.  Agent Rowe did not ask any more questions about the Scotland trip in that meeting or in the follow up interview regarding other matters,[19] and he stated that Mr. Safavian answered all of his questions.  Id. at 59:4-5.

Even if this charge was appropriate for the circumstances, the government has failed to negate the reasonableness of the Mr. Safavian's statement that he had relied on Mr. Abramoff's calculation of the cost of the trip and had been told that $3,100 covered his lodging, airfare, and greens fees.  5.31.06 p.m. at 47:17-19, 61:18-21.  See Whiteside, 285 F.3d at 1351-52 (holding that government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law); Migliaccio, 34 F.3d at 1525. Certainly, Agent Rowe thought the statement reasonable as he did not know how expensive the

---

[19] For instance, Agent Rowe did not ask how many rounds of golf Mr. Safavian played during the trip. 5.31.06 p.m. at 48:12-13.  He did not ask what method of transportation Mr. Safavian used or how expensive the airfare was.  Id. at 48:16-24, 60:2-6.  He did not ask for a schedule of the trip, id. at 81:16-18, or for any materials related to the trip.  Id. at 81:19-20.  He did not ask for a copy or stub of the plane tickets.  Id. at 81:21-22.  Rowe did not ask what day Mr. Safavian left for the trip.  Id. at 81:23-25.

St. Andrews greens fees were and was given the number to call Jack Abramoff or St. Andrews directly to verify, and did not to do so.  48:8-11. [20]

E.    **The Government Failed to Present Sufficient Evidence that Mr. Safavian Acted "Corruptly"**

In order to be convicted under § 1505, the government was required to prove beyond a reasonable doubt that Mr. Safavian had "corrupt" intent to influence, obstruct, or impede the GSA-OIG investigation of Agent Rowe.  See Jury Instructions at 68.  The term "corruptly" was defined as "having a wrongful, immoral, depraved or evil purposes, motive or intent."  Jury Instructions at 99.  However, based on the evidence presented at trial, no reasonable juror could conclude that Mr. Safavian possessed "corrupt" intent in the context of the GSA-OIG investigation, particularly since the jury also found that he did not make the false statement concerning whether Abramoff had business with the GSA in Count Three.

As discussed previously in detail, the evidence presented at trial showed: (1) that Mr. Safavian relied on Mr. Abramoff's calculation of the cost of the trip, 06.02.06 a.m. at 80:1-11, 91:13-92:9; (2) that Mr. Safavian did not independently verify Mr. Abramoff's calculations, id.; (3) at no point was Mr. Safavian ever told that the $3,100 check was insufficient or what the "true" cost of the trip was, id.;[21] (4) Mr. Safavian informed Agent Rowe that the $3,100 figure

_____

[20] As Ms. Ellison explained, the GSA counsel's office can rely on the employee's representations of the costs in filling out the SF-278 annual gift disclosure form.  05.31.06 p.m. at 9:21-22.  Ellison described a similar situation where a different GSA employee relied on their friend for the value of a ticket that turned out to be only half of what the ticket was actually worth.  When the GSA-OIG office discovered the discrepancy, the employee was simply asked to pay the difference in value.  Id. at 10:8-20; 19:24-20:11.

[21] For all of the government's histrionic displays at trial, the evidence related to the cost of the trip does not establish "corrupt" intent during the discussion with Agent Rowe.  Including the cash Mr. Safavian spent during the trip, he paid approximately $3,750 for the trip, plus credit card charges.  See Def. Ex. 237; 06.02.06 AM Transcript at 86:8-24.  Even using the governments gaudiest numbers for the costs of the hotels (St. Andrews: $400.night * 4 nights, Mandarin: $500.night * 3 nights), and greens fees (Old Course: $400.round * 1 round) yields a cost of $3,500, and notably the evidence showed that Mr. Safavian played only one of "four or five" rounds of golf at the Old Course.  See 06.02.06 p.m. at 67:22 – 69:14.  There is no evidence in the record of what the greens fees or caddy fees were on any of the other courses.

- 50 -

was simply a figure provided by Mr. Abramoff, which Mr. Safavian understood and accepted to have covered lodging, airfare, and greens fees, 5.31.06 p.m. at 47:17-19, 61:18-21; (5) Mr. Safavian provided the Inspector with Mr. Abramoff's contact information so that the Inspector could follow-up with any additional questions he might have about the trip, including the possibility of inquiring further into the cost of the trip and Mr. Abramoff's calculations behind the $3,100 figure, id. at 60:19-61:5; [22] and (6) the Inspector chose not to contact Abramoff, whom the Inspector was well aware would have been the person with full, complete, and accurate information on the true cost of the trip, and whom the Inspector knew Mr. Safavian relied upon for the amount he paid to cover the trips costs. Id.

Consequently, the fact that the government failed to prove that Mr. Safavian had knowledge of the actual cost of the trip negates any possibility that his representations to Agent Rowe could have been made with the requisite "wrongful, immoral, depraved or evil purposes, motive or intent" to obstruct the investigation.

