## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES of AMERICA,

v.

DAVID HOSSEIN SAFAVIAN,                          Criminal No. 05-370 (PLF)

Defendant

### DEFENDANT'S MOTION FOR NEW TRIAL

In the alternative to granting the Motion for Judgment of Acquittal, Defendant David H. Safavian, by and through undersigned counsel, hereby moves this Court to grant a new trial pursuant to Fed. R. Crim. P. 33.

Motions seeking new trial are to be granted "if the interests of justice so requires." Fed. R. Crim. P. 33(a). "Unlike a motion for judgment of acquittal, when ruling on a motion for a new trial 'the Court need not accept the evidence in the light most favorable to the government, and [it] may weigh the testimony and may consider the credibility of the witnesses.'" United States v. Howard, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (citing United States v. Edmonds, 765 F. Supp. 1112, 1118-19 (D.D.C. 1991)).

I.    **The Admission of Jack Abramoff E-Mails Under the Theory That Such Statements Merely Demonstrated "Work" "Context" and "State of Mind" was Improper and Unfairly Prejudicial**

The admission of improper evidence that prejudices the defendant warrants the grant of a new trial pursuant to Rule 33. See, e.g., United States v. Columbo, 909 F.2d 711, 715 (2d Cir. 1990) (reversing and remanding conviction where the trial court's limiting instruction regarding purely background purpose for which it was admitting evidence of uncharged crimes was not sufficient to cure prejudice resulting from admission of such evidence); United States v. Pagan,

721 F.2d 24 (2d Cir. 1983) (remanding for new trial based on erroneous admission of defendant's prior conviction as a youth).

In this instance, to prevent Mr. Safavian from having an opportunity to cross-examine the key figure in this case, Jack Abramoff, the government was permitted to offer into evidence over two-hundred fifty of his e-mails obtained from the server of his former law firm, Greenberg Traurig, LLP. Mr. Abramoff's e-mails are plainly out-of-court declarations. However, the government contended that these Abramoff e-mails should be given to the jury primarily under the theories that: (1) "the statements constitute[d] non-verbal conduct by the defendant, Jack Abramoff or another person, or show lobbying 'work' or 'business' by Mr. Abramoff or his colleagues;" (2) "the e-mails provide[d] necessary context for certain statements made by the defendant;" and (3) "the statements are admissible non-hearsay statements offered to show the defendant's state of mind (including intent, plan, motive or design) under Rule 803(3) of the Federal Rules of Evidence." May 23, 2006 Opinion (Doc. 99) at 10, 23-29. The Court granted the government's motion, and also permitted a more limited number of these exhibits to come in as "admissions" purportedly adopted by Mr. Safavian as his own under Rule 801(d)(2)(A).[1]

The government introduced the bulk of these e-mails through FBI Agent Reising's reading. The admission of these hearsay documents over the defendants objections was improper and prejudicial to Mr. Safavian.

1.    The Abramoff E-Mails Do Not Constitute "Non-Verbal Conduct" and There is No "Work" Exception to the Hearsay Rule

---

[1] The Court also admitted certain e-mails under the party-opponent exception in F.R.E. 801(d)(2)(A) and on the grounds that some of the Abramoff e-mails constituted inquiries and not assertions, but it rejected the government's co-conspiracy contention under F.R.E. 801(d)(2)(E). See May 23, 2006 Op. (Doc. 99) at 11-16 .

The Court ruled that the Abramoff e-mails did not constitute "non-verbal conduct"—a recognized category of non-hearsay documents, see 1972 Advisory Committee Note, Fed. R. Evid. 801(a), because by definition e-mails are verbal actions and not gestures that communicate without words.  Doc. 99 at 13 & n.6.  Nevertheless, the Court agreed with the government that the Abramoff e-mails could come in on the basis that the communications constituted lobbying "work" performed by Abramoff.  Doc. 99 at 23-29.

"Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."  Fed. R. Evid. 802.  The defense maintains that there is no "work" exception to the hearsay rule.  The absence of such an exception stems from the logic that a trier of fact cannot possibly know whether an e-mail constitutes "work," or some other type of communication, such as "leisure" or "friendship," as so many of these e-mails from Abramoff were, see, e.g., Gov. Exs. 217-20, *without evaluating* the declarant's actual words and the truth of the assertions therein.   Accordingly, the e-mails remain hearsay since the truth or credibility of the matter asserted must be weighed by the jury.  United States v. Stover, 329 F.3d 859, 870 (D.C. Cir. 2003) (rejecting out-of-court statements from four tapes despite government contention that they were not being offered for truth because the jury could only infer the supposedly alternative point the government was trying to make, that defendant and his co-conspirators referred to drugs as clothes, "from the fact that Lama and Bryant referred to drugs as clothes - that is, through the statement's content"); United States v. Gaertner, 705 F.2d 210, 214 (7th Cir. 1983) (rejecting admission on state of mind grounds since before the jury could have assessed intent or motive "they would necessarily have had to have found credible the truthfulness of [declarant's] alleged statements").

