## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No 05-370 (PLF)** |
| | : | |
| v. | : | |
| | : | |
| **DAVID HOSSEIN SAFAVIAN** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### MOTION FOR NEW TRIAL

The United States of America, by and through its undersigned attorneys, hereby respectfully submits this Opposition to Defendant's Motion for New Trial.  Defendant has requested a new trial based on the "interests of justice."  Fed. R. Crim. P. 33(a).  (Def. Motion, p. 1).  This motion should be summarily denied, as it is based almost entirely on arguments that have been previously briefed, argued and rejected by this Court.[1]

**I.     The Abramoff-Safavian E-mails Were Properly Admitted at Trial**

In his Motion, defendant once again repeats his argument that it was error for the Court to admit e-mails written by Jack Abramoff and sent to defendant.  Defendant repeatedly made this same argument in his pre-trial pleadings (see Defendant's Motion in Limine to Exclude Evidence that is Hearsay or Irrelevant, Doc. # 70; Defendant's Opposition to Government's Motion for Pre-Trial Admissibility of Certain Evidence, Doc. # 82, pp. 15 - 19).  In its Opinion and Order of

---

[1]Because the arguments made by defendant are, for the most part, simply a repetition of previously made arguments, the government will, in this response, strive to avoid simply repeating the responsive arguments that it has previously made to the Court both in its pleadings and in open court.  Instead, the government will, where appropriate, simply refer to its earlier pleadings.

May 23, 2006, this Court considered – and rejected – all of the arguments against the admissibility of the emails that defendant once again urges the Court to adopt.  For example, in his instant motion, defendant

> maintains that there is no 'work' exception to the hearsay rule.  Def. Mot., p. 2 - 4. The absence of such an exception stems from the logic that a trier of fact cannot possibly know whether an e-mail constitutes 'work,' or some other type of communication, such as 'leisure' or 'friendship,' as so many of these e-mails from Abramoff were [], *without evaluating* the declarant's actual words and the truth of the assertions therein.  Accordingly, the e-mails remain hearsay since the truth or credibility of the matter asserted must be weighed by the jury.

Def. Motion, p. 3 (emphasis in original).

This Court, in its Opinion and Order, considered and rejected this precise argument:

> The defendant objects to the admission of e-mails under these theories, arguing that the truth and credibility of the contents of the e-mails necessarily are at issue if the government is introducing them to show that 'work' or 'business' was being conducted.
>
> Under the circumstances of this case, the government is correct that certain e-mails themselves can constitute the 'work' that Mr. Abramoff did, without regard to the truth of their contents.  Lobbying is conducted through words ... Whether the lobbyist is seeking favors for his client through oral or written communication, it is necessarily communication that constitutes the work – unlike, say, carpentry work which could involve the swinging of a hammer, or drug dealing work which involves the physical exchange of drugs for money.  In this case, the lobbying "work" or business that Mr. Abramoff engaged in included sending e-mails to Mr. Safavian seeking assistance and favors.  In many of the e-mails, Mr. Abramoff asks questions without asserting the truth of any matters.... Other e-mails contain imperative statements instructing Mr. Safavian on how to provide assistance and similarly are offered not for the truth of the matters therein ....Still other e-mails contain information along with explicit or implicit requests for assistance.  Those requests (with the factual context provided in some) constitute the non-hearsay "work."... The truth of the assertions in the e-mail and the draft letter about the school are not at issue under the government' theory of this case.  Whether Mr. Abramoff correctly represented certain facts about the business he was conducting or whether he was able to successfully obtain for his clients what they wanted is irrelevant to the fact that he was requesting assistance from Mr. Safavian in reaching these goals.

Opinion and Order of May 23, 2006 (docket # 99), pp.14 - 15.

Defendant's argument that Abramoff's e-mails were only properly admissible if "offered to demonstrate *his* [Abramoff's] then existing state of mind, not Mr. Safavian's" (Def. Motion, p. 6, emphasis in original) is simply wrong. "The Federal Rules of Evidence provide that '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" United States v. Sesay, 313 F.3d 591, 598-99 (D.C. Cir. 2002), citing Fed. R. Evid. 801(c). While hearsay is generally inadmissible as evidence, "an out-of court statement that is offered to show its effect on the *hearer's* state of mind is not hearsay under Rule 801(c)." Id. at 599, citing United States v. Thompson, 279 F.3d 1043, 1047 (D.C. Cir. 2002) cert. denied, 537 U.S. 904 (2002)(emphasis supplied). This is precisely the theory under which the Abramoff e-mails were admitted in this case: not to prove the truth of the matters asserted therein, put to show its effect on defendant's – the "hearer's" – state of mind. Thus, the e-mails were not inadmissible hearsay. See also, United States v. Demopoulos, 506 F.2d 1171, 1175-76 (7th Cir. 1974) cert. denied, 95 S.Ct. 1427 (1975) (extortion victim permitted to testify about contents of telephone call from someone identifying himself as a Chicago Police Department vice officer instructing victim that he would not receive the liquor license he had applied for unless he met the "officer" at a particular location and paid him $3,000, where court advised jury that testimony regarding the conversation "was admitted to allow you to understand subsequent actions which were taken by the [extortion victim] and others" and not "as proof of the matters asserted in that conversation.")

Moreover, the jury was repeatedly instructed by the Court that e-mails written by anyone

other than a witness who testified at trial were not to be considered for the truth of the matter

asserted. For example, on the first day of trial testimony, the Court told the jury the following:

> You may have heard the term "hearsay." That, if you come in and you tell me that you had a conversation with somebody else and that person's not here, I'm just relying on your statement that that happened. Usually in a trial we have witnesses who come in and tell us something, and they can be examined by one lawyer and cross-examined by another lawyer.

