## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

### DEFENDANT'S REPLY IN SUPPORT OF THE MOTION FOR ACQUITTAL

The government has failed to rebut the contentions that require reversal of the convictions as a matter of law. For the following reasons and those stated in the initial motion, Defendant David Safavian renews his request for judgment of acquittal. Fed. R. Crim. P. 29(c).

I.     **The Failures To Secure Fifth Amendment Due Process Warrant Reversal of All Remaining Counts**

Rather than directly counter the constitutional infirmities raised in the Rule 29 Motion, the government resorts to converting Defendant's due process contentions into an "exculpatory no" defense and knocking it down with an inapposite Supreme Court ruling in Brogan v. United States, 522 U.S. 398 (1998). The government also simply ignores the various citations of warning and notice procedures required by internal executive memoranda and provided by the Senate Committee on Indian Affairs (SCIA) to other witnesses in its investigation of Mr. Abramoff's activities. These due process failures require reversal of all convictions against Mr. Safavian.

The government's reliance on Brogan is based on several false premises. First, the "exculpatory no" argument has never been raised at any point in these proceedings (i.e., the argument that Mr. Safavian's statements amounted to a denial of guilt and that such denials are

exempt from a 18 U.S.C. § 1001 prosecution). Rather, Mr. Safavian has argued that due process in the §§ 1001, 1505 context requires that a person be informed via letter or word of the need to be "truthful and forthcoming"; the "right not to speak"; and of the "implications of making false statements if he did choose to speak" before a conviction can be sustained under either § 1001 or § 1505. United States v. Cisneros, 26 F. Supp. 2d 24, 42-43 (D.D.C. 1998). Where the government does not "sufficiently alert" of the danger that statements may lead to a felony conviction, the verdict must be reversed. See Def. Mot. at 11-12 (quoting United States v. Ehrlichman, 379 F. Supp. 291, 292 (D.D.C. 1974) (reversing § 1001 conviction for FBI interview). At no point did the Brogan majority opinion address, let alone establish "clear precedent" regarding the due process arguments raised in this case, as the government suggests.

The government's other false premise is that in Brogan "federal investigators asked the defendant [questions], and he gave false answers without being given any warning of the potential legal consequences." Gov't Opp. at 3. However, the opinion explicitly noted that Brogan had been: (1) informed by federal agents from the Department of Labor and the Internal Revenue Service of his right to an attorney, including appointed counsel; (2) "asked if he would answer some questions"; (3) told that "*lying to federal agents in the course of an investigation was a crime*"; and (4) afforded an opportunity to "modify his answers" in light of this information. Brogan, 522 U.S. at 400 (emphasis added). These basic misconstructions render Brogan and the government's discussion thereof utterly irrelevant to the issues in this case.

The government also objects, on timeliness grounds, to Defendant's additional discussion of Garrity v. New Jersey, 385 U.S. 493 (1967), and its progeny, for the Fifth Amendment due process infirmities that pervaded the GSA-OIG investigation (Counts One and Three (A)). Gov't Opp. at 3. The government raises this objection at the same time it contends the Court has

previously ruled on these issues.  Id. at 2.  Nevertheless, Defendant has made arguments in its

pre-trial papers with respect to the warnings and notice that must be afforded to defendants "in a

§ 1001 prosecution."  See, e.g., MTD Reply (Doc. 52) at 2-3, 5-7.[1]  As discussed in the Rule

29(a) motion before this Court, Tr. 06.05.06 p.m. at 101-02, the immunity from prosecution

afforded by Garrity and acknowledged amongst the investigatory bodies of the executive branch,

see Def. Mot. at 14-15 & n.5, arises out of the same set of Fifth Amendment due process rights

in these proceedings.[2]  Moreover, as discussed in the Rule 33 motion, it was the government that

objected to "Garrity warnings . . . any type of warnings" about which defense counsel sought to

inquire of Agent Rowe, or of whether he had made any statements that would confer upon Mr.

Safavian the due process rights provided in the § 1001 and § 1505 cases also discussed in these

proceedings, including, inter alia, Cisneros.  See Tr. 06.02.06 p.m. at 29-31.

        Employees need only face the threat of a penalty for Garrity to apply.  See Lefkowitz v.

Cunningham, 431 U.S. 801, 806 (1977) (holding that potential loss of party office violated Fifth

Amendment and noting that "the touchstone of the Fifth Amendment is compulsion, and direct

economic sanctions and imprisonment are not the only penalties capable of forcing the self

incrimination which the Amendment forbids").[3]  Federal employees are generally required to

---

[1]     A pre-trial motion does not have to cite every case it seeks to utilize in support of a broad
Constitutional question, and the government's lone citation to United States v. Mitchell, 951 F.2d 1291,
1296 (D.C. Cir. 1996), is not to the contrary.  The court in Mitchell merely held that a challenge to a
search at trial based only on lack of probable cause did not permit a challenge on appeal based on the
absence of a warrant.  951 F.2d at 1296.

[2]     Even if Defendant had not raised due process contentions at the pre-trial and trial stage, the
government cites no authority for the proposition that Garrity immunity must be raised via a motion to
suppress at the pre-trial stage.  This is particularly true since, as the government itself contends, facts must
be adduced at trial (e.g. warnings and opportunities for voluntary waiver from the agent and subjective
belief in prospects of punishment), to lay the foundation for Garrity immunity.

[3]     There is no question that Mr. Safavian did in fact face the threat of disciplinary action—both for
the allegations levied against him and failure to cooperate with the investigation.  "A violation of the
Standards of Ethical Conduct . . . may lead to disciplinary action against an employee."  See Def. Ex. 148.

cooperate with inspector general investigations.[4]   And even where a federal agency does not explicitly require cooperation, the pressure to cooperate leaves employees with no real choice. "Whenever information or assistance requested . . . is unreasonably refused or not provided, the Inspector General shall report the circumstances to the head of establishment without delay." 5 U.S.C. § 6(b)(2).  The failure to comply with the dictates of <u>Garrity</u> and its progeny requires the dismissal of Count One and Three as a matter of law.

## II.    The 18 U.S.C. § 1001 Concealment Convictions for Counts Two (A) and Three (A) Must Be Reversed As a Matter of Law

In response to a vast array of case law holding that a specific and unambiguous legal duty to disclose must be found *as a matter of law*, and that no such duty was noticed here, the government resorts to mischaracterizing the relevant case law, this Court's previous rulings, and the consistent position taken by Mr. Safavian throughout this case.

