## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES of AMERICA,

v.

DAVID HOSSEIN SAFAVIAN,                    Criminal No. 05-370 (PLF)

Defendant

### DEFENDANT'S REPLY IN SUPPORT OF THE MOTION FOR A NEW TRIAL

In its opposition, the government fails to respond directly to the legal arguments offered by Defendant concerning the preservation of rights and guarantees under federal law and the U.S. Constitution. Accordingly, Defendant respectfully renews his request that, in the alternative to issuing an order of acquittal of the remaining charges, a new trial be granted pursuant to Fed. R. Crim. P. 33.[1]

I.      **The Court's Decision to Preclude Examination As to the Conditions Surrounding the OIG Interview Was Erroneous and Prejudicial Based on the Government's Erroneous Assertion that Mr. Safavian Had No Due Process Rights**

The Court's decision to preclude examinations into the satisfaction of Mr. Safavian's due process rights in the context of the GSA-OIG investigation was erroneous and patently prejudicial. Because it cannot refute the substance of Defendant's contentions regarding the inability to inquire as to the lack of warnings given or fully appreciate the significance thereof, the government misrepresents the record as to the relevant inquiry into the warnings, the scope of its objections, and the resulting direction from the Court. The government, which freely cited

---

[1]      In several instances, the government objects on grounds that the Court has previously decided the question. Irrespective of the merits of its contention, to the extent that any issues raised in this Motion do require the Court to reconsider evidentiary or other matters addressed in a prior context, Defendant respectfully requests that it so consider.

copious segments of the transcript in prior sections, appears to suggest that only one paragraph of the series of events is relevant.  However, as revealed below, the record speaks for itself.  Specifically, when defense counsel attempted to inquire as to what warnings were given prior to the OIG interview on March 27, 2003, the government objected, leading to the following exchange at the bench:

> THE COURT:  Why is this relevant?
>
> DEFENSE: Your Honor, the whole issue is a specific legal duty to disclose, and the question is what kind of warnings or what kind of statements did Mr. Rowe make before he just started this conversation.
>
> GOVERNMENT: His specific duty, legal duty, didn't flow from Miranda warnings, which weren't legally required in an interview like this, and the suggestion that he didn't give them could be taken by the jury as somehow some violation of the law or policy or procedure, when in fact this is the most innocuous type of interview imaginable.  They're showing him around the office when they walked out.  It could be anything.  It's not a custodial arrest, and there was no need --
>
> DEFENSE:  I won't use Miranda.  I'll rephrase.
>
> GOVERNMENT**:  I object to any type of warnings**.  **There was no legal requirement for warnings, Garrity warnings, Miranda warnings, anything. It's a legal issue for the Court to decide, if at all, not for the jury to consider.**
>
> DEFENSE:  You can't say to the judge that it's innocuous, and then say that I have to defend an obstruction and a false statement for an innocuous interview, because materiality is a specific part of both of these crimes that I have to defend.
>
> THE COURT:  There's no custodial interrogation, there's no need for a Miranda warning.  Furthermore, I think it's fair to say, what did he say to you, what did he tell you the purpose of it was, and what the environment was, but I think that it is misleading to suggest to the jury that he was required to give him **Miranda warnings or any other kind of warnings.**
>
> DEFENSE:  **Well, actually, I do think he is required to give what is now called Kalkines warnings.  And I won't go into this, but the Kalkines case, which is the DC Circuit, says that when you are interviewed by IG agents, you are to be told that you don't have to answer anything, but if you don't answer anything, you are subject to discipline for insubordination.  And there's a whole line of Kalkines cases in this district.**

GOVERNMENT:   Believe me, a motion on that type of argument has long passed.

DEFENSE:  No, I'm just saying that I'm not sure I'm agreeing with the general idea that there were no warnings as a matter of law.

