## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No 05-370 (PLF)** |
| | : | |
| v. | : | |
| | : | |
| **DAVID HOSSEIN SAFAVIAN** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned attorneys, hereby respectfully submits the following Sentencing Memorandum.

### INTRODUCTION

After a jury trial, defendant was convicted of four counts: one count of obstruction of justice and three counts of false statements. The evidence at trial established, beyond a reasonable doubt, that defendant lied to, concealed from and generally misled ethics officials at the Government Services Administration ("GSA"), the GSA Office of Inspector General ("OIG"), and the United States Senate. Defendant's lies and obstructive conduct were all designed to conceal the true nature of his relationship with lobbyist Jack Abramoff. The evidence at trial clearly established that defendant did not want anyone to know about the inappropriate assistance he had been providing to Abramoff from the time defendant began work as the Chief of Staff of the GSA. The help and assistance defendant provided to Mr. Abramoff continued unabated throughout defendant's tenure at GSA, and continued even after defendant left GSA to become the chief procurement officer at Office of Management and Budget ("OMB"). At trial, the government introduced several hundred e-mail messages between

defendant and Abramoff that clearly established – notwithstanding defendant's testimony to the contrary – that Abramoff was doing and seeking to do business with GSA at the time defendant was contemplating going on an expensive golf junket to Scotland with Abramoff. The e-mails also established – again, notwithstanding defendant's testimony to the contrary – that defendant's assertion to his ethics officer that Abramoff did all of his business on Capitol Hill was simply false.

Now, after having abused the public trust placed in him by using his position of authority at GSA to further the interests of his close personal friend, Jack Abramoff, and after lying and obstructing justice in order to conceal this improper relationship from public view, defendant asks this Court to disregard the sentencing guidelines and impose an extraordinarily lenient sentence of probation, home detention, and/or community service. Def.'s Memorandum, p. 36. Such a sentence is wholly unwarranted and would constitute a miscarriage of justice. Far from taking responsibility for his criminal conduct as he claims, defendant has tried to deflect blame from himself and place it on Abramoff while at the same time minimizing the conduct for which he has been convicted. Moreover, defendant's criminal conduct, far from aberrational as he tries to claim, constituted a long-standing pattern of conduct.

Perhaps most astonishing is the fact that defendant seeks a two-level reduction for acceptance of responsibility, despite the fact that he elected to go to trial rather than plead guilty, and at that trial he testified that he never attempted to conceal the true nature of his relationship with Abramoff from anyone – a contention explicitly and unanimously rejected by the jury. For these reasons, and the other reasons enumerated below, there is simply no basis for this Court to accept defendant's invitation to disregard the sentencing guidelines and impose such a

2

breathtakingly lenient sentence.

**The Court Must First Determine Defendant's Proper Guideline Sentence**

United States v. Booker, 543 U.S. 220 (2005), made only one change to the United States Sentencing Guidelines: they are now advisory rather than mandatory.  Booker, 543 U.S. at 244-50.  Nevertheless, the Supreme Court made clear that "the district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Id. at 264.  Moreover, the D.C. Circuit has held that a guidelines sentence is presumptively reasonable.  United States v. Dorcely, 454 F.3d 366, 376 (D.C. Cir. 2006)("We agree with our sister circuits that a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness.") It is only after properly calculating a defendant's Guidelines sentence that the Court should consider the factors outlined in 18 U.S.C. § 3553.[1]

**Using the 2005 Sentencing Guidelines, Defendant's Base Offense Level, Before Adjustments, is Level 14**

_____The PSI Report indicates (¶ 21) that the 2002 Edition of the Guidelines Manual was used in order to avoid any ex post facto concerns.  We believe this is incorrect, and that the 2005 Edition of the Guidelines should apply.

§ 1B1.11(a) states that "The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."

---

[1]Defendant argues that the Guidelines deserve no special weight and should simply be considered along with the all of the other factors listed in 18 U.S.C. § 3553, citing as authority for this proposition United States v. Zavala, 443 F.3d 1165, 1170-71 (9th Cir. 2006). Def. Memorandum, pp. 6-7.   The Zavala court's apparent view that the Sentencing Guidelines should be treated identically to the other enumerated factors in § 3553 cannot be reconciled with this Circuit's decision in Dorcely.

In the instant case, the 2005 Manual is in effect as of the date of defendant's sentencing.

§ 1B1.11(3) states: "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses."

§ 1B1.11(3) controls in this case. Defendant was convicted for conduct which occurred in 2002 (Count 2), 2003 (Counts 1 and 3), and 2005 (Count 5). Therefore, the later version of the guidelines should apply – the 2005 version – because it is the "revised version."

The Application Note to § 1B1.11(3) directly applies to this situation:

> Subsection (b)(3) provided that where the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses, even if the revised edition results in an increased penalty for the first offense. Because the defendant completed the second offense after the amendment to the guidelines took effect, the ex post facto clause does not prevent determining the sentence for that count based on the amended guidelines. For example, ... a defendant convicted of two counts of embezzlement, one committed before the amendments were enacted, and the second after. In this example, the ex post facto clause would not bar application of the amended guideline to the first conviction; a contrary conclusion would mean that such defendant was subject to a lower guideline range than if convicted only of the second offense.

According, using the 2005 Guidelines, defendant's base offense (pursuant to § 2J1.2) is level 14.[2]

---

[2]We note that at least one Circuit has questioned whether, post-Booker, the Guidelines can run afoul of the ex post facto clause in any circumstance. See United States v. Demaree, 459 F.3d 791 (7th Cir. 2006)("ex post facto clause should apply only to laws and regulations that bind rather than advise").

**Defendant's False Testimony at Trial Warrants a 2-level Increase for Obstruction of Justice, Pursuant to U.S.S.G. § 3C1.1**

Defendant's base offense level of 14 should be increased 2 levels, pursuant to U.S.S.G. § 3C1.1, for obstructive conduct, namely, defendant's false testimony at trial. The application notes to § 3C1.1, include perjury among a variety of conduct that could trigger §3C1.1's prohibition against obstructive conduct. There can be no doubt that defendant repeatedly perjured himself when he testified at trial, a conclusion that is borne out when one compares defendant's trial testimony with the jury verdicts.

The Legal Standard

Perjury, in the context of § 3C1.1, occurs when a witness testifying under oath "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). The Supreme Court has previously rejected defendant's suggestion that applying this enhancement somehow interferes with defendant's right to testify in his own behalf. Id. at 96 ("Respondent cannot contend that increasing her sentence because of her perjury interferes with her right to testify, for we have held on a number of occasions that a defendant's right to testify does not include a right to commit perjury.") (citations omitted).

