**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED
SEP 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES of AMERICA, | |
| v. | |
| DAVID HOSSEIN SAFAVIAN, | Criminal No. 05-370 (PLF) |
| Defendant | FILED UNDER SEAL |

### DAVID H. SAFAVIAN'S SENTENCING MEMORANDUM

David H. Safavian, through undersigned counsel, hereby submits the following Sentencing Memorandum to provide the Court with a framework to consider an appropriate sentence for Mr. Safavian. In submitting this Memorandum, Mr. Safavian accepts all responsibility for his actions and does not seek to minimize the seriousness of the offenses of which he has been convicted. This Memorandum is intended to correct inaccuracies in the Pre-Sentence Report (PSR), which may affect the Court's calculation of a just and appropriate sentence and to support Mr. Safavian's request that, in light of all the facts and circumstances, this Court should exercise its discretion to determine a sentence that is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   THE OFFENSES ....................................................................................... 4

III.  SECTION 3553 GOVERNS THE FEDERAL SENTENCING SCHEME AFTER
      BOOKER ................................................................................................. 5

IV.   APPLICATION OF 18 U.S.C. § 3553(A) WARRANTS ALTERNATIVE
      SENTENCING UNDER BOOKER ............................................................ 8

      A.   Factor 1: The History and Characteristics Of the Defendant Warrant
           Alternative Sentencing Under § 3553(a)(1)) ......................................... 8

      B.   Factor 2. A Guideline Sentence Is Not Necessary to Further The Purposes
           of Sentencing (Retribution: General Deterrence: Specific Deterrence; and
           Rehabilitation) (Reviewed in Reverse Order) ..................................... 13

      C.   Factor 3: There Are Several Kinds of Alternative Sentences Available
           That Would Achieve These Objectives (§ 3553(a)(3)) ........................ 15

      D.   Factors 4-5: Sentencing Guidelines Range and Pertinent Policies ..................... 16

      E.   Factor 6: Alternative Sentencing Is Necessary to Avoid Disparity in
           Treatment of Similar Offenders (18 U.S.C. § 3553(a)(6)) ......................... 26

      F.   Factor 7: There is No Need to Provide Restitution To any Victims of the
           Offense .............................................................................................. 27

V.    DOWNWARD DEPARTURES ARE ALSO WARRANTED UNDER § 5K2.0
      AND FOR ACCEPTANCE OF RESPONSIBILITY ..................................... 27

      A.   § 5K2.0 ................................................................................................. 27

      B.   Acceptance of Responsibility under § 3E1.1 ........................................ 32

VI.   THE FACTORS OF SECTION 3572 WEIGH HEAVILY AGAINST THE
      IMPOSITION OF A FINE ......................................................................... 34

VII.  CONCLUSION ......................................................................................... 35

## I.    **INTRODUCTION**

Mr. Safavian's experiences and character demonstrate that he is a man who is committed to serving and protecting society and its laws, not undermining them. He is described by family, friends, colleagues, and superiors as a hard-working, thoughtful, and caring individual. His record confirms this characterization. David has not only excelled in both private practice and public service, earning the praises and esteem of high-level government officials, but has also served his community in ways that do not draw public attention, such as his work as a reservist with the Metropolitan Police Department ("MPD"), an auxiliary officer in Dumfires, Virginia, and as an official and unofficial volunteer to members and centers at his local church. 06.02.06 a.m. Tr. at 40-43.

The facts underlying his conviction corroborate their observation that Mr. Safavian's conduct was an isolated aberration from an otherwise exemplary life of public service and personal charitable contribution. Mr. Safavian acknowledges that the nature of the offenses seriously detracted from the integrity of government; however, they did not result in any pecuniary loss to the government or society and did not amount to a *quid pro quo*. This is a case of a man who misplaced considerable trust in someone he thought was a friend. For this misguided loyalty, Mr. Safavian has already paid dearly. The immediate consequences of his conviction are profound. Mr. Safavian has already been notified that he will be disbarred from the practice of law in the District of Columbia for a period of five years. Reciprocal disbarment in the other states in which he is licensed to practice law is a certainty.

The emotional cost of this ordeal to Mr. Safavian and his family has been considerable. His actions have been greatly misunderstood in the press and public. His name will be forever listed in the litany of Abramoff co-conspirators who defrauded their clients for millions of dollars or who, unlike David, made no attempt to seek guidance regarding the propriety of the

trip or pay their own way. Indeed, even the PSR mischaracterizes Mr. Safavian's conduct as "related" to Abramoff's case. See PSR at 1.[1] This linkage has not only harmed Mr. Safavian's reputation and possibility for public rehabilitation, it has also affected his wife's career.[2]

Mr. Safavian disagrees with the PSR's ultimate sentencing calculation. The advisory Sentence Guidelines would suggest a Base Offense Level 6 (0 to 6 months) for an 18 U.S.C. § 1001 offense and a Base Offense Level 12 (10 to 16 months) for an 18 U.S.C. § 1505 offense. Mr. Safavian suggests that a just review of the facts and circumstances of this matter reveals that his conduct is more properly akin to a level 6 violation than a level 12, or at least somewhere between the two levels. Thus, for instance, a sentence in the 8 to 10 level would be in conformity with the sentencing statute's directive that the District Court "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]. 18 U.S.C. § 3553(a). Mr. Safavian disagrees with the government and the PSR that he obstructed justice when he voluntarily testified at trial, where he admitted his culpability for his foolish actions.

In any event, after United States v. Booker, 543 U.S. 220 (2005), the Guidelines are just one of several factors the Court must examine in determining a proper sentence. The process, as

---

[1] The defense disagrees with the several aspects of the PSR, including, but not limited to its wholesale adoption of the government's characterization of the facts and underlying offenses, as well as its application of the Sentencing Guidelines to Mr. Safavian's conduct. See infra Part IV.D. These and all other factual corrections and disputes will be submitted to the Probation Office on October 5, 2006, pursuant to Local Rule 32(f)(2).

[2] Public criticism from congressional leaders for her relationship to her husband resulted in her exclusion from, among other things, working as the lead investigative staffer for the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina. Jonathan E. Kaplan, *Arrest of top Bush official makes wife a political issue for Dems*, The Hill, Sept. 21, 2005, available at http://www.hillnews.com/thehill/export/TheHill/News/Frontpage/092105/bush.html; see also Philip Shenon, *Democrats Say Relief Effort Needs Independent Inquiry*, N.Y. Times, Sept. 21, 2005, at A15.

governed by § 3553, is designed to promote the time-honored principles of criminal justice, including: (1) a just and proportionate punishment; (2) deterrence; and (3) rehabilitation of the defendant. 18 U.S.C. § 3553(a)(2). The seven factors that the statute sets forth to achieve these objectives include:

1.  The nature of the offense and the history and characteristics of the defendant;

2.  The purposes of sentencing (Retribution; Specific Deterrence; General Deterrence; and Rehabilitation);

3.  The kinds of sentences available (i.e., alternatives to prison);

4-5.  The Sentencing Guidelines and their Policy statements (which are now advisory);

6.  Avoiding disparity in treatment of similar offenders; and

7.  The need to provide restitution.

Notably, the very first factor the Court must consider in furthering these objectives includes the defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1). Indeed, after Booker, there is "no limitation ... on the information concerning the background, character, and conduct of a person convicted of an offense of the United States which the court may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Proper consideration of these factors demonstrates that Mr. Safavian should not be incarcerated. He was convicted of serious offenses to be sure, but his convictions are not indicative of Mr. Safavian's character, background, and overall conduct.

In considering the first set of sentencing objectives, retribution and deterrence, we would request that the Court consider the punishment that Mr. Safavian and his family have already suffered. Mr. Safavian can no longer practice law, after having been a member of three state bars for over a decade. Moreover, the arrest and convictions have essentially ended Mr. Safavian's career as a public servant. In addition, Mr. Safavian has even been precluded from volunteering for the Metropolitan Police Department and the Dumfries, Virginia security force.

Thus, the damage to Mr. Safavian's reputation and his career, not to mention the significant financial and emotion toll of the extensive media attention on his family, are sufficient to deter Mr. Safavian and other public servants from such future misconduct and need to be considered when evaluating whether the purpose retribution has been satisfied.

