# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,** | |
| **v.** | |
| **DAVID HOSSEIN SAFAVIAN,** | **Criminal No. 05-370 (PLF)** |
| **Defendant** | |

## DAVID H. SAFAVIAN'S REPLY TO THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant David H. Safavian, through undersigned counsel, hereby submits his Reply to the Government's Sentencing Memorandum to provide the Court with a framework to consider an appropriate sentence for Mr. Safavian.

## I.    INTRODUCTION

The government claims that the defendant's request for sentencing within the Guidelines Manual ("Guidelines Manual" or "Manual") range of 6 to 12, including alternatives to incarceration, would constitute a "breathtaking" departure and a miscarriage of justice. Notwithstanding the government's characterization, the reality is that it is the government's request—not that of the defense—that constitutes a substantial departure from the heartland of false statement and derivative obstruction cases, as well as the base level calculations of the Pre-Sentence Report.

In United States v. Booker, the Court "sever[ed] and excise[d] . . . the [18 U.S.C. § 3553] provision that requires sentencing courts to impose a sentence within the applicable Guidelines range (in the absence of circumstances that justify a departure)," as well as the provision that "sets forth standards of review on appeal, including *de novo* review of departures from the

applicable Guidelines range." 543 U.S. 220, 259 (2005). The government quibbles with the logic that this decision renders *all seven factors* in 18 U.S.C. § 3553(a), the governing "guidelines" for sentencing. Gov't Memo at 3. The Court in Booker disagreed:

> Section 3553(a) remains in effect, and sets forth **numerous factors that guide sentencing**. **Those factors in turn will guide appellate courts**, as they have in the past, **in determining whether a sentence is unreasonable**.

Id. at 261 (emphasis added).

While a properly calculated Manual range is entitled to a rebuttable presumption of reasonableness on appeal, see United States v. Dorcely, 454 F.3d 366, 376 (D.C. Cir. 2006), the standard of appellate review enunciated in Dorcely did not and could not alter Booker's multi-factor framework and render the other factors mere afterthoughts, as the government suggests. To do so would be to ignore the Supreme Court's direction in favor of a *de facto* mandatory Manual sentencing process that would differ little from the methodology utilized before the seminal case. Booker held that the mandatory Guidelines violated the Sixth Amendment because they required increased sentences for facts not proved to a jury beyond a reasonable doubt. See Booker, 543 U.S. at 244. Moreover, "any system which held it *per se* unreasonable (and hence reversible) for a sentencing judge to reject the Guidelines is indistinguishable from the mandatory Guidelines system that the Court today holds unconstitutional." Id. at 311 (Scalia, J., dissenting in part). See Def. Sent. Mem. at 5-8 (discussing post-Booker cases analyzing § 3553(a) sentencing factors).

In that regard, proper consideration of all § 3553(a) factors demonstrates that while punishment is warranted, incarceration is not "necessary" to comply with the statute's sentencing guidelines in this case. 18 U.S.C. § 3553(a). With regard to his history and character, the government strains to argue that Mr. Safavian's first criminal offense, based on his three identical representations concerning Jack Abramoff's business with the GSA, somehow

outweigh his otherwise impeccable record in federal and local voluntary public service. The third-party assessment of his supervisors, colleagues, and acquaintances, see Att. B, compel a different conclusion.

Incarceration is also not necessary to deter this defendant, or peers serving in public office, from committing such crimes in the future. The government has acknowledged that the defendant poses "no threat" to the public as long as he is "not in a position of public trust." Gov't Memo at 32. As discussed at length in the defendant's sentencing memorandum and in letters from family and friends, Mr. Safavian is both officially (via disbarment and felony convictions) and unofficially (via the associated media attention and public airing) precluded from public and community service. No person with Mr. Safavian's background and history would ever want to put themselves or their wife, child, or family through the financial, emotional, and spiritual hardships associated with this ordeal. Indeed, the credible past and present threats to his wife and child's safety as a result of this case would be enough to make anyone avoid questionable judgment again. See Def. Sent. Memo Att. A (Ltr. From Mrs. Safavian); Att. B-1 (Ltr. From Robert J. McLaughlin). Thus, incarceration is not only unnecessary to deter and secure the public's safety but would force the defendant to cease current efforts to rehabilitate a career, family life, and active role in his church and community.

In fashioning a sentence of probation or home confinement consistent with the treatment of similar offenders, see § 3553(a)(6); Ex. 1 (chart of public official § 1001, § 1505 sentences), this Court, "while not bound to apply the Guidelines [Manual], [still] must consult those Guidelines and take them into account when sentencing." Booker, 543 U.S. at 264. In taking the Guidelines Manual into account, this Court should reject the government's attempt to ratchet up points on the scale against Mr. Safavian as retribution for his pursuit of a jury trial.

First, as this Court has acknowledged, the government's contention that the Court should retroactively apply the 2005 Manual for the Count One (spring 2003) Obstruction of Justice (18 U.S.C. § 1505) conviction, thereby increasing the base offense level from 12 to 14, would violate the Ex Post Facto clause because it "changes the legal consequences of acts completed before its effective date," and "disadvantage[s] the offender affected by it." United States v. Coates, 295 F. Supp. 2d 11, 16-18 (D.D.C. 2003) (citing Miller v. Florida, 482 U.S. 423 (1987) (internal quotations omitted)).    Thus, the initial PSR's base offense level calculation (12) under the November 1, 2002 Sentencing Manual should be utilized.

Second, the government's position regarding grouping is inconsistent with other matters. For example, the United States Attorneys (D.C.) took the opposite view in a recent case involving false writings by a public official to his internal agency officials and then later to a Senate Committee, combining both branches of government to form a single group under § 3d1.2(b).    That matter, like this one, involved the same victim (i.e. "society"), and, as the government has claimed throughout this case, were "all designed to conceal the true nature of his relationship with lobbyist Jack Abramoff."    Gov't Memo at 1; see also U.S.S.G. § 3D1.2(b) ("connected by a common criminal objective or constitute part of a common scheme or plan").

Third, the government's request for a three-level enhancement for the acquitted Count Four charge of obstruction of justice is mistaken in both its basis and application.    The Court does have discretion to consider elements of acquitted conduct, such as its consequential financial loss, in addressing the *offense of conviction* (in this case the Count Five false statement conviction under 18 U.S.C. § 1001) if the government proves obstruction of justice by a preponderance of the evidence.    See Dorcely, 454 F.3d at 371.    However, the government cannot simply have the Court *substitute* an acquitted charge for the actual convicted offense because it

prefers the acquitted conduct's higher base level (in this case § 1505 is a 12 and § 1001 a 6). Federal criminal procedure does not afford the government an opportunity to seek judgment as a matter of law or an appeal of a jury acquittal. It certainly does not permit the government to have this Court substitute acquitted charges where guilt is established under a significantly lower evidentiary standard. In any event, consideration of acquitted conduct, if proven, would not result in a three-level enhancement.

Fourth, the government's request for a two-level enhancement for Mr. Safavian's denial of guilt at trial as to the ultimate accusations (e.g. "Did you conceal any facts in connection with those four transactions?"), Gov't Memo at 7, must be rejected. A defendant's denial of guilt or refusal to admit guilt at trial does not establish, by "clear and convincing evidence," an independent finding of a "significant further obstruction" at trial. U.S.S.G. § 3C1.1 cmt. 2, 7; United States v. Montague, 40 F.3d 1251 (D.C. Cir. 1994).

Furthermore, the government fails to even address the reality that this case falls outside the "heartland" of obstruction of justice cases, warranting a departure under § 5K2.0. The ample citations in the defendant's initial memorandum forcefully illustrate that the typical obstruction case involves conduct beyond making false and misleading statements, and instead involves such conduct as destroying evidence, and corruptly influencing others to commit perjury and make false statements. See Def. Sent. Mem. at 28-29 & n.12. The government's silence in response to this important distinction leaves little doubt that this case represents an outlier in § 1505 sentencing. This fact, combined with the reality that this is essentially a conviction for three renditions of the same false statement, which warrants a base offense level of only 6, compels a sentence below that which the Guidelines Manual would advise for an obstruction offense, both under this Court's statutory authority specified in 18 U.S.C. § 3553(a), as well as USSG § 5K2.0.

In sum, the "strength of [Mr. Safavian's] community and family ties;" the adequate deterrence achieved by the defendant's disbarment, public shame, and familial hardships; his "initial resolve to rehabilitate h[im]self," in combination with a proper Guidelines Manual analysis together justify an alternative to incarceration and a "significant downward departure from the otherwise applicable Guideline sentencing range" as authorized and warranted under Koon v. United States, 518 U.S. 81 (1996), Booker, 543 U.S. 220, § 5K2.0 of the Guidelines manual, and in keeping with the treatment of similar offenders.  See Coates, 295 F. Supp. 2d at 26.

