# Exhibit 2

# SPECIFIC DETERRENCE IN A SAMPLE OF OFFENDERS CONVICTED OF WHITE-COLLAR CRIMES*

DAVID WEISBURD
  Hebrew University Law School

ELIN WARING
ELLEN CHAYET
  Rutgers University

*It is generally argued that white-collar criminals will be particularly influenced by punishment policies. White-collar crime is seen as a highly rational form of criminality, in which the risks and rewards are carefully evaluated by potential offenders, and white-collar criminals are assumed to have much more to lose through sanctions than more common law violators. In this article we examine the impact of sanctions on the criminal careers of 742 offenders convicted of white-collar crimes in seven U.S. district courts between fiscal years 1976 and 1978. Utilizing data on court-imposed sanctions originally compiled by Wheeler et al. (1988b), as well as information on subsequent criminal behavior provided by the Identification Bureau of the Federal Bureau of Investigation, we assess the effect of imprisonment upon the official criminal records of people convicted of white-collar crimes. Comparing prison and no-prison groups that were matched in terms of factors that led to their receipt of a prison sanction, we find that prison does not have a specific deterrent impact upon the likelihood of rearrest over a 126-month follow-up period.*

Although scholars have focused increasing attention upon the criminal careers of street criminals, they have largely overlooked those of white-collar offenders. Behind this neglect lies a common assumption about the nature of white-collar criminality. In contrast to street criminals who are assumed to be highly likely to recidivate, those convicted of white-collar crimes are generally thought to be "one shot" offenders unlikely to be processed in the justice system after their initial brush with the law (see Benson, 1985; Edelhertz and Overcast, 1982; Wheeler et al., 1988a).

---

* Research for this article was supported by the National Institute of Justice (Grant 88-IJ-CX-0046, "White Collar Criminal Careers: A Study of Sanctioning Effects"). We would like to thank Malcolm Feeley, Gidon Fishman, Simcha Landau, Richard Linster, Michael Maltz, Cynthia Nahabedian, Winnifred Reed, Leslie Sebba, and Christy Visher for their helpful comments on earlier drafts.

588                        WEISBURD ET AL.

Studies of people who are prosecuted for white-collar crimes contradict this common assumption about white-collar criminals. In two major investigations examining offenders convicted under white-collar crime statutes in the U.S. federal courts in the 1970s, a substantial number of defendants were found to have prior arrests. Benson and Moore (1992), for example, report that almost 40% of their sample, which included those convicted of bribery, bank embezzlement, income tax evasion, false claims, and mail fraud, had at least one prior arrest. Weisburd et al. (1990b), studying these crimes and securities violations, antitrust violations, and credit fraud, found that more than 40% of their sample evidenced at least one prior arrest and more than a quarter had two reported prior arrests.

These studies raise significant research and policy questions concerning the impact of sanctions on those prosecuted for white-collar crimes. The common perception that white-collar criminals have avoided the most serious penalties in the justice system, for example, has led to increased severity in the sanctions meted out to federal white-collar offenders (U.S. Sentencing Commission, 1987) and to a larger number of such criminals being sentenced to imprisonment (U.S. Sentencing Commission, 1991). In good part because of the assumption that white-collar criminals are unlikely to have multiple contacts with the criminal justice system, such policies have been developed without investigation of their impact on future criminal conduct among sanctioned white-collar criminals.

Examination of the effects of sanctions upon convicted white-collar offenders can also provide insight for the understanding of theories of specific deterrence. The failure of sanctions to provide specific deterrent effects in studies of street criminals is often attributed to the fact that such offenders have so little to lose through contact with the justice system (Mann et al., 1980; see also Piliavin et al., 1986). Convicted white-collar criminals have much more to lose as a result of the criminal process than do more common offenders (see Weisburd et al., 1991), and thus they provide a special opportunity to critically examine assumptions underlying specific deterrence theory.

In this article we examine the impact of sanctions on the criminal careers of 742 offenders convicted of white-collar crimes in seven U.S. district courts between fiscal years 1976 and 1978. Utilizing data on court-imposed sanctions originally compiled by Wheeler et al. (1988b), as well as information on subsequent criminal behavior provided by the Identification Bureau of the Federal Bureau of Investigation (FBI), we assess the effect of imprisonment upon the official criminal records of people convicted of white-collar crimes. Comparing prison and no-prison groups that were similar in terms of factors that led to their receipt of a prison sanction, we do not find significant differences in the likelihood of recidivism over a 10.5-year follow-up period.

# SPECIFIC DETERRENCE AND
# WHITE-COLLAR CRIME

Both in the criminal law and in the public consciousness, prison sanctions are perceived as an effective deterrent to continued criminality among offenders (Farrington et al., 1986). There is, however, little empirical evidence to support this assumption (Lab, 1988). At least since the 1970s criminologists have consistently shown that those who are sentenced to prison have at best about the same rates of recidivism as nonimprisoned offenders, and in some cases a much higher rate (e.g., see Bartell and Winfree, 1977; Beck and Hoffman, 1976; Cohen et al., 1991; Hopkins, 1976). Findings regarding the relationship between sentence length and recidivism evidence a similar pattern (e.g., see Babst et al., 1972; Gottfredson et al., 1977), though isolated specific deterrent effects have been noted in specific circumstances (e.g., see Gottfredson et al., 1977 in the case of very long prison sentences).

It is generally argued that white-collar criminals will be particularly influenced by punishment policies (e.g., see Braithwaite, 1985; Braithwaite and Geis, 1982; Geis, 1982; Zimring and Hawkins, 1973). White-collar crime is seen as a highly rational form of criminality, in which the risks and rewards are carefully evaluated by potential offenders, and white-collar criminals are assumed to have much more to lose through sanctions than more common law violators (Braithwaite and Geis, 1982; Geis, 1982). Zimring and Hawkins note, in this regard, that "success determines the amount of investment in society an individual puts at risk when committing a threatened behavior" (1973:128). In contrast to street criminals who generally have little to risk, white-collar criminals would seem especially susceptible to the threat of punishment.

While the relatively established economic and social positions of those convicted of white-collar crimes lead a number of scholars to the conclusion that these offenders should be responsive to punishment policies, most discussion of deterrence for individual white-collar criminals centers on the problem of general rather than specific effects (Wheeler et al., 1988a). Moreover, research has generally focused on the corporate, rather than the individual offender, and frequently examines general deterrence resulting from new legislation, changes in prosecution, or the introduction of regulations (e.g., see Geis and Clay, 1982; Hopkins, 1980; Stotland et al., 1980). Studies of corporate sanctioning provide some support for a specific deterrent effect of sanctions in white-collar crime (e.g., see Simpson and Koper, 1992). Nevertheless, it is difficult to generalize from corporate to individual offenders.

