UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES of AMERICA,**<br><br>v.<br><br>**DAVID HOSSEIN SAFAVIAN,**<br><br>Defendant | Criminal No. 05-370 (PLF) |

**DAVID H. SAFAVIAN'S REPLY IN SUPPORT OF THE MOTION FOR RELEASE PENDING APPEAL**

David H. Safavian, by and through his attorneys, hereby respectfully submits this Reply to the Government's Opposition to the Defendant's Motion for Release Pending Appeal.

The government concedes that the first two prongs of 18 U.S.C. § 3143 are met. The defendant poses no danger of flight or threat to the public. These factors are significant to the Court's analysis. See 18 U.S.C. § 3143(b)(A) (requiring proof by clear and convincing evidence). The government also acknowledges that if the Court of Appeals decided the legal issues presented in the defendant's motion differently, it would result in a new trial, reversal, or reduced sentence under § 3143(B). See Gov't Opp. (Dock. 143) at n.4.[1]

As for the sole remaining issue, Courts have rejected the government's test for determining whether the defendant has raised a "substantial question of law." The standard "***is not***," as the government would have it, "whether the Court believes defendant has a

---

[1] The government acknowledges that if the Court of Appeals decided the admissibility and § 1505 issues differently, the result would be an order for a new trial, reversal, or a reduced sentence. The government incorrectly contends that if the Court of Appeals accepted the defendant's Section 1001 and sentencing arguments, it would not likely result in a "reduced sentence to a term of imprisonment less than the total of the time already served plus the duration of the appeal process." 18 U.S.C. § 3143(b)(B)(iv). See infra Section II.

shown a likelihood of success on the merits of the appeal." United States v. Quinn, 416 F. Supp. 2d 133, 136 (D.D.C. 2006) (emphasis added); compare with Gov't Opp. at 3.[2] Nor does the statute require "the district court to predict the probability of reversal." United States v. Miller, 753 F.2d 19, 23 (3d Cir. 1985). Rather "courts in this jurisdiction ask whether the question is a close question or one that very well could be decided the other way." Quinn, 416 F. Supp. 2d at 136 (quoting United States v. Perholz, 836 F.2d 554, 555 (D.C. Cir. 1987) (citing cases from the First, Second, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits) (internal quotes omitted).[3]

It appears that the Court has already acknowledged that several of the legal matters presented in this case were "interesting" questions and "close calls . . . that different people might have approached [] differently." 08.24.06 a.m. Tr. at 24. The government has not presented any reason for it to conclude otherwise for purposes of granting release pending appeal.[4]

---

[2] The government complains that the defendant is "rehash[ing] legal arguments that this Court has previously considered." Gov't Opp. at 3. The government, after giving lip service to the language of the statute and law of this Circuit, id. at 2, would have the Court effectively operate under a standard equivalent to that of a motion for reconsideration. That is plainly not the standard, and the defense is not asking this Court to reconsider its rulings. The statute requires that the defendant persuade the Court that some of the legal issues in this case were "close calls," which requires analysis of the supportive caselaw.

[3] In Perholtz, the D.C. Circuit explicitly rejected the "fairly doubtful" standard of review put forth by the government in favor of the "close question" criterion. Perholtz, 836 F.2d at 555-56; Gov't Opp. at 3 & n.2.

[4] The defense has chosen to discuss only those issues that it believes the Court has already suggested were close questions. However, there are several additional issues preserved under Federal Rules 29 (Dock. Nos. 121, 125); 30 (objections to jury instructions); and 33 (Dock. Nos. 122, 126) that the Court of Appeals will also examine.

**I.**     **The Defendant's Position Regarding the Inadmissibility of the Abramoff Emails Is Supported by Circuit Precedent and Qualifies as a Close Question That Could Be Decided Differently on Appeal**

The admission of almost 300 emails containing out-of-court declarations by Jack Abramoff was, at the least, a close question and one that very well could be decided differently on appeal. The government claims that the admission of these emails was neither a debatable issue nor a significant aspect of its presentation to the jury. The government's challenge is based on errors and mischaracterizations of law and fact.

The government first asserts that 123 of these emails were admitted because they were statements of a party opponent under Fed. R. Evid. 801(d)(2). The government is mischaracterizing the nature of the evidence at issue. Only 10 of the exhibits admitted under the Court's May 23, 2006 Order and Opinion (Dock. 99 at 23-29) consist of email chains containing *only* the defendant's statements. The defendant's portion of these, or any of the remaining email chains admitted under § 801(d)(2), are clearly not the basis for this motion.

