ATTACHMENT TO JUDGMENT AND COMMITMENT
United States v. David H. Safavian, Criminal No. 05-0370

**Court's Disagreements with the Presentence Investigation Report**

Mr. Safavian raised a number of objections to the Presentence Investigation Report ("PSR") prepared by the Probation Office, many of which were dealt with during the sentencing hearing, and in the Court's Opinion, appended to the Judgment and Commitment. The Court did not accept or agree with most of defendant's objections. There are, however, several objections that the Court agrees point up inaccuracies in the PSR that must be brought to the attention of the Bureau of Prisons and the Sentencing Commission. The Court specifically disagrees with the following portions of the PSR, found at the pages and paragraphs given:

1.    Description of Jack Abramoff's case as "related" and the suggestion that he and Mr. Safavian were co-conspirators. See PSR at pages 1, 3, and 6, and ¶¶ 4, 17.

2.    Use of 2005 edition of the Guidelines Manual and calculation of offense level. See PSR ¶¶ 21, 23, 28, 39, 44.

3.    Upward adjustment for obstruction of justice under USSG § 3C1.1. See PSR ¶¶ 19, 22, 28, 33, 34, 39, 41, 44.

4.    Grouping analysis. See PSR ¶¶ 22, 36, 37, 38, 40, 41, 42.

First, Mr. Safavian has objected to those sections of the PSR that refer to Jack Abramoff's plea in Criminal Number 06-001-01 as "related," or suggest that Mr. Safavian and Mr. Abramoff were co-conspirators. See PSR ¶¶ 4, 17. The Court finds that the cases were not related, and the men were not co-conspirators.

The government has never formally noticed this case as being "related" to any other case under the under the Local Criminal Rules of this Court. Those cases that are "related" to Mr. Abramoff's were so designated by the government and therefore were all assigned to another judge of this Court. No other case or other defendant has ever been designated as "related" to Mr. Safavian.

Furthermore, the charges and convictions in this case do not pertain to a charged or uncharged conspiracy between Mr. Abramoff and Mr. Safavian, and the Court has previously rejected such a contention in its May 23, 2006 Opinion and Order. See United States v. Safavian, 435 F.Supp. 2d 36, 47-48 (D.D.C. 2006). Mr. Safavian and Mr. Abramoff should not be considered as co-conspirators, their cases should not be considered as related, and Mr. Safavian's involvement in the Scotland golf trip should not be considered in the context of Mr. Abramoff's *separate* conspiracy with *other persons* to provide government officials with things of value. Mr. Safavian was not found guilty of taking any things of value or conspiring to take any things of value from Mr. Abramoff. The acts of Mr. Abramoff and his co-conspirators, which were the subject of separate charges, separate pleas, and separate cases, are not directly implicated in the offenses which Mr. Safavian was convicted of committing. Accordingly, the Bureau of Prisons should disregard those parts of the Presentence Investigation Report that suggest Mr. Safavian's actions were connected to those for which Mr. Abramoff was convicted.

Second, applying the *ex post facto* clause of the United States Constitution and Section 1B1.11(b)(1) of the Guidelines Manual, the Court has concluded that the 2002 edition of the Manual applies. The Court therefore disagrees with paragraph 21 of the PSR, stating that the 2005 Guidelines Manual applies. Under the 2002 Guidelines Manual, the base offense level for

2

obstruction of justice under USSG § 2J1.2 is 12 (not 14, as it would be under the 2005 Manual). The Court therefore disagrees with paragraphs 23, 28, 39 and 44 of the PSR, as well. The Court's reasoning is further explained in the Sentencing Opinion issued on November 16, 2006.

Third, the Court expressly has rejected the government's request to adjust upward under USSG § 3C1.1 for obstruction of justice for the reasons stated in open court and in the Sentencing Opinion, issued on November 16, 2006. The government did not satisfy its burden of proof. The Court therefore rejects paragraphs 19, 22, 28, 33, 34, 39, 41 and 44 of the PSR.

Fourth, for the reasons stated in open court and in the Sentencing Opinion issued on November 16, 2006, the Court disagrees with the grouping analysis in the PSR and the calculations based on it. See PSR ¶¶ 22, 36, 37, 38, 40, 41, 42.

At sentencing, the Court applied the 2002 Guidelines Manual, and concluded that the base offense level for obstruction of justice (Count One) under Section 2J1.2 was 12 (not 14, as it would be under the 2005 Manual). The Court concluded that the base offense level for each of the false statements and concealments under Section 2B1.1 (Counts Two, Three and Five) is six. None of the specific offense characteristics that would increase the base offense level applied under either Section 2J1.2 or 2B1.1. The Court declined to consider acquitted conduct and ruled that no upward or downward adjustments or departures were warranted. The Court grouped the four counts of conviction into three groups of closely related counts under Section 3D1.2: (1) Counts One and Three; (2) Count Two; and (3) Count Five. Because the difference between 12 (the offense level for obstruction) and 6 (the offense level for false statements/concealments) is 6, the second and third groups each get one half Unit under Section 3D1.4 of the Guidelines, while the Group with the highest offense level gets one Unit. With a

3

total of two Units, two offense levels are added to the highest offense level, the offense level for

obstruction (12). USSG § 3D1.4. The Court therefore determined that the combined offense

level under Sections 3D1.3 and 3D1.4 was 14. At offense level 14 and Criminal History

Category I, the Guideline sentencing range for this defendant is 15 to 21 months.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

NOV 1 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

)
UNITED STATES OF AMERICA,    )
)
)
v.                           )    Criminal No. 05-0370 (PLF)
)
DAVID HOSSEIN SAFAVIAN,      )
)
Defendant.          )
)

## OPINION

### I. BACKGROUND

On June 20, 2006, David Hossein Safavian was convicted by a jury of three

counts of false statements and concealments pursuant to 18 U.S.C. § 1001(a)(1), and one count

of obstruction of a GSA-OIG investigation pursuant to 18 U.S.C. § 1505. He was acquitted of

one count of obstructing a Senate Committee investigation pursuant to 18 U.S.C. § 1505. The

