UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUL 2 1 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 05-0370 (PLF)
)
DAVID HOSSEIN SAFAVIAN, )
)
Defendant. )
)

OPINION AND ORDER

This matter is before the Court on defendant David Safavian's motion for

judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and his

motion for a new trial pursuant to Rule 33. The Court heard oral argument on these motions on

April 20, 2009. Upon consideration of the motions papers, oppositions, replies, supplemental

filings, oral arguments of counsel, and the entire record in this case, the Court concludes that the

defendant's motions should be denied.

I. BACKGROUND

From May 16, 2002 until January 2004, David Safavian was the Chief of Staff for

the Administrator of the General Services Administration ("GSA"). On August 3, 2002,

Mr. Safavian, the lobbyist Jack Abramoff, and seven other individuals -- including a member of

the United States House of Representatives, members of the Representative's staff, and other

lobbyists employed at the same law firm as Jack Abramoff -- flew by private jet to Scotland to

play golf at St. Andrew's golf course. Mr. Safavian, Mr. Abramoff and some of the others

continued on to London, England.  Mr. Safavian and Mr. Abramoff eventually returned to the United States by private jet on August 11, 2002.

In July 2002, prior to going on the golfing trip, Mr. Safavian sought and received an ethics opinion from a GSA ethics officer, Eugenia Ellison, regarding whether he could participate in the trip, and, more specifically, whether he could accept a gift of free air transportation on a private jet from Mr. Abramoff.  Both the GSA Office of the Inspector General ("GSA-OIG") and the Senate Committee on Indian Affairs subsequently conducted investigations into the Scotland trip.  The GSA-OIG's investigation was opened in March 2003 after the receipt of an anonymous tip.  On February 22, 2004, the Washington Post published the first of a series of articles about Mr. Abramoff's dealings with several Indian tribes, triggering the Senate Committee's investigation.  In the course of each of these investigations, Mr. Safavian was questioned about the trip, his relationship to Mr. Abramoff, and how the trip was financed.  He responded to each of the inquiries both orally and by providing documents, including a copy of the ethics opinion to the Senate.  Mr. Safavian also wrote a letter accompanying the documents he provided to the Senate.

A grand jury returned a five count indictment against Mr. Safavian, charging him with three counts of making false statements or engaging in acts of concealment under 18 U.S.C. § 1001(a)(1) and two counts of obstruction under 18 U.S.C. § 1505.  Specifically, Count One of the original indictment alleged that the defendant obstructed the GSA-OIG investigation, in violation of 18 U.S.C. § 1505; Count Two alleged that he made a false statement and committed acts of concealment in connection with seeking the GSA ethics opinion prior to the trip, in violation of 18 U.S.C. § 1001(a)(1); Count Three alleged that he made a false statement and committed acts of concealment in the course of the GSA-OIG investigation, in violation of 18

2

U.S.C. § 1001(a)(1); Count Four alleged that he obstructed the Senate Committee investigation, in violation of 18 U.S.C. § 1505; and Count Five alleged that he made a false statement, committed acts of concealment, and provided false documentation in the course of the Senate Committee investigation, in violation of 18 U.S.C. § 1001(a)(1).

Mr. Safavian's trial began on May 22, 2006. On June 20, 2006, the jury returned a verdict finding him guilty on Count One, which alleged that he had obstructed "the official investigation being conducted by the GSA-OIG into [Mr.] Safavian's participation in an 'international golfing trip provided by lobbyists.'" Retyped Indictment, Dkt. No. 117 ¶ 27; see also Verdict Form (2006 Trial), Dkt. No. 119 at 1. The jury acquitted Mr. Safavian on Count Four, which alleged that he had obstructed "the inquiry by Senator John McCain, as Chairman of the Senate Committee on Indian Affairs, into allegations of misconduct by lobbyists for Native American tribes." Retyped Indictment ¶ 38; see also Verdict Form (2006 Trial) at 3.

Mr. Safavian was found guilty on all three counts of false statements and/or concealment under 18 U.S.C. § 1001(a)(1). See Verdict Form (2006 Trial) at 2-4. With respect to Count Two, the jury found that Mr. Safavian had both "concealed his assistance to Mr. Abramoff in GSA-related activities" and had "falsely stated to the GSA ethics officer that Mr. Abramoff did all his work on Capitol Hill, when in truth and fact, Mr. Safavian well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or purchase GSA-controlled property." Verdict Form (2006 Trial) at 2; see also Retyped Indictment ¶ 29. With respect to Count Three, the jury found that Mr. Safavian had "concealed his assistance to Mr. Abramoff in GSA-related activities." Verdict Form (2006 Trial) at 3; see also Retyped Indictment ¶ 31. With respect to Count Five, the jury found that Mr. Safavian had "falsely stated in a letter to the [Senate] Committee that Mr. Abramoff did not have any business with GSA at

3

the time Mr. Safavian was invited on the trip to Scotland, when in truth and fact, Mr. Safavian

well knew, prior to the August 2002 Scotland trip that Mr. Abramoff was seeking to lease or

purchase GSA-controlled property." Verdict Form (2006 Trial) at 4; see also Retyped

Indictment ¶ 40.

      Mr. Safavian moved for a judgment of acquittal and for a new trial on all four

counts of which he was convicted. After oral argument, the Court denied the motion in its

entirety by opinion of September 12, 2006. See United States v. Safavian, 451 F. Supp. 2d 232

(D.D.C. 2006). The Court sentenced the defendant to a period of eighteen months in prison, see

Judgment and Commitment, Dkt. No. 147 at 3; see also United States v. Safavian, 461 F. Supp.

2d 76 (D.D.C. 2006), but permitted him to remain free on bond pending appeal. See United

States v. Safavian, Memorandum Opinion and Order, Dkt. No. 146 at 3 (D.D.C. Nov. 16, 2006).

      On appeal, the court of appeals reversed Mr. Safavian's conviction with respect to

the concealment portion of Count Two and the entirety of Count Three of the indictment, where

the jury found Mr. Safavian guilty only of concealment. See United States v. Safavian, 528 F.3d

957, 963-65 (D.C. Cir. 2008). The court of appeals concluded that, in order for there to be a

concealment in violation of 18 U.S.C. § 1001(a)(1), there must be a "legal duty" to disclose and

that the government had failed to identify any such legal duty. The court held that Section

1001(a) does not demand "that individuals choose between saying everything and saying

nothing." Id. at 965. It therefore concluded that Safavian "had no legal duty to disclose and that

his concealment convictions cannot stand." Id.