### F. Mr. Safavian's Statement Did Not Have the "Natural and Probable Effect" of Influencing the GSA-OIG Investigation

The Supreme Court has held that "corruptly endeavor[ing] to influence, obstruct, and impede" an investigation requires a "nexus" such that the defendant's actions must have a

---

Furthermore, with regard to airfare, as Administrator Perry himself testified, the evidence showed that the proper way to report the cost of a chartered flight is not the traveler's pro rata share of the charter fare, as the government has argued, but instead the retail cost of a commercial airline ticket. See 5.24.4.06 AM Transcript at 20:2-13. As this Court has recognized, it is difficult to judge the exact value because so much of the cost depends on when and how you look for a ticket. However, hearsay evidence properly deemed inadmissible by the Court would have only stated that *at most* a commercial flight between London and BWI would have cost $758. See Gov't Ex. 12.

[22] For instance, Agent Rowe did not ask how many rounds of golf Mr. Safavian played during the trip. 5.31.06 p.m. at 48:12-13. He did not ask what method of transportation Mr. Safavian used or how expensive the airfare was. Id. at 48:16-24, 60:2-6. He did not ask for a schedule of the trip, id. at 81:16-18, or for any materials related to the trip. Id. at 81:19-20. He did not ask for a copy or stub of the plane tickets. 81:21-22. Rowe did not even ask what day Mr. Safavian left for the trip. Id. at 81:23-25.

relationship in time, causation, or logic with the proceedings allegedly obstructed. See United States v. Aguilar, 515 U.S. 593, 599 (1995); see also United States v. Quattrone, 441 F.3d 153, 174 (2d Cir. 2006) (applying "nexus" requirement to 18 U.S.C. § 1505). This means that the endeavor must have the "natural and probable effect" of interfering with the due administration of justice. See Aguilar, 515 U.S. at 599. Expressed another way, there can be no obstruction of justice, even under oath, unless the statement concerns a material matter. United States v. Saunders, 359 F.3d 874, 879 (7th Cir. 2004) (citing United States v. Buckley, 192 F.3d 708, 710 (7th Cir.1999)). While after Gaudin, 515 U.S. at 512, the defendant retains the right to have a jury decide the question of materiality under § 1001, see United States v. Cisneros, 169 F.3d 763, 767 (D.C. Cir. 1999), that right has been satisfied in this instance and, in any event, materiality under the obstruction statutes are mixed questions to be decided by the courts. Saunders, 359 F.3d at 879; see also Barrett, 111 F.3d at 953 (determining that the issue of whether misstatements under oath were "material" to the proceeding under 18 U.S.C. § 1623(a) was an issue for the Court to decide).[23]

"The test of materiality is whether the statement 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination.'" Barrett, 111 F.3d at 953 (citations omitted). As discussed above, the evidence demonstrated that Mr. Safavian was made aware that the scope of the GSA-OIG investigation was whether he participated in a golfing trip "provided by lobbyists." 5.31.06 p.m. at 46:10-15. Mr. Safavian informed Agent Rowe that he gave Mr. Abramoff $3,100 and relied on Mr. Abramoff's calculation of the cost of the trip. Id. at 47:17-19, 61:18-21. Agent Rowe did not ask what the

---

[23] Even if § 1505 materiality was an issue exclusively relegated to the jury as opposed to a right the defendant preserves, the Court can still render a decision on the reasonability of the jury's conclusion on this element under Fed. R. Crim. P. 29(c).

cost was for St. Andrews greens fees or whether Mr. Safavian even knew what the cost was. <u>Id</u>. at 48:8-11. Agent Rowe did not ask how many rounds of golf Mr. Safavian played during the trip. <u>Id</u>. at 48:12-13. Agent Rowe did not ask what method of transportation Mr. Safavian used or how expensive the airfare was. <u>Id</u>. at 48:16-24, 60:2-6. Rowe did not ask for a schedule of the trip. <u>Id</u>. at 81:16-18. Rowe did not ask for any materials related to the trip. <u>Id</u>. at 81:19-20. Rowe did not ask for a copy or stub of the plane tickets. <u>Id</u>. at 81:21-22. Rowe did not ask what day Mr. Safavian left for the trip. <u>Id</u>. at 81:23-25. Simply stated, Rowe was satisfied with the $3,100 figure and conducted no independent investigation, leaving the Department of Justice to now ask questions that Agent Rowe never did. As such, Mr. Safavian's statements on March 27, 2003 were not "capable of influencing" the Inspector General in making his decision to close the inquiry.

## CONCLUSION

For the aforementioned reasons, and on the basis of the record, Defendant David H. Safavian respectfully requests this Court for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c).

Respectfully submitted,

By: <u>/s/ Barbara Van Gelder</u>
    Barbara Van Gelder (D.C. Bar # 265603)
    Roderick L. Thomas (D.C. Bar # 433433)
    Albert C. Lambert (D.C. Bar # 489562)
    WILEY REIN & FIELDING LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032

Dated: July 10, 2006        *Attorneys for David H. Safavian*