Indeed, the Court's final limiting instruction effectively told the jury to weigh the content of the Abramoff e-mails and figure out whether or not they supported the government's contention that Jack Abramoff was doing business with the GSA at the time of the August 2002 Scotland trip. See Final Jury Instructions at 47 (instructing jury that e-mails of non-testifying declarants (e.g., Abramoff) can be considered "for the fact that the communication occurred and what that might show").

2.    That the Abramoff E-Mails Provided Relevant "Context" Does Not Render Them Non-Hearsay

The Court also ruled that a number of the Abramoff e-mails were admissible because they "provided context for the defendant's statements." Doc. 99 at 12. However, "[t]hat a statement provides context to other evidence does not mean that the statement is not hearsay." Stover, 329 F.3d at 870. Carving such an exception would lead to a serious erosion of the application and purpose of the hearsay rule since "all relevant evidence provides context to the events underlying the charged crime." Id.

This Court recently rejected the same government contention in United States v. Tann, 425 F. Supp. 2d 26, 33-34 (D.D.C. 2006). In that case, the government tried to admit a host of "payee" entrees on the defendant's personal checks (in a bank and wire fraud case) on the grounds that they were not being offered for the truth of the matter asserted, but merely providing context. As the Court explained, relying on Stover:

> While the Government essentially obfuscates its true intentions, the Government is essentially seeking to introduce the "payee" section of Defendant's personal checks for the truth of the matter asserted. When the Defendant's personal checks list "Catholic University" as the "payee," the Government wants the jury to glean that the document is accurate on its face—i.e., Defendant intended to pay Catholic University for some service, specifically listed Catholic University as the payee, and the subsequent payment was made. . . . Because the "payee" sections of Defendant's personal checks are being offered for the truth of the

> matter asserted, they fall outside of the "verbal acts" doctrine and
> must come into evidence—if they are admissible—under a
> separate exemption or exception.

Id. (citing Stover, 339 F.3d at 870).   Similarly in this case, when the government offered

Abramoff e-mails into evidence, it wanted the jury to glean that Jack Abramoff was writing

words that constituted "work" or "business" with Mr. Safavian and the GSA.   As the Court

explained in Tann, that objective is not a reason to admit these documents, but rather to preclude

them since they require the jury to evaluate the content and credibility of the matters therein.

In Stover, the Court of Appeals case which essentially foreclosed this "exception," the

government had argued for the admission of two videotapes and two audiotapes that captured a

co-conspirator of the defendants and an undercover agent engaging in drug deals and negotiating

a future exchange of heroin for cocaine.   On one of the videotapes, the co-conspirator told the

agent what they should call the drugs in future conversations and in another the co-conspirator

states that he is going to Washington, D.C. for a drug deal.   After noting that the "verbal acts"

doctrine did not apply to non-legally binding pieces of evidence like tapes, the Court rejected the

argument that the recordings should be admitted to establish context, stating:

> the Government seems to be saying that all out-of-court statements
> offered for context do not constitute hearsay.  However, that a
> statement provides context to other evidence does not mean that
> the statement is not hearsay. All relevant evidence provides context
> to the events underlying the charged crime. The question is
> whether the statement is offered for its truth.   Here, the
> Government introduced Lama's statement that Agent Bryant and
> Lama should refer to drugs as clothes as evidence of the fact that
> Lama used clothing terminology to refer to drugs in other
> conversations. **The statement is not probative of that fact unless
> the Government offered the statement for the truth of its
> content. The jury, using the statement, could infer that Lama
> and his co-conspirators referred to drugs as clothes only from
> the fact that Lama and Bryant referred to drugs as clothes -
> that is, through the statement's content.**  The statement thus was
> hearsay, and its admission was erroneous.

Stover, 329 F.3d at 869-70 (citing Fed. R. Evid. 802) (internal citations omitted) (finding the error harmless because the evidence came in under the co-conspirator exception in Rule 801(d)(2)(E)).

Likewise in this case, that the Abramoff e-mails were probative to the issue of whether Abramoff was doing "work" or "business" with GSA is a reason to exclude them from evidence, rather than shield the e-mails from the reach of the hearsay rule.

3.    Federal Rule 803(3) Only Permits An Exception for the Declarant's Then Existing State of Mind

The Court also admitted a number of the Abramoff e-mails "under Rule 803(3) to show Mr. Safavian's state of mind at the time he received them or at some later time." Doc. 99 at 10, 12. However, Federal Rule 803(3) only provides an exception for a "statement of *the declarant's* then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health). . . ." Fed. R. Evid. 803(3) (emphasis added). Therefore, Abramoff's e-mails could only come in under the Rule 803(3) exception if they were offered to demonstrate *his* then existing state of mind, not Mr. Safavian's.