> There are some things that are not hearsay, even though they might look like they are. And there are other things that have exceptions to the hearsay rule. So, we've spent a lot of time, the lawyers and I, talking about a couple of hundred e-mails, many of which you may see during the course of this trial. I have ruled that lots of them are admissible, but for different purposes and on different theories.

> \*      \*      \*      \*

> [For some e-mails] we're going to tell you don't rely on what's said in the body of this e-mail, but only the fact that it was said, or to give you context for other things that will come into evidence, or to consider whether or not if Mr. Safavian received a particular e-mail on a particular date it might have affected his motive, or intent, or whatever.

> \*      \*      \*      \*

> But other things are not coming in for the truth of what's said in an e-mail. It's like if, well you know, you probably all work with computers, send e-mails back and forth to your friends. Somebody sends you an e-mail saying it's raining outside, I can't meet you in five minutes outside the building. And you look out the window and you say, well, what's he talking about? It's not raining outside. You're not going to believe that, but you're not going to show up in five minutes because he's told you he's not going to be there in five minutes.

Tr. 5/24/06, p.m., pp. 8 - 10.[2]

     Prior to the testimony of Agent Reising, the Court once again cautioned the jury regarding

_____

[2]After giving this instruction, the Court invited the government and defense "to come to the bench and make a comment an objection whatever." Tr. 5/24/06, p.m., p. 10. Defense offered no objection or comment to this instruction. Id.

the proper use of the Abramoff e-mails:

> And basically yesterday I explained to you generally what hearsay is, and about the fact that some hearsay can be considered for the truth of what's stated in the e-mails and some cannot. Now what you've actually got some real examples, you'll see what we're talking about.

> So, for example, things that you conclude – the agent can't draw any conclusions. He's reading. Things that you conclude were sent by Mr. Safavian and that you conclude therefore were is statements, they can be accepted for the truth of what was stated. There may be other statements that were made by other people, but you may conclude that they were, in effect adopted by Mr. Safavian as his own when he sent them on to other people. Those can all be considered for the truth of the matter asserted.

> But there are other e-mails that came from different people, not Mr. Safavian, or where part of the e-mail came from people, not Mr. Safavian, and those e-mails are not admitted for the truth of what they state. So they can be considered only for the fact that they exist, that somebody sent an e-mail to somebody else, and for you to consider whether, for example, does the e-mail or the exchange of e-mails show, in your opinion, that Mr. Abramoff was engaged in lobbying work or business with the GSA, or interacting with the GSA. Not what he or others said, but the fact that he was communicating at all.

> Or if you conclude that Mr. Safavian received or saw a certain e-mail, it's not – by somebody else who is not a witness here at trial, and then took certain actions or didn't take certain actions, you can consider the fact that he had seen this e-mail when you consider what his state of mind might have been if the e-mail came close in time to anything that he might have done.

> This particular e-mail – and the agent hasn't testified about it yet – I was about to tell you who I thought it was from and who I thought it was to, but I'm not sure I understand it. It doesn't appear to be, however, from Mr. Safavian, and therefore, unless you hear from the witness – from a witness who says he or she wrote it, you can't consider it for the truth of the matter, but only to show the state of mind or motive or intent, or whatever, of Mr. Safavian if you conclude that he saw this.

> So that's sort of a general instruction. I'll try to give you some others as we go along, but basically an e-mail like this may be considered for such matters as whether it may have affected Mr. Safavian's state of mind, whether the fact that he received it, if you conclude that he did receive it, gave him a motive or intent to do certain things, or whatever. But for these purposes you can consider this e-mail and similar e-mails for as much or little weight as you think it deserves,

given the purpose for which it's offered.

Tr. 5/25/06, p.m., pp. 23 - 25.

At the conclusion of the government's initial closing argument, the Court once

again addressed the issue of the proper use of the e-mails:

> Sometimes people say things in a way that might be misconstrued. I think Mr. Edmonds, and it's your recollection that controls, but I think Mr. Edmonds made a statement in his closing to the effect that he submitted to you that you can take these e-mails for the truth of the matter. And he may have said it after he was discussing the witnesses that I talked about earlier, Mr. Safavian, Mr. Volz, Ms. Ellison, and Mr. McKenna and Mr. Costa, and maybe he was referring only to those e-mails, and I'm sure that he didn't intend to do anything inconsistent with what I had said previously.

> But just so you're clear and you don't misconstrue what he said or what I said, the e-mails by those specific witnesses may be considered for their truth, but all o f the other e-mails that we talked about from Mr. Abramoff and from other people that didn't testify here in court and weren't available to be cross-examined, cannot be considered for the truth of the matter in those e-mails.

> And I gave you a lengthy instruction on the limited purposes for which you can consider all of those other e-mails. Those restrictions that I gave you before still apply.

Tr. 6/12/06, p.m., pp. 58 - 59.

Then, in its final instructions to the jury, the Court instructed that

> Any e-mail, or part of an e-mail that was sent to Mr. Safavian should not be considered for the truth of the matter, if the sender was not here and available for cross-examination but instead may be considered only for a limited purpose, including such purposes as the impact on someone's state of mind, motive, purpose, intent, or absence of mistake, or for the fact that the communication occurred and what that might show. When you consider such e-mails, you must limit your consideration to one or more of those limited purposes.

Jury Instruction re: Evidence Admitted for Limited Purpose.