### A.    Whether a Duty Exists is a Matter for The Court To Decide

Entrenching a pattern of procedural gamesmanship throughout its brief, the government's primary argument is that Mr. Safavian has reversed his position from the one taken at trial because he "requested that the 'duty to disclose' be considered an element for the jury to

---

Mr. Safavian clearly believed he was compelled to speak to the OIG, as demonstrated by the fact that he met with Agent Rowe the next day after the hotline complaint was received. Tr. 05.31.06 p.m. at 45. Inspector Rowe requested his cooperation in an investigation, and the OIG has "statutory law enforcement authority," including the ability to make arrests, execute searches, and serve subpoenas.  Tr. 5.31.06 p.m. at 44:18-24.

[4]    <u>See</u>, <u>e.g.</u>, <u>AFL-CIO v. Dep't of Army</u>, 441 F. Supp. 1308, 1314 n.21 (D.D.C. 1977) (Department of Defense employees required to cooperate with IG investigation); 39 C.F.R. § 230.3 (Postal Service employees shall cooperate with IG investigations); 18 C.F.R. § 3c.3(c) (FERC employees shall cooperate with IG investigations); 29 C.F.R. § 100.201 (NLRB employees shall cooperate with IG investigations or face disciplinary action); Dep't of Commerce Directive No. DAO 213-2 at 5.04 (Commerce employees must cooperate fully with IG investigations); Dep't of Justice Inspector General Manual, III-226.8(I) (refusal to cooperate with IG investigation may result in disciplinary action), http://cryptome.sabotage.org/doj-igm-226.htm#226.8.

determine." Gov't Opp. at 6. The record speaks for itself and demonstrates that the defense has consistently maintained that whether a duty to disclose exists, a question of due process in concealment cases, is for this Court to decide as a matter of law. See MTD (Doc. 32) at 33; Tr. 06.01.06 p.m. at 9; Def. Mot. at 18.[5] Likewise, the government's assertion that this Court had issued a "previous decision that it was for the jury to determine if [Mr. Safavian] had a duty to disclose" is also erroneous – indeed the issue has been continuously raised in the Rule 29 context, and understandably the government provides no reference point. Gov't Opp. at 5.

As the court stated in Crop Growers, relying on a sampling of authority from multiple circuits, the legal duty to disclose requirement is a matter of due process, and thereby must be decided by a Court. See Def. Mot. at 19 (citing, *inter alia*, Crop Growers, 954 F. Supp. at 345-46 ("[W]hether Defendants herein had a duty to disclose the five pieces of information that the [Independent Counsel] alleges as the basis for liability, *the Court must first decide as a matter of law, whether such duty existed*") (emphasis added); see also United States v. Murphy, 809 F.2d 1427, 1431 (9th Cir. 1987) (finding that the relevant regulations created an ambiguity such that due process precluded the imposition of criminal sanctions for concealment under § 1001).[6]

_____

[5] The government's argument also appears to rely on a faulty recollection of the discussions, some of which occurred in chambers, concerning jury instructions. Defense counsel, relying on United States v. Crop Growers Corp., 954 F. Supp. 335 (D.D.C. 1997), consistently maintained that the duty to disclose was an issue of law for the Court to decide, and noted that United States v. Blackley, 167 F.3d 543 (D.C. Cir. 1999), had recognized that most courts had acknowledged the same. In any event, the "jury instruction" the government speaks of simply mentions the duty to disclose as an element of a concealment action. The element was included because it is an essential element of the crime (as is "jurisdiction," also a matter of law), and the Court deferred this Rule 29 question until after trial.

[6] The government's contention that the "recent" decision of United States v. Gaudin, 515 U.S. 506 (1995) (holding that a defendant *has the right* to have the issue of *materiality* decided by the jury under § 1001), compels the legal duty to disclose question to be decided by the jury, is without merit. Subsequent cases have not even held that the issue of materiality in related criminal cases needs to be decided by the jury, see United States v. Barrett, 111 F.3d 947, 953 (D.C. Cir. 1997) (holding that defendant's perjury was not a material false statement), let alone the issue here of due process. See United States v. Gibson, 409 F.3d 325, 332 (6th Cir. 2005) (holding that the duty to disclose issue is a matter of law for the Court to decide and granting defendant's motion for acquittal on § 1001 concealment charge).

- 5 -

**B.      Neither The Principles of Ethical Conduct Nor <u>Cisneros</u> Can Serve as the Basis for the Duty to Disclose As a Matter of Law**

The Rule 29 motion extensively outlines a number of cases in which courts have expressly rejected, as a matter of law, generic, non-specific disclosure requirements, rules or regulations as the bases for criminal liability for concealment under § 1001 – many of which are similar to the ethical principles relied on by the government here.  <u>See</u> Def. Mot. at 21-25 & n.8. Rather than respond directly, the government simply reiterates its position, ignoring the breadth of authorities concluding otherwise.

The ethical principles cited by the government have nothing to do with the manner of seeking advice to determine whether a person can accept a trip from a friend, nor do they "unambiguously" inform a person as to what substantive information must be revealed as matter of law in this (Counts Two and Three (A)), or any other context.  Def. Mot. at 23-24.  Thus, even taking into account the government's strained and misguided effort to narrow the breadth and extensive analyses in those cases, <u>see</u> Gov't Opp. at 10, the principles do not constitute "specific statutes and regulations governing each filing [that] unambiguously required disclosure" of the conduct that the jury found to be concealed, namely "assistance to Abramoff in GSA related activities."[7]

Even if the principles had clearly and unambiguously outlined the conduct alleged to have been concealed, they do not set forth unlawful conduct in and of themselves, and were certainly not provided to Defendant at the time his statements were made, either in specific written form or through oral representation.  <u>See</u> Def. Mot. at 18-23 & nn.8-10; Tr. 06.05.06 p.m.