THE COURT**: But you won't go into it?**

DEFENSE**:  Right.  I won't.**

Tr. 06.02.06 p.m. at 29:12-31:11 (emphases added).  Accordingly, contrary to the government's misrepresentation, it objected to not just Miranda warnings but "any type of warnings" based on the erroneous assertion that "[t]here was *no legal requirement* for warnings, Garrity warnings, Miranda warnings, anything.  It's a legal issue for the Court to decide, if at all, not for the jury to consider."  Id. at 30:7-10 (emphasis added).  The government's contention was at complete odds with governing cases, not to mention its own internal memoranda[2] and those of the respective executive Offices of Inspector General.[3]  See Inspector General Academy "Employee Rights and

---

[2]        In light of Garrity, prosecutors and the Offices of Inspector General are advised that:

Such statements are effectively "immunized." This type of immunity will be found if an employee has an objectively reasonable belief that he or she will be disciplined if he  or she refuses to answer questions. *The risk of creating such immunity is particularly acute when interviews are conducted by Inspector General agents because they handle both criminal investigations and investigations that lead to administrative discipline.* In order to address these concerns, when a federal employees is interviewed *during the course of an investigation being conducted by an Office of Inspector General, the agents should provide the employee with an advice of rights form that is designed to preserve the government's ability to use the employee's statements by advising the employee that the interview is voluntary and that the employee will not be disciplined solely for refusing to answer questions.* This is commonly referred to as the "Garrity" warning.

Letter from Christopher Wray, Assistant Attorney General, to Federal Prosecutors, "Uniform Advice of Rights Forms for Interviews of Government Employees" (May 6, 2005) (emphasis added). (Rule 29 Ex. 4).

[3]        In addition, the FCC Inspector General manual provides in relevant part that:

Advisements, available at http://www.igcia.gov/course_igitp.html (Rule 29 Ex. 5) (noting that examples of topics include "Employee Rights & Advisements (Kalkines, Garrity, & Weingarten)"); <u>see</u> <u>also</u> Def. Mot. (Doc. 121) at Section I; Def. Rule 29 Reply at Section I; and Rule 33 (Doc. 122) at 14-15. Accordingly, it was the government's comprehensive objection that prompted this Court to preclude inquiry into "Miranda warnings or *any other kind* of warnings." 06.02.06 p.m. at 30:16-21 (emphasis added).

Thus, the government's entire discussion, suggesting that it had only objected to Miranda warnings and that the defense was free to ask about other warnings, is at best, misleading and should be rejected. Furthermore, it is hard to imagine that government counsel would have objected so vociferously to defense counsel's line of inquiry if such warnings were not: a) relevant and applicable as a matter of law; and b) not given. Accordingly, the failures of due process inherent in the GSA-OIG investigation, indeed throughout the circumstances underlying each of the charges in this case, warrant acquittal as a matter of law, or certainly at the very least, require a new trial.

---

When applicable, a statement of the individual's rights with regard to, among other things, remaining silent and obtaining legal counsel or union representation is stated directly and personally at each interview. These statements of rights are referred to as "warnings." The four types of warnings that may be administered during investigations are Miranda, Kalkines, Garrity, and Weingarten. . . .

> Kalkines warnings are given when the possibility of criminal prosecution has been removed, usually by a declination to prosecute by the DOJ, and the employee is required to answer questions relating to the performance of his or her official duties or be subject to disciplinary action.
>
> Garrity warnings are given when an individual is requested to give information on a voluntary basis in connection with his or her own administrative misconduct, and the answers might also be used in a future criminal proceeding. The individual is apprised of his or her right to remain silent if the answers may tend to incriminate him or her; that anything said may be used against him or her in either a criminal or administrative proceeding; and he or she cannot be disciplined for remaining silent.

Federal Communications Commission Office of Inspector General Employee Rights and Warnings, available at http://www.fcc.gov/oig/oigrights.html. (Rule 29 Ex. 6).

II.    **The Improper Admission of Hearsay Materials Unfairly Prejudiced Defendant and Thus Warrants a New Trial on the Merits**

A.    **Abramoff E-Mails Were Inadmissible and the Resulting Prejudice Was Not Cured by the Court's Limiting Instruction**

The government does not respond directly to the merits of Defendant's challenges to the three principle theories through which the government entered an overwhelming number of hearsay exhibits from every available witness. The admission of hearsay evidence that prejudices a defendant is a significant error that warrants a new trial, particularly given the manner and degree of the erroneous admission. See, e.g., United States v. Patrick, 959 F.2d 991, 999-1003 (D.C. Cir. 1992) (vacating jury's verdict and ordering new trial where admission of hearsay evidence was erroneous and where such error was not harmless), *abrogated on other grounds by* Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Columbo, 909 F.2d 711, 715 (2d Cir. 1990) (reversing conviction and remanding for new trial based on improper admission of evidence). Relying in part on mischaracterizations of Defendant's arguments and the record, the government's attempts to simply paper over the substance of a request for a new trial should be rejected.