Application Note 2 to § 3C1.1 states:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilty (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily

5

reflect a willful attempt to obstruct justice.

In addressing whether this adjustment applies, the sentencing court must make "independent findings" by the "clear and convincing" evidentiary standard that defendant committed perjury.  <u>United States v. Montague</u>, 40 F.3d 1251, 1254 & 1256 (D.C. Cir. 1994).  In this case, the government has clearly met that standard.  Indeed, the jury's finding is strong evidence that the jury concluded beyond a reasonable doubt that defendant's trial testimony was false, as it would have been impossible for the jury to have believed the crux of defendant's trial testimony and returned the verdicts they returned.  While defendant's testimony was replete with perjurious statements, the government will point out a few of the most egregious examples:

At the beginning of the second day of cross-examination, the following exchange occurred with the defendant:

Q:     When we finished up on Friday, I was talking to you about the lobbying in general.  And I want to return to that in a minute, but before I do so I just want to ask you some other questions related to what Ms. Van Gelder asked you on Friday.  She asked you a number of questions about whether you had lied or concealed in connection with your conduct throughout this case; do you recall being asked about those?

A.     Yes.

Q:     And I want to, just so it's clear to these questions, I'm going to ask you pertaining to your – in connection with your interactions with the GSA officials in connection with your obtaining the ethics opinion, your interview with GSA Office of Inspector General Special Agent Gregory Rowe, your interaction with the Senate investigators, and your interview with FBI Special Agent Jeffrey Reising, I'm going to compress it rather than go through each one.  But if you don't understand my questions, just stop me.
       Is it your testimony, sir, that in your interactions with all of these individuals, the GSA officials, with your ethics opinion, your interview with GSA Special Agent Gregory Rowe, Senate investigators, your interactions with Agent Reising, that you were always completely honest?

A.     Yes.  I may have been mistaken on some facts, but yes.

Q.    Did you knowingly conceal any facts in connection with any of those four transactions?

A.    No.

Q.    Did you attempt to deceive anyone in connection with any of those four transactions?

A.    Absolutely not.

Q.    Did you try to mislead anyone?

A.    No.

Q.    Were you completely candid?

A.    Yes.

Q.    Were you forthright?

A.    Define "forthright."

Q.    Well let me go back to it.  Were you trying as best you could to be helpful?

A.    I was.

Q.    Were you trying to hide anything about the nature of your relationship with Mr. Abramoff?

A.    No.

Q.    Did you want all of those individuals in connection with those four transactions, did you want them to have all of the relevant facts?

A.    I did.  I answered the questions as best I could.

Tr. 6/5/06, a.m., pp. 9-10.

The fact that the jury unanimously found that defendant obstructed the GSA OIG investigation (Count One) establishes that defendant's claim that he was "always completely honest" and never "knowingly conceal[ed] any facts," and never attempted to mislead the OIG, is false.

The same can be said for the guilty findings on Counts II and III, in which the jury found, respectively, that defendant made a false statement to a GSA ethics official when he "concealed his assistance to Mr. Abramoff in GSA-related activities," and that defendant made a false statement to the GSA-OIG when he "concealed his assistance to Mr. Abramoff in GSA-related activities."

Finally, in Count V, the jury found that defendant made a false statement to the Senate Committee on Indian Affairs when he "falsely stated in a letter to the Committee that Mr. Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland, when in truth and in fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property."

The defendant's testimony quoted above simply cannot be reconciled with the jury's verdicts. Where a guilty verdict could not have been found without a finding that defendant's testimony was false, a failure to grant an enhancement pursuant to § 3C1.1 would be "anomalous." United States v. Thompson, 962 F.2d 1069, 1071-2 (D.C. 1992) ("When the jury has [necessarily concluded] beyond a reasonable doubt that the defendant lied, and could not have convicted otherwise, it might be anomalous for the judge to sentence the defendant upon the basis of the jury verdict and yet refuse to enhance the sentence for perjury merely because the judge entertains a doubt that the defendant lied.") And given that these answers were consistent with those given on direct examination[3] and, indeed, with what he told his ethics officers, the

_____

[3] See Tr. 6/2/06, p.m., p. 24 (Q: Were you intending to conceal all the help that you had been giving when you made this request [for the ethics opinion]? A: No.); Id., p. 27 (Q: Now you don't have your e-mails now, as we've learned, but if Ms. Ellison had asked you for your e-mails, or asked you questions about Mr. Abramoff, would you have told her? A: Sure. I had nothing to hide about Jack Abramoff.); Id., p. 39 (Q: When you wrote this ethics request on July 25th, 2002, did you intend

OIG and the Senate, defendant can hardly claim now that this testimony was only inaccurate as a result of "confusion, mistake, or faulty memory." Application Note 2, § 3C1.1. Rather, this version of events was defendant's cover story – the same story he has tried to sell to anyone and everyone who has questioned him about his conduct in this matter.

Defendant's contention that § 3C1.1 has been rendered unconstitutional by virtue of the Booker decision is simply wrong. Def. Memorandum, fn. 9. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied, 125 S.Ct. 2935 (2005)("the Sixth Amendment right to trial by jury is violated where *under a mandatory guidelines system* a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury.)(emphasis in original); United States v. Mitov, 460 F.3d 901 (7th Cir. 2006)(rejecting defendant's claim that § 3C1.1 enhancement must be found by beyond a reasonable doubt standard; "such a burden of proof is necessary only where the finding yields an imposed sentence greater than the statutory maximum. Mitov, however, was sentenced to a term of twenty-four months, well below the statutory maximum of twenty years.")(Citation omitted); United States v. Smith, 450 F.3d 856, 862 (8th Cir. 2006) (trial court erred in refusing, as a matter of policy, to find enhancements not found by a jury and concluding that Booker "required the prosecution to bring a perjury charge against Smith because the enhancement increased Smith's maximum sentence by a factor not found by the jury"; held, "Booker did not change how the

---

to conceal your relationship with Mr. Abramoff from Mr. McKenna or Ms. Ellison?  A: No.  Q: When you spoke to the GSA-IG in March and April of 2003, did you intend to hide your assistance or insight with Mr. Abramoff from him?  A: No.); Id., p. 46 (Q: Now, did you intentionally conceal what you knew about Mr. Abramoff from Mr. Parker?  A: Absolutely not.); Id., p. 55 (Q: Did you lie or conceal anything from Ms. Ellison or Mr. McKenna?  A:  No.  Q: Did you lie or conceal anything from Agent Rowe?  A: No.  Q:  Did you lie or conceal anything from Mr. Parker or the Senate Committee on Indian Affairs.  A: I did not.)