Indeed, consistent with his resourceful nature, Mr. Safavian has already taken steps to rehabilitate and recover from his ordeal. He is taking classes to explore new career options, and has strengthened the bonds of faith and family by spending more time in worship and service at his parish, as well as with his three-year old daughter.

In sum, imprisonment is not only unnecessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), it would impede some of the more effective means for rehabilitation that are currently available to him. Accordingly, and consistent with defendants "with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), we respectfully request that the Court exercise its post-Booker statutory discretion in issuing an alternative sentence, such as probation, home confinement, and/or community service.

## II.    **THE OFFENSES**

On October 5, 2005, a grand jury returned a five count indictment against Mr. Safavian, charging him with three counts of making false statements or acts of concealment under 18 U.S.C. § 1001(a)(1) and two counts of obstruction under 18 U.S.C. § 1505.

On June 20, 2006, a criminal jury returned a verdict finding him guilty on Count One, which alleged that he had obstructed "the official investigation being conducted by the GSA-OIG into [Mr.] Safavian's participation in an 'international golfing trip provided by lobbyists.'" Amended Indictment ¶ 27; see also Verdict Form at 1. The jury did not find Mr. Safavian guilty of the charges in Count Four, which alleged that he had obstructed "the inquiry by Senator John

4

McCain as Chairman of the Senate Committee on Indian Affairs, into allegations of misconduct by lobbyists for Native American tribes." Indictment ¶ 38; see also Verdict Form at 3.

Each of the false statement/concealment counts under 18 U.S.C. § 1001(a)(1) alleged multiple false statements or acts of concealment, and thus the Court used a special verdict form. With respect to the § 1001(a)(1) charges, in Count Two, the jury found that Mr. Safavian had both "concealed his assistance to Mr. Abramoff in GSA-related activities" and that he had "falsely stated to the GSA ethics officer that Mr. Abramoff did all his work on Capitol Hill, when in truth and fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property." Verdict Form at 2; see also Indictment ¶ 29. With respect to Count Three, the jury found only that Mr. Safavian had "concealed his assistance to Mr. Abramoff in GSA-related activities." Verdict Form at 3; see also Indictment ¶ 31. With respect to Count Five, the jury found only that Mr. Safavian had again "falsely stated in a letter to the Committee that Mr. Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland, when in truth and fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property." Verdict Form at 4; see also Indictment ¶ 40.

## III.    SECTION 3553 GOVERNS THE FEDERAL SENTENCING SCHEME AFTER *BOOKER*

The statutory basis of the federal sentencing regime is found in 18 U.S.C. § 3553. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Sixth Amendment requires that the Guidelines cannot operate as mandatory sentencing rules. The Court thereby reaffirmed its holding in Apprendi v. New Jersey, 530 U.S. 466 (2000), that any fact, other than a prior conviction, that increases the penalty for a crime must be proved to a jury beyond a reasonable doubt or admitted by the defendant on the stand. Booker, 543 U.S. at 244.

In so doing, the Court ruled that two provisions were unconstitutional: 18 U.S.C. § 3553(b)(1) (the provision of the federal sentencing statute that required sentencing courts to impose a sentence within the applicable Guidelines range unless it found a basis for departure) and 18 U.S.C. § 3742(e) (the provision that established the standard for appellate review). The Court found both of these provisions severable and excised them from the statute, leaving the remainder of the sentencing scheme intact. Booker, 543 U.S. at 259-60. So modified, the Court made the Sentencing Guidelines "effectively advisory." Id. at 245.

Thus, under Booker, the Court *must* consider, apart from the guidelines, the seven factors listed in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing listed in § 3553(a)(2). Id. at 259-60; United States v. Simpson, 430 F.3d 1177, 1186 (D.C. Cir. 2005) ("Booker require[s] sentencing courts to consider the § 3553(a) factors"); United States v. Ayers, 428 F.3d 312, 314 (D.C. Cir. 2005) (reversing sentence where it was not clear beyond a reasonable doubt that "the district court, when announcing its alternative sentence, understood its obligation to consider the factors in § 3553(a)").

Neither Booker nor section 3553(a) gives special weight to any single factor. The plain language of section 3553(a) does not support a preference for one factor over the others. Accordingly, courts have recognized that after Booker:

> If a district court . . . makes the Guideline calculation the presumptive sentence, it will commit legal error by misapplying § 3553(a), which now makes the Guideline a, but only a, factor to be considered. It will fail to embrace the discretion that it has, which is to reach the right answer to the sentencing decision rather than a merely plausible answer. . . .

> In short, Booker has resuscitated the much-lamented discretion that the sentencing statute seemed to take away from district courts, and has at least partially restored that halcyon condition that district judges have longed for these many years. District courts neither should, nor can, ignore that by placing undue weight on the Guideline portion of the sentencing chemistry. They must properly use the

> Guideline calculation as advisory and start there, but they must not accord it greater weight than they accord the other § 3553(a) factors. Rather, they must consider all of the information before them, as they used to do, and then reach for the correct sentence under all of the circumstances. For our part, we will then review the ultimate result for reasonableness.

United States v. Zavala, 443 F.3d 1165, 1170-71 (9th Cir. 2006). Thus, giving any one factor more weight than others is inconsistent with § 3553(a) and would be error under Booker. See, e.g., Huerta-Rodriguez, 355 F. Supp. 2d at 1023 ("Significantly, [Booker] neither held nor implied that the measure of reasonableness is the Guideline sentencing range. . . . [R]easonableness in the first instance, then, will be guided by the statutory factors set out in 18 U.S.C. § 3553(a), together with consideration of the now-advisory Guidelines.");[3] United States v. Myers, 353 F. Supp. 2d 1026, 1028 (S.D. Iowa 2005) ("If presumptive, the Guidelines would continue to overshadow the other factors listed in section 3553(a), causing an imbalance in the application of the statute to a particular defendant by making the Guidelines, in effect, still mandatory."); United States v. Ranum, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005) ("[C]ourts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors.").

In addition, while the Guidelines have always contained exceptions (e.g. 5K2.0), § 3553 contains factors that were forbidden from consideration under the Guidelines but now *must* be considered independently. See, e.g., United States v. Nellum, 2005 U.S. Dist. LEXIS 1568, at *2

---

[3] The Huerta-Rodriguez court also noted:

[T]he court will not preserve a "de facto" mandatory Guidelines scheme by affording the Guidelines a presumption of reasonableness in every case. Such an interpretation of the Booker remedy would circumvent Booker's substantive holding, and would defy the directive that the court consider the factors in 18 U.S.C. § 3553(a).

355 F. Supp. 2d at 1025.

(N.D. Ind., Feb. 3, 2005) ("[M]any of the § 3553(a) factors – such as the history and characteristics of the defendant – are factors that the guidelines 'either reject or ignore.'"); United States v. Cherry, 366 F. Supp. 2d 372, 378 (E.D. Va. 2005) ("[T]he guidelines reject the consideration of many of the critical factors . . . that the Court is required to consider pursuant to § 3553(a)."). [4]  As detailed below, these factors not only permit a lower sentence within the Court's discretion, but in this case, proper consideration of these factors demonstrates that Mr. Safavian warrants a lesser sentence.

## IV.     APPLICATION OF 18 U.S.C. § 3553(A) WARRANTS ALTERNATIVE SENTENCING UNDER *BOOKER*

### A.     Factor 1: The History and Characteristics Of the Defendant Warrant Alternative Sentencing Under § 3553(a)(1))

#### 1.     History and Character of Mr. Safavian

After Booker, there is "no limitation … on the information concerning the background, character, and conduct of the defendant which a court may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. § 3661.[5] Mr. Safavian's personal history and character demonstrate that the conduct for which he has been convicted is an anomaly in a life comprised of hard work and dedication to family and public service.

Mr. Safavian was born in Michigan in 1967. He grew up in Michigan, Missouri, and Virginia, for the most part, in a single-parent home with his mother and his sister.