## II.    CONSIDERATION OF THE NUMEROUS FACTORS OF § 3553(a) WARRANTS ALTERNATIVE SENTENCING

### A.    Factor 1: The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant Alternative Sentencing

The government minimizes its discussion of the *first* sentencing guideline factor in § 3553(a), that is the nature of the offense and the defendant's history and characteristics.  Gov't Memo at 28-29.  Consistent with the dictates of 18 U.S.C. § 3661, however, courts have granted sentences well below the recommended manual range in circumstances far less compelling than Mr. Safavian's.  See, e.g., United States v. Smith, 359 F. Supp. 2d 771, 776, 782 (E.D. Wisc. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds – because he had been married several years supports his children, cares for his mother and obtained letters as to his good character from his pastor and others); United States v. Beamon, 373 F. Supp. 2d 878, 887 (E.D. Wisc. 2005) ("Defendant's admirable service as a mentor to young men, his assistance to his ill father, and his positive influence on younger family members merited some consideration."); see also Def. Memo at 8-13 (citing cases).

In its limited discussion, the government relies on mischaracterizations, elevated rhetoric, and loose speculation as to Mr. Safavian's subjective beliefs and intentions in its attempt to

distort the defendant's history and overall character.  For example, the government argues that

Mr. Safavian was "focused on rewarding Abramoff" and that Mr. Safavian's "desire to emulate

Abramoff . . . motivated defendant to disregard his obligation to pursue public good, and,

instead, seek to help Abramoff at every turn in the hopes that defendant would later be rewarded

in some fashion."  Gov't Memo at 28.  There are several problems with such assertions.  First, it

is misleading for the government to make such accusations based on its own small sampling of

the defendant's e-mails which necessarily "focused" on conversations with Abramoff.  As GSA

policy and common sense would indicate, Mr. Safavian and other GSA employees

communicated literally tens of thousands of e-mails during the relevant time period.  Mr.

Safavian, GSA Administrator Perry, and others testified that it was routine and an encouraged

practice for GSA employees to meet and exchange information with people in the private sector.

06/02/2006 a.m. Tr. at 101:3-6 ("SAFAVIAN: Part of the function of GSA is to provide

information and to work with the private sector.  And the career staff at GSA get these types of

inquiries routinely and as a matter of course."); 05/24/2006 a.m. Tr. at 41 ("VAN GELDER:

GSA encourages the communication with the developers so that everybody is on the right page;

is that a fair summary?  PERRY: Yes.  It's all a part of our effort to facilitate private sector

business to be able to contract successfully with the Federal government."); 06/01/2006 p.m. Tr.

at 92:16-23 ("ANIKEEFF: the FAR encourages the government to engage in all sorts of

discourse with members of the public so that the government gets the benefit of industry's

perspective.  And that range is everything from the web site to one-on-one meetings.").  Whether

Administrator Perry knew about or would have been pleased with all of Mr. Safavian's

correspondence with Abramoff, it can hardly be said that Mr. Safavian was "focused" on

Abramoff, when Abramoff did not benefit from any official GSA action or decision.  See

05/24/2006 a.m. Tr. at 42 ("VAN GELDER: Did David Safavian ever ask you to do anything for Jack Abramoff? PERRY: No. Never."). Such supposed "focus" would also be inconsistent with Administrator Perry's appraisal of Mr. Safavian as "an excellent worker" who Perry himself would have supported taking over as Administrator of GSA. See id.

Several other supervisors, colleagues, and public officials have written on Mr. Safavian's behalf to take special note of Mr. Safavian's service at the GSA. See, e.g., Att. B-2 (Ltr. from Rep. W. Jones) ("David Safavian was the **_only_** member of the Executive Branch that exhibited any level of apparent concern for the well-being of the taxpayers in this incident.") (emphasis in original). Mr. Safavian continued this exceptional level of dedication during his service at the Office of Management and Budget. See Att. B-3 (Ltr. from C. Johnson) (describing David Safavian as a "real professional" who "recused himself at even the slightest possibility of the appearance of a conflict of interest."). Of course, these recent comments by the very people supervising Mr. Safavian during the relevant time period of course do not alter the jury's conclusions, but are simply inconsistent with the government's characterization that he was "focused" on Abramoff.

Second, there has never been any suggestion of any *quid pro quo*, and Abramoff never benefited from *any* contract, decision, or policy of the GSA. Tony Costa testified that, other than simply setting up a meeting, Mr. Safavian never tried to influence him to give any benefit to Abramoff. See 5/25/2006a.m. Tr. at 74:14. The record, including the testimony of Mr. Costa and Administrator Perry, simply does not support the government's attempts to caricature Mr. Safavian as someone obsessed with "rewarding" Abramoff.

Finally, the government's effort to attribute the motive of reaping financial rewards from Abramoff finds no support in, and indeed runs counter to, the sum of the evidence before the

Court.  It is highly fashionable, and lucrative, for Congressional staffers to enter into private lobbying practice in Washington, D.C. upon leaving Capitol Hill.  Instead of following this path after his departure from Congressmen Cannon's office in the spring of 2002, however, Mr. Safavian chose instead to embark upon four years of official (GSA, Office of Management and Budget) and voluntary (Metropolitan Police Dept. and Dumfries) public service.  His work ethic and record in each of these endeavors was exemplary.  See Att. B-3 (Ltr. from C. Johnson) ("I had great confidence in [David Safavian] to represent OMB and to lead our efforts to improve the Government's procurement process"); B-4 (Ltr. from Lt. C.P. Smith of the Metropolitan Police Dept.) ("David's interaction with those we served as police officers made a real difference in people's lives, and he did so without regard to compensation or recognition."); B-5 (Ltr. from T. Clouse of Metropolitan Police Dept.) (describing Mr. Safavian's demeanor as "far from what I expected from someone who, in civilian life, worked in the upper echelons of the federal executive branch . . . [as he] was happy to perform tasks that held little excitement and garnered no recognition").[1]

The government's caricature cannot detract from the fact that, as acquaintances, supervisors, and colleagues attest, Mr. Safavian's history and character reflects dedication to his family, his community, and country.  It is their perception of Mr. Safavian's history and character, not that of the prosecution, that should guide the analysis of this factor.  See also Att. B-7 (Ltr. from Michael R. Shannon, Dumfries Police Dept. Auxiliary Program  ("David's only motivation for serving is a genuine desire to make a difference and simply help."); Att. B-8 (Ltr.

---

[1] See also Att. A (Ltr. from Rep. Cannon) ("When David was my Chief of Staff, he worked tirelessly in my Washington office.  He would come in early, stay late, and devote his undivided attention to the needs of the people in Utah's Third Congressional District."); Att. B-6 (Ltr. from M. Wojciak) (explaining that at the GSA "David was always responsive to inquiries from me on behalf of the [Government Reform] Committee . . . worked closely with me to track legislation and [] always ensured that he was responsible in managing the taxpayer's dollars.").

from James H. Perry) ("David's true character; loving father, husband, son, and friend, combined

with his training and legal skills are attributes that our society should use to its advantage.").

Thus, the record before this Court reveals that while the convicted offenses are serious,

they are nevertheless anomalous to Mr. Safavian as a man.  See Att. B-9 (Ltr. from Rev.

Kleinmann) ("I realize this [great toll] is to be expected . . . however, [] I have only known David

to be a good man who is faithful to his family and his Church.").   Consistent with the

requirements of § 3553(a), the defense requests that the Court consider this truth in fashioning an

appropriate sentence. See United States v. Simpson, 430 F.3d 1177, 1186 (D.C. Cir. 2005)

("Booker require[s] sentencing courts to consider the § 3553(a) factors"); United States v. Ayers,

428 F.3d 312, 314 (D.C. Cir. 2005) (reversing sentence where it was not clear beyond a

reasonable doubt that "the district court, when announcing its alternative sentence, understood its

obligation to consider the factors in § 3553(a)"); Def. Memo at 8-12 & n.5 (citing cases holding

that the Court must now consider these factors).

### B.     Incarceration Is Not Necessary To Deter the Defendant and Would Impede the Rehabilitative Goals of § 3553(a)(2)

Regarding the § 3553(a)(1)(B)-(C) factors of deterrence, rehabilitation, and retribution,

experience, history, and scientific data simply do not support the government's assertion that a

lengthy sentence of imprisonment is required to achieve these objectives for the convicted

offenses.  See Gov't Memo at 29-30.  The statute directs the Court to "impose a sentence

sufficient, *but not greater than necessary,* to comply with the purposes" set forth in § 3553(a)(2).

The government concedes in their brief that Mr. Safavian poses no risk to the public, Gov't

Memo at 33, and yet still asks for close to a three year prison sentence based on an offense level

of 19.   In short, it is asking the Court to eschew the statute's directives by enforcing a

punishment that is "greater than necessary." Id.