Evidence that sanctions may backfire and lead offenders to more serious or frequent offending (Bridges and Stone, 1986; Farrington et al., 1986;

590                          WEISBURD ET AL.

Petersilia and Turner, 1986; Sherman et al., 1986) also has implications for understanding the impact of sanctions on white-collar criminals. The experience of punishment might be expected to reinforce the costs of criminality for the white-collar offender (see Benson and Cullen, 1988). Nevertheless, arrest, prosecution, conviction, and incarceration may also produce changes in an offender's current and future legitimate or criminal opportunities, thus altering, and sometimes increasing, his or her likelihood of reoffending (see Waring et al., 1994).

The stigma of the criminal label may, in turn, render the deterrent threat of punishment less serious. Once prestige and status are lost, they may be perceived as difficult to regain. Once the cost of illicit behavior has been minimized, recidivism may be more likely. In some sense, the model of a spiraling process of deviance set into play by a labelling experience (see Wilkins, 1965) may be more appropriate for white-collar criminals than for the common criminals for whom the concept was initially developed.

## THE SAMPLE

Our sample is drawn from a study of white-collar criminals conducted by Wheeler et al. (1988b; see also Weisburd et al., 1991). They define white-collar crime as "economic offenses committed through the use of some combination of fraud, deception, or collusion" (Wheeler et al., 1982:642; see also Shapiro, 1980). Following this, they examine eight such crimes in the federal judicial system in fiscal years 1976-1978: antitrust offenses, securities fraud, mail and wire fraud, false claims and statements, credit and lending institution fraud, bank embezzlement, income tax fraud, and bribery.

Wheeler et al. focused their investigation in seven federal judicial districts (Central California, Northern Georgia, Northern Illinois, Maryland, Southern New York, Northern Texas, Western Washington). The districts were chosen in part to create geographic spread, in part because they were being examined in other studies, and in part because they were known to have a substantial amount of white-collar prosecution. In order to allow a detailed reading of individual cases, as well as to avoid the dominance of specific offenses like Internal Revenue Service (IRS) fraud (which overwhelm in frequency other types of white-collar crimes in the federal system) a maximum of 30 convicted defendants from each offense category in each district were examined.[1] The resulting sample therefore contains more antitrust and securities fraud offenders, and fewer postal fraud, IRS

---

1.  For some offenses the universe of available cases in specific districts did not reach the 30-defendant threshold. This was particularly true for securities frauds, antitrust violations, and bribery.

DETERRENCE AND WHITE-COLLAR CRIMES    591

fraud and bank embezzlement offenders than a non-stratified random sample would (see Appendix 2 for the distribution of cases used in our analyses). But it offers "a broad sampling of white collar offenders" in the federal courts (Wheeler et al., 1982:643).[2]

The Wheeler et al. sample is drawn from a different population than most street crime samples. For example, only 8% of the sample as a whole were unemployed at the time they committed their offense. This is in stark contrast to street criminals, most of whom are not employed in legitimate occupations (Sviridoff and McElroy, 1985). More than three quarters of those working were employed in white-collar jobs (as defined by the Census Bureau), and almost one third of the sample were officers or owners of businesses.

While the offenders examined by Wheeler et al. (1988b) are clearly more "white collar" than a sample of street criminals would be, they also depart in some ways from accepted images of white-collar criminals. The common portrait of white-collar criminals focuses on people of elite social status who use their established social and economic positions to commit crimes and avoid criminal justice punishment (Braithwaite, 1992; Clarke, 1978; Geis, 1992; Geis and Stotland, 1980; Sutherland, 1949). In contrast, the Wheeler et al. (1988b) sample identifies offenders who are very similar to average or middle class Americans (Weisburd et al., 1991). As Weisburd et al. (1991:3) explain:

> Some of those examined were indeed located far above middle class status and use resources to commit their crimes and avoid punishment that are unavailable to all but the most privileged. And indeed these criminals are as alien to middle class citizens as are the poor who are popularly associated with most street crimes. But the majority occupy positions in society that are neither far above nor far below the middle, and their crimes do not necessitate nor do their defenses rely upon elite social status. Opportunities to commit these crimes are available to average Americans.

## IDENTIFYING CRIMINAL HISTORIES

Although all official measures of recidivism include a substantial degree of error, arrest is generally assumed to provide a more accurate measure of reoffending than conviction, sentencing, or incarceration (Blumstein et al., 1986; Maltz, 1984). Nonetheless, we recognize at the outset that the meaning of an arrest and its validity in defining reoffending may be different for white-collar as compared with common crimes.

---

2. For a detailed description of sampling methods used by Wheeler et al. (1988b), see Weisburd et al. (1991:Ch. 1).

592                          WEISBURD ET AL.

Prosecutors, not the police, are often the primary investigators of white-collar crime (Katz, 1979). White-collar criminals may, in turn, be "arrested" much later in the investigative process than are street criminals (Braithwaite and Geis, 1982). Such offenders may not be arrested at all if prosecutors decide to use civil actions instead of a criminal prosecution (Mann, 1992). The fact that white-collar crimes are often of longer duration than are street crimes (see Weisburd et al., 1991) provides added potential for misunderstanding criminal careers in a sample of white-collar offenders, as does the fact that reliable estimates are lacking of the relationship between the official criminal records of such offenders and their actual involvement in criminal behavior.

While the potential biases in using arrests as a measure of reoffending in white-collar crime are not insubstantial, they may not be as different from those found among common crime offenders as has generally been assumed. In part this is the case because white-collar criminals are often not specialists in white-collar crime, at least in terms of their official criminal records (see Benson and Moore, 1992; Weisburd et al., 1990b, 1994). In assessing the criminal careers of people convicted of white-collar crimes, it is important to note that they commit non-white-collar offenses as well. Moreover, the popular image of white-collar crime often overstates the degree to which these criminals and their offenses differ from other types of crimes and criminals (Hirschi and Gottfredson, 1987; Weisburd et al., 1991).