As the government is surely aware, the substantial question on appeal will be whether the portions of emails containing statements made by Abramoff were properly admitted. As noted above, this includes all of Gov. Exs. 100-367 (save 10). As outlined in the Defendant's Motion, see Dock. 140-1 at 5-6, the Court admitted these Abramoff emails on the grounds that they provided "context;" that they themselves constituted "work" or "business;" and/or that they fell within the state-of-mind exception to the hearsay rule under 803(3). See May 23, 2006 Order (Dock. 99) at 12-13.

The government says that the Court's decision to admit these out of court statements was "hardly a controversial proposition." Gov't Opp. at 4. It claims support from dicta in United States v. Thompson, an inapposite case decided *prior* to United States v. Stover and United States v. Sesay, in arguing that an out of court statement is admissible as long as it is

relevant to the hearer's state of mind.  Gov't Opp. at 4 (citing United States v. Thompson, 279 F.3d 1043, 1047 (D.C. Cir. 2002) (*upholding the exclusion* of defendant's statements as hearsay because, *inter alia*, he did not proffer to the court the nature or purpose of the evidence sought to be adduced).  However, neither Thompson, nor the cases decided thereafter, would support that position.  Rather, in Thompson, the Court stated that a statement could be admissible if the *only* purpose for admitting the statement is the affect on the listener.  Id. at 1048 ("*If* Thompson offered Douglas's post-transaction statements **only** as they might tend to bear on his state of mind, the testimony would not have been hearsay.") (first emphasis in original).

The government cannot maintain on appeal that the Abramoff emails were introduced *solely* for impact on the hearer's state of mind when both the dictates of logic and, as explained below, its own trial arguments compelled the jury to consider their content in support of the proposition that Abramoff was *in fact* working with or conducting business with the GSA.  In any event, the government fails to inform that in United States v. Sesay, the Court, after citing Thompson, *subsequently* explained that if discerning the impact of an out of court statement on the hearer's state of mind is logically predicated to any extent "on the truth of the statement," it remains inadmissible hearsay.  Sesay, 313 F.3d 591, 599-600 (D.C. Cir. 2002) (refusing to admit statements by witnesses in police report as to identify of weapon possessor on "state of mind" basis because it required the jury to assess the veracity of the underlying content).  To conclude otherwise "would be to permit a loophole in the hearsay rule large enough to swallow the rule itself." Id. (citation omitted).

The Court of Appeals then proceeded to foreclose the remaining grounds for admission, the "verbal acts" doctrine (the nearest equivalent to the "work" or "business"

exception) and the so-called "context" exception, the following year. United States v. Stover, 329 F.3d 859, 870 (D.C. Cir. 2003). In Stover, the government contended, as it did here, that it was not introducing the out of court statements between one of the defendants and government agent for their truth, but only for the fact that the defendant and the Agent had engaged in drug negotiations. The Court rejected this fiction, explaining that the "verbal acts" doctrine encompasses only statements that "have independent legal significance, such as contractual offers or inter vivos gifts." Id. at 870 (citing Fed. R. Evid. 801 advisory committee's note). As in Stover, the Court of Appeals can conclude in this case that the Abramoff emails were not "verbal acts" (i.e. that they were only being introduced to indicate that they had occurred and constituted "business" or "work").

As for "context," the Court in Stover explained: "[T]hat a statement provides context to other evidence does not mean that the statement is not hearsay [since] [a]ll relevant evidence provides context to the events underlying the charged crime." Id. at 870. The Court reasoned that "context" was not an exception to the hearsay rule because the jury could only determine that the out of court statements provided relevant or probative context (e.g. of the fact that the co-defendant used clothing terminology to refer to drugs in other conversations) through an examination of the "the truth of [the statements'] content." Id. (citing Sesay, 313 F.3d at 599-600). Similarly in this case, the jury could only determine that an Abramoff email provided probative context as to whether he was conducting "work/business" or, for example, discussing plans to play racquetball or golf as they had done for many years, by evaluating the content and the veracity of the underlying email. In light of Stover, courts have outright rejected the notion that "context" is an exception to the hearsay rule. See Jackson v. City of Moline, 2006 WL 1554075, *2 (C.D. Ill. 2006) ("All

relevant evidence provides context, however, . . . and 'context' is not one of the exceptions to hearsay.") (citing Stover, 329 F.3d at 870).