Court denied the defendant's motions for judgment of acquittal and a new trial on September 12,

2006. Thereafter, the parties filed extensive sentencing memoranda.

On October 27, 2006, the Court held a sentencing hearing, at which time the

defendant and the government presented various arguments, many of which related to the proper

calculation of Mr. Safavian's offense level under the United States Sentencing Guidelines. After

considering the parties' arguments, the Sentencing Guidelines, and the applicable law, the Court

calculated Mr. Safavian's total offense level under the Guidelines at level 14. It was agreed that

he was in Criminal History Category I. Thus, Mr. Safavian's Guideline sentencing range was 15

to 21 months. After considering all the relevant factors under 18 U.S.C. § 3553(a) as the

Supreme Court mandated in Booker v. United States, 543 U.S. 220 (2005), the Court sentenced

Mr. Safavian to 18 months in prison for the reasons stated in open court. This Opinion further

explains the reasoning underlying the Court's calculation of the defendant's offense level.

On Count One of the Indictment, the jury found that "[f]rom on or about March

27, 2003 to in or about May 2003," Mr. Safavian obstructed "the official investigation being

conducted by the GSA-OIG into [Mr.] Safavian's participation in an 'international golfing trip

provided by lobbyists,'" in violation of 18 U.S.C. § 1505. Amended Indictment ¶ 27; see also

Verdict Form at 1. On Count Two of the Indictment, the jury found that "[f]rom in or about May

2002 to in or about August 2002," Mr. Safavian "concealed his assistance to Mr. Abramoff in

GSA-related activities" and that he "falsely stated to the GSA ethics officer that Mr. Abramoff

did all his work on Capitol Hill, when in truth and fact, Mr. Safavian well knew, prior to the

August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled

property," in violation of 18 U.S.C. § 1001(a)(1). Verdict Form at 2; see also Amended

Indictment ¶ 29. On Count Three of the Indictment, the jury found that "[f]rom on or about

March 27, 2003 to in or about May 2003," Mr. Safavian concealed from the GSA-OIG his

"assistance to Mr. Abramoff in GSA-related activities," in violation of 18 U.S.C. § 1001(a)(1).

Verdict Form at 3; see also Amended Indictment ¶ 31. On Count Five of the Indictment, the

jury found that "[f]rom in or about February 2005 to in or about March 2005," Mr. Safavian

"falsely stated in a letter to the [Senate] Committee [on Indian Affairs] that Mr. Abramoff did not

have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland, when

in truth and fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr.

2

Abramoff was seeking to lease or purchase GSA-controlled property," in violation of 18 U.S.C.

§ 1001(a)(1).  Verdict Form at 4;  see also Amended Indictment ¶ 40.

As to Count Four, on which Mr. Safavian was acquitted, the jury found that the

government did not prove beyond a reasonable doubt that "[f]rom in or about February 2005 to in

or about March 2005," Mr. Safavian obstructed "the inquiry by Senator John McCain, as

Chairman of the Senate Committee on Indian Affairs, into allegations of misconduct by lobbyists

for Native American tribes."  Amended Indictment ¶ 38;  see also Verdict Form at 3.

## II.  ANALYSIS

### A.  *Appropriate Edition of Guidelines Manual/Ex Post Facto Concerns*

The government argued that the language of Section 1B1.11(b)(3) of the

Guidelines requires application of the 2005 edition of the Guidelines Manual because Mr.

Safavian was convicted of multiple offenses, the last of which took place in February and March

of 2005.  Government's Sentencing Memorandum ("Gov't Mem.") at 3.[1]  The defendant argued

that the 2002 Manual should be applied because use of the 2005 Manual would violate the *ex*

*post facto* clause of the United States Constitution.  David H. Safavian's Reply to the

Government's Sentencing Memorandum ("Def. Reply") at 14-17.[2]  Specifically, the defendant

---

[1]     The Court notes that the 2004 edition of the Manual, and not the 2005 edition of the Manual, was actually in effect at the time of the conduct charged in Count Five.  The 2005 Manual did not go into effect until November 1, 2005, after the last offense alleged in the indictment and proven at trial.  The sections of the Manual in dispute in this case are identical in the 2004 and 2005 Manuals, however, and the Court therefore will refer only to the 2005 Manual, as it was the edition the government argued should be used and the one cited throughout the parties' briefs and in the Presentence Investigation Report.

[2]     The *ex post facto* clause is actually two clauses in Article I of the Constitution, one applying to the United States Congress, the other to the states.  As applied to the United

argued that he would be disadvantaged by the change in base offense levels between the two

editions of the Manual. Id. The base offense level for obstruction would be 12 under the 2002

edition of the Manual, which was the edition in force at the time of the obstruction charged in

Count One, between March 27, 2003 and May 2003. See USSG § 2J1.2 (2002). Under the 2005

edition of the Manual, the base offense level would be 14, two levels higher. See USSG § 2J1.2

(2005). This Court agreed with the defendant that use of the 2005 Manual and the accompanying

two-level increase in the obstruction base offense level would put Mr. Safavian at a serious

disadvantage, in violation of the *ex post facto* clause of the Constitution. The Court therefore

applied the 2002 Manual, and applied it in its entirety under the one-book rule.[3]

　　　　　Section 1B1.11(a) of the United States Sentencing Guidelines directs the Court to

"use the Guidelines Manual in effect on the date that the defendant is sentenced." USSG

§ 1B1.11(a) (2005). If, however, use of such Manual would violate the *ex post facto* clause of

the Constitution, the Court must use "the Guidelines Manual in effect on the date that the offense

of conviction was committed." USSG § 1B1.11(b)(1) (2005). The Guidelines instruct,

however, that "[i]f the defendant is convicted of two offenses, the first committed before, and the

---

States Congress, the clause states that "No Bill of Attainder or ex post facto Law shall be
passed." U.S. CONST. art. I, § 9, cl. 3. See also U.S. CONST. art. I, § 10, cl.1. ("No State shall . . .
pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts").