      The remaining charges related to the alleged false statements Mr. Safavian had

made as specified in Count One (obstruction of justice under 18 U.S.C. § 1505), the remainder of

Count Two, and Count Five (false statements under 18 U.S.C. § 1001(a)(1)). Each of these

4

statements was to the effect that Mr. Abramoff had "no business" with GSA and "did all of his work on Capitol Hill" at the time of the golf trip. See United States v. Safavian, 528 F.3d at 965 & n.10. Mr. Safavian testified at trial that he intended his "no business with GSA" statements to have the meaning common to government contracts professionals rather than to lay persons. Id. at 965-66. The court of appeals concluded that this Court had abused its discretion in excluding the defendant's proffered expert testimony on how government contracting professionals view "having business or working with GSA." Id. at 966. The court therefore vacated Mr. Safavian's convictions on Count One, the false statement portion of Count Two, and Count Five and remanded those counts for a new trial at which the excluded expert would be permitted to testify. Id. at 967-68.[1]

      After remand from the court of appeals, the parties engaged in unsuccessful plea negotiations. Thereafter, the grand jury returned a five-count superseding indictment. See Superseding Indictment, Dkt. No. 167. Count One again charged obstruction of the GSA Inspector General's investigation, in violation of 18 U.S.C. § 1505. Count Two charged false statements to the GSA ethics officer, in violation of 18 U.S.C. § 1001(a)(1) and (a)(2). It again focused on the making of false statements in connection with whether Mr. Abramoff "did all of his work on Capitol Hill" or rather was seeking to acquire GSA-controlled property. Because of the court of appeals' decision, this time there was no concealment charge in Count Two. Count Four charged Mr. Safavian with making false statements to the Committee on Indian Affairs of the United States Senate, under 18 U.S.C. § 1001(a)(1) and (a)(2). Again, because of the court of appeals' opinion, there was no concealment allegation. The superseding indictment also

------

[1]      Ironically, at the second trial, the defendant chose not to call the expert witness.

contained two entirely new counts. Count Three charged Mr. Safavian with having made false statements on his financial disclosure form in violation of 18 U.S.C. § 1001(a)(2). Count Five charged Mr. Safavian with having made false statements to the Federal Bureau of Investigation, also in violation of 18 U.S.C. § 1001(a)(2).

Following the resolution of numerous pretrial motions and motions in limine, the case went to trial for the second time on December 1, 2008. The jury returned its verdict on December 19, 2008. The jury found the defendant guilty on Counts One, Two, Three and Five, and not guilty on Count Four (false statements to the Senate Committee on Indian Affairs). See Verdict Form (2008 Trial), Dkt. No. 233. With respect to Count Five, the jury had been instructed that it must be unanimous, beyond a reasonable doubt, as to whether the defendant made one of three specific false statements. It found him guilty of Specification (C), which charged that Mr. Safavian falsely stated to the FBI that "at the time Abramoff invited him on the August 2, 2002 Trip, defendant Safavian would not have been able to help Abramoff with GSA-related activities if he wanted to since defendant Safavian was new at GSA" when, in fact, Safavian knew at the time of the invitation that he had assisted Abramoff "with his efforts to lease, purchase, acquire and redevelop GSA-controlled property." Superseding Indictment ¶ 53(C); see also Verdict Form (2008 Trial) at 3.[2]

---

[2]     Specification (C) of the superseding indictment is referenced as Specification (B) in both the jury instructions and the jury verdict form because before submitting the case to the jury, the Court granted the defendant's motion for judgment of acquittal as to Specification (A) of Count Five, see Transcript of Trial at 82 (Dec. 15, 2008 -- afternoon session), and re-lettered the remaining specifications in the jury instructions and jury verdict form. See Transcript of Trial at 12 (Dec. 16, 2008 -- afternoon session).

## II. MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

Under Rule 29 of the Federal Rules of Criminal Procedure, the Court must enter a judgment of acquittal on any offense charged for which the evidence is insufficient to sustain a conviction. In ruling on a motion for judgment of acquittal, the Court must "consider[] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." United States v. Kayode, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting United States v. Harrington, 108 F.3d 1460, 1464 (D.C. Cir. 1997)). The Court must "accord[] the government the benefit of all legitimate inferences," United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983) (citations omitted), and accept the jury's verdict of guilt if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Arrington, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (citations omitted). Put another way, the Court may grant a motion for judgment of acquittal only where "a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant['s] guilt." United States v. Weisz, 718 F.2d at 437 (emphasis in original) (citations omitted).

Rule 33(a) of the Federal Rules of Criminal Procedure provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." 3 WRIGHT, KING & KLEIN, FEDERAL PRACTICE AND PROCEDURE § 556 (3d ed. 2004). Grounds for granting such a motion can include a wide variety of errors, including where the Court finds that the weight of the evidence is such that the verdict constitutes a miscarriage of justice. See 3 WRIGHT, KING & KLEIN, FEDERAL PRACTICE AND PROCEDURE § 553 (3d ed. 2004); see also Tibbs v. Florida, 457 U.S. 31,

38 n.11 (1982). A new trial should be granted only if the defendant has shown that "the error was substantial, not harmless, and that the error 'affected the defendant's substantial rights.'" United States v. Walker, 899 F. Supp. 14, 15 (D.D.C. 1995), aff'd 99 F.3d 439 (D.C. Cir. 1996) (quoting United States v. Johnson, 769 F. Supp. 389, 395-96 (D.D.C. 1991)). Whether to grant a motion for a new trial is "a decision committed to the Court's sound discretion." United States v. Neill, 964 F. Supp. 438, 441 (D.D.C. 1997).

## III. MATERIALITY

The defendant argues that a judgment of acquittal should be entered on Count Two because the statements made to the ethics officer in obtaining an ethics opinion could not be material as a matter of law since the ethics officer, Eugenia Ellison, was not a decision-maker, her decisions were advisory only, and the statements Mr. Safavian made to her therefore could not have affected any governmental decision. See Defendant's Motion for a Judgment of Acquittal and for a New Trial ("Mot."), Dkt. No. 239 at 2-4. He argues that a judgment of acquittal should be entered on Count Five because the conviction on that count was based on a single statement made to FBI Agent Jeffrey Reising (as set forth in Specification (C)) that could not be material since it conveyed information that the agent already knew and therefore could not have influenced him in any decision he made. See id. at 5-6. As the Court instructed the jury with respect to the false statements charged in these counts under 18 U.S.C. § 1001(a)(1) and (a)(2): "A statement, representation or fact is material if it had the effect of influencing the particular decisions, actions or activities of an agency or committee, or was capable of, or had the potential to do so. It is not necessary that the statement, representation or fact actually have had that influence or be relied on by the agency or committee, so long as it had the potential or

capability to do so." Transcript of Trial at 76 (Dec. 16, 2008 -- morning session).[3] Defendant

argues that each of the two statements on which he was convicted fails to meet this test.

## A. Count Two

With respect to Count Two, the defendant argues that a false statement made in a

request for an ethics opinion cannot be "material" as a matter of law. He reasons as follows:

First, to be material, a statement "must have 'a natural tendency to influence, or [be] capable of

influencing, the decision of the decisionmaking body to which it was addressed.'" Mot. at 2

(quoting United States v. Gaudin, 515 U.S. 506, 509 (1995)) (internal quotation marks and

citation omitted). Second, the GSA ethics officer's opinion was "purely advisory" in the sense

that it "did not determine, or even influence, whether the defendant's behavior was lawful or

unlawful [in the eyes of the government] under the relevant ethics rules." Mot. at 3; see also id.

(arguing that the "substance of the ethics opinion [was] a matter of indifference to the

government"). Third, because the GSA ethics officer's opinion was advisory, it was not a

decision (and the GSA ethics officer was not acting as a "decisionmaking body") for purposes of

the materiality analysis. See id. ("An ethics official who provides an advisory opinion is not a

'decisionmaking body' and does not provide an 'official decision.'"). The ethics opinion

therefore was "immaterial as a matter of law." Id. Fourth and finally, because the "substance of

the [GSA ethics officer's] advice was immaterial, then [so too were] the defendant's statements

[to the GSA ethics officer], even if they influenced the [GSA ethics officer's] advice." Id. In

---

[3] The only substantive difference between this instruction and the one requested by the defendant is that instead of the words "had the effect of influencing . . . or was capable of [influencing]," the defendant requested the language: "To be material, a statement must have a natural tendency to influence, or be capable of influencing . . . ." See Proposed Joint Jury Instructions Pursuant to Court Order Dated November 18, 2008, Dkt. No. 209 at 64.

other words, in the defendant's view, because he "was requesting an ethics opinion that was immaterial, the false statement charged in Count Two was not material." Id. at 4. The Court disagrees with the defendant's reasoning.