Courts have also been reluctant to embrace a different argument, than the one that appeared to be adopted here, i.e., that the out of court statement is offered only to show its effect on the hearer and therefore is not hearsay under Fed. R. Evid. 801(c). The reason being, in most contexts it would create an exception that would engulf the rule itself, "a loophole this circuit has previously refused to open." United States v. Evans, 216 F.3d 80, 86 (D.C. Cir. 2000) ("If we were to accept the government's rationale here, then explaining why government agents 'did what they did' through reference to statements of absent informants would be acceptable in almost any case involving an undercover operation, and in many others as well.").

Indeed, in almost every instance where the government makes the contention that hearsay evidence should come in because it is only being offered to show its effect on the listener, a fact finder must necessarily conclude that the underlying statement was true.  Hence, the jury will likely, even be required, to first consider the credibility of the matter therein in order to make that determination, thereby rendering the statement precisely the kind of evidence precluded by the rule.  <u>Stover</u>, 329 F.3d at 870 ("The jury, using the statement, could infer that Lama and his co-conspirators referred to drugs as clothes only from the fact that Lama and Bryant referred to drugs as clothes - that is, through the statement's content."); <u>United States v. Sesay</u>, 313 F.3d 591, 599-600 (D.C. Cir. 2002); <u>Evans</u>, 216 F.3d at 85 ("But if Darnell's testimony about the FBI's 'information' did not go to the truth of that assertion, to what did it go?"); <u>Gaertner</u>, 705 F.2d at 214 (rejecting admission on state of mind grounds since before the jury could have assessed intent or motive "they would necessarily have had to have found credible the truthfulness of [declarant's] alleged statements").

Furthermore, in this case the government was not simply seeking to admit one or two audio tapes where the witness is unavailable, and where the truth of the matter asserted is "utterly irrelevant" and there is no "danger that the jury would misuse [hearsay declarant's] statements for their truth." <u>United States v. Jordan</u>, 810 F.2d 262, 264 (D.C. Cir. 1987).  Rather, in this case, Abramoff was available to the government and his e-mails are essentially the entirety of the government's case.

4.  <u>The Improper Admission of the Several Hundred E-Mails Prejudiced the Defendant</u>

The prejudice to the defendant for the admission of these e-mails is readily apparent.  As the Court stated in <u>Evans</u>, notwithstanding the defendant's technical right to call any witness, "The problem with hearsay is that it deprives the defendant of the opportunity to cross-examine

the person who uttered the statement at issue." <u>Evans</u>, 216 F.3d at 85. The Abramoff e-mails constituted more than three-quarters of the government's evidence in this case, and Agent Reising spent almost a full day's worth of trial reading them into the record. More fundamentally, since the government's theory of the case was that Abramoff was doing business with the GSA at the time at which he invited Mr. Safavian to play golf trip, the admission of several hundred e-mails in an effort to show that he was in fact doing work at the GSA, renders the admission of these e-mails fatally prejudicial to this case.

## II.    The Admission of the Hearsay within the Ethics Opinion Under 801(d)(2)(B) Was Improper and Unfairly Prejudicial

The Court permitted the contents of the July 26, 2002 ethics opinion sent to Mr. Safavian by Ray McKenna, and apparently drafted for McKenna by Eugenia Ellison, to be considered in Counts One through Three to demonstrate that "Ellison drafted an ethics opinion and to show the defendant's state of mind, motive, or intent, or to provide context." Jury Instructions at 51. The Court allowed the contents of the July 26, 2002 ethics opinion to come in for the truth of the matter for Counts Four and Five on the grounds that Mr. Safavian adopted the substance of the ethics opinion as his own under Fed. R. Evid. 801(d)(2)(B) by attaching the opinion to his March 17, 2005 cover letter (Def. Ex. 204) as requested by Mr. Parker. 06.01.06am Tr. at 22:12-13.

As the Court recognized, however, the ethics opinion not only constituted hearsay but contained a significant amount of "hearsay within hearsay," the most significant being:

> You stated that neither Mr. Abramhoff [sic] nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend.

Def. Ex. 204; Gov. Exs. 41, 83, 167, 168. At trial, Ms. Ellison stated that she did not speak with Mr. Safavian before she drafted the copy of the opinion that she sent to Ray McKenna, and that she "never had a conversation with Mr. Safavian where Mr. Safavian has said, 'seeking to do

business' with GSA."  05.31.06 a.m. Tr. at 55:14-17 (A. "No.").  McKenna confirmed that he did

not speak with Mr. Safavian before sending him the opinion on July 26, 2002. 05.31.06 p.m. Tr.

at 28:10.

Specifically, Ms. Ellison agreed that all of the information that she added to the ethics

opinion beginning with the terms "you stated" was given to her by McKenna.  05.31.06 Tr. at

55:6-9 (A. "Right.  I'm writing the letter.  It's for Mr. McKenna to respond back to Mr.

Safavian.").  Ms. Ellison also stated that it is her usual practice to track a statute or regulation's

actual language when writing an ethics opinion and that it was likely in this instance that the

language quoted above attempted to track the language of provision 5 C.F.R. § 2635.202, and not

the words of Mr. McKenna or certainly of Mr. Safavian.