None of the new cases now cited by defendant provide him with any legal support for his

request for a new trial. For example, in United States v. Stover, 329 F.3d 859, 869-70 (D.C. Cir. 2003), a case involving allegations of a narcotics conspiracy, this Circuit held that the trial court erred in admitting evidence of recordings between another drug-dealer and an undercover FBI agent. This was error because "the Government introduced [the drug-dealer's] statement that Agent Bryant and [the drug-dealer] should refer to drugs as clothes as evidence of the fact that [the drug-dealer] used clothing terminology to refer to drugs in other conversations. The statement is not probative of that fact unless the Government offered the statement for the truth of its content. The jury, using the statement, could infer that [the drug-dealer] and his co-conspirators referred to drugs as clothes only from the fact that [the drug-dealer] and Bryant referred to drugs as clothes – that is, through the statements content." Id. at 870.

Stover provides no help to defendant. In this case, the Abramoff e-mails were not admitted for their truth. The government did not admit the e-mails pertaining to White Oak in order to prove that Mr. Abramoff wanted the White Oak property for a school. Whether Mr. Abramoff wanted the property for a school, a gambling casino or a shopping mall was not an issue at trial. Nor did it matter that Mr. Abramoff was truly under time constraints, as he claimed, or was merely claiming this was the case because he thought by doing so he was more likely to get quick action from defendant. Similarly, it was irrelevant for the jury's consideration of whether or not defendant lied or obstructed justice whether Mr. Abramoff was *truly* interested in turning the Old Post Office into a five star hotel as he claimed, or he wanted to quickly sell it to other investors. The e-mails were admitted to show, among other things, the fact of communication between defendant and Abramoff regarding White Oak and the Old Post Office. Thus, the e-mails were relevant *regardless* of their underlying veracity, in order to demonstrate

the impact on defendant's state of mind.

United States v. Evans, 216 F.3d 80 (D.C. Cir. 2000) cert. denied, 531 U.S. 971 (2000), another case cited by defendant, is likewise inapposite.  The Evans court held that it was error for an FBI agent to testify, in response to the question of how it was that defendant Evans came to the FBI's attention, that the FBI "'had received ... information that Mr. Evans was involved in drug trafficking.'"  Id. at 85 - 91.  On appeal, the government argued, inter alia, that this statement, which was clearly hearsay, was admissible to explain why the agent did what he did.  Id.  The Court noted this rationale failed because the agent's state-of-mind was not – at least at the time the witness testified – a relevant  issue at trial.  Id.  Nor was the statement properly admitted to "combat the threat of 'jury nullification.'"  Id. at 86.  This argument failed because to the extent that this evidence may have helped present to the jury the "'whole story,'" this rationale did not create an exception to the general rule that hearsay is inadmissible to prove the truth of the matter asserted.  Id. at 86 - 87.  Finally, the Court found that given that the defense in the case was entrapment, there was a significant risk that the testimony at issue would be improperly used by the jury to defeat defendant's claim that he lacked the predisposition to commit the crime at issue.  Id. at 88 - 89.  This risk of unfair prejudice was compounded by the fact that the trial court gave no limiting instruction when the testimony was introduced into evidence, and then later gave an entrapment instruction which may have suggested to the jury that they could consider the agent's testimony in determining defendant's willingness to commit the crime in question.  Id.

None of the concerns in Evans are present in the instant case.  Defendant's state-of-mind when he communicated with his ethics officer, the GSA-OIG and the United States Senate was,

unlike the state of mind of the FBI agent in <u>Evans</u>, directly relevant to this case. Moreover, defendant's state-of-mind was not determined by the truth of the e-mails. In this case, the jury was repeatedly and properly instructed that the e-mails could not be considered for the truth of the matter asserted unless the e-mail's author was available to be cross-examined.[3]

The remaining two cases cited by defendant are similarly unhelpful to his cause. In <u>United States v. Gaertner</u>, 705 F.2d 210, 214 (7th Cir. 1983) <u>cert</u>. <u>denied</u>, 464 U.S. 1071 (1984), the Court upheld the trial court's ruling that proffered testimony by the defendant about what he had been told by the government's informant was barred by the rule against hearsay since "the defendant was in fact attempting to introduce [the informant's] alleged statements ... to prove the truth of the matter asserted and not to prove the defendant's state of mind," <u>Id</u>., – something which did not occur in this case. Indeed, as noted <u>supra</u>, the jury was repeatedly instructed that

---

[3]Defendant also argues that the admission of the e-mails caused him prejudice. Def. Motion, p. 7. In fact, <u>Evans</u> supports the contrary argument: that even if the admission of the e-mails was error, the error was harmless by virtue of the fact defendant elected to take the stand and testify about his understanding of what the e-mails meant. Defendant acknowledged on cross-examination that he assisted Mr. Abramoff in Abramoff's efforts to obtain leases for both the Old Post Office and White Oak (Tr. 6/5/06, p.m., pp. 40 - 41); defendant simply disagreed whether these requests for assistance constituted "doing business." Thus, any error in admitting the e-mails should be deemed harmless. <u>Evans</u>, 216 F.3d at 90 (error in admitting agent's testimony that his attention was initially drawn to defendant because he "had received ... information that [defendant] was involved in drug trafficking" held harmless where defendant testified at trial and admitted he committed the charged drug offenses but claimed that he had been entrapped. <u>Id</u>. Although the agent's testimony "could have been prejudicial with respect to predisposition," this issue was not relevant since defendant failed in making the threshold showing to have even been entitled to an entrapment instruction. <u>Id</u>. "Because entrapment was Evans' only defense (given his concession to having participated in the charged drug transactions), we can say with certainty that the erroneous admission of Agent Darnell's testimony did not contribute to the result in this case." <u>Id</u>. at 91.
The same analysis applies in the instant case: because defendant elected to testify about receiving the e-mails as well as his understanding that Mr. Abramoff wanted his assistance in obtaining leases for White Oak and the Old Post Office, any error in admitting the e-mails should be deemed harmless.

the Abramoff e-mails were *not* to be considered for the truth of the matter asserted.