---

[7]      See <u>Crop Growers</u>, 954 F. Supp. at 345; <u>United States v. Dale</u>, 140 F.3d 1054, 1056 (D.C. Cir. 1998) (noting that "[i]n each case the filed form specifically requested the information withheld"); <u>see also</u> <u>United States v. Anzalone</u>, 766 F.2d 676, 682 (1st Cir. 1985) ("If the government wishes to impose a duty . . . let it require so in plain language. It should not attempt to impose such a duty by implication.").

at 99-102 (framing the duty to disclose as arising out of written forms or oral inquiries about such forms as in <u>Cisneros</u>). Thus, as this Court has already observed, the government's reliance on <u>Cisneros</u> in the concealment context is misplaced, Gov't Opp. at n.7; <u>see</u> Def. Mot. at nn.9-10 (citing Tr. 06.12.06 p.m. at 16:18-25),[8] as is the reference to <u>United States v. Moore</u>, 446 F.3d 671, 679 (7th Cir. 2006) ("[T]he underlying duty to avoid conflicts of interest comes directly from regulations duly promulgated and codified in the Code of Federal Regulations . . . replicated in the [government] *form contract* that the City used [and Moore signed], and the contract *spelled out the duty to disclose*.") (emphasis added).[9]

In addition, contrary to the government's representation, fundamentally ambiguous contexts cannot form the basis of a false statement or concealment prosecution under § 1001. <u>See</u> <u>e.g.</u>, <u>Murphy</u>, 809 F.2d at 1431 (reversing § 1001 concealment conviction); <u>United States v. Manapat,</u> 928 F.2d 1097, 1099-1102 (11th Cir. 1991) (same). Because the government has not

---

[8]    The government cites no proposition to support its remarkable contention that the due process requirement underlying a duty to disclose does not apply equally to a person working for the government. Due process protections apply equally to private and public persons alike. U.S. Const. amend. V ("No *person* shall be  . . . deprived of life, liberty, or property, without due process of law.") (emphasis added); <u>see</u> <u>also</u> <u>Garrity</u>, 385 U.S. at 500 ("[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.").

[9]    Noting that the court in <u>United States v. Gimbel</u>, 830 F.2d 621, 624 n.2 (7th Cir. 1987) (reversing concealment conviction), had limited a finding of a legal duty to disclose not only to government forms, but forms which complied with the APA, 5 U.S.C. § 552 *et seq.*, the court in <u>Moore</u> took pains to make clear that the HUD contracts were "the functional equivalent of any other government form" and that Moore's contract extensively cited and quoted the pertinent federal regulations defining prohibited conflict of interests. <u>Moore</u>, 446 F.3d at 678 (highlighting contractual provision which stated "[a]*n interest on the part of the CONTRACTOR or his/her employees must be disclosed to the CITY*").

Furthermore, the government's request that the Court overlook the number of § 1001 reversals on legal grounds in favor of <u>United States v. Stephenson</u>, 895 F.2d 867, 873-74 (2d Cir. 1990), is misplaced. The case, while apparently not involving a specific form or filing, involved the rather unique fact scenario of a Commerce Department official who told the FBI that a Chinese corporate official asked him for a bribe when it was Stephenson that had actually demanded the bribe while processing a license. The Court did not engage, however, in the legal duty to disclose analysis because Stephenson had *lied* about the true initiator of the bribe. <u>Id.</u> at 874. In any event, as evidenced by the fact that he "reported" it, the need to properly disclose the crime of bribery and not pin it on the person you are trying to bribe is not in dispute, and is quite a different matter than the important, but nonetheless amorphous, ethical obligations the government relies on in this case.

satisfied the demands of due process in identifying a specific legal duty to disclose the alleged "assistance" of Mr. Safavian in the context of Counts Two (A) and Three (A), this Court should reverse those convictions as a matter of law.

**III.    The Section 1001 Convictions Cannot Stand as a Matter of Law Because They Arise Out of Fundamentally Ambiguous Contexts and Because Mr. Safavian's Statements Are Supported as Reasonable Constructions of the Questions Presented**

The government does not directly challenge the principle that a § 1001 conviction cannot be sustained "as a matter of law" where the statement is supported as a "reasonable interpretation" of the question posed.  Def. Mot. at 25-26 (citing United States v. Dale, 782 F. Supp. 615, 627 (D.D.C. 1991) and, inter alia, United States v. Race, 632 F.2d 1114, 1120 (4th Cir. 1980).  The "ambiguous" nature of the contexts of the remaining false statement convictions themselves inherently warrant reversal of the § 1001 charges.  Dale, 782 F. Supp. at 627; Manapat, 928 F.2d 1099-1102; see also United States v. Culliton, 328 F.3d 1074, 1078 (9th Cir. 2003) (acknowledging that excessive vagueness or ambiguity in questions may not form the basis for a perjury or false statement prosecution).  But even if ambiguous questions susceptible of multiple reasonable constructions could serve as a basis for these charges, the convictions cannot stand because the government has not even attempted to meet its burden of negating as "unreasonable" the statements in response to these contexts.  Dale, 782 F. Supp. at 627 (citing Race, 632 F.2d at 1119-20) (holding that § 1001 convictions must be reversed as a matter of law regardless of fact sensitive issues such as "good faith" whenever defendant's statement accords with a reasonable construction of the question presented).

The Eleventh Circuit recently affirmed the same principles in reversing § 1001 convictions in United States v. Whiteside, 285 F.3d 1345 (11th Cir. 2002).  Again, in the context of statements made on a government form that contained requisite certifications and a signed

acknowledgement that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law," the court found that "no Medicare, regulation, administrative ruling, or judicial decision exists that clearly require[d] [disclosure of] interest expense to be reported in accordance with the original use of the loan." Id. at 1351-52.  Thus, the court reversed the § 1001 convictions and sentences as a matter of law because the government did not demonstrate that the defendant's interpretation of the requirements or questions at issue (i.e., Medicare forms) was "not unreasonable." Id. at 1353.  In doing so, the court acknowledged the "administrative authority" that lent support to the defendant's construction and explained that mere "contradictory evidence" as to the proper interpretation of the requirements offered by the government simply confirmed the notion that the defendant's statements were "not unreasonable" and hence was insufficient to sustain a § 1001 conviction.  Id. at 1352-53; see also Dale, 782 F. Supp. at 627 (acknowledging that where questions and statements are capable of "at least two reasonable constructions" defendants cannot be guilty as a matter of law) (quoting Race, 632 F.2d at 1120)).

The government *does not even attempt* to meet its burden of negating the reasonable construction of the questions at issue as supported by testimony from the pertinent GSA ethics officials and administrative authorities.  See Def. Mot. at 25-29.  Instead, ignoring the text of its own Indictment and proposed Verdict Form, as well as the plain meaning of the terms of the statute, the government concocts a chimerical distinction regarding "false" statement convictions under § 1001.   The government actually claims that the convictions for Count Two (C) (defendant "*falsely stated* to the GSA ethics officer that Mr. Abramoff did all his work on Capitol Hill, *when in truth* and in fact . . . ."), Verdict Form at 2 (emphasis added), and the lone finding in Count Five (that defendant "*falsely stated* in a letter to the Committee that Mr.