As noted in the underlying Rule 33 Motion, the primary grounds for admitting the Abramoff e-mails included the theories that they: (1) show "work" or "business" by Mr. Abramoff or his colleagues; (2) "necessary context"; and (3) "the defendant's state of mind (including intent, plan, motive, or design) *under Rule 803(3)* of the Federal Rules of Evidence." Def. Rule 33 Mot. at 2 (quoting May 23, 2006 Opinion (Doc. 99) at 10, 23-29 (emphasis added)).

The government seeks to avoid controlling law in this Circuit under <u>United States v.</u> <u>Stover</u>, 329 F.3d 859, 870 (D.C. Cir. 2003),[4] and echoed elsewhere, which hold that "context" is not a legitimate exception to the hearsay rule and that it is utterly irrelevant whether the government *states* that hearsay materials are not being offered for their truth. The pertinent question is whether from an objective standpoint, there is any chance that the jury will be led to examine the underlying content. Notably, in its ten pages of briefing on the subject, the government does not directly answer the charge that a trier of fact cannot possibly know whether an Abramoff e-mail constituted "work," "business," or some other type of personal communication, such as "racquetball" or "golf" *without evaluating* the substance of the e-mail and credibility of the matters therein. In <u>Stover</u>, the jury could infer that the drug dealer and his co-conspirators referred to drugs as clothes "only from the fact that [the drug dealer] and Bryant referred to drugs as clothes – that is *through the statements' content*." <u>Id.</u> at 870. In this case, the jury could infer that Abramoff was conducting "work" with Safavian only from the fact that Abramoff was asking about GSA properties (and not for example, asking Safavian if he wanted to play golf or go out to dinner) – that is *through the statements' content*.

The government does not cite one case in support of the "work" exception and its response to <u>Stover</u> is its "scouts honor" representation that the "Abramoff e-mails were not admitted for their truth." Gov't Rule 33 Opp. at 7. Tellingly, however, it can only bring itself to say that it did not "admit the e-mails pertaining to White Oak in order to prove that Mr. Abramoff wanted the White Oak property *for a school*," conceding that it would not mind if the jury determined, among other things, that it was true that Mr. Abramoff in fact wanted the White

---

[4]    The government says that <u>Stover</u> is a "new case[] now cited by defendant." Gov't Rule 33 Opp. at 6. The government simply misstates the facts. Defendant cited <u>Stover</u> in its submission to the Court objecting to the government's proposed e-mail chart on May 19, 2006. The government even responded to this submission shortly thereafter, but elected not to address the case.

Oak property based on the hearsay e-mail.  Id. (emphasis added).  In other words, it only was seeking to admit the hearsay evidence for the "relevant" underlying truth it believed would permit it to prove its case without having to call Mr. Abramoff – a quintessential inadmissible hearsay context.

As recognized in Stover and recently applied in cases such as United States v. Tann, 425 F. Supp. 2d 26, 33-34 (D.D.C. 2006), if the government can admit hearsay material via a simple declaration that it *does not want* to admit the evidence for the truth, the hearsay rule would be eviscerated.   Under Stover, a court must necessarily make an objective determination as to whether the content of a statement would be weighed by the jury in its evaluation.[5]   In this instance, the government readily concedes that the jury would consider the content of such a statement.   In this context, the instruction directing the jury to evaluate "the fact that the communication occurred and what that might show," Jury Instruction Re: Limited Purpose, may have actually encouraged, rather than precluded the danger of, the jury's consideration of the underlying content in the e-mails.  United States v. Jordan, 810 F.2d 262, 264 (D.C. Cir. 1987) (admitting select number of audio tapes only where the witness was unavailable and there was no "danger that the jury would misuse [hearsay declarant's] statements for their truth").