Guidelines are calculated. In determining the advisory Guideline sentence, the district court must rule on all applicable Guidelines departures and adjustments. *Application of an obstruction of justice enhancement is not discretionary if the requisite factual findings are made.*") (emphasis supplied) (citations omitted).

While this Circuit has yet to rule on a § 3C1.1 enhancement post-<u>Booker</u>, given that it has upheld a four-fold increase in a defendant's sentence (from six to 24 months) based on acquitted conduct that a judge found by a preponderance of the evidence standard, <u>see</u> <u>United States v. Dorcely</u>, 454 F.3d 366 (D.C. Cir. 2006), there can be little doubt as to the continued viability of this sentencing enhancement.[4]

Notwithstanding defendant's protestations to the contrary, the jury found that defendant knowingly and intentionally lied, concealed and misled – all conduct defendant denied under oath. Accordingly, § 3C1.1 should apply, and defendant's offense level should be adjusted upwards by 2 levels.

**<u>Defendant Should Be Held Accountable for Acquitted Conduct</u>**

This Court should hold defendant responsible for the acquitted conduct in this case (Count 4, which charged defendant with Obstruction of Justice in connection with the United States Senate). <u>See</u> <u>United States v. Dorcely</u>, 454 F.3d 366, 371 ("a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial

---

[4]None of the cases cited by defendant offer support for the contrary position. <u>United States v. Washington</u>, 398 F.3d 306 (4th Cir. 2005), <u>United States v. Brooks</u>, 417 F.3d 982 (8th Cir. 2005) and <u>United States v. Yagar</u>, (6th Cir. 2005) all involve sentences which were imposed pre-<u>Booker</u> and their appeals reviewed post-<u>Booker</u>. Thus, at the time of the enhancement at issue, the defendants were being sentenced under a *mandatory* sentencing scheme; hence, remands were necessary to ensure that the sentencing court would have imposed the sentence at issue even if the guidelines were advisory.

by jury.  In so holding, we agree with every circuit that has considered the question post-

Booker.")  The Court must find that the alleged conduct occurred by employing the

preponderance of evidence standard.  Id. at 372.  ("In Watts, the Supreme Court held that a

'jury's verdict of acquittal does not prevent the sentencing court from considering conduct

underlying the acquitted charge so long as that conduct has been proved by a preponderance of

the evidence.'... Nothing in Booker suggests a contrary result.")  Id.  (Citations omitted.)

The government submits that it did establish, by at least the preponderance of evidence

standard, that defendant obstructed the Senate investigation by making false statements to the

Senate regarding the nature of Abramoff's business with GSA and the costs of the Scotland trip.

An analysis of both the legal elements of 18 U.S.C. § 1505 and 18 U.S.C. § 1001, and the

testimony at trial is sufficient to show that Defendant obstructed justice by making false

statements, concealing relevant information and attempting to mislead Senate investigators.

In order to have the sentencing Guidelines apply to the defendant's acts obstructing the

Senate investigation, the Government must prove the following elements of § 1505 by a

preponderance of the evidence:

1) the proceeding identified in the indictment was pending at the time of the alleged

obstruction;

2) Mr. Safavian knew that this proceeding was pending;

3) Mr. Safavian did corruptly influence, obstruct or impede or did corruptly endeavor to

influence, obstruct and impede the due and proper exercise of the power of inquiry under which

any inquiry or investigation was being conducted by the United States Senate Committee on

Indian Affairs.

Jury Instructions p. 80-81.

For the court's analysis regarding acquitted conduct, most of the elements are not in dispute because the jury found similar facts necessary to convict defendant of Count Five - false statements to the Senate.[5]  In Count Five, the jury found beyond a reasonable doubt that Defendant made false statements to the Senate "by falsely stating in a letter that Mr. Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland."  Docket 119 (Verdict Form).[6]

In determining whether the government has proven Obstruction of the Senate by a preponderance of the evidence, the Court must look to the elements of § 1505 that are not captured in the jury's finding of § 1001.  The primary difference between a conviction for false statements and a conviction for obstruction is the level of intent required.  A false statement conviction requires "knowing"[7] and "willful"[8] conduct.  An obstruction conviction requires

---

[5]While Defendant has argued that the Senate did not have jurisdiction, Defendant has not contested that the proceeding was pending and that Defendant had knowledge of the proceeding by being informed by the Senate letter requesting documents from Defendant.

[6]The elements of Count Five were:
One: Mr. Safavian knowingly concealed a fact by any trick, scheme or device;
Two: Mr. Safavian acted willfully in concealing the fact
Three: The fact concealed by Mr. Safavian was material to the Senate Committee on Indian Affairs;
Four: The subject was within the jurisdiction of the legislative branch of the Government of the United States, namely the Senate Committee on Indian Affairs, under applicable rules of the Senate;
Five: Mr. Safavian had a legal duty to disclose the facts allegedly concealed.
Jury Instructions 84-86.

[7]The Jury Instructions provide: "You are instructed to consider that a person acts 'knowingly,' as that term is used in these instructions only if that person acts consciously and with awareness and comprehension and not because of ignorance, mistake or misunderstanding or other

"corrupt" intent.[9]

The Government submits that the facts as presented in trial indicate that defendant acted with corrupt intent to obstruct the investigation:

1) As the jury found in the conviction on Count Five, defendant made a knowing and willful false statement to the Senate by claiming in a letter that Abramoff had no business with GSA.  Docket 119.

2) Defendant forwarded to the Senate his June 2002 GSA ethics request stating that Abramoff had no business with GSA and does all of his work on Capitol Hill.  G. Exh. 8.  G. Exh. 101 to G. Exh. 360 demonstrate that Abramoff was conducting his lobbying work at GSA by attempting to secure favorable treatment for his clients, gather information and pressure the Hill to act on his behalf.

3) Defendant forwarded Ms. Ellison's June 2002 response stating that Abramoff was not doing business or seeking to do business with GSA, despite the fact that Abramoff was seeking to get White Oak land from GSA and was seeking to get a redevelopment contract for the Old

---

similar reason.  A person who makes, submits, or uses a statement or writing which that person believes to be truthful does not 'knowingly' make, submit or use a false, fictitious or fraudulent statement."  Jury Instructions 91-92

[8]The Jury Instructions provide: "A person acts 'willfully' as that term is used in these instructions, when that person acts deliberately, voluntarily and intentionally." Jury Instructions 93.