Mr. Safavian has been married to his wife Jennifer for approximately eleven years. They

---

[4] Myers, 353 F. Supp. 2d at 1028 ("Guideline provisions and statutory provisions under § 3553(a) often contradict one another."); see also Ranum, 353 F. Supp. 2d at 986.

[5] See also Ranum, 353 F. Supp. 2d at 985-86; Myers, 353 F. Supp. 2d. at 1028; Nellum, 2005 U.S. Dist. LEXIS 1568, at *2 (holding that the Court must now consider factors, such as the defendant's good character or family ties, that were effectively precluded from consideration under the mandatory Guidelines regime).

have a three-year old daughter.        As her attached letter indicates, David is known as a

thoughtful and caring individual and a wonderful father.        The last year has

obviously been very difficult for the entire family, especially Mrs. Safavian, who also has

established a career in public service in Washington, D.C. They have been subject to unwelcome

public scrutiny, hate mail, and crank phone calls.

Mr. Safavian worked to put himself through school and earned a B.A. in Political Science

from St. Louis University in Missouri in 1988; a J.D. degree from Detroit College of Law in

1993; and a Master of Laws in Tax Law from Georgetown University in 1994. Licensed to

practice law in Michigan, Missouri and the District of Columbia until June 22, 2006, Mr.

Safavian has devoted a substantial amount of his career and time to public service. In early

2001, Mr. Safavian left his profitable consulting firm, Janus Merritt Strategies, to work as Chief

of Staff for Congressman Chris Cannon from the Third District of Utah. Mr. Safavian worked

for Congressman Cannon for more than a year and a half. 06.02.06 a.m. Tr. at 34:7-8.

Subsequently, Mr. Safavian declined opportunities in the private sector and instead left the

Congressman's office to work as the Chief of Staff of the GSA in May of 2002. Id. at 37:10-11.

As GSA Administrator Stephen A. Perry testified at trial, Mr. Safavian was hired at GSA

for his "stellar background" and extensive experience. He was "far and above the best

candidate" reviewed for the position. 05.24.06 a.m. Tr. at 6:1-5. At the GSA he was known as

an "excellent worker" who genuinely enjoyed public service and "contributed significantly to the

agency's success." Id. at 42, 45. Consequently, when Mr. Safavian left the GSA in January

2004 to serve as Administrator of the Office of Federal Procurement Policy ("OFPP") of the

Office of Management and Budget ("OMB"), Administrator Perry awarded him with a bonus.

Id. at 42.

Demonstrating that his commitment to public service extended beyond the halls and corridors of this ambitious city, Mr. Safavian also dedicated a significant portion of his time outside the office to the community. Beginning in January of 2002, motivated in substantial part by the President's requests for the American public to volunteer in the wake of the September 11th tragedy, Mr. Safavian began volunteering at the Metropolitan Police Department ("MPD") as a reserve officer in the District of Columbia (over Mrs. Safavian's objections on grounds of safety). 06.02.06 a.m. Tr. at 40. The MPD Reserve trained volunteers to help in the event that some disaster struck the city. Upon completion of his training, Mr. Safavian worked 16 hours a month for the MPD as a reserve officer. Mr. Safavian's duties included intake for people coming into the District's police stations, crowd and traffic control for major public events like parades, and patrol with District police officers. Mr. Safavian also did some work for the Fraud and Cyber Crimes unit of the MPD. Id. at 41.

Furthermore, in late 2004, Mr. Safavian also began volunteering as a police auxiliary for the town of Dumfries, Virginia. He assisted the town with security when they held parades or similar events. One of the most dispiriting consequences of his arrest and trial is that David can no longer serve as a volunteer officer. Mr. Safavian also resigned his position at the OMB effective September 16, 2005—three days before his arrest. Id. at 42. The loss of these career and volunteer opportunities to contribute to his community has been incredibly hard on Mr. Safavian and his wife.

These losses, however, have led Mr. Safavian to seek other opportunities to pursue community service, and he has done so in a way that also reaffirms his core values and demonstrates his character. After having to resign his position with the OMB and his work as a reserve officer, Mr. Safavian began volunteering at the Carpenter's Shelter where his church

10

provides a dinner once a month to those in need of food and a home. Id. at 43. He has also visited sick members of his church. See Att. A. Indeed, Mr. Safavian has been an active member of                                    for some time, and since his arrest is an almost daily attendee at Mass or prayer.

History is defined as a "narrative of past events," and a characteristic is defined as a "distinguishing attribute or element." Webster's II New College Dictionary (2001). Mr. Safavian's narrative is filled with efforts to help members of the public, not harm them. And his distinguishing attribute is consistent dedication to his family, faith, and community.[6] It should go without saying that someone who has already had so much—in terms of reputation, relationships, and professional life—taken from him, is extremely unlikely to engage in any future misconduct, and someone with Mr. Safavian's background certainly does not pose any future threat to society. We respectfully urge that under § 3553(a)(1), this Court consider the loss that Mr. Safavian and his family have experienced already, as well as the incalculable loss of separating a father from his three-year old daughter and supporting wife in exercising leniency. See, e.g., Myers, 353 F. Supp. 2d at 1028 (S.D. Iowa 2005) (noting that because of the conflict between § 3553(a)(1) and many of the Guidelines' policy statements, see USSG §§ 5H1.1-6, 10-12, "in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range"); Nellum, 2005 U.S. Dist. LEXIS 1568, at *10 (acknowledging that while family ties were not ordinarily relevant under the Guidelines, "under § 3553(a), the history and characteristics of the defendant, including his

---

6 We have attached a sample of letters from colleagues, friends, family, and others who confirm this depiction. See Att. A. Additional letters are forthcoming.

family ties, are pertinent to crafting an appropriate sentence"); United States v. Smith, 359 F.

Supp. 2d 771, 782 (E.D. Wis. 2005).

        2.      Nature of the Offense

      The four convictions against Mr. Safavian all arise out of the same factual nucleus, that

he assisted Jack Abramoff with Abramoff's interests in GSA-controlled properties; participated

in a golf trip to Scotland hosted by Mr. Abramoff (for which he paid the sum of $3,100); and in

discourse with government officials either failed to disclose this assistance or asserted that Mr.

Abramoff had no business with the GSA.

      Mr. Safavian acknowledged at trial that it was "inappropriate" and "not a brilliant move"

to forward internal GSA emails to Abramoff. See 06.02.06 p.m. Tr. at 16-19. Nevertheless,

because we are at this point looking to ascertain the proper degree of punishment, it is important

to also take stock of the limited nature of the assistance Mr. Safavian provided Abramoff. First,

none of these activities involved official GSA action or affected GSA decision-making.

Additionally, with respect to arranging the meeting with GSA officials, both Tony Costa and Mr.

Safavian knew prior to the meeting that White Oak would not be appropriate for the Eshkol

Academy. See 05.25.06 a.m. Tr. at 65; 06.02.06 a.m. Tr. at 104-06. Furthermore, Mr.

Safavian's advice regarding Abramoff's draft letter to GSA was limited to suggesting that

Abramoff should include information about the history and mission of the Eshkol Academy in

the letter, and to limit his request to a short term lease. Gov't Ex. 171-72. Mr. Costa himself

testified that none of this information was confidential. See 05.25.06 a.m. Tr. at 73.

      It is also important to highlight that Mr. Safavian's conduct did not result in any

economic loss to the government or society. Moreover, to the extent that this Court has deemed

the cost of the Scotland trip relevant to the obstruction of justice charge in Count One, Mr.

Safavian's actions did not amount to the acceptance of a *quid pro quo*.

**B.    Factor 2. A Guideline Sentence Is Not Necessary to Further The Purposes of Sentencing (Retribution: General Deterrence: Specific Deterrence; and Rehabilitation) (Reviewed in Reverse Order)**

Congress has directed that a District Court "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a). Thus, this Court is <u>required</u> by law to impose the <u>minimum</u> sentence sufficient to fulfill the following objectives:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

1.    Rehabilitation

Regarding the objective enumerated in subsection (D), Mr. Safavian has taken it upon himself to seek rehabilitation from the realities of his arrest, trial, and conviction, and the conduct which led to these events. Having lost his license to practice law, he has since enrolled in classes and started a services-related company in an attempt to help provide for his family. A committed Roman Catholic before these events, his faith, as well as his service to others as an outgrowth of this faith, have only increased in importance in these trying times. As noted by Mrs. Safavian, perhaps the one positive development from this ordeal is that he has actually been able to spend more time with his wife and young daughter.    The code itself directs that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). However in this instance, it is clear that imprisonment would not only fail to rehabilitate, but would seriously impede the regenerative effects of industry, family, and faith that are currently underway.