1.        Retribution and Adequate General Deterrence

Studies of white collar offenders from before the enactment of the guideline manual have shown no difference in recidivism patterns between offenders who received jail time and those sentenced to probation.  See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (Ex. 2).   These studies are consistent with the findings of earlier criminological studies dating back to the 1970s.  See Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. Univ. L.J. 485, 495 (1999). Rather than longer sentences, it appears to be "the criminal process itself—charge, trial, conviction, and sentencing—[that] has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence." Id.

Similarly, a study of defendants in the U.S. District Court for the Northern District of California found no meaningful difference in recidivism rates between those sentenced to probation and community service and those defendants who were eligible for such a sentence under the Sentencing Guidelines but who were instead sentenced to incarceration or incarceration plus probation.   Malcolm M. Feeley et al., Between Two Extremes: An Examination of the Efficiency and Effectiveness of Community Service Orders and Their Implications for the U.S. Sentencing Guidelines, 66 S. Cal. L. Rev. 155, 191 (1992).

That "adequate" general deterrence of offenses such as false statements does not require, and hence does not merit, incarceration does not translate into an argument that "only the unemployed and disadvantaged are deserving of jail," as the government mischaracterizes. Gov't Memo at 32; 18 U.S.C. § 3553(a)(2)(B).  Rather, the salient point is that the statistics demonstrate that, irrespective of background, motivations for committing such offenses are effectively discouraged by the unemployment and disadvantages that result from the

corresponding automatic termination, suspensions and disbarments, and public shame and embarrassment.

Furthermore, the government's citation to United States v. Martin, 455 F.3d 1227 (11th Cir. 2006), is wholly inapposite.  Michael Martin, the former Chief Financial Officer of HealthSouth, was convicted of falsifying books and records and defrauding investors and lenders for a loss of over $14.1 Billion.  As a result of his conduct, many shareholders, employees, and other collateral victims lost their life savings while Martin reaped millions in rewards.  Id. at 1230-31.  Beyond the government's request for a 9 level downward departure from 31 to 22 (42 months), the District Court departed downward by 23 levels to a sentence of seven days in prison, a $50,000 fine, and a $2.375 million forfeiture for a man worth almost $9 million at the time.  Id. at 1233.  Not surprisingly, the appellate Court believed that the general deterrence message of that particular sentence was inadequate.  Id. at 1240.

By extreme contrast, Mr. Safavian's conduct was not fraudulent and caused *no loss* to anyone.  Mr. Safavian never disclosed proprietary information or directed anyone to take improper action.  Jack Abramoff never benefited from any official action of the GSA, and he never leased or obtained any GSA property.  Moreover, Mr. Safavian is not asking for a downward departure even remotely approaching the magnitude of the one granted in Martin.  Based on a total offense level of 12 as calculated in the Defendant's Sentencing Memorandum, as well as the fact that this case lies outside the "heartland" of § 1505 offenses, the defense has simply asked this Court to depart downward between 2 and 4 levels to a total offense level between 8 and 10.  Unlike Martin, such a departure would make Mr. Safavian's sentence more consistent, not less, with guideline Section 2B1.1 (offense level 6), since all charges in this case arise out of making false or misleading statements.

12

2.    Specific Deterrence To Protect the Public From Further Crimes of the Defendant

Contrary to the government's speculation, Gov't Memo at 32, the consequences Mr. Safavian and his family have suffered were clearly not foreseeable in any subjective or objective sense. Even the government could not find precedent for a § 1001 prosecution for statements made in an informal ethics opinion request, and its own internal memoranda indicate that prosecutions for statements made to Inspectors General are rare in light of the due process requirements of Garrity v. New Jersey, 385 U.S. 493 (1967), and Kalkines v. United States, 473 F.2d 1391, 1393 (1973). See Letter from Christopher Wray, Assistant Attorney General, to Federal Prosecutors, "Uniform Advice of Rights Forms for Interviews of Government Employees" (May 6, 2005) (Dock. No. 121 Ex. 4) ("[W]hen a federal employees is interviewed during the course of an investigation being conducted by an Office of Inspector General, the agents should provide the employee with an advice of rights."). But even if such consequences could have been foreseeable, the issue under § 3553(a)(2) is whether incarceration is needed to protect society from Mr. Safavian from *re-offending*. 18 U.S.C. § 3553(a)(2)(C) ("to protect the public from *further crimes* of the defendant"). Not only is the defendant not disposed to commit such offenses again, but in light of the disbarment and related ramifications of his conviction, he is logistically incapable of doing so.

3.     <u>Rehabilitation</u>

The government also neglects to discuss the remaining factors in § 3553(a)(2), including rehabilitation.  Mr. Safavian's active steps to pursue another career and start a new business in lieu of disbarment; his active role in his church and affiliated service; and his commitment to his young daughter and wife render imprisonment not only an "[in]appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), but a hindrance to such remedies.

The *sine qua non* of § 3553(a)(2) is that a sentencing court must impose the *minimum sentence* necessary to achieve the goals of retribution, deterrence, and rehabilitation. Decades of scientific studies and experience have uncovered that the financial and emotional tolls of trials themselves, coupled with the automatic trigger of suspensions and the career-crippling social stigma associated with conviction, go far towards achieving those goals.  The government has conceded that Mr. Safavian presents no threat to the public and that its goal is his removal from government service.  Gov't Memo at 33.  That objective has been achieved and imprisonment is not necessary to address the remaining purposes of § 3553(a)(2).  Accordingly, the defense requests that the Court consider departure and alternative sentencing.

**III.    Proper Guideline Manual Analysis Results in a Base Offense Level of 12 and a Departure**

**A.     Retroactive Application of the 2005 Base Offense Level for Obstruction of Justice Would Run Afoul of the Ex Post Facto Clause**

The government now contends that the version of the Guidelines Manual, effective November 1, 2005 should be applied retroactively to the obstruction of justice calculus for Count One, even though all of the conduct relevant to the offenses in this case occurred before the effective date.  <u>See</u> Indictment ¶ 27 (dating Count One conduct from the period March 25, 2003 through May 2003).  However, the law is clear that a Sentencing Guideline Manual, which

14

becomes effective after the offense of conviction was committed, violates the Ex Post Facto

clause of the Constitution if it increases the sentence the defendant would otherwise receive:

> If the court determines that use of the Guidelines Manual in effect on the date that
> the defendant is sentenced would violate the ex post facto clause of the United
> States Constitution, the court shall use the Guidelines Manual in effect on the date
> that the offense of conviction was committed.

USSG § 1B1.11(1); see also Coates, 295 F. Supp. at 16-18 (D.D.C. 2003) (citing, inter alia,

United States v. Thomas, 114 F.3d 228, 268 n.19 (D.C. Cir. 1997)).

The PSR initially used the 2002 version of the Guidelines Manual, effective November 1,

2002, to avoid the ex post facto problems presented by application of the 2005 Guidelines, which

provide for a more onerous base offense level for Obstruction of Justice. Compare USSG §

2J1.2 (2005) (assigning a base level of 14) with id. (2002) (assigning a base level of 12).

However, the government persuaded the Probation Office to adopt the 2005 offense level in its

final report, citing an Application Note to § 1B1.11(3):

> Subsection (b)(3) provides that where the defendant is convicted of two offenses,
> the first committed before, and the second after, a revised edition of the
> Guidelines Manual became effective, the revised edition of the Guidelines
> Manual is to be applied to both offenses, even if the revised edition results in an
> increased penalty for the first offense. Because the defendant completed the
> second offense after the amendment to the guidelines took effect, the ex post facto
> clause does not prevent determining the sentence for that count based on the
> amended guidelines. For example . . .. The same would be true for a defendant
> convicted of *two counts of embezzlement, one committed before the amendments
> were enacted, and the second after*. In this example, the ex post facto clause
> would not bar application of the amended guideline to the first conviction; a
> contrary conclusion would mean that such defendant was subject to a lower
> guideline range than if convicted only of the second offense.

U.S.S.G. § 1B.11 application note 2 (emphasis added). The government's position is incorrect

for two reasons. First, as the application note itself explains, the retroactive policy is designed

for the multiple convictions of the *same* offenses that occur before and after the Guideline

Manual change, as indicated by the rationale to avoid having a defendant be "subject to a lower

guideline range than if convicted only of the second offense." Id.  In this case, however, there is no obstruction conduct after the change in the Guideline Manual, and the defendant in this case would not be subject to a lower guideline range than if convicted only of the Count Five false statement offense -- the only offense to occur after the offense level for obstruction was elevated from 12 to 14.

In any event, the PSR's ultimate decision to accept the government's argument without independent ex post facto analysis contradicts the Manual policy itself which explains that "Commentary in the Guidelines manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  U.S.S.G. § 1B1.7 commentary (quoting Stinson v. United States, 508 U.S. 36, 38 (1993)).