We collected information on arrest histories for our sample from FBI "rap sheets." Rap sheets provide the single most comprehensive source of information on an individual's arrest history, drawing data from local, state, and federal criminal justice agencies. However, the primary method of identifying individuals in this system is through FBI identification numbers, which were not consistently included in the pre-sentence investigation reports examined by Wheeler et al. (1988b). Using FBI numbers when available, as well as other identifiers from the Wheeler et al. data, we were able to gain arrest history information on 7 of every 10 individuals drawn in the original Wheeler et al. study.[3]

## THE EFFECTS OF IMPRISONMENT: METHODOLOGICAL CONCERNS

In the analyses that follow, we focus on the impact of a prison sanction

---

3. This case attrition does not threaten the internal validity of the comparisons between prison and no-prison groups we examine later. However, it does raise questions about our ability to make inferences to a larger population. Specifically, the sample is significantly less likely to include women, those with less serious prior records, those not sentenced to imprisonment, and older offenders.

## DETERRENCE AND WHITE-COLLAR CRIMES    593

upon subsequent criminality. We do not examine the effect of length of
sentence, in part because of the difficulty we encountered in accurately
defining time served for the criterion offense. Even after reviewing data
from the FBI, Bureau of Prisons, and the federal Parole Bureau, we were
not able to establish how long those sentenced to prison actually remained
incarcerated. Because of possible reductions in prison sentence through
either "good time" credits or parole release, imposed sentences could not
be used to provide a precise estimate of time served for individual
prisoners.

Irrespective of the difficulty of gaining information on the length of
served prison terms in our sample, our decision not to examine the impact
of length of prison upon recidivism is consistent with other criminal career
studies (e.g., see Blumstein et al., 1986, 1988; Schmidt and Witte, 1988). In
our sample, as in most street crime samples, relatively few offenders are
sentenced to very long prison terms, and thus, there is little basis upon
which to make comparisons of the experiences of the offenders examined.
Only half of those sentenced received a prison term (see Table 1). Of
these individuals, more than half were sentenced to prison terms of less
than six months. Only 2% of those sentenced to prison were sentenced to
a term of more than five years. Because prisoners in the federal system
were unlikely to serve more than one third of their imposed sentence
before the imposition of the U.S. Sentencing Guidelines (see U.S. Sen-
tencing Commission, 1991:Vol. 2), this means that nearly all of those in our
sample who were sentenced to prison were likely to serve prison terms of
less than two years.

Table 1.   Prison Sentences Imposed

|  | Percent |
|---|---|
| Percent Receiving Prison Sentence ($N$ = 742) | 49.6 |
| Sentence Length for Those Receiving Prison Sentence ($N$ = 368) |  |
| 1 to 6 Months | 56.8 |
| 7 to 12 Months | 9.2 |
| 13 to 36 Months | 23.6 |
| 37 to 60 Months | 7.9 |
| 61 Months or Longer | 2.4 |

Given the 126-month follow-up period used in our study, time served
for the criterion offense accounts for a very small proportion of the overall
time at risk for offenders in our sample. However, because we do not
have information on time served, we cannot take into account how prison

594                           WEISBURD ET AL.

penalties affected the time that specific individuals were "at risk" to recidi-
vate in the follow-up period. On average, it takes a very long time for
offenders who will reoffend in our sample to gain a subsequent rap sheet
entry. Only 23% of those in the sample who gain an additional rap sheet
entry do so within the first year of follow-up from time of sentencing (see
Table 2). Of the 217 individuals in the sample who are arrested in the
follow-up period, almost half take more than three years to gain a subse-
quent rap sheet entry. Even if we look only at those in the sample who did
not receive a prison penalty (and thus were at risk of reoffending from the
start of the follow-up period), it takes on average more than 38 months for
individuals to gain a subsequent rap sheet entry. This may be compared
with studies of street criminals, which often find reoffending likely within a
year of follow-up (Visher and Linster, 1990).

Table 2.   Time Until Failure, Total Sample

| Time Since Sentencing for Criterion Offense | Number of Failures Occurring in Interval | Percent of All Failures Occurring in Interval | Percent Failing by End of Interval |
|---|---|---|---|
| 6 Months or Less | 20 | 9.2 | 2.3 |
| 6 Months and 1 Day to 1 Year | 29 | 13.4 | 6.6 |
| 1 Year and 1 Day to 3 Years | 63 | 29.5 | 15.1 |
| 3 Years and 1 Day to 5 Years | 50 | 23.0 | 21.8 |
| 5 Years and 1 Day to 8 Years | 33 | 15.2 | 26.3 |
| 8 Years and 1 Day to 10.5 Years | 22 | 10.1 | 29.4 |
| Total Failures | 217 | | |
| Total at Risk | 742 | | |

## COMPARING RECIDIVISM FOR SIMILAR OFFENDERS

In the following analyses we compare like groups of offenders who did
and did not receive a prison sanction.[4] The comparison groups were

---

4. This method allows us to focus specifically on the question of the impact of
prison sanctions on reoffending. It also assumes that the impact of sanctions may be
different for different types of offenders (defined here by the likelihood of receiving a

developed from a multivariate logistic regression model that assessed factors influencing receipt of a prison sanction. We used this model to calculate, for each offender we study, the predicted probability of going to prison for the criterion offense (irrespective of whether that particular offender was actually sentenced to a term of imprisonment). In our analyses we examine similar offenders (in regard to their predicted probability of imprisonment) who were sentenced differently.

In developing our estimates of the predicted probabilities of imprisonment, we drew from a model of sentencing behavior developed for this data set by Wheeler et al. (1982; see also Weisburd et al., 1990a). Their model took into account 21 variables, including such legally relevant indicators as prior record, type of conviction, statutory category of the offense, the district of conviction, and obvious social dimensions: sex, race, age, education, and social status. Going beyond prior sentencing studies, they also controlled for both "act-related" (e.g., amount of victimization, geographic spread, type and number of victims, and offense complexity) and "actor-related" (role in the offense, cooperation with prosecution, remorse over the crime, and social record) variables often mentioned by federal judges (see Wheeler et al., 1988a). We estimate a reduced logistic regression model including only the significant parameters ($p < .05$) for sample cases (see Appendix 1). This model, which categorized 72% of the cases correctly (an increase of 33% over the base rate of 54%),[5] was then used to develop predicted imprisonment scores for each offender we studied.

Examining the distribution of these scores for those sentenced to prison and those not, we identified prison and no-prison groups closest in their mean probability estimates by dividing our sample into three subsamples. The first includes offenders with a relatively low probability of imprisonment ($p \leq .40$). The second includes those offenders with a relatively high predicted likelihood of receiving an imprisonment sanction ($p > .60$). The final group represents a moderate probability category ($.40 < p \leq .60$).