The Court of Appeals can also reverse these admissibility decisions on the ground that the government did not proffer Abramoff emails "only" for these alternative reasons. The government represented in its papers to this Court that it was not seeking to admit emails for their content. However, it *repeatedly instructed* the jury to consider the content of Abramoff's emails as a basis to conclude that Mr. Abramoff was conducting business with the agency and that the defendant was guilty for representing otherwise.

Opening (05.24.06 a.m.) at 19:
> You will see e-mails written from the defendant to Mr. Abramoff and **from Mr. Abramoff to the defendant, and they will demonstrate clearly, not equivocally, that at the time of that trip, Mr. Abramoff was lobbying GSA. He was working with GSA, and he was doing business and seeking to do business with GSA**, and that the representations the defendant made to the contrary were false and misleading.

Closing (06.12.06 p.m.) at 24:
> **What the e-mails show . . . is that the relationship between Jack Abramoff and David Safavian was two-way, it was a give and take relationship.** Mr. Abramoff offered in the currency that he had, which was money, he offered things of value. He offered trips to Scotland, he offered luxury boxes, he offered tickets to sporting events, he offered Scotch and cigars and lavish accommodations.

Closing at 32-33:
> You will recall that Mr. Costa testified that Mr. Safavian opposed the Women's History Museum, opposed it even though a representative, a member of Congress, Eleanor Holmes Norton, the delegate of all of D.C. wanted a museum dedicated to women in this historic building. He opposed it even though 16 members of the Senate wanted this building. Why did he oppose it? Because he wanted to make sure that Jack Abramoff and others could turn it into a five star hotel.
>
> . . . Government's Exhibit 240 [Abramoff E-Mail]. "What idiots. This would kill a five star hotel for sure." What idiots. Idiots for considering a museum on Pennsylvania Avenue honoring women in the Nation's Capital between the White House and the Capitol building. **This e-mail is before you because it**

>shows you the relationship, and it shows you the relationship that is tilted heavily in favor of friends, and not the interest of the public.[5]

Closing at 33-34:
>**You remember Abramoff very early on, he sent an e-mail saying "they have so much property." That was the quote, "they have so much property, surely there's something you can do for me." Surely there's something that I can get from my friend to help me out, 50 acres of land for my school.**
>
>**Once Mr. Abramoff learned what his friend could do, you saw the e-mails fly.** You saw one eight days after Mr. Safavian arrived, and you saw them time and again trying to figure out how to get this land transferred from the United States to the pocket of Jack Abramoff.

Closing at 37:
>**I suggest you go back and look through those e-mails**, and in the couple of days right before he asked for this ethics opinion **there are dozens of e-mails talking about White Oak and talking about the Old Post Office. In the days before the July 25th request, dozens of e-mails. And I want you to ask yourself, looking at those e-mails ask yourself how can that not be Abramoff's work?  He's asking to get this property**.

Closing at 40:
>Well, let's look at golf. . . . Greens fees are about $300 a round. How many rounds? Well, between four and eight. The lowest number would be four. **They were actually there five days, but the itinerary, July 23rd, 2002, itinerary shows that there were eight scheduled rounds of golf**.

Closing at 106:
>**He knows you people are intelligent, you can read these e-mails**. How is he going to argue that that's not seeking to do business with GSA? How is he going to argue that black is white and white is black and up is down? **Of course it's seeking to do business**.
>   . . . . **So now he's stuck. He's got the e-mails that clearly show that Abramoff is doing business and seeking to do business with GSA**.

---

[5] In the government's opposition to the Defendant's Rule 33 Motion, it claims that the emails aren't offered for the truth of the matter because it wasn't seeking to prove that Abramoff wanted the OPO or White Oaks for a hotel, school, or some other purpose.  As defendant discussed extensively in its Rule 33 papers, that was not the point.  The relevant issue in this case was whether Abramoff's conduct in these emails rendered Mr. Safavian's statements to government officials false, and the jury could not discern what Abramoff was doing without evaluating the content of the emails.  In any event, this excerpt demonstrates that the Government, contrary to its representations to this Court, was also using emails to have the jury evaluate why Abramoff wanted the OPO.