[3]　　　"The Guidelines Manual in effect on a particular date must be applied in its
entirety." USSG § 1B1.11(b)(2)(2005). Whichever edition the Court uses, it must be the only
edition used, although any amendments in subsequent editions must be considered, "to the extent
that such amendments are clarifying rather than substantive changes." USSG § 1B1.11(b)(2)
(2005). This directive is known as the "one-book rule." See, e.g., United States v. Butler, 429
F.3d 140, 153 (5th Cir. 2005). But see United States v. Ortland, 109 F.3d 539, 546-47 (9th Cir.
1997) (remanding with direction to the district court to apply more than one Guidelines Manual
to avoid violation of *ex post facto* clause).

second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." USSG § 1B1.11(b)(3) (2005). Even though it recognizes that use of the later Manual may result "in an increased penalty for the first offense," the commentary with respect to Section 1B1.11(b)(3) attempts to justify this provision as being consistent with the *ex post facto* clause by positing an example involving the consideration of "relevant conduct" that occured before the revision of the Guideline that applies both to the offense of conviction and to relevant conduct for which the defendant was not convicted. USSG § 1B1.11, comment. (backg'd.) (2005). It is significant that the prior "relevant conduct" in the commentary's example involves the same offense as the offense of conviction -- an uncharged embezzlement before the revision and a conviction for embezzlement after the revision. The commentary then analogizes that situation to one involving two convictions for embezzlement, one occuring before and one after the revision. Id. The commentary states: "In this example, the ex post facto clause would not bar application of the amended guideline to the first conviction; a contrary conclusion would mean that such defendant was subject to a lower guideline range than if convicted only of the second offense." Id. The commentary's other attempt to justify Section 1B1.11(b)(3) is an example involving two bank robberies, one committed before and one after the revision of a guideline, and the statement that "[u]nder the guideline sentencing system, a single sentencing range is determined based on the defendant's overall conduct, even if there are mulitple counts of conviction." Id.

What the Commission never addresses in the commentary, however, is the case of the habitual embezzler or bank robber who once, years earlier, had trafficked in cocaine, and now finds himself facing a harsher sentence because the offense level for cocaine trafficking -- not the

one for embezzlement or bank robbery -- has been increased since his cocaine offense occurred.
Yet Section 1B1.11(b)(3) applies equally to this situation as to the ones posited in the examples
in the commentary. The commentary's cryptic and curious observations and the examples that
accompany them simply are not persuasive in demonstrating that, at least in some cases, Section
1B1.11(b)(3) does not violate the *ex post facto* clause, as embodied in Section 1B1.11(b)(1).
This is particularly true where the earlier and later committed offenses are not similar.
Consistent with the duty of this Court and the dictates of the Constitution, the Court must
conclude that because Section 1B1.11(b)(1) implicates a constitutional right, it necessarily
trumps any other Guideline directives in Section 1B1.11.

Under traditional *ex post facto* law principles, for the application of a specific
statute or Sentencing Guideline to violate the *ex post facto* clause, the application (1) must be
"retrospective," that is, it must "apply to events occurring before [that statute's or that
Guideline's] enactment"; and (2) must "disadvantage the offender affected by it." Miller v.
Florida, 482 U.S. 423, 430 (1987) (quoting Weaver v. Graham, 450 U.S. 24, 29 (1981)). An
application is "retrospective" if it "changes the legal consequences of acts completed before its
effective date." Id. A defendant is "disadvantaged" if the new or amended law or Guideline
"alter[s] the definition of criminal conduct or increas[es] the punishment for the crime." Lynce
v. Mathis, 519 U.S. 433, 441 (1997). Indeed, most *ex post facto* claims involve increases in
punishment. Id. (the "bulk" of *ex post facto* claims are "claims that the law has inflicted a 'a
[sic] greater punishment, than the law annexed to the crime, when committed'") (quoting Calder
v. Bull, 3 U.S. 386, 390 (1798)). These principles apply to laws or sentencing Guidelines
enacted or amended after a defendant has committed criminal acts if application of the new or

6

amended law or Guideline would make his or her sentence more onerous. See Miller v. Florida,

482 U.S. at 431; United States v. Thomas, 114 F.3d 228, 268 n.19 (D.C. Cir. 1997) (retroactive

application of amended Guidelines would violate *ex post facto* clause); United States v. Lam

Kwong-Wan, 924 F.2d 298, 304 (D.C. Cir. 1991) ("if the amendments to the Guidelines effected

substantive changes that would adversely affect [a defendant's] sentencing, then they may not be

applied retroactively without violating the *ex post facto* clause of the Constitution"); see also

United States v. Maldonado, 242 F.3d 1, 5 (1st Cir. 2001) (when Guidelines have been made

more severe in the interim, version in effect at time of crime is used to avoid *ex post facto*

increase in penalty).

    Several courts of appeals considered the issue of the constitutionality of

Section 1B1.11(b)(3) prior to the Supreme Court's decision in United States v. Booker, 543 U.S.

220 (2005). The Third and Ninth Circuits held that Section 1B1.11(b)(3) violated the *ex post*

*facto* clause. See United States v. Ortland, 109 F.3d at 545-47; United States v. Bertoli, 40 F.3d

1384, 1402-04 (3d Cir. 1994). The First, Fourth, Fifth, Seventh, Eighth, Tenth, and Eleventh

Circuits, however, held on various grounds and rationales that Section 1B1.11(b)(3) was

constitutional. See United States v. Sullivan, 255 F.3d 1256, 1261-63 (10th Cir. 2001); United

States v. Lewis, 235 F.3d 215, 218 (4th Cir. 2000); United States v. Vivit, 214 F.3d 908, 917-19

(7th Cir. 2000); United States v. Kimler, 167 F.3d 889, 895 (5th Cir. 1999); United States v.