The defendant's argument seems to hinge on the notion that the GSA ethics officer's opinion is immaterial because it was "purely advisory" and hence not a "decision." Mot. at 2-3. That notion is flawed. It is true that the GSA ethics officer's role can be distinguished from the roles of other, more traditional "decisionmaking bodies" because the GSA ethics officer issues advisory opinions rather than binding decisions. The defendant, however, has cited no authority for the proposition that this distinction automatically renders misrepresentations made to an ethics officer immaterial for purposes of Section 1001, and the Court is not persuaded by that argument.

In any event, the jury was instructed that a statement, representation or fact is "material" not only if it "had the effect of influencing the particular *decision*" of the ethics officer, but also if it "had the effect of influencing . . . *actions or activities of an agency* . . . or was capable of, or had the potential to do so." Transcript of Trial at 76 (Dec. 16, 2008 -- morning session) (emphases added). (Notably, the defendant did not object to this instruction.) In the Court's view, there is no doubt that a reasonable jury could have concluded that the defendant's statements to the GSA ethics officer either influenced or had the potential to influence her official actions or activities -- that is, the preparation and issuance of the ethics opinion. See United States v. Barrett, 111 F.3d 947, 953 (D.C. Cir. 1997) (quoting United States v. Hansen, 772 F.2d 940, 949 (D.C. Cir. 1985)) ("Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects."). As the government points out, had Mr. Safavian told the ethics officer that (in the government's

words) Mr. Abramoff was "a lobbyist [who was] trying to get two major pieces of property under GSA's control" and that Mr. Safavian was trying to help Mr. Abramoff obtain those properties by overruling subordinates, providing Mr. Abramoff with non-public information, setting up meetings with key decision-makers at GSA, and not letting anybody know of these facts and of the relationship between Mr. Abramoff and Mr. Safavian, those statements likely would have influenced the ethics officer (and the way in which she wrote her ethics opinion) in at least two ways. See Transcript of Motions Hearing at 18-19 (Apr. 20, 2009). First, these statements likely would have changed Ms. Ellison's opinion as to whether Mr. Abramoff was a "prohibited source" under the applicable regulations and thus whether Mr. Safavian could go on the Scotland trip with Mr. Abramoff at all, or whether Mr. Safavian could accept the trip (or a portion of it) as a gift. Second, these statements likely would have affected how Ms. Ellison advised Mr. Safavian with respect to his obligations under the financial disclosure rules.

In short, even assuming that the ethics opinion did not constitute an official "decision" because of its advisory nature, the preparation and issuance of the opinion surely constituted official "actions" or "activities." It was prepared and issued in the course of the GSA ethics officer's official duties, and a reasonable jury could have found that the defendant's statements significantly influenced the action and activity of preparing and issuing the ethics opinion. Thus, the Court cannot conclude that a reasonable jury necessarily must have had a reasonable doubt as to whether the defendant's statements to the GSA ethics officer were "material" under these circumstances. See United States v. Kayode, 254 F.3d at 212-13; United States v. Weisz, 718 F.2d at 437.

11

*B. Count Five*

With respect to Count Five, the defendant argues that the false statement he made to FBI Agent Jeffrey Reising -- that at the time of the Scotland trip the defendant "would not have been able to help Abramoff with GSA-related activities if he wanted to since defendant Safavian was new at GSA," Superseding Indictment ¶ 53(C) -- could not have influenced Agent Reising because Agent Reising already knew, from reading certain e-mails and other background material, that the statement was inaccurate at the time Mr. Safavian uttered it. Thus, reasons the defendant, because his statement did not influence and could not have influenced Agent Reising's view with respect to whether Mr. Safavian could have "help[ed] Abramoff with GSA-related activities" -- or whether Mr. Safavian was being truthful on this score -- his statement therefore was immaterial as a matter of law. See Mot. at 5-6.

This argument fails for two reasons. First, it incorrectly narrows the scope of the materiality inquiry. The defendant assumes that his statement to Agent Reising could be material *only* if it persuaded (or had the potential to persuade) Agent Reising that Mr. Safavian was not able to help Mr. Abramoff, or that Mr. Safavian was lying with respect to his ability to help Mr. Abramoff. See Mot. at 5. But nothing about the materiality standard requires that the defendant's statements must have influenced or had the potential to influence those specific decisions. Thus, even if Mr. Safavian's statement to Agent Reising did not influence and could not have influenced Agent Reising's views as to whether Mr. Safavian was able to help Mr. Abramoff (because Agent Reising already knew that Mr. Safavian could have been of assistance) or whether Mr. Safavian was speaking truthfully about his ability to help Mr. Abramoff (for the same reason), a reasonable jury could still find that Mr. Safavian's statement influenced or could have influenced *other* decisions, actions or activities by Agent Reising. For example, the jury

12

could have found that Mr. Safavian's statement to Agent Reising was material because it raised

suspicions in Agent Reising's mind as to whether Mr. Safavian was lying about other matters as

well, and thereby actually or potentially influenced Agent Reising's decisions as to the

seriousness and scope of the defendant's wrongdoing, how to pursue the investigation, how to

order his investigative priorities, and whether to recommend prosecution on certain charges.  A

reasonable jury therefore could have concluded that Mr. Safavian's statement was material.

Second, even assuming that only Agent Reising's decisions about whether Mr.

Safavian was able to help Mr. Abramoff and whether Mr. Safavian was speaking truthfully to

Agent Reising about his ability to help Mr. Abramoff matter in this context, and further

assuming that Agent Reising's views on those matters were not influenced by Mr. Safavian's

statement, a reasonable jury still could find the defendant's statement to be material.  The

defendant argues categorically that a statement is material only if it is made "to a listener who

was actually deceived, or could have been deceived, because he did not know facts contradicting

the statement."  Mot. at 6.  This argument reads much too much into a single bracketed word in a

single sentence from a single court of appeals decision.  See In re Sealed Case, 162 F.3d 670,

673 (D.C. Cir. 1998); see also Mot. at 6.  To satisfy the materiality element, "[i]t is not necessary

that the statement, representation or fact actually have [influenced] the agency . . . , *so long as it*

*had the potential or capability to do so.*"  Transcript of Trial at 76 (Dec. 16, 2008 -- morning

session) (emphasis added).  Here, Mr. Safavian's statement clearly had the "potential or

capability" to influence an FBI agent's decisions about whether Mr. Safavian was able to help

Mr. Abramoff and whether Mr. Safavian was speaking truthfully about his ability to help Mr.

Abramoff.  Indeed, the only reason suggested by Mr. Safavian as to why this statement did not

have that effect is that Agent Reising prepared for his interview with Mr. Safavian by first

reviewing the evidence at his disposal. Under the defendant's theory, Agent Reising's pre-interview preparation precluded Mr. Safavian's statements from being considered material. If, on the other hand, Agent Reising had not prepared for the interview, the defendant argues, the statement Mr. Safavian made to the agent may have been material because it could have influenced or potentially influenced Agent Reising's decisions, actions or activities. See Mot. at 6. In this Court's view, materiality and thus criminality cannot turn on such an arbitrary distinction. As Judge Posner appropriately noted in a different context, this type of "no harm-no foul" argument "usually fare[s] badly in criminal cases." United States v. Black, 530 F.3d 596, 600 (7th Cir. 2008), cert. granted, 129 S. Ct. 2379 (2009).