The hearsay within hearsay in the ethics opinion is not only unreliable but irrelevant  to

Counts One and Three regarding the Office of Inspector General investigation.   The ethics

opinion at issue, or whether one existed, was not discussed at any point by Mr. Rowe or Mr.

Safavian during the spring 2003 GSA-OIG investigation.  05.31.06 p.m. Tr. at 59:6-15.  And

even if it was relevant, it should have been precluded since its probative value into these Counts

was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury" under Fed. R. Evid. 403.[2]

Regarding the opinion's admission into evidence for the truth of the matter in Count Five,

Federal Rule of Evidence 801(d)(2)(B) does permit the admissions as statements of a party-

opponent  "a statement of which the party has manifested an adoption or belief in its truth."  Fed.

---

[2] Notably, the government was not able to produce any of the original and contemporaneous internal GSA
correspondence, including the drafts of the ethics opinion itself, between Ellison and McKenna in July
2002.  As noted at trial, the Court's rejection of the defense's proposed missing evidence instruction, D.C.
Crim. § 241, was also improper and unfairly prejudicial to Mr. Safavian.  06.01.06 Tr. at 4.

R. Evid. 801(d)(2)(B).   However, "In order to demonstrate that [a party] has 'adopted' the statement of a third party, [the offeror] must show that [the party against which the statement is offered] somehow 'has manifested (its) adoption or belief in (the statement's) truth.'" United States v. AT&T, 516 F. Supp. 1237, 1238 (D.D.C. 1981).   A "party's assent must be unambiguous."   United States v. Beckham, 968 F.2d 47, 52 (D.C. Cir. 1992).

Mr. Safavian's forwarding of the July 26, 2002 ethics opinion to Mr. Parker does not provide the "unambiguous assent" necessary for the hearsay within hearsay in the opinion to be imputed to Mr. Safavian.   Mr. Safavian was simply responding to Mr. Parker's request for the opinion as relevant to the February 23, 2005 document request.   Gov. Ex. 80.   Mr. Safavian's forwarding of the ethics opinion to Jack Abramoff likewise does not unambiguously demonstrate Mr. Safavian's adoption of the analysis or the factual recitations included in the opinion.   Mr. Safavian's forwarding comment "[i]t looks like Scotland is a go" is unambiguous only to the conclusion of the opinion, and as such, does not manifest the assent necessary to qualify for the rule.   See Garcia-Martinez v. City and County of Denver, 392 F.3d 1187, 1195 (10th Cir. 2004) (holding that officers did not adopt the underlying facts in disciplinary records by simply signing the statement "I accept the recommended penalty," but only the actual penalty imposed).

That Mr. Safavian was unfairly prejudiced by the decision to admit the hearsay within hearsay in the ethics opinion on these grounds as evidenced by, *inter alia*, the fact that Counts Three(C) and Five(C) allege the same exact statement,[3] and yet the jury acquitted Mr. Safavian on the Count Three false statement charge but found him guilty in Count Five.   Count Three (C) charges that Mr. Safavian "falsely stated . . . that Mr. Abramoff *did not have any business with*

---

[3] Actually, the case for a false statement in Count Five is even more of a stretch given that the allegation was that Abramoff had business with the GSA at the time Mr. Safavian "was invited on the trip to Scotland" in June 2002.   Verdict Form Count Five(C).

*GSA*, when in truth and fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property." Verdict Form Count Three (C). Count Five (C) charges that Mr. Safavian "falsely stated in a letter to the Committee that Mr. Abramoff *did not have any business with GSA* at the time Mr. Safavian *was invited on the trip to Scotland*, when in truth and in fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property." Verdict Form Count Five (C) (emphasis added).

## III. Assuming Arguendo that the Admission of the Abramoff E-Mails Was Proper the Court's Limiting Instruction Was Insufficient

Even if the Abramoff e-mails had been properly admitted, the Court's instructions regarding the introduction of e-mails for a limited purpose were insufficient protections against the danger that the jury would misuse the statements for their truth. The two-hundred fifty odd e-mails were introduced for limited purposes, in many cases parts of an "e-mail chain" were admissible for one purpose, while another part was admissible for another purpose.

The e-mails were introduced through an FBI agent reading the e-mails one after another, more or less without interruption. The court did not explain prior to the reading of each e-mail the basis for the introduction of that e-mail nor did the court mark or identify each exhibit in such a manner that the limited admissibility of that e-mail could be readily determined by the jury. See generally 05/25/06 P.M. Tr. (Reising); 05/26/06 A.M. Tr. (Reising). Instead, the jury was sent to deliberate with the following instruction:

> Any e-mail, or part of an e-mail, that was sent to Mr. Safavian should not be considered for the truth of the matter, if the sender was not here and available for cross-examination but instead may be considered only for a limited purpose, including such purposes as the impact on someone's state of mind, motive, purpose, intent, or absence of mistake, or for the fact that the communication occurred and what that might show. When you consider such e-

> mails you must limit your consideration to one or more of those
> purposes.