Defendant also cites <u>United States v. Tann</u>, 425 F. Supp. 2d 26 (D. D.C., 2006), which actually supports the government's position in the instant case.  In <u>Tann</u>, the Court analyzed the admissibility of various checks the government sought to introduce at trial.  The Court held that checks made out to defendant were admissible because the government was

> not introducing the checks to show that Defendant's employers' actually intended to pay Defendant certain sums, and that money was transferred from the employers' accounts to Defendant's accounts pursuant to the instruction of the authorized signor.  Rather, the Government [was] introducing the employer checks for a separate purpose not apparent on their face: the Government [was] using the employer checks to show that the information contained on the face of the document is actually false – i.e., the employers did not intend and did not authorize payment at that time, in that amount, and in that form to Defendant.

<u>Id</u>. at 32 -33.

This same analysis did not, however, apply with respect to checks written by defendant to other commercial entities, where the purpose of the admission of the checks was to prove defendant in fact paid the entities the monies indicated on the check.  <u>Id</u>. at 33.  Because "the Government [was] essentially seeking to introduce the 'payee' section of the Defendant's personal checks for the truth of the matter asserted" ... i.e., Defendant intended to pay Catholic University for some service, specifically listed Catholic University as the payee, and the subsequent payment was made," they admission was barred by the hearsay rule.  <u>Id</u>. at 33 - 34. <u>Tann</u> is inapposite to the instant case because, as noted above, the government did not admit any of the Abramoff e-mails for the truth of the matter asserted therein.

10

**II.     The Entirety of the Ethics Opinion was Properly Admitted as an Adoptive Admission**

Defendant once again repeats the identical arguments he made pre-trial regarding the admissibility of the ethics opinion.  See Doc. 67 & 88.  These arguments have been previously, and thoroughly, responded to by the government.  See Docket # 80.  Because there were no facts represented in the government's pleading that did not come to pass at trial, defendant's argument should be summarily denied.

Moreover, it is misleading to claim, as defendant does, that in sending the ethics opinion on to Bryan Parker "Mr. Safavian was simply responding to Mr. Parker's request for the opinion as relevant to the February 23, 2005 document request."  Def. Motion, p. 10.  In reality, as Mr. Parker's testimony made clear, defendant is the one who brought up the subject of the ethics opinion, and he did it in a manner to suggest that it completely exonerated his conduct:

Mr. Parker:     When we were talking about the Scotland golf trip, I mentioned that some of the issues we were looking out for included, and I said take no offense at this, I'm not suggesting anything, but whether there was any quid pro quo or influence peddling.  And at that point Mr. Safavian volunteered that before that golf trip he had gone to counsel at GSA and had gotten what I call an ethics compliance letter, but essentially clearance, to go on the trip.  I said, oh, really?  And he said, yes. He said, look, I've disclosed everything.  And then he listed a number of things that he had disclosed, that he and Mr. Abramoff were long-time friends, they had known each other from their years at Preston Gates ...

                                                *      *      *      *

Q.     When Mr. Safavian said he had disclosed everything to the ethics officer, was that statement important to you?

A.     Yes.

Q.     Why was that important to you?

A.     Well, if you're going to get a compliance letter on ethics or anything else, you

have to disclose all the relevant facts, otherwise it may not be any good.

Q.     Did he say how he acquired the ethics opinion, in what form?

A.     He said it was a letter.  At the time of our first conversation, because I had asked if I could get a copy of it, he said he wasn't sure whether he still had a copy.  He gave me the names of two people at GSA who could help me out with that in the event he did not have a copy.

Tr. 6/01/06, a.m., pp. 21 - 22.

Thus, it was defendant who brought up the subject of ethics opinion, as well as the fact that he had disclosed all relevant information, and that he had been given permission to go on the trip.  It was only after these revelations that Mr. Parker requested a copy of the ethics opinion, which defendant then sent.  It simply is not the case, as defendant suggests, that Mr. Parker contacted defendant and requested that defendant forward to him the ethics opinion.  Mr. Parker did even know the ethics opinion existed until defendant discussed it with him.  As this Court has previously pointed out when it denied defendant's motion to exclude this evidence, this was how defendant chose to respond to the Senate request for information.

The jury was not required to accept the ethics opinion at face value; they were  free to accept defendant's argument at trial that he did not read the ethics opinion before he sent it on and that it contained statements he did not make.  But this argument is not, in and of itself, a proper legal basis to preclude admission of the opinion as evidence at trial.  Simply put, there is no basis to argue that it was reversible error to admit into evidence the ethics opinion as an adoptive admission, where defendant voluntarily sent the opinion to the Senate as a way of explaining his conduct in connection with the Scotland golf trip.  Indeed, it is difficult to imagine under what circumstances the doctrine of adoptive admission could ever apply, if not to these

facts and circumstances.

### III.    The Admission of Exhibit 175 Was Proper

Defendant now claims that the admission of government Exhibit # 175[4] was prejudicial error of such gravity that it necessitates the granting of a new trial.  Defendant's claim is groundless; a proper foundation for the admission of Exhibit 175 was laid by the government through Anthony Costa, and defendant subsequently withdrew his objection to the letter's admission.  Moreover, the initial objection was based upon lack of foundation, not because of any hearsay objections, and consequently, the hearsay objection is waived and must be reviewed only for plain error.