- 9 -

Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland, *when in truth* and in fact, Mr. Safavian well knew . . . ."), id. at 4, were somehow not convictions of "falsity" but rather "concealment."  Gov't Opp. at 12-13.

As the government is surely aware, because it presumably crafted its own Indictment and certainly drafted the Verdict Form, a person can be charged with making *false* statements in several different ways under § 1001.  In relevant part, § 1001(a)(1) punishes anyone who knowingly and willfully "*falsifies*, conceals, or covers up by any trick, scheme, or device a material fact."  18 U.S.C. § 1001(a)(1) (emphasis added).  Section 1001(a)(2) criminalizes the making of "any materially *false*, fictitious, or fraudulent statement or representation."  Id. § 1001(a)(2).  To "falsify" under § 1001(a)(1) means "to make an untrue statement which is untrue at the time made and is known to be untrue at the time made." 2-36 Modern Federal Jury Instructions-Criminal 36.01.  A statement or representation is "'false" under § 1001(a)(2) "if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made."  Id.  Hence, as one might expect, there is no difference in the definition of "false" in the two provisions, and the government's non-sequitur that a legal defense against "false statements" does not apply to a conviction for "falsely stating" facts should be rejected.[10]

Indeed, the only apparent reason for a choice between the two provisions is whether the government wants to make the argument that the person *also* concealed or covered up pre-existing facts under § 1001(a)(1), or that the person made "fictitious" representations about facts

---

[10]     The government fails to inform this Court that the statute was not even separated into numerically distinct provisions until the False Statements Accountability Act of 1996, Pub.L. No. 104-292, § 2, 110 Stat. 3459.  The Rule 29 motions filed by both parties have relied on cases decided both before and after this largely cosmetic alteration.  The only substantive changes to the statute in 1996 were to clarify that the entirety of § 1001 applies to representations made to any of the three branches of government, in response to the Court's decision in United States v. Hubbard, 514 U.S. 695 (1995), and to make explicit that materiality is a requisite element for all § 1001 cases.  See United States v. Zalman, 870 F.2d 1047, 1056 n.10 (6th Cir. 1989).  See 2-36 Modern Federal Jury Instructions § 36.01.

which do not exist under § 1001(a)(2).  See id. § 40.03 notes (suggesting that the only difference between "falsifying a fact" and "making a false statement" is that the latter involves creating a falsity and the former involves falsifying a fact which already exists).  The government in this instance chose the former and accordingly fought for the opportunity to provide the jury with the option of finding that Mr. Safavian *either* falsified *or* concealed material facts in his statements under § 1001(a)(1).[11]

In Count Five, the jury found that Mr. Safavian *did not conceal* any facts to the SCIA in Count Five, but that he did "*falsely state*[] in a letter . . . that Mr. Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip" in June 2002.  Verdict Form at 4 (emphasis added). The government does not even challenge the reasonable construction of Mr. Safavian's statements with respect to Count Five (C).  See Def. Mot. at 28-29 & n.11.  For this reason alone, as a matter of law, Count Five must be dismissed.  Dale, 782 F. Supp. at 627.

In Count Two, the jury found that Mr. Safavian did not "*conceal*[] Mr. Abramoff's business relationships," but concluded that he did "*falsely state*[] to the GSA ethics officer that Mr. Abramoff did all his work on Capitol Hill."  Verdict Form at 2 (emphasis added).  The government's only remark is the curious misrepresentation in a footnote that Defendant "never addresses the issue of [Mr. Safavian's] use of 'work.'"  Gov't Opp. n.9.  However, as the motion detailed in straightforward fashion at multiple junctures, the testimony of GSA ethics official Eugenia Ellison established that Mr. Safavian's representation was not unreasonable.  Ellison

---

[11]    The disingenuous nature of the government's tenuous distinction manifests itself on many fronts.  First, the government argues elsewhere in its brief, citing to the Second Circuit, that a court does not commit plain error for "failing to instruct the jurors that they must agree unanimously as to which theory of the offense-*false statement or concealment*-supported the verdict."  United States v. Stewart, 433 F.3d 273, 319 (2d Cir. 2006) (emphasis added).  Second, to take the government at its word that it was only alleging concealment, the remaining "options" Counts Two (C) and Five (C) should be dismissed summarily.  Further, if the government was "really only alleging concealment" for Counts Two, Three, and Five then the lack of a specific, legal duty to disclose would require dismissal of Counts Two and Five (C) as well.

testified that she equated the phrase "all work on Capitol Hill" with the representation that the host "ha[d] no business before GSA." Def. Mot. at 27 (quoting Tr. 05.31.06 a.m. at 33:5-7). In doing so, Ms. Ellison rendered the GSA and Office of Government Ethics definitions of "business" under 5 C.F.R. § 2635.203(d)(2) (i.e., "GSA contractor" or having "existing arrangements" with the agency, respectively), decisive for Count Two (C) as well, as there was absolutely no evidence that Abramoff had any such arrangements. See Def. Mot. at 27-28; see also Whiteside, 285 F.3d at 1352 (reversing § 1001 convictions where the definitions provided by "[a]dministrative authorit[ies]," such as the Health Care Financing Administration, rendered the defendant's form representations "not unreasonable" even if not entirely accurate).

Notably, the government does not put forth any counter definitions. Nevertheless, even if the terms "business" or "work" "can be interpreted different ways," the existence of "contradictory evidence lends credence to defendants' argument that their interpretation was not unreasonable." Whiteside, 285 F.3d at 1352-53 (holding that where there are competing interpretations, the government fails to meet its burden of demonstrating "actual falsity as a matter of law") (citation omitted); accord Dale, 782 F. Supp. at 627.[12]

The government mischaracterizes Dale when it suggests that the court there did not apply the reasonable construction analysis to concealment counts. Compare Gov't Opp. at 14 with United States v. Dale, 991 F.2d 819, 832-33 (D.C. Cir. 1993) (applying the reasonable construction analysis to "counts 6, 8, and 10, charging her with concealing facts from and making false statements to the federal government"). The government's failure to negate

---

[12]    See Letter to a Federal Employee from Marilyn L. Glynn, Acting Director, Office of Government Ethics (Jan. 7, 2004) (stating that a "competing contractor is a prohibited source because it seeks to do business with the agency [and] [e]ven a contractor that is not presently competing for new business with the agency is a prohibited source if it is actually doing business with the agency pursuant to existing arrangements") (Def. Mot. to Dismiss, Ex. 15).