Moreover, the government ignores that the Court's previous understanding that the so-called "state of mind" exception had been predicated on Fed. R. Evid. 803(3).  The application of this particular exception has relevance only as to the *declarant's* state of mind; therefore, the

---

[5]     The government's fundamental misunderstanding of this point is evident in its analysis of the Tann case. Gov't Rule 33 Opp. at 10.  In that case, irrespective of what theory the government put forth as to its intentions, the issue was whether the "payee" entries on checks would in fact lead the jury to consider the fact that the defendant intended to pay the third party for services, revealing the identity of the payee, the accuracy of the intent to pay, and that subsequent payment was in fact made.  Tann, 425 F. Supp.2d at 33-34.  In this case, the government did not mask, but rather overtly sought to admit hearsay e-mails to establish the fact that Mr. Abramoff was e-mailing (identity) Mr. Safavian (accuracy) about GSA business affairs and not mere personal relationship matters.

admission of Mr. Abramoff's e-mails were only proper to show his, not Mr. Safavian's, state of mind. The government's lone relevant cite for its new proposition, United States v. Sesay, 313 F.3d 591 (D.C. Cir. 2002), that the e-mails were not hearsay because were only introduced to ascertain the state of mind of the reader, thoroughly endorses Defendant's position that this so-called exemption from the hearsay rule can hardly, if ever, be implemented. If the material is not related to the truth of the matter then it will not be relevant, or at the very least, will be more prejudicial than probative. As the Court in Sesay explained:

> Likewise, in this case, the statement in the PD 163 that "witnesses at the scene of the shooting observed Def #2 with a gun in his hand during and/or just after the shooting" is not relevant for anything other than its truth. And if it has any relevance as "background," the probative value was substantially outweighed by the danger of prejudice.
>
> Appellant argues that the statement at issue here was offered to show the state of mind of the officers when they arrested Fowler, Coates, and appellant. The "state of mind" to which appellant refers is "that the police understood there to be witnesses who saw the victim with the gun immediately after the shooting." However, this "state of mind," if not based on the truth of the statement, is not relevant to a fact of consequence in the trial. The only real issue at trial was who possessed the gun and drugs. The statement in the PD 163 was only relevant to this issue if it was accurate. If, as the Government asserted, the statement reflected a mistaken rumor, then it would not have assisted the jury in determining who possessed the gun and drugs. To accept appellant's "state of mind" argument would be to permit a loophole in the hearsay rule large enough to swallow the rule itself.

Sesay, 313 F.3d at 599-600. The government's circular argument that the several hundred "Abramoff e-mails" were admissible "because they were not admitted for its truth" is not a sufficient basis for admission, and as accepted for en masse materials as in this case, represents a significant erosion of hearsay protections grounded in Constitutional principles. Accordingly, the court must grant Mr. Safavian's request for a new trial.

**B.     Hearsay within Hearsay in the Ethics Opinion**

The government does not respond to the merits of Defendant's contention that Mr. Safavian did not manifest the necessary assent for the adoptive admission exception to apply to the hearsay, and hearsay within hearsay, contained in the ethics opinion. Instead the government focuses on one sentence taken out of context from Defendant's motion concerning the circumstances in which the existence of ethics opinion was first discussed. The government is correct that it was Mr. Safavian who technically first raised the existence of an ethics compliance letter (the defense had not tried to suggest otherwise). In addition, as the transcript reveals, Mr. Safavian had not mentioned the ethics opinion in a vacuum but rather, in response to SCIA investigator Parker's suggestive comments regarding the Senate Committee's inquiries into "no offense . . . influence peddling." Gov't Rule 33 Opp. at 11 (citing Tr. 06.01.06 a.m. at 21-22). It was in this context that Parker then asked Mr. Safavian to provide a copy of the ethics opinion as part of his document request. Tr. 06.01.06 a.m. at 22:12-18. However, the government fails to note in its opposition that Mr. Safavian did not have a copy of the ethics opinion and had to contact his former colleague, Eugenia Ellison, to obtain one, thus leaving the false impression that Mr. Safavian contemporaneously knew all of the contents of the ethics opinion when he informed Parker that he had received one. Gov't Rule 33 Opp. at 11-12.