[9]The Jury Instructions provide: "The word 'corruptly' as used in Counts One and Four means having a wrongful, immoral, depraved or evil purpose, motive or intent.  To act 'corruptly,' as that word is used in these instructions means to [] act voluntarily and deliberately and for the purpose of improperly influencing or obstructing or interfering with a proceeding.  In order to have acted 'corruptly,' Mr. Safavian must have known that his intentional acts would have the natural and probable effect of interfering with a matter material to, not ancillary [] to the proceeding."  Jury Instructions 99-100.

Post Office for his clients.

4) Defendant stated to Senate investigator Parker that he had disclosed all relevant facts to the ethics officer.  The jury's conviction of Count 2 indicates that defendant did not provide all relevant facts to the GSA ethics officer.

5) Defendant claimed to the Senate investigator hat $3100 was the total value of the Scotland trip.  G. Exh. 81-82.  Using defendant's own estimation of the Scotland trip, the total costs of everything but airfare was $3048, leaving $62 for airfare.  Using facts in evidence provided by other witnesses, the total costs of the Scotland trip could have been over $17000.

Those facts should be sufficient for the Court to determine that defendant acted "corruptly," that is to "act voluntarily and deliberately and for the purpose of improperly influencing or obstructing or interfering" the Senate proceeding.  Jury Instructions at 99-100. Consequently, in the analysis of Grouping, infra, the Court should consider Count Four as it would any other conduct.

## AS A RESULT OF GROUPING, DEFENDANT'S OFFENSE LEVEL IS INCREASED 3 LEVELS

### Determination of Closely Related Counts

For the purposes of grouping under § 3D1.2 and 3D1.4, three separate criminal acts occurred – in 2002 (Count 2), 2003 (Counts 1 and 3) and 2005 (Count 5).  Defendant argues that the grouping rules should yield a single group that contains all four counts of conviction upon the notion that the sole victim of Defendant's crimes is "society."  Def. Mem. 17-19.  Such an argument is misplaced on the facts and the law.

In order to determine the grouping requirements, the Court looks to U.S.S.G. §3D1.2, Groups of Closely Related Counts.  Counts may be grouped together under § 3D1.2(a) if they

14

involve the same victim and the same act or transaction, or under § 3D1.2(b) if they involve multiple transactions, but still involve the same victim and are connected by a common scheme or plan.

The Government readily concedes that convictions of Counts One and Three (obstruction and false statements to GSA-OIG) should be grouped together pursuant to § 3D1.2(a). Defendant's conviction of obstruction and false statements involved the same victim (GSA-OIG Special Agent Gregory Rowe) and the same transaction (statements made to Gregory Rowe in connection with an investigation into Defendant's participation in an international golfing trip provided by lobbyists).[10]

Counts 2 and 5, however, should not be grouped either with each other or with the GSA-OIG group (Counts 1 and 3) because there were (a) multiple transactions over nearly a three-year period, (b) the counts involved different victims and © they were not linked by a common scheme or plan. As a result, none of the provisions of § 3D1.2 apply, and the court should calculate the guidelines based on three separate groups.

## A.  Different Transactions

The counts of conviction occurred during a three year span and involved different statements and concealments.  The guidelines themselves indicate that temporal separation is relevant, if not dispositive in determining what constitutes a "transaction."  § 3D1.2 cmt. n.3 (stating that two counts of assault for shooting twice at a federal officer while attempting to

---

[10]Similarly, Count Five should be grouped with the acquitted conduct of Count 4 because the conduct involved the same victim, the Senate, and the same transaction statements and letters provided in February and March 2005.  For ease of reference, the closely related Group of Acquitted Conduct Four and Conviction Count 5 will be referred to simply as Count 5.

prevent apprehension should be grouped as part of the same transaction, but that two counts of assault for shooting at the same officer on two separate days should not be grouped). Count 2, false statements to the GSA Ethics officer, occurred between May 2002 and August 2002. Counts 1 and 3, obstruction and false statements to GSA-OIG Special Agent Rowe, occurred in April and May 2003. Count 5, false statements to the Senate, occurred in February and March 2005. Because each of these actions occurred on a separate date with separate conduct, they should be considered three separate transactions. See, e.g., United States v. Sherman, 268 F.3d 539, 546 (7th Cir. 2001) (affirming district court's finding that three acts violating the same statute were three separate transactions for grouping purposes).

*B. Different Victims*

Defendant's actions comprising the counts of conviction were also made to different victims. Defendant argues that the grouping rules yield a single group that contains all four counts of conviction because the sole victim of defendant's crimes is "society. However, different government entities may constitute different victims if they serve distinct purposes. United States v. Cueto, 151 F.3d 620, 639 (7th Cir. 1998) (holding the proper functioning of the FBI, a grand jury and a district court were three distinct societal interests); United States v. Beard, 960 F.2d 965, 968 (11th Cir. 1992) (grand jury and district court separate victims).

Defendant argues that the "society" as a whole is a victim of the crimes. The government contends that the victims of the crimes were those that he made false statements to: the GSA ethics office, the GSA-OIG and the Senate. However, even if the Court were to accept the idea that "society" was the victims of Defendant's crimes, the application note discussing the term "victim," provides that for victimless crimes in which society at large is the victim, "the grouping

decision must be based primarily upon the nature of the interest invaded by each offense."
U.S.S.G. §3D1.2, application note 2.

_____ Defendant fails to cite relevant D.C. Circuit case law that found that "society" does not automatically group when another victim is a governmental entity.  See, e.g., United States. v. Braxtonbrown-Smith, 278 F.3d 1348, 1355-56 (D.C. Cir. 2002) (grouping fraud counts separately from money laundering and tax evasion counts, given court's finding that there were different victims because one involved a bank, another a D.C. governmental entity and the third society at large); United States v. McCoy, 242 F.3d 399, 409 (D.C. Cir. 2001) (approving non-grouping of perjury and fraud/false statement counts because victim of perjury was integrity of legal system, while a governmental entity and bank were victims of fraud/false statements).  As the cases within the D.C. Circuit implicitly acknowledge, any analysis of grouping must be done pursuant to the nature of the interest violated by Defendant's crimes, as discussed supra in Cueto.[11]

    In the instant case, the separation between the Executive and Legislative branches is sufficient to distinguish Counts 1, 2 and 3 (GSA Ethics Office and GSA-OIG) from Count 5

---

[11]Defendant's citations to cases outside the D.C. Circuit are unavailing and factually inapposite.  See, e.g., United States v. Frank, 354 F.3d 910, 924 (8th Cir. 2004) (grouping counts together because counts were related to ongoing criminal conspiracy); United States v. Riviere, 924 F.2d 1289, 1304-06 (3d Cir. 1991) (possession of firearms offense has "society" as victim; grouped under § 3D1.2© because one count was a specific offense characteristic of the other); United States v. Berkowitz, 712 F. Supp. 707, 710 (N.D. Ill. 1989) (grouping together counts where same obstructive conduct affected two different entities).  Defendant also relies upon United States v. Kim, 896 F.2d 678, 687 (2d Cir. 1990) for the proposition that a court should group victims of society together.  Defendant fails to note that the Kim court rejected the defendant's argument that all crimes against the United States involved the same victim of "society."  Id. ("The interests protected by the immigration laws and the currency laws are so distinct that it is not realistic to consider both offenses to have as a common 'victim' the United States.").