13

2.     Specific Deterrence and Protection of the Public

Imprisonment is not needed to protect society from Mr. Safavian re-offending. He is not only otherwise a law-abiding citizen, but has been a dedicated servant to his community who, after this case, will have no opportunity or inclination to break these, or any other laws.

Since being convicted, Mr. Safavian has been disbarred from the District of Columbia after having been a member in good standing for over a decade. Moreover, as government rules dictate and the many public articles and press reports have noted, these convictions have essentially ended Mr. Safavian's career as a public servant. In addition, Mr. Safavian has been precluded from volunteering for the Metropolitan Police Department and the Dumfries, Virginia security force. In sum, the damage to Mr. Safavian's reputation, the fact that his career as a lawyer and public servant are over, and the significant effects of the extensive media attention on his family are sufficient to deter Mr. Safavian from any future misconduct.

3.     Adequate General Deterrence

Courts have acknowledged that there is considerable evidence that short or alternative sentences, such as probation or home detention, can have a strong deterrent effect on prospective white collar offenders. See, e.g., United States v. Adelson, No. 05-CR-325 (S.D.N.Y. July 20, 2006) (Sentencing Memorandum) (citing Richard Frase, Punishment Purposes, Stan. L. Rev. 67, 80 (2005) (noting that white collar offenders are more likely to be deterred by modest penalties)); see also Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. U. L. J. 485, 492 (1998).

In particular, the very public punishment that Mr. Safavian has experienced during the last year has already contributed to the goal of deterrence. No public official serving in this city or elsewhere in government would want to lose their job, professional license, reputation, and key relationships, or experience the humiliation and shame of having to defend criminal

14

accusations concerning their integrity before a public audience. Nor would they want to put their families through the trauma of any of the foregoing. A sentence is expected but neither prison nor long term confinement of any kind is necessary for an "adequate" message of deterrence to be heard.

4.    Retribution

Lastly, the objective of retribution that is set forth in subsection (A) is also mitigated in this case. While there is no question that making false statements to the government, concealing material facts, and obstructing justice are serious offenses that deserve punishment, there are other mitigating factors that allow the goal of retribution to be fulfilled with a more moderate punishment than the guidelines call for. See infra Part V (discussing § 5K2.0 departure).

**C.    Factor 3: There Are Several Kinds of Alternative Sentences Available That Would Achieve These Objectives (§ 3553(a)(3))**

Under § 3553, the Court must consider a wide range of alternatives to imprisonment to fashion a just sentence, such as home confinement and community service. Simpson, 430 F.3d at 1186. In addition, because the Sentencing Guidelines are now advisory, the sentencing table and the restrictions on probationary sentences, sentences of home confinement, and split sentences in USSG §§ 5A, 5B1, and 5C1 are also advisory. Booker, 543 U.S. at 259. Thus, for instance, to receive a sentence of probation, Mr. Safavian's offense level does not have to fall within Zone A or B. Also, to receive a split sentence of half imprisonment and half home confinement, the offense level does not have to fall within Zone C. See United States v. Haidley, 400 F.3d 642, 645 (8th Cir. 2005) (noting that because Booker made guidelines advisory, the fact that they specified an offense level of 13, Zone D would not prevent District Court from "sentenc[ing] the defendant to a lesser sentence, or impos[ing] different terms of confinement, such as community correction confinement or home detention"); United States v. Duhon, 440

15

F.3d 711, 717 (5th Cir. 2006) (reversing non-guideline sentence as unreasonable, but noting that a District Court may impose a sentence of probation despite an offense level in Zone D and "the court, at a minimum, should acknowledge that it is aware that probation would not ordinarily be available under the advisory Guidelines").

Accordingly, under either the advisory Guideline calculus described directly below, or the PSR draft analysis, this Court has the discretion to, and should, impose an alternative sentence.

**D.      Factors 4-5: Sentencing Guidelines Range and Pertinent Policies**

The defense disagrees with the draft PSR's wholesale adoption of the government's characterization of the underlying offense and its application of the Sentencing Guidelines to Mr. Safavian's conduct. First, the PSR should have grouped all four counts into a single group, rather than creating two separate groups. This misapplication of § 3D1.2 resulted in an improper increase in the offense level by 1 unit. Second, the PSR is in error when it added two levels for obstruction of justice pursuant to § 3C1.1 despite the fact that this enhancement requires "clear and convincing" evidence, which is lacking in this case. See United States v. Montague, 40 F.3d 1251, 1254 (D.C. Cir. 1994). Each of these arguments is addressed more fully below, and lead to the conclusion that proper application of the Sentencing Guidelines, would have resulted in an advisory offense level of 12, rather than 15 as indicated in the PSR.

16

1.    Proper Application of § 3D1.2 Results in a Single Grouping for All Four
       Counts

Proper application of the grouping rules should yield a single group containing all four

counts of conviction, rather than two groups as found by the PSR.[7] All four counts involved

substantially the same conduct and resulted in substantially the same harm. USSG § 3D1.2.

The guidelines provide a list of criteria for determining whether counts should be

grouped according to that standard. See USSG § 3D1.2(a)-(d). Because all four counts meet the

criteria of § 3D1.2, they should all be combined to form one group for the purposes of

calculating the combined offense level in § 3D1.4.

This result is supported by the commentary to Part D of the Sentencing Guidelines, which

states:

> Some offenses that may be charged in multiple-count indictments are so closely
> intertwined with other offenses that conviction for them ordinarily would not
> warrant increasing the guideline range. For example, embezzling money from a
> bank and falsifying the related records, although legally distinct offenses,
> represent essentially the same type of wrongful conduct with the same ultimate
> harm, so that it would be more appropriate to treat them as a single offense for
> purposes of sentencing.

USSG ch. 3, pt. D, introductory cmt. Like the above example, the single obstruction count and

the three false statement counts in this case should be grouped together because: (1) they

represent the same type of wrongful conduct, making false or misleading statements to the

United States government about Mr. Safavian's relationship with Jack Abramoff; and (2)

resulted in the same ultimate harm, misleading the government regarding that relationship.

---

[7]    The consequence of the PSR's calculation based on two groups is that Mr. Safavian
received a one-level enhancement to his offense level pursuant to USSG § 3D1.4. PSR ¶¶ 35-40.
If this Court were to group all four counts into a single group, as this memo argues, Mr. Safavian
would not receive any enhancement under § 3D1.4.

One of the objectives of the guidelines is to "limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct." USSG ch. 3, pt. D, introductory cmt. Only by grouping all four counts into one group can this Court avoid multiple punishment for substantially identical conduct and exacerbating the significance of the prosecutor's charging decision. This is demonstrated by recognizing the following facts: (1) as the PSR advises, offenses under 18 U.S.C. § 1001(a)(1) are to be grouped pursuant to § 3D1.2(d); (2) this means that Count Three, which is an offense under 18 U.S.C. § 1001(a)(1) should be grouped with Counts Two and Five through subsection (d); (3) Counts One and Three involve convictions for substantially identical offense conduct—making false or misleading statements to the GSA-OIG; (4) the primary objectives of the grouping rules are to "limit the significance of the formal charging decision and to *prevent multiple punishment for substantially identical offense conduct*," USSG ch. 3, pt. D, introductory cmt.; see also United States v. Riviere, 924 F.2d 1289, 1305 (3d Cir. 1991) (noting that "multiple counts do not result in a sentence enhancement unless they represent *additional conduct* that is not otherwise accounted for by the guidelines").

        a.     All Four Counts Should Be Grouped Pursuant to § 3D1.2(b)

The Sentencing Guidelines provide that multiple counts shall be grouped together, even when they involve two or more acts or transactions, if (1) they involve the same victim, and (2) they are connected by a common criminal objective or constitute part of a common scheme or plan. USSG § 3D1.2(b). Because all four counts that Mr. Safavian was found guilty of committing meet the above criteria, they should be grouped together to form a single group.