Applying the 2005 base offense level in the 2005 edition of the Guidelines Manual to the 2003 Obstruction of Justice conduct would violate the ex post facto clause of the constitution. As this Court acknowledged in Coates, application of the Guidelines Manual violates the Ex Post Facto clause where the application is "retrospective," that is, if it "changes the legal consequences of acts completed before its effective date," and "disadvantage[s] the offender affected by it." Coates, 295 F. Supp. 2d at 16-18 (citing Miller v. Florida, 482 U.S. 423 (1987) (internal quotations omitted)).  A defendant is "disadvantaged" by a retrospective Guideline application if the new or amended law or Guidelines "alter the definition of criminal conduct or increase the punishment for the crime." Id. (quoting Lynce v. Mathis, 519 U.S. 433, 441 (1997)). Thus, the Ex Post Facto principles "apply to laws or sentencing Guidelines enacted or amended after a defendant has committed criminal acts that would make his or her sentence more onerous." Id. (citing, inter alia, Thomas, 114 F.3d at 229 (retroactive application of amended

Guidelines would violate Ex Post Facto clause); United States v. Lam Kwong-Wah, 924 F.2d 298, 304 (D.C. Cir. 1991) ("[I]f the amendments to the Guidelines effected substantive changes that would adversely affect [a defendant's] sentencing, then they may not be applied retroactively without violating the Ex Post Facto clause of the Constitution."); United States v. Maldonado, 242 F.3d 1, 5 (1st Cir. 2001) (directing where Guidelines have been made more severe in the interim, version in effect at time crime was committed must be used to avoid Ex Post Facto increase in penalty).

In this instance, application of the November 1, 2005 Guidelines Manual for a March-May 2003 obstruction offense would clearly disadvantage the defendant by retroactively increasing the base offense level from 12 to 14 for the obstruction charge. Because the obstruction offense has a higher offense level than the three false statement counts, an increase in the base level of that offense will result in an increased sentence under the grouping rules of section 3D1.3(a), and thereby "run afoul of the *ex post facto* clause of the Constitution." Coates, 295 F. Supp. 2d at 17 (applying edition of Guidelines in effect at time of defendant's offense, rather than edition in effect of the date of sentencing to avoid *ex post facto* violation, because newer Guideline Manual precluded consideration of post-sentencing rehabilitative efforts to award downward departure) (citations omitted).

Hence, this Court should find that the 2002 edition of the Sentencing Guidelines must be used to calculate the offense level for obstruction of justice.

**B.**     **Defendant's Denial of Guilt In a False Statement Case Does Not Constitute An Independent Finding of a Clear and Convincing "Significant Further" Obstruction of Justice and Cannot Lead to A Two Level-Enhancement**

The Government has followed through on its forecast to seek a two-level enhancement under § 3C1.1 on the ground that Mr. Safavian "willfully obstructed or impeded, or attempted to

obstruct or impede, the administration of justice" at trial.  U.S.S.G. § 3C1.1.  The Court should

reject this request.

> The Guidelines Manual itself explains that the § 3C1.1 obstruction enhancement
>
> is not intended to punish a defendant for the exercise of a constitutional right.  A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. . . .

Id. at App. Note 2.  Moreover, in cases such as this where

> the defendant is convicted of an offense covered by § 2J1.1 (Contempt), § 2J1.2 (Obstruction of Justice) . . ., this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction

As an example of a "significant further obstruction," the Guidelines indicate "e.g., if the

defendant threatened a witness during the course of the prosecution for the obstruction offense."

Id.  Here, there is no "significant further obstruction" because, even if false, Mr. Safavian's

testimony does not resemble the examples cited in the Guidelines Manual and did not "impose

incremental burdens upon the government, either in investigation or proof."  United States v.

McLaughlin, 126 F.3d 130, 140 (3d Cir. 1997) (holding that 3C1.1 enhancement requires clear

and convincing evidence of perjury that goes beyond mere denial of guilt).

Moreover, the government's attempt to concoct a two-level enhancement because Mr.

Safavian denied guilt for its § 1001 concealment charge plainly fails to establish, by "clear and

convincing evidence," an independent finding of a "significant further obstruction" at trial.

United States v. Montague, 40 F.3d 1251 (D.C. Cir. 1994) (establishing the "clear and

convincing" standard for section 3C1.1 enhancement); United States v. Dunnigan, 507 U.S. 87,

94 (1993).

In support of its contention, the government relies on one case, United States v.

Thompson, 962 F.2d 1069 (D.C. Cir. 1992).  Thompson is not on point, and in any event has

been superseded by the binding D.C. Circuit and Supreme Court precedent cited in the Defendant's Memorandum and ignored by the government.[2] <u>Dunnigan</u>, 507 U.S. 87 (requiring courts to make "independent findings" to support section 3C1.1 enhancement), and <u>Montague</u>, 40 F.3d 1251 (establishing the "clear and convincing" standard for section 3C1.1 enhancement).

In <u>Thompson</u>, the defendant's testimony was in reference to *objective facts* that were fundamentally inconsistent with the testimony of other witnesses at trial. Thus, contrary to Thompson's arguments to the D.C. Circuit, and unlike the circumstances in this case, his testimony amounted to more than a "simple denial of guilt." Thompson was charged with dealing drugs, and at his trial police officers testified that they had observed Thompson engaging in eight drug transactions. They further testified that when Thompson saw the officers, he fled and threw away a bag, which later was determined to contain cocaine. Thompson's testimony was objectively inconsistent with this testimony of the police officers. Thompson testified that he had been playing chess nearby, had not engaged in any transactions that could be mistaken for drug deals, and that the officers had confused him with the true culprit. <u>Thompson</u>, 962 F.2d at 1070. It was this testimony as to objective facts that formed the basis of the obstruction enhancement.

By contrast, Mr. Safavian's testimony does not concern facts above and beyond denial or refusal to admit guilt of the offenses charged. The referenced testimony involves purely subjective issues that only heighten the danger, specifically addressed by the Supreme Court in <u>Dunnigan</u>, that the "testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." <u>Dunnigan</u>, 507 U.S. at 95; Gov't Sent. Mem. at 6-7 (quoting allegedly perjured testimony as to whether defendant "knowingly

---

[2] The government also concedes that the D.C. Circuit has not upheld section 3C1.1 since the Supreme Court's ruling in <u>Booker</u>.

conceal[ed]" facts, "attempted to deceive," "tr[ied] to mislead," was "trying to hide anything," etc.).

In any event, even if <u>Thompson</u> had actually supported the government's argument that a 3C1.1 enhancement is warranted whenever a jury verdict conflicts with a defendant's denial of guilt on the stand, it would have been overruled by <u>Dunnigan</u>:

> Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. As we have just observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress, or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. *For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.*

<u>Dunnigan</u>, 507 U.S. at 95 (emphasis added). The holding in <u>Thompson</u> is further called into question by the more recent D.C. Circuit opinion in <u>Montague</u>, which, established the "clear and convincing" evidence standard for a 3C1.1 enhancement.[3] The D.C. Circuit cases that have been decided after <u>Dunnigan</u> and <u>Montague</u> have also required independent documentary and testimonial evidence clearly contradicting the defendant's testimony. See <u>United States v. Sobin</u>,

---

[3] The holdings of other circuits, post-<u>Dunnigan</u>, are also more in line with <u>Montague</u> than <u>Thompson</u>. For example, after finding that 3C1.1 enhancement requires "clearly convincing" evidence, the court in <u>United States v. McLaughlin</u>, 126 F.3d 130, 140 (3d Cir. 1997) held:

> Even assuming that Mark's conviction for "willful evasion of tax" implies that the jury rejected all of Mark's explanations for the failure to declare either account's balance as income, that alone would not be sufficient to support a finding that Mark testified "with the willful intent to provide false testimony." As we held in <u>United States v. Colletti</u>, 984 F.2d 1339 (3d Cir. 1992):
>
> > In order to warrant the two point enhancement for obstruction of justice, the perjury of the defendant must not only be clearly established, and supported by evidence other than the jury's having disbelieved him, but also must be sufficiently far-reaching as to impose some incremental burdens upon the government, either in investigation or proof, which would not have been necessary but for the perjury.

56 F.3d 1423, 1429 (D.C. Cir. 1995) (upholding 3C1.1 enhancement where defendant's testimony that he resided at a particular address was in conflict with the trial testimony as two witnesses, as well as Sobin's own voter registration and bankruptcy records, all of which directly conflicted with his testimony); United States v. Gaviria, 116 F.3d 1498, 1518-19 (D.C. Cir. 1997) (upholding 3C1.1 enhancement where defendant's testimony was contradicted by testimony of two witnesses at trial and tape-recorded phone conversations involving defendant); United States v. Washington, 106 F.3d 983, 1016-17 (D.C. Cir. 1997) (upholding 3C1.1 enhancement where Washington's testimony was contradicted by testimony of three other witnesses, as well as video tape-recording of drug transaction he was involved in).