As Table 3 illustrates, dividing the sample in this manner provides prison and no-prison groups with a fairly large number of cases that are relatively close in their overall mean estimates of probability of imprisonment.[6] Of the three subsamples, the "moderate" category has the closest

---

prison sanction for the criterion offense), as suggested by Farrington et al. (1986). However, while adjusting for factors that influence recidivism, we do not compare the effect of a prison sanction to other potential explanatory variables. We examine this issue elsewhere in the context of an accelerated failure time model (see Weisburd et al., 1994).

   5.  For this analysis offenders were placed in the "predicted prison category" if their probability estimate of imprisonment was greater than 50%.

   6.  Sample size per group was important because we wanted to ensure adequate

596                          WEISBURD ET AL.

estimates; both prison and no-prison groups show an average probability
of about 50%. The "low probability" category, with a difference of 7%
between the prison and no-prison groups, has the largest gap in mean
probability estimates.

Table 3.   Mean Predicted Probability of Imprisonment, by
           Offender Groupings and Prison Sentence Imposed

| Grouping | Mean Predicted Probability of Imprisonment | Number of Cases |
|---|---|---|
| Low Group | | |
| Prison | .276 | 79 |
| No Prison | .202 | 255 |
| Moderate Group | | |
| Prison | .499 | 100 |
| No Prison | .495 | 67 |
| High Group | | |
| Prison | .787 | 189 |
| No Prison | .738 | 52 |

   When we examine specific variables that might impact subsequent crim-
inality across the prison and no-prison comparison groups, we find strong
support for this basic approach. Looking at sex, race, class, marital status,
type of residence, employment history, drug and alcohol problems, prior
arrests, class position, district, and type of conviction for the criterion
offense, we find few substantive differences between the matched groups
and none that are statistically significant at the 5% level (see Appendix
2).[7] Even in the case of death sometime during the follow-up period, the
comparison samples are very similar.[8]

THE IMPACT OF IMPRISONMENT ON RECIDIVISM

   In Table 4 we present a comparison of how the prison and no-prison

statistical power for the statistical tests we employed (see Weisburd, 1993). Using
Cohen's (1988) definition of a moderate effect and a .05 significance threshold, each
comparison sample provides a statistical power level above .80—a minimum power
level suggested by Gelber and Zelen (1985) and Cohen (1988).
   7.   Data for these comparisons are drawn from Wheeler et al. (1988b). It should
be noted that a few comparisons do come close to the .05 significance threshold. Thus,
for example, a .10 threshold would have yielded two significant relationships from the
36 separate tests examined. Overall, we think these results provide strong support for
the research design employed, and based upon them, we do not adjust for specific dif-
ferences in the comparison samples (see Berk, 1987).
   8.   Information on death was obtained through the National Death Index
(Department of Health and Human Services, 1981).

DETERRENCE AND WHITE-COLLAR CRIMES    597

groups differed in terms of their likelihood of "failure" during the follow-up period. Failure is defined as any subsequent rap sheet entry for a new event, usually coded as an arrest, but sometimes evidenced by a prison or jail entry for a new offense (with no arrest noted on the rap sheet) or a probation or parole violation in which a fingerprint record was transferred to the FBI. Follow-up begins at time of sentencing.

Table 4.  Proportion of Recidivists over 126 Months of Follow-Up, by Prison Sentence Imposed and Offender Groupings

| Offender Group | Low | | Moderate | | High | |
|---|---|---|---|---|---|---|
| | Prison | No Prison | Prison | No Prison | Prison | No Prison |
| Total Failures | 22 | 62 | 33 | 19 | 67 | 16 |
| Total At Risk | 79 | 255 | 100 | 67 | 189 | 52 |
| Percent Who Fail | 27.8 | 23.5 | 33.0 | 28.4 | 35.4 | 30.8 |
| $\chi^2$ Test for Independence* | $\chi^2 = .607, p < .436$ | | $\chi^2 = .403, p < .525$ | | $\chi^2 = .396, p < .529$ | |

* There is 1 degree of freedom for each $\chi^2$ calculation.

Because we do not account for time spent in prison for the criterion offense, time at risk of reoffending may vary for individuals in the sample. For the prison groups there is differential exposure depending on the length of incarceration for those sentenced to prison. Overall, the no-prison groups have a longer exposure time than the prison samples since they are at risk from time of sentencing rather than from time of release from prison. Nonetheless, as noted earlier, prison sentences meted out to these offenders are relatively short. Individuals in the sample are likely to experience a substantial period of risk during the 126-month follow-up period.[9]

There is no evidence of a specific deterrent effect of prison in our analyses. Indeed, in each of the comparisons we examine, those in the prison sample are slightly more likely to recidivate than those in the no-prison sample. In the group defined by a high probability of imprisonment, the prison sample had an overall failure rate of 35% and the no-prison sample a rate of 31%. In the low prison group, the results are very similar, though

---

9. Our analyses do not take into account the possibility that some of these offenders will fail after the censoring date of the study (i.e., the last date for which data were collected). While this has been a major concern in criminal career research, the bias here is likely to be small given the very long follow-up period that is employed. We also do not account for censoring due to death during the follow-up period, though the number of deaths recorded in our sample is small (about 5%) and distributed fairly evenly within the prison and no-prison comparison groups (see Appendix 2).

598                    WEISBURD ET AL.

the base rate of failure for both samples is lower. Twenty eight percent of the prison sample recidivated in the follow-up period, as opposed to 24% of the no-prison sample. In the moderate probability of imprisonment category, 33% of the prison sample failed in the follow-up period as contrasted with 28% of the no-prison sample. None of these differences is statistically significant at the 5% level.[10]

Because we could not accurately define time served for the criterion offense, it is difficult to fit a model for time to failure in the early part of the follow-up period.[11] Nonetheless, our results are consistent for other follow-up periods in which the bulk of those studied would have been at risk of reoffending for a substantial time. As noted earlier, nearly all of those sentenced to prison would have likely served less than a two-year prison term. Looking at follow-up for six, seven, eight, or nine years, we also gain results that are not statistically significant and in the direction of backfire rather than deterrence.

## PRISON AND WHITE-COLLAR CRIMINALS

In comparing like groups of offenders who did and did not receive a prison sanction, we find little impact of prison on the long-term likelihood of reoffending. Before concluding we want to discuss potential explanations for why a sanction that is considered so serious within the criminal justice system does not have greater impact upon the likelihood of recidivism for offenders convicted of white-collar crimes.