Hence, there cannot be any serious doubt that the government introduced emails written by Abramoff, at least in significant part, to persuade the jury of the "truth" of the contents therein; that Abramoff had business or work with the GSA. The pattern and practice of telling the Court that hearsay evidence is being admitted for some other reason and then referring the jury to the content will provide *additional* support for the defendant's challenge on appeal. See, e.g., United States v. Cass, 127 F.3d 1218, 1222 (10th Cir. 1997) ("Although the government's purported use for the statements was to show why the investigation focused on Sonya herself, rather than on an alleged kidnapper, in fact, from the beginning of the trial to the end, the government relied on the out-of-court statements for their truth"); United States v. Sallins, 993 F.2d 344 (3d Cir. 1993) (finding out-of-court "background" statements hearsay where the government had alternative sources of the information and where it relied on the contents of the statements during closing arguments).[6] In addition, that some of the Abramoff's emails included questions does not mean that those segments are *per se* excluded

---

[6] The government, while failing to address the significance of precedent in this Circuit, claims that United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006) lends support for the introduction of Abramoff's e-mails. Not so. In a case involving wire fraud for the bilking of millions of investor dollars through an elaborate scheme, the Court permitted the introduction of a select set of emails from one group of investors who had complained about the use of certain funds. Unlike the case here, the emails did not constitute the majority of the government's case, thereby presenting much less of a Fed. R. Evid. 403 concern of undue prejudice outweighing probative value.

Furthermore, the government did not refer to these email exchanges, as it did here, for their content and as proof of the defendant's underlying guilt, i.e. that funds were being fraudulently diverted to accommodate unrelated personal luxuries. Rather it simply used them "to rebut defendants' argument that they had no reason to know the Roberta Project was fraudulent." Id. at 137. In any event, for purposes of this motion, to the extent that the government contends that another circuit's ruling differs from the D.C. Circuit's (and others) renunciation of the "context" exception in Stover, it would merely confirm, not undermine, that the issue constitutes a "close question or one that could very well be decided the other way." Quinn, 416 F. Supp. 2d at 136 (quoting United States v. Perholz, 836 F.2d 554, 555 (D.C. Cir. 1987)).

from the scope of the hearsay rule. United States v. Summers, 414 F.3d 1287, 1300 (10th Cir. 2005) ("Taken together, *Jackson* and *Long* do not foreclose the possibility that a declaration in the form of a question may nevertheless constitute an assertion within the meaning of Rule 801(a) and (c).").

In short, as this Court has acknowledged, the admissibility of the emails is a crucial piece of this case and a "great issue on appeal." 08.24.06 a.m. Tr. at 24. The defendant has thus demonstrated, at the very least, that his position is "not without some support" and could conceivably go the other way. Quinn, 416 F. Supp. 2d at 136; see also United States v. Alfonso-Reyes, 427 F. Supp. 2d 41, 45 (D.P.R. 2006) (granting release pending appeal after false statement conviction where court reasserted that its opinion correctly relied upon governing law but where the defendants' arguments were "not entirely unsubstantial" and the specific question had not been authoritatively answered); United States v. Desimone, 424 F. Supp. 2d 344, 352-53 (D.R.I. 2006) (granting release pending appeal upon defendant's demonstration of a number of "close questions" dealing with admissibility of evidence and noting that the standard does not require that the court "become an advocate for its prior rulings; nor is it appropriate to express a view about whether an error occurred . . . [i]t is enough if the questions are close").

II. **There Are Numerous Other Close Questions of Law For Which The Defendant Has Presented Adequate Support to Warrant a Release Pending Appeal**

The government largely ignores the remaining issues, Gov't Opp. at 7 n.4, and the defense primarily refers to the original motion and post-trial pleadings for authorities in support of his contention that the application of § 1001 and § 1505 in this case present close questions of law that could be decided differently.

In particular, the government does not refute that the D.C. Circuit has yet to address whether § 1505 has been cured of its unconstitutional ambiguity as applied to "false and misleading" statements via the 1996 amendments. United States v. Poindexter remains the last word from the Court of Appeals on this question, and the defense has provided ample support for the proposition that the Court of Appeals could decide that Congress has not remedied the inadequacies identified in that case with Section 1515(b). See United States v. Russo, 104 F.3d 431, 435 (D.C. Cir. 1997) ("Relying on *United States v. Poindexter* . . . Russo argues that § 1503 'is not violated by the mere giving of false testimony to a grand jury.' **This is true**, but beside the point . . . the '*Poindexter* court [ ] drew a sharp distinction between § 1505 and § 1503, and repeatedly warned that the provisions were too 'materially different' for the construction of one to guide the other.'"); see also Motion at 15-16 and Rule 29 Motion & Reply (Dock. Nos. 121, 125) (citing cases in support of finding unconstitutional ambiguity and potential for arbitrary enforcement).