Bailey, 123 F.3d 1381, 1406-07 (11th Cir. 1997); United States v. Cooper, 35 F.3d 1248, 1250-

52 (8th Cir. 1994), cert. granted, judgment vacated 514 U.S. 1094 (1995), opinion reinstated, 63

F.3d 761, 763 (8th Cir. 1995); United States v. Regan, 989 F.2d 44, 48 (1st Cir. 1993). Post-

Booker, several circuits have reconsidered the issue and once again upheld the constitutionality

and use of Section 1B1.11(b)(3).  See United States v. Butler, 429 F.3d 140, 153-54 (5th Cir.

2005); United States v. Foote, 413 F.3d 1240, 1249 n.5 (10th Cir. 2005).  Cf. United States v.

Demaree, 459 F.3d 791, 795 (7th Cir. 2006) (concluding post-Booker that even though changes

to the voluntary, advisory sentencing guidelines are "bound to influence judges' sentencing

decisions" and thus fit the Supreme Court's literal definition of an *ex post facto* clause-prohibited

"disadvantage or substantial disadvantage" to the defendant, nevertheless, "the ex post facto

clause should apply only to laws and regulations that bind rather than advise") (citations

omitted)).

        "[T]he central concern of the Ex Post Facto clause is fair notice to the defendant

that the punishment for a crime has been increased from what it was when the crime was

committed."  United States v. Sullivan, 255 F.3d at 1262;  see also United States v. Lacefield,

146 Fed. Appx. 15, 22 (6th Cir. 2005).  While such notice obviously is constructive, not actual,

the directive of Section 1B1.11(b)(3)  to use the later edition of the Guidelines whenever a

defendant has been convicted of offenses occurring both before and after a revision that increased

the offense level after the earlier offense conduct occurs is "in seeming contradiction with its

guidance on the Ex Post Facto Clause," United States v. Lacefield, 146 Fed. Appx. at 21, and

with the clause itself.  The problem is particularly acute when the crime that triggers the

increased offense level is in no way similar to the most recent crime committed -- that is, the

crime committed after the unrelated Guideline was revised.  To penalize a defendant when

sentencing him for earlier-committed Crime A (in this case, obstruction) simply because he

committed dissimilar Crime B (false statement/concealment) after the Sentencing Commission

increased the offense level for Crime A, but *not* for Crime B, is inconsistent with the principles

8

underlying the proscription against *ex post facto* application of the law. For this reason, the Sixth

Circuit held that Section 1B1.11(b)(3), at least as applied in the case before it, violated the *ex*

*post facto* clause because the defendant did not have "fair notice . . . that the punishment for [the]

crime ha[d] been increased from what it was when the crime was committed." United States v.

Lacefield, 146 Fed. Appx. at 22. This Court similarly concluded in this case that use of the 2005

Guidelines Manual would violate the *ex post facto* clause as applied because, under the grouping

rules, the 2005 obstruction guideline base offense level would drive the determination of the total

offense level even though the obstruction of which Mr. Safavian was convicted took place in

2003 when the offense level for obstruction was lower.

   The effect of using the 2005 Guidelines Manual in Mr. Safavian's case would be

retroactively to increase the base offense level for obstruction under Section 2J1.2 of the

Guidelines, the most relevant offense level for grouping purposes, because he later committed a

dissimilar crime, false statement/concealment as charged in Count Five.[4]   The base offense level

for obstruction was increased by an amendment to the obstruction Guideline in November 2003

-- from 12 to 14 -- but the obstruction of which the defendant was convicted under Count One

took place from March 27, 2003 to May 2003 (when the 2002 Manual was still in effect).

Compare USSG § 2J1.2 (2002) with USSG § 2J1.2 (2005).  Under the grouping rules the total

offense level for the four offenses of which Mr. Safavian was convicted would be driven by the

2003 obstruction conviction under either edition of the Manual, because the obstruction base

---

[4]  Mr. Safavian's base offense level for the Count Five false statement/concealment
offense is not affected by the use of the earlier or later editions. Compare USSG § 2B1.1 (2005)
with USSG § 2B1.1 (2002). While in the 2004 and 2005 Manuals, Section 2B1.1 does provide
for an increased base offense level under certain circumstances, none of those circumstances
applies to the instant case.

9

offense level is higher than the false statements base offense level (which has always been 6).

But to apply the 2005 edition of the Manual, which revised the obstruction guideline range,

would be contrary to the underlying rationale of the *ex post facto* clause. Not only did Mr.

Safavian commit the obstruction offense prior to the amendment revising Section 2J1.2, and

increasing the base offense level for obstruction, he was not found by the jury to have repeated

the offense of obstruction at any time after the revision took effect. Thus, it cannot even be said

that he was on fair notice that he risked an increased Guideline calculation using an increased

obstruction base offense level under the later Guidelines Manual, as one could argue is true for a

person who continues to commit the same offense again after such a revision. See United States

v. Sullivan, 255 F.3d at 1261 ("a defendant knows, when he continues to commit related crimes,

that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines

Manual"); id. at 1263 (the grouping rules may "provide warning to criminals that completing

another criminal offense similar to one committed previously places them in peril of sentencing

under a revised version of the Guidelines") (quoting United States v. Vivit, 214 F.3d at 919). To

apply the revised Guideline would violate the *ex post facto* clause because it places Mr. Safavian

at a disadvantage under the Guidelines without providing fair warning.