## IV.  VINDICTIVE PROSECUTION

The defendant next argues that by adding new charges in the superseding indictment arising from the same operative facts already known to the government at the time of the original indictment -- namely, false statements made by Mr. Safavian in his financial disclosure form (Count Three) and false statements made to the FBI (Count Five) -- the government acted vindictively or is at least subject to a presumption of vindictive prosecution which the government must affirmatively overcome. See United States v. Gary, 291 F.3d 30, 34 (D.C. Cir. 2002); Maddox v. Elzie, 238 F.3d 437, 446 (D.C. Cir. 2001).[4]  A presumption of vindictiveness may arise where the objective evidence suggests that the prosecutor's charging decision "was motivated by a desire to punish [the defendant] for doing something that the law

---

[4]      The defendant relies primarily on the presumption of vindictiveness because actual vindictiveness is "exceedingly difficult" to prove. Maddox v. Elzie, 238 F.3d at 446 (proving actual vindictiveness requires objective evidence that the prosecutor's actions were "designed to punish a defendant for asserting his legal rights").

plainly allowed him to do." United States v. Goodwin, 457 U.S. 368, 384 (1982); see also

United States v. Falcon, 347 F.3d 1000, 1004 (7th Cir. 2003) (vindictive prosecution claim arises

"when the government pursues prosecution in retaliation for the exercise of a protected statutory

or constitutional right"); Maddox v. Elzie, 238 F.3d at 446 (same). And "a change in the

charging decision made *after* an initial trial is completed is much more likely to be improperly

motivated than is a pretrial decision." United States v. Goodwin, 457 U.S. at 381 (emphasis

added). Mr. Safavian maintains that the addition of the new charges in Counts Three and Five

following the successful exercise of his right of appeal and after unsuccessful plea negotiations

raises a presumption of vindictiveness. See Defendant's Reply Memorandum in Support of

Motion to Dismiss the Superseding Indictment ("Reply in Support of Mot. to Dismiss"), Dkt.

No. 193 at   4-5.

        To invoke the presumption of vindictiveness in this context, the Court must find

that "a reasonable likelihood of vindictiveness exists -- that is, that the second indictment was

'more likely than not attributable to vindictiveness on the part of' the Government." United

States v. Gary, 291 F. 3d at 34 (quoting Alabama v. Smith, 490 U.S. 794, 801 (1989)). "The

mere possibility that the second indictment was vindictively motivated does not suffice -- [the

defendant] must show that there is a 'realistic likelihood' of vindictive motivation." Id. (quoting

United States v. Goodwin, 457 U.S. at 384). When a court finds a sufficient basis to invoke a

presumption of vindictiveness, the prosecution may "overcome the presumption with objective

information in the record justifying the increased . . . charges." United States v. Gary, 291 F.3d

at 34 (quoting Maddox v. Elzie, 238 F.3d at 446); see also United States v. Goodwin, 457 U.S. at

374. Once the presumption is raised, the burden shifts to the government to rebut the

presumption of vindictiveness by showing legitimate "objective reasons" for the new charges.

See United States v. Thomas, 410 F.3d 1235, 1247 (10th Cir. 2005); United States v. Suarez, 263

F.3d 468, 479-80 (6th Cir. 2001); United States v. King, 126 F.3d 394, 399 (2d Cir. 1997);

United States v. Tobin, 598 F. Supp. 2d 125, 128 (D. Me. 2009); United States v. Frankel, 739 F.

Supp. 629, 631 (D.D.C. 1990).

   In denying the defense motion to dismiss before trial, the Court assumed but did

not decide that there was a presumption of vindictiveness. See Transcript of Motions Hearing at

11 (Nov. 26, 2008). The Court now concludes that the defendant has said enough for the Court

to invoke the presumption, thus shifting the burden to the government to rebut the presumption

of vindictiveness by proffering legitimate objective reasons for adding the new charges to the

superseding indictment. In this case, the government points to the following justifications for

the two new charges: First, since the original indictment, the government received additional

evidence from the United Kingdom regarding the actual costs of the August 2002 trip, which

then made it possible to prove the new charge contained in Count Three. Second, the addition of

Count Five was a strategic response to the court of appeals' earlier decision that the defendant

must be permitted to present testimony from an expert witness regarding the technical meaning

of "doing business." The government argues that introducing the statements made to the FBI

agent (the subject of Count Five) would undermine the defense that Mr. Safavian relied on the

technical meaning of doing business in his earlier statements because Mr. Safavian did not raise

the issue of the technical definition in his interview with the FBI agent. Count Five was added,

in part, to attempt to ensure that these alleged statements would not be excluded as related to

uncharged conduct. See Opposition to Defendant's Motion to Dismiss ("Opp. to Mot. to

Dismiss"), Dkt. No. 187 at 15-16.

## A. Count Three

As noted above, the government argues that the addition of Count Three is not evidence of vindictive prosecution because it is based on substantial new and additional evidence that the government did not have at the time of the first trial and only obtained after that trial and before the return of the superseding indictment. See Opp. to Mot. to Dismiss at 15, 17. The relevant case law makes clear that a presumption of vindictiveness can be overcome when the evidence supporting the new charges in a superseding indictment was demonstrably unavailable to the government at the time of the first trial. See, e.g., United States v. Suarez, 263 F.3d at 480 ("If the prosecution can show that the additional charges were not brought earlier because they were based on new evidence, it will successfully rebut a showing of vindictiveness."); see also United States v. Campbell, 410 F.3d 456, 462 (8th Cir. 2005) ("There can be no prosecutorial vindictiveness if the prosecutor revised the charge because of newly discovered evidence or some objective reason other than to punish the defendant for exercising his legal rights."). The defense does not dispute this principle of law but simply does not believe the government's representations as to what evidence was and was not available at the time of the original trial. See Reply in Support of Mot. to Dismiss at 10-11.

The government represents that the testimony of Laura van Zyl, a Scottish travel agent who participated in arranging the 2002 golf trip, only became available to it after the first trial. Ms. van Zyl described the Scottish leg of the trip and provided the jury with a detailed analysis of the costs of the trip. This evidence was relevant to a number of the charges in the indictment but particularly supported the new Count Three. The government represented that Ms. van Zyl was not available to it until after the first trial because her testimony and the interview itself were secured through the Mutual Legal Assistance Treaty ("MLAT") between

17

the United States and the United Kingdom, see Transcript of Motions Hearing at 23-24 (Apr. 20, 2009), and that the MLAT process had not been completed at the time of the first trial. See Opp. to Mot. to Dismiss at 15, 17-20.[5] The government also represented that at least some of the invoices, proofs of payment and other records to which Ms. van Zyl referred during her trial testimony were produced pursuant to the MLAT process. See id.; see also Government's Opposition to Defendant's Motion for a Judgment of Acquittal and for a New Trial ("Opp. to Mot."), Dkt. No. 241 at 13. The Court has no reason to disbelieve government counsel's representations, and "[i]n light of the prosecution's reasonable explanation, [the defendant's] claim of vindictiveness fails." United States v. O'Hara, 301 F.3d 563, 571 (7th Cir. 2002).