Jury Instructions at 43-47.  This "curative instruction that the jury was to use such testimony merely as background does not change [the] conclusion in this case where the prosecution dwelled on" such evidence as the central focus of the trial.  United States v. Colombo,  909 F.2d 711, 715 (2d Cir. 1990).

Federal Rule of Evidence 105 supports the issuance of limiting instructions where evidence is admissible for one purpose but is not admissible for another.  According to the comments to Rule 105, a limiting instruction is intended to "provide[] protection" to the "non-offering party who will be prejudiced by the 'bad' purpose."  While it is generally true that juries are expected to follow the court's instructions, "there are limits upon the power of jurors – or judges or anyone – to keep the interconnected thoughts separated from each other." United States v. Kaplan, 510 F.2d 606, 611 (2d Cir. 1974).  Indeed, where the "authorized use of the evidence shade[s] so closely and uncontrollably into the forbidden," even "technically admirable instructions limiting the effect of the evidence may not be accepted as effective.  Id. at 611-12. In such instances, the conviction must be reversed for new trial.  Id.; United States v. Reyes, 18 F.3d 65, 72 (2d Cir. 1994) (reversing conviction where instructions "did not clearly explain the difficult task of considering information for one purpose but not for another").

The defendant was prejudiced by the failure of the Court to adequately differentiate between those e-mails introduced for the truth of the matter asserted and those introduced for limited purposes.  Given the volume of e-mails introduced, and the importance of these e-mails to the issues at trial, a substantial likelihood exists that the jury was unable to differentiate the limited uses assigned to different e-mails.  Such a likelihood compels the granting of a new trial.

**IV.    The Admission of Exhibit 175 Was Improper and Unfairly Prejudicial**

Government Exhibit 175 is a document purporting to be a letter sent from the Headmaster of Eshkol Academy to Joseph Moravec.  However, this unsigned document was improperly admitted into evidence over defendant's objection.  See 5.24.06pm Tr. at 71:12-74:14.  The letter constitutes hearsay that does not fit under a recognized exception. See United States v. Kim, 595 F.2d 755, 760 (D.C. Cir. 1979).  In order to be admitted under the business records exception, Fed. R. Evid. 803(6) requires the testimony of a "custodian or other qualified witness" to establish that the document was "kept in the course of a regularly conducted business activity" and that "it was the regular practice of that business activity to make the" document. Consequently, exhibit 175 fails to meet the requirements of Rule 803(6) for three independent reasons: (1) there is no evidence on the record establishing that Tony Costa was a custodian of GSA or in any way qualified to testify regarding the document retention policies of GSA; (2) even if Mr. Costa were so qualified, he would be incompetent to satisfy Rule 803(6) because there was no evidence that exhibit 175 was obtained from GSA records; and (3) there was no testimony from any source, including Mr. Costa, that exhibit 175 was made in the course of a regularly conducted business activity, or that it was kept in the course of a regularly conducted business activity.

**V.    The Court Should Grant a New Trial for The Decision to Limit Examination On the Conditions Attending to His March 27, 2003 Interview With Mr. Safavian**

The Jury returned a verdict under Count Three (A) finding Mr. Safavian guilty of concealing assistance to Jack Abramoff in certain "GSA-related activities" to GSA-OIG Inspector Gregory Rowe.

During direct examination of Mr. Safavian, counsel attempted to elicit from Mr. Safavian information concerning his interview with Agent Rowe.  Specifically, counsel sought to

- 13 -

determine whether Mr. Safavian was given warnings about the consequences of answering questions posed by Agent Rowe.  06.02.06 P.M. Tr. at 29:13. Mr. Safavian was not, however, permitted to answer this question.  The court sustained the objection directing counsel to avoid inquiring into any warnings Mr. Safavian may or may not have received in connection with his interview with Agent Rowe. Id. at 29:15-31:11.

As stated extensively in the Motions to Dismiss and the Rule 29 papers, it is well-established that Fifth Amendment due process in an 18 U.S.C. § 1001, 1505 context requires that a person be given adequate notice of the potential criminal implications when responding to government inquiries, including notice of the right not to speak and the implications of making false statements if one does choose to speak.  United States v. Cisneros, 26 F. Supp. 2d 24, 43 (D.D.C. 1998) (holding that because the Indictment alleged that the FBI repeatedly informed Cisneros that he had to be "truthful and forthcoming during the background investigation, his right not to speak and of the implications of making false statements if he did choose to speak Cisneros was adequately made aware that making false statements to the FBI could have criminal repercussions); United States v. Ehrlichman, 379 F. Supp. 291, 292 (D.D.C. 1974) (holding that § 1001 requires that government officials alert the person interviewed to the danger that false statements may lead to a felony conviction); see also Garrity v. New Jersey, 385 U.S. 493, 498-99 (1967); United States v. Frederick, 842 F.2d 382, 395 (D.C. Cir. 1988) ("[O]ne may not be required to relinquish one's privilege [against self-incrimination] on threat of penalty such as loss of job."); Devine v. Goodstein, 680 F.2d 243, 246 (D.C. Cir. 1982) ("[P]ublic employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination") (citing Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of City of New York, 392 U.S. 280, 284-85 (1968)); cf. Kalkines v. United States, 473

F.2d 1391 (Ct. Cl. 1973) (holding that a government employee may not be discharged for refusing to answer questions about his conduct unless he is informed that his answers or the fruit of those answers will not be used against him in any criminal prosecution).[4]

By limiting counsel's opportunity to inquire into the circumstances surrounding Mr. Safavian's interview with Agent Rowe, the Court prevented the defendant from developing evidence supporting the dismissal of the Counts at hand on due process grounds.