Mr. Costa was shown Exhibit 175 and testified that he recognized it, although he could not recall the specific day that he first saw it.  Tr. 5/24/06, p.m., p. 70.  He further testified that he was familiar with the document because his "organization was assigned the responsibility respond to the document" and that it came to him "through the normal channels."  Id. at 71.

When the government initially moved to introduce the exhibit the following occurred:

Ms. Van Gelder:        Objection

The Court:       Do you want to come to the bench?

Ms. Van Gelder:        You know my objection.

The Court:       No additional objection  – well, why don't you come to the bench.

             (Bench conference on the record.)

Ms. Van Gelder:        I have another point to make, too.  My first objection is, I know he

---

[4]Exhibit 175 was an unsigned copy of a letter purporting to be from the headmaster of Eshkol Academy to Joseph Moravec.  Earlier iterations of this letter were found in e-mails sent between Mr. Abramoff and defendant.

said he saw this, but this is an unsigned signature, and I would like him to say he saw this document before this document comes in as the document he saw.

\*     \*     \*     \*

The Court:     With respect to 175, I take it – this particular exhibit came from where?

Mr. Edmonds:          This particular exhibit came from the e-mail from Greenberg Traurig contained as an attachment to it.

The Court:          And Mr. Perry at least testified that he had stamped things when they went out.  So we don't have a signature and we don't have a stamp.

Mr. Edmonds:          That's correct.

The Court:     The question is, what does Costa say?  And he clearly doesn't say I have seen this copy of this.

Mr. Edmonds:          No.  He's seen the essence of the letter and the words on the page.

Ms. Van Gelder:     My concern is that's not what he just said.

The Court:     How does he remember that?

Mr. Edmonds:          He remembers very specifically, and we can explore this further if you would like, he remembers specifically the requests and the necessity for the meeting that led from the overall –

The Court:     I think we should clarify that.  He can't say for sure he saw this copy of this letter.

Mr. Edmonds:          He cannot say that he saw that exact copy without a signature.  That's correct.

The Court:     It doesn't have a signature, or a signature stamp or a signing.  I think we should clarify that.

Mr. Edmonds:          Okay.

The Court:     If it helps, I suppose I can tell the jury, or you all can stipulate that this particular copy came from files of Greenberg Traurig or not, because if he's asked that question, he won't know where it came from.

14

Ms. Van Gelder:     **I think that as long – if the question is, is this a copy of what you recall, as opposed to this is what your recall, then I can cross-examine him if I want, that's fine.**

The Court:     I think that's fair.

Mr. Zeidenberg:     Okay.

(End of Bench Conference.)

By Mr. Edmonds:     Mr. Costa, is this a copy of a letter that you saw, or is this the exact letter that you saw?

Mr. Costa:     Well, it's on the screen, so it's an image of a copy of a letter I saw.  It's a copy of a letter I saw.

Q.     Specifically in relation to the signature block, is there a signature on that page that you recognize?

A.     Well, there's no signature.

Q:     Typically in your correspondence from GSA, do you receive letters with signatures?

A:     Yes.

The Court:     So presumably if this came from a GSA file, if it were the original of the letter that GSA received, it would be signed.  And if somebody made a copy of what GSA received, presumably the copy would show a signature?

The Witness:  Right, yes.

Mr. Edmonds:     At this time the government would still offer this into evidence.

The Court:     I understand the defense's concern and objection, and I will admit it.

Tr. 5/24/06, p.m., pp. 71 - 74 (emphasis added).

A fair reading of the transcript indicates that defendant withdrew its initial objection to the admissibility of the letter on foundational grounds.  At no point did defendant suggest what he does now: that the letter contains inadmissible hearsay.  Therefore, the argument should be

15

deemed waived absent a showing of "plain error that affects substantial rights."  Fed. R. Crim. P.

52; see also, Advisory Committee Notes to Rule 52 ("errors not specified will be disregarded,

'save as the court, at its option, may notice a plain error not assigned or specified.'") United

States v. Breedlove, 204 F.3d 267, 270 (D.C. Cir. 2000) ("An objection is not properly raised if it

is couched in terms too general to have alerted the trial court to the substance of the petitioner's

point."); United States v. Stover, 329 F.3d 859, 868 (D.C. Cir. 2003), cert. denied, 541 U.S. 1018

(2004) (same).

Moreover, even if the argument had been preserved, it is without merit, because the letter

was not admitted for the truth of the matter asserted.  Exhibit 175 was admitted to 1) explain why

Mr. Costa took the actions that he took; and 2) to demonstrate that this letter, which defendant

helped draft, did in fact end up being sent to the GSA.[5]  Therefore, its admission was not error.

## IV.    The Court Did Not Err in Precluding the Defense from Cross-Examining Agent Rowe About Whether He Mirandized Defendant

Defendant claims he is entitled to a new trial because the Court precluded the defendant

testifying about "the conditions attending to his March 27, 2003 interview" with OIG Special

Agent Gregory Rowe.  Defendant's argument is frivolous and misleading.  Defendant claims that

"[d]uring direct examination of Mr. Safavian ...counsel sought to determine whether Mr.

Safavian *was given warnings about the consequences of answering questions posed by Agent*

*Rowe*.  Mr. Safavian was not, however, permitted to answer this question."  Def. Motion, pp 13 -

14.   Defendant then goes on to argue that this evidentiary ruling prevented him from

demonstrating that he lacked "adequate notice of the potential criminal implications when

_____

[5]Defendant testified that he assisted Mr. Abramoff in drafting the letter to Mr. Moravec (Tr. 6/5/06, p.m., p. 5 - 7).

responding to government inquiries, including notice of the right not to speak and the implications of making false statements if one does choose to speak." Id. at 14.