Defendant's reasonable interpretation also warrants the reversal of the conviction as to the finding of concealment "of assistance to Mr. Abramoff in GSA-related activities" in Counts Two (A) and Three (A). Whiteside, 285 F.3d at 1352-53 (determining that reasonable interpretation of Medicare forms required reversal of § 1001 conviction for failing to disclose interest expenses in accordance with the original use of the loan); United States v. Rowe, 144 F.3d 15, 21-22 (4th Cir. 1998) (reversing false statement conviction for defendant's failure to list payments made by affiliated entity in bankruptcy filing to hide his relationship with the entity because the representation was supported by an objectively reasonable interpretation of the Schedule J form); United States v. Gahagan, 881 F.2d 1380, 1382-83 (6th Cir. 1989) (holding that defendant's reasonable representations meant he "could not be guilty of either concealing his ownership rights in the Jaguar or falsely reporting that his assets did not include the automobile").

The government relies heavily on United States v. Stephenson, 895 F.2d 867 (2d Cir. 1990), in support of its contention that the reasonable construction analysis does not apply to concealment allegations. However, by the government's own admission, the court in that factually inapposite case considered only whether the jury had properly determined that the statement was not "literally true" in the unambiguous context of the defendant's knowledge that he, not the corporate official, had initiated bribery. Id. at 873. The court did not consider whether the government had met its burden of negating as a matter of law any and all reasonable interpretations on a question or regulation subject to multiple interpretations. Whiteside, 285 F.3d at 1352-53; Dale, 782 F. Supp. at 627; Race, 632 F.2d at 1119-20; Rowe, 144 F.3d at 21-22; see also United States v. Johnson, 937 F.2d 392, 398-99 (8th Cir. 1991) (holding that in ambiguous contexts, the government will typically not be able to negate a defendant's reasonable interpretation as a matter of law). As recognized in Dale, the government's attempt to reduce the

reasonable construction analysis to a "factual defense to the charge which must be decided by the jury," "misconstrues" the argument. 782 F. Supp. at 627.

In sum, the government's inability to negate the reasonable construction of Mr. Safavian's statements warrants reversal of Counts Two, Three, and Five as a matter of law.

## IV.    Multiplicity of Counts Two and Three

Counts Two and Three should also be dismissed because they require the "same factual proof" of the same alleged falsehood and are therefore multiplicitous as a matter of law. United States v. Graham, 60 F.3d 463, 467 (8th Cir. 1995). The government asks this Court to ignore the standard articulated in Graham, in which the court found the counts multiplicitous inasmuch as they were "practically identical" statements made to "three different individuals." See Gov't Opp. at 16 & n.11 (citing United States v. Salas-Camacho, 859 F.2d 788, 791 (9th Cir. 1988)).

The court in Graham expressly cast its decision as a "merger of standards from multiple circuits, including the "rationale of Trent, Olsowy and Salas-Camacho in creating a unitary harm rule whereby repetition of a false statement which does not 'constitute an additional impairment of . . . governmental functions,' should not be charged separately in an indictment." Graham, 60 F.3d at 467 (quoting Salas-Camacho, 859 F.2d at 791). Contrary to the government's representation, the multiplicitous basis for the charges in Graham were not "exactly" identical but, as here, "practically" identical. Notably, the government does not argue the statements at issue in Counts Two and Three, as articulated in the Verdict Form, were not *practically* identical.

Moreover, the statements in Graham were made to different individuals—the United States Trustee and two attorneys representing creditors—each with the same short-term objective with respect to the defendant's statements: "to ascertain all assets that should have been included in the bankruptcy estate," but each serving different *ultimate* agents (one on behalf of the

government and the others on behalf of the creditors). 60 F.3d at 467. Here, both GSA General Counsel McKenna and Inspector General Rowe served the same ultimate agents. Furthermore, as the "practically identical" language in the Verdict Form for Counts Two and Three illustrates, each was attempting to determine whether Abramoff had business with the GSA prior to the Scotland trip.

Accordingly, the statements at issue in Counts Two and Three are impermissibly multiplicitous because they "*require different factual proof of their falsehood*, notwithstanding their relationship to a common nexus of fact." Graham, 60 F.3d at 467.

**V.    Counts Two, Three, and Five Should Also Be Dismissed On Grounds of Insufficient Evidence of the Requisite Elements**

**A.    Count Two**

With regard to Defendant's contention that there was insufficient evidence of specific intent under the standards of Rule 29, the government again simply relies on contortions of its own Verdict Form and Indictment, as well as its contrived distinction without a difference between the definition of "false" in §§ 1001(a)(1) and (a)(2).[13] See Gov't Opp. at 18; supra at 14-15 (citing definitions in Modern and Federal Criminal Jury Instruction Treatises). While the government quibbles with the legal dictionary definition of "false," it again fails to discuss the actual merits of Defendant's contentions regarding the alleged "false statement" in the July 25, 2002 ethics request. See Def. Mot. at 32. The government says nothing about the significance of Ms. Ellison's testimony that she interpreted the language used in the e-mail through the lens

---

[13]    Notably, unlike the matters of law that require dismissal of Counts Two, Three, and Five at issue in Sections I-IV, the standard of review for analyzing arguments based on insufficiency of the evidence, apart from the legal question of jurisdiction, is whether a reasonable juror could have found the elements of the offense beyond a reasonable doubt. United States v. Ehrlichman, 379 F. Supp. 291, 292 (D.D.C. 1974) (reversing § 1001 conviction on motion for Rule 29 acquittal); United States v. Clifford, 426 F. Supp. 696, 702-03 (E.D.N.Y. 1976) (granting Rule 29 motion and setting aside § 1001 conviction where "there was no basis, other than pure speculation upon which a reasonable juror could determine what question was asked and what response was given").

of the *only relevant* regulation and provision, the prohibited source definition in 5 C.F.R. § 2635.202 *et seq.*  It is uncontested that there is no evidence that Mr. Abramoff has ever been a "GSA contractor" or held "existing arrangements" with the agency, and certainly not prior to the Scotland trip.  Hence, Mr. Safavian cannot reasonably be said to have had the requisite willfulness of making a "false" statement to the GSA general counsel in Count Two (C).