More importantly, it is incorrect as a matter of law to suggest that the adoptive admission exception applies simply because Mr. Safavian referred to the fact that he had, three years prior, obtained "an ethics compliance letter" for the trip. This act does not manifest the necessary "unambiguous" assent to the entirety of the contents of the ethics opinion. See Garcia-Martinez v. City and County of Denver, 392 F.3d 1187, 1195 (10th Cir. 2004) (holding that officers did not adopt the underlying facts in disciplinary records by simply signing the statement "I accept the recommended penalty," but only the actual penalty imposed). Furthermore, even if it did

constitute an adoptive admission for the hearsay contained in the opinion, it would not in fact warrant the admission of the "hearsay within hearsay" at issue in this case.  The government's response that the jury had inherent free will to accept or reject the significance of the contents therein is simply not an exception to the hearsay rule, thus warranting a new trial.

C.    **Government Exhibit 175**

The government's argument that Defendant waived any objection to the admission of Government Exhibit 175 is misplaced.  Indeed, after the government moved for the admission of hundreds of e-mails—including Government Exhibit 175, which is an attachment to the e-mail in Government Exhibit 174—the defense noted its objection to these potential exhibits on hearsay grounds.  See Def. Opp. to Mot. for Admissibility (Doc. No. 92).  In addition, this Court specifically noted that the defense preserved all existing objections to these exhibits.  See Tr. 5.25.06 p.m. at 23 ("All of your prior objections are preserved.").  Furthermore, in the segment of the transcript just before the snippet quoted by the government, the defense incorporated these prior objections by reference:

| | |
|---|---|
| MR. EDMONDS: | We would offer [Gov't Ex. 175] into evidence. |
| MS. VAN GELDER: | Objection. |
| THE COURT: | Do you want to come to the bench? |
| MS. VAN GELDER: | You know my objection. |
| THE COURT: | No additional objection—well, why don't you come to the bench. |

Tr. 05.24.06 p.m. at 71:4-10.

Finally, the government's contention that Government Exhibit 175 is not hearsay because it was not offered for the truth of the matter is without merit because the finder of fact must find the statements it asserts are true in order for the exhibit to be relevant.  See United States v.

- 10 -

Gaertner, 705 F.2d 210, 214 (7th Cir. 1983) (rejecting argument that out of court statements were not being offered for the truth of the matter because "before the jury could believe that the alleged loan/collateral transaction took place they would necessarily have had to have found credible the truthfulness of [declarant's] alleged statements"). For these reasons, Defendant has not waived its objection to the introduction of Government Exhibit 175.

### D.    Speculative Testimony

Defendant maintains that at least four prosecution witnesses were improperly permitted to offer speculative testimony that: (1) they would have liked to have known about Mr. Abramoff's interest in White Oaks and the Old Post Office; and (2) such information would have changed the manner in which they dealt with Mr. Safavian. The government argues that the testimony in question was not speculative because the witnesses' testimony was limited to how *they* would have acted under a hypothetical set of facts, rather than how *others* would have acted. However, the law does not make this distinction, and *any* testimony regarding how a witness would have acted under different and hypothetical circumstances is inadmissible. See Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 15 n.8 (1st Cir. 2001) (holding that testimony regarding how witness would have acted under different circumstances was properly held inadmissible under Fed. R. Evid. 701 because it was not based on the witness's contemporaneous perceptions); Lee v. Wal-Mart Stores, Inc., 34 F.3d 285, 290 (5th Cir. 1994) (ruling that testimony of witness that they had no alternatives was insufficient to establish coercion because testimony concerning what a party would have done under different circumstances is generally not admissible) (citing Bridgen v. Scott, 456 F. Supp. 1048, 1063 (S.D. Tex. 1978))); Washington v. Dep't of Transp., 8 F.3d 296, 300 (5th Cir. 1993) (holding that testimony as to what witness would have done under different circumstances was properly excluded because it

was not based upon witness's own perception); Delancy v. St. Paul Fire & Marine Ins. Co., 947 F.2d 1536, 1553 (11th Cir. 1991) (noting that testimony as to what an injured party would do under different circumstances would be speculative).