17

(Senate Committee on Indian Affairs).  The Senate, as defendant repeatedly has argued, was investigating allegations of fraud against the Indian tribes perpetrated by Jack Abramoff and Michael Scanlon.  The title of the hearings were  "Oversight Hearing In re Tribal Lobbying Matters, et al."  The Senate was investigating not just whether Indian tribes were defrauded by Abramoff in terms of kickbacks paid by Michael Scanlon, but also trying to gather data regarding payments by Indian tribes to Abramoff and Scanlon.  Tribal funds solicited by Abramoff were used to pay for the trip to Scotland in 2002 that Defendant attended.  The Senate was gathering information on the flow of funds, the activities on the trip, and who paid for the activities on the trip.

The GSA ethics officer's responsibilities were vastly different than the Senate's investigatory role because Ellison's responsibilities only included the answering of  employees' questions regarding proper conduct.  See G. Exh. 33 (5 C.F.R. § 2635.107).  As part of the duties in the GSA General Counsel's office, the ethics officer was required to opine on the appropriateness of situations identified in employee's ethics requests, including questions about the receipts of gifts.  The GSA ethics officer was acting only in an advisory capacity to determine how Abramoff's gift of free airfare should be treated by defendant.

In contrast, GSA-OIG is a federal law enforcement agency that was investigating whether defendant had committed wrongdoing by accepting a free trip from a lobbyist who could have been seeking to do business with GSA.  The purpose of the GSA-OIG's investigation was not to provide advice on how to "treat the airfare," but rather to determine if any unethical or illegal conduct occurred by defendant and his interaction with a lobbyist who provided him a free trip to Scotland.

18

Because defendant made false statements to three separate entities with separate purposes, § 3D1.2(b) does not apply because separate victims were harmed.

## C.  Separate Criminal Objectives

Because the counts involve different victims as discussed supra, the Court need not reach the question under §3D1.2(b) whether the transactions are part of a common criminal objective or common scheme or plan.  However, if the Court were to find that the three separate acts to three different entities in three different years were the same transaction made to the same victim, "society," the counts should still be considered separately because they fall under separate criminal objectives.

 The application notes of the Guidelines provide a helpful starting point for analysis.  See § 3D1.2 cmt. n.4. The Committee provided examples illustrating that two counts of mail fraud and one of wire fraud should be grouped even if they occurred on different days, provided they were in furtherance of a single fraudulent scheme.  Id.  Similarly, a count of auto theft and a count of altering the vehicle identification number on the stolen car should be grouped.  Id. However, the Committee also found that a defendant who is convicted of two counts of rape for raping the same person on different days should not be grouped together.  Id.

Applying those examples to the instant case, defendant has nowhere acknowledged that the false statements in 2002 and 2005 were part of the same common scheme or plan.  While the government has argued that the defendant was acting with the same intent and motive to cover up his unethical relationship with Jack Abramoff, the government does not now contend that the

19

actions were part of a larger common scheme or plan.[12]  The examples in the Committee notes indicate an overarching scheme that applies to all of the criminal acts.  While a car thief might plan to alter the VIN number at the outset of stealing the car, it is unimaginable that defendant expected to make false statements to the Senate Committee on Indian affairs in 2005 when he lied to the GSA ethics officer years nearly three years previously.  Similarly, the isolated acts of rape of a single individual on multiple days may have been caused by the same motive and intent, but the acts are considered legally distinct for grouping purposes.[13]

_____

[12]Indeed, the Court rejected the Government's argument that there was an overarching common criminal objective when it rejected the admission of emails based upon an alleged conspiracy between Jack Abramoff and David Safavian.  Docket # 99.

[13]United States v. Pitts, 176 F.3d 239, 244 (4th Cir. 1999) is a helpful case to determine the contours of §3D1.2(b).  It evaluates a "course of conduct" based on "the duration of the defendant's conduct and whether the conduct of conviction overlaps in time, the locations in which the conduct occurs, the persons involved, the means used to accomplish the criminal purpose, and the separateness of the fear and risks of harm created by the defendant's multiple acts," and describes a "common criminal objective" as "a single goal that is in fact accomplished only by the entirety of the defendant's conduct, and where the behavior is ended upon the completion of that single goal," adding that "a defendant cannot merely define his scheme in broad fashion and argue that all his conduct was undertaken to satisfy that broad goal. . . . a more particularized definition of the defendant's intent is required."  Id. at 244-45.

In Pitts, the court held that the defendant's various espionage related counts should not be grouped as being part of a single course of conduct stating, "the counts depended upon two separate time periods, involved the supplying of information to two distinct sets of people in two separate locations, and resulted in the passage of an entirely different category of sensitive materials involving separate and distinct instances of harm," id., and that they were not unified by a common criminal goal because, "[t]he defendant did not intend merely to transfer a sum certain of sensitive information to a foreign power with the intent to terminate the relationship as soon as that goal was completed.  Rather, the defendant aimed to hand over as much sensitive information as he could.  Each act of espionage satisfied that goal to a degree unrelated to and independent of every other act of espionage," id.; cf. United States v. Wessells, 936 F.3d 165, 168 (4th Cir. 1991) (finding three efforts to construct an arsenal over one and a half years to be separate because of the passage of time).  Following Pitt, Defendant's actions are not a "course of conduct."  The false statements occurred over the period of a few years, in different locations, to varying people and agencies and harmed the interests of the "society" in varying ways.