All four counts in this case involve the same victim, the United States government or "society." See, e.g., United States v. Frank, 354 F.3d 910, 916-20, 924 (8th Cir. 2004) (grouping forty-seven counts into a single group, including two counts of obstruction of justice, sixteen

counts of false statements, money laundering, conspiracy, five counts of wire fraud, and twenty-two counts of mail fraud, where all charges involved the same victim of "society."); Riviere, 924 F.2d at 1304-06 (grouping firearms offenses together because each involved the same victim, society); United States v. Berkowitz, 712 F. Supp. 707, 710 (N.D. Ill. 1989) (grouping two obstruction of justice counts and one count of stealing property of the United States because all three counts involved the same victim of "society at large"), rev'd on other grounds, 927 F.2d 1376 (7th Cir. 1991).[8]  Indeed, it is the government's own theory of the case, as embodied in several of its briefs submitted to this Court, that all four counts are connected by a common objective, scheme, or plan concerning disclosure of the nature of his relationship with Abramoff within the meaning of § 3D1.2(b).  See Gov't Opp. to Def. Mot. to Dismiss at 14, 20, 30 (Docket #45) (repeatedly noting that Mr. Safavian's actions had the common objective of hiding his relationship with Mr. Abramoff); Gov't Mot. for Pre-trial Admissibility at 3, 9, 13, 15 (Docket #66); see also United States v. Mizrachi, 48 F.3d 651, 655 (2d Cir. 1995) (grouping conspiracy to commit arson and mail fraud, arson, two counts of mail fraud, and money laundering as part of one continuous scheme to profit from a fraudulent insurance claim); United States v. O'Hara, 1991 WL 286176 at *2 (D. Me. Sept. 13, 1991) (grouping charges for price-fixing and false

---

[8] Some courts have analyzed harm caused to the United States government in terms of the societal interest that is harmed.  See United States v. Kim, 896 F.2d 678, 687 (2d Cir. 1990); USSG § 3D1.2 cmt. n.2 ("For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed.").  This analysis yields the same result that all four counts should be grouped together because each count impacts the same societal interest—the ability of the United States government to enforce its laws.  See United States v. Gastelum-Almeida, 298 F.3d 1167, 1175 (9th Cir. 2002) (noting that the societal interest affected by false statements is "the provision of truthful information for law enforcement").  Moreover, the fact that some of the statements were made to the GSA and others were made to the Senate does not affect this analysis.  In Frank, the court found all forty-nine counts involved the same victim of "society" where the defendant's conduct was directed at different organizations within the federal government: the Probation Office, a U.S. Attorney's Office, a grand jury, and a court of law.  Frank, 354 F.3d at 916-18.  Notably, the two obstruction of justice charges that Frank was convicted of involved different federal entities, the grand jury and a court order.  Id. at 918.

statements because they both involved the same victim of the United States and were connected by a common criminal objective to extract as much profit from selling fish to the Defense Department as possible) (not reported).

Consequently, all four counts involved in the case meet both prongs of the § 3D1.2(b) analysis and should be grouped together to form a single group.

> b.    Even Assuming that Multiple Victims Were Involved, All Four Counts Should Be Grouped Pursuant to §§ 3D1.2(b) and (d)

The Sentencing Guidelines provide that a single group may be created by successive application of multiple subsections of § 3D1.2. See USSG § 3D1.2 cmt. n.7 ("A single case may result in application of several of the rules in this section."). The guidelines provide an example of this process in the commentary to § 3D1.2, note 6, example (8), which explains that in a case involving two counts of check forgery and one count of uttering the first forged check, all three counts are to be grouped together. The notes explain that this is accomplished by first grouping the uttering count with the first forgery count under § 3D1.2(a), followed by adding the second forgery count to the group under § 3D1.2(d) and adding the monetary loss involved in the two forgery counts. See USSG § 3D1.2 cmt. nn.6-7.

In this case, all four counts can be grouped in a manner identical to the process used in example (8), even assuming for the sake of argument that the four counts do not involve the same person or agency within the United States government. As recommended by the PSR, Counts One and Three can be grouped pursuant to § 3D1.2(b), because they involve the same victim (the GSA or society) and are connected by a common scheme or plan. See PSR at 7, ¶ 22. Furthermore, Count Two can be added to the group pursuant to *either* § 3D1.2(b) or (d). Count Two can be added under subsection (b) because it involves the same victim as Counts One and Three (the GSA or society), and is connected by a common criminal objective or constitutes part

of a common scheme or plan. See supra Section IV.D.1(a). Alternatively, if this Court determined that Count Two did not involve the same victim as Counts One and Three, or that Count Two was not part of a common scheme or plan, then that count can still be added to the group under subsection (d).

Even if this Court found that Counts Two and Five involved different victims from Counts One and Three, or were not part of a common scheme or plan, both can be added to this group pursuant to § 3D1.2(d), which provides for grouping even between counts involving different victims. See USSG § 3D1.2 cmt. background ("Counts involving different victims . . . are grouped together only as provided in subsection (c) or (d)."). This is due to the fact that § 3D1.2(d) specifically lists § 2B1.1, the guideline that controls Counts Two, Three, and Five, see USSG app. A, as one of the guidelines to be grouped under that subsection. In addition, § 3D1.2(d) provides that offenses should be grouped:

> [w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

§ 2B1.1 is written to cover such behavior through § 2B1.1(b)(1) and (2), which provide for enhancements to the offense level based on the amount of money and number of victims involved. Therefore, through § 3D1.2(d), Count Five (and, if necessary, Count Two) is added to the group to combine with Count Three and adding the loss involved in those counts according to § 2B1.1.

The PSR used this very process to combine Counts Two and Five under § 3D1.2(d). See PSR ¶ 22 ("Counts Two and Five . . . are grouped together pursuant to § 3D1.2(d)"). However, the PSR failed to follow example (8) by not recognizing that counts can be added to a group based on successive application of different subsections of § 3D1.2. Another way to view this

approach would be to *first* group all three false statement counts in accordance with § 3D1.2(d), and *then* add Count One pursuant to § 3D1.2(b) because it involves the same victim as Count Three and is part of a common scheme or plan with Count Three.

       2.    <u>An Upward Adjustment For "Obstructing or Impeding the Administration of Justice" Is Not Warranted Under § 3C1.1</u>

     The PSR declined to take a position on the application of an adjustment for obstruction of justice pursuant to § 3C1.1, but accounted for the government's request in its calculation of the total offense level. PSR ¶ 19 ("[I]t is the position of probation that the Court proceeded over the trial, heard trial testimony, and will therefore be in the best posture to apply the enhancement."). The Sixth Amendment of the Constitution, the precedent in this Circuit, as well as the objectives of the adjustment as stated by the Sentencing Commission, require this Court to reject application of that adjustment to this case.[9] There is no evidence that Mr. Safavian obstructed or impeded the administration of justice "during the course of the investigation, prosecution, or sentencing" of the offenses of which he was convicted, USSG § 3C1.1, let alone "clear and

---

[9] Indeed, this Court may lack the authority to apply the § 3C1.1 enhancement, since whether Mr. Safavian committed perjury was never an issue at trial and has not been proven to a jury beyond a reasonable doubt. Applying a § 3C1.1 sentence enhancement based on facts not submitted to the jury would violate the requirement that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." <u>Booker</u>, 543 U.S. at 244. Furthermore, many courts have taken this very interpretation of <u>Booker</u>. <u>See</u> <u>United States v. Washington</u>, 398 F.3d 306, 312 (4th Cir. 2005) (finding District Court committed plain error by applying § 3C1.1 enhancement where the facts underlying the enhancement were not proven to a jury beyond a reasonable doubt); <u>United States v. Brooks</u>, 417 F.3d 982, 984 (8th Cir. 2005) (finding the maximum sentence authorized by the facts proven beyond a reasonable doubt is the maximum of the guidelines range without additional findings made by judge); <u>United States v. Yagar</u>, 404 F.3d 967, 969 (6th Cir. 2005) (reversing for plain error where District Court used "judge-found facts" to enhance sentence); <u>Huerta-Rodriguez</u>, 355 F. Supp. 2d at 1028-29 ("Whatever the constitutional limitations on the advisory sentencing scheme, the court finds that it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt").

convincing" evidence of an "independent" nature as is required by United States v. Dunnigan, 507 U.S. 87, 95 (1993) and United States v. Montague, 40 F.3d 1251, 1254 (D.C. Cir. 1994).