By contrast, the government cites *no evidence* in this case that contradicts Mr. Safavian's testimony; instead, it simply relies on the jury result. However, the jury may have simply disbelieved the testimony, or found it "insufficient to excuse criminal liability or prove lack of intent." Dunnigan, 507 U.S. at 95. Thus, a jury verdict alone does not prove the willful intent to provide material false testimony under Dunnigan and Montague.

C.    **All Four Convicted Offenses Should Be Grouped Because They Involve the Same Societal Interest and a Common Course of Conduct or Scheme**

Contrary to the government's contention, this Court should group all four counts into a single group for the reasons articulated in the Defendant's Sentencing Memorandum. The government begins its attack by arguing a non sequitur: that the four counts cannot be grouped because the relevant actions involved three different "transactions."[4] However, the existence of multiple "transactions" is the beginning, not the end, of the grouping analysis under §§ 3D1.2(b),

---

[4] The defense agrees with the government that Counts One and Three involved a single transaction and could be grouped under § 3D1.2(a). However, whether these two counts are grouped under subsection (a), as the government argues, or subsection (b), as the PSR found, see PSR at 6-7, ¶ 22, is largely academic as neither option would preclude further grouping with other closely related counts under subsection (b), (c), or (d). See USSG § 3D1.2 cmt. 7 (allowing successive application of multiple subsections to form a single group).

(c), or (d). Multiple counts involving two or more acts or transactions can be combined to form a single group under § 3D1.2(b) if they meet two requirements: (1) they involve the same victim; and (2) they are connected by a common criminal objective or constitute part of a common scheme or plan. USSG § 3D1.2(b).

        1.     <u>All Four Counts Involve the Same Victim</u>

The government argues that the counts cannot be grouped under subsection (b) because they involve different victims, which given the nature of the offenses and the subject at hand, is "society." In other words, the government contends that the nearly identical representation (that Abramoff did not "have any business with the GSA") made to the General Counsel[5] and Inspector General of the same government agency, and then the staffer for the Senate Committee on Indian Affairs, harmed different societal interests. The government's position does not square with its own posture in parallel cases, its own referenced cases, or the guideline manual.

In a recent case in this Court involving false writing on an SF-278 financial disclosure form, 18 U.S.C. § 1018, and Conflict of Interests, 18 U.S.C. §§ 208, 216, the U.S. Attorneys agreed with the principle that false statements to conceal conflicts of interests made to an internal agency official, and then a Senate Committee over one year later, constituted the same victim (i.e. society) and thus could be grouped according to § 3D1.2(b). See <u>United States v. Crawford</u>, Crim. No. 06-438 (D.D.C. Oct. 16, 2006). The similarities with this case, which also involved false statements to internal agency officials and a staff attorney from the Senate Committee, are irrefutable.

---

[5] Count Two consisted of the representation that Abramoff (the "host of the trip") was "a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill)." Gov't Trial Ex. 40.

The U.S. Attorney's position in that matter not only makes sense, but is consistent with precedent.  See Def. Memo at 18-20 (citing cases).  The cases cited by the government also *uphold* grouping of conduct affecting different entities, where the false statements were the same.  In United States v. McCoy, 242 F.3d 399, 409 & n.18 (D.C. Cir. 2001), the Court did in fact group false statement counts made to two different entities, Adams National Bank and the Small Business Administration.  The court did conclude that subsequent perjury in a bankruptcy proceeding involved a different victim, because "the societal interest harmed by perjury is the integrity of the legal system," whereas the victim in the false statement offenses included the financial interests of the private bank and the Small Business Administration.  Id.  By contrast, this matter does not include actual loss for which restitution should be made to different victims, nor does it involve perjury or a private entity.

The government's reliance on United States v. Braxtonbrown-Smith, 278 F.3d 1348 (D.C. Cir. 2002) is also mistaken.  That case merely held that bank, mail, and wire fraud, which defrauded the D.C. Medicaid Fund and Mellon Bank out of millions of dollars, involved a different victim than money laundering and tax evasion, which were victimless and therefore affected "society at large."  See id. at 1356.  Indeed, the court appears to have upheld a grouping of money laundering and tax evasion, on the basis that they both involved the victim of "society at large."  See id.[6]

---

[6] The out-of-circuit cases cited by the government are also not comparable to this case.  For instance, the Seventh Circuit in United States v. Beard, 960 F.2d 965, 967 (11th Cir. 1992), actually reiterated that "when a defendant has been convicted of more than one count, the court should group all counts involving substantially the same harm into a single group."  Id.  It then proceeded to refuse to group two convictions for obstruction of justice because the first involved persuading one employee to take the blame for tax crimes, and the second concerned the defendant's persuasion of a second employee, two years later, to lie to the grand jury.

His conduct with Dannerman involved a substantial interference with the district court because the court sentenced Dannerman without being apprised of Beard's participation

Consequently, this case is more akin to those cited in the Defendant's Sentencing Memorandum at 18-19. The government attempts to cast aside the ruling in United States v. Frank, 354 F.3d 910, 924 (8th Cir. 2004), because it is directly on point. In Frank, the court found all forty-nine counts involved the same victim of "society" where the defendant's conduct was directed at different organizations within the federal government: the Probation Office, a U.S. Attorney's Office, a grand jury, and a court of law. Frank, 354 F.3d at 916-18. Notably, the two obstruction of justice charges that Frank was convicted of involved different federal entities, the grand jury and a court order. Id. at 918.[7]

> 2. All Four Counts Are Connected by a Common Criminal Objective or Constitute
> Part of a Common Scheme or Plan

The government has consistently maintained in almost one year's worth of filings and briefs that all of Mr. Safavian's actions were connected by the common objective concerning the

---

> in the rebate scheme. His conduct with Hauswirth, on the other hand, involved an
> attempt to convince Hauswirth to lie to the grand jury two years later.

Id. at 968. Meanwhile, in United States v. Cueto, 151 F.3d 620, 639 (7th Cir. 1998), the obstruction charges were not grouped because they "did not involve a single course of action." The first count related to filing false pleadings to the federal courts; the second involved attempts to encourage and persuade the State Attorney to indict another individual; and the third involved false pleadings in connection with a different racketeering case. Id. at 629. Here, the four convictions all arise out of the same factual nucleus, that Mr. Safavian assisted Jack Abramoff with Abramoff's interests in GSA-controlled properties; participated in a golf trip to Scotland hosted by Mr. Abramoff (for which he paid the sum of $3,100); and in discourse with government officials either failed to disclose this assistance or asserted that Mr. Abramoff had no business with the GSA.

[7] The government mischaracterizes the defense's citation to United States v. Kim, 896 F.2d 678, 687 (2d Cir. 1990). See Gov't Sent. Mem. at 17 n.11; Def. Sent. Mem. at 19 n.8 (citing Kim). The citation to Kim was used to specifically address the issue of "societal interest" and note that even if this court did conduct the grouping analysis by looking to the societal interests involved, all four counts should still be grouped because all four counts of conviction involved the same societal interest. When courts analyze the "societal interest" that is harmed by particular offense, they typically use the purpose of the specific law that was violated. See United States v. Gastelum-Almeida, 298 F.3d 1167, 1175 (9th Cir. 2002) (noting that the societal interest affected by false statements to the government is "the provision of truthful information for law enforcement"); Kim, 896 F.2d at 687 (analyzing the societal interest in terms of the United States and its interests in enforcing immigration laws). Here, all four counts harmed the same societal interest because both § 1505 (particularly when predicated on false and misleading statements) and § 1001 are intended to protect the same societal interests—the provision of truthful information. Gastelum-Almeida, 298 F.3d at 1175.

disclosure of the nature of his relationship with Jack Abramoff. See Gov't Opp. to Def. Mot. to Dismiss at 14, 20, 30 (Docket #45); Gov't Mot. for Pre-trial Admissibility at 3, 9, 13, 15 (Docket #66). The government continues to postulate in its Sentencing Memorandum that "Defendant's lies and obstructive conduct were all designed to conceal the true nature of his relationship with Jack Abramoff."  Gov't Memo at 1; accord id. at 19 (stating that all four charges had the same criminal objective of "cover[ing] up his unethical relationship with Jack Abramoff."); id. at 29 ("all were designed to keep his inappropriate relationship with Abramoff from becoming public").

Yet, after essentially spelling out the "common objective, scheme, or plan" in its Memorandum, the government manages to take the opposite position in its grouping analysis.  Its grouping recommendation is not only internally inconsistent, but also does not comport with the dictates of the Guidelines Manual.