One fact to note is that prison may have very important impacts on other aspects of the lives of these criminals that are not assessed in our study. For example, we believe it is likely that imprisonment would affect the occupational or personal histories of offenders (see Waring et al., 1994), though of course, criminal history information provides little evidence of these very central features of their lives. Other studies suggest that criminal justice interventions that are deemed as failures in terms of recidivism may have significant impacts on quality of life, as measured by

---

10.  While statistical significance provides a method for assessing whether the differences obtained between the comparison groups are likely to be due to simple sampling fluctuations, some caution should be exercised in interpreting significance in our analyses. Our sample is stratified and thus does not represent the true population of offenders convicted of the crimes we examine. Offenders are divided into like groups that represent in a broad way those with low, moderate, and high risks of imprisonment. These are the populations to which inferences are made.

11.  In a paper in preparation (Waring et al., 1995), we discuss methodological problems associated with and basic findings from an event history analysis (Allison, 1984) applied to these data. These analyses also suggest that there is little impact of prison on recidivism in the sample.

DETERRENCE AND WHITE-COLLAR CRIMES     599

employment or personal stability, of those studied (Berk et al., 1980; Rossi et al., 1980).

Moreover, though policymakers often assume that imprisonment influences the future conduct of prisoners (Schlegel, 1990), as we noted earlier, there is little evidence of specific deterrent effects in previous studies. The focus on incapacitation, or the crime control benefits gained through dangerous offenders being isolated from the community, has developed in part because so little evidence exists that imprisonment deters those sanctioned from future offending (Clarke and Weisburd, 1990). Nonetheless, it is often noted that there is not a specific deterrent effect for street criminals either because they have so little to lose from contact with the criminal justice system (Mann et al., 1980; Pollack and Smith, 1983) or they are at the outset unlikely to act rationally in their decisions about criminality (Braithwaite and Geis, 1982).

The white-collar criminals we examine provide an important case study precisely because they differ from the street criminals that have ordinarily been the focus of criminal career studies. These offenders are generally better off than common criminals and make decisions about crime with a significant degree of rationality (see Weisburd et al., 1991, 1994). We believe that a closer understanding of the offenders in the sample and the nature of their criminal careers can provide insight into why imprisonment does not have more significant impacts on their official criminal histories.

A number of the offenders in our sample do not fit common stereotypes of criminality. They are often conventional people who confront some special crisis or opportunity that leads them to cross the line temporarily and commit crime (see Weisburd et al., 1994). These people evidence a high degree of stability in their professional and personal lives. Such offenders are likely to be strongly affected by the process of punishment itself (Feeley, 1979; Wheeler et al., 1988a). For them, a short prison stay (the main type of prison sanction in our sample) may not provide more than a marginal impact beyond the experience of prosecution, conviction, and sentencing (see Benson, 1982). Whatever specific deterrence is gained may be produced before the imprisonment sanction is imposed.

For members of our sample who are more committed to criminality, we again think it understandable that short prison stays have relatively little impact on reoffending. Overall, the time to failure for those in our sample is relatively long. Almost half of those who did fail during the follow-up period go more than three years without a subsequent rap sheet arrest. Even taking into account the differential risk periods for those sentenced to prison, there is generally a long period of exposure before a second offense is recorded. It seems to us unreasonable to expect that a prison sentence of a few months would guard against future crimes that occur years later.

600                         WEISBURD ET AL.

It may be that white-collar offenders who approach crime in a calculat-ing fashion would be influenced by particularly long prison experiences. This assumes, of course, that for these offenders a long prison stay has a special impact beyond the stigma of criminal justice processing and the initial experiences of imprisonment. While we cannot examine this ques-tion with our data, we believe it reasonable that such offenders might decide that the rewards of continued criminal behavior are offset by the experience of a long prison stay. However, it is very rare for white-collar offenders, or indeed any offenders in the federal system not convicted of violent or drug crimes, to be sentenced to prison terms of even a few years in length (U.S. Sentencing Commission, 1991:Vol. 2).

With regard to the relatively small group in our sample who evidence significant personal and occupational instability, such an effect would not be likely. Their life experiences generally are consistent with those described by Gottfredson and Hirschi (1990) in their portrait of criminal-ity. These offenders evidence low self-control and an inability to delay gratification. There is no reason to expect that imprisonment in their past would prevent them from seeking short-term gratification in the present.

## CONCLUSION

In concluding we want to speculate on two specific limitations of our method and data and how they might affect our portrait of specific deter-rence in a white-collar crime sample.

While the ethical and practical constraints surrounding random alloca-tion of prison sanctions have generally prevented experimental studies of imprisonment, only a true experimental design would allow researchers to make a clear and unambiguous connection between imprisonment sanc-tions and recidivism (Farrington, 1983). In this study we relied upon a method that placed convicted white-collar offenders in like comparison groups. If judges in the districts we studied gave significant weight to vari-ables that are not assessed in the model that forms the basis of this alloca-tion procedure, we would expect systematic biases in our results.

This problem is relevant to all nonexperimental research designs, and it is likely to be more serious in cases in which the overall model used is not well specified. While the Wheeler et al. model of imprisonment takes into account a large number of factors that influence the imprisonment deci-sion, we recognize that biases that develop from excluded factors cannot be ruled out completely in our study. The appearance of small backfire effects in our analyses, for example, might reflect differences in the types of offenders likely to reoffend in the prison comparison samples rather than any specific influence of prison sanctions on recidivism.

Our failure to measure time served for those offenders sentenced to a

DETERRENCE AND WHITE-COLLAR CRIMES     601

prison sanction may also bias our estimates of the effects of prison on officially recorded recidivism. Absent data on time served, we cannot specify the magnitude of this bias. Nonetheless, though the time of exposure is different for different offenders in our sample, those studied are likely to experience a substantial period of risk by the end of the follow-up period.

It has often been assumed by scholars and policymakers that white-collar criminals will be particularly affected by imprisonment. Our analyses suggest that this assumption is wrong, at least as regards official reoffending among those convicted of white-collar crimes in the federal courts. We find that prison does not have a specific deterrent impact upon the likelihood of rearrest over a 126-month follow-up period.

# REFERENCES

Allison, Paul D.
  1984     Event History Analysis: Regression for Longitudinal Event Data. Beverly Hills, Calif.: Sage.