In addition, even if the Court of Appeals were to conclude that § 1505 is constitutionally firm when based on nothing more than "false or misleading" statements, it is certainly reasonable to believe that it could disagree with this Court and hold that in light of such a decision, the § 1001 defenses would be applicable to § 1505 (i.e. requirement for a legal duty to disclose; prohibitive "fundamental ambiguity" in the material term "business;"

and for the government to negate any reasonable construction that would make the statements factually correct). At the very least, the application of false statement defenses to an obstruction charge based on false statements is a "novel" question for this circuit. As the government has acknowledged, novel questions, or issues that have not been authoritatively resolved, warrant release pending appeal. See Quinn, 416 F. Supp. 2d at 136; Alfonso-Reyes, 427 F. Supp. 2d at 45; Miller, 753 F.2d at 23.

Regarding the § 1001 defenses, the government conclusively states in a footnote that it is "exceedingly unlikely" that the Court of Appeals will find for the defendant even though, among other things: (1) the government has yet to cite an appellate decision that would support a concealment conviction where the due process requirement of a specific, legal duty to disclose was predicated upon general ethical platitudes not provided to the defendant at the time of the representation; (2) the government has yet to cite an appellate decision upholding a false statement conviction where the *defendant's* definition of the operative term that would make his statements at least a reasonable construction is consistent with the one used by the governing administrative authorities. The government's continued assertion that these were solely questions for the jury stands in direct contradiction to the litany of cases cited by the defendant in this Motion and his post-trial papers.

Finally, the government's contention that the false statement and sentencing issues are not likely to result in a reduced sentence to a term of imprisonment less than the expected duration of the appeal process is erroneous. See 18 U.S.C. § 3143(b)(1)(B)(iv).

First, as stated above, the same statements that form the basis for the false statement charge (in Count Three) also form the basis of the obstruction charge (in Count One). Thus, these convictions are interwoven to such a degree that any ruling by the Court of Appeals

which would undermine the false statement charges would also undermine the obstruction charge. Hence, there is a strong possibility that these issues could lead to a complete reversal, not just of the false statement charges, but of all offenses of conviction, including the obstruction charge, thereby satisfying § 3143(b)(1)(B)(i). See Perholtz 836 F.2d at 555.

Second, even if the obstruction charge otherwise stands, a reversal of the false statement charges alone would satisfy § 3143(b)(1)(B)(iv) because such a ruling would be likely to result in a reduced sentence less than the expected duration of the appeal process. A reversal of the false statement convictions would reduce Mr. Safavian's offense level to 12, which corresponds to an advisory sentencing range of 10 to 16 months imprisonment. While the government is quite confident in the "relative swiftness" of this Court of Appeals, the empirical data does not suggest that the Court of Appeals would necessarily render its ultimate decision within that time frame. See 2005 Annual Report of the Director, Leonidas Ralph Mecham, Table B-4 (Ex. 1) (documenting that the *average* time from notice to ultimate resolution after a hearing equals 13.4 months in the D.C. Circuit and longer elsewhere) (available at http://www.uscourts.gov/judbus2005/appendices/b4.pdf). Equally important, however, this offense level of 12 would fall under Zone C, which under the advisory guidelines allows for split sentencing, where up to half of the sentence can be served in home detention. See USSG § 5C1.1(d). The mere fact that an appeal of the § 1001 issues could lead to an offense level in a different Zone allowing for alternative methods of confinement satisfies § 3143(b)(1)(B)(iv). See United States v. Antico, 123 F. Supp. 2d 285, 289-90 (E.D. Pa. 2000) (holding § 3143(b)(1)(B)(iii) and (iv) satisfied where appeal could lead to offense level in Zone B, which would allow for period of imprisonment to be satisfied by intermittent confinement, community confinement, or home detention).

## III.   CONCLUSION

For the foregoing reasons, as well as the arguments outlined in the Motion for Release, Defendant David H. Safavian respectfully requests that this Court enter the proposed order staying the execution of his sentence pending appeal.

Respectfully submitted,

WILEY REIN & FIELDING LLP

By: /s/ Barbara Van Gelder

Barbara Van Gelder (D.C. Bar # 265603)
Roderick L. Thomas (D.C. Bar # 433433)
Albert Lambert (D.C. Bar # 489562)
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7032
FAX: 202.719.7049

Dated: November 13, 2006

*Attorneys for David H. Safavian*