      Post-Booker, the Sentencing Guidelines are advisory, not mandatory. The Court

must consider multiple factors, including the "nature and circumstances of the offense[s]" and

"the need for the sentence imposed to reflect the seriousness of the offense[s] . . . and to provide

just punishment for the offense[s]." 18 U.S.C. § 3553(a)(1); § 3553(a)(2)(A). Thus, even if

Section 1B1.11(b)(3) were not itself unconstitutional, *ex post facto* considerations such as those

just discussed clearly can inform the Court's discretion in considering the Guidelines, and

whether the Guideline range for this individual defendant properly reflects the nature and circumstances of his offenses, the seriousness of those offenses, and what sentence would constitute just punishment for those offenses. The punishment must be "sufficient, but not greater than necessary" to comply with these purposes, and all others listed in 18 U.S.C. § 3553(a). In this case, not only does Section 1B1.11(b)(3) fail to give fair warning or constructive notice, its operation simply is unfair to this defendant, who was in fact acquitted of an obstruction of justice he was charged with having committed after the obstruction Guideline was increased. An appropriate sentence is arrived at not by an inflexible application of Section 1B1.11(b)(3), but by a consideration of the obstruction Guideline in effect when the defendant was found to have committed that crime along with the Guideline in effect on each occasion he committed the crime of false statement/concealment.

### B. Acquitted Conduct and Grouping

The government asked the Court to find by a preponderance of the evidence that the defendant obstructed the Senate Committee, as charged in Count Four, even though the jury acquitted Mr. Safavian on that count. Gov't Mem. at 10-22.[5] The government then argued that the Court should effectively include Count Four as a conviction in the grouping calculation under Section 3D1.2 of the Guidelines. Id. The Court declined to do so.

---

[5]     At the sentencing hearing, the government implied that such a finding -- that Mr. Safavian had committed obstruction in 2005 -- would also serve to alleviate the *ex post facto* concerns discussed in the previous section of this Opinion, since the conduct charged in that count took place while the 2005 edition of the Guidelines Manual and the increased base offense level were in effect.

11

In United States v. Dorcely, 454 F.3d 366 (D.C. Cir. 2006), the D.C. Circuit held

that because the Supreme Court in Booker did not overturn United States v. Watts, 519 U.S. 148

(1997), acquitted conduct may be considered in sentencing, and that, in view of Justice Breyer's

majority remedy opinion in Booker, it may be considered under a preponderance of the evidence

standard. United States v. Dorcely, 454 F.3d at 372. The holding in Dorcely, however, does not

mandate consideration of acquitted conduct under the Guidelines, stating only that "we believe

[Booker's] language is broad enough to allow consideration of acquitted conduct so long as the

court 'deems [it] relevant.'" Id. The opinion goes on to cite language in United States v. Watts

that takes a similarly permissive view of whether a judge may consider acquitted conduct.

United States v. Dorcely, 454 F.3d at 372 ("a jury's verdict of acquittal *does not prevent* the

sentencing court from considering conduct underlying the acquitted charge, so long as that

conduct has been proved by a preponderance of the evidence") (quoting United States v. Watts,

519 U.S. at 157) (internal punctuation omitted) (emphasis added)). This Court declines to

exercise its discretion under the advisory Guidelines to consider such conduct, because it has

long believed that consideration of acquitted conduct "trivializes 'legal guilt' or 'legal

innocence,' which is what a jury decides." United States v. Pimental, 367 F.Supp. 2d 143, 152

(D. Mass. 2005).

## C. Grouping of Closely Related Counts

Section 3D1.2 of the Sentencing Guidelines sets forth the criteria for creating

"Groups of Closely Related Counts." USSG § 3D1.2. This Court and both parties agreed that

Counts One and Three -- the obstruction of the GSA-OIG investigation and the concealment

12

from the GSA-OIG investigator -- are properly grouped together under Section 3D1.2(a), because

they both involve the "same victim" and the "same act or transaction." The parties disagreed,

however, on all other grouping issues. Mr. Safavian argued that all four offenses should be

placed in a single group through the application of Section 3D1.2(b) or, in the alternative,

Section 3D1.2(b) and (d) combined. See David H. Safavian's Sentencing Memorandum ("Def.

Mem.") at 17-22. The government argued that they should be placed into three groups --

(1) Count Two (false statement to and concealment from the GSA ethics office), (2) Count One

with Count Three (GSA-OIG obstruction and concealment, respectively), and (3) Count Five

(false statement to the Senate Committee). See Gov't Mem. at 14-22. This Court agreed with

the government that the offenses in Counts Two and Five should not be grouped together or with

Counts One and Three, and that there were therefore three separate groups for purposes of

calculating Mr. Safavian's total offense level under Section 3D1.2.

      The objective of Section 3D1.2 is to group together for sentencing those closely

related counts that "involve substantially the same harm." USSG § 3D1.2. Paragraphs (a)

through (d) of Section 3D1.2 set forth alternative criteria for such grouping. The application

notes state that where there are ambiguities, they "should be resolved in according with the

purpose of this section as stated in the lead paragraph, i.e., to identify and group 'counts

involving substantially the same harm.'" USSG § 3D1.2, comment. (n.2). The paragraphs

arguably relevant to this case were Section 3D1.2(a), (b) and (d). Section 3D1.2(a) states that

grouping should occur "[w]hen counts involve the same victim and the same act or transaction."

Section 3D1.2(b) states that grouping should occur "[w]hen counts involve the same victim and

two or more acts or transactions connected by a common criminal objective or constituting part

of a common scheme or plan." Common to both is the requirement of the "same victim," which

the defendant argued was either society in general or the United States government in general.

The government argued that there were multiple victims and that they were the various persons

or entities within the government to whom the defendant lied or whom he obstructed. Finally,

Section 3D1.2(d) applies to certain categories of offenses (listed in the paragraph) "[w]hen the

offense level is determined largely on the basis of the total amount of harm or loss, the quantity

of a substance involved, or some other measure of aggregate harm, or if the offense behavior is

ongoing or continuous in nature and the offense guideline is written to cover such behavior."

### 1. § 3D1.2(b)

#### a. "Same Victim"

This Court disagreed with Mr. Safavian's contention that "society" was the only

victim of Mr. Safavian's conduct (in the way that "society" may be the victim where a defendant

possesses a firearm without using it). The application notes to Section 3D1.2 state that "societal

interest" is the "victim" only "[f]or offenses in which there are no identifiable victims," using as

two examples "drug or immigration offenses." USSG § 3D1.2, comment. (n.2). That simply

was not the case here.