Another new piece of evidence on which the government relied in support of Count Three (as well as other counts) was the testimony of Will Heaton, who at the time of the first trial had not yet pled guilty to the charges pending against him and had asserted -- or had advised the government of his intent to assert -- his Fifth Amendment privilege. See Transcript of Motions Hearing at 24, 40 (Apr. 20, 2009). He thus was unavailable at the time of the first trial but was available at the second. Mr. Heaton's testimony was important to support the false statement charge in Count Three as it related to the cost of the trip to Scotland. Furthermore, as the Court noted at oral argument on this motion, Mr. Heaton was a much more credible witness than the other congressional staffer, Neil Volz, who was available and did testify at both the first and second trials. See id. at 34-35. Thus, Mr. Heaton's availability for the second trial after he

---

[5]      The length of time that frequently is required to acquire evidence by way of an MLAT request is reflected in 18 U.S.C. § 3292, which provides for the suspension of the statute of limitations for the United States to return an indictment for a particular offense for up to three years when the government makes a showing that evidence of the offense is likely in a foreign country and that an MLAT request has been made.

had entered his own guilty plea was an additional objective reason for the addition of Count

Three.  In sum, the government has demonstrated to the Court's satisfaction that much of the

evidence in support of Count Three was not available to it at the time of the first trial.  See supra

at 17-19.[6]

### B.  Count Five

The government's argument as to why it has overcome the presumption of

vindictiveness with respect to Count Five is different.  That count charged Mr. Safavian with

making a series of false statements to the FBI.  The government seeks to justify the addition of

this new charge not on the basis of the acquisition of new evidence after the first trial but on a

change in trial strategy that it says was required by the opinion of the court of appeals.

Specifically, the government argues that once the court of appeals held that Mr. Safavian's

procurement expert must be permitted to testify about the technical definition of the phrase

"doing business" with GSA, it was appropriate to add the charge relating to false statements to

the FBI because this charge and the evidence relating to it would undermine the expected

testimony of the expert witness and thus Mr. Safavian's key defense to a number of the charges

against him.  See Opp. to Mot. at 14-15.  As Agent Reising testified, when Mr. Safavian talked

---

[6]     The cases primarily relied upon by the defendant with respect to Count Three therefore
are unavailing.  See United States v. Tobin, 598 F. Supp. 2d at 129 (noting that "the government
has not identified any newly discovered evidence that might justify its charging decisions . . . . It
possesses the same evidence today as four years ago, and could have readily brought the false
statements charges before the initial indictment . . ."); United States v. Williams, 7 F. Supp. 40,
47 (D.D.C. 1998) (the prosecution "knew, and admits that it knew, every fact necessary to every
charge that has been brought against defendant Williams before the original indictment was
filed, and indeed, the [prosecutor] formed the intent before proceeding to trial on the false
statements charges alone that he would later charge Williams with all of the charges he now
faces").

to the FBI in May of 2005, Mr. Safavian did not mention the technical definition he relied upon during his testimony at the first trial. Nor did he state that he had this definition in mind when talking to the GSA ethics officer, the OIG, and representatives of the Senate Committee. It was Mr. Safavian's 2006 trial testimony and the technical definition of "doing business" it supported that persuaded the court of appeals of Mr. Safavian's entitlement to an expert witness with respect to that technical definition. In the government's view, the court of appeals' decision, which could not have been fully anticipated, made its change of strategy reasonable.

The defendant argues that this strategic decision by the government to add the additional false statement charge contained in Count Five cannot overcome the presumption of vindictiveness when all of the evidence relevant to that new charge was known to the government at the time of the original indictment and the first trial: "[T]he government's subjective assessment of sound trial strategy is wholly inadequate to rebut the presumption of vindictiveness which can only be 'overcome by objective evidence justifying the prosecutor's action.' . . . To allow the government to rely upon its own subjective judgment would do little to dispel a defendant's legitimate fear of vindictiveness, for virtually any prosecutorial decision could be justified in terms of 'trial strategy.'" Reply in Support of Mot. to Dismiss at 11 (quoting United States v. Goodwin, 457 U.S. at 376 n.8).

The Court agrees that the government cannot always overcome a presumption of vindictiveness simply by claiming to have developed a preferable trial strategy after a mistrial or reversal. Nevertheless, the presumption of vindictiveness may be overcome if the court is persuaded that the government has embraced a new strategy not devised or intended to punish the defendant for being successful on appeal or for exercising some legally protected right, but to overcome evidentiary or other procedural problems that have become apparent as a result of an

appellate decision in the case, or of rulings by the trial court itself, or even through conversations with the jury after a mistrial. See United States v. Thomas, 410 F.3d at 1247 (presumption of vindictiveness overcome where mistrial declared for neutral reason and not because defendant exercised constitutional right, and jury then suggested in discussions with counsel that uncharged conduct was more egregious than conduct originally charged); United States v. Poole, 407 F.3d 767, 776-77 (6th Cir. 2005) (not vindictive to re-indict and add new charge after mistrial in order to ensure introduction of evidence ruled inadmissible at first trial); United States. v. Davis, 108 Fed. Appx. 131, 135-36 (5th Cir. 2004) ("plausible explanation" for the superseding indictment that adding conspiracy charge would overcome issue of admissibility as to certain testimony, allowing the government "greater flexibility in introducing witness testimony"); United States v. Hill, 93 Fed. Appx. 540, 546 (4th Cir. 2004) (permissible for government to charge overt acts of conspiracy as separate counts in superseding indictment in order to overcome evidentiary rulings in first trial that contributed to mistrial; this was a "wholly neutral, and rational, reason for the additional charges [which] defeats the presumption of vindictiveness").

This is not a case in which the government has failed to identify "any relevant change in circumstances or any other rational reason for charging" Mr. Safavian as it did in the superseding indictment. United States v. Wood, 36 F.3d 945, 947 (10th Cir. 1994); see also United States v. Tobin, 598 F. Supp. 2d at 131. Rather, as in the cases cited in the previous paragraph, the government has justified its change of trial strategy (that is, adding Count Five to the superseding indictment) by setting forth neutral, rational reasons related to evidentiary and other procedural problems that became apparent only after the first trial and the decision of the court of appeals. In short, the asserted objective basis for the addition of Count Five was that the testimony needed to support it would also undermine the prospective testimony of Mr.

21

Safavian's expert witnesses.  Objective evidence in the record renders that asserted basis plausible.  Expecting that the jury at the second trial would hear expert testimony on the technical meaning of "doing business" because of the court of appeals' decision, it was a perfectly rational (and neutral) decision for the government to add the charge of false statements to the FBI in order to ensure that this Court would permit testimony from Agent Reising that during an interview of the defendant in May of 2005 Mr. Safavian did not mention the technical definition of "doing business."  The government persuasively argues that its strategic decision to add Count Five was not intended to increase the potential punishment that Mr. Safavian might face but to counter a defense -- now to be supported by the expert testimony required by the court of appeals -- that was relevant to at least four counts of the superseding indictment: Counts One, Two, Four and Five.  While in some cases it may be difficult to distinguish between a subjective reason for a change in strategy and an objective one, in this case "the government has adequately rebutted any presumption of vindictiveness by showing that its decision to re-indict was not motivated by a vindictive desire to punish the defendant for exercising his right[s]," but rather by a reasonable reevaluation of trial strategy in light of the court of appeals' decision. United States v. Poole, 407 F.3d at 777.