## VI.    Mr. Safavian was Prejudiced When Government Witnesses Were Allowed to Offer Speculative Testimony at Trial

Prior to trial, the defense sought to preclude the introduction of speculative testimony as being beyond the scope of the personal knowledge of the witness and invading the province of the jury. See Speculation Motion in Limine, filed April 14, 2006 (Doc. 65) (citing Fed. R. Evid. 602 (limiting a witness's testimony to matters for which the witness has personal knowledge)). This Court denied the motion, but without prejudice to allow the merits of the motion to be heard in context. See Minute Order, June 16, 2006. However, in open court, the Court let it be known that there would be no speculative testimony offered at trial and that the government would do so at its own peril. Nevertheless, the government elicited speculative testimony over objections from defense counsel from no less than four prosecution witnesses: Mr. McKenna, Ms. Ellison, Agent Rowe and Mr. Parker.

When the government sought to have Ms. Ellison provide speculative testimony as to whether she would have wanted to know about Mr. Abramoff's interest in White Oak or the Old Post Office, the defense promptly objected.   5/31/06 a.m. Tr. at 41:19-42:19.   The court nevertheless allowed Ms. Ellison the opportunity to answer.[5]   For the reasons provided below,

---

[4] See Memorandum in Support of Motion for a Judgment of Acquittal at Section I.

[5] With regard to Mr. McKenna, the Court elicited the following speculative testimony:

the introduction of speculative testimony by Ms. Ellison, Mr. McKenna, Mr. Rowe, and Mr. Parker was unfairly prejudicial to Mr. Safavian, and thus warrants the granting of a new trial.

While the Rules of Evidence permit a lay person to offer opinion testimony, the admission of such is strictly limited to testimony that is "rationally based on the perception of the witness." Fed. R. Evid. 701. Admission of speculative testimony regarding the state of mind of another person is unfairly prejudicial and must be barred pursuant to Rule 403. Fed. R. Evid. 403 (excluding evidence if the probative value is substantially outweighed by, *inter alia*, danger of unfair prejudice, misleading the jury, or needless presentation of cumulative evidence).

In this case, the government, over defense objections, elicited testimony from Ms. Ellison, Mr. McKenna, Mr. Rowe, and Mr. Parker that: (1) they would have liked to have known of Mr. Abramoff's interest in White Oak and the Old Post Office, and (2) such knowledge would have changed the way they dealt with Mr. Safavian as it related to his attendance on the 2002 Scotland trip. This type of speculative testimony has been soundly rejected. For instance, plaintiffs proposed to introduce testimony through a physician, to the effect that physicians would not have prescribed a certain medication if they had been provided with more complete information about the drug. In re Rezulin Products Liability Litigation, 309 F. Supp. 2d 531 (S.D.N.Y. 2004). The district court, in ruling the testimony inadmissible, determined that "[u]nlike opining about what physicians in general expect to see on a label, [the expert witness's]

---

The Court: But the questions is – I guess the better question is, what would you have done if you had had that sort of information? If you had – assume for the moment that Mr. Abramoff was interested in White Oak or the Old Post Office building. If you had had that information, what would you have done or what would you have asked Ms. Ellison to have done?

Mr. McKenna: Well, I think it would have prompted further inquiry, because clearly the legal advice that was given in response would have been in error, or incomplete, at the very least.

05.31.06 pm at 34:21-25, p. 35:1-5.

surmising as to what physicians would do with different information is purely speculative and not based on scientific knowledge." Id. at 556-57. [6] "Vague, self-serving speculative testimony concerning what a party would have done under different circumstances is generally not admissible." Bridgen v. Scott, 456 F. Supp. 1048, 1064 (S.D. Tex. 1978) (rejecting as speculative the testimony of plaintiffs that they would not have invested in property had they known that it was sold twice on the same day); see also Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 298 F.2d 356, 360 (6th Cir. 1961) ("[A] witness may not testify to what he would have done had the situation been different from what it actually was. Such an answer is too speculative to be admissible.").

In a criminal case, speculative or hypothetical testimony is highly suspect. The danger of unfair prejudice inherent in hypothetical questions such as those posed by the government at trial substantially outweighed their probative value. Accordingly, because the district court erred in failing to exclude this testimony, Mr. Safavian is entitled to a new trial.