      In fact, the Court did not preclude the defense from questioning the defendant regarding the circumstances surrounding his interview.  Nor did it rule that defendant could not testify that he was never warned that he could be prosecuted for false statements or obstruction of justice if his answers were false or misleading.  The Court merely – and properly – precluded the defense from asking defendant if had received Miranda warnings [6], which, as the Court – and, presumably defense counsel – is well-aware, are not legally required for non-custodial interviews such as the March 27, 2003 interview with Agent Rowe.

      For reasons unknown, defendant chose not to ask either defendant or Agent Rowe whether defendant was ever advised of the potential legal consequences for answering Agent Rowe's questions in a false or misleading manner.  Such questions, had they been asked, would have been entirely unobjectionable.[7]  What was improper is what defendant attempted to do here: ask whether defendant received Miranda warnings when such warnings were not warranted or

---

   [6]At no point did the Court prevent defendant from testifying about any of the *relevant* circumstances surrounding his interview:

> The Court:   There's no custodial interrogation, there's no need for a Miranda warning. Furthermore, I think it's fair to say, what did he say to you, what did he tell you the purpose of it was, and what the environment was, but I think that it is misleading to suggest to the jury that the was required to give him Miranda warnings or any other kind of warnings.

Tr. 6/2/06, p.m., p. 30.

   [7]Presumably, defense counsel did not ask these questions for tactical reasons, as defendant's testimony at trial was not that he gave false and misleading statements because he was unaware that they could result in criminal charges, but that at all times he was completely honest and forthcoming.

required.  Permitting such a question would have run a severe risk of unfairly prejudicing the

government in the eyes of the jury, who might well have believed that the failure to give Miranda

warnings was evidence of improper government conduct.  As such, the Court properly excluded

the question.[8]

## V.     Government Witnesses Were Not Permitted to Improperly Speculate

Defendant claims that he is entitled to a new trial because the Court erred in permitting

government witnesses Raymond McKenna, Eugenia Ellison, Agent Gregory Rowe and Senate

investigator Bryan Parker to testify about whether or not it would have been relevant to them in

the course of their official duties if they had been aware of certain facts.  Defendant claims that

this testimony should have been barred as speculation by Fed. R. Evid. 403.[9]  Def. Motion, pp. 15

- 17.  Defendant's argument is groundless.  The evidence in question was directly relevant to a

contested issue at trial: whether or not defendant's statements were materially false, an issue that

---

[8]Defendant offers no authority for his novel argument that the Court erred by curtailing further cross-examination because he was thereby "prevented [] from developing evidence supporting the dismissal of the Counts at hand on due process grounds."  Def. Motion, p. 15.  Defendant's apparent argument that the scope of cross-examination should be broadened to permit counsel to attempt to "develop evidence" that could prove helpful for post-trial motions is frivolous.

Notwithstanding the fact that defendant filed a Motion to Dismiss and a Reply in support thereof that totaled 108 pages, it is only after his conviction that defendant raises either a <u>Kalkines</u> or <u>Garrity</u> issue.  Had defendant wished to properly litigate this issue, he could have requested an evidentiary hearing prior to trial.  Instead, defendant has waited for post-trial motions to attempt to explore these issues.  <u>See</u> discussion in Govt. Resp. To Def. Motion for Acquittal, filed this date.

[9]Fed. R. Evid. 403 states:
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the government alleged – and was required to prove – and that the defendant denied. Moreover, the witnesses did not speculate; they testified about the effect the statements had on *them*, not what effect the statements might have had on *others*. Thus defendant could have, had he chosen to do so, cross-examined each witness about whether or not the alleged false statement really "had the effect of influencing" "or was capable of, or had the potential" to influence the respective witness.

The cases cited by defendant offer him no support for his motion for new trial. In re Rezulin Products Liability Litigation, 309 F.Supp.2d 531 (S.D.N.Y. 2004) stated merely that an expert witness could not testify about what "doctors in general think," something very different than what happened at the instant trial, where the witnesses in question were merely asked what *they themselves* thought.

Bridgen v. Scott, 456 F. Supp. 1048 (S.D. Tex. 1978) is likewise inapposite. In Bridgen, the Court held that "vague, self-serving" testimony of allegedly defrauded investors in complex land deal that they would not have consummated deal had they known certain facts was "simply meaningless" under the facts presented. Id. at 1063-64. "Testimony of plaintiffs that they would not have invested had they known that 'the property was sold twice on the same day' is simply meaningless. It is a gross and misleading over-simplification to say that 'the property was sold twice on the same day.'... This general, self-serving testimony which is in addition to other infirmities a manifest over simplification is similarly without substantial probative force" [under all of the facts presented here.] Id. In the instant case, the testimony at issue was neither self-serving or overly simplified. Nor was it lacking in probative force. Indeed, it was directly relevant and probative to one of the key issues in dispute – materiality.