With regard to Count Two (A), the government fails to address the definition of "willfulness" utilized in the cases cited by Defendant.  See Gov't Opp. at 18; see also Def. Mot. at 32 (citing United States v. Irwin, 654 F.2d 671, 679 & n.9 (10th Cir. 1981); United States v. Cochran, 109 F.3d 660, 665-66 (10th Cir. 1997) (reversing concealment convictions)).  A person cannot "willfully," or "deliberately, voluntarily and intentionally" conceal material information under § 1001(a)(1) unless the concealment constitutes a "specific intent to fail to do something which the law requires to be done."  Irwin, 654 F.2d at 679 & n.9.  Consequently, while the absence of a specific and unambiguous duty to disclose "assistance" as alleged in Count Two (A) requires the dismissal of the conviction as a matter of law, see supra Section II, this Count must also be dismissed because there is insufficient evidence of specific intent to conceal.[14]

Finally, regarding the element of materiality, the government also fails to provide any authority for the notion that providing informal ethics advice constitutes "official action" of the

---

[14]    The government drops a footnote to attempt to provide some support for the notion that the alleged concealment of "assistance" is detailed somewhere as unlawful.  Gov't Opp. at n.13.  The referenced Principles of Ethical Conduct (e.g. "financial transactions using nonpublic Government information or allow[ing] the improper use of such information to further any private interest") say nothing of the sort and are hardly "specific" as to its ethical pronouncements, let alone any prohibitions of law.  In any event, as Mr. Safavian testified to at trial, "provid[ing] information [to] and work[ing] with the private sector" is a routine function of the GSA.  Tr. 06.02.06 a.m. at 101:3-6; see also Tr. 06.05.06 a.m. at 13:20-22 ("I had an open door policy with respect to my office, and I had a lot of meetings with a lot of different people, not just with Mr. Abramoff.").  Furthermore, it is uncontested that these principles were not contemporaneously noticed to Mr. Safavian in any form or conversation with GSA ethics officials at the time during which he was seeking the ethics opinion – an absolute necessity in establishing the heightened requirement of specific intent.  See supra Section II.

agency, particularly when the ethics advice was not even utilized in the subsequent internal agency inquiry (GSA-OIG investigation) into the underlying activity. Gov't Opp. at 19; Def. Mot. at 33. The government also incorrectly states that Defendant "ignores" the facts set forth by Ms. Ellison in determining whether an employee could accept a gift from a friend, *even if* they are a prohibited source. See Def. Mot. at 33-34 (citing to testimony discussing the relevant factors including "the history of the relationship and whether the friend personally pays for the gift"). Rather, it is the government that does not respond to Defendant's contention that there is no evidence in the record that Mr. Safavian had any knowledge of the source of Mr. Abramoff's funds for the trip at any relevant time. Hence, assuming *arguendo* that Mr. Abramoff had been a "prohibited source" under the relevant regulations and that any portion of Mr. Safavian's attendance on the Scotland trip constituted a "gift" under the same, he still would have been able to accept the trip under the friends and family exception.

**B.    Count Three**

The government does not contest the fact that the only question ever asked of Mr. Safavian about Mr. Abramoff's relationship to the GSA at any point relevant to the Indictment, including Count Three, was: "did Jack Abramoff have any business with GSA?" Tr. 05.31.06 p.m. at 46:23-25. The government also does not challenge the ample evidence of Mr. Rowe's trial confirmation of Mr. Safavian's full cooperation with all questions and offers to contact Abramoff about any additional issues. The government's sole response is that the jury "could have relied upon the e-mails between [Mr. Safavian] and Abramoff to evaluate *Defendant's choice* of the word 'business' in speaking with Agent Rowe." Gov't Opp. at 20-21 (emphasis added). Thus, the government's response is predicated on the patently false premise that it was Mr. Safavian who set the parameters of the inquiry. However, the evidence adduced at trial

revealed that Agent Rowe chose the terminology when he asked the initial question of whether Mr. Abramoff had any "business" with the agency.  Tr. 05.31.06 p.m. at 46:23-25.   In the absence of further questions broadening the scope of the inquiry beyond "business,"[15] Mr. Safavian's conviction for "willfully" concealing his "assistance to Mr. Abramoff in GSA-related activities" simply cannot stand.  See supra Section III & n.12.

### C.      Count Five

Under controlling law interpreting § 1001(a)(2), the alleged false *statement* at issue must be within the jurisdiction of the legislative branch at the time the statement was made.  United States v. Pickett, 353 F.3d 62, 69 (D.C. Cir. 2004); see also United States v. Rodgers, 466 U.S. 475, 479 (1984) (defining the term "jurisdiction" to mean "the power to exercise authority in a particular situation" so that a "matter within the jurisdiction of a department or agency" must concern an "authorized function of an agency or department [rather than] matters peripheral to the business of that body").

The only charge remaining at issue is the allegation in Count Five that Mr. Safavian "falsely stated in a letter to the Committee that Mr. Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland, when in truth and in fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property."  Verdict Form at 4.  The government presents a selective rendering of issues SCIA investigator Bryan Parker claimed the Committee wanted to examine and was examining *before* he arrived at his position in January 2005 and *before* Mr. Safavian responded to the document request with his letter in March 2005.  Tellingly, however,

---

[15]      Agent Rowe demonstrated his ability to thoroughly conduct an investigation as evidenced by his independent inquiry into the Hatch Act allegation—an issue which he returned to in a subsequent interview and a significant factor the government ignores.

the government presents no such discussion of what the SCIA was looking into *at the time* of Mr.

Safavian's response or thereafter. Gov't Opp. at 22-23. More importantly, the government cites

*no authority* in support of the notion that the SCIA *had jurisdiction* over matters relevant to Mr.

Safavian's "statement" at the time it was made. Id.

Beyond this infirmity, and those discussed in Sections I & III, the Count Five charge

should follow the path of the § 1505 obstruction charge of Count Four because, as the

government implicitly acknowledges, the statement "ha[d] no impact" on the investigation, Tr.

06.01.06 a.m. at 34:20-21, and therefore did not have the capacity to influence the SCIA inquiry

at the time the statement was made. Def. Mot. at 39 (arguing that the record unequivocally states

that the SCIA was not investigating influence peddling at the time the letter was received); Gov't

Opp. at 24 (noting that the SCIA was investigating money flow and influence peddling "at the

time of the *request* to the defendant"); United States v. Barrett, 111 F.3d 947, 953 (D.C. Cir.