The government's attempt to lessen the strength of the holding in Elyria-Lorain Broadcasting Company v. Lorain, 298 F.2d 356 (6th Cir. 1961), is unavailing.  The government readily concedes the finding in Elyria-Lorain that "a witness may not testify to what he would have done had the situation been different from what it actually was."  Gov't Opp. at 20 (citing Elyria-Lorain, 298 F.2d at 360).  The government argues, however, that rule of law is tempered because the opinion does not reveal what questions or facts were at issue there.[6]  Id.  Without more, the government then tries to cast that rule of law in doubt, citing United States v. Bush, 522 F.2d 641 (7th Cir. 1975), which itself observed that "[t]he propriety of admitting speculative and hypothetical testimony in a judicial proceeding is always questionable. Admission of such testimony in a criminal proceeding is always highly suspect."  Id. at 650.

Courts have been reticent to allow this type of speculative testimony to be introduced at trial.  In Hardie v. Cotter and Co., 849 F.2d 1097 (8th Cir. 1988), the plaintiff brought a wrongful discharge action against a former employer.  At trial, the plaintiff sought to elicit testimony from the employer as to whether the decision to discharge would have been the same had the plaintiff's personnel file been completely clear of complaints.  Id. at 1101 (noting that the testimony established the contents of the personnel file played a large part in the decision to discharge the plaintiff).  In affirming the district court's decision to disallow such testimony, the

---

[6]     And, while the government takes pains to point out that Elyria-Lorain is a civil case, such a distinction only highlights the prejudice that the introduction of such impermissible testimony has in the *criminal* context.  While it "is dubious to rely on criminal cases to support the proposition that . . . testimony was unduly prejudicial . . . [b]ecause criminal defendants are afforded far greater constitutional protection than parties to a civil suit," the converse holds true that prejudicial testimony identified in a civil suit would certainly be prejudicial to a criminal defendant.  See Jinro Am. Inc. v. Secure Inv., Inc., 266 F.3d 993, 1012 (9th Cir. 2001).

Eight Circuit concluded that "[s]peculation regarding what [the employer] might have done had the situation been different had no relevance to the issues presented in the case, and was properly excluded." Id.

In sum, where testimony as to what an individual would have done had certain information been available to them is entirely too speculative to be admitted at trial and the unfair prejudice inherent in such testimony substantially outweighs any probative value. Accordingly, because Mr. Safavian was prejudiced by the introduction of this testimony, he must be granted a new trial.

## III.    The Court Did Not Have Discretion to Remove Juror 3

The government, again choosing to simply ignore instead of refute Defendant's extensive citation of the record, see Rule 33 (Doc. 122) at 19-21 & n. 7, and inaccurately claims that "there was no record evidence in this case as to Juror 3's view of the government's evidence." Gov't Rule 33 Opp. (Doc. 123) at 23.  In any event, the government's emphasis is misplaced.  As outlined in the initial motion and left unaddressed by the government, the standard articulated in United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987) (noting that where "the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the insufficiency of the government's evidence" the court loses its discretion and "*must* deny the request"), refers to *both* the juror who raised the issue and the juror who is subject to the complaint.  United States v. Thomas, 116 F.3d 606, 622 (2d Cir. 1997) (holding that the rule in *Brown* applies as a limitation on a juror's dismissal "*in any case* where the juror allegedly refuses to follow the law-whether the juror himself requests to be discharged from duty or, as in the instant case, fellow jurors raise allegations of this form of misconduct") (emphasis in original).

The government cannot, and does not, dispute that the June 13, 2006 hearing revealed at least some suggestions as to the views of Juror 3, in addition to those of Jurors 11 and 12. Nor can the government dispute the possibility that the other jurors were raising an issue about Juror 3 because of her views of the case. A significant amount of discussion concerning Juror 3's statements regarding the cost of golf was placed on the record, in addition to the comments by Juror 12 in which she complained that Juror 3 had prematurely "ma[de] a comment about Mr. Safavian's guilt or guiltiness." Def. Rule 33 Mot. (Doc. 122) at 21 & n.7 (quoting Tr. 06.13.06 a.m. at 18:1-3). As such, because the record evidence discloses "a possibility" that the request from Juror 12 to discharge Juror 3 stemmed from Juror 12's thoughts as to Juror 3's "view of the sufficiency of the government's evidence," the court was precluded from granting the request, notwithstanding this court's list of distinct reasons. Brown, 823 F.2d at 596; see also Thomas, 116 F.3d at 622 ("[A] lower evidentiary standard could lead to the removal of jurors on the basis of *their* view of the sufficiency of the prosecution's evidence.") (emphasis added).