*D. § 3D1.2(d) is Inapplicable*

Defendant argues that all of the counts of conviction could be grouped together by creating a successive application of § 3D1.2(b) and § 3D1.2(d).  Def. Mem. 20.  Defendant relies upon the commentary to § 3D1.2(d) that groups two counts of check forgery with a count of uttering the first forged check.  What defendant fails to note is that the commentary groups them together because the check forgery and uttering are grouped together by § 3D1.2(b) because they involve the same victim and transaction, but the two checks are grouped together under §3D1.2(d) by adding together the monetary losses.  In the instant case, the false statements do not involve monetary losses that can be added together to show the aggregate harm.

Defendant also argues that all the 18 U.S.C. §1001 counts should be grouped together to "prevent multiple punishment for substantially identical offense conduct."  Def. Mem. 18, 21-22 citing U.S.S.G. ch. 3, pt. D.   What Defendant fails to recognize is that his conduct was not "identical" but instead involved different concealments and different statements made to different entities at vastly different periods of time.   Defendant can cite no case law that would support his contention that all § 1001 counts should be grouped together if they do not fit into the other aspects of § 3D1.2.  United States v. Roberts, 134 Fed.Appx. 470, 473 (2d Cir. 2005)(finding error in district court's grouping of lies to Executive Branch and private entity because "the fact that two offenses involve the same type of criminal conduct is not alone a permissible basis for grouping.").

Grouping of Closely Related Counts

Based on the foregoing analysis, Counts 1 and 3 should be grouped as closely related counts.  Counts 2 and 5 are separate groups.

21

As discussed previously, the government contends that the offense level for each of these groups is as follows: Count 2: level 8 (level 6 for false statements plus 2 level adjustment for obstructive conduct); Counts 1 and 3: level 16 (level 14 for obstruction of justice plus an additional 2 level adjustment for obstructive conduct); Count 5: level 16 (level 14 for acquitted conduct of obstruction of justice, plus 2 level adjustment for obstructive conduct). Pursuant to U.S.S.G. § 3D1.4, the Defendant would receive an increase of 3 levels based upon the three separate criminal acts that occurred – in 2002 (Count 2), 2003 (Counts 1 and 3) and 2005 (Count 5).

Based upon the Government's recommendations, the Guidelines analysis is as follows:

| Closely Related Group | Base Offense Level | Specif Offense Adjustment (obstruction) | TOTAL |
|---|---|---|---|
| Counts 1 and 3 | 14 | 2 | 16 |
| Count 2 | 6 | 2 | 8 |
| Count 5 (and 4) | 14 | 2 | 16 |
| Analysis Pursuant to 3D1.4: | | | |
| Highest Offense = 16 (Counts 1 and 3) | | | 1 Unit |
| Number of Additional Units | Count 2 = + ½ (8 levels less) | Count 5 (and 4) = +1 (same level) | + 1 ½ Units |
| TOTAL UNITS | | | 2 ½ units = +3 levels |
| **TOTAL OFFENSE LEVEL** | | | **16 + 3 = 19 (30-37 months)** |

**Defendant Should Not Receive Downward Adjustment for Acceptance of Responsibility**

Defendant argues that he is "entitled" to a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1 because he has "clearly demonstrate[d] acceptance of responsibility for his offense." Def. Memorandum, p. 32. This argument is frivolous. Defendant has not only failed to accept any responsibility for his conduct, he has aggressively contested every allegation against him; continuously denied any criminal culpability whatsoever; and has testified falsely on his own behalf in an attempt to win an acquittal. Seeing that those efforts were in vain, defendant, almost unbelievably, now seeks a reduction in his criminal offense level for acceptance of responsibility.

While defendant is correct that a conviction at trial does not *automatically* preclude the possibility that a defendant might qualify for a 3E1.1 decrease (Def. Memorandum, p. 33), such circumstances are necessarily "rare." Application Note 2, § 3E1.1.

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues *that do not relate to factual guilt* (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). *In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.*

Id. (Emphasis supplied.)

The Application Notes also make clear that

> This adjustment is *not* intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is

23

convicted, and only then admits guilty and expresses remorse.[14]

Id. (Emphasis supplied.)

This can hardly be deemed that "rare" case where a defendant is entitled to acceptance of responsibility after having gone to trial. Despite defendant's attempt to shoehorn himself into the above-listed exceptions to the general rule that defendant's who go to trial do not get rewarded with acceptance of responsibility, the fact remains that defendant has never admitted that any of the statements at issue in this case – to his ethics officials, the GSA OIG or the Senate – were knowingly and intentionally false. Even now, after having been convicted of four felonies, defendant, while trying to paint himself as full of remorse – never acknowledges he knowingly and intentionally violated the law. Thus, defendant's request for a 2-level reduction in his offense level for acceptance of responsibility must be denied.

Defendant now claims that he "admitted all of the relevant conduct[15] well before trial. Mr. Safavian's challenge to the prosecution against him has always been limited to the constitutionality and application of law to his conduct.... All of Mr. Safavian's challenges to the charges were limited to matters of law." Def. Memorandum, p. 33. Defendant's claim is specious. Defendant has steadfastly and consistently maintained – pre-trial, during trial, and post-trial – that he was not guilty of the substantive offense against him.

_____

[14]Defendant does not even meet this low standard: even now, after his conviction, he is unable to admit that he knowingly and intentionally violated 18 U.S.C. §§ 1001 and 1505.

[15]It is notable that while defendant asserts – incorrectly, in the government's view – that he admitted "all of the *relevant conduct* well before trial" (def. Memorandum, p. 33 (emphasis supplied)), he does not make a similar claim in regards to his *conduct of conviction*, ie., the obstruction of justice or false statements counts.

A review of defendant's Motion to Dismiss Indictment, Docket # 32, easily puts to rest defendant's claim that "all" of defendant's challenges to the charges against him were purely legal. In his 63-page Motion to Dismiss, Mr. Safavian seemingly raised every objection that the imagination could conjure to attack the merits of the Indictment. To suggest now that these objections were based solely on legal arguments is baseless. Indeed, in denying defendant's Motion to Dismiss, this Court ruled that defendant's "motion, while purporting to address matters of law only, in fact argues for dismissal almost entirely on *sufficiency-of-the-evidence grounds*. Such a determination is improper in this case because there has been no full proffer of the evidence by the government, there is no stipulated record, and numerous material facts remain in dispute." Opinion and Order, April 28, 2006 (Docket 83), pp. 3-4 (emphasis supplied).