In order to make an adjustment under § 3C1.1 on the basis of the defendant's alleged perjury, a court must "review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition." Dunnigan, 507 U.S. at 95. Accordingly, a § 3C1.1 enhancement requires a court to find that the defendant provided "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. at 94. Furthermore, "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." Id. at 95.

According to the PSR and contrary to established principles, the government's position appears to be that the mere fact that the defendant was convicted of false statements and obstruction of justice is evidence that the defendant committed perjury during his testimony. See PSR at 6, ¶ 19 ("It is the government's contention, that the guilty jury verdict demonstrated that the jury concluded 'beyond a reasonable doubt' the defendant's statement are [sic] 'false and perjurious.'"). However, an upward adjustment pursuant to § 3C1.1 cannot be based on the mere fact of conviction for § 1505 or § 1001 because the guideline only provides for enhancement when the defendant obstructs "the investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1. Indeed, the guidelines make this clear in the commentary to that section by noting "[i]f the defendant is convicted of an offense covered by . . . § 2J1.2 (Obstruction of Justice), . . . this adjustment is not to be applied to the offense level for that offense except if a *significant further obstruction* occurred during the investigation, prosecution,

or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense)." USSG § 3C1.1 cmt. n.7

The government's position finds no support in the law and runs afoul of Mr. Safavian's Sixth Amendment right to testify. Montague, 40 F.3d at 1254 n.1 (recognizing that the danger in applying § 3C1.1 is that "there may be an inhibiting effect on a defendant's right to testify attributable to 'a defendant's rational fear that his truthful testimony will be perceived as false'"). The Supreme Court specifically cautioned with respect to §3C1.1 that:

> not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. As we have just observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress, or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent.

Id. Moreover, the guidelines themselves provide that "[§ 3C1.1] is not intended to punish a defendant for the exercise of a constitutional right." USSG § 3C1.1 cmt. n.2. Accordingly, the government's position that the guilty jury verdict is sufficient for an enhancement under § 3C1.1 is contrary to the Sixth Amendment as interpreted by Dunnigan and the objectives of the Sentencing Guidelines themselves.

Even if the government could come up with specific allegations independent of the charges at issue at trial, the D.C. Circuit has held that because of constitutional issues at stake, a district court cannot make an upward adjustment pursuant to § 3C1.1 on the grounds of the defendant's alleged perjury unless the court finds "clear and convincing" evidence of the "independent findings" required by Dunnigan. See Montague, 40 F.3d at 1254. Specifically, the D.C. Circuit noted that

> it is crucial that the judge be clear as to his or her findings and give the benefit of the doubt to the defendant when the judge has no firm conviction. Simply put,

> cases that cause a district court pause require separate and clear findings and careful attention to the evaluating standard in supporting the determination.

Id. at 1256. Furthermore, the D.C. Circuit has recognized that a guilty verdict is not sufficient to support an adjustment under § 3C1.1 simply because the defendant took the stand. See id. at 1256 n.4 (recognizing "Dunnigan's requirement that trial court judges make findings *independent of the jury's verdict* before enhancing a sentence for perjury") (emphasis added).

Consequently, the Court must disregard the PSR's two-level enhancement for obstruction of justice. The government's representation that the defendant "repeatedly" provided perjurious testimony because the jury concluded "beyond a reasonable doubt" that the statements at issue in the Indictment were "false and perjurious" is: (1) inaccurate since there was never any discussion of perjury in this case; (2) prohibited by the Guidelines and Sixth Amendment; and (3) far short of the "independent" and "clear and convincing" standards enunciated in Dunnigan and Montague. See Dunnigan, 507 U.S. at 94 (requiring the court to look beyond the guilty verdict and make independent findings that (1) the defendant gave false testimony concerning a material matter, and (2) that the false testimony was the due to a *willful intent* to provide false testimony, *rather than as a result of confusion, mistake, or faulty memory*).

### 3.    Calculation of the Guidelines Recommended Offense Level

According to the above calculation, the guidelines recommend an offense level of 12, which would correspond to a sentence range of 10-16 months, Zone C, for criminal history category I.[10]

---

[10] Notably, under the grouping analysis described above, the Multiple Count Adjustment outlined in the draft PSR at ¶¶ 35-40 would be inapplicable.

**E.    Factor 6: Alternative Sentencing Is Necessary to Avoid Disparity in Treatment of Similar Offenders (18 U.S.C. § 3553(a)(6))**

Congress has directed sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). An imprisonment within the Guidelines range will not achieve this objective.

On several occasions, this Court and the parties have found it worthwhile to refer to the facts and legal conclusions of United States v. Cisneros.[11] See e.g., United States v. Safavian, Dock. No. 130, at 9, 15. In Cisneros, the defendant was charged with an eighteen-count indictment, including one count of conspiracy to defraud the United States, 18 U.S.C. § 371, sixteen counts of false statements, 18 U.S.C. § 1001, and one count of obstruction of justice, 18 U.S.C. § 1505. The indictment alleged that in connection with his nomination to be Secretary of HUD, Cisneros committed the following conduct: Cisneros directed two other individuals to conceal information from the FBI during their background investigation, and in exchange for concealing this information the individuals would receive jobs once Cisneros was confirmed; Cisneros submitted an SF-86 form that contained false information; in response to direct questions from the FBI regarding whether there was any information that could be used to coerce or compromise him, and knowing that he was currently being blackmailed by a woman to keep quiet about their sexual relationship, Cisneros falsely told the FBI there was no such information; after the FBI learned about the "hush" payments Cisneros was making, the FBI confronted him with the information—"repeatedly inform[ing] Cisneros of his right not to speak and of the implications of making false statements if he did choose to speak"—yet Cisneros again falsely denied that he was being blackmailed and gave the FBI false information about the amount of the

---

[11] 26 F. Supp. 2d 24 (D.D.C. 1998), aff'd, 169 F.3d 763 (D.C. Cir 1999).

payments. As a result of these actions, Cisneros was formally appointed and confirmed as Secretary of HUD. Cisneros, 26 F. Supp. 2d at 32, 43. Ultimately, however, the penalty imposed on Cisneros was a $10,000 misdemeanor fine and a $25 special assessment. United States v. Cisneros, 66 F. Supp. 2d 38, 41 (D.D.C. 1999). By contrast, in this case there was no *quid pro quo*, no conspiracy to deceive the government, no illicit payments to secure false statements. As such, imprisonment of Mr. Safavian on the facts presented here would create intolerable disparities.

The attached table provides some additional insight into treatment of persons found guilty of the crimes at issue here in the pre-Booker era of mandatory guideline sentencing and demonstrates that alternative sentencing is warranted to ensure consistent treatment. See Ex. 1.

### F.    Factor 7: There is No Need to Provide Restitution To any Victims of the Offense

The conduct that Mr. Safavian was found guilty of did not result in any economic loss or physical or emotional harm to any individual victims. Accordingly, the PSR does not recommend any restitution in this case.