The Sentencing Commission's notes for § 3D1.2(b) specifically provide that multiple counts are to be grouped under this subsection when they "are part of a single course of conduct with a *single criminal objective*."  USSG § 3D1.2 cmt. n.4.  The notes also explain:

> "Common scheme or plan" and "same course of conduct" are two closely related concepts.
>
> (A) Common scheme or plan. For two or more offenses to constitute part of a common scheme or plan, *they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.* For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), *or* similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).

(B) <u>Same course of conduct</u>. *Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other* as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. *Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.* When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

§ 1B1.3 application note 9(A)-(B).   Because the government cannot escape the fact that all four offenses are "substantially connected to each other by *at least one common factor*, such as common victims, common accomplices, common purpose, or similar modus operandi."   <u>Id</u> (emphasis added), it resorts to an attempt to read into §3D1.2(b) a requirement that the defendant must have contemplated each criminal act from the outset.  Gov't Memo at 19-20.  This theory must be rejected for several reasons.

First, it is contradicted by the text of § 3D1.2(b) which provides for grouping of multiple counts "connected by a common criminal objective <u>or</u> constituting part of a common scheme or plan."  Thus, even if the government was right that Mr. Safavian's actions were not part of a common scheme or plan, clearly it has been their position all along that all four counts had a "common criminal *objective*."  This is sufficient to meet the requirements of § 3D1.2(b).

Second, the government's contention is not supported by the examples provided in the commentary, which provide:

(2) The defendant is convicted of two counts of mail fraud and one count of wire fraud, each in furtherance of a single fraudulent scheme.  The counts are to be grouped together, even if the mailings and telephone call occurred on different

> days. . . . (4) The defendant is convicted of two counts of distributing a controlled substance, each count involving a separate sale of 10 grams of cocaine that is part of a common scheme or plan. . . . The two counts will then be grouped together under either this subsection or subsection (d) to avoid double counting.

USSG § 3D1.2 cmt. n.4. Nowhere do these examples require each act to have been specifically foreseen by the defendant. Indeed, just as the defendant in example (4) was operating under a "common scheme or plan" by selling cocaine to anyone who would buy it, so the government's position has been that Mr. Safavian was covering up his unethical relationship with Abramoff to anyone who asked about it. See Gov't Memo at 1; 19, 29 ("all were designed to keep his inappropriate relationship with Abramoff from becoming public"); Gov't Opp. to Def. Mot. to Dismiss at 14, 20, 30 (Docket #45); Gov't Mot. for Pre-trial Admissibility at 3, 9, 13, 15 (Docket #66). This is clearly sufficient to meet the requirements of § 3D1.2(b).[8] See United States v. Norman, 951 F.2d 1182, 1185 (10th Cir. 1991) (holding that two separate false reports on separate occasions connected by a common criminal objective of harming another individual should be grouped under section 3D1.2(b)); United States v. Wilson, 920 F.2d 1290, 1294 (6th Cir. 1990) (grouping six counts of solicitation of murder involving five separate telephone calls and one letter connected by a common criminal objective of having his wife killed).

---

[8] The government's citation to United States v. Pitt, 176 F.3d 239 (4th Cir. 1999) is misplaced. First, the court recognized that the grouping analysis under § 3D1.2(b) are "heavily fact specific," and noted that "[w]hether or not offenses are connected by a common criminal objective is also a critical determination." Id. at 244. Second, the factual circumstances involved in Pitt are substantially different from this case. There, Pitts was involved in two separate instances of espionage against the United States spanning ten years. United States v. Pitt, 973 F. Supp. 576, 581 (E.D. Va. 1997). Furthermore, each instance of espionage involved transferring different intelligence to different governments—the first offense involved giving secrets to Russian intelligence, while the second offense involved giving different secrets to undercover U.S. FBI agents. Id.; Pitt, 176 F.3d at 245. Here, Mr. Safavian was convicted of making the same false and misleading statements to the United States on three separate instances, spanning a much shorter period of time. Moreover, in Pitt, the District Court found that both charges involved the same "societal interest" despite involving different governmental agencies (and different governments altogether). See Pitt, 973 F. Supp. at 581 n.11 ("[T]he government concedes that Counts 1 and 3 threatened the Nation's "societal interest.").

3.    All Four Offenses Can Be Grouped Through Successive Application of §
3D1.2(b) and (d).

As discussed in the Defendant's Sentencing Memorandum, the Guidelines allow for a single group to be created by successive application of multiple subsections of § 3D1.2.  See USSG § 3D1.2 cmt. nn.6-7.  The government disagrees with this conclusion, as well as the view of the PSR (with respect to Counts Two and Five), that the false statement counts can be grouped under subsection (d), which provides for grouping "if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."  USSG § 3D1.2(d).  The government's only asserted theory for why subsection (d) is not applicable is that Mr. Safavian's false statements did not cause any financial loss.  However, subsection (d) does not require financial loss in order for grouping to be proper; it simply requires offense behavior that is ongoing or continuous in nature, and that the offense guideline is written to cover such behavior.  Id.  Here, Mr. Safavian's conduct was clearly "ongoing or continuous in nature," as all four counts are based on the same statements and concealment of the same facts (the nature of his relationship with Abramoff).  Moreover, the applicable guideline for § 1001 is written to cover such ongoing behavior, as it provides for enhancements based on aggregate number of victims as well as amount of loss.  USSG § 2B1.1(b)(1) and (2).[9]

---

[9] In addition, the caselaw supports the proposition that charges can be grouped under subsection (d) despite not having caused financial loss.  In United States v. Smith, 105 Fed. Appx. 506 (4th Cir. Aug. 3, 2004) (not reported), the court grouped two § 1001 false statement counts with one count of making a false claim, using section 3D1.2(d).  See id. at 507.  While there was a loss attributable to the false claim charge, there was no loss associated with the two § 1001 counts.  Therefore, counts can be grouped under subsection (d) despite the fact that they caused no financial loss.  Notably, a contrary ruling would have the paradoxical effect of *punishing* Mr. Safavian for the fact that his offenses were less severe and did not lead to any financial loss.

**D.    This Court Must Reject The Government's Extraordinary Request for the Substitution of the Acquitted Conduct In Count Four And Its Three-Level Enhancement**

The government's discussion of acquitted conduct is misguided in both its formulation and application.  It attempts to stretch this Court's limited discretion to consider "acquitted conduct" (proven by a preponderance of the evidence) to fashion an appropriate base level for the underlying convicted offense [in this instance the § 1001 conviction in Count Five] into a notion that this Court should effectively substitute the Count Four acquittal for the § 1505 charge and its corresponding offense level.  The government then still asks the Court to apply three one-level enhancements based on its faulty grouping analysis, even though the very premise of its own grouping discussion is that Count Five is not sufficiently related to any of the other counts.

The government request for this Court to ignore the offense guideline § 2B1.1 applicable to a conviction of 18 U.S.C. § 1001, rests on a misunderstanding of United States v. Dorcely, 454 F.3d 366 (D.C. Cir. 2006), and would require this Court to ignore fundamental principles governing the application of the Guidelines Manual.

The very first step in calculating the Guidelines sentencing range is to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the *offense of conviction* (i.e., the offense conduct charged in the count of the indictment or information *of which the defendant was convicted*)."  USSG §§ 1B1.1(a), 1B1.2(a) (emphasis added).  In order to determine the applicable "offense guideline section," the Court is to "[r]efer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index *for the offense of conviction*.  Id. (emphasis added).  Here, the "offense of conviction" for

Count Five is 18 U.S.C. § 1001, and the Statutory Index states that the applicable offense guideline is section 2B1.1.[10]

The next step is to "[d]etermine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline."  USSG § 1B1.1(b).  Using the applicable offense guideline for Count Five, § 2B1.1, the base offense level is 6.  Furthermore, no party has argued that any specific offense characteristics, cross references, or special instructions listed in § 2B1.1 are applicable to Count Five.  Notably, it is only during this second step that the Guidelines allow "relevant conduct" to be considered.  See USSG § 1B1.2(b) ("*After* determining the appropriate offense guideline section pursuant to [§ 1B1.2(a)], determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct).") (emphasis added).  Accordingly, the only information relevant to determining which offense guideline applies is the offense of conviction, and "relevant conduct" (e.g., acquitted conduct) is only utilized to determine whether specific offense characteristics, cross references, or special instructions apply under that guideline.

With this procedure in mind, it is clear that the government's argument either stems from misapplication of the Guidelines Manual, or an incredible request to have the Court set aside the acquittal for Count Four, find him guilty of that offense under a "Rule 29" type judgment as a matter of law (under a lower evidentiary burden), and then sentence Mr. Safavian as though he were convicted of all five counts.  See, e.g., Gov't Sent. Mem. at 11 ("The government submits that it did establish, by at least the preponderance of evidence standard, that defendant obstructed the Senate investigation."); id. at 14 ("[T]he Court should consider Count Four as it would any

---

[10]  The Index lists 2J1.2 as an alternative for a conviction of 18 U.S.C. § 1001, but only "when the statutory maximum term of imprisonment relating to international terrorism or domestic terrorism is applicable."  See USSG App. A.

other conduct."); id. at 15 n.10 ("Count Five should be grouped with the acquitted conduct of Count 4.").