Babst, Dean V., Mary Koval, and M.G. Neithercutt
  1972     Relationship of time served to parole outcomes for different classifications of burglars based on males paroled in fifty jurisdictions in 1968 and 1969. Journal of Research in Crime and Delinquency 9:99-116.

Bartell, Ted and L. Thomas Winfree, Jr.
  1977     Recidivist impacts of differential sentencing practices for burglary offenders. Criminology 15:387-396.

Beck, James L. and Peter B. Hoffman
  1976     Time served and release performance: A research note. Journal of Research in Crime and Delinquency 13:127-132.

Benson, Michael
  1982     Collateral Consequences of Conviction for a White Collar Crime. Unpublished dissertation. University Microfilms International, Ann Arbor, Mich.
  1985     White-collar offenders under community supervision. Justice Quarterly 2:429-438.

Benson, Michael and Francis T. Cullen
  1988     The special sensitivity of white-collar offenders to prison: A critique and research agenda. Journal of Criminal Justice 16:207-215.

Benson, Michael and Elizabeth Moore
  1992     Are white-collar and common offenders the same? An empirical and theoretical critique of a recently proposed general theory of crime. Journal of Research in Crime and Delinquency 29:251-272.

Berk, Richard A.
  1987     Causal inference as a prediction problem. In Don Gottfredson and Michael Tonry (eds.), Prediction and Classification. Chicago: University of Chicago Press.

602                    WEISBURD ET AL.

Berk, Richard A., Kenneth J. Lenihan, and Peter H. Rossi
    1980    Crime and poverty: Some experimental evidence from ex-offenders.
            American Sociological Review 45:766-786.

Blumstein, Alfred, Jacqueline Cohen, Jeffrey A. Roth, and Christy A. Visher (eds.)
    1986    Criminal Careers and "Career Criminals." 2 vols. Washington, D.C.:
            National Academy Press.

Blumstein, Alfred, Jacqueline Cohen, and David P. Farrington
    1988    Criminal career research: Its value for criminology. Criminology 26:1-36.

Braithwaite, John
    1985    White collar crime. Annual Review of Sociology 11:1-25.
    1992    Poverty, power, and white collar crime: Sutherland and the paradoxes of
            criminological theory. In Kip Schlegel and David Weisburd (eds.), White-
            Collar Crime Reconsidered. Boston: Northeastern University Press.

Braithwaite, John and Gilbert Geis
    1982    On theory and action for corporate crime control. In Gilbert Geis (eds.),
            White Collar Crime. Lexington, Mass.: D.C. Heath.

Bridges, George S. and James A. Stone
    1986    Effects of criminal punishment on perceived threat of punishment:
            Toward an understanding of specific deterrence. Journal of Research in
            Crime and Delinquency 23:207-239.

Clarke, Michael J.
    1978    White collar crime, occupational crime, and legitimacy. International
            Journal of Criminology and Penology 6:121-136.

Clarke, Ronald V. and David Weisburd
    1990    On the distribution of deviance. In Ronald V. Clarke and Donald
            Gottfredson (eds.), Policy and Theory in Criminal Justice. London:
            Gower, Farnborough, Hants.

Cohen, Ben-Zion, Ruth Eden, and Amnon Lazar
    1991    The efficacy of probation versus imprisonment in reducing recidivism of
            serious offenders in Israel. Journal of Criminal Justice 19:263-270.

Cohen, Jacob
    1988    Statistical Power Analysis for the Behavioral Sciences. 2d ed. New York:
            Academic Press.

Department of Health and Human Services
    1981    User's Manual: The National Death Index. Hyattsville, Md.: Depart-
            ment of Health and Human Services.

Edelhertz, Herbert and Thomas D. Overcast (eds.)
    1982    White Collar Crime: An Agenda for Research. Lexington, Mass.: D.C.
            Heath.

Farrington, David P.
    1983    Randomized experiments in criminal justice. Crime and Justice 4:257-308.

Farrington, David P., Lloyd E. Ohlin, and James Q. Wilson
    1986    Understanding and Controlling Crime. New York: Springer-Verlag.

Feeley, Malcolm
    1979    The Process Is the Punishment: Handling Cases in a Lower Criminal
            Court. New York: Russell Sage Foundation.

DETERRENCE AND WHITE-COLLAR CRIMES    603

Geis, Gilbert A.
  1982    A research and action agenda with respect to white collar crime. In
          Herbert Edelhertz and Thomas D. Overcast (eds.), White Collar Crime:
          An Agenda for Research. Lexington, Mass.: D.C. Heath.
  1992    White-collar crime: What is it? In Kip Schlegel and David Weisburd
          (eds.), White-Collar Crime Reconsidered. Boston: Northeastern Univer-
          sity Press.

Geis, Gilbert A. and Thomas R. Clay
  1982    Criminal enforcement of California's Occupational Carcinogens Control
          Act. In Gilbert Geis (ed.), On White Collar Crime. Lexington, Mass.:
          D.C. Heath.

Geis, Gilbert A. and Ezra Stotland (eds.)
  1980    White-Collar Crime: Theory and Research. Beverly Hills, Calif.: Sage.

Gelber, Richard D. and Marvin Zelen
  1985    Planning and reporting of clinical trials. In Paul Calabresi, Philip E.
          Schein, and Saul Rosenberg (eds.), Medical Oncology: Basic Principles
          and Clinical Management of Cancer. New York: Macmillan.

Gottfredson, Donald M., Michael R. Gottfredson, and James Garofalo
  1977    Time served in prison and parole outcomes among parolee risk catego-
          ries. Journal of Criminal Justice 5:1-12.

Gottfredson, Michael and Travis Hirschi
  1990    A General Theory of Crime. Stanford, Calif.: Stanford University Press.

Hirschi, Travis and Michael Gottfredson
  1987    Causes of white collar crime. Criminology 25:949-974.

Hopkins, Andrew
  1976    Imprisonment and recidivism: A quasi-experimental study. Journal of
          Research in Crime and Delinquency 13:13-32.
  1980    Controlling corporate deviance. Criminology 18:198-214.

Katz, Jack
  1979    Legality and equality: Plea bargaining in the prosecution of white-collar
          and common crime. Law & Society Review 13:431-459.

Lab, Steven P.
  1988    Crime Prevention: Approaches, Practices and Evaluations. Cincinnati:
          Anderson.

Maltz, Michael D.
  1984    Recidivism. Orlando, Fla.: Academic Press.