The verdict demonstrated that each of these offenses had an identifiable victim.

To find Mr. Safavian guilty of the false statements/concealments alleged in Counts Two, Three,

and Five, the jury had to find that the fact falsified or concealed was "material," that is, that "it

had the effect of influencing the action of an agency or committee, or was capable of, or had the

potential to do so." Jury Instructions at 93. Thus, the conduct involved in each of these offenses

14

was clearly directed at a particular entity -- the GSA ethics office, the GSA-OIG, and the Senate

Committee on Indian Affairs, all of which Mr. Safavian influenced at different times or had the

capability of influencing. Similarly, to find Mr. Safavian guilty of the obstruction alleged in

Count One the jury had to find that he "did corruptly influence, obstruct or impede or did

corruptly endeavor to influence, obstruct, or impede the due administration of the law under

which the pending GSA-Office of the Inspector General proceeding . . . was being conducted."

Jury Instructions at 68-69. Again, the GSA-OIG, not society at large, was clearly the victim of

the obstructive conduct under 18 U.S.C. § 1505.

        The Court found that there were three separate victims of the false statements and

concealments charged in Counts Two, Three, and Five -- those particular offices of the

government toward whom the lies and concealments were directed. Similarly, the obstruction

charged in Count One, like the concealment in Count Three, was directed at the GSA-OIG.

Three different and separate agencies or committees were potentially influenced and three

separate and independent government functions were impaired by Mr. Safavian's conduct.

        b. "Common Criminal Objective or Part of a Common Scheme or Plan"

        Even were the Court to have found that there was a single victim, as the defendant

argued, it would not have grouped these crimes under Section 3D1.2(b) because it did not find

that the "acts or transactions [were] connected by a common criminal objective or constitut[ed]

part of a common scheme or plan." USSG § 3D1.2(b). Paragraph (b) is intended to group

"counts that are part of a single course of conduct with a single criminal objective and represent

essentially one composite harm." USSG § 3D1.2, comment. (n.4). An example of what would

15

constitute a "single composite harm" under this subpart is a defendant who commits two counts

of mail fraud and one of wire fraud, "each in furtherance of a single fraudulent scheme," even if

occurring on different days. Id. A single or the "[s]ame course of conduct" connotes a series of

"[o]ffenses . . . sufficiently connected or related to each other as to warrant the conclusion that

they are part of a single episode, spree or ongoing series of offenses." USSG § 1B1.3, comment.

(n.9(B)).

        Mr. Safavian was not engaged in a single scheme to conceal and falsify facts or

obstruct government bodies. Rather, he engaged in a series of separate concealments and

falsifications, either in response to the various investigative bodies looking into Jack Abramoff

(Counts One, Three, and Five), or in an initial effort to take the trip to Scotland without arousing

suspicion (Count Two). His lies, concealments, and obstruction were intermittent. Each was

done in a different year, each was directed at a different entity, and each was done in a wholly

different fashion (he was convicted of different lies and concealments as indicated by the jury's

responses in the special verdict form). As the Court noted in its opinion denying his motions for

a judgment of acquittal and for a new trial with respect to defendant's multiplicity argument, the

various counts constituted different impairments of different government functions. United

States v. Safavian, --- F.Supp.2d ---, WL 2598269 *7-8 (D.D.C. Sept. 12, 2006).

## 2. §3D1.2(d)

        Finally, Section 3D1.2(d) directs the Court to group those counts listed in that part

(including those offenses covered by Section 2B1.1, the guideline governing the false statement

counts) if the offense behavior is "ongoing or continuous in nature." USSG § 3D1.2(d). While

16

the Sentencing Guidelines do not provide a specific definition of the term "ongoing or continuous in nature" in Section 3D1.2(d), the definition of "[s]ame course of conduct" in Section 1B1.3, just discussed, includes those which are "part of a[n] . . . *ongoing series of offenses.*" § 1B1.3, comment. (n.9(B)). The note goes on to state that:

> Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

Id.

Some circuits have held that any offenses falling under the list of guideline sections that follow Section 3D1.2(d) that "are to be grouped" under Section 3D1.2 *must* be grouped, even if factually unrelated. See United States v. Tolbert, 306 F.3d 244, 247 (5th Cir. 2002) (holding that Section 3D1.2(d) would be rendered superfluous if it necessarily involved factually related counts, given the requirements of Section 3D1.2(a) and (b)). Most however, have held that the "are to be grouped" language does not result in automatic grouping. See, e.g., United States v. Williams, 154 F.3d 655, 657 (6th Cir. 1998); United States v. Taylor, 984 F.2d 298, 303 (9th Cir. 1993); United States v. Seligsohn, 981 F.2d 1418, 1425 (3d Cir. 1992); United States v. Harper, 972 F.2d 321, 322 (11th Cir. 1992); United States v. Johnson, 971 F.2d 562,

17

576 (10th Cir. 1992). This Court also rejects the automatic approach to grouping, as it is plainly

contrary to the purpose underlying Section 3D1.2 in general and Section 3D1.2(d) in particular.

As explained in the commentary, the purpose of Section 3D1.2 is to ensure that the offenses

entailed substantially the same harm and therefore deserve close grouping. See USSG § 3D1.2,

comment. (n.2). Grouping offenses that share the same sentencing Guideline without reference

to the facts and circumstances underlying each offense would not serve this purpose.