The defendant further argues that the government's argument on this point must fail because the jury only convicted Mr. Safavian on Specification (C) of Count Five, charging that Mr. Safavian falsely stated to the FBI agent that he "would not have been able to help Abramoff with GSA-related activities if he wanted to since [he] was new at GSA."  Superseding Indictment ¶ 53(C).  As the defendant correctly notes, this particular specification has nothing to do with the expert's anticipated testimony and therefore its addition is not independently justified by the prosecution's change in trial strategy.  See Mot. at 8-9.  The defendant argues

22

that the rationale articulated by the government -- and now accepted by the Court -- justified *at most* the addition of Specifications (A) and (B), specifications as to which the jury made no findings.[7]  The defendant further argues that a finding that the government had objective reasons for adding Specifications (A) and (B) does not give the government *carte blanche* to add any other specifications it chooses, while still overcoming the presumption of vindictiveness. Because Specification (C) is unrelated to the government's objective reason for adding Specifications (A) and (B), defendant's argument goes, its addition does not overcome the presumption of vindictiveness and a judgment of acquittal therefore is required on Count Five.

While the Court agrees with the defendant that a finding that the government has overcome the presumption of vindictiveness with regard to certain additional charges does not permit the addition of wholly unrelated charges, such a concern does not apply here. The conduct alleged in Specification (C) is directly related to the conduct alleged in Specifications (A) and (B) -- all concern allegedly false statements made by Mr. Safavian to an individual FBI agent in the course of a single interview. They are so closely related that it would border on the illogical for the government to charge the conduct in Specifications (A) and (B) as false statements and not include additional palpably material false statements made to the same FBI agent at the same time. Once the government made the legitimate decision to add a charge that the defendant made false statements in his interview with Agent Reising, it was reasonable to

_____

[7]     The Court granted the defendant's motion for judgment of acquittal on Specification (A) prior to submitting the case to the jury; thus the jury never considered it.  See Transcript of Trial at 82 (Dec. 15, 2008 -- afternoon session).  The jury verdict form makes plain that the jury only found guilt beyond a reasonable doubt on Specification (C) of the superseding indictment, see note 2, supra, and not on Specifications (B) or (D).

include as a part of that count all of the statements made during that interview that the government had reason to believe were false.

Ultimately, of course, the jury only convicted the defendant on Specification (C). At the time that the government requested the grand jury to add Count Five, however, the government could not have predicted how the trial would proceed; it did not even learn that the defense would not call the expert witness relating to the technical definition of "doing business" until the beginning of the defense case. And certainly the government could not have known at the time of the indictment on which specifications the jury would find proof beyond a reasonable doubt. The government made the judgment that this new charge would help prove that Mr. Safavian did not intend the technical definition of "doing business" when he asked for the ethics opinion, spoke with the OIG, communicated with the Senate Committee, or was interviewed by the FBI. The government therefore believed the new Count Five would undermine the centerpiece of the defense as to the old counts -- Counts One, Two and Four -- as well as to Count Five itself. In determining whether the government acted vindictively, the Court must consider the facts and circumstances that existed when the superseding indictment was returned. Having done so, it finds that the government has overcome the presumption of vindictiveness.

## V.  COST OF THE CHARTER FLIGHT

The defendant argues that he is entitled to a new trial under Rule 33 of the Federal Rules of Criminal Procedure on Counts One and Three because evidence regarding the cost of the charter flight was erroneously admitted, was crucial to both counts, and was extremely prejudicial -- indeed, he maintains that it was "devastating to the defense." Mot. at 9.  Count One alleged that Mr. Safavian obstructed justice, in part by falsely telling the GSA Office of the

Inspector General that he had paid the full cost of the Scotland trip by writing a check to Mr. Abramoff for $3,100.  Count Three charged that Mr. Safavian made a false statement by failing to disclose the trip as a gift on his financial disclosure form.  The defense argues that evidence of the cost of the charter flight, $90,000, necessarily affected the jury's decisions with respect to both counts in an impermissible way.  Specifically, the defense claims that the admission of this evidence allowed the jury to speculate -- without any basis in the evidence and with no guidance from any statute, regulation or policy as to how to value airfare -- in determining Mr. Safavian's guilt on Counts One and Three.

### A. The *Yates* Argument

Before directly addressing this argument, which applies to both Count One and Count Three, the Court must first consider defendant's predicate argument that the jury's verdict on Count One is infirm in light of the admission of the charter flight evidence because of the Supreme Court's decision in Yates v. United States, 354 U.S. 298 (1957).  Count One alleged that Mr. Safavian obstructed the Office of Inspector General Investigation by falsely stating to the investigator (1) that "Abramoff had no business with GSA" at the time of the August 2002 trip; and (2) that he had "paid Abramoff for the total cost of his share of the August 2002 trip, including airfare, hotels and golf green fees."  Superseding Indictment ¶ 25.  The jury returned a general verdict of guilty on this count.  The defendant argues that this general verdict may have rested on a "legally infirm" basis because one cannot know whether the jury based its general verdict on the first alleged false statement or the second; and if the jury found Mr. Safavian guilty based on the second, such a finding necessarily resulted from the impermissible admission

of the charter flight evidence. <u>See</u> Mot. at 12-13.[8] Relying on <u>Yates</u>, the defendant argues that "when the jury is given two possible grounds for conviction, but one of those grounds is legally invalid, 'and it is impossible to tell which ground the jury selected,' then 'the proper rule to be applied is that which requires a verdict to be set aside.' . . . <u>Yates</u> requires vacatur of convictions that 'may have relied' on invalid theories of guilt." <u>See id.</u> at 12 (quoting <u>Yates v. United States</u>, 354 U.S. at 312); <u>see also</u> Defendant's Reply Memorandum in Support of Motion for Judgment of Acquittal and for a New Trial, Dkt. No. 242 at 12-13.

The government replies that Mr. Safavian's reliance on <u>Yates</u> is misplaced because <u>Yates</u> addressed a situation in which there was a "fatal error in the prosecution's theory as *a matter of law*, not [as here] a claim that certain evidence was irrelevant or unduly prejudicial." <u>See</u> Opp. to Mot. at 20. The government is correct that the defendant misreads or overreads <u>Yates</u>. As the Supreme Court pointed out in <u>Griffin v. United States</u>, 502 U.S. 46 (1991), a host of Supreme Court decisions both before and after <u>Yates</u> recognized that sometimes general verdict convictions must be set aside but only when they rest "on an unconstitutional ground." <u>Id.</u> at 55 (citing <u>Stromberg v. California</u>, 283 U.S. 359 (1931)). According to the Supreme Court, <u>Yates</u> "was the first and only case of ours to apply <u>Stromberg</u> to a general verdict in which one of the possible bases of conviction did not violate any provision of the Constitution" but was legally inadequate for other reasons. <u>Id.</u> at 55. Describing <u>Yates</u> as "an unexplained extension" of prior (and subsequent) law, the Supreme Court in <u>Griffin</u> declined to extend <u>Yates</u> even further. <u>Id.</u> at 55-56. As the Court said, there simply is no support in the case law for setting aside a general verdict "because one of the possible bases of conviction was

_____

[8]     The Court notes that defense counsel actually requested that the general verdict form be used. <u>See</u> Transcript of Trial at 34-39 (Dec. 16, 2008 -- morning session).

neither unconstitutional as in <u>Stromberg</u>, nor even illegal as in <u>Yates</u>, but merely unsupported by sufficient evidence." <u>Id.</u> at 56.