## VII.    Mr. Safavian Was Unfairly Prejudiced by the Court's Decision to Employ a Verdict Form that Amended the Indictment

The verdict form approved by the Court over the defendant's objections, altered the terms of the Indictment, thereby prejudicing the defendant.

Counts Two, Three, and Five of the Indictment set forth charging language providing that Mr. Safavian took certain actions in each count that violated 18 U.S.C. § 1001. These actions were provided in the Indictment in the *conjunctive* form, that is, Mr. Safavian was charged with concealing assistance to Mr. Abramoff with respect to GSA-related activities, *and*, concealing

---

[6]    Importantly, none of the government witnesses were called as experts. Therefore, while their testimony need not have been based on scientific knowledge, as lay witnesses, they were nevertheless prohibited from providing speculative testimony and limited to matters for which they had personal knowledge. See Fed. R. Evid. 602.

Mr. Abramoff's business relationship with the GSA, *and*, making certain false statements concerning whether Mr. Abramoff was doing business before the GSA prior to August 2002. See Indictment ¶¶ 29, 31 & 40.

This Court, however, accepted, and provided to the jury, the government's proposed verdict form which set forth the charging language in the *disjunctive*, that is, pursuant to the verdict form, the jury did not need to find that Mr. Safavian took *all* the actions set forth in the Indictment but only that he took one (or more) of the actions set forth in the Indictment. The verdict form asked the jury to determine whether Mr. Safavian concealed assistance to Mr. Abramoff with respect to GSA-related activities, *or*, concealed Mr. Abramoff's business relationship with the GSA, *or*, made certain false statements concerning whether Mr. Abramoff was doing business before the GSA prior to August 2002. In essence, the verdict form transformed three counts of violating § 1001 into nine counts.

This last minute alteration to the Indictment was particularly egregious since it permitted the jury to find the defendant "guilty" of concealing information, such as (A) "assistance to Abramoff in GSA related activities," or (B) "Mr. Abramoff's business relationships," allegations not noticed *anywhere* in statute or code as constituting a violation. Specifically, the GSA regulations concerning gifts for executive employees that define "prohibited source" at issue for Ms. Ellison in drafting her opinion and, ultimately, for Agent Rowe in his subsequent GSA-OIG investigation only use the terms "doing business" and "seeking to do business." 5 C.F.R. § 2635.202. The government was effectively permitted to ask the same question, whether Mr. Safavian falsified or concealed facts that would have prohibited him from accepting the gift of the Scotland trip without violating the underlying guidelines in several different ways, none of which actually comported with the underlying provisions. Hence, the phrase used in the verdict

form "assistance to Abramoff in GSA related activities," which the jury found Mr. Safavian guilty of concealing in Counts Two(A) and Three (A), was impermissibly overbroad.

The other byproduct of the verdict form's alteration of the Indictment is that the language "when in truth in fact, as the defendant well-knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA controlled property," was removed as a qualifier of the Verdict form allegations in Counts Two (A) and Three (A). See Verdict Form at Counts Two and Three; compare with Indictment at ¶¶ 29, 31; see also United States v. Taylor, 510 F.2d 1283, 1289 (D.C. Cir. 1975) (reversing guilty verdict on state of mind issue where the court was "troubled [] by prejudice lurking in the form of written verdict submitted to and used by the jury").

## VIII.    The Removal of Juror 3 Upon Government Motion to Discharge Was Improper

After deliberation had begun, the Court took what the advisory committee notes have termed the "unusual step" of dismissing Juror 3 for good cause.  Fed. R. Crim. P. 23 advisory committee's notes to 1983 Amendments.  The decision was prompted by an allegation from Juror 12 that Juror 3 had made a statement to her father about the cost of golf and made up her mind on the merits of the case.

The actions of Juror 3 fell well short of the "necessary" standard for removing jurors in this Circuit.  United States v. Patterson, 26 F.3d 1127, 1129 (D.C. Cir. 1994).  "Good cause" to replace or remove did not exist in this case because 1) no evidence suggested Juror 3 was unavailable to deliberate, indeed the government argued that she appeared too eager to participate; and 2) any suggestion that Juror 3 had been compromised by her brief, unspecific comments to her father about the cost of golf were not concrete or germane enough to necessitate removal. Indeed, cost was not an issue anywhere in the verdict form.

Even if the government had been able to establish good cause, the law of this circuit is that "if the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court *must deny* the request." United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987) (overturning multiple count RICO conviction) (emphasis added); United States v. Thomas, 116 F.3d 606, 622 (2d Cir. 1997) ("adopt[ing] the *Brown* rule as an appropriate limitation on a juror's dismissal *in any case* where the juror allegedly refuses to follow the law - whether the juror himself requests to be discharged from duty or, as in the instant case, fellow jurors raise allegations of this form of misconduct") (emphasis in original).  This standard is designed to protect against a case where there is "any possibility" a juror is raising an issue about a fellow juror because of her views on a case. Thomas, 116 F.3d at 622.  Any "lower evidentiary standard could lead to the removal of jurors on the basis of their view of the sufficiency of the prosecution's evidence." Id.