Defendant's citation to a civil case, Elyria-Lorain Broadcasting Company v. Lorain Journal Company, et al., 298 F.2d 356 (6th Cir. 1961), is similarly unpersuasive. Although Elyria-Lorain Broadcasting does state the general proposition that "a witness may not testify to what he would have done had the situation been different from what it actually was," it does so without any reference to the question or facts at issue in that particular case. Id. at 360. More on point is a case defendant failed to cite, United States v. Bush, 522 F.2d 641 (7th Cir. 1975), cert. denied, 424 U.S. 977 (1976), which refused to follow Elyria-Lorain Broadcasting in ruling that hypothetical questions to three aldermen called to testify in a fraud trial were admissible. Id. at 649 - 650. The defense "strenuously objected" to the government asking the aldermen if they would have awarded a particular contract if they had known that defendant Bush was the 100% owner. Id. at 649. The Bush Court held that this question was proper:

> In ruling on the objection, Judge Tone specifically stated that the issue of whether city officials would have recommended the contract in the absence of a misrepresentation by Bush was material in proving the crime charged. Each city official was allowed to testify about his state of mind in order that the government could prove-up the fraud charges. Had the witnesses testified that Bush's interest would not have affected their decision then we doubt whether the jury or the court could have found that a fraud was committed.

Id. See also, Phillips v. United States, 356 F.2d 297, 308-09 (9th Cir. 1965), cert. denied, 384 U.S. 952 (1966); Haid v. United States, 157 F.2d 630, 632 (9th Cir. 1946) (rev'd on other grounds, United States v. DeBright, 730 F.2d 1255 (9th Cir. 1984). In the instant case, as noted above, the issue of materiality was critical. Indeed, had the answer to the now complained-of questions been in the negative, i.e., had either McKenna, Ellison, Rowe or Parker been prepared to testify that the information would *not* have been of interest to them, one can hardly imagine the defense agreeing that such testimony was inadmissible because it was too speculative.

20

## VI.     The Verdict Form Did Not Amend the Indictment

Defendant argues that because the Indictment charged defendant in the conjunctive and the verdict form permitted conviction if conduct was committed in disjunctive (i.e., defendant was charged with concealing his assistance to Mr. Abramoff, *and* concealing Mr. Abramoff's business relationship with GSA, *and* making certain false statements, whereas the verdict form permitted conviction if *any* of these acts occurred), defendant claims that the verdict form constituted a constructive amendment of the Indictment.  Def. Mot., pp. 17 - 19.  Defendant's argument, made without citation to legal authority, is without merit.  This identical argument has been routinely rejected by the Courts that have considered it.

For example, in  United States v. Poarch, 878 F.2d 1355 (11th Cir. 1989), a case directly on point, defendant was charged with violating 18 U.S.C. Sec. 1001 by "falsifying, concealing *and* covering up" material facts within the jurisdiction of the Defense Logistics Agency.  The court's jury instructions, however, charged the jury that Poorch could be found guilty if he did "'falsify, conceal *or* cover up' a material fact."  Id. at 1358.  Poarch argued on appeal "that the use of the conjunctive 'and' in the indictment but the disjunctive 'or' in the jury instructions" constituted an improper and prejudicial "constructive amendment to the indictment."  Id.

The Poorch court disagreed:

> A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the indictment.  In this case the indictment alleged that Poorch falsified material facts, concealed material facts, and covered up material facts.  Under the statute, the government need only show that one of those acts was committed in order to prove guilt.  The indictment, however, alleges that all three acts were committed, each of which violates the statue –  in effect, the government obtained a more difficult indictment than it was required to by the statute.  Our literal application of the Lignarolo test forces us to conclude

that Poarch could not possibly have been convicted by a ground not alleged in the indictment, since the indictment alleges all three possible grounds for guilt. (Citations and footnote omitted.)

Id. at 1358.

The holding in Poarch applies with equal force to defendant's claim. By charging defendant as it did, the government essentially obtained an indictment "more difficult" than required by statute. The statutes permit defendant to be convicted if he committed one of several different acts. The verdict form made clear to the jury that they had to find that defendant committed any one of these acts beyond a reasonable doubt. Thus, there was no constructive amendment of the Indictment. See also, United States v. Abascal, 564 F.2d 821, 832 (9th Cir. 1977) cert. denied, 435 U.S. 942 (1978)("The government may charge in the conjunctive form that which the statutes denounce disjunctively, and the evidence supporting any one of the charges will support a guilty verdict."); United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) (defendant argued impermissible amendment of indictment where indictment charged him "with threatening suspension *and* termination while the evidence revealed threats of suspension *or* termination"; court held "When a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged.") (citations omitted).

## VII.   The Court Had 'Good Cause' to Remove Juror 3

Defendant argues that he should be granted a new trial because the Court erred in dismissing Juror 3 and replacing her with an alternate juror. Defendant's argument fails because there was ample evidence in the record to support the Court's finding that Juror 3 had repeatedly

violated the Court's admonitions, and, therefore the Court had "good cause"[10] to dismiss Juror 3.

Defendant argues that United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987), which states that the Court must deny any government request for dismissal where "the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence," controls in the instant case.  Def. Motion, p. 20. Defendant's reliance on Brown is misplaced, as there was no record evidence in this case as to Juror 3's view of the government's evidence.  See Tr. 6/14/06, a.m., p. 19, 28.  Indeed, this Circuit recently affirmed the dismissal of a deliberating juror after more than one week[11] of deliberations, and where the record evidence included affirmative responses by two jurors to the question, "If [Juror No. 3] were to be excused from further deliberations, do you think that you would be able to progress more rapidly with respect to reaching a verdict?"  United States v. Carson, Westlaw 2034361, C.A.D.C., July 21, 2006, p. 10.  The Carson Court rejected the defense claim that the true reason for the juror's dismissal was the judge's belief that the juror was impeding conviction.  Id. at 13.  While the Carson Court recognized that "'if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence the court must deny the request'", (Id. at 27 - 28, citing United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987)), it found no such pretext:

---

[10]The "good cause" standard comes from Fed. R. Crim. P. 23(b).  The government hereby incorporates by reference its previous discussion regarding Rule 23(b) in general and how courts have interpreted the "good cause" standard  in particular in its Memorandum in Support of its Oral Motion to Dismiss Juror (Docket # 110).  R. 23(b) was amended in 2002 and the standard of "just cause" was replaced with the term "good cause."  See Carson, Id., p. 19, fn. 12.