1997) (material fact must be capable of influencing official action); United States v. Gaudin, 515

U.S. 506, 509 (1995); United States v. Sarihifard, 155 F.3d 301, 307 (4th Cir. 1998)

(acknowledging that a false statement's materiality, i.e. capacity to influence, "must be measured

at the point in time that the statement was uttered") (citation omitted).[16]

## VI. Count One Cannot Be Sustained As a Matter of Law

### A. Section 1505 Is Unconstitutionally Vague As Applied

Apart from the due process failures discussed in Section I, the government also fails to

demonstrate that Congress has remedied the unconstitutional ambiguity of 18 U.S.C. § 1505 as

---

[16] It is assumed that when the government says that "nothing in the SCIA report undermines the factual and legal basis for the materiality of Defendant's statement" it is only because there is nothing left factually to undermine whether this "statement" could have had any influence on the SCIA investigation given Senate counsel Parker's unequivocal testimony that "ha[d] no impact." Tr. 06.01.06 a.m. at 34:20-21. Mr. Safavian's statement was not only true but utterly incapable of influencing the Committee investigation in the conclusions it was trying to reach. Barrett, 111 F.3d at 953; Gaudin, 515 U.S. at 509.

applied to "false and misleading statements." United States v. Poindexter, 951 F.2d 369, 386 (D.C. Cir. 1991).

The government argues that § 1505 is not unconstitutionally vague because the defense is only offering "hypertechnical theories as to what the statute covers." Gov't Opp. at 26 (citing Hill v. Colorado, 530 U.S. 703, 732-33 (2000)). However, Hill involved clear, *objective* criteria for when the statute was violated—approaching within eight feet—and the "hypertechnical" theory that petitioners put forward as evidence of the statute's vagueness was whether an outstretched arm penetrating the eight foot radius would be considered "approaching." Id. at 732. In contrast, the statute in this case involves purely *subjective* criteria—whether a statement was true but misleading. See Tucson Woman's Clinic v. Eden, 379 F.3d 531, 555 (9th Cir. 2004) (finding statute unconstitutionally vague because it imposed criminal penalties based on subjective criteria);[17] Free Speech Coalition v. Reno, 198 F.3d 1083, 1095 (9th Cir. 1999) (same);[18] Def. Mot. at 44-45; Tr. 05.31.06 p.m. at 46:23-47:4 (describing the variances in Agent

---

[17]     The government argues that the cases cited in Defendant's Rule 29 motion involved heightened review. Gov't Opp. at 28 n.22. Indeed, the court in Eden did apply heightened scrutiny to the statute in that case because "[i]f a statute subjects transgressors to criminal penalties, as this one does, vagueness review is even more exacting." Eden, 379 F.3d at 554. Hence, heightened scrutiny also applies to § 1505.

[18]     The government argues that this case is distinguishable from Free Speech Coalition and other cases cited in our motion because there is no infringement of First Amendment freedoms. Gov't Opp. at 28 n.22. To the contrary, § 1505, as defined by § 1515(b), imposes criminal penalties for "false or misleading" statements; therefore, it is a content-based regulation of speech. See New York Times Co. v. Sullivan, 376 U.S. 254 (1964). The Supreme Court has carved out certain exceptions for false statements from First Amendment protection under specific circumstances. See, e.g., id. at 279-80 (finding false statements of and concerning government official not protected by First Amendment when made with actual malice). The only context in which the Supreme Court has ever upheld government regulation of "misleading" speech is in the context of commercial speech. See, e.g., Peel v. Attorney Registration & Disciplinary Comm'n, 496 U.S. 91, 100 (1990). However, it has been long recognized that commercial speech does not enjoy the full protection of the First Amendment that is given to non-commercial speech. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759 n.5 (1985). Moreover, to the extent that § 1505 restricts protected speech, it is also unconstitutionally overbroad. City of Houston v. Hill, 482 U.S. 451, 458-59 (1987).

Rowe's account of Mr. Safavian's representations concerning trip details based on the nature of the question asked).

Notably, the government acknowledges that there is no established legal definition of the term "misleading," Gov't Opp. at 27, but it contends that the existence of a scienter requirement nevertheless saves the statute from arbitrary enforcement. The government is correct that in certain situations, the presence of a scienter requirement in a statute can mitigate an otherwise vague statute. See, e.g., Hill, 530 U.S. at 732-33. However, a scienter requirement does not cure *all* defects for *all* purposes and would not do so here where a finding of even a "corrupt" intent to be "misleading" does not cure the inherent ambiguity of the latter term. See, e.g., United States v. Loy, 237 F.3d 251, 265-66 (3d Cir. 2001) (finding condition of supervised release prohibiting parolee from possessing "all forms of pornography, including legal adult pornography" was unconstitutionally vague even if scienter requirement were read into the condition).[19] As the Third Circuit noted in Loy, "a contrary rule would rob the vagueness doctrine of all of its meaning, for legislatures would simply repair otherwise vague statutes by inserting the word 'knowingly.'" Id. at 265; see also United States v. L. Cohen Grocery Co., 255 U.S. 81, 89 (1921) (striking down statute despite scienter requirement and absence of First Amendment element because it did not specifically identify requisite steps to comply).

Far from solving the problem, the 1996 amendments to § 1515(b) actually *perpetuated* the ambiguity. Section 1505, as defined by Poindexter, did not criminalize "false or misleading" statements made to government officials because of the transitive/intransitive distinction. 951

---

[19]    See Cramp v. Bd. of Pub. Instruction, 368 U.S. 278, 286 (1961) (invalidating a loyalty oath as unconstitutionally vague, notwithstanding the fact that the oath-taker was required only to affirm that he or she had never "knowingly" counseled or supported Communists); Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 138 (3d Cir. 2000) (holding that a scienter requirement cannot save a statute criminalizing an inherently vague definition of a medical procedure); Planned Parenthood Fed'n of Am., Inc., 435 F.3d 1163, 1181-85 (9th Cir. 2006) (same).