The recent decision in United States v. Carsons, 2006 WL 2034361 (July 21, 2006), does not alter the result. Unlike the case here, there were no indications that the notes to the judge from other jurors related to any substantive matter at issue in the case. Rather they "relayed some concern about Juror No. 3's health and overall well-being," and ability to "focus on deliberations," 2006 WL 2034361 * 9. There certainly was no suggestion that the juror had developed a view on the case. In addition, in the midst of deliberating upon a rather dark and disturbing fact pattern involving murder and mayhem, the discharged juror had manifested: (1) serious mental and/or physical health issues; (2) problems with his supervisor for missing work; (3) lewd and offensive comments to a female juror that were interpreted by the other juror as a threat to kill her; (4) pressured fellow jurors not to have the court deputy relay their concerns to

the judge via "comments referencing homicide, and suicide and certain violent tendencies." Id. at

*9-11.     Clearly, the circumstances in this case are so far divorced from those in Carson, any

substantive comparison between the two is irrelevant.

## IV.     Verdict Form

The verdict form presented to the jury constituted an alteration in the indictment, which

requires a new trial.  The government argues that United States v. Poarch, 878 F.2d 1355 (11th

Cir. 1989), dictates otherwise, but this argument is misplaced.  Poarch simply held that where the

indictment charges multiple means of committing the crime with the conjunctive form "and," it

is not an unlawful alteration of the indictment to subsequently use the disjunctive form "or" on

the verdict form, so long as the jury could not have found the defendant guilty based on

allegations not contained in the indictment.  See id. at 1358.  In this case, the verdict form did

constitute a constructive amendment to the Indictment because the combination of: (1) altering

the language in the Indictment from the conjunctive to the disjunctive, and (2) removing the

language "when in truth in fact, as the defendant well-knew, prior to the August 2002 Scotland

trip that Mr. Abramoff was seeking to lease or purchase GSA controlled property" as a qualifier

for (A) and (B) of Counts Two, Three, and Five, did allow the jury to find Mr. Safavian guilty on

those counts based on allegations not contained in the Indictment.  These alterations allowed the

jury to find guilt on concealment based on future knowledge that Mr. Safavian did not have at

the time, and altered the substantive information that Mr. Safavian was charged with concealing.

For example, with respect to Count Two, the Indictment charged Mr. Safavian with

concealing information that he had "prior to the August 2002 Scotland trip" from the ethics

officers in the summer of 2002.  However, based on the verdict form, the jury could have found

that Mr. Safavian concealed information that did not exist until *after* the Scotland trip, even

though the alleged concealment occurred *prior to* the Scotland trip.  Furthermore, with respect to Counts Three and Five, the Indictment charged Mr. Safavian with concealing information related to events "*prior to* the August 2002 Scotland trip."  However, the verdict form again allowed the jury to find guilt based on concealment of information about events occurring *after* the trip.

For these reasons, the verdict form's alteration of the charges in the indictment necessitate the granting of a new trial.

## CONCLUSION

For the aforementioned reasons, those stated in Defendant's initial Rule 33 Motion (Doc. 122) and the entire record herein, Defendant David H. Safavian respectfully requests that, in the alternative to granting the Motion for Judgment of Acquittal (Doc. 121) (as filed today under separate cover), the Court order a new trial pursuant to Fed. R. Crim. P. 33.

Respectfully submitted,

By: /s/ Barbara Van Gelder
    Barbara Van Gelder (D.C. Bar # 265603)
    Roderick L. Thomas (D.C. Bar # 433433)
    Albert C. Lambert (D.C. Bar # 489562)
    WILEY REIN & FIELDING LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032

Dated: August 10, 2006        *Attorneys for David H. Safavian*