Likewise, defendant's post-trial Motion for Judgement of Acquittal (Docket # 121) was not limited to merely legal issues. To take just a few examples: defendant argued that "Mr. Safavian's representation that Abramoff 'had no business before GSA (he does all of his work on Capitol Hill') (Count Two); and 'did not have any business with GSA' (Counts Three and Five) *are not only true on their face*, but at the very least, constitute a reasonable construction of the question posited that is supported by definition of: a) the OGE; b) the GSA Ethics Manual; and c) the GSA ethic officer Eugenia Ellison." Docket 121, p. 26 (emphasis supplied). Defendant also argued that there was "*insufficient evidence* to support the notion that Mr. Safavian's statement that Abramoff "ha[d] no business before GSA (he does all his work on Capitol Hill)' was intentionally false." Docket 121, p. 32 (emphasis supplied). In addition, defendant also argued that the statements defendant made to the Senate were "not knowingly and willfully false." Docket 121, p. 39.

Most importantly, in determining whether or not defendant has fully accepted responsibility for his conduct, the Court should consider defendant's trial testimony in which, as the excerpts above vividly illustrate, defendant steadfastly denied any criminal intent or conduct. While defendant allowed that he may have used poor judgement on occasion, he adamantly denied ever intentionally lying, misleading or concealing.  Understandably, defendant does not attempt to explain how this trial testimony can be reconciled with his present argument that "he has clearly accepted responsibility for his conduct."  Def. Memorandum, p. 32.

Further evidence of defendant's failure to accept responsibility for his criminal conduct can be seen in defendant Sentencing Memorandum which, despite its 36-page length, contains not a single acknowledgment that defendant knowingly and intentionally lied to his ethics officer, the OIG and the United States Senate, and that his conduct obstructed the OIG and Senate investigations.  Rather, defendant repeatedly minimizes and denigrates the nature and seriousness of his own conduct.  See, Def. Mem., p. 1 ("This is a case of a man who misplaced considerable trust in someone who was a friend."); Id. (defendant's "actions have been greatly misunderstood in the press and public."); pp. 1-2 (defendant, unlike others linked to the Abramoff scandal, "attempt[ed] to seek guidance regarding the propriety of the [Scotland] trip"); p. 2 (defendant has admitted his conduct was "foolish"); p. 12 (defendant's conduct was 'inappropriate' and 'not a brilliant move'); p. 35 (defendant's actions constituted "a lapse in judgement".)  The fact that now, after falsely denying at trial any criminal culpability and after being convicted of four felonies, defendant can bring himself no further than to admit his conduct was "foolish" and "inappropriate," falls woefully short of "clearly" demonstrating acceptance of responsibility for

26

his criminal conduct.[16]

Of course, none of the foregoing is meant to suggest that defendant is not free to maintain his innocence and to continue to fight to overturn what he contends are the unjust verdicts in this case.[17]  We argue only that for this Court to grant defendant a downward adjustment for acceptance of responsibility while defendant maintains his innocence would be manifestly unjust.[18]

## The Other § 3553 Factors

In fashioning a reasonable sentence post-Booker, the Court must, after properly calculating and considering defendant's guideline sentence, take into account the other factors listed under 18 U.S.C. § 3553(a), see United States v. Dorcely, 454F.3d 366, 374, and fashion a sentence "sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).

---

[16]Defendant's citation to United States v. Cortes, 299 F.3d 1030, 1038 (9th Cir. 2002) is not helpful to his argument.  In Cortes, the trial judge denied Cortes a 2 level reduction for acceptance of responsibility after Cortes went to trial.  Id.  The Circuit Court did not hold that it was error to have denied Cortes his acceptance of responsibility; rather, it merely remanded the case back to the trial judge so that the court could make explicit factual findings that the decision to deny Cortes's request was not made as a matter of law simply because Cortes had elected to go to trial.  Id.

[17]We note that defendant has already noticed his appeal in this matter.

[18]Awarding defendant a reduction for acceptance of responsibility under these circumstances would render a further injustice in regards to all of the other defendants who, after consultation with their attorneys and a thoughtful analysis of the Sentencing Guidelines, choose to admit their guilt and plead guilty, rather than go to trial, in order to qualify for the acceptance of responsibility adjustment. If Mr. Safavian were to be awarded this reduction after going to trial and testifying to his innocence, those other defendants would rightly wonder why they gave up their chance of an acquittal.

27

<u>The Nature and Circumstances of the Offense and the History and Characteristics of the</u>
<u>Defendant</u>

     Defendant's conduct in this case constituted an abuse of the public trust.  He was appointed to a position of authority in the government and used that position to unfairly advantage a close, personal friend, in violation of his ethical duties.  Then, when confronted about his conduct, rather than admit the truth, he lied.  These lies, which covered a span of three years, were designed for no purpose other than to protect defendant from, at the very least, public censure and reprimand, or, at worst,  criminal prosecution.

     The Court has seen several hundred e-mails that the government introduced at trial which evidenced defendant's unethical relationship with Jack Abramoff, and, consequently, the government will not here describe them further at any significant length.  These e-mails clearly show that rather than focus on the public good, defendant was focused on rewarding Abramoff. It is clear from these e-mails, as well as the testimony at trial, that defendant liked and admired Abramoff and, as defendant wrote in one e-mail to Abramoff: "[Y]ou are the most watched lobbyist of the new generation.  I can only hope to follow suit someday."[19]  It was this desire to someday emulate Abramoff that motivated defendant to disregard his obligation to pursue public good and, instead, seek to help Abramoff at every turn in the hopes that defendant would later be rewarded in some fashion.

     None of defendant's lies can be excused as being the result of unfair surprise or ambush. In the Summer of 2002 defendant sent the first false statement via email to his ethics adviser on his own initiative.  Nobody instructed him to send the e-mail.  Defendant had the time and

---

[19]Govt. Ex. 100.

opportunity to carefully choose what he was and was not going to say. The false statements/obstruction of justice in regards to the GSA OIG in 2003 occurred during an interview that had been set up over the telephone. Hence, defendant was given advance notice and warning about when and where he was going to be interviewed and what the subject matter would cover. Finally, defendant was notified about the Senate's interest in the Scotland trip via certified letter in 2005. Thus, defendant was once again alerted exactly what it was that this inquiry was about. Defendant had weeks to fashion his response. After considering his options, defendant chose, once again, to lie.

All of these lies were premeditated. And all were designed to keep his inappropriate relationship with Abramoff from becoming public.

<u>The Sentence Must Reflect the Seriousness of the Offense</u>

Defendant's conduct in this case was extremely serious. Because of his position at both GSA and OMB, defendant's actions are particularly damaging because they effectively undermine the trust the public has in its government officials. Defendant abused the trust that was placed in him, and attempted to use his high office to further his own selfish aims. Then he lied to cover his tracks. Rather than being aberrant, it is quite clear that this conduct was long-standing and pervasive. Indeed, it began with defendant's appointment at GSA in 2002, continued through defendant's appointment at OMB, and culminated almost four years later at defendant's trial in 2006, when defendant lied under oath in a vain attempt to win an acquittal.