## V.    DOWNWARD DEPARTURES ARE ALSO WARRANTED UNDER § 5K2.0 AND FOR ACCEPTANCE OF RESPONSIBILITY

### A.    § 5K2.0

Although a court is not required to apply the sentence that they specify, Booker, 543 U.S. at 259-60, the Guidelines themselves have created a mechanism through which a district court is authorized to depart from their recommended sentence if the court finds a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission. USSG § 5K2.0. The Supreme Court has noted that in formulating the Guidelines, the Commission "did not adequately take into account cases that are, for one reason or another, 'unusual'" and that "[p]otential departure factors 'cannot, by their very nature, be

comprehensively listed and analyzed in advance.'" <u>Koon v. United States</u>, 518 U.S. 81, 93-94

(1996). In <u>Koon</u>, the Court directed that in determining whether to depart from the Guidelines, a

court should ask the following questions: "(1) What features of the case, potentially, take it

outside the Guidelines' "heartland" and make of it a special, or unusual, case? (2) Has the

Commission forbidden departures based on those features?  (3) If not, has the Commission

encouraged departures based on those features?  (4) If not, has the Commission discouraged

departures based on those features?" <u>Id.</u> at 95.

In making this determination, the court is only prevented from departing if the special

factor that makes the case unusual is specifically forbidden as a basis of departure by the

Guidelines. <u>Id.</u> at 95-96. Moreover, if a factor is unmentioned in the Guidelines, the court is to

consider the structure and theory of both relevant individual guidelines and the Guidelines taken

as a whole and decide whether it is sufficient to take the case out of the Guideline's heartland.

<u>Id.</u> at 96.

Accordingly, this case warrants departure from the Guidelines for the § 1505 charge in

Count One because the circumstances take this case well outside the "heartland" of the ordinary

obstruction of justice charge. The typical § 1505 case involves culpable conduct that transcends

making false statements and concealing material facts. <u>See</u>, <u>e.g.</u>, <u>United States v. Kelley</u>, 36

F.3d 1118 (D.C. Cir. 1994) (plotting with others to deceive investigators, falsify documents, and

encouraging others to make false statements and conceal material facts); <u>United States v. North</u>

("<i>North I</i>"), 910 F.2d 843 (D.C. Cir. 1990) (destroying, altering, and removing documents),

<u>opinion withdrawn and superseded in part by</u>, <u>United States v. North</u>, 920 F.2d 940 (D.C. Cir.

1990); <u>United States v. Kanchanalak</u>, 37 F. Supp. 2d 1 (D.D.C. 1999) (destruction of documents

responsive to grand jury subpoena and other evidence); <u>United States v. Trie</u>, 21 F. Supp. 2d 7

28

(D.D.C. 1998) (instructing a witness to alter, destroy or conceal documents responsive to a subpoena or related to an investigation); Cisneros, 26 F. Supp. 2d 24 (making false statements, concealing information, and directing third parties to conceal information from investigators); United States v. Batten, 226 F. Supp. 492 (D.D.C. 1964) (inducing third party to commit perjury).[12]

Other courts have used a similar process of looking at other cases to define what the typical or "heartland" case for a given offense is. See, e.g., United States v. Mason, 90 F. Supp. 2d 1, 2 (D.D.C. 1999) (finding that departure was warranted in conviction for unlawful possession of firearm because typical possession case involved possession in connection with some other unlawful behavior). Like Mason, the typical § 1505 offense involves some conduct *in addition to* false statements and concealment, such as falsifying and destroying evidence, making threats, or corruptly influencing third parties to aid the obstruction.

Several other factors operate to bring this case outside the "heartland" of typical § 1505 cases. First, Mr. Safavian and Jack Abramoff were longtime friends who golfed and dined together well before Mr. Safavian was ever employed by the federal government. Second, out of

---

[12] See also United States v. Technic Servs. Inc., 314 F.3d 1031 (9th Cir. 2002) (tampering with evidence and soliciting others to sign false statement); United States v. Jacques Dessange, Inc., 4 F. App'x. 59 (2d Cir. 2001) (falsifying records being submitted to investigators) (not published); United States v. Hernandez, 199 F.3d 1328 (4th Cir. 1999) (falsifying documents); United States v. Messer, 139 F.3d 895 (4th Cir. 1998) (falsifying documents and instructing third parties to falsify documents) (table); United States v. Price, 951 F.2d 1028 (9th Cir. 1991) (threatening communications and submitting false report); United States v. Coleman, 875 F.2d 316 (4th Cir. 1989) (falsifying documents) (table); United States v. Ratcliff, 806 F.2d 1253 (5th Cir. 1986) (threatening communication); United States v. Lewis, 657 F.2d 44 (4th Cir. 1981) (falsifying documents); United States v. Fruchtman, 421 F.2d 1019 (6th Cir. 1970) (directing third party to falsify records); Stein v. United States, 337 F.2d 14 (9th Cir. 1964) (inducing third party to testify falsely before United States Senate); United States v. Tallant, 407 F. Supp. 878 (N.D. Ga. 1975) (causing the falsification of records); United States v. Henderson, 386 F. Supp. 1048 (S.D.N.Y. 1974) (falsifying documents).

the nine people who went on the trip to Scotland, Mr. Safavian was the only public official who used *any* of their own personal money to pay for the trip.

In addition, the harm caused by Mr. Safavian's wrongful conduct is minimized by several factors. First, there was no economic loss suffered as the result of his actions. See PSR at 6-7. Second, Abramoff never bid on or obtained any GSA property, nor did he otherwise benefit from *any* action of the GSA. Third, the extent of Mr. Safavian's assistance to Abramoff was limited, as the government has only alleged that Mr. Safavian improperly assisted Abramoff in the following ways: providing advice on how best to compete for GSA property, forwarding GSA emails to Abramoff, offering Abramoff advice on a draft letter to GSA, and setting up a meeting with representatives of the Eshkol Academy and GSA officials. See Gov't Mot. on Admissibility [Dock. No. 66] at 4-5, 9-10.

This assistance that Mr. Safavian provided Abramoff was limited for many reasons. For one, none of these activities involved official GSA action or affected GSA decision-making. Nevertheless, Mr. Safavian has admitted that it was "inappropriate" and "not a brilliant move" to forward internal GSA emails to Abramoff. However, none of these forwarded emails contained information of the type or nature that would have given Mr. Abramoff an actual advantage in the bidding process. See 06.02.06 p.m. Tr. at 16-19. Additionally, with respect to arranging the meeting with GSA officials, both Tony Costa and Mr. Safavian knew prior to the meeting that White Oak would not be appropriate for the Eshkol Academy. See 05.25.06 a.m. Tr. at 65; 06.22.06 a.m. Tr. at 104-06. Furthermore, Mr. Safavian's advice regarding Abramoff's draft letter to GSA was limited to suggesting that Abramoff should include information about the history and mission of the Eshkol Academy in the letter, and to limit his request to a short term

30

lease. Gov't Ex. 171-72. Mr. Costa himself testified that none of this information was confidential, see 5/25/06 a.m. Tr. at 73.

In determining whether this case is outside the "heartland," this Court is allowed to consider all of these factors in combination, even if each factor operating alone would be insufficient to warrant departure. See USSG § 5K2.0 cmt. n.3(C). Also, as noted above, when a factor is not addressed by the Guidelines (and thus is neither encouraged nor discouraged), the court is to consider the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole and decide whether it is sufficient to take the case out of the Guideline's heartland. Koon, 518 U.S. at 96. Accordingly, the Guideline that provides the most relevant guidance for a potential departure in this case would be USSG § 2B1.1. This is due to the fact that the conduct for which Mr. Safavian was convicted in Count One—false or misleading statements—is the type of conduct closer to the "heartland" of § 2B1.1 rather than § 2J1.2. See United States v. Buchanan, 987 F. Supp. 56, 65 (D. Mass. 1997) (finding departure warranted to "harmonize" convictions for two different charges involving the same essential elements "with strikingly different results"); United States v. Maas, 2006 WL 2328724, *9 (E.D. Wis. Aug. 5, 2006) (noting that departure consistent with other guidelines can be appropriate, even where they do not technically apply, when "a rigid interpretation [of the guidelines] is contrary to the Commission's intent or is otherwise contrary to the purposes of sentencing in § 3553(a)").