Assuming that the government is seeking a more limited application of acquitted conduct, however, the analysis still fails because neither the government, nor the Probation Office has argued that any specific offense characteristics, cross references, or special instructions under the applicable offense guideline § 2B1.1. A proper application of § 2B1.1 should result in a base offense level of 6, see PSR at 7, ¶ 29, rather than 14 as argued by the government. See Gov't Sent. Mem. at 22. The government is asking this court to disregard the Guidelines instructions in §§ 1B1.1(a) and (b), which require this Court to apply § 2B1.1 for a conviction of 18 U.S.C. § 1001, and instead apply an entirely different guideline, namely § 2J1.2.

The government offers no stated reason for the application of a different guideline than the one specified in the Statutory Index, other than their assertion that they proved the elements of Count Four by a preponderance of the evidence.[11] However, as noted above, the Guidelines

---

[11] Before Dorcely, this Court recognized that a heightened scrutiny was necessary to apply acquitted conduct to sentencing enhancements. See United States v. Baldwin, 389 F. Supp. 2d 1, 2 (D.D.C. 2005) (Friedman, J.) ("The burden of proof to be applied on all issues at the sentencing in this case under United States v. Booker, and the Fifth and Sixth Amendments to the United States Constitution, will be proof by a preponderance of the evidence, except with respect to (a) acquitted conduct (if it may be considered at all), where the standard would have to be proof beyond a reasonable doubt."). Indeed, Apprendi v. New Jersey, 530 U.S. 466 (2000) established two distinct rights, the right to have a jury find every fact, and the right to a standard of proof beyond a reasonable doubt. See id. at 478. Several courts have argued that the reasonable doubt standard in Apprendi applies to judge-found facts after Booker and that the holding in Booker has called the holding in United States v. Watts, 519 U.S. 148 (1997), into question. See United States v. Kandirakis, 441 F. Supp. 2d 282, 325-27 (D. Mass. 2006) (discussing that the Supreme Court's rulings in Booker and Apprendi logically require that defendant has a right to a standard of proof beyond a reasonable doubt for all sentencing enhancement factors); United States v. Pimental, 367 F. Supp. 2d 143, 150 (D. Mass. 2005) ("United States v. Booker substantially undermines the continued vitality of United States v. Watts both by its logic and by its words. It makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, and also conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing."); United States v. Ibanga, 2006 U.S. Dist. Lexis 72612, at *21-22 (E.D. Va. Oct. 5, 2006) ("Punishing defendant Ibanga for his acquitted conduct would have contravened the statutory goal of furthering respect for the law and would have resulted in unjust punishment for the offense for which he was convicted (i.e., money laundering). From defendant Ibanga's perspective, a Guidelines sentence would certainly have resulted in confusion as to the law, and confusion

explicitly state that "relevant conduct" (e.g., acquitted conduct) is not used to determine which offense guideline applies to the particular offense of conviction.  See USSG § 1B1.2(b) (instructing that the applicable offense guideline is to be determined *prior to* the application of § 1B1.3 (Relevant Conduct)).

The only case cited by the government for its proposition does not support their argument.  See Dorcely, 454 F.3d at 371.  In Dorcely, the defendant was convicted of making a false statement and acquitted of a conspiracy to defraud the United States.  Id. at 370.  At sentencing, the District Court applied § 2F1.1, the guideline for the offense that Dorcely was convicted of—making a false statement—as specified by the Sentencing Guidelines in effect when the crime was committed.  See USSG, App. A (2000).  Accordingly, the court found that the base offense level for making the false statement was six, but *in calculating the specific offense characteristic of loss*, the court increased the offense level by eleven because the court found by a preponderance of the evidence that, despite being acquitted, Dorcely was involved in the conspiracy to defraud, which resulted in a loss of $953,328.47.[12]  See USSG § 2F1.1(b)(1)(L) (2000) (indicating that the base offense level for a false statement that resulted in a loss of more

---

breeds contempt. . . . What could instill more confusion and disrespect than finding out that you will be sentenced to an extra ten years in prison for the alleged crimes of which you were acquitted? The law would have gone from something venerable and respected to a farce and a sham."); United States v. Coleman, 370 F. Supp. 2d 661, 668 (S.D. Ohio 2005) ("At sentencing, acquitted conduct should always be considered using a reasonable doubt standard; otherwise, a defendant's Sixth Amendment right to a jury trial is eviscerated. . . . The viability of Watts, however, was questioned by Justice Stevens' constitutional majority opinion in Booker. While stating that Watts is not 'inconsistent with today's decision,' Justice Stevens remarked that Watts did not involve 'any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment. The issue we confront today simply was not presented.' Booker, 125 S.Ct. at 754. Moreover, in a footnote, Justice Stevens continued: 'Watts, in particular, presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of a full briefing or oral argument.  It is unsurprising that we failed to consider fully the issues presented to us in these cases.'").

[12] The procedure used by the District Court is explained in the Defendant Dorcely's Appellate Brief to the D.C. Circuit.  See Ex. 3.

than $800,000 is to be increased by eleven levels).  Consequently, the court in <u>Dorcely</u> merely held that in applying the specific offense characteristics (loss) for the guideline corresponding to the offense of conviction (§ 2F1.1 for false statements in 2000 version), it was proper for the District Court to consider in part the loss resulting from conduct for which the defendant was acquitted (the conspiracy).  The case did not hold, as the government claims, that a court can apply an *entirely different guideline* (2J1.2 instead of 2B1.1) that is only applicable to an offense of which the defendant was acquitted (Count Four).[13]  And of course it did not hold that if the government does not obtain a jury verdict at trial on a given count, all it has to do is simply ask the Court to find the defendant guilty of that count under a *lower* evidentiary standard, even though it is well-established that the government does not even have a right to a judgment as a matter of law or an appeal to a jury acquittal.

For these reasons, the government's discussion of the "acquitted conduct" related to Count Four should be disregarded.[14]  Nevertheless, it should be noted that the government also

_____

[13] Every case the defense has seen considering acquitted conduct at sentencing has merely used the conduct when determining the sentence under the applicable offense guideline specified in Appendix A. No case has applied a guideline for a different offense of which a defendant was acquitted.  <u>See</u>, <u>e.g.</u>, <u>United States v. Faust</u>, 456 F.3d 1342 (11th Cir. 2006) (acquitted conduct of possession of ecstasy and possession of dangerous weapon could be applied as specific offense characteristics of guideline for offense of conviction, § 2D1.1 (cocaine possession)).

[14] Even if the Court should entertain a proper request for consideration of acquitted conduct in Count Four, the government could not meet its burden of demonstrating obstruction by a preponderance of the evidence.  First, it assumes, simply because the jury convicted Mr. Safavian of making a False Statement to the Senate staffer in Count Five, that the only element in dispute is the elevated *mens rea* requirement for finding obstruction of justice, namely the requirement for "corrupt" intent.  Notably, in doing so, the government seeks to diminish the definition of the requisite level of intent which goes well beyond simply acting "voluntarily and deliberately." Gov't Memo at 14; compare with Jury Instructions at 99-100. (emphasis added).

Accordingly, the jury could have concluded that Mr. Safavian did not have this level of "wrongful, immoral, depraved, or [] evil" intent. Instructions at 99-100.  Among other things, Mr. Safavian provided all documents he was asked for in the document request and subsequent conversations. Gov. Exs. 80-81.  In addition, Bryan Parker testified that Mr. Safavian's statements had "no impact" on their investigation, 06.01.06 a.m. Tr. at 34:20-21, and that the committee had already ceased any examination into issues beyond the actual "money trail" of tribal funds.  <u>Id</u>. at 34:22-35:10.

errs in its pursuit of a three-level enhancement under both its faulty grouping analysis (reserved uniquely for Mr. Safavian) and the correct grouping as outlined in Part II.C.  If acquitted conduct were to be proven and considered to calculate some yet to be identified specific offense characteristics, cross references, or special instructions under § 2B1.1, it is solely for the singular group of offenses.  See supra Part III.C.

E.    **The Circumstances of this Case are Outside the "Heartland" of § 1505 Cases and Warrant a Downward Departure under 5K2.0**

In our initial sentencing memorandum, the defense put forth an argument demonstrating why a downward departure pursuant to USSG § 5K2.0 is warranted in this case because it lies outside the "heartland" of typical obstruction of justice offenses.  See Def. Sent. Mem. at 27-32.  However, the government failed to address the "heartland" issue in its response.