Mann, Kenneth
  1992    Procedure rules and information control: Gaining leverage over white-
          collar crime. In Kip Schlegel and David Weisburd (eds.), White-Collar
          Crime Reconsidered. Boston: Northeastern University Press.

Mann, Kenneth, Stanton Wheeler, and Austin Sarat
  1980    Sentencing the white-collar offender. American Criminal Law Review
          17:479-500.

Petersilia, Joan and Susan Turner
  1986    Prison Versus Probation in California. Santa Monica, Calif.: Rand.

604                    WEISBURD ET AL.

Piliavin, Irving, Rosemary Gartner, Craig Thornton, and Ross L. Matsueda
    1986      Crime, deterrence, and rational choice. American Sociological Review
              51:101-119.

Pollack, Harriet and Alexander B. Smith
    1983      White-collar v. street crime sentencing disparity: How judges see the
              problem. Judicature 4:175-182.

Rossi, Peter H., Richard A. Berk, and Kenneth J. Lenihan
    1980      Money, Work, and Crime: Experimental Evidence. New York: Aca-
              demic Press.

Schlegel, Kip
    1990      Just Deserts for Corporate Criminals. Boston: Northeastern University
              Press.

Schmidt, Peter and Ann Dryden Witte
    1988      Predicting Recidivism Using Survival Models. New York: Springer-
              Verlag.

Shapiro, Susan P.
    1980      Thinking About White Collar Crime: Matters of Conceptualization and
              Research. Washington, D.C.: National Institute of Justice.

Sherman, Lawrence W., Patrick Gartin, David Doig, and Susan Miller
    1986      The effects of jail time on drunk drivers. Presentation at the annual
              meeting of the American Society of Criminology, Atlanta, November.

Simpson, Sally and Christopher S. Koper
    1992      Deterring corporate crime. Criminology 30:347-375.

Stotland, Ezra, Michael Brintnall, Andre L'Heureux, and Eva Ashmore
    1980      Do convictions deter home repair fraud? In Gilbert Geis and Ezra
              Stotland (eds.), White Collar Crime: Theory and Research. Beverly
              Hills, Calif.: Sage.

Sutherland, Edwin H.
    1949      White Collar Crime. New York: Holt, Rinehart & Winston.

Sviridoff, Michele and Jerome E. McElroy
    1985      Employment and Crime: A Summary Report. New York: Vera Institute
              of Justice.

U.S. Sentencing Commission
    1987      Sentencing Guidelines and Policy Statements. Washington, D.C.: U.S.
              Government Printing Office.
    1991      The Federal Sentencing Guidelines: A Report on the Operation of the
              Guidelines System and Short-term Impacts on Disparity in Sentencing,
              Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining.
              Washington, D.C.: U.S. Sentencing Commission.

Visher, Christy A. and Richard L. Linster
    1990      A survival model of pretrial failure. Journal of Quantitative Criminology
              6:153-184.

Waring, Elin, David Weisburd, and Ellen Chayet
    1994      White collar crime and anomie. Advances in Criminological Theory
              6:207-225.
    1995      Time to failure for white collar criminals: An event history analysis.
              Unpublished manuscript.

DETERRENCE AND WHITE-COLLAR CRIMES    605

Weisburd, David
    1993    Design sensitivity in a sample of criminal justice experiments. Crime and Justice 17:337-379.

Weisburd, David, Elin Waring, and Stanton Wheeler
    1990a   Class, status, and the punishment of white-collar criminals. Law & Social Inquiry 15:223-243.

Weisburd, David, Ellen F. Chayet, and Elin Waring
    1990b   White-collar crime and criminal careers:  Some preliminary findings. Crime and Delinquency 36:342-355.

Weisburd, David, Stanton Wheeler, Elin Waring, and Nancy Bode
    1991    Crimes of the Middle Classes:  White Collar Offenders in the Federal Courts. New Haven: Yale University Press.

Weisburd, David, Elin Waring, and Ellen Chayet
    1994    White Collar Crime and Criminal Careers. Final report to the National Institute of Justice, Washington, D.C.

Wheeler, Stanton, David Weisburd, and Nancy Bode
    1982    Sentencing the white collar offender: Rhetoric and reality. American Sociological Review 47:641-659.

Wheeler, Stanton, Kenneth Mann and Austin Sarat
    1988a   Sitting in Judgment: The Sentencing of White Collar Offenders. New Haven:  Yale University Press.

Wheeler, Stanton, David Weisburd, and Nancy Bode
    1988b   Study of Convicted Federal White-Collar Crime Defendants. National Archives of Criminal Justice Data. The Inter-University Consortium for Political and Social Research. Ann Arbor:  University of Michigan.

Wilkins, Leslie T.
    1965    Social Deviance: Social Policy, Action, and Research. Englewood Cliffs, N.J.:  Prentice-Hall.

Zimring, Franklin E. and Gordon J. Hawkins
    1973    Deterrence: The Legal Threat in Crime Control. Chicago:  University of Chicago Press.

David Weisburd is Associate Professor of Criminology at the Hebrew University Law School in Jerusalem. His current research interests include white collar criminal careers, policing hot spots of crime, and study of crime and place.

Elin Waring is an Assistant Professor at the Rutgers University School of Criminal Justice. Her current research is on co-offending, Soviet emigre organized crime, and white-collar crime.

Ellen Chayet is a Research Associate at the Center for Crime Prevention Studies at Rutgers University. Her current research is on the use of "good time," alternatives to incarceration, and white-collar criminal careers.

606                              WEISBURD ET AL.

Appendix 1.    Reduced Logistic Regression Model Used to
               Predict the Likelihood of Imprisonment of
               the Offenders in the Wheeler et al. Sample