   The application of Section 3D1.2(d) occurs most frequently in drug cases,

involving "the quantity of the substance involved," USSG § 3D1.2(d), or in embezzlement, fraud

or theft cases under Section 2B1.1, where "the measure of aggregate harm" is the determining

factor. USSG § 3D1.2(d). Of the few cases dealing with application of Section 3D1.2(d) to

situations invovling neither drug quantity nor amount of loss but where the offense behavior is

"ongoing or continuous," most seem to employ a common sense approach to whether or not the

counts in question should be grouped. See United States v. Chambers, 14 Fed. Appx. 140, 143

(4th Cir. 2001) (holding that bank larceny and money laundering counts should not be grouped

under Section 3D1.2(d) because the plan to steal the money and the plan to launder it, each of

which involved a different group of confederates, were not "sufficiently integrated"); United

States v. Gist, 101 F.3d 32, 34 (5th Cir. 1996) (holding that although count alleging hazardous

waste disposal at one location and count alleging knowing transport of hazardous waste to

another location were "ongoing" at each location, they were not properly grouped under Section

3D1.2(d) since they "involved separate victims injured at different locations on different dates");

United States v. Mizrachi, 48 F.3d 651, 655 (2d Cir. 1995) (holding that grouping of bank fraud,

arson, and insurance fraud offenses was consistent with "ongoing and continuous" definition in

Section 3D1.2(d) where all three offenses were "part of one continuous scheme" in which

defendant "planned from the outset to borrow [] money by fraud, buy [a] building, destroy it,

collect the insurance, pay off [a] loan, and pocket the difference between the insurance proceeds

and the loan."); United States v. Rudolph, 137 F.3d 173, 179-80 (3d Cir. 1998) (court had

"doubt" as to whether defendant's two bribery offenses were "ongoing and continuous" in nature

given time separation of a year between first and second offenses, even though both bribes were

received from same individual).

   In this case, the three false statements/concealments were not uninterrupted and

did not take place at regular intervals. They were sporadic or intermittent. The first was initiated

by Mr. Safavian himself in 2002; the latter two were in response to inquiries by others, one by

the GSA-OIG in 2003, the other by the Senate Committee in 2005. In one instance, an

anonymous tipster to the GSA-OIG set off an investigation, and in the later instance, Jack

Abramoff's lobbying practice and involvement with Indian tribes became the subject of the

Senate Committee's investigation. In both of these latter instances, Mr. Safavian responded,

rather than initiated.  Consistent with the underlying rationale for grouping under any paragraph

of Section 3D1.2, the Court did not find that the three separate false statements entailed

"substantially the same harm." As previously stated, the different victims, different means and

manner of making the false statements or concealments that the jury convicted Mr. Safavian of

committing, all at different times, and the separate government functions impaired by those false

statements or concealments all lead to the conclusion that Counts Two, Three and Five should

not be grouped as closely related counts within the meaning of this Section.

19

### D. Perjury Upward Adjustment

A two-level upward adjustment may be given for obstructing or impeding the

administration of justice where the Court finds that:

> the defendant willfully obstructed or impeded, or attempted to
> obstruct or impede, the administration of justice during the course
> of the investigation, prosecution, or sentencing of the instant
> offense of conviction, and . . . the obstructive conduct related to . . .
> the defendant's offense of conviction and any relevant conduct.

USSG §3C1.1. The provision is not intended to punish a defendant for the exercise of a

constitutional right, including the right to testify on his own behalf at trial. USSG §3C1.1,

comment (n.2). "A defendant's denial of guilt (other than a denial of guilt under oath that

constitutes perjury) . . . is not a basis for application of [Section 3C1.1] . . . [N]ot all inaccurate

testimony or statements necessarily reflect a willful attempt to obstruct justice." Id. Perjury for

purposes of Section 3C1.1 is the same as perjury under the federal perjury statute, 18 U.S.C.

§ 1621. United States v. Dunnigan, 507 U.S. 87, 94 (1993). It occurs where:

> [a] witness testifying under oath or affirmation . . . gives false
> testimony concerning a material matter with the willful intent to
> provide false testimony, rather than as a result of confusion,
> mistake, or faulty memory.

Id.

The parties agreed that the standard for evaluating the defendant's testimony at

trial for purposes of the perjury enhancement under Section 3C1.1 is clear and convincing

evidence. See Gov't Mem. at 5-6; Def. Reply at 18. See also United States v. Montague, 40

F.3d 1251, 1254 (D.C. Cir. 1994); see also United States v. Gaviria, 116 F.3d 1498, 1518 (D.C.

20

Cir. 1997); United States v. Baldwin, 389 F.Supp. 2d 1, 2 (D.D.C. 2005). Because of the parties'

agreement, the Court therefore analyzed the question under this heightened standard.[6]

The government argued that the defendant repeatedly perjured himself at trial, and

certainly much of Mr. Safavian's testimony at trial was not credible. In particular, his testimony

that he had no idea what the cost of the trip to Scotland was, including the cost of his flight on a

private jet from Baltimore to Scotland to London and back to Baltimore; the cost of greens fees

at St. Andrews, perhaps the most famous golf course in the world; the cost of his hotel rooms;

and the cost of the meals and liquor provided. There were also significant inconsistencies in the

reasons he cited for seeking the ethics opinion from the GSA ethics officer, whether he intended

to pay for the trip, and whether the ethics opinion answered the question he asked. Furthermore,

Mr. Safavian testified that he told the GSA-OIG that the $3100 he paid Jack Abramoff for his

trip was the amount he thought that it actually cost, but later admitted on cross examination that

the figure was a "ballpark" or "guesstimate," as it was paid in advance.

Despite these contradictions and inconsistencies, the Court did not find that the

lack of credibility of Mr. Safavian's testimony was sufficient to warrant the upward adjustment

---

[6]    The Court notes that while there is no post-Booker guidance from the D.C. Circuit
on the standard to be used, and the government and the defendant agreed upon this standard, the
cases upon which the parties relied all applied editions of the Guidelines Manual directing the
Court to evaluate a defendant's testimony "in a light most favorable to the defendant." A
guideline amendment that took effect on November 1, 1997 deleted that phrase, "so that the
Application Note 'no longer suggests use of a heightened standard of proof.'"  United States
v. Dozier, 162 F.3d 120, 124 n. 1 (D.C. Cir. 1998) (quoting USSG App. C, amend. 566
(Nov. 1997)). This Circuit has noted this change and the implication that the standard under
subsequent editions of the Guidelines Manual is now only proof by a preponderance of the
evidence.  United States v. McCoy, 242 F.3d 399, 407 n. 14 (D.C. Cir. 2001).  Because the
parties agreed to the heightened standard, however, the Court did not address this issue and
considered the enhancement under that standard to which they agreed.

for obstruction under a clear and convincing evidence standard. Mr. Safavian's testimony, and particularly those parts that the government alleges were untrue, were not based on objective, verifiable facts directly contradicted by documentary evidence or other witnesses. Rather, they centered on his state of mind, his intent, and his willfulness. While the jury obviously found the willfulness and specific intent required to convict Mr. Safavian of these charges, the Court was reluctant to enhance Mr. Safavian's offense level under the clear and convincing standard in such subjective areas (as opposed to an objective fact, such as where a defendant gives a plainly false alibi in his testimony or attempts to place the blame for the crime on another person who could not possibly have committed the crime) and his lack of credibility.

### E. Acceptance of Responsibility Downward Adjustment

The defendant argued that he should receive a two-level downward adjustment for acceptance of responsibility under Section 3E1.1 of the Guidelines. Def. Mem. at 32. He maintained that he had accepted responsibility for his conduct -- that is, he had admitted to the relevant conduct -- but had only challenged "the constitutionality and application of law" to that conduct. Id. at 32-33. The Court agreed with the government that such a downward adjustment was completely unwarranted.

Under 18 U.S.C. § 1001, the "relevant conduct" was not merely that Mr. Safavian "knowingly and willfully" made certain statements, that happened to be false (in effect, he made a mistake). The "relevant conduct" was that Mr. Safavian "falsifie[d]" a material fact or "conceal[ed] or cover[ed] up by a[] trick, scheme or device" such a fact, meaning that he engaged in a "deliberate plan or course of action, or [] affirmative act, or [] knowing omission designed to

22

deceive others by preventing or delaying the discovery of information." Jury Instructions at 87-88; see also id. at 72, 73, 75, 82, 84. The relevant conduct under 18 U.S.C. § 1505 was not merely that Mr. Safavian's actions obstructed the GSA-OIG investigation, but that he undertook those actions "corruptly" -- that is, with "a wrongful, immoral, depraved or evil purpose, motive or intent" and that he acted "voluntarily and deliberately and for the purpose of improperly influencing or obstructing or interfering with a proceeding." Jury Instructions at 99. Mr. Safavian has never admitted to acting "corruptly," to engaging in a "deliberate plan or course of action," an "affirmative act," or "knowing omission," at any time in the course of this case, including during his allocution to the Court at the sentencing hearing. He therefore failed to meet the definition of someone who has "truthfully admitt[ed] the conduct comprising the offense(s) of conviction." USSG § 3E1.1, comment. (n.1(a)).

### F.  Other Factors

Mr. Safavian argued that this case warrants a downward departure under Section 5K2.0, which permits the Court to take into account a variety of circumstances otherwise not accounted for in the Guidelines. The defendant argued that in this case the obstruction conviction in Count One lay "outside the heartland" of ordinary obstruction prosecutions. See Def. Mem. at 28. Essentially, he contended that the offending conduct underlying the obstruction conviction is atypical because it did not include conduct "*in addition to* false statements and concealment, such as falsifying and destroying evidence, making threats, or corruptly influencing third parties to aid the obstruction." Id. at 29 (emphasis added). He then

23

cited to a variety of cases involving false statements, concealments and other kinds of obstruction that are comparable to the obstruction he committed. Id.

The defendant's argument was similar in nature to the one he made in his motion for judgment of acquittal that the obstructive conduct alleged in Count One fell outside the purview of 18 U.S.C. § 1505 because it was "intransitive," that is, he did not implicate or influence a third person in the obstruction. As discussed there, this issue was resolved after the decision United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991), when Congress amended the statutory definition in 18 U.S.C. § 1515(b) specifically to include so-called "intransitive" obstruction. Similarly, the statutory definition states that "corruptly" includes "making a false or misleading statement *or* withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b) (emphasis added). The language of the definition clearly encompasses obstruction by false or misleading statement alone, without the accompanying document destruction or whatever additional conduct the defendant claims constitutes a "heartland" offense. The Court was unpersuaded that the conduct for which Mr. Safavian was convicted of committing obstruction under Count One falls outside the "heartland" such that it warrants a Section 5K2.0 downward adjustment.

### III. CONCLUSION

Applying the 2002 Guidelines Manual, the Court concluded that the base offense level for obstruction of justice (Count One) under Section 2J1.2 was 12 (not 14, as it would be under the 2005 Manual). The Court concluded that the base offense level for each of the false statements and concealments under Section 2B1.1 (Counts Two, Three and Five) is six. None of

24

the specific offense characteristics that would increase the base offense level applied under either

Section 2J1.2 or 2B1.1. The Court declined to consider acquitted conduct and ruled that no

upward or downward adjustments or departures were warranted. The Court grouped the four

counts of conviction into three groups of closely related counts under Section 3D1.2: (1) Counts

One and Three; (2) Count Two; and (3) Count Five. Because the difference between 12 (the

offense level for obstruction) and 6 (the offense level for false statements/concealments) is 6, the

second and third groups each get one half Unit under Section 3D1.4 of the Guidelines, while the

Group with the highest offense level gets one Unit. With a total of two Units, two offense levels

are added to the highest offense level, the offense level for obstruction (12). USSG § 3D1.4. The

Court therefore determined that the combined offense level under Sections 3D1.3 and 3D1.4 was

14. At offense level 14 and Criminal History Category I, the Guideline sentencing range for this

defendant is 15 to 21 months.

PAUL L. FRIEDMAN
United States District Judge

DATE: 11/16/06

25