If <u>Yates</u> does not provide support for the proposition that a general verdict should be set aside merely because of insufficient evidence supporting one of two alternative theories, surely it is not a basis for setting aside a general verdict that arguably is "tainted" by prejudicial or irrelevant evidence that should not have been admitted as to one of two alternative theories when, as here, there was an alternative basis on which the jury fairly could have found guilt. As the Supreme Court said in <u>Griffin</u>, "legal error," as that term was used in <u>Yates</u>, "means a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence." <u>Griffin v. United States</u>, 502 U.S. at 59; <u>see also</u> <u>United States v. Black</u>, 530 F.3d at 602 (when two correct theories are presented in the instructions and there is sufficient evidence to convict on one, "the jury is assumed to have followed the instruction on the government's burden of proof and therefore to have rejected the insufficiently supported theory"). In short, the defendant's <u>Yates</u> argument must fail.

### B. Admission of the Charter Flight Cost

The defendant argues that he is entitled to a new trial on both Counts One and Three because the jury's verdict necessarily was based on evidence that the charter flight cost $90,000, which evidence, according to the defendant, was improperly admitted, was prejudicial, and required the jury to speculate as to how to value Mr. Safavian's airfare to Scotland. According to the defendant, the jury was left to speculate because the government never offered any legal authority with respect to how a GSA employee such as Mr. Safavian should have valued the airfare portion of the putative gift from Mr. Abramoff to Mr. Safavian. This error

requires a new trial, argues the defendant, because the government invited the jury to use Mr.

Safavian's pro rata share of the $90,000 cost of the private charter in calculating the cost of the

trip, while pointing to no legal rule, statute, regulation or policy in support of this interpretation.

In addition, the defendant points out, none of the government's witnesses could cite any rule,

regulation or policy supporting this basis on which to value the cost of a gift of airfare.  See Mot.

at 10 & n.1.[9]  On the record before it, the defendant argues, no jury could reasonably find that the

defendant was obligated to value the air transportation by using a pro rata share of the charter

flight.  Rather, the jury was left to speculate on how to "incorporate that potentially devastating

evidence into its deliberations."  See Mot. at 11; see also Defendant's Motion for a Judgment of

Acquittal, Dkt. No. 230 at 5-6.  The government has three answers to this argument.

First, the government responds that there was in fact evidence at trial to support

the pro rata share theory of valuation.  The ethics training or briefing materials with which Mr.

Safavian was familiar were admitted in evidence without objection as Government Exhibit 111.

---

[9]      Stephen Perry, the Administrator of GSA, testified that he had no specific understanding
of GSA's practice for valuing a seat on a chartered flight.  See Transcript of Trial at 14 (Dec. 9,
2008 -- afternoon session).  Raymond McKenna, the General Counsel of GSA, stated that he was
unaware of any GSA regulation, statute or law governing the valuation of charter flights or of a
gift of air transportation.  See Transcript of Trial at 45, 51 (Dec. 12, 2008 -- afternoon session).
The ethics officer, Eugenia Ellison, testified that she had never had to deal with that question and
that, should it arise, she would have to ask the Office of Government Ethics for an opinion.  See
Transcript of Trial at 53 (Dec. 10, 2008 -- afternoon session).  She said there is no single GSA
regulation, guidance or policy that provides the answer.  See id.  Danny Ross, a Senior Assistant
General Counsel at GSA, testified that there was no GSA policy or regulation that addressed
how to value travel aboard a charter flight or to determine the "fair market value" of such a gift.
See Transcript of Trial at 126-27 (Dec. 12, 2008 -- afternoon session).  He testified that there
were three alternative methods for valuing the fair market value of a gift of air travel on a charter
flight -- namely, first class commercial airfare for the same route, one's pro-rata share of the cost
of the charter, or, if the destination were not well served by commercial flights, the cost of the
charter itself.  See id. at 127.  He said that if confronted with the question he would seek advice
from the Justice Department or the Office of Government Ethics to clarify which of the three
alternative methods would be sufficient for valuing the cost.  See id. at 128.

See Transcript of Trial at 21-22 (Dec. 10, 2008 -- afternoon session).  These materials --
including particularly 5 C.F.R. § 2635.203(c) -- the government maintains, do support the
valuation of airfare at market value and the view that market value means pro rata share.  The
government argues that under the regulations "market value means the retail cost," 5 C.F.R.
§ 2635.203(c), of the flight and that a *"reasonable interpretation"* of the market value of Mr.
Safavian's airfare is a pro rata share of the actual cost of the charter flight.  See Notice of
Evidence, Dkt. No. 210 at 3 (emphasis added); see also Opp. to Mot at 16.  It relies on the
definition of "market value" in the regulation, of which it says Mr. Safavian was well aware, and
on Example 2 following that definition for its view that the "market value" or "fair market
value" of Mr. Safavian's airfare to Scotland should be his pro rata share of the "retail cost" that
he "would incur to purchase the gift."  5 C.F.R. § 2635.203(c).[10]

     Furthermore, the government says, the trial testimony of Eugenia Ellison, the
GSA ethics officer, supports this theory.  Ms. Ellison testified that when David Safavian joined
GSA in 2002 he attended the ethics training class that is given to all new employees at GSA.
See Transcript of Trial at 18-20 (Dec. 10, 2008 -- afternoon session).  She further testified that a
year or so later, in 2003, Mr. Safavian attended another ethics training course required annually
of all employees.  See id. at 20-21.  Ms. Ellison then identified the training materials that were

---

[10]    Example 2 reads as follows:

> Example 2: A prohibited source has offered an employee a ticket
> to a charitable event consisting of a cocktail reception to be
> followed by an evening of chamber music.  Even though the food,
> refreshments, and entertainment provided at the event may be
> worth only $20, the market value of the ticket is its $250 face
> value.

5 C.F.R. § 2635.203(c).

provided to Mr. Safavian (and presumably to others) at the June 2002 new employee ethics training program.  See Government Exhibit 111.  She also identified the ethics training attendance sheets from June 2002 and September 2003 (Government Exhibits 105 and 106) confirming Mr. Safavian's attendance at both trainings.  See Transcript of Trial at 18-22 (Dec. 10, 2008 -- afternoon session).  During the course of her testimony, Ms. Ellison was directed to the portion of the training materials containing 5 C.F.R. § 2635.203, the regulation concerning gifts from outside sources.  See id. at 25.  Ms. Ellison then read from the portion of the regulation that defines the term "market value," as follows:

> Market value means the retail cost the employee would incur to purchase the gift.  An employee who cannot ascertain the market value of a gift may estimate its market value by reference to the retail cost of similar items of like quality.  The market value of a gift of a ticket entitling the holder to food, refreshments, entertainment, or any other benefit shall be the face value of the ticket.

See id. at 31; see also 5 C.F.R. §2635.203(c).

On the basis of the foregoing, the Court concludes that there was *some evidence* provided to the jury in the form of the ethics training materials and Ms. Ellison's testimony to support the government's pro rata share theory.  Thus -- contrary to the defendant's argument -- the jury was not left to speculate impermissibly because there was an evidentiary foundation for the pro rata share theory.  The jury could consider this evidence along with all of the other evidence (and any legitimate inferences therefrom) in determining Mr. Safavian's guilt or innocence.

Second, in view of all of the evidence that the jury heard on cost and valuation from the various witnesses -- inconsistent though it may have been -- the defendant cannot succeed in his argument that the jury *necessarily* relied upon the evidence concerning Mr.

Safavian's pro rata share of the $90,000 cost of the charter flight in reaching its verdicts on

Count One and Count Three.  Nor did the government ask the jury to do so.  Indeed, in its

closing argument, the government offered the jury several alternative theories of valuation based

on the evidence before it.  See Transcript of Trial at 111-12 (Dec. 16, 2008 -- morning session).

The prosecutor certainly mentioned that the defendant's pro rata share of the $90,000 charter

flight was approximately $11,000, and asked the jury to infer that the term "market value" in the

regulations meant "actual cost."  Id. at 111.  But the prosecutor also suggested, in the alternative,

that the jury could look at the cost of a commercial flight "first class ticket," id. at 111, or that it

could use for comparison purposes the $1,000 that the witness, Will Heaton, testified he paid for

a round-trip coach ticket to Scotland on a prior occasion.  See id. at 112.  Thus, the government

acknowledged that there were alternative ways to value the cost of the airfare to Scotland.

Mr. Safavian's lawyer responded in kind.  See Transcript of Trial at 143-47

(December 16, 2008 -- morning session).  During his closing argument, defense counsel noted

that "during the course of this trial we heard all manner of testimony of how you are supposed to

value -- how you are supposed to decide the fair market value of a charter."  Id. at 143.  He

reminded the jury that Administrator Perry had mentioned the use of a commercial equivalent,

that Mr. McKenna and Ms. Ellison did not know of any particular rule, and that Mr. Ross had

mentioned three possible separate rules.  See id. at 143.  Counsel argued: "We've heard all

kinds of numbers, all kinds of rules from Perry and Ellison and others.  Nobody knows."  Id. at

144.  Finally, as a part of the defense theory of the case instruction, the Court instructed the jury

as follows:

As to the airfare component of the trip, the defense
contends that the evidence demonstrates that there is no
established method at GSA for valuing travel on a chartered flight.
The defense also contends that there is no evidence that Mr.
Safavian knew of any policy for valuing the cost of airfare in this
case.

Id. at 83.  In sum, the jury had a sufficient basis to find the defendant guilty on Count One and

Count Three without necessarily relying on the theory that market value meant the pro rata share

of the charter flight, and the jury was well aware of defendant's challenges to that method.

Third, there was sufficient evidence for the jury to disregard any and all evidence

relating to the value of the airfare and still convict the defendant on Count One and Count Three.

The undisputed testimony at trial was that Mr. Safavian wrote a check to Mr. Abramoff for

$3,100 for his share of the trip.  Count One of the superseding indictment charged that when Mr.

Safavian stated that he had "paid Abramoff for the total cost of his share of the August 2002

Trip, *including, airfare*, hotels and golf green fees," Mr. Safavian knew the true cost of his share

was greater than $3,100.  Superseding Indictment ¶ 25 (emphasis added).  Count Three of the

superseding indictment charged the defendant with failing to report his trip to Scotland as a gift

on his 2002 financial disclosure form.  Id. ¶¶ 33, 37.  At the time he filed the form, on or about

May 12, 2003, the applicable law and regulations required the reporting of any gift from a single

source if the aggregate value of the gift or gifts from that source was greater than $260.  Mr.

Safavian did not include any information in his 2002 financial disclosure form regarding the

August 2002 trip to Scotland even though the ethics opinion that Ms. Ellison drafted and Mr.

McKenna sent to Mr. Safavian on July 26, 2002 specifically stated:  "You are reminded that you

must report the gift of free transportation on Schedule B, Part II, of your next Public Financial

Disclosure Report if the gift totals more than $260."  Government Exhibit 116 at 2.

Thus, while the government maintains that evidence regarding the cost of the charter flight was properly admitted in evidence, it also argues that no "manifest injustice" justifying a new trial has occurred because a reasonable juror could have found the defendant guilty on Count One and on Count Three without -- as the defendant puts it -- "incorporat[ing] that potentially devastating evidence into its deliberations" or considering that evidence at all. Mot. at 11. Again, Mr. Safavian wrote Mr. Abramoff a check for $3,100, and the financial disclosure form required Mr. Safavian to disclose gifts totalling more than $260. The defendant therefore was required to list the August 2002 trip as a gift on his financial disclosure form so long as his share of the trip exceeded $3,360 -- that is, $3,100 plus $260. Based on all of the evidence presented at trial, the Court concludes that the jury easily could have found that the cost of the trip exceeded $3,100 for Count One and $3,360 for Count Three without considering the cost of the airfare at all.

Ms. van Zyl testified about the cost of Mr. Safavian's hotel rooms in Scotland. The least expensive of these was about $400 per night, and (the evidence showed) Mr. Safavian was there for four nights. See Transcript of Trial at 18-20 (Dec. 12, 2008 -- morning session). She also testified about the cost of greens fees at the time of the trip, which started at several hundred dollars for a guaranteed tee time per round of golf. See id. at 29. Neil Volz testified that greens fees were about $300 per round of golf and that the caddy fees for each round were approximately $100 more. See Transcript of Trial at 96 (Dec. 11, 2008 -- morning session). He also testified that he believed that Mr. Safavian played golf each of the five days, and probably more than once per day. See id. at 98. Ms. van Zyl told the jury that the average cost of the Scotland trip per golfer -- not including any airfare, the time spent in London, or any meals or drinks outside the hotel in Scotland -- was approximately $4,324. See Transcript of Trial at 31-

32 (Dec. 12, 2008 -- morning session). Both Mr. Volz and Mr. Heaton described the expensive

drinks the group had, including, for example, one round of Scotch that cost more than $100. See

Transcript of Trial at 92, 99 (Dec. 12, 2008 -- morning session) (Heaton); Transcript of Trial at

102 (Dec. 11, 2008 -- morning session) (Volz). Mr. Volz also testified that his room in the

Mandarin Oriental Hotel in London, where Mr. Safavian stayed for three nights, cost about $500

per night. See id. at 103-04. A reasonable juror could have considered this testimony along with

the other evidence before it and determined beyond a reasonable doubt that Mr. Safavian knew

that the cost of the Scotland trip was more than $3,100 when he spoke with OIG Inspector Rowe

and that he was untruthful when he represented that the total cost of the trip was $3,360 or less

on his financial disclosure form.

      The Court concludes that the admission of evidence regarding the actual cost of

the charter flight was not error, let alone substantial error. See United States v. Walker, 899 F.

Supp. at 15. And even if it was error to admit that evidence, the error was harmless. Thus, the

interest of justice does not require a new trial for any of the reasons identified by the defendant.

See FED. R. CRIM. P. 33.

## VI. CONCLUSION

      For all of these reasons, the Court concludes that the defendant is not entitled to

either a judgment of acquittal or a new trial. As explained above, the Court finds that a

reasonable juror could have found that the statements on which Counts Two and Five were based

were material and therefore could have found the defendant guilty beyond a reasonable doubt on

those counts. The Court also concludes that the government has overcome the presumption of

prosecutorial vindictiveness with respect to Counts Three and Five. The defendant therefore is

not entitled to a judgment of acquittal.  Finally, for the reasons stated, the Court finds that there

was no miscarriage of justice, that no substantial error was committed and that the defendant's

substantial rights were not affected by the admission of evidence concerning the cost of the

charter flight.  The defendant therefore is not entitled to a new trial on Count One or Count

Three.  Accordingly, it is hereby

ORDERED that the defendant's motion for judgment of acquittal under Rule 29

of the Federal Rules of Criminal Procedure, Dkt No. 239, and his motion for a new trial under

Rule 33(a) of the Federal Rules, Dkt. No. 239, are DENIED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7/21/09