Notably, this Court, and courts applying this Circuit's standard, *has never upheld a request for discharge* even when made by a member of the jury.  United States v. Ginyard, 444 F.3d 648, 653-54 (D.C. Cir. 2006) (vacating conviction where the court did not sufficiently inquire into the precise nature of the unavailability of a juror); Brown, 823 F.2d at 596; see also Thomas, 116 F.3d at 622 ("[o]ne unavoidable consequence of imposing a lower evidentiary standard would thus be to open up the possibility that judges, in response to demands of counsel or otherwise, would wind up taking sides in disputes between jurors on allegations of juror nullification-in effect, to permit judicial interference with, if not usurpation of, the fact-finding role of the jury").  It  certainly has never entertained, let alone granted a request for discharge upon the *government's motion after it had an opportunity to hear* the Juror's view on the evidence and that the Juror had already made up her mind on the case.

There is certainly at least a "possibility" that the issue was raised and that the government's motion ensued based on a perception as to Juror 3's "view of the sufficiency of the government's evidence." Brown, 823 F.2d at 596.[7]  Under such circumstances, a district court is stripped of its discretion and  "*must deny*" the request.  Brown, 823 F.2d at 596 (emphasis added); Thomas, 116 F.3d at 622;  United States v. Symington, 195 F.3d 1080, 1087-88 (9th Cir. 1999) (reversing and vacating conviction and sentence where there was a reasonable possibility that the request to discharge stemmed from the juror's view as to the merits of the case); United States v. Hernandez, 862 F.2d 17, 23 (2d Cir. 1988) (reversing conviction because

---

[7] This issue concerning Juror 3 originally arose when the foreperson stated in a note that "juror number three has admitted to having conversations with her father regarding golf trip expenses during the trial. She wanted to confirm costs, comparisons/discrepancies.  Does this conversation compromise our deliberations?"  June 13, 2006 A.M. Tr. at 2-3.  In response to questioning from the parties and the Court, Juror 3 stated that approximately one week prior she commented to her father while he was watching Tiger Woods play golf on television that she could not "believe what it cost to play golf." Id. at 8:17.  Her father responded "oh, yeah, yeah, [m]ove." Id. at 8:25-9:1.  Juror 3 stated that she never talked with her father (or received any additional information) again about the cost of golf, nor did she speak with her father about any aspect of this trial at any point.  Id. at 9-10.  When asked by the government whether her father conveyed any information to her that she didn't know before, Juror 3 responded "No, because what I learned about the Scotland trip I learned here in the trial.  And what I knew about golf here in the United States I learned about his playing golf every day and my helping him find tee times [in February]."  Id. at 9:16-19.  At this point, the government was not particularly troubled by juror 3's statements. Id. at 11:17-18.

Notably, the Court's subsequent explanation that it was making the decision to dismiss Juror 3 on the basis of her lack of credibility is not a basis for "good cause" discharge.  Even if it was, the Court initially deferred to the parties to agree as to how they wanted to proceed concerning the juror and gave the parties an opportunity to think about the question over a lunch break.  The government initially had no problem with Juror 3's representations.  It was only *after* the government heard from Juror 12 that Juror 3 had: a) appeared to challenge the representations of Juror 11 that: "the *cost discrepancies* and information with the hotel rooms were in keeping with her father's experience as a golfer" 06.14.06 Tr. at 13:15-16, and  "ma[de] a comment about Mr. Safavian's guilt or not guiltiness," 6.13.06 Tr. at 18:1-3, that it changed its initial position and filed a rather vigorous motion requesting the removal of Juror 3.

Compounding the issue further, the Court suggested that it based its decision on Juror 12's credibility.  However, Juror 12 had not been speaking directly to Juror 3.  She merely overheard a conversation between Juror 3 and Juror 11.  Yet, Juror 11 contradicted Juror 12's testimony, saying that Juror 3 "didn't say specifically what her father said," just that she had "talked to him about it, and that she was surprised at how expensive that St. Andrews could be compared to the stuff that she had done with her golf, but she never said whether her father gave her a specific number about it." Id. at 23:15-20.

it was not clear whether the removal of a juror was because of mental incompetence or the juror's view on the merits of the case).

**CONCLUSION**

For the aforementioned reasons, Defendant David H. Safavian respectfully requests that, in the alternative to granting the Motion for Judgment of Acquittal as filed under separate cover, that the Court order a new trial under Fed. R. Crim. P. 33.

Respectfully submitted,

By: /s/ Barbara Van Gelder
   Barbara Van Gelder (D.C. Bar # 265603)
   Roderick L. Thomas (D.C. Bar # 433433)
   Albert C. Lambert (D.C. Bar # 489562)
   WILEY REIN & FIELDING LLP
   1776 K Street NW
   Washington, DC  20006
   TEL: 202.719.7032

Dated: July 10, 2006                 *Attorneys for David H. Safavian*