[11]In this case, the excused juror had been deliberating for approximately two hours when the Court halted any further deliberations.  Tr. 06/14/06, a.m., pp. 20 - 21.

The judge plainly stated his reasons for the dismissal and they had nothing to do with the juror's view of the case.  The judge did not believe Juror No. 3 could 'continue his service as juror' in light of 'his deceptive answers to *voir dire* questions' and the testimony, described above, of Adams and the two jurors who were empaneled with him. [] There is no evidence the judge was motivated by Juror No. 3's 'view of the sufficiency of the government's evidence.' (Citation omitted.)  The judge was scrupulous to counsel Jurors No. 1 and 17 not to reveal 'how [they] may be split any way on the verdict' or anything about [their] deliberations on the merits of the case or who may have voted what way,' [], and they did not.  Nor is there any suggestion in the record that the judge had the least inkling of Juror No. 3's views regarding innocence or guilt.... In <u>Brown</u>, by contrast, we found that the record 'indicate[d] a substantial possibility that [the dismissed juror] requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction," based on his statements that 'his difficulty was with 'the way [the law is] written *and* the way the evidence has been presented'" and that "'[i]f the evidence was presented in a fashion in which the law is written, then, maybe, [he] would be able to discharge [his] duties.'"

<u>Id</u>. at 13, brackets and emphasis in original.

The rationale in <u>Carson</u> applies with equal force in this case.  Here, the Court explicitly stated that it did not believe that the government made the motion to dismiss Juror 3 as a pretext because of concerns of her views on the evidence (Tr. 6/14/06 a.m., p. 19) and went on to find that, even in the event that the government's motion was pretextual, the Court was not basing its decision on that basis.  <u>Id</u>.  Nor was there any way for the Court, or the parties, to glean which way Juror 3 might have been leaning – either for conviction or for acquittal.  Nor did the Court dismiss Juror 3 because she had a difficult personality.  <u>Id</u>. at 20 - 21.

Instead, the Court dismissed Juror 3 because she violated the Court's instructions that the jurors not conduct independent research or investigation on their own or talk about the case with family or anyone not connected with the case.  <u>Id</u>. at 21 - 23.  The Court found that Juror 3 also violated the Court's instructions that she be on time and that she not talk about the case until the

evidence was completed.  Id. at 23.  Juror 3 also failed to follow the preliminary instruction not

to discuss the case with fellow jurors prior to the conclusion of the case.  See Carson, Id. at 11 -

12 (upholding dismissal of juror where "court relied on a combination of factors – including that

Juror No. 3 had lied about his symptoms before visiting the hospital, provided inaccurate voir

dire responses about mental health treatment and was, according to Juror No. 1 and Juror No. 17,

distracted and unfocused (and even threatening) during deliberations.  These findings are amply

supported by the evidence.")

      Additionally, the Court found that Juror 3 was not credible.  Id. at 23 - 27.  This finding

was based both on the Court's assessment of Juror 3's demeanor, as well as the fact that she had

previously denied being late to Court despite the fact that numerous of her fellow jurors reported

otherwise to Court staff.  Id. at 23 - 24.  Id. at 25.  This conclusion was rational and well-

founded.  See Carson, Id., p. 29 ("Here the judge did not rely on [Juror No. 3's] voir dire

misstatements as a basis for dismissal but only to explain, in part, why he did not credit Juror No.

3's assurance that he could continue to deliberate notwithstanding evidence to the contrary.")

      The Court specifically found Jurors 11 and 12's testimony about what Juror 3 said and did

in the jury room credible, and did not believe Juror 3's account of her conversation with her

father.  Id. at 25 - 26.  In sum, the Court had a well-supported basis to conclude that Juror 3

"refused to follow instructions on several occasions, and maybe some we don't know of, that she

has done independent research and investigation, and that she's talked to people she shouldn't

have talked to during the course of the trial."  Id. at 28.  All of these findings were fully justified

and, under the cases cited both herein and previously, clearly constitute "good cause."

## **CONCLUSION**

      For the foregoing reasons, as well as the arguments contained in Dockets 66, 75, 80, 85 and 110, Defendant's Motion for New Trial should be denied.


                                    Respectfully submitted,


   /s/ Nathaniel Edmonds                 /s/ Peter Zeidenberg
NATHANIEL B. EDMONDS          PETER R. ZEIDENBERG
Trial Attorney, Fraud Section         Trial Attorney, Public Integrity Section
Criminal Division                      Criminal Division
United States Department of Justice   United States Department of Justice
Bond Building                       Bond Building
1400 N.Y. Avenue, N.W.          1400 N.Y. Avenue, N.W.
Washington, D.C.  20005         Washington, D.C.  20005
(202)307-0629                      (202)514-2042

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of July, 2006, a copy of the foregoing was served on

the following counsel by electronic service to:

> Barbara Van Gelder, Esq.
> Wiley Rein & Fielding
> 1776 K Street NW
> Washington, DC 20006
> Tel: 202-719-7032
> Facsimile: 202-719-7049

> <u>Nathaniel Edmonds</u>
> NATHANIEL B. EDMONDS
> Trial Attorney
> Fraud Section, Criminal Division
> United States Department of Justice