F.2d at 379, 386, 390-92.  It was not until after the 1996 amendments that the statute specifically included "false or misleading" statements in the definition of "corruptly."  Continuing the pattern of ignoring arguments already addressed in Defendant's motion, the government contends that United States v. Kanchanalak, 37 F. Supp. 2d 1 (D.D.C. 1999), has already settled this issue.  But as noted previously, Kanchanalak *specifically* limited its holding, observing that the "statute is not unconstitutionally vague *as applied to the conduct alleged in the Superseding Indictment*," id. at 4 (emphasis added), none of which involved making false or misleading statements.

> **B.**    **Jury Did Not Find Mr. Safavian Guilty As to the Only Alleged False Statement Included in the Basis of Count One**

In its attempts to rebut the sufficiency of the evidence arguments made in Defendant's Rule 29 Motion, the government places heavy reliance on 18 U.S.C. § 1515(b)'s inclusion of "misleading statements" in the definition of "corruptly."  See Gov't Opp. at 30-31.  In so doing, the government turns history and logic on its head and essentially argues that § 1505 should be a much easier offense to violate and criminalizes much more innocent conduct than § 1001.

Moreover, the government cites United States v. Dykes, 406 F.3d 717, 722-23 (D.C. Cir. 2005), and United States v. Stewart, 433 F.3d 273, 319 (2d Cir. 2006), for the proposition that the failure of the Verdict Form to establish whether the jury unanimously agreed on the act that constituted the § 1505 violation is not fatal to Count One.  Gov't Opp. at 31 & n.6. However, the lack of a special verdict form for Count One makes it likely that the verdict was based on Mr. Safavian's alleged concealment of his "assistance" to Mr. Abramoff, particularly since that is the only part of Count Three of which the jury unanimously found Mr. Safavian guilty.  This is in fact fatal to Count One because, as discussed supra Section II, Mr. Safavian did not have a duty to disclose this assistance to Agent Rowe.  The lack of this essential element precludes it from being the basis of a § 1505 charge and requires dismissal of Count One as well.  See Irwin, 654

F.2d at 679-80 (reversing conspiracy conviction where verdict could have been based on § 1001 concealment charges that court had set aside as a matter of law due to a lack of materiality), overruled on other grounds, United States v. Daily, 921 F.2d 994, 1003-05 (10th Cir. 1991).

C.    **Section 1505 Convictions Cannot Be Sustained in Such Fundamentally Ambiguous Contexts**

Assuming that the § 1505 charges can be predicated upon § 1001 conduct as alleged in Count Three, the conviction should nevertheless be reversed as a matter of law for the reasons stated with respect to Count Three, namely that excessive vagueness and ambiguity in questions may not form the basis of a prosecution of obstruction of justice based on § 1001 claims.  See Section II.B.   The government contends that it cannot find a case explicitly applying the fundamental ambiguity principle in the § 1505 context.  But as explained above in Part A., that is in part because it was not until 1996 that Congress reacted to clear Court precedent precluding intransitive obstruction of justice charges predicated upon § 1001 type conduct.

D.    **Insufficient Evidence of "Corrupt" Intent and Materiality**

In its opposition, the government argues that there is sufficient evidence of corrupt intent for Count One, despite the fact that the jury did not find that Mr. Safavian made any false statements to Agent Rowe.[20]  Therefore the government essentially relies on the statement, not even alleged as false in the Indictment and not found in the Verdict Form or the jury instructions, that the $3,100 covered airfare, lodging, and greens fees.

The government simply ignores all of the arguments in the Motion for Acquittal and simply asserts that the total cost of the Scotland trip was $17,000.  However, the government

---

[20]    The government claims that merely making a "misleading" statement is sufficient evidence of corrupt intent for 18 U.S.C. § 1505.  However, even if constitutionally sound, see supra Section VI.A, the term "misleading" was not part of Count One or Count Three and the jury had full opportunity to consider all the government's "options" for conviction on Count Three, agreeing unanimously on only one concealment.

fails to provide any explanation as to how it arrived at this figure from the trial record.  See Gov't Opp. at 33.  Presumably, the government is holding Mr. Safavian responsible for paying the pro rata share of the cost of the charter flight despite the fact that no other attending party reported, or was obligated to report the flight in that manner and Administrator Perry's uncontested testimony that the cost of a charter flight is properly calculated as the cost of an equivalent commercial flight.  Tr. 05.24.06 a.m. at 20:4-13 (Perry testimony).  Moreover, even if there were evidence that the actual cost of the trip was more than what Mr. Safavian paid, this alone is not sufficient evidence of corrupt intent.  Indeed, without evidence that Mr. Safavian knew that the actual cost of the trip was more than what he paid, he could not have possessed "wrongful, immoral, depraved or evil purposes, motive or intent."

Furthermore, the uncontested testimony of Agent Rowe himself demonstrated that Mr. Safavian informed him that the $3,100 figure was provided by Abramoff, and was not calculated by Mr. Safavian.  It is also uncontested that Mr. Safavian provided Agent Rowe with Abramoff's phone number so that Agent Rowe could contact him if he wished to verify any of the information.  But because the $3,100 figure was as reasonable to Agent Rowe as it was for Mr. Safavian at the time, Rowe did not feel the matter was worth investigating further, and at that point, Mr. Safavian ceased to be capable of influencing the investigation.  Indeed, the evidence demonstrated that when Agent Rowe felt an issue was important, he would follow up with independent investigation and additional questions, as he did for the Hatch Act issue.  See 5.31.06 p.m. at 68:1-70:11.  Thus, as a matter of law, Count One must be dismissed because none of Mr. Safavian's statements had the "natural tendency to influence, or [were] capable of influencing" Agent Rowe's investigation.  See United States v. Barrett, 111 F.3d 947, 953 (D.C.

Cir. 1997) (finding statement made under oath was immaterial as a matter of law under 18

U.S.C. § 1623(a)); see also United States v. Quattrone, 441 F.3d 153, 174 (2d Cir. 2006).

## CONCLUSION

For the aforementioned reasons, and on the basis of the record, Defendant David H.

Safavian respectfully requests this Court for a judgment of acquittal pursuant to Fed. R. Crim. P.

29(c).


                                        Respectfully submitted,

                                        By: /s/ Barbara Van Gelder
                                            Barbara Van Gelder (D.C. Bar # 265603)
                                            Roderick L. Thomas (D.C. Bar # 433433)
                                            Albert C. Lambert (D.C. Bar # 489562)
                                            WILEY REIN & FIELDING LLP
                                            1776 K Street NW
                                            Washington, DC  20006
                                            TEL: 202.719.7032

        Dated: August 10, 2006           *Attorneys for David H. Safavian*