<u>The Sentence Must Afford Adequate Deterrence</u>

Defendant argues at length that a sentence of probation or home detention would provide

adequate deterrence to others.  Def. Mem., pp. 14-15.  Defendant points to the fact that he will be debarred from practicing law, has lost his job and reputation, and that this case has placed a significant emotional toll on him and his family.  Id. at pp. 1, 3, 4, 14-15.  None of these facts, taken alone or in combination, come close to providing adequate deterrence to other public officials who routinely face temptations to enrich themselves rather than faithfully serve the public good.

Defendant's argument echoes the one made by the district judge, who was reversed, in United States v. Martin, 455 F.3d 1227 (11th Cir. 2006).  Martin pled guilty to conspiracy to commit securities and mail fraud in connection with the HealthSouth investigation, agreed to cooperate with the government, and testified for five days against the lead defendant.  Id. at 1233.  Although the government conceded that Martin's cooperation had been valuable, it argued for a sentence of 62 months imprisonment.  Id. at 1232.  Finding defendant's cooperation to be the most extraordinary it had seen in its 25 years on the bench, the Court imposed a sentence of 7 days incarceration and 2 years supervised release.  Id. at 1233-34.  In determining this sentence, the judge found, inter alia, that the conduct was aberrational and that the experience had been so "devastating" to Martin that others similarly situated would be adequately deterred.  Id. at 1234.

The 11th Circuit, in reviewing the reasonableness of the sentence, stated that it was "shockingly short and wholly fails to serve the purposes of sentencing set forth by Congress in § 3553(a).  Id. at 1239.  Not only did the sentence fail to adequately reflect the seriousness of Martin's course of conduct, in words particularly apt for the instant case, the Court stated

> The 7-day sentence imposed by the district court also utterly fails to afford adequate deterrence to criminal conduct.  Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or

> opportunity," these crimes are"prime candidate[s] for general deterrence."
> Defendants in white collar crimes often calculate the financial gain and risk of
> loss, and white collar crime therefore can be affected and reduced with serious
> punishment.  Yet the message of Martin's 7-day sentence is that would-be white-
> collar criminals stand to lose little more than a portion of their ill-gotten gains and
> practically none of their liberty.

Id. at 1240 (citations omitted).

The Martin court went on to note that "As the legislative history of the adoption of §

3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white

collar crime.  Congress was especially concerned that '[m]ajor white collar criminals often

[were] sentenced to small fines and little or no imprisonment." Id. at 1240 (citations omitted).

Congress's fears would indeed be well-founded if the Court were to adopt defendant's request

for a non-prison sentence.

The hardships defendant has suffered as a result of is convictions, while undoubtedly real,

hardly make defendant's situation unique.  Indeed, the same hardships would likely be endured

by virtually any public official convicted of a public corruption crime.  If these natural and

foreseeable byproducts of a defendant's criminal conduct meant that he should not have to go to

prison, then few white-collar defendants would ever be incarcerated.

Virtually all high public officials have clean criminal backgrounds[20] and are individuals

of high-achievement.  They have, like this defendant, generally excelled in school and in work

and have been rewarded for their excellence with positions of trust and power.  Defendant's

argument suggests that these same virtues that qualified him for a position of public trust should

---

[20]Given the need for an FBI background check and, in the case of defendant's job at OMB,
Senate confirmation, this should hardly be surprising.

also insulate him from serious punishment now that he's been convicted of lying to cover up his violation of the public trust.  This argument suggests that only the unemployed and disadvantaged are deserving of jail because, given their relatively low station in life, a criminal conviction would, in and of itself, mean relatively little to them or their families.

Defendant's loss of job and reputation, and the resulting emotional toll, were an entirely foreseeable and predictable byproduct of defendant's criminal conduct.  And yet, defendant chose to ignore the distinct possibility that if he broke the law he could lose these things that were so important to him.  Obviously, the prospect of losing these intangible things was not adequate to deter defendant.  Nor is this prospect, alone, adequate to deter others who might be tempted to use their public office for private gain and to then lie to government officials in order to protect that unethical conduct from being discovered.

Sentence Should Protect the Public from Further Crimes of the Defendant

So long as defendant is not in a position of public trust, the government does not believe defendant poses a risk to the public.[21]

---

[21]After acknowledging that 18 U.S.C. 3553(a)(6) explicitly states that judges should strive to "avoid unwarranted sentence disparities among defendant with similar records who have been found guilty of similar conduct,"defendant then goes on to cherry-pick 10 individual cases, covering a span of approximately 17 years, and says that he should be sentenced similarly to them.  (Def. Memorandum, p. 26).  Obviously, without knowing all of the details of each case, it is impossible to judge whether these cases bear any real similarity to defendant's.  Nevertheless, we note that of these 10 cases defendant cites, eight were disposed by way of a guilty plea, and of those eight, four pled to misdemeanors and one pled to contempt.  Defendant fails to explain why he believes his sentence should be comparable to these defendants – almost all of whom pled guilty, many to misdemeanors.  Their cases are clearly distinguishable from defendant's, who elected to go to trial and was convicted of four felonies.

The most reliable way to ensure sentencing consistency is not to compare defendant's situation with cherry-picked cases; it is by adhering to the Sentencing Guidelines, which were established in order to ensure sentencing consistency across the United States.

## **CONCLUSION**

The defendant's offense level is 19, giving him a sentencing range of 30 to 37 months.

For the foregoing reasons, the Court should sentence defendant at the high end of that range.


Respectfully submitted,


/s/ Nathaniel B. Edmonds                    /s/ Peter R. Zeidenberg
NATHANIEL B. EDMONDS                       PETER R. ZEIDENBERG
Trial Attorney, Fraud Section               Trial Attorney, Public Integrity Section
Criminal Division                           Criminal Division
United States Department of Justice         United States Department of Justice

33

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of October, 2006,  a copy of the foregoing was

served on the following counsel by electronic service to:

Barbara Van Gelder, Esq.

Wiley Rein & Fielding

1776 K Street NW

Washington, DC 20006

Tel: 202-719-7032

Facsimile: 202-719-7049

/s/ Peter R. Zeidenberg

PETER R. ZEIDENBERG

Trial Attorney

Public Integrity Section

United States Department of Justice

34