In Buchanan, the defendant was the owner of a bank who was convicted of structuring and money laundering charges. These two charges were based on a $50,000 check belonging to the bank, which Buchanan received as the bank's owner, as settlement for a malpractice claim. Buchanan broke the check down into five $10,000 checks to avoid reporting requirements, made

each check out to a fictitious person, and cashed the checks. Buchanan, 987 F. Supp. at 59. Despite the fact that both the structuring and money laundering charges were based on the same transaction, the court noted that the charges had "strikingly different results" under the Guidelines since the offense level for the structuring charge was 15, whereas the offense level for the money laundering charge was 22. The Buchanan court decided to depart from the money laundering guidelines to 15 in order to "harmonize" the offense level for the two charges, based on the fact that the money laundering in that case was a "byproduct" of the structuring, and the fact that the money laundering fell outside the "heartland" of cases, which typically involved "knowing conversion of large sums of money from illegal transactions, like drug trafficking or mob activities." Id. at 65.

Like Buchanan, a downward departure from the § 1505 charge is needed in this case to "harmonize" the obstruction and false statement charges. This is due to the fact that the same factors that justified the departure in Buchanan are present in this case: (1) here, the obstruction charge arises out of the same transaction as the false statement charge in Count Three and is essentially a "byproduct" of the actions that form the basis of the conviction in Count Three; and (2) the obstruction charge in Count One falls outside the "heartland" of § 1505 cases which typically involve more than false statements and concealment, such as falsifying and destroying evidence, making threats, or corruptly influencing third parties to aid in the obstruction.

**B.      Acceptance of Responsibility under § 3E1.1**

Mr. Safavian is further entitled to a two-point reduction in offense level pursuant to USSG § 3E1.1 for acceptance of responsibility. Section 3E1.1 provides that a defendant is entitled to a two-point reduction if he "clearly demonstrates acceptance of responsibility for his offense." Mr. Safavian should be awarded this reduction because he has clearly accepted responsibility for his conduct. The fact that Mr. Safavian exercised his constitutional right to

trial does not preclude the award of an Acceptance of Responsibility reduction under § 3E1.1. The Guidelines make clear that "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for [an acceptance of responsibility] reduction." USSG § 3E1.1 cmt. n.2. Indeed, conditioning an award of acceptance of responsibility on a waiver of a defendant's constitutional right to a trial would constitute an "impermissible burden placed on the exercise of a constitutional right." United States v. Jones, 997 F.2d 1475, 1478 (D.C. Cir. 1993).

In Jones, the D.C. Circuit affirmed a District Court award of a two-point reduction for acceptance of responsibility for a defendant who only admitted guilt *after* he was convicted. 997 F.2d at 1477. However, in this case Mr. Safavian admitted all of the relevant conduct well before trial. Mr. Safavian's challenge to the prosecution against him has always been limited to the constitutionality and application of law to his conduct. See USSG § 3E1.1 cmt. n.2 (providing as an example of a defendant who could qualify for acceptance of responsibility after going to trial, one who "make[s] a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct"). In the pre-trial motions before this Court, Mr. Safavian acknowledged making all of the statements alleged in the indictment, and he admitted providing all of the assistance to Mr. Abramoff that the government alleged.[13] See Def. Mot. to Dismiss (Docket #32) ("MTD") at 5-13; Def. Opp. to Gov't Mot. on Admissibility (Docket #82) at 14-15. All of Mr. Safavian's challenges to the charges were limited to matters of law—at no

---

[13] The only statement that Mr. Safavian contested was the allegation that he stated to a GSA ethics officer that Mr. Abramoff was not "seeking to do business" with GSA. However, this Court dismissed that allegation during trial for lack of evidence. The fact that Mr. Safavian challenged the government on this issue does not preclude application of § 3E1.1. See United States v. Guerrero-Cortez, 1110 F.3d 647, 655-56 (8th Cir. 1997) (holding defendant was entitled to acceptance of responsibility reduction where he went to trial to challenge government allegation that he intended to deal five kilograms of cocaine, rather than two kilograms, and District Court found defendant was only responsible for two kilograms).

point did he "falsely den[y], or frivolously contest[], relevant conduct." USSG § 3E1.1 cmt. n.1(a). Indeed, throughout these proceedings, Mr. Safavian's challenges to the charges against him were limited to legal arguments concerning: (1) due process; (2) legal duty to disclose the allegedly concealed information; (3) whether his statements comported with a reasonable construction that would make them true; (4) multiplicity in the Indictment; (5) the SCIA's jurisdiction over internal GSA ethics issues; and (5) materiality and other elements of the respective statutes. See MTD (Dock. No. 32); Rule 29 Mot. (Dock. No. 121).

However, even where a defendant does go to trial to challenge "factual guilt," he can still qualify for a reduction where he manifests "genuine contrition" for his acts. See United States v. Cortes, 299 F.3d 1030, 1038 (9th Cir. 2002). Mr. Safavian has manifested "genuine contrition" and in the aftermath of the devastating consequences of his conviction, he has attempted to rebuild his life by furthering his commitment to faith and service and starting up a new business. See USSG § 3E1.1 cmt. n.1(g) (listing "post-offense rehabilitative efforts" as a factor in favor of acceptance of responsibility). Therefore, downward departure for acceptance of responsibility is also warranted.

## VI. THE FACTORS OF SECTION 3572 WEIGH HEAVILY AGAINST THE IMPOSITION OF A FINE

Section 3572 of Title 18 of the United States Code enumerates a list of factors that this Court is to consider, in addition to the factors listed in 18 U.S.C. § 3553(a), in imposing a fine. The first factor requires this Court to consider Mr. Safavian's "income, earning capacity, and financial resources." 18 U.S.C. § 3572(a)(1). The PSR has determined that Mr. Safavian's earning capacity has been dramatically reduced due to the fact that his conviction has resulted in him being disbarred. The PSR has also calculated that Mr. Safavian has a total net worth of _____ however, this figure overstates the true extent of Mr. Safavian's resources as it

34

includes a ⟨     ⟩ equity in his home.  Any fine that would force Mr. Safavian to sell his home would have a devastating impact on his family, as he currently has a wife and three-year-old daughter who live there.  Indeed, this Court is to take into account the burden that a fine will impose upon "any person who is financially dependent on the defendant."  18 U.S.C. § 3572(a)(2).  Therefore, subtracting the home equity from Mr. Safavian's net worth yields a negative net worth of             ).[14]

Other factors enumerated in § 3572 also weigh against imposition of a large fine. Subsection (3) directs this court to consider "any pecuniary loss inflicted upon others as a result of the offense."  18 U.S.C. § 3572(a)(3).  In this case, Mr. Safavian's conduct did not cause any pecuniary loss.  See PSR at 6-7.  Moreover, subsection (5) indicates "the need to deprive the defendant of illegally obtained gains from the offense."  18 U.S.C. § 3572(a)(5).  However, Mr. Safavian did not profit financially from any of his statements to the ethics officers, the GSA-OIG, or the Senate.  Furthermore, most of the other subsections of § 3572 are inapplicable to this case.  See 18 U.S.C. § 3572(a)(4),(7)-(8).

**VII.   CONCLUSION**

Sentencing, it is often said, is the most difficult task for a Judge to undertake.  While the Court cannot be blind to Mr. Safavian's conduct or the severity of his convictions, it must also acknowledge the merits of the man and contributions he has made to his country and community. As the forgoing discussion makes clear, Mr. Safavian's conduct in this matter is anomalous from an otherwise faultless record of public service and civic contribution.  The actions at issue were clearly an a lapse in judgment that will never be repeated.  Mr. Safavian has accepted

---

[14]
█

responsibility for this conduct and regrets the impact that his actions have had, not only for his family, but for former colleagues and peers. The public nature of his arrest and trial will ensure that he will carry the consequences of his convictions for the rest of his life. His career, especially in law and public service, is ruined. In light of all the factors listed above, including the policy goals of § 3553(a) and requirement that the sentence imposed be the minimum necessary to achieve the four sentencing objectives of subsection (a)(2), we respectfully request this court impose a probationary sentence, home detention, and/or community service.

Respectfully submitted,

WILEY REIN & FIELDING LLP

By: _B. Van Gelder_____

Barbara Van Gelder (D.C. Bar # 265603)
Roderick L. Thomas (D.C. Bar # 433433)
Albert Lambert (D.C. Bar # 489562)
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7032
FAX: 202.719.7049

Dated: September 29, 2006        *Attorneys for David H. Safavian*

36