The Defendant's Sentencing Memorandum outlines what the "heartland" of § 1505 is by citation to numerous cases within the District of Columbia and other jurisdictions.  See Def. Sent. Mem. at 27-32 (citing cases).[15]  Moreover, the legislative history also supports a finding that the facts of this case are well outside the "heartland" of the typical case Congress and the U.S. Sentencing Commission had in mind when they established USSG § 2J1.2, the applicable offense guideline for a § 1505 offense.  See United States v. Sidhom, 142 F. Supp. 2d 150, 154-56 (D. Mass. 2001) (analyzing legislative history behind USSG § 2S1.1 to determine that downward departure was warranted because case fell outside the "heartland" of money

---

[15] See also United States v. Nachamie, 121 F. Supp. 2d 285, 295 (S.D.N.Y. 2000) (awarding downward departure in fraud case where defendants did not have the willful intent to violate the law at the outset of the scheme); United States v. Hancock, 95 F. Supp. 2d 280, 284 (E.D. Pa. 2000) (awarding downward departure for conviction of felon in possession of a firearm because the case fell outside the "heartland" of typical cases where the defendant concealed the weapon or used the weapon to commit another crime); United States v. Best, 2001 U.S. Dist. LEXIS 20161, at *14-15 (M.D.N.C. Sept. 26, 2001) (awarding downward departure for filing false documents with the IRS because defendant's case was not typical in that defendant did not personally benefit from the fraud and there was no risk of recidivism).

laundering offense, which typically involved additional conduct connected with drug activity or other crimes).

**F.    Circumstances Warrant a Downward Departure under Section 3E1.1 Because Mr. Safavian Has Accepted Responsibility For His Conduct**

The government agrees with this Circuit that a defendant can qualify for a downward departure for acceptance of responsibility under § 3E1.1, even though he exercises his constitutional right to trial where he goes to trial to assert issues that do not relate to factual guilt. § 3E1.1, Application Note 2.[16]    According to the government's memorandum, the crux of the dispute appears to be whether the defendant's challenges related to factual guilt or the application of the statutes to the defendant's conduct.    The government does not contest that the defendant's point that the Rule 29 Motion focused on due process issues, multiplicity, unconstitutional application of § 1505, and whether the evidence in the trial record amounted to the requisite elements of the respective statute.

The government focuses on the defendant's Rule 29 challenge to the allegation that the defendant 's assertion that Abramoff "had no business before GSA (he does all of his work on Capitol Hill)" (Count Two); and "did not have any business with GSA" (Count Five) were false. The government claims this was a factual challenge.    The government is incorrect.    The defendant's challenge was whether a § 1001 case could be sustained where the government could not negate every reasonable interpretation that made the defendant's assertion factually correct. Def. Rule 29 Mot. at 25-26 (citing United States v. Gatewood, 173 F.3d 983, 988 (6th Cir. 1999) (government has burden of "negat[ing] *any* reasonable interpretations that would make a defendant's statement factually correct") (emphasis added); United States v. Moses, 94 F.3d 182,

---

[16] And even when a defendant goes to trial to challenge factual guilt, he still can qualify for a reduction with "genuine contrition" for his acts.  See United States v. Cortes, 299 F.3d 1030 (9th Cir. 2002).

188 (5th Cir. 1996) (vacating § 1001 conviction where the alleged statement forming the basis of the violation, making false statements on an INS form, was "true on its face").  As the cases relied on explained, this was an argument to reverse the § 1001 conviction "*as a matter of law,*" since the statement could be supported as true under the definitions of the material terms by the Office of Government Ethics; the GSA Ethics Manual; and the GSA Ethics Officer.  Id. (citing United States v. Dale, 782 F. Supp. 615, 627 (D.D.C. 1991) and, *inter alia*, United States v. Race, 632 F.2d 1114, 1120 (4th Cir. 1980)).

The government also points to the use of the term "insufficient evidence" in the Rule 29 brief as a preface to this argument, but that is simply the posture commanded by the Federal Rule when challenging the application of a statute to the record of conduct.  Furthermore, the question cannot be examined without taking into account the nature of false statement and derivative obstruction cases, which unlike standard criminal cases, tend to focus on circumstantial interpretation, as opposed to hard facts that can be challenged or verified.  In short, Mr. Safavian has not denied any of the *facts* of the case, that is the who, what, where, and when of any communication or event with Abramoff. At no point has he "falsely den[ied], or frivolously contest[], relevant conduct."  U.S.S.G. § 3E1.1 cmt.  Instead, Mr. Safavian has admitted many of the *communications* were "inappropriate" and wrong, see 06.02.06 p.m. Tr. at 16-19, thereby manifesting "genuine contrition" and "rehabilitative effort."  Thus, downward departure for acceptance of responsibility is also warranted.   USSG § 3E1.1. cmt. n.1(g).

The following chart summarizes the sum of these calculations and the corresponding departures.

| **Group I:  Counts 1, 2, 3, 5** | |
|---|---|
| **Base Offense Level** | **12** |

| | |
|---|---|
| **No Obstruction Adjustment (3C1.1)** | **0** |
| **Guideline Offense Level:** | **12** |
| **Acceptance of Responsibility (3E1.1)** | **-2** |
| **"Heartland" Departure (5K2.0)** | **-2 to -6** |
| **Total Offense Level** | **6 to 10** |

### G.    The Government's Guideline Recommendation and Sentencing Request Would Constitute An Unwarranted Disparity in Treatment of Similar Offenders (18 U.S.C. § 3553(a)(6))

The government's Guideline Manual calculation is not only incorrect for the aforementioned reasons, but would lead to substantial and unwarranted "sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The government's basic criticism to the Defendant's attached chart of comparable sentences for §§ 1001, 1505, (see Ex. 1) is that it is selective. Yet tellingly, the government fails to offer any counter examples where a defendant received the penalty they are seeking under the Guidelines. Furthermore, after relying on the case throughout these proceedings, the government now chooses to ignore the results of United States v. Cisneros, 26 F. Supp. 2d 24 (D.D.C. 1998), aff'd 169 F.3d 763 (D.C. Cir. 1999), where the defendant was charged with 18 felonies, involving false statements and concealment concerning bribes on an SF-86 form to receive the nomination to a high-level executive position and the Court upheld a sentence of a $10,000 fine and $25. See Def. Sent. Memo at 26-27 (citing cases in chart at Ex. 1).

More recent cases, such as United States v. Berger continue to confirm that a guideline sentence to imprisonment, particularly at the government's miscalculated level, would constitute a great disparity with the majority of similar public offender sentences. In Berger, for example,

again in a case involving unlawful conduct relating to issues of National Security (illegal removal of copies of classified documents from the National Archives in 2003 while preparing to testify before the Sept. 11 commission), the Court sentenced the defendant to -- a $50,000 fine, two years of probation, 100 hours of community service and a three-year ban on access to classified documents.  See U.S. v. Berger, Crim. No. 05-157M (D.D.C. Sept. 13, 2005).

The government's other qualification is that some of the cited cases involved plea agreements. The decision to exercise one's constitutional right, however, does not play in the calculus of "treatment of similar offenders," 18 U.S.C. § 355(a)(6), and the government offers no examples of convicted offenders with sentences anywhere near the government's calculus.

## IV.    CONCLUSION

The governing 18 U.S.C. § 3553(a) factors merit an alternative sentence equivalent to a Guideline Manual level of 8 to 10 (downward departures from a base 12 level-offense). Incarceration at the base offense level is not "necessary to comply with purposes set forth in [§ 3553(a)(2)]."   See supra Section II.B (analyzing deterrence, rehabilitation, and retribution factors).[17]   For the aforementioned reasons and those stated in the Defendant's Sentence Memorandum, we respectfully request this court impose an sentence that includes alternatives to incarceration.

---

[17] In the event this Court decides to impose a sentence that includes some imprisonment, however, we ask it to include in its Judgment and Commitment Order a recommendation that the Bureau of Prisons designate Mr. Safavian to a Minimum Security facility at either Cumberland in Cumberland, Maryland, or Morgantown in Morgantown, West Virginia.  These facilities are close to his wife, young daughter, and family members in the metropolitan area, but would also make visits from his mom and family in southeast Michigan more feasible.  As noted by the Defendant's motion for emergency travel earlier this year (see Dock. No. 27 granting motion), his mother has been in ill-health.  We should also note that the amended PSR has recommended an alcohol assessment.  PSR ¶ 60.

Respectfully submitted,

WILEY REIN & FIELDING LLP


By: /s/ Barbara Van Gelder
_____

    Barbara Van Gelder (D.C. Bar # 265603)
    Roderick L. Thomas (D.C. Bar # 433433)
    Albert Lambert (D.C. Bar # 489562)
    Wiley Rein & Fielding LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032
    FAX: 202.719.7049

Dated: October 23, 2006       *Attorneys for David H. Safavian*