| Variable | Beta | Chi Square |
|---|---|---|
| Intercept | −5.2 | 26.57 |
| Act-Related Variables | | |
|    Dollar Victimization | 0.17 | 22.41 |
|    Offense Complexity | 0.10 | 4.96 |
|    Geographic Spread of Illegality | 0.25 | 6.62 |
|    Maximum Exposure to Imprisonment | 0.15 | 34.28 |
| Actor-Related Variables | | |
|    Duncan Socioeconomic Index | 0.01 | 10.69 |
|    Impeccability | −0.13 | 4.87 |
|    Number of Prior Arrests | 0.09 | 9.64 |
|    Most Serious Prior Arrest | 0.24 | 5.92 |
|    Role in Offense[a] | | |
|       Middle | −1.03 | 5.13 |
|       Minor | −0.90 | 11.19 |
|       Missing | −0.41 | 3.58 |
| Legal Process Variables | | |
|    Statutory Offense[b] | | |
|       Bank Embezzlement | −0.34 | 1.49 |
|       Tax Violations | 0.82 | 9.15 |
|       Mail Fraud | −0.39 | 1.81 |
|       Securities Violations | 0.12 | 0.07 |
|       False Claims and Statements | −0.60 | 4.38 |
|       Bribery | −0.78 | 3.71 |
|       Antitrust | −0.94 | 2.00 |
| Other Variables | | |
|    Sex | −1.13 | 21.39 |
|    Age | 0.08 | 3.19 |
|    Age Squared | −.001 | 5.01 |
|    Judicial District[c] | | |
|       Central California | 0.33 | 1.26 |
|       Maryland | 0.65 | 4.00 |
|       Southern New York | −0.07 | 0.07 |
|       Northern Texas | 1.05 | 11.87 |
|       Northern Illinois | 0.67 | 4.82 |
|       Western Washington | 0.41 | 1.69 |

NOTES: $N$ of cases = 989; model chi-square = 305.08 with 27 degrees of freedom; −2 log likelihood = 1058.30, $p < .001$; all variables are statistically significant at the .05 level.

[a]  Major role is the excluded category.
[b]  Credit fraud is the excluded category.
[c]  Northern Georgia is the excluded category.

DETERRENCE AND WHITE-COLLAR CRIMES    607

Appendix 2.    Comparison of Sample Characteristics, by Prison Sentence Imposed and Offender Groupings

| Variable | Low Prison | Low No Prison | Moderate Prison | Moderate No Prison | High Prison | High No Prison | Total Sample % | Total Sample N |
|---|---|---|---|---|---|---|---|---|
| **Offense Category** | | | | | | | | |
| Bank Embezzlement | 20.3% | 35.3% | 19.0% | 16.4% | 7.9% | 9.6% | 21.0% | 742 |
| Tax Fraud | 6.3 | 5.5 | 28.0 | 20.9 | 30.2 | 32.7 | 18.2 | 742 |
| Credit Fraud | 17.7 | 15.3 | 16.0 | 17.9 | 12.7 | 15.4 | 15.2 | 742 |
| Mail Fraud | 15.2 | 12.9 | 14.0 | 22.4 | 24.3 | 19.2 | 17.5 | 742 |
| Securities Fraud | 3.8 | 0.4 | 2.0 | 3.0 | 9.5 | 7.7 | 4.0 | 742 |
| False Claims | 21.5 | 16.1 | 15.0 | 14.9 | 13.2 | 11.5 | 15.4 | 742 |
| Bribery | 10.1 | 9.4 | 6.0 | 3.0 | 2.1 | 3.9 | 6.2 | 742 |
| Antitrust | 5.1 | 5.1 | 0.0 | 1.5 | 0.0 | 0.0 | 2.4 | 742 |
| Female | 27.9 | 40.0 | 7.0 | 1.5 | 2.1 | 0.0 | 18.3 | 742 |
| White | 68.4 | 71.8 | 79.0 | 77.6 | 81.0 | 86.6 | 76.3 | 742 |
| Married | 53.2 | 51.4 | 50.0 | 62.7 | 61.4 | 61.5 | 55.7 | 742 |
| Own Home | 52.1 | 41.4 | 40.7 | 41 | 38.5 | 44.1 | 43.0 | 688 |
| Steadily Employed | 51.4 | 55.0 | 50.6 | 45.2 | 49.1 | 40.4 | 52.4 | 675 |
| Alcohol Problems | 5.1 | 4.3 | 9.0 | 11.9 | 9.0 | 7.7 | 7.1 | 742 |
| Drug Problems | 5.1 | 9.4 | 14.0 | 13.4 | 16.9 | 11.5 | 12.0 | 742 |
| **Prior Arrests** | | | | | | | | |
| None | 65.8 | 71.0 | 50.0 | 58.2 | 33.3 | 32.7 | 54.2 | 742 |
| One | 10.1 | 16.5 | 21.0 | 14.9 | 15.9 | 19.2 | 16.3 | 742 |
| 2–5 | 21.5 | 11.0 | 20.0 | 17.9 | 24.3 | 19.2 | 17.9 | 742 |
| 6 or more | 2.5 | 1.6 | 9.0 | 9.0 | 26.5 | 28.9 | 11.6 | 742 |
| **Class** | | | | | | | | |
| Worker | 60.8 | 67.8 | 59.0 | 47.8 | 36.5 | 32.7 | 53.6 | 742 |
| Owner | 13.9 | 15.3 | 18.0 | 23.9 | 28.0 | 28.9 | 20.5 | 742 |
| Officer | 3.8 | 3.5 | 6.0 | 10.5 | 9.0 | 13.5 | 6.6 | 742 |
| Manager | 11.4 | 8.2 | 6.0 | 10.5 | 13.2 | 3.8 | 9.4 | 742 |
| Sole Proprietor | 10.1 | 5.1 | 11.0 | 7.5 | 13.2 | 13.2 | 9.8 | 742 |
| **District** | | | | | | | | |
| Southern New York | 22.8 | 21.2 | 17.0 | 23.9 | 13.2 | 13.5 | 18.5 | 742 |
| Maryland | 3.8 | 9.4 | 15.0 | 9.0 | 11.6 | 0.0 | 9.4 | 742 |
| Northern Georgia | 15.2 | 14.5 | 14.0 | 10.5 | 11.1 | 13.5 | 13.2 | 742 |
| Northern Texas | 12.7 | 12.2 | 10.0 | 14.9 | 24.9 | 19.2 | 15.9 | 742 |
| Northern Illinois | 13.9 | 7.5 | 11.0 | 17.9 | 15.3 | 15.4 | 12.1 | 742 |
| Central California | 22.8 | 19.2 | 17.0 | 13.4 | 14.3 | 23.1 | 17.8 | 742 |
| Western Washington | 8.9 | 16.1 | 16.0 | 10.5 | 9.5 | 15.4 | 13.1 | 742 |
| **Death During** | | | | | | | | |
| Follow-Up | 5.1 | 3.9 | 3.0 | 4.5 | 6.9 | 3.9 | 4.7 | 742 |

NOTE: None of the comparisons is statistically significant at $p < .05$. A single significance test is used for the four multicategory variables (offense category, prior arrests, class of worker, and district of